RICHARD H. CLOSE (Bar No. 50298)
rclose@gilchristrutter.com
THOMAS W. CASPARIAN (Bar No. 169763)
tcasparian@gilchristrutter.com
YEN N. HOPE (Bar No. 233880)
yhope@gilchristrutter.com
GILCHRIST & RUTTER
Professional Corporation
1299 Ocean Avenue, Suite 900
Santa Monica, California 90401-1000
Telephone: (310) 393-4000
Facsimile: (310) 394-4700

MATTHEW W. CLOSE (Bar No. 188570)
mclose@omm.com
DIMITRI D. PORTNOI (Bar No. 282871)
dportnoi@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Attorneys for Plaintiff Colony Cove Properties, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

COLONY COVE PROPERTIES, LLC, a Delaware limited liability company,

Plaintiff,

v.

CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body; and DOES 1 to 10, inclusive,

Defendants.

Case No. CV 14-03242 PSG (PJWx)

**DECLARATION OF MATTHEW W. CLOSE IN SUPPORT OF PLAINTIFF'S MOTIONS *IN LIMINE* NOS. 1–8**

Hearing: April 5, 2016 at 9:00 a.m.
Courtroom: 880
Judge: Hon. Philip S. Gutierrez
Trial Date: April 5, 2016

I, Matthew W. Close, hereby state and declare as follows:

1. I am a member in good standing of the State Bar of California and am admitted to practice before this Court. I am a partner of O'Melveny & Myers LLP, counsel of record for Plaintiff Colony Cove Properties, LLC ("Colony Cove"). I have personal knowledge of the facts set forth below, and, if called upon, I could and would testify to the truth of the following.

2. Attached hereto as **Exhibit 1** is a true and correct copy of Defendant City of Carson's Special Interrogatories to Plaintiff, Colony Cove Properties, LLC (Set One), served on Colony Cove on or around September 3, 2015. On page 9, Defendant City of Carson propounded discovery requesting that Colony Cove "state, in as much detail as YOU are able, the actions YOU took, if any, to determine if any residents of THE PARK could afford any of the rent increases YOU applied for at THE PARK."

3. Attached hereto as **Exhibit 2** is a true and correct copy of Defendant City of Carson's Responses to Plaintiff Colony Cove Properties, LLC's Request for Production of Documents Propounded on Defendant City of Carson, Set No. One, including Defendant City of Carson's Privilege Log for Documents Relating to Plaintiff's RFP No. One to City of Carson, served on Colony Cove on or around October 26, 2015. Defendant City of Carson invoked the deliberative-process privilege on pages 3–7 of its Responses and on pages 1–17, 19–27, and 44–48 of its Privilege Log.

4. On December 3, 2015, Colony Cove served Defendants City of Carson and City of Carson Mobilehome Park Rental Review Board (collectively, "Defendants") with former Mayor Jim Dear's deposition subpoena. On December 30, 2015, Defendants' counsel sent an email to Plaintiff's counsel agreeing to produce former Mayor Dear for deposition on January 22, 2016. Nine days later, on January 8, 2016, Defendants stated in an email that former Mayor Dear would be unavailable on January 22. Defendants have not provided Colony Cove with

another date on which former Mayor Dear would be available for deposition. Attached hereto as **Exhibit 3** is a true and correct copy of an email Jeff Malawy, counsel for Defendant City of Carson, sent to Plaintiff's counsel on January 8, 2016, wherein he stated former Mayor Dear would be unavailable for deposition on January 22, 2016.

5. Attached hereto as **Exhibit 4** is a true and correct copy of excerpts of the transcript of James F. Goldstein's deposition, taken on December 18, 2015.

6. Attached hereto as **Exhibit 5** is a true and correct copy of excerpts of the transcript of Ken Freschauf's deposition, taken on January 15, 2016.

7. Attached hereto as **Exhibit 6** is a true and correct copy of Kenneth K. Baar's report titled, "Analysis of Reasonable Investment Backed Expectations of Colony Cove Mobile Estates and Discussion of Treatment of Debt Service and Rationale for Maintenance of Net Operating Income Fair Return Standard under Rent Regulation (Carson, California)," dated January 2016 (exhibits omitted).

8. Attached hereto as **Exhibit 7** is a true and correct copy of City of Carson's Guidelines for Implementation of the Mobilehome Space Rent Control Ordinance, adopted February 17, 1998, through City Council Resolution No. 98-010.

9. Attached hereto as **Exhibit 8** is a true and correct copy of excerpts of the transcript of Kenneth K. Baar's deposition, taken on February 2, 2016.

10. Attached hereto as **Exhibit 9** is a true and correct copy of an excerpt of Kenneth K. Baar's Curriculum Vitae.

11. Attached hereto as **Exhibit 10** is a true and correct copy of the Expert Report of Peter A. Salomon, CPA, CFF, dated January 11, 2016 (exhibits omitted).

12. Attached hereto as **Exhibit 11** is a true and correct copy of City of Carson Staff Report to Mobilehome Park Rental Review Board, dated February 13, 2008 (exhibits omitted).

13. Attached hereto as **Exhibit 12** is a true and correct copy of James Brabant, MAI's report titled "Rent Increase Application Colony Cove Mobile Estates," dated June 5, 2008.

14. Attached hereto as **Exhibit 13** is a true and correct copy of Defendants' Expert Witness Disclosure [FRCP 26(a)(2)], served on Colony Cove on or around January 11, 2016 (attachment and exhibits omitted).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 22, 2016, in Los Angeles, California.

/s/ Matthew W. Close
Matthew W. Close

3

CLOSE DECL. ISO PLAINTIFF'S MOTIONS IN LIMINE NOS. 1–8
CV 14-03242 PSG (PJWx)

# EXHIBIT 1

ALESHIRE & WYNDER, LLP
SUNNY K. SOLTANI, State Bar No. 209774
*ssoltani@awattorneys.com*
JUNE S. AILIN, State Bar No. 109498
*jailin@awattorneys.com*
STEPHEN R. ONSTOT, State Bar No. 139319
*sonston@awatttorneys.com*
JEFF M. MALAWY, State Bar No. 252428
*jmalawy@awattorneys.com*
MARGARET W. ROSE, State Bar No. 298965
*mrose@awattorneys.com*
LARA LEITNER, State Bar No. 303162
*lleitner@awattorneys.com*
18881 Von Karman Avenue, Suite 1700
Irvine, California 92612
Telephone: (949) 223.1170
Facsimile: (949) 223.1180

Attorneys for Defendants
CITY OF CARSON and CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

COLONY COVE PROPERTIES, LLC a Delaware limited liability company,

Plaintiff,

v.

CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body; and DOES 1 to 10, inclusive,

Defendants.

Case No. CV14-03242 PSG (PJWx)

Assigned to:
Hon. Philip S. Gutierrez
Courtroom: 880

**CITY OF CARSON'S SPECIAL INTERROGATORIES TO PLAINTIFF, COLONY COVE PROPERTIES, LLC (SET ONE)**

[Served concurrently with City of Carson's Request for Production of Documents and Things to Plaintiff, Colony Cove Properties, LLC (Set One)]

Trial Date: April 5, 2016

PROPOUNDING PARTY: Defendant, CITY OF CARSON

RESPONDING PARTY: Plaintiff, COLONY COVE PROPERTIES, LLC

SET NO.: ONE

**TO PLAINTIFF, COLONY COVE PROPERTIES, LLC AND TO ITS ATTORNEY(S) OF RECORD HEREIN:**

Defendant, CITY OF CARSON ("Defendant" or "Propounding Party") hereby propounds the following special interrogatories pursuant to Rule 33 of the *Federal Rules of Civil Procedure* and Rules 33.1-.3 of the Central District Local Rules. Defendant requests that Plaintiff COLONY COVE PROPERTIES, LLC ("Plaintiff") answer, under oath, the following interrogatories within thirty (30) days.

**DEFINITIONS AND INSTRUCTIONS**

1. In answering these interrogatories, you are required to furnish all information available to you, including information in the possession of your attorneys or investigators, or other persons who are directly or indirectly employed by them or by you, or connected with you or your attorneys, and anyone else acting in your behalf or otherwise subject to your control.

2. Your answers must be served within 30 days after you are served with these interrogatories.

3. Each answer must be immediately preceded by a quote of the interrogatory to which it pertains.

4. Each answer must be as complete and straightforward as the information reasonably available to you permits. Merely attaching reports or records prepared by someone other than you will be non-responsive. If an interrogatory cannot be answered completely, answer it to the extent possible.

5. Whenever an interrogatory may be answered by referring to any material or any document, the material or document may be attached as an exhibit to the response and referred to in the response. If the material or document has more than one page, refer to the page and section where the answer to the interrogatory can be found.

6. In answering these interrogatories, you must make a diligent search of your records in your possession, as well as materials which are subject to your control even though in the control of other persons. If you cannot obtain information or records

in time to answer these interrogatories, you must explain the circumstances concerning your inability to obtain such information and what is being done to obtain such information.

7. A request for the listing of materials or documents shall be deemed without further specification to include a request for the following information for each item:

(a) the nature of the materials or documents;

(b) the date, if any, which the materials or documents bear;

(c) the person or persons executing the materials or documents;

(d) the person, if any, to whom the materials or documents are addressed;

(e) any file number used in connection with the materials or documents;

(f) the location of the materials or documents;

(g) the name and last known address of the person or persons having possession, custody or control of the materials or documents.

(h) If any or all documents identified in your responses are no longer in existence or no longer in your possession, custody, or control because of destruction, loss, or any other reason, identify each and every such document.

8. A request for the name of any person shall be deemed without further specification to include a request for that person's last known business and residence address.

9. **<u>Instruction Regarding Alleged Ambiguity</u>: To avoid ambiguity, significant effort has been spent to define a number of terms used in the following discovery requests. If you or your attorney claim you do not understand the meaning of a term, please refer to the list of definitions or contact the opposing attorney for clarification, preferably before responses are due so that the alleged ambiguous term can be clarified.**

///

///

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW A&W

10. The following terms used in these instructions and interrogatories are defined as follows (and are to be construed as broadly as possible to include the most information responsive to the discovery requests propounded herein):

(a) **"DEFENDANTS"** means CITY OF CARSON and CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD.

(b) "**IDENTIFY**" shall mean and refer to describing with sufficient particularity so as to permit propounding party to properly articulate a demand for inspection or subpoena.

(c) **"DOCUMENT"** means a writing, as defined in *Federal Rules of Evidence*, Rule 1001, and includes the original or a copy of any handwriting, typewriting, printing, transcription, photostating, photographing, magnetic impulse, mechanical or electronic recording, and every other means of recording upon any tangible thing and form of communicating or representation, including letters, words, pictures, tapes, sounds or symbols, or combinations of them. Additionally, it is a term used in its broadest sense and includes, but is not limited to, the original and all non-identical copies, whether different from the original by reason of notations made on such copies or otherwise, and all drafts of: computer data, letters, telegrams, memorandum, reports of telephone conversations, ledgers, journals, invoices, bills, sales orders, call reports, financial and business records, receipts, contracts, reports, studies, calendar entries, diary entries, maps, pamphlets, notes, charts, forms, tabulations, analyses, statistical or informational accumulations, summaries or abstracts, any kind of records of meetings or conversations, firm impressions, sound or mechanical reproductions, rules, regulations, opinions, orders, interpretations, exceptions, position papers, guidelines, publications, instructions, transparencies, handbooks, manuals, operating procedures, appointment calendars, call slips, file jackets, course materials, training materials, minutes, testimony, press releases, speeches, surveys, graphs, statistics, tables, printed or typewritten forms (whether of visits, telephone calls, or otherwise) indices, agreements, graphic representations,

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW

canceled checks, correspondence, memos, telephone message slips, sketches, notes of conversations, and all other written, printed, typed or other reported matter (including electronic or magnetic recordings), photographs, e-mails or other data compilations in which information can be obtained, which are in the possession, custody, or control of plaintiffs, plaintiff's attorneys, agents, physicians, directors, officers, partners, affiliates, subsidiaries, servants, or employees.

(d) The "**COMPLAINT**" shall mean Plaintiff COLONY COVE PROPERTIES, LLC's First Amended Complaint, filed on or about April 16, 2015 in the above-captioned action.

(e) "**YOU**" and "**YOUR**" shall refer to Plaintiff COLONY COVE PROPERTIES, LLC. and YOUR agents, associates, employees, insurance companies, their agents, their employees, YOUR attorneys, accountants, investigators, lenders, investment advisors, and anyone else acting on YOUR behalf.

(f) "**THE PARK**" shall mean Plaintiff's mobilehome park Colony Cove Mobile Estates, located at 17700 S. Avalon Blvd., Carson, California 90746, which is the subject of the above-captioned action.

(g) "**MEMBERS**" shall mean the members, owners, managing agent(s), or agent(s) of Plaintiff, COLONY COVE PROPERTIES, LLC, a limited liability company.

(h) "**YOUR AFFILIATES**" shall mean James F. Goldstein as an individual or any entity which James F. Goldstein owns in whole or in part.

(i) The "**BOARD**" shall mean Defendant CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD.

(j) "**AND**" and "**OR**" shall mean And/Or.

(k) "**PERSON**" means not only natural persons, but also firms, businesses, trusts, corporations, partnerships, organizations, associations, industry groups, entities, joint venturers, corporations, or any government or governmental entity, commission or agency and any divisions or departments or other units of any of the entities defined

herein.

11. **This discovery request is continuing**. You are reminded that, in answering these interrogatories, you have a continuing duty to update your responses in the event you learn or obtain subsequent information that would affect your answers at the time made. In the event that any such information comes to your attention, possession, custody or control or the attention, possession, custody or control of your associates or your attorneys subsequent to the submission of your response, when the information is responsive to any interrogatory in this set, you are required to furnish said additional information to the opposing attorney immediately.

ALESHIRE & WYNDER LLP
ATTORNEYS AT LAW

**SPECIAL INTERROGATORIES**

**SPECIAL INTERROGATORY NO. 1:**

Please IDENTIFY each of YOUR MEMBERS (including residence address, residence telephone number, business address, and business telephone number) who were MEMBERS prior to April 4, 2006.

**SPECIAL INTERROGATORY NO. 2:**

Please state, in as great of detail as YOU are able, all facts that describe the relationship between YOU and James F. Goldstein at all times before, during, and after YOU purchased THE PARK.

**SPECIAL INTERROGATORY NO. 3:**

Please state the names, addresses, and current owners of all mobilehome parks which were owned by YOU or any of YOUR AFFILIATES in a jurisdiction with mobilehome space rent control at any time before April 4, 2006.

**SPECIAL INTERROGATORY NO. 4:**

For each mobilehome park that YOU identified in Special Interrogatory No. 3, please identify which of those parks were acquired in whole or in part through debt financing.

**SPECIAL INTERROGATORY NO. 5:**

For each mobilehome park that YOU identified in Special Interrogatory No. 4, please state the name and address for each park where YOU or YOUR AFFILIATES were permitted to include the debt service on such park in calculating a rent increase.

**SPECIAL INTERROGATORY NO. 6:**

Please state the name and address of each mobilehome park owned by YOU or YOUR AFFILIATES for which an application to subdivide or convert to another land use or to a condominium was submitted at any time, whether before, during, or after YOU acquired THE PARK.

**SPECIAL INTERROGATORY NO. 7:**

For each of the mobilehome parks owned by YOU or YOUR AFFILIATES, please state the name and address of each mobilehome park owned by YOU or YOUR AFFILIATES for which an application to subdivide or convert to another land use or a condominium has been granted at any time before, during, or after YOU acquired THE PARK.

**SPECIAL INTERROGATORY NO. 8:**

Please IDENTIFY each PERSON (including residence address, residence telephone number, business address, business telephone number, AND relationship to YOU of that individual) who YOU consulted with in deciding to submit YOUR application to subdivide THE PARK including ,but not limited to, real estate agents, investment advisors, and attorneys.

**SPECIAL INTERROGATORY NO. 9:**

Please IDENTIFY each PERSON (including residence address, residence telephone number, business address, business telephone number, AND relationship to YOU of that individual) who YOU consulted with in deciding to acquire THE PARK, including but not limited to real estate agents, investment advisors, and attorneys.

/ / /

/ / /

**SPECIAL INTERROGATORY NO. 10:**

Please IDENTIFY each mobilehome park owner in Carson that YOU communicated with about debt service being included in the BOARD's rent increase decisions before YOU acquired THE PARK. (For the purposes of this Special Interrogatory, "owners" includes the managers, agents, associates, employees, insurance companies, their agents, their employees, attorneys, accountants, investigators, lenders, investment advisors, and anyone else acting on the owner's behalf.)

**SPECIAL INTERROGATORY NO. 11:**

Please IDENTIFY each PERSON (including residence address, residence telephone number, business address, business telephone number, AND relationship to YOU of that individual) who YOU spoke with about DEFENDANTS' mobilehome space rent control ordinance, policies and practices before YOU acquired THE PARK.

**SPECIAL INTERROGATORY NO. 12:**

Prior to acquiring THE PARK, please state the amount of pretax profit (i.e. amount earned less amount spent before taxes) YOU expected to make from THE PARK in each calendar year between 2006 and 2010.

**SPECIAL INTERROGATORY NO. 13:**

Please IDENTIFY each PERSON (including residence address, residence telephone number, business address, business telephone number, AND relationship to YOU of that individual) YOU consulted with in determining the "profit," identified in Paragraph 4 of the COMPLAINT, that YOU expected when YOU purchased THE PARK.

**SPECIAL INTERROGATORY NO. 14:**

Please state, in as much detail as YOU are able, all facts that support your allegation in Paragraph 17 of the COMPLAINT that, "prior to Colony Cove's acquisition of the Park, the City always (or virtually always) considered a park owner's debt service when disposing of fair return rent applications."

**SPECIAL INTERROGATORY NO. 15:**

Please IDENTIFY each PERSON (including residence address, residence telephone number, business address, business telephone number, AND relationship to YOU of that individual) you spoke to in forming the basis for YOUR allegation in Paragraph 17 of the COMPLAINT that, "prior to Colony Cove's acquisition of the Park, the City always (or virtually always) considered a park owner's debt service when disposing of fair return rent applications."

**SPECIAL INTERROGATORY NO. 16:**

Please IDENTIFY each PERSON (including the residence address, residence telephone number, business address, business telephone number, AND relationship to YOU of that individual) YOU consulted with in forming YOUR allegation in Paragraph 25 of the COMPLAINT that, "a rent increase of approximately $200 per space per month is necessary for Colony Cove to earn a fair return on its investment."

**SPECIAL INTERROGATORY NO. 17:**

Please state, in as much detail as YOU are able, all facts to support your allegation in Paragraph 63 of the COMPLAINT that the BOARD has prohibited "all economically beneficial use of the land."

**SPECIAL INTERROGATORY NO. 18:**

Please state, in as much detail as YOU are able, all facts upon which YOU base YOUR allegation at paragraph 19 of the COMPLAINT that "the purchase price that Colony Cove paid represented fair market value of the Park..."

**SPECIAL INTERROGATORY NO. 19:**

Please state, in as much detail as YOU are able, the actions YOU took, if any, to determine if any residents of THE PARK could afford any of the rent increases YOU applied for at THE PARK.

///

///

///

DATED: September 3, 2015

ALESHIRE & WYNDER, LLP
SUNNY K. SOLTANI
JUNE S. AILIN
STEPHEN R. ONSTOT
JEFF M. MALAWY
LARA LEITNER
MARGARET W. ROSE

By: [signature]

MARGARET W. ROSE
Attorneys for Defendants CITY OF CARSON and CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD

ALESHIRE & WYNDER LLP
ATTORNEYS AT LAW



**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 2361 Rosecrans Ave., Suite 475, El Segundo, CA 90245.

On **September 3, 2015**, I served true copies of the following document(s) described as **CITY OF CARSON'S SPECIAL INTERROGATORIES TO PLAINTIFF, COLONY COVE PROPERTIES, LLC (SET ONE** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of Aleshire & Wynder, LLP for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at El Segundo, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **September 3, 2015**, at El Segundo, California.

DIANE N. BRANCHE

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW

ALESHIRE & WYNDER LLP
ATTORNEYS AT LAW
A&W

**SERVICE LIST**
**Colony Cove Properties, LLC v. City of Carson, et al.**
**Case No. CV14-03242 PSG**

| | |
|---|---|
| Richard H. Close, Esq.<br>Thomas W. Casparian, Esq.<br>Yen N. Hope Esq.<br>GILCHRIST & RUTTER<br>1299 Ocean Avenue, Suite 900<br>Santa Monica, CA 90401<br>Tel: (310) 393-4000<br>Fax: (310) 394-4700<br>rclose@gilchristrutter.com<br>tcasparian@gilchristrutter.com<br>yhope@gilchristrutter.com | ***Attorneys for Plaintiff***<br>*Colony Cove Properties, LLC* |
| Dimitri D Portnoi, Esq.<br>Matthew W. Close, Esq.<br>O'Melveny and Myers LLP<br>400 South Hope Street<br>Los Angeles, CA 90071-2899<br>Tel: (213)-430-6000<br>Fax: (213)-430-6407<br>dportnoi@omm.com<br>mclose@omm.com | ***Attorneys for Plaintiff***<br>*Colony Cove Properties, LLC* |

# EXHIBIT 2




ALESHIRE & WYNDER, LLP
WILLIAM W. WYNDER, State Bar No. 84753
*wwynder@awattorneys.com*
SUNNY K. SOLTANI, State Bar No. 209774
*ssoltani@awattorneys.com*
JEFF M. MALAWY, State Bar No. 252428
*jmalawy@awattorneys.com*
18881 Von Karman Avenue, Suite 1700
Irvine, California 92612
Telephone: (949) 223.1170
Facsimile: (949) 223.1180

Attorneys for Defendants
CITY OF CARSON and CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD

ALESHIRE & WYNDER LLP

A&W

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| COLONY COVE PROPERTIES, LLC a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body; and DOES 1 to 10, inclusive,<br><br>Defendants. | Case No. CV14-03242 PSG (PJWx)<br><br>Assigned to:<br>The Hon. Philip S. Gutierrez<br><br>**DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED ON DEFENDANT CITY OF CARSON, SET NO. ONE**<br><br>Trial Date: April 5, 2016 |

PROPOUNDING PARTY: PLAINTIFF, COLONY COVE PROPERTIES, LLC

RESPONDING PARTY: DEFENDANT, CITY OF CARSON

SET NO.: ONE

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant, CITY OF CARSON ("Responding Party" or "Answering Party"), hereby responds to Plaintiff COLONY COVE PROPERTIES, LLC's ("Propounding Party" or "Requesting Party") Request for Production of Documents, Set One as follows:

01007.0504/269843.1 Case No. CV14-03242 PSG (PJWx)

DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS , SET NO. ONE

**Exhibit 2**
**Page 16**

**PRELIMINARY STATEMENT AND GENERAL OBJECTIONS**

These responses are made solely for the purpose of, and in relation to, this action. Each response is given subject to all appropriate objections including, but not limited to, objections concerning competency, relevancy, materiality, propriety and admissibility, which would require the exclusion of any statement contained herein where made by a witness present and testifying in court. All such objections and grounds therefore are reserved, and may be interposed at the time of trial.

It should be noted that this Responding Party has not fully completed its investigation of the facts relating to this case and has not completed its preparation for trial. Investigation and discovery by the Responding Party are continuing and are not complete. As discovery proceeds, witnesses, facts and evidence may be discovered which are not set forth herein, but which may have been responsive to a request for production. Facts and evidence now known may be imperfectly understood or the relevance or consequences of such facts and evidence may be imperfectly understood, and, accordingly, such facts and evidence may, in good faith, not be included in the following responses. All of the responses contained herein are based only upon such information and documents which are presently available to and specifically known to this Responding Party and disclose only those contentions which presently occur to such Responding Party. It is anticipated that further discovery, independent investigation, legal research and analysis may supply additional facts, add meaning to the known facts, as well as establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the contentions set forth herein.

The following responses are given without prejudice to Responding Party's right to produce evidence of any subsequently discovered facts which this Responding Party may later recall. Responding Party accordingly reserves the right to change any and all responses herein as additional facts are ascertained, analyses are made, legal research is completed, and contentions are made.

01007.0504/269843.1 -2- Case No. CV14-03242 PSG (PJWx)

DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS , SET NO. ONE

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW A&W

**Exhibit 2**
**Page 17**

This preliminary response is incorporated into each and every response herein by this reference.

Responding Party incorporates all of these objections (the "General Objections") into each of the responses herein. Subject to and without waiving any of the foregoing, Responding Party makes the following responses:

**RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION NO. 1:**

All DOCUMENTS that YOU referred to or relied on in Resolution No. 2001-215, entitled "A Resolution Of The Carson Mobilehome Park Rental Review Board Granting A Rent Increase For Carson Gardens Trailer Lodge."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Responding Party objects based on the General Objections above, which are incorporated by reference as if stated in full herein. In addition, Responding Party objects to this request to the extent it requests information protected by the attorney-client, deliberative process, and/or mental processes privileges. See Privilege Log attached as "Exhibit A." Without waiving those objections, or the General Objections above, Responding Party responds that it will produce documents in its possession, custody, and control responsive to this request.

**REQUEST FOR PRODUCTION NO. 2:**

All DOCUMENTS CONCERNING the "33 previous prior applications" referenced on page 6, line 18 of YOUR Motion to Dismiss First Amended Complaint Pursuant To F.R.C.P. 12(b)(6), filed in this ACTION on May 6, 2015.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Responding Party objects based on the General Objections above, which are incorporated by reference as if stated in full herein. In addition, Responding Party objects to this request to the extent it requests information protected by the attorney-client, deliberative process, and/or mental processes privileges. See Privilege Log attached as "Exhibit A." Without waiving those objections, or the General Objections

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW

01007.0504/269843.1 -3- Case No. CV14-03242 PSG (PJWx)

DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS , SET NO. ONE

Exhibit 2
Page 18

above, Responding Party responds that it will produce documents in its possession, custody, and control responsive to this request.

**REQUEST FOR PRODUCTION NO. 3:**

All DOCUMENTS CONCERNING the written application for a rent increase submitted to the City of Carson Mobilehome Park Rental Review Board by Carson Gardens, LLC on or about October 11, 2000, including all DOCUMENTS related to the litigation CONCERNING said application.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

City objects based on the General Objections above, which are incorporated by reference as if stated in full herein. In addition, Responding Party objects to this request to the extent it requests information protected by the attorney-client, attorney work product, deliberative process, and/or mental processes privileges. See Privilege Log attached as "Exhibit A." Without waiving those objections, or the General Objections above, Responding Party responds that it will produce documents in its possession, custody, and control responsive to this request.

**REQUEST FOR PRODUCTION NO. 4:**

All DOCUMENTS CONCERNING any rent increase applications submitted from 1992 through 2007 to YOU pursuant to Section IV of YOUR "Guidelines for Implementation of the Mobilehome Space Rent Control Ordinance."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

City objects based on the General Objections above, which are incorporated by reference as if stated in full herein. In addition, Responding Party objects that this request is unduly burdensome because neither Defendant City of Carson nor Defendant City of Carson Mobilehome Park Rental Review Board ("Board") tracks which applications are Section IV rent increase applications and which are General rent increase applications. Moreover, neither the rent increase applications themselves nor the Board's resolutions pertaining thereto clearly reflect the nature of a particular rent increase application. However, Responding Party has conducted a diligent search in a

01007.0504/269843.1 -4- Case No. CV14-03242 PSG (PJWx)

DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS , SET NO. ONE

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW A&W

Exhibit 2
Page 19

good faith effort to respond and believes it has identified the responsive applications. This request is also objectionable to the extent it requests information protected by the attorney-client, deliberative process, and/or mental processes privileges. See Privilege Log attached as "Exhibit A." Without waiving those objections, or the General Objections above, Responding Party will produce all responsive non-privileged documents in its possession, custody, and control where the Board's resolutions indicated in some way that the application under consideration may have been submitted pursuant to Section IV of the Board's "Guidelines for Implementation of the Mobilehome Space Rent Control Ordinance."

**REQUEST FOR PRODUCTION NO. 5:**

All DOCUMENTS CONCERNING rent increase applications in which an increase was granted, at least in part, due to increased debt-service expense and which were submitted within three years of a change in ownership of the mobilehome park.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

City objects based on the General Objections above, which are incorporated by reference as if stated in full herein. In addition, Responding Party objects that this request is unduly burdensome due to the extreme difficulty of locating the information requested therein. The City of Carson Mobilehome Park Rental Review Board's ("Board") resolutions pertaining to a specific application do not always clearly reflect whether the Board granted a rent increase, at least in part, due to increased debt-service. However, Responding Party has conducted a diligent search in a good faith effort to respond and believes it has identified the responsive applications. This request is also objectionable to the extent it requests information protected by the attorney-client, deliberative process, and/or mental processes privileges. See Privilege Log attached as "Exhibit A." Without waiving those objections, or the General Objections above, Responding Party will produce all responsive non-privileged documents in its possession, custody, and control where the application was submitted within three years of a change in ownership of the mobilehome park and the Board's resolutions indicated

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW
A&W

01007.0504/269843.1 -5- Case No. CV14-03242 PSG (PJWx)

DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS , SET NO. ONE

Exhibit 2
Page 20

in some way that the requested rent increase may have been granted, at least in part, due to increased debt-service expense.

**REQUEST FOR PRODUCTION NO. 6:**

All DOCUMENTS not already produced to COLONY COVE CONCERNING the reports and testimony of Kenneth Baar in connection with COLONY COVE'S Year One and Year Two applications, including any COMMUNICATION between Kenneth Baar and YOU, and his conclusion that debt service should not be considered as a factor in rent increase applications.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

City objects based on the General Objections above, which are incorporated by reference as if stated in full herein. The City also objects that this request is vague and ambiguous as to the terms "reports and testimony," which are utilized in this request without providing any definition to Responding Party. This request is also objectionable to the extent it requests information protected by the attorney client, deliberative process, and/or mental processes privileges. See Privilege Log attached as "Exhibit A." Without waiving those objections, or the General Objections above, Responding Party responds that it will produce documents in its possession, custody, and control responsive to this request.

**REQUEST FOR PRODUCTION NO. 7:**

All DOCUMENTS not already produced to COLONY COVE CONCERNING the reports and testimony of James Brabant in connection with COLONY COVE'S Year One and Year Two applications, including any COMMUNICATION between James Brabant and YOU, and his conclusion that debt service should not be considered as a factor in rent increase applications.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

City objects based on the General Objections above, which are incorporated by reference as if stated in full herein. The City also objects that this request is vague and ambiguous as to the terms "reports and testimony," which are utilized in this request

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW A&W

01007.0504/269843.1 -6- Case No. CV14-03242 PSG (PJWx)
DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS , SET NO. ONE

Exhibit 2
Page 21

without providing any definition to Responding Party. This request is also objectionable to the extent it requests information protected by the attorney client, deliberative process, and/or mental processes privileges. See Privilege Log attached as "Exhibit A." Without waiving those objections, or the General Objections above, Responding Party responds that it will produce documents in its possession, custody, and control responsive to this request.

DATED: October 26, 2015

ALESHIRE & WYNDER, LLP
SUNNY K. SOLTANI
JUNE S. AILIN
STEPHEN R. ONSTOT
JEFF M. MALAWY

By: Jeff Malawy /mr
JEFF M. MALAWY
Attorneys for Defendants CITY OF CARSON and CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD

ALESHIRE & WYNDER LLP

01007.0504/269843.1 -7- Case No. CV14-03242 PSG (PJWx)
DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS , SET NO. ONE

Exhibit 2
Page 22

# EXHIBIT A

Exhibit 2
Page 23

Colony Cove Properties, LLC v. City of Carson, et al.

USDC CASE NO. CV-14-03242

**PRIVILEGE LOG FOR DOCUMENTS RELATING TO PLAINTIFF'S RFP NO. ONE TO CITY OF CARSON**

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/8/08 | William Wynder | Sunny Soltani, Anthony R. Taylor, Ken Farsing, Ken Baar | Email chain re: Colony Cove Fair Return Application | Deliberative Process Privilege; Mental Process Privilege; Attorney Client Privilege; Attorney Work Product; Mental Processes Privilege |
| 5/15/02 | Rochelle Browne | Keith Bennett | Email regarding complaint by resident at Park Avalon Estates regarding mobilehome residency law (MRL) | Attorney Client Privilege |
| 9/24/02 | Keith Bennett | Rochelle Browne | Email regarding Imperial Carson staff report | Attorney Client Privilege; Deliberative Process Privilege; Mental Process Privilege; |
| 9/12/02 | Keith Bennett | Rochelle Browne | Expenditures for Imperial Carson | Attorney Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 6/1/09 | Ken Baar | William Wynder & Ken Freschauf | Email and Colony Cove draft report | Deliberative Process Privilege; Mental Process Privilege; Attorney Client Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/21/09 | Ken Baar | Ken Freschauf | Email regarding calculations | Deliberative Process Privilege; Mental Process Privilege |
| 7/8/09 | Ken Baar | Ken Freschauf & William Wynder | Email regarding Colony Cove Fair Return MRRB Resolution | Deliberative Process Privilege; Mental Process Privilege; Attorney Client Privilege |
| 7/8/09 | William Wynder | Ken Freschauf & Ken Baar | Email regarding Colony Cove Fair Return MRRB Resolution | Deliberative Process Privilege; Mental Process Privilege; Attorney Client Privilege |
| 7/8/09 | William Wynder | Ken Freschauf & Ken Baar | Email regarding Colony Cove Fair Return MRRB Resolution | Deliberative Process Privilege; Mental Process Privilege; Attorney Client Privilege |
| 5/26/09 | Ken Baar | Ken Freschauf | Email regarding MNOI & GPM Calcs | Deliberative Process Privilege; Mental Process Privilege |
| 5/26/09 | Ken Baar | Ken Freschauf | Email regarding MNOI & GPM Calcs | Deliberative Process Privilege; Mental Process Privilege |
| 5/27/09 | Ken Baar | Ken Freschauf | Email regarding KF draft SR-CC-2007-08 | Deliberative Process Privilege; Mental Process Privilege |
| 5/24/09 | Ken Baar | Ken Freschauf | Email regarding draft Colony Cover Staff Report | Deliberative Process Privilege; Mental Process Privilege |
| 5/27/09 | Ken Baar | Ken Freschauf | Email regarding MNOI | Deliberative Process Privilege; Mental Process Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 7/8/09 | Ken Freschauf | William Wynder | Email regarding Colony Cover Return MRRB Resolution | Attorney Client Privilege |
| 5/11/09 | Ken Freschauf | Ken Baar & William Wynder | Email regarding Colony Cove Revised Calcs | Attorney Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 5/20/09 | Ken Freschauf | Ken Baar & William Wynder | Email regarding Colony Cove Spreadsheets | Attorney Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 5/20/09 | Ken Freschauf | Ken Baar & William Wynder | Email regarding Expense Corrections/Increase Comparisons | Attorney Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 5/28/09 | Ken Freschauf | William Wynder | Email regarding Final Draft of the Colony Cove Staff Report | Attorney Client Privilege |
| 5/13/09 | Ken Freschauf | William Wynder | Email regarding minor corrections to Colony Cover O&M sheet | Attorney Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 5/28/09 | Ken Freschauf | William Wynder | Email regarding CC-SR-2007-08 | Attorney Client Privilege |
| 5/28/09 | Ken Freschauf | William Wynder | Email regarding Final Draft of the Colony Cove Staff Report | Attorney Client Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/26/09 | Ken Freschauf | Ken Baar | Email regarding CC-MNOI-2 & CC-GPM-2 | Deliberative Process Privilege; Mental Process Privilege |
| 12/15/09 | Ken Freschauf | Sunny Soltani | Email regarding draft of commentary re legal Colony Cover legal fees | Attorney Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 5/28/09 | Ken Freschauf | Ken Baar | Email regarding GPM Calc. | Deliberative Process Privilege; Mental Process Privilege |
| 5/20/09 | Ken Freschauf | Ken Baar | Email regarding CC-MNOI-2 | Deliberative Process Privilege; Mental Process Privilege |
| 5/26/09 | Ken Freschauf | Ken Baar | Email regarding MNOI & GPM Calcs | Deliberative Process Privilege; Mental Process Privilege |
| 5/27/09 | Ken Freschauf | Ken Baar | Email regarding MNOI Do-Over | Deliberative Process Privilege; Mental Process Privilege |
| 5/26/09 | Ken Freschauf | Ken Baar | Email regarding Draft Colony Cove Staff Report | Deliberative Process Privilege; Mental Process Privilege |
| 5/26/09 | Ken Freschauf | Ken Baar | Email regarding MNOI & GPM Calcs | Deliberative Process Privilege; Mental Process Privilege |
| 5/26/09 | Ken Freschauf | Ken Baar | Email regarding MNOI & GPM Calcs | Deliberative Process Privilege; Mental Process Privilege |
| 5/27/09 | Ken Freschauf | Ken Baar | Email regarding MNOI Do-Over | Deliberative Process Privilege; Mental Process Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 1/9/08 | | | Staff Report to Mobilehome Park Rental Review Board | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 8/5/09 | | | Mobilehome Park Rental Review Board Staff Report Carson Gardens Trailer Lodge | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 8/27/07 | Mark Alpert | Anthony Taylor | Email regarding 36690.005 Community Asset Mgmt/Carson Gardens/Suppl. Writ/Case # BS072845 | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 1/29/07 | Sandy Moore, Anthony Taylor, Kenneth Freschauf | Sandy Moore, Anthony Taylor, Kenneth Freschauf | Email chain regarding 36690.005 Community Asset Mgmt/Carson Gardens/Suppl. Writ/Case # BS072845 | Attorney-Client Privilege |
| 11/28/06 | | | Interoffice Memorandum regarding Public Records Request | Attorney-Client Privilege |
| 12/1/06 | Janet Byrne, Senior Clerk | Mark Alpert | Letter regarding Public Records Request | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 11/6/06 | Ken Freschauf | William Wynder | Carson Gardens Memorandum regarding general rent increase and ruling from the superior court | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 11/15/06 | William Wynder | Ken Freschauf | Email regarding Ruling on Carson Gardens Motion Requiring any Further rent increase | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 9/21/06 | William Wynder | Ken Freschauf, Ken Barr, Anthony Taylor | Email regarding and Motion to Further Enforce Judgment | Attorney-Client Privilege |
| 8/9/06 | Anthony Taylor | William Wynder | Email regarding and Motion to Carson Gardens Objections to Writ Return | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 6/20/06 | William Wynder | Anthony Taylor, Ken Freschauf, Mark Alpert | Email chain regarding 36690.005 Community Asset Mgmt/Carson Gardens/Suppl. Writ/Case # BS072845 & Analysis of Carson Gardens Rent Increase Petition | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 8/22/01 | | | Draft Staff Report to Mobilehome Park Rental Review Board | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/18/06 | Anthony Taylor | Ken Baar | Fax & Analyzation of the Carson Garden's rent increase application | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/12/06 | Anthony Taylor | Ken Baar, Ken Freschauf | Email regarding and transcript of hearing on Carson Gardens' Motion for Remand Order | Attorney-Client Privilege |
| 6/23/06 | William Wynder | Robert Coldren, Ken Freschauf | Email chain regarding 36690.005 Community Asset Mgmt/Carson Gardens/Suppl. Writ/Case # BS072845 | Attorney-Client Privilege |
| 6/24/09 | Ken Freschauf | Anthony Taylor | Fax re: Mark Alpert's letter to Ken Freschauf regarding Carson Gardens Trailer Park Rent Increase Applicaiton | Attorney-Client Privilege |
| 7/8/09 | Ken Freschauf | Anthony Taylor, William Wynder | Email regarding Carson Gardens (2007-2008 expense years) | Attorney-Client Privilege |
| 2/26/09 | Anthony Taylor | William Wynder | Email regarding Notice of Entry of Judgment | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 1/22/09 | Ken Freschauf | Anthony Taylor | Fax regarding Application for Rent Increase for Carson Gardens | Attorney-Client Privilege |
| 11/14/08 | Mark Alpert | Anthony Taylor | Email regarding 3690.015 Carson Gardens/Writ, includes attorney's notes | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/3/06 | William Wynder | Anthony Taylor, Ken Baar, Ken Freschauf | Email regarding Carson Gardens – Remand Order | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/3/06 | Anthony Taylor | William Wynder, Ken Baar, Ken Freschauf | Email regarding Carson Gardens – Remand Order | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 4/28/06 | Jerry Groomes | William Wynder | Payment for reimbursement costs | Attorney-Client Privilege |
| 4/12/06 | Ken Baar | Anthony Taylor | Letter regarding transcripts from 8/11/04 meeting of Mobile home Rental Review Board | Attorney-Client Privilege |
| 3/16/06 | William Wynder | Ken Freschauf, Ken Baar | Fax regarding Rental Review Board | Attorney-Client Privilege |
| 3/16/06 | William Wynder | Anthony Taylor | Email regarding Carson Gardens | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 1/29/06 | Anthony Taylor | William Wynder | Email regarding Carson Garden Appeal | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 1/18/06 | William Wynder | Stuart, Ken Freschauf | Email regarding Carson Gardens Court of Appeal Opinion | Attorney-Client Privilege |
| 1/23/06 | William Wynder | Jerome Groomes, Ken Freschauf | Email regarding Letter to attorneys to distribute to Council | Attorney-Client Privilege |
| 8/25/05 | Ken Freschauf | William Wynder | Transmittal of Administrative Record Volumes 1-10 | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 3/8/05 | William Wynder | Ken Freschauf | Fax regarding authorities for HR&C letter | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 6/13/05 | Anthony Taylor | William Wynder | Email regarding residents need for letter of denial | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/26/06 | Anthony Taylor | William Wynder | Email regarding Carson Garden's Ex Parte | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 3/8/05 | William Wynder | Ken Freschauf | Order on Petitioner's Motion for Attorney's Fees; Notice of Entry of Order | Attorney-Client Privilege |
| 3/3/05 | William Wynder | Ken Freschauf | Notice & Motion to Dismiss Appeal and Supportive documents | Attorney-Client Privilege |
| 2/25/05 | | | Tentative Decision notes | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 1/27/05 | William Wynder | Ken Freschauf | Letter regarding Petitioner's Motion for Attorneys' Fees and Costs | Attorney-Client Privilege |
| 2/16/05 | William Wynder | Ken Freschauf | Fax regarding Opposition to Carson Gardens' Motion for Attorneys' Fees and costs and reply brief | Attorney-Client Privilege |
| 2/16/05 | | William Wynder | Fax regarding reply brief and scheduling of Motion for Writ | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 2/4/05 | William Wynder | Ken Freschauf | Fax regarding missing pages of Ex. E of Petition's Motion for Attorneys' Fees and Costs | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 1/3/05 | | Sunny Soltani, William Wynder | Email regarding Notices of Appeal | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 12/15/04 | William Wynder | Ken Freschauf | Fax regarding file and Court's Minute Order with executed Judgment on Motion for Supplemental Writ | Attorney-Client Privilege |
| 11/8/04 | William Wynder | Ken Freschauf, Ken Baar | Fax regarding Reply in Support of Motion for Order Further Enforcing Judgment on Writ of Administrative Mandamus and Peremptory Writ of Mandamus | Attorney-Client Privilege |
| 10/18/04 | William Wynder | Ken Freschauf | Email regarding continuance of Petition's Petition for Order to Further Enforce Judgment | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 10/15/04 | William Wynder | Ken Freschauf | Letter regarding hearing transcript and Declaration or Marji Muniverz | Attorney-Client Privilege |
| 10/13/04 | City Manager's Office | City Attorney's Office | Fax regarding substitution of Counsel in Carson Gardens vs. State of CA | Attorney-Client Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 10/70/4 | Sunny Soltani | Ken Freschauf, Ken Baar | Letter regarding Notice of Petition for Order Further Enforcing Judgment on Writ of Administrative Mandamus and Peremptory Writ of Mandamus | Attorney-Client Privilege |
| 10/7/04 | Ken Freschauf | Linda Yarvis | Email regarding confirmation of contact information | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 10/6/04 | Rochelle Brown | William Wynder | Letter regarding Substitution of Attorney | Work Product Privilege |
| 9/1/04 | William Wynder | Ken Freschauf | Email regarding final draft of Resolution regarding Rent Increase | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 8/13/04 | William Wynder | Ken Freschauf | Email regarding final draft of Resolution regarding Rent Increase | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 7/14/04 | Ken Freschauf | William Wynder | Report of Heather Xitco | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 10/2/08 | Tiffany Israel | Steven Lantsberger | Housey Escrow Instructions and Natural Hazard Disclosures | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 8/22/01 | | | Request for a General Rent Increase, Secretary's Report | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 7/20/04 | | | Internal Memorandum regarding Carson Gardens Rehearing of August 5, 2005 | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 7/6/06 | Ken Freschauf | Anthony Taylor | Letter regarding rent adjustments | Attorney-Client Privilege; Deliberative; Mental Process Privilege Process Privilege; Work Product Privilege |
| | | | Draft Privilege Log regarding Carson Gardens – Public Record Request | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 6/22/06 | Anthony Taylor | Belinda Hayes, Ken Freschauf, William Wynder, Helen Kawagoe | Email regarding objections to Public Records Acts request | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 3/17/05 | William Wynder | Ken Freschauf | Email regarding and Brief in Opposition to motion to Dismiss Appeal | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 1/17/06 | William Wynder | Ken Freschauf | Email regarding and Carson Gardens Opinion | Attorney-Client Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 1/23/06 | William Wynder | Jerome Groomes, Ken Freschauf | Email regarding Letter to attorneys to distribute to Council | Attorney-Client Privilege |
| 2/27/06 | William Wynder | Jerome Groomes, Ken Freschauf | Email regarding and status report regarding remaining 3 litigation cases | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 1/31/06 | William Wynder | Ken Freschauf, Ken Baar, Anthony Taylor | Email regarding Carson Gardens Appeal | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 3/3/06 | William Wynder | Ken Freschauf | Email chain regarding Carson Gardens' letter and re- hearing | Attorney-Client Privilege |
| 4/6/06 | Ken Freschauf | William Wynder, Ken Baar, Anthony Taylor | Email regarding and Carson Gardens Staff Report | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 4/27/06 | Anthony Taylor | Ken Freschauf, William Wynder | Email regarding and Carson Gardens' Motion for Report Order and Judgment & Reply Brief | Attorney-Client Privilege |
| 4/27/06 | Anthony Taylor | Ken Freschauf, William Wynder | Email regarding and Proposed Remand Order | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/9/06 | Anthony Taylor, Mark Alpert | William Wynder, Ken Freschauf, | Email chain regarding closed session to include pending litigation and coordination of new hearing in front of rent commission | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 6/7/06 | William Wynder | Ken Freschauf | Email regarding and close session memorandum | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 6/20/06 | Ken Freschauf | William Wynder, Anthony Taylor | Email regarding and Mobilehome Park Renal Review Board Staff Report | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/3/06 | Anthony Taylor | Ken Baar, Ken Freschauf, William Wynder | Email regarding and Tentative Decision & Final Remand Order | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 5/3/06 | William Wynder | Anthony Taylor, Ken Baar, Ken Freschauf | Email regarding order of transcript | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 5/9/06 | Anthony Taylor | Ken Baar, Ken Freschauf, William Wynder | Email regarding Legal Analysis for Carson Gardens' Staff Report | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 5/10/06 | Ken Freschauf | Anthony Taylor, Ken Baar | Email regarding Legal Analysis for Carson Gardens' Staff Report | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/12/06 | Anthony Taylor | Ken Baar, Ken Freschauf, William Wynder | Email regarding and transcript pages of hearing on Motion for a Remand Order | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 5/23/06 | Anthony Taylor | William Wynder, Ken Baar, Ken Freschauf | Email regarding new court opinion | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 6/6/06 | William Wynder | Ken Freschauf, Ken Baar, William Wynder | Emailed regarding and latest draft of staff report | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 1/29/09 | Anthony Taylor | William Wynder | Email regarding options for proceeding after Court of Appeal Decision | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| | | | Attorney's Notes and Case Law Research | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 9/15/03 | Sunny Soltani | Rochelle Brown | Email chain regarding litigation files to be forwarded for review prior to re-hearing | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 9/4/03 | Rochelle Brown | Ron Winkler | Letter regarding rehearing on the Application of Cason Garden Mobilehome Park and enclosed Analysis of Carson Gardens Rent Increase Application | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 9/19/06 | | | Stipulation & [Proposed] Order regarding Exceeding Page Limitations for Petitioner's Motion | Work Product Privilege |
| 9/19/06 | | | Petitioner's Notice of Motion and Motion for Order Further Enforcing Judgment on Writ of Administrative Mandamus and Peremptory Writ of Mandamus Issued April 16, 2003; Memorandum of Points and Authorities and Declaration of Mark D. Alpert in Support Thereof | Work Product Privilege |
| 9/19/06 | | | Request to Take Judicial Notice in Support of Petitioner's Motion for Further Enforcing Judgment, et al. | Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 9/19/06 | | | Notice of Re-Lodging Administrative Record in Support of Motion for Order Further Enforcing Judgment, et al. | Work Product Privilege |
| 10/16/06 | | | Opposition Brief by Respondent to Petitioner's Notice of Motion and Motion to for Order Further Enforcing Judgment on Writ of Administrative Mandamus Issued April 16, 2003 | Work Product Privilege |
| 10/16/006 | | | Declaration of William W. Wynder in Support of Opposition Brief by Respondent | Work Product Privilege |
| 10/20/06 | | | Petitioner's Reply Brief in Support of Motion for Order Further Enforcing Judgment on Writ of Administrative Mandamus and Peremptory Writ of Mandamus Issued April 16, 2003 | Work Product Privilege |
| | | | Case Law Research | Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/25/88 | | | Handwritten notes/minutes of MRRB Meeting | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes regarding percent CPI and approval | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes regarding funding situation | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/25/88 | | | Staff Report to Mobilehome Park Rental Review Board with handwritten notes regarding Capital Improvement Rent Increase | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/25/88 | | | Staff Report to Mobilehome Park Rental Review Board with handwritten notes regarding General Rent Increase | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/11/88 | | | Staff Report to Mobilehome Park Rental Review Board with handwritten notes regarding Capital Improvement Rent Increase | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 4/8/88 | Gary Nehrenberg | Timothy O'Rourke | Internal Memorandum regarding Landfill Gas Collection System | Attorney Client Privilege |
| 5/11/88 | | | Staff Report to Mobilehome Park Rental Review Board with handwritten notes regarding General Rent Increase | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/11/88 | | | Agenda to Mobilehome Park Rental Review Board Meeting with handwritten notes | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/11/88 | | | Staff Report to Mobilehome Park Rental Review Board with handwritten notes regarding Capital Improvement Rent Increase | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 2/2/88 | Rochelle Brown | Timothy O'Rourke | Letter regarding Imperial Carson Mobilehome Park Rent Increase Application | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes of mobile home park residents | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Notice of Public Hearing Application for a Capital Improvement Rent Increase with handwritten notes | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 3/9/87 | | | Miscellaneous residents' handwritten notes regarding meeting at City Attorney's Office | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten Calculations for base rent and increase percentage | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 3/29/88 | Michele Beal Bagneris | Harry Foisia | *People v. Anton Berkovich* Imperial Carson Mobilehome Estates | Attorney Client Privilege |
| 3/30/88 | Joe Bedina | Richard Gunnarson | *People v. Anton Berkovich* Imperial Carson Mobilehome Estates | Attorney Client Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 3/29/88 | Michele Beal Bagneris | Harry Foisia | *People v. Anton Berkovich* Imperial Carson Mobilehome Estates with legal opinions | Attorney Client Privilege |
| | | | Handwritten notes regarding legal opinions from City Attorney's Office | Attorney Client Privilege |
| 2/25/87 | | | Handwritten Draft of Staff Report to Mobilehome Park Rental Review Board with handwritten notes regarding Capital Improvement Rent Increase | Attorney Client Privilege |
| 3/23/87 | | | Draft Staff Report and Application Material | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 3/14/90 | | | Draft Staff Report to The Mobilehome Park Rent Review Board with handwritten notes | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Operating Expenses & Income of 1989 | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| | | | Handwritten notes regarding staff's review of residents' letters for accuracy | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes from 8/14/91 meeting | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes regarding calculations of rents for units in various years from 1979-1988 | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes regarding calculations of general counsel | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes from 1990 regarding rent, utilities and property maintenance fees | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes from 1988 & 1989 regarding rent, utilities and property maintenance fees | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Operating Income & Expenses – per 1991 | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| | | | Handwritten Notes of meeting and residents' comments | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | 1989 Operating Expenses with handwritten notes | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes regarding late charge income, factors, etc. | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes regarding property maintenance/amenities costs | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes regarding postages costs | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes regarding parking costs | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 8/24/88 | | | Handwritten notes regarding residents' comments regarding rent increase | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| | | | Handwritten calculations regarding fees, CPI, taxes and comparable rents | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes with phone messages, meetings and calculations | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | 1987 Operating Expenses & Income | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 11/25/87 | | | Handwritten notes regarding staff report | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 11/25/87 | | | Staff Report to Mobilehome Park Rental Review Board regarding general rent increase with handwritten notes | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 11/25/87 | | | Rental Review Board Staff Report Addendum with notes | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 11/20/87 | | | Handwritten Calculations regarding bringing El Rancho up to Dominguez rents | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 10/22/87 | | | Handwritten comparisons regarding park and units | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 4/18/84 | Alberta Caldwell | | Owners Reasons for Rent Increase & Figures | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Handwritten notes regarding payroll, management and deb service | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Analysis of Carson Gardens Rent Increase Petition | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/9/06 | Ken Freschauf | Ken Baar, Anthony Taylor, William Wynder | Email regarding Carson Gardens Calcs. | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/23/06 | Ken Baar | Ken Freschauf, Anthony Taylor | Email regarding drafts of Carson Gardens report | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| | | | Carson Gardens Calculations | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| | | | Summary Comparison Chart of Rent Increase Proposals for Carson Gardens Trailer Lodge – (1999 Expense Year) | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 9/19/08 | Anthony Taylor | Ken Baar | Email regarding submission of final versions of resolution and acknowledgement of receipt of same | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 5/18/06 | Anthony Taylor | Ken Baar | Email chain regarding suggested revisions to resolution | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 4/10/06 | Ken Baar | William Wynder, Ken Freschauf, Anthony Taylor | Email regarding staff report review | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 6/28/06 | Ken Baar, William Wynder, Anthony Taylor, Ken Freschauf | William Wynder, Anthony Taylor | Email chain regarding revisions to Carson Gardens Mobilehome Park Resolution | Deliberative Process Privilege; Mental Process Privilege Work Product Privilege |
| 1/29/08 | Mark Alpert | Ken Freschauf | Letter regarding final decision of Rent Board | Attorney-Client Privilege |
| | | | Draft Declaration of Kenneth Freschauf | Attorney-Client Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| | | | Draft [Proposed] Judgment Granting in Park Peremptory Writ of Mandamus | Attorney-Client Privilege |
| 7/21/08 | William Wynder | Ken Freschauf, Linda Mann, Jerome Groomes, Ken Baar, Anthony Taylor, Sunny Soltani | Email regarding Carson Gardens Decision from Court of Appeals | Attorney-Client Privilege |
| 9/21/06 | William Wynder | Ken Freschauf, Ken Baar, Anthony Taylor | Email regarding legal arguments | Attorney-Client Privilege |
| 3/27/06 | William Wynder | Ken Freschauf, Ken Baar, Anthony Taylor | Email regarding meeting schedule | Attorney-Client Privilege |
| 3/29/06 | William Wynder | Ken Freschauf, Ken Baar, Anthony Taylor | Email regarding meeting schedule | Attorney-Client Privilege |
| 1/31/06 | William Wynder | Ken Freschauf, Ken Baar, Anthony Taylor | Email regarding Carson Gardens Appeal | Attorney-Client Privilege |
| 9/21/06 | Kenneth Freschauf | William Wynder, Anthony Taylor | Email regarding Carson Gardens Motion for new hearing | Attorney-Client Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 10/16/06 | Linda Yarvis | Ken Freschauf, William Wynder, Anthony Taylor | Email with Carson Gardens Opposition | Attorney-Client Privilege |
| 4/6/06 | Ken Freschauf | William Wynder, Ken Baar, Anthony Taylor | Email regarding revisions to Carson Gardens Staff Report | Attorney-Client Privilege |
| | | | Draft Summary Comparison Chart of Rent Increase Proposals for Carson Gardens Trailer Lodge – (1999 Expense Year) | Attorney-Client Privilege |
| | | | Draft Summary Comparison Chart of Rent Increase Proposals for Carson Gardens Mobilehome Park | Attorney-Client Privilege |
| | | | Draft Summary Comparison Chart of Rent Increase Proposals for Carson Gardens Trailer Lodge – (1999 Expense Year) | Attorney-Client Privilege |
| 8/22/01 | | | Draft Staff Report to Mobilehome Park Rental Review Board | Attorney-Client Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/8/08 | William Wynder | Sunny Soltani, Anthony Taylor, Ken Freschauf, Ken Baar | Email regarding Colony Cove Fair Return Application | Attorney-Client Privilege |
| 1/19/08 | William Wynder | Ken Freschauf, Anthony Taylor | Draft of Carson Gardens letter | Attorney-Client Privilege |
| 6/20/06 | Ken Freschauf | William Wynder, Anthony Taylor | Email regarding 36690.005 Community Asset Mgmt/Carson Gardens Suppl. Writ/Case # BS072845 | Attorney-Client Privilege |
| 6/10/08 | Ken Freschauf | Anthony Taylor | Email regarding Carson Gardens 2007 MHP Rent Increase Application | Attorney-Client Privilege |
| 11/1/08 | William Wynder | Ken Freschauf, Ken Baar, Anthony Taylor | Email regarding Carson Gardens III decision on writ petition | Attorney-Client Privilege |
| 9/25/08 | Ken Freschauf | William Wynder, Anthony Taylor | Email regarding comments on Carson Gardens document | Attorney-Client Privilege |
| 5/10/06 | Ken Freschauf | Anthony Taylor, Ken Baar | Email regarding Legal Analysis for Carson Gardens' Staff Report | Attorney-Client Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 7/20/06 | William Wynder | Ken Freschauf, Anthony Taylor | Email regarding Objections to Discharge of Writ and Request to Take Judicial Notice | Attorney-Client Privilege |
| | | | Draft Litigation History and the Board's Task at this Proceeding | Attorney-Client Privilege |
| 12/12/06 | Janet Byrne | Anthony Taylor, Belinda Hayes, Donyea Adams, Norberto Boceta | Email regarding PRA Requests from HK&C | Attorney-Client Privilege |
| 12/13/06 | Norberto Boceta | Anthony Taylor, Belinda Hayes | Email regarding PRA Requests from HK&C | Attorney-Client Privilege |
| 5/24/06 | Ken Freschauf | Anthony Taylor | Email chain regarding closed session memo | Attorney-Client Privilege |
| 5/9/09 | William Wynder | Ken Freschauf, Anthony Taylor | Email regarding 36690.005 Community Asset Mgmt/Carson Gardens Suppl. Writ/Case # BS072845 | Attorney-Client Privilege |
| 9/18/08 | Ken Freschauf | Anthony Taylor | Email regarding scheduling of meeting | Attorney-Client Privilege |
| 9/17/08 | Ken Freschauf | Anthony Taylor | Email regarding scheduling of meeting | Attorney-Client Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/15/06 | Ken Freschauf | Anthony Taylor | Email regarding scheduling of meeting | Attorney-Client Privilege |
| 5/12/06 | William Wynder | Anthony Taylor, Ken Freschauf, Ken Baar | Email regarding Hearing regarding Carson Garden's Motion for Remand Order | Attorney-Client Privilege |
| 6/22/06 | Jen Freschauf | Anthony Taylor | Email regarding PRA Requests from HK&C | Attorney-Client Privilege |
| 5/3/06 | William Wynder | Anthony Taylor, Ken Freschauf, Ken Baar | Email regarding Carson Gardens Remand Order | Attorney-Client Privilege |
| 9/25/08 | Anthony Taylor | Ken Freschauf | Email regarding need for Declaration | Attorney-Client Privilege |
| 3/17/06 | William Wynder | Anthony Taylor, Ken Freschauf, Ken Baar | Email chain regarding scheduling of meeting | Attorney-Client Privilege |
| 10/31/08 | William Wynder | Anthony Taylor, Ken Freschauf, Ken Baar | Email regarding decision on writ petition and next course of action | Attorney-Client Privilege |
| 10/30/08 | William Wynder | Anthony Taylor, Ken Freschauf, Ken Baar | Email regarding decision on writ petition and next course of action | Attorney-Client Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 11/3/08 | William Wynder | Anthony Taylor, Ken Freschauf, Ken Baar | Email regarding decision on writ petition and next course of action | Attorney-Client Privilege |
| 9/18/08 | William Wynder | Sunny Soltani, Anthony Taylor, Ken Freschauf, Ken Baar | Email regarding Indian Springs draft opinion and scheduling of meeting | Attorney-Client Privilege |
| 6/27/06 | William Wynder | Anthony Taylor, Ken Freschauf, Ken Baar | Email regarding draft of Carson Resolution | Attorney-Client Privilege |
| 12/22/08 | Ken Freschauf | Anthony Taylor, Williams Wynder | Email regarding info. for untimely filing of a general rent increase application | Attorney-Client Privilege |
| 11/15/06 | William Wynder | Ken Freschauf, Anthony Taylor, Jerome Groomes | Email regarding ruling in favor of the MRRB on all grounds | Attorney-Client Privilege |
| 9/23/08 | Ken Freschauf | Anthony Taylor | Email regarding PRK-Hearings | Attorney-Client Privilege |
| 8/20/08 | Eileen Lee | Anthony Taylor | Email regarding billing history | Work Product Privilege |
| 8/20/08 | | | July Ledger Report of Billing | Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 10/23/08 | Eileen Lee | Anthony Taylor, Terry Vickrey, Rhonda Villines, Candace Boyer | Email chair regarding Carson's copy bill | Work Product Privilege |
| 11/22/06 | William Wynder | Linda Yarvis, Anthony Taylor | Email chain regarding 11/3/06 Carson Gardens Transcript | Work Product Privilege |
| | | | May to August Ledger Report of Billing | Work Product Privilege |
| | | | November 2007 – January 2008 Ledger Report of Billing | Work Product Privilege |
| 3/7/08 | Fred Galante | Attorneys | Email regarding Carson Audit | Work Product Privilege |
| 10/4/06 | Linda Yarvis | Anthony Taylor, William Wynder | Email regarding Ex Parte Notice | Work Product Privilege |
| 6/29/06 | Linda Yarvis | Anthony Taylor | Email regarding Carson Gardens completed filing in Dept. 85 | Work Product Privilege |
| 10/13/06 | Kimberly Bradley | Anthony Taylor, Linda Yarvis | Email regarding Motion to Disqualify opposition due date | Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 7/9/07 | Linda Yarvis | William Wynder, Anthony Taylor, Kimberly Bradley | Email regarding and Notice from Court of Appeal | Work Product Privilege |
| 4/5/06 | William Wynder | Anthony Taylor | Email regarding and Draft of Proposed Remand Order | Work Product Privilege |
| 9/4/07 | William Wynder | Anthony Taylor | Email regarding receipt of Carson Gardens' brief | Work Product Privilege |
| 8/30/07 | William Wynder | Anthony Taylor | Email regarding deadlines of Carson Gardens' brief | Work Product Privilege |
| 7/19/07 | William Wynder | Anthony Taylor | Email regarding receipt of Carson Gardens' clerks and reporter's transcripts | Work Product Privilege |
| 5/2/06 | William Wynder | Anthony Taylor | Email regarding date of hearing | Work Product Privilege |
| 9/27/06 | Jeff Malawy | William Wynder, Anthony Taylor | Email regarding status of brief for Carson Gardens | Work Product Privilege |
| 9/30/08 | William Wynder | Anthony Taylor | Email regarding review of brief | Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 1/24/06 | William Wynder | Attorneys | Email regarding and article regarding Court's reversal of rent increases at Carson Mobilehome Park | Work Product Privilege |
| 7/14/06 | Kimberly Bradley | Anthony Taylor | Email regarding Carson Gardens Privilege Log | Work Product Privilege |
| 4/19/06 | Linda Yarvis | Anthony Taylor | Email regarding filing of Carson Gardens | Work Product Privilege |
| 10/15/07 | William Wynder | Anthony Taylor | Email regarding Carson Gardens' Appellate Order | Work Product Privilege |
| 10/16/08 | Linda Yarvis | Anthony Taylor | Email regarding Joint Appendix | Work Product Privilege |
| 5/5/08 | William Wynder | Glen Tucker | Email regarding Cypress and Carson Litigation Matters | Work Product Privilege |
| 2/8/07 | Christy Lopez | Anthony Taylor | Email regarding and case regarding legal research | Work Product Privilege |
| 6/5/06 | William Wynder | Anthony Taylor | Email regarding settlement proposal | Work Product Privilege |
| 6/23/06 | William Wynder | Anthony Taylor | Email regarding proposed resolution | Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 6/5/06 | William Wynder | Anthony Taylor | Email regarding possible offer | Work Product Privilege |
| 1/29/08 | William Wynder | Anthony Taylor, Sunny Soltani | Email regarding and letter regarding Carson Gardens 2007 MHP Rent Increase Application | Work Product Privilege |
| 8/30/07 | William Wynder | Anthony Taylor | Email regarding Court of Appeal Notification for B196223 | Work Product Privilege |
| 7/21/08 | William Wynder | Attorneys | Email regarding and Appellate Decision | Work Product Privilege |
| 11/16/06 | William Wynder | Anthony Taylor | Email regarding Carson Gardens Memo | Work Product Privilege |
| 1/25/06 | William Wynder | Anthony Taylor | Email regarding and summary of Carson Gardens' rent options | Work Product Privilege |
| 8/20/08 | Linda Yarvis | Anthony Taylor | Email regarding and New Stipulation | Work Product Privilege |
| 7/22/08 | William Wynder | Anthony Taylor | Email regarding and Carson Gardens Web Page Article | Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 3/16/06 | William Wynder | Anthony Taylor | Email regarding analyzation of judge's ruling | Work Product Privilege |
| 10/4/06 | William Wynder | Anthony Taylor | Email regarding California Property Rights Journal Huntington Beach Mobile Home Park Conversion | Work Product Privilege |
| 12/11/08 | Dave Aleshire | Glen Tucker, Anthony Taylor, Wesley Miliband | Email regarding and January seminar flyer | Work Product Privilege |
| 7/31/07 | Deanne Castore | Anthony Taylor | Email regarding and Proposed Civil Gang Injunction – Varrio Hawaiian Gardens | Work Product Privilege |
| 3/22/06 | William Wynder | Anthony Taylor | Email regarding and Insert for 32006 Carson Gardens Response Letter | Work Product Privilege |
| 8/7/07 | Deanne Castore | Anthony Taylor | Email regarding Magin Civil Language | Work Product Privilege |
| 8/15/07 | Linda Yarvis | William Wynder, Anthony Taylor, Sunny Soltani | Email regarding and appellate filing schedule | Work Product Privilege |
| 2/8/07 | Fred Galante | Attorneys | Email regarding Montelello vote | Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 5/30/08 | William Wynder | Anthony Taylor | Email regarding New Carson Gardens Writ Case | Work Product Privilege |
| 9/20/07 | William Wynder | Anthony Taylor | Email regarding Padilla and Carson Gardens | Work Product Privilege |
| 4/27/06 | Linda Yarvis | Anthony Taylor | Email regarding and Motion for Remand Order & judgment | Work Product Privilege |
| 6/29/06 | Linda Yarvis | Anthony Taylor | Email regarding and Carson Gardens Return on Supplemental Writ of Mandate with exhibits | Work Product Privilege |
| 10/23/06 | Linda Yarvis | Anthony Taylor | Email regarding and Carson Gardens Reply Motion to Enforce Judgment and Reply to Opposing Motion and exhibits | Work Product Privilege |
| 9/20/06 | Linda Yarvis | William Wynder, Anthony Taylor | Email regarding and Carson Gardens Motion to Enforce Judgment | Work Product Privilege |
| 7/20/06 | Linda Yarvis | William Wynder, Anthony Taylor | Email regarding and Carson Gardens Notice of Objection of Writ and Request to Take Judicial Notice | Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 11/28/06 | Linda Yarvis | William Wynder, Anthony Taylor | Email regarding and Carson Gardens Motion for Reconsideration & Proposed Order and exhibits | Work Product Privilege |
| 11/27/07 | Linda Yarvis | William Wynder, Anthony Taylor | Email regarding and Carson Gardens Reply Brief | Work Product Privilege |
| 7/25/06 | Linda Yarvis | Anthony Taylor | Email regarding and Carson Gardens Report | Work Product Privilege |
| 12/3/07 | Linda Yarvis | William Wynder, Anthony Taylor | Email regarding and Carson Gardens Appeal | Work Product Privilege |
| 12/3/07 | Linda Yarvis | William Wynder, Anthony Taylor | Email regarding and Carson Gardens Letter of Withdraw of Adjustment Under Protect | Work Product Privilege |
| 6/7/07 | William Wynder | Anthony Taylor | Email regarding Litigation Report | Work Product Privilege |
| 10/10/06 | William Wynder | Anthony Taylor, Dawn Honeywell | Email regarding board member contact information | Work Product Privilege |
| 9/20/06 | William Wynder | Anthony Taylor | Email regarding Carson Gardens Motion to Enforce the Writ | Work Product Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 7/1/06 | William Wynder | Anthony Taylor | Email regarding scheduling | Work Product Privilege |
| 4/18/06 | William Wynder | Anthony Taylor | Email regarding review and comments | Work Product Privilege |
| 3/31/06 | Linda Yarvis | Anthony Taylor | Email regarding Court of Appeal record | Work Product Privilege |
| 10/4/06 | William Wynder | Anthony Taylor | Email regarding board member contact information | Work Product Privilege |
| 10/3/06 | William Wynder | Anthony Taylor | Email regarding legal strategy | Work Product Privilege |
| 6/20/06 | William Wynder | Anthony Taylor | Email regarding draft resolution | Work Product Privilege |
| 5/20/06 | William Wynder | Anthony Taylor | Email regarding attorneys fees for motion for remand hearing | Work Product Privilege |
| 10/18/07 | William Wynder | Anthony Taylor | Email regarding and Revised appellate brief | Work Product Privilege |
| 10/16/07 | William Wynder | Anthony Taylor | Email regarding Palm Springs case | Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 10/9/07 | Dawn Honeywell | Anthony Taylor | Email regarding housing issue and rent review board | Work Product Privilege |
| 9/21/06 | William Wynder | Anthony Taylor | Email regarding Motion to Disqualify firm | Work Product Privilege |
| 9/19/06 | William Wynder | Anthony Taylor | Email regarding counsel's request for stipulation | Work Product Privilege |
| 10/22/08 | William Wynder | Anthony Taylor | Email regarding Response to Evidentiary Objections | Work Product Privilege |
| 6/29/08 | William Wynder | Anthony Taylor | Email regarding Return on Supplemental Writ | Work Product Privilege |
| 12/11/06 | William Wynder | Anthony Taylor | Email regarding PRA Request | Work Product Privilege |
| 11/15/06 | William Wynder | Anthony Taylor | Email regarding ruling on Carson Gardens Motion Requiring any Further Rent Increase | Work Product Privilege |
| 7/4/07 | Deanne Castore | Anthony Taylor | Email regarding and draft complaint regarding Hawaiian Gardens | Work Product Privilege |
| 6/26/08 | Linda Yarvis | Anthony Taylor | Email regarding and redline of Carson Resolution | Work Product Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 6/23/06 | Doug Haubert | Attorneys | Email regarding Rent increase approved for Carson mobile home park | Work Product  Privilege |
| 8/10/06 | William Wynder | Anthony Taylor | Email regarding and Response to Carson Gardens Objections to Writ Return | Work Product  Privilege |
| 4/6/06 | William Wynder | Anthony Taylor | Email regarding revisions to Carson Gardens Remand Order | Work Product  Privilege |
| 8/26/07 | Deanne Castore | Anthony Taylor | Email regarding VHG Injunction | Work Product  Privilege |
| 11/14/08 | William Wynder | Anthony Taylor | Email regarding proposed revisions and settlement offer | Work Product  Privilege |
| 10/30/08 | William Wynder | Anthony Taylor | Email regarding Carson Gardens III decision on writ petition | Work Product  Privilege |
| 9/26/08 | William Wynder | Anthony Taylor | Email chain regarding draft opposition brief | Work Product  Privilege |
| 8/15/07 | Rick Hicks | Anthony Taylor | Email regarding Gang Injunction | Work Product  Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 9/26/07 | Tracy Rinauro | Anthony Taylor | Email regarding Gang Injunction | Work Product Privilege |
| 6/7/06 | Williams Wynder | Doug Haubert | Email regarding Judge Janavs | Work Product Privilege |
| 2/16/94 | Rochelle Browne | James D. Mellein | Letter regarding General Rent Increase Application | Attorney-Client Privilege |
| 2/1/94 | Rochelle Browne | James Mellein | Internal Memorandum regarding Rent Increase Application by Imperial Carson – Debt Service and Fair Return Issues | Attorney-Client Privilege |
| 2/2/94 | Shelly Browne | Jim Mellein | Fax Cover Sheet forwarding Internal Memorandum | Attorney-Client Privilege |
| 9/18/95 | Rochelle Browne | Adolfo Reyes | Letter regarding Lea Associates Invoices and Invoice | Attorney-Client Privilege |
| 6/1/95 | Rochelle Browne | Sheri Repp and Adolfo Reyes | Letter regarding Shangri Lodge Rent Increase Application | Attorney-Client Privilege |
| 5/19/95 | John G. Ellis | Rochelle Brown, Esq. | Letter regarding Consulting Services | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 6/15/95 | Rochelle Browne | Adolfo Reyes | Fax Cover Sheet transmitting correspondence and correspondence regarding Shangri Lodge Rent Increase Application and Consulting Services | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 6/19/15 | Rochelle Browne | Adolfo Reyes | Letter regarding Shangri Lodge Rent Increase Application w/enclosures | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 8/3/95 | Lea Associates | Rochelle Browne | Invoice for completion of rate of return analysis | Attorney Client; Deliberative Process Privilege; Mental Process Privilege |
| 11/6/95 | Rochelle Browne | Mayor and Members of the City Council | Memorandum regarding Pending Litigation | Attorney-Client Privilege |
| 7/19/95 | John G. Ellis | Patrick Brown | Letter regarding Consulting Services | Deliberative Process Privilege; Mental Process Privilege |
| 8/7/95 | AR | James Mellein | Note regarding calculation of value | Deliberative Process Privilege; Mental Process Privilege |
| 11/16/95 | AR | Jim | Note regarding discussion with S. Browne | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |
| 6/1/95 | Rochelle Browne | Sheri Repp and Adolfo Reyes | Letter regarding Shangri Lodge Rent Increase Application | Attorney-Client Privilege; Deliberative Process Privilege; Mental Process Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 8/7/95 | Rochelle Browne | Adolfo Reyes | Letter regarding Mobilehome Park Rental Review Board | Attorney-Client Privilege |
| 10/20/95 | Rochelle Browne | James Mellein | Letter regarding Litigation with Fax Cover Sheet | Attorney-Client Privilege |
| 7/25/95 | John G. Ellis | Patrick Brown | Amended Analysis | Deliberative Process Privilege; Mental Process Privilege |
| 5/16/95 | Adolfo Reyes | Jim Mellein | Regarding Shangri Lodge Mobilehome Park | Deliberative Process Privilege; Mental Process Privilege |
| 7/19/94 | | | Calculator tapes and notes with various figures and calculations | Deliberative Process Privilege; Mental Process Privilege |
| | | | Staff Report Calculations and various documents with hand-written notes | Deliberative Process Privilege; Mental Process Privilege |
| | | | Copies of pages from review copies of correspondence with hand-written notes and calculations | Deliberative Process Privilege; Mental Process Privilege |
| 9/23/92 | Rochelle Browne | MPRRB | Memorandum regarding Legal Interpretation | Attorney-Client Privilege; Deliberative Process; Mental Process Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| 12/11/96 | | | Staff Report to MPRRV | Deliberative Process Privilege; Mental Process Privilege |
| 1/30/97 | Patrick D. Brown | Mayor Mitoma and City Council Members | Internal Memorandum re MRRB Hearing of 1/22/97 | Deliberative Process Privilege; Mental Process Privilege |
| 1/9/97 | Rochelle Browne | James Mellein | Fax Cover Sheet and Draft Staff Report | Attorney-Client Privilege; Deliberative Process; Mental Process Privilege |
| 10/17/96 | Rochelle Browne | James Mellein | Letter regarding Rent Increase Application | Attorney-Client Privilege; Deliberative Process; Mental Process Privilege |
| 6/20/96 | Rochelle Browne | James Mellein | Letter regarding Rent Increase Application | Attorney-Client Privilege |
| | | | Calculator tapes and hand-written notes with various figures and calculations | Deliberative Process Privilege; Mental Process Privilege |
| 2/5/97 | Rochelle Browne | Mayor Michael Mitoma | Memorandum regarding Rent Increase | Attorney-Client Privilege |
| | | | Copies of pages from review copies of correspondence with hand-written notes and calculations | Deliberative Process Privilege; Mental Process Privilege |

01007.0504/272510.1

| DATE | FROM | TO | DOCUMENT | BASIS FOR PRIVILEGE |
|---|---|---|---|---|
| | | | Hand-written notes regarding discussions with counsel and copies of pages from review copies of correspondence and various documents with hand-written notes and calculations | Deliberative Process Privilege; Mental Process Privilege |

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 2361 Rosecrans Ave., Suite 475, El Segundo, CA 90245.

On **October 26, 2015**, I served true copies of the following document(s) described as **DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED ON DEFENDANT CITY OF CARSON, SET NO. ONE** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of Aleshire & Wynder, LLP for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at El Segundo, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **October 26, 2015**, at El Segundo, California.

DIANE N. BRANCHE

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW

01007.0504/269843.1 -1- Case No. CV14-03242 PSG (PJWx)

DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS , SET NO. ONE

**Exhibit 2**
**Page 72**

**SERVICE LIST**
**Colony Cove Properties, LLC v. City of Carson, et al.**
**Case No. CV14-03242 PSG**

Richard H. Close, Esq.
Thomas W. Casparian, Esq.
Yen N. Hope Esq.
GILCHRIST & RUTTER
1299 Ocean Avenue, Suite 900
Santa Monica, CA 90401
Tel: (310) 393-4000
Fax: (310) 394-4700
rclose@gilchristrutter.com
tcasparian@gilchristrutter.com
yhope@gilchristrutter.com

***Attorneys for Plaintiff***

*Colony Cove Properties, LLC*

Dimitri D Portnoi, Esq.
Matthew W. Close, Esq.
O'Melveny and Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Tel: (213)-430-6000
Fax: (213)-430-6407
dportnoi@omm.com
mclose@omm.com

***Attorneys for Plaintiff***

*Colony Cove Properties, LLC*

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW
A&W

01007.0504/269843.1 -2- Case No. CV14-03242 PSG (PJWx)
DEFENDANT CITY OF CARSON'S RESPONSES TO PLAINTIFF COLONY COVE PROPERTIES, LLC'S REQUEST FOR PRODUCTION OF DOCUMENTS , SET NO. ONE

Exhibit 2
Page 73

# EXHIBIT 3

## Yen Hope

**From:** Jeff M. Malawy <jmalawy@awattorneys.com>
**Sent:** Friday, January 08, 2016 5:42 PM
**To:** Yen Hope
**Cc:** June S. Ailin; Stephen R. Onstot; Margaret Rose; Lara Leitner; Thomas Casparian; 'dtully@omm.com'; 'Close, Matthew W.'
**Subject:** RE: Colony Cove v. Carson

Yen -- Baar's meeting in San Jose is Wednesday, January 27. Based on his schedule and A&W's schedule, the best days for his deposition are February 1, 2, or 3. His deposition can be taken in the LA area -- in your Santa Monica office or in downtown. Do any of those dates work for your side?

Also, I have unfortunate news to report about Jim Dear's deposition. Mr. Dear is no longer available on January 22. This is an inconvenience for us as well, as Bill Wynder had planned to be here that day from Ohio. We are trying to get a list of available dates from Mr. Dear for the weeks of January 18, January 25, and February 1.

**Jeff Malawy**
**Aleshire & Wynder, LLP** | 18881 Von Karman Ave., Suite 1700, Irvine, CA 92612
Tel: (949) 223-1170 | Dir: (949) 250-5422 | Fax: (949) 223-1180 | jmalawy@awattorneys.com | awattorneys.com

This email and any files transmitted with it may contain privileged or otherwise confidential information. If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via email and delete the email you received.

---

**From:** Jeff M. Malawy
**Sent:** Wednesday, December 30, 2015 7:45 PM
**To:** 'Yen Hope'
**Cc:** June S. Ailin; Stephen R. Onstot; Margaret Rose; Lara Leitner; Thomas Casparian; dtully@omm.com; Close, Matthew W.
**Subject:** RE: Colony Cove v. Carson

Yen -- Mr. Dear is confirmed for January 22 at 10 a.m. in your Santa Monica office. I will provide you available dates for Dr. Baar by January 10.

Our proof of service indicates John Neet was served on November 30, 2015. The process server left the subpoena with the receptionist at his office in Murrieta.

We have not been able to get anywhere with GE. It is unlikely we will schedule another GE PMQ deposition.

**Jeff Malawy**
**Aleshire & Wynder, LLP** | 18881 Von Karman Ave., Suite 1700, Irvine, CA 92612
Tel: (949) 223-1170 | Dir: (949) 250-5422 | Fax: (949) 223-1180 | jmalawy@awattorneys.com | awattorneys.com

This email and any files transmitted with it may contain privileged or otherwise confidential information. If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via email and delete the email you received.

---

**From:** Yen Hope [mailto:yhope@gilchristrutter.com]
**Sent:** Tuesday, December 29, 2015 1:32 PM
**To:** Jeff M. Malawy
**Cc:** June S. Ailin; Stephen R. Onstot; Margaret Rose; Lara Leitner; Thomas Casparian; mclose@omm.com; dtully@omm.com; Close, Matthew W.
**Subject:** RE: Colony Cove v. Carson

Hi Jeff,

Thank you for accommodating our request regarding Detling.

With respect to Dear and Baar, I don't see how the ball is in our court. You had stated: "It seems to me the best solution is to confirm Dear for January 22 and leave the Baar date floating until at the latest January 10 (likely earlier)." Accordingly, we are confirming Dear for the 22nd and asking that you advise us of Mr. Baar's availability to be deposed, in our Santa Monica office, by the end of next week. I believe the ball is therefore in your court to advise us of Mr. Baar's availability.

Lastly, please me know if you have successfully served Neet. We are reaching out to him, but have not yet been able to confirm.

Thanks,

**Yen Hope, Esq.**
**Gilchrist & Rutter**

---

**From:** Jeff M. Malawy [mailto:jmalawy@awattorneys.com]
**Sent:** Tuesday, December 29, 2015 12:24 PM
**To:** Yen Hope
**Cc:** June S. Ailin; Stephen R. Onstot; Margaret Rose; Lara Leitner; Thomas Casparian; mclose@omm.com; dtully@omm.com
**Subject:** RE: Colony Cove v. Carson

Hi Yen. Thank you for confirming Detling. An 11 am start time is good for us.

On Dear and Baar, I thought the ball was in your court. See my attached December 17 email to Tom. Let me know if that proposal is ok with you.

Also, I proposed several January dates for the John Neet deposition back on December 16. They were January 7, 8, 11, 13, 14. Let me know as soon as possible which date is best for you and Mr. Neet.

I will get back to you on the GE PMQ.

Thank you.

**Jeff Malawy**
**Aleshire & Wynder, LLP** | 18881 Von Karman Ave., Suite 1700, Irvine, CA 92612
Tel: (949) 223-1170 | Dir: (949) 250-5422 | Fax: (949) 223-1180 | jmalawy@awattorneys.com | awattorneys.com

This email and any files transmitted with it may contain privileged or otherwise confidential information. If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via email and delete the email you received.

---

**From:** Yen Hope [mailto:yhope@gilchristrutter.com]
**Sent:** Monday, December 28, 2015 7:31 PM
**To:** Jeff M. Malawy

**Cc:** Thomas Casparian; mclose@omm.com; dtully@omm.com
**Subject:** Colony Cove v. Carson

Hi Jeff,

We have confirmed that Mr. Detling is available to be deposed on January 7th at Aleshire & Wynder's Irvine office.  However, we request that the deposition be pushed back to 11 am.  Please let me know if you are amenable to the request.

With respect to Mr. Dear, as you know, we have rescheduled his deposition as an accommodation to Mr. Wynder.  Please confirm that Mr. Dear will be available for a deposition on January 22nd at 10 am in our Santa Monica office.

Relatedly, we are still waiting for confirmation of Mr. Baar's deposition date, previously scheduled for January 22nd.  Please advise us of Mr. Baar's availability to be deposed, in our Santa Monica office, by the end of next week.

Lastly, please let me know if you have made any progress in scheduling a deposition for GE's PMQ. We have still not received any documents from GE in response to our document subpoena and they have not responded to any of our recent outreach attempts.

Thanks,

**Yen Hope, Esq.**
**Gilchrist & Rutter**
1299 Ocean Avenue, Suite 900
Santa Monica, CA  90401
Tel:         (310) 393-4000
Fax:        (310) 394-4700

# EXHIBIT 4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DISTRICT

COLONY COVE PROPERTIES, LLC )
a Delaware limited liability )
company, )
)
Plaintiff, )
)
vs. ) Case No. CV14-03242 PSG (PJWx)
)
CITY OF CARSON, a municipal )
corporation; CITY OF CARSON )
MOBILEHOME PARK RENTAL REVIEW )
BOARD, a public administrative )
body; and DOES 1 to 10, )
inclusive, )
)
Defendants. ) (Pages 1 - 197)
________________________________)

JAMES F. GOLDSTEIN, on 12/18/2015
COLONY COVE PROPERTIES vs. CITY OF CARSON, et al.

Certified Transcript

VIDEOTAPED DEPOSITION OF

JAMES F. GOLDSTEIN

323.393.3768 • 888.99.iDepo
www.iDepoReporters.com

Friday, December 18, 2015

Reported by: Irene Nakamura, RPR, CLR
CA CSR No. 9478, HI CSR No. 496
NV CSR No. 893, WA CCR No. 3177

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DISTRICT

COLONY COVE PROPERTIES, LLC, a Delaware limited liability company,

Plaintiff,

JAMES F. GOLDSTEIN, on 12/18/2015
COLONY COVE PROPERTIES vs. CITY OF CARSON, et al.

vs. ) Case No. CV14-03242 PSG (PJWx)

CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body; and DOES 1 to 10, inclusive,

Defendants.

Videotaped Deposition of James F. Goldstein, taken on behalf of Defendants, at 2361 Rosecrans Avenue, Suite 475, El Segundo, California, commencing at 10:01 a.m., Friday, December 18, 2015, before Irene Nakamura, Certified Shorthand Reporter for the State of California No. 9478, RPR, CLR,Hawaii CSR No. 496, Nevada CSR No. 893, Washington CCR No. 3177.

323.393.3768 • 888.99.iDepo
www.iDepoReporters.com

APPEARANCES:

For Plaintiff:

LAW OFFICES GILCHRIST & RUTTER, PC
BY: THOMAS W. CASPARIAN, ESQ.
1299 Ocean Avenue
Suite 900
Santa Monica, California 90401
(310) 393-4000
tcasparian@gilchristrutter.com

For Defendants:

ALESHIRE & WYNDER, LLP
BY: STEPHEN R. ONSTOT, ESQ.
3880 Lemon Street
Suite 520
Riverside, California 92501
(951) 241-7338
sonstot@awattorneys.com

- and -

ALESHIRE & WYNDER, LLP
BY: JUNE S. AILIN, ESQ.
BY: MARGARET W. ROSE, ESQ.
2361 Rosecrans Avenue
Suite 475
El Segundo, California 90245
(310) 527-6660
jailin@awattorneys.com
mrose@awattorneys.com

Also Present:

Dennis Davis, Videographer

BY MS. AILIN: 13:44:49

Q. And this is a document with page numbers CC002691 through CC002754. And it has a cover page on it that says "Loan Agreement Between Colony Cove Properties, LLC as Borrower and General Electric Capital Corporation as Lender," dated March 30, 2006. 13:45:03 13:45:05 13:45:14 13:45:20 13:45:23 13:45:26

JAMES F. GOLDSTEIN, on 12/18/2015
COLONY COVE PROPERTIES vs. CITY OF CARSON, et al.

And do you recall seeing this document before, Mr. Goldstein? 13:45:32 13:45:34

A. Yes. 13:45:35

Q. And on page 2731, is that your signature? 13:45:35

A. Yes. 13:45:45

Q. And on page 2716, there's a paragraph 8.4 that has the title "Operation Maintenance Inspection Conversion." And in that paragraph on the next page, 2717, there are some provisions related to a condominium conversion of Colony Cove Mobile Estates. 13:45:57 13:46:13 13:46:17 13:46:22 13:46:28 13:46:42

Were you already planning to convert Colony Cove to a condominium before you purchased it? 13:46:42 13:46:45 13:46:49

323.393.3768 • 888.99.iDepo
www.iDepoReporters.com

MR. CASPARIAN: Objection; vague and ambiguous. 13:46:49 13:46:54

When you say "convert," do you mean seek to -- 13:46:54 13:46:56

MS. AILIN: Subdivide it. 13:46:57
MR. CASPARIAN: But do you mean seek to obtain the map, or do you mean proceed to actually sell lots? 13:46:58 13:47:00 13:47:02
MS. AILIN: Seek to obtain the map, the subdivision approval. So let me re-ask that. 13:47:03 13:47:07
BY MS. AILIN: 13:47:10

JAMES F. GOLDSTEIN, on 12/18/2015
COLONY COVE PROPERTIES vs. CITY OF CARSON, et al.

**Q. Had you already decided before you purchased Colony Cove Mobile Estates that you were going to file an application for subdivision of the mobile home park?** 13:47:11 13:47:13 13:47:16 13:47:21
A. I had decided to file for a subdivision, but I had not decided to proceed with the subdivision. 13:47:22 13:47:30 13:47:34
**Q. And have you received the subdivision approval from the City for Colony Cove Mobile Estates?** 13:47:35 13:47:38 13:47:43
A. Yes, I have. 13:47:43
**Q. And have you taken any additional steps towards selling units in Colony Cove Mobile Estates?** 13:47:44 13:47:47 13:47:50

323.393.3768 • 888.99.iDepo
www.iDepoReporters.com

A. No, I haven't. 13:47:50
**Q. Why not?** 13:47:51
A. Because the market conditions do not warrant the sale of spaces. 13:47:52 13:48:01

Q. What is it about the market conditions that sale of the spaces is not warranted? 13:48:06 13:48:13

A. I don't feel that I would have the ability to sell the spaces at an attractive price at this time. 13:48:17 13:48:23 13:48:34

Q. When you say "an attractive price," do you mean attractive to you or attractive to the buyer? 13:48:34 13:48:37

JAMES F. GOLDSTEIN, on 12/18/2015
COLONY COVE PROPERTIES vs. CITY OF CARSON, et al.

A. The price that would be attractive to the buyer would not be a price that would be attractive to me. 13:48:40 13:48:47 13:48:51

Q. If you were to sell a unit in Colony Cove, that would change how the rental control ordinance applies to Colony Cove; correct? 13:49:01 13:49:09 13:49:12

A. Correct. 13:49:14

Q. And if you sold a unit in Colony Cove, you could generate more revenue from Colony Cove; correct? 13:49:14 13:49:20 13:49:25

A. Correct. 13:49:25

Q. So why don't you do it? 13:49:25

323.393.3768 • 888.99.iDepo
www.iDepoReporters.com

A. It was never my intent to get around rent control by virtue of proceeding with the sale of spaces. 13:49:27 13:49:36 13:49:42

Q. Then why go through the subdivision process? 13:49:49 13:49:52

A. Why did I do it? 13:49:53

**Q. Yes. Why go through the application process and spend the money that it takes to go through that process if you don't intend to sell the spaces?** 13:49:55 13:49:59 13:50:03 13:50:07

A. As I mentioned before, I always like to have as many options available to me as possible. I think that in the long run, at some point, the market might be at a level that warrants selling the spaces, but I don't know when that is going to happen. But I want to have the ability to sell spaces or a future owner to have that ability because I think it's in my better interest. 13:50:08 13:50:13 13:50:18 13:50:26 13:50:33 13:50:40 13:50:44 13:50:48

JAMES F. GOLDSTEIN, on 12/18/2015
COLONY COVE PROPERTIES vs. CITY OF CARSON, et al.

**Q. Before you could sell the spaces in Colony Cove, there's a process you would have to go through with the Bureau of Real Estate; correct?** 13:50:53 13:50:57 13:50:59

A. Correct. 13:51:02

**Q. And it will take some time to go through that process; correct?** 13:51:02 13:51:05

A. Correct. 13:51:06

323.393.3768 • 888.99.iDepo
www.iDepoReporters.com

**Q. Do you have any idea how long it takes to go through that process?** 13:51:06 13:51:09

A. I've been told it's, I think, six to nine months, something like that. 13:51:09 13:51:15

**Q. And do you have no concern that the market could change between when you start that process** 13:51:16 13:51:23

**and when you complete that process?** 13:51:27

A. I have minor concern, not major concern. 13:51:28

**Q. Wouldn't it be preferable to go through that process now so that if the market changes in such a way that selling the units would be feasible, you're ready to go?** 13:51:47 13:51:49 13:51:51 13:51:55

MR. CASPARIAN: Objection; speculation, incomplete hypothetical, and misstates his prior testimony. 13:51:57 13:51:59 13:52:10

JAMES F. GOLDSTEIN, on 12/18/2015
COLONY COVE PROPERTIES vs. CITY OF CARSON, et al.

THE DEPONENT: I don't feel that market conditions are going to significantly change in the next six months. 13:52:10 13:52:16 13:52:21

BY MS. AILIN: 13:52:23

**Q. From your perspective, what would be an attractive price for a unit in Colony Cove Mobile Estates?** 13:52:31 13:52:33 13:52:39

MR. CASPARIAN: Today? 13:52:39

MS. AILIN: Today. 13:52:40

THE DEPONENT: I can't answer that without giving it considerable thought. My only answer to that is currently the prices are not -- I should say the values are not in the range that are of interest to me. 13:52:50 13:52:51 13:52:57 13:53:04 13:53:11

323.393.3768 • 888.99.iDepo
www.iDepoReporters.com

BY MS. AILIN: 13:53:12

**Q. How do you know that?** 13:53:12



I, Irene Nakamura, CSR 9478, RPR, CLR, do hereby declare:

That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30 (f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

JAMES F. GOLDSTEIN, on 12/18/2015
COLONY COVE PROPERTIES vs. CITY OF CARSON, et al.

XX___ That the witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

______ No changes have been provided by the witness during the period allowed.

______ The changes made by the witness are appended to the transcript.

______ No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

323.393.3768 • 888.99.iDepo
www.iDepoReporters.com

Witness my hand this 28th day of December, 2015.

______________________________
DEPOSITION OFFICER

# EXHIBIT 5

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

____________________________

COLONY COVE PROPERTIES, LLC, a Delaware limited liability company,

Plaintiff,

v.

CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body; and DOES 1 to 10, inclusive,

Defendants.

____________________________

Case No. CV 14-03242 PSG(PJWx)

VIDEOTAPED DEPOSITION OF KEN FRESCHAUF

NEWPORT BEACH, CALIFORNIA

FRIDAY, JANUARY 15, 2016

Reported by:
DENISE HESS
CSR NO. 7564
Job No.: 2212875
PAGES 1 - 295

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

____________________________

COLONY COVE PROPERTIES, LLC, a Delaware limited liability company,

Plaintiff,

v.

CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body; and DOES 1 to 10, inclusive,

Defendants.

____________________________

Case No. CV 14-03242 PSG(PJWx)

Videotaped Deposition of KEN FRESCHAUF, taken at 610 Newport Center Drive, 17th Floor, Newport Beach, California, beginning at 10:04 a.m. and ending at 5:13 p.m on Friday, January 15, 2016, before DENISE HESS, CSR No. 7564.

APPEARANCES:

For Plaintiff:

O'MELVENY & MYERS LLC
BY: MATTHEW W. CLOSE, ESQ.
610 Newport Center Drive
17th Floor
Newport Beach, California 90071
(213) 430-6000
mclose@omm.com

For Defendants:

ALESHIRE & WYNDER LLP
BY: JUNE S. AILIN, ESQ.
AND
BY: JEFF M. MALAWY, ESQ.
2361 Rosecrans Avenue
Suite 475
El Segundo, CA 90245
(310) 527-6660
jailin@awattorneys.com

ALSO PRESENT: JENNIFER WILLIAMS, Videographer

spaces, pads, or lots? 11:08

A The market rate?

Q The market value of those -- that piece of land upon which those coaches sit is irrelevant to the setting of the rent levels in 11:08 Colony Cove?

A Correct.

MS. AILIN: Objection; vague and ambiguous.

BY MR. CLOSE: 11:08

Q Sorry, go ahead and answer.

MS. AILIN: Go ahead and answer.

BY MR. CLOSE:

Q You said correct?

A Correct, yes. 11:08

Q So the market value of the entire park, then, would be irrelevant to your rent setting decisions for Colony Cove in 2007, correct?

MS. AILIN: Objection; vague and 11:09 ambiguous.

Go ahead and answer.

THE WITNESS: Well, what a park owner -- are you talking about the value of the park or what the park owner paid for the park? 11:09

BY MR. CLOSE: 11:09

Q I said the value -- well, the value of the park is irrelevant to the rent setting decisions in the City of Carson in the 2007 time period, correct? 11:09

A Yes, correct.

Q And, in fact, when you were advising the Rent Control Board on Colony Cove rent applications in 2007, you had no idea what the value of the Colony Cove Park was, correct? 11:09

MS. AILIN: Objection; deliberative process privilege, mental process privilege.

Don't answer.

BY MR. CLOSE:

Q Over the course of your career at 11:10 the City of Carson, would you -- would it be fair to say you reviewed over 200 rent control applications?

A Yes.

(Whereupon the document referred 11:10 to is marked by the reporter as Exhibit 47 for identification and is attached hereto.)

BY MR. CLOSE:

Q I would like to mark as Exhibit 47 a document that I think you will help me identify 11:11

including debt service, yes. 11:28

Q Okay. What -- who else other than yourself and whoever was serving on the Rent Control Board, who else at the City of Carson participated in the evaluation of rent control 11:28 applications or the making of recommendations to the board on rent control applications in the -- let's say the 2005 to 2008 time period?

MS. AILIN: Objection; vague and ambiguous as to participated. 11:28

But go ahead and answer.

THE WITNESS: Well, I'd say 99.9 percent of it was probably mine. Occasionally, I would have to bounce something off of our attorney's office. I would 11:28 bounce something off my supervisor, Sherry Repp. And once in a long while, we'd have to call a consultant in on something. But generally speaking, it was my decision.

BY MR. CLOSE: 11:29

Q So generally speaking in the 2005 to 2007 time period, I think you said 99 percent of the evaluation of rent control applications was done by you?

A Correct. And we're talking about 11:29

just the evaluation of the application itself. 11:29

Q Okay.

A Which could be different than I'm getting information later on.

Q Okay. 11:29

A But I did the actual evaluations.

Q Okay. Did anyone at the City of Carson ever tell you to go hard or be difficult on my client's rent control applications?

MS. AILIN: Objection; deliberative 11:29 process privilege, mental process privilege.

Do not answer.

THE WITNESS: Okay.

BY MR. CLOSE:

Q Did Sherry Repp ever tell you to go 11:30 hard on Mr. Goldstein's applications?

MS. AILIN: Objection; deliberative process privilege, mental process privilege.

Do not answer.

BY MR. CLOSE: 11:30

Q Did Jim Dear ever tell you to go hard and go tough on my client's rent applications?

MS. AILIN: Objection; deliberate process privilege, mental process privilege. 11:30

Do not answer. 11:30

BY MR. CLOSE:

Q Will you testify about what elected officials in the City of Carson told you about how they wanted you to review rent control 11:30 applications filed by my client?

MS. AILIN: Objection; assumes -- well, objection; calls for speculation, attorney-client privilege.

Don't answer. 11:30

MR. CLOSE: Are you sure that you want to make a privilege objection to will you testify about something? I mean, this is probably going to go -- I mean, I would like to try and -- if the witness -- if you're 11:30 instructing the witness not to answer and you're not going to let me ask about it, I'm not going to argue about it on the record, but I just want to make sure we all understand what's happening here. 11:31

I'm inquiring about whether the person who was 99.9 percent responsible for making recommendations on rent control applications ever received pressure or direction from elected officials about how to do his job 11:31

on our applications. 11:31

And you're going to refuse to allow me to elicit testimony on that subject.

Is that -- I just want to make sure we're correct, because this probably will go to the court. 11:31

MS. AILIN: Let's go off the record.

MR. CLOSE: Sure.

MS. AILIN: If that's okay.

THE VIDEOGRAPHER: Going off the record. The time is 11:31. 11:31

(Brief recess.)

THE VIDEOGRAPHER: This is the beginning of Media 2. We are back on the record at 11:45. 11:45

BY MR. CLOSE:

Q Before the break, Mr. Freschauf, I think you testified that you were the person who was 99 percent responsible for making the staff recommendations on rent control applications in the 2005, 2007 time period, correct? 11:45

A Correct.

Q In making those recommendations on my client's rent control applications, did you ever feel pressure from any elected officials to -- 11:46

to influence your recommendations? 11:46

MS. AILIN: Objection; deliberative process privilege, mental process privilege.

Do not answer.

BY MR. CLOSE: 11:46

Q And I assume you will follow your client's -- your lawyer's instruction?

A Yes.

Q Okay. Did the -- did Mayor Jim Dear ever communicate to you any of his views in the 11:46 2005, 2007 time period in connection with my client's rent control applications on Colony Cove?

MS. AILIN: Objection; deliberative process privilege, mental process privilege. 11:46

Do not answer.

BY MR. CLOSE:

Q Did you ever feel any pressure from any elected official to influence or shade or affect your recommendation on my client's 11:47 rent control applications?

MS. AILIN: Objection; deliberative process privilege, mental process privilege.

Do not answer.

BY MR. CLOSE: 11:47

Q Were the staff reports that were published on my client's rent control applications in any way influenced by political pressure in the City of Carson in your judgment 11:47 and experience?

MS. AILIN: Objection; deliberative process privilege, mental process privilege.

Do not answer.

BY MR. CLOSE: 11:47

Q You were the person who drafted those staff recommendations on my client's rent control applications, correct?

A With the exception of the MNOI reports that were done by Dr. Baar, yes. 11:47

Q Okay. Is it -- what consideration -- well, is it -- let me strike that. Let me start again.

Isn't it true that the preferences and desires of mobilehome park residents are one 11:48 of the most important factors in setting the rents in the City of Carson?

MS. AILIN: Objection; no foundation, deliberative process privilege, mental process privilege. 11:48

Do not answer. 11:48

BY MR. CLOSE:

Q Are the --

In your 20-plus years experience, are the views of residents taken into 11:48 consideration when the City of Carson sets rents?

MS. AILIN: Objection; deliberative process privilege, mental process privilege.

Do not answer. 11:48

BY MR. CLOSE:

Q When doing -- when preparing your staff recommendations on my client's rent control applications, did you give any consideration to the preferences, desires or 11:48 views of the residents in the park?

MS. AILIN: Objection; deliberative process privilege, mental process privilege.

Do not answer.

BY MR. CLOSE: 11:49

Q Do residents in the park have any opportunity to voice their opinions or views on rent control applications?

A Yes.

Q Are they allowed to do so in public 11:49

trying to remember how this was phrased. 12:39

The -- somehow we got on to the issue of the park being converted. And the letter was sent out to the park residents within two weeks of the purchase of the park by your 12:40 client. And that's how -- in the context of what was happening, I know some question came up from a board member or somebody, is my recollection, that, you know, what I thought was going to happen or -- because an application had 12:40 been filed at that point. Hadn't been approved by the City. And that drug -- drug out quite a while, which had its own life. But ...

BY MR. CLOSE:

Q Do you remember -- 12:40

Were you under oath when you -- when you -- when you speak at these hearings?

A I don't take an oath, but I'm -- so I don't know what the correct answer for that is. 12:40

Q But you don't take an oath?

A No.

Q But you --

As I assume at these hearings you try to be -- to the best of your ability, 12:40

truthful and accurate? 12:40

A Yes.

Q Okay.

A Yes.

Q Was it your view in 2008 that my 12:41 client purchased the park to take a one- or two-year loss and then convert the park and make a huge gain?

A Yes.

Q Has that happened? 12:41

A No.

Q Almost ten years later, correct?

A That's correct.

Q Because you thought the park would be converted within a matter of one or two 12:41 years, and because you thought that conversion would generate a huge gain, you recommended a rent increase to the board that was well below the amount that would allow my client to cover debt service, correct? 12:41

MS. AILIN: Objection; assumes facts not in evidence.

But go ahead and answer.

THE WITNESS: No. The recommendation came from Dr. Baar. 12:41

BY MR. CLOSE: 12:41

Q You didn't make any recommendation on my client's rent control applications?

A It was from Dr. Baar.

Q So there is a -- oh, the two staff 12:42 reports that you told me you wrote, correct?

A Right.

Q They include a recommendation, correct?

A Correct. 12:42

Q Those weren't in any way your recommendations?

A They were my recommendations, but they were from the report done by Dr. Baar.

Q But you had other -- you had also an 12:42 analysis that showed $200 per space, correct?

A I had all kinds of analyses in there like we always did.

Q And who chose -- what member of the staff decides which of those analyses should be 12:42 the basis for the staff recollection?

A I do. Sometimes in consultation with -- with counsel and/or expert witnesses.

Q Okay. In connection with my client's applications, were you the -- was it 12:42

not in evidence, calls for speculation. 02:24

Go ahead and answer.

THE WITNESS: Yes.

BY MR. CLOSE:

Q Okay. Now, because of that 02:24 objection, we saw documents before, and you testified before based on your staff report that including debt service and before any disallowances, the park was actually operating at a million or more loss, correct? 02:24

A As the initial application was submitted, yes.

Q And that was reviewed and verified by the staff subject to some disallowances, correct? 02:24

A Correct.

Q So in this circumstance, the rent control ordinance and Rent Control Board did not provide a rent level that would allow my client to maintain the park, correct? 02:24

MS. AILIN: Objection; vague and ambiguous as to this circumstance.

Go ahead and answer.

THE WITNESS: Yes.

BY MR. CLOSE: 02:24

Q That's correct?

The rent levels would not allow my client -- would not permit my client to maintain the park, correct? 02:25

MS. AILIN: Objection; vague and ambiguous, assumes facts not in evidence, calls for speculation.

Go ahead and answer.

THE WITNESS: Yes. 02:25

BY MR. CLOSE:

Q Has the City of Carson, to your knowledge, done any studies to ascertain the income of park residents in Colony Cove?

A No. 02:25

Q To your knowledge, has the City of Carson done any studies or analyses to determine the net worth of the residents --

A I'm sorry. Let's back up.

Q Sure. 02:25

A Yes to the first question about whether we had done a study or anything.

We did send out surveys -- man, I can't remember when it went out. We sent out a mobilehome residents survey and asked for all 02:25

kinds of information. We based it off of something similar to the -- your -- the ten-year ... 02:25

Q I'd help you if I could. I don't know. 02:26

A Yeah, I'm trying to think of the term. Every ten years the federal government does it.

Q Census.

A Thank you. There we go, the census, bing, bing, bing. 02:26

We took something similar to the census and took out questions that we didn't think would apply. This was something that I believe my boss Sherry Repp got heavily involved with. And we put together a survey to send out to mobilehome residents. 02:26

Don't remember the time frame that that went out. I know we did it two different times. And I believe one of the questions on at least one of the two surveys, if not both, had to do with income levels. And we left the broad brackets of income, so that we would know whether they were very low, low, moderate, above moderate type of calculations. 02:26 02:27

And then household size, I believe we put a chart in there each of the two years, so the people would be able to tell where they are at. 02:27

So, yes, we did have a vague idea of what generally rents were -- not rents, income. 02:27

Q Based on the residents' own sort of self-reporting?

A Right, yeah. It was not probably the best survey in the world, but it at least gave us something to generally go by. 02:27

Q And probably the residents had a lot of incentive to use lower numbers for rent setting purposes, correct?

MS. AILIN: Objection; calls for speculation. 02:27

Go ahead and answer.

THE WITNESS: They didn't know why we were doing this. And I don't know whether it would affect -- I mean we had a lot of people did not respond at all. I think we had as high as -- well, 30 percent. But I guess for survey purposes that's usually statistically pretty good -- reply from a number of parks. 02:27

I believe Colony Cove we had upwards 02:28

of 30 percent also. 02:28

BY MR. CLOSE:

Q Was this data relevant to rent setting?

A Not to rent setting itself, no, and I don't even remember the context of why we did this. This was something that Sherry had pushed and wanted. And I don't remember if it had something to do with the conversion or what it was that triggered wanting to get information. It wasn't rent control, I know that. 02:28 02:28

MR. CLOSE: I don't believe any of this has been produced to us. If it's something the City intends to use in the case, I would formally request that it be searched for and produced. Just for the record, first I've heard of it. 02:28

MS. AILIN: I don't think it -- it's the first I've heard of it. I don't think it falls within any of the categories of documents that were requested. 02:28

MR. MALAWY: Yeah, I agree with that.

MS. AILIN: And as I'm asking here right now, I can't say. 02:28

MR. CLOSE: It wasn't in any initial disclosures or anything else. I'm just kind of -- my request is noted if it shows up later. I don't believe it's been produced to us. And -- 02:28 02:29

MS. AILIN: Understood.

MR. CLOSE: Okay.

BY MR. CLOSE:

Q Do you have any knowledge of the net worth of the residents in Colony Cove as of -- as of 2006, 2007? 02:29

MS. AILIN: Objection; vague and ambiguous, calls for speculation.

Go ahead and answer.

THE WITNESS: You know, we had a chart on that for each park that's in that report, actually. I can't remember. I mean, I know majority of the residents were below moderate income. I don't remember the exact breakdown, though. 02:29 02:29

And that's probably changing now, as time goes by, too. We have got, seems like more and more people moving into the park that probably are still working versus a lot of the retired folks that originally were in the park. 02:29

BY MR. CLOSE: 02:30

Q Do you recall at one time on Carson Harbor my client obtained a rent increase that was large enough that some residents were objecting to it? 02:30

A Uh-huh.

Q Yes? I just want to --

Do you recall in connection with that, my client offered to provide deferrals and other accommodations to any residents who were 02:30 unable, because of their income level or wherewithal, to pay increased rents?

A Well, the one that's coming to mind to me is like a $55 increase a dozen years or so ago. Had to do with the removal of the bridge 02:30 in the park. I don't offhand remember him offering that, although I know he did offer a couple other times, like during the conversions and other things to, you know, make concessions to residents. 02:31

So it wouldn't surprise me if you pulled out a piece of paper that said that, but I don't recall it offhand.

Q I'm not that good a lawyer to pull it out right now. 02:31

control guidelines, as they existed at the time my client purchased the park. 02:33

And we can talk about it, but I just want to -- I know there was an amendment to the guidelines sometime around, but I think this is prior to the amendment. 02:33

Take a moment and familiarize yourself with it, please.

Am I wrong about it?

MR. MALAWY: No, you're correct. 02:34

MR. CLOSE: Okay. Thanks, Jeff.

BY MR. CLOSE:

Q So as I said, this is the ordinance and guidelines as they existed at the time my client purchased the park. 02:34

A Yes.

Q Okay. I would like -- I don't think the ordinance changed, but turning to page 4 of 7 in the top right, it's you know, 47, Ordinance Section 4704. I guess is it -- it's not -- ordinance isn't the right word, is it? 02:35

A Resolution you're talking about?

Q No. It's --

MS. AILIN: No. It is part of the municipal code. 02:35

BY MR. CLOSE: 02:35

Q I think it's the code. It's codified in the code.

That's right. 4704G at the top of the page there. 02:35

A Okay.

Q Is it your view that the rent decisions in Year 1 and Year 2 on my client's application were fair, just and reasonable?

A Yes. 02:35

Q At the time my client purchased the park, is it correct that the guidelines provided that an owner's debt service shall be considered as an allowable operating expense?

A And I believe the wording is 02:36 generally allowable operating expense.

Q Okay. And historically prior --

The guidelines were changed after my client purchased the park, correct?

A Yes. 02:37

Q What's your understanding as to why the guidelines were charged after my client purchased the park?

MS. AILIN: Objection; deliberative process and mental process privileges. 02:37

Do not answer. And also potentially attorney-client privilege. 02:37

BY MR. CLOSE:

Q So I don't want to -- was there.

I don't want any information about what the City attorneys may have told you or you may have heard from them. 02:37

Were the guidelines -- did the City of Carson change the guidelines in response to my client's purchase of Colony Cove? 02:37

MS. AILIN: Objection; deliberative process privilege, mental process privilege.

Do not answer.

BY MR. CLOSE:

Q Can you identify any reason why the City of Carson changed the guidelines other than my client's purchase of Colony Cove? 02:37

MS. AILIN: Objection, no foundation, assumes facts not in evidence, deliberative process privilege and mental process privilege. 02:38

Do not answer.

BY MR. CLOSE:

Q Because of the foundation objection.

The guidelines were changed shortly 02:38

after my client purchased Colony Cove, correct? 02:38

MS. AILIN: Vague and ambiguous as to shortly after.

THE WITNESS: I'm not sure what the date was. 02:38

BY MR. CLOSE:

Q Okay.

A Because I don't have --

Q The guidelines were charged after my client purchased the park, correct? 02:38

A Yes.

Q Okay.

MR. CLOSE: And am I correct, Counsel, that you're going to instruct on any question I ask about why those guidelines were 02:38 changed?

MS. AILIN: Yes. And I'll also point out that Mr. Freschauf was not in a position to make a decision about whether they would be changed, but I would stand by the 02:38 deliberative process and mental process privilege objection as to why.

MR. CLOSE: Okay. Well, he's the 99 percent expert on rent control. And we're talking to rent control guidelines, so you and I 02:39

have met and conferred off the record on this. 02:39
We disagree. I don't want to spill more ink or drag the afternoon off. I mean we've used a period of time off the record to meet and confer on this. 02:39

BY MR. CLOSE:

Q Is there anything you can point me to prior to the time my client purchased Colony Cove that should have put him on notice that the City would be changing the guidelines? 02:39

MS. AILIN: Objection; because for speculation.

But go ahead and answer.

THE WITNESS: Changing the guidelines, well, I'm sure we sent out notices 02:39 on it. We'd also been using Dr. Baar for a couple of years for various rent control cases when issues on debt service came up, and especially when debt service changed and park owners changed in the park. 02:40

So he should have had some idea that something was changing.

BY MR. CLOSE:

Q Do you have a recollection if notice went out to the public of a potential change in 02:40

the guidelines before my client purchased Colony Cove? 02:40

A Of the change in the guidelines before he purchased, no. I think there was a bit of time between there. I don't remember the exact dates, but -- 02:40

Q Okay, okay. Is there anything in the guidelines as they existed at the time my client purchased the park that referred to Dr. Baar? 02:40

A That referred to Dr. Baar?

Q Yes.

A No.

Q So there is nothing about the guidelines as they existed at the time my client purchased the park that would have put any one on notice about the importance of Dr. Baar, correct? 02:41

A No, but I mean, there -- there are comments in the guidelines, the second page of the guidelines, paragraph D, No one factor in the ordinance is determinative, and the factors must be considered together and balanced in light of the purposes of the ordinance and all relevant evidence. The ordinance does not 02:41 02:41

because gross profit could be manipulated depending on purchase price of a park, how expenses were used, versus MNOI, which gives you a more true, steady picture of how a park is done over the years. 03:02

Q But the MNOI ignores the reality of actual debt expense that is being paid, correct?

A Yes.

Q Did the staff rely on the gross profit maintenance analysis in making its recommendations on the Year 1 application by my client? 03:02

MS. AILIN: Objection; vague and ambiguous; deliberative process privilege, mental process privilege. 03:02

Do not answer.

THE WITNESS: Okay.

MS. AILIN: It's in the document or it's not in the document.

MR. CLOSE: Yeah, okay. 03:03

MS. AILIN: You've got the staff report.

MR. CLOSE: Let me try and move it along.

BY MR. CLOSE: 03:03

Q You would agree that the City did not give Colony Cove a rent increase sufficient to cover its debt service for operating years 2007 or 2008, correct? 03:03

A Well, as to which part he didn't get enough for is up to Mr. Goldstein on which part to pay, but he did not have enough of an increase to cover all of his allowable expenses, yes. 03:03

Q And was that because the City of Carson deemed the debt service to be unreasonably high?

MS. AILIN: Objection; deliberative process privilege, mental process privilege. 03:04

Do not answer.

BY MR. CLOSE:

Q Did the City of Carson in setting the rents on this park conclude that the debt service actually being paid was unreasonably 03:04 high?

MS. AILIN: Objection; the resolution speaks for itself.

But go ahead and answer.

THE WITNESS: Okay, I'm sorry, say 03:04

it one more time. 03:04

BY MR. CLOSE:

Q Did the City of Carson in setting the rents on this park, Year 1 and Year 2, conclude that the debt service my client was 03:04 actually paying was unreasonably high?

MS. AILIN: Objection; the resolution speaks for itself.

Go ahead and answer.

THE WITNESS: I don't think the debt 03:04 service was the only issue, but I guess in short, yes, okay.

BY MR. CLOSE:

Q And the debt service was based on the purchase price, correct? 03:05

A Yes, yes.

Q The same purchase price you used to calculate the allowable amount of property taxes, correct?

A That Dr. Baar calculated, yes, that 03:05 wasn't my calculation.

Q But the same purchase price that the City of Carson used to determine the allowable amount of property taxes, correct?

A That the board approved, yes. 03:05

public. 04:53

MR. CLOSE: I'm asking him -- the statement makes no sense, take rent control in a different direction.

What -- 04:53

MS. AILIN: Well --

MR. CLOSE: North, south, east, west, up, down.

MS. AILIN: For whatever reason, a decision was made not to disclose the different 04:53 direction in this document. And --

MR. CLOSE: And you can -- your position is it can be hidden in this litigation from the court and the jury.

MS. AILIN: The waiver goes to 04:53 what's been disclosed. It doesn't go to what has not been disclosed.

MR. CLOSE: I'm not going to spend more time. We're going to go before the court.

My position is, just to be clear, 04:53 the City of Carson has no grounds to hide from the court, the jury and the public what in the world was meant by the public statement that the mayor and City tried to take control of rent control and take it in a different direction. 04:54

But the court will have to decide that. 04:54

And I'm reserving my right to recall the witness to examine all these lines of inquiry, because there has been a ton of 04:54 instructions earlier today that are clearly improper in terms of what is on the City's website in my view, and the City Attorney should know what's on the City's website. There was a waiver of the attorney-client privilege that the 04:54 City Attorney should know about, the lead counsel in this case on the pleadings is the City Attorney of the City of Carson, yet all day I faced instructions on subjects that are out on the website. 04:54

BY MR. CLOSE:

Q Did Mayor Jim Dear request that the guidelines be changed after my client purchased the park?

MS. AILIN: Objection; vague and 04:55 ambiguous, calls for speculation, because Mr. Freschauf is -- is not a member of the legislative body that would make that decision.

BY MR. CLOSE:

Q Do you know if Mayor Jim Dear was 04:55

involved -- encouraged the City to change the rent control guidelines after my client purchased the park? 04:55

MS. AILIN: Objection; deliberative process privilege and mental process privilege. 04:55

Do not answer.

And legislative privilege actually.

BY MR. CLOSE:

Q How were at-large members of the Rent Control Board selected? 04:56

A There is a notice period given when there is a vacancy on the board. I think it stays open for 30 days, and then any applications that come in are reviewed by the mayor and/or City Council who decide, you know, 04:56 who to put on the board. Or on every two-year election cycle, as they have done on some years was vacate the entire board and make everyone reapply, which was more than a problem on one occasion. 04:56

Q Do at-large members play an important role on the Rent Control Board in balancing between the park owner representatives and resident representatives?

A Yes. 04:56

Q Isn't it correct that Rent Control Board members faced de-appointment in 2007 and 2008 if they would have approved a $200 per space rent increase on Colony Cove? 04:57

MS. AILIN: Objection; no foundation, calls for speculation. 04:57

Go ahead and answer.

THE WITNESS: I have no idea.

BY MR. CLOSE:

Q Okay. Is it your understanding that Mayor Jim Dear told board member Vaughn to recuse himself from a rent control matter if Mr. Vaughn knew what was good for him? 04:57

MS. AILIN: Objection; no foundation, calls for speculation. 04:57

Go ahead and answer.

THE WITNESS: Are you asking me if I -- if I had, what, firsthand knowledge or --

BY MR. CLOSE:

Q No. Is that your understanding that Mayor Dear told board member Vaughn to recuse himself if he was -- if he knew what was good for him? 04:58

A Again, it was not within the time period that we're discussing, but, yes, I 04:58

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth, that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated 1/20/16

DENISE HESS CSR No. 7564

# EXHIBIT 6

# Analysis of Reasonable Investment Backed Expectations of Colony Cove Mobile Estates and Discussion of Treatment of Debt Service and Rationale for Maintenance of Net Operating Income Fair Return Standard under Rent Regulation

**(Carson, California)**

Kenneth K. Baar, Ph.D
(January 2016)

---

This report was prepared on behalf of the City of Carson. The opinions expressed herein are those of the author and do not necessarily represent the views of the City or of the Mobilehome Rental Review Board.

1. **Did the Park Owner Have a Reasonable "Investment Backed Expectation" that a Rent Increase Could be Obtained to Cover Its Debt Service**

In this analysis, this author's views of what constitutes an "investment backed expectation" are based on the concepts that: " 'Distinct investment-backed expectations' implies reasonable probability," "those who do business in a regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end," and the current legislative scheme and the decisions implementing that scheme should be taken into account in formulating what is a reasonable investment backed expectation.

***A. The ordinance and regulations in place when the Park Owner purchased the property did not command the allowance of debt-service pass-through***

The Park Owner purchased Colony Cove in April, 2006.

When the park owner purchased the property the ordinance set forth broad principles in regard to the setting of maximum allowable rents. It stated that the Board shall set rents at levels that protect mobilehome owners from "excessive" rent increases while allowing a park owner "a fair return on investment." Rather than containing a specific formula or standard for setting allowable rents or creating a right to a rent adjustment based on a single factor, the ordinance included a list of factors that shall be considered. These directions were subject to the qualification that "no one (1) factor shall be determinative."

The ordinance stated:

> **The Board shall grant such rent increases as it determines to be fair, just and reasonable. A rent increase is fair, just and reasonable if it protects Homeowners from excessive rent increases and allows a fair return on investment to the Park Owner. The Board shall consider the following factors and any Guidelines adopted by the City Council, as well as any other relevant factors, in making its determination and no one (1) factor shall be determinative. (Ordinance, Section 4704)**

The terms "*no one (1) factor shall be determinative*" pointed to a process in which differing factors could be considered and given differing weights in setting rents, as opposed to creating a right to a rent adjustment based on a single factor.

The ordinance did not list debt service as a factor to be considered; but the ordinance directed the Board to consider "Guidelines" adopted pursuant to the ordinance. The Guidelines provided that debt service "shall be considered". However, the direction to consider debt service was subject to qualifications in regard to the extent to which debt service would be considered. That extent was dependent on the reasonability of the debt service "in light of existing rents."

> **Debt service shall be considered as an allowable operating expense. Debt service obtained after the adoption the ordinance shall be an allowable operating expense to the extent that it is reasonable in light of the existing rents and prudent financing procedures. (Guidelines, Sec. II.A.2.f)**

The Guidelines also stated that a "Gross Profits Maintenance analysis" (GPM) "shall be performed." (Guidelines, Sec. II.B) A GPM analysis takes into account mortgage payments and operating expenses in order to determine cash flow. (A GPM analysis may be distinguished from a "maintenance of net operating income (MNOI) analysis" which is based on a calculation of net operating income (income net of operating expenses without consideration of debt service.)

While the Guidelines require the performance of the GPM analysis they reiterated the concept in the ordinance that the no single factor shall be determinative by stating that this factor shall be "considered in conjunction with other factors" and shall not "create any entitlement."

> **This analysis shall be considered in conjunction with other factors; however, it shall not "create any entitlement." (Guidelines, Sec.II.B.)**

One may debate precisely what the ordinance and the Guidelines would require in a particular case. However, at a minimum, these terms provided notice of a significant probability that an increase in debt service may not be covered by an allowable rent adjustment.

Also, the ordinance provided notice and direction that consideration of other factors could offset consideration based on any single factor including an allowance for increases in debt service. Most notably the ordinance contained the purpose of preventing "excessive" rent increases.

**B. The Circumstances in the *Colony Cove* case pointed to a possible limitation or exclusion of the debt service in setting the allowable rent.**

As indicated the Guidelines provided that debt service shall be an allowable factor in determining the permissible rent to the extent the debt service was "***reasonable in light of the existing rents***." In this case, the Park Owner expected the Board to consider whether the existing rents were reasonable in light of the debt service. However, the Guidelines directed consideration of whether the debt service was reasonable in light of the existing rents.

In this case of Colony Cove, claimed that an increase in monthly space rents of $342.46 was required to cover debt service and maintain gross profits (cash flow).[1] Clearly, there was a significant possibility that the purpose in the ordinance of preventing "excessive" increases would be an offsetting factor and that the debt service would not be considered reasonable.

**C. Since 1996 the Board Had Not Allowed a Substantial Rent Increase Based on an Increase in Debt Service (Except under one special circumstance.)**

**City Analysis of Debt Service As a Factor in Setting Allowable Rents Provided to Board**

In the Carson Gardens rent increase application submitted in 2004 (by another park owner), the applicant submitted a detailed memorandum about why the GPM formula, including the debt service factor, should be considered. The applicant's memorandum stated that "the Board invariably uses the GPM method, as the dispositive method for rent calculations." In support of the analysis, the applicant included an "Analysis of Resolutions and Dispositive Methodology," which consists of a table which lists the methodology used in each of 31 Board decisions. The applicant's memorandum stated: "Of thirty (sic) 31 Board decisions since 1996 to present, only three (3) times has the Board not used the GPM formula for unique reasons inapplicable here."

In that case the city staff prepared a chart which compared the debt service in the base year and in the current year in each case decided by the Board.

The data submitted by the staff to the Board covered the 33 cases, which had considered fair return issues, that had come before Board since 1996. The data

[1] Colony Cove Rent Increase Application,p. 3 (September 28, 2008), supplied by the City in discovery in this case.

indicated that in 30 out of the 33 cases debt service either decreased, stayed the same, or increased by only a very small amount. (In 21 of the cases debt service decreased. In 4 of the cases debt service remained unchanged. In 5 cases debt service increased by less than $5.00 per space per month.)

In 3 cases, there was a significant increase in debt service. However, in one of those cases the Board used the CPI rather than the GPM methodology in order to determine the allowable rent increase. In another one of the cases, the Board did not permit any rent increase. In the third case, the debt service increases were equal to $23.13 per space per month and the Board granted a rent increase of $15.29.

**Rent Adjustment Cases**
**1996-2003**
**Impact of Debt Service in Rent Adjustment Determinations**

| Impact of Debt Service | No. of Cases |
|---|---|
| | |
| Debt service decreased from base year to current year | 21 |
| Debt service did not change | 4 |
| Debt service increase less than $5/month per mobilehome space | 5 |
| Debt service increase significant – award of rent adjustment based on CPI | 1 |
| Debt service increase significant no rent increase granted | 1 |
| Debt service increase - $23/space/mo. Rent Board granted $15.23 rent increase. | 1 |

The foregoing data indicated that from 1996 to 2003 the Board had not granted substantial rent increases based on increases in debt service. Furthermore, in the one case where a rent determinations took into account a significant increase in debt service, on a per space basis the increase was equal to less than one-third of the increase involved in this case.

**Prior Denial of Debt Service Pass-through Involving Rent Increase Application by the Owner of Colony Cove in a Case Involving Another Mobilehome Park**

In 1983, the owner of Colony Cove, submitted a rent increase application, requesting a rent increase that would cover the increased debt service associated with his purchase of the Carson Harbor Village Mobilehome Park in April1983.

The Board's rent increase decision did not include an allowance for this cost. The Board's decision noted that: "However, the increase in debt service was due to the applicant's purchase of the park for $8,000,000 in 1983 ... Said purchase was made ... with knowledge of the existing rents and expenses and of the debt which would be incurred as a result of the purchase."[2]

**D. In the Paradise Trailer Park case in 2004, the Board excluded consideration debt service in allowable rent determination.**

The Park Owner presented evidence that from 1999 through 2003, the total of its operating expenses and debt service expenses increased by $125,268. Most of this increase, $103,492 out of $125,268, was attributable to an increase in debt service associated with the purchase mortgage of the new owner.

In its decision, the Board excluded any allowance for the increase in debt service.[3]

**E. Judicial Precedent involving Carson Set Forth Potential Limitations on Consideration of Increases in Debt Service Its Rent Setting Cases.**
**The Carson Gardens Case**

In the Carson Gardens case, the treatment of debt service was the central issue. At the same time, it should be noted that the precedential weight of that case was largely impacted by its procedural posture.

In that case, the debt service on the property had increased from $0 to $88,638, an increase of $76.71 per month per mobilehome space. This increase accounted for most of the $105.50 rent increase requested by the applicant.

The increase in mortgage costs occurred in conjunction with the sale of the property. If the prior owner had a substantial mortgage (rather than owning the property free and clear), there would have been only a small increase in debt service expenses. If the current owner had paid cash for the property, there would be no allowable cost increase associated with an increase in debt service, although the current owner's overall investment in the property (cash + mortgage) would be the same.

---

[2] Rental Review Board Resolution No. 84-057, Section d., Feb. 4, 1984, supplied by the City in discovery in this case.

[3] Rental Review Board Resolution No. 2004-225, (May 12, 2004) (supplied by the City in discovery in this case)

The staff report concluded that it would not be appropriate to consider the increase in debt service:

> **Ordinarily, staff would prepare and include an Estimated Gross Profit Maintenance Analysis for this staff report. The purpose of the Estimated Gross Profit Maintenance Analysis is to help determine how a park has been operating since its last general rent increase and/or last hearing before the Board and the effects that inflation may have had on the park's profit level... However, the use of an Estimated Gross Profit Maintenance Analysis would not be appropriate in an instance such as this, in which the park was purchased with such a high proportion of debt, whereas the previous owner had no debt service costs. In such an instance, the expenses over the period under review are not directly comparable. ...**[4]

The report indicated that the gross profit maintenance analysis would "not be appropriate in an instance such as this, " (emphasis added) due to an exceptional increase in debt service.

In April 2003 the Superior Court remanded that decision to the Rental Review Board for reconsideration.[5] The Writ that was issued by the Court ordered the Board to take into consideration "reasonable expenses in acquiring the park."

> **... apply the gross profits maintenance analysis discussed in the Guidelines ... or another reasonable analysis or methodology that gives due consideration to the Park's actual reasonable operating expenses, including actual reasonable expenses incurred in acquiring the Park, and comports with the requirements of the pre-existing Ordinance and the Guidelines.**

That decision was never appealed. Instead, on remand the Board used an MNOI formula, based on its belief that such an action would be consistent with the writ order.

The Park Owner returned to court contending that because the Board had not considered the park owner's debt service it had not complied with the original writ. The trial court concurred with this conclusion.

The City appealed the trial court opinion. However, the Court of Appeal ruled that by failing to appeal the initial trial court judgment the Board waived the right to raise the issue of whether the Board was required to consider debt service and, therefore the Court of Appeal could not consider this issue. T

However, the Court emphasized that if it were writing on a "clean slate", in the absence of a trial court judgment which could not be reviewed, it was not addressing the "fundamental issue ... whether Carson Gardens was entitled to rely on the Board's use of gross profits methodology in determining a fair return." In other words, the Court stated that it might

---

[4] Provided by the City in discovery. Administrative Record in Carson Gardens case, AR 198, Staff Report, p. 198.

[5] *Carson Gardens v. City of Carson Mobilehome Rent Review Board*, BS 072845 (Superior Court, County of Los Angeles, Judgment (March 19, 2003)

have ruled differently in regard to whether the Board was required to use a methodology that considered debt service.

> **If we were writing on the proverbial clean slate, our analysis of the propriety of the trial court's order would first require an assessment of a fundamental, controlling issue; the meaning of the Carson ordinance, including whether Carson Gardens was entitled to rely on the Board's use of gross profits maintenance methodology in determining a fair return. .... On the other hand, if the ordinance does not require use of that methodology, and does not require the Board to include debt service costs in operating expenses, then the Board was free to use some other method of determining the amount of a rent increase that would provide a fair return. (See Carson Mobilehome Park Owners' Assn. v. City of Carson (1983) 35 Cal.3d. 184, 191 [rent control agencies are not obliged by the state or federal Constitution to fix rents by application of any particular method or formula].)**
>
> **We are not, however, writing on a clean slate. ... by failing to appeal the April 16, 2003 judgment, the Board "waived any right to raise [any] issues" arising out of the judgment. The Board having failed to do so, we cannot now review that issue.[6]**

At the same time, the Court of Appeal concluded that while the Board cannot take new evidence, it was not required to apply "any particular formula or methodology without deviation" and that it can make findings "in consonance with its duty under the ordinance to grant an increase that both 'protects Homeowners from excessive rent increases and allows a fair return on investment...'"

> **While the Board cannot take new evidence on remand, nothing in the City's ordinance requires the Board to apply any particular formula or methodology without deviation. Indeed, the city's Guidelines specifically state that the gross profits maintenance analysis "is an aid to assist the Board in applying the factors in the Ordinance and is to be considered together with the factors in [the ordinance], other relevant evidence presented and purposes of the Ordinance," and is not intended to create any entitlement to any particular rent increase. Accordingly we see no reason why the Board may not, on the present administrative record, assess the evidence, consider the results of the gross profits maintenance analysis, and make findings as to the appropriate implementation of that analysis – all in consonance with its duty under the ordinance to grant an increase that both "protects**

---

[6] *Carson Gardens, L.L.C. v. City of Carson Mobilehome Park Rental Review Bd.* (2006), 135 Cal. App.4th 856, 867.

> **Homeowners from excessive rent increases and allows a fair return on investment..." (Mun. Code Sec.4704, subd (g).)**[7]

At, another point in its decision, the Court explained that "the Board can exercise discretion on the question of whether passing through the entire amount of debt service costs was necessary to provide a fair return":

> **... the trial court's order sets a rent increase in an amount the Board expressly found would create a "windfall" for Carson Gardens. Moreover, the court itself expressly recognized that, if the Board had used gross profits maintenance analysis "and would have come to the conclusion that not all of it would be passed because it is too excessive and fifty percent would be fair to add, that's one thing." The court, however, could not tell whether allowing 50 percent would amount to a fair return, "because the City did not use that method." Under these circumstances, we think the court was obliged to remand the case once again, so that the Board can exercise discretion on the question of whether passing through the entire amount of debt service costs was necessary to provide a fair return.**[8]

**F. In Published California Court of Appeal Decisions Involving Fair Return Cases pursuant to Mobilehome Park Rent Control Ordinances of other jurisdictions in 1993 and 1994, Courts held that Consideration of Debt Service in Setting Allowable Rents was not Reasonable or had no Rational Basis**

The general judicial doctrine regarding fair return, which has been frequently reiterated in California appellate decisions has been that: "[r]ent control agencies are not obliged by either the state or federal Constitution to fix rents by application of any particular method or formula."[9] However, in three cases the California Court of Appeal has held that consideration of debt service in a rent setting process has "no reason" or "no rational basis." In one case the Court stated:

> **Assume two identical parks both purchased at the same time for $1 million each. Park A is purchased for cash; Park B is heavily financed. Under Palomar's approach, calculating return based on total historic cost and treating interest payments as typical business expenses would mean that Park A would show a considerably higher operating income than Park B. Assuming a**

---

[7] *Id*, 135 Cal. App.4th at ___)

[8] *Id*., 135 Cal. App.4th at 867.

[9] *Kavanau v. Santa Monica Rent Control Board*, 16 Cal.4th 761, 768 (1997)

> **constant rate of return, the owners of Park B would be entitled to charge higher rents than the owners of Park A. We see no reason why this should be the case.** [10]

In a subsequent opinion, the same Court of Appeal reaffirmed its conclusion in regard to the treatment of debt service expenses. "We have previously rejected the notion that permissible rental rates based on a fair rate of return can vary depending solely on the fortuity of how the acquisition was financed."[11]

**G. Overall Conclusion Regarding Investment Backed Expectations of a Right to a Rent Adjustment Covering a Park Owner's Increase in Debt Service**

In this case, it was clear that a purchaser of a mobilehome park in Carson in 2006 could not have an investment backed expectation that an increase in debt service costs, especially a large increase, would be incorporated into the allowable rent under the City's rent ordinance.

(i) The City's ordinance and Guidelines set forth qualifications and limitations on the consideration of debt service, including the purpose of preventing "excessive" rent increases and the limitation of not allowing for debt service costs that were not "reasonable in light of existing rents."

(ii) There was a prior record of Rent Board exclusion of increases in debt service costs associated with park purchases,

(iii) The appellate courts had not ruled that consideration of debt service would be required,

(iv) In two cases involving fair rent determinations for mobilehome parks in other cities, a Court of Appeal had held that consideration of debt service had no rational basis.

Rather than having an investment backed expectation of a right to a rent increase that would cover its debt service, at best the Park Owner might have had an expectation that such a rent increase was not an impossibility.

---

[10], *Palomar Mobilehome Park Ass'n v. Mobile Home Rent Review Commission [of San Marcos]*, 16 Cal.App. 4th 481,489 (1993);

[11] *Westwinds Mobile Home Park v. Mobilehome Park Rental Review Bd.*, 30 Cal.App.4th 84, 94 (1994)

**2. Why it is not rational to include purchase mortgage costs in a determination of allowable rents (a fair return calculation)**

Mortgage costs are a standard cost of investors in income producing real estate (as well other purchasers of real estate). Consideration of mortgage costs is central to calculations by real estate investors of their rate of return.

However, it is not rational to take into account individual owner's mortgage costs in the context of a determination of fair return and of what rents should be permitted under a rent regulation.

Mortgage costs are a part of the purchase cost of a property, constituting the cost of acquiring the capital to undertake the purchase. If mortgage costs are taken into account, the regulatory process becomes circular. Under a standard which includes mortgage debt service as a cost the regulated owner is able to determine the allowable rent by setting the mortgage amount and terms, with the only on the rent being the market.

Under rent regulation (and land use regulation in general) it becomes the duty of the investor to determine what investment is reasonable in light of the regulation, rather than the regulator's role to determine what rent level or what land use should be permitted based on the costs of the investment.

If mortgage costs are considered under Carson's rent stabilization, two park owners with comparable parks and comparable operating costs may be permitted greatly different rents depending on their mortgages. The practical consequence would be that recent purchasers would be allowed much higher rents than long term owners, who had lower purchase prices and usually much smaller mortgage debt.

Even in the case of park owners who purchased mobilehome parks at about the same time for the same price per mobilehome space, mortgage costs may vary substantially as a result of differences in the portion of the purchase price that was financed with a mortgage.

The general judicial doctrine regarding fair return, which has been frequently reiterated in California appellate decisions has been that: "[r]ent control agencies are not obliged by either the state or federal Constitution to fix rents by application of any particular method or formula."[12] However, in three cases the California Court of Appeal has held that consideration of debt service in a rent setting process has "no reason" or "no rational basis." In one case, the Court stated:

> **Assume two identical parks both purchased at the same time for $1 million each. Park A is purchased for cash; Park B is heavily financed. Under Palomar's approach, calculating return based on**

[12] *Kavanau v. Santa Monica Rent Control Board*, 16 Cal.4th 761, 768 (1997)

> **total historic cost and treating interest payments as typical business expenses would mean that Park A would show a considerably higher operating income than Park B. Assuming a constant rate of return, the owners of Park B would be entitled to charge higher rents than the owners of Park A. We see no reason why this should be the case.**[13]

In a subsequent opinion, the same Court of Appeal reaffirmed its conclusion in regard to the treatment of debt service expenses. "We have previously rejected the notion that permissible rental rates based on a fair rate of return can vary depending solely on the fortuity of how the acquisition was financed."[14]

In a recent (2013) opinion, a California Court of Appeal again affirmed the view that tying rents to individual owners' financing arrangements has no rational basis.

> **Apart from the inequities that would result from permitting a party who financed its purchase of rent-controlled property to obtain higher rents than a party who paid all cash, there are additional reasons for disregarding debt service. ...debt service arrangements could easily be manipulated for the purpose of obtaining larger rent increases, by applying for an increase based on servicing a high interest loan and then refinancing at a lower interest rate or paying off the loan after the increase was granted. Alternatively, an owner might periodically tap the equity in a valuable piece of rental property, thus increasing the debt load. In any event, we discern no rational basis for tying rents to the vagaries of individual owners' financing arrangements.**[15]

While the foregoing precedent holds that debt service should not be considered, in two cases around 1990, a California Court of Appeal carved out an exception to this rule. The Court held that mobilehome park owners have a vested right to have their debt service considered if the debt service was an allowable expense under the fair return standard in effect at the time the property was purchased.[16] In *Palacio de Anza v. Palm Springs Rent Review Commission*, the Court concluded that the guidelines in effect when the mobilehome park was purchased created vested rights.

---

[13] Id, at 489.

[14] *Westwinds Mobile Home Park v. Mobilehome Park Rental Review Bd.*, 30 Cal.App.4th 84, 94 (1994)

[15] *Colony Cove Properties v. City of Carson*, 220 Cal.App. 840,871 (2013), . Courts in other states have reached similar conclusions. In 1978, when considering the constitutionality of an apartment rent control ordinance, the New Jersey Supreme concluded that: "Similarly circumstanced landlords ... must be treated alike. Discrimination based upon the age of mortgages serves no legitimate purpose." *Helmsley v. Borough of Fort Lee*, 394 A.2d. 65,80-81 (1978).

[16] *Palacio de Anza v. Palm Springs Rent Review Com.*, 209 Cal.App.3d. 116 (1989)

> [the guidelines]... created land-use property rights which became vested ... when the financing of the ... purchase was undertaken in reliance on the existing rent-control laws. In this sense, [the park owner] enjoys a situation or status analogous to that of one who had established the right to pursue a nonconforming use on land following a zoning change.[17]

In a subsequent case, in 1991, the same court reaffirmed this conclusion.[18]

**3. The rationale for using a "maintenance of net operating income" (MNOI) standard for determining fair return.**

Under a maintenance of net operating income (MNOI) standard, owners are permitted rent increases which cover increases in operating costs and provide for an increase in net operating income based on the increase in the CPI.

The rationale for a maintenance of net operating income (MNOI) approach is that regulated owners are permitted an equal rate of growth in NOI regardless of their particular purchase and financing arrangements. Therefore, rents are regulated depending on increases in expenses and the inflation rate (Consumer Price Index). It becomes the investors task to determine what investment and financing arrangements make sense in light of the growth in net operating income permitted under the fair return standard. By permitting growth in net operating income, the standard makes room for increasing debt service and finance costs.

This formula provides for reasonable growth in net operating income, which is the portion of rental income that is available to cover reasonable increases in debt service. Rather than considering each owner's particular financing circumstances, it provides all owners with additional net operating income which can cover additional financing costs and/or provide additional cash flow return on investment.

Furthermore, because value is a function (multiple) of net operating income, indexing NOI leads to appreciation in the value of a property, which may be converted into a capital gain. This approach meets the ordinance objectives of providing a fair return on investment and at the same meet its objectives of "protecting" the mobilehome owners from "excessive increases" and providing park owners with a "fair return on investment".

As opposed to considering the specific financing and purchasing arrangements of particular investors, the use of a maintenance of net operating income (MNOI) formula would insure the provision of a fair return while protecting the mobilehome owners from excessive rent increase. The MNOI standard is now widely used in California in fair return cases under mobilehome space rent regulations.

---

[17] *Palacio, Id*,, 209 Cal. App.3d at 120.

[18] *El Dorado Palm Springs, Ltd.v. Rent Review Com.*, 230 Cal.App.3d. 335 (1991).

In *Rainbow Disposal v. Mobilehome Park Rental Review Board*, the Court concluded that the MNOI formula is a "fairly constructed formula" which provides a ""just and reasonable" return on ... investment," even if another formula may provide a higher return.

> ...[The] MNOI approach adopted by the Board is a "fairly constructed formula" which provided Rainbow a sufficiently "just and reasonable" return on its investment. ... The Board was not obliged to reject Baar's MNOI analysis just because an historical cost/book value formula using Rainbow's actual cost of acquisition and a 10 percent rate of return would have yielded a higher rent increase.[19]

Prior to the Rainbow case, in several cases, California appellate courts approved the MNOI method. In *Oceanside Mobilehome Park Owners' Ass'n v. City Oceanside* and *Baker v. City of Santa Monica*, California appellate courts upheld maintenance of net operating income fair return standards.[20] In *Oceanside* the Court found that the standard was reasonable because it allowed an owner to maintain prior levels of profit.

Kenneth K. Baar

[19] *Rainbow Disposal v.Mobilehome Park Rental Review Board* [Escondido], 64 Cal.App.4th 1159, 1172 (1998)

[20] *Oceanside Mobilehome Park Owners' Ass'n v. City of Oceanside*, 157 Cal.App.887 (1984); Baker v. *City of Santa Monica*, 181 Cal.App.3d. 972 (1986)

# EXHIBIT 7

GUIDELINES FOR IMPLEMENTATION OF THE
MOBILEHOME SPACE RENT CONTROL ORDINANCE

These Guidelines are intended to assist the Board in
implementing the Ordinance.  However, the purpose of the
Ordinance and the provisions of the Ordinance are controlling.

I.    Purpose and General Principles

A.    The purpose of the Ordinance is to protect the
homeowners who rent spaces in mobilehome parks in the City from
excessive rents and to allow Park Owners to earn a "just and
reasonable" or "fair" return on investment.  Mobilehome owners
("homeowners") are a uniquely vulnerable group of tenants due to
the investment made in purchasing and maintaining their homes and
the high cost and difficulty involved in attempting to move a
home.  Additionally, many of the homeowners in the City are
seniors on fixed incomes and many have low or moderate incomes.
Unlike apartment tenants, homeowners cannot just pack their
personal belongings and move if rents increase to a level they
cannot afford.  In order not to lose the considerable investment
made in purchasing and maintaining their homes, they must either
sell their home in place in the park or move their home if they
cannot afford the rent.  However, it is very costly to move a
home and even when vacant spaces are available in the surrounding
area, the parks having those vacant spaces often restrict them to
rental by new mobilehomes and will not accept homes being
relocated from another park.  Thus, moving the mobilehome is not
generally a feasible alternative.  A homeowner who can no longer
afford the rent must sell the home quickly to avoid being evicted
or defaulting on the mortgage on the home.  However, excessive
rents make a home difficult to sell and often require the
homeowner to sell the home at a price which is insufficient to
allow recovery of the investment made in the home.

B.    Prior approval of the Board is required before any rent
increase may be charged unless a specific exception is provided
in the California Mobilehome Residency Law, Civil Code § 798, et
seq.  That Law exempts spaces subject to long term leases meeting
its requirements from local regulation.  It also exempts
increases in utility charges under certain circumstances and
exempts newly constructed spaces, as defined by the Mobilehome
Residency Law.

C.    The Ordinance assumes that the profit earned by park
owners when the Ordinance was adopted provided a fair return
because it was based on rents chosen by the owners prior to
regulation.  (see §I(F) re rebutting this assumption)  The
Ordinance, therefore, uses the factors in § 4704(g) to focus on
changes in a park's income, expenses and circumstances, including
changes in the general economy, to determine whether a rent
increase is appropriate to allow the owner to keep earning a fair
return, and when a rent increase is appropriate to determine the
amount of that increase.  The factors also require the Board to

consider any changes in the maintenance, services and amenities provided and rents for spaces in comparable mobilehome parks in the City and any change in the Consumer Price Index ("CPI") since the last hearing on an application by a park. A decrease in, or elimination of, services, maintenance or amenities may constitute a de facto rent increase in violation of the Ordinance and increases in the CPI may, in certain circumstances, indicate the need for a rent increase to offset the erosion of profit by inflation.

D. No one factor in the Ordinance is determinative and the factors must be considered together and balanced in light of the purposes of the Ordinance and all the relevant evidence. The Ordinance does not mandate the use of any formula or guarantee increases equal to the increase in the CPI, or any percentage of the CPI.

E. Each park owner had the right to rebut the assumption that the rents set before the Ordinance was adopted provided a fair return when the park owner applied for the park's first rent increase, but cannot challenge the decisions of the Board except by legal challenge as provided in Ordinance §4798(c). When the Board grants a rent increase it is making a determination that the rent approved is "fair, just and reasonable." In other words, the Board determined that the rent approved was not excessive and allowed the park owner a fair return. The Board cannot reconsider its decisions on a rent adjustment application after they have been embodied in a formal written resolution setting forth the findings of the Board. Therefore, each rent increase application after the first application is evaluated only on the basis of changes in income, expenses, profit, the CPI, maintenance, amenities and services that have occurred since the date of the last increase approved by the Board. A park owner or homeowner who wishes to challenge the decision may do so by seeking review in the courts, as set forth in §4708(c) of the Ordinance.

F. Notwithstanding Section D above, each park owner has the right to apply for an increase on the ground that existing rents do not allow the park owner to earn a fair return, as set forth in §IV below, in addition to an increase based on the factors in § 4704(g).

II. Income, Operating Expenses And Profit

A. An applicant must provide the most current data which is reasonably available concerning its income, expenses and profit. In general, an application should include expenses, income and profit documentation for all years subsequent to those for which data was supplied with the last application through at least six months prior to the date of the application. An application that does not provide income, expense and profit data for the period between the date of the data submitted for the last increase application through six months prior to the date of

the current application will be deemed incomplete unless satisfactory reason is shown why such data cannot be supplied. (For example, records destroyed by fire, flood, etc., new owner cannot obtain files going back to date of last application.) The necessary data may be provided by calendar year, fiscal year or any other 12 month period selected by the applicant provided that the same 12 month period is used for all data supplied and the applicant utilizes the same 12 month period (e.g., July 1, 1993 through June 30, 1994, January 1, 1993 through December 31, 1993, April 1, 1993 through March 31, 1994) each time it applies for a rent increase. If an applicant changes the 12 month reporting period used, the applicant will have to supply calendar year data for the years since the last increase as well as data presented according to the newly selected 12 month reporting period.

1. Income includes rents, fees for services not included in the rent such as RV parking, cable TV, security, etc., and any other income derived from the Park. Income from utilities is not income within the meaning of the Ordinance. No fee may be charged in addition to the rent for a service that was included in the rent charged when the Ordinance was adopted, except as otherwise provided in the Mobilehome Residency Law.

2. Examples of operating expenses are taxes, utility costs paid to a public utility if not billed separately, maintenance (except maintenance of utilities which is to be paid for from utility income pursuant to PUC ruling), repairs, management and accounting services. All expenses may be reviewed for reasonableness.

a. Owner performed labor is generally an allowable operating expense so long as the amount and type of labor performed is documented and is not duplicated by expenses paid to others.

b. Fees paid to management companies not in excess of 5% of gross rents are generally allowable; higher fees are not generally allowed unless justified by the applicant. Costs incurred for resident managers are allowable in addition to off-site management expenses so long as there is no evidence of duplication of services.

c. Land lease payments are generally an allowable operating expense only when paid to a landowner other than the park owner. Lease payments made by a park owner to an entity owned by the park owner will generally be deemed profit rather than an operating expense.

d. Debt service incurred prior to adoption of the Ordinance to purchase or operate the park is generally an allowable operating expense.

e. Debt Service necessarily incurred to operate the park after adoption of the Ordinance is generally an

allowable operating expense if the financing arrangements were prudent and consistent with customary business practice.

f. Debt service incurred after adoption of the Ordinance to purchase a park may be an allowable operating expense if the purchase price paid was reasonable in light of the rents allowed under the Ordinance and involved prudent and customary financing practices. An applicant shall have the burden of establishing the reasonableness of the purchase price and financing procedures. If the applicant relies on an appraisal, the appraiser must be available for questioning at the hearing. Any other person relied upon must also be available at the hearing. When it is determined that some increase in debt service was reasonably necessary to acquire the park, but that the amount incurred was not reasonable in light of the Ordinance and customary and prudent financing practices, then only the appropriate portion of the debt service incurred may be allowed as an operating expense. The reason for these general rules is that passing on increased debt service due to purchases at prices above those that can be justified by the income earned by the park under rent control or incurred by unusual financing methods, such as 100% financing, would defeat the purpose of rent control.

g. Debt service incurred in making capital improvements to a park may be recovered pursuant to the Capital Improvement Rent Increase provisions set forth below and is not an allowable operating expense.

h. Principal payments on a mortgage are not an allowable operating expense.

i. Reasonable attorneys' fees directly incurred in operating a park are generally allowable operating expenses. Attorneys' fees incurred in presenting applications to the Board, for enforcing court rules or for eviction are examples of fees that are allowable operating expenses. Examples of attorneys' fees which are not allowable are those incurred in connection with challenging the Ordinance or decisions of the Board or in connection with litigation seeking to recover damages or reimbursement from third parties or the City.

j. Charitable and political contributions are not allowable operating expenses.

k. If the operating expenses submitted for a park show a significant increase in expenses which is not due to the increased cost of regular operating expenses, is for an item which is not normally recurring, or is due to accumulating significant expenses in a single year instead of spreading them pursuant to a regular maintenance schedule, or if the expenses for a year are unusually low, the Board may consider the average of the park's last three years of expenses. The Board may consider the pattern of a park's income and expenses instead of

focusing on the income and expenses for a single year in order to avoid unreasonable results.

1. An operating expenditure which covers expenses for more than one year may be pro-rated over the years to which it is attributable even if the cost thereof is paid all in one year in order to avoid unreasonable results. An example of such an operating expense is an insurance premium which covers two or three years. An operating expense which is financed shall also be pro-rated over the life of the loan by which it was financed.

B. Gross Profits Maintenance Analysis. In evaluating a rent increase application, the Board may consider, in addition to the factors specified in §4704(g) of the Ordinance, a "gross profits maintenance analysis," which compares the gross profit level expected from the last rent increase granted to the park prior to the current application ("target profit") to the gross profit shown by the current application. This analysis will be included in the staff report to the Board in addition to analysis concerning the eleven factors when there is sufficient data to permit such an analysis.

The analysis is intended to provide an estimate of whether a park is earning the profit estimated to provide a fair return, as established by the immediately prior rent increase, with some adjustment to reflect any increase in the CPI. The analysis is an aid to assist the Board in applying the factors in the Ordinance and is to be considered together with the factors in §4704(g), other relevant evidence presented and the purposes of the Ordinance. The analysis is not intended to create any entitlement to any particular rent increase.

III. Comparable Parks and Changes in Services, Maintenance and Amenities

A. Comparable Parks. The Ordinance directs the Board to consider rents in comparable parks in the City. Consideration of the rents for spaces in comparable mobilehome parks can assist the Board in determining the range of reasonable rents for a particular park. The reason the Ordinance specifies parks in the City is that comparison to rents in parks outside the City which are not subject to rent control would promote the excessive upward pressure on rents that the Ordinance is designed to avoid. Rents in unregulated markets are the result of the unequal bargaining power which arises from the shortage of spaces for relocating homes and the cost and difficulties inherent in trying to relocate a home. The Ordinance is designed to prevent the excessive rents that can occur in such a market absent regulation. Even if evidence were submitted showing a park in a neighboring jurisdiction with rent control to be comparable in quality, amenities, services and location, evidence would be required concerning the nature of the rent control regulations in effect in that jurisdiction during the period from 1979 to the

present before the Board could determine whether the park was comparable within the meaning of the Ordinance. Parks subject to the Los Angeles County mobilehome rent regulation ordinance have not been subject to rent regulation at all times since the adoption of the Carson Ordinance and were not and are not now subject to similar rent regulation. Therefore, rents in spaces in parks in unincorporated areas of Los Angeles County are not comparable within the meaning of the Ordinance. Newly constructed spaces, as defined by the Mobilehome Residency Law, are also not comparable spaces within the meaning of the Ordinance even when they are located in City because the rents for those spaces are exempt from rent control and have never been subject to rent regulation.

B. <u>Changes in Park Amenities, Services and Maintenance</u>. There is a range of rents or zone of reasonableness which will permit a fair return. Decreases in amenities, services and maintenance may indicate that a lesser increase within the zone of reasonableness is appropriate and increases in services, amenities and maintenance may indicate that a greater increase within the zone of reasonableness is appropriate. Further, the elimination of or decrease in maintenance, services and amenities may constitute a de facto rent increase imposed without the approval of the Board in violation of the Ordinance and may, in some circumstances require a decrease in the rent increase that might otherwise be granted or the denial of a rent increase.

IV. OTHER RELEVANT EVIDENCE AND FAIR RETURN

A. The Ordinance is based on the assumption that the rents in effect before the adoption of the Ordinance provided a fair return and park owners attempted to rebut that presumption when they first applied for an increase. Most applications submitted to the Board have been based on the factors in the Ordinance and Park Owners rarely offer evidence concerning their investment in a park, the return being earned on the park or the return being earned by comparable mobilehome parks. However, an applicant may file an application based on the claim that a rent increase is necessary because the park cannot earn a fair return without an increase greater than that permitted by application of the factors in the Ordinance as well as on the grounds provided by the factors in the Ordinance. Such an application must be made at the same time as a regular rent increase application and must include the following information, including supporting documentation and testimony, as well as the information concerning income, expenses and profit which is ordinarily required:

1. The date the applicant purchased the park and the purchase price of the park. If the park was purchased after the adoption of the Ordinance, the applicant shall also provide the rents charged, the net operating income of the park prior to the purchase and an appraisal of the park at the time of purchase. Net operating income means gross income minus allowable operating

expenses (as set forth above) minus debt service. The appraiser performing the appraisal and preparing any appraisal report will be required to attend the hearing on the rent increase application.

2. Any down payment made upon purchase of the park and the total amount of equity in the park on the date of the application. Any refinancing of the park since the date of purchase and whether the proceeds of the refinancing were used to improve the park or for other purposes.

3. Any capital improvements made to the park, the cost thereof and whether that cost was recovered by a capital improvement rent increase.

4. The Overall Rate of Return (ratio of net operating income to purchase price) being earned by comparable mobilehome parks in jurisdictions with and without rent control at the time of the application. The Overall Rate of Return being earned by the applicant's park (after making any adjustments to the purchase price necessary as a result of purchase after the adoption of rent control). Other measures of the rate of return being earned on the applicant's park and comparable parks and other evidence considered relevant by the applicant may also be submitted, but the Board is concerned with return on investment. It will not consider return based on the current fair market value of a park or the value of park property for purposes other than use as a mobilehome park. Any expert relied upon concerning the return being earned by the applicant or comparable parks or investments must be available for testimony and questioning at the hearing. Since mobilehome parks are unique investments, it is unlikely that the return on other types of investments would be found relevant by the Board. Thus, the return on investments which do not have the potential for appreciation in value are not relevant. Similarly, comparison to the return being earned by other residential rental property is not likely to be relevant since the owners of such properties must maintain the actual housing units whereas the owners of mobilehome parks do not have this responsibility or expense because mobilehome owners are responsible for maintaining them and the spaces which they rent. The owners of apartment complexes incur expenses in re-renting vacant units which are not incurred by mobilehome park owners and apartment owners experience a much higher vacancy rate. In the case of mobilehome parks, the existence of a vacant space is uncommon since homes are usually sold in place and rent is generally paid on a space so the home can remain on the space until it is sold even if the owner has moved out. Further, the residents of mobilehome parks invest in improvements which enhance the applicant's investment and this does not occur in other types of residential rental properties.

V. MISCELLANEOUS

A. Evidence concerning the income of the park owner from sources other than the mobilehome park is not relevant and will not be considered. Evidence of the income of homeowners will generally not be considered because the need to protect low income homeowners is one of the reasons for adopting the Ordinance, which is designed to protect them and all homeowners from excessive rents.

B. Evidence concerning expenses, income, profit or changes in services, maintenance and amenities that was considered at the last hearing on a rent increase application by a park will not be reconsidered.

C. The Board cannot grant an increase greater than that specified in the application. Considering a larger increase could deprive affected homeowners of an opportunity to oppose the larger increase. Residents are given notice of the specific increase requested and decide whether to submit written opposition or appear to testify concerning the application based, in part, on the amount of the increase noticed. Although a resident might not oppose the noticed increase and not be present to testify at the hearing for that reason, that resident might have appeared to oppose a larger increase.

VI. Capital Improvement Rent Increases

A. Definition and Examples. Capital Improvement is defined by Section 4701(c) of the Mobilehome Space Rent Control Ordinance to mean "improvements to a mobilehome park and major rehabilitation of a mobilehome park that involve more than ordinary maintenance and repairs."

1. Normal routine maintenance and repair of a park is not a capital improvement. For example, patching of potholes and slurrying of asphalt streets and roadways constitute ordinary repairs and are not capital improvements within the meaning of the Ordinance.

2. Replacement or major reconstruction of an existing facility or improvement constitutes a capital improvement. For example, the replacement and/or reconstruction of streets or roadways, constitute capital improvements. Repairs to common areas where such work is part of a major rehabilitation, refurbishment, reconstruction, or remediation project, are also examples of capital improvements.

3. Addition of new facilities in a park, such as a new office or utility room, a sauna, jacuzzi, pool or an addition to a recreation room, are also examples of capital improvements.

4. The costs of major rehabilitation or refurbishment necessitated by acts of nature (earthquake, fire, flood, storm) or major remediation work such as environmental clean-up are also examples of capital improvements.

5. Capital improvements which would otherwise form the basis for a capital improvement rent increase cannot be the basis of such an increase if the park owner charges a fee for the use of the improvement. For example, additional washers and dryers installed for the use of residents cannot be the basis for a capital improvement rent increase if the tenants must pay to use them.

6. Portable items, such as pool furniture and landscaping or gardening equipment, do not constitute capital improvements, unless they are part of a major rehabilitation or refurbishment.

7. Costs of any capital improvement that have been recovered by the owner through any insurance claim, litigation, or other right of indemnity shall be excluded for purposes of determining the amount of any capital improvement.

B. Determination of Allowable Increases.

1. Amortization Periods

In amortizing capital improvements, the following schedule shall be used to determine the amortization period of the capital improvement. For those items not listed, the amortization period for an improvement which has similar characteristics shall be used. The amortization period below may be increased or decreased depending upon the quality of the improvement, the conditions placed upon it or any other relevant factors affecting amortization. The Board may rely upon Department studies or reports it deems appropriate in establishing a greater or lesser amortization period or an amortization period for any item not listed below:

| Expenditure | Years |
|---|---|
| Appliances | |
| Major Appliances, residential | 10-18 |
| Garage door openers | 8-11 |
| Garbage disposers, washing machines | 6-12 |
| Home electronics | 5-12 |
| Telephone systems | 9-12 |
| Vacuum-cleaning system | 12-17 |
| Exterior | |
| Awnings and window screens | 3-9 |
| Canopies and patio covers | 12-19 |
| Exterior paint | 3-7 |
| sealers, silicone, etc. | 1-5 |

| Item | Years |
|---|---|
| Fireplaces, chimneys, masonry | 35-55 |
| metal | 20-35 |
| Shutters | 3-7 |
| Storefronts | 18-25 |
| entrance doors, automatic | 7-20 |
| **Floor Covering** | |
| Access (Computer) floor | 10-18 |
| Carpet and pad | 4-10 |
| Carpet tiles | 5-10 |
| Ceramic, quarry, precast terrazzo tile/pavers | 25-40 |
| Indoor-outdoor carpet | 3-10 |
| Linoleum | 10-20 |
| Rubber mats | 3-6 |
| Terrazzo, bonded or epoxy | 25-50 |
| Vinyl composition tile or sheet | 7-19 |
| Vinyl or rubber tile or sheet | 12-24 |
| Wood flooring | 20-35 |
| **Hazardous Waste Removal/ Environmental Clean-up** | 10-20 |
| **Interior** | |
| Acoustical ceiling tiles or panels | 8-15 |
| Cabinets | 15-35 |
| Countertops, laminates | 10-35 |
| Doors, hollow core | 18-25 |
| solid | 25-50 |
| shower | 5-25 |
| Drapery | 6-12 |
| Lighting | 15-35 |
| Paint | 3-10 |
| Tile, glazed | 20-45 |
| Vertical blinds | 5-16 |
| Wallpaper | 7-18 |
| **Heating, Ventilating and Air Conditioning** | |
| Solar-heating systems | 5-15 |
| Exhaust and ventilating fans | 6-18 |
| Air ducts, galvanized steel | 17-30 |
| aluminum | 15-32 |
| fiberglass | 14-28 |
| duct insulation | 12-24 |
| Fans and motors | 14-20 |
| Heating and cooling coils | 10-17 |
| **Plumbing** | |
| Plumbing fixtures | 17-30 |
| enameled steel | 5-14 |
| fiberglass | 10-20 |
| Faucets and valves | 8-16 |

| | |
|---|---|
| Water heaters, residential | 3-12 |
| commercial | 8-20 |
| Pumps, sump and well | 8-15 |
| Pipe, galvanized | 12-30 |
| copper | 20-35 |
| plastic | 15-33 |
| Sprinkler and fire protection systems | 20-30 |
| residential smoke detectors | 10-17 |
| smoke and heat detectors | 13-20 |
| fire hose and misc. equip | 7-13 |
| Miscellaneous pumps, motors, controls | 3-10 |
| Rehabilitation Expenses (Earthquake, fire, flood, storm) | |
| Architectural and Engineering Fees | 3-5 |
| Emergency Services | |
| Clean-up | 3-5 |
| Fencing and Security | 3-5 |
| Management | 3-5 |
| Tenant Assistance | 3-5 |
| Structural Repair and Retrofitting | |
| Foundation Repair | 5-10 |
| Foundation Replacement | 15-20 |
| Foundation Bolting | 15-20 |
| Iron or Steel Work | 15-20 |
| Masonry-Chimney Repair | 15-20 |
| Shear Wall Installation | 5-10 |
| Grading | 15-20 |
| Roofing | |
| Built-up tar and gravel | 10-20 |
| Composition shingles | 12-30 |
| Elastomeric | 12-25 |
| Metal | 13-45 |
| Slate or copper | 50-60 |
| Tile, concrete or clay | 30-50 |
| Wood shakes | 20-35 |
| Wood shingles | 16-30 |
| Exposed insulation | 19-24 |
| Gutters and downspouts | 10-30 |
| Site Improvements | |
| Bulkheads, concrete | 30-40 |
| steel | 25-35 |
| wood | 20-30 |
| Culverts, concrete | 30-40 |
| Curbing, concrete | 15-25 |
| Flagpole | 16-30 |

| | |
|---|---|
| Fencing, chain link | 13-20 |
| masonry walls | 20-35 |
| wood | 6-12 |
| wind screens | 4-7 |
| Landscaping, decorative shrubs, trees, etc. | 7-20 |
| Outdoor furniture | 3-10 |
| Outdoor lighting fixtures | 10-20 |
| Parking lot bumpers | 3-7 |
| guard rails | 7-13 |
| Paving, asphalt | 5-17 |
| concrete/brick | 10-20 |
| Railings | 5-10 |
| Signs | 8-14 |
| Sprinklers, galvanized pipe | 10-25 |
| plastic pipe | 15-28 |
| controllers and pumping systems | 8-13 |
| Stairway and decks, wood | 7-15 |
| cement composition | 12-25 |
| Structural Additions (utility room, offices, guardhouses) | 10-20 |
| Swimming pool, commercial, concrete | 15-30 |
| Mechanical equipment | 10-20 |
| Spas | 3-12 |
| Solar pool equipment | 7-20 |
| Synthetic sports surfaces | 3-8 |
| Tennis court | 18-25 |
| asphalt/colored concrete | |
| resurfacing | 3-7 |
| nets | 1-3 |
| Underground sewer and water lines | 22-32 |

2. Calculation

The monthly rent increase for each mobilehome space based on a capital improvement shall be calculated according to the following formula: Cost of the capital improvement, including interest, divided by the amortization period; the result of that calculation divided by twelve (12) months; and the result of that calculation by the number of all spaces.

For example, the allowable capital improvement rent increase for a street replacement (paving) costing $10,000 (including interest) and having a useful/amortizable life of ten (10) years is calculated as follows:

$$\frac{\$10,000.00}{10\ \text{years}} = \$1,000.00 \text{ annual amortization cost.}$$

$$\frac{\$\ 1,000.00}{12\ \text{months}} = \$83.33 \text{ monthly amortization cost.}$$

$$\frac{\$\ \ \ 83.33}{30\ \text{spaces}} = \$2.78 \text{ monthly rent increase per space for ten years}$$

3. In general, a capital improvement should not be amortized over a period which would yield a monthly per space increase of over ten percent (10%). In such a case, a longer amortization period may be appropriate. The percent increase represented by a particular capital improvement rent increase shall be calculated by dividing the proposed capital improvement rent increase by the amount of the existing base rent. Thus, in the case of the above street replacement example, the percent increase is calculated as follows:

$2.78 (proposed capital improvement
<u>rent increase</u> = 2.1% (rent increase)
$130 (existing base rent)

In cases where a longer amortization period is used to avoid a monthly per space increase of over ten percent (10%), interest at the legal rate of interest shall be allowed over the entire amortization period.

4. Notwithstanding the subsections above, based upon the circumstances of a particular case, the Board shall have the discretion to determine capital improvement costs or appropriate amortization in any alternative manner necessary to protect the residents of the mobilehome park from excessive rents while ensuring the park owner receives a fair return.

C. <u>Cost of the Capital Improvement</u>. The applicant shall provide documentary evidence of the actual cost incurred for the capital improvement. The cost thereof shall include the interest expense incurred on money borrowed to pay for the capital improvement. In those cases where the park owner finances the capital improvement or a part thereof with his/her own funds, interest at the legal rate of interest computed over a reasonable amount of time shall be included as a part of the capital improvement cost. In determining the reasonable amount of time over which interest shall be allowed, the Board shall be guided by the current practices of state and federally chartered banks and/or savings & loan associations as to the length of time for repayment of improvement loans, provided, however, that the time shall not exceed the amortization period used in calculating the allowable capital improvement rent increase. The staff report shall provide data to the Board concerning the reasonable amount of time over which interest shall be allowed.

D. <u>Application Procedures</u>.

1. An applicant may, but is not required to, submit an application for a capital improvement rent increase at the same time as the application for a general rent increase. However, if an application for a general rent increase and an application for a capital improvement rent increase for the same park are submitted together they will be considered on the same hearing date except in unusual circumstances.

2. An application for a capital improvement rent increase is to be evaluated and heard separately from an application for a general rent increase. A separate application form must be submitted for each type of rent increase application. When a general rent increase application and a capital improvement rent increase application are filed together, the capital improvement rent increase application shall be heard first.

3. A fee shall be charged for each rent increase application. However, if an application for a capital improvement rent increase and an application for a general rent increase for the same park are submitted together, only one fee will be charged.

4. When the owner submits an application for both a general rent increase and a capital improvement increase at the same time and they are set for hearing on the same date, the notice to tenants prepared and sent by staff shall indicate that both increases are requested and will be heard on the same hearing date but will be heard separately. On the hearing date set to consider the applications the Board shall hold a separate public hearing on each application and the capital improvement rent increase application shall be heard first.

# EXHIBIT 8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

COLONY COVE PROPERTIES, LLC, a Delaware limited liability company,

Plaintiff,

vs.

CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body; and DOES 1 to 10, inclusive,

Defendants.

No. CV14-03242 PSG (PJWx)

Volume 1
Pages 1 to 250

KENNETH BAAR - 02/02/2016

DEPOSITION OF:

KENNETH BAAR

Tuesday, February 2, 2016

DTI Court Reporting Solutions - Woodland Hills
1-800-826-0277 www.deposition.com

10:01 a.m.

Reported by:

MONICA T. VOGELBACHER

CSR No. 6406

Deposition of KENNETH BAAR, Volume 1, taken at 1299 Ocean Avenue, Suite 900, Santa Monica, California, beginning at 10:01 a.m. and ending at 6:52 p.m., on Tuesday, February 2, 2016, before MONICA T. VOGELBACHER, Certified Shorthand Reporter No. 6406.

APPEARANCES:

KENNETH BAAR - 02/02/2016

For Plaintiff:

GILCHRIST & RUTTER
BY: THOMAS W. CASPARIAN
Attorney at Law
1299 Ocean Avenue, Suite 900
Santa Monica, California 90401
(310) 393-4000
tcasparian@gilchristrutter.com

DTI Court Reporting Solutions - Woodland Hills
1-800-826-0277 www.deposition.com

APPEARANCES (Continued):

The Defendants:

ALESHIRE & WYNDER, LLP
BY: JUNE S. AILIN
JEFF M. MALAWY
Attorney at Law
2361 Rosecrans Avenue, Suite 475
El Segundo, California 90245
(310) 527-6665
jailin@awattorneys.com
jmalawy@awattorneys.com

KENNETH BAAR - 02/02/2016

Also Present:

SUSY FORBATH

DTI Court Reporting Solutions - Woodland Hills
1-800-826-0277 www.deposition.com

A What was your statement, again?

Q Pursuant to the ordinance and guidelines, debt service must be considered in determining a fair, just and reasonable expense?

A Yeah, there is a qualification in that, which is, you know, the rest of that, you know:

"Debt service obtained after the adoption of the ordinance should be allowed all operating expenses to the extent it is reasonable, in light of the existing rents and prudent financing procedures."

So it's a qualified. Yes, it says it shall be considered, and then the next sentence says it's subject to this qualification to the extent it's reasonable.

Q Understood. So let's dig deeper into that.

That's -- according to your report, that's at II, capital A, 2, small f in the guidelines.

A Right.

Q Tell me when you've located that within the guidelines.

A Okay, that's on page 6 of 16.

Q Okay. And if you could read the first sentence. You want us to refer to this to qualify the extent to which debt services is allowable, correct?

A That's correct.

Q Okay. If you could read the first sentence of what you're referring to here.

A "Debt service incurred after
the adoption of the ordinance to
purchase a park may be an allowable
operating expense if the purchase
price paid was reasonable in light of
the rents allowed under the ordinance
and involved prudent and customary
financing practices."

Q Okay. And in your report, you state, and purporting to quote that very same section, it seems:
"Debt service shall be considered as
an allowable operating expense. Debt
service obtained after the adoption of
the ordinance shall be an allowable
operating expense to the extent that
it is reasonable in light of the
existing rents and prudent financing
procedures."
That phrase, "in light of the existing rents," does not appear in these guidelines, does it? It certainly doesn't appear in section 2A2f.

A Right, the word "existing" isn't there.

Q Right. The guidelines actually say: "...in light of the rents allowed under the ordinance..." Correct?

A Yes.

Q It does not say, "to the extent that it is reasonable in light of the existing rents."

A Right. Yes. And that's a correction I would make.

KENNETH BAAR - 02/02/2016

Q You've misquoted the guidelines in your report, haven't you?

A Right. I've left -- I put in a word that is not there.

Q No, it's more than just putting in a word, right? You can take some time. I'm not trying to, you know, trap you or anything.

It's more than just the word "existing rents." It's "rents allowed under the ordinance," as opposed to "existing rents."

DTI Court Reporting Solutions - Woodland Hills 1-800-826-0277 www.deposition.com

A Right. Okay, yes.

Q And in preparing your report, you relied on your phrasing of the guidelines as you quoted it here in the report, correct?

A Yes.

Q So we don't examine the debt services' reasonableness in light of existing rents, an investor

should examine the reasonableness of the debt service in light of what rents are allowed under the ordinance, correct?

A Yes.

Q That could change the whole meaning of the reasonableness of the debt service, couldn't it?

A No.

MS. AILIN: Objection, argumentative.

Go ahead and answer.

THE WITNESS: I'd say the rents -- the existing rents are the rents allowed under the ordinance.

BY MR. CASPARIAN:

Q Existing rents would be included in this rents allowed under the ordinance, right?

A Yes.

Q But rents allowed under the ordinance could also be future rent increases allowed under the ordinance, right?

MS. AILIN: Objection, vague and ambiguous, argumentative, calls for speculation.

Go ahead and answer.

THE WITNESS: Well, if -- put it this way... Yeah, the rents allowed under the ordinance is not defined.

BY MR. CASPARIAN:

or not a park owner was earning a fair return?

A My understanding is no.

Q They don't discuss a maintenance of net operating income formula anywhere in them, do they?

A No, they didn't at that time.

Q I'm going to direct your attention back to your 2016 report, page 2 of your report.

A Okay.

KENNETH BAAR - 02/02/2016

Q You discuss the gross profit maintenance analysis. You explain that the guidelines require the performance of a gross profit maintenance analysis, but they reiterate that no single factor shall be determinative, and it shall be considered in conjunction with other factors, correct?

A Yes.

Q And then you quote a section of the guidelines that they do not create an entitlement.

Next you state:

DTI Court Reporting Solutions - Woodland Hills
1-800-826-0277 www.deposition.com

"One may debate precisely what the ordinance in the guidelines would require in a particular case. However, at a minimum, these terms provided notice of a significant probability that an increase in debt service may not be covered by an

allowable rent adjustment."

Do you mean to say "probability" or do you mean to say "possibility"?

A Okay, I would say possibility.

Q So it would be fair to amend your opinion there to replace "probability" with "possibility"?

A Right, when we're talking about the guidelines.

Q Fair enough. KENNETH BAAR - 02/02/2016

One of the purposes of the ordinance and guidelines is to prevent excessive rents, correct?

A Yes.

Q And "excessive" doesn't mean affordable to low income, right?

MS. AILIN: Objection, vague and ambiguous.

Go ahead and answer.

THE WITNESS: Well, it's not the way I would define "excessive."

BY MR. CASPARIAN:

DTI Court Reporting Solutions - Woodland Hills
1-800-826-0277 www.deposition.com

Q It's really got nothing to do with the income of the park residents, correct? This isn't like the inclusionary housing that you were talking about, that was part of your work done for the city of Berkeley?

A Let me say the fair return standards don't take into account tenant income.

Q All right.

expense calculation or not.

Q Maybe I misunderstood your testimony.

I thought your report and your testimony today was that in 32 of these 33 cases, the final rent decision was based on the gross profit maintenance formula.

A Yes. Okay, all I'm saying, they used the gross profit maintenance formula, and I'm just saying, you know, when they applied it -- I don't remember looking at the final calculation, I looked at the fact that the debt service decreased in 21 of those cases. So I don't remember seeing the mathematical calculations.

I think -- I'm not disagreeing with you, I just don't remember exactly what they did. They used a GPM analysis.

Q When you say "they used the GPM analysis," you don't mean that it was performed as it was in the Colony Cove case but not relied on, you mean the GPM formula was the formula used to determine the rent increase in 32 cases, correct?

A That was my understanding what they did.

Q And you reviewed the rent decisions themselves? I don't expect you to have a perfect memory of any of them. I'm just saying --

A Yeah, I remember -- yeah, I don't completely remember the process, but, yeah, I think I reviewed them.

Q Okay. So necessarily, if the final rent decision was the result of application of the gross profit maintenance formula, then, necessarily, the decrease in debt service was factored into that final decision?

A Yes, I agree with that. All I'm saying is, I didn't look to see if they necessarily completely followed it in those cases. I mean --

KENNETH BAAR - 02/02/2016

Q You didn't look to see if they did it accurately?

A Right. Or, for example, they said, you know, "We're not going to reduce it by the reduction in debt service, we're not going to count what that" -- they did a GPM analysis. I'm just saying I don't know if they followed every single step of it as you describe, which would be the logical result.

Q Okay. That wouldn't really be doing the gross profit maintenance analysis, would it?

DTI Court Reporting Solutions - Woodland Hills 1-800-826-0277 www.deposition.com

A Well, I say they wouldn't be following -- you know, I believe they followed it. I'm just saying sitting here, if they decide in one case, well, we're using this GPM, but we're not going to subtract for the reduction in debt service, I don't remember verifying it. That's all I'm saying.

Q But that would be --

STATE OF CALIFORNIA )
: SS
COUNTY OF LOS ANGELES )

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is a true record of the testimony given.

Before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not interested in the outcome of the action.

WITNESS my hand this date February 17, 2016.

Monica T. Vogelbacher

MONICA T. VOGELBACHER, CSR No. 6406

# EXHIBIT 9

# CURRICULUM VITAE

**Kenneth Kalvin Baar**
**Urban Planner & Attorney**
2151½ Stuart St. Berkeley, Ca. 94705
kenbaar@aol.com

## Education:

B.A., 1969, Wesleyan University, Middletown, Conn. Major: Government

J.D., 1973, Hastings College of Law, Univ. of California, San Francisco, Ca.

M.A., 1982, Urban Planning, University of California at Los Angeles

Ph.D., 1989, Urban Planning, University of California at Los Angeles
(Dissertation topic: "Explaining Crises in Rental Housing Construction: Myth and Schizophrenia in Policy Analysis")

**Foreign Languages**: French and Italian

## Teaching:

Instructor, San Francisco State University, Urban Studies Program (1983-1984)

Visiting Professor (Fulbright Scholar), Budapest University of Economic Sciences (Sept. 1991- June 1993)

Visiting Assistant Professor, Urban Planning Department, School of Architecture, Planning, and Preservation, Columbia University, New York (1994 - 1995) (courses: planning law, introduction to housing, comparative housing)

Visiting Professor (Fulbright Scholar), Technical University, Tirana, Albania (Introduction to urban planning) (2002-2003)

## Short Courses, Series of Lectures

Kiev University Law School, real estate law (1992, one week course)

Polis University, Tirana, Albania, urban planning studios (two week courses, 2009 & 2010)

# EXHIBIT 10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLONY COVE PROPERTIES, LLC<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CARSON and CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD<br><br>Defendants. | Case No. CV14-03242 PSG (PJWx) |

EXPERT REPORT OF

PETER A. SALOMON, CPA, CFF

JANUARY 11, 2016

INDEX

Page

I. RETENTION…………………………………….………………..…………….3

II. BACKGROUND………………………………………………………………….3

III. ECONOMIC DAMAGES

Monthly Amount of Damages Per Space…………………………….……………....4

Period of Damages……………………………………………………………..….6

Discount Rate……………………………………………………………………...6

Prejudgment Interest………………………………………………………………7

Total Damages………………………………………………………………………8

Reasonableness of Damages…………………………………………………………8

IV. DOCUMENTS AND OTHER INFORMATION CONSIDERED………….…………....9

V. QUALIFICATIONS OF PETER A. SALOMON, CPA, CFF………………………..…11

VI. PRIOR EXPERT TESTIMONY AND PUBLICATIONS WRITTEN……….………12

VII. COMPENSATION…………………………………………………………………12

## I. RETENTION

I have been retained by O'Melveny & Myers LLP and Gilchrist & Rutter Professional Corporation, counsel for plaintiff Colony Cove Properties, LLC ("Colony Cove"). I have been asked to offer my expert opinions on the amount of economic damages owed to Colony Cove due to the actions of the City of Carson and the City of Carson Mobilehome Park Rental Review Board ("Defendants"). These actions relate to not providing rent increases that account for the financing costs incurred to purchase a 404-space mobilehome park in the City of Carson (the "Mobilehome Park") on April 4, 2006. I have also been asked to calculate a prejudgment interest rate and calculate the amount of prejudgment interest on these economic damages.

## II. BACKGROUND

Colony Cove purchased the Mobilehome Park on April 4, 2006 for $23,050,000, with a down payment of $5,050,000 (representing 21.9% of the purchase price) and a mortgage of $18,000,000.[1] An independent appraisal of the property by Rob Detling indicated the property had a value of $23 million as of March 30, 2006. There are 403 rentable spaces in the Mobilehome Park.

In the first year of operations (fiscal year ended March 31, 2007) Colony Cove incurred a loss of $1,082,191, in large part due to costs associated with financing the purchase of the property (interest of $1,224,681 and loan fees of $29,461[2] for a total of $1,254,142).[3] Colony Cove had the expectation when it purchased the property that the costs of financing the property would be considered and included in future rent increases related to the general and fair return rent increases that could be approved by Defendants. This expectation was principally based upon the provisions contained in the City of Carson Guidelines for Implementation of the Mobile Space Rent Control Ordinance ("City of Carson Guidelines"), the prior conduct of Defendants in granting increases in rents for other rent-controlled properties as well as certain judicial rulings.

[1] First Amended Complaint, paragraphs 19 - 21.
[2] Pursuant to the City of Carson Staff Report corrections to reduce the operating expenses of Colony Cove for the 2007 fiscal year, the actual loan fees paid of $147,306 are amortized over the 5-year life of the loan at $29,461 (00733 – 00734).
[3] Colony Cove Mobile Estates Application for Mobilehome Space Rent Increase for the fiscal year ended March 31, 2007, page 11 of 16.

The City of Carson Guidelines provide the following with regards to debt service:

> Debt service incurred after adoption of the Ordinance to purchase a park may be an allowable operating expense if the purchase price paid was reasonable in light of the rents allowed under the Ordinance and involved prudent and customary financing practices. An applicant shall have the burden of establishing the reasonableness of the purchase price and financing procedures.[4]

Colony Cove submitted applications for mobilehome space rent increases for the two annual periods ended March 31, 2007 and 2008 (the "Rent Applications") for both general rent increases and fair return rent increases. As part of both Rent Applications, Colony Cove included its financing costs related to the purchase ($1,254,142 for 2007 and $1,353,161 for 2008). The Defendants excluded Colony Cove's financing costs in determining the amount of the monthly rent increase for the space rentals in the Rent Applications. Defendants awarded a $36.74 per month, per space, rent increase related to 2007 and a $25.02 per month, per space, rent increase related to 2008. None of these increases in rent reflected any of Colony Cove's financing costs. Colony Cove's average monthly financing cost for each of the 404 spaces was $258.69 for 2007 and $279.12 for 2008.

## III. <u>ECONOMIC DAMAGES</u>

### Monthly Amount of Damages Per Space

I have created an economic damages model that isolates the impact of Defendants' exclusion of Colony Cove's debt service from the calculation of the rent increase. In doing so I considered Colony Cove's other actual expenses and adopted the adjustments or exclusions made in the City of Carson Staff Report ("Staff Report") to reduce these actual expenses incurred and make adjustments to inflation to acceptable amounts and levels to the Defendants. This approach or

[4] Resolution No. 98-010, Section II. A.2.f.

methodology will isolate the impact of the exclusion of debt service in calculating the rent increase.

To do this I looked at the work in the Staff Report and the conclusions of Defendants in granting the rent increase related to Colony Cove's application for fiscal 2007. I relied upon the work and conclusions related to the Gross Profit Maintenance Standard ("GPM Standard") to isolate the impact of excluding debt service. In doing this I also excluded certain other expenses included in Colony Cove's rent application that were not acceptable to Defendants. I also relied upon the Defendants' finding that 75%, and not 100%, of the 6.19% increase in the Consumer Price Index (for inflation), as contained in the Baar Report,[5] be used to calculate the actual rent increase awarded of $36.74 per month per space under the maintenance of net operating income approach ("MNOI Approach").

The analysis performed in the Staff Report for the Gross Profit Maintenance Standard for the year ended March 31, 2007, which includes an adjusted and reduced amount of debt service costs, concluded the amount of monthly rent adjustment to be $200.93 per space. This amount included an adjustment for 100% of the inflation of 6.19% noted above. Because the Defendants concluded that only 75% of the inflation rate was appropriate under the MNOI Approach utilized to award the $36.74 actual rent increase, I utilized 75% of the inflation rate in my damages model to isolate the impact of the exclusion of debt service in calculating the rent increase. The impact of utilizing 75% of the actual inflation rate is to reduce the $200.93 amount in the Staff Report to $198.56.[6]

I then reduced the $198.56 rent increase amount by the actual amount of the monthly rent increase that was approved by Defendants of $36.74.[7] The monthly damage per space is the difference between these two amounts, or $161.82. The annual damages would be $161.82 multiplied by 403 rental spaces ($65,213.46 per month) multiplied by 12 months, which equals $782,561.52 per year. Based upon the appraisal performed in connection with the acquisition of

[5] Expert Report of Kenneth K. Baar, Ph.D prepared on behalf of the City of Carson (February 2008) entitled Analysis of the Colony Cove Mobile Estates Rent Increase Application.
[6] Ibid., page 11 and Exhibit Y to the City of Carson Staff Report for fiscal year 2007.
[7] Resolution No. 2008-256, A Resolution of the Carson Mobilehome Park Rental Review Board Granting a General Rent Increase for Colony Cove Mobile Estates, dated August 6, 2008, Exhibit A.

the Mobilehome Park, there was historically a zero percent vacancy rate at this and at comparable mobile home parks.[8] Therefore, no amount is provided to reduce the increased rents for vacancies.

**Period of Damages**

The increased rents actually awarded to Colony Cove related to the application for the rent increase for the year ended March 31, 2007, commenced December 1, 2008.[9] This is the date for the commencement of the damages period. The trial in this matter is scheduled to commence April 5, 2016, and is expected to end by the end of that week, or on or about April 8, 2016.

If Colony Cove prevails at trial, then Colony Cove will submit another application for a rent increase on or before June 30, 2016, which would result in the increase becoming effective approximately February 1, 2017.[10] Therefore, the damage period will end as of January 1, 2017 (representing the last rent payment due date for the month of January 2017 before the rent increase can take effect for February 2017). The damages period is a little over eight years, and the total damages amount prior to applying a present value discount is $6,390,919 ($65,213.46 per month for 98 months).

**Discount Rate**

The economic damages as of the commencement of the damages period of December 1, 2008, through the end of the damages period of January 1, 2017, need to be discounted back to the start of the damages period to account for the time value of money. The appropriate discount rate to reflect that value would be equal to the risk of not collecting the rents. Based upon the fact that rents are well below market rents in the rent-controlled Mobilehome Park, and historically there has been effectively a zero percent vacancy rate, a risk free discount rate would be appropriate.

[8] Appraisal report of Rob A. Detling as of March 30, 2006, page 29.
[9] This is based upon the date that the rent increase actually awarded was permitted to be effective (90 days after notice was given by the Carson Mobilehome Park Rental Review Board.
[10] This is based upon interpretation by counsel of documents identified in Section IV of this report, item numbers 18 – 21, that provide rules, regulations and time periods to process an application to increase rents and have the rent increase approved.

A risk-free discount rate in these particular circumstances would be the rate on a 10-year U.S. treasury note as of December 1, 2008. That rate is 2.72%.[11] Discounting the $6,390,919 in damages to the start of the damages period using a 2.72% discount rate results in damages of $5,738,050. See Exhibit A to this report for the calculation of the damages amount. The present valuing creates a discount of $652,869.

**Prejudgment Interest**

I have also been asked to calculate an appropriate prejudgment interest rate and then apply that rate to the economic damages to calculate prejudgment interest damages. The prejudgment interest rate I have calculated is based upon the concept of a reasonably prudent person investing funds in a diverse group of securities (including U.S. treasury bills) to produce a reasonable return while maintaining safety of principal.[12] The investments I have chosen to fit these criteria are three types of securities. I have equally weighted the rates of returns of these securities to calculate a weighted average return for the prejudgment interest rate. The securities I utilized are listed below along with a calculation of the weighted average rate of return.

1. 10-year U.S. treasury bill as of December 1, 2008
2. AAA rated corporate bond rate as of December 1, 2008[13]
3. S&P 500 index average rate of return from December 1, 2008 to present[14]

Weighted Average Rate of Return for the Prejudgment Interest Rate

| | |
|---|---|
| U.S. treasury bills | 2.72% |
| AAA rated bonds | 5.35% |
| S&P 500 index fund | 15.34% |
| Total | 23.41% divided by 3 = 7.80% Prejudgment Interest Rate |

[11] https://research.st.louisfed.org/fred2/series/DGS10
[12] 285 F.3d 784 United States Court of Appeals, Ninth Circuit. Louis Schneider v. County of San Diego
[13] https://research.stlouisfed.org/fred2/series/Daaa/downloaddata
[14] http://finance.yahoo.com/q/hp?s=SPY+Historical+Prices

In the scenario above, one-third of the funds would be invested in a 10-year U.S. treasury bill as of December 1, 2008, that had a 2.72% interest rate. One-third of the funds would be invested in AAA corporate bonds, which had an average rate of return of 5.35% as of December 1, 2008. This investment would have a high degree of safety of principal because this type of bond has the highest possible rating from credit rating agencies, meaning the companies issuing these bonds demonstrate an exceptional degree of creditworthiness in meeting their financial commitments. The last one-third of the funds would be invested in an exchange-traded fund that provides investment results, before fund expenses, equal to the performance of the Standard & Poor's 500 Index. This is a highly diversified equity investment due to the large number of companies included in the index. In addition to the diversity of companies in this investment, the duration of this investment being over eight years would contribute to the high degree of safety of principal.

The prejudgment interest rate calculation is shown in more detail on Exhibit B to this report. The amount of prejudgment interest damages is $4,229,607 and the calculation of this amount is shown on Exhibit A to this report.

**Total Damages**

| | |
|---|---|
| Value of lost rent increases as of 12/1/08 | $5,738,050 |
| Prejudgment interest | 4,229,607 |
| Total damages | $9,967,657 |

**Reasonableness of Damages**

I have considered the increase in rent of $161.82 per month per space that I calculated in relation to other economic considerations during this time frame. The average monthly per space rent in the Mobilehome Park was approximately $408.[15] The monthly increase approved by Defendants was $36.74, for a new total average of $444.74 per month. The lost rent damages of $161.82 per month represents an increase of 36.4%, to a total monthly rent of $606.56.

[15] Appraisal report of Rob A. Detling as of March 30, 2006, page 45.

The market value of the average monthly rent per space at the Mobilehome Park was $800[16] when it was purchased by Colony Cove. The $606.56 hypothetical rent is still 24% below market value rents.

The $408 actual monthly rent for the fiscal 2007 year is "approximately $150 below the rents at the most comparable mobile home park in Carson (Carson Harbor Village) and well below the rent levels at other mobile home parks that are not subject to rent control…"[17] The average per month space rental at Carson Harbor Village for rent controlled spaces was $560 at that time, and for the eleven spaces at this mobile home park that are not rent controlled, the monthly rentals ranged from $780 - $880 per month.[18]

In its first five years of operations, 2007 through 2011, Colony Cove lost almost $4 million.[19] This represents a substantial negative return on the equity invested into Colony Cove.

## IV. DOCUMENTS AND OTHER INFORMATION CONSIDERED

The significant documents and other information I considered includes:

1. First Amended Complaint
2. Order Granting in Part and Denying in Part Defendants' Motion to Dismiss dated December 18, 2014
3. Order Granting in Part and Denying in Part Defendants' Motion to Dismiss dated June 23, 2015
4. Application for Mobilehome Space Rent Increase for the period April 1, 2006 through March 31, 2007
5. Application for Mobilehome Space Rent Increase for the period April 1, 2007 through March 31, 2008

---

[16] Appraisal report of Rob A. Detling as of March 30, 2006, page 45.
[17] Ibid., page 50.
[18] Ibid., page 45.
[19] First Amended Complaint, page 1, lines 20 – 23.

6. Report of John P. Neet, MAI dated September 25, 2007
7. Appraisal report for Colony Cove MHP as of March 30, 2006 prepared by Rob A. Detling
8. Analysis of the Colony Cove Mobile Estates Rent Increase Application by Kenneth K. Baar, Ph.D (February 2008)
9. Analysis of the Colony Cove Mobile Estates Rent Increase Application by Kenneth K. Baar, Ph.D (June 2009)
10. Memorandum to the Carson Mobilehome Park Rental Review Board from Michael St. John, Ph.D. dated May 27, 2008
11. City of Carson Staff Report to the Mobilehome Park Rental Review Board dated February 13, 2008
12. City of Carson Staff Report to the Mobilehome Park Rental Review Board dated June 10, 2009
13. Resolution No. 2008-256, A Resolution of the Carson Mobilehome Park Rental Review Board Granting a General Rent Increase for Colony Cove Mobile Estates
14. Resolution No. 2009-269, A Resolution of the Carson Mobilehome Park Rental Review Board Granting a General Rent Increase for Colony Cove Mobile Estates
15. 612 F.2d 459 United States Court of Appeals, Ninth Circuit, U.S. v 429.59 Acres of Land
16. 285 F.3d 784 United States Court of Appeals, Ninth Circuit, Louis Schneider v. County of San Diego and Reybro, Inc.
17. Transcript of Public Meeting at Carson Planning Commission held on June 11, 2008
18. Resolution No. 98-010, a Resolution of the City Council of the City of Carson adopting Revised Guidelines for the Implementation of the Mobilehome Space Rent Control Ordinance, Chapter 7, Article IV, of the Carson Municipal Code and Replacing the Policy Guideline for Capital Improvement Rent Increases

19. http://www.codepublishing.com/CA/Carson/html/Carson04/Carson040700.html (Chapter 7 Mobilehome Space Rent Control)

20. City of Carson letter dated August 11, 2008 to the residents of the Mobilehome Park regarding a $36.74 general rent increase per space per month

21. California Code of Civil Procedure paragraph 1094.6 Judicial review; decisions of local agencies; petition; filing; time; record; decision and party defined; ordinance or resolution

22. Exhibit Y to the City of Caron Staff Report for fiscal 2007.

23. Explanation of Staff Corrections and/or Additions/(Reduction) to the Applicant's General Operating Income and Expense Sheets

24. Letter to the Staff of the Mobilehome Rent Review Board of the City of Carson from Gilchrist & Rutter dated September 28, 2007

25. Scheduling Order dated April 14, 2015

## V.   QUALIFICATIONS OF PETER A. SALOMON, CPA, CFF

I am the Managing Partner of Salomon Forensics, LLP, a certified public accounting firm specializing in performing litigation and forensic consulting services.  I am a Certified Public Accountant in California and New York with over thirty-five years of professional accounting experience.  I have specialized in forensic accounting for more than twenty-five years.  Before specializing in forensic accounting, I worked for nine years auditing financial statements for two of the "Big 4" public accounting firms.

I have provided expert testimony in Federal Courts, State Courts and arbitrations regarding the calculation of economic damages.  I have been retained on five occasions as an accounting referee or special master by Superior Courts in California.  I was retained by the United States Securities and Exchange Commission ("SEC") as an expert witness.  I have also assisted a

variety of public companies, audit committees and individuals under investigation by the SEC and others by performing independent and other specialized accounting investigations. I have made presentations to the SEC and the United States Department of Justice on the findings of several of these investigations.

I am the most recent former Chair of the Forensic Services Section of the California Society of Certified Public Accountants and a former Chair of its Fraud Section. A copy of my curriculum vitae is attached as Exhibit C to this report.

## VI. PRIOR EXPERT TESTIMONY AND PUBLICATIONS WRITTEN

A list of all cases in which I have testified as an expert at trial or in deposition within the preceding four years is attached as Exhibit D to this report. Articles I have written that were published within the preceding ten years are listed in Exhibit E to this report.

## VII. COMPENSATION

The compensation paid to Salomon Forensics for work performed by me and other professionals working at my direction is based upon hourly billing rates ranging from $180 to $495. In addition to professional fees, Salomon Forensics is reimbursed at cost for out-of-pocket expenses. Salomon Forensics has incurred fees of approximately $16,000 through the date of this report.

---

This report presents my opinions. The opinions in this report are subject to modification based upon additional facts or information that may become available. I may amend this report based upon testimony or evidence presented at trial. This report is prepared and issued solely for use in the above-cited matter.

Executed on January 11, 2016, in Hermosa Beach, California.

Peter Salomon

Peter A. Salomon, CPA, CFF

Expert Report of Peter A. Salomon, CPA, CFF Page 13 of 13

**Exhibit 10**
**Page 176**

# EXHIBIT 11

**CITY OF CARSON**
**STAFF REPORT TO**
**MOBILEHOME PARK RENTAL REVIEW BOARD**

| | |
|---|---|
| **Public Hearing:** | February 13, 2008 |
| **Application:** | Request for a General Rent Increase |
| **Mobilehome Park:** | Colony Cove Mobile Estates<br>17700 S. Avalon Blvd.<br>Carson, CA 90746 |
| **Owner:** | Colony Cove Properties, LLC<br>Goldstein Properties, Inc.<br>Mr. James Goldstein, Owner<br>2029 Century Park East, Ste. 1450<br>Los Angeles, CA 90067 |
| **Owner's Representative:** | James & Associates, Inc.<br>Ms. Anne James, Owner<br>255 N. El Cielo, Ste. 140 #286<br>Palm Springs, CA 92262 |
| **Owner's Attorney:** | Thomas W. Casparian, Esq.<br>Gilchrist & Rutter<br>1299 Ocean Avenue, Ste. 900<br>Santa Monica, CA 90401 |
| **Request:** | The park owner proposes a general rent increase for 403 of the 404 rental spaces in the park, in an amount of $618.05 per space, per month, or a range increase of from 136.26% to 178.61%. It is proposed to increase the monthly space rents in the mobilehome park from the current range of from $346.03 to $453.58 per space, per month up to $964.08 to $1,071.63 per space, per month. This would also increase the current average monthly rent from $414.25 per space to $1,032.30 per space and increase the park's yearly income by $2,988,889.80. |
| **Staff Recommendation:** | It is staff's recommendation that the Board consider granting a general rent increase for 403 of the 404 spaces in the park at this time for the owners of Colony Cove Mobile Estates in the amount of $15.65 or (3.45% to 4.52%) per space, per month. This would bring the rent range in the park up to $361.68 to $469.23 per space, per month, increase the average park rent to $429.90 and increase the yearly park income by $75,683.40. |

00346

**SECRETARY'S REPORT**

On Monday, January 28, 2008, staff mailed public hearing notices to the Mobilehome Park Rental Review Board, the park owner, the owner's representative, the owner's attorney, and all affected residents in the park. On Wednesday, February 6, 2006, staff transmitted copies of the Agenda Face Sheet to the City Clerk's Office for public posting. The Staff Report to the Board was finalized and mailed or hand delivered to the Mobilehome Park Rental Review Board, the park owner, the park owner's representative, the park owner's attorney, the resident's representative and made available to the general public not later than Thursday, February 7, 2008.

**NOTIFICATION AND COMMENT LETTERS**

Staff received the general rent increase application and filing fee from Colony Cove Mobile Estates on October 1, 2007. The application is shown as Exhibit-A along with a Fair Return Analysis which is shown as Exhibit-B to this staff report. The application was reviewed and deemed incomplete by fax on October 23, 2007 and November 1, 2007. After receipt of additional information from the park dated October 23, 2007, and November 5, 2007, the application was deemed substantially complete on December 11, 2007. Some additional information was received from the park on January 4, 2008, substantiating earlier discussions on expenses with park representatives.

The Housing and Neighborhood Development Division mailed each resident a letter, dated October 11, 2007, announcing that an application had been filed with the department. Subsequently, the Housing and Neighborhood Development Division mailed each resident a letter, dated December 11, 2007, announcing that the application had been deemed substantially complete and that it was available for public inspection in the Housing Division Offices. The letter further stated that an appointed or approved resident representative could obtain a copy of the application request to assist the mobilehome park residents in submitting factual information to the Board. Finally, the letter stated that residents could submit letters, bills, photographs, and/or other relevant material to the City by Thursday, January 11, 2008, at 6:00 p. m., for inclusion in the staff report to the Board. As of Monday, January 14, 2008, the Housing and Neighborhood Development Division received approximately 36 letters from residents regarding the proposed rent increase request. These 36-pages of letters are included in Exhibit-C of this staff report.

**BACKGROUND**

Colony Cove Mobile Estates is located at 17700 South Avalon Boulevard in a district zoned RM-8-D (Residential, Multiple Dwelling-8 units per acre-Design Overlay Review). The park has 404 spaces, which are presently occupied by one (1) triple-wide, 347 double-wide, and 56 single-wide mobilehomes.

Park amenities include a large central clubhouse style building with a kitchen, banquet room/auditorium, swimming pool, Jacuzzi, billiard/card room, library/television room, exercise room, indoor spa, and other facilities. A laundry room with coin-operated washers and dryers is also provided.

A recreational vehicle storage area is available and the residents may rent spaces at an additional cost. A pet exercise run is provided for residents' use. The park has a pay cable television service for commercial and pay television channels, which is provided at extra cost to the residents. Park management will provide individual antennas to residents as a service provided within the rent structure. Gated security services are provided on a 24-hour basis, and residents pay a fee of $48.00, per person, per year to partially offset this security cost. Water, sewer, and trash collection services are provided for the residents within the base rent.

**OWNER'S REQUEST AND STATEMENT**

In the current rent increase application, the park owner's state, in part, that it is necessary to request a general rent increase at this time because:

1. In order to provide the park owner with a fair return on investment, as mandated by the United States Constitution, the California Constitution and the City of Carson rent control ordinance and regulations, a rent increase of $618.05, or an average of 152.93%, is required.

2. Colony Cove lost $1,102,773 from 2005 to the 2006-2007 fiscal year, as compared to an adjusted profit of more than $1,102,773 in 2005. In order to maintain the base year (2005) gross profit for the 2006-2007 fiscal year, a 96% rent increase is required.

**STAFF COMMENTS ON THE OWNER'S GENERAL RENT INCREASE APPLICATION AND SUPPLEMENTAL TO THE APPLICATION**

1. The owner has claimed operating expenses above and beyond those that staff has allowed in this staff report. Staff's summary of the explanations for the disallowed items is contained in Exhibit-E (pages E-16 to E-19) of this staff report. The residents have also disputed some of the operating expenses and other claims that have been made by the owner. Their comments are contained in the comment letters and other documentation which are attached as Exhibit-C (pages C-1 to C-36) of this staff report. The Mobilehome Park Rental Review Board may wish to review these expenses and their reasonableness and take whatever action (inclusion or exclusion) which it deems to be appropriate.

2. There may be circumstances where a case can be made by an owner, which would require the Board to take into account different analysis methods, and/or information which has historically been considered irrelevant by both staff and the Board. The Carson Municipal Code, Article IV, Chapter 7, Subsection 4704 (g) reads, in part, as follows: "The Board shall consider the following factors, in addition to any other factors it considers relevant, in making such determination."

   In this case, the Mobilehome Space Rent Control Ordinance allows an owner to present any and all information believed to be relevant to a rent increase proposal even though a particular item may not be specifically listed as one of the Eleven Factors in the Ordinance. Past court rulings and case law decisions have outlined various issues and arguments which are allowable as evidence to help demonstrate that a particular park owner or park is being treated unfairly by an ordinance and/or Board.

   The owner has attempted to use this provision in the application process and has submitted supplemental information in support of his arguments. However, staff's analysis has found that most of these arguments were inaccurate, irrelevant and/or lacking sufficient documentation to be of any merit and were therefore disregarded from further consideration in the preparation of this report. As an example, some of the issues brought forward by the owner included the following:

   A. Numerous sections and pages of the owner's current General Rent Increase Application Summary and Supplement to the Application contain references to the year 1978, 1979 and/or other base years. As the Board is aware, each application has historically been reviewed and evaluated only for the period of time since the park's last public hearing. This fact has been discussed at numerous public hearings, including past hearings for the owner's other park, Carson Harbor Village Mobilehome Park. In addition, the current revised guidelines for the implementation of the Ordinance specifically address this issue and preclude the Board from reconsidering past actions, as noted in: Section V, Miscellaneous, Subsection B, page 8.

      All calculations and statements which have references to 1978, 1979 or any other base years that are not applicable as a base line year, and are not to be considered by the Board in its formulation of a decision for the current general rent increase request. Additionally, the owner didn't even own the park in 1978 or 1979; nor did he own it during the 2004 and 2005 expense years previously reviewed by the Board for

that matter. Therefore, these alternate base years were not used by staff in any way to establish staff's recommendation. Also, as a result of litigation against the Board and City, prior court decisions have rejected this same claim by the current park owner involving his other park, Carson Harbor Village Mobilehome Park.

B. It is also noted that the owner provided an analysis under Factor No. 2 in its Supplemental Application material, which, in part, requests the Board to consider a comparison of Colony Cove Mobile Estates with parks outside of the City of Carson, specifically Del Amo Mobile Estates and Dominguez Hills Estates.

Based on Section III, Subsection (A), of the Revised Guidelines for Implementation of the Mobilehome Space Rent Control Ordinance, as adopted by the City Council on February 17, 1998, the owner's desired comparison with other mobilehome parks is not valid. Section III, Subsection (A), is stated as follows:

III. Comparable Parks and Changes in Services, Maintenance and Amenities.

"A. Comparable Parks. The Ordinance directs the Board to consider rents in comparable parks in the City. Consideration of the rents for spaces in comparable mobilehome parks can assist the Board in determining the range of reasonable rents for a particular park. The reason the Ordinance specifies parks in the City is that comparison to rents in parks outside the City which are not subject to rent control would promote the excessive upward pressure on rents that the Ordinance is designed to avoid. Rents in unregulated markets are the result of unequal bargaining power, which arises from the shortage of spaces for relocating homes and the cost and difficulties inherent in trying to relocate a home. The Ordinance is designed to prevent the excessive rents that can occur in such a market absent regulation. Even if evidence were submitted showing a park in a neighboring jurisdiction with rent control to be comparable in quality, amenities, services and location, evidence would be required concerning the nature of the rent control regulations in effect in that jurisdiction during the period from 1979 to the present before the Board could determine whether the park was comparable within the meaning of the Ordinance. Parks subject to the Los Angeles County mobilehome rent regulation ordinance have not been subject to rent regulation at all times since the adoption of the Carson Ordinance and were not and are not now subject to similar regulation. Therefore, rents in spaces in parks in incorporated areas of Los Angeles County are not comparable within the meaning of the Ordinance. Newly constructed spaces, as defined by the Mobilehome Residency Law, are also not comparable spaces within the meaning of the Ordinance even when they are located in the City because the rents for those spaces are exempt from rent control and have never been subject to rent regulation."

Again, as a result of litigation against the Board and City, prior court decisions have rejected the claim by this owner regarding his other park, Carson Harbor Village Mobilehome Park, that these allegedly similar parks outside the city are comparable. Also, the Board has previously rejected the claim that the newly constructed spaces within Carson Harbor Village Mobilehome Park are "comparable" within the meaning of the Ordinance.

C. The park owner provided their own Maintenance of Net Operating Income (MNOI) analysis that is noted as Factor No. 13 and is shown in Exhibit-A (pages A-4 & A-25). However, this analysis (as discussed in detail in the section below) is preliminary to staff's review of the park's income and operating expenses.

Additionally, the CPI multiplier utilized in the park owner's calculation are in excess of the actual CPI amount utilized by both staff and Dr. Baar in their analyses. Finally, the park owner's calculation utilizes only 100% of the CPI, when arguably a lesser amount such as 75% and or 50% of the CPI increase may be adequate under the particular circumstances of a given application and hearing. Because of these previously stated issues, staff's own analysis shows the park owner's analysis to be more than double our calculations and the attached report of Dr. Baar will address this particular analysis in much more detail.

3. Within the general rent increase application materials in the Summary of Rent Increase Factors Exhibit-A (page A-3), the owner makes the following statement, which it labels "Factor 12":

"On September 27, 2006, the Board concluded that Colony Cove Mobile Estates' gross profit should be $748,368.28. That calculation was based upon the Consumer Price Index as of December 31, 2005.

Since that time the Consumer Price Index has increased 6.67%. In order to maintain the same profit in constant dollars the $748,368.28 must be increased by 7.17% to $798,284.44. The April 1, 2006 - March 21, 2007 Colony Cove loss was ($1,082,191). There has been a profit reduction of $1,880,475.44. That deficiency requires a 96.22% rent increase on the lower adjusted rents or $388.85 per space."

It must be pointed out that the owner's statement above contains a number of errors of fact and conclusion. The owner makes a reference to a section of the staff report prepared for the park's most recent general rent increase hearing. That particular section; indeed, the entire staff report; is an analysis and recommendation prepared for the Board by staff, not a finding or conclusion of the Board.

The Board's findings and conclusions are contained within Resolution No. 2006-244, which the Board adopted at the conclusion of that September 27, 2006, public hearing and is included in this staff report as Exhibit E (pages E-1 to E-10). The figure of $748,368.28 is drawn from an estimated gross profit-based analysis contained in the September 27, 2006, staff report, and is a combination of the parks "Actual Gross Profit for 2005" as adjusted by staff in each report to the Board and the yearly sum of the Board's last approved increase in 2006. The Board did not specifically cite that the amount of $748,368.28 was the new target amount for the following year(s) within their findings, as noted in Resolution 2006-244. There is no implication in those findings of the establishment or entitlement to a level of gross profit maintenance or amount towards a fair return on investment for the park. Rather, that the slight decrease in park expenses and the modest increase in the CPI had been covered by the small increase in income granted by the Board based on the all the factors in the Ordinance, the Implementation Guidelines and taking into account resident testimony at the public hearing.

Additionally, the references in the owner's statement above to the Consumer Price Index, as it is used in the gross profit analysis process, are incorrect. As is explained in the preface to the Estimated Gross Profit Maintenance Analysis section of each staff report, the purpose of that analysis is to help determine the effects that inflation may have had on the park's gross profit through the end of the expense year(s) being reviewed.

The expense period reviewed in the gross profit analysis within the September 27, 2006, staff report ended with December 2005. The expense period reviewed in the gross profits analyses in the current staff report ends with March, 2007. Thus, the relevant measuring points for determining the effect of inflation on the park's gross profit for the 2006-2007 expense year in this instance are December 2005, through March 2007. The Consumer Price index figures for those points in time are 602.3 (December 2005) and 639.6 (March 2007). The increase between December 2005 and March 2007 is 6.19%. The 6.67% Consumer Price Index increase asserted by the owner appears to be from some other lengthened time period that is irrelevant to this particular analysis.

Further, the owner's assertion that the park's 2006-2007 year profit was actually a loss of $1,082,191 and that there has been a reduction in income of $1,880,475, while based on information the owner provided in support of its rent increase request, is preliminary to staff's review of gross income and operating expenses.

Following staff's review of the application and supporting documentation, which resulted in adjustments to gross income and operating expenses as detailed in Exhibit-E (pages E-16 to E-19), (Explanation of Staff Corrections and/or Additions/Reductions to the Owner's General Operating Income and Expense Sheets), staff asserts that the park's gross income, operating expenses, and gross profit is as indicated later in this staff report in Table No. 2, Gross Income and Operating Expenses, which is on page 7 of this staff report to the Board.

Also, the gross profit maintenance analysis is merely a tool to aid the Board in making its decision. The use of a gross profit maintenance analysis does not create any entitlement, and evidence concerning all of the factors must be considered and balanced in determining whether to grant a rent increase and the amount of any such increase. This is clearly stated on page 5 of the Guidelines for the Implementation of the Ordinance at II, B, Gross Profit Maintenance Analysis.

**TABLE No. 1 (OWNER'S PROPOSED RENT INCREASE)**

The Board last reviewed an application for a general rent increase for Colony Cove Mobile Estates at its September 27, 2006 meeting. At that public hearing, the park owner was granted a general rent increase of $6.23 per space, per month, or a range of from 1.39% to 1.83%, for 403 of the 404 rental spaces in the park. This rent increase provided additional income of $30,128.28 on a yearly basis to the park. The full effect of this increase was realized in the 2007 income and expense year for Colony Cove Mobile Estates which was only partially submitted with this application. A copy of the Resolution No. 2006-244, approving the above action by the Board is included in Exhibit-E (pages E-1 to E-10) of this staff report.

At this time, the park owner has proposed a general rent increase of $618.05 per space, per month, or a range of from 136.26% to 178.61% for 403 of the 404 rental spaces in the park, as presented in the following table:

| Spaces per Rent Level | | Current General Base Rent | + | Requested General Rent Increase | = | New Requested Base Rent | % Increase |
|---|---|---|---|---|---|---|---|
| 1 | Sp. | $346.03 | + | $618.05 | = | $964.08 | 178.61% |
| 1 | Sp. | $357.76 | + | $618.05 | = | $975.81 | 172.76% |
| 1 | Sp. | $363.23 | + | $618.05 | = | $981.28 | 170.15% |
| 6 | Sp. | $379.88 | + | $618.05 | = | $997.93 | 162.70% |
| 21 | Sp. | $387.24 | + | $618.05 | = | $1,005.29 | 159.60% |
| 1 | Sp. | $389.69 | + | $618.05 | = | $1,007.74 | 158.60% |
| 71 | Sp. | $394.62 | + | $618.05 | = | $1,012.67 | 156.62% |
| 34 | Sp. | $401.98 | + | $618.05 | = | $1,020.03 | 153.75% |
| 42 | Sp. | $409.36 | + | $618.05 | = | $1,027.41 | 150.98% |
| 52 | Sp. | $416.72 | + | $618.05 | = | $1,034.77 | 148.31% |
| 86 | Sp. | $424.10 | + | $618.05 | = | $1,042.15 | 145.73% |
| 29 | Sp. | $431.47 | + | $618.05 | = | $1,049.52 | 143.24% |
| 51 | Sp. | $438.85 | + | $618.05 | = | $1,056.90 | 140.83% |
| 2 | Sp. | $446.21 | + | $618.05 | = | $1,064.26 | 138.51% |
| 5 | Sp. | $453.58 | + | $618.05 | = | $1,071.63 | 136.26% |
| 1 | Sp. | $0.00 | + | $0.00 | = | $0.00 | 0.00% |
| **404** | **Sp.** | **$2,003,313.96** | **+** | **$2,988,889.80** | **=** | **$4,992,203.76** | |

If the mobilehome park were 100.0% full for a one (1) year period, the total income for Colony Cove Mobile Estates as collected from current base rents would be $2,003,313.96 per year. In this case, the proposed general rent increase is equal to $2,988,889.80 in additional rental income on a yearly basis.

Therefore, if the mobilehome park were operating at 100.0% capacity for a one-year period (403 spaces paying rent), the projected rental income (without other sources of income included) would be:

| Current Rental Income on A Yearly Basis | + | Proposed Rental Increase On a Yearly Basis Based On Owner's Request | = | New Rental Income on A Yearly Basis |
|---|---|---|---|---|
| $ 2,003,313.96 | | $ 2,988,889.80 | | $ 4,992,203.76 |

TABLE No. 2 (GROSS INCOME AND OPERATING EXPENSES)

As previously mentioned, the Board last granted a general rent increase to the park owner at its most recent review of the park's income and expenses on September 27, 2006. At that time, the park owner submitted income and operating expense documentation for 2004 through 2005 that was compared and evaluated against documentation for 2004.

At this time, the park owner is providing income and expense documentation for April 2006 through March 2007, which will be compared with information from 2005. The 2005 information was obtained from the park's last general rent increase application file.

Facts: The annual changes in gross income, operating expenses, and gross profit for 2005 through the 2006-2007 expense period, are shown as follows:

| | 2005 | 2006-07 | $ Change |
|---|---|---|---|
| Gross Income | $ 2,038,703 | $ 2,005,262 | (-) $ 33,441 |
| (-) Operating Expenses | - 1,320,463 | - 2,198,172 | (+) $ 877, 709 |
| Gross Profit | $ 718,240 | ($ 192,910) | (-) $ 911,150 |

Findings: Gross Income for Colony Cove Mobile Estates decreased by $33,441 or 1.7%, between 2005 and the 2006-07 expense year.

Operating expenses increased by $877,709 or 66.5%, between 2005 and the 2006-07 expense year.

As a result of the trends in gross income and operating expenses described above, gross profit for the park decreased by $911,150 or 126.9% between 2005 and the 2006-07 expense year.

---

TABLE No. 3 (ANALYSIS OF FACTORS No. 1 THROUGH 11)

**Pursuant to Chapter 7 of Article IV of the Carson Municipal Code, otherwise cited as the "*Mobilehome* Space Rent Control Ordinance", the Board shall consider the following eleven (11) factors in addition to any other factors it considers relevant in making a determination on a rental increase request. Section 4704 (g) reads, in part, as follows:**

**FACTOR No. 1, "Changes in the Consumer Price Index for all urban consumers in the Los Angeles-Riverside-Orange County Metropolitan Area published by the Bureau of Labor Statistics."**

Facts: In this case, staff has utilized the August, 2006 Consumer Price Index figure for all urban consumers in the Los Angeles-Riverside-Orange County metropolitan area for calculating the percent change in the CPI since the park's last general rent increase application. The CPI at that time, the time of the last hearing before the Board (on a 1967 = 100 base) was 626.1.

The most recent CPI figure available as of the writing of this report is for December, 2007. This CPI is listed as 648.1 on a 1967 = 100 base, as provided by the U. S. Bureau of Labor Statistics.

Findings: The per cent change in the CPI is calculated as follows:

| | | |
|---|---|---|
| CPI (December, 2007) | = | 648.1 |
| CPI (August, 2006) | = | -626.1 |
| CPI (Point Change) | = | 22.0 |

Therefore:

| 22.0 (CPI point change) / 626.1 (CPI, August, 2006) | x 100 | 3.51 % (Percent change in the CPI) |
|---|---|---|

**FACTOR No. 2, "The rent lawfully charged for comparable mobilehome spaces in the City of Carson."**

Facts: Staff finds that Colony Cove Mobile Estates is comparable to two (2) mobilehome parks in the City in terms of rental space size and amenities provided, as follows:

| Name & Date of Park Construction | No. of Units | Park Amenities | Current General Base Rents/Month | Current Capital Improvement/ Month |
|---|---|---|---|---|
| Colony Cove Mobile Estates 17700 S. Avalon Blvd. Carson, CA 90746 (1995) | 404 | Recreation building and banquet room/ auditorium, billiards/game room, lounge/card room, library/TV room, laundry w/coin washers & dryers, office/lobby, exercise room, indoor spa and saunas, swimming pool, outdoor clothes drying area, car wash area, pet run area, RV storage area and manned entry gate. Water, sewer, & trash collection services are included in the monthly rent. A separate fee of $48.00 per person per year is paid for security. | $346.03 to $453.58 The last general rent increase was for $6.23 per space per month, or a range of from 1.39% to 1.83%. It was approved by the Board on 09-27-06. | $2.48 per space, per month, for a period of 60 months, or until 12-31-06, for clubhouse, Jacuzzi, walls, landscaping, etc. (approved 10-01-01). $13.76 per space, per month, for a period of 60 months, or until 05-31-12, clubhouse, furniture & fixtures, etc. (approved 02-07-07) through Reso. No. 2007-245. |

**COMPARABLE PARKS:**

| | | | | |
|---|---|---|---|---|
| Carson Harbor Village MHP 17701 S. Avalon Blvd. Carson, CA 90745<br><br>(1978) | 420 | Recreation building w/kitchen & banquet room/auditorium, billiards/game room, lounge/card room, library/TV room, laundry w/coin washers & dryers, office/lobby, exercise/crafts room, indoor spa & saunas, swimming pool, outdoor clothes drying area, three automated security gates.<br><br>Water, sewer & trash collection services are included in the monthly rent. | $539.67 to $578.72*<br><br>The last general rent increase was for 2.15% per space per month or a range of from $11.36 to $12.18.<br><br>It was approved by the Board on 11-28-07. | $15.95 per space, per month, through March 31, 2008 and a final one month payment in April 2008 of $6.74. Originally approved by the MRRB on July 23, 2003, through Reso. No. 2003-221 and later amended by court order and the Board on May 25, 2005 through Reso. No. 2005-236<br><br>$22.43 per space, per month for 4 years though April 30, 2012, for portions of the perimeter wall and renovations to the clubhouse, pool, spa, & park streets. Approved by the Board on January 23, 2008 through Reso. No. 2008-255. |
| Imperial Avalon Mobile Estates 21207 S. Avalon Blvd. Carson, CA 90746 | 225 | Recreation building w/kitchen, card room, billiard room, laundry w/coin washers & dryers, lounge, office, swimming pool, jacuzzi, car wash & storage area.<br><br>Sewer & security services are included in the monthly rent. | $284.11 to $337.54<br><br>The last general rent adjustment was for $9.68 or a range of from 2.95% to 3.53%.<br><br>It was approved by the Board on 09-26-07. | $28.66 per space, per month for 10 years through December 31, 2017, for 3 storm drains, streets, culverts, clubhouse air, major leak repair to the fire hydrant line. Approved by the Board on September 26, 2007 through Reso. No. 2007-249. |

*The owner of Carson Harbor Village constructed 11 new spaces in 1995, which are exempt from the City's rent control ordinance. These space rents are not considered to be comparable because they are on non-rent controlled spaces. Therefore, they are excluded from this comparison.

Findings: In this case, staff compared Colony Cove Mobile Estates with the two other mobilehome parks which have the most comparable rental spaces and similar amenities. It is acknowledged that these three parks are not exactly the same. However, they are the most comparable of the parks in the City of Carson. Each park provides sewer and trash collection services within the rent structure.

Carson Harbor Village provides three automated security gates within the monthly rent structure while Colony Cove charges a separate fee of $48.00 per person, per year, in connection with its manned 24-hour gated security. This fee pays for a portion of the total cost of security services.

Imperial Avalon has no security gate, no indoor sauna, and is approximately half the overall size of the other two comparison parks. However, as noted above, the rental space size and most of the other amenities are fairly comparable to Colony Cove, although are arguably inferior overall.

The following list compares each of the three parks by presenting the variations in the current rent structures. The rent structures are ranked from 1 through 3, with number 1 being the highest average monthly rent.

| | | **Base Rent Range** | **Avg. Base Rent** |
|---|---|---|---|
| 1. | Carson Harbor Village MHP * | $539.67 to $578.72 | $543.35 |
| **2.** | **Colony Cove Mobile Estates** | **$346.03 to $453.58** | **$414.25** |
| 3. | Imperial Avalon Mobile Estates | $284.11 to $337.54 | $300.57 |

*Rent controlled spaces only.

With respect to the average base rent charged at comparable mobilehome parks, the above list shows that Colony Cove Mobile Estates has an average base rent that is ranked second out of three comparable mobilehome parks.

**FACTOR No. 3. "The length of time since either the last hearing and final determination by the Board on a rent increase application or the last rent increase if no previous rent increase application has been made."**

Facts: The Mobilehome Park Rental Review Board last granted a general rent increase adjustment to Colony Cove Mobile Estates at the Board's September 27, 2006 meeting.

Findings: The total period of time from the Board's September 27, 2006 meeting to tonight's meeting is approximately 17-1/2 months, or one year, 5-1/2 months.

**FACTOR No. 4. "The completion of any Capital Improvements or rehabilitation work related to the mobilehome space or spaces specified in the rent increase application, and the cost thereof, including materials, labor, construction interest, permit fees, and other items as the Board deems appropriate."**

Facts: Staff has removed some $266,123 in what we believe to be major rehabilitation and/or capital improvements to the park from this general rent increase application. We ask the Board to review these items shown in Exhibit-E (pages E-17 to E-19) and if there are any disagreements, to call out those items before the entire Board for discussion and a vote of whether to either be included or excluded from the general rent increase application before the Board.

Findings: Staff requests that the Board direct the park owner to apply for a capital improvement rent increase in the amount of approximately $266,213 at their earliest convenience assuming no changes are made to the total as noted above.

**FACTOR No. 5. "Changes in property taxes or other taxes related to the subject mobilehome park."**

Facts:

| | **2005** | **2006-07** | **$ Change** |
|---|---|---|---|
| Property Taxes | $ 172,001 | $ 188,464 | (+) $ 16,463 |

Findings: The change in property taxes from 2005 through 2006-07 was an increase of $188,464 or 9.6%.

**FACTOR No. 6, "Changes in the rent paid by the applicant for the lease of the land on which the subject mobilehome park is located."**

Facts: None.

Findings: Not applicable.

**FACTOR No. 7, "Changes in the utility charges for the subject mobilehome park paid by the applicant and the extent if any, of reimbursement from the residents."**

Facts:

| | 2005 | 2006-07 | $ Change |
|---|---|---|---|
| Electric Costs (Common Area): | $ 16,731 | $ 21,095 | (+) $ 4,364 |

Findings: From 2005 through 2006-07, the park's common area electric costs increased by $4,364 or 26.1%.

Facts:

| | 2005 | 2006-07 | $ Change |
|---|---|---|---|
| Natural Gas (Common Area): | $ 17,847 | $ 21,098 | (+) $ 3,251 |

Findings: From 2005 through 2006-07, the park's common area natural gas costs increased by $ 3,251 or 18.2%.

Facts:

| | 2005 | 2006-07 | $ Change |
|---|---|---|---|
| Water Costs: (Com. Areas & Pk. Res.) | $ 79,850 | $ 85,091 | (+) $ 5,241 |

Findings: From 2005 through 2006-07, the parks water costs decreased by $ 5,241 or 6.6%.

Facts:

| | 2005 | 2006-07 | $ Change |
|---|---|---|---|
| Trash Collections: | $ 39,426 | $ 43,571 | (+) $ 4,145 |

Findings: From 2005 through 2006-07, the parks trash collection costs increased by $ 4,145 or 10.5%.

**FACTOR No. 8, "Changes in the reasonable operating and maintenance (O&M) expenses."**

For this rent application submittal, the park owner presented operating expense and income sheets for the 2006-07 expense year which will be compared with 2005 data. Expenses that have increased and/or decreased during this period are shown below. It should be noted that property taxes, electricity, natural gas, water, and trash collection costs (which have just been reviewed) are once again included in these figures for comparison purposes to show the total increases and decreases in operating expenses for the park.

| | 2005 Base Year | 2006-07 Current Applic. | (+,-) | 2005 thru 2006-07 |
|---|---|---|---|---|
| Accounting | $ 39,500 | $ 0 | (-) | $ (39,500) |
| Insurance | $ 50,106 | $ 39,476 | (-) | $ (10,629) |
| Legal | $ 53,479 | $ 80,716 | (+) | $ 27,237 |
| License/Fees/Dues | $ 13,537 | $ 4,722 | (-) | $ (8,815) |
| Office Expenses | $ 33,090 | $ 24,960 | (-) | $ (8,130) |
| Telephone | $ 8,504 | $ 5,754 | (-) | $ (2,750) |
| Salaries:(on-site) | $ 149,775 | $ 133,978 | (-) | $ (15,797) |
| Management Fees | $ 99,276 | $ 81,010 | (-) | $ (18,266) |
| Debt Service, Int. | $ 354,405 | $ 1,254,143 | (+) | $ 899,738 |
| Property Taxes | $ 172,001 | $ 188,464 | (+) | $ 16,463 |
| Trash Collection | $ 39,426 | $ 43,571 | (+) | $ 4,145 |
| Water (com) | $ 79,850 | $ 85,091 | (+) | $ 5,241 |
| Electricity (com) | $ 16,731 | $ 21,095 | (+) | $ 4,364 |
| Natural Gas (com) | $ 17,847 | $ 21,098 | (+) | $ 3,251 |
| Com. Area Lt. Credit | $ 19,633 | $ 19,624 | (-) | $ (9) |
| Electric (Maint.) | $ 1,967 | $ 1,800 | (-) | $ (167) |
| Landscaping | $ 16,983 | $ 49,677 | (+) | $ 32,694 |
| Plumbing | $ 4,726 | $ 5,247 | (+) | $ 521 |
| Pool Maint./Supl. | $ 7,070 | $ 6,777 | (-) | $ (293) |
| Street Maint. | $ 0 | $ 0 | (=) | $ - |
| Street Sweeping | $ 2,280 | $ 2,280 | (=) | $ - |
| Security | $ 103,137 | $ 104,444 | (+) | $ 1,307 |
| Other Maint. | $ 37,141 | $24,245 | (-) | $ (12,896) |
| **Totals** | **$ 1,320,463** | **$ 2,198,172** | **(+)** | **$ 877,709** |

Findings: From 2005 through 2006-07, the park's operating expenses increased by $ 877,709 or 66.5%.

**FACTOR No. 9, "The need for repairs caused by circumstances other than ordinary wear and tear."**

Facts: None.

Findings: Not applicable.

**FACTOR No. 10, "The amount and quality of services provided by the applicant to the affected tenant."**

Facts: The Mobilehome Park Rental Review Board is referred to Factor No. 2 of this report where staff has outlined various amenities at Colony Cove Mobile Estates and compared the park with the other mobilehome parks with comparable rental spaces and similar amenities.

Findings: On Wednesday, February 6, 2008, starting at approximately 9:30 AM, Board staff conducted an inspection of the park, and we were accompanied by one of our consulting rehabilitation inspectors, Mr. Don Knechtel and the following comments are noted:

1. **Perimeter Exterior Landscaping**

a. West Side: The landscaping along South Avalon Boulevard consists of trees and grass. The area there appeared to be maintained in a neat manner with no significant amount of weeds or litter noted.

b. North Side: The landscaping along East Albertoni Street consists of newly planted ground cover, shrubs and trees. Some litter was noted in the landscaping, but with the nearby fast food establishments some litter is probably unavoidable. The park has a fire exit gate near the northwest corner, but there is no paved driveway or curb cut for emergency exit purposes. (In this case, the exit would be into the parking lot of the adjacent fast food restaurant.)

c. East Side: The landscaping along South Rainsbury Avenue consists of trees, grass, and low ground cover which appeared to be in good condition. There are two emergency gates located on the east perimeter wall of the park. Neither gate had a paved driveway or curb cut to the public street.

d. South Side: The landscaping along East Victoria Street consists of trees and grass. The grass was cut and the area was nicely maintained. An emergency exit gate is located at the southeast corner of the park, and this gate likewise had no paved driveway or curb cut to the public street.

2. **Security Gate System**

The security system includes two lanes each for entering and exiting the park. At the time of the inspection, a security guard was present in the guard booth at the park entrance. The gates consist of wooden arms, which raise and lower to halt traffic from entering the park. Steel spikes in the roadway of the exit lanes serve to deter vehicles from entering in the wrong direction. The guard booth is staffed on a 24-hour basis. The landscaping at the entrance to the park consisted of grass and planter areas with flowers and trees.

3. **Recreation Building (Main Entrance and Exterior)**

A concrete patio area at the main entrance contained two varnished wood and wrought iron benches. Also on this patio are two newspaper vending machines. A smaller patio area at the rear of the building has a similar wood/iron bench. The recreation building has grass areas with trees and shrubs around the perimeter of building, including a large tree at the entrance. The landscaping was all well trimmed and relatively neat in appearance.

4. **Recreation Building (Central Section)**

a. Office and Reception/Main Lobby: The manager's office is located to the right of the main entrance to the recreation building. The park manager was present at the time of the visit. Park maintenance employees were observed on duty in several places during our visit.

There is a central lobby area, which contains couches, chairs, and tables. The carpeting and the walls appeared well maintained. The office area was also neat and clean in appearance.

b. Library/TV Room: The room contains tables, table lamps, couches, chairs, a television, and an assortment of books and magazines. The room's furnishings appeared to be in good condition and the carpet appeared to be well maintained.

c. Restroom Facilities and Hallway Area: The men and women's rest rooms were clean and well maintained.

d. Kitchen Facilities: The kitchen is fully equipped and it included two ovens, two four-burner cook tops, a large restaurant-style griddle, a coffee maker, a microwave oven, filtered water dispenser

and miscellaneous storage cupboards. Additionally, there were counter tops, a double sink, a dishwasher, and two new refrigerator/freezers. A fire extinguisher was on the wall. The floor was clean, and the area was maintained in very good condition.

 e. Lounge/Card Room and Hallway Area: This area contains four sets of tables and chairs. The furniture was in good condition and the room had a neat and clean appearance. In the hallway, there were a soft drink machine, a snack vending machine and several refrigerators.

**5. Recreation Building (North Wing)**

Auditorium/Meeting Room: The auditorium contained a large carpeted stage, wooden dance floor, decorated banquet tables and chairs. The carpet was clean and in good condition. The stage had a piano and flags on it. The entire room was in good condition.

**6. Recreation Building (East Wing)**

 a. Exercise Room: The room included an array of exercise equipment that all appeared to be in working order with one wall half mirrored and a TV. The carpet was clean, and the room appeared to be in good order.

 b. Indoor Spa: The indoor spa water appeared to be clean. Despite the fact that the facility is conducive to moisture, the wall tiles and ceiling were maintained in very good condition.

 c. Restroom Facilities and Hallway Area: Men and women's restroom facilities are also located in the spa area. The floor of the hallway leading to the restrooms is covered by rubber or plastic mesh matting, which was neat and clean. Each restroom contains showers, a sauna, and toilet facilities, and each was clean at the time of inspection.

**7. Recreation Building (South Wing)**

 a. Billiard/Game Room: This area contains four billiard tables, and two card tables with chairs. Additionally, there were six barstools located along the walls to observe the billiard games.

 b. Laundry Room and Outdoor Drying Yard: Posted hours for the laundry area were 8:00 AM to 9:00 PM. The laundry contains four coin-operated washers, four coin-operated dryers, and a sink area. (Plumbing outlets exist for an additional two washers.) There are three counter areas for folding clothes. The counter areas, as well as the floor, were clean. The east wall is lined with a magazine rack, above which is located a bulletin board. A fire extinguisher was also located on the wall. An enclosed outdoor area with clotheslines is provided adjacent to the laundry room.

**8. Swimming Pool/Patio Area**

The water level in the swimming pool had been lowered to facilitate the installation of railing to assist residents in and out of the pool. The patio area contained numerous tables, chairs, and lounges. There were also several wooden tables and chairs and large metal shade covers. Pool safety equipment was visible near the pool, and pool signs (hours, rules, and pool capacity) were posted. Also in the pool area for use by the residents are two gas barbecues.

**9. Streets, Curbs and Gutters**

No potholes were observed on major or secondary streets. Speed bumps and drainage gutters are located throughout the park, and these help keep vehicle speeds to a reasonable level (a 15-mph speed limit is posted throughout the park). During the inspection, staff did not observe any vehicles parked illegally on the interior streets with the exception of several contractors who were working on some mobiles.

10. **Recreational Vehicle Storage**

The recreational vehicle storage areas are located in the southeast corner and on the northerly boundary of the park. These areas are fenced and/or block walled enclosures, with lockable gates for security.

11. **Trash Enclosures**

Trash enclosures are located throughout the park. At the time of the inspection, the enclosures were generally clean and appeared to be well maintained.

12. **Recreational Building/Guest Parking**

The recreation building has a total of 38 resident and/or guest parking spaces adjacent to the facility. Additionally, there are approximately 69 guest parking spaces located next to the various former oil well sites located throughout the park.

13. **Mobilehome Spaces and Driveways**

Generally, staff noted that the individual mobilehomes, driveways and yards are well to very well maintained. Most of the mobilehome residents have very neatly trimmed landscaping and most of the mobilehomes were in good to new condition. There were a few mobilehome spaces where the unit and landscaping was not maintained as well as their neighbors, however, they were definitely in the minority of home owners.

14. ***Interior Street Lighting***

The park now has an electric street lighting system, which replaced the original gas filament-illuminated system.

**FACTOR No. *11*, "*Any written lease lawfully entered into between the applicant and the affected residents.*"**

Facts: None.

Findings: Not applicable.

---

**ADDITIONAL ANALYSIS**

The following additional analyses are provided to assist the Board in applying the factors in the Ordinance. They show the impact of the owner's request on the park's income and the impact of the rent increases based on the increase in the consumer price index, or portions thereof, on the park's income. Additionally, analyses are included that show the effects of inflation on the gross profit of the park during the expense years under review, based on the gross profits maintenance estimate.

---

**OPTION NO. 1 - OWNER'S PROPOSAL**

The Board may wish to consider granting a general rent increase based on the owner's proposal, which would be for $618.05 per space per month, or a range of from 136.26% to 178.61%. The park owner proposes to increase the monthly space rents on 403 of the 404 spaces in the park, as follows:

| Spaces per Rent Level | | Current General Base Rent | + | Requested General Rent Increase | = | New Requested Base Rent | % Increase |
|---|---|---|---|---|---|---|---|
| 1 | Sp. | $346.03 | + | $618.05 | = | $964.08 | 178.61% |
| 1 | Sp. | $357.76 | + | $618.05 | = | $975.81 | 172.76% |
| 1 | Sp. | $363.23 | + | $618.05 | = | $981.28 | 170.15% |
| 6 | Sp. | $379.88 | + | $618.05 | = | $997.93 | 162.70% |
| 21 | Sp. | $387.24 | + | $618.05 | = | $1,005.29 | 159.60% |
| 1 | Sp. | $389.69 | + | $618.05 | = | $1,007.74 | 158.60% |
| 71 | Sp. | $394.62 | + | $618.05 | = | $1,012.67 | 156.62% |
| 34 | Sp. | $401.98 | + | $618.05 | = | $1,020.03 | 153.75% |
| 42 | Sp. | $409.36 | + | $618.05 | = | $1,027.41 | 150.98% |
| 52 | Sp. | $416.72 | + | $618.05 | = | $1,034.77 | 148.31% |
| 86 | Sp. | $424.10 | + | $618.05 | = | $1,042.15 | 145.73% |
| 29 | Sp. | $431.47 | + | $618.05 | = | $1,049.52 | 143.24% |
| 51 | Sp. | $438.85 | + | $618.05 | = | $1,056.90 | 140.83% |
| 2 | Sp. | $446.21 | + | $618.05 | = | $1,064.26 | 138.51% |
| 5 | Sp. | $453.58 | + | $618.05 | = | $1,071.63 | 136.26% |
| 1 | Sp. | $0.00 | + | $0.00 | = | $0.00 | 0.00% |
| **404** | **Sp.** | **$2,003,313.96** | **+** | **$2,988,889.80** | **=** | **$4,992,203.76** | |

In this case, the owner's proposal of a $618.05 monthly increase for the 403 affected spaces would equal $2,988,889.80 in additional income on a yearly basis.

---

**OPTION No. 2A - CONSUMER PRICE INDEX (100.0% METHOD)**

Next, the Board may wish to consider granting a general rent increase based on all or a portion of the 3.51% CPI (100% of change between August 2006 and, December, 2007). This would amount to a proposed rent increase of from $12.16 to $15.94 per space, per month for the 403 rental spaces, as follows:

| Number of Spaces per Rent Level | | Current General Base Rent | + | Proposed General Rent Increase | = | New Proposed Base Rent | % Increase |
|---|---|---|---|---|---|---|---|
| 1 | Sp. | $346.03 | + | $12.16 | = | $358.19 | 3.51% |
| 1 | Sp. | $357.76 | + | $12.57 | = | $370.33 | 3.51% |
| 1 | Sp. | $363.23 | + | $12.76 | = | $375.99 | 3.51% |
| 6 | Sp. | $379.88 | + | $13.35 | = | $393.23 | 3.51% |
| 21 | Sp. | $387.24 | + | $13.61 | = | $400.85 | 3.51% |
| 1 | Sp. | $389.69 | + | $13.69 | = | $403.38 | 3.51% |
| 71 | Sp. | $394.62 | + | $13.87 | = | $408.49 | 3.51% |
| 34 | Sp. | $401.98 | + | $14.12 | = | $416.10 | 3.51% |
| 42 | Sp. | $409.36 | + | $14.38 | = | $423.74 | 3.51% |
| 52 | Sp. | $416.72 | + | $14.64 | = | $431.36 | 3.51% |
| 86 | Sp. | $424.10 | + | $14.90 | = | $439.00 | 3.51% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 29 | Sp. | $431.47 | + | $15.16 | = | $446.63 | 3.51% |
| 51 | Sp. | $438.85 | + | $15.42 | = | $454.27 | 3.51% |
| 2 | Sp. | $446.21 | + | $15.68 | = | $461.89 | 3.51% |
| 5 | Sp. | $453.58 | + | $15.94 | = | $469.52 | 3.51% |
| 1 | Sp. | $0.00 | + | $0.00 | = | $0.00 | 0.00% |
| **404** | **Sp.** | **$2,003,313.96** | **+** | **$70,392.76** | **=** | **$2,073,706.72** | |

In this case, the proposed 3.51% CPI increase of the 403 affected base rents will be equal to an additional $70,392.76 of rental income on a yearly basis.

**OPTION No. 2B - CONSUMER PRICE INDEX (75.0% METHOD)**

Next, the Board may wish to consider granting a general rent increase based on all or a portion of a sum equal to 75% of the 3.51 % CPI change between August, 2006 and December, 2007. This would amount to a proposed 2.64 % rent increase, or from $9.12 to $ 11.95 per space, per month for the 403 rental spaces, as follows:

| Number of Spaces per Rent Level | | Current General Base Rent | + | Proposed General Rent Increase | + | New Proposed Base Rent | % Increase |
|---|---|---|---|---|---|---|---|
| 1 | Sp. | $346.03 | + | $9.12 | = | $355.15 | 2.64% |
| 1 | Sp. | $357.76 | + | $9.43 | = | $367.19 | 2.64% |
| 1 | Sp. | $363.23 | + | $9.57 | = | $372.80 | 2.64% |
| 6 | Sp. | $379.88 | + | $10.01 | = | $389.89 | 2.64% |
| 21 | Sp. | $387.24 | + | $10.21 | = | $397.45 | 2.64% |
| 1 | Sp. | $389.69 | + | $10.27 | = | $399.96 | 2.64% |
| 71 | Sp. | $394.62 | + | $10.40 | = | $405.02 | 2.64% |
| 34 | Sp. | $401.98 | + | $10.59 | = | $412.57 | 2.64% |
| 42 | Sp. | $409.36 | + | $10.79 | = | $420.15 | 2.64% |
| 52 | Sp. | $416.72 | + | $10.98 | = | $427.70 | 2.64% |
| 86 | Sp. | $424.10 | + | $11.18 | = | $435.28 | 2.64% |
| 29 | Sp. | $431.47 | + | $11.37 | = | $442.84 | 2.64% |
| 51 | Sp. | $438.85 | + | $11.57 | = | $450.42 | 2.64% |
| 2 | Sp. | $446.21 | + | $11.76 | = | $457.97 | 2.64% |
| 5 | Sp. | $453.58 | + | $11.95 | = | $465.53 | 2.64% |
| 1 | Sp. | $0.00 | + | $0.00 | = | $0.00 | 0.00% |
| **404** | **Sp.** | **$2,003,313.96** | **+** | **$52,794.57** | **=** | **$2,056,108.53** | |

In this case, the proposed 2.64% increase of the 403 affected base rents will be equal to an additional $52,794.53 of rental income on a yearly basis.

**OPTION No. 2C - CONSUMER PRICE INDEX (50.0% METHOD)**

Next, the Board may wish to consider granting a general rent increase based on all or a portion of a sum equal to 50% of the 3.51% CPI change between August 2006 and December, 2007. This would amount to a proposed 1.76% rent increase, or from $6.08 to $7.97 per space, per month, as follows:

| Number of Spaces per Rent Level | | Current General Base Rent | + | Proposed General Rent Increase | + | New Proposed Base Rent | % Increase |
|---|---|---|---|---|---|---|---|
| 1 | Sp. | $346.03 | + | $6.08 | = | $352.11 | 1.76% |
| 1 | Sp. | $357.76 | + | $6.29 | = | $364.05 | 1.76% |
| 1 | Sp. | $363.23 | + | $6.38 | = | $369.61 | 1.76% |
| 6 | Sp. | $379.88 | + | $6.67 | = | $386.55 | 1.76% |
| 21 | Sp. | $387.24 | + | $6.80 | = | $394.04 | 1.76% |
| 1 | Sp. | $389.69 | + | $6.85 | = | $396.54 | 1.76% |
| 71 | Sp. | $394.62 | + | $6.93 | = | $401.55 | 1.76% |
| 34 | Sp. | $401.98 | + | $7.06 | = | $409.04 | 1.76% |
| 42 | Sp. | $409.36 | + | $7.19 | = | $416.55 | 1.76% |
| 52 | Sp. | $416.72 | + | $7.32 | = | $424.04 | 1.76% |
| 86 | Sp. | $424.10 | + | $7.45 | = | $431.55 | 1.76% |
| 29 | Sp. | $431.47 | + | $7.58 | = | $439.05 | 1.76% |
| 51 | Sp. | $438.85 | + | $7.71 | = | $446.56 | 1.76% |
| 2 | Sp. | $446.21 | + | $7.84 | = | $454.05 | 1.76% |
| 5 | Sp. | $453.58 | + | $7.97 | = | $461.55 | 1.76% |
| 1 | Sp. | $0.00 | + | $0.00 | = | $0.00 | 0.00% |
| **404** | **Sp.** | **$2,003,313.96** | **+** | **$35,196.38** | **=** | **$2,038,510.34** | |

In this case, the proposed 1.76 % increase of the 403 affected base rents will be equal to an additional $35,196.38 of rental income on a yearly basis.

**OPTION No. 3A - ESTIMATED GROSS PROFIT MAINTENANCE ANALYSIS (100.0% CPI METHOD, BASED ON THE FINAL EXPENSE YEAR)**

The following is the Estimated Gross Profits Maintenance Analysis calculation utilizing a 100% of the CPI adjustment, for Colony Cove Mobile Estates, based on the final expense year being reviewed, or in this case, 2006-07. The purpose of the Estimated Gross Profit Maintenance Analysis is to help determine how a park has been operating since its last general rent increase and/or last hearing before the Board and the effects that inflation may have had on the park's profit level through the end of the expense year(s) being reviewed. The park's last general rent increase was granted on September 27, 2006. Given the legally required 90-day notification period, 2007 is the first year during which the effects of the last general rent increase could be fully observed. During the park's last hearing before the Board, a rent increase of $6.23 per space, per month, for a range of from 1.39% to 1.83%, was granted.

Because the most current documentation submitted for this application is for 2006-07, staff does not have a full comparison year on which to perform an unadjusted gross profit maintenance analysis. However, staff will update the 2005 figures to show the full effects of inflation on the park's profit level in order to provide an as up-to-date as possible comparison figure. Staff will use 2005 as the base year for the comparison with 2006-07 as it was the last full year of expenses submitted by the owner and reviewed by the Board during the park's most recent public hearing on September 27, 2006.

| | |
|---|---|
| $ 30,128.28 | Amount of Last General Rent Increase Granted by the Board on 9-27-06 & Collectible in 2007. |
| - 0.00 | Amount of Last Rent Increase Granted due to Increased Operating Expenses (2005). |
| $ 30,128.28 | Amount of Last Rent Increase Granted by Board for Additional Gross Profit Maintenance. |
| $ 30,128.28 | Amount of Last Rent Increase Granted by Board for Additional Gross Profit Maintenance. |
| - 22,596.21 | Amount of the Last Rent Increase Not Collectible in 2006-07 (9-Months, April-December 07). |
| $ 7,532.07 | Amount of the Last Rent Increase Collectible in 2006-07 (3-Months, January-March 07). |

| | |
|---|---|
| $ 718,240.00 | Actual Gross Profit for 2005. |
| + 7,532.07 | Amount of the Last Rent Increase Collectible in 2006-07 (3-Months, January-March 07). |
| $ 733,304.14 | Estimated Gross Profit Target for 2006-07. |

| | |
|---|---|
| $ 733,304.14 | Estimated Gross Profit Target for 2006-07. |
| x 6.19% | CPI Adjustment (12/05 through 03/07). |
| $ 45,391.53 | CPI Adjustment to Maintain Estimated Gross Profit through 2006-07. |

| | |
|---|---|
| $ 733,304.14 | Estimated Gross Profit Target for 2006-07. |
| + 45,391.53 | CPI Adjustment to Maintain Estimated Gross Profit through 2006-07. |
| $ 778,695.67 | Adjusted Gross Profit Target for 2006-07. |

| | |
|---|---|
| $ 778,695.67 | Adjusted Gross Profit Target for 2006-07. |
| - (192,910) | Actual Gross Profit for 2006-07. |
| $ 971,605.67 | Estimated Deficit in Gross Profit compared to Projected 100% CPI Maint. Level for 2006-07. |

Therefore, the estimated gross profit of the park has not been maintained at a rate equal to or greater than 100% of the CPI change from December, 2005 through March, 2007.

Therefore, $ 971,695.67 ÷ 403 rental spaces = $4,411.16 ÷ 12 months = **$ 200.93** per space, per month.

Accordingly, the Board may wish to consider granting a general rent increase based on all or a portion of a sum equal to 100% of the deficit in the estimated gross profit maintenance target for 2006-07. This will amount to a proposed rent increase of $200.93 or (44.30% to 58.07%) per space, per month for 403 of the 404 spaces in the park, as follows:

| Spaces per Rent Level | | Current General Base Rent | + | Requested General Rent Increase | = | New Requested Base Rent | % Increase |
|---|---|---|---|---|---|---|---|
| 1 | Sp. | $346.03 | + | $200.93 | = | $546.96 | 58.07% |
| 1 | Sp. | $357.76 | + | $200.93 | = | $558.69 | 56.16% |
| 1 | Sp. | $363.23 | + | $200.93 | = | $564.16 | 55.32% |
| 6 | Sp. | $379.88 | + | $200.93 | = | $580.81 | 52.89% |
| 21 | Sp. | $387.24 | + | $200.93 | = | $588.17 | 51.89% |
| 1 | Sp. | $389.69 | + | $200.93 | = | $590.62 | 51.56% |
| 71 | Sp. | $394.62 | + | $200.93 | = | $595.55 | 50.92% |
| 34 | Sp. | $401.98 | + | $200.93 | = | $602.91 | 49.99% |
| 42 | Sp. | $409.36 | + | $200.93 | = | $610.29 | 49.08% |
| 52 | Sp. | $416.72 | + | $200.93 | = | $617.65 | 48.22% |
| 86 | Sp. | $424.10 | + | $200.93 | = | $625.03 | 47.38% |
| 29 | Sp. | $431.47 | + | $200.93 | = | $632.40 | 46.57% |
| 51 | Sp. | $438.85 | + | $200.93 | = | $639.78 | 45.79% |
| 2 | Sp. | $446.21 | + | $200.93 | = | $647.14 | 45.03% |
| 5 | Sp. | $453.58 | + | $200.93 | = | $654.51 | 44.30% |
| 1 | Sp. | $0.00 | + | $0.00 | = | $0.00 | 0.00% |
| **404** | **Sp.** | **$2,003,313.96** | + | **$971,697.48** | = | **$2,975,011.44** | |

In this case, the proposed $200.93 increase of the 403 affected base rents will be equal to an additional $971,697.48 of rental income on a yearly basis.

**OPTION No. 3B - ESTIMATED GROSS PROFIT MAINTENANCE ANALYSIS (75.0% CPI METHOD, BASED ON THE FINAL EXPENSE YEAR)**

| | |
|---|---|
| $ 733,304.14 | Estimated Gross Profit Target for 2006-07. |
| x 4.64% | 75% of the CPI Adjustment, (12-05 to 03-07). |
| $ 34,025.31 | CPI Adjustment to Maintain Estimated Gross Profit through 2006-07. |

| | |
|---|---|
| $ 733,304.14 | Estimated Gross Profit Target for 2006-07. |
| + 34,025.31 | CPI Adjustment to Maintain Estimated Gross Profit through 2006-07. |
| $ 767,329.45 | Adjusted Gross Profit Target for 2006-07. |

| | |
|---|---|
| $ 767,329.45 | Adjusted Gross Profit Target for 2006-07. |
| - (192,910) | Actual Gross Profit for 2006-07. |
| $ 960,239.45 | Estimated Deficit in Gross Profit compared to Projected 75% CPI Maintenance Level for 2005. |

Therefore, the estimated gross profit target for the park (final expense year method – as adjusted by staff) has not been maintained at a rate equal to 75% of the CPI change from December, 2005, to March 2007.

Therefore, $960,239.45 ÷ 403 rental spaces = $2,382.73 ÷ 12 months = **$ 198.56** per space, per month.

Accordingly, the Board may wish to consider granting a general rent increase based on all or a portion of a sum equal to 75% of the deficit in the estimated gross profit maintenance target for 2006-07. This will amount to a proposed rent increase of $ 198.56 or (43.78% to 57.38%) per space, per month for all spaces in the park, as follows:

| Spaces per Rent Level | | Current General Base Rent | + | Requested General Rent Increase | = | New Requested Base Rent | % Increase |
|---|---|---|---|---|---|---|---|
| 1 | Sp. | $346.03 | + | $198.56 | = | $544.59 | 57.38% |
| 1 | Sp. | $357.76 | + | $198.56 | = | $556.32 | 55.50% |
| 1 | Sp. | $363.23 | + | $198.56 | = | $561.79 | 54.67% |
| 6 | Sp. | $379.88 | + | $198.56 | = | $578.44 | 52.27% |
| 21 | Sp. | $387.24 | + | $198.56 | = | $585.80 | 51.28% |
| 1 | Sp. | $389.69 | + | $198.56 | = | $588.25 | 50.95% |
| 71 | Sp. | $394.62 | + | $198.56 | = | $593.18 | 50.32% |
| 34 | Sp. | $401.98 | + | $198.56 | = | $600.54 | 49.40% |
| 42 | Sp. | $409.36 | + | $198.56 | = | $607.92 | 48.50% |
| 52 | Sp. | $416.72 | + | $198.56 | = | $615.28 | 47.65% |
| 86 | Sp. | $424.10 | + | $198.56 | = | $622.66 | 46.82% |
| 29 | Sp. | $431.47 | + | $198.56 | = | $630.03 | 46.02% |
| 51 | Sp. | $438.85 | + | $198.56 | = | $637.41 | 45.25% |
| 2 | Sp. | $446.21 | + | $198.56 | = | $644.77 | 44.50% |
| 5 | Sp. | $453.58 | + | $198.56 | = | $652.14 | 43.78% |
| 1 | Sp. | $0.00 | + | $0.00 | = | $0.00 | 0.00% |
| **404** | **Sp.** | **$2,003,313.96** | **+** | **$960,236.16** | **=** | **$2,963,550.12** | |

In this case, the proposed $198.56 increase of the current base rents will be equal to an additional $960,236.16 in additional income on a yearly basis from the 403 rent producing spaces in the park.

**OPTION No. 3C - ESTIMATED GROSS PROFIT MAINTENANCE ANALYSIS (50.0% CPI METHOD, BASED ON THE FINAL EXPENSE YEAR)**

| | |
|---|---|
| $ 733,304.14 | Estimated Gross Profit Target for 2006-07. |
| x 3.10% | 50% of the CPI Adjustment, (12-05 to 03-07). |
| $ 22,732.43 | CPI Adjustment to Maintain Estimated Gross Profit through 2006-07. |

| | |
|---|---|
| $ 733,304.14 | Estimated Gross Profit Target for 2006-07. |
| + 22,732.43 | CPI Adjustment to Maintain Estimated Gross Profit through 2006-07. |
| $ 756,036.56 | Adjusted Gross Profit Target for 2006-07. |

| | |
|---|---|
| $ 756,036.56 | Adjusted Gross Profit Target for 2006-07. |
| - (192,910) | Actual Gross Profit Target for 2006-07. |
| $ 948,946.56 | Estimated Excess in Gross Profit compared to Projected 50% CPI Maint. Level for 2006-07. |

Therefore, the estimated gross profit target for the park (final expense year method – as adjusted by staff) has not been maintained at a rate equal to 50% of the CPI change from December, 2005, to March 2007.

Therefore, $948,946.56 ÷ 403 rental spaces = $2,354.71 ÷ 12 months = **$ 196.23** per space, per month.

Accordingly, the Board may wish to consider granting a general rent increase based on all or a portion of a sum equal to 50% of the deficit in the estimated gross profit maintenance target for 2006-07. This will amount to a proposed rent increase of $ 196.23 or (43.26% to 56.71%) per space, per month for all spaces in the park, as follows:

| Spaces per Rent Level | | Current General Base Rent | + | Requested General Rent Increase | = | New Requested Base Rent | % Increase |
|---|---|---|---|---|---|---|---|
| 1 | Sp. | $346.03 | + | $196.23 | = | $542.26 | 56.71% |
| 1 | Sp. | $357.76 | + | $196.23 | = | $553.99 | 54.85% |
| 1 | Sp. | $363.23 | + | $196.23 | = | $559.46 | 54.02% |
| 6 | Sp. | $379.88 | + | $196.23 | = | $576.11 | 51.66% |
| 21 | Sp. | $387.24 | + | $196.23 | = | $583.47 | 50.67% |
| 1 | Sp. | $389.69 | + | $196.23 | = | $585.92 | 50.36% |
| 71 | Sp. | $394.62 | + | $196.23 | = | $590.85 | 49.73% |
| 34 | Sp. | $401.98 | + | $196.23 | = | $598.21 | 48.82% |
| 42 | Sp. | $409.36 | + | $196.23 | = | $605.59 | 47.94% |
| 52 | Sp. | $416.72 | + | $196.23 | = | $612.95 | 47.09% |
| 86 | Sp. | $424.10 | + | $196.23 | = | $620.33 | 46.27% |
| 29 | Sp. | $431.47 | + | $196.23 | = | $627.70 | 45.48% |
| 51 | Sp. | $438.85 | + | $196.23 | = | $635.08 | 44.71% |
| 2 | Sp. | $446.21 | + | $196.23 | = | $642.44 | 43.98% |
| 5 | Sp. | $453.58 | + | $196.23 | = | $649.81 | 43.26% |
| 1 | Sp. | $0.00 | + | $0.00 | = | $0.00 | 0.00% |
| **404** | **Sp.** | **$2,003,313.96** | + | **$948,968.28** | = | **$2,952,282.24** | |

In this case, the proposed $196.23 increase of the current base rents will be equal to an additional $948,968.28 in additional income on a yearly basis from the 403 rent producing spaces in the park.

**OPTION No. 4 A-C, MAINTENANCE OF NET OPERATING INCOME (MNOI) (Adjusted by 100%, 75% and 50% of CPI on the Parks Net Operating Income).**

**The explanation and discussion of these options are discussed in attached report from Dr. Baar's Analysis, Exhibit-D, pages D-22 to D-27 and the individual rent level calculations are shown in the staff exhibits, Exhibit-E, pages E-23 and E-24.**

---

**RECOMMENDATION**

The Mobilehome Park Rental Review Board may wish to take one of the following actions:

1. Grant the increase as requested, or
2. Grant a modified increase.

Staff has presented the owner's proposal as submitted in Exhibit-A (pages A-1 to A-33) and the park owner's fair return analysis in Exhibit-B (pages B-1 to B-223. The residents and their representatives have provided information through letters noted in Exhibit-C (pages C-1 to C-36). Staff has reviewed these documents and prepared this staff report and supplemental staff information noted in Exhibit-E (pages E-1 to E-25 and Dr. Baar has submitted his independent fair return analysis that is noted in Exhibit-D (pages D-1 to D-54. Based on a careful review of the income and expense documentation, Factors Numbers 1 through 11 as outlined in the Mobilehome Space Rent Control Ordinance, the revised implementation guidelines, and all the submitted documents, it is staff's recommendation that the board grant Colony Cove Mobile Estates a general rent increase of $15.65 or (3.45% to 4.52%) per space, per month for 403 of the 404 spaces in the park at this time. This would raise the general base rents in the park to a range of $361.68 to $469.23 and to an average rent of $429.90 per space, per month and represents a yearly increase of $75,683.40.

Staff's recommendation is considered to be fair, just and reasonable for Colony Cove Mobile Estates at this time, based on the following findings:

1. Gross Income for Colony Cove Mobile Estates decreased by $ 33,441 or 1.7 %, between 2005 and 2006-07.

2. Operating Expenses for the park increased by $ 877,709 or 66.5 %, between 2005 and 2006-07. (This increase is entirely due to the increased debt service incurred by the new park owner to purchase the park.)

3. Due to the issues noted above, the Gross Profit of the park decreased $ 911,150 or 126.9 % between 2005 and 2006-07 before factoring in the deteriorating effects of inflation on the park's gross income.

4. The local Consumer Price Index has increased by 3.51% from August 2006, (the most recent measurement available at the time of the park's last general rent increase hearing) and December, 2007, (the most recent measurement available at the time of the writing of this staff report).

5. Colony Cove Mobile Estates currently ranks second in its comparison group of three mobilehome parks in terms of average base rent. The park would continue to rank second in this comparison group if staff's recommendation is approved.

6. The period of time since the Board's September 27, 2006 meeting, at which the Board last heard a rent increase request by Colony Cove Mobile Estates, and tonight's meeting, is 17-1/2 months, or one year, five and a half months.

7. The park's property taxes have increased $16,463 or 9.6%, between 2005 and 2006-07.

8. The park's common area electric costs have increased by $4,364 or 26.1%, between 2005 and 2006-07.

9. The park's common area natural gas costs have increased $3,251 or 18.2%, between 2005 and 2006-07.

10. The park's water costs have increased $5,241, or 6.6%, between 2005 and 2006-07.

11. The park's trash collection costs have increased by $4,145 or 10.5%, between 2005 and 2006-07.

12. Staff's inspection of the park on Wednesday, February 6, 2008, indicates that the park is still providing a better level of maintenance, overall upkeep, management and over-sight as compared to past years by the prior park ownership and management.

**EXHIBITS**

**A.** 2006-07 Application Materials for Colony Cove Mobile Estates. (Pgs. A-1 to A-33)

**B.** Fair Return Analysis by John P. Neet, MAI. (Pgs. B-1 to B-223)

**C.** Resident Comment Letters. (Pgs. C-1 to C-36)

**D.** Fair Return Analysis by Dr. Kenneth Baar. Pgs. (Pgs. D-1 to D-54)

**E.** Staff Exhibits. (Pgs. E-1 to E-25)

KF:kf MRRB/CC-2006-07/CC-SR

# EXHIBIT 12

ANDERSON & BRABANT, INC.
REAL ESTATE APPRAISERS AND CONSULTANTS
353 W. NINTH AVENUE
ESCONDIDO, CALIFORNIA 92025-5032
TELEPHONE (760) 741-4146
FAX (760) 741-1049

June 5, 2008

William W. Wynder, Esq.
Aleshire & Wynder, LLP
South Bay Center
1515 West 190th Street
South Tower, Suite 565
Gardena, CA 90248

Re: Rent Increase Application
Colony Cove Mobile Estates

Dear Mr. Wynder:

I have completed a review of a fair return analysis for Colony Cove Mobile Estates prepared by John P. Neet, MAI. His report of September 25, 2007 provides three analyses and opinions of the increase in rent that would be necessary to provide a fair return for Colony Cove Mobile Estates for fiscal year April 2006 through March 2007.

I have also reviewed his updated analysis dated May 28, 2008, that was forwarded to the City on May 29, 2008. In addition I have analyzed Neet's review of Dr. Kenneth Baar's analysis of Colony Cove Mobile Estates. Finally, I have reviewed an appraisal of Colony Cove Mobile Estates, dated March 13, 2007, with a date of value of March 30, 2006, that was prepared by Rob Detling of PGP Valuation Inc.

The purpose of my reviews has been to make a determination as to the adequacy and appropriateness of the analyses and conclusions in the Neet and Detling reports.

**Client/Intended Use**

My client for this assignment is Aleshire & Wynder, LLP, City Attorney to the City of Carson. The report has been prepared to be provided to the Carson Mobilehome Park Rent Review Board ("MRRB") to provide an independent and expert assessment of the submittals noted above, and to assist the MRRB in understanding the meaning and significance of such submittals in connection with a pending application for a so-called "fair return" rent increase application. The author, and Anderson & Brabant, Inc., are not responsible for any unintended use of this report.

**Extent Of The Review Process**

I have read the reports prepared by John Neet and Rob Detling that are previously referenced. I have also reviewed the Application for Mobilehome Space Rent Increase submitted by the park owner, Dr. Kenneth Baar's report and the City Staff Report

F (1)

00254

**Comments On The Reports Reviewed**

1. **Neet's Investment Basis**

Neet's fair return analysis (page 1) discusses the purchase of Colony Cove by the current owner on April 4, 2006, at a price of $22,990,000. He then adds certain costs and fees and concludes that the adjusted purchase price was $23,050,060.99. Next, he references the appraisal by PGP Valuation Inc. as of March 30, 2006, with a market value conclusion of $23,000,000 and comments that this appraisal confirms that the market value estimate essentially equals the purchase price. The PGP appraisal is included in the Addenda to his report.

2. **Neet's Net Operating Income Analysis is Inconsistent With the PGP Appraisal.**

While Neet reports a net operating income of $304,838 the PGP appraisal estimates that the net operating income is $1,110,009. Neet's Net Operating Income Analysis begins by referencing the park owner's financial statements for the period April 2006 through March 2007 (page 7). He makes it clear that he has not reviewed or adjusted the reported income and expenses, except for several adjustments that are specifically addressed in the ordinance or the guidelines. His figures for income, expenses and net operating income are as follows:

| | |
|---|---|
| Reported Collected Income | $2,184,527 |
| Adjustments | ( 152,586) |
| Adjusted Collected Income | $2,031,941 |
| | |
| Reported Operating Expenses | $1,829,297 |
| Adjustments | ( 102,194) |
| Adjusted Operating Expenses | $1,727,103 |
| | |
| Net Operating Income | $ 304,838 |

In the PGP Valuation Inc. appraisal that Neet cites in order to justify the purchase price there is an income analysis that indicates a potential gross income of $2,207,884 which is very close to Neet's reported collected income before the adjustments. However, in the PGP appraisal, the operating expenses total $1,038,535 while the operating expenses reported by Neet are $1,829,297 and the adjusted expenses total $1,727,103.

As indicated, the PGP appraisal estimates a net operating income of $1,110,009 while Neet has a net operating income of only $304,838. Consequently, the applicant is using a net operating income ($1,110,009) to justify the purchase price, but another net operating

F (2)

income ($304,838) that is only a fraction of that amount to justify the park owners need for a rent increase in order to obtain a fair return on the same purchase price.

Obviously, these two sets of expense and net operating income estimates cannot both be correct. The PGP estimates could be viewed as more credible. PGP had access to historical expenses from the subject property and they also referenced expense comparables from other parks. PGP included a complete discussion and analysis of the various expenses. On the other hand Neet simply used the reported expenses, with his relatively minor adjustments, and even indicates that he did not review the reported expenses. Consequently, it is my professional judgment that the MRRB could, in the exercise of its discretion, give little weight to or choose not to have confidence in Neet's estimates of expenses and net operating income.

Neet also uses a 9.0% rate of return (overall capitalization rate) to calculate the increase in rent necessary to produce a fair return. This 9.0% rate was arrived at after he considered discount rates from published sources and a history of rent increases for parks in the City of Carson. His analysis fails to include any overall capitalization rates from comparable sales.

However, the PGP appraisal did include overall capitalization rates from six comparable sales that ranged from 3.9% to 6.3% and PGP selected a capitalization rate of 4.75 percent for the analysis. In other words, the park owner purchased the property on the basis of a 4.75 percent capitalization rate, while Neet claims the park owner is entitled to a 9.0% rate of return. Again, it is my professional judgment that the MRRB could, in the exercise of its discretion, give little weight to or choose not to have confidence in the reasonableness of Neet's conclusion.

**3. Applicant is Not Entitled to Re-define Fair Rate of Return**

In my professional experience and judgment, even if this applicant were entitled to a fair return on investment, such an entitlement does not follow regardless of the purchase price paid for this mobilehome park property. If a given applicant chooses to overpay for the purchase of a mobilehome park property (meaning a purchase price above the market value) such an applicant would not, in my professional experience and judgment, be entitled to a fair return on an unreasonable investment.

In addition, if any given applicant purchases a mobilehome park property at market value, such an applicant is not, in my professional experience and judgment, entitled to redefine the term "fair return" for purposes of a rent increase application. In my judgment, this appears to be what is happening in connection with this pending "fair return" application.

The applicant and his experts claim that the property was purchased at a market price, based on a 4.75% capitalization rate (See PGP appraisal, page 51). The purchase price is

F 3

00256

justified as being a market rate purchase based upon an extensive analysis of overall capitalization rates from comparable parks. The applicant then elects to utilize a 9.0% rate, that Neet chooses to call a "discount rate" (but is really a capitalization rate), to calculate the increase in rent necessary to produce a fair return (see Neet report, Net Operating Income Analysis, page 7). If you perform an analysis that uses one rate to justify a purchase price and then use a higher rate for the fair return analysis, a rent increase will always be indicated. However, in my judgment this amounts to an unjustified re-defining of the meaning of "fair return."

Neet's 9.0% capitalization rate is not obtained from direct comparison of capitalization rates from mobile home parks in the State of California, but from an analysis of discount rates from a national survey, from which he deducts an appreciation rate. This entire analysis is not grounded in a direct comparison with capitalization rates from mobile home parks (the relevant comparison to have been utilized) and is extremely misleading, and in my professional experience and judgment could, if the MRRB so determined, in the exercise of its discretion, be rejected as a basis for a "fair return" application.

**4. Neet's Net Income to Equity Analysis is Not Credible**

Based upon the documents I have reviewed, the applicant apparently leveraged his investment in Colony Cove with a loan in the amount of $18,000,000. The annual debt service (interest only) for this loan is reportedly $1,309,236. This results in Neet's calculation of a negative equity dividend (cash flow after debt service) of $1,004,398. Neet has determined that the "required equity dividend amounts to $580,750" and that results in his conclusion that a rent increase of $327.78 is necessary to produce a fair return.

However, according to the PGP appraisal, when the property was acquired by the applicant it was not producing anything approaching the income necessary to cover the debt service of $1,309,236 and provide a positive cash flow of $580,750. In fact with a net income before debt service of $1,110,009 and debt service of $1,309,236 the equity dividend projected for the first year of the applicant's ownership was a negative $199,227. The Neet analysis fails to take into account any equity dividend rates extracted from sales of mobile home parks to support his use of an 11.5% rate. Consequently, it is my professional judgment that the MRRB could, in the exercise of its discretion, give little weight to or choose not to have confidence in this aspect of the Neet analysis.

**5. Neet's Net Operating Income (Including Debt Service) Analysis Defies Logic**

Neet's Net Operating Income (Including Debt Service) Analysis produces a meaningless result. He calculates an equity dividend (cash flow after debt service) that should be analyzed with a rate that considers the equity investment. Instead, he uses a rate (9%) that is applicable for the total property value, not just the equity investment. I know of no professional appraisal publication that would support such an analysis and it is my

F 4

professional judgment that the MRRB could, in the exercise of its discretion, give little weight to or choose not to have confidence in, the Neet NOI calculations.

6. **Comments on Neet's Criticism of Dr. Baar's Report**

In his report dated March 24, 2008, Neet objects that Dr. Baar did not compare Colony Cove's return with other investments having commensurate risk. This criticism is not convincing when you consider that such an analysis by Neet led him to conclude that the applicant was entitled to a 9% capitalization rate, when comparable sales suggested that a 4.75% capitalization rate was appropriate.

Neet is also critical of Dr. Baar for concluding that mobile home parks are a "risk free" investment. He goes on to list some of the risks associated with the ownership of mobile home parks. However, the opinion actually expressed by Dr. Baar on page 35 was that "after a park has been constructed and occupied with mobilehomes, there is virtually no rental risk." This conclusion has been supported and documented in countless studies and I have personally observed this phenomena in over 30 years of appraising mobile home parks.

This is not to say that there is never any vacancy in any mobile home park. However, in well located parks like this one, they typically remain full and if an older home is moved out, a new one is then moved in and there is virtually no vacancy. The truth of this generalization can be seen in the investment survey data utilized by Mr. Neet. In the Investor Survey by Robert G. Watts that Neet utilizes in his analyses, the discount rates for Mobile Home Park acquisitions are lower than the rates for apartments, office buildings, industrial properties and retail facilities. The lower rate for mobilehome park investments is reflective, at least in part, of the lower risk of vacancy.

This review appraisal is followed by a listing of Assumptions and Limiting Conditions as well as a signed Certification and a Statement of Qualifications. Thank you for the opportunity to be of service.

Sincerely,

ANDERSON & BRABANT, INC.

James Brabant, MAI
Certified General Real Estate Appraiser
OREA Appraiser No. AG002100

F 5

## ASSUMPTIONS AND LIMITING CONDITIONS

**This appraisal is subject to the following special assumptions and limiting conditions:**

1. This is a *Review Appraisal* which is intended to comply with the reporting requirements set forth under Standards Rule 3 and Advisory Opinion 6 of the Uniform Standards of Professional Appraisal Practice (USPAP). The information contained in this report is specific to the needs of the client and any other intended users for the intended use as stated in this report. Anderson & Brabant, Inc. is not responsible for unauthorized use of this report.

**This appraisal is subject to the following general assumptions and limiting conditions:**

1. It is assumed that information furnished to us by our client, including maps, cost estimates, and legal descriptions, is substantially correct.

2. No responsibility is assumed for matters legal in character, nor do we render an opinion as to title, which is assumed to be held in fee simple interest as of the date of valuation unless otherwise specified.

3. It is assumed that the property is readily marketable, free of all liens and encumbrances except any specifically discussed herein, and under responsible ownership and management.

4. Photographs, plat, and maps furnished in this appraisal are to assist the reader in visualizing the property. No survey of the property has been made and no responsibility has been assumed in this matter.

5. It is assumed that there are no legitimate environmental or ecological reasons that would prevent orderly development of the land to its highest and best use under economically feasible conditions.

6. Soils engineering studies have not been provided to Anderson & Brabant, Inc. It is, therefore, assumed that there are no hidden or unapparent conditions of the property such as hazardous or toxic wastes and/or other subsoil conditions which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which might be required to discover such factors.

7. The appraiser is not qualified to detect hazardous waste and/or toxic materials. Any comment by the appraiser that might suggest the possibility of the presence of such substances should not be taken as confirmation of the presence of hazardous waste and/or toxic materials. Such determination would require investigation by a qualified expert in the field of environmental assessment. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property.

The appraiser's value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value unless otherwise stated in this report. No responsibility is assumed for any environmental conditions, or for any expertise or engineering knowledge required to discover them. The appraiser's descriptions and resulting comments are the result of the routine observations made during the appraisal process.

8. Possession of this report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any person other than the party to whom it is addressed without the written consent of Anderson & Brabant, Inc., and in any event, only with proper written qualification and only in its entirety.

9. Disclosure of the contents of this appraisal report is governed by the by-laws and regulations of the Appraisal Institute. Neither all nor any part of the contents of this report (especially reference to the Appraisal Institute or the MAI designation) shall be disseminated to the public through advertising media, public relations media, news media, sales media, or any other public means of communication without prior written consent and approval of Anderson & Brabant, Inc.

10. The submission of this report constitutes completion of the services authorized. It is submitted on the condition that the client will provide Anderson & Brabant, Inc. customary compensation relating to any subsequent required depositions, conferences, additional preparation or testimony.

11. The valuation estimate is of surface rights only and the mineral rights, if any, have been disregarded.

12. No warranty is made as to the seismic stability of the subject property.

13. It is assumed that all applicable zoning and land use regulations and restrictions have been complied with, unless a nonconformity has been stated, defined, and considered in this appraisal report.

14. It is assumed that all required licenses, certificates of occupancy, or other legislative or administrative authority from any local, state, or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report are based.

15. It is assumed that the utilization of the land and improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless otherwise stated in this report.

## APPRAISER'S CERTIFICATE

I do hereby certify that, to the best of my knowledge and belief, ...

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions and conclusions.

3. I have no present or prospective future interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

4. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute and the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.

8. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

9. I have made a personal inspection of the property that is the subject of this report.

10. No one provided significant professional assistance to the person signing this report.

11. As of the date of this report, I have completed the requirements of the continuing education program of the Appraisal Institute.

James Brabant, MAI
State Certification No. AG002100

June 5, 2008
Date

## QUALIFICATIONS OF THE APPRAISER

James Brabant, MAI
Anderson & Brabant, Inc.
353 W. Ninth Avenue
Escondido, CA 92025
(760) 741-4146 Ext. 312

I. Resident of San Diego County since 1977

II. **Educational Background:**

- A. University of Southern California, B.S. degree in Real Estate — 1960
- B. School of Theology at Claremont, Master of Theology — 1966
- C. Professional Education Completed:
  1. Appraisal Institute
     - a. "Basic Appraisal Principles, Methods and Techniques" — Course I-A
     - b. "Capitalization Theory and Techniques" — Course I-B
     - c. "Urban Properties" — Course II
     - d. "Investment Analysis" — Course IV
     - e. "Standards of Professional Practice"
     - f. "Litigation Valuation"
     - g. Special Applications of Appraisal Analysis Course 301
  2. Lincoln Graduate Center
     - a. Manufactured Housing Appraisal Course 669
  3. Continuing Education (Partial List):

     Eminent Domain Case Update, 10/95, 3/97, 10/07
     Business Practice and Ethics, 6/07
     San Diego Apartment & Housing Seminar, 10/98, 5/07
     San Diego Economic Forecasts, 2/05, 2/07
     Appraiser as Expert Witness, 12/06
     USPAP Course, 9/04, 5/06
     Deal and Development Analysis – Downtown S.D., 9/05
     Litigation Seminar, 11/04
     Appraising Manufactured Housing, 1/04
     Economic and Real Estate Forum, 09/02
     Gramm-Leach-Bliley Act, 10/01
     Condemnation on Trial (Participant), 5/00
     Attorneys, Appraisers & Real Estate; 9/98
     Damages, Diminution & Mitigation; 8/98
     Appraisal of Partial Interests; 6/98
     Mitigation Land Update & Valuation Issues, 4/97
     Federal & State Laws & Regulations Workshop, 9/95
     Fair Lending, 12/94
     Partial Acquisition, 9/94

III. **Professional Affiliations:**

A. Member, Appraisal Institute, MAI (1985 President, San Diego Chapter)

B. Realtor Member, North County Association of Realtors

C. Member, International Right of Way Association

D. Real Estate Brokers License, State of California

E. Teaching Credential, State of California, Community College Level

F. Certified General Real Estate Appraiser (AG002100)
Office of Real Estate Appraisers, State of California

IV. **Appraisal Experience:**

Co-Owner — Anderson & Brabant, Inc., Since 1979
Co-Owner — Robert M. Dodd & Associates, Inc., 1977 - 1979
Appraisal Manager — California First Bank, Huntington Beach, California, 1974 - 1977
Staff Appraiser — California First Bank, San Diego, California, 1972 - 1974
Staff Appraiser — O. W. Cotton Co., San Diego, California, 1970 - 1972
Staff Appraiser — Davis Brabant, MAI, Huntington Park, California, 1960 - 1962

V. **Teaching Experience:**

Southwestern College, Chula Vista, California, "Real Estate Appraisal"

VI. **Expert Witness:**

Superior Court, San Diego, Los Angeles, Riverside, and San Bernardino Counties
Rent Control Hearings: Oceanside, Escondido, Ventura, Concord, Yucaipa, Carpenteria, Palmdale, San Marcos
Various Arbitration Hearings
Assessment Appeals Board, Riverside County and San Diego County
Federal Bankruptcy Court, San Diego County & Santa Barbara County
United States District Court – Northern District of California

VII. **Types of Appraisals:**

| | |
|---|---|
| Residential Property: | Single-family residence, condominiums, apartments, subdivisions, existing and proposed |
| Commercial Property: | Office buildings, shopping centers, office condominiums, etc., existing and proposed |
| Industrial Property: | Single/multi-tenant, business parks, etc., existing and proposed |
| Vacant Land: | Industrial, commercial, residential, and rural |
| Agricultural: | Ranches, avocado and citrus groves, etc. |
| Special Purpose Appraisals: | Leasehold estates, possessory interest, historical appraisals, etc. |
| Mobile Home Parks: | For a variety of purposes including rent hearings, park closure, park conversions, failure to maintain litigation, etc. |

F (10)

VIII. **Partial List of Appraisal Clients:**

**Banks**
Bank of America
Bank of New York
City National Bank
Downey Savings
Fidelity Federal Bank
First Interstate Bank
First Pacific National Bank
Flagship Federal Savings
Great Western Bank
Industrial Bank of Japan
Palomar Savings & Loan
Redlands Federal Bank
Union Bank of California
Wells Fargo Bank

**Government Agencies and Municipalities**
California Department of Transportation/Caltrans
Carlsbad Municipal Water District
City of Carlsbad
City of Chula Vista
City of Colton
City of Concord
City of Escondido
City of Laguna Beach
City of La Mesa
City of Salinas
City of San Bernardino
City of San Diego
City of San Marcos
City of Vista
City of Yucaipa
County of San Diego
Metropolitan Water District
Oceanside Unified School District
Pacific Telephone
Poway Municipal Water District
Ramona Unified School District
SANDAG (San Diego Assoc. of Govts.)
San Diego County Water Authority
San Diego Unified Port District
San Marcos Unified School District
U.S. Depart. of the Interior
Bureau of Indian Affairs
U.S. Department of Justice

Law Firms
Asaro, Keagy, Freeland. McKinley & Bartz
Best, Best & Krieger
Daley & Heft
Endeman, Lincoln, Turek & Heater
Foley, Lardner, Weissburg & Aronson
Fulbright & Jaworski
Gray, Cary, Ware & Freidenrich
Higgs, Fletcher & Mack
Latham & Watkins
Lounsbery, Ferguson, Altona & Peak
Luce, Forward, Hamilton & Scripps
McDonald & Allen
McInnis, Fitzgerald, Rees, Sharkey & McIntyre
O'Melveny & Meyers
Post, Kirby, Noonan & Sweat
Procopio, Cory, Hargreaves & Savitch
Rutan & Tucker
Singer, Richard
Sullivan Wertz McDade & Wallace
Tatro & Zamoyski
Thorsnes Bartolotta & McGuire
Worden Williams, APC

**Title Companies**
Chicago Title
Fidelity National Title Insurance
First American Title
St. Paul Title
Title Insurance & Trust

**Others**
Avco Community Developers
Coldwell Banker
Dixieline Lumber
Golden Eagle Insurance
National Steel & Shipbuilding Co.
Northern San Diego County Hospital District
Prudential Insurance Corp.
Rosenow, Spevacek, Group
San Diego Gas & Electric Co.
San Luis Rey Downs (Vessels)
Steefel, Levitt & Weiss
Tellwright-Campbell, Inc.
Transamerica Relocation Service
Vedder Park Management

## PARTIAL LIST OF MOBILE HOME AND MOBILE HOME PARK APPRAISALS

**Rent Studies**

| | |
|---|---|
| Carlsbad, California | Rancho Carlsbad |
| Chula Vista, California | Brentwood Mobile Home Park |
| Concord, California | Brookview Park<br>Concord Mobile Home Park<br>Vista Del Monte Trailer & Mobile Home Park<br>Town & Country Mobile Village<br>The Trees |
| El Cajon, California | Rancho Laguna Mobile Home Park |
| Escondido, California | Escondido Mobile Park West<br>Town & Country Mobile Home Park<br>Valley Parkway Mobile Home Park |
| Hollister, California | Mission Oak Mobile Home Park |
| La Mesa, California | La Mesa Terrace |
| Malibu, California | Paradise Cove |
| Oceanside, California | Laguna Vista Mobile Home Park |
| Pacific Palisades, California | Palisades Bowl |
| Rocklin, California | Sierra Lakes Adult Mobile Home Community |
| Salinas, California | Alisal Country Estates |
| San Marcos, California | El Dorado Mobile Home Park<br>San Marcos Mobile Estates |

**Mobile Home Park Conversions**

| | |
|---|---|
| Carlsbad, California | Rancho Carlsbad |
| Carson, California | Carson Harbor Village |
| Colton, California | Rancho Mediterrania |
| Escondido, California | Champagne Village<br>(formerly Lawrence Welk Village) |
| Fallbrook, California | Rancho Monserate |
| Lakeside, California | Lake Jennings Mobile Home Park |
| Palm Desert | Indian Springs Mobile Home Park |
| Palm Springs, California | El Dorado Mobile Home Park |
| Paso Robles, California | Rancho Paso Mobile Home Park |
| Vista, California | Vista Cascade |
| Woodland Hills, California | Mountain View Estates |

**Mobile Home Park Subdivisions**

| | |
|---|---|
| Thousand Palms, California | Ivey Ranch |
| Vista, California | Vista Del Mar<br>Shadowridge Crossing |

**For Possible Acquisition**

| | |
|---|---|
| Colton, California | Lake Cadena Mobile Home Park<br>Reche Canyon Mobile Home Park |
| El Cajon, California | Glenview Mobile Home Park |
| Montclair, California | Villa Montclair<br>Hacienda |
| San Bernardino, California | Glen Aire<br>Friendly Village<br>Pacific Palms<br>Ninth Street<br>Royal Coach<br>Rancho Meridian<br>Meridian Terrace<br>Sequoia Plaza<br>Orangewood |
| San Marcos, California | Palomar Estates East Mobile Home Park<br>Palomar Estates West Mobile Home Park<br>Rancheros Mobile Home Park<br>San Marcos View Estates<br>Twin Oaks Valley<br>Villa Vista |
| Vista, California | Sycamore Creek |

**For Estate Purposes**

| | |
|---|---|
| Camarillo, California | Camarillo Mobile Home Park |
| Cathedral City, California | Royal Palms Mobile Home Park |
| Chino, California | Pembroke Downs Mobile Home Park |
| La Habra, California | Friendly Village La Habra |
| Lakeside, California | Lakefront Mobile Home Park |
| Modesto, California | Friendly Village-Modesto |
| Newbury Park, California | Vallecito Mobile Home Park |
| Rancho Cucamonga, CA | Alta Laguna Mobile Estates |
| Riverside, California | Rancho Caballero Mobile Home Park |
| San Juan Capistrano, CA | Rancho Alipaz Mobile Home Park |
| San Pedro, California | Palos Verdes Shores Mobile Home Park |
| Scotts Valley, California | Whispering Pines Mobile Home Park |
| Simi, California | Friendly Village Simi Mobile Home Park |
| Temecula, California | Heritage Mobile Home |
| Ventura, California | Colony Mobile Home Park<br>Lemonwood Mobile Home Park |
| Victorville, California | Victor Villa Mobile Home Park |
| West Covina, California | Friendly Village West Covina |
| Tempe, Arizona | Tempe Cascade Mobile Estates |

**Litigation Purposes**

| | |
|---|---|
| Agua Dolce, California | Hacienda Vasquez |
| Anaheim, California | Western Skies Mobile Home Park |
| Apple Valley, California | Rancho de Las Brisas |
| Barstow, California | Chateau Barstow |
| Bloomington, California | Cedar Village Mobile Home Park |
| Carlsbad, California | Rancho Carlsbad |
| Carson, California | Avalon Carson Mobile Estates |
| Castaic, California | Paradise Ranch Mobile Home Park |
| Colton, California | Lake Cadena Mobile Home Park |
| Cotati, California | Countryside Mobile Park Estates<br>Ramble Creek Mobile Park<br>Sierra Mobile Home Park |
| Cypress, California | Lincoln Center Mobile Home Park |
| Dana Point, California | Beachwood Mobile Home Park |
| East Palo Alto, California | Palo Mobile Estates |
| Grand Terrace, California | Terrace Pines Mobile Home Park |
| Hollister, California | Mission Oaks Mobile Home Park |
| Laguna Beach, California | Laguna Terrace Mobile Home Park |
| Lodi, California | Villa Cerezos Mobile Home Park |
| Long Beach, California | Belmont Shores Mobile Home Park<br>Friendly Village Mobile Home Park<br>Villa Park |
| Malibu, California | Paradise Cove |
| Modesto, California | Pinewood Meadows |
| Napa, California | Wine Country MHP |
| Oceanside, California | El Camino 76 Mobile Estates |
| Palm Springs, California | Western Village Mobile Home Park |
| Pedley, California | Santiago Mobile Home Park |
| Pomona, California | Mission Boulevard |
| Poway, California | Poway Royal Mobile Home Estates |
| Sacramento, California | Regency Mobile Home Park |
| San Rafael, California | Contempo Marin |
| Santa Cruz, California | De Anza Santa Cruz |
| Santa Monica, California | Village Trailer Park |
| Santee, California | Highlands Mobile Home Park<br>Meadowbrook Mobile Home Park |
| Stanton, California | Katella Mobile Home Park |
| Van Nuys, California | Park Royale |
| Windsor, California | Royal Manor Mobile Home Park<br>Windsorland Mobile Home Park |

# EXHIBIT 13

ALESHIRE & WYNDER, LLP
SUNNY K. SOLTANI, State Bar No. 209774
*ssoltani@awattorneys.com*
JUNE S. AILIN, State Bar No. 109498
*jailin@awattorneys.com*
STEPHEN R. ONSTOT, State Bar No. 139319
*sonston@awatttorneys.com*
JEFF M. MALAWY, State Bar No. 252428
*jmalawy@awattorneys.com*
MARGARET W. ROSE, State Bar No. 298965
*mrose@awattorneys.com*
LARA LEITNER, State Bar No. 303162
*lleitner@awattorneys.com*
18881 Von Karman Avenue, Suite 1700
Irvine, California 92612
Telephone: (949) 223.1170
Facsimile: (949) 223.1180

Attorneys for Defendants
CITY OF CARSON and CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW
A&W

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

COLONY COVE PROPERTIES, LLC a Delaware limited liability company,

Plaintiff,

v.

CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body; and DOES 1 to 10, inclusive,

Defendants.

Case No. CV14-03242 PSG (PJWx)

Assigned to Hon. Philip S. Gutierrez
Courtroom 880, Roybal

**DEFENDANTS' EXPERT WITNESS DISCLOSURE [FRCP 26(a)(2)]**

First Amended Complaint filed: April 16, 2015
Trial date: April 5, 2016

Pursuant to FRCP 26(a)(2), Defendants hereby provide the following disclosures of information about witnesses who may be used at trial to present expert testimony:

Pursuant to FRCP 26(a)(2)(B), Defendants designate Kenneth K. Baar, Ph.D. A copy of the report required by FRCP 26(a)(2)(B) from Dr. Baar is attached hereto.

Pursuant to FRCP 26(a)(2)(C), Defendants designate Kenneth K. Baar, Ph.D. The subject matter upon which Dr. Baar is expected to present evidence pursuant to FRCP 26(a)(2)(C) is: (1) Factors and methods that the Carson Rent Board may consider in setting allowable rent increases; (2) Rent Board precedent in regard to consideration of increases in debt service in its decisions setting allowable rents; (3) The reasonability of the conclusions of the Park Owner's experts, Dr. Michael St. John and John Neet, in regard to what rent increase would be reasonable under the standards in the ordinance and constitutional fair return standards, in Colony Cove's applications to the Board in its first two years of park ownership.

A summary of the facts and opinions to which Dr. Baar is expected to testify pursuant to FRCP 26(a)(2)(C) is as follows:

1. The City's Mobilehome Park Rent Ordinance specifies factors that the Rent Board shall consider in setting allowable rent increases. In addition, in applying its rent adjustment standards constitutional fair return standards shall be met, including a requirement that base year net operating income is not frozen. In setting maximum allowable rents, the Board may consider increases in the CPI, the objective of protecting residents from excessive increases, fair return analyses based on rate of return on investment, gross profit maintenance, maintenance of net operating income standards, comparable rents, and other factors that are relevant.

2. In applying the Rent Ordinance , since 1996 the Board has not permitted substantial rent increases based on increases in debt service.

3. Dr. St. John's conclusion that a pre-rent control base year must be used in a maintenance of net operating income analysis is not consistent with the Guidelines. Mr. Neet's conclusions about what rate is a fair rate of return on investment are not reasonable.

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW

Pursuant to FRCP 26(a)(2)(C), Defendants designate James L. Brabant, MAI. The subject matter upon which Mr. Brabant is expected to present evidence pursuant to FRCP 26(a)(2)(C) is:

1. A critical analysis of Plaintiff's fair return analysis for Colony Cove Mobile Estates, as contained in two reports by John Neet, MAI, and one report by Rob Detling of PGP Valuation Inc. The Neet reports are dated September 25, 2007, and May 28, 2008, while the PGP report is dated March 13, 2007.
2. Based on Mr. Brabant's critical analysis above, his professional judgment that the Carson Mobilehome Park Rental Review Board (MRRB) could, in the exercise of its discretion, give little weight to or choose not to have confidence in Neet's fair return analyses.

A summary of the facts and opinions to which Mr. Brabant is expected to testify pursuant to FRCP 26(a)(2)(C) is as follows:

1. **Neet references and utilizes the PGP appraisal in his fair return analysis.** The PGP appraisal is included in the Addenda to Neet's report and has a conclusion of market value at $23,000,000 as of March 30, 2006. Neet comments that this appraisal confirms that the market value estimate essentially equals the purchase price. Colony Cove was purchased by the current owner on April 4, 2006, at a price of $22,990,000.

2. **Neet's net operating income analysis is inconsistent with the PGP Appraisal.** In his fair return analysis, Neet reports a net operating income of $304,838 while the PGP appraisal estimates the net operating income at $1,110,009 for the same period. Thus, Neet uses the much higher net income from PGP to justify the purchase price of the park, but uses a much lower net income for his fair return calculation. Obviously, these two numbers cannot both be true and suggest his analysis is flawed. It is illogical for the applicant to use a net operating income of $1,110,009 to justify the purchase price, but another net operating income of $304,838, that is only a fraction of that amount, to justify the park owner's need for a rent increase in order to obtain a fair return on the same purchase price.

3. **Neet's estimate of net operating income is not credible.** Neet references the park owner's financial statements for the period April 2006 through March 2007, but makes it clear that he has not reviewed or adjusted the

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW

reported income and expenses, except for several adjustments that are specifically addressed in the City ordinance or guidelines. This is in contrast with the PGP analysis of expenses, where they had access to historical expenses from the subject property and also referenced expense comparables from other parks. Consequently, Neet's calculation of net operating is not considered to be credible.

4. **Neet (nor the Applicant) is not entitled to re-define fair rate of return.** Neet claims that Colony Cove was purchased at a market price, based on a 4.75% capitalization rate. The purchase price is identified as being a market rate purchase based upon an extensive analysis of overall capitalization rates from comparable parks. However, Neet then elects to utilize a 9.0% rate, that he chooses to call a "discount rate" (but is actually utilized as a capitalization rate), to calculate the increase in rent necessary to produce a fair return. If you perform an analysis that uses one rate to justify a purchase price and then use a higher rate for the fair return analysis, a rent increase will always be indicated. However, in my judgment this amounts to an unjustified re-defining of the meaning of "fair return."

5. **Neet's 9.0% rate of return is not credible.** Neet's 9.0% rate of return is obtained from a national survey of discount rates from investors, from which he deducts an appreciation rate. When you deduct a growth rate from a discount rate, you approximate a capitalization rate. However, in this case, his rate does not come close to approximating a capitalization rate for a mobile home park in the State of California. Rates of return in the State of California are very different than national averages. Furthermore, capitalization rates for parks in California were readily available, as indicated in the PGP appraisal. The PGP appraisal included capitalization rates from six comparable sales of mobile home parks in California that ranged from 3.9% to 6.3% and PGP selected a rate of 4.75%.

6. **Neet's net income to equity analysis is not credible**. The purchase of Colony Cove in 2006 was reportedly leveraged with a loan of $18,000,000 and an annual debt service (interest only) of $1,309,236. This resulted in a negative cash flow (equity dividend) of $1,004,398. Neet opines that an equity dividend rate of 11.5% would be fair and, if they were achieving that, it would produce a positive cash flow of $580,750. His calculations suggest that a rent increase of $327.78 would be required for a fair return. However, his analysis fails to take into account any equity dividend rates extracted from sales of mobile home parks. In addition, according to the PGP appraisal, when the property was acquired by the applicant it was not producing anything approaching the income necessary to cover the debt service of

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW

$1,309,236 and provide a positive cash flow of $580,750. In fact, with a net income before debt service of $1,110,009 and debt service of $1,309,236 the equity dividend projected for the first year of the applicant's ownership was a negative $199,227.

7. **Neet's Net Operating Income (Including Debt Service) Analysis Defies Logic**. He calculates an equity dividend (cash flow after debt service) that should be analyzed with a rate that considers the equity investment. Instead, he uses a rate (9%) that he previously uses for the total property value, not just the equity investment. I know of no professional appraisal publication or appraiser that would support such an analysis.

8. **Conclusion.** Based on the above analyses, it is my professional judgment that the Carson Mobilehome Park Rental Review Board (MRRB) could, in the exercise of its discretion, give little weight to or choose not to have confidence in Neet's fair return analyses.

Defendants reserve the right to supplement these disclosures and to designate additional experts and witnesses as necessary to rebut any experts designated by any other party to the instant action.

DATED: January 11, 2016 ALESHIRE & WYNDER, LLP

By: [signature]
Jeff M. Malawy
Attorneys for Defendants CITY OF CARSON and CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD

ALESHIRE & WYNDER LLP ATTORNEYS AT LAW A&W