1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

3        HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5   COLONY COVE PROPERTIES, LLC, a          )
    Delaware limited liability company,    )
6                                          )
                    PLAINTIFF,             )   CASE NO.
7                                          )
            vs.                            )   CV 14-03242-PSG
8                                          )
    CITY OF CARSON, a municipal            )
9   corporation; CITY OF CARSON            )
    MOBILEHOME PARK RENTAL REVIEW BOARD,   )   PAGES (87 to 190)
10  a public administrative body; and      )
    DOES 1 to 10, inclusive,               )   VOLUME 2
11                                         )
                    DEFENDANTS.            )
12  _____    )

13

14

15

16                  REPORTER'S TRANSCRIPT OF
                         TRIAL DAY 1
17                 THURSDAY, APRIL 28, 2016
                         1:31 P.M.
18                  LOS ANGELES, CALIFORNIA

19

20

21

22

23   _____

24              MIRANDA ALGORRI, CSR 12743, CRR
             FEDERAL OFFICIAL COURT REPORTER
25          312 NORTH SPRING STREET, ROOM 435
               LOS ANGELES, CALIFORNIA 90012
                  MIRANDAALGORRI@GMAIL.COM

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4

5          O'MELVENY & MYERS, LLP
           BY:  DIMITRI D. PORTNOI
           BY:  MATTHEW W. CLOSE
6          400 South Hope Street
           18th Floor
7          Los Angeles, California 90071

8

9          GILCHRIST & RUTTER, APC
           BY:  THOMAS W. CASPARIAN
           Wilshire Palisades Building
10         1299 Ocean Avenue
           Suite 900
11         Santa Monica, California 90401

12

13   **FOR THE DEFENDANTS:**

14

15         ALESHIRE & WYNDER, LLP
           BY:  JEFFREY MICHAEL MALAWY
           BY:  JUNE SUSAN AILIN
16         BY:  STEPHEN R. ONSTOT
           18881 Von Karman Avenue
17         Suite 1700
           Irvine, California 92612

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1
**I N D E X**

2

3
**THURSDAY, APRIL 28, 2016; VOLUME 2**

4

5
**Chronological Index of Witnesses**

6

7

8
Witnesses:_____          Page_____

9
GOLDSTEIN, James

10
    Direct examination by Mr. Cross                124
    Cross-examination by Ms. Ailin                 158

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**EXHIBITS**

**THURSDAY, APRIL 28, 2016; VOLUME 2**

| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 8 | G.E. Letter to Goldstein 2/17/06 | 95 | 95 |
| 9 | Hansen Letter to Goldstein 03/03/2006 | 95 | 95 |
| 10 | Tuverson Email to Hansen 03/07/06 | 95 | 95 |
| 11 | Loan Disbursement Statement | 95 | 95 |
| 18 | Goldstein Letter to Crowe | 95 | 95 |
| 21 | CC Projected Income & Expense | 95 | 95 |
| 23 | Handwritten Notes | 95 | 95 |
| 25 | Supplement to Purchase Offer & Sales Contract | 95 | 95 |
| 26 | Amendment to Purchase Offer & Sales Contract | 95 | 95 |
| 28 | Loan Agreement | 95 | 95 |
| 29 | Promissory Note | 95 | 95 |
| 30 | Deed of Trust | 95 | 95 |
| 35 | Gilchrist Letter to Freschauf 03/27/08 | 95 | 95 |
| 36 | Detling Appraisal Report | 95 | 95 |
| 39 | Cal Am Letter and Offer 01/30/06 | 95 | 95 |
| 40 | Weisswasser Summary of Offer | 95 | 95 |
| 41 | Purchase Offer & Sales Contract | 95 | 95 |

1     **EXHIBITS CON'T**

2

3     **THURSDAY, APRIL 28, 2016; VOLUME 2**

4
                                                      For        In
5     Exhibit                                         ID         EVD

6     46    CC Mobile Estates Application for          95         95
            Rent Increase
7
      47    CC Mobile Estates Application for          95         95
8           Rent Increase

9     48    City Staff Report 02/13/08                 95         95

10    49    City Staff Report 06/10/09                 95         95

11    50    Resolution No. 2008-256                    95         95

12    51    Resolution No. 2009-269                    95         95

13    54    Staff's Property Tax Worksheet             95         95

14    55    06-07 Operating Expense Adjustments        95         95

15    61    Gilchrist Letter to Freshchauf            95         95

16    65    Goldstein Letter to Crowe                  95         95

17    71    Kenneth Baar Subpoena to Testify          95         95

18    78    Resolution No. 84-057                      95         95

19    84    Uniform Standards of Professional          95         95
            Appraisal Practice 2010-2011
20
      86    Uniform Standards of Professional          95         95
21          Appraisal Practice 2016-2017

22    87    Assumption and Limiting Conditions         95         95

23    88    Appraiser's Certificate by Brabant         95         95

24    89    Excerpts from The Appraisal of Real        95         95
            Estate
25

**UNITED STATES DISTRICT COURT**

**EXHIBITS CON'T**

**THURSDAY, APRIL 28, 2016; VOLUME 2**

| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 92 | Uniform Standards of Professional Appraisal Practice 2006 | 95 | 95 |
| 94 | Expert Report of Salomon | 95 | 95 |
| 95 | Salomon Letter to Close | 95 | 95 |
| 96 | US vs. 429.59 Acres of Land | 95 | 95 |
| 1000 | Offering Memorandum | 95 | 95 |
| 1001 | Resolution No. 98-010 | 95 | 95 |
| 1002 | Carson Municipal Code Chapter 7 | 95 | 95 |
| 1003 | Resolution No. 06-149 | 95 | 95 |
| 1004 | Palacio Rent Review Commission | 186 | 186 |
| 1005 | Carson Gardens Docs | 137 | 137 |
| 2007 | Self-Contained Appraisal Colony Cove | 95 | 95 |
| 2008 | Ellis Rebuttal Report | 95 | 95 |
| 2009 | Brabant Expert Report | 95 | 95 |
| 2012 | Year 1 Operating Calculation | 95 | 95 |
| 2013 | Year 2 Staff's Adjustments to Claims | 95 | 95 |
| 2014 | Year 2 Operating Calculation | 95 | 95 |
| 2021 | Year 4 Staff's Adjustments to Claims | 95 | 95 |
| 2027 | Resolution No. 84-057 Staff Report | 95 | 95 |
| 2029 | Resolution No. 84-057 Board Meeting Minutes | 95 | 95 |

**EXHIBITS CON'T**

**THURSDAY, APRIL 28, 2016; VOLUME 2**

| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 2030 | Resolution No. 84-057 Appraisal | 95 | 95 |

1          **LOS ANGELES, CALIFORNIA; THURSDAY, APRIL 28, 2016**

2                              **1:31 P.M.**

3                               **---**

4

5          (The following proceedings were held in

6          open court out of the presence of the jury:)

7                    THE COURT:  With regard to the exhibits --

8                    MR. CLOSE:  Matthew Close for the plaintiff.

9                    I would move to admit those exhibits on the

10   exhibit list presented to the clerk that were stipulated to

11   both authenticity and admissibility by both parties.

12                    THE COURT:  Do you have a list handy, the number?

13   Are they just the ones that you talk about that have "SS" by

14   them?

15                    MR. CLOSE:  Yes, Your Honor.

16                    THE COURT:  Okay.  I'll work it out with the

17   clerk.

18                    So all exhibits that -- for example, exhibit

19   identified with the markings of two SS's will be admitted, and

20   I'll go through with the courtroom deputy to make sure we're

21   all on the same page.

22                    MR. CLOSE:  Thank you, Your Honor.

23                    THE COURT:  Those are admitted.

24   ///

25   ///

**UNITED STATES DISTRICT COURT**

```
 1                (Marked for identification and received

 2                into evidence Exhibit No. 8, 9, 10, 11,

 3                18, 21, 23, 25, 26, 28, 29, 30, 35, 36,

 4                39, 40, 41, 46, 47, 48, 49, 50, 51, 54,

 5                55, 61, 65, 71, 78, 84, 86, 87, 88, 89,

 6                92, 94, 95, 96, 1000, 1001, 1002, 1003,

 7                2007, 2008, 2009, 2012, 2013, 2014, 2027,

 8                2028, 2029, and 2030.)

 9                THE COURT:  Anything else before we bring the

10   jurors out?

11                MR. CLOSE:  Not from the plaintiff, Your Honor.

12                THE COURT:  One last thing.  The computers that

13   are being operated on the side, I'm not sure where the sound

14   was coming from, but it's -- I'm getting the sound of

15   retrieving e-mails, the prompt.  So the computers need to be in

16   airplane mode so I don't hear -- or either silence them so we

17   don't hear the ping that an e-mail has arrived.

18                Okay.  Let's bring the jurors in.

19                (The following proceedings were held in

20                open court in the presence of the jury:)

21                THE COURT:  Good afternoon.

22                Plaintiff's opening.

23                MR. CLOSE:  Good afternoon, and thank you.  My

24   name is Matthew Close, and along with my colleagues, we are

25   proud to represent our clients James Goldstein and Colony Cove
```

1    Properties in this matter.

2             You are all here today because of this document,

3    the United States Constitution.  That's what brings us all

4    together today.  Indeed, we have juries in this country because

5    of this Constitution.  In many other countries, there are no

6    jury trials.  The right to have your cases heard by a jury is

7    one of the things that makes our Constitution special.

8             There's something else about our Constitution

9    that is special.  Hundreds of years ago, rulers, kings, queens,

10   governments, they used to just be able to confiscate somebody's

11   property, just take it away from them.  That's the way things

12   worked back then.  But about 225 years ago, our Constitution

13   said that our government cannot take our property away from us,

14   our private property away from us without providing just

15   compensation.  That is a right guaranteed by the 5th Amendment

16   to the Constitution.

17            If the government wants to use your property to

18   build a park or wants to use a small part of your property for

19   a sidewalk or a shelter, it can do that, but it must pay you

20   just compensation.  Those are the rules, and that is what this

21   case is about.

22            You will decide if the defendants, City of Carson

23   and its Rent Control Board went too far and violated this

24   Constitution and owe my client, Mr. Goldstein, and his property

25   just compensation.

**UNITED STATES DISTRICT COURT**

```
 1              Let me introduce Mr. Goldstein.  He is passionate
 2   about fashion, art, and basketball.  He knows a lot about those
 3   things.  But he also knows a lot about the mobile home park
 4   industry.  That's been his business for over 30 years, and it's
 5   how he made his money.  He learned the mobile home park
 6   business in Southern California after graduating from UCLA here
 7   in Los Angeles and Stanford University in Northern California.
 8   He eventually got the chance to buy his first park with some
 9   support from partners and some loans, and Jim really took off
10   from there.  You will meet him today and hear his story.
11              Jim Goldstein owns five star high quality mobile
12   home parks.  This case is about a park that Jim owns that has a
13   swimming pool, jacuzzi, indoor sauna, banquet room, recreation
14   clubhouse.  It even has an exercise area for the residents'
15   pets.  Until some recent changes, it had areas for the
16   residents to park their RV's when they weren't using them for
17   travel or vacation.  Jim takes pride in his --
18              THE COURT:  Mr. Close, proper name.  Not Jim.
19   Proper name.
20              MR. CLOSE:  Sorry, Your Honor.
21              Jim Goldstein takes pride in his parks, and they
22   are his business.  He will tell you how he maintains them and
23   improves them.  And in that business, he spends a lot of time
24   learning the rules and playing by the rules.
25              Mr. Goldstein is also not afraid to stand up for
```

1    his rights and to question the government from time to time.

2    That right is also in this Constitution.  It's part of the

3    1st Amendment.  Constitutional rights sometimes involve big

4    issues of national importance that everyone is talking about.

5    But sometimes constitutional rights involve issues that are

6    very important to only a few people -- one person's life, one

7    person's liberty, or one man's property in the City of Carson.

8    The Constitution protects each one of us every day.  That's

9    what makes it special.

10                   Mr. Goldstein owns two mobile home parks in

11   Carson.  In early -- in the early 1980's, he bought a park

12   called Carson Harbor Village.  That's the park in blue on the

13   map.  More than 20 years later in 19 -- excuse me -- in 2006,

14   Mr. Goldstein decided to make another investment in Carson.  He

15   was comfortable investing in Carson because he understood the

16   rules.  He purchased the mobile home park across the street

17   called Colony Cove.  It's in green on the map.

18                   During this case and already this morning you've

19   heard a lot about rent control, and you're going to hear more

20   about rent control in Carson.  Rent control means that the city

21   decides how much rent can be charged in the mobile home parks

22   in the city with a few small exceptions.

23                   The rents set by the city are not -- are not

24   based on the wealth of any particular resident, based on the

25   income of any particular resident, based on any particular

1    resident's ability to pay.  The rents set by the City of Carson

2    are the same whether someone has $5,000 in the bank account or

3    $500,000, whether someone lives on a big paycheck or manages to

4    get by on a Social Security check.  The rents are the same.  It

5    doesn't matter if someone has a new RV or not.  And the rents

6    do not change or increase when someone moves out of the park

7    and someone else moves in.  The rents stay the same.  They

8    don't increase automatically every year.  The owner must always

9    apply for permission to raise the rents.  Those are the rules,

10   and Mr. Goldstein knows those rules.

11           Mr. Goldstein is an expert in Carson's rent

12   control rules.  At one point he was selected to serve on

13   Carson's Rent Control Board, one of the defendants in this

14   case.  Mr. Goldstein will tell you about the training he

15   received from the City on how its rent control rules were

16   supposed to operate and be applied.  Those rent control rules

17   have been in place for decades.  Carson published those rent

18   control rules so that property owners, investors, and residents

19   would understand how the system worked and how rents would be

20   set.

21           Mr. Goldstein knew and understand those rules and

22   followed closely how the City applied them.  He had owned that

23   mobile home park in blue for decades.

24           When Colony Cove came on the market for sale in

25   the beginning of 2006, Jim Goldstein was very interested.

1   Jim Goldstein could have invested his money anywhere, but he

2   chose Carson.  A few months later he purchased Colony Cove.  He

3   will explain to you that he made that investment because he

4   expected the rent rules to be followed.  Jim Goldstein will

5   tell you that, if Carson followed its rules and treated him as

6   they had in the past, he would have received the rent increase

7   from the City that would let him pay his expenses and make a

8   small profit on Colony Cove.  He will tell you that that's the

9   way Carson had treated him and done business with him for years

10  on his first park, Carson Harbor Village in blue on the map

11  when it was up.

12           But here is what happened right after

13  Jim Goldstein purchased Colony Cove.  The city changed the

14  rules.  The Carson politicians changed the rent control rules

15  and guidelines that they had adopted and published many years

16  before.  What was the change?  The new rules said that the City

17  could now set rents using a formula that disregarded and

18  ignored Mr. Goldstein's biggest expense at Colony Cove, his

19  mortgage payment.  The City's new rule said that this expense

20  could be overlooked and disregarded.

21           Just so we are all on the same page, let me

22  explain what I mean.  When Mr. Goldstein purchased Colony Cove,

23  he borrowed some of the money.  He got a loan.  In the real

24  estate business, they call it a mortgage.  Every month

25  Mr. Goldstein needed to pay interest on that loan.  That's the

1    mortgage payment we are talking about, the interest he owed

2    every month on the money that he borrowed to help buy part of

3    the park.

4              The City admits in this case that it is not

5    unreasonable or improper to borrow money to purchase a mobile

6    home park in Carson.  The City admits that now, but right after

7    Mr. Goldstein purchased Colony Cove, they targeted and changed

8    the rule that he had been relying on to be able to get enough

9    rent to pay the mortgage expenses on the park.

10             To be clear, we are not -- we are not saying the

11   City can never change its rules.  Of course it can.  The judge

12   will instruct you later on the law in this case, but it is our

13   position that, when the City of Carson decided to change its

14   rules, it had two options.  First, it could say, Mr. Goldstein,

15   you had just purchased that Colony Cove Park.  We're not going

16   to apply these new rules to you.  Instead, we're going to let

17   you operate under the rules that existed when you made this

18   investment.  Some people call that grandfathering in.  Or,

19   second, if the City didn't want to do that, it is our position

20   that they then needed to pay Mr. Goldstein just and fair

21   compensation for the loss of value in the park and the damages

22   he was suffering.

23             You will decide if it is fair and reasonable to

24   switch the rules like that right after someone spends millions

25   of dollars buying a property in reliance on the rules.  I

1   suspect you can imagine what happened after Carson changed the

2   rules.  The City ignored the mortgage payments Mr. Goldstein

3   had on the park and set the rents so low that Mr. Goldstein was

4   forced to lose a million dollars per year back then.  Is that

5   okay?  You will decide.

6           The City set the rents at Colony Cove far, far

7   below the market rents right across the street.  You can see on

8   the map in blue across the street at Carson Harbor there were a

9   small number of spaces that had no rent control.  The market

10  price was $828 per space.  That was the market price.  At

11  Colony Cove the rents were only $414, 50 percent lower than the

12  market rate.  Half off.  Even the rents set by the City across

13  the street at Carson Harbor, the rents set by them under rent

14  control were substantially higher than the rents they permitted

15  Mr. Goldstein to charge at Colony Cove.

16          Mr. Goldstein owned Carson Harbor.  He knew the

17  rents.  He knew the market.  He will explain why he expected a

18  rent increase at Colony Cove.  But the city changed the rules

19  and kept the rents at Colony Cove far below the market rents

20  right across the street, and they did this knowing that

21  Mr. Goldstein would lose millions of dollars.  They knew they

22  were not letting him charge enough to pay the mortgage and

23  other expenses.  You will decide if this was fair.

24          Luckily for the Colony Cove Park and the hundreds

25  of residents who live in that park, it was Jim Goldstein who

1    had purchased that park.  He was able to put more of his money

2    into the park to cover the bills, pay the mortgage, and

3    actually improve and maintain the park in excellent condition.

4    Another investor would have gone bankrupt.  What if this was a

5    first-time investor?  What if this was a small-time investor?

6    The Carson politicians knew Jim Goldstein wouldn't go bankrupt.

7    They knew Jim Goldstein wouldn't let -- would not abandon the

8    park.  But the City also did not want to let him charge enough

9    rent to pay the bills.  And let's be clear.  Rents far below

10   the market levels would have been sufficient to let

11   Mr. Goldstein both pay the bills and even, there I say, earn a

12   small profit.

13           And when he purchased the Colony Cove Park,

14   Jim Goldstein will tell you why he had every reason to expect

15   and believe that the City would let him raise the rents enough

16   to pay his bills, the mortgage expense, and earn a small

17   profit.  That could be done while maintaining the rents well

18   below market.

19           Let's talk some more about Mr. Goldstein's

20   purchase of Colony Cove Park in 2006.  The evidence will show

21   that Jim Goldstein paid fair market value for the park.  The

22   City admits that Jim Goldstein purchased Colony Cove in an

23   arm's-length market transaction.  That's a fact.  They admit

24   it.  Arm's-length market transaction.  That means the price was

25   set by the market.

1          When he purchased Colony Cove, Jim Goldstein was

2  prepared to pay fair market value.  He was not going to be

3  gouged.  He would not overpay.  The seller had owned the park

4  for decades, a big real estate group out of Arizona called

5  Grossman.  Completely unrelated to Jim Goldstein.  The Grossman

6  group hired the biggest real estate broker in the country to

7  market, promote, and sell the park.  They offered the park for

8  sale at $28 million.  $28,500,000.  Excuse me.

9          Two other investors in the mobile home park

10  industry made offers to purchase this park.  One offer was from

11  Cal Am, and they offered -- Cal Am Properties offered to

12  purchase the park for $21.5 million.  Another mobile home park

13  investor with experience in the industry, David Weisswasser,

14  offered to purchase the park for $24 million.  The city admits

15  in this case that these were both legitimate offers, no dispute

16  about that.

17          Jim Goldstein's offer was in the middle of those

18  two offers, and it's at the bottom of the chart.  After

19  negotiations with the seller, Jim Goldstein agreed to purchase

20  Colony Cove for $23.05 million.  That was not even the highest

21  offer, but the seller knew that Mr. Goldstein was a

22  sophisticated operator of mobile homes who knew how to do

23  business in Carson.  The seller wanted to do business with him.

24          But then the seller negotiated hard for a higher

25  price, and Jim negotiated -- Jim Goldstein negotiated hard for

**UNITED STATES DISTRICT COURT**

1   a lower price.  Back and forth they went.  These were

2   sophisticated business people.  The seller's broker, that big

3   national firm, they put together a large offering document to

4   explain why buyers should want to pay $28 million for the

5   property.  They set out all the reasons why lots of money could

6   be made on the property.  It even talked about how a potential

7   buyer could get rent increases.

8            But Jim Goldstein did not want to pay

9   $28 million.  He wanted a lower price.  He negotiated and made

10  all the arguments for why the price should come down.  To make

11  sure he got the lowest price he could, Mr. Goldstein even had

12  his lawyer write a letter that he could give to the seller

13  explaining all the reasons why the Carson politicians and staff

14  would look for any loophole or something in the fine print to

15  prevent the rents from going up.  And Mr. Goldstein gave that

16  letter to the seller as part of the negotiations.

17  Mr. Goldstein did everything a smart businessperson would do to

18  try to pay a lower price.

19            Mr. Goldstein will tell you what that letter was

20  all about.  The seller wanted 28 million.  Mr. Goldstein

21  ultimately purchased the park at 23.05 million.  The City

22  admits that this was an arm's-length market transaction.

23            Mr. Goldstein will tell you that he agreed to

24  this price because he rightly expected that Carson would keep

25  doing business the same way it had done business with him for

years.  He expected Carson to follow the rules that allowed a rent increase to pay park expenses and earn a small profit. Why did Mr. Goldstein expect this?  Because that's how the rules had worked in Carson all along.  He saw that an owner could collect enough rent to pay their expenses, including the mortgage, so long as the rents were kept below market.  Every year that's the way Carson had handled his park right across the street.

And here's another thing.  Mr. Goldstein will tell you that, during the previous 20 years, when interest rates went up and his mortgage expense went up, that would contribute to increases in the rents.  But when interest rates went down and his mortgage expense went down, that would serve to prevent the rents from increasing.  It worked both ways. Those were the rules.

And Mr. Goldstein knew the rules.  For example, he knew that, if he wanted a rent increase to cover his mortgage, he would need to get a legitimate genuine mortgage loan.  Those are the rules.  You can't go out and borrow money from a friend, pay a sky-high interest rate, and expect Carson to allow that expense.  No way.  Mr. Goldstein knew that.  He plays by the rules.

He got his loan from General Electric Capital, G.E.  They make washer machines and appliances, but they also had a large business making commercial real estate loans to

1   investors.

2              To pull together the $23 million purchase price,

3   Mr. Goldstein put in $5 million of his own money.

4   General Electric came in, looked at the -- looked at the

5   property, looked at Mr. Goldstein's sophistication and

6   experience, and agreed to loan him the other $18 million.  The

7   city admits that this G.E. loan was an arm's-length mortgage.

8              Mr. Goldstein did not cut a backroom deal with

9   the seller or borrow money from someone on some sort of

10  questionable sourcing.  He played by the rules.  This

11  $23 million purchase price was a very big investment.  That is

12  a lot of money.  But Mr. Goldstein understood the rent control

13  rules and understood that they allowed him to earn enough rent

14  to pay his bills so long as the rents stayed below market

15  levels.

16             You will also hear testimony tomorrow from

17  Rob Detling, an appraiser of mobile home parks.  Mr. Detling's

18  profession is to value mobile home parks through a process

19  called an appraisal.  He did an appraisal of this park in 2007

20  long before this litigation.  Mr. Detling will testify that

21  Jim Goldstein did not get suckered by the seller into

22  overpaying.  Mr. Goldstein's offer wasn't even the highest.

23  There was another credible buyer offering to pay more.

24             Now, Jim Goldstein knew that he was paying more

25  for the park than that seller Grossman had paid when it bought

1    the park back in the 1970's.  Everyone knows that prices change

2    over 30 years.  The price of gas is higher now than it was in

3    the 70's.  Coffee used to cost a quarter.  What does it cost

4    now?  Movie theaters aren't forced to charge the same ticket

5    prices they were years ago.  So since he was buying the park in

6    2006, Mr. Goldstein had a mortgage from G.E. that the seller,

7    Grossman, did not have because they had purchased the park

8    30 years earlier.  But remember, the City admits in this case

9    that it is not unreasonable or improper to borrow money to

10   purchase a mobile home park.

11              Mr. Goldstein knew that he could pay the interest

12   on that mortgage and his other expenses to maintain the park by

13   charging rents that were well below market levels.  He did the

14   math.  He knew he could make it work.  He might not make a lot

15   of money, but he could pay his expenses and make a small profit

16   while charging rents well below market.  From his decades of

17   experience in Carson, Mr. Goldstein knew the rules and had seen

18   the rules applied so owners could recover their mortgage

19   payments so long as there was no funny business.

20              And one more thing Mr. Goldstein will tell you

21   about.  He knew that in 2003 another owner had taken Carson to

22   court to make sure the City took into account that owner's

23   mortgage expenses on the property.  That lawsuit involved a

24   park called Carson Gardens.

25              And Mr. Goldstein will tell you that he followed

**UNITED STATES DISTRICT COURT**

1   that *Carson Gardens* case and a few other lawsuits.  He will

2   explain that the superior court judge in that case had ruled in

3   favor of the owner of the Carson Gardens Park, and this

4   confirmed what Jim Goldstein knew all along.  Carson needed to

5   consider an owner's mortgage interest payments as part of the

6   rent-setting process so long as there was no funny business or

7   fraud.

8              That *Carson Gardens* case even went to the Court

9   of Appeal.  The Court made its public ruling in January, 2006,

10  at the same time Colony Cove was being offered for sale.  It's

11  right here in this book with the other California Court of

12  Appeal decisions from January of 2006.  And Jim Goldstein knew

13  about it.  That's how closely and carefully he followed this

14  business.

15             The Court decisions confirmed what he had

16  experienced in his park right across the street.  Interest on

17  the loan used to buy a park was a legitimate and allowable

18  expense.  That was true when the expense went up, and it had

19  been true for Mr. Goldstein when the expense went down.

20             So ten weeks later Mr. Goldstein purchased

21  Colony Cove.  That's in red on the slide that's up on the

22  screen.  What happened next just six months later, Carson

23  changed the rules.  Jim said, wait, wait, you cannot change the

24  rules on me now.  I just made this investment.  He should have

25  been grandfathered in and protected under the old rules.  He

1    had just bought Colony Cove.  But the Carson politicians had

2    other ideas.

3              Here's the thing.  There are a lot of

4    rent-controlled parks in Carson, and a lot of voters live in

5    those parks, and the Carson politicians depend on those voters

6    to keep them in office come election time.  Jim Goldstein

7    fought hard though to get the rent increase he needed to pay

8    his bills.  He hired lawyers.  He made the applications.  He

9    filed the paperwork.  He did the reports.  He asked for rents

10   that would let him make a profit just like the seller Grossman

11   had made the year before.  And even if the City would not let

12   him make a profit, Jim Goldstein insisted that he could not be

13   forced to operate at huge losses.

14             Carson had a different idea.  They took the new

15   rules and said that Jim Goldstein's mortgage payments would be

16   ignored.  They forced him to operate and lose more than a

17   million dollars that year.  Carson did the same thing the next

18   year when Mr. Goldstein again applied for a rent increase to

19   pay the bills.

20             Now, Jim Goldstein was still paying the mortgage

21   of course.  The lender wanted its money.  Interest needed to be

22   paid or G.E. could foreclose.  Hundreds of people live in that

23   park, and Jim Goldstein was not going to end his long and

24   successful business career that way, and he wasn't going to

25   lose his $5 million investment.

1          Jim Goldstein will tell you that he never would

2   have purchased that park for $23 million if he knew Carson

3   would change the rules and force him to lose about a million

4   dollars in cash in those years.  Mr. Goldstein had done

5   business in Carson for decades.  He knew the tenants liked no

6   rents.  No surprise.  But Jim Goldstein knew the rules, and he

7   will tell you why he expected Carson to follow the rules.

8   Government sets the rules.  Government should follow the rules

9   it sets.

10          Carson's decision to change the rules in the

11   middle of the game had a substantial and severe impact on

12   Jim Goldstein's investment.  Each side in this case has hired

13   an expert who will testify about these issues.  And guess what,

14   they disagree.  But here's the thing.  They don't disagree by

15   much.

16          Our expert, Peter Salomon, a certified public

17   accountant, says in his report that the City's decision to

18   ignore the mortgage expenses reduce the park's value by about

19   $5.7 million before interest.  The city's expert,

20   Mr. John Ellis, also prepared a report, and it says two things.

21   First, he says the City wins, we get nothing, everybody go

22   home.  But, second, he said, if what the City did was wrong

23   when they denied Mr. Goldstein the rent increases to pay his

24   mortgage, if that was improper, then the damage is

25   $6.39 million before interest.  That's even more than our

number.  Their expert, Mr. Ellis, says the damage before interest was more than our expert Mr. Salomon.

Now, the two experts use different approaches. The City's expert calculates interest differently than ours. But even with interest, one expert says in his report that the damage was 9.96 million, and the other expert says 7.55 million.  Both numbers are significant.  This is real damage.

The evidence will show that the City's decision to change the rules and ignore Jim Goldstein's mortgage payments had a major economic impact on the value of the park. Rather than let Jim Goldstein charge below-market rents to cover his expenses, they made him lose millions of dollars.

Next week at the end of this case, we will ask you to deliver a verdict that Carson's conduct violated this Constitution.  We will ask you to find that the -- that they changed the rules in the middle of the game and forced Jim Goldstein to charge rents that were so far below market and so far below those just right across the street that he could not pay the bills.  Millions of dollars in damage were done. You will decide if Carson went too far and must pay my client just and fair compensation.

Thank you very much.

THE COURT:  Defense opening.

MR. ONSTOT:  Good afternoon, ladies and

1   gentlemen.  My name is Stephen Onstot, and I represent the

2   defendants -- the City of Carson and the Carson

3   Rent Control Board.

4          Fact, Carson Harbor Village is an all-age park.

5   Colony Cove is a senior citizens park.  Fact, the rules did not

6   change at all in the City of Carson as to rent control from the

7   time that Mr. Goldstein purchased Colony Cove until after his

8   at least second application for rent increase.  Fact,

9   Mr. Goldstein paid almost twice as high of an interest rate as

10  the next offer for Colony Cove incurring massive debt.

11         The day before plaintiff purchased Colony Cove in

12  April, 2006, the average monthly rent for mobile home space --

13  now, that's not the dwelling unit itself.  The residents owned

14  the dwelling itself, but just the space was $414.  18 months

15  later, after plaintiff purchased the park, he applied for an

16  average rent increase of $618 per month which equates to a

17  149 percent increase.  That would have immediately brought the

18  average rent from 414 a month up to $1,032.

19         The Rent Board rejected plaintiff's request, but

20  they did grant a rent increase of 8.8 percent which still put

21  over $178,000 more in revenue into Mr. Goldstein's pocket for

22  the year than the previous owner had.

23         Now, the following year plaintiff applied for

24  another rent increase.  This time, just the increase, $342 a

25  month per space which equates to a 76 percent rent increase.

1    And the Carson Rent Board rejected that request as well, but it

2    did grant a 5.5 percent increase which put another 121,000 more

3    in revenue in plaintiff's pocket than in the previous year.

4              But as Mr. Close said, plaintiff said that's not

5    enough.  I took out an $18 million mortgage to buy Colony Cove,

6    and the Rent Board didn't let me pass on my mortgage payments

7    to the residents.  So here they are in court.  Mr. Close's last

8    slide asked for nearly $10 million in damages.  That equates to

9    over $20,000 for each and every mobile home space in

10   Colony Cove that is owned by a senior.

11             MR. CLOSE:  Objection, Your Honor.

12             THE COURT:  Overruled.

13             MR. ONSTOT:  To understand why we have to step

14   back in time -- and as Mr. Close mentioned, in 1979, that was

15   the year Carson adopted its mobile home Rent Control Ordinance.

16   A valid law, many parts are still in effect today.  And part of

17   that law states -- and I want to quote it accurately -- that

18   *The board shall grant rent increases as it determines to be*

19   *fair, just, and reasonable -- a fair, just, and reasonable rent*

20   *increase if it protects mobile home owners from excessive rent*

21   *increases and allows a fair return to the park owner.*  There is

22   no guarantee of profit in the Carson Rent Control Ordinance,

23   and there are no rights to profits under the Constitution that

24   Mr. Close held up.

25             The ordinance also states that the board shall

1    consider certain factors in determining whether to grant a rate

2    increase, and a mobile home park owner's mortgage payment may

3    be allowed but only to the extent it's reasonable in light of

4    existing rents.

5            Now, during the course of this trial, you will

6    see and hear evidence that rent increases are not automatic --

7    park owners must apply for them -- and that the Rent Board is

8    and always has been legally authorized to use, consider, and

9    apply any formula it wants that it considers to be fair and

10   just and reasonable.  It could use what's called the CPI, the

11   consumer price index, which is a measure of inflation.  It

12   could use comparable rents of other mobile home parks.  It

13   could use a formula that takes into account mortgages, mortgage

14   payments.  Or it can use a formula called MNOI which does not

15   take into account mortgage payments but does guarantee or

16   assure that the net income from the park is maintained

17   year-after-year and accounting for inflation.

18           Now, fast forward from 1979 to 1983.  As

19   Mr. Close pointed out, that's when Mr. Goldstein bought

20   Carson Harbor Village right across the street from Colony Cove.

21   Now, at the time that he purchased Carson Harbor Village,

22   Mr. Goldstein knew that Carson had a Rent Control Ordinance,

23   and, yes, he was a sophisticated investor, and he knew that

24   Colony Cove was subject to that rent control.

25           Then in October, 1983, Mr. Goldstein applied for

1  his first rent increase at Carson Harbor Village, and that

2  increase he asked for $42.50 per space to cover the mortgage

3  payment.  The Board awarded only $12 per month per space, and

4  the minutes of the Board, explaining its reasons why, are set

5  forth.  And you will see those later on, and you will hear

6  testimony on that.

7            Thus, Mr. Goldstein in 1984 was on notice that

8  the Carson Rent Control Board did not always pass on some or

9  all of the mortgage debt onto the residents.  Now, from 1984 to

10  2006, many things happened.  Over that 22-year period,

11  Mr. Goldstein continued to own Carson Harbor Village, and he

12  had more experience dealing with Carson's Rent Control Board

13  year-after-year with numerous applications for rent increase.

14  And you will learn that Mr. Goldstein followed the cases.

15  Mr. Close pointed out one of them, the *Carson Gardens* case.

16  But you will hear evidence of other instances where the Board

17  did not grant rent increases that passed on mortgage debt to

18  the park owners.

19            And Mr. Goldstein applied for and received

20  permission to subdivide and sell mobile home spaces at another

21  one of his parks in the Palm Springs area, and you will learn

22  in the course of this trial why that is important.

23            Then in early 2006, Colony Cove came on the

24  market.  The owner at the time was a company called

25  Grossman Properties, and as Mr. Close pointed out, they

1    produced the document called an Offering Memorandum which is

2    given to perspective buyers and outlines a number of things to

3    tell the buyer what the property is about -- its location, the

4    past rent increases, the amenities, things such as that.  And

5    it also includes a clear disclosure that Colony Cove was a

6    rent-controlled senior park, that future rent increases was not

7    guaranteed, and that Colony Cove had 21 undeveloped mobile home

8    spaces that the new owner could develop that would not be

9    subject to rent control.

10               Now, Mr. Goldstein had his long-time lawyer and

11   trusted advisor Richard Close, not Matthew Close who represents

12   plaintiff here, read the Offering Memorandum and opine on it.

13   And in response, Mr. Close wrote Mr. Goldstein a six-page

14   letter that was alluded to by plaintiff's counsel setting forth

15   a long list of reasons why anybody who purchases Colony Cove

16   should not expect substantial benefit from its investment.  You

17   will hear Mr. Goldstein testify about that, the letter in its

18   entirety, and have that letter in the jury room.  It is

19   Exhibit 18; so please remember that number.

20               And the last sentence of the last page of that

21   letter that I have blown up here and is highlighted, if you can

22   see, it states, *In our opinion, a purchaser should not rely on*

23   *collecting any increased rents from those collected currently.*

24   That letter was not written to Grossman Properties.  That

25   letter was written to James Goldstein by his lawyer.  Despite

1    Mr. Close's warnings, Mr. Goldstein purchased Colony Cove.

2                Now, having covered the facts and circumstances

3    and the expectations leading up to Mr. Goldstein's purchase of

4    the park, now we'll turn to events as to what happened after

5    the acquisition.

6                First, you will see and hear evidence that the

7    net operating income, that's the operating revenue, less the

8    expenses at the time Mr. Goldstein purchased the park was about

9    $1.1 million a year, but in order to buy the park, he took out

10   a mortgage that cost him $1.2 million a year to service.  He

11   started, as a lot of people will call it, underwater.  And this

12   occurred before October, 2006, when plaintiffs contend the

13   rules were changed.  So the evidence will show Mr. Goldstein

14   was underwater from the start.

15               Second, you will hear evidence that it's not

16   appropriate to pass through plaintiff's mortgage payments to

17   the seniors at Colony Cove for two main reasons.  Our witnesses

18   will testify one of those reasons is that debt service could be

19   manipulated.  The second is that it defeats the purpose of rent

20   control.

21               Now, I've already mentioned that the City granted

22   plaintiff an 8.8 percent increase the first year, 5.5 the

23   second year.  These are the only two actions that the

24   City of Carson and the Rent Control Board took with regards to

25   Colony Cove in the years complained of here.  And you will

**UNITED STATES DISTRICT COURT**

1    hear, in each of those actions, the rent increased; and you

2    will hear testimony that, when the rent increases, the value of

3    the park increases.

4              You will hear evidence of Mr. Goldstein adding to

5    the value of the park by applying for and receiving permission

6    from the City to subdivide Colony Cove so that he could

7    eliminate rent control in the park and sell individual spaces.

8    You will learn that, by selling just one mobile home space,

9    plaintiff can eliminate rent control for the entire

10   Colony Cove Park.

11             Now, the same is true with the 21 lots that

12   Mr. Goldstein is free to develop into mobile home spaces that

13   would not be subject to rent control.

14             Now, I've given you an overview of what the

15   evidence will show, but there are some things you will see no

16   evidence of.  You will see no evidence that the city physically

17   took any of Mr. Goldstein's property.  The geographical

18   boundaries of Colony Cove today are the same as it was when

19   Mr. Goldstein purchased the park in 2006.  There's no evidence

20   of taking any of the use away from Mr. Goldstein.  The park was

21   a rent-controlled senior park when Mr. Goldstein purchased it.

22   It's the same today.  There's no evidence of the city taking

23   rent money that Colony Cove received or was entitled to.

24             Every year Colony Cove applied for a rent

25   increase, it got one.  The City never reduced the rent for

1    Colony Cove and what it was allowed to charge.  You will see no

2    evidence that Colony Cove declined in value.  In fact, the

3    evidence will show the contrary.  There's no evidence that the

4    City caused the plaintiff any loss.  The City had nothing to do

5    with regard to the amount of debt Mr. Goldstein wanted to

6    undertake to be dang sure that he got that park paying almost

7    8 percent when the next highest bidder was going to pay

8    4 percent.

9              Each action result in plaintiff being in a better

10   position after the City took action by raising the rents than

11   before the City acted.  The City will -- the evidence will show

12   that the cause of any economic loss by plaintiff was its own

13   self-inflicted unreasonable expectations.

14             Finally, I would like to introduce you to the

15   people who will be testifying in this case.  You will hear from

16   Dr. Kenneth Baar, a recognized expert throughout the country in

17   rent control theory and application.  He will explain to you

18   the various methods of calculating rent increases that have

19   been accepted by the industry and formed part of the analysis

20   of rent increase under the Carson ordinance.

21             Dr. Baar will also explain why the formula the

22   City used that did not include pass through of the large debt

23   service Mr. Goldstein incurred was appropriate and why

24   plaintiff's expectations to the contrary were unreasonable.

25             You will hear from Ken Freschauf, the city staff

person, who reviewed and analyzed Colony Cove's applications

for rent increase and reported his findings to the Rent Board.

He will testify as to the process employed to provide the

Rent Board with the information necessary for it to act on

Mr. Goldstein's application.

You will meet Mark Hansen, the land broker for

plaintiff, who will testify as to the goals and objectives

Mr. Goldstein had when he purchased the property, one of those

goals being maximize the amount of the loan.

You will meet John Ellis who is an expert in real

estate appraisal and real estate economics who teaches courses

on damages and capitalization of income.  Mr. Ellis will expose

the flaws and damage calculations performed by Mr. Salomon and

how such flaws result in an inflated calculation of damages.

Unlike what Mr. Close just told you, Mr. Ellis does not have an

opinion on whether plaintiff was damaged or what the amount of

damages should be.

We'll have some questions for Mr. Goldstein and

Ms. Noelle Stephens as well, and there may be some witnesses

who won't be able to make it to trial, and their testimony will

come via deposition.  One is a fellow named Doug Danny who is

the real estate broker for the purchase of Colony Cove and

he'll testify as to that transaction and the preparation of the

Offering Memorandum that was given to Mr. Goldstein and formed

the basis of Mr. Close's letter that I showed you earlier.

**UNITED STATES DISTRICT COURT**

1          You will also hear from Mr. Matt Crowe, the

2   president of Grossman Properties, which is the company that

3   owned Colony Cove before plaintiff.  And he'll testify as to

4   his experience with the City regulating the rents from 1992 to

5   2006.

6          And you may hear from Ms. Ann James the property

7   manager for all of the mobile home parks owned by

8   Mr. Goldstein.  She will testify as to plaintiff's knowledge

9   and expectation of the potential to subdivide the mobile home

10  parks before the plaintiff acquired Colony Cove.

11         In sum, we are confident that, after you see and

12  hear and consider the evidence presented, you will come to

13  three distinct and inescapable conclusions as what the totality

14  of the evidence shows:

15         One, that any adverse economic impact to

16  plaintiff was self-inflicted and not caused in any way by the

17  city which took nothing from plaintiff.  It gave;

18         Two, that plaintiff's expectation at the time it

19  acquired Colony Cove, that it would be allowed to pass through

20  its mortgage payments onto the senior residents was

21  unreasonable; and,

22         Three, the character of the City's action was an

23  attempt to be fair and just and reasonable, not just to

24  Mr. Goldstein but to the residents of Colony Cove as well.  It

25  is a two-way street.

1          Based on these conclusions, we ask at the

2    conclusion of this trial that you return a verdict for the

3    defense.

4          Thank you.

5          THE COURT:  Thank you.

6          Ladies and gentlemen, we're just going to take a

7    short break to set up.  We'll be about ten minutes, and then

8    you'll hear from the first witness.

9          Remember not to discuss the case amongst

10   yourselves or with anyone else.  Don't form or express any

11   opinions until the case is submitted to you.

12         We'll see you in ten minutes.

13         THE CLERK:  All rise.

14      (The following proceedings were held in

15        open court out of the presence of the jury:)

16         THE COURT:  I'll continue to watch, but he was an

17   equal opportunity sleeper.  He slept during both arguments.

18   That was juror in seat No. 2.  I think he was asleep during

19   both arguments.  Let's keep an eye on him, and then we'll

20   discuss it at the end of the day.

21      (A recess was taken at 2:25 p.m.)

22         THE COURT:  Be seated.  Plaintiff's first

23   witness.

24         MR. CLOSE:  Your Honor, the plaintiff calls

25   Mr. James F. Goldstein.

```
 1                    THE CLERK:  If you can please stand next to the
 2    court reporter.  Raise your right hand.
 3                    Do you solemnly state that the testimony you may
 4    give in the cause now pending before this court shall be the
 5    truth, the whole truth, and nothing but the truth, so help you
 6    god?
 7                    THE WITNESS:  Yes.
 8                    THE CLERK:  Thank you.  Please take a seat.
 9                    For the record, can you please state your full
10    name.
11                    THE WITNESS:  James F. Goldstein.
12                    THE COURT:  You may inquire.
13                         JAMES F. GOLDSTEIN,
14                    PLAINTIFF'S WITNESS, SWORN:
15                         DIRECT EXAMINATION
16    BY MR. CLOSE:
17         Q      Good afternoon, Mr. Goldstein.  If at any point
18    you cannot hear me, will you please ask me to repeat myself?
19         A      Yes.
20         Q      Do you live in Southern California?
21         A      Correct.
22         Q      Have you always lived in L.A.?
23         A      I grew up in Milwaukee, Wisconsin, and came to
24    California to attend college at Stanford University.  I liked
25    it in California; so I never moved back to Milwaukee.
```

**UNITED STATES DISTRICT COURT**

```
 1          Q       Mr. Goldstein, what do you do for a living?

 2          A       My source of income is from the mobile home parks

 3   that I own.

 4                  THE COURT:  I'm sorry to interrupt.

 5                  For the folks in the audience, please turn off

 6   your cell phones.  Thank you.

 7                  You may.

 8          Q       BY MR. CLOSE:  Do you spend all your time

 9   managing and operating your mobile home parks, Mr. Goldstein?

10          A       No, I don't.  I have assistants who handle the

11   day-to-day operations of the mobile home parks, and I get

12   involved in the more important decisions.

13          Q       Mr. Goldstein, when did you purchase your first

14   mobile home park?

15          A       I believe it was sometime around 1980.

16          Q       And how did you get into the business of buying

17   and operating mobile home parks?

18          A       When I finished college, I went to work for a

19   real estate investment firm, and after roughly five years or so

20   of working for them, they decided to make mobile home park

21   investments and assigned me with the job of buying the mobile

22   home parks for the company and for their investors and, of

23   course, negotiating those purchases.

24          Q       At some point were you able to participate as an

25   owner in the purchase of a mobile home park?
```

**UNITED STATES DISTRICT COURT**

1    A    After a number of years, I was given the

2    opportunity to enter into a partnership with the owner of the

3    company that I work for and to share in the profits.

4    Q    And, Mr. Goldstein, how many mobile home parks do

5    you own now?

6    A    I currently own five mobile home parks, all in

7    California.

8    Q    In addition to the parks in Carson, where are the

9    others located?

10   A    As you mentioned, two in Carson, one in

11   Palm Springs, one in Palm Desert, and one in Ronark Park which

12   is north of San Francisco.

13   Q    It sounds like and looks like -- have you been

14   pretty successful in this business?

15   A    I've done okay.  And I would like to add that all

16   the parks I own are top quality mobile home parks known in the

17   business as five star mobile home parks.

18   Q    Mr. Goldstein, what's your approach to mobile

19   home park investments?

20   A    That's difficult to answer in a general way, but

21   I try to find mobile home parks that, number one, are top

22   quality in their amenities, in the homes that are located

23   there, the recreational facilities, et cetera.  Number two, I

24   like them to be in top quality locations so that the land value

25   is very high and the demand to live there, in my opinion, would

**UNITED STATES DISTRICT COURT**

1    remain high.

2         Q       Growing up in Milwaukee, did you ever work in the

3    real estate business?

4         A       No, I didn't.

5         Q       What was your first job growing up in Milwaukee?

6         A       Well, I never lived in Milwaukee except while I

7    was a student.  So I had summer jobs including working for my

8    father or working for the village where I lived, that sort of

9    thing.

10         Q       Do you own the mobile home park at issue in this

11    case, Colony Cove Mobile Estates?

12         A       Yes, I do.

13         Q       And where is it located?

14         A       It's located on what is the main thoroughfare of

15    the City of Carson.

16              MR. CLOSE:  Mr. Newcomb, could you put up the

17    slide I used during opening which I'll call D-1.

18         Q       How long have you owned Colony Cove?

19         A       I've owned Colony Cove since 2006, roughly ten

20    years.

21         Q       And how much did you pay to purchase Colony Cove?

22         A       Just over $23 million.

23         Q       And how did you come up with the money?

24         A       I came up with $5 million of my own money that I

25    had in a bank account and borrowed the balance from a very

1    reputable lender that I had done previous business with.

2         Q      And who was that lender?

3         A      G.E. Capital.

4         Q      We'll talk more about that later.

5                What kind of mobile home park is Colony Cove?

6         A      Colony Cove is the type of park that I referred

7    to previously, a top quality five star mobile home park with

8    very top quality amenities including the clubhouse recreational

9    facilities and so forth.

10        Q      I know you testified that you own another park in

11   Carson.  What's its name, and when did you purchase it?

12        A      I purchased Carson Harbor Village right across

13   the street in the early 1980's.  Both parks were developed by

14   the same party.  They're both the same size in terms of number

15   of spaces, and so they're quite similar.

16        Q      Now, is Carson Harbor Village, the park in blue,

17   is that a family park?

18        A      Carson Harbor Village is a family park.  That's

19   correct.

20        Q      And does that make Carson Harbor Village more

21   valuable than the Colony Cove Park across the street?

22        A      Not necessarily.  It's really in the eye of the

23   beholder.  There's certain advantages and certain

24   disadvantages.  Some people don't like to own parks with many

25   children running around that can make the living conditions

1    unpopular with some of the older residents.  So there's some

2    definite negative sides to owning a family park.

3                    I personally have the right to convert

4    Colony Cove to a family park at any time I so decide.  I

5    haven't done so.  I know the residents at Colony Cove would not

6    be happy if I did that, and I like to do things to the benefit

7    of my residents.

8         Q       Are both Carson Harbor Village and Colony Cove

9    subject to Carson's rent control laws?

10        A       Yes, they are.

11        Q       Now, are there some spaces in Carson Harbor that

12   are not?

13        A       That's correct.  I added 11 spaces to

14   Carson Harbor Village, and under the state law, any new spaces

15   that were constructed after a certain year -- I forget which

16   year it is -- but, anyway, any recently constructed spaces are

17   not subject to rent control.

18        Q       At the time you purchased Colony Cove in 2006,

19   how did the rents at Colony Cove compare to the rents across

20   the street at Carson Harbor?

21        A       As you've pointed out in your visual, the rents

22   at Colony Cove were exactly 50 percent of what the non-rent

23   control spaces across the street were at the time.  And because

24   I was able to set the rents at any figure I so desired for

25   those new spaces and the fact that they filled quite quickly

1    after they were constructed is a very good indicator of what

2    the market rents in that location truly are.

3          Q       So in your experience, the rents at Colony Cove

4    are 50 percent below the market rents?

5          A       At the time of purchase, they were 50 percent.

6          Q       Mr. Goldstein, did you know Colony Cove was

7    subject to rent control when you purchased that park in 2006?

8          A       Absolutely I knew that.

9          Q       Isn't that challenging and difficult for you as

10   an investor?

11         A       All of the parks that I own have been subject to

12   rent control, and it's a matter of learning the rules of the

13   Rent Control Ordinance in the city in which the park is located

14   and abiding by those rules and understanding the rules, knowing

15   how to operate the park within those rules.

16         Q       Mr. Goldstein, were you ever asked to serve on

17   Carson's Rent Control Board?

18         A       I was asked to serve on the Rent Control Board,

19   and I took up the invitation and did serve on the

20   Rent Control Board.

21         Q       For how long did you serve on the Carson

22   Rent Control Board?

23         A       The city council apparently felt that they didn't

24   want me on the Rent Control Board after I served for only one

25   hearing.

1    Q     Do you know why the city council wanted you to

2    give up that position on the Rent Control Board?

3    A     Well, I was never given any justification for

4    their actions, but I assumed that they were concerned that I

5    understood the Rent Control Ordinance too well and preferred to

6    have a less knowledgeable person on that Board.

7    Q     When you were on the Carson Rent Control Board,

8    did you get any training from the City about how the City's

9    Rent Control Ordinance and guidelines were supposed to work?

10   A     While I served briefly on the Rent Control Board,

11   there was a seminar, so to speak, given by the Carson city

12   attorney instructing the members of the Rent Control Board in

13   the way that the ordinance worked.

14   Q     Do you recall any of the key principles or

15   purposes that were explained to you in that seminar and

16   training?

17   A     Yes.  I recall very well.  And the most important

18   tenet that we were instructed to follow was that, no matter

19   what approach was used to determine the rent under a rent

20   increase application, that the applicant was entitled to a fair

21   return.

22   Q     Mr. Goldstein, what does "fair return" mean in

23   this context?

24   A     Fair return certainly doesn't mean a $1 million

25   loss.  Fair return means --

**UNITED STATES DISTRICT COURT**

1            MS. AILIN:  Objection.  No foundation.

2            THE COURT:  Overruled.

3            THE WITNESS:  Fair return means a reasonable

4    percentage of profit in comparison with the person's

5    investment.

6        Q     BY MR. CLOSE:  Do you recall if you were told by

7    the City during this training that the rent control guidelines

8    were an important part of the City's rent control laws and

9    rules?

10       A     Yes, I was.

11       Q     Before you purchased Colony Cove in 2006, were

12   you familiar with Carson's mobile home park Rent Control

13   Ordinance and Guidelines?

14       A     Having owned Carson Harbor Village for more than

15   20 years, of course I was very conversive with the mobile home

16   park rent control laws.

17       Q     When you purchased the Colony Cove Park in 2006,

18   what was your understanding of how rent increases would be

19   decided under Carson's rules?

20       A     For more than 20 years, I had been making annual

21   rent increase applications at Carson Harbor Village, and in all

22   the applications, the same form was provided by the City which

23   an applicant was required to fill out.  And on that form, it

24   had a list of income and expenses for a three-year period which

25   were then analyzed very carefully by the rent control staff at

1    the City of Carson.  And in every staff report that came out as

2    the result of that application, a comparison was made between

3    all the expenses of the current year as well as the previous

4    year, and that list of expenses included interest.

5         Q       I'd like to take a look at Exhibit 1001 which are

6    the guidelines that were in effect at the time you purchased

7    Colony Cove.  What was your recollection --

8                 THE COURT:  Exhibit number?

9                 MR. CLOSE:  1001.

10                THE COURT:  Thank you.

11        Q       BY MR. CLOSE:  Mr. Goldstein, what do you recall

12   that the guidelines said about mortgage payments -- mortgage

13   interest payments as an allowable expense?

14        A       Interest payments in all my applications was

15   treated as an allowable expense.

16        Q       I'd like to turn to page 6 of Exhibit 1001.

17                Is this part of the guidelines you are referring

18   to, Mr. Goldstein?

19        A       Yes, it is.

20        Q       I'd like to read into the record a few sentences

21   that Mr. Newcomb will highlight.

22                *Debt service incurred after adoption of the*

23   *ordinance to purchase a park may be an allowable operating*

24   *expense if the purchase price paid was reasonable in light of*

25   *the rents allowed under the ordinance and involved prudent and*

1    *customary financing practices.*

2              Skipping two sentences.

3              *When it is determined that some increase in debt*

4    *service was reasonably necessary to acquire the park but the*

5    *amount incurred was not reasonable in light of the ordinance*

6    *and customary and prudent financing practices, then only the*

7    *appropriate portion of the debt service incurred may be allowed*

8    *as an operating expense.*

9              Mr. Goldstein, did I read that correctly?

10   A       Yes, you did.

11   Q       Actually, a quick question.

12             The guidelines talk about debt service.  Is that

13   the same as mortgage payments?

14   A       Yes, it is.

15   Q       Is there anything in the guidelines that you can

16   recall that indicated that the City would completely disregard

17   the mortgage payments or debt service?

18   A       There was nothing that made me think they would

19   disregard debt service, particularly after more than 20 years

20   of experience with Carson Harbor Village.

21   Q       And that's -- Carson Harbor Village is the park

22   that you had owned for 20 years; right?

23   A       Correct.

24   Q       And how did the City account for your mortgage

25   interest expense over those 20 years at Carson Harbor Village?

1    A    They considered the original amount of financing

2  that I had when I had purchased the park and compared the

3  interest each year to the previous year.

4    Q    So did they take that mortgage interest expense

5  into account when setting rents at Carson Harbor Village?

6    A    Absolutely.

7    Q    And did -- over that 20-year period, did the

8  mortgage interest payments remain the same or constant at

9  Carson Harbor Village?

10    A    The mortgage payments changed as interest rates

11  changed.  It actually worked to my detriment in many years as

12  the interest rates decreased.  I was given less of a rent

13  increase than I would have received had the interest rate

14  remained the same.

15    Q    Okay.  Is there anywhere in the guidelines, do

16  you recall, that they state -- what is the purpose of rent

17  control in Carson?  Is that set forth in these guidelines?

18    A    I'm not sure if it's technically stated in the

19  guidelines versus the overall ordinance.  The purpose of rent

20  control is to provide low income housing for those people that

21  need it.  But unfortunately rent control doesn't work the way

22  the goals of rent control are set forth.

23    Q    I'd like to take --

24    MS. AILIN:  Move to strike.  No foundation.

25    THE COURT:  Overruled.

**UNITED STATES DISTRICT COURT**

1    Q       BY MR. CLOSE:  I'd like to take a look at the --

2    Exhibit 1001, page 3.  And I'll ask Mr. Newcomb to put that on

3    the screen.

4           Mr. Goldstein, at the top there, do you see a

5    portion that refers to the purpose of the Rent Control

6    Ordinance and Guidelines in the City of Carson?

7    A       Yes.

8    Q       And what does it say there that's been

9    highlighted by the --

10   A       *The purpose of the ordinance is to protect the*

11   *homeowners who rent spaces in mobile home parks in the city*

12   *from excessive rents and to allow park owners to earn a just*

13   *and reasonable or fair return on investment.*

14   Q       So is it a balance, in your opinion and

15   experience, Mr. Goldstein?

16   A       Well, two different questions.  Ordinance

17   designed to create a balance between the owner and the

18   residents, clearly it is.  But second question, has it been

19   achieving a balance?  Certainly in my case at Colony Cove, it

20   has not.

21   Q       So let's talk about before you purchased

22   Colony Cove.

23          In your 20 years prior to that owner in

24   Carson Harbor Village, did the City account for your mortgage

25   payments in trying to evaluate a fair return?

1    A       Yes, they did.

2    Q       And based on those 20 years of experience, how

3  did you expect the city to treat and account for the mortgage

4  payments you were incurring on the Colony Cove property?

5    A       Just as they had done with Carson Harbor Village,

6  I expected them to be consistent with Colony Cove.

7    Q       Now, before you purchased Colony Cove, were you

8  aware of any court decisions that interpreted Carson's rent

9  control rules and the treatment of mortgage payments or debt

10 service?

11   A       Yes.  Shortly before I purchased Colony Cove,

12 there was another park in Carson called Carson Gardens which

13 had some litigation involving the issue of whether or not debt

14 service should be examined.

15   Q       That *Carson Gardens* case is Exhibit 1005 in the

16 book next to you.

17           Any objection to me putting it up on the screen?

18           THE COURT:  1005.  You may.  I'm sorry.  Is there

19 an objection?

20           MS. AILIN:  There's no objection.

21           THE COURT:  Move to admit?

22           MR. CLOSE:  Move to admit, Your Honor.

23           THE COURT:  1005 admitted.

24       (Marked for identification and received

25         into evidence Exhibit No. 1005.)

**UNITED STATES DISTRICT COURT**

1  Q    BY MR. CLOSE:  Mr. Goldstein, is this the

2  Carson Gardens Court of Appeal case you are referring to?

3  A    Yes.

4  Q    And what was your understanding at the time you

5  purchased Colony Cove of what the Court decided in the

6  *Carson Gardens* case?

7  A    The Court decided that the owner had the right to

8  have his mortgage payments be used as a basis for calculating

9  the rent increase.

10  Q    Had this been a dispute between the City and that

11  owner leading up to the litigation?

12  A    I believe so.

13  Q    Were you involved in this lawsuit?

14  A    No, I was not.

15  Q    Did you follow it?

16  A    Of course I followed it quite closely.

17  Q    And this litigation and court decision you're

18  referring to occurred before you purchased Colony Cove;

19  correct?

20  A    Correct.

21  Q    And was it something you relied on in evaluating

22  your decision to purchase Colony Cove?

23  A    Yes, I did.

24  MR. CLOSE:  Mr. Newcomb, I'd ask you to go to

25  page 6 of this Exhibit 1005.  I'd like to ask you to highlight

1    a sentence that I'm going to read.

2        Q       It says, *The Board was thus bound to comply with*

3    *the trial court's writ which required it to use gross profits*

4    *maintenance analysis or some other methodology giving due*

5    *consideration to debt service costs in calculating a fair*

6    *return.*

7                Did I read that correctly, Mr. Goldstein?

8        A       Yes, you did.

9        Q       And was this conclusion important to your

10   analysis and decision to purchase Colony Cove?

11       A       Absolutely.

12       Q       Were there any other lawsuits that were important

13   for your decision to buy Colony Cove?

14       A       Yes.  My own experience involved a similar issue

15   a number of years prior to this in Palm Springs where I had

16   purchased a mobile home park.

17       Q       Are you referring to the *Palacio* case?

18       A       Yes, I am.

19               MR. CLOSE:  That's Exhibit 1004 in the binder.

20   I'd like, with the Court's permission, to put that on the

21   screen and move to admit it.

22               THE COURT:  Any objection?  Any objection?

23               MS. AILIN:  Your Honor, it's objectionable

24   because the factual basis of the case is too different.  It's

25   misleading.

1          THE COURT:  I'll allow it published, and we'll

2     discuss the admission later.

3          Q     BY MR. CLOSE:  Mr. Goldstein, what was -- why was

4     this Palm Springs case significant to you?

5          A     Because it involved whether the reliance upon an

6     existing ordinance at the time of purchase made it -- made the

7     City to be required to treat a rent application made after the

8     purchase to be consistent with the previous rules so that, just

9     like my Colony Cove purchase, a purchase in Palm Springs that

10    relied on existing rules that were later changed made the City

11    use the previous rules for that party who relied on it.

12         Q     Did the case involve the investigator and owner's

13    debt service?

14         A     Yes.

15         Q     And so it was your understanding that in

16    Palm Springs they had changed the guidelines after an owner

17    purchased the property and the Court said effectively you had

18    to grandfather the owner in under the old guidelines; correct?

19         A     Exactly.

20         Q     I'd like to turn to page 3 of Exhibit 1004, and I

21    will read in a portion and ask you a question about it.

22              It says, *Any attempt to retroactively apply the*

23    *repeal of the guidelines' debt financing cost allowance to*

24    *Palacio's vested rights would constitute an invalid impairment*

25    *of an established economic property interest without due*

*process of law.  Notwithstanding the adoption of resolution*

*16072, Palacio continues to enjoy the benefit of the guideline*

*debt financing cost allowance provisions which were in effect*

*when Palacio assumed its purchase debt obligation.*

Did I read that correctly, Mr. Goldstein?

A       Yes, you did.

Q       Is that a portion of this judicial decision that you relied on when deciding to purchase Colony Cove?

A       It was a very strong factor for me.

Q       I'd like to now talk directly about the decision to purchase the Colony Cove Park.

Do you recall that, around the same time as that Carson Gardens decision, Colony Cove was listed for sale for about $28 million?

A       Yes.

Q       Did you think $28 million was a fair price for that park?

A       I thought it was far too high, but every property that is offered for sale is generally offered at a higher price than what the seller expects to get.

Q       What kind of homework did you do on the Colony Cove Park before making the decision to purchase it?

A       Having owned the park across the street for quite a few years, I wanted to closely examine the level of operating expenses and the condition of the park and compare it to the

1   operating expenses and the condition of the park I already

2   owned.  So that was a big part of my analysis prior to my

3   purchase.

4        Q     Did you or anyone working for you visit the park?

5        A     Yes.  My overall property manager examined the

6   park quite closely, and, of course, I examined it myself.

7        Q     And did you investigate the rents at the park?

8        A     Yes.  Of course I looked at the rent history

9   which I had been following quite closely over the years because

10  of the fact that the park was right across the street from

11  mine.

12       Q     Who did you negotiate with on the seller's --

13  excuse me.

14             Who did you purchase the park from?

15       A     I purchased the park from an investment -- real

16  estate investment company in Arizona and handled all the

17  negotiations with a gentleman by the name of Matt Crowe who

18  worked for that investment company.

19       Q     Did you ever engage in any negotiations with a

20  Mr. Douglas Danny?

21       A     Not that I recall.

22       Q     And what was your approach to these negotiations

23  with Matt Crowe from the seller in Arizona?

24       A     My approach in dealing with Matt Crowe was to try

25  to establish a formula for reaching a fair price, and that

1    formula was to use in the business what is called a

2    capitalization rate.  We both agreed that it should be a

3    5 percent capitalization rate which was the going rate at that

4    time for five star mobile home parks in California.

5         Q       Did the seller hire a real estate broker to

6    market and promote the Colony Cove Park?

7         A       Yes.  The seller had already acquired an

8    arrangement with the real estate broker before I found out that

9    it was being offered for sale.  But nevertheless, my

10   negotiations were not through the real estate broker.  They

11   were handled directly with Matt Crowe who was the seller, so to

12   speak.

13        Q       But did that broker prepare marketing materials

14   for the park?

15        A       Yes.  The broker prepared what's called a setup

16   on the property which outlined the factual income and expenses

17   of the property, a pro forma of income and expenses, some

18   material based on how the rents could be increased based upon

19   the Carson ordinance, photos, et cetera.

20        Q       Okay.  Was it your impression that the broker was

21   trying to generate demand for as high of price as possible?

22        A       The broker's job, of course, is to try to make

23   any property that he's offering for sale look as attractive as

24   possible.  And so knowing that, I felt the broker probably gave

25   the seller as much optimism as possible that he could achieve

1    that price.

2         Q       And as someone who has been in this business for

3    a while, how do you, when you're looking to purchase a

4    property, engage or respond or negotiate in the face of this?

5         A       Even though the seller and I at the outset had

6    agreed on what I described as a 5 percent capitalization rate,

7    we still had to come to an agreement on how to calculate that

8    5 percent cap rate.  In other words, what operating expenses

9    were valid, which ones were low, that sort of thing.  So I

10   wanted to do everything I could to reduce the seller's optimism

11   about what his property was worth.

12        Q       Am I correct that one thing that the broker cited

13   in support of the $28 million price was the possibility of rent

14   increases?

15        A       Yes, he did.

16        Q       And so what did you do, if anything, to respond

17   to that aspect of the broker's promotion and support for the

18   $28 million sale price?

19        A       I wanted to dispel the seller's confidence a

20   little bit about the potential rent increases.  Even though I

21   believed in them myself and didn't find anything wrong with the

22   broker's promotion on the property, I still, in order to try to

23   drive the price down as much as possible, wanted to reduce his

24   confidence in obtaining that rent increase.

25               And with that in mind, I asked my attorney, who

had been involved with me for over 20 years on Carson Harbor

Village across the street, I asked him to prepare a negative

kind of letter outlining some potential pitfalls.  I didn't

need to ask him to prepare the letter for my own information.

I had been there 20 years, more than 20 years.  He had been

there more than 20 years working with me.  We both knew

everything about the ordinance and the way things worked in the

City of Carson.  So the only reason for my asking him to

prepare this letter was to try to drive the price down of my

acquisition.

        MR. CLOSE:  And I'd like to put up on the screen

Exhibit 18 at page 11 and just make sure we know what letter

we're all talking about here.

        Let's zoom in on the top portion, please,

Mr. Newcomb.

        Now, Your Honor, I actually don't want anyone in

the courtroom to be confused.  The date on the first page of

the letter says 2005, but I think everyone agrees that it's a

typographical error and the letter is from 2006.

        Mr. Newcomb, can you pull up maybe the second

page header and we can --

    Q    Mr. Goldstein, was this letter prepared in 2006?

    A    Yes.  This letter was prepared in 2006, and I

might add that the letter is addressed to me rather than

Matt Crowe because of legal rules of attorney's relationship,

1  and Matt Crowe was not his client.  I was his client.  So the

2  letter had to be addressed to me even though it was not meant

3  to inform me of anything.

4       Q    So just to be clear, you asked to have this

5  letter prepared in order to provide it to the seller.

6       A    Right from the start.

7       Q    And you also asked for a letter that would be --

8  make every argument possible against the rent increase;

9  correct?

10      A    I wanted a letter to be as negative as possible

11 in order to drag down the price.

12      Q    Did you believe you would get a rent increase

13 after purchasing the Colony Cove Park sufficient to pay the

14 bills?

15      A    Yes, I did.

16      Q    Did you really believe that Carson would prevent

17 you from raising rents and force you to operate at

18 million-dollar losses after buying the park?

19      A    No, I didn't because, not only had I had 20 years

20 of experience of using debt service to calculate the rent

21 increase and the ordinance providing that their method of

22 procedure on my other park was clearly spelled out, I felt they

23 would be using the same system.  I had every reason to believe

24 that they would use the same system.

25           But even in the back of my mind, if they suddenly

```
1    switched systems, I also had something else in the ordinance
2    going for me, and that is the language we discussed a little
3    while ago that said the owner is entitled to a fair return.  I
4    thought that, even though I didn't expect it to happen, that,
5    if the unexpected would happen, I would still have the fair
6    return language that would save me, so to speak.
7              I also had the benefit of the knowledge of what
8    happened in Palm Springs to protect me on that.  So I felt
9    quite confident that I would be able to get the necessary rent
10   increase.  And along with that, I had the benefit of knowing
11   that the rent increase I needed would still leave the park with
12   rents well under the market value, and that was a very
13   important consideration as well.
14        Q      So the final purchase price was 23 million, and
15   the offer price was 28 million; correct?
16        A      Correct.
17        Q      So you saved -- you knocked it down by about
18   20 percent?
19        A      Something like that.
20        Q      You mentioned earlier in the testimony that you
21   used $5 million of your own money and borrowed 18 million from
22   General Electric Capital.  Based on your experience for decades
23   in this business, is that a fairly common approach for funding
24   a mobile home park purchase?
25        A      That's a common approach not only with mobile
```

**UNITED STATES DISTRICT COURT**

1    home parks but all real estate whether it's a single-family

2    residence, an apartment building, whatever.  A down payment

3    somewhere in the 20 to 25 percent range is quite typical.

4              MR. CLOSE:  I'd like to put that timeline back up

5    on the screen, the D-3, Mr. Newcomb.

6         Q    After you purchased the park, did you expect to

7    get a rent increase to cover that mortgage payment?

8         A    Yes, I did.

9         Q    And what happened to the Carson rent control

10   rules after you purchased the Colony Cove Park?

11        A    Very shortly after I purchased, I think less than

12   60 days later, the rules were amended with the deletion of

13   interest as a consideration.

14             The City claims that they had many different ways

15   of calculating the rent increase even before that changed.  So

16   in my own mind, of course, why did they feel the need to add

17   that new provision which wasn't there before?

18        Q    In your prior 20 years as an owner in Carson and

19   as an observer of the rent control process there, could you

20   recall any other time where the City changed the rules in

21   response to an owner's purchase of a park?

22        A    No, I do not.

23             MS. AILIN:  Move to strike.  Assumes facts not in

24   evidence.

25             THE COURT:  Overruled.

1       Q       BY MR. CLOSE:  When were you buying Colony Cove,

2   did you believe the City could change the rules on you without

3   protecting your investment?

4       A       Based on my experience in Carson--

5               MS. AILIN:  Objection.

6               THE WITNESS:  And the instruction --

7               THE COURT:  Hold on.  I didn't hear.

8               MS. AILIN:  Objection.  Vague and ambiguous.

9               THE COURT:  Overruled.

10              You may answer.

11              THE WITNESS:  Based on my experience in Carson

12  and the knowledge that the ordinance clearly provided that the

13  owner was entitled to a fair return, I didn't think that they

14  could get away with a change in the ordinance that would take

15  that away from me.

16      Q       Despite this change, did you still apply for a

17  rent increase?

18      A       Yes, I did.

19      Q       And did the City's rent control staff prepare a

20  report on that rent increase application?

21      A       Yes, they did.

22      Q       And did the City staff in that report calculate

23  the amount of the rent increase that you would have been

24  entitled to under the previous versions of the guidelines in

25  light of your mortgage expenses?

1    A    Yes.  The staff calculated the amount of rent

2 increase that I was entitled to under several different

3 methodologies, one of them being the methodology that had

4 always been used before.

5    Q    And do you recall under that methodology that had

6 always been used before how large of a rent increase the city

7 staff calculated that you were entitled to?

8    A    The City staff calculated under the old

9 methodology I would be entitled to roughly a $200 rent

10 increase.

11    Q    And with a rent increase of that size, how would

12 the rents at Colony Cove compare to the market rents across the

13 street?

14    A    That would leave the rents at Colony Cove still

15 at a more than 25 percent reduction from the market rents.

16    Q    And that rent level would have given you enough

17 income just to pay the expenses; correct?

18    A    I'm not clear on whether it would be precisely

19 equal to paying the expenses, but certainly in that ballpark.

20    Q    Now, when you made that -- when you had that

21 first rent increase application submitted, did you request more

22 than $200?

23    A    I requested more than $200 for a couple of

24 reasons.  Number one, the methodology that was provided for in

25 the guidelines was a matter of making arithmetic calculations,

```
 1   and those arithmetic calculations yielded a figure of more than

 2   $200 by my staff's calculations.  The City knocked out certain

 3   expenses and so forth and ended up with a lesser number.

 4              But not only did I try to follow the City's

 5   methodology in computing the amount of rent increase that I was

 6   asking for, but I had it in mind that I wanted some -- to offer

 7   some political coverage for the city council which I knew would

 8   be under pressure from the residents over --

 9              MS. AILIN:  Objection --

10              THE WITNESS:  -- over that kind of rent increase.

11   So I wanted to show --

12              THE COURT:  Hold on.

13              MS. AILIN:  Objection.  Speculation.

14              THE COURT:  Overruled.

15       Q     BY MR. CLOSE:  Please continue.

16       A     I wanted to have the city council have the

17   benefit of showing that, even though it was a significant rent

18   increase, that it was far less than what I had requested.

19       Q     Mr. Goldstein, I have a question.

20              What if someone living in that park could not

21   afford the rent increase?  What do you do then?

22              MS. AILIN:  Objection.  Calls for speculation.

23              THE COURT:  Overruled.

24              THE WITNESS:  I was very concerned about the

25   residents being able to pay that kind of rent increase.
```

**UNITED STATES DISTRICT COURT**

1    Historically in the other properties that I've owned, I've

2    always taken into account the financial situation for my

3    residents.  I'm not interested in evicting residents because

4    they can't pay the rent.

5                So in the other properties that I've owned, if

6    they showed that they had some financial difficulties, I always

7    instructed my management people to try to work things out with

8    them so that they would only be required to pay what they could

9    afford and the balance could be deferred until they sold their

10   property.

11        Q    BY MR. CLOSE:  Is rent control in Carson

12   available only to low income residents?

13        A    Rent control is the same for everybody no matter

14   what their financial condition.

15        Q    When a resident moves out of the park or sells

16   their mobile home, does Carson let you raise the rents up to

17   the market level at that time?

18        A    In other municipalities, there is called -- there

19   is something which is referred to as vacancy decontrol whereby

20   the rents can be raised when someone moves out.

21                Carson does not have that provision.  So the

22   rents remain the same for the new occupant.  And as a result of

23   that, the residents are able to charge much higher prices for

24   the sale of their homes, thereby, sort of defeating the purpose

25   of rent control because the new incoming resident gets a

**UNITED STATES DISTRICT COURT**

1    bargain on the rents but has to pay a premium on homes.  It's

2    been my experience that homes that may only be worth a few

3    thousand dollars in -- on a sales lot can be worth more than a

4    hundred thousand dollars because of the low rents.

5              MS. AILIN:  Move to strike.  No foundation.

6              THE COURT:  Overruled.

7         Q    BY MR. CLOSE:  So in your experience, people who

8    want to move into these parks in Carson have to vastly overpay

9    to purchase the four walls and a ceiling in order to get into

10   the park because the people that are selling them, that

11   structure, are trying to basically be paid for the value of the

12   below-market rents; correct?

13        A    Exactly.

14             MR. CLOSE:  Let's go back to the timeline.  I

15   think that's D-3, Mr. Newcomb.

16             You testified that the City staff calculated that

17   a $200 rent increase was needed to cover your mortgage expense.

18   Did the Rent Control Board grant that increase?

19        A    No, they did not.

20        Q    Did they grant you an increase that took into

21   account your mortgage payments?

22        A    No, they did not.

23        Q    Did the Rent Control Board let you charge rents

24   sufficient to pay the expenses?

25        A    No, they did not.

**UNITED STATES DISTRICT COURT**

154

1      Q      Do you recall how large a rent increase they gave

2  you?

3      A      I believe it was roughly $35.

4      Q      And that would have been added to about the $414?

5      A      Yes.

6      Q      That would still have been more than $300 below

7  the market rents across the street?

8      A      Yes.

9      Q      Would you have purchased Colony Cove for

10  $23 million if you had known that Carson was going to change

11  the rent rules, Mr. Goldstein?

12      A      If I had known that, I would not have gone

13  forward with my purchase.

14      Q      Mr. Goldstein, in your 30 years of experience as

15  an investor in Carson, have you observed that political

16  considerations sometimes influence the rent-setting decisions

17  in the City of Carson?

18      A      I have followed the elections of the city council

19  members quite closely from time to time and have observed that

20  a very high percentage, sometimes more than 75 percent of the

21  voters who vote for the city council members, live in mobile

22  home parks.  Even in a city of what I believe is more than

23  90,000 people, there are more than 30 mobile home parks in the

24  City of Carson.  And so the mobile home park residents carry

25  tremendous political clout.

1    Q      Have you ever seen correspondence from Carson

2    city council members criticizing the Rent Control Board for

3    giving a rent increase?

4    A      Yes.

5           MS. AILIN:  Objection.  Calls for hearsay.

6           THE COURT:  Overruled.

7           THE WITNESS:  Yes.  I have seen such a letter.

8    Q      BY MR. CLOSE:  Mr. Goldstein, do you think

9    there's any connection between the City's decision to change

10   those rent control guidelines, that Court of Appeal decisions

11   in Carson Gardens, and your purchase of the Colony Cove Park

12   all in 2006?

13   A      It seems pretty evident and more than a

14   coincidence that, after more than 20 years of operating in the

15   same way, that suddenly right after my purchase the rules get

16   changed.

17   Q      Are you aware now of any unfair rent control

18   practices on the part of members of the Carson city council or

19   its mayor?

20          MS. AILIN:  Objection.  Vague and ambiguous.

21          THE COURT:  Overruled.

22          MS. AILIN:  Objection.  Calls for speculation.

23          THE COURT:  Overruled.

24          THE WITNESS:  I don't have firsthand experience

25   with the mayor of Carson or the city council, but I do read the

**UNITED STATES DISTRICT COURT**

```
 1   newspaper in the area which has carried extensive reports on

 2   the investigation of --

 3               MS. AILIN:  Objection.  Hearsay.

 4               MR. CLOSE:  Hold on.

 5               MS. AILIN:  Objection.  Hearsay.

 6               THE COURT:  Motion to strike.  Speculation.

 7               You may.

 8      Q     BY MR. CLOSE:  Okay.  Let's move on.

 9               During the opening statements, Mr. Onstot talked

10   about this conversion of a park.  Can you explain what that is

11   all about?

12               MS. AILIN:  Objection.  Vague and ambiguous.

13               THE COURT:  Sustained.  Rephrase.

14      Q     BY MR. CLOSE:  Can you explain what a mobile home

15   park conversion is?

16      A     The term "conversion" means that the residents of

17   the property have the right to purchase the land below their

18   homes.  It's similar to an apartment conversion to a

19   condominium.  I applied for an approval of a conversion of

20   Colony Cove, not because I necessarily was intending to do it

21   immediately but because I like to keep as many options as

22   possible.

23               So after considerable delays, I was able to

24   obtain approval for the conversion of Colony Cove quite a few

25   years ago, and obviously I've never gone forward with that
```

1    conversion.

2        Q      You've owned Colony Cove for ten years?

3        A      Yes.

4        Q      Have you converted the park?

5        A      No.

6        Q      But you've taken some preliminary steps to obtain

7    certain approvals if in the future you or perhaps the next

8    owner wanted to do that?

9        A      Yes, I have.

10       Q      Why have you not converted the Colony Cove Park

11   and sold it off to its residents or, I believe as we heard in

12   opening statements, break free of rent control?

13       A      I won't truly break free of rent control if I did

14   a conversion.  Under the conversion rules, the residents don't

15   have to buy their space.  They can continue to rent the space.

16   And there is still a form of rent control that would be in

17   effect.

18              But my real goal, even though I converted one of

19   my parks, the one in Palm Springs, my goal is to hold onto

20   income-producing properties.  And the other parks that I've

21   owned, the one in Northern California I've owned for more than

22   30 years.  The one in Palm Desert I've owned for more than

23   30 years.  I'm not really looking to sell off my parks.  I want

24   to make a reasonable income on the parks.

25       Q      Do the residents of Colony Cove want the park

1    converted, in your judgment?

2                    MS. AILIN:  Objection.  Calls for speculation.

3                    THE COURT:  Overruled.

4                    THE WITNESS:  My staff has done some

5    investigation in regard to that.  We were required to do that

6    prior to making the application for the conversion.  And some

7    residents want it; some residents do not want it.

8         Q     BY MR. CLOSE:  Could you make a lot of money

9    converting -- move to strike.

10                   Why have you not converted the Colony Cove Park

11   to resident ownership?

12        A     Well, as I just stated, my preference is to have

13   an income-producing property that gives me a fair return rather

14   than to turn properties, sell off one, then have to go look for

15   another one to buy.  I'm a passive investor, so to speak.  So

16   it's really not my financial planning objective to sell off

17   Colony Cove.

18                   MR. CLOSE:  Thank you, Mr. Goldstein.

19                   No further questions for now.

20                   THE COURT:  Cross-examination.

21                        **CROSS-EXAMINATION**

22   BY MS. AILIN:

23        Q     Good afternoon, Mr. Goldstein.

24        A     Good afternoon.

25        Q     There were a few things that Mr. Close mentioned

1    in his opening that we haven't heard from you yet.

2              You graduated from Stanford University in 1962

3    with a Bachelor's degree in economics, didn't you?

4        A    Yes.

5        Q    And then you went on to get a Master's degree in

6    business administration from UCLA; correct?

7        A    Correct.

8        Q    And in your Master's in business administration,

9    you had a specialization in finance; correct?

10       A    Correct.

11       Q    In your experience in working in real estate,

12   have you become -- you've become familiar with the term "due

13   diligence," haven't you?

14       A    Yes.

15       Q    And that means gathering information about a

16   property before you decide to buy it; right?

17       A    Right.

18       Q    And it also means gathering information about

19   government regulations that affect the property; right?

20       A    Right.

21       Q    And you had an opportunity before buying

22   Colony Cove to gather information about Carson's mobile home

23   park Rent Control Ordinance because you already owned

24   Carson Harbor Village; correct?

25       A    Correct.

**UNITED STATES DISTRICT COURT**

1       Q       After you purchased Carson Harbor Village, you

2   filed an application for a rent increase, didn't you?

3       A       Yes.

4               MS. AILIN:  And could I have Exhibit 2028.

5               THE COURT:  I'm sorry.  Which number?

6               MS. AILIN:  Exhibit 2028.

7       Q       I know it's a little hard to see.  Probably the

8   best place to look is the big screen up on the wall.

9               This is the application that you filed, the first

10  application you filed for a rent increase for the Carson

11  Harbor Village Mobilehome Park; correct?

12      A       I don't know.  You're asking me about an

13  application that was filed more than 30 years ago.  I can't

14  just look at one page and in two seconds tell you whether

15  that's the application I filed.

16      Q       There is a set of binders -- there should be a

17  set of binders up there at the witness stand.  Would you please

18  look at Exhibit 2028.

19      A       Is it No. 28 in the binder?

20      Q       2028.

21      A       These are just double digit tabs.  So I don't

22  know where in this big book to look.  There's a 28.  Is that --

23              THE COURT:  Counsel can ask to approach to show

24  him the exhibit.

25              THE WITNESS:  I see 28-2.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Can you show counsel the document?  I

2    assumed you were going to show the binder.  But can you show

3    counsel the exhibit, please?

4          MR. CLOSE:  We have no objection.  I know that

5    counsel has given him a correct copy of it.

6          THE COURT:  As long as you know that.

7          MR. CLOSE:  Yes.  I was just suggesting that she

8    maybe help him find the binders.

9          THE COURT:  We can proceed.

10          THE WITNESS:  I have a two-page document in my

11    hand, and I recognize my signature on the second page.

12     Q     BY MS. AILIN:  And so that is the first rent

13    increase application that you filed for Carson Harbor Village;

14    correct?

15     A     First of all, I really can't tell whether this

16    was the first one, the second one or not.  Secondly, the facts

17    on the application are a little confusing because I had an

18    option to purchase Carson Harbor Village, and during that

19    option period, a rent increase application was filed under my

20    direction even though I did not technically own the property at

21    that time.

22     Q     Well, Mr. Goldstein, after you purchased

23    Carson Harbor Village you filed an application seeking a rent

24    increase of $57.85 per space per month, didn't you?

25     A     As I said before, I wish my memory were that good

1      to be able to recall all the facts from 30 years ago.

2           Q      And about 41 percent of the increase you were

3      asking was to cover the increase in debt service related to

4      your purchase of the park; correct?

5           A      I don't know.

6           Q      And the Rent Review Board only allowed a $12

7      increase per space per month; correct?

8           A      I would like to point out under the previous

9      application that was filed during my option period that my

10     recollection is that a substantial rent increase was granted

11     due to a large increase in the interest rate at that time.

12                 MS. AILIN:  Move to strike as nonresponsive.

13                 THE COURT:  Motion to strike granted.

14          Q      BY MS. AILIN:  Now, after the first application

15     that you filed for a rent increase for Carson Harbor Village

16     resulted in only a $12 increase, you filed a lawsuit against

17     the City, didn't you?  Against the city and the

18     Rent Review Board?

19          A      I don't recall if a lawsuit was filed at that

20     particular time.

21                 THE COURT:  Hold on.  Before you publish, let me

22     know what you're publishing.  Take it down.  Before you publish

23     anything, I need to know what exhibit you're posting.

24                 MS. AILIN:  I'm sorry, Your Honor.  It's

25     Exhibit 2001.

**UNITED STATES DISTRICT COURT**

1            THE COURT:  Hold on.  Hold on.  Don't publish --

2    let's have a sidebar.

3        (The following proceedings were held at sidebar:)

4            THE COURT:  If an exhibit has not been admitted,

5    do not publish it without the Court's permission.

6            MS. AILIN:  Thank you.

7        (The following proceedings were held in

8        open court in the presence of the jury:)

9            MS. AILIN:  Your Honor, do I have permission to

10   publish the exhibit now?

11            THE COURT:  Move to admit?

12            MR. CLOSE:  We object, Your Honor.  30-some

13   year old lawsuit under different guidelines.  Different case,

14   different lawsuit.

15            THE COURT:  Overruled.

16            You may publish.

17       Q     BY MS. AILIN:  Mr. Goldstein, do you recognize

18   this is the first page of the Complaint that was filed in your

19   lawsuit regarding the rent increase granted on your first rent

20   increase application after you purchased Carson Harbor Village?

21       A     Do I recognize it?  I'm looking at the date.  Is

22   it 1993?  I can't read it.

23       Q     This is just the first of many lawsuits that

24   you've filed against the City and the Rent Review Board, isn't

25   it?

1     A     I don't know what this document is just by

2  looking at a partial caption on what is apparently the first

3  page.

4     Q     In paragraph 24 on page 8 of Exhibit 2001, you

5  allege that the City's rent control decision had damaged you to

6  the tune of more than $21 million, didn't you, Mr. Goldstein?

7     A     I don't recall.  I see the figure there.

8     Q     And so after alleging that the City and the

9  Rent Control Board had damaged you to the tune of $21 million,

10  you still went ahead and bought another mobile home park in the

11  City of Carson; right, Mr. Goldstein?

12     A     Yes.

13     Q     And you were not successful in this lawsuit

14  regarding Carson Harbor Village, were you, Mr. Goldstein?

15     A     Sorry?

16     Q     You did not win your case against the City and

17  the Rent Review Board regarding Carson Harbor Village, did you,

18  on this Complaint that's up on the ELMO.

19     A     I assume that I did not win this lawsuit.  As I

20  say, I'm not clear as to which lawsuit it is based on the year

21  that I see them.

22     Q     Over the years you have filed more than half a

23  dozen lawsuits against the City of Carson and its

24  Rent Review Board, haven't you?

25     A     I don't know if half a dozen is the correct

1    number.

2         Q     It's been more than one; correct?

3         A     More than one.

4         Q     More than two?

5         A     Possibly.

6         Q     More than three?

7         A     I don't recall the number.

8         Q     And every single one of those lawsuits that

9    you've filed against the City and the Rent Review Board has

10   been ultimately decided against you; correct?

11                MR. CLOSE:  Objection, Your Honor.  Irrelevant.

12                THE COURT:  Overruled.

13                THE WITNESS:  That's not correct.

14        Q     BY MS. AILIN:  That's not correct?

15        A     No.

16        Q     Now, we have been throughout your testimony here

17   talking about you as the owner of the mobile home parks.  You

18   don't own the mobile home parks as an individual, do you?

19        A     No.

20        Q     The named plaintiff in this case is Colony Cove

21   Properties, LLC, and that LLC means limited liability company;

22   correct?

23        A     Correct.

24        Q     And that's a type of business entity; correct?

25        A     Yes.

1      Q      So you are the owner of some interest in that

2  business entity; correct?

3      A      99 percent to be exact.

4      Q      And it's the business entity that actually owns

5  the mobile home park; correct?

6      A      Correct.

7      Q      And that's the case with Carson Harbor Village

8  and all your other mobile home parks; correct?

9      A      Correct.

10     Q      You've testified that you've followed the

11 *Carson Gardens* case.  Was the *Carson Gardens* case the only

12 thing that the Rent Review Board was doing that you were

13 following?

14     A      No.

15     Q      You were following what the Rent Review Board was

16 doing generally; correct?

17     A      In some cases there are more than 30 mobile home

18 parks in Carson.  Many are quite small.  Some are larger.  I

19 was not following every single rent increase application, but I

20 did follow a significant number of cases.

21     Q      And you have seen many rent increase applications

22 that were filed with respect to other mobile home parks in

23 Carson that you didn't own; correct?

24     A      Yes.

25     Q      And you obtained copies of rent increase

```
 1   applications and other documents filed with the

 2   Rent Review Board from the rent control staff; correct?

 3        A     I think it was mostly not the application itself

 4   but the staff recommendation as well as the final result.

 5        Q     So in following what the Rent Review Board was

 6   doing, you were -- you were looking at the resolutions that the

 7   Rent Review Board was adopting; correct?

 8        A     I looked at some, yes.

 9        Q     So before you bought Colony Cove, you knew that

10   in May, 2004, the new owner of Paradise Trailer Park applied

11   for a rent increase to cover increased debt service, didn't

12   you?

13        A     No.

14        Q     And you know that he got no rent increase to

15   cover increase debt service; right?

16        A     I have no idea.

17        Q     And that was because the Board applied the

18   maintenance of net operating income analysis in making its

19   decision on that application; right?

20        A     I'm not familiar with that case.

21        Q     But you are familiar with the maintenance of net

22   operating income analysis; correct?

23        A     If you're referring to an analysis that doesn't

24   include debt service -- you know, it's Carson's own

25   terminology.  Is that what you're referring to?
```

**UNITED STATES DISTRICT COURT**

 1        Q        Well, that's the analysis that you are referring
 2   to in your testimony when you talk about Carson changing the
 3   rules; correct?
 4        A        You've given a name, and I always get confused by
 5   the names that Carson uses.  If you could tell me that it's the
 6   one that does not include debt service, then at least I know
 7   what you're asking me about.
 8        Q        Okay.  It's the one that does not include debt
 9   service.
10        A        Okay.
11        Q        So because you were following what the
12   Rent Control Board was doing, you were aware that the
13   Rent Control Board had applied this analysis that doesn't take
14   debt service into account to Paradise Trailer Park's
15   application that was decided in May, 2004, weren't you?
16        A        No.  I didn't -- I already told you that I did
17   not follow Paradise Trailer Park.  And just by the name of it,
18   it sounds like a small park which I was not following.
19        Q        Were you not following small parks because you
20   thought the rules were different for small parks?
21        A        I was not -- let me back up.
22               Because there were more than 30 parks in Carson,
23   it was not very feasible for me to follow every single one.  So
24   if I did follow other parks, I tried to focus primarily on the
25   larger parks.  Furthermore, based on my discussions with other

1  owners, at one time we had a mobile home park owner

2  association.  I've discovered that many of the smaller parks

3  owner's chose not to apply for a rent increase on a regular

4  basis.  Sometimes they went several years without applying --

5          MS. AILIN:  Move to strike as nonresponsive.

6          THE COURT:  Motion to strike denied.

7      Q      BY MS. AILIN:  So because you were following what

8  the Rent Review Board was doing, you knew that in June, 2004,

9  the Board considered using this method that doesn't take debt

10  service into account in ruling on an application for the

11  Park Villa Mobilehome Park.

12          You know about that; right?

13      A      No, I did not.  And I would have to see the

14  evidence to believe it.

15      Q      And you also knew, because you were following

16  what the Rent Review Board was doing, that in September of

17  2004, the new owner of Park Granada Mobilehome Park applied for

18  a rent increase; right?

19      A      No, I didn't.

20      Q      And you know, because you were following what the

21  Rent Review Board was doing, that the Board considered two

22  different methods in that case -- one that considered debt

23  service and one that did not.

24          Right?

25          MR. CLOSE:  Objection, Your Honor.  Lacks

```
 1   foundation.

 2                   THE WITNESS:  You keep --

 3                   THE COURT:  Hold on.  Hold on.

 4                   MR. CLOSE:  Objection, Your Honor.  Foundation.

 5                   THE COURT:  Sustained.

 6        Q      BY MS. AILIN:  Let's take another look at the

 7   language of the ordinance that we were discussing earlier, and

 8   this is exhibit -- this is Exhibit 1002.

 9                   THE COURT:  You may.

10        Q      BY MS. AILIN:  And, Mr. Goldstein, you were

11   talking earlier about the Rent Control Ordinance requiring that

12   rent increases be fair, just, and reasonable.

13                   Do you see that language on the document that's

14   on the screen?

15        A      I see the entire sentence which goes on to say

16   that it allows a fair return on investment to the park owner.

17        Q      Right.  But before we get there, it says, *A rent*

18   *increase is fair, just, and reasonable if it protects*

19   *homeowners from excessive rent increases.*

20                   You see that language there, don't you?

21        A      Yes.

22        Q      And so the purpose of the Rent Control Ordinance

23   is twofold.  As Mr. Close was saying, there's a balance between

24   a fair, just, and reasonable rent for the park owner, and that

25   rent also has to protect the homeowners from excessive rents;
```

```
 1   correct?

 2       A       Correct.

 3       Q       Now, you had read the ordinance before you bought

 4   Colony Cove; correct?

 5       A       Yes.

 6       Q       And you had also read the rent control

 7   guidelines; correct?

 8       A       Yes.

 9       Q       Let's look at the introductory paragraph to the

10   guidelines.  This is part of Exhibit 1003.  What the

11   introductory paragraph says is *The guidelines are intended to*

12   *assist the Board in implementing the ordinance.*

13               Do you see that language, Mr. Goldstein?

14       A       Yes.  And I also see the follow-up sentence which

15   includes "The purpose of the ordinance and provisions of the

16   ordinance are controlling" which includes the language that we

17   just talked about, providing a fair return to the owner.

18       Q       And moving on to page 4, there's a paragraph that

19   starts with the letter "D,"  Mr. Goldstein.  We'll find that

20   for you in a minute.

21               THE COURT:  What is up on the board?

22               MS. AILIN:  It is an excerpt from the guidelines.

23               THE COURT:  What exhibit?

24               MS. AILIN:  Exhibit 1001.

25               THE COURT:  Okay.
```

1          Q       BY MS. AILIN:  Paragraph D on page 4 from

2    Exhibit 1001 from the guidelines says, *No one factor in the*

3    *ordinance is determinative.*

4                  Do you see that, Mr. Goldstein?

5          A       Well, it's crossed out.

6          Q       Actually, it was highlighted.

7                  But you see that at the beginning of paragraph D;

8    correct?  *No one factor in the ordinance is determinative.*

9          A       I'm reading that now.  It's not highlighted.

10                 (Witness reviewing exhibit.)

11                 Okay.  I see it.

12         Q       That's what the guidelines say, that *No one*

13   *factor in the ordinance is determinative.*

14                 Correct, Mr. Goldstein?

15         A       That's what it says.

16         Q       And the next sentence says, *The ordinance does*

17   *not mandate the use of any formula or guarantee increases equal*

18   *to the increase in the CPI, the consumer price index, or any*

19   *percentage of the CPI.*

20                 Do you see that, Mr. Goldstein?

21         A       Yes.

22         Q       And that language was in the guidelines when you

23   read them prior to the purchase of Colony Cove; correct?

24         A       Correct.

25         Q       Now, on page 6 of Exhibit 1001, we have a

1    paragraph that begins with the small letter "f," and I believe

2    this is something that was discussed previously that says, *Debt*

3    *service incurred after adoption of the ordinance to purchase a*

4    *park may be an allowable operating expense* --

5                 THE COURT:  Hold on.  Let's take a break.  Ladies

6    and gentlemen, let's take a five-minute break.

7                 Don't discuss the case among yourselves or with

8    anyone else.  Don't form or express any opinions about the case

9    until it's finally submitted to you.  We'll see you in five

10   minutes.

11               (The following proceedings were held in

12               open court out of the presence of the jury:)

13               THE COURT:  The presentation of the exhibits is

14   ridiculously distracting, and it's going to change right now.

15   No more easels with blowups.  The exhibits -- first of all,

16   counsel for the plaintiffs cannot see what's being presented

17   behind them.  I can't see what's being presented behind them.

18   I'm not sure what the jurors can see or not see.  I don't know

19   if it's part of the exhibit or something else.  So no more

20   easel with cards.  We're going to use the ELMO, one place.

21               From this point on, neither side -- even though

22   it's admitted, I want to hear what exhibit is being referred to

23   and the page number as opposed to just throwing things on the

24   ELMO without any idea what page number.  So take down the easel

25   and the boards.  We're going to go off the ELMO or use of

```
 1    computer to put it on the screen in one place.  And before it's
 2    presented -- before it's presented for publication, I want to
 3    know the page and the exhibit number before that happens.
 4              Does everybody understand?
 5              MS. AILIN:  Yes, Your Honor.
 6              MR. CLOSE:  Yes, Your Honor.
 7              THE COURT:  All right.  Let's bring the jurors
 8    in.
 9         (The following proceedings were held in
10         open court in the presence of the jury:)
11              THE COURT:  You may.
12              MS. AILIN:  Thank you, Your Honor.
13    Q    Mr. Goldstein, on page 6 from Exhibit 1001 which
14    is up on the ELMO, this is a document that your attorney
15    brought up in your direct examination.  We have paragraph F
16    that begins, Debt service incurred after adoption of the
17    ordinance to purchase a park may be an allowable operating
18    expense.
19              Do you see that?
20    A    Yes.
21    Q    And you're familiar with what the word "may"
22    means, aren't you?
23    A    Yes.
24    Q    And that means that you can do something or have
25    something; right?
```

1        A        Yes.

2        Q        It doesn't necessarily mean that you're entitled

3    to it; correct?

4        A        What it means is that every year on Carson Harbor

5    Village it was used.

6                 MS. AILIN:  Move to strike as nonresponsive.

7                 THE COURT:  Motion to strike granted.

8        Q        BY MS. AILIN:  And then continuing with

9    Exhibit 1007 -- excuse me -- 1001 on page 7, we have -- where

10   paragraph B, again, reference to the gross profits maintenance

11   analysis.

12               Mr. Goldstein, that's the method that you

13   understand includes debt service in a rent increase; correct?

14       A        If you say so.

15       Q        The first sentence after the heading reads, *In*

16   *evaluating a rent increase application, the Board may consider,*

17   *in addition to the factors specified in section 4704(g) of the*

18   *ordinance, a gross profits maintenance analysis.*

19               Again, we have the word "may," don't we,

20   Mr. Goldstein?

21       A        Yes.

22       Q        So what the guidelines say is that the gross

23   profits maintenance analysis may be used, not that it must be

24   used; correct?

25       A        Yes.

1    Q    When you purchased the park, Mr. Goldstein, you

2 got a copy of a document called an Offering Memorandum, didn't

3 you?

4    A    I got a document.  I don't know if it was called

5 that.

6    Q    Okay.  Well, I'd like you to take a look at

7 Exhibit 1000.  Let's start with the --

8         THE COURT:  It's admitted.  You may publish.

9 It's been admitted.

10    Q    BY MS. AILIN:  Let's start with the cover page of

11 Exhibit 1000.

12         You've seen this document before, haven't you,

13 Mr. Goldstein?

14    A    All I see are two photos of the park and the name

15 of the park.  So just from that I don't know what it is, if

16 it's something I saw before.

17    Q    Well, then let's take a look at the next page.

18 Does this page look familiar to you, Mr. Goldstein?

19    A    This is something that was purportedly shown to

20 me ten years ago.  So I can't just look at one paragraph and

21 say that it's something I saw before.  I would assume that it's

22 something I saw before.

23    Q    Turning to page 8 of Exhibit 1000, we have some

24 information about the mobile home Rent Control Ordinance for

25 Carson, don't we?

1      A      Yes.

2      Q      And the last paragraph in that section reads,

3  *Prospective purchasers are urged to carefully review the*

4  *ordinance and its guidelines for implementation as well as the*

5  *staff report and Carson Mobilehome Park Rental Review Board*

6  *rental adoption pertaining to the last rent increase in*

7  *August, 2003.  Copies of these documents can be obtained from*

8  *the listing agents.*

9             Isn't that what it says, Mr. Goldstein?

10     A      Yes.

11     Q      So in offering Colony Cove for sale, the seller

12  was encouraging people to get more information about the

13  Rent Control Ordinance; correct?

14     A      This is something from the broker, not the

15  seller.  And the broker has to put in this kind of a language

16  so they won't be sued.

17     Q      And then on page 16 of Exhibit 1000, there's a

18  paragraph about potential rent increases.  The last sentence in

19  the first paragraph on that page says, *The actual increase --*

20  *the actual rent increase is based upon a detailed analysis of*

21  *the property's operations, rents at other Carson parks, and*

22  *changes to the consumer price index, all of which is subject to*

23  *the often unpredictable decision rendered by the Mobile Home*

24  *Park Rent Review Board.*

25             Do you see that, Mr. Goldstein?

**UNITED STATES DISTRICT COURT**

```
 1        A        I don't see it, but I listened to what you read.

 2        Q        Now, let's take a look at the letter that your

 3   lawyer wrote you that you say you had him write just because

 4   you were trying to grind the price down on your purchase of the

 5   park.  That's part of Exhibit 18.

 6                 THE COURT:  You may publish.

 7        Q        BY MS. AILIN:  This is the letter we saw

 8   previously, wasn't it, Mr. Goldstein?

 9        A        Yes.

10        Q        You do recall this letter?

11        A        Yes.

12        Q        And on page 12 of Exhibit 18, in the first

13   paragraph it says, In fact, the City makes clear at every

14   opportunity there is no entitlement to any rent increase under

15   the city Rent Control Law.

16                 Do you see that, Mr. Goldstein?  It's in the

17   first sentence at the top of the page.

18        A        Okay.

19        Q        You see that, Mr. Goldstein, can't you?

20        A        I can't read it too well because there's a shadow

21   covering it, but I'll take your word for it.

22        Q        And then on page 14 of Exhibit 18, there's a

23   paragraph that begins, In fact, in an appellate decision

24   published yesterday -- and that's a reference to the

25   Carson Gardens case that you testified about, isn't it?
```

**UNITED STATES DISTRICT COURT**

1          A        Yes.

2          Q        And at the end of that paragraph or toward the

3    end of that paragraph, it says that particular case is very

4    instructive to any potential buyer of a mobile home park in

5    Carson regarding the lengths the City will go to to minimize or

6    eliminate rent increases.

7                   Do you see that, Mr. Goldstein?

8          A        Yes.  Including violating an order from the

9    Court.

10         Q        And on page 16 of Exhibit 18, the very last

11   sentence of the letter says, *In our opinion, a purchaser should*

12   *not rely on collecting any increased rents from those collected*

13   *currently.*

14                  Do you see that, Mr. Goldstein?

15         A        I see it.

16         Q        And you say that this letter was written just for

17   purposes of negotiating with the seller; correct?

18         A        As I stated before, I had been working in Carson

19   for 20 years with my other mobile home park --

20                  MS. AILIN:  Move to strike.

21                  THE WITNESS:  My attorney had been working for

22   20 years in Carson with me.  I had no need to ask for his

23   opinions for my own benefit.  These were done strictly for the

24   purpose of driving the price down.

25                  MS. AILIN:  Move to strike as nonresponsive.

1              THE COURT:  I would strike everything except the

2   last sentence, *These were done strictly for driving down the*

3   *price.*

4       Q      BY MS. AILIN:  Now, it turned out that your

5   lawyer was quite accurate in what he told you though, didn't

6   it?

7              MR. CLOSE:  Objection.  Vague and ambiguous.

8              THE COURT:  Sustained.  Rephrase.

9       Q      BY MS. AILIN:  The warnings that your lawyer gave

10  you in this letter turned out to be good warnings, weren't

11  they?  Because, in fact, it turned out you couldn't count on

12  getting a rent increase; correct?

13      A      The warnings were not intended for me.

14      Q      But they turned out to be accurate, didn't they?

15      A      So far.

16      Q      Now, in Exhibit 46 -- and Exhibit 46, Your Honor,

17  is the --

18              THE COURT:  It's been admitted.  You may publish.

19              MS. AILIN:  I'm sorry, Your Honor?

20              THE COURT:  You may publish.

21      Q      BY MS. AILIN:  Exhibit 46 is the first rent

22  increase application you filed for Colony Cove, isn't it?

23      A      I don't know.

24      Q      Well, you testified earlier that you applied for

25  a rent increase that initially was for $618 per space per

**UNITED STATES DISTRICT COURT**

1    month; correct?

2        A       I don't recall the precise number, but if that's

3    what you say it was, I will go along with it.

4        Q       And this application has your signature on it,

5    doesn't it?

6        A       I don't see a page with my signature on it; so I

7    don't know.

8        Q       We'll find it.

9        A       What you're referring to.

10       Q       But you're here today testifying about how this

11   application was processed, and you don't recognize the

12   application?

13       A       You showed me a brief portion of one page of an

14   application and asked me whether it was the first application I

15   ever filed.  So I cannot recognize whether it was the first

16   application, nor do I remember or should remember exactly how

17   the first page of an application filed ten years ago looked.

18       Q       Well, on page 4 of Exhibit 46, the application

19   states that the previous owner's net operating income was

20   $1,102,644.

21               Do you see that there?

22       A       The red bracket does not line up next to the

23   number you just recited.

24       Q       You're quite correct about that.  Down here.

25               That was the estimated net operating income

1   target for the current base here.  Do you see that,

2   Mr. Goldstein?

3       A     Yes.

4       Q     And then on page 11 of Exhibit 46, the

5   application shows the amount of debt service which was

6   $1,224,681.  That was your mortgage payment at the time, wasn't

7   it, Mr. Goldstein?

8       A     I don't recall the exact amount of my mortgage

9   payment ten years ago.

10      Q     Well, based --

11      A     I see the figure on this page, yes.

12      Q     Well, based on the information in the

13  application, your mortgage payment was greater than the income

14  that you were expecting from the park for that year; correct?

15      A     I don't know.

16      Q     Mr. Goldstein, you say that the guidelines were

17  amended 60 days after you bought Colony Cove, but in the

18  timeline, Exhibit D-3 that your attorney used, it shows you

19  purchased the park in April of 2006.  That's when you purchased

20  Colony Cove; correct?

21      A     I recall that I purchased it in 2006.  I don't

22  recall which month it was.

23      Q     And the guidelines were amended in October of

24  2006; correct?

25      A     Again, I don't recall the precise date.

1      Q      But something else that happened in early 2006

2  was that *Carson Gardens* case that your attorney had you testify

3  about was decided in January of 2006, wasn't it?

4      A      My recollection, it was decided approximately

5  that time.

6      Q      And you were generally aware that the guidelines

7  could be amended, weren't you?

8      A      I'm aware that any law can be amended.  It's a

9  question of whether the amendment targets a specific party or

10 whether it's done for the general population.

11             MS. AILIN:  Move to strike as nonresponsive.

12             THE COURT:  Motion to strike granted.

13     Q      BY MS. AILIN:  And you, in fact, anticipated that

14 there could be a change in the guidelines, didn't you?

15     A      No.

16     Q      Well, you signed a Purchase and Sale Agreement

17 for Colony Cove that includes a statement related to the

18 potential for the guidelines to change, didn't you?

19     A      If you're referring to the statement that says

20 that I rely on the guidelines or the ordinance as it now

21 stands, I included that in my purchase agreement based on my

22 experience in Palm Springs.  I always do as much as possible to

23 cover the bases or protect myself even though I don't think

24 it's a high likelihood of happening.

25     Q      But you knew it was possible; correct?

184

1      A      As I just said, changes are always possible.

2      Q      So when the city council in Carson considered the

3   amendments to the guidelines, you went to the city council

4   meeting; right?

5      A      No, I didn't.

6      Q      And if you had gone to the city council meeting,

7   you would have had an opportunity to comment on the proposed

8   change to the guidelines; right?

9      A      If I had gone?  Yes.

10     Q      But you didn't do that, did you?

11     A      I leave those things to my attorneys.

12     Q      And your attorneys didn't go to that meeting

13   either, did they?

14     A      I don't know.

15     Q      Now, one of the things that you mentioned as a

16   possible influence on rent control decisions in Carson is

17   politics and voting for the city council; correct?

18     A      Correct.

19     Q      And you said that the mobile home park residents

20   go out and vote for city council members; correct?

21     A      Correct.

22     Q      That's their right to do that, isn't it?

23     A      Absolutely.

24     Q      And how do you know it's the mobile home park

25   residents?  Do you go sit at the polling places to see if you

1    see anyone you recognize?

2         A       There are many political studies of what

3    categories of voters -- how they're comprised -- male, female.

4    How they're comprised college education or not.  I could go on

5    and on.  The primaries that are going on right now for the

6    presidential election are full every day of who the voters are.

7                     MS. AILIN:  Move to strike as nonresponsive.

8                     THE COURT:  Motion to strike denied.

9         Q       BY MS. AILIN:  Mr. Goldstein, the testimony you

10   gave earlier today was specific to Carson; correct?

11        A       Correct.

12        Q       Did you go to the Registrar Voter's Office after

13   the election to see who actually voted?

14        A       I didn't have to do that directly.  Whether

15   you're questioning whether the information that I obtained from

16   the newspaper or from political studies was accurate or not, I

17   can't comment.

18        Q       So you don't remember what the rent control

19   application that is the subject of this case looks like or

20   says, but you remember things that you've read about elections

21   in Carson?

22                     MR. CLOSE:  Objection, Your Honor.

23   Argumentative.

24                     THE COURT:  Sustained.

25        Q       BY MS. AILIN:  Mr. Goldstein, one of the other

**UNITED STATES DISTRICT COURT**

1  things you testified about was a court decision Exhibit 1004

2  involving a mobile home park in Palm Springs.

3          Do you remember that testimony?

4          THE COURT:  It sounds like we're going to a

5  different topic area; so let's go ahead and break for the day.

6          Ladies and gentlemen, we're going to break for

7  the day.  We're going to resume again tomorrow at 9:00 o'clock.

8  We'll see you at 9:00 o'clock in the morning.

9          Remember not to discuss the case among yourselves

10 or with anyone else.  Don't form or express any opinions about

11 the case, and we'll see you at 9:00 o'clock.  Good night.  Have

12 a nice night.

13         THE CLERK:  All rise.

14     (The following proceedings were held in

15     open court out of the presence of the jury:)

16         THE COURT:  Just a couple things before we

17 adjourn.

18         There was an objection.  I allowed the exhibit be

19 published, 1004.  The objection is overruled.  It's admitted.

20     (Marked for identification and received

21     into evidence Exhibit No. 1004.)

22         THE COURT:  I do have a question.  On

23 cross-examination there was a reference to six lawsuits, I

24 believe.  Is that correct?  Is my memory correct?

25         MS. AILIN:  Yes.

```
 1              THE COURT:  There was one lawsuit that was
 2    presented to the witness that related to a district court case
 3    in the Central District of California some time ago in the
 4    90's.  That's one of the six?
 5              MS. AILIN:  Right.
 6              THE COURT:  Do any of the six that you were
 7    referring to make reference to the state court actions for
 8    years one through five in this case?
 9              MS. AILIN:  Those are some of the six.  I'm
10    actually not certain of the total number.  I know there's been
11    at least six.
12              THE COURT:  But inclusive of that subset, are you
13    including the state court actions for years one through five?
14              MS. AILIN:  I am.
15              THE COURT:  Wouldn't that violate the Motion in
16    Limine No. 6?  Motion In Limine No. 6 related pretty
17    specifically to years one through five, and that was granted,
18    and it was granted because it's misleading.  The standard of
19    reviewing the state court is different than the standard of
20    review in this case.  So I think it's -- if your question
21    included as a subset years one through five, you intentionally
22    violated the Court orders.
23              Is that conclusion incorrect by backdoor?
24              MS. AILIN:  It was not intentional, Your Honor.
25              THE COURT:  Well, then it was a negligent
```

1   violation of the Court order to make reference to lawsuits that

2   I had specifically stated in the motion in limine they

3   shouldn't be made reference to.  It was misleading then to say

4   in front of the jurors, although the answer was he didn't know,

5   but it was misleading to say "And you've lost every single one

6   of them if that included years one through five in state

7   court."  Isn't that misleading in light of the -- in light of

8   the Court's ruling on the motion in limine?

9          Do we want -- how do you know -- how does the

10  plaintiff now explain that those cases that you were referring

11  to may have been about the same subject but had a different

12  standard of review without opening this door?  I'm just curious

13  because I don't know how closely I'm going to have to watch

14  during the course of this trial if my motions in limine are

15  going to be violated.

16         MS. AILIN:  I understood the motion in limine to

17  be directed to our not bringing in any testimony about the

18  financial results of the park during years three to five.  The

19  issue of there being a different standard of review was

20  actually related to our Motions in Limine 1 and 2.

21         THE COURT:  Motion in Limine No. 6 was

22  specifically to exclude the trial court files from the state

23  court proceedings between the parties and testimony regarding

24  those lawsuits.  Just by looking at the title and the question

25  that was asked, doesn't that violate the Court's ruling

```
1    granting that motion to begin to ask questions regarding

2    testimony relating to those lawsuits?  Doesn't it violate the

3    Court order whether intentional or not?

4              MS. AILIN:  It certainly wasn't intentional.

5              THE COURT:  But essentially what you wanted to

6    get in is that -- you didn't get into it any more

7    specifically -- is that he's lost cases relating to years one

8    through five when I specifically said don't talk about it.

9              Anyway, if it happens again, I will point out the

10   violation of the Court order in front of the jury.  Okay.

11             MS. AILIN:  Understood.

12             THE COURT:  We'll see you tomorrow at

13   9:00 o'clock.

14             MS. AILIN:  Thank you, Your Honor.

15             MR. CLOSE:  Thank you, Your Honor.

16         (Proceedings concluded at 4:30 p.m.)

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1                     CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                          DATED THIS  28TH  DAY OF APRIL, 2016.

16

17

18                          /S/ MIRANDA ALGORRI
                            _____
19                          MIRANDA ALGORRI, CSR NO. 12743, CRR
                            FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

## $

**$1,032** [1] - 113:16
**$1,102,644** [1] - 181:18
**$1,224,681** [1] - 182:4
**$10** [1] - 114:6
**$12** [3] - 116:1, 162:4, 162:14
**$178,000** [1] - 113:19
**$18** [2] - 107:4, 114:3
**$20,000** [1] - 114:7
**$200** [5] - 150:7, 150:20, 150:21, 150:25, 153:15
**$21** [2] - 164:4, 164:7
**$23** [5] - 106:25, 107:9, 110:25, 127:20, 154:8
**$23.05** [1] - 104:18
**$24** [1] - 104:12
**$28** [7] - 104:6, 105:2, 105:7, 141:12, 141:14, 144:11, 144:16
**$28,500,000** [1] - 104:6
**$300** [1] - 154:4
**$342** [1] - 113:22
**$35** [1] - 154:1
**$414** [3] - 102:9, 113:12, 154:2
**$42.50** [1] - 115:25
**$5,000** [1] - 98:25
**$500,000** [1] - 99:1
**$57.85** [1] - 161:22
**$6.39** [1] - 111:23
**$618** [2] - 113:14, 180:23
**$828** [1] - 102:8

## /

**/S** [1] - 190:18

## 0

**01/30/06** [1] - 90:22
**02/13/08** [1] - 91:8
**03/03/2006** [1] - 90:7
**03/07/06** [1] - 90:8
**03/27/08** [1] - 90:20
**06-07** [1] - 91:13
**06-149** [1] - 92:12
**06/10/09** [1] - 91:9

## 1

**1** [5] - 87:10, 87:16,

92:18, 131:22, 188:18
**1.1** [1] - 118:7
**1.2** [1] - 118:8
**10** [3] - 87:10, 90:8, 94:25
**1000** [6] - 92:9, 95:4, 176:5, 176:9, 176:21, 177:15
**1001** [11] - 92:10, 95:4, 133:3, 133:7, 133:14, 135:25, 171:22, 171:25, 172:23, 174:11, 175:7
**1002** [3] - 92:11, 95:4, 170:6
**1003** [3] - 92:12, 95:4, 171:8
**1004** [6] - 92:13, 139:17, 140:18, 185:24, 186:17, 186:19
**1005** [6] - 92:14, 137:13, 137:16, 137:21, 137:23, 138:23
**1007** [1] - 175:7
**11** [5] - 90:9, 94:25, 129:11, 145:10, 182:2
**12** [1] - 178:10
**121,000** [1] - 113:25
**12743** [2] - 87:23, 190:19
**1299** [1] - 88:10
**14** [1] - 178:20
**14-03242-PSG** [1] - 87:7
**149** [1] - 113:15
**16** [2] - 177:15, 179:8
**16072** [1] - 140:25
**1700** [1] - 88:17
**18** [10] - 90:10, 95:1, 113:12, 117:17, 145:10, 147:19, 178:3, 178:10, 178:20, 179:8
**18881** [1] - 88:16
**18TH** [1] - 88:6
**19** [1] - 98:11
**1962** [1] - 158:25
**1970'S** [1] - 107:24
**1979** [2] - 114:12, 115:16
**1980** [1] - 125:13
**1980'S** [2] - 98:9, 128:11
**1983** [2] - 115:16, 115:23
**1984** [2] - 116:5, 116:7
**1992** [1] - 122:2

**1993** [1] - 163:20
**1:31** [2] - 87:17, 94:2
**1ST** [1] - 98:1

## 2

**2** [10] - 87:10, 89:3, 90:3, 91:3, 92:3, 92:19, 92:20, 93:3, 123:16, 188:18
**2/17/06** [1] - 90:6
**20** [20] - 98:11, 106:8, 132:13, 132:18, 134:17, 134:20, 134:23, 136:21, 136:25, 144:24, 145:3, 145:4, 146:17, 147:16, 148:1, 148:16, 155:12, 179:17, 179:20
**20-YEAR** [1] - 135:5
**2001** [2] - 162:23, 164:2
**2003** [2] - 108:19, 177:5
**2004** [4] - 167:8, 168:13, 169:6, 169:15
**2005** [1] - 145:16
**2006** [27] - 91:25, 98:11, 99:23, 103:18, 108:4, 109:7, 109:10, 113:10, 116:8, 116:21, 118:10, 119:17, 122:3, 127:17, 129:16, 130:5, 132:9, 132:15, 145:17, 145:20, 145:21, 155:10, 182:17, 182:19, 182:22, 182:24, 183:1
**2007** [3] - 92:15, 95:5, 107:17
**2008** [2] - 92:16, 95:5
**2008-256** [1] - 91:10
**2009** [2] - 92:17, 95:5
**2009-269** [1] - 91:11
**2010-2011** [1] - 91:18
**2012** [2] - 92:18, 95:5
**2013** [2] - 92:19, 95:5
**2014** [2] - 92:20, 95:5
**2016** [8] - 87:16, 89:3, 90:3, 91:3, 92:3, 93:3, 94:1, 190:15
**2016-2017** [1] - 91:20
**2021** [1] - 92:21
**2027** [2] - 92:22, 95:5
**2028** [6] - 92:23, 95:6, 160:2, 160:4, 160:16, 160:18

**2029** [2] - 92:25, 95:6
**2030** [2] - 93:6, 95:6
**21** [4] - 90:11, 95:1, 117:5, 119:9
**21.5** [1] - 104:10
**22-YEAR** [1] - 116:8
**225** [1] - 96:10
**23** [3] - 90:12, 95:1, 147:12
**23.05** [1] - 105:19
**24** [1] - 164:2
**25** [4] - 90:13, 95:1, 148:1, 150:13
**26** [2] - 90:15, 95:1
**28** [14] - 87:16, 89:3, 90:3, 90:16, 91:3, 92:3, 93:3, 94:1, 95:1, 105:18, 147:13, 160:17, 160:20, 190:8
**28-2** [1] - 160:23
**28TH** [1] - 190:15
**29** [2] - 90:17, 95:1
**2:25** [1] - 123:19

## 3

**3** [2] - 135:25, 140:18
**30** [13] - 90:18, 95:1, 97:2, 107:25, 108:6, 154:12, 154:21, 157:20, 157:21, 160:11, 161:24, 166:15, 168:20
**30-SOME** [1] - 163:10
**312** [1] - 87:24
**35** [2] - 90:19, 95:1
**36** [2] - 90:21, 95:1
**39** [2] - 90:22, 95:2

## 4

**4** [5] - 92:21, 120:6, 171:16, 171:24, 181:16
**40** [2] - 90:23, 95:2
**400** [1] - 88:6
**41** [3] - 90:24, 95:2, 161:25
**414** [1] - 113:16
**429.59** [1] - 92:8
**435** [1] - 87:24
**46** [7] - 90:25, 95:2, 180:14, 180:19, 181:16, 182:2
**47** [2] - 91:6, 95:2
**4704(G** [1] - 175:15
**48** [2] - 91:8, 95:2
**49** [2] - 91:9, 95:2
**4:30** [1] - 189:14

## 5

**5** [7] - 107:1, 110:23, 127:22, 143:1, 144:4, 144:6, 147:19
**5.5** [2] - 113:25, 118:20
**5.7** [1] - 111:17
**50** [6] - 91:10, 95:2, 102:9, 129:20, 130:2, 130:3
**51** [2] - 91:11, 95:2
**54** [2] - 91:12, 95:2
**55** [2] - 91:13, 95:3
**5TH** [1] - 96:13

## 6

**6** [1] - 133:14, 138:23, 172:23, 174:11, 187:14, 188:19
**60** [2] - 148:10, 182:15
**61** [2] - 91:14, 95:3
**65** [2] - 91:15, 95:3

## 7

**7** [2] - 92:11, 175:7
**7.55** [1] - 112:5
**70'S** [1] - 108:1
**71** [2] - 91:16, 95:3
**75** [1] - 154:18
**753** [1] - 190:8
**76** [1] - 113:23
**78** [2] - 91:17, 95:3

## 8

**8** [5] - 90:6, 94:25, 120:5, 164:2, 176:21
**8.8** [2] - 113:18, 118:20
**84** [2] - 91:18, 95:3
**84-057** [5] - 91:17, 92:22, 92:23, 92:25, 93:6
**86** [2] - 91:19, 95:3
**87** [3] - 87:9, 91:21, 95:3
**88** [2] - 91:22, 95:3
**89** [2] - 91:23, 95:3

## 9

**9** [1] - 90:7, 94:25
**9.96** [1] - 112:4
**90'S** [1] - 187:2
**90,000** [1] - 154:21

**900** [1] - 88:10
**90012** [1] - 87:25
**90071** [1] - 88:7
**90401** [1] - 88:11
**92** [2] - 91:24, 95:4
**92612** [1] - 88:17
**94** [2] - 92:6, 95:4
**95** [1] - 92:7, 95:4
**96** [2] - 92:8, 95:4
**98-010** [1] - 92:10
**99** [1] - 166:1
**9:00** [4] - 186:5, 186:6, 186:9, 189:11

# A

**ABANDON** [1] - 103:5
**ABIDING** [1] - 130:12
**ABILITY** [1] - 98:24
**ABLE** [11] - 96:8, 101:6, 102:24, 121:18, 125:22, 129:22, 147:7, 151:23, 152:21, 156:21, 161:24
**ABOVE** [1] - 190:11
**ABOVE-ENTITLED** [1] - 190:11
**ABSOLUTELY** [4] - 130:6, 135:4, 139:9, 184:21
**ACCEPTED** [1] - 120:17
**ACCOUNT** [13] - 98:25, 108:20, 115:11, 115:13, 127:23, 134:22, 135:3, 136:22, 137:1, 151:25, 153:19, 168:12, 169:8
**ACCOUNTANT** [1] - 111:15
**ACCOUNTING** [1] - 115:15
**ACCURATE** [3] - 180:3, 180:12, 185:14
**ACCURATELY** [1] - 114:15
**ACHIEVE** [1] - 143:23
**ACHIEVING** [1] - 136:17
**ACQUIRE** [1] - 134:2
**ACQUIRED** [3] - 122:8, 122:17, 143:5
**ACQUISITION** [2] - 118:3, 145:8
**ACRES** [1] - 92:8
**ACT** [1] - 121:2

**ACTED** [1] - 120:9
**ACTION** [3] - 120:7, 120:8, 122:20
**ACTIONS** [5] - 118:21, 118:24, 131:2, 187:5, 187:11
**ACTUAL** [2] - 177:17, 177:18
**ADD** [3] - 126:13, 145:22, 148:14
**ADDED** [2] - 129:11, 154:2
**ADDING** [1] - 119:2
**ADDITION** [2] - 126:6, 175:15
**ADDRESSED** [2] - 145:22, 145:25
**ADJOURN** [1] - 186:15
**ADJUSTMENTS** [3] - 91:13, 92:19, 92:21
**ADMINISTRATION** [2] - 159:4, 159:6
**ADMINISTRATIVE** [1] - 87:10
**ADMISSIBILITY** [1] - 94:11
**ADMISSION** [1] - 139:25
**ADMIT** [6] - 94:9, 103:21, 137:19, 137:20, 139:19, 163:9
**ADMITS** [7] - 101:2, 101:4, 103:20, 104:12, 105:20, 107:5, 108:6
**ADMITTED** [9] - 94:19, 94:23, 137:21, 163:2, 173:20, 176:6, 176:7, 180:16, 186:17
**ADOPTED** [2] - 100:13, 114:13
**ADOPTING** [1] - 167:5
**ADOPTION** [5] - 133:20, 140:24, 173:1, 174:14, 177:4
**ADVANTAGES** [1] - 128:21
**ADVERSE** [1] - 122:13
**ADVISOR** [1] - 117:9
**AFFECT** [1] - 159:17
**AFFORD** [2] - 151:19, 152:7
**AFRAID** [1] - 97:23
**AFTERNOON** [6] - 95:19, 95:21, 112:23, 124:15, 158:21, 158:22

**AGE** [1] - 113:2
**AGENTS** [1] - 177:6
**AGO** [11] - 96:7, 96:10, 108:3, 147:1, 156:23, 160:11, 161:24, 176:18, 181:15, 182:7, 187:1
**AGREED** [5] - 104:17, 105:21, 107:4, 142:25, 144:4
**AGREEMENT** [2] - 90:16, 183:14
**AGREEMENT** [1] - 144:5, 183:19
**AGREES** [1] - 145:16
**AHEAD** [2] - 164:8, 186:3
**AILIN** [63] - 88:15, 131:24, 135:22, 137:18, 139:21, 148:21, 149:3, 149:6, 151:7, 151:11, 151:20, 153:3, 155:3, 155:18, 155:20, 156:1, 156:3, 156:10, 157:25, 158:20, 160:2, 160:4, 161:10, 162:10, 162:12, 162:22, 163:4, 163:7, 163:15, 165:12, 169:3, 169:5, 170:4, 170:8, 171:20, 171:22, 171:24, 174:3, 174:10, 175:4, 175:6, 176:8, 178:5, 179:18, 179:23, 180:2, 180:7, 180:17, 180:19, 183:9, 183:11, 185:5, 185:7, 185:23, 186:23, 187:3, 187:7, 187:12, 187:22, 188:14, 189:2, 189:9, 189:12
**AILIN** [1] - 89:10
**AIRPLANE** [1] - 95:14
**ALESHIRE** [1] - 88:14
**ALGORRI** [4] - 87:23, 190:5, 190:18, 190:19
**ALL-AGE** [1] - 113:2
**ALLEGE** [1] - 164:3
**ALLEGING** [1] - 164:6
**ALLOW** [3] - 106:19, 136:10, 139:24
**ALLOWABLE** [6] - 109:15, 133:11, 133:13, 133:21,

173:2, 174:15
**ALLOWANCE** [2] - 140:21, 141:1
**ALLOWED** [9] - 105:24, 107:11, 115:1, 119:24, 122:17, 133:23, 134:5, 162:4, 186:16
**ALLOWS** [2] - 114:19, 170:14
**ALLUDED** [1] - 117:12
**ALMOST** [2] - 113:7, 120:4
**AMBIGUOUS** [4] - 149:6, 155:18, 156:10, 180:5
**AMENDED** [5] - 148:10, 182:15, 182:21, 183:5, 183:6
**AMENDMENT** [1] - 183:7
**AMENDMENT** [3] - 90:15, 96:13, 98:1
**AMENDMENTS** [1] - 184:1
**AMENITIES** [3] - 117:2, 126:20, 128:6
**AMOUNT** [10] - 120:3, 121:7, 121:14, 134:3, 134:24, 149:21, 149:24, 151:3, 182:3, 182:6
**ANALYSIS** [13] - 120:17, 139:2, 139:8, 141:25, 167:16, 167:20, 167:21, 167:24, 168:11, 175:9, 175:16, 175:21, 177:18
**ANALYZED** [2] - 120:24, 132:23
**AND** [3] - 190:6, 190:9, 190:11
**ANGELES** [2] - 88:7, 97:5
**ANGELES** [3] - 87:17, 87:25, 94:1
**ANN** [1] - 122:4
**ANNUAL** [1] - 132:18
**ANSWER** [3] - 126:18, 149:8, 188:2
**ANTICIPATED** [1] - 183:11
**ANYWAY** [2] - 129:14, 189:7
**APARTMENT** [2] - 147:25, 156:16
**APC** [1] - 88:8
**APPEAL** [4] - 109:7,

109:10, 137:25, 155:8
**APPEARANCES** [1] - 88:1
**APPELLATE** [1] - 178:21
**APPLIANCES** [1] - 106:22
**APPLICANT** [2] - 131:18, 132:21
**APPLICATION** [39] - 113:6, 120:15, 121:3, 131:18, 132:25, 140:5, 149:18, 150:19, 158:4, 159:25, 160:7, 160:8, 160:11, 160:13, 161:11, 161:15, 161:17, 161:21, 162:7, 162:12, 163:18, 166:17, 167:1, 167:17, 168:13, 169:8, 175:14, 180:20, 181:2, 181:9, 181:10, 181:12, 181:14, 181:15, 181:16, 182:3, 182:11, 185:17
**APPLICATION** [3] - 90:25, 91:6, 92:24
**APPLICATIONS** [8] - 110:6, 116:11, 120:24, 132:19, 132:20, 133:12, 166:19, 166:24
**APPLIED** [15] - 99:14, 99:20, 108:16, 110:16, 113:13, 113:21, 115:23, 116:17, 119:22, 156:17, 167:8, 167:15, 168:11, 169:15, 180:22
**APPLY** [7] - 99:7, 101:14, 115:5, 115:7, 140:20, 149:14, 169:1
**APPLYING** [2] - 119:3, 169:2
**APPRAISAL** [3] - 90:21, 91:23, 92:15
**APPRAISAL** [7] - 91:18, 91:20, 91:25, 93:7, 107:17, 121:9
**APPRAISER** [1] - 107:15
**APPRAISER'S** [1] - 91:22
**APPROACH** [7] - 126:16, 131:17, 142:20, 142:22, 147:21, 147:23,

160:21
**APPROACHES** [1] - 112:1
**APPROPRIATE** [3] - 118:14, 120:21, 134:5
**APPROVAL** [2] - 156:17, 156:22
**APPROVALS** [1] - 157:5
**APRIL** [2] - 113:10, 182:17
**APRIL** [8] - 87:16, 89:3, 90:3, 91:3, 92:3, 93:3, 94:1, 190:15
**AREA** [4] - 97:12, 116:19, 155:24, 186:3
**AREAS** [1] - 97:13
**ARGUMENT** [1] - 146:6
**ARGUMENTATIVE** [1] - 185:21
**ARGUMENTS** [3] - 105:8, 123:15, 123:17
**ARITHMETIC** [2] - 150:23, 150:24
**ARIZONA** [3] - 104:2, 142:14, 142:21
**ARM'S** [4] - 103:21, 103:22, 105:20, 107:5
**ARM'S-LENGTH** [4] - 103:21, 103:22, 105:20, 107:5
**ARRANGEMENT** [1] - 143:6
**ARRIVED** [1] - 95:15
**ART** [1] - 96:25
**ASLEEP** [1] - 123:16
**ASPECT** [1] - 144:15
**ASSIGNED** [1] - 125:19
**ASSIST** [1] - 171:10
**ASSISTANTS** [1] - 125:8
**ASSOCIATION** [1] - 168:25
**ASSUME** [2] - 164:17, 176:19
**ASSUMED** [3] - 131:2, 141:2, 160:25
**ASSUMES** [1] - 148:21
**ASSUMPTION** [1] - 91:21
**ASSURE** [1] - 115:14
**ATTEMPT** [2] - 122:21, 140:20
**ATTEND** [1] - 124:22
**ATTORNEY** [6] - 131:10, 144:23, 174:12, 179:19,

182:16, 182:25
**ATTORNEY'S** [1] - 145:23
**ATTORNEYS** [2] - 184:9, 184:10
**ATTRACTIVE** [1] - 143:21
**AUDIENCE** [1] - 125:3
**AUGUST** [1] - 177:5
**AUTHENTICITY** [1] - 94:11
**AUTHORIZED** [1] - 115:6
**AUTOMATIC** [1] - 115:4
**AUTOMATICALLY** [1] - 99:6
**AVAILABLE** [1] - 152:10
**AVENUE** [2] - 88:10, 88:16
**AVERAGE** [3] - 113:10, 113:14, 113:16
**AWARDED** [1] - 116:1
**AWARE** [5] - 137:6, 155:15, 168:10, 183:4, 183:6

# B

**BAAR** [3] - 91:16, 120:14, 120:19
**BACHELOR'S** [1] - 159:1
**BACKDOOR** [1] - 187:21
**BACKROOM** [1] - 107:6
**BALANCE** [6] - 127:23, 136:12, 136:15, 136:17, 152:7, 170:21
**BALLPARK** [1] - 150:17
**BANK** [2] - 98:25, 127:23
**BANKRUPT** [2] - 103:2, 103:4
**BANQUET** [1] - 97:11
**BARGAIN** [1] - 152:24
**BASE** [1] - 181:24
**BASED** [16] - 98:22, 98:23, 122:24, 136:25, 143:16, 147:20, 149:2, 149:9,

164:18, 168:23, 177:18, 182:8, 182:10, 183:19
**BASES** [1] - 183:21
**BASIS** [4] - 121:23, 138:6, 139:22, 169:2
**BASKETBALL** [1] - 96:25
**BECOME** [2] - 159:10
**BEGIN** [1] - 188:24
**BEGINNING** [2] - 99:23, 172:5
**BEGINS** [3] - 172:24, 174:14, 178:21
**BEHIND** [2] - 173:15
**BEHOLDER** [1] - 128:21
**BELOW** [15] - 102:5, 102:17, 103:7, 103:16, 106:4, 107:12, 108:11, 108:14, 112:10, 112:16, 112:17, 130:2, 153:10, 154:4, 156:15
**BELOW-MARKET** [2] - 112:10, 153:10
**BENEFIT** [7] - 117:14, 129:4, 140:25, 147:5, 147:8, 151:15, 179:21
**BEST** [1] - 160:6
**BETTER** [1] - 120:7
**BETWEEN** [6] - 132:25, 136:15, 138:8, 155:7, 170:21, 188:21
**BIDDER** [1] - 120:5
**BIG** [8] - 98:1, 99:1, 104:2, 104:25, 107:9, 141:25, 160:6, 160:20
**BIGGEST** [2] - 100:16, 104:4
**BILLS** [9] - 102:25, 103:7, 103:9, 103:14, 107:12, 110:6, 110:17, 112:18, 146:12
**BINDER** [3] - 139:17, 160:17, 160:25
**BINDERS** [3] - 160:14, 160:15, 161:6
**BIT** [1] - 144:18
**BLOWN** [1] - 117:19
**BLOWUPS** [1] - 173:13
**BLUE** [5] - 98:10, 99:21, 100:8, 102:6, 128:14

**BOARD** [54] - 92:25, 96:21, 99:11, 113:1, 113:17, 113:24, 114:4, 115:5, 116:1, 116:2, 116:6, 116:10, 116:14, 118:22, 120:25, 121:2, 130:15, 130:16, 130:18, 130:20, 130:22, 130:25, 131:4, 131:5, 131:8, 131:10, 138:25, 153:16, 153:21, 154:25, 162:4, 162:16, 163:22, 164:7, 164:15, 164:22, 165:7, 166:10, 166:13, 166:25, 167:3, 167:5, 167:15, 168:10, 168:11, 169:6, 169:7, 169:14, 169:19, 171:10, 175:14, 177:3, 177:22
**BOARD** [3] - 114:16, 114:23, 171:19
**BOARD** [1] - 87:9
**BOARDS** [1] - 173:23
**BODY** [1] - 87:10
**BOOK** [3] - 109:9, 137:14, 160:20
**BORROW** [4] - 101:3, 106:17, 107:7, 108:7
**BORROWED** [4] - 100:21, 100:25, 127:23, 147:19
**BOTTOM** [1] - 104:16
**BOUGHT** [8] - 98:9, 107:23, 109:24, 115:17, 164:8, 167:7, 171:1, 182:15
**BOUND** [1] - 138:25
**BOUNDARIES** [1] - 119:16
**BRABANT** [2] - 91:22, 92:17
**BRACKET** [1] - 181:20
**BREAK** [7] - 123:5, 157:10, 157:11, 173:3, 173:4, 186:3, 186:4
**BRIEF** [1] - 181:11
**BRIEFLY** [1] - 131:8
**BRING** [3] - 95:7, 95:16, 174:5
**BRINGING** [1] -

188:15
**BRINGS** [1] - 96:1
**BROKER** [14] - 104:4, 104:25, 121:4, 121:20, 143:3, 143:6, 143:8, 143:11, 143:13, 143:18, 143:22, 144:10, 177:12, 177:13
**BROKER'S** [3] - 143:20, 144:15, 144:20
**BROUGHT** [2] - 113:15, 174:13
**BUILD** [1] - 96:16
**BUILDING** [1] - 147:25
**BUILDING** [1] - 88:9
**BUSINESS** [30] - 97:2, 97:4, 97:20, 97:21, 100:7, 100:22, 104:21, 104:25, 105:23, 106:23, 108:17, 109:4, 109:12, 110:22, 111:3, 125:14, 126:12, 126:15, 127:1, 127:24, 142:24, 143:25, 147:21, 159:4, 159:6, 165:22, 165:25, 166:2
**BUSINESSPERSON** [1] - 105:15
**BUY** [9] - 97:6, 100:25, 109:15, 114:3, 118:7, 139:11, 157:13, 158:13, 159:14
**BUYER** [4] - 105:5, 107:21, 117:1, 179:2
**BUYERS** [2] - 105:2, 116:25
**BUYING** [7] - 101:23, 108:3, 125:14, 125:19, 146:16, 148:24, 159:19
**BY** [39] - 88:5, 88:5, 88:9, 88:15, 88:15, 88:16, 124:14, 125:6, 132:4, 133:9, 135:24, 137:24, 140:1, 148:24, 151:13, 152:9, 153:5, 155:6, 156:6, 156:12, 158:6, 158:20, 161:10, 162:12, 163:15, 165:12, 169:5, 170:4, 170:8, 171:24, 175:6, 176:8, 178:5, 180:2, 180:7, 180:19,

183:11, 185:7, 185:23

## C

**CAL** [3] - 90:22, 104:9
**CALCULATE** [3] - 144:5, 146:18, 149:20
**CALCULATED** [4] - 149:24, 150:5, 150:6, 153:14
**CALCULATES** [1] - 112:2
**CALCULATING** [4] - 120:16, 138:6, 139:3, 148:13
**CALCULATION** [2] - 92:18, 92:20
**CALCULATION** [1] - 121:12
**CALCULATIONS** [4] - 121:11, 150:23, 150:24, 150:25
**CALIFORNIA** [5] - 87:2, 87:17, 87:25, 94:1, 190:7
**CALIFORNIA** [13] - 88:7, 88:11, 88:17, 97:4, 97:5, 109:9, 124:18, 124:22, 124:23, 126:5, 143:2, 157:19, 187:1
**CANNOT** [5] - 96:11, 109:21, 124:16, 173:14, 181:13
**CAP** [1] - 144:6
**CAPITAL** [3] - 106:21, 128:1, 147:20
**CAPITALIZATION** [4] - 121:10, 142:25, 143:1, 144:4
**CAPTION** [1] - 163:25
**CARDS** [1] - 173:18
**CAREER** [1] - 110:22
**CAREFULLY** [3] - 109:11, 132:23, 177:1
**CARRIED** [1] - 155:24
**CARRY** [1] - 154:22
**CARSON** [149] - 92:11, 92:14, 96:20, 98:5, 98:9, 98:10, 98:12, 98:13, 98:18, 98:24, 99:15, 99:25, 100:3, 100:7, 100:8, 100:12, 101:4, 101:11, 101:24, 102:6, 102:11, 102:14, 103:4,

104:21, 105:11, 105:22, 105:24, 106:2, 106:5, 106:18, 108:15, 108:19, 108:22, 108:24, 109:1, 109:2, 109:6, 109:20, 109:24, 110:2, 110:3, 110:12, 110:15, 110:25, 111:3, 111:5, 112:19, 112:25, 113:2, 113:4, 113:24, 114:13, 114:20, 115:18, 115:19, 115:20, 115:24, 116:6, 116:9, 116:13, 118:22, 120:18, 126:6, 126:8, 127:13, 128:9, 128:10, 128:14, 128:16, 128:18, 129:6, 129:9, 129:12, 129:18, 130:19, 131:5, 131:9, 132:12, 132:19, 132:24, 134:18, 134:19, 134:23, 135:3, 135:7, 135:15, 136:4, 136:22, 137:3, 137:10, 137:13, 137:25, 138:4, 141:11, 143:17, 144:24, 145:6, 146:14, 148:7, 148:16, 149:2, 149:9, 152:9, 152:14, 152:19, 153:6, 154:8, 154:13, 154:15, 154:22, 154:24, 155:9, 155:16, 155:23, 159:22, 159:24, 160:8, 161:11, 161:16, 161:21, 162:13, 163:18, 164:9, 164:12, 164:15, 164:21, 166:5, 166:9, 166:16, 166:21, 167:25, 168:3, 168:20, 175:2, 176:23, 177:3, 177:19, 178:23, 179:3, 179:16, 179:20, 182:25, 183:25, 184:14, 185:8, 185:19
**CARSON** [2] - 87:8, 87:9
**CARSON'S** [12] - 99:9, 99:11, 111:8, 112:13, 116:10, 129:7, 130:15,

132:10, 132:17, 137:6, 159:20, 167:22
**CASE** [45] - 96:19, 97:10, 98:16, 99:12, 101:2, 101:10, 104:13, 108:6, 108:24, 108:25, 109:6, 111:10, 112:12, 116:13, 120:13, 123:7, 123:9, 127:9, 136:17, 137:13, 137:25, 138:4, 139:15, 139:22, 140:2, 140:10, 163:11, 164:14, 165:18, 166:5, 166:9, 167:18, 169:20, 173:5, 173:6, 178:23, 179:1, 182:25, 185:17, 186:7, 186:9, 186:25, 187:6, 187:18
**CASE** [1] - 87:6
**CASES** [6] - 96:4, 116:12, 166:15, 166:18, 188:8, 189:5
**CASH** [1] - 111:2
**CASPARIAN** [1] - 88:9
**CATEGORIES** [1] - 185:1
**CAUSED** [2] - 120:2, 122:14
**CC** [3] - 90:11, 90:25, 91:6
**CEILING** [1] - 153:7
**CELL** [1] - 125:4
**CENTRAL** [2] - 87:2, 190:7
**CENTRAL** [1] - 187:1
**CERTAIN** [7] - 114:24, 128:21, 129:13, 150:25, 157:5, 187:8
**CERTAINLY** [4] - 131:22, 136:17, 150:17, 189:2
**CERTIFICATE** [1] - 190:1
**CERTIFICATE** [1] - 91:22
**CERTIFIED** [1] - 111:14
**CERTIFY** [1] - 190:7
**CETERA** [2] - 126:21, 143:17
**CHALLENGING** [1] - 130:7
**CHANCE** [1] - 97:6
**CHANGE** [19] - 99:4,

100:14, 101:9, 101:11, 107:24, 109:21, 111:1, 111:8, 112:8, 113:4, 148:25, 149:12, 149:14, 154:8, 155:7, 173:12, 183:12, 183:16, 184:6
**CHANGED** [15] - 100:11, 100:12, 101:5, 101:24, 102:16, 109:21, 112:15, 118:11, 135:8, 135:9, 140:8, 140:14, 148:13, 148:18, 155:14
**CHANGES** [3] - 97:13, 177:20, 183:24
**CHANGING** [1] - 167:25
**CHAPTER** [1] - 92:11
**CHARACTER** [1] - 122:20
**CHARGE** [9] - 102:13, 102:20, 103:6, 108:2, 110:10, 112:16, 119:24, 152:21, 153:21
**CHARGED** [1] - 98:19
**CHARGING** [2] - 108:11, 108:14
**CHART** [1] - 104:16
**CHECK** [1] - 99:2
**CHILDREN** [1] - 128:23
**CHOSE** [2] - 99:25, 169:1
**CHRONOLOGICAL** [1] - 89:5
**CIRCUMSTANCES** [1] - 117:25
**CITED** [1] - 144:10
**CITIZENS** [1] - 113:3
**CITY** [33] - 98:18, 98:20, 98:21, 100:11, 102:16, 104:12, 107:5, 119:14, 119:20, 120:23, 122:15, 130:11, 130:21, 130:24, 131:9, 136:9, 137:1, 150:4, 151:5, 151:14, 154:16, 154:19, 154:20, 154:25, 155:16, 155:23, 162:15, 178:13, 183:25, 184:1, 184:4, 184:15, 184:18
**CITY** [2] - 87:8, 87:9
**CITY** [70] - 91:8,

91:9, 96:20, 98:5, 98:24, 99:13, 99:20, 100:5, 100:14, 101:2, 101:4, 101:9, 101:11, 101:17, 101:25, 102:4, 102:10, 103:6, 103:13, 103:20, 105:19, 108:6, 108:20, 110:9, 111:19, 111:20, 112:25, 113:4, 118:19, 118:22, 119:4, 119:23, 120:2, 120:8, 120:9, 120:20, 122:2, 127:13, 131:6, 132:5, 132:20, 132:24, 134:14, 134:22, 136:4, 136:22, 138:8, 140:5, 143:6, 148:12, 148:18, 148:25, 149:20, 150:6, 150:25, 153:14, 154:15, 154:22, 162:15, 163:22, 164:6, 164:9, 164:14, 164:21, 165:7, 178:11, 179:3
**CITY'S** [11] - 100:17, 111:15, 112:2, 112:7, 122:20, 131:6, 132:6, 149:17, 151:2, 155:7, 164:3
**CITY'S** [1] - 111:17
**CLAIMS** [2] - 92:19, 92:21
**CLAIMS** [1] - 148:12
**CLEAR** [7] - 101:8, 103:7, 117:3, 146:2, 150:16, 164:18, 178:11
**CLEARLY** [3] - 136:16, 146:20, 149:10
**CLERK** [4] - 123:11, 123:24, 124:6, 186:11
**CLERK** [2] - 94:10, 94:17
**CLIENT** [4] - 96:22, 112:19, 145:24
**CLIENTS** [1] - 95:23
**CLOSE** [44] - 88:5, 94:8, 94:15, 94:22, 95:9, 95:21, 97:18, 114:9, 123:22, 124:14, 125:6, 127:14, 132:4, 133:7, 133:9, 135:24, 137:20, 137:24, 138:22, 139:17,

140:1, 145:9, 148:2, 148:24, 151:13, 152:9, 153:5, 153:12, 155:6, 156:2, 156:6, 156:12, 158:6, 158:16, 161:2, 161:5, 163:10, 165:9, 169:23, 170:2, 174:4, 180:5, 185:20, 189:13

**CLOSE** [5] - 92:7, 94:8, 95:22, 117:9

**CLOSE** [11] - 97:16, 114:2, 114:12, 114:22, 115:17, 116:13, 116:23, 117:11, 121:13, 158:23, 170:21

**CLOSE'S** [3] - 114:5, 117:24, 121:23

**CLOSELY** [8] - 99:20, 109:11, 138:14, 141:22, 142:4, 142:7, 154:17, 188:11

**CLOUT** [1] - 154:23

**CLUBHOUSE** [2] - 97:12, 128:6

**CODE** [1] - 190:8

**CODE** [1] - 92:11

**COFFEE** [1] - 108:1

**COINCIDENCE** [1] - 155:12

**COLLEAGUES** [1] - 95:22

**COLLECT** [1] - 106:3

**COLLECTED** [2] - 117:21, 179:10

**COLLECTING** [2] - 117:21, 179:10

**COLLEGE** [3] - 124:22, 125:16, 185:2

**COLONY** [1] - 87:5

**COLONY** [112] - 92:15, 95:23, 98:15, 99:22, 99:25, 100:6, 100:11, 100:16, 100:20, 101:5, 101:13, 102:4, 102:9, 102:13, 102:16, 102:17, 102:22, 103:11, 103:18, 103:20, 103:24, 104:18, 109:8, 109:19, 109:24, 113:3, 113:5, 113:8, 113:9, 114:3, 114:8, 115:18, 115:22, 116:21, 117:3, 117:5, 117:13, 117:24, 118:15, 118:23,

119:4, 119:8, 119:16, 119:21, 119:22, 119:24, 119:25, 120:24, 121:20, 122:1, 122:8, 122:17, 122:22, 127:9, 127:16, 127:17, 127:19, 128:3, 128:4, 128:19, 129:2, 129:3, 129:6, 129:16, 129:17, 129:20, 130:1, 130:4, 132:9, 132:15, 133:5, 136:17, 136:20, 137:2, 137:4, 137:5, 137:9, 138:3, 138:16, 138:20, 139:8, 139:11, 140:7, 141:6, 141:9, 141:11, 141:20, 143:4, 146:11, 148:8, 148:24, 150:10, 150:12, 154:7, 155:9, 156:18, 156:22, 156:25, 157:8, 157:23, 158:8, 158:15, 159:20, 165:18, 167:7, 171:2, 172:21, 177:9, 180:20, 182:15, 182:18, 183:15

**COMFORTABLE** [1] - 98:13

**COMING** [1] - 95:12

**COMMENT** [2] - 184:5, 185:15

**COMMERCIAL** [1] - 106:23

**COMMISSION** [1] - 92:13

**COMMON** [2] - 147:21, 147:23

**COMPANY** [8] - 87:5, 116:22, 121:25, 125:20, 126:1, 142:14, 142:16, 165:19

**COMPARABLE** [1] - 115:10

**COMPARE** [3] - 129:17, 141:23, 150:10

**COMPARED** [1] - 134:25

**COMPARISON** [2] - 132:2, 132:25

**COMPENSATION** [5] - 96:13, 96:18, 96:23, 101:19, 112:20

**COMPLAINED** [1] -

118:23

**COMPLAINT** [2] - 163:16, 164:16

**COMPLETELY** [2] - 104:3, 134:14

**COMPLY** [1] - 138:25

**COMPRISED** [2] - 185:1, 185:2

**COMPUTER** [1] - 173:24

**COMPUTERS** [2] - 95:10, 95:13

**COMPUTING** [1] - 151:3

**CON'T** [2] - 91:1, 92:1

**CONCERNED** [2] - 131:2, 151:22

**CONCLUDED** [1] - 189:14

**CONCLUSION** [3] - 122:25, 139:7, 187:21

**CONCLUSIONS** [2] - 122:11, 122:24

**CONDITION** [4] - 103:1, 141:23, 141:24, 152:12

**CONDITIONS** [1] - 128:23

**CONDITIONS** [1] - 91:21

**CONDOMINIUM** [1] - 156:17

**CONDUCT** [1] - 112:13

**CONFERENCE** [1] - 190:12

**CONFIDENCE** [2] - 144:17, 144:22

**CONFIDENT** [2] - 122:9, 147:7

**CONFIRMED** [2] - 109:2, 109:13

**CONFISCATE** [1] - 96:8

**CONFORMANCE** [1] - 190:12

**CONFUSED** [2] - 145:15, 168:2

**CONFUSING** [1] - 161:15

**CONNECTION** [1] - 155:7

**CONSIDER** [5] - 109:3, 114:24, 115:6, 122:10, 175:14

**CONSIDERABLE** [1] - 156:21

**CONSIDERATION**

[3] - 139:3, 147:11, 148:11

**CONSIDERATIONS** [1] - 154:14

**CONSIDERED** [5] - 134:24, 169:7, 169:19, 169:20, 183:25

**CONSIDERS** [1] - 115:7

**CONSISTENT** [2] - 137:4, 140:6

**CONSTANT** [1] - 135:6

**CONSTITUTE** [1] - 140:22

**CONSTITUTION** [11] - 96:1, 96:3, 96:5, 96:6, 96:10, 96:14, 96:22, 97:25, 98:6, 112:14, 114:21

**CONSTITUTIONAL** [2] - 98:1, 98:3

**CONSTRUCTED** [3] - 129:13, 129:14, 129:24

**CONSUMER** [3] - 115:9, 172:16, 177:20

**CONTAINED** [1] - 92:15

**CONTEND** [1] - 118:10

**CONTEXT** [1] - 131:21

**CONTINUE** [3] - 123:14, 151:13, 157:13

**CONTINUED** [1] - 116:9

**CONTINUES** [1] - 140:25

**CONTINUING** [1] - 175:6

**CONTRACT** [3] - 90:14, 90:15, 90:24

**CONTRARY** [2] - 120:1, 120:22

**CONTRIBUTE** [1] - 106:10

**CONTROL** [35] - 96:21, 99:11, 113:1, 114:13, 114:20, 115:20, 116:6, 116:10, 118:22, 130:11, 130:15, 130:16, 130:18, 130:20, 130:22, 130:25, 131:3, 131:5, 131:7, 131:8, 131:10, 132:10, 136:3,

153:16, 153:21, 154:25, 159:21, 164:7, 168:10, 168:11, 170:9, 170:20, 176:22, 177:11, 178:13

**CONTROL** [49] - 98:17, 98:18, 99:10, 99:13, 99:14, 99:16, 100:12, 102:7, 102:12, 107:10, 113:4, 115:22, 117:7, 118:18, 119:5, 119:7, 119:11, 120:15, 129:7, 129:15, 130:5, 130:10, 132:5, 132:6, 132:14, 132:23, 135:15, 135:18, 135:19, 135:20, 137:7, 148:7, 148:17, 149:17, 152:9, 152:11, 152:23, 155:8, 155:15, 157:10, 157:11, 157:14, 164:3, 166:25, 171:4, 184:14, 185:16

**CONTROLLED** [3] - 110:2, 117:4, 119:19

**CONTROLLING** [1] - 171:14

**CONVERSION** [10] - 156:8, 156:13, 156:14, 156:16, 156:17, 156:22, 156:24, 157:12, 158:4

**CONVERSIVE** [1] - 132:13

**CONVERT** [1] - 129:1

**CONVERTED** [5] - 157:2, 157:8, 157:16, 157:24, 158:8

**CONVERTING** [1] - 158:7

**COPIES** [2] - 166:23, 177:5

**COPY** [1] - 161:3, 175:25

**CORPORATION** [1] - 87:9

**CORRECT** [1] - 190:9

**CORRECT** [71] - 124:19, 128:17, 129:11, 134:21, 138:17, 138:18, 140:16, 144:10, 146:7, 147:13,

147:14, 150:15, 153:10, 159:4, 159:5, 159:7, 159:8, 159:22, 159:23, 160:9, 161:3, 161:12, 162:2, 162:5, 164:23, 164:25, 165:8, 165:11, 165:12, 165:20, 165:21, 165:22, 165:25, 166:3, 166:4, 166:6, 166:7, 166:14, 166:21, 166:25, 167:5, 167:20, 168:1, 170:24, 170:25, 171:2, 171:5, 172:6, 172:12, 172:21, 172:22, 175:1, 175:11, 175:22, 177:11, 179:15, 180:10, 180:24, 181:22, 182:12, 182:18, 182:22, 183:23, 184:15, 184:16, 184:18, 184:19, 185:8, 185:9, 186:22

**CORRECTLY** [3] - 134:7, 139:5, 141:3

**CORRESPONDEN CE** [1] - 154:24

**COST** [5] - 108:1, 118:8, 140:21, 141:1

**COSTS** [1] - 139:3

**COUNCIL** [14] - 130:21, 130:24, 151:5, 151:14, 154:16, 154:19, 154:25, 155:16, 155:23, 183:25, 184:1, 184:4, 184:15, 184:18

**COUNSEL** [6] - 117:12, 160:21, 160:24, 161:1, 161:3, 173:14

**COUNSEL** [1] - 88:1

**COUNT** [1] - 180:9

**COUNTRIES** [1] - 96:3

**COUNTRY** [3] - 96:2, 104:4, 120:14

**COUPLE** [2] - 150:21, 186:14

**COURSE** [12] - 101:9, 110:19, 115:3, 116:20, 125:21, 132:13, 138:14, 142:4, 142:6, 143:20, 148:14, 188:12

**COURSES** [1] -

121:9

**COURT** [22] - 94:6, 95:18, 108:20, 108:25, 114:5, 123:13, 123:25, 124:2, 137:6, 138:15, 163:6, 173:10, 174:8, 185:24, 186:13, 186:25, 187:5, 187:11, 187:17, 187:8, 188:20, 188:21

**COURT** [14] - 109:6, 109:7, 109:9, 109:13, 137:25, 138:3, 138:5, 140:15, 155:8, 179:7, 187:20, 187:24, 189:1, 189:8

**COURT** [87] - 87:1, 87:24, 94:7, 94:12, 94:16, 94:23, 95:7, 95:10, 95:19, 97:16, 112:22, 114:10, 123:3, 123:14, 123:20, 124:10, 125:2, 131:25, 133:6, 133:8, 135:23, 137:16, 137:19, 137:21, 139:20, 139:24, 148:23, 149:5, 149:7, 151:10, 151:12, 151:21, 153:4, 155:4, 155:19, 155:21, 156:4, 156:11, 158:1, 158:18, 160:3, 160:21, 160:24, 161:4, 161:7, 162:11, 162:19, 162:24, 163:2, 163:9, 163:13, 165:10, 169:4, 170:1, 170:3, 170:7, 171:19, 171:21, 171:23, 173:3, 173:11, 174:5, 174:9, 175:5, 176:6, 178:4, 179:24, 180:6, 180:16, 180:18, 183:10, 185:6, 185:22, 186:2, 186:14, 186:20, 186:24, 187:4, 187:10, 187:13, 187:23, 188:19, 189:3, 189:10, 190:6, 190:19

**COURT'S** [1] - 139:1

**COURT'S** [4] - 139:18, 163:3, 188:6, 188:23

**COURTROOM** [2] - 94:20, 145:15

COVE [111] - 92:15, 95:23, 98:15, 99:22, 99:25, 100:6, 100:11, 100:16, 100:20, 101:5, 101:13, 102:4, 102:9, 102:13, 102:16, 102:17, 102:22, 103:11, 103:18, 103:20, 103:24, 104:18, 109:8, 109:19, 109:24, 113:3, 113:5, 113:8, 113:9, 114:3, 114:8, 115:18, 115:22, 116:21, 117:3, 117:5, 117:13, 117:24, 118:15, 118:23, 119:4, 119:8, 119:16, 119:21, 119:22, 119:24, 119:25, 121:20, 122:1, 122:8, 122:17, 122:22, 127:9, 127:16, 127:17, 127:19, 128:3, 128:4, 128:19, 129:2, 129:3, 129:6, 129:16, 129:17, 129:20, 130:1, 130:4, 132:9, 132:15, 133:5, 136:17, 136:20, 137:2, 137:4, 137:5, 137:9, 138:3, 138:16, 138:20, 139:8, 139:11, 140:7, 141:6, 141:9, 141:11, 141:20, 143:4, 146:11, 148:8, 148:24, 150:10, 150:12, 154:7, 155:9, 156:18, 156:22, 156:25, 157:8, 157:23, 158:8, 158:15, 159:20, 165:18, 167:7, 171:2, 172:21, 177:9, 180:20, 182:15, 182:18, 183:15

**COVE** [1] - 87:5

**COVE'S** [1] - 120:24

**COVER** [11] - 102:25, 106:15, 112:11, 115:25, 148:5, 153:15, 162:1, 167:9, 167:13, 176:8, 183:21

**COVERAGE** [1] - 151:5

**COVERED** [1] - 117:25

**COVERING** [1] -

178:19

**CPI** [3] - 115:8, 172:16, 172:17

**CREATE** [1] - 136:15

**CREDIBLE** [1] - 107:21

**CRITICIZING** [1] - 154:25

**CROSS** [2] - 89:9, 89:10

**CROSS** [2] - 158:18, 186:21

**CROSS** [1] - 158:19

**CROSS-EXAMINATION** [1] - 89:10

**CROSS-EXAMINATION** [2] - 158:18, 186:21

**CROSS-EXAMINATION** [1] - 158:19

**CROSSED** [1] - 172:3

**CROWE** [9] - 90:10, 91:15, 121:24, 142:15, 142:21, 142:22, 143:9, 145:23, 145:24

**CRR** [2] - 87:23, 190:19

**CSR** [2] - 87:23, 190:19

**CURIOUS** [1] - 188:10

**CURRENT** [2] - 133:1, 181:24

**CUSTOMARY** [2] - 133:24, 134:4

**CUT** [1] - 107:6

**CV** [1] - 87:7

# D

**D-1** [1] - 127:15

**D-3** [1] - 148:3, 153:13, 182:16

**DAMAGE** [6] - 111:22, 111:24, 112:4, 112:6, 112:18, 121:11

**DAMAGED** [3] - 121:14, 164:3, 164:7

**DAMAGES** [5] - 101:19, 114:6, 121:10, 121:12, 121:15

**DANG** [1] - 120:4

**DANNY** [2] - 121:19, 142:18

**DATE** [3] - 145:15, 163:19, 182:23

**DATED** [1] - 190:15

**DAVID** [1] - 104:11

**DAY** [2] - 87:16, 190:15

**DAY-TO-DAY** [1] - 125:9

**DAYS** [2] - 148:10, 182:15

**DEAL** [1] - 107:6

**DEALING** [2] - 116:10, 142:22

**DEBT** [2] - 172:25, 174:14

**DEBT** [31] - 113:8, 116:7, 116:15, 118:16, 120:3, 120:20, 133:20, 134:1, 134:5, 134:10, 134:15, 134:17, 137:7, 137:11, 139:3, 140:11, 140:21, 141:1, 141:2, 146:18, 162:1, 167:9, 167:13, 167:22, 168:4, 168:6, 168:12, 169:7, 169:20, 175:11, 182:3

**DECADES** [6] - 99:15, 99:21, 104:2, 108:14, 111:3, 147:20

**DECIDE** [7] - 96:20, 101:21, 102:3, 102:21, 112:19, 129:2, 159:14

**DECIDED** [10] - 98:12, 101:11, 125:18, 132:17, 138:3, 138:5, 165:8, 168:13, 183:1, 183:2

**DECIDES** [1] - 98:19

**DECIDING** [1] - 141:6

**DECISION** [17] - 111:8, 111:15, 112:7, 138:15, 138:20, 139:8, 139:11, 141:5, 141:8, 141:11, 141:20, 155:7, 164:3, 167:17, 177:21, 178:21, 185:24

**DECISIONS** [7] - 109:10, 109:13, 125:10, 137:6, 154:14, 155:8, 184:14

**DECLINED** [1] - 119:25

**DECONTROL** [1] - 152:17

**DECREASED** [1] -

135:10
**DEED** [1] - 90:18
**DEFEATING** [1] - 152:22
**DEFEATS** [1] - 118:17
**DEFENDANTS** [2] - 87:11, 88:13
**DEFENDANTS** [3] - 96:20, 99:11, 112:25
**DEFENSE** [2] - 112:22, 123:1
**DEFERRED** [1] - 152:7
**DEFINITE** [1] - 128:25
**DEGREE** [2] - 159:1, 159:3
**DELAWARE** [1] - 87:5
**DELAYS** [1] - 156:21
**DELETION** [1] - 148:10
**DELIVER** [1] - 112:13
**DEMAND** [2] - 126:23, 143:19
**DENIED** [3] - 111:21, 169:4, 185:6
**DEPOSITION** [1] - 121:19
**DEPUTY** [1] - 94:20
**DESCRIBED** [1] - 144:4
**DESERT** [2] - 126:9, 157:20
**DESIGNED** [1] - 136:15
**DESIRED** [1] - 129:22
**DESPITE** [2] - 117:23, 149:14
**DETAILED** [1] - 177:18
**DETERMINATIVE** [3] - 172:1, 172:6, 172:11
**DETERMINE** [1] - 131:17
**DETERMINED** [1] - 134:1
**DETERMINES** [1] - 114:16
**DETERMINING** [1] - 114:24
**DETLING** [3] - 90:21, 107:15, 107:18
**DETLING'S** [1] - 107:15
**DETRIMENT** [1] - 135:9

**DEVELOP** [2] - 117:6, 119:10
**DEVELOPED** [1] - 128:11
**DIFFERENT** [15] - 110:12, 112:1, 136:14, 139:22, 148:12, 149:25, 163:11, 163:12, 168:18, 169:20, 186:3, 187:17, 188:9, 188:17
**DIFFERENTLY** [1] - 112:2
**DIFFICULT** [2] - 126:18, 130:7
**DIFFICULTIES** [1] - 152:4
**DIGIT** [1] - 160:19
**DILIGENCE** [1] - 159:11
**DIMITRI** [1] - 88:5
**DIRECT** [1] - 174:13
**DIRECT** [1] - 89:9
**DIRECT** [1] - 124:13
**DIRECTED** [1] - 188:15
**DIRECTION** [1] - 161:18
**DIRECTLY** [3] - 141:8, 143:9, 185:12
**DISADVANTAGES** [1] - 128:22
**DISAGREE** [1] - 111:12
**DISBURSEMENT** [1] - 90:9
**DISCLOSURE** [1] - 117:3
**DISCOVERED** [1] - 168:25
**DISCUSS** [5] - 123:7, 123:18, 139:25, 173:5, 186:7
**DISCUSSED** [2] - 146:25, 172:25
**DISCUSSING** [1] - 170:5
**DISCUSSIONS** [1] - 168:23
**DISPEL** [1] - 144:17
**DISPUTE** [2] - 104:13, 138:8
**DISREGARD** [2] - 134:14, 134:17
**DISREGARDED** [2] - 100:15, 100:18
**DISTINCT** [1] - 122:11
**DISTRACTING** [1] -

173:12
**DISTRICT** [1] - 186:25
**DISTRICT** [5] - 87:1, 87:2, 87:3, 190:6, 190:7
**DISTRICT** [1] - 187:1
**DIVISION** [1] - 87:2
**DO** [1] - 190:7
**DOCS** [1] - 92:14
**DOCUMENT** [11] - 95:25, 105:1, 116:24, 160:24, 161:8, 163:24, 170:11, 174:12, 175:25, 176:2, 176:10
**DOCUMENTS** [2] - 166:24, 177:5
**DOES** [1] - 87:10
**DOLLAR** [1] - 146:16
**DOLLARS** [9] - 101:23, 102:2, 102:19, 110:15, 111:2, 112:11, 112:18, 153:1, 153:2
**DONE** [13] - 100:7, 103:15, 105:23, 111:2, 112:18, 126:13, 127:24, 129:3, 137:3, 158:2, 179:21, 179:25, 183:8
**DOOR** [1] - 188:10
**DOUBLE** [1] - 160:19
**DOUG** [1] - 121:19
**DOUGLAS** [1] - 142:18
**DOWN** [15] - 105:8, 106:11, 109:17, 144:21, 145:7, 146:9, 147:15, 147:25, 162:20, 173:22, 178:2, 179:22, 179:25, 181:22
**DOZEN** [2] - 164:21, 164:23
**DR** [2] - 120:14, 120:19
**DRAG** [1] - 146:9
**DRIVE** [2] - 144:21, 145:7
**DRIVING** [2] - 179:22, 179:25
**DUE** [4] - 139:2, 140:23, 159:10, 162:9
**DURING** [12] - 96:16, 106:8, 115:3, 123:15, 123:16, 127:15, 132:5, 156:7, 161:16, 162:7, 188:12, 188:16
**DWELLING** [2] -

113:11, 113:12

# E

**E-MAIL** [1] - 95:15
**E-MAILS** [1] - 95:13
**EARLY** [5] - 98:9, 116:21, 128:11, 182:24
**EARN** [5] - 103:9, 103:14, 105:25, 107:11, 136:10
**EASEL** [2] - 173:18, 173:22
**EASELS** [1] - 173:13
**ECONOMIC** [4] - 112:9, 120:10, 122:13, 140:23
**ECONOMICS** [2] - 121:9, 159:1
**EDUCATION** [1] - 185:2
**EFFECT** [4] - 114:14, 133:4, 141:1, 157:15
**EFFECTIVELY** [1] - 140:15
**EITHER** [2] - 95:14, 184:11
**ELECTION** [3] - 110:4, 185:4, 185:11
**ELECTIONS** [2] - 154:16, 185:18
**ELECTRIC** [3] - 106:21, 107:2, 147:20
**ELIMINATE** [3] - 119:5, 119:7, 179:4
**ELLIS** [6] - 92:16, 111:18, 111:24, 121:8, 121:10, 121:13
**ELMO** [5] - 164:16, 173:18, 173:22, 173:23, 174:12
**EMAIL** [1] - 90:8
**EMPLOYED** [1] - 121:1
**ENCOURAGING** [1] - 177:10
**END** [5] - 110:21, 112:12, 123:18, 178:25, 179:1
**ENDED** [1] - 151:1
**ENGAGE** [2] - 142:17, 144:2
**ENJOY** [1] - 140:25
**ENTER** [1] - 125:25
**ENTIRE** [2] - 119:7, 170:13
**ENTIRETY** [1] - 117:16
**ENTITLED** [1] -

190:11
**ENTITLED** [9] - 119:21, 131:18, 147:1, 149:11, 149:22, 149:25, 150:5, 150:7, 174:25
**ENTITLEMENT** [1] - 178:12
**ENTITY** [3] - 165:22, 165:25, 166:2
**EQUAL** [2] - 123:15, 150:17, 172:15
**EQUATES** [3] - 113:14, 113:23, 114:6
**ERROR** [1] - 145:17
**ESSENTIALLY** [1] - 189:3
**ESTABLISH** [1] - 142:23
**ESTABLISHED** [1] - 140:23
**ESTATE** [15] - 100:22, 104:2, 104:4, 106:23, 121:9, 121:20, 125:17, 127:1, 142:14, 143:3, 143:6, 143:8, 147:24, 159:9
**ESTATE** [1] - 91:23
**ESTATES** [3] - 90:25, 91:6, 127:9
**ESTIMATED** [1] - 181:23
**ET** [2] - 126:21, 143:17
**EVALUATE** [1] - 136:23
**EVALUATING** [1] - 138:19, 175:14
**EVD** [4] - 90:5, 91:5, 92:5, 93:5
**EVENTS** [1] - 118:2
**EVENTUALLY** [1] - 97:6
**EVICTING** [1] - 152:1
**EVIDENCE** [24] - 94:25, 103:18, 112:7, 115:4, 116:14, 118:4, 118:11, 118:13, 119:2, 119:13, 119:14, 119:17, 119:20, 119:25, 120:1, 120:9, 122:10, 122:12, 137:23, 148:22, 169:12, 186:19
**EVIDENT** [1] - 155:11
**EXACT** [2] - 166:1, 182:6

**EXACTLY** [4] - 129:20, 140:17, 153:11, 181:14

**EXAMINATION** [2] - 124:13, 158:19

**EXAMINATION** [5] - 89:9, 89:10, 158:18, 174:13, 186:21

**EXAMINE** [1] - 141:22

**EXAMINED** [3] - 137:12, 142:3, 142:4

**EXAMPLE** [2] - 94:18, 106:14

**EXCELLENT** [1] - 103:1

**EXCEPT** [2] - 127:4, 179:24

**EXCEPTIONS** [1] - 98:20

**EXCERPT** [1] - 171:20

**EXCERPTS** [1] - 91:23

**EXCESSIVE** [4] - 114:18, 136:10, 170:17, 170:23

**EXCLUDE** [1] - 188:20

**EXCUSE** [4] - 98:11, 104:6, 142:11, 175:7

**EXERCISE** [1] - 97:12

**EXHIBIT** [43] - 90:5, 91:5, 92:5, 93:5, 94:25, 117:17, 133:3, 133:14, 135:25, 137:13, 137:23, 138:23, 139:17, 140:18, 145:10, 160:2, 160:4, 160:16, 162:23, 164:2, 170:6, 171:8, 171:22, 171:25, 172:23, 174:11, 175:7, 176:5, 176:9, 176:21, 177:15, 178:3, 178:10, 178:20, 179:8, 180:14, 180:19, 181:16, 182:2, 182:16, 185:24, 186:19

**EXHIBIT** [15] - 94:10, 94:18, 133:6, 160:22, 161:1, 162:21, 163:2, 163:8, 170:6, 171:21, 172:8, 173:17, 173:20, 174:1, 186:16

**EXHIBITS** [4] - 90:1, 91:1, 92:1, 93:1

**EXHIBITS** [5] - 94:7, 94:9, 94:18, 173:11, 173:13

**EXISTED** [1] - 101:15

**EXISTING** [3] - 115:2, 140:4, 140:8

**EXPECT** [7] - 103:12, 106:1, 106:18, 117:14, 137:1, 147:2, 148:4

**EXPECTATION** [2] - 122:7, 122:16

**EXPECTATIONS** [3] - 118:1, 120:11, 120:22

**EXPECTED** [6] - 100:2, 102:15, 105:22, 105:24, 111:5, 137:4

**EXPECTING** [1] - 182:12

**EXPECTS** [1] - 141:18

**EXPENSE** [2] - 90:11, 91:13

**EXPENSE** [18] - 100:16, 100:17, 103:14, 106:9, 106:11, 106:19, 109:16, 109:17, 133:11, 133:13, 133:22, 134:6, 134:23, 135:2, 153:15, 173:2, 174:16

**EXPENSES** [24] - 100:5, 101:7, 102:21, 105:25, 106:3, 108:10, 108:13, 108:21, 111:16, 112:11, 118:6, 132:22, 133:1, 133:2, 141:23, 141:24, 143:14, 143:15, 144:6, 149:23, 150:15, 150:17, 151:1, 153:22

**EXPERIENCE** [20] - 104:11, 107:4, 108:15, 116:10, 122:2, 130:1, 134:18, 136:13, 136:25, 139:12, 146:18, 147:20, 149:2, 149:9, 152:25, 153:5, 154:12, 155:22, 159:9, 183:20

**EXPERIENCED** [1] - 109:14

**EXPERT** [11] - 99:9,

111:11, 111:14, 111:17, 111:24, 111:25, 112:2, 112:3, 112:4, 120:14, 121:8

**EXPERT** [2] - 92:6, 92:17

**EXPERTS** [1] - 112:1

**EXPLAIN** [10] - 100:1, 100:20, 102:15, 105:2, 108:25, 120:15, 120:19, 156:8, 156:12, 188:8

**EXPLAINED** [1] - 131:13

**EXPLAINING** [2] - 105:11, 116:2

**EXPOSE** [1] - 121:10

**EXPRESS** [3] - 123:8, 173:6, 186:8

**EXTENSIVE** [1] - 155:24

**EXTENT** [1] - 115:1

**EYE** [2] - 123:17, 128:20

## F

**FACE** [1] - 144:2

**FACILITIES** [2] - 126:21, 128:7

**FACT** [11] - 103:21, 113:2, 113:3, 113:6, 119:25, 129:23, 142:8, 178:11, 178:21, 180:9, 183:11

**FACTOR** [4] - 141:7, 171:25, 172:6, 172:11

**FACTORS** [2] - 114:24, 175:15

**FACTS** [4] - 117:25, 148:21, 161:14, 161:24

**FACTUAL** [2] - 139:22, 143:14

**FAIR** [30] - 101:18, 101:21, 102:21, 103:19, 103:25, 112:20, 114:17, 114:19, 115:7, 122:21, 131:18, 131:20, 131:22, 131:23, 132:1, 136:11, 136:23, 139:3, 141:14, 142:23, 147:1, 147:3, 149:11, 158:11, 170:10, 170:14, 170:16, 170:22, 171:15

**FAIRLY** [1] - 147:21

**FAMILIAR** [6] - 132:10, 159:10, 167:18, 167:19, 174:19, 176:16

**FAMILY** [5] - 128:15, 128:16, 128:25, 129:2, 147:24

**FAR** [11] - 96:21, 102:4, 102:17, 103:7, 112:16, 112:17, 112:19, 141:16, 151:16, 180:13

**FASHION** [1] - 96:25

**FAST** [1] - 115:16

**FATHER** [1] - 127:6

**FAVOR** [1] - 109:1

**FEASIBLE** [1] - 168:21

**FEDERAL** [3] - 87:24, 190:5, 190:19

**FELLOW** [1] - 121:19

**FELT** [4] - 130:21, 143:22, 146:20, 147:6

**FEMALE** [1] - 185:1

**FEW** [9] - 98:4, 98:20, 99:25, 108:24, 133:18, 141:22, 152:25, 156:22, 158:23

**FIGURE** [4] - 129:22, 150:24, 164:5, 182:9

**FILED** [22] - 110:7, 159:25, 160:7, 160:8, 160:11, 160:13, 161:11, 161:17, 161:21, 162:7, 162:13, 162:14, 162:17, 163:16, 163:22, 164:20, 165:7, 166:20, 166:24, 180:20, 181:13, 181:15

**FILES** [1] - 188:20

**FILL** [1] - 132:21

**FILLED** [1] - 129:23

**FINAL** [2] - 147:12, 167:2

**FINALLY** [2] - 120:12, 173:7

**FINANCE** [1] - 159:7

**FINANCIAL** [5] - 151:25, 152:4, 152:12, 158:14, 188:16

**FINANCING** [5] - 133:24, 134:4, 134:24, 140:21, 141:1

**FINDINGS** [1] - 120:25

**FINE** [1] - 105:12

**FINISHED** [1] - 125:16

**FIRM** [2] - 105:1, 125:17

**FIRST** [32] - 97:6, 100:8, 101:12, 103:3, 111:19, 115:24, 118:4, 118:20, 123:6, 123:20, 125:11, 127:3, 145:15, 150:19, 160:7, 161:10, 161:13, 161:14, 162:12, 163:16, 163:17, 163:21, 163:25, 173:13, 175:13, 177:17, 178:10, 178:15, 180:19, 181:12, 181:13, 181:15

**FIRST-TIME** [1] - 103:3

**FIRSTHAND** [1] - 155:22

**FIVE** [15] - 97:9, 125:17, 126:4, 126:15, 128:5, 143:2, 173:4, 173:7, 187:6, 187:11, 187:15, 187:19, 188:4, 188:16, 189:6

**FIVE-MINUTE** [1] - 173:4

**FLAWS** [2] - 121:11, 121:12

**FLOOR** [1] - 88:6

**FOCUS** [1] - 168:22

**FOLKS** [1] - 125:3

**FOLLOW** [1] - 105:24, 111:5, 111:6, 131:16, 138:13, 151:2, 166:18, 168:15, 168:21, 168:24, 169:11

**FOLLOW-UP** [1] - 171:12

**FOLLOWED** [9] - 99:20, 100:2, 100:3, 108:23, 109:11, 116:12, 138:14, 154:16, 166:8

**FOLLOWING** [20] - 94:5, 95:17, 113:21, 123:12, 142:7, 163:1, 163:5, 166:11, 166:13, 166:17, 167:3, 168:9, 168:16, 168:17, 169:5, 169:13, 169:18,

173:9, 174:7, 186:12
**FOR** [4] - 88:3, 88:13, 190:6
**FORCE** [2] - 111:1, 146:15
**FORCED** [5] - 102:2, 108:2, 110:11, 110:14, 112:15
**FORECLOSE** [1] - 110:20
**FOREGOING** [1] - 190:9
**FORGET** [1] - 129:13
**FORM** [6] - 123:8, 132:20, 132:21, 157:14, 173:6, 186:8
**FORMA** [1] - 143:15
**FORMAT** [1] - 190:11
**FORMED** [2] - 120:17, 121:22
**FORMULA** [8] - 100:15, 115:7, 115:11, 115:12, 120:19, 142:23, 142:24, 172:15
**FORTH** [7] - 104:24, 116:3, 117:12, 128:7, 135:15, 135:20, 151:1
**FORWARD** [3] - 115:16, 154:11, 156:23
**FOUGHT** [1] - 110:5
**FOUNDATION** [5] - 131:24, 135:22, 153:3, 169:24, 170:2
**FOUR** [1] - 153:7
**FRANCISCO** [1] - 126:10
**FRAUD** [1] - 109:5
**FREE** [3] - 119:10, 157:10, 157:11
**FRESCHAUF** [2] - 90:19, 120:23
**FRESHCHAUF** [1] - 91:14
**FRIEND** [1] - 106:18
**FRONT** [2] - 188:2, 189:8
**FULL** [2] - 124:7, 185:4
**FUNDING** [1] - 147:21
**FUNNY** [2] - 108:17, 109:4
**FURTHERMORE** [1] - 168:23
**FUTURE** [2] - 117:4, 157:5

# G

**G.E** [6] - 90:6, 106:22, 107:5, 108:4, 110:20, 128:1
**GAME** [2] - 111:9, 112:15
**GARDENS** [16] - 92:14, 108:22, 108:24, 109:1, 109:6, 116:13, 137:10, 137:13, 137:25, 138:4, 141:11, 155:9, 166:9, 178:23, 182:25
**GAS** [1] - 107:25
**GATHER** [1] - 159:20
**GATHERING** [2] - 159:13, 159:16
**GENERAL** [2] - 126:18, 183:8
**GENERAL** [3] - 106:21, 107:2, 147:20
**GENERALLY** [3] - 141:17, 166:14, 183:4
**GENERATE** [1] - 143:19
**GENTLEMAN** [1] - 142:15
**GENTLEMEN** [4] - 112:24, 123:4, 173:4, 186:4
**GENUINE** [1] - 106:16
**GEOGRAPHICAL** [1] - 119:15
**GILCHRIST** [2] - 90:19, 91:14
**GILCHRIST** [1] - 88:8
**GIVEN** [10] - 116:25, 119:12, 121:22, 125:24, 131:1, 131:9, 135:10, 150:14, 161:3, 168:2
**GOAL** [2] - 157:16, 157:17
**GOALS** [3] - 121:5, 121:7, 135:20
**GOD** [1] - 124:4
**GOLDSTEIN** [2] - 89:8, 124:11
**GOLDSTEIN** [162] - 90:6, 90:7, 90:10, 91:15, 95:23, 96:22, 96:24, 97:9, 97:19, 97:23, 98:8, 98:12, 99:8, 99:9, 99:12, 99:19, 99:23, 99:24, 100:2, 100:11, 100:20, 100:23,

101:5, 101:12, 101:18, 101:25, 102:1, 102:13, 102:14, 102:19, 102:23, 103:4, 103:5, 103:9, 103:12, 103:19, 103:20, 103:24, 104:3, 104:17, 104:19, 104:23, 105:6, 105:9, 105:13, 105:15, 105:17, 105:18, 105:21, 106:1, 106:7, 106:14, 106:19, 107:1, 107:6, 107:10, 107:19, 107:22, 108:4, 108:9, 108:15, 108:18, 108:23, 109:2, 109:10, 109:17, 109:18, 110:4, 110:10, 110:16, 110:18, 110:21, 110:24, 111:2, 111:4, 111:21, 112:10, 112:16, 113:5, 113:7, 115:17, 115:20, 115:23, 116:5, 116:9, 116:12, 116:17, 117:8, 117:11, 117:15, 117:23, 117:24, 118:6, 118:11, 119:2, 119:10, 119:17, 119:18, 119:19, 120:3, 120:21, 121:6, 121:16, 121:22, 122:6, 122:22, 123:23, 124:9, 124:15, 124:24, 125:7, 125:11, 126:2, 126:16, 130:4, 130:14, 131:20, 133:9, 133:16, 134:7, 136:2, 136:13, 137:24, 139:5, 140:1, 141:3, 145:20, 151:17, 154:9, 154:12, 155:6, 158:16, 158:21, 161:20, 163:15, 164:4, 164:9, 164:12, 170:8, 171:11, 171:17, 172:2, 172:12, 172:18, 174:11, 175:10, 175:18, 175:24, 176:11, 176:16, 177:7, 177:23, 178:6, 178:14, 178:17, 179:5, 179:12, 181:25, 182:5,

182:14, 185:7, 185:23
**GOLDSTEIN'S** [12] - 100:16, 103:17, 104:15, 107:3, 107:20, 110:13, 111:10, 112:8, 113:19, 118:1, 119:15, 121:3
**GOUGED** [1] - 104:1
**GOVERNMENT** [6] - 96:11, 96:15, 97:24, 111:6, 159:17
**GOVERNMENTS** [1] - 96:8
**GRADUATED** [1] - 158:25
**GRADUATING** [1] - 97:4
**GRANADA** [1] - 169:15
**GRANDFATHER** [1] - 140:16
**GRANDFATHERED** [1] - 109:23
**GRANDFATHERING** [1] - 101:16
**GRANT** [7] - 113:18, 113:25, 114:16, 114:24, 116:15, 153:16, 153:18
**GRANTED** [8] - 118:19, 162:8, 162:11, 163:17, 175:5, 183:10, 187:15, 187:16
**GRANTING** [1] - 188:24
**GREATER** [1] - 182:11
**GREEN** [1] - 98:15
**GREW** [1] - 124:21
**GRIND** [1] - 178:2
**GROSS** [4] - 139:1, 175:8, 175:16, 175:20
**GROSSMAN** [8] - 104:3, 107:23, 108:5, 110:8, 116:23, 117:22, 121:25
**GROUP** [2] - 104:2, 104:4
**GROWING** [2] - 126:25, 127:3
**GUARANTEE** [3] - 114:20, 115:13, 172:15
**GUARANTEED** [2] - 96:13, 117:5
**GUESS** [1] - 111:11
**GUIDELINE** [1] - 140:25

**GUIDELINES** [34] - 100:13, 131:7, 132:5, 133:4, 133:10, 133:15, 134:10, 134:13, 135:13, 135:15, 135:17, 140:14, 140:16, 149:22, 150:23, 155:8, 163:11, 171:5, 171:8, 171:9, 171:20, 171:25, 172:10, 172:20, 175:20, 177:2, 182:14, 182:21, 183:4, 183:12, 183:16, 183:18, 184:1, 184:6
**GUIDELINES** [2] - 132:11, 136:4
**GUIDELINES'** [1] - 140:21
**GUTIERREZ** [1] - 87:3

# H

**HALF** [3] - 102:10, 164:20, 164:23
**HAND** [2] - 123:25, 161:9
**HANDLE** [1] - 125:8
**HANDLED** [3] - 106:5, 142:14, 143:9
**HANDWRITTEN** [1] - 90:12
**HANDY** [1] - 94:12
**HANSEN** [3] - 90:7, 90:8, 121:4
**HAPPY** [1] - 129:4
**HARBOR** [40] - 98:10, 100:8, 102:6, 102:11, 102:14, 113:2, 115:18, 115:19, 115:24, 116:9, 128:10, 128:14, 128:16, 128:18, 129:6, 129:9, 129:12, 129:18, 132:12, 132:19, 134:18, 134:19, 134:23, 135:3, 135:7, 136:22, 137:3, 144:24, 159:22, 159:24, 160:9, 161:11, 161:16, 161:21, 162:13, 163:18, 164:12, 164:15, 166:5, 175:2
**HARD** [4] - 104:22, 104:23, 110:5, 160:5
**HEADER** [1] - 145:19

HEADING [1] - 175:13

HEAR [23] - 95:14, 95:15, 97:8, 98:17, 107:14, 115:4, 116:3, 116:14, 117:15, 118:4, 118:13, 118:24, 118:25, 119:2, 120:13, 120:23, 121:24, 122:4, 122:10, 123:6, 124:16, 149:5, 173:20

HEARD [4] - 96:4, 98:17, 157:9, 158:24

HEARING [1] - 130:23

HEARSAY [3] - 155:3, 156:1, 156:3

HELD [9] - 94:5, 95:17, 114:22, 123:12, 163:1, 163:5, 173:9, 174:7, 186:12

HELD [1] - 190:10

HELP [3] - 100:25, 124:3, 161:6

HEREBY [1] - 190:7

HIGH [9] - 97:9, 106:18, 113:7, 126:23, 126:24, 141:16, 143:19, 154:18, 183:22

HIGHER [5] - 102:12, 104:22, 107:25, 141:17, 152:21

HIGHEST [3] - 104:18, 107:20, 120:5

HIGHLIGHT [2] - 133:19, 138:23

HIGHLIGHTED [4] - 117:19, 136:7, 172:4, 172:7

HIRE [1] - 143:3

HIRED [3] - 104:4, 110:6, 111:10

HISTORICALLY [1] - 151:24

HISTORY [1] - 142:6

HOLD [10] - 149:5, 151:10, 156:2, 157:17, 162:19, 162:24, 170:1, 173:3

HOME [70] - 97:1, 97:3, 97:10, 98:8, 98:14, 98:19, 99:21, 101:4, 104:7, 104:10, 107:15, 107:16, 108:8, 111:20, 113:10, 114:7, 114:13, 114:18, 114:25, 115:10,

116:18, 117:5, 119:6, 119:10, 122:5, 122:7, 124:25, 125:7, 125:9, 125:12, 125:15, 125:18, 125:20, 125:23, 126:2, 126:4, 126:14, 126:15, 126:17, 126:19, 127:8, 128:3, 128:5, 132:10, 132:13, 139:14, 139:14, 143:2, 147:22, 147:24, 152:14, 154:20, 154:21, 154:22, 156:12, 159:20, 164:8, 165:15, 165:16, 166:3, 166:6, 166:15, 166:20, 168:24, 176:22, 179:2, 179:17, 184:17, 184:22, 185:25

HOME [1] - 177:21

HOMEOWNERS [3] - 136:9, 170:17, 170:23

HOMES [6] - 104:20, 126:20, 152:22, 152:24, 152:25, 156:16

HOMEWORK [1] - 141:19

HONOR [24] - 94:15, 94:22, 95:9, 97:18, 114:9, 123:22, 137:20, 139:21, 145:14, 162:22, 163:7, 163:10, 165:9, 169:23, 170:2, 174:3, 174:4, 174:10, 180:14, 180:17, 185:20, 187:22, 189:12, 189:13

HONORABLE [1] - 87:3

HOPE [1] - 88:6

HOUSING [1] - 135:18

HUGE [1] - 110:11

HUNDRED [1] - 153:2

HUNDREDS [3] - 96:7, 102:22, 110:20

---

## I

ID [4] - 90:5, 91:5, 92:5, 93:5

IDEA [3] - 110:12, 167:14, 173:22

IDEAS [1] - 109:25

IDENTIFICATION [3] - 94:24, 137:22, 186:18

IDENTIFIED [1] - 94:19

IGNORE [2] - 111:16, 112:8

IGNORED [3] - 100:16, 101:25, 110:14

IMAGINE [1] - 101:24

IMMEDIATELY [2] - 113:15, 156:19

IMPACT [3] - 111:9, 112:9, 122:13

IMPAIRMENT [1] - 140:22

IMPLEMENTATION [1] - 177:2

IMPLEMENTING [1] - 171:10

IMPORTANCE [1] - 98:2

IMPORTANT [8] - 98:4, 116:20, 125:10, 131:15, 132:6, 139:7, 139:10, 147:11

IMPRESSION [1] - 143:18

IMPROPER [3] - 101:3, 108:7, 111:22

IMPROVE [1] - 103:1

IMPROVES [1] - 97:21

IN [3] - 190:6, 190:10, 190:11

INCLUDE [4] - 120:20, 167:22, 168:4, 168:6

INCLUDED [4] - 133:2, 183:19, 187:19, 188:4

INCLUDES [5] - 117:3, 171:13, 171:14, 175:11, 183:15

INCLUDING [5] - 106:3, 127:5, 128:6, 179:6, 187:11

INCLUSIVE [2] - 87:10, 187:10

INCOME [1] - 90:11

INCOME [19] - 98:23, 115:14, 118:5, 121:10, 124:25, 132:22, 135:18, 143:14, 143:15, 150:15, 152:10, 157:18, 157:22, 158:11, 167:16,

167:20, 181:17, 181:23, 182:11

INCOME-PRODUCING [2] - 157:18, 158:11

INCOMING [1] - 152:23

INCORRECT [1] - 187:21

INCREASE [89] - 99:4, 99:6, 100:4, 102:16, 105:25, 106:15, 110:5, 110:16, 113:6, 113:14, 113:15, 113:18, 113:22, 113:23, 113:25, 114:18, 114:25, 115:24, 115:25, 116:11, 118:20, 119:23, 120:18, 120:25, 131:18, 132:19, 134:1, 135:11, 138:7, 144:22, 146:6, 146:10, 146:19, 147:8, 147:9, 148:5, 148:13, 149:15, 149:18, 149:21, 149:25, 150:4, 150:8, 150:9, 150:19, 151:3, 151:8, 151:16, 151:19, 151:23, 153:15, 153:16, 153:18, 153:24, 155:1, 159:25, 160:8, 161:11, 161:17, 161:22, 161:25, 162:1, 162:5, 162:8, 162:9, 162:13, 162:14, 163:17, 163:18, 166:17, 166:19, 166:23, 167:9, 167:12, 167:13, 169:1, 169:16, 170:16, 172:16, 175:11, 175:14, 177:4, 177:17, 177:18, 178:12, 180:10, 180:20, 180:23

INCREASE [3] - 90:25, 91:7, 92:24

INCREASED [5] - 117:21, 118:24, 143:16, 167:9, 179:10

INCREASES [20] - 105:5, 106:10, 111:21, 114:16, 114:19, 115:4,

116:15, 117:2, 117:4, 118:25, 119:1, 120:16, 132:16, 144:12, 144:18, 170:10, 170:17, 172:15, 177:16, 179:4

INCREASING [1] - 106:12

INCURRED [6] - 120:21, 133:20, 134:3, 134:5, 173:1, 174:14

INCURRING [2] - 113:8, 137:2

INDEED [1] - 96:2

INDEX [3] - 115:9, 172:16, 177:20

INDEX [1] - 89:5

INDICATED [1] - 134:14

INDICATOR [1] - 129:24

INDIVIDUAL [2] - 119:5, 165:16

INDOOR [1] - 97:11

INDUSTRY [4] - 97:2, 104:8, 104:11, 120:17

INESCAPABLE [1] - 122:11

INFLATED [1] - 121:12

INFLATION [2] - 115:9, 115:15

INFLICTED [2] - 120:11, 122:14

INFLUENCE [2] - 154:14, 184:14

INFORM [1] - 146:1

INFORMATION [9] - 121:2, 145:2, 159:13, 159:16, 159:20, 176:22, 177:10, 182:10, 185:13

INQUIRE [1] - 124:10

INSISTED [1] - 110:10

INSTANCES [1] - 116:14

INSTEAD [1] - 101:14

INSTRUCT [1] - 101:10

INSTRUCTED [2] - 131:16, 152:5

INSTRUCTING [1] - 131:10

INSTRUCTION [1] - 149:4

INSTRUCTIVE [1] -

179:2
**INTENDED** [2] - 171:9, 180:11
**INTENDING** [1] - 156:18
**INTENTIONAL** [3] - 187:22, 189:1, 189:2
**INTENTIONALLY** [1] - 187:19
**INTEREST** [29] - 100:23, 100:24, 106:8, 106:10, 106:18, 108:9, 109:3, 109:14, 110:19, 111:17, 111:23, 111:25, 112:2, 112:3, 113:7, 133:2, 133:11, 133:12, 134:23, 135:1, 135:2, 135:6, 135:8, 135:10, 135:11, 140:23, 148:11, 162:9, 165:24
**INTERESTED** [2] - 99:23, 152:1
**INTERPRETED** [1] - 137:6
**INTERRUPT** [1] - 125:2
**INTRODUCE** [2] - 96:24, 120:12
**INTRODUCTORY** [1] - 171:7, 171:9
**INVALID** [1] - 140:22
**INVESTED** [1] - 99:24
**INVESTIGATE** [1] - 142:5
**INVESTIGATION** [2] - 155:25, 158:3
**INVESTIGATOR** [1] - 140:10
**INVESTING** [1] - 98:13
**INVESTMENT** [16] - 98:12, 100:1, 101:16, 107:9, 109:22, 110:23, 111:10, 117:14, 125:17, 132:3, 136:11, 142:13, 142:14, 142:16, 149:1, 170:14
**INVESTMENTS** [2] - 125:19, 126:17
**INVESTOR** [8] - 103:2, 103:3, 104:11, 115:21, 130:8, 154:13, 158:13
**INVESTORS** [4] - 99:16, 104:7, 106:24, 125:20

**INVITATION** [1] - 130:17
**INVOLVE** [3] - 98:1, 98:3, 140:10
**INVOLVED** [7] - 108:21, 125:10, 133:23, 138:11, 139:12, 140:3, 144:24
**INVOLVING** [2] - 137:11, 185:25
**IRRELEVANT** [1] - 165:9
**IRVINE** [1] - 88:17
**IS** [2] - 190:9, 190:11
**ISSUE** [4] - 127:8, 137:11, 139:12, 188:17
**ISSUES** [3] - 98:2, 98:3, 111:11
**ITSELF** [3] - 113:11, 113:12, 167:1

## J

**JACUZZI** [1] - 97:11
**JAMES** [1] - 124:11
**JAMES** [6] - 89:8, 95:23, 117:23, 122:4, 123:23, 124:9
**JANUARY** [3] - 109:7, 109:10, 183:1
**JEFFREY** [1] - 88:15
**JIM** [39] - 97:7, 97:9, 97:10, 97:15, 97:16, 97:19, 99:23, 99:24, 100:2, 100:11, 102:23, 103:4, 103:5, 103:12, 103:19, 103:20, 103:24, 104:3, 104:15, 104:17, 104:23, 105:6, 107:19, 107:22, 109:2, 109:10, 109:21, 110:4, 110:10, 110:13, 110:18, 110:21, 110:24, 111:4, 111:10, 112:8, 112:10, 112:16
**JOB** [3] - 125:19, 127:3, 143:20
**JOBS** [1] - 127:5
**JOHN** [2] - 111:18, 121:8
**JUDGE** [1] - 87:3
**JUDGE** [2] - 101:9, 108:25
**JUDGMENT** [1] - 157:24
**JUDICIAL** [1] -

190:12
**JUDICIAL** [1] - 141:5
**JUNE** [1] - 88:15
**JUNE** [1] - 169:6
**JURIES** [1] - 96:2
**JUROR** [1] - 123:16
**JURORS** [5] - 95:8, 95:16, 173:16, 174:5, 188:2
**JURY** [11] - 94:6, 95:18, 96:4, 117:16, 123:13, 163:6, 173:10, 174:8, 186:13, 189:8
**JUSTIFICATION** [1] - 131:1

## K

**KARMAN** [1] - 88:16
**KEEP** [5] - 105:22, 110:4, 123:17, 156:19, 169:25
**KEN** [1] - 120:23
**KENNETH** [2] - 91:16, 120:14
**KEPT** [2] - 102:17, 106:4
**KEY** [1] - 131:12
**KIND** [6] - 128:3, 141:19, 145:1, 151:8, 151:23, 177:13
**KINGS** [1] - 96:7
**KNOCKED** [2] - 147:15, 150:25
**KNOWING** [4] - 102:18, 130:12, 143:22, 147:8
**KNOWLEDGE** [3] - 122:6, 147:5, 149:10
**KNOWLEDGEABLE** [1] - 131:4
**KNOWN** [3] - 126:14, 154:8, 154:10
**KNOWS** [4] - 96:25, 97:1, 99:8, 107:24

## L

**L.A** [1] - 124:20
**LACKS** [1] - 169:23
**LADIES** [4] - 112:23, 123:4, 173:3, 186:4
**LAND** [1] - 92:8
**LAND** [1] - 121:4, 126:22, 156:15
**LANGUAGE** [9] - 146:25, 147:4, 170:5, 170:11, 170:18, 171:11, 171:14,

172:20, 177:13
**LARGE** [6] - 105:1, 106:23, 120:20, 150:4, 153:24, 162:9
**LARGER** [2] - 166:16, 168:23
**LAST** [9] - 95:10, 114:5, 117:18, 176:25, 177:4, 177:16, 179:8, 179:25
**LAW** [6] - 101:10, 114:14, 114:15, 129:12, 140:24, 183:6
**LAW** [1] - 178:13
**LAWS** [3] - 129:7, 132:6, 132:14
**LAWSUIT** [11] - 108:21, 138:11, 162:14, 162:17, 163:11, 163:12, 163:17, 164:11, 164:17, 164:18, 186:24
**LAWSUITS** [9] - 108:24, 139:10, 163:21, 164:21, 165:6, 186:21, 187:24, 188:22, 188:25
**LAWYER** [6] - 105:10, 117:8, 117:23, 178:1, 180:3, 180:7
**LAWYERS** [1] - 110:6
**LEADING** [2] - 118:1, 138:9
**LEARN** [3] - 116:12, 116:19, 119:6
**LEARNED** [1] - 97:3
**LEARNING** [2] - 97:22, 130:10
**LEAST** [3] - 113:6, 168:4, 187:9
**LEAVE** [3] - 147:9, 150:12, 184:9
**LEGAL** [1] - 145:23
**LEGALLY** [1] - 115:6
**LEGITIMATE** [3] - 104:13, 106:16, 109:15
**LENDER** [3] - 110:19, 127:24, 127:25
**LENGTH** [4] - 103:21, 103:22, 105:20, 107:5
**LENGTHS** [1] - 179:3
**LESS** [5] - 118:5, 131:4, 135:10, 148:9,

151:16
**LESSER** [1] - 151:1
**LETTER** [8] - 90:6, 90:7, 90:10, 90:19, 90:22, 91:14, 91:15, 92:7
**LETTER** [32] - 105:10, 105:14, 105:17, 117:12, 117:15, 117:16, 117:19, 117:22, 117:23, 121:23, 145:1, 145:2, 145:7, 145:10, 145:16, 145:17, 145:20, 145:21, 145:22, 145:25, 146:3, 146:5, 146:8, 155:5, 171:17, 172:24, 177:25, 178:5, 178:8, 179:9, 179:14, 180:8
**LETTING** [1] - 102:20
**LEVEL** [3] - 141:22, 150:14, 152:15
**LEVELS** [3] - 103:8, 107:13, 108:11
**LIABILITY** [2] - 87:5, 165:19
**LIBERTY** [1] - 98:5
**LIFE** [6] - 115:1, 133:22, 134:3, 149:23, 188:5
**LIGHT** [4] - 115:1, 133:22, 134:3, 149:23, 188:5
**LIKELIHOOD** [1] - 183:22
**LIMINE** [4] - 187:14, 188:18, 188:19
**LIMINE** [4] - 187:25, 188:6, 188:12, 188:14
**LIMITED** [2] - 87:5, 165:19
**LIMITING** [1] - 91:21
**LINE** [1] - 181:20
**LIST** [5] - 94:10, 94:12, 117:13, 132:22, 133:2
**LISTED** [1] - 141:11
**LISTENED** [1] - 177:24
**LISTING** [1] - 177:6
**LITIGATION** [4] - 107:18, 137:11, 138:9, 138:15
**LIVE** [6] - 102:23, 110:2, 110:20, 124:18, 126:23, 154:19
**LIVED** [3] - 124:20, 127:4, 127:6

**LIVES** [1] - 99:1
**LIVING** [3] - 124:24, 128:23, 151:18
**LLC** [3] - 87:5, 165:19
**LLP** [2] - 88:4, 88:14
**LOAN** [2] - 90:9, 90:16
**LOAN** [8] - 100:21, 100:23, 106:17, 106:21, 107:4, 107:5, 109:15, 121:7
**LOANS** [2] - 97:7, 106:23
**LOCATED** [5] - 126:7, 126:20, 127:11, 127:12, 130:11
**LOCATION** [2] - 117:1, 129:25
**LOCATIONS** [1] - 126:22
**LONG-TIME** [1] - 117:8
**LOOK** [16] - 105:12, 133:3, 135:24, 143:21, 158:12, 160:6, 160:12, 160:16, 160:20, 170:4, 171:7, 176:4, 176:15, 176:16, 176:18, 177:25
**LOOKED** [6] - 107:2, 107:3, 142:6, 167:6, 181:15
**LOOKING** [6] - 144:1, 157:21, 163:19, 163:25, 167:4, 188:22
**LOOKS** [2] - 126:11, 185:17
**LOOPHOLE** [1] - 105:12
**LOS** [2] - 88:7, 97:5
**LOS** [3] - 87:17, 87:25, 94:1
**LOSE** [6] - 102:2, 102:19, 110:14, 110:23, 111:1, 112:11
**LOSS** [4] - 101:19, 120:2, 120:10, 131:23
**LOSSES** [2] - 110:11, 146:16
**LOST** [2] - 188:3, 189:5
**LOW** [5] - 102:1, 135:18, 144:7, 152:10, 153:2
**LOWER** [4] - 102:9, 104:24, 105:7, 105:16

**LOWEST** [1] - 105:9
**LUCKILY** [1] - 102:22

## M

**MACHINES** [1] - 106:22
**MAIL** [1] - 95:15
**MAILS** [1] - 95:13
**MAIN** [2] - 118:15, 127:12
**MAINTAIN** [2] - 103:1, 108:10
**MAINTAINED** [1] - 115:14
**MAINTAINING** [1] - 103:15
**MAINTAINS** [1] - 97:20
**MAINTENANCE** [6] - 139:2, 167:16, 167:19, 175:8, 175:16, 175:21
**MAJOR** [1] - 112:9
**MALAWY** [1] - 88:15
**MALE** [1] - 185:1
**MAN'S** [1] - 98:5
**MANAGEMENT** [1] - 152:5
**MANAGER** [2] - 122:5, 142:3
**MANAGES** [1] - 99:1
**MANAGING** [1] - 125:7
**MANDATE** [1] - 172:15
**MANIPULATED** [1] - 118:17
**MAP** [4] - 98:11, 98:15, 100:8, 102:6
**MARK** [1] - 121:4
**MARKED** [3] - 94:24, 137:22, 186:18
**MARKET** [32] - 99:22, 102:5, 102:7, 102:8, 102:10, 102:15, 102:17, 103:8, 103:16, 103:19, 103:21, 103:22, 103:23, 103:25, 104:5, 105:20, 106:4, 107:12, 108:11, 108:14, 112:10, 112:16, 116:22, 129:25, 130:2, 143:4, 147:10, 150:10, 150:13, 152:15, 153:10, 154:5

**MARKETING** [1] - 143:11
**MARKINGS** [1] - 94:19
**MASSIVE** [1] - 113:8
**MASTER'S** [2] - 159:3, 159:6
**MATERIAL** [1] - 143:16
**MATERIALS** [1] - 143:11
**MATH** [1] - 108:12
**MATT** [7] - 121:24, 142:15, 142:21, 142:22, 143:9, 145:23, 145:24
**MATTER** [1] - 190:11
**MATTER** [6] - 95:24, 99:3, 130:10, 131:16, 150:23, 152:11
**MATTHEW** [1] - 88:5
**MATTHEW** [3] - 94:8, 95:22, 117:9
**MAXIMIZE** [1] - 121:7
**MAYOR** [2] - 155:17, 155:23
**MEAN** [4] - 100:20, 131:20, 131:22, 174:25
**MEANS** [11] - 98:18, 103:22, 131:23, 132:1, 156:14, 159:13, 159:16, 165:19, 174:20, 174:22, 175:2
**MEANT** [1] - 145:25
**MEASURE** [1] - 115:9
**MEET** [3] - 97:8, 121:4, 121:8
**MEETING** [3] - 184:2, 184:4, 184:10
**MEETING** [1] - 92:25
**MEMBERS** [6] - 131:10, 154:17, 154:19, 154:25, 155:16, 184:18
**MEMORANDUM** [5] - 92:9, 116:24, 117:10, 121:22, 175:25
**MEMORY** [2] - 161:23, 186:22
**MENTIONED** [6] - 114:12, 118:19, 126:8, 147:18, 158:23, 184:13
**METHOD** [3] - 146:19, 169:7, 175:10
**METHODOLOGIES**

[1] - 150:1
**METHODOLOGY** [6] - 139:2, 150:1, 150:3, 150:7, 150:22, 151:3
**METHODS** [2] - 120:16, 169:20
**MICHAEL** [1] - 88:15
**MIDDLE** [3] - 104:15, 111:9, 112:15
**MIGHT** [2] - 108:12, 145:22
**MILLION** [40] - 102:2, 104:6, 104:10, 104:12, 104:18, 105:2, 105:7, 105:18, 105:19, 106:25, 107:1, 107:4, 107:9, 110:15, 110:23, 110:25, 111:1, 111:17, 111:23, 112:4, 112:5, 114:3, 114:6, 118:7, 118:8, 127:20, 127:22, 131:22, 141:12, 141:14, 141:11, 144:16, 146:16, 147:12, 147:13, 147:19, 154:8, 164:4, 164:7
**MILLION-DOLLAR** [1] - 146:16
**MILLIONS** [4] - 101:22, 102:19, 112:11, 112:18
**MILWAUKEE** [5] - 124:21, 124:23, 126:25, 127:3, 127:4
**MIND** [4] - 144:23, 146:23, 148:14, 151:4
**MINE** [1] - 142:9
**MINIMIZE** [1] - 179:3
**MINUTE** [2] - 171:18, 173:4
**MINUTES** [4] - 116:2, 123:5, 123:10, 173:8
**MINUTES** [1] - 92:25
**MIRANDA** [4] - 87:23, 190:5, 190:18, 190:19
**MIRANDAALGORRI@GMAIL.COM** [1] - 87:25
**MISLEADING** [5] - 139:23, 187:16, 188:1, 188:3, 188:5
**MNOI** [1] - 115:12
**MOBILE** [4] - 90:25, 91:6, 127:9, 177:21
**MOBILE** [70] - 97:1, 97:3, 97:9, 98:8,

98:14, 98:19, 99:21, 101:3, 104:7, 104:10, 104:20, 107:15, 107:16, 108:8, 113:10, 114:7, 114:13, 114:18, 114:25, 115:10, 116:18, 117:5, 119:6, 119:10, 122:5, 122:7, 124:25, 125:7, 125:9, 125:12, 125:15, 125:18, 125:19, 125:23, 126:2, 126:4, 126:14, 126:15, 126:16, 126:19, 127:8, 128:3, 128:5, 132:10, 132:13, 136:9, 139:14, 143:2, 147:22, 147:23, 152:14, 154:19, 154:21, 154:22, 156:12, 159:20, 164:8, 165:15, 165:16, 166:3, 166:6, 166:15, 166:20, 168:24, 176:22, 179:2, 179:17, 184:17, 184:22, 185:25
**MOBILEHOME** [1] - 87:9
**MOBILEHOME** [4] - 160:9, 169:9, 169:15, 177:3
**MODE** [1] - 95:14
**MONEY** [19] - 97:3, 99:24, 100:21, 100:25, 101:3, 102:24, 105:3, 106:17, 107:1, 107:7, 107:10, 108:7, 108:13, 110:19, 119:21, 127:21, 127:22, 147:19, 158:6
**MONICA** [1] - 88:11
**MONTH** [10] - 100:22, 100:25, 113:14, 113:16, 113:23, 116:1, 161:22, 162:5, 180:24, 182:20
**MONTHLY** [1] - 113:10
**MONTHS** [3] - 99:25, 109:20, 113:12
**MORNING** [2] - 98:16, 186:6
**MORTGAGE** [54] - 100:17, 100:22, 100:24, 101:7,

101:25, 102:20, 102:25, 103:14, 106:4, 106:9, 106:11, 106:16, 107:5, 108:4, 108:10, 108:16, 108:21, 109:3, 110:13, 110:18, 111:16, 111:22, 112:8, 114:3, 114:4, 114:25, 115:11, 115:13, 115:25, 116:7, 116:15, 118:8, 118:14, 122:18, 133:10, 134:11, 134:15, 134:22, 135:2, 135:6, 135:8, 136:22, 137:1, 137:7, 138:6, 148:5, 149:23, 153:15, 153:19, 182:4, 182:6, 182:11
**MORTGAGES** [1] - 115:11
**MOST** [1] - 131:15
**MOSTLY** [1] - 167:1
**MOTION** [11] - 156:4, 162:11, 169:4, 175:5, 183:10, 185:6, 187:25, 188:6, 188:14, 188:19, 188:24
**MOTION** [2] - 187:13, 187:14
**MOTIONS** [1] - 188:12
**MOTIONS** [1] - 188:18
**MOVE** [18] - 94:9, 135:22, 137:19, 137:20, 139:19, 148:21, 153:3, 153:6, 156:6, 158:7, 162:10, 163:9, 169:3, 175:4, 179:18, 179:23, 183:9, 185:5
**MOVED** [1] - 124:23
**MOVES** [4] - 99:4, 99:5, 152:13, 152:18
**MOVIE** [1] - 108:2
**MOVING** [1] - 171:16
**MR** [45] - 94:8, 94:15, 94:22, 95:9, 95:21, 97:18, 122:23, 114:9, 114:11, 123:22, 124:14, 125:6, 127:14, 132:4, 133:7, 133:9, 135:24, 137:20, 137:24, 138:22, 139:17, 140:1, 145:9, 148:2, 148:24, 151:13,

152:9, 153:5, 153:12, 155:6, 156:2, 156:6, 156:12, 158:6, 158:16, 161:2, 161:5, 163:10, 165:9, 169:23, 170:2, 174:4, 180:5, 185:20, 189:13
**MS** [62] - 131:24, 135:22, 137:18, 139:21, 148:21, 149:3, 149:6, 151:7, 151:11, 151:20, 153:3, 155:3, 155:18, 155:20, 156:1, 156:3, 156:10, 157:25, 158:20, 160:2, 160:4, 161:10, 162:10, 162:12, 162:22, 163:4, 163:7, 163:15, 165:12, 169:3, 169:5, 170:4, 170:8, 171:20, 171:22, 171:24, 174:3, 174:10, 175:4, 175:6, 176:8, 178:5, 179:18, 179:23, 180:2, 180:7, 180:17, 180:19, 183:9, 183:11, 185:5, 185:7, 185:23, 186:23, 187:3, 187:7, 187:12, 187:22, 188:14, 189:2, 189:9, 189:12
**MUNICIPAL** [1] - 87:8
**MUNICIPAL** [1] - 92:11
**MUNICIPALITIES** [1] - 152:16
**MUST** [5] - 96:17, 99:6, 112:19, 115:5, 175:21
**MYERS** [1] - 88:4

# N

**NAME** [10] - 95:22, 97:16, 97:17, 112:24, 124:8, 128:9, 142:15, 168:2, 168:15, 176:12
**NAMED** [2] - 121:19, 165:18
**NAMES** [1] - 168:3
**NATIONAL** [2] - 98:2, 105:1
**NEARLY** [1] - 114:6
**NECESSARILY** [3] - 128:20, 156:18, 174:25
**NECESSARY** [3] - 121:2, 134:2, 147:7

**NEED** [7] - 95:13, 106:16, 135:19, 145:2, 148:14, 162:21, 179:20
**NEEDED** [7] - 100:23, 101:18, 109:2, 110:5, 110:19, 147:9, 153:15
**NEGATIVE** [3] - 128:25, 144:25, 146:8
**NEGLIGENT** [1] - 187:23
**NEGOTIATE** [2] - 142:10, 144:2
**NEGOTIATED** [4] - 104:22, 104:23, 105:7
**NEGOTIATING** [2] - 125:21, 179:15
**NEGOTIATIONS** [6] - 104:17, 105:14, 142:15, 142:17, 142:20, 143:8
**NET** [6] - 115:14, 118:5, 167:16, 167:19, 181:17, 181:23
**NEVER** [7] - 101:9, 110:24, 119:23, 124:23, 127:4, 131:1, 156:23
**NEVERTHELESS** [1] - 143:7
**NEW** [13] - 99:3, 100:14, 100:17, 101:14, 110:12, 117:6, 129:12, 129:23, 148:15, 152:20, 152:23, 167:8, 169:15
**NEWCOMB** [8] - 127:14, 133:19, 135:25, 138:22, 145:13, 145:18, 148:3, 153:13
**NEWSPAPER** [2] - 155:24, 185:14
**NEXT** [11] - 109:20, 110:15, 112:12, 113:8, 120:5, 123:24, 137:14, 157:5, 172:14, 176:15, 181:20
**NICE** [1] - 186:10
**NIGHT** [2] - 186:9, 186:10
**NO** [2] - 87:6, 190:19
**NOELLE** [1] - 121:17
**NON** [1] - 129:20
**NON-RENT** [1] - 129:20

**NONRESPONSIVE** [6] - 162:10, 169:3, 175:4, 179:23, 183:9, 185:5
**NORTH** [1] - 87:24
**NORTH** [1] - 126:10
**NORTHERN** [2] - 97:5, 157:19
**NOTE** [1] - 90:17
**NOTES** [1] - 90:12
**NOTHING** [5] - 111:19, 120:2, 122:15, 124:3, 134:16
**NOTICE** [1] - 116:5
**NOTWITHSTANDING** [1] - 140:24
**NUMBER** [23] - 94:12, 102:7, 111:24, 116:25, 117:17, 125:24, 126:19, 126:21, 128:12, 133:6, 139:13, 150:22, 151:1, 160:3, 164:24, 165:5, 166:18, 173:21, 173:22, 174:1, 180:25, 181:21, 187:8
**NUMBERS** [1] - 112:5
**NUMEROUS** [1] - 116:11

# O

**O'CLOCK** [4] - 186:5, 186:6, 186:9, 189:11
**O'MELVENY** [1] - 88:4
**OBJECT** [1] - 163:10
**OBJECTION** [27] - 114:9, 131:24, 137:17, 137:18, 139:20, 149:3, 149:6, 151:7, 151:11, 151:20, 155:3, 155:18, 155:20, 156:1, 156:3, 156:10, 157:25, 161:2, 165:9, 169:23, 170:2, 180:5, 185:20, 186:16, 186:17
**OBJECTIONABLE** [1] - 139:21
**OBJECTIVE** [1] - 158:14
**OBJECTIVES** [1] - 121:5
**OBLIGATION** [1] - 141:2

**OBSERVED** [2] - 154:13, 154:17
**OBSERVER** [1] - 148:17
**OBTAIN** [2] - 156:22, 157:4
**OBTAINED** [3] - 166:23, 177:5, 185:13
**OBTAINING** [1] - 144:22
**OBVIOUSLY** [1] - 156:23
**OCCUPANT** [1] - 152:20
**OCCURRED** [2] - 118:10, 138:16
**OCEAN** [1] - 88:10
**OCTOBER** [3] - 115:23, 118:10, 182:21
**OF** [11] - 87:2, 87:8, 87:9, 87:15, 88:1, 190:1, 190:7, 190:9, 190:12, 190:15
**OFFER** [7] - 104:8, 104:15, 104:19, 107:20, 113:8, 147:13, 151:4
**OFFER** [5] - 90:13, 90:15, 90:22, 90:23, 90:24
**OFFERED** [8] - 104:5, 104:9, 104:12, 109:8, 141:17, 143:7
**OFFERING** [5] - 92:9, 116:24, 117:10, 121:22, 175:25
**OFFERING** [4] - 105:1, 107:21, 143:21, 177:9
**OFFERS** [3] - 104:8, 104:13, 104:16
**OFFICE** [1] - 185:10
**OFFICE** [1] - 110:4
**OFFICIAL** [4] - 87:24, 190:1, 190:5, 190:19
**OFTEN** [1] - 177:21
**OLD** [4] - 109:23, 140:16, 150:6, 163:11
**OLDER** [1] - 128:24
**ONE** [63] - 95:10, 96:5, 98:4, 98:5, 98:6, 99:10, 99:11, 104:8, 108:18, 112:3, 116:13, 116:19, 118:16, 119:6, 119:23, 121:6, 121:19, 122:13, 126:8, 126:9, 126:19,

130:22, 144:10, 150:1, 150:22, 157:16, 157:17, 157:19, 157:20, 158:12, 158:13, 160:12, 161:14, 164:25, 165:1, 165:6, 168:4, 168:6, 168:21, 168:24, 169:20, 169:21, 171:25, 172:6, 172:10, 173:18, 173:24, 176:18, 181:11, 184:13, 185:23, 186:24, 187:2, 187:6, 187:11, 187:15, 187:19, 188:3, 188:4, 189:5

**ONES** [2] - 94:13, 144:7

**ONSTOT** [2] - 112:24, 156:7

**ONSTOT** [3] - 88:16, 112:23, 114:11

**OPEN** [7] - 94:6, 95:18, 123:13, 163:6, 173:10, 174:8, 186:13

**OPENING** [7] - 95:20, 112:22, 127:15, 156:7, 157:10, 158:24, 188:10

**OPERATE** [6] - 99:14, 101:15, 110:11, 110:14, 130:13, 146:15

**OPERATED** [1] - 95:11

**OPERATING** [16] - 118:5, 125:7, 125:15, 133:21, 134:6, 141:22, 141:24, 144:6, 155:12, 167:16, 167:20, 173:2, 174:15, 181:17, 181:23

**OPERATING** [3] - 91:13, 92:18, 92:20

**OPERATIONS** [2] - 125:9, 177:19

**OPERATOR** [1] - 104:20

**OPINE** [1] - 117:10

**OPINION** [5] - 117:20, 121:14, 126:23, 136:12, 179:9

**OPINIONS** [4] - 123:9, 173:6, 179:21, 186:8

**OPPORTUNITY** [5] -

123:15, 125:25, 159:19, 178:12, 184:5

**OPPOSED** [1] - 173:21

**OPTIMISM** [2] - 143:23, 144:8

**OPTION** [3] - 161:16, 161:17, 162:7

**OPTIONS** [2] - 101:12, 156:19

**ORDER** [9] - 118:7, 144:20, 146:3, 146:9, 153:7, 179:6, 187:24, 189:1, 189:8

**ORDERS** [1] - 187:20

**ORDINANCE** [30] - 114:23, 120:18, 131:11, 133:21, 133:23, 134:3, 135:17, 136:8, 136:14, 140:4, 143:17, 145:5, 146:19, 146:24, 149:10, 149:12, 170:5, 171:1, 171:10, 171:13, 171:14, 172:1, 172:6, 172:11, 172:14, 173:1, 174:15, 175:16, 177:2, 183:18

**ORDINANCE** [13] - 114:13, 114:20, 115:20, 130:11, 131:3, 131:7, 132:11, 136:4, 159:21, 170:9, 170:20, 176:22, 177:11

**ORIGINAL** [1] - 134:24

**OUTLINED** [1] - 143:14

**OUTLINES** [1] - 116:25

**OUTLINING** [1] - 145:1

**OUTSET** [1] - 144:3

**OVERALL** [2] - 135:17, 142:3

**OVERLOOKED** [1] - 100:18

**OVERPAY** [2] - 104:1, 153:6

**OVERPAYING** [1] - 107:20

**OVERRULED** [15] - 114:10, 131:25, 135:23, 148:23, 149:7, 151:12, 151:21, 153:4, 155:4,

155:19, 155:21, 158:1, 163:13, 165:10, 186:17

**OVERVIEW** [1] - 119:12

**OWE** [1] - 96:22

**OWED** [1] - 100:24

**OWN** [21] - 107:1, 116:9, 120:10, 125:1, 126:3, 126:4, 126:14, 127:8, 127:22, 128:8, 128:22, 130:9, 139:12, 145:2, 147:19, 148:14, 161:18, 165:16, 166:21, 167:22, 179:21

**OWNED** [20] - 99:20, 102:14, 104:1, 113:11, 114:8, 122:1, 122:5, 127:16, 127:17, 132:12, 134:20, 141:21, 141:25, 151:24, 152:3, 156:25, 157:19, 157:20, 159:21

**OWNER** [28] - 99:6, 106:2, 108:19, 109:1, 113:20, 114:19, 116:22, 117:6, 125:23, 125:25, 136:15, 136:21, 138:5, 138:9, 140:14, 140:16, 147:1, 148:16, 149:11, 157:6, 165:15, 165:24, 167:8, 168:24, 169:15, 170:14, 170:22, 171:15

**OWNER'S** [7] - 108:20, 109:3, 114:25, 140:10, 148:19, 169:1, 181:17

**OWNERS** [7] - 99:16, 108:16, 114:18, 115:5, 116:16, 136:10, 168:24

**OWNERSHIP** [1] - 158:9

**OWNING** [1] - 128:25

**OWNS** [4] - 97:9, 97:10, 98:8, 166:2

---

# P

**P.M** [2] - 87:17, 94:2
**P.M** [2] - 123:19, 189:14

**PAGE** [41] - 94:21, 100:19, 117:11, 117:18, 133:14, 135:25, 138:23, 140:18, 145:10, 145:15, 145:19, 160:12, 161:8, 161:9, 163:16, 164:1, 164:2, 171:16, 171:24, 172:23, 173:21, 173:22, 174:1, 174:11, 175:7, 176:8, 176:15, 176:16, 176:21, 177:15, 177:17, 178:10, 178:15, 178:20, 179:8, 181:4, 181:11, 181:15, 181:16, 182:2, 182:9

**PAGE** [1] - 89:7

**PAGE** [1] - 190:11

**PAGES** [1] - 87:9

**PAID** [6] - 103:19, 107:23, 110:20, 113:7, 133:22, 153:9

**PALACIO** [4] - 92:13, 139:15, 140:25, 141:2

**PALACIO'S** [1] - 140:22

**PALISADES** [1] - 88:9

**PALM** [12] - 116:19, 126:9, 139:13, 140:2, 140:7, 140:14, 147:6, 157:17, 157:20, 183:20, 185:25

**PAPERWORK** [1] - 110:7

**PARADISE** [3] - 167:8, 168:12, 168:15

**PARAGRAPH** [17] - 164:2, 171:7, 171:9, 171:16, 171:24, 172:5, 172:24, 174:13, 175:8, 176:18, 176:25, 177:16, 177:17, 178:11, 178:21, 178:25, 179:1

**PARK** [1] - 87:9

**PARK** [26] - 101:13, 102:22, 103:11, 103:18, 109:1, 119:8, 126:9, 128:19, 132:15, 141:9, 141:20, 143:4, 146:11, 148:8, 155:9, 157:8, 158:8, 160:9, 167:8, 168:15, 169:9, 169:15, 177:3, 177:22

**PARK** [139] - 96:16, 97:1, 97:3, 97:6, 97:10, 97:14, 98:9, 98:10, 98:14, 99:4, 99:21, 100:8, 101:1, 101:4, 101:7, 101:19, 102:1, 102:23, 102:24, 102:25, 103:1, 103:6, 103:19, 104:1, 104:5, 104:7, 104:8, 104:10, 104:12, 105:19, 105:25, 106:5, 107:17, 107:23, 107:24, 108:3, 108:5, 108:8, 108:10, 108:22, 109:14, 109:15, 110:21, 110:25, 112:9, 113:2, 113:3, 113:13, 114:19, 114:25, 115:5, 115:14, 116:16, 117:4, 118:2, 118:6, 118:7, 119:1, 119:3, 119:5, 119:17, 119:18, 119:19, 120:4, 125:12, 125:18, 125:23, 126:17, 127:8, 128:3, 128:4, 128:5, 128:8, 128:14, 128:15, 128:16, 128:25, 129:2, 130:5, 130:11, 130:13, 132:10, 132:14, 133:21, 134:2, 134:19, 134:25, 136:10, 137:10, 139:14, 141:15, 141:21, 141:24, 142:2, 142:4, 142:5, 142:8, 142:12, 142:13, 143:12, 146:16, 146:20, 147:9, 147:22, 148:4, 148:19, 151:18, 152:13, 153:8, 154:22, 156:8, 156:13, 157:2, 157:23, 159:21, 162:2, 164:8, 166:3, 168:16, 168:24, 170:14, 170:22, 173:2, 174:15, 175:24, 176:12, 176:13, 178:3, 179:2, 179:17, 182:12, 182:17, 184:17, 184:22, 185:25, 188:16

**PARK'S** [1] - 168:12

**PARK'S** [1] - 111:16
**PARKS** [49] - 97:10, 97:19, 98:8, 98:19, 107:15, 107:16, 110:2, 110:3, 115:10, 116:19, 122:5, 122:8, 124:25, 125:7, 125:9, 125:15, 125:20, 126:2, 126:4, 126:6, 126:14, 126:15, 126:19, 128:11, 128:22, 130:9, 136:9, 143:2, 147:24, 153:6, 154:20, 154:21, 157:17, 157:18, 157:21, 157:22, 165:15, 165:16, 166:6, 166:16, 166:20, 168:17, 168:18, 168:20, 168:22, 168:23, 168:25, 177:19
**PART** [14] - 96:16, 97:25, 100:25, 105:14, 109:3, 114:14, 120:17, 132:6, 133:15, 141:25, 155:16, 171:8, 173:17, 178:3
**PARTIAL** [1] - 163:25
**PARTICIPATE** [1] - 125:22
**PARTICULAR** [5] - 98:22, 98:23, 162:18, 179:1
**PARTICULARLY** [1] - 134:17
**PARTIES** [2] - 94:11, 188:21
**PARTNERS** [1] - 97:7
**PARTNERSHIP** [1] - 125:25
**PARTS** [1] - 114:14
**PARTY** [3] - 128:12, 140:9, 183:7
**PASS** [5] - 114:4, 116:6, 118:14, 120:20, 122:17
**PASSED** [1] - 116:15
**PASSIONATE** [1] - 96:24
**PASSIVE** [1] - 158:13
**PAST** [2] - 100:4, 117:2
**PAY** [36] - 96:17, 98:24, 100:5, 100:23, 101:7, 101:18,

102:20, 102:25, 103:7, 103:9, 103:14, 103:25, 105:2, 105:6, 105:16, 105:25, 106:3, 106:18, 107:12, 107:21, 108:9, 108:13, 110:5, 110:17, 111:21, 112:18, 112:19, 120:5, 127:19, 146:11, 150:15, 151:23, 152:2, 152:6, 152:24, 153:22
**PAYCHECK** [1] - 99:1
**PAYING** [4] - 107:22, 110:18, 120:4, 150:17
**PAYMENT** [9] - 100:17, 100:24, 114:25, 116:1, 147:25, 148:5, 182:4, 182:7, 182:11
**PAYMENTS** [22] - 101:25, 108:17, 109:3, 110:13, 112:9, 114:4, 115:12, 115:13, 118:14, 122:18, 133:10, 133:11, 133:12, 134:11, 134:15, 135:6, 135:8, 136:23, 137:2, 137:7, 138:6, 153:19
**PENDING** [1] - 124:2
**PEOPLE** [13] - 98:4, 101:16, 104:25, 110:20, 118:9, 120:13, 128:22, 135:18, 152:5, 153:5, 153:8, 154:21, 177:10
**PER** [13] - 102:2, 102:8, 113:14, 113:23, 115:25, 116:1, 161:22, 162:5, 180:23
**PERCENT** [20] - 102:9, 113:15, 113:18, 113:23, 113:25, 118:20, 120:5, 120:6, 129:20, 130:2, 130:3, 143:1, 144:4, 144:6, 147:16, 148:1, 150:13, 154:18, 161:25, 166:1
**PERCENTAGE** [3] - 132:2, 154:18, 172:17
**PERFORMED** [1] - 121:11
**PERHAPS** [1] - 157:5
**PERIOD** [5] - 116:8,

132:22, 135:5, 161:17, 162:7
**PERMISSION** [6] - 99:7, 116:18, 119:3, 139:18, 163:3, 163:7
**PERMITTED** [1] - 102:12
**PERSON** [2] - 120:24, 131:4
**PERSON'S** [3] - 98:4, 98:5, 132:2
**PERSONALLY** [1] - 129:1
**PERSPECTIVE** [1] - 116:25
**PERTAINING** [1] - 177:4
**PETER** [1] - 111:14
**PETS** [1] - 97:13
**PHILIP** [1] - 87:3
**PHONES** [1] - 125:4
**PHOTOS** [2] - 143:17, 176:12
**PHYSICALLY** [1] - 119:14
**PING** [1] - 95:15
**PITFALLS** [1] - 145:1
**PLACE** [4] - 99:15, 160:6, 173:18, 173:24
**PLACES** [1] - 184:23
**PLAINTIFF** [2] - 87:6, 88:3
**PLAINTIFF** [21] - 94:8, 95:9, 113:9, 113:13, 113:21, 114:2, 117:10, 118:20, 119:7, 120:2, 120:7, 120:10, 121:5, 121:14, 122:1, 122:8, 122:14, 122:15, 123:22, 165:18, 188:8
**PLAINTIFF'S** [1] - 124:12
**PLAINTIFF'S** [9] - 95:20, 113:17, 114:1, 117:12, 118:14, 120:22, 122:6, 122:16, 123:20
**PLAINTIFFS** [2] - 118:10, 173:14
**PLANNING** [1] - 158:14
**PLAYED** [1] - 107:8
**PLAYING** [1] - 97:22
**PLAYS** [1] - 106:20
**POCKET** [2] - 113:19, 114:1
**POINT** [6] - 99:10, 124:15, 125:22, 162:6, 173:19, 189:7

**POINTED** [4] - 115:17, 116:13, 116:23, 129:19
**POLITICAL** [5] - 151:5, 154:13, 154:23, 184:25, 185:14
**POLITICIANS** [5] - 100:12, 103:4, 105:11, 109:24, 110:3
**POLITICS** [1] - 184:15
**POLLING** [1] - 184:23
**POOL** [1] - 97:11
**POPULATION** [1] - 183:8
**PORTION** [6] - 134:5, 136:3, 140:19, 141:5, 145:12, 181:11
**PORTNOI** [1] - 88:5
**POSITION** [4] - 101:11, 101:17, 120:8, 130:25
**POSSIBILITY** [1] - 144:11
**POSSIBLE** [11] - 143:19, 143:22, 143:23, 144:21, 146:6, 146:8, 156:20, 183:20, 183:23, 183:24, 184:14
**POSSIBLY** [1] - 165:3
**POSTING** [1] - 162:21
**POTENTIAL** [7] - 105:4, 122:7, 144:18, 145:1, 177:16, 179:2, 183:16
**PRACTICE** [3] - 91:18, 91:20, 91:25
**PRACTICES** [3] - 133:24, 134:4, 155:16
**PRECISE** [2] - 180:25, 182:23
**PRECISELY** [1] - 150:16
**PREFERENCE** [1] - 158:10
**PREFERRED** [1] - 131:3
**PRELIMINARY** [1] - 157:4
**PREMIUM** [1] - 152:24
**PREPARATION** [1] - 121:21
**PREPARE** [5] - 143:11, 144:25,

145:2, 145:7, 149:17
**PREPARED** [6] - 103:25, 111:18, 143:13, 145:20, 145:21, 146:3
**PRESENCE** [7] - 94:6, 95:18, 123:13, 163:6, 173:10, 174:8, 186:13
**PRESENTATION** [1] - 173:11
**PRESENTED** [7] - 94:10, 122:10, 173:14, 173:15, 173:25, 186:25
**PRESIDENT** [1] - 121:25
**PRESIDENTIAL** [1] - 185:4
**PRESSURE** [1] - 151:6
**PRETTY** [3] - 126:12, 155:11, 187:14
**PREVENT** [3] - 105:13, 106:12, 146:14
**PREVIOUS** [11] - 106:8, 113:20, 114:1, 127:24, 133:1, 135:1, 140:6, 140:9, 149:22, 162:6, 181:17
**PREVIOUSLY** [3] - 128:5, 172:25, 178:6
**PRICE** [32] - 102:8, 103:22, 104:23, 104:24, 105:7, 105:8, 105:9, 105:16, 105:22, 106:25, 107:9, 107:25, 115:9, 133:22, 141:14, 141:17, 142:23, 143:19, 143:24, 144:16, 144:21, 145:7, 146:9, 147:12, 147:13, 172:16, 177:20, 178:2, 179:22, 180:1
**PRICES** [3] - 107:24, 108:3, 152:21
**PRIDE** [2] - 97:15, 97:19
**PRIMARIES** [1] - 185:3
**PRIMARILY** [1] - 168:22
**PRINCIPLES** [1] - 131:12
**PRINT** [1] - 105:12
**PRIVATE** [1] - 96:12
**PRO** [1] - 143:15

**UNITED STATES DISTRICT COURT**

**PROCEDURE** [1] - 146:20

**PROCEED** [1] - 161:7

**PROCEEDINGS** [1] - 190:10

**PROCEEDINGS** [10] - 94:5, 95:17, 123:12, 163:1, 163:5, 173:9, 174:7, 186:12, 188:21, 189:14

**PROCESS** [5] - 107:16, 109:4, 121:1, 140:24, 148:17

**PROCESSED** [1] - 181:9

**PRODUCED** [1] - 116:24

**PRODUCING** [2] - 157:18, 158:11

**PROFESSION** [1] - 107:16

**PROFESSIONAL** [3] - 91:18, 91:19, 91:24

**PROFIT** [9] - 100:6, 103:10, 103:15, 105:25, 108:13, 110:8, 110:10, 114:20, 132:2

**PROFITS** [6] - 114:21, 126:1, 139:1, 175:8, 175:16, 175:21

**PROJECTED** [1] - 90:11

**PROMISSORY** [1] - 90:17

**PROMOTE** [2] - 104:5, 143:4

**PROMOTION** [2] - 144:15, 144:20

**PROMPT** [1] - 95:13

**PROPER** [2] - 97:16, 97:17

**PROPERTIES** [4] - 151:24, 152:3, 157:18, 158:12

**PROPERTIES** [6] - 95:24, 104:9, 116:23, 117:22, 121:25, 165:19

**PROPERTIES** [1] - 87:5

**PROPERTY** [1] - 91:12

**PROPERTY** [34] - 96:9, 96:11, 96:12, 96:15, 96:16, 96:22, 98:5, 99:16, 101:23, 105:3, 105:4, 107:3, 108:21, 117:1,

119:15, 121:6, 122:4, 137:2, 140:15, 140:23, 141:16, 142:3, 143:14, 143:15, 143:21, 144:2, 144:9, 144:20, 152:8, 156:15, 158:11, 159:14, 159:17, 161:18

**PROPERTY'S** [1] - 177:19

**PROPOSED** [1] - 184:5

**PROSPECTIVE** [1] - 177:1

**PROTECT** [4] - 136:8, 147:6, 170:23, 183:21

**PROTECTED** [1] - 109:23

**PROTECTING** [1] - 149:1

**PROTECTS** [3] - 98:6, 114:18, 170:16

**PROUD** [1] - 95:23

**PROVIDE** [2] - 121:1, 135:18, 146:3

**PROVIDED** [3] - 132:20, 149:10, 150:22

**PROVIDING** [3] - 96:12, 146:19, 171:15

**PROVISION** [2] - 148:15, 152:19

**PROVISIONS** [2] - 141:1, 171:13

**PRUDENT** [2] - 133:23, 134:4

**PUBLIC** [3] - 87:10, 109:7, 111:14

**PUBLICATION** [1] - 173:25

**PUBLISH** [10] - 162:19, 162:20, 162:24, 163:3, 163:8, 163:14, 176:6, 178:4, 180:16, 180:18

**PUBLISHED** [5] - 99:15, 100:13, 139:24, 178:22, 186:17

**PUBLISHING** [1] - 162:20

**PULL** [2] - 106:25, 145:18

**PURCHASE** [4] - 90:13, 90:15, 90:24, 183:14

**PURCHASE** [46] - 101:3, 103:18, 104:8,

104:10, 104:12, 104:17, 106:25, 107:9, 108:8, 118:1, 121:20, 125:11, 125:23, 127:19, 128:9, 130:3, 133:21, 133:22, 138:20, 139:8, 140:4, 140:6, 140:7, 141:2, 141:6, 141:9, 141:20, 142:1, 142:12, 144:1, 147:12, 147:22, 148:19, 153:7, 154:11, 155:9, 155:13, 156:15, 161:16, 162:2, 172:21, 173:1, 174:15, 178:2, 183:19

**PURCHASED** [49] - 98:14, 99:25, 100:11, 100:20, 101:5, 101:13, 102:24, 103:11, 103:20, 103:24, 105:19, 108:5, 109:18, 110:25, 113:5, 113:9, 113:13, 115:19, 117:24, 118:6, 119:17, 119:19, 121:6, 128:10, 129:16, 130:5, 132:9, 132:15, 133:4, 134:25, 136:19, 137:5, 137:9, 138:3, 138:16, 139:14, 140:15, 142:13, 148:4, 148:8, 148:9, 154:7, 159:24, 161:20, 163:18, 175:24, 182:17, 182:19

**PURCHASER** [2] - 117:20, 179:9

**PURCHASERS** [1] - 177:1

**PURCHASES** [2] - 117:13, 125:21

**PURCHASING** [1] - 146:11

**PURPORTEDLY** [1] - 176:17

**PURPOSE** [9] - 118:17, 135:14, 135:17, 136:3, 136:8, 152:22, 170:20, 171:13, 179:22

**PURPOSES** [2] - 131:13, 179:15

**PURSUANT** [1] - 190:8

**PUT** [12] - 102:24, 105:1, 107:1, 113:18, 113:25, 127:14, 135:25, 139:18, 145:9, 148:2, 173:24, 177:13

**PUTTING** [1] - 137:15

---

**Q**

**QUALITY** [6] - 97:9, 126:14, 126:20, 126:22, 128:5, 128:6

**QUARTER** [1] - 108:1

**QUEENS** [1] - 96:7

**QUESTIONABLE** [1] - 107:8

**QUESTIONING** [1] - 185:13

**QUESTIONS** [4] - 121:16, 136:14, 158:17, 188:24

**QUICK** [1] - 134:9

**QUICKLY** [1] - 129:23

**QUITE** [13] - 128:13, 129:23, 138:14, 141:21, 142:4, 142:7, 147:7, 148:1, 154:17, 156:22, 166:16, 180:3, 181:22

**QUOTE** [1] - 114:15

---

**R**

**RAISE** [4] - 99:7, 103:13, 123:25, 152:14

**RAISED** [1] - 152:18

**RAISING** [2] - 120:8, 146:15

**RANGE** [1] - 148:1

**RATE** [11] - 102:10, 106:18, 113:7, 114:24, 135:11, 142:25, 143:1, 144:4, 144:6, 162:9

**RATES** [4] - 106:9, 106:10, 135:8, 135:10

**RATHER** [3] - 112:10, 145:22, 158:11

**REACHING** [1] - 142:23

**READ** [15] - 117:10, 133:18, 134:7, 138:24, 139:5, 140:19, 141:3,

155:23, 163:20, 171:1, 171:4, 172:21, 177:24, 178:18, 185:18

**READING** [1] - 172:7

**READS** [2] - 175:13, 176:25

**REAL** [1] - 91:23

**REAL** [17] - 100:21, 104:2, 104:4, 106:23, 112:5, 121:8, 121:9, 121:20, 125:17, 127:1, 142:13, 143:3, 143:6, 143:8, 147:24, 157:16, 159:9

**REALLY** [6] - 97:7, 128:20, 146:14, 157:21, 158:14, 161:13

**REALTIME** [1] - 190:5

**REASON** [3] - 103:12, 145:6, 146:21

**REASONABLE** [14] - 101:21, 114:17, 115:1, 115:8, 122:21, 132:1, 133:22, 134:3, 136:11, 157:22, 170:10, 170:16, 170:22

**REASONABLY** [1] - 134:2

**REASONS** [7] - 105:3, 105:11, 116:2, 117:13, 118:15, 118:16, 150:22

**REBUTTAL** [1] - 92:16

**RECEIVED** [8] - 94:24, 99:13, 100:4, 116:17, 119:21, 135:11, 137:22, 186:18

**RECEIVING** [1] - 119:3

**RECENT** [1] - 97:13

**RECENTLY** [1] - 129:14

**RECESS** [1] - 123:19

**RECITED** [1] - 181:21

**RECOGNIZE** [6] - 161:9, 163:15, 163:19, 181:9, 181:13, 184:24

**RECOGNIZED** [1] - 120:14

**RECOLLECTION** [3] - 133:5, 162:8, 183:2

**RECOMMENDATIO**

N [1] - 167:2
RECORD [2] - 124:7, 133:18
RECOVER [1] - 108:16
RECREATION [1] - 97:11
RECREATIONAL [2] - 126:21, 128:6
RED [2] - 109:19, 181:20
REDUCE [3] - 111:16, 144:8, 144:21
REDUCED [1] - 119:23
REDUCTION [1] - 150:13
REFERENCE [6] - 175:8, 178:22, 186:21, 187:5, 187:24, 188:1
REFERRED [3] - 128:4, 152:17, 173:20
REFERRING [11] - 133:15, 137:25, 138:16, 139:15, 167:21, 167:23, 167:24, 181:7, 183:17, 187:5, 188:8
REFERS [1] - 136:3
REGARD [3] - 94:7, 120:3, 158:3
REGARDING [6] - 163:17, 164:12, 164:15, 179:3, 188:21, 188:24
REGARDS [1] - 118:22
REGISTRAR [1] - 185:10
REGULAR [1] - 169:1
REGULATING [1] - 122:2
REGULATIONS [1] - 159:17
REGULATIONS [1] - 190:12
REJECTED [2] - 113:17, 113:24
RELATED [5] - 162:1, 183:15, 186:25, 187:14, 188:18
RELATING [1] - 188:25, 189:5
RELATIONSHIP [1] - 145:23
RELIANCE [2] - 101:23, 140:3

RELIED [4] - 138:19, 140:8, 140:9, 141:6
RELY [3] - 117:20, 179:10, 183:18
RELYING [1] - 101:6
REMAIN [3] - 126:24, 135:6, 152:20
REMAINED [1] - 135:12
REMEMBER [9] - 108:6, 117:17, 123:7, 181:14, 185:16, 185:18, 186:1, 186:7
RENDERED [1] - 177:21
RENT [162] - 98:17, 98:18, 98:19, 99:9, 99:13, 99:14, 99:15, 100:2, 100:4, 100:12, 101:7, 102:7, 102:11, 102:16, 103:7, 105:5, 105:25, 106:3, 106:15, 107:10, 107:11, 109:4, 110:2, 110:5, 110:16, 111:21, 113:4, 113:6, 113:10, 113:14, 113:16, 113:18, 113:22, 113:23, 114:16, 114:17, 114:18, 115:4, 115:22, 115:24, 116:11, 116:15, 117:2, 117:4, 117:7, 117:17, 118:24, 118:25, 119:5, 119:7, 119:11, 119:19, 119:21, 119:22, 119:23, 120:15, 120:16, 120:18, 120:25, 129:7, 129:15, 129:20, 130:5, 130:10, 131:17, 132:5, 132:6, 132:14, 132:16, 132:19, 132:23, 135:10, 135:14, 135:17, 135:19, 135:20, 136:9, 137:6, 138:7, 140:5, 142:6, 144:11, 144:18, 144:22, 146:6, 146:10, 146:18, 147:7, 147:9, 148:5, 148:7, 148:13, 148:17, 149:15, 149:17, 149:18, 149:21, 149:24, 150:4, 150:7, 150:9, 150:14, 150:19,

151:3, 151:8, 151:15, 151:19, 151:23, 152:2, 152:9, 152:11, 152:23, 153:15, 153:24, 154:9, 154:14, 155:1, 155:8, 155:15, 157:10, 157:11, 157:13, 157:14, 159:25, 160:8, 161:10, 161:17, 161:21, 162:8, 162:13, 163:17, 164:3, 166:17, 166:19, 166:23, 166:25, 167:9, 167:12, 169:1, 169:16, 170:10, 170:15, 170:17, 170:22, 170:23, 171:4, 175:11, 175:14, 177:4, 177:16, 177:18, 178:12, 179:4, 180:10, 180:19, 180:23, 184:14, 185:16
RENT [60] - 90:25, 91:7, 92:13, 92:24, 96:21, 99:11, 113:1, 113:17, 113:24, 114:4, 114:13, 114:20, 115:5, 115:20, 116:6, 116:10, 118:22, 120:25, 121:2, 130:11, 130:15, 130:16, 130:18, 130:20, 130:22, 130:25, 131:3, 131:5, 131:7, 131:8, 131:10, 132:10, 136:3, 153:16, 153:21, 154:25, 159:21, 162:4, 162:16, 163:22, 164:7, 164:15, 164:22, 165:7, 166:10, 166:13, 166:25, 167:3, 167:5, 168:10, 168:11, 169:6, 169:14, 169:19, 170:9, 170:20, 176:22, 177:11, 177:22, 178:13
RENT-CONTROLLED [3] - 110:2, 117:4, 119:19
RENT-SETTING [2] - 109:4, 154:14
RENTAL [1] - 87:9

RENTAL [1] - 177:3
RENTAL [1] - 177:4
RENTS [66] - 98:21, 98:24, 99:2, 99:3, 99:5, 99:7, 99:17, 100:15, 102:1, 102:4, 102:5, 102:9, 102:10, 102:11, 102:12, 102:15, 102:17, 103:7, 103:13, 103:15, 105:13, 106:4, 106:10, 106:12, 107:12, 108:11, 108:14, 110:7, 111:4, 112:10, 112:16, 115:2, 115:10, 117:21, 120:8, 122:2, 129:17, 129:19, 129:22, 129:25, 130:1, 130:2, 133:23, 135:3, 136:10, 142:5, 143:16, 146:15, 147:10, 150:10, 150:12, 150:13, 152:14, 152:18, 152:20, 152:24, 153:2, 153:10, 153:21, 154:5, 170:23, 177:19, 179:10
REPEAL [1] - 140:21
REPEAT [1] - 124:16
REPHRASE [2] - 156:11, 180:6
REPORT [7] - 111:15, 111:18, 112:3, 132:24, 149:18, 149:20, 177:3
REPORT [7] - 90:21, 91:8, 91:9, 92:6, 92:16, 92:17, 92:22
REPORTED [1] - 190:10
REPORTED [1] - 120:25
REPORTER [4] - 87:24, 190:1, 190:6, 190:19
REPORTER [1] - 123:25
REPORTER'S [1] - 87:15
REPORTS [2] - 110:7, 155:24
REPRESENT [2] - 95:23, 112:24
REPRESENTS [1] - 117:9
REPUTABLE [1] -

127:24
REQUEST [3] - 113:17, 113:24, 150:19
REQUESTED [2] - 150:21, 151:16
REQUIRED [5] - 132:21, 139:1, 140:5, 152:6, 158:3
REQUIRING [1] - 170:9
RESIDENCE [1] - 147:25
RESIDENT [5] - 98:22, 98:23, 152:13, 152:23, 158:9
RESIDENT'S [1] - 98:24
RESIDENTS [27] - 97:14, 99:16, 102:23, 113:11, 114:5, 116:7, 122:18, 122:22, 128:24, 129:3, 129:5, 136:16, 151:6, 151:23, 152:1, 152:10, 152:21, 154:22, 156:14, 157:9, 157:12, 157:23, 158:5, 184:17, 184:23
RESIDENTS' [1] - 97:12
RESOLUTION [9] - 91:10, 91:11, 91:17, 92:10, 92:12, 92:22, 92:23, 92:25, 93:6
RESOLUTION [1] - 140:24
RESOLUTIONS [1] - 167:4
RESPECT [1] - 166:20
RESPOND [2] - 144:2, 144:14
RESPONSE [2] - 117:11, 148:19
RESULT [5] - 120:7, 121:12, 132:25, 152:20, 167:2
RESULTED [1] - 162:14
RESULTS [1] - 188:16
RESUME [1] - 186:5
RETRIEVING [1] - 95:13
RETROACTIVELY [1] - 140:20
RETURN [16] - 114:19, 122:25,

131:19, 131:20, 131:22, 131:23, 132:1, 136:11, 136:23, 139:4, 147:1, 147:4, 149:11, 158:11, 170:14, 171:15
**REVENUE** [3] - 113:19, 114:1, 118:5
**REVIEW** [17] - 92:13, 162:4, 162:16, 163:22, 164:15, 164:22, 165:7, 166:10, 166:13, 166:25, 167:3, 167:5, 169:6, 169:14, 169:19, 177:3, 177:22
**REVIEW** [1] - 87:9
**REVIEW** [4] - 177:1, 187:18, 188:10, 188:17
**REVIEWED** [1] - 120:24
**REVIEWING** [2] - 172:8, 187:17
**RICHARD** [1] - 117:9
**RIDICULOUSLY** [1] - 173:12
**RIGHTLY** [1] - 105:22
**RIGHTS** [5] - 97:24, 98:1, 98:3, 114:21, 140:22
**RISE** [2] - 123:11, 186:11
**ROB** [1] - 107:15
**RONARK** [1] - 126:9
**ROOM** [1] - 87:24
**ROOM** [2] - 97:11, 117:16
**ROUGHLY** [4] - 125:17, 127:17, 150:7, 154:1
**RULE** [2] - 100:17, 101:6
**RULED** [1] - 108:25
**RULERS** [1] - 96:7
**RULES** [68] - 96:18, 97:22, 98:14, 99:7, 99:8, 99:10, 99:13, 99:14, 99:16, 99:19, 100:2, 100:3, 100:12, 100:14, 101:9, 101:12, 101:14, 101:15, 101:22, 101:23, 101:25, 102:16, 105:24, 106:2, 106:13, 106:14, 106:17, 106:20, 107:8,

107:11, 108:15, 108:16, 109:21, 109:22, 109:23, 110:13, 111:1, 111:4, 111:5, 111:6, 111:8, 112:8, 112:15, 113:3, 118:11, 130:10, 130:12, 130:13, 132:7, 132:17, 137:7, 140:6, 140:8, 140:9, 145:23, 148:8, 148:10, 148:18, 148:25, 154:9, 155:13, 157:12, 168:1, 168:18
**RULING** [4] - 109:7, 169:8, 188:6, 188:23
**RUNNING** [1] - 128:23
**RUTTER** [1] - 88:8
**RV** [1] - 99:3
**RV'S** [1] - 97:14

# S

**SALE** [10] - 99:22, 104:6, 109:8, 141:11, 141:17, 143:7, 143:21, 144:16, 152:22, 177:9
**SALE** [1] - 183:14
**SALES** [1] - 153:1
**SALES** [3] - 90:13, 90:15, 90:24
**SALOMON** [5] - 92:6, 92:7, 111:14, 111:25, 121:11
**SAN** [1] - 126:10
**SANTA** [1] - 88:11
**SAUNA** [1] - 97:11
**SAVE** [1] - 147:4
**SAVED** [1] - 147:15
**SAW** [5] - 106:2, 176:14, 176:19, 176:20, 178:5
**SCREEN** [9] - 109:20, 136:1, 137:15, 139:19, 145:9, 148:3, 160:6, 170:12, 173:24
**SEAT** [2] - 123:16, 124:6
**SEATED** [1] - 123:20
**SECOND** [10] - 101:17, 111:20, 113:6, 118:13, 118:17, 118:21, 136:16, 145:18, 161:9, 161:14
**SECONDLY** [1] -

161:14
**SECONDS** [1] - 160:12
**SECTION** [2] - 175:15, 176:25
**SECTION** [1] - 190:8
**SECURITY** [1] - 99:2
**SEE** [49] - 102:5, 115:4, 116:3, 117:20, 118:4, 119:13, 119:14, 119:24, 122:9, 123:10, 136:2, 160:5, 160:23, 164:5, 164:19, 169:11, 170:11, 170:13, 170:18, 171:11, 171:12, 172:2, 172:5, 172:9, 172:18, 173:7, 173:14, 173:15, 173:16, 174:17, 176:12, 177:23, 177:24, 178:14, 178:17, 179:5, 179:12, 179:13, 181:4, 181:19, 181:24, 182:9, 184:23, 184:24, 185:11, 186:6, 186:9, 189:10
**SEEKING** [1] - 161:21
**SELECTED** [1] - 99:10
**SELF** [2] - 120:11, 122:14
**SELF** [1] - 92:15
**SELF-CONTAINED** [1] - 92:15
**SELF-INFLICTED** [2] - 120:11, 122:14
**SELL** [6] - 104:5, 116:18, 119:5, 157:21, 158:12, 158:14
**SELLER** [24] - 104:1, 104:17, 104:19, 104:21, 104:22, 105:10, 105:14, 105:18, 107:7, 107:19, 107:23, 108:4, 110:8, 141:18, 142:21, 143:3, 143:5, 143:9, 143:23, 144:3, 146:3, 177:9, 177:13, 179:15
**SELLER'S** [4] - 104:25, 142:10, 144:8, 144:17
**SELLING** [2] - 119:6, 153:8

**SELLS** [1] - 152:13
**SEMINAR** [2] - 131:9, 131:13
**SENIOR** [5] - 113:3, 114:8, 117:4, 119:19, 122:18
**SENIORS** [1] - 118:15
**SENTENCE** [10] - 117:18, 138:24, 170:13, 171:12, 172:14, 175:13, 177:16, 178:15, 179:9, 179:25
**SENTENCES** [2] - 133:18, 133:25
**SEPTEMBER** [1] - 169:14
**SERVE** [6] - 99:10, 106:11, 130:14, 130:16, 130:17, 130:19
**SERVED** [2] - 130:22, 131:8
**SERVICE** [27] - 118:8, 118:16, 120:21, 133:20, 134:2, 134:5, 134:10, 134:15, 134:17, 137:8, 137:12, 139:3, 140:11, 146:18, 162:1, 167:9, 167:13, 167:22, 168:4, 168:7, 168:12, 169:8, 169:21, 173:1, 174:14, 175:11, 182:3
**SET** [17] - 98:21, 98:24, 99:18, 100:15, 102:1, 102:4, 102:10, 102:11, 103:23, 105:3, 116:2, 123:5, 129:22, 135:15, 135:20, 160:14, 160:15
**SETS** [2] - 111:6, 111:7
**SETTING** [4] - 109:4, 117:12, 135:3, 154:14
**SETUP** [1] - 143:13
**SEVERAL** [2] - 149:25, 169:2
**SEVERE** [1] - 111:9
**SHADOW** [1] - 178:18
**SHALL** [3] - 114:16, 114:23, 124:2
**SHARE** [1] - 126:1
**SHELTER** [1] - 96:17
**SHORT** [1] - 123:5
**SHORTLY** [2] -

137:9, 148:9
**SHOW** [11] - 103:18, 112:7, 118:11, 119:13, 120:1, 120:9, 151:9, 160:21, 160:24, 160:25
**SHOWED** [3] - 121:23, 152:4, 181:11
**SHOWING** [1] - 151:15
**SHOWN** [1] - 176:17
**SHOWS** [3] - 122:12, 182:3, 182:16
**SIDE** [3] - 95:11, 111:10, 173:19
**SIDEBAR** [2] - 162:25, 163:1
**SIDES** [1] - 128:25
**SIDEWALK** [1] - 96:17
**SIGNATURE** [3] - 161:9, 181:2, 181:4
**SIGNED** [1] - 183:14
**SIGNIFICANT** [4] - 112:5, 140:2, 151:15, 166:18
**SILENCE** [1] - 95:14
**SIMILAR** [3] - 128:13, 139:12, 156:16
**SINGLE** [5] - 147:24, 165:6, 166:17, 168:21, 188:3
**SINGLE-FAMILY** [1] - 147:24
**SIT** [1] - 184:23
**SITUATION** [1] - 151:25
**SIX** [7] - 109:20, 117:11, 186:21, 187:2, 187:4, 187:7, 187:9
**SIX-PAGE** [1] - 117:11
**SIZE** [2] - 128:12, 150:9
**SKIPPING** [1] - 133:25
**SKY** [1] - 106:18
**SKY-HIGH** [1] - 106:18
**SLEEPER** [1] - 123:15
**SLEPT** [1] - 123:15
**SLIDE** [3] - 109:19, 114:6, 127:15
**SMALL** [14] - 96:16, 98:20, 100:6, 102:7, 103:3, 103:10, 103:14, 105:25,

108:13, 166:16, 168:16, 168:17, 168:18, 172:24
**SMALL-TIME** [1] - 103:3
**SMALLER** [1] - 168:25
**SMART** [1] - 105:15
**SOCIAL** [1] - 99:2
**SOLD** [2] - 152:7, 157:9
**SOLEMNLY** [1] - 124:1
**SOMEONE** [10] - 98:25, 99:1, 99:3, 99:4, 99:5, 101:22, 107:7, 143:25, 151:18, 152:18
**SOMETIME** [1] - 125:13
**SOMETIMES** [5] - 98:1, 98:3, 154:14, 154:18, 169:2
**SOMEWHERE** [1] - 148:1
**SOPHISTICATED** [3] - 104:20, 104:25, 115:21
**SOPHISTICATION** [1] - 107:3
**SORRY** [7] - 97:18, 125:2, 137:16, 160:3, 162:22, 164:13, 180:17
**SORT** [4] - 107:7, 127:6, 144:7, 152:22
**SOUND** [2] - 95:11, 95:12
**SOUNDS** [3] - 126:11, 168:16, 186:2
**SOURCE** [1] - 124:25
**SOURCING** [1] - 107:8
**SOUTH** [1] - 88:6
**SOUTHERN** [2] - 97:4, 124:18
**SPACE** [13] - 102:8, 113:10, 113:12, 113:23, 114:7, 115:25, 116:1, 119:6, 157:13, 161:22, 162:5, 180:23
**SPACES** [13] - 102:7, 116:18, 117:6, 119:5, 119:10, 128:13, 129:9, 129:11, 129:12, 129:14, 129:21, 129:23, 136:9
**SPECIAL** [3] - 96:5,

96:7, 98:7
**SPECIALIZATION** [1] - 159:7
**SPECIFIC** [2] - 183:7, 185:8
**SPECIFICALLY** [5] - 187:15, 187:25, 188:20, 189:5, 189:6
**SPECIFIED** [1] - 175:15
**SPECULATION** [5] - 151:11, 151:20, 155:20, 156:4, 157:25
**SPELLED** [1] - 146:20
**SPEND** [1] - 125:6
**SPENDS** [2] - 97:21, 101:22
**SPRING** [1] - 87:24
**SPRINGS** [10] - 116:19, 126:9, 139:13, 140:2, 140:7, 140:14, 147:6, 157:17, 183:20, 185:25
**SS** [1] - 94:13
**SS'S** [1] - 94:19
**STAFF** [1] - 91:8, 91:9, 92:22
**STAFF** [14] - 105:11, 120:23, 132:23, 132:24, 149:17, 149:20, 149:24, 150:5, 150:6, 153:14, 158:2, 166:25, 167:2, 177:3
**STAFF'S** [1] - 150:25
**STAFF'S** [3] - 91:12, 92:19, 92:21
**STAND** [3] - 97:23, 123:24, 160:15
**STANDARD** [4] - 187:16, 187:17, 188:10, 188:17
**STANDARDS** [3] - 91:18, 91:19, 91:24
**STANDS** [1] - 183:19
**STANFORD** [3] - 97:5, 124:22, 158:25
**STAR** [4] - 97:9, 126:15, 128:5, 143:2
**START** [4] - 118:12, 146:4, 176:5, 176:8
**STARTED** [1] - 118:9
**STARTS** [1] - 171:17
**STATE** [9] - 124:1, 124:7, 129:12, 146:15, 187:5, 187:11, 187:17, 188:4, 188:20

**STATEMENT** [1] - 90:9
**STATEMENT** [2] - 183:15, 183:17
**STATEMENTS** [2] - 156:7, 157:10
**STATES** [1] - 96:1
**STATES** [4] - 114:15, 114:23, 117:20, 181:17
**STATES** [4] - 87:1, 190:6, 190:8, 190:13
**STAY** [1] - 99:5
**STAYED** [1] - 107:12
**STENOGRAPHICALLY** [1] - 190:10
**STEP** [1] - 114:11
**STEPHEN** [1] - 88:16
**STEPHEN** [1] - 112:24
**STEPHENS** [1] - 121:17
**STEPS** [1] - 157:4
**STILL** [12] - 110:18, 113:18, 114:14, 144:5, 144:20, 147:3, 147:9, 149:14, 150:12, 154:4, 157:14, 164:8
**STIPULATED** [1] - 94:10
**STORY** [1] - 97:8
**STREET** [19] - 98:14, 102:5, 102:6, 102:11, 102:18, 106:6, 109:14, 112:17, 115:18, 122:23, 128:11, 128:19, 129:18, 129:21, 141:21, 142:8, 144:25, 150:11, 154:5
**STREET** [1] - 87:24
**STREET** [1] - 88:6
**STRICTLY** [2] - 179:21, 179:25
**STRIKE** [18] - 135:22, 148:21, 153:3, 156:4, 158:7, 162:10, 162:11, 169:3, 169:4, 175:4, 175:5, 179:18, 179:23, 179:24, 183:9, 183:10, 185:5, 185:6
**STRONG** [1] - 141:7
**STRUCTURE** [1] - 153:9
**STUDENT** [1] - 127:5
**STUDIES** [2] - 184:25, 185:14

**SUBDIVIDE** [3] - 116:18, 119:4, 122:7
**SUBJECT** [10] - 115:22, 117:7, 119:11, 129:7, 129:15, 130:5, 130:9, 177:20, 185:17, 188:9
**SUBMITTED** [3] - 123:9, 150:19, 173:7
**SUBPOENA** [1] - 91:16
**SUBSET** [2] - 187:10, 187:19
**SUBSTANTIAL** [3] - 111:9, 117:14, 162:8
**SUBSTANTIALLY** [1] - 102:12
**SUCCESSFUL** [3] - 110:22, 126:12, 164:11
**SUCKERED** [1] - 107:19
**SUDDENLY** [2] - 146:23, 155:13
**SUED** [1] - 177:14
**SUFFERING** [1] - 101:20
**SUFFICIENT** [3] - 103:8, 146:11, 153:22
**SUGGESTING** [1] - 161:5
**SUITE** [2] - 88:10, 88:17
**SUM** [1] - 122:9
**SUMMARY** [1] - 90:23
**SUMMER** [1] - 127:5
**SUPERIOR** [1] - 108:25
**SUPPLEMENT** [1] - 90:13
**SUPPORT** [3] - 97:7, 144:11, 144:15
**SUPPOSED** [2] - 99:14, 131:7
**SURPRISE** [1] - 111:4
**SUSAN** [1] - 88:15
**SUSPECT** [1] - 101:24
**SUSTAINED** [4] - 156:11, 170:3, 180:6, 185:22
**SWIMMING** [1] - 97:11
**SWITCH** [1] - 101:22
**SWITCHED** [1] - 146:24
**SWORN** [1] - 124:12
**SYSTEM** [3] - 99:17,

146:21, 146:22
**SYSTEMS** [1] - 146:24

**T**

**TABS** [1] - 160:19
**TARGET** [1] - 181:24
**TARGETED** [1] - 101:5
**TARGETS** [1] - 183:7
**TAX** [1] - 91:12
**TEACHES** [1] - 121:9
**TECHNICALLY** [1] - 135:16, 161:18
**TEN** [8] - 109:18, 123:5, 123:10, 127:17, 156:25, 176:18, 181:15, 182:7
**TENANTS** [1] - 111:3
**TENET** [1] - 131:16
**TERM** [2] - 156:14, 159:10
**TERMINOLOGY** [1] - 167:23
**TERMS** [1] - 128:12
**TESTIFIED** [6] - 128:8, 153:14, 166:8, 178:23, 180:22, 185:24
**TESTIFY** [1] - 91:16
**TESTIFY** [10] - 107:18, 111:11, 117:15, 118:16, 121:1, 121:5, 121:21, 122:1, 122:6, 182:25
**TESTIFYING** [2] - 120:13, 181:8
**TESTIMONY** [13] - 107:14, 116:4, 118:25, 121:18, 124:1, 147:18, 165:14, 167:25, 185:7, 186:1, 188:15, 188:21, 188:25
**THAT** [3] - 190:7, 190:8, 190:11
**THE** [112] - 88:3, 88:13, 94:7, 94:12, 94:16, 94:23, 95:7, 95:10, 95:19, 97:16, 112:22, 114:10, 123:3, 123:11, 123:14, 123:20, 123:24, 124:5, 124:6, 124:9, 124:10, 125:2, 131:25, 132:1, 133:6, 133:8, 135:23, 137:16, 137:19, 137:21, 139:20,

139:24, 148:23, 149:4, 149:5, 149:7, 149:9, 151:8, 151:10, 151:12, 151:21, 151:22, 153:4, 155:4, 155:5, 155:19, 155:21, 155:22, 156:4, 156:11, 158:1, 158:2, 158:18, 160:3, 160:21, 160:23, 160:24, 161:4, 161:7, 161:8, 162:11, 162:19, 162:24, 163:2, 163:9, 163:13, 165:10, 165:11, 169:4, 169:25, 170:1, 170:3, 170:7, 171:19, 171:21, 171:23, 173:3, 173:11, 174:5, 174:9, 175:5, 176:6, 178:4, 179:19, 179:24, 180:6, 180:16, 180:18, 183:10, 185:6, 185:22, 186:2, 186:11, 186:14, 186:20, 186:24, 187:4, 187:10, 187:13, 187:23, 188:19, 189:3, 189:10, 190:6, 190:7, 190:8, 190:9, 190:10, 190:11, 190:12, 190:13

**THEATERS** [1] - 108:2

**THEORY** [1] - 120:15

**THEREBY** [1] - 152:22

**THIS** [1] - 190:15

**THOMAS** [1] - 88:9

**THOROUGHFARE** [1] - 127:12

**THOUSAND** [2] - 153:1, 153:2

**THREE** [5] - 122:11, 122:20, 132:22, 165:4, 188:16

**THREE-YEAR** [1] - 132:22

**THROUGHOUT** [2] - 120:14, 165:14

**THROWING** [1] - 173:21

**THURSDAY** [7] - 87:16, 89:3, 90:3, 91:3, 92:3, 93:3, 94:1

**TICKET** [1] - 108:2

**TIMELINE** [3] - 148:2, 153:12, 182:16

**TITLE** [1] - 188:22

**TITLE** [1] - 190:8

**TO** [1] - 190:8

**TODAY** [8] - 95:25, 96:2, 97:8, 114:14, 119:16, 119:20, 181:8, 185:8

**TOGETHER** [3] - 96:2, 105:1, 106:25

**TOMORROW** [3] - 107:14, 186:5, 189:10

**TOOK** [11] - 97:7, 108:20, 110:12, 114:3, 118:7, 118:22, 119:15, 120:8, 122:15, 130:17, 153:18

**TOP** [8] - 126:14, 126:19, 126:22, 128:5, 128:6, 136:2, 145:12, 178:15

**TOPIC** [1] - 186:3

**TOTAL** [1] - 187:8

**TOTALITY** [1] - 122:11

**TOWARD** [1] - 178:25

**TRAILER** [3] - 167:8, 168:12, 168:15

**TRAINING** [4] - 99:12, 131:6, 131:14, 132:5

**TRANSACTION** [4] - 103:21, 103:22, 105:20, 121:21

**TRANSCRIPT** [3] - 87:15, 190:9, 190:11

**TRAVEL** [1] - 97:15

**TREAT** [2] - 137:1, 140:5

**TREATED** [3] - 100:3, 100:7, 133:13

**TREATMENT** [1] - 137:7

**TREMENDOUS** [1] - 154:23

**TRIAL** [1] - 87:16

**TRIAL** [7] - 115:3, 116:20, 121:18, 122:25, 139:1, 188:12, 188:20

**TRIALS** [1] - 96:4

**TRIED** [1] - 168:22

**TRUE** [3] - 109:16, 109:17, 119:9

**TRUE** [1] - 190:9

**TRULY** [2] - 129:25, 157:11

**TRUST** [1] - 90:18

**TRUSTED** [1] - 117:9

**TRUTH** [3] - 124:3

**TRY** [8] - 105:16, 126:19, 142:22, 143:20, 144:20, 145:7, 151:2, 152:5

**TRYING** [4] - 136:23, 143:19, 153:9, 178:2

**TUNE** [2] - 164:4, 164:7

**TURN** [5] - 118:2, 125:3, 133:14, 140:18, 158:12

**TURNED** [4] - 180:2, 180:8, 180:9, 180:12

**TURNING** [1] - 176:21

**TUVERSON** [1] - 90:8

**TWICE** [1] - 113:7

**TWO** [20] - 94:19, 98:8, 101:12, 104:7, 104:16, 111:18, 112:1, 118:15, 118:21, 122:16, 122:23, 126:8, 126:21, 133:25, 136:14, 160:12, 161:8, 165:2, 169:19, 176:12

**TWO-PAGE** [1] - 161:8

**TWO-WAY** [1] - 122:23

**TWOFOLD** [1] - 170:21

**TYPE** [2] - 128:4, 165:22

**TYPICAL** [1] - 148:1

**TYPOGRAPHICAL** [1] - 145:17

## U

**U.S** [1] - 87:3

**UCLA** [2] - 97:4, 159:4

**ULTIMATELY** [2] - 105:19, 165:8

**UNDER** [21] - 101:15, 102:11, 109:23, 114:21, 120:18, 129:12, 131:17, 132:17, 133:23, 140:16, 147:10, 149:22, 149:25, 150:3, 150:6, 151:6, 157:12, 161:17, 162:6, 163:11, 178:12

**UNDERSTOOD** [6] - 98:13, 107:10,

107:11, 131:3, 188:14, 189:9

**UNDERTAKE** [1] - 120:4

**UNDERWATER** [2] - 118:9, 118:12

**UNDEVELOPED** [1] - 117:5

**UNEXPECTED** [1] - 147:3

**UNFAIR** [1] - 155:15

**UNFORTUNATELY** [1] - 135:19

**UNIFORM** [3] - 91:18, 91:19, 91:24

**UNIT** [1] - 113:11

**UNITED** [4] - 87:1, 190:6, 190:8, 190:13

**UNITED** [1] - 96:1

**UNIVERSITY** [3] - 97:5, 124:22, 158:25

**UNLIKE** [1] - 121:13

**UNPOPULAR** [1] - 128:24

**UNPREDICTABLE** [1] - 177:21

**UNREASONABLE** [5] - 101:3, 108:7, 120:11, 120:22, 122:19

**UNRELATED** [1] - 104:3

**UP** [36] - 97:23, 100:9, 105:13, 106:9, 109:16, 109:19, 113:16, 114:22, 117:19, 118:1, 123:5, 124:21, 126:25, 127:3, 127:14, 127:21, 127:22, 130:17, 130:25, 137:15, 138:9, 145:9, 145:18, 148:2, 151:1, 152:14, 160:6, 160:15, 164:16, 168:19, 171:12, 171:19, 174:12, 174:13, 181:20

**URGED** [1] - 177:1

**US** [1] - 92:8

**USES** [1] - 168:3

## V

**VACANCY** [1] - 152:17

**VACATION** [1] - 97:15

**VAGUE** [4] - 149:6, 155:18, 156:10, 180:5

**VALID** [2] - 114:14, 144:7

**VALUABLE** [1] - 128:19

**VALUE** [12] - 101:19, 103:19, 103:25, 107:16, 111:16, 112:9, 118:25, 119:3, 119:25, 126:22, 147:10, 153:9

**VARIOUS** [1] - 120:16

**VASTLY** [1] - 153:6

**VERDICT** [2] - 112:13, 122:25

**VERSIONS** [1] - 149:22

**VERSUS** [1] - 135:17

**VESTED** [1] - 140:22

**VIA** [1] - 121:19

**VILLA** [1] - 169:9

**VILLAGE** [35] - 98:10, 100:8, 113:2, 115:18, 115:19, 115:24, 116:9, 128:10, 128:14, 128:16, 128:18, 129:6, 129:12, 132:12, 132:19, 134:18, 134:19, 134:23, 135:3, 135:7, 136:22, 137:3, 144:25, 159:22, 159:24, 160:9, 161:11, 161:16, 161:21, 162:13, 163:18, 164:12, 164:15, 166:5, 175:3

**VILLAGE** [1] - 127:6

**VIOLATE** [3] - 187:13, 188:23, 188:25

**VIOLATED** [4] - 96:21, 112:13, 187:20, 188:13

**VIOLATING** [1] - 179:6

**VIOLATION** [2] - 187:24, 189:8

**VISIT** [1] - 142:2

**VISUAL** [1] - 129:19

**VOLUME** [6] - 87:10, 89:3, 90:3, 91:3, 92:3, 93:3

**VON** [1] - 88:16

**VOTE** [2] - 154:19, 184:18

**VOTED** [1] - 185:11

**VOTER'S** [1] - 185:10

**UNITED STATES DISTRICT COURT**

**VOTERS** [5] - 110:2, 110:3, 154:19, 185:1, 185:4
**VOTING** [1] - 184:15
**VS** [2] - 87:7, 92:8

## W

**WAIT** [2] - 109:21
**WALL** [1] - 160:6
**WALLS** [1] - 153:7
**WANTS** [3] - 96:15, 96:16, 115:7
**WARNINGS** [4] - 117:24, 180:7, 180:8, 180:11
**WASHER** [1] - 106:22
**WATCH** [2] - 123:14, 188:11
**WAYS** [2] - 106:12, 148:12
**WEALTH** [1] - 98:22
**WEEK** [1] - 112:12
**WEEKS** [1] - 109:18
**WEISSWASSER** [2] - 90:23, 104:11
**WESTERN** [1] - 87:2
**WHEREBY** [1] - 152:17
**WHOLE** [1] - 124:3
**WILSHIRE** [1] - 88:9
**WIN** [2] - 164:14, 164:17
**WINS** [1] - 111:19
**WISCONSIN** [1] - 124:21
**WISH** [1] - 161:23
**WITH** [1] - 190:12
**WITNESS** [5] - 123:6, 123:21, 160:15, 172:8, 186:25
**WITNESS** [16] - 124:5, 124:9, 124:12, 132:1, 149:4, 149:9, 151:8, 151:22, 155:5, 155:22, 158:2, 160:23, 161:8, 165:11, 169:25, 179:19
**WITNESSES** [2] - 118:15, 121:17
**WITNESSES** [2] - 89:5, 89:7
**WORD** [3] - 174:19, 175:17, 178:19
**WORDS** [1] - 144:6
**WORKSHEET** [1] - 91:12
**WORTH** [3] - 144:9,

152:25, 153:1
**WRIT** [1] - 139:1
**WRITE** [2] - 105:10, 178:1
**WRITTEN** [3] - 117:22, 117:23, 179:14
**WROTE** [2] - 117:11, 178:1
**WYNDER** [1] - 88:14

## X

**XX** [1] - 87:9

## Y

**YEAR** [4] - 92:18, 92:19, 92:20, 92:21
**YEAR** [30] - 99:6, 102:2, 106:5, 110:9, 110:15, 110:16, 113:20, 113:21, 114:1, 114:13, 115:15, 116:11, 118:7, 118:8, 118:20, 118:21, 119:22, 129:13, 129:14, 132:22, 133:1, 133:2, 135:1, 163:11, 164:18, 175:2, 182:12
**YEAR-AFTER-YEAR** [2] - 115:15, 116:11
**YEARS** [55] - 96:7, 96:10, 97:2, 98:11, 100:7, 100:13, 105:24, 106:8, 107:25, 108:3, 108:6, 111:2, 118:23, 125:17, 125:24, 127:18, 132:13, 132:18, 134:17, 134:20, 134:23, 135:9, 136:21, 136:25, 139:13, 141:22, 142:7, 144:24, 145:3, 145:4, 146:17, 148:16, 154:12, 155:12, 156:23, 156:25, 157:20, 157:21, 160:11, 161:24, 164:20, 169:2, 176:18, 179:17, 179:20, 181:15, 182:7, 187:6, 187:11, 187:15, 187:19, 188:4, 188:16, 189:5
**YESTERDAY** [1] -

178:22
**YIELDED** [1] - 150:24
**YOURSELVES** [3] - 123:8, 173:5, 186:7

## Z

**ZOOM** [1] - 145:12