1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

3          HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5    COLONY COVE PROPERTIES, LLC, a        )
     Delaware limited liability company,  )
6                                         )
                   PLAINTIFF,             )   CASE NO.
7                                         )
          vs.                             )   CV 14-03242-PSG
8                                         )
     CITY OF CARSON, a municipal          )
9    corporation; CITY OF CARSON          )
     MOBILEHOME PARK RENTAL REVIEW BOARD, )   PAGES (293 to 396)
10   a public administrative body; and    )
     DOES 1 to 10, inclusive,             )   VOLUME 4
11                                        )
                   DEFENDANTS.            )
12   _____)

13

14

15

16                    REPORTER'S TRANSCRIPT OF
                           TRIAL DAY 2
17                   FRIDAY, APRIL 29, 2016
                          1:33 P.M.
18                   LOS ANGELES, CALIFORNIA

19

20

21

22

23   _____

24            MIRANDA ALGORRI, CSR 12743, CRR
              FEDERAL OFFICIAL COURT REPORTER
             312 NORTH SPRING STREET, ROOM 435
25            LOS ANGELES, CALIFORNIA 90012
                 MIRANDAALGORRI@GMAIL.COM


                   UNITED STATES DISTRICT COURT

1                   **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4

5      O'MELVENY & MYERS, LLP
       BY:  DIMITRI D. PORTNOI
       BY:  MATTHEW W. CLOSE

6      400 South Hope Street
       18th Floor

7      Los Angeles, California 90071

8

9      GILCHRIST & RUTTER, APC
       BY:  THOMAS W. CASPARIAN
       Wilshire Palisades Building

10     1299 Ocean Avenue
      Suite 900

11     Santa Monica, California 90401

12

13  **FOR THE DEFENDANTS:**

14

15     ALESHIRE & WYNDER, LLP
      BY:  JEFFREY MICHAEL MALAWY
      BY:  JUNE SUSAN AILIN

16     BY:  STEPHEN R. ONSTOT
      18881 Von Karman Avenue

17     Suite 1700
      Irvine, California 92612

18

19

20

21

22

23

24

25

1                      <u>**I N D E X**</u>

2

3              **FRIDAY, APRIL 29, 2016; VOLUME 4**

4

5            <u>**Chronological Index of Witnesses**</u>

6

7

<u>Witnesses:</u>_____     <u>Page</u>

8

SALOMON, Peter

9

       Direct examination resumed by Mr. Close        299
10     Cross-examination by Ms. Ailin                  308

11

12  <u>Defendant's:</u>

13  FRESCHAUF, Kenneth

14

       Direct examination by Ms. Ailin                 322
15     Cross-examination by Mr. Close                   361

16

17

18

19

20

21

22

23

24

25

                **UNITED STATES DISTRICT COURT**

1 **EXHIBITS**

2

3 **FRIDAY, APRIL 30, 2016; VOLUME 4**

4

| Exhibit | | For ID | In EVD |
|---|---|---|---|
| 1008 | Historical Prices of S&P Index | 301 | 361 |
| 2014 | Year 2 CC Operating & Maintenance Expenses Calculations | 342 | 359 |
| 2028 | CHV Resolution 84-057 Application for Rent Increase | 348 | 359 |
| 2027 | CHV Resolution 84-057 Staff Report | 350 | 359 |
| 2042 | PTP Resolution 04-225 Staff Report | 351 | 359 |
| 2043 | PTP Resolution 04-225 Exhibit C to Staff Report | 351 | 359 |
| 79 | Carson Resolution No. 2004-225 | 351 | 359 |
| 2044 | Park Villa Resolution 04-226 Staff Report | 353 | 359 |
| 2045 | Park Villa Resolution 04-226 Exhibit D to Staff Report | 353 | 359 |
| 2046 | Park Villa Resolution 04-226 | 353 | 359 |
| 2047 | Park Granada Resolution 04-230 Staff Report | 355 | 359 |
| 2048 | Park Granada Resolution 04-230 Exhibit D to Staff Report | 355 | 359 |
| 2049 | Park Granada Resolution 04-230 | 356 | 359 |

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 30, 2016

 2                            1:33 P.M.

 3                              ---

 4

 5           (The following proceedings were held in

 6           open court out of the presence of the jury:)

 7                    THE COURT:  There's a question?

 8                    MS. AILIN:  Your Honor, we just wanted to have a

 9      brief discussion about scheduling.  I believe Mr. Salomon is

10      going to be plaintiff's last witness, and we have our first

11      witness, Ken Freschauf, out in the hall.  But I think it's

12      unlikely that he will take the entire afternoon and get us to

13      4:30.  Our next witnesses are coming in from out of town.  So

14      since we were so uncertain about the scheduling, we did not ask

15      them to be here this afternoon.

16                    I've spoken with Mr. Close, and the two of us

17      think we can still keep to the Court's schedule.  We can still

18      get this case to the jury on Wednesday even if we were to end a

19      little early today.

20                    THE COURT:  That's fine.

21                    MS. AILIN:  We wanted to discuss that with you.

22                    THE COURT:  That's fine.

23                    MS. AILIN:  Thank you, Your Honor.

24                    MR. CLOSE:  Agreed with everything although I

25      guess, in my mind, I was thinking it was open -- I thought the
```

UNITED STATES DISTRICT COURT

```
 1   case would maybe go to the jury Thursday morning.

 2                THE COURT:  That's probably -- that's --

 3                MS. AILIN:  I'm -- done with evidence by --

 4                THE COURT:  I suspect that it may be earlier

 5   Wednesday depending on the time allotments.  Anyway, my mind

 6   was instruct and argue Thursday morning.

 7                MR. CLOSE:  That's what I thought.  We were

 8   comfortably on the way.  I think, even if we break a little

 9   before 4:30 today, we'll --

10                THE COURT:  Of the scenario, potentially I think

11   it's best for me to instruct Wednesday and then you argue

12   Thursday morning, and then you'd have the instructions for your

13   arguments.  That's not likely, but it could work.

14                MR. CLOSE:  I just want to make sure that my

15   understanding from yesterday is correct.  So Mr. Salomon is our

16   last witness.  Before we close, as I understood, the Court

17   wanted to handle the admitted facts through a reading of them

18   to the jury.  I think that was -- or not the Court handle but

19   if I wanted to --

20                THE COURT:  Yeah.  So after this, if you want to

21   just -- do you have a list of them?

22                MR. CLOSE:  I do.

23                THE COURT:  One available for the Court?

24                MR. CLOSE:  I do.  They're actually in the

25   Court's book as Exhibit 1007.  No one is jumping up and down.
```

1    None of my colleagues are waving their hands.  Will the Court

2    introduce that for the jury that's going to happen?  I don't

3    want to present it in a way that's --

4              THE COURT:  What I'll do is, after you're done

5    with Mr. Salomon, I'll just let the jurors know that the

6    parties have stipulated that the following facts are true and

7    invite you to the lectern to read them.

8              MR. CLOSE:  Very well.  Thank you.

9              MS. AILIN:  Thank you, Your Honor.

10             THE COURT:  Let's go ahead and bring the jurors

11   in.

12         (The following proceedings were held in

13         open court in the presence of the jury:)

14             THE COURT:  You may resume on direct examination.

15             MR. CLOSE:  Thank you, Your Honor.

16                       **PETER SALOMON,**

17                 **PLAINTIFF'S WITNESS, SWORN:**

18                 **DIRECT EXAMINATION (RESUMED)**

19   BY MR. CLOSE:

20        Q    Welcome back, Mr. Salomon.

21             I'd like to put back on the screen slide D-6,

22   which I believe we were talking about before the lunch break,

23   where you were going through the three securities that you used

24   or three items that you used to calculate the prejudgment

25   interest rate.  I think we touched on the government bonds, the

**UNITED STATES DISTRICT COURT**

1    treasury bills, the AAA rated corporate bonds, and I think

2    right at lunch we were going to talk about the third item on

3    that list which is the S&P 500 Index average rate of return

4    from December, 2008, to the present.

5                    Mr. Salomon, why did you choose to use the

6    S&P 500 Index?

7        A        The S&P 500 covers a very wide diverse identified

8    portfolio stocks, something close to 80 percent of the stocks.

9    So that's a very diverse identified fund, and that also

10   contributes to the safety of the principal.

11       Q        Why S&P 500 Index and not something else that has

12   a lot of stocks like the NASDAQ?

13       A        Well, I looked at both the S&P 500 and the NASDAQ

14   Index.  The S&P Index is a much more conservative index.  Its

15   average rate of return is lower and more conservative than the

16   NASDAQ.  NASDAQ Index goes up much more.  So I decided to

17   choose a conservative index.

18       Q        Okay.  Well, what if you had used the

19   NASDAQ Index in your return calculation here for prejudgment

20   interest?  What would have been the result in making that

21   choice?

22       A        If the S&P 500 over this period of time averaged

23   15.34 percent, the NASDAQ Index over the same time was over

24   20 percent.  It might have been over 21 percent.  The result of

25   that in calculating a prejudgment interest rate would have made

**UNITED STATES DISTRICT COURT**

```
 1   the 7.8 percent be over 10 percent.

 2         Q     So you made a judgment to select the lower return

 3   to generate a lower prejudgment interest rate in order to be

 4   conservative?

 5         A     Yes.

 6         Q     Now, did you use the S&P 500 Index's actual rate

 7   of return, or did you try to project a rate of return?

 8         A     I used the actual rate of return of the S&P 500

 9   starting at December 1st, 2008, the beginning of the damage

10   period, through the date of my report.

11         Q     And what was the actual rate of return of the

12   S&P 500 during this period?

13         A     It's the 15.34 percent that's on the chart.

14         Q     At this time, Mr. Salomon, could you take

15   Exhibit 1008 in the binder up there.  Probably plaintiff's

16   binder 3.  4.  Plaintiff's binder 4.  Take a look at that.

17              (Marked for identification Exhibit No. 1008.)

18              THE WITNESS:  Did you say 1008?

19         Q     BY MR. CLOSE:  I believe so, yes.

20         A     (Witness reviewing document.)

21              I'm there.

22         Q     What is Exhibit 1008?

23         A     Exhibit 1008 is a listing of the daily S&P 500

24   indices starting at December 1st, 2000, through

25   December 1st, 2014.
```

1          Q       Did you print that document yourself?

2          A       I personally downloaded this from Yahoo Finance

3   and printed it, yes.

4                  MR. CLOSE:  Your Honor, move to admit

5   Exhibit 1008.  It's also a subject of a pending request for

6   judicial notice.

7                  MS. AILIN:  Objection, Your Honor.  This was

8   exchanged late.

9                  THE COURT:  You can publish it, and then we'll

10  discuss admission later.

11                 MR. CLOSE:  All right.

12         Q       This document is -- is this a picture of the

13  first page of document 1008?

14         A       Yes, it is.

15         Q       Moving on, why did you use the S&P 500 rate of

16  return over this particular time period, Mr. Salomon?

17         A       Because this is the actual time period of the

18  economic damages that I calculated earlier.

19         Q       Referring to the 2008 time period, December,

20  2008, to January, 2017?

21         A       Well, actually, the -- from 2008 through January

22  of my report.  I didn't have future numbers.

23         Q       I apologize.

24                 Did you consider using a projected rate of return

25  on stocks as of December, 2008, instead of an actual rate of

```
 1   return?
 2        A      I did not.
 3        Q      Why not?
 4        A      It would be inappropriate to use a projected rate
 5   of return if I had the actual numbers.  If I have the actuals
 6   available to me, I use those.
 7        Q      And did the City's appraisal expert, Mr. Ellis,
 8   also use the S&P 500 Index to calculate a prejudgment interest
 9   rate?
10        A      He did.
11        Q      Did he use the same actual rate of return of the
12   S&P 500 Index that you used to calculate the prejudgment
13   interest rate?
14        A      No, he did not.
15        Q      What S&P 500 rate of return did Mr. Ellis use to
16   calculate the prejudgment interest rate?
17             MS. AILIN:  Objection, Your Honor.  Assumes facts
18   not in evidence.
19             THE COURT:  Overruled.
20             THE WITNESS:  He chose an arbitrary 14-year
21   period to calculate the return on the S&P 500.
22             MS. AILIN:  Objection.  Misstates -- move to
23   strike.  Misstates Mr. Ellis's report.
24             THE COURT:  Overruled.
25        Q      BY MR. CLOSE:  Why do you refer to it as
```

1    arbitrary, Mr. Salomon?

2         A       Because the period he picked doesn't depict what

3    would have happened.  It doesn't match anything that relates to

4    the actual damage period.

5         Q       Did he -- is this what he referred to as the

6    stabilized performance period in his report?

7         A       Yes.  This 14-year period he referred to as a

8    stabilized period of investment returns.

9         Q       Have you prepared a demonstrative to analyze the

10   14-year stabilized performance period that Mr. Ellis created in

11   his report?

12        A       I have.

13               MR. CLOSE:  I'd like to put up the D-7 slide, the

14   historical levels of the S&P 500 Index.

15               THE COURT:  You may.

16        Q       BY MR. CLOSE:  What is this demonstrative that

17   you prepared, Mr. Salomon, and what does it show?

18               MS. AILIN:  Objection.  No foundation.

19               THE COURT:  Overruled.

20               THE WITNESS:  It shows several things.  I outlaid

21   the historical levels of the S&P 500 from January 1st, 1980,

22   through the period of my report which is January, 2016.  I then

23   looked at the stabilized performance period Mr. Ellis testified

24   or wrote about in his report, and I put a blue box around his

25   stabilized performance period.  And when I did that, I noticed

1   that his stabilized performance period had two of the largest

2   crashes in the history of the stock market.

3           The first huge dip in his performance period is

4   the dot-com bust of 2000 to 2002, and the second huge dip in

5   his period was the great recision of 2007 through 2009 related

6   to when the real estate market and the stock market crashed.

7       Q   BY MR. CLOSE:  So what is the -- what is the

8   impact of including the two largest stock market crashes in the

9   history of the stock market in the average rate of return for

10  Mr. Ellis' 14-year period?

11      A   It makes the return very small.  It drives the

12  return down to a rate of 5.25 percent which is even less than

13  the bond rate that we're both using.

14      Q   Why do you think Mr. Ellis chose a 14-year period

15  that stretched back all the way to, did you say, 2001?  2002?

16  Why do you think he chose that period?

17          MS. AILIN:  Objection.  Calls for speculation.

18          THE COURT:  Sustained.  Rephrase.

19      Q   BY MR. CLOSE:  Are you aware from Mr. -- have you

20  reviewed Mr. Ellis' report?

21      A   Yes.

22      Q   Does he indicate in that report why he chose the

23  14-year period?

24      A   It's either in his report or deposition.  He

25  stated that --

**UNITED STATES DISTRICT COURT**

1            MS. AILIN:  Objection.  Hearsay.

2            THE COURT:  Overruled.

3            THE WITNESS:  He stated in his report or his

4    deposition, which I've read, that the actual period in my

5    report was a seven-year period.  So he wanted to double my

6    seven-year period to make it stabilized.

7        Q    BY MR. CLOSE:  And how would you describe the

8    14-year period that Mr. Ellis selected?

9        A    I would say it's probably the most unstabilized

10   period in history of the stock market.  It shows a very

11   not-representative, not-objective rate of return compared to

12   the history of the stock market.

13       Q    Okay.  I'd like to return to the slide D-5, the

14   lost rent damages.

15            So, Mr. Salomon, based on these three securities

16   that you've selected, how did you calculate the average rate of

17   return to arrive at the prejudgment interest rate?

18       A    Well, I valued the government securities, the AAA

19   bonds, and the S&P 500 equally.  So I took their combined rates

20   of return and divided by three.

21       Q    Okay.  What did you arrive at?

22       A    I think this is the wrong slide.

23       Q    I apologize.  Calculation of prejudgment

24   interest.  Is this the slide you were referring to?

25       A    You're asking the questions, but I think this is

**UNITED STATES DISTRICT COURT**

1    not the slide you want to be asking the questions about.

2         Q      What were the total damages that you calculated

3    after applying the prejudgment interest rate?

4         A      I need the second slide that we used this

5    morning.

6         Q      Can I have slide D-5, please.

7         A      Yes.  That's it.

8         Q      Thank you.  Let me ask you again.

9                What was the total damages you calculated for

10   Colony Cove's damages -- lost rent damages in this case?

11        A      The lost rent damages is in the column where it

12   says "Present value of lost rent December 1st, 2008."  That's

13   $5,738,050.

14        Q      Okay.  I would like to go back to the first slide

15   you presented to us today which I have as D-4 of the lost rent

16   damage calculations slide.  I apologize for that.

17               Now, I'd like to just, in summary, the -- is it

18   correct that the damage calculations you made in this case are

19   based on a rent increase of $198 for covering the mortgage

20   interest expense on the park?

21        A      The increase I show is $161.82 based on the

22   $198.56 related to debt service.

23        Q      And you subtracted from that $198 the amount of

24   the actual rent increase granted?

25        A      Yes.

1    Q      In any way are your damage calculations based on

2    assuming a rent increase of $600?

3    A      No.

4    Q      In summary, how would you describe the approach

5    you used to the damage calculations?

6    A      Well, I think I tried to take a very conservative

7    and straight-forward approach.

8    Q      Why do you say that?

9    A      Well, my approach is conservative because I've

10   used the S&P 500 versus using NASDAQ average or the average of

11   both of those.  I've used AAA corporate bonds which is the

12   lowest rate of corporate bonds, and I think it's very straight

13   forward because I've used to calculate the damages the numbers

14   that the City staff themselves calculated for what it would be

15   for the inclusion of debt service.

16          MR. CLOSE:  Thank you, Mr. Salomon.  No further

17   questions.

18          THE COURT:  Cross-examination.

19                     **CROSS-EXAMINATION**

20   BY MS. AILIN:

21   Q      Good afternoon, Mr. Salomon.

22   A      Good afternoon.

23   Q      You spent many years as an auditor, didn't you?

24   A      Approximately nine.

25   Q      And what an auditor does is verify the accuracy

```
 1   of the reporting of financial statements and transactions;
 2   correct?
 3        A      And issue an opinion on those financial
 4   statements, yes.
 5        Q      And in your work in this case, you didn't do any
 6   examination of the accuracy of the reporting of transactions or
 7   anything like that in the rent increase applications you were
 8   given to review; correct?
 9        A      I did not perform an audit, no.
10        Q      And you're not a real estate appraiser, are you?
11        A      No, I'm not.
12               THE COURT:  I'm sorry, Mr. Salomon.  If you can
13   move a little back from the microphone.  Thank you.
14               Go ahead.
15        Q      BY MS. AILIN:  And you're not an expert in mobile
16   home park operations, are you?
17        A      No.
18        Q      One of the --
19               THE COURT:  I'm sorry.  Take it down.  Please
20   tell us what the exhibit is before --
21               MS. AILIN:  This is one of the demonstrative
22   exhibits that was used during Mr. Salomon's direct testimony.
23               THE COURT:  You may.
24               MS. AILIN:  Thank you, Your Honor.
25        Q      Now, Mr. Salomon, this is the table showing your
```

UNITED STATES DISTRICT COURT

1  calculation of lost rent damages that was used during your

2  direct testimony; correct?

3       A       That's correct.

4       Q       And this chart is a little bit different from the

5  chart in your report that was identified as Exhibit 94;

6  correct?

7       A       When you say it's different, it's not the same

8  chart.  I've simplified the chart in my report which is three

9  pages to make it fit onto one page.

10      Q       And you did that by just using an annual lost

11 rent amount for certain years; correct?

12      A       Of course.

13      Q       And something else that's different about this

14 chart compared to the one in your report is that this one shows

15 the present value factor you applied in each year, and the one

16 in your report does not; correct?

17      A       That is true.

18      Q       Now, if Colony Cove Properties had gotten the

19 rent increase that it wanted, that additional rent would have

20 been used to pay the mortgage; right?

21      A       It could have been used to pay the mortgage, yes.

22      Q       Well, if it hadn't been used to pay the mortgage,

23 then the bank could have foreclosed on the park, and then

24 Mr. Goldstein wouldn't get any more revenue from the tenants;

25 correct?

**UNITED STATES DISTRICT COURT**

```
 1        A       Well, the mortgage was not foreclosed on.  So I'm
 2   not sure I understand your question.
 3        Q       Well, if the money were used to pay the mortgage,
 4   then the only thing it was going to be invested in was the
 5   mobile home park itself; correct?
 6        A       I don't think I understand your question.
 7        Q       Well, it wasn't -- if the money was used to pay
 8   the mortgage, it wasn't going to be invested in U.S. Government
 9   Treasury bills, would it?
10        A       No.
11        Q       And it wouldn't be invested in corporate bonds,
12   would it?
13        A       No.
14        Q       And it wouldn't be invested in the stock market,
15   would it?
16        A       No.
17        Q       And so the return on that money would have been
18   the increase in value over time of the mobile home park because
19   it would be invested in the mobile home park by paying the
20   mortgage; correct?
21        A       It depends on how the money was used.  Cash is a
22   fungible item.  It could be used to pay off the debt service.
23   It could be used to pay salaries.  It could be used to make
24   improvements.  It could be used for a number of things.
25        Q       Well, the particular thing we've been hearing
```

```
 1    that Mr. Goldstein wanted additional cash for was to pay the
 2    mortgage.  Isn't that correct, Mr. Salomon?  That's what he
 3    says he was entitled to a rent increase for, and he didn't get
 4    it; right?
 5                  MR. CLOSE:  Objection, Your Honor.  No
 6    foundation.
 7                  THE COURT:  Overruled.
 8                  THE WITNESS:  That's my understanding.
 9         Q     BY MS. AILIN:  So what Mr. Goldstein would need
10    to do with this money, if he had gotten the additional rent, is
11    pay the mortgage; right?
12         A     But he already did pay the mortgage.
13         Q     You're treating this transaction as if
14    Mr. Goldstein had gotten all of the rent, a discounted amount,
15    but, again, all of the rent on December, 2008, aren't you?
16         A     Yes.
17         Q     So you're not looking at it from the perspective
18    of Mr. Goldstein already paid the mortgage, are you?
19         A     Yes.  Because I know he already did pay the
20    mortgage.
21         Q     But in reality, if he had gotten the rent
22    increase, the only thing the money would have been invested in
23    was the mobile home park by paying the mortgage; correct?
24         A     The mortgage is already paid by Mr. Goldstein.
25    So that would have been additional money he would have had on
```

```
 1    top of that because he had already paid the mortgage.
 2         Q      Let's take a look at another of the demonstrative
 3    exhibits used during your direct testimony, the one about the
 4    historical levels of the S&P 500 Index.
 5              Now, the period that you used in calculating your
 6    prejudgment interest rate for an estimate of what would happen
 7    to money invested in the stock market was the period from
 8    December 1st, 2008, to the current period essentially; correct?
 9         A      Yes.
10         Q      And isn't it true that December 1st, 2008, was a
11    historic low point for the market?
12         A      It might have been if we can look at the other
13    chart.
14         Q      And isn't it true that the rise in the market
15    between December, 2008, and the end of 2015 was one of the most
16    dramatic ever?
17         A      It's very -- it's fairly dramatic, yes.
18         Q      So an investor choosing an investment and looking
19    at the stock market at any given point in time, they're not
20    really going to expect to see a 15 percent return every year,
21    are they?
22         A      It depends on the investor.  I mean, you don't --
23    nothing is guaranteed in the stock market.  Some periods of
24    time it goes down; some periods of time it goes up.
25         Q      And you just happened to hit on a period here
```

UNITED STATES DISTRICT COURT

```
 1   where it went up rather dramatically and more than it went
 2   down; right?
 3        A     I didn't hit on a period.  This period happens to
 4   coincide with the start of the damage period in this case.
 5        Q     And so if we had been looking at a different
 6   period or if the market had been doing something different, you
 7   would have concluded on a different interest rate for
 8   prejudgment interest; correct?
 9        A     Of course.
10        Q     And isn't the fact that you don't know what the
11   stock market is going to do in any given period that
12   December 1st, 2008 -- one would not have predicted a 15 percent
13   annual increase in the stock market.  Isn't that a good reason
14   to look at something that takes a longer period into account?
15        A     No.
16        Q     Mr. Salomon, are you an expert in investments?
17        A     I don't hold myself out to that, but I'm a pretty
18   good investor, yes.
19        Q     Did you make any determination -- strike that.
20              You didn't make any determination of the total
21   net income of Colony Cove over its entire useful life, did you?
22        A     I did not.
23        Q     And you didn't -- you didn't do that at all.  You
24   didn't do it -- do one calculation assuming that the rent
25   increase that had been requested was granted and then compare
```

1    it with another calculation assuming the rent increase was not.

2    You didn't do that, did you?

3         A       Of course not.

4         Q       And you have made no estimate of what percentage

5    of the value of Colony Cove your damages amount represents,

6    have you?

7         A       No.

8         Q       Mr. Salomon, if the conclusion were that the

9    Rent Review Board acted properly when it did not take debt

10   service into account in granting the rent increase for

11   Colony Cove, then the starting point, for your calculation,

12   instead of being $200 or $163 a month, the starting point for

13   your calculation would be zero -- right? -- because, if what

14   the Rent Review Board did was appropriate, there would be no

15   damages due to Mr. Goldstein; correct?

16        A       As I understand that question, that is the crux

17   of the liability issue.  That's something that I have an

18   opinion on.

19        Q       But if the amount that Mr. Goldstein was entitled

20   to for debt service was zero, then his damages would be zero,

21   wouldn't they?

22        A       I guess that would be true.  That's the crux of

23   this lawsuit as I understand it.

24             MS. AILIN:  Thank you, Mr. Salomon.

25             Nothing further.

```
 1                    MR. CLOSE:  No further questions, Your Honor.

 2                    THE COURT:  You may step down.  Thank you.

 3                    Any additional witnesses for the plaintiff?

 4                    MR. CLOSE:  No, Your Honor.

 5                    THE COURT:  At this time, ladies and gentlemen of

 6        the jury, Mr. Close is going to read some facts into the court

 7        record.  They are stipulated facts.  That means both sides have

 8        agreed that these facts are true.

 9                    Mr. Close, you may read into the record the

10        admitted facts.

11                    MR. CLOSE:  Thank you, Your Honor.

12                    MR. ONSTOT:  What number?

13                    MR. CLOSE:  1007.

14                    Admitted fact A, James F. Goldstein is president

15        of Goldstein Properties which is a general partner of El Dorado

16        Palm Springs, Limited, which serves as manager of Colony Cove

17        Properties, LLC.

18                    Plaintiff Colony Cove is the owner of Colony Cove

19        Mobile Estates, a mobile home park located at

20        1700 South Avalon Boulevard, Carson, California 90746 defined

21        as "the park."

22                    For purposes of the trial, the parties will refer

23        to Mr. Goldstein as the owner of Colony Cove.

24                    Goldstein properties, Inc., is a general partner

25        also of Carson Harbor Village, Limited, a California limited
```

**UNITED STATES DISTRICT COURT**

1    partnership.

2              THE COURT:  I'm sorry, Mr. Close.  Slow down.

3              MR. CLOSE:  Carson Harbor Village is the owner of

4    Carson Harbor Village, a mobile home park located at

5    1701 South Avalon Boulevard, Carson, California 90746.  For

6    purposes of the trial, the parties will refer to Mr. Goldstein

7    as the owner of Carson Harbor Village.

8              Mr. Goldstein has owned Carson Harbor Village

9    since the mid 1980's.

10             The park -- the Colony Cove Park, provides

11   residents with the following amenities:

12             One, a large central clubhouse style building

13   with a kitchen, banquet room, auditorium, swimming pool,

14   jacuzzi, billiards card room, library television room, exercise

15   room, indoor spa, and laundry room;

16             Two, recreational vehicle storage spaces which

17   may be rented by residents at an additional cost;

18             Three, a pet exercise run;

19             Four, 24-hour-gated security services; and,

20             Five, water, sewer, trash collection.

21             Admitted fact D, Defendant City of Carson is a

22   municipal corporation located within the state of California in

23   the County of Los Angeles.

24             E, Defendant City of Carson Mobilehome Park

25   Rent Review Board is a public administrative body created by

1   Carson's Mobile Home Space Rent Control Ordinance to hear and

2   determine applications of property owners for rent adjustments.

3           F, at all times relevant to this action, the City

4   and the Board were acting under color of state law.

5           Admitted fact G, Colony Cove Associates had owned

6   and controlled the park since the 1970's until Plaintiff,

7   Colony Cove, purchased it in April of 2006.

8           H, Grossman Properties -- Grossman Company

9   Properties, which is related to Colony Cove Associates, handled

10  the sale of the park on behalf of Colony Cove Associates.

11          Admitted fact I, Colony Cove Associates/Grossman

12  hired Marcus & Millichap to market the park.

13  Marcus & Millichap is one of the largest commercial real estate

14  brokers in the country.

15          Admitted fact J, in late 2005 or early 2006, the

16  park was listed for $28,000,000, and at least three offers were

17  received.

18          Admitted fact K, Cal Am Properties, Inc.,

19  submitted an offer to purchase the park for $21.5 million

20  subject to the terms set forth in that written offer.

21          Admitted fact L, David Weisswasser submitted an

22  offer to purchase the park for $24 million subject to the terms

23  set forth in that written offer.

24          Admitted fact M, both Cal Am's and Weisswasser's

25  offers were legitimate offers.

1          Admitted fact N, on April 4, 2006, Colony Cove

2    purchased the park for approximately $23.05 million from the

3    seller Colony Cove Associates.

4          Admitted fact O, Colony Cove purchased the park

5    with 5,00,000 of its own money as its initial equity

6    investment.

7          Admitted fact P, General Electric Capital

8    Corporation, G.E. Capital, provided $18 million in financing

9    for Colony Cove's acquisition of the park in an arm's-length

10   mortgage, the terms of which are set forth in the loan

11   agreement and promissory note.

12         Admitted fact Q, the sale of the park from

13   Colony Cove Associates to Colony Cove in 2006 was an

14   arm's-length market transaction.

15         Admitted fact R, it is not unreasonable or

16   improper to borrow money to purchase a mobile home park in

17   Carson.

18         Admitted fact S, in 1979, Carson enacted a rent

19   control ordinance known as the mobile home space rent control

20   ordinance which would be referred to as the ordinance.

21         In conjunction with the ordinance, Carson adopted

22   guidelines for implementation of the Mobile Home Space Rent

23   Control Ordinance to be referred to as "the guidelines."

24         Admitted fact U, the guidelines are published to

25   guide the Board in implementing the ordinance and calculating

1   rent increases.

2           Admitted fact V, the ordinance and guidelines do

3   not permit an automatic rent increase based on a set formula.

4   Instead, they require a park owner to prepare and submit a rent

5   increase application to obtain any rent increase.

6           Admitted fact W, at the time Colony Cove

7   purchased the park, the City had in place guidelines adopted

8   via resolution 98-010 entitled "A resolution of the

9   City of Carson adopting revised guidelines for the

10  implementation of the Mobile Home Space Rent Control Ordinance.

11  These are referred to as "the original guidelines."

12          In the years preceding Colony Cove's purchase of

13  the park, Mr. Goldstein submitted numerous rent increase

14  applications on behalf of Carson Harbor Village.

15          Admitted fact Y, after Colony Cove purchased the

16  park, the City amended the original guidelines on

17  October 31, 2006, when it adopted resolution number 06-149

18  titled "A resolution of the city council of the City of Carson,

19  California, amending resolution No. 98-010 adopting revised

20  guidelines for implementation of the Mobile Home Space Rent

21  Control Ordinance" referred to as "the revised guidelines."

22          Admitted fact Z, Colony Cove submitted its first

23  set of rent increase applications on or around

24  September 28, 2007.

25          Admitted fact aa, Colony Cove submitted its

```
 1   second set of rent increase applications on or around

 2   September 28, 2008.

 3              That's it, Your Honor.

 4              THE COURT:  Any additional evidence for the

 5   plaintiff?

 6              MR. CLOSE:  No, Your Honor.  The plaintiff rests

 7   subject to rebuttal.

 8              THE COURT:  First witness for the defense.

 9              MS. AILIN:  Your Honor, if I may, I'd like to

10   send someone out in the hall, please.

11              THE COURT:  Sure.

12              THE CLERK:  Please come forward and stand next to

13   the court reporter's desk.  Please raise your right hand.

14              Do you solemnly state that the testimony you may

15   give in the cause now pending before this court shall be the

16   truth, the whole truth, and nothing but the truth, so help you

17   god?

18              THE WITNESS:  I do.

19              THE CLERK:  Thank you.  Please take a seat.

20              For the record, can you please state your full

21   name and spell your last name.

22              THE WITNESS:  Kenneth Paul Freschauf,

23   F-r-e-s-c-h-a-u-f.

24   ///

25   ///
```

**UNITED STATES DISTRICT COURT**

```
 1                  KENNETH PAUL FRESCHAUF,

 2              DEFENDANT'S WITNESS, SWORN:

 3                  DIRECT EXAMINATION

 4   BY MS. AILIN:

 5        Q     Good afternoon, Mr. Freschauf.

 6        A     Good afternoon.

 7        Q     Do you work for the City of Carson?

 8        A     Not at this time.

 9        Q     Did you used to work for the City of Carson?

10        A     Yes.  I was an employee there for about 29 years.

11        Q     And when did you retire?

12        A     It was December of 2014.

13        Q     What were your duties when you worked for the

14   City?

15        A     Predominantly mobile home park rent control

16   approximately 20 of those 29 years.

17        Q     And how did you learn about mobile home park rent

18   control?

19        A     Well, the gentleman that was doing it at the time

20   was moving on to be assistant city manager in another city, and

21   I was tasked to take over that slot.  So I had a two-week crash

22   course from him.

23        Q     And then you also had many years of experience

24   following that; correct?

25        A     Yes.
```

1      Q      What is your current relationship with the City?

2      A      I work with the City off and on as a consultant

3  through Rosenow Spevacek Group, RSG.

4      Q      Is the work you do still related to rent control?

5      A      Yes.

6      Q      Is the City paying you for your testimony today?

7      A      No.

8      Q      Is your pension conditioned in any way on the

9  testimony you give in this case?

10      A      No.

11      Q      Mr. Freschauf, there are a number of binders

12  around the witness stand there, and I may be referring to some

13  documents in those binders.  So feel free when you need to, and

14  I'll direct you to which exhibit to look at.

15             How long has Carson had a Mobile Home Rent

16  Control Ordinance?

17      A      I believe it was May of 1979 they established the

18  ordinance.

19      Q      If you would take a look at Exhibit 1002 which

20  would be in one of the black binders up there.

21      A      All right.

22      Q      Is Exhibit 1002 the Mobile Home Rent Control

23  Ordinance?

24      A      Yes, it is.

25      Q      Is the ordinance the only document that is

```
 1   relevant or was relevant to you as the staff person responsible
 2   for administering the ordinance?
 3          A      No.  Probably even more important, at least for
 4   day-to-day operation, were the guidelines.
 5          Q      And would you please take a look at Exhibit 1001.
 6          A      (Witness reviewing document.)
 7                 All right.
 8          Q      And are those the guidelines?
 9          A      Yes.
10          Q      Do the guidelines say anything about the purpose
11   of the Mobile Home Rent Control Ordinance?
12          A      Yes.
13          Q      And on page 3 of Exhibit 1001, there's a
14   paragraph Roman numeral I-A, and that paragraph says something
15   about the purpose of the ordinance.  Can you read that to us,
16   please.
17          A      "This is purpose and general principles.  The
18   purpose of the ordinance is to protect the homeowners who rent
19   spaces in mobile home parks in the city from excessive rents
20   and to allow park owners to earn a just and reasonable or fair
21   return on investment.
22                 Mobile homeowners or homeowners are uniquely -- a
23   uniquely vulnerable group of tenants due to the investment made
24   in purchasing and maintaining their homes and the high cost and
25   difficulty involved in attempting to move the home.
```

**UNITED STATES DISTRICT COURT**

1          *Additionally, many of the homeowners in the city*

2     *are seniors on fixed incomes, and many have low or moderate*

3     *incomes.  Unlike the apartment -- unlike apartment tenants,*

4     *homeowners cannot just pack up their personal belongings and*

5     *move if rents increase to a level they cannot afford.*

6          *In order not to lose the considerable investment*

7     *made in purchasing and maintaining their homes, they must*

8     *either sell their home in place in the park or move their home*

9     *if they cannot afford the rent.  However, it is very costly to*

10    *move a home and even when vacant spaces are available in*

11    *surrounding area.  The parks having those vacant spaces often*

12    *restrict them to rental by new mobile homes and will not allow*

13    *homes being relocated from another park.*

14         *Thus, moving the mobile home is not generally a*

15    *feasible alternative.  A homeowner who can no longer afford the*

16    *rent must sell the home quickly to avoid being evicted or*

17    *defaulting on the mortgage of the home.  However, excessive*

18    *rents make a home difficult to sell and often require the*

19    *homeowner to sell the home at a price which is insufficient to*

20    *allow recovery of the investment made in the home.*"

21         Q     And that paragraph that you just read to us, that

22    explains the whole reason for having the Mobile Home Rent

23    Control Ordinance?

24         A     Yes.  That's the nuts and bolts.

25         Q     So being a tenant in a mobile home park is

1    different from being a tenant in an apartment building?

2         A       Yes.

3         Q       And that paragraph from the guidelines that you

4    just read, was that part of the guidelines the entire time you

5    worked for Carson?

6         A       Yes.  I don't think that part has changed.

7         Q       And the guidelines were amended in October of

8    2006; is that correct?

9         A       Yes.

10        Q       And please take a look at Exhibit 1003.

11        A       All right.

12        Q       You've seen that document before?

13        A       Yes.

14        Q       What is Exhibit 1003?

15        A       It was an amendment to the guidelines resolution

16   No. 06-149 amending the guidelines adding the maintenance of

17   net operating income or MNOI formula to what we would normally

18   be doing for each hearing and outlining how it would be done.

19        Q       So let's back up a little bit.

20               The guidelines set forth what that affects how

21   you would process a rent control application?

22        A       Yes.  It's the general guidelines that staff uses

23   when they're going through a rent process, yes.

24        Q       And does it list a variety of factors that are to

25   be considered in making a rent increase decision?

1       A       Between that and the ordinance, yes.

2       Q       And how many factors are identified in the

3   guidelines?

4       A       Well, the ordinance, I think, has 12 factors

5   listed.  The guidelines has several formulas that we would use.

6               THE COURT:  I'm sorry to interrupt.  Give me just

7   one second.

8       Q       BY MS. AILIN:  You were saying, Mr. Freschauf,

9   that the guidelines contain formulas that you would use.

10      A       Yes.

11      Q       What are some of those formulas?

12      A       Well, maintenance of net operating income was

13  this one that was added.  Prior to that, gross profit

14  maintenance was described, I believe, in the guidelines also.

15      Q       Was there also a CPI formula that was used?

16      A       That actually is kind of in the ordinance itself,

17  but I think we did elaborate on it some in the guidelines, yes.

18      Q       So what was the CPI formula?

19      A       Just using the consumer price index or the change

20  in inflation since the last park hearing and base that on the

21  gross rent of the park, the total rent.

22      Q       So what you were looking at in applying the CPI

23  was changes in inflation between the last increase that was

24  granted and another increase being sought?

25      A       Yes.

1        Q        And you also mentioned the gross profits

2   maintenance formula.

3        A        Yes.

4        Q        Tell us a little more about that.

5        A        Well, using CPI -- instead of on the total rent,

6   used it on the total income from one point in time which had

7   normally been the last hearing all the way to the most recent

8   month available for the hearing coming up.

9        Q        And then you said that in October, 2006, the

10  guidelines were amended to add the MNOI formula.

11               What is the MNOI formula?

12       A        It's the maintenance of net operating income, and

13  that one you use CPI on the net operating income only which

14  does not include debt service as a cost to the park.  It's left

15  as part of the profit -- the profit side of that equation, and

16  that does not get increased by the CPI, only increases in the

17  other expenses in the park.

18       Q        Did the guidelines say you must use a particular

19  formula and determine the rent increase just by that one

20  formula?

21       A        No.  There's nowhere in any of the guidelines or

22  the ordinance where it specifically states you have to use

23  anything.  It's a combination of all of them.

24       Q        So the guidelines didn't say that before

25  October, 2006, you must use this one formula?

1        A       No.

2        Q       And even after October, 2006, after the MNOI

3   method was specified in the guidelines, did the guidelines say

4   you must use a certain formula to determine a rent increase?

5        A       No.  And we had used MNOI prior to it actually

6   even being put into the guidelines on several occasions.

7        Q       We'll talk more specifically about those in a

8   little bit.

9                If a mobile home park owner in Carson wants to

10  increase the rent, what does the mobile home park owner need to

11  do?

12       A       We have an application form that they fill out.

13  They provide copies of all their checks and all their invoices

14  and then submit those to staff.

15       Q       And what was your role in that application

16  process?

17       A       I was the lucky person designated to have to go

18  through all of them.  My fingerprints are on every document

19  that was submitted, every bill, every check.  I had to double

20  check those against the summary sheets that were submitted

21  against each category to determine whether or not the expenses

22  that were listed are correct and then go through each one and

23  determine whether or not those expenses were reasonable based

24  on the ordinance and guidelines.

25       Q       Was it your job to decide whether a rent increase

1   would be approved?

2        A      No.  I would make a recommendation, though, to

3   the Rent Review Board and then, during a public hearing where

4   the park owner and his representatives could testify, they were

5   allowed to do so.  And then the board made up their minds after

6   the hearing.

7        Q      Now, in the period from 2007, 2008, how were

8   members of the Rent Review Board appointed?

9        A      2007/2008, I'm not a hundred percent sure.  But

10  my recollection during that time period, I believe they were

11  being made -- well, it's one of two ways.  It was either the

12  mayor directly was making all nominations, but I'm thinking

13  that back then he was still getting recommendations from each

14  individual counsel member, and then he would choose from that

15  list.

16       Q      Did the ordinance provide that the board members

17  are to be drawn from different categories of people?

18       A      Yes.  There's three different categories on the

19  current board that we've been using probably for at least ten

20  years or more now.  There's three neutral members who are

21  neither a park owner nor a park resident nor do they own rental

22  property, and then there are two park owners and two park

23  residents.  So normally we have a seven-member board although,

24  if for some reason somebody is not there and we cannot get an

25  alternate, let's say, a park owner member isn't able to make

1    it, we'll also take off a park resident so we still have a

2    balanced board.

3         Q       Now, Mr. Freschauf, I take it you know

4    Mr. Goldstein who is in court today?

5         A       Yes.

6         Q       Was Mr. Goldstein ever on the board?

7         A       For a short time, yes.

8         Q       Approximately how long was Mr. Goldstein on the

9    board?

10        A       Couple weeks to a month at the most.

11        Q       What's your understanding of why Mr. Goldstein

12   was removed from the board?

13        A       Well, we had a discussion -- or at least I

14   brought it to the attorney's attention that we were in

15   litigation with Mr. Goldstein and it probably wouldn't be a

16   real good idea to have him on the board.

17        Q       So we've talked a little bit about the amendment

18   to the guidelines.  Did the amendment to the guidelines change

19   the way you processed rent increase applications?

20        A       No.

21        Q       So you still went through the same process of

22   having the park owner submit an application, and you went

23   through all the details and made a recommendation to the board?

24        A       Correct.

25        Q       Mr. Freschauf, please take a look at Exhibit 46.

**UNITED STATES DISTRICT COURT**

1      That would be in one of the black binders up there.

2           A      Okay.  I'm sorry.  I'm not finding that one.

3           Q      Mr. Freschauf, there's a binder up on the rail

4      behind your chair.  Perhaps it's that one.

5           A      Yes, it is.  All right.

6           Q      And is this the rent increase application that

7      Colony Cove filed around September 28, 2007?

8           A      Yes, it is.

9           Q      And if I refer to that as the Year 1 Application,

10     will you know that I'm referring to that application,

11     Exhibit 46?

12          A      Uh-huh.

13          Q      And in that rent increase application, how large

14     a rent increase did Colony Cove initially ask for?

15          A      $618.05.

16          Q      Did the amount of increase requested change as

17     the processing of the application was going on?

18          A      Yeah.  My recollection is that it went somehow --

19     I think verbally during the hearing it was changed to 200

20     something which would have been the gross profit maintenance

21     analysis 100 percent CPI.

22          Q      And what was your understanding of the primary

23     reason Colony Cove was asking for the Year 1 rent increase?

24          A      Well, it had almost 100 percent to do with the

25     increase in debt service on the park.

**UNITED STATES DISTRICT COURT**

1          Q      Did you review and analyze Colony Cove's

2     Year 1 Application?

3          A      Yes.

4          Q      Tell us what you did in the process of reviewing

5     and analyzing the application, Exhibit 46.

6          A      Well, the application that's here in front of me

7     is only probably, what, 20, 30 pages long, 25.  There's a

8     supplemental application that gets attached to that, and then

9     there's usually from five to six binders, these three-inch

10    binders, very similar to what's down here now.  That would be

11    one application.

12               And I would go through every page of it and have

13    to document the checks and the invoices and then -- against the

14    summary page for each category and make sure that they all

15    added up correctly, flag anything that looked like it didn't

16    belong or that it wouldn't be an allowable expense, and send a

17    letter back to the park owner explaining if there were things

18    in there that I needed additional information on which I think

19    there was on this hearing I'm sure.

20               Then that information would come back,

21    application would be deemed complete at that time.  I would

22    start preparing a staff report for the board hearing.

23         Q      In your answer you used the phrase "allowable

24    expense."  What do you mean by that?

25         A      Well, the park owner submits everything just as

1    if he was probably taking, I guess for lack of a better term,

2    all of your invoices and everything as if you were going to

3    your tax man, but we don't use everything that a tax person

4    would use.  There's a number of items that you would use on

5    federal income tax that we don't allow as an operating expense

6    to run a mobile home park.

7         Q       Now, would you please take a look at Exhibit 55.

8         A       All right.

9         Q       And can you tell us what Exhibit 55 is?

10        A       Yes.  This is a staff exhibit that I prepare for

11   each hearing on each application that outlines what individual

12   items are being taken out of a rent increase application, the

13   total amount, and then the reason why.

14        Q       And Exhibit 55 is specifically your analysis of

15   adjustments to the expenses for the Year 1 Application; right?

16        A       Yes.

17        Q       And what sort of expenses did you take out of the

18   analysis for the Year 1 Application?

19        A       On the last page there, it just has a brief

20   summary.  They were prorated items that had to do with the

21   purchase of the park -- attorney's fees, nonrecurring expenses

22   for the loan itself to buy the park.  Those were prorated out

23   over the term of the loan.  So I believe that was a five-year

24   loan.  So 80 percent of the expenses in each of those

25   categories were taken out of this particular year, and

335

```
 1    20 percent are going to be placed in the next four years of the

 2    applications.

 3              There were -- there was almost 125,000 in that

 4    particular category.  There was another 485,000 almost that

 5    were taken out of -- those were reductions to operating

 6    expenses that were deemed not allowable expenses, and I can go

 7    back and look at each one of those.  I think most of them had

 8    to do with either adding additional spaces to the park or the

 9    conversion of the park to another use.  He was interested at

10    that time in converting the park for resident ownership rather

11    than holding the park as a rental park.

12        Q     And the expenses that you took out that were

13    related to converting the park to an ownership park, were those

14    attorney's fees or other kinds of expenses?

15        A     They were attorney's fees, expert witness -- not

16    witness.  We weren't in court at that point.  Engineering fees,

17    just other experts that he had working on that particular

18    project.  There was also an additional 266,000 that were

19    removed that were all capital improvements to the park that,

20    even though he had just purchased the park, there were a number

21    of items that needed significant repair.  So 266,000 were taken

22    out of the general rent increase application.  The park owner

23    then came back later and got a capital improvement rent

24    increase based on those expenses.

25        Q     Now, when Mr. Goldstein purchased Colony Cove --
```

**UNITED STATES DISTRICT COURT**

1  we've heard a number of witnesses and a fair amount of

2  testimony in this case comparing Colony Cove to the park across

3  the street, Carson Harbor Village.  You're familiar with both

4  parks, aren't you?

5      A      Yes.  Uh-huh.

6      Q      And back in 2006 when Mr. Goldstein purchased

7  Colony Cove, how did it compare to Carson Harbor Village?

8      A      Well, it was an inferior park.  Carson Harbor

9  Village was a larger park.  It had more area within the park

10 itself.  It had a nice marsh and wildlife area in the center of

11 the park.  And I mean, I know some residents complain about

12 smell at some point or they may complain about this or that

13 about the marsh area, but it provided a nice vista and a nice

14 walking area within that park.

15          It was also -- I believe there's slightly better

16 amenities at Carson Harbor Village versus Colony Cove.  At that

17 point Colony Cove was not as well kept up as Carson Harbor

18 Village was.  Carson Harbor Village was owned by Mr. Goldstein,

19 and it was inarguably better shape than Colony Cove was at the

20 point of his purchase.

21     Q      So at the time that Mr. Goldstein purchased

22 Colony Cove, would it be a fair comparison to compare the rent

23 for a space in Carson Harbor Village to the rent for a space in

24 Colony Cove?

25     A      Well, no.  There had always been upwards of 100,

**UNITED STATES DISTRICT COURT**

1   $110 rent differential between the two ever since the rent

2   review ordinance was established.  And Colony Cove had done

3   nothing at that point under prior ownership, not Mr. Goldstein,

4   but nothing had occurred in that park to bring it up to the

5   same level as Carson Harbor Village.  They would have to add

6   some amenities to make it arguably the same level.

7        Q       And we have also heard testimony in this case

8   comparing the rent at Colony Cove with the rent on some spaces

9   in Carson Harbor Village that are not subject to rent control.

10              Is that a fair comparison?

11       A       No.  Those are apple and oranges.  You have rent

12  control spaces that have been held down, and with good reason

13  for years, probably are 250, $300 lower than a market rate

14  space that was more recently installed.  At the time that

15  Mr. Goldstein put those spaces into the park, they were no

16  longer under rent control.  They weren't under rent control.

17  So he could charge market rate rents for those.

18              So the only fair comparison is going to the

19  non-rent -- excuse me, the rent-controlled spaces within

20  Carson Harbor versus the rent-controlled in Colony Cove.  But,

21  again, there's always been a little over $100 rent

22  differential.

23       Q       Now, let's go back to the Year 1 Rent

24  Application.

25              In your analysis of the Year 1 Application, was

 1    there anyone who assisted you in the Year 1 Application?

 2         A    Well, I'm sure I sat down with my supervisor who

 3    was Sherry Repp at this point.  She was the planning manager.

 4    She was the only other person within city staff that I could

 5    really sit down and discuss rent control issues with.  We also

 6    ended up calling Dr. Ken Baar for help with the MNOI

 7    calculation.  We had used him on several prior to this and, you

 8    know, looking at the type of increase that was requested and

 9    the application itself I knew I would need some assistance with

10    that.

11         Q    Now, as part of the rent increase application

12    process, was it customary for the City to have the park

13    appraised by a real estate appraiser?

14         A    No.  We very rarely do that.

15         Q    Did park owners sometimes get real estate

16    appraisals to support their rent increase applications?

17         A    Once in a while.  Generally, it's when a park

18    changed hands.

19         Q    And did Colony Cove Properties provide the City

20    with an appraisal of the Colony Cove Mobilehome Park as part of

21    the Year 1 Application?

22         A    Yes.

23         Q    After you did your analysis of Colony Cove's

24    Year 1 rent increase application, what happened next?

25         A    This gets a little confusing, and I'm sorry.

```
 1              Usually they're pretty cut and dry, but this one
 2   wasn't.  We went to hearing, and for whatever reason that
 3   night -- I'm thinking we didn't have a balanced board --
 4        Q      Before we get to a hearing, you prepared a staff
 5   report; right?
 6        A      Yes.  I did my normal staff report.  Dr. Baar, I
 7   believe, prepared a report, and then we sent that out.  It was
 8   rather extensive as normally we would have exhibits A, B, C, D
 9   and E at the most.  I think this one got up to V, W, X, Y.
10   There was an unbelievable amount of paperwork with this one.
11   That all went out to the board.  We sat for the first hearing,
12   but I believe we did not have a balanced board the first night;
13   so the hearing was postponed.
14        Q      I'm sorry.  I'm going to interrupt you one more
15   time.
16        A      Okay.
17        Q      Exhibit 48 in the binders in front of you, it
18   should be in the same binder Exhibit 46 was in.
19              Is 48 the staff report that you prepared?
20        A      Yes.
21        Q      And I'm sorry I interrupted you.  You were
22   talking about the hearing on this application.
23        A      Yeah.  We went through -- I'd have to go through
24   all the records in city hall to remember this exactly, but it
25   seems to me we went through about three separate hearings to
```

1    finally get a final hearing on this matter before the board and

2    have the board recommendation and a resolution adopted.

3          Q        And in your staff report, Exhibit 48, what was

4    the rent increase that was recommended?

5          A        The staff recommendation was $15.65.

6          Q        And did that recommendation change as you were

7    going through the hearing process?

8          A        Yes.  There was an issue that came forward with

9    regards to the property taxes on the -- on the park.  Since it

10   was a new purchase, it was going to be reassessed.

11   Historically we never had granted a rent increase based on an

12   expected expense.  However, it came up during this hearing

13   between Dr. Baar and some of the other experts on the other

14   side.  They decided it would be fair to add that expected

15   increase into this.  And I think that is why we ended up going

16   to a third hearing because that -- we didn't have that number I

17   don't think settled yet.

18         Q        Did the board ultimately adopt a resolution

19   granting an increase in response to the Year 1 Application?

20         A        Yes.

21         Q        And please take a look at Exhibit 50.

22         A        All right.

23         Q        Is that the resolution that was adopted by the

24   Rent Review Board on the Year 1 Application?

25         A        Yes.

1     Q        And what was the amount of the rent increase that

2  was granted on the Year 1 Application?

3     A        $36.74, and I believe that was for just -- just

4  for a one-year period of time.

5     Q        What do you mean it was for --

6     A        It was for one expense year.  I'm sorry.  It goes

7  forward forever, but it was only granted on one year, one year

8  of expenses.

9     Q        One year of looking backward?

10    A        Yes.

11    Q        Okay.  Now, did Colony Cove file another rent

12 increase application around September 28, 2008?

13    A        Yes.

14    Q        And please take a look at Exhibit 47.  Do you

15 recognize -- let me let you get there.

16             Do you recognize that as the rent increase

17 application that Colony Cove filed around September 28, 2008?

18    A        Yes.

19    Q        And if I refer to that as the Year 2 Application,

20 will you understand that Exhibit 47 is the application I'm

21 talking about?

22    A        Yes.  Uh-huh.

23    Q        And did you process the Year 2 Application pretty

24 much the same way you processed the Year 1 Application?

25    A        Yes, I did.

**UNITED STATES DISTRICT COURT**

1      Q       And in the Year 2 Application, what was the rent

2  increase that Colony Cove requested?

3      A       Give me a second.  They're not always in the same

4  place here.

5              $342.46.

6      Q       And what was your understanding of the primary

7  reason Colony Cove was asking for this rent increase?

8      A       Well, in my mind, it was probably they were

9  trying to make up what they didn't get at the previous hearing.

10 I don't think -- there was some increase in expenses, but I

11 don't think it was that significant.

12     Q       In processing the Year 2 Application, did you

13 make adjustments to expenses similar to the ones you made in

14 the Year 1 Application?

15     A       I'm sure I did, yes.

16     Q       In one of the white binders up there, there are

17 two exhibits 2013 and 2014.

18         (Marked for identification Exhibit No. 2014.)

19     Q       BY MS. AILIN:  Would you please locate those.

20     A       2013 and -14?

21     Q       Yes.  2013 and 2014.

22     A       All right.

23     Q       Could you explain to us what Exhibit 2013 is.

24     A       That's another staff correction sheet that would

25 have been submitted as an exhibit to the Year 2 Application as

1    part of my staff report.

2        Q      So that document reflects the documents to

3    expenses you made for the Year 2 Application?

4        A      Yes.

5        Q      And what is Exhibit 2014?

6        A      That was a spreadsheet that I also included to

7    help show the increases and decreases and expenses and income.

8        Q      And sorry to make you shift binders again, but in

9    one of the black binders, there's Exhibit 49.

10       A      All right.

11       Q      What is Exhibit 49?

12       A      This looks like the Year 2 staff report prepared

13   by me.

14       Q      And was the Year 2 Application presented to the

15   board?

16       A      Yes, it was.

17       Q      And did the board grant a rent increase based on

18   the Year 2 Application?

19       A      Yes.

20       Q      How much was the rent increase that was granted?

21       A      Without looking at the reso, I'm going to have

22   trouble.

23       Q      Take a look at Exhibit 51.  Is that the

24   resolution?

25       A      Yes.

1      Q        Granting the Year 2 Application?

2      A        Yeah, it is.

3      Q        And how much was the rent increase?

4      A        25.02.

5      Q        $25.02?

6      A        Yes.

7      Q        On the years you have worked on rent control for

8  Carson, what's the largest single increase in terms of dollars

9  that you can remember the board granting?

10     A        I'm thinking we had one around $100, but it was

11 for a period of time that was 12, 15 years, something like

12 that.  It was for an extended period.

13     Q        So there was a park owner who hadn't come in with

14 a rent increase application for a decade?

15     A        Right.

16     Q        So that park owner got a large rent increase all

17 in one lump sum?

18     A        Uh-huh.

19     Q        Now I'm going to shift gears for a moment.

20              As an employee for the City of Carson, did you

21 pay attention to the results or -- did you pay attention to the

22 results of city elections?

23     A        Yes.

24     Q        And in doing so, have you obtained any

25 information on what percentage of the voters in Carson are

```
 1   mobile home park residents?
 2        A      It's roughly five percent, a little over I
 3   believe.
 4        Q      And how many mobile home parks are there in
 5   Carson?
 6        A      There's currently 21 I believe we're at.
 7        Q      And as an employee of the City, did you know
 8   someone named Jim Dear?
 9        A      Yes.
10        Q      And who is Mr. Dear?
11        A      He's a former council member, former mayor, and
12   now the former city clerk.
13        Q      And during the period from 2006 to 2009, was
14   Mr. Dear mayor at the time?
15        A      What time period?  I'm sorry.
16        Q      2006 to 2009.
17        A      I'm thinking he was still a council member at
18   that time.
19        Q      So he was on the city council, but he was not the
20   mayor.
21        A      Yes.  I think so.  I don't think he had become
22   mayor at that point.
23        Q      And during that period of time, did Mr. Dear talk
24   to you about the Year 1 Colony Cove rent increase application?
25        A      I don't recall any specific conversations with
```

**UNITED STATES DISTRICT COURT**

1   him on that, no.

2        Q        And during that period of time from 2006 to 2009,

3   did Mr. Dear talk to you about the Year 2 Colony Cove rent

4   increase application?

5        A        Not that I recall, no.

6        Q        During the period from 2006 to 2009, did Mr. Dear

7   talk to you about any other rent increase application?

8        A        I'm sure he did.  It wasn't unusual for a council

9   member once a month or so to either phone me or, if they were

10  coming in the back door, come by my office and ask a question

11  about an application.  They were generally benign questions,

12  you know, why do we do it this way?  Why is somebody allowed to

13  do that?  Can somebody ask for whatever amount of increase they

14  want?  I mean, just general informational questions.

15       Q        During that period from 2006 to 2009, do you

16  remember any council member or the mayor coming to you and

17  saying anything about how they thought a rent increase

18  application should be decided?

19       A        No.

20       Q        Do you recall ever having any conversations with

21  Mr. Dear about Mr. Goldstein?

22       A        No.

23       Q        Do you recall ever having a conversation with

24  Mr. Dear about Colony Cove Mobilehome Park?

25       A        No.

**UNITED STATES DISTRICT COURT**

1        Q       Do you ever recall having a conversation with

2   Mr. Dear about Carson Harbor Village?

3        A       No.

4        Q       Did you ever hear that Mr. Dear had removed

5   someone from the Rent Review Board?

6        A       Yes.

7        Q       And what did you hear about that?

8        A       I'm going to guess it probably occurred a half a

9   dozen times that he removed a board member which he is allowed

10  to do.  He is the mayor.  He's the only one that can remove

11  someone from the board.

12       Q       And do you have any recollection of when that

13  happened?

14       A       No.  Not specific dates, no.

15       Q       Did you ever hear that Mr. Dear had texted a

16  member of the Rent Review Board during a meeting of the board?

17       A       Yes.  I did hear that.

18       Q       And do you know -- do you recall approximately

19  when you heard that?

20       A       It was much more recent.  I'm going to say around

21  2012, 2013, somewhere in there.

22       Q       But you're -- you're certain it was not during

23  the period from 2007 to 2009?

24       A       That's correct.

25       Q       Shifting back to the rent increase process

1    itself, while you were employed by the City of Carson, did you

2    also process rent increase applications for the other mobile

3    home park in Carson that Mr. Goldstein owns, Carson Harbor

4    Village?

5         A    Yes.

6         Q    And in your work on those rent increase

7    applications, did you look back at earlier rent increase

8    applications that were filed for Carson Harbor Village?

9         A    Yeah.  Either for the applications or at various

10   times we were in negotiations and potential settlement talks

11   with Mr. Goldstein.

12        Q    Now, I'd like you to look at Exhibit 2028.

13            (Marked for identification Exhibit No. 2028.)

14            THE WITNESS:  White or black?

15        Q    BY MS. AILIN:  That would be white.

16        A    All right.

17        Q    And do you recognize that document as the rent

18   increase application for Carson Harbor Village that was

19   submitted in 1984?

20        A    Yes.

21        Q    Was this the first application for a rent

22   increase that Mr. Goldstein made after purchasing Carson Harbor

23   Village?

24        A    I believe so.

25        Q    Was there also a rent increase application that

```
 1    was made before Mr. Goldstein purchased Carson Harbor Village?

 2        A       Yes.

 3        Q       Let's talk about that rent increase application

 4    first.

 5                That was made by the previous owner?

 6        A       What's the date on this again?  Okay.  See, I'm

 7    not going to know much about it.  I know there was previous

 8    hearings and there was previous applications sent in.

 9        Q       Okay.  Then let's stick with the 1984

10    application.

11                Did the 1984 application ask for a rent increase

12    to cover an increase in debt service related to Mr. Goldstein's

13    purchase of the park?

14        A       Yes.  He had just purchased it.  Correct.

15        Q       How large a rent increase did Carson Harbor

16    Village want?

17        A       Hang on a second.  I have to find the right page

18    here.

19                $57.85 per space.

20        Q       And how much of that was for debt service and

21    property taxes?

22        A       Well, if he -- if you include both, it's probably

23    100 percent.

24        Q       And, Mr. Freschauf, would you please look at

25    Exhibit 78.
```

**UNITED STATES DISTRICT COURT**

1        A        Give me a clue.

2        Q        That would be in a black binder.

3                 Mr. Freschauf, Mr. Malawy is saying it might be

4   in a white binder.

5        A        I'm agreeing with him.  All right.

6        Q        And is that the board resolution on the 1984 rent

7   increase application for Carson Harbor Village?

8        A        Yes, it is.

9        Q        And does the resolution tell you how large a rent

10  increase Carson Harbor Village got?

11       A        $12 per space per month.

12       Q        And just to make sure that we are complete here,

13  please take a look at Exhibit 2027 which is also in a white

14  binder.

15       A        All right.

16          (Marked for identification Exhibit No. 2027.)

17       Q        BY MS. AILIN:  And is that document, Exhibit

18  2027, the staff report on the 1984 Carson Harbor Village rent

19  increase application?

20       A        Yes, it is.

21       Q        Now, earlier when we were talking about the

22  different formulas that the guidelines identify as ways to

23  calculate a rent increase, you said something about MNOI, the

24  maintenance of net operating income approach.

25                Do you recall that?

```
1        A       Yes.

2        Q       And you also mentioned that there were times even

3   before the guidelines were amended when the board actually

4   considered or applied that method.

5        A       Yes.

6        Q       Please take a look at Exhibit 2042.  That would

7   be in a white binder.

8        A       Got it.

9          (Marked for identification Exhibit No. 2042.)

10       Q       BY MS. AILIN:  And do you recognize that as the

11  staff report regarding a rent increase for Paradise Trailer

12  Park?

13       A       Yes.

14       Q       And there's right behind it Exhibit 2043.

15       A       Yes.

16         (Marked for identification Exhibit No. 2043.)

17       Q       BY MS. AILIN:  Is that a report regarding

18  Paradise Trailer Park that was prepared by Dr. Kenneth Baar?

19       A       Yes.

20       Q       And page -- excuse me.  Exhibit 79 --

21       A       All right.

22         (Marked for identification Exhibit No. 79.)

23       Q       BY MS. AILIN:  Is that the resolution of the

24  board granting a rent increase to Paradise Trailer Park?

25       A       Yes.
```

**UNITED STATES DISTRICT COURT**

1       Q       Now, this Paradise Trailer Park application, you

2   were working on rent control when that application came in;

3   correct?

4       A       Yes.  I signed the reso.

5       Q       And you were the one who processed the

6   application?

7       A       It appears so, yes.

8       Q       And that was in May of 2004?

9       A       Yes.

10      Q       And how did the board apply the maintenance of

11  net operating income analysis on that rent increase

12  application?

13      A       Actually, I don't have -- let's see.  Bear with

14  me here.  I have to see where it discusses that.

15              (Witness reviewing document.)

16              Which was the exhibit for Dr. Baar that related

17  to this?

18      Q       2043.

19      A       At this point in time, he was preparing a

20  separate report.  So I didn't necessarily have all of his

21  numbers in my staff report.  So excuse me a second.

22              It looks like they went with the MNOI calculation

23  here.

24      Q       And in that rent increase application, was

25  Paradise Trailer Park looking for a rent increase after a new

1    owner bought the park to cover debt service?

2        A    Yes.

3        Q    And was a rent increase granted to cover the new

4    owner's debt service?

5        A    No.  That did not cover it.

6        Q    Now, there was other testimony in this case to

7    the effect that Paradise Trailer Park is a small mobile home

8    park.  Do you happen to know how many spaces it is?

9        A    I think that's 84 spaces.

10        Q    Are the ordinance and the guidelines applied

11    differently to a small mobile home park as compared to how it's

12    applied to a large mobile home park?

13        A    No.  It's the same.  It doesn't matter.  I

14    consider that a medium-sized park for Carson.

15        Q    Now, let's take a look at another application

16    from 2004.  Let's start with Exhibit 2044 which would be in a

17    white binder.

18        A    Got it.

19          (Marked for identification Exhibit No. 2044.)

20        Q    BY MS. AILIN:  And Exhibit 2045.

21        A    All right.

22          (Marked for identification Exhibit No. 2045.)

23        Q    BY MS. AILIN:  And Exhibit 2046.

24        A    Okay.

25          (Marked for identification Exhibit No. 2046.)

 1          Q          BY MS. AILIN:  Is Exhibit 2044, a staff report

 2   regarding a rent increase application by the Park Villa

 3   Mobilehome Park.

 4          A          Yes.

 5          Q          Is Exhibit 2045 Dr. Baar's report on that rent

 6   increase application?

 7          A          Yes.

 8          Q          And is Exhibit 2046 the resolution?

 9          A          Yes.

10          Q          Was the decision on that rent increase made in

11   June, 2004?

12          A          I'm sorry.  I thought there was more.

13          Q          No.  Was that resolution adopted by the board in

14   June, 2004?

15          A          Yes, it was.

16          Q          And in adopting that resolution, did the board

17   consider using the MNOI formula?

18          A          Yes, they did.

19          Q          Did they apply it?

20          A          I wish I could tell you quicker, but I've done

21   over 200 of these, and they start blending in together.  No.

22   It was not -- I'm sorry.  You better ask your question again

23   before I say this wrong.

24          Q          Did the board apply the MNOI method in deciding

25   this June, 2004, rent increase for Park Villa?

```
 1        A        I'm sorry.  I'm getting confused looking at all

 2   of these.  I have to verify three or four pages to make sure I

 3   give you the right answer.

 4              (Witness reviewing document.)

 5              Yes, I did.

 6        Q        And did the park -- they considered it, or they

 7   applied it?

 8        A        They applied it.

 9        Q        Now, was this a first application by Park Villa

10   after purchase of the park?

11        A        No.  This was after a long extended period

12   without coming in for a rent increase it looks like.  I believe

13   the Yakuras had owned that park ever since I'd been involved in

14   rent control.  Y-a-k-u-r-a.

15        Q        And let's talk about one more.  Please take a

16   look at Exhibit 2047.

17        A        All right.

18          (Marked for identification Exhibit No. 2047.)

19        Q        BY MS. AILIN:  And is that the staff report on a

20   rent increase application from the Park Granada Mobilehome

21   Park?

22        A        Yes.

23        Q        And please take a look at Exhibit 2048.

24          (Marked for identification Exhibit No. 2048.)

25        Q        BY MS. AILIN:  Is that Dr. Kenneth Baar's report
```

```
 1   on the same rent increase application from Park Granada?

 2        A     Yes.

 3        Q     And Exhibit 2049, is that the board's resolution

 4   on the Park Granada rent increase application?

 5        A     Yes.

 6          (Marked for identification Exhibit No. 2049.)

 7        Q     BY MS. AILIN:  And the board decided this rent

 8   increase application in September, 2004; correct?

 9        A     Yes.

10        Q     And did the board consider the MNOI method in

11   analyzing the Park Granada rent increase application?

12        A     Yes.  They would have considered it.

13        Q     Did they actually apply it in that case?

14        A     Again, I'm going to have to ask you to hang on a

15   second.

16                (Witness reviewing document.)

17                No.  Wait a minute.  No, they did not.

18        Q     Now, these three applications were all decided in

19   2004; correct?

20        A     Yes.

21        Q     And the guidelines were amended to specifically

22   refer to the MNOI formula a couple of years later in

23   October, 2006.

24        A     Right.  We just wanted to codify it so that at

25   some point, if I wasn't there or whoever, there would be some
```

```
 1   sort of a paper trail as to why we were doing it.

 2        Q      Now, would information about these rent increase

 3   applications by Paradise Trailer Park, Park Villa, and

 4   Park Granada have been available to Mr. Goldstein?

 5        A      Yes.

 6        Q      And how would they have been available to him?

 7        A      Somebody would have called me.  I would have

 8   given them a copy.

 9        Q      Now, earlier you confirmed that you know

10   Mr. Goldstein.  You also know the attorneys and consultants and

11   the park managers who work with Mr. Goldstein on rent increase

12   applications and managing his mobile home parks; correct?

13        A      Yes.

14        Q      Did any of them come to you before Mr. Goldstein

15   purchased Colony Cove and say, we're thinking about buying this

16   park for $23 million but we're going to have a big new loan.

17   Do you have any idea what would happen when we come in with an

18   application for a rent increase?

19        A      No.

20             MR. CLOSE:  Objection.  Calls for speculation.

21             THE COURT:  Overruled.

22             THE WITNESS:  Nobody came in and asked anything

23   about how it would apply on a new purchase.

24             MS. AILIN:  Your Honor, that completes my direct

25   examination with Mr. Freschauf.  Would this be a good time to
```

```
 1    discuss moving exhibits into evidence that were mentioned
 2    during his testimony?
 3              THE COURT:  Let's take the afternoon break.
 4              Ladies and gentlemen, we're going to break for
 5    about 15 minutes.  Remember not to discuss the case among
 6    yourselves or with anyone else.  Don't form or express any
 7    opinions.
 8              We'll see you in 15 minutes.
 9              THE CLERK:  All rise.
10          (The following proceedings were held in
11          open court out of the presence of the jury:)
12              THE COURT:  You may be heard.
13              MS. AILIN:  Defendants move into evidence
14    Exhibits 2013 -- I don't know whether you want to do these one
15    at a time or whether I should read all the numbers.
16              THE COURT:  Give the list first.
17              MS. AILIN:  2013.
18              THE COURT:  Hold on.  Okay.
19              MS. AILIN:  2014, 2028, 78, 2027, 2042, 2043.
20              THE COURT:  2048?
21              MS. AILIN:  2043.
22              THE COURT:  It's going to be 2043 sequentially
23    through 2048?
24              MS. AILIN:  Actually, through 2049.  Exhibit 79
25    would be the last one.
```

**UNITED STATES DISTRICT COURT**

1                    THE COURT:  Let's deal first with 2042 through

2     2049.

3                    Objection?  Any objection?

4                    MR. CLOSE:  No, Your Honor.

5                    THE COURT:  All right.  2042 through 2049 are

6     admitted.

7              (Received into evidence Exhibit

8           Nos. 2042 through 2049.)

9                    THE COURT:  78 has been admitted already.

10                   Any objection to 79?

11                   MR. CLOSE:  No, Your Honor.

12                   THE COURT:  Admitted.

13             (Received into evidence Exhibit No. 79.)

14                   THE COURT:  And then 2013 has previously been

15    admitted.  And then let's finally -- all the document so we're

16    on the same page basically, all the exhibits you just

17    identified are now admitted.

18                   MS. AILIN:  Thank you, Your Honor.

19             (Received into evidence Exhibit

20           Nos. 2014, 2028, and 2027.)

21                   THE COURT:  And then just, lastly, with regard

22    to -- the plaintiffs move to admit 1018 {sic}, the S&P 500 that

23    was referred to in Mr. Salomon's testimony.

24                   Objection?

25                   MS. AILIN:  Your Honor, the first time we were

UNITED STATES DISTRICT COURT

```
 1    given any notice that plaintiff intended to use that as an

 2    exhibit was on Sunday, August 24, which was well beyond the

 3    time for disclosing exhibits.  Excuse me.  April.

 4    April 24, 2016 was when we first learned that plaintiffs

 5    intended to use that as an exhibit.

 6                THE COURT:  In his expert report, did he make

 7    reference to the numbers referred to in the exhibit?

 8                MS. AILIN:  Well, it's in reference to in the

 9    since that --

10                THE COURT:  He relied on it.

11                MS. AILIN:  He relied on it.

12                THE COURT:  Okay.  Any other objection besides

13    that?

14                MS. AILIN:  No, Your Honor.

15                THE COURT:  Okay.  So explain the lateness

16    disclosure.

17                MR. CLOSE:  Your Honor, we had originally --

18    before that period of time, we had been presenting it as a

19    request for judicial notice and a jury instruction that the

20    defendants were not agreeing to either because --

21                THE COURT:  When was the request for judicial

22    notice made?

23                MR. CLOSE:  Within the time periods contemplated

24    by the sharing of jury instructions.

25                THE COURT:  All right.  Admitted.
```

UNITED STATES DISTRICT COURT

```
 1              (Received into evidence Exhibit No. 1008.)

 2                   THE COURT:  Okay.  We'll see you in ten minutes.

 3              (A recess was taken at 3:09 p.m.)

 4              (The following proceedings were held in

 5         open court in the presence of the jury:)

 6                   THE COURT:  Cross-examination.

 7                        CROSS-EXAMINATION

 8    BY MR. CLOSE:

 9         Q     Good afternoon, Mr. Freschauf.  How are you?

10         A     Good afternoon, Mr. Close.  Just fine.

11         Q     Good.

12               During the -- are you up there?

13         A     Just doing housekeeping.

14         Q     Take a moment.

15         A     We can start all over.

16         Q     When your -- when the City's attorney was

17    examining you, you discussed a handful of rent increase

18    applications in the 2004 time period where the MNOI process had

19    been used; isn't that correct?

20         A     Yes.

21         Q     But one thing that wasn't discussed during that

22    examination was the Carson Gardens application.

23               Wasn't that correct?

24         A     Correct.

25         Q     I would like to ask Mr. Newcomb to put on the
```

UNITED STATES DISTRICT COURT

```
 1   board Exhibit 1005 the Carson Gardens litigation.

 2            You're familiar with the Carson Gardens

 3   litigation, aren't you, Mr. Freschauf?

 4        A    Oh, yes.

 5        Q    And you were involved in that rent increase --

 6   that rent application process, weren't you?

 7        A    Yes.

 8        Q    And you were -- in your capacity at the City

 9   monitoring and assisting the City in that litigation; isn't

10   that correct?

11        A    Although I'm not sure I was a staff person on the

12   very first case of this.

13        Q    Okay.  But you're familiar with the litigation?

14        A    Yes.  Yes.

15        Q    Part of your job probably to follow the

16   litigation like this; isn't that correct?

17        A    No.  Not really.  I mean, I would hear about it

18   but --

19        Q    The Court's decisions weren't an important factor

20   in how you performed your function at the City?

21        A    Right.  But I didn't follow it.  Our attorneys

22   would send whatever the results were.  It wasn't something I

23   came in and logged onto and checked all the time.

24        Q    Okay.  I'd like to put on the board and direct

25   your attention to page 5 of Exhibit 1005, please.  The bottom
```

**UNITED STATES DISTRICT COURT**

1    of the left-hand column, and maybe we'll blow that out.

2             And the Court of appeal in this case said that

3    *"The trial court issued the April 16, 2003, writ based on its*

4    *conclusion that the board had historically acted to account for*

5    *and was required by its own process to utilize a methodology*

6    *for reviewing discretionary rent increase applications which*

7    *gives due consideration to the park's actual reasonable*

8    *operating expenses including any financing costs associated*

9    *with ownership and acquisition of a park."*

10            Isn't that what Court of Appeal said in that

11   provision there, Mr. Freschauf?

12       A       I believe so, yes.

13       Q       And let's go to the next page, please, page 6 of

14   Exhibit 1005, the column on the right, the bottom of the first

15   paragraph, the last sentence.

16            The Court of Appeal said, *"The board was thus*

17   *bound to comply with the trial court's writ which required it*

18   *to use gross profits maintenance analysis or some other*

19   *methodology giving due consideration to debt service costs in*

20   *calculating a fair return."*

21            Isn't that what the Court of Appeal said in that

22   case?

23       A       Yes.  It appears so.

24       Q       Going down to the next paragraph, the provision

25   that's already highlighted, the second sentence, Court of

1    Appeal said -- actually, I'll do the first two sentences.

2              *"The board contends that it fully complied with*

3    *the original writ and that its selection of MNOI methodology*

4    *was authorized by the City's ordinance and guidelines as well*

5    *as Court of Appeal precedence.  It is plain, however, that the*

6    *board did not, in fact, comply with the writ because it did not*

7    *use a methodology that considered debt service costs.*

8              *Indeed, the record supports the trial court's*

9    *finding that the board chose the MNOI methodology for the*

10   *purpose of deleting certain costs from the process."*

11             Isn't that what the Court of appeal said,

12   Mr. Freschauf?

13        A    Yes.  I'm not sure at which time because I

14   believe there was at least two hearings before that court.  But

15   at some point they said that, yes.

16        Q    Okay.  And then let's go back to page 1 of

17   Exhibit 1005, please, at the top.  The date of this decision is

18   January, 2006.

19             Isn't that correct, Mr. Freschauf?

20        A    Yes.

21        Q    Okay.  And this was, of course, after the three

22   rent applications that the City's attorney asked you about

23   during direct examination.

24             Isn't that right?

25        A    That's correct.

```
 1          Q       So after the Court of appeal -- strike that.
 2                  After the California courts found that the
 3   City of Carson was required to use a methodology that took into
 4   account debt service, the City of Carson decided to amend its
 5   guidelines; isn't that correct?
 6                  MS. AILIN:  Objection, Your Honor.  Misstates the
 7   opinion of Court of Appeal.
 8                  MR. CLOSE:  I'll withdraw and rephrase,
 9   Your Honor.
10                  THE COURT:  Okay.
11          Q       BY MR. CLOSE:  After the Court of Appeal decision
12   that's Exhibit 1005, the City of Carson decided that it would
13   now amend its guidelines; isn't that correct?
14          A       Yes.
15          Q       Okay.  I'd like to take a look at that -- what is
16   Exhibit 1003, please.
17                  Do you recognize this as a resolution of the city
18   council of the City of Carson amending the guidelines?
19          A       Yes.
20          Q       I'd like to first turn your attention to the last
21   page, page 3.
22                  The signature in the middle of the page there,
23   can you -- do you recognize that as the signature of
24   Mayor Jim Dear?
25          A       Yes.
```

1          Q          And does seeing this page 3 of Exhibit 1003

2     refresh your recollection that, in October, 2006, when the

3     guidelines were amended, Jim Dear was Carson's mayor?

4          A          Apparently he was, yes.

5          Q          I'd like to return to the first page.  There's a

6     couple whereas clauses.  I'm going to focus your attention to

7     the third whereas clause to the middle of the page.  I'm going

8     to read this into the record.

9                     *"Whereas the city council hereby finds that*

10    *amendment of the current guidelines that govern administration*

11    *of the City's Mobile Home Space Rent Control Ordinance will*

12    *provide additional analytical tools to evaluate pending*

13    *applications for rent increase and that such analytical tools*

14    *will also help to assure that the mobile home park owners*

15    *within the City receive a constitutional fair return on their*

16    *investments."*

17                    Do you see that, Mr. Freschauf?

18         A          Yes.

19         Q          Was that a true and accurate statement in that

20    resolution?

21                    MS. AILIN:  Objection.  No foundation.  Calls for

22    speculation.

23                    THE COURT:  Overruled.

24                    THE WITNESS:  Do I know if it's true?

25         Q          BY MR. CLOSE:  In your experience and your

**UNITED STATES DISTRICT COURT**

1    involvement in the rent control process in Carson at that time,

2    is that a true statement?

3         A       I don't know whether it is or not.  I'm not sure

4    what you're getting at.

5         Q       Okay.  That's fine.

6              Let's look down right below that No. 1.  It says,

7    *"Now, therefore, the city council of the City of Carson*

8    *California does hereby find determine and resolve as follows:*

9              *No. 1, the foregoing recitals are true and*

10   *correct."*

11             Do you see that, Mr. Freschauf?

12        A       Yes.

13        Q       Okay.  No. 2, is No. 2 the portion of the

14   resolution that amends the guidelines to add the MNOI analysis?

15        A       Yes.  It looks like it.

16        Q       And that's the same MNOI analysis that the courts

17   in the Carson Gardens litigation found to be improper; isn't

18   that correct?

19        A       They found it to be improper in that particular

20   case, yes.

21        Q       So in response, the City amended the guidelines;

22   correct?

23             MS. AILIN:  Objection.  No foundation.  Assumes

24   facts not in evidence.

25             THE COURT:  Sustained.  Rephrase.

1    Q        BY MR. CLOSE:  I'd like to take a look on page 2

2    of the resolution, Exhibit 1003, the item that's numbered 2.  I

3    want you to have an opportunity to look at its entirety.  I'm

4    going to focus on some text in the middle, but I want to make

5    sure you have a chance to read the full there.

6    A        (Witness reviewing document.)

7             All right.

8    Q        Okay.  Is it accurate that the MNOI analysis, as

9    it says in the middle, is a methodology in which changes and

10   debt service expenses are not to be considered in the analysis

11   unlike the gross profits maintenance analysis where such

12   changes may be considered?

13            Is that correct?

14   A        Yes.

15   Q        And in the resolution, the City of Carson said

16   that this was a methodology that had been approved by the

17   courts; correct?

18   A        I'm sorry.  Say that again.

19   Q        The resolution announces that this methodology

20   has been approved by the courts -- correct? -- right in front

21   of the --

22   A        Right.  Yes.

23   Q        Okay.  And I believe you testified, when the

24   City's attorney was examining you, that these guidelines can be

25   even more important than the ordinance.

1            Is that right, Mr. Freschauf?

2            MS. AILIN:  Objection.  Misstates the testimony.

3            THE COURT:  Overruled.

4            THE WITNESS:  Repeat the question.  I'm sorry.

5       Q       BY MR. CLOSE:  Did you testify just a little

6  while ago that the guidelines can be even more important than

7  the ordinance?

8       A       For the processing of an application, yes.

9       Q       Do you recall during your direct examination you

10  gave some testimony about some Carson Harbor Village rent

11  applications and rent decisions back in the early 1980's?

12      A       Yes.

13      Q       You weren't working for the City handling

14  rent-control matters back then, were you, Mr. Freschauf?

15      A       No.

16      Q       And you testified earlier that, in connection

17  with the Year 1 Application filed by my client, at that

18  hearing, my client's representatives, said to the board that my

19  client would be willing to accept a rent increase of $200 which

20  the staff had calculated would be the amount that would cover

21  the debt service; correct?

22      A       I'm sorry.  Say that again.

23      Q       Isn't it true that, at the hearing on my client's

24  rent application, the Year 1 Application, Mr. Goldstein's

25  representatives announced to the board that Mr. Goldstein would

```
 1    accept a rent increase of $200 which was the amount the staff

 2    had calculated as being the -- necessary to provide a

 3    sufficient revenue and income to pay the debt service?

 4         A     Yes.

 5         Q     I want to make sure I understand.

 6               Isn't it true that Mr. Goldstein was removed from

 7    the Rent Control Board because he had decided to file a lawsuit

 8    against the city on a rent matter?

 9         A     There were multiple lawsuits pending as far as I

10    recall.

11         Q     Was this -- did this occur before or after you

12    actually became -- came into the employ of the City?

13         A     His lawsuits?

14         Q     No.  The decision to throw him off the board.

15         A     Oh, while I was employed.

16         Q     On direct examination, did you say it would not

17    be fair to compare rents at Carson Harbor Village to rents at

18    Colony Cove at the time my client was applying for rent

19    increase -- applying for a rent increase?

20         A     It wouldn't be fair to compare them if you were

21    trying to make the case that they should be equal.

22         Q     But you would agree that, for purposes of your

23    analysis, you viewed in the staff report Carson Harbor Village

24    to be the number one most comparable park.

25               Isn't that true?
```

**UNITED STATES DISTRICT COURT**

1        A        It's the closest comparable, yes.  There's also

2   one below it.  Colony Cove is kind of the middle of the three.

3        Q        So it would be perfectly fair to compare the

4   rents at Colony Cove to that as Carson Harbor Village.

5                 Isn't that true, Mr. Freschauf?

6        A        As long as you take into account the historical

7   difference, yes.

8        Q        Do you recall how frequently the prior owner of

9   Colony Cove sought general rent increases from the

10  City of Carson?

11       A        I'd say every two to three years.

12       Q        And do you recall the name of the park where the

13  City of Carson granted a $100 or more rent increase that you

14  testified about during direct examination?

15       A        I thought of it earlier.  Now I'm trying to

16  remember.  Again, it was a park that hadn't been in for quite a

17  while.

18       Q        All right.

19       A        I believe it was Country Estates.

20       Q        And the reason you recall that the $100 or more

21  rent increase was approved was because that owner just hadn't

22  applied for a rent increase for that park in ten years; is that

23  correct?

24       A        I believe it was longer than that.  That was one

25  of the major reasons was the length of time.

372

1    Q       Do you recall if that owner had any changes in

2   their actual expenses to justify a rent increase?

3    A       I know they had separately billed utilities which

4   became part of that hearing.

5    Q       But it was okay to give that triple digit rent

6   increase to that owner.

7            Isn't that correct, Mr. Freschauf?

8    A       Okay.  I'm sorry.  I'm remembering what happened

9   now.  The prior owner, both the husband and wife had died, and

10  the park went to their daughters at that point.  They had to

11  spend quite a bit of money to bring the park up to what they

12  considered to be a reasonable level.

13   Q       And the board concluded for those reasons and

14  others that it was fair to both the owners and the renters to

15  allow a triple figure rent increase; correct?

16   A       Yes.  But I believe it was phased in.  It wasn't

17  all at once.

18   Q       So the board has the authority to phase in rent

19  increases; is that right?

20   A       Yes.  We've done it on a few occasions.

21   Q       Can you recall how many?

22   A       I'd say less than a half a dozen.

23   Q       But two staff reports on my client's two

24  applications that you reviewed with the City's counsel, the

25  staff never recommended or proposed phasing in a larger rent

1    increase to provide enough revenue for Mr. Goldstein to pay the

2    mortgage, did it?

3        A      No, it did not.

4        Q      And at the hearing before the Rent Board, you --

5    you testified; correct?  You addressed the rent --

6        A      I go over the staff report and answer any

7    questions, yes.

8        Q      And you were at that hearing; correct?

9        A      Yes.

10       Q      Did anyone on the City staff or anyone on the

11   Rent Review Board raise or discuss or suggest that we should do

12   a phased-in rent increase?

13       A      They may have.  I don't recall.

14       Q      Okay.  But that's something -- the ability to

15   award a rent increase and then have it staggered and phased in

16   is something that's within the power of the board under the

17   ordinance and the guidelines; isn't that correct,

18   Mr. Freschauf?

19       A      Yes.  It's not something that staff has ever

20   recommended.

21       Q      Now, I recall some testimony on direct about

22   the -- when there was discussion of the comparison of the

23   parks, that Colony Cove wasn't quite up to the level of

24   Carson Harbor Village.

25              Do you remember that discussion?

374

```
 1          A       Yes.

 2          Q       But isn't it also true, Mr. Freschauf, that, as

 3   soon as James Goldstein purchased Colony Cove, he improved the

 4   quality and the condition of the park?

 5          A       Yes.  He spent a considerable amount of money

 6   doing capital improvements over the next several years which he

 7   got compensated for.

 8          Q       Is there anything wrong with making those

 9   improvements?

10          A       No.

11          Q       It's actually for the betterment of the

12   community, isn't it?

13          A       Correct.  That's why he was reimbursed for all of

14   it.

15          Q       But your testimony about the disparity and the

16   condition of the park was premised on the period of time before

17   Mr. Goldstein owned it; isn't that right?

18          A       As of the date -- I'm thinking of the date he

19   bought it, that staff report, there was a significant

20   difference in the quality of upkeep of the park.

21          Q       But that differential changed after Mr. Goldstein

22   purchased the park; isn't that right?

23          A       Yes.

24          Q       Based on your experience with Mr. Goldstein over

25   the years, you agree that he has a good understanding of rent
```

1    control in Carson; isn't that true?

2         A    For the most part, yes.

3         Q    Mr. Freschauf, you would agree it would be

4    reasonable for a park owner to believe in 2006 that the

5    rent-setting process in Carson would allow that park owner to

6    charge rents sufficient to cover the park owner's operating

7    expenses including debt service?

8         A    No.  Not necessarily.

9         Q    Mr. Freschauf, do you recall that your deposition

10   was taken by me in this litigation?

11        A    I recall.

12        Q    And you took an oath to tell the truth at that

13   deposition?

14        A    Yes.

15        Q    Did you do so to the best of your ability?

16        A    I believe so.

17             MR. CLOSE:  All right.  I'd like to approach,

18   Your Honor, with copies of Mr. Freschauf's deposition.

19             THE COURT:  Just cite the page and line and ask

20   permission to read it.

21             MR. CLOSE:  Okay.  Page 84, line -- page 84,

22   lines 19 through 25.

23             THE COURT:  One moment, please.

24             MR. CLOSE:  And it continues on to page 85,

25   line 1.

```
 1                    THE COURT:  You may.
 2                    MR. CLOSE:  May I also have Mr. Newcomb publish
 3        it?
 4                    THE COURT:  You may.
 5                    MR. CLOSE:  Question:  Let's talk
 6              about operating expenses.  Should --
 7              would it be reasonable for a park owner
 8              to believe in 2006 that the rent-setting
 9              process in Carson would allow that park
10              owner to charge rents sufficient to cover
11              the park owner's operating expenses?
12                    Answer:  If by operating expenses
13              we're including debt service, yes.
14                    THE WITNESS:  All right.  I guess the only --
15         Q        BY MR. CLOSE:  Excuse me.  There's no question
16        pending, Mr. Freschauf.
17         A        Okay.
18         Q        You agree that the $23 million that Mr. Goldstein
19        paid for Colony Cove Mobile Estates in April of 2006 was a
20        market-rate price; is that correct?
21         A        In a rent-controlled jurisdiction, probably not,
22        but as a market rate where there is no rent control involved,
23        yes, it probably was.
24                    MR. CLOSE:  Your Honor, I would refer to page 81
25        of the deposition, line 17 through 21.
```

**UNITED STATES DISTRICT COURT**

```
1                    THE COURT:  That's not necessarily inconsistent.

2                    MR. CLOSE:  Okay.

3          Q        Mr. Freschauf, was it your judgment in 2007 that

4     Mr. Goldstein paid a market rate price for the park?

5          A        No, it wasn't.

6                    THE COURT:  You may read.

7                    MR. CLOSE:  Thank you.  May I publish also?

8                    THE COURT:  You may.

9                    MR. CLOSE:  Again, this is from the deposition

10    where you were sworn under oath, page 81, line 17.

11                   So, it was your judgment in 2007

12               that Mr. Goldstein paid a market-rate

13               price for the park; correct?

14                   Answer:  Generally speaking, from

15               looking at it, he had to have, yes.

16         Q        Mr. Freschauf, would you agree that one purpose

17    of the Carson rent control ordinance was to allow park owners

18    to earn a fair and reasonable return on their investment?

19         A        Yes.

20         Q        Mr. Freschauf, you gave some testimony earlier

21    that no one -- no representatives of Mr. Goldstein came to you

22    to discuss whether or not or what might happen if he purchased

23    the park; correct?

24         A        Right.

25         Q        Before Mr. Goldstein purchased the park, there
```

 1   was no public notice about a potential change in the

 2   guidelines.

 3                Isn't that true?

 4        A     At that time there wouldn't have been a public

 5   notice.  It would have been later on.

 6        Q     So it's true that there was no public notice

 7   after the *Carson Gardens* case but before the time Mr. Goldstein

 8   purchased the park that the City of Carson was considering a

 9   change to the guidelines.

10        A     Without having a timeline in front of me to help,

11   but I think your statement is correct, yes.

12        Q     You don't recall anything inconsistent?

13        A     No.

14        Q     Before Mr. Goldstein purchased the

15   Colony Cove Park, there was nothing in the guidelines or the

16   rent ordinance that referred to Dr. Kenneth Baar, was there?

17        A     No.  He was just somebody that we used, but it

18   wasn't mentioned.

19        Q     And before Mr. Goldstein purchased the

20   Colony Cove Park, there was nothing in the guidelines and

21   nothing in the ordinance that referred to the MNOI formula and

22   dis -- let me rephrase.

23                Before Mr. Goldstein purchased the park, there

24   was nothing in the guidelines or the ordinance that referred to

25   MNOI.

1          Isn't that true?

2     A     That's true.

3     Q     Mr. Freschauf, have you ever referred to some of

4  the mobile home park owners in Carson as mom and pop type

5  owners?

6     A     Yes.

7     Q     And that refers to owners that are not that --

8  not as sophisticated or not quite the same resources as

9  potentially more sophisticated owners?

10    A     It had more to do with people that had owned that

11 land historically and switched it into mobile home parks.

12 There was quite a few Japanese families in the area, and they

13 owned about half a dozen parks.  That's who I thought was mom

14 and pop because I've dealt with mom and pop.

15    Q     When the Rent Control Board acted on

16 Mr. Goldstein's first application for a rent increase, did it

17 allow Mr. Goldstein to raise the rents in an amount sufficient

18 to pay for his debt service?

19    A     No.

20    Q     When the Rent Control Board acted on

21 Mr. Goldstein's Year 2 Application, did it allow my client to

22 charge rents sufficient to cover the debt service expense?

23    A     No.

24    Q     Mr. Freschauf, isn't it true that, when you were

25 handling rent control matters in the City of Carson you would

**UNITED STATES DISTRICT COURT**

```
 1   sometimes feel pressure from elected officials?
 2        A      During any particular time period are we talking
 3   about or --
 4        Q      Well, let's start -- my question is, during the
 5   20-year period where you were handling rent control matters in
 6   the City of Carson, did you ever feel pressure from elected
 7   officials?
 8        A      During that time --
 9               MS. AILIN:  Objection.  Vague as to time and not
10   focused on the relevant time period.
11               THE COURT:  Overruled.
12               THE WITNESS:  Did I feel pressure?  Yes.
13        Q      BY MR. CLOSE:  During times -- during the
14   period -- strike that.
15               At any time when you were working on rent control
16   matters in the City of Carson, did Jim Dear, the Carson mayor,
17   at any time control members of the Rent Control Board?
18               MS. AILIN:  Objection.  No foundation.  Calls for
19   speculation.
20               THE COURT:  Overruled.
21               THE WITNESS:  Control them?  Well, he puts them
22   on the board for the most part and can take them off at any
23   time.  So I guess that's control.
24        Q      BY MR. CLOSE:  Right.  You would agree that
25   Mr. Dear was controlling certain members of the
```

```
 1    Rent Review Board, wouldn't you?
 2              MS. AILIN:  Objection.  Calls for speculation.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Yes.
 5        Q     BY MR. CLOSE:  I think you testified to this
 6    already, but I want to confirm.
 7              It's your understanding that mayor Jim Dear did
 8    use his power to appoint and remove Rent Control Board
 9    directors based on their favorable pro-residents stance; isn't
10    that correct?
11              MS. AILIN:  Objection.  Calls for speculation.
12    No foundation.
13              THE COURT:  Overruled.
14              THE WITNESS:  Yes.
15        Q     BY MR. CLOSE:  Is it your understanding,
16    Mr. Freschauf, that the City of Carson conducted an
17    investigation into misconduct by former Mayor Jim Dear?
18        A     Yes.
19        Q     And you spoke with the lawyer, the investigator,
20    who was investigating that misconduct on behalf of the City.
21    Isn't that true?
22        A     On behalf of the City?  Well, I was retired at
23    that point.
24        Q     I'm sorry.  My question was not good.  Late in
25    the day on Friday.  Let me try again, Mr. Freschauf.  I
```

1    apologize.

2              There was a lawyer, an investigator, that the

3    City engaged to conduct this investigation for the City;

4    correct?

5         A    Yes.

6         Q    And you spoke to that investigator; correct?

7         A    Yes.

8         Q    And you told that investigator truthfully that

9    Mr. Dear used his power to appoint and remove directors of the

10   Rent Control Board based on their favorable pro-residents

11   stance; isn't that right?

12        A    Yes.

13        Q    And, in fact, Mr. Freschauf, in your experience,

14   some Rent Control Board members were de-appointed or removed

15   from the board if they attempted to be fair and neutral.

16             Isn't that true?

17             MS. AILIN:  Objection.  Calls for speculation.

18   No foundation.

19             THE COURT:  Overruled.

20             THE WITNESS:  Yes.

21        Q    BY MR. CLOSE:  But, Mr. Freschauf, in your

22   personal experience and judgment, aren't Rent Control Board

23   members supposed to be fair and neutral?

24        A    I would hope so, yes.  Although there is some

25   inherent bias, I suppose, with the two park owner reps and the

```
 1    two park resident reps.
 2         Q       But when they're serving on the
 3    Rent Control Board and evaluating applications, they are
 4    supposed to be fair and neutral; correct?
 5         A       Correct.  They're supposed to have their blinders
 6    on.
 7         Q       And the structure of the Rent Control Board is
 8    premised on the fact that resident representatives and owner
 9    representatives can, in fact, do that; right?
10         A       Yes.
11         Q       But isn't it true that, when Mr. Goldstein was
12    selected to serve on that board, he was removed; correct?
13         A       That's correct.
14         Q       Now, when you spoke to the investigator for the
15    City, you told that investigator that at times no trigger was
16    pulled at the City unless it was approved by Mayor Dear.
17                 Isn't that true?
18         A       I think that was about the statement I made, yes.
19         Q       Mr. Freschauf, did Mr. Goldstein or anyone --
20    strike that.  Let me rephrase and try it again.
21                 Did Mr. Goldstein ever tell you that he purchased
22    Colony Cove at the price he did because he planned to convert
23    it?
24         A       No.  He never mentioned it although the residents
25    were noticed within two weeks of the purchase.  So I would
```

384

1    assume that was the plan.

2         Q    And we are here at the end of April, 2016, and

3    you know very well that the park has not been converted.

4              Correct, Mr. Freschauf?

5         A    No.  But I'm pretty sure it's just about to be.

6    But your question is correct.

7         Q    Has Mr. Goldstein or anyone acting on his behalf

8    told you that the park is going to be converted?

9         A    No.

10        Q    You're just speculating, aren't you?

11        A    No.  I've had a call from residents about some

12   notice they just got.  They were kind of shook up about it.

13        Q    Are you regularly -- you don't work for the

14   City of Carson anymore; correct?

15        A    Yeah.  As a consultant, yes.

16        Q    And how frequently do you get calls from the

17   tenants and residents that share with you developments in the

18   parks?

19        A    Weekly.

20        Q    Mr. Freschauf, there's a binder down there, a

21   black one, plaintiff's exhibits.  I would like volume 1,

22   Exhibit 62 entitled supplemental report of investigation of

23   City Clerk Jim Dear.

24        A    Got it.

25        Q    You have it?

**UNITED STATES DISTRICT COURT**

```
 1        A       Yes.

 2                MR. CLOSE:  I'll wait for the Court.

 3                THE COURT:  You may.

 4        Q       BY MR. CLOSE:  Is this the investigation

 5   conducted by an investigator for the City of Carson that we

 6   were talking about just a few moments ago?

 7        A       Hang on just a second.  Yes.

 8        Q       And on page 12 of Exhibit 62 is where the

 9   investigator summarizes and at times I think -- well,

10   summarizes her interview with you; is that correct?

11        A       Yes.

12                MR. CLOSE:  Your Honor, move to admit Exhibit 62.

13                THE COURT:  Objection?

14                MS. AILIN:  Just one moment, Your Honor.

15           (Counsel confer.)

16                MS. AILIN:  Yes, Your Honor.  Hearsay and

17   relevance.

18                THE COURT:  Sustained as to the entire document.

19   We'll discuss it later.

20                MR. CLOSE:  Okay.

21                THE COURT:  All right.

22        Q       BY MR. CLOSE:  While we have that binder up, I'd

23   like to turn your attention to tab 46, Mr. Freschauf, which is

24   the Year 1 Application that's been admitted into evidence.

25   Page 17 is where I would like to direct your attention.
```

386

1            And with the Court's permission, I'd like to

2    publish.

3            THE COURT:  You may.

4        Q    BY MR. CLOSE:  I'd like to draw your attention to

5    the bottom third of that exhibit.

6            Now, Mr. Freschauf, does the information that --

7            THE COURT:  I'm sorry.  One moment.

8            You may.

9        Q    BY MR. CLOSE:  Does the information that I've

10   pulled out there compare over an almost 30-year period how the

11   consumer price index in Los Angeles, Riverside, Orange County

12   has increased between 1978 and 2007 and how the rents at

13   Colony Cove Park increased over that same 29-year period?  Is

14   that what that information shows?

15       A    Yeah.  It's generally correct although I normally

16   found mistakes in these, but it's probably close.

17       Q    You have no reason to believe it's mistaken right

18   now, do you?

19       A    I'd have to look back at the staff report and see

20   if I made mention of it.  It would have told me if I saw

21   something that didn't look right.

22       Q    It would be in the staff report if you found a

23   calculation error in this data; correct?

24       A    Yes.

25       Q    And the information here shows that, over this

**UNITED STATES DISTRICT COURT**

```
 1    29-year period, the CPI -- what is the CPI, Mr. Freschauf?
 2         A      Consumer price index.  It's the measure of goods
 3    and services in the local area.  We use the L.A.,
 4    Orange County, Riverside area as our focal point.
 5         Q      And, in fact, the guidelines instruct that that's
 6    a factor that needs to be considered by the staff and the
 7    board; correct?
 8         A      Yes.
 9         Q      And so this data here shows that, over the
10    29-year period, the CPI rose by 232.36 percent but rents in
11    Colony Cove rose by 132.58 percent over that same 29-year
12    period.
13                Isn't that accurate?
14         A      That's correct.
15         Q      So on a real dollar inflation adjusted basis,
16    over that 29-year period, rents were effectively going down at
17    Colony Cove.
18                Isn't that true, Mr. Freschauf?
19         A      It's true.
20         Q      Mr. Freschauf, it's correct that Colony Cove is
21    not reserved for people with incomes below a certain level;
22    isn't that right?
23         A      Correct.
24         Q      And there's no income requirement by ordinance or
25    guideline or anything in the City of Carson to restrict
```

**UNITED STATES DISTRICT COURT**

1    Colony Cove to low income or lower middle income people.

2                   Isn't that true?

3         A       Correct.

4         Q       So it's true, therefore, that somebody who makes

5    six figures a year can live in Colony Cove and enjoy all the

6    benefits of the below-market rents; isn't that correct?

7         A       Yes.

8                   MS. AILIN:  Objection.  Calls for speculation.

9                   THE COURT:  Overruled.

10        Q       BY MR. CLOSE:  And there is no provision in the

11   Carson ordinance or guidelines to allow for higher rents for

12   those residents who have plenty of income to pay those higher

13   rents.

14                  Isn't that true?

15        A       Yes.

16                  MS. AILIN:  Objection.  Argumentative.

17                  THE COURT:  Overruled.

18                  MR. CLOSE:  I didn't hear the answer.

19                  THE COURT:  Overruled.

20                  THE WITNESS:  Yes.

21        Q       BY MR. CLOSE:  Prior to 2006, the estimated gross

22   profit maintenance was the analysis that had been used and

23   conducted virtually on all rent applications in Carson.

24                  Isn't that true?

25        A       No.  Well, after the ordinance started, I don't

```
 1    think it was used for quite a number of years.  It came -- that
 2    formula came in later.  I'm not sure it was used on every
 3    application.
 4         Q     But you would agree that it was used on virtually
 5    all applications; correct?
 6         A     No.  I just said it wasn't.
 7         Q     It wasn't one of the -- it wasn't one of the
 8    analyses that had been conducted virtually on all applications?
 9         A     Not on all, no.
10         Q     Virtually all?
11         A     Not even virtually all.  I don't think it was
12    used for a number of years until that formula came into being.
13    So it may have been five to ten years until that started up.
14    So there were a good hundred or more applications probably done
15    without it.
16              MR. CLOSE:  Your Honor, deposition page 100,
17    lines 9 through 12.
18              THE COURT:  You may read.
19              MR. CLOSE:  May I publish?
20              THE COURT:  You may.
21              MR. CLOSE:  Page 100, lines 9 through 11.  This
22    is from your deposition when you were under oath.
23              Question:  But estimated gross
24         profit maintenance was the analysis
25         that had been conducted virtually on
```

**UNITED STATES DISTRICT COURT**

1          *all applications?*

2                    *Answer:  It was one of them, yes.*

3          Q        During your time when you were actually employed

4     handling rent control matters at the City of Carson, isn't it

5     true that on the -- Mr. Goldstein's Carson Harbor Village Park,

6     that portion of his debt service that related to the park's

7     acquisition loan was considered an allowable expense?

8                    Isn't that right?

9          A        For -- okay.  I'm sorry.  You have to repeat it.

10         Q        At Carson Harbor Village, the portion of the debt

11    service that related to the park's prior acquisition loan was

12    treated as an allowable expense in rent setting; right?

13                   MS. AILIN:  Objection.  Vague and ambiguous.

14                   THE COURT:  Overruled.

15         Q        BY MR. CLOSE:  And, in fact, the resolutions

16    approving those rent increases at Carson Harbor said that, for

17    loan interest to be allowed, it has to be loans that were

18    incurred for the acquisition of the park or used for the

19    operation, maintenance, or improvement of the park.

20                   Isn't that true, Mr. Freschauf?

21         A        Are you referring to the guidelines?  I'm sorry.

22         Q        The Rent Board's decisions on the rent increase

23    applications at Carson Harbor Village.

24         A        I'm sorry.  I don't know what it said exactly.

25         Q        Mr. Freschauf, you're not a qualified appraiser,

```
 1   are you?

 2       A      No.

 3       Q      And you've never given an appraisal, correct?

 4       A      No.

 5       Q      And you've never been trained to give an

 6   appraisal; correct?

 7       A      No.

 8       Q      And unless something has changed in the last few

 9   months, in the last 20 years you've never purchased a

10   commercial property.

11             Isn't that true?

12       A      That's correct.

13       Q      And you've never purchased real estate as a

14   profession; correct?

15       A      Correct.

16       Q      And in 2006 and 2007, you had no idea what a

17   reasonable price per space was for a rent-controlled mobile

18   home park in California.

19             Isn't that correct?

20             MS. AILIN:  Objection.  Argumentative.

21             THE COURT:  Overruled.

22             THE WITNESS:  Well, I would back into it by

23   looking at what the rents could afford.  I'm trying to think of

24   the term.  I'm drawing a blank on this.

25             There's a section in most appraisals' cost
```

**UNITED STATES DISTRICT COURT**

1   analysis section or something to that effect, where you look at

2   the total rent of a property and you can estimate what the

3   total purchase price could be off of that.  And I've gone to

4   seminars and things where that was discussed as I worked in

5   redevelopment for quite a while.

6            MR. CLOSE:  Your Honor, 123, 18 to 22, please.

7            THE COURT:  You may.

8            MR. CLOSE:  May I publish?

9            THE COURT:  You may.

10           MR. CLOSE:  Again, this is going to be from your

11  deposition when you were sworn under oath.  Lines 18 to 22.

12           So in 2006 -- question.  Excuse me.

13           *So in 2006, 2007, you had no idea*

14      *what a reasonable price per space was*

15      *for a mobile home park in California;*

16      *correct?*

17           *Answer:  In a rent-controlled*

18      *jurisdiction, no.*

19      Q     When you were doing the rent control -- when you

20  were doing the staff reports on the Year 1 and Year 2 rent

21  applications on Colony Cove, you had no idea whether or not

22  there were other potential buyers offering to purchase the park

23  at more -- you had no idea whether there were other potential

24  buyers offering to purchase the park, did you?

25      A     No.

1              MS. AILIN:  Objection.  Relevance.  No

2    foundation.

3              THE COURT:  Overruled.

4        Q    BY MR. CLOSE:  The answer?  I'm sorry?

5        A    No.

6        Q    Thank you.

7              Isn't it true that the board, when it determined

8    the rent, it would award on the Year 1 Application accepted and

9    used the $23 million purchase price?

10             Isn't that correct?

11             MS. AILIN:  Objection.  Vague and ambiguous.

12             THE COURT:  Overruled.

13             THE WITNESS:  Accepted and used.  I mean, we

14   didn't -- we used MNOI's.  So it didn't factor debt service in.

15       Q    BY MR. CLOSE:  And, again, I know it's late in

16   the day, and it's my -- my questions are not great.  So I'm

17   going to try it again, and I apologize to everybody.

18             The board, in determining the rent levels on the

19   Year 1 Application, accepted and used the $23 million purchase

20   price; correct?

21             MS. AILIN:  Objection.  Vague and ambiguous.  No

22   foundation.

23             THE COURT:  Overruled.

24             THE WITNESS:  I'm not sure what you mean by

25   "accepted."  Did we -- I don't think we made an issue of it I

```
1    guess.  Is that what you're getting at?

2         Q    BY MR. CLOSE:  You didn't dispute it, did you?

3         A    No.

4         Q    Did the board's resolution take issue with the

5    $23 million purchase price?

6         A    I don't recall offhand.

7         Q    Sorry.  You don't recall?

8         A    I don't recall offhand, no.

9         Q    And if they did, it would be in there, wouldn't

10   it?

11        A    Yes.

12        Q    Now, do you recall on direct examination

13   answering some questions from your lawyer regarding whether or

14   not Mayor Jim Dear ever communicated to you his views in

15   connection with the Colony Cove rent applications in the 2005,

16   2007 time period?

17             Do you recall that testimony?

18        A    I don't know that we put a time frame on it, but

19   yes.

20        Q    Okay.

21             THE COURT:  Mr. Close, I'm sorry.  I need to

22   adjourn early today to deal with another matter.  We're

23   adjourned.  We'll see you again on Tuesday at 9:00 o'clock.

24   Have a nice weekend.

25             Remember not to discuss the case amongst
```

UNITED STATES DISTRICT COURT

1    yourselves or with anyone else.  Don't form or express an

2    opinion about the case until it's finally submitted to you.

3                We'll see you Tuesday at 9:00 o'clock.

4                THE CLERK:  All rise.

5          (The following proceedings were held in

6          open court out of the presence of the jury:)

7                THE COURT:  I need to handle a criminal case

8    where I need to close the courtroom and seal the records.  So

9    if you would leave the courtroom.  It will only take a few

10   minutes and then come back and retrieve your items.

11               MR. CLOSE:  Can we leave them on counsel table?

12               THE COURT:  Yes.  Yes.

13         (Proceedings concluded at 4:13 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5             I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15                            DATED THIS  29TH  DAY OF APRIL, 2016.

16

17

18                    /S/ MIRANDA ALGORRI

19                    MIRANDA ALGORRI, CSR NO. 12743, CRR
                      FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

## $

**$100** [4] - 337:21, 344:10, 371:13, 371:20
**$110** [1] - 337:1
**$12** [1] - 350:11
**$15.65** [1] - 340:5
**$161.82** [1] - 307:21
**$163** [1] - 315:12
**$18** [1] - 319:8
**$198** [2] - 307:19, 307:23
**$198.56** [1] - 307:22
**$200** [3] - 315:12, 369:19, 370:1
**$23** [5] - 357:16, 376:18, 393:9, 393:19, 394:5
**$23.05** [1] - 319:2
**$24** [1] - 318:22
**$25.02** [1] - 344:5
**$28,000,000** [1] - 318:16
**$300** [1] - 337:13
**$342.46** [1] - 342:5
**$36.74** [1] - 341:3
**$5,738,050** [1] - 307:13
**$57.85** [1] - 349:19
**$600** [1] - 308:2
**$618.05** [1] - 332:15

## /

**/S** [1] - 396:18

## 0

**06-149** [2] - 320:17, 326:16

## 1

**1** [28] - 293:10, 332:9, 332:23, 333:2, 334:15, 334:18, 337:23, 337:25, 338:1, 338:21, 338:24, 340:19, 340:24, 341:2, 341:24, 342:14, 345:24, 364:16, 367:6, 367:9, 369:17, 369:24, 375:25, 384:21, 385:24, 392:20, 393:8, 393:19
**10** [2] - 293:10, 301:1
**100** [6] - 332:21, 332:24, 336:25,
349:23, 389:16, 389:21
**1001** [2] - 324:5, 324:13
**1002** [2] - 323:19, 323:22
**1003** [5] - 326:10, 326:14, 365:16, 366:1, 368:2
**1005** [5] - 362:1, 362:25, 363:14, 364:17, 365:12
**1007** [2] - 298:25, 316:13
**1008** [7] - 301:15, 301:17, 301:18, 301:22, 301:23, 302:5, 302:13
**1018** [2] - 359:22, 361:1
**11** [1] - 389:21
**12** [4] - 327:4, 344:11, 385:8, 389:17
**123** [1] - 392:6
**125,000** [1] - 335:3
**12743** [2] - 293:23, 396:19
**1299** [1] - 294:10
**132.58** [1] - 387:11
**14** [1] - 342:20
**14-03242-PSG** [1] - 293:7
**14-YEAR** [7] - 303:20, 304:7, 304:10, 305:10, 305:14, 305:23, 306:8
**15** [5] - 313:20, 314:12, 344:11, 358:5, 358:8
**15.34** [2] - 300:23, 301:13
**16** [1] - 363:3
**17** [3] - 376:25, 377:10, 385:25
**1700** [2] - 294:17, 316:20
**1701** [1] - 317:5
**18** [2] - 392:6, 392:11
**18881** [1] - 294:16
**18TH** [1] - 294:6
**19** [1] - 375:22
**1970'S** [1] - 318:6
**1978** [1] - 386:12
**1979** [2] - 319:18, 323:17
**1980** [1] - 304:21
**1980'S** [2] - 317:9, 369:11
**1984** [3] - 348:19, 349:9, 349:11, 350:6,
350:18
**1:33** [2] - 293:17, 297:2
**1ST** [8] - 301:9, 301:24, 301:25, 304:21, 307:12, 313:8, 313:10, 314:12

## 2

**2** [18] - 293:16, 341:19, 341:23, 342:1, 342:12, 342:25, 343:3, 343:12, 343:14, 343:18, 344:1, 346:3, 367:13, 368:1, 368:2, 379:21, 392:20
**20** [5] - 300:24, 322:16, 333:7, 335:1, 391:9
**20-YEAR** [1] - 380:5
**200** [2] - 332:19, 354:21
**2000** [2] - 301:24, 305:4
**2001** [1] - 305:15
**2002** [2] - 305:4, 305:15
**2003** [1] - 363:3
**2004** [8] - 352:8, 353:16, 354:11, 354:14, 354:25, 356:8, 356:19, 361:18
**2005** [2] - 318:15, 394:15
**2006** [25] - 318:7, 318:15, 319:1, 319:13, 320:17, 326:8, 328:9, 328:25, 329:2, 336:6, 345:13, 345:16, 346:2, 346:6, 346:15, 356:23, 364:18, 366:2, 375:4, 376:8, 376:19, 388:21, 391:16, 392:12, 392:13
**2007** [11] - 305:5, 320:24, 330:7, 332:7, 347:23, 377:3, 377:11, 386:12, 391:16, 392:13, 394:16
**2007/2008** [1] - 330:9
**2008** [16] - 300:4, 301:9, 302:19, 302:20, 302:21, 302:25, 307:12, 312:15, 313:8, 313:10, 313:15,
314:12, 321:2, 330:7, 341:12, 341:17
**2009** [7] - 305:5, 345:13, 345:16, 346:2, 346:6, 346:15, 347:23
**2012** [1] - 347:21
**2013** [8] - 342:17, 342:20, 342:21, 342:23, 347:21, 358:14, 358:17, 359:14
**2014** [8] - 301:25, 322:12, 342:17, 342:18, 342:21, 343:5, 358:19, 359:20
**2015** [1] - 313:15
**2016** [8] - 293:16, 295:3, 296:3, 297:1, 304:22, 360:4, 384:2, 396:15
**2017** [1] - 302:20
**2027** [5] - 350:13, 350:16, 350:18, 358:19, 359:20
**2028** [4] - 348:12, 348:13, 358:19, 359:20
**2042** [6] - 351:6, 351:9, 358:19, 359:1, 359:5, 359:8
**2043** [2] - 351:14, 351:16, 352:18, 358:19, 358:21, 358:22
**2044** [3] - 353:16, 353:19, 354:1
**2045** [3] - 353:20, 353:22, 354:5
**2046** [3] - 353:23, 353:25, 354:8
**2047** [2] - 355:16, 355:18
**2048** [4] - 355:23, 355:24, 358:20, 358:23
**2049** [6] - 356:3, 356:6, 358:24, 359:2, 359:5, 359:8
**21** [3] - 300:24, 345:6, 376:25
**21.5** [1] - 318:19
**22** [2] - 392:6, 392:11
**232.36** [1] - 387:10
**24** [2] - 360:2, 360:4
**24-HOUR-GATED** [1] - 317:19
**25** [2] - 333:7, 375:22
**25.02** [1] - 344:4
**250** [1] - 337:13
**266,000** [2] - 335:18, 335:21
**28** [6] - 320:24, 321:2, 332:7, 341:12, 341:17, 396:8
**29** [4] - 293:16, 295:3, 322:10, 322:16
**29-YEAR** [5] - 386:13, 387:1, 387:10, 387:11, 387:16
**293** [1] - 293:9
**29TH** [1] - 396:15

## 3

**3** [4] - 301:16, 324:13, 365:21, 366:1
**30** [3] - 296:3, 297:1, 333:7
**30-YEAR** [1] - 386:10
**31** [1] - 320:17
**312** [1] - 293:24
**3:09** [1] - 361:3

## 4

**4** [6] - 293:10, 295:3, 296:3, 301:16, 319:1
**400** [1] - 294:6
**435** [1] - 293:24
**46** [5] - 331:25, 332:11, 333:5, 339:18, 385:23
**47** [2] - 341:14, 341:20
**48** [3] - 339:17, 339:19, 340:3
**485,000** [1] - 335:4
**49** [2] - 343:9, 343:11
**4:13** [1] - 395:13
**4:30** [2] - 297:13, 298:9

## 5

**5** [1] - 362:25
**5,00,000** [1] - 319:5
**5.25** [1] - 305:12
**50** [1] - 340:21
**500** [21] - 300:3, 300:6, 300:7, 300:11, 300:13, 300:22, 301:6, 301:8, 301:12, 301:23, 302:15, 303:8, 303:12, 303:15, 303:21, 304:14, 304:21, 306:19, 308:10, 313:4, 359:22

**51** [1] - 343:23
**55** [3] - 334:7, 334:9, 334:14

---

**6**

**6** [1] - 363:13
**62** [3] - 384:22, 385:8, 385:12

---

**7**

**7.8** [1] - 301:1
**753** [1] - 396:8
**78** [3] - 349:25, 358:19, 359:9
**79** [5] - 351:20, 351:22, 358:24, 359:10, 359:13

---

**8**

**80** [2] - 300:8, 334:24
**81** [2] - 376:24, 377:10
**84** [3] - 353:9, 375:21
**85** [1] - 375:24

---

**9**

**9** [2] - 389:17, 389:21
**900** [1] - 294:10
**90012** [1] - 293:25
**90071** [1] - 294:7
**90401** [1] - 294:11
**90746** [2] - 316:20, 317:5
**92612** [1] - 294:17
**94** [1] - 310:5
**98-010** [2] - 320:8, 320:19
**9:00** [2] - 394:23, 395:3

---

**A**

**AA** [1] - 320:25
**AAA** [3] - 300:1, 306:18, 308:11
**ABILITY** [2] - 373:14, 375:15
**ABLE** [1] - 330:25
**ABOVE** [1] - 396:11
**ABOVE-ENTITLED** [1] - 396:11
**ACCEPT** [2] - 369:19, 370:1
**ACCEPTED** [4] - 393:8, 393:13, 393:19, 393:25

**ACCOUNT** [5] - 314:14, 315:10, 363:4, 365:4, 371:6
**ACCURACY** [2] - 308:25, 309:6
**ACCURATE** [3] - 366:19, 368:8, 387:13
**ACQUISITION** [5] - 319:9, 363:9, 390:7, 390:11, 390:18
**ACTED** [4] - 315:9, 363:4, 379:15, 379:20
**ACTING** [2] - 318:4, 384:7
**ACTION** [1] - 318:3
**ACTUAL** [12] - 301:6, 301:8, 301:11, 302:17, 302:25, 303:5, 303:11, 304:4, 306:4, 307:24, 363:7, 372:2
**ACTUALS** [1] - 303:5
**ADD** [4] - 328:10, 337:5, 340:14, 367:14
**ADDED** [2] - 327:13, 333:15
**ADDING** [2] - 326:16, 335:8
**ADDITIONAL** [11] - 310:19, 312:1, 312:10, 312:25, 316:3, 317:17, 321:4, 333:18, 335:8, 335:18, 366:12
**ADDITIONALLY** [1] - 325:1
**ADDRESSED** [1] - 373:5
**ADJOURN** [1] - 394:22
**ADJOURNED** [1] - 394:23
**ADJUSTED** [1] - 387:15
**ADJUSTMENTS** [3] - 318:2, 334:15, 342:13
**ADMINISTERING** [1] - 324:2
**ADMINISTRATION** [1] - 366:10
**ADMINISTRATIVE** [2] - 293:10, 317:25
**ADMISSION** [1] - 302:10
**ADMIT** [3] - 302:4, 359:22, 385:12
**ADMITTED** [29] - 298:17, 316:10, 316:14, 317:21, 318:5, 318:11,

318:15, 318:18, 318:21, 318:24, 319:1, 319:4, 319:7, 319:12, 319:15, 319:18, 319:24, 320:2, 320:6, 320:15, 320:22, 320:25, 359:6, 359:9, 359:12, 359:15, 359:17, 360:25, 385:24
**ADOPT** [1] - 340:18
**ADOPTED** [6] - 319:21, 320:7, 320:17, 340:2, 340:23, 354:13
**ADOPTING** [3] - 320:9, 320:19, 354:16
**AFFECTS** [1] - 326:20
**AFFORD** [4] - 325:5, 325:9, 325:15, 391:23
**AFTERNOON** [9] - 297:12, 297:15, 308:21, 308:22, 322:5, 322:6, 358:3, 361:9, 361:10
**AGO** [2] - 369:6, 385:6
**AGREE** [7] - 370:22, 374:25, 375:3, 376:18, 377:16, 380:24, 389:4
**AGREED** [2] - 297:24, 316:8
**AGREEING** [2] - 350:5, 360:20
**AGREEMENT** [1] - 319:11
**AHEAD** [2] - 299:10, 309:14
**AILIN** [61] - 294:15, 297:8, 297:21, 297:23, 298:3, 299:9, 302:7, 303:17, 303:22, 304:18, 305:17, 306:1, 308:20, 309:15, 309:21, 309:24, 312:9, 315:24, 321:9, 322:4, 327:8, 342:19, 348:15, 350:17, 351:10, 351:17, 351:23, 353:20, 353:23, 354:1, 355:19, 355:25, 357:24, 358:13, 358:17, 358:19, 358:21, 358:24, 359:18, 359:25, 360:8, 360:11,

360:14, 365:6, 366:21, 367:23, 369:2, 380:9, 380:18, 381:2, 381:11, 382:17, 385:14, 385:16, 388:8, 388:16, 390:13, 391:20, 393:1, 393:11, 393:21
**ALESHIRE** [1] - 294:14
**ALGORRI** [4] - 293:23, 396:5, 396:18, 396:19
**ALLOTMENTS** [1] - 298:5
**ALLOW** [11] - 324:20, 325:12, 325:20, 334:5, 372:15, 375:5, 376:9, 377:17, 379:17, 379:21, 388:11
**ALLOWABLE** [5] - 333:16, 333:23, 335:6, 390:7, 390:12
**ALLOWED** [4] - 330:5, 346:12, 347:9, 390:17
**ALMOST** [4] - 332:24, 335:3, 335:4, 386:10
**ALTERNATE** [1] - 330:25
**ALTERNATIVE** [1] - 325:15
**AM'S** [1] - 318:24
**AMBIGUOUS** [3] - 390:13, 393:11, 393:21
**AMEND** [2] - 365:4, 365:13
**AMENDED** [7] - 320:16, 326:7, 328:10, 351:3, 356:21, 366:3, 367:21
**AMENDING** [1] - 320:19, 326:16, 365:18
**AMENDMENT** [4] - 326:15, 331:17, 331:18, 366:10
**AMENDS** [1] - 367:14
**AMENITIES** [3] - 317:1, 336:16, 337:6
**AMOUNT** [15] - 307:23, 310:11, 312:14, 315:5, 315:19, 332:16, 334:13, 336:1,

339:10, 341:1, 346:13, 369:20, 370:1, 374:5, 379:17
**ANALYSES** [1] - 389:8
**ANALYSIS** [16] - 332:21, 334:14, 334:18, 337:25, 338:23, 352:11, 363:18, 367:14, 367:16, 368:8, 368:10, 368:11, 370:23, 388:22, 389:24, 392:1
**ANALYTICAL** [2] - 366:12, 366:13
**ANALYZE** [2] - 304:9, 333:1
**ANALYZING** [2] - 333:5, 356:11
**AND** [3] - 396:6, 396:9, 396:11
**ANGELES** [3] - 294:7, 317:23, 386:11
**ANGELES** [3] - 293:17, 293:25, 297:1
**ANNOUNCED** [1] - 369:25
**ANNOUNCES** [1] - 368:19
**ANNUAL** [2] - 310:10, 314:13
**ANSWER** [7] - 333:23, 355:3, 373:6, 376:12, 377:14, 388:18, 390:2, 392:17, 393:4
**ANSWERING** [1] - 394:13
**ANYWAY** [1] - 298:5
**APARTMENT** [3] - 325:3, 326:1
**APC** [1] - 294:8
**APOLOGIZE** [5] - 302:23, 306:23, 307:16, 382:1, 393:17
**APPEAL** [7] - 363:10, 363:16, 363:21, 364:1, 364:5, 365:7, 365:11
**APPEAL** [3] - 363:2, 364:11, 365:1
**APPEARANCES** [1] - 294:1
**APPLE** [1] - 337:11
**APPLICATION** [28] - 332:9, 333:2, 334:15, 334:18, 337:24, 337:25, 338:1, 338:21, 340:19,

340:24, 341:2, 341:19, 341:23, 341:24, 342:1, 342:12, 342:14, 342:25, 343:3, 343:14, 343:18, 344:1, 369:17, 369:24, 379:21, 385:24, 393:8, 393:19

**APPLICATION** [59] - 320:5, 326:21, 329:12, 329:15, 331:22, 332:6, 332:10, 332:13, 332:17, 333:5, 333:6, 333:8, 333:11, 333:21, 334:11, 334:12, 335:22, 338:9, 338:11, 338:24, 339:22, 341:12, 341:17, 341:20, 344:14, 345:24, 346:4, 346:7, 346:11, 346:18, 348:18, 348:21, 348:25, 349:3, 349:10, 349:11, 350:7, 350:19, 352:1, 352:2, 352:6, 352:12, 352:24, 353:15, 354:2, 354:6, 355:9, 355:20, 356:1, 356:4, 356:8, 356:11, 357:18, 361:22, 362:6, 369:8, 369:24, 379:16, 389:3

**APPLICATIONS** [31] - 309:7, 318:2, 320:14, 320:23, 321:1, 331:19, 335:2, 338:16, 348:2, 348:7, 348:8, 348:9, 349:8, 356:18, 357:3, 357:12, 361:18, 363:6, 364:22, 366:13, 369:11, 372:24, 383:3, 388:23, 389:5, 389:8, 389:14, 390:1, 390:23, 392:21, 394:15

**APPLIED** [7] - 310:15, 351:4, 353:10, 353:12, 355:7, 355:8, 371:22

**APPLY** [5] - 352:10, 354:19, 354:24, 356:13, 357:23

**APPLYING** [4] - 307:3, 327:22,

370:18, 370:19

**APPOINT** [2] - 381:8, 382:9

**APPOINTED** [2] - 330:8, 382:14

**APPRAISAL** [4] - 303:7, 338:20, 391:3, 391:6

**APPRAISALS** [1] - 338:16

**APPRAISALS'** [1] - 391:25

**APPRAISED** [1] - 338:13

**APPRAISER** [3] - 309:10, 338:13, 390:25

**APPROACH** [5] - 308:4, 308:7, 308:9, 350:24, 375:17

**APPROPRIATE** [1] - 315:14

**APPROVED** [5] - 330:1, 368:16, 368:20, 371:21, 383:16

**APPROVING** [1] - 390:16

**APRIL** [5] - 293:16, 295:3, 296:3, 297:1, 396:15

**APRIL** [7] - 318:7, 319:1, 360:3, 360:4, 363:3, 376:19, 384:2

**ARBITRARY** [2] - 303:20, 304:1

**AREA** [8] - 325:11, 336:9, 336:10, 336:13, 336:14, 379:12, 387:3, 387:4

**ARGUABLY** [1] - 337:6

**ARGUE** [2] - 298:6, 298:11

**ARGUMENTATIVE** [2] - 388:16, 391:20

**ARGUMENTS** [1] - 298:13

**ARM'S** [2] - 319:9, 319:14

**ARM'S-LENGTH** [2] - 319:9, 319:14

**ARRIVE** [2] - 306:17, 306:21

**ASSISTANCE** [1] - 338:9

**ASSISTANT** [1] - 322:20

**ASSISTED** [1] - 338:1

**ASSISTING** [1] - 362:9

**ASSOCIATED** [1] - 363:8

**ASSOCIATES** [5] - 318:5, 318:9, 318:10, 319:3, 319:13

**ASSOCIATES/ GROSSMAN** [1] - 318:11

**ASSUME** [1] - 384:1

**ASSUMES** [2] - 303:17, 367:23

**ASSUMING** [3] - 308:2, 314:24, 315:1

**ASSURE** [1] - 366:14

**ATTACHED** [1] - 333:8

**ATTEMPTED** [1] - 382:15

**ATTEMPTING** [1] - 324:25

**ATTENTION** [9] - 331:14, 344:21, 362:25, 365:20, 366:6, 385:23, 385:25, 386:4

**ATTORNEY** [3] - 361:16, 364:22, 368:24

**ATTORNEY'S** [4] - 331:14, 334:21, 335:14, 335:15

**ATTORNEYS** [2] - 357:10, 362:21

**AUDIT** [1] - 309:9

**AUDITOR** [2] - 308:23, 308:25

**AUDITORIUM** [1] - 317:13

**AUGUST** [1] - 360:2

**AUTHORITY** [1] - 372:18

**AUTHORIZED** [1] - 364:4

**AUTOMATIC** [1] - 320:3

**AVAILABLE** [6] - 298:23, 303:6, 325:10, 328:8, 357:4, 357:6

**AVALON** [2] - 316:20, 317:5

**AVENUE** [2] - 294:10, 294:16

**AVERAGE** [4] - 300:3, 300:15, 305:9, 306:16, 308:10

**AVERAGED** [1] - 300:22

**AVOID** [1] - 325:16

**AWARD** [2] - 373:15, 393:8

**AWARE** [1] - 305:19

# B

**BAAR** [6] - 338:6, 339:6, 340:13, 351:18, 352:16, 378:16

**BAAR'S** [2] - 354:5, 355:25

**BACKWARD** [1] - 341:9

**BALANCED** [3] - 331:2, 339:3, 339:12

**BANK** [1] - 310:23

**BANQUET** [1] - 317:13

**BASE** [1] - 327:20

**BASED** [13] - 306:15, 307:19, 307:21, 308:1, 320:3, 329:23, 335:24, 340:11, 343:17, 363:3, 374:24, 381:9, 382:10

**BASIS** [1] - 387:15

**BEAR** [1] - 352:13

**BECAME** [2] - 370:12, 372:4

**BECOME** [1] - 345:21

**BEGINNING** [1] - 301:9

**BEHALF** [5] - 318:10, 320:14, 381:20, 381:22, 384:7

**BEHIND** [2] - 332:4, 351:14

**BELONG** [1] - 333:16

**BELONGINGS** [1] - 325:4

**BELOW** [4] - 367:6, 371:2, 387:21, 388:6

**BELOW-MARKET** [1] - 388:6

**BENEFITS** [1] - 388:6

**BENIGN** [1] - 346:11

**BEST** [2] - 298:11, 375:15

**BETTER** [4] - 334:1, 336:15, 336:19, 354:22

**BETTERMENT** [1] - 374:11

**BETWEEN** [6] - 313:15, 327:1,

327:23, 337:1, 340:13, 386:12

**BEYOND** [1] - 360:2

**BIAS** [1] - 382:25

**BIG** [1] - 357:16

**BILL** [1] - 329:19

**BILLED** [1] - 372:3

**BILLIARDS** [1] - 317:14

**BILLS** [2] - 300:1, 311:9

**BINDER** [12] - 301:15, 301:16, 332:3, 339:18, 350:2, 350:4, 350:14, 351:7, 353:17, 384:20, 385:22

**BINDERS** [10] - 323:11, 323:13, 323:20, 332:1, 333:9, 333:10, 339:17, 342:16, 343:8, 343:9

**BIT** [5] - 310:4, 326:19, 329:8, 331:17, 372:11

**BLACK** [6] - 323:20, 332:1, 343:9, 348:14, 350:2, 384:21

**BLANK** [1] - 391:24

**BLENDING** [1] - 354:21

**BLINDERS** [1] - 383:5

**BLOW** [1] - 363:1

**BLUE** [1] - 304:24

**BOARD** [51] - 330:5, 330:16, 330:19, 330:23, 331:2, 331:6, 331:9, 331:12, 331:16, 331:23, 333:22, 339:3, 339:11, 339:12, 340:1, 340:2, 340:18, 343:15, 343:17, 344:9, 347:9, 347:11, 347:16, 350:6, 351:3, 351:24, 352:10, 354:13, 354:16, 354:24, 356:7, 356:10, 362:1, 362:24, 363:4, 363:16, 364:2, 364:6, 364:9, 369:18, 369:25, 370:14, 372:13, 372:18, 373:16, 380:22, 382:15, 383:12, 387:7, 393:7, 393:18

**BOARD** [23] - 315:9, 315:14, 317:25,

318:4, 319:25, 330:3, 330:8, 340:24, 347:5, 347:16, 370:7, 373:4, 373:11, 379:15, 379:20, 380:17, 381:1, 381:8, 382:10, 382:14, 382:22, 383:3, 383:7
**BOARD** [1] - 293:9
**BOARD'S** [1] - 390:22
**BOARD'S** [2] - 356:3, 394:4
**BODY** [2] - 293:10, 317:25
**BOLTS** [1] - 325:24
**BOND** [1] - 305:13
**BONDS** [6] - 299:25, 300:1, 306:19, 308:11, 308:12, 311:11
**BOOK** [1] - 298:25
**BORROW** [1] - 319:16
**BOTTOM** [3] - 362:25, 363:14, 386:5
**BOUGHT** [2] - 353:1, 374:19
**BOULEVARD** [2] - 316:20, 317:5
**BOUND** [1] - 363:17
**BOX** [1] - 304:24
**BREAK** [4] - 298:8, 299:22, 358:3, 358:4
**BRIEF** [2] - 297:9, 334:19
**BRING** [3] - 299:10, 337:4, 372:11
**BROKERS** [1] - 318:14
**BROUGHT** [1] - 331:14
**BUILDING** [2] - 317:12, 326:1
**BUILDING** [1] - 294:9
**BUST** [1] - 305:4
**BUY** [1] - 334:22
**BUYERS** [2] - 392:22, 392:24
**BUYING** [1] - 357:15
**BY** [51] - 294:5, 294:5, 294:9, 294:15, 294:15, 294:16, 299:19, 301:19, 303:25, 304:16, 305:7, 305:19, 306:7, 308:20, 309:15, 312:9, 322:4, 327:8, 342:19, 348:15,

350:17, 351:10, 351:17, 351:23, 353:20, 353:23, 354:1, 355:19, 355:25, 356:7, 361:8, 365:11, 366:25, 368:1, 369:5, 376:15, 380:13, 380:24, 381:5, 381:15, 382:21, 385:4, 385:22, 386:4, 386:9, 388:10, 388:21, 390:15, 393:4, 393:15, 394:2

---

# C

**CAL** [2] - 318:18, 318:24
**CALCULATE** [8] - 299:24, 303:8, 303:12, 303:16, 303:21, 306:16, 308:13, 350:23
**CALCULATED** [6] - 302:18, 307:2, 307:9, 308:14, 369:20, 370:2
**CALCULATING** [4] - 300:25, 313:5, 319:25, 363:20
**CALCULATION** [10] - 300:19, 306:23, 310:1, 314:24, 315:1, 315:11, 315:13, 338:7, 352:22, 386:23
**CALCULATIONS** [4] - 307:16, 307:18, 308:1, 308:5
**CALIFORNIA** [5] - 293:2, 293:17, 293:25, 297:1, 396:7
**CALIFORNIA** [12] - 294:7, 294:11, 294:17, 316:20, 316:25, 317:5, 317:22, 320:19, 365:2, 367:8, 391:18, 392:15
**CANNOT** [4] - 325:4, 325:5, 325:9, 330:24
**CAPACITY** [1] - 362:8
**CAPITAL** [2] - 319:7, 319:8
**CAPITAL** [3] - 335:19, 335:23, 374:6
**CARD** [1] - 317:14
**CARSON** [2] - 293:8, 293:9
**CARSON** [87] -

316:20, 316:25, 317:3, 317:4, 317:5, 317:7, 317:8, 317:21, 317:24, 319:17, 319:18, 319:21, 320:9, 320:14, 320:18, 322:7, 322:9, 323:15, 326:5, 329:9, 336:3, 336:7, 336:8, 336:16, 336:17, 336:18, 336:23, 337:5, 337:9, 337:20, 344:8, 344:20, 344:25, 345:5, 347:2, 348:1, 348:3, 348:8, 348:18, 348:22, 349:1, 349:15, 350:7, 350:10, 350:18, 353:14, 361:22, 362:1, 362:2, 365:3, 365:4, 365:12, 365:18, 367:1, 367:7, 367:17, 368:15, 369:10, 370:17, 370:23, 371:4, 371:10, 371:13, 373:24, 375:1, 375:5, 376:9, 377:17, 378:7, 378:8, 379:4, 379:25, 380:6, 380:16, 381:16, 384:14, 385:5, 387:25, 388:11, 388:23, 390:4, 390:5, 390:10, 390:16, 390:23
**CARSON'S** [2] - 318:1, 366:3
**CASE** [21] - 297:18, 298:1, 307:10, 307:18, 309:5, 314:4, 323:9, 336:2, 337:7, 353:6, 356:13, 358:5, 362:12, 363:2, 363:22, 367:20, 370:21, 378:7, 394:25, 395:2, 395:7
**CASE** [1] - 293:6
**CASH** [2] - 311:21, 312:1
**CASPARIAN** [1] - 294:9
**CATEGORIES** [3] - 330:17, 330:18, 334:25
**CATEGORY** [3] - 329:21, 333:14, 335:4
**CENTER** [1] - 336:10
**CENTRAL** [1] - 317:12
**CENTRAL** [2] -

293:2, 396:7
**CERTAIN** [6] - 310:11, 329:4, 347:22, 364:10, 380:25, 387:21
**CERTIFICATE** [1] - 396:1
**CERTIFY** [1] - 396:7
**CHAIR** [1] - 332:4
**CHANCE** [1] - 368:5
**CHANGE** [6] - 327:19, 331:18, 332:16, 340:6, 378:1, 378:9
**CHANGED** [5] - 326:6, 332:19, 338:18, 374:21, 391:8
**CHANGES** [4] - 327:23, 368:9, 368:12, 372:1
**CHARGE** [4] - 337:17, 375:6, 376:10, 379:22
**CHART** [7] - 301:13, 310:4, 310:5, 310:8, 310:14, 313:13
**CHECK** [2] - 329:19, 329:20
**CHECKED** [1] - 362:23
**CHECKS** [2] - 329:13, 333:13
**CHOICE** [1] - 300:21
**CHOOSE** [3] - 300:5, 300:17, 330:14
**CHOOSING** [1] - 313:18
**CHOSE** [5] - 303:20, 305:14, 305:16, 305:22, 364:9
**CHRONOLOGICAL** [1] - 295:5
**CITE** [1] - 375:19
**CITY** [14] - 320:18, 322:20, 324:19, 325:1, 338:4, 339:24, 344:22, 345:12, 345:19, 365:17, 366:9, 367:7, 370:8
**CITY** [51] - 308:14, 317:21, 317:24, 318:3, 320:7, 320:9, 320:16, 320:18, 322:7, 322:9, 322:14, 323:1, 323:2, 323:6, 338:12, 338:19, 344:20, 345:7, 348:1, 362:8, 362:9, 362:20, 365:3, 365:4, 365:12, 365:18, 366:15,

367:7, 367:21, 368:15, 369:13, 370:12, 371:10, 371:13, 373:10, 378:8, 379:25, 380:6, 380:16, 381:16, 381:20, 381:22, 382:3, 383:15, 383:16, 384:14, 384:23, 385:5, 387:25, 390:4
**CITY** [2] - 293:8, 293:9
**CITY'S** [7] - 303:7, 361:16, 364:4, 364:22, 366:11, 368:24, 372:24
**CLAUSE** [1] - 366:7
**CLAUSES** [1] - 366:6
**CLERK** [1] - 345:12
**CLERK** [1] - 384:23
**CLERK** [4] - 321:12, 321:19, 358:9, 395:4
**CLIENT** [4] - 369:17, 369:19, 370:18, 379:21
**CLIENT'S** [3] - 369:18, 369:23, 372:23
**CLOSE** [74] - 294:5, 297:24, 298:7, 298:14, 298:22, 298:24, 299:8, 299:15, 299:19, 301:19, 302:4, 302:11, 303:25, 304:13, 304:16, 305:7, 305:19, 306:7, 308:16, 312:5, 316:1, 316:4, 316:11, 316:13, 317:3, 321:6, 356:7, 357:20, 359:4, 359:11, 360:17, 360:23, 361:8, 365:8, 365:11, 366:25, 368:1, 369:5, 375:17, 375:21, 375:24, 376:2, 376:5, 376:15, 376:24, 377:2, 377:7, 377:9, 380:13, 380:24, 381:5, 381:15, 382:21, 385:2, 385:4, 385:12, 385:20, 385:22, 386:4, 386:9, 388:10, 388:18, 388:21, 389:16, 389:19, 389:21, 390:15, 392:6, 392:8, 392:10, 393:4, 393:15, 394:2,

395:11
**CLOSE** [10] - 297:16, 298:16, 300:8, 316:6, 316:9, 317:2, 361:10, 386:16, 394:21, 395:8
**CLOSEST** [1] - 371:1
**CLUBHOUSE** [1] - 317:12
**CLUE** [1] - 350:1
**CODE** [1] - 396:8
**CODIFY** [1] - 356:24
**COINCIDE** [1] - 314:4
**COLLEAGUES** [1] - 299:1
**COLLECTION** [1] - 317:20
**COLONY** [1] - 293:5
**COLONY** [70] - 307:10, 310:18, 314:21, 315:5, 315:11, 316:16, 316:18, 316:23, 317:10, 318:5, 318:7, 318:9, 318:10, 318:11, 319:1, 319:3, 319:4, 319:9, 319:13, 320:6, 320:12, 320:15, 320:22, 320:25, 332:7, 332:14, 332:23, 333:1, 335:25, 336:2, 336:7, 336:16, 336:17, 336:19, 336:22, 336:24, 337:2, 337:8, 337:20, 338:19, 338:20, 338:23, 341:11, 341:17, 342:2, 342:7, 345:24, 346:3, 346:24, 357:15, 370:18, 371:2, 371:4, 371:9, 373:23, 374:3, 376:19, 378:15, 378:20, 383:22, 386:13, 387:11, 387:17, 387:20, 388:1, 388:5, 392:21, 394:15
**COLOR** [1] - 318:4
**COLUMN** [3] - 307:11, 363:1, 363:14
**COM** [1] - 305:4
**COMBINATION** [1] - 328:23
**COMBINED** [1] - 306:19
**COMFORTABLY** [1] - 298:8
**COMING** [5] -

297:13, 328:8, 346:10, 346:16, 355:12
**COMMERCIAL** [2] - 318:13, 391:10
**COMMUNICATED** [1] - 394:14
**COMMUNITY** [1] - 374:12
**COMPANY** [1] - 318:8
**COMPANY** [1] - 293:5
**COMPARABLE** [2] - 370:24, 371:1
**COMPARE** [7] - 314:25, 336:7, 336:22, 370:17, 370:20, 371:3, 386:10
**COMPARED** [3] - 306:11, 310:14, 353:11
**COMPARING** [2] - 336:2, 337:8
**COMPARISON** [4] - 336:22, 337:10, 337:18, 373:22
**COMPENSATED** [1] - 374:7
**COMPLAIN** [2] - 336:11, 336:12
**COMPLETE** [2] - 333:21, 350:12
**COMPLETES** [1] - 357:24
**COMPLIED** [1] - 364:2
**COMPLY** [2] - 363:17, 364:6
**CONCLUDED** [3] - 314:7, 372:13, 395:13
**CONCLUSION** [2] - 315:8, 363:4
**CONDITION** [2] - 374:4, 374:16
**CONDITIONED** [1] - 323:8
**CONDUCT** [1] - 382:3
**CONDUCTED** [5] - 381:16, 385:5, 388:23, 389:8, 389:25
**CONFER** [1] - 385:15
**CONFERENCE** [1] - 396:12
**CONFIRM** [1] - 381:6
**CONFIRMED** [1] - 357:9
**CONFORMANCE** [1] - 396:12

**CONFUSED** [1] - 355:1
**CONFUSING** [1] - 338:25
**CONJUNCTION** [1] - 319:21
**CONNECTION** [2] - 369:16, 394:15
**CONSERVATIVE** [6] - 300:14, 300:15, 300:17, 301:4, 308:6, 308:9
**CONSIDER** [4] - 302:24, 353:14, 354:17, 356:10
**CONSIDERABLE** [2] - 325:6, 374:5
**CONSIDERATION** [2] - 363:7, 363:19
**CONSIDERED** [10] - 326:25, 351:4, 355:6, 356:12, 364:7, 368:10, 368:12, 372:12, 387:6, 390:7
**CONSIDERING** [1] - 378:8
**CONSTITUTIONAL** [1] - 366:15
**CONSULTANT** [2] - 323:2, 384:15
**CONSULTANTS** [1] - 357:10
**CONSUMER** [3] - 327:19, 386:11, 387:2
**CONTAIN** [1] - 327:9
**CONTEMPLATED** [1] - 360:23
**CONTENDS** [1] - 364:2
**CONTINUES** [1] - 375:24
**CONTRIBUTES** [1] - 300:10
**CONTROL** [19] - 318:1, 319:23, 320:10, 320:21, 323:16, 323:22, 324:11, 325:23, 366:11, 370:7, 379:15, 379:20, 380:17, 381:8, 382:10, 382:14, 382:22, 383:3, 383:7
**CONTROL** [27] - 319:19, 322:15, 322:18, 323:4, 326:21, 337:9, 337:12, 337:16, 338:5, 344:7, 352:2, 355:14, 367:1,

369:14, 375:1, 376:22, 377:17, 379:25, 380:5, 380:15, 380:17, 380:21, 380:23, 390:4, 392:19
**CONTROLLED** [6] - 318:6, 337:19, 337:20, 376:21, 391:17, 392:17
**CONTROLLING** [1] - 380:25
**CONVERSATION** [2] - 346:23, 347:1
**CONVERSATIONS** [2] - 345:25, 346:20
**CONVERSION** [1] - 335:9
**CONVERT** [1] - 383:22
**CONVERTED** [2] - 384:3, 384:8
**CONVERTING** [2] - 335:10, 335:13
**COPIES** [2] - 329:13, 375:18
**COPY** [1] - 357:8
**CORPORATE** [4] - 300:1, 308:11, 308:12, 311:11
**CORPORATION** [2] - 293:9, 317:22
**CORPORATION** [1] - 319:8
**CORRECT** [83] - 298:15, 307:18, 309:2, 309:8, 310:2, 310:3, 310:6, 310:11, 310:16, 310:25, 311:5, 311:20, 312:2, 312:23, 313:8, 314:8, 315:15, 322:24, 326:8, 329:22, 331:24, 347:24, 349:14, 352:3, 356:8, 356:19, 357:12, 361:19, 361:23, 361:24, 362:10, 362:16, 364:19, 364:25, 365:5, 365:13, 367:10, 367:18, 367:22, 368:13, 368:17, 368:20, 369:21, 371:23, 372:7, 372:15, 373:5, 373:8, 373:17, 374:13, 376:20, 377:13, 377:23, 378:11, 381:10, 382:4, 382:6,

383:4, 383:5, 383:12, 383:13, 384:4, 384:6, 384:14, 385:10, 386:15, 386:23, 387:7, 387:14, 387:20, 387:23, 388:3, 388:6, 389:5, 391:3, 391:6, 391:12, 391:14, 391:15, 391:19, 392:16, 393:10, 393:20
**CORRECT** [1] - 396:9
**CORRECTION** [1] - 342:24
**CORRECTLY** [1] - 333:15
**COST** [4] - 317:17, 324:24, 328:14, 391:25
**COSTLY** [1] - 325:9
**COSTS** [4] - 363:8, 363:19, 364:7, 364:10
**COUNCIL** [9] - 320:18, 345:11, 345:17, 345:19, 346:8, 346:16, 365:18, 366:9, 367:7
**COUNSEL** [1] - 294:1
**COUNSEL** [4] - 330:14, 372:24, 385:15, 395:11
**COUNTRY** [1] - 318:14
**COUNTRY** [1] - 371:19
**COUNTY** [3] - 317:23, 386:11, 387:4
**COUPLE** [3] - 331:10, 356:22, 366:6
**COURSE** [5] - 310:12, 314:9, 315:3, 322:22, 364:21
**COURT** [12] - 297:6, 299:13, 316:6, 321:13, 321:15, 331:4, 335:16, 358:11, 361:5, 363:3, 364:14, 395:6
**COURT** [93] - 293:1, 293:24, 297:7, 297:20, 297:22, 298:2, 298:4, 298:10, 298:20, 298:23, 299:4, 299:10, 299:14, 302:9, 303:19, 303:24, 304:15, 304:19, 305:18, 306:2,

308:18, 309:12,
309:19, 309:23,
312:7, 316:2, 316:5,
317:2, 321:4, 321:8,
321:11, 327:6,
357:21, 358:3,
358:12, 358:16,
358:18, 358:20,
358:22, 359:1, 359:5,
359:9, 359:12,
359:14, 359:21,
360:6, 360:10,
360:12, 360:15,
360:21, 360:25,
361:2, 361:6, 365:10,
366:23, 367:25,
369:3, 375:19,
375:23, 376:1, 376:4,
377:1, 377:6, 377:8,
380:11, 380:20,
381:3, 381:13,
382:19, 385:3,
385:13, 385:18,
385:21, 386:3, 386:7,
388:9, 388:17,
388:19, 389:18,
389:20, 390:14,
391:21, 392:7, 392:9,
393:3, 393:12,
393:23, 394:21,
395:7, 395:12, 396:6,
396:19
   **COURT** [15] - 298:16,
298:18, 298:23,
299:1, 363:2, 363:10,
363:16, 363:21,
363:25, 364:5,
364:11, 365:1, 365:7,
365:11, 385:2
   **COURT'S** [2] -
363:17, 364:8
   **COURT'S** [4] -
297:17, 298:25,
362:19, 386:1
   **COURTROOM** [2] -
395:8, 395:9
   **COURTS** [4] - 365:2,
367:16, 368:17,
368:20
   **COVE** [65] - 310:18,
314:21, 315:5,
315:11, 316:16,
316:18, 316:23,
317:10, 318:5, 318:7,
318:9, 318:10,
318:11, 319:1, 319:3,
319:4, 319:13, 320:6,
320:15, 320:22,
320:25, 332:7,
332:14, 332:23,

335:25, 336:2, 336:7,
336:16, 336:17,
336:19, 336:22,
336:24, 337:2, 337:8,
337:20, 338:19,
338:20, 341:11,
341:17, 342:2, 342:7,
345:24, 346:3,
346:24, 357:15,
370:18, 371:2, 371:4,
371:9, 373:23, 374:3,
376:19, 378:15,
378:20, 383:22,
386:13, 387:11,
387:17, 387:20,
388:1, 388:5, 392:21,
394:15
   **COVE** [1] - 293:5
   **COVE'S** [5] - 307:10,
319:9, 320:12, 333:1,
338:23
   **COVER** [8] - 349:12,
353:1, 353:3, 353:5,
369:20, 375:6,
376:10, 379:22
   **COVERING** [1] -
307:19
   **COVERS** [1] - 300:7
   **CPI** [10] - 327:15,
327:18, 327:22,
328:5, 328:13,
328:16, 332:21,
387:1, 387:10
   **CRASH** [1] - 322:21
   **CRASHED** [1] -
305:6
   **CRASHES** [2] -
305:2, 305:8
   **CREATED** [2] -
304:10, 317:25
   **CRIMINAL** [1] -
395:7
   **CROSS** [2] - 295:10,
295:16
   **CROSS** [2] - 308:19,
361:7
   **CROSS** [4] - 295:11,
295:17, 308:18, 361:6
   **CROSS-EXA
MINATION** [2] -
308:18, 361:6
   **CROSS-
EXAMINATION** [2] -
295:10, 295:16
   **CROSS-
EXAMINATION** [2] -
308:19, 361:7
   **CRR** [2] - 293:23,
396:19
   **CRUX** [2] - 315:16,

315:22
   **CSR** [2] - 293:23,
396:19
   **CURRENT** [4] -
313:8, 323:1, 330:19,
366:10
   **CUSTOMARY** [1] -
338:12
   **CUT** [1] - 339:1
   **CV** [1] - 293:7

# D

   **D-4** [1] - 307:15
   **D-5** [2] - 306:13,
307:6
   **D-6** [1] - 299:21
   **D-7** [1] - 304:13
   **DAILY** [1] - 301:23
   **DAMAGE** [7] - 301:9,
304:4, 307:16,
307:18, 308:1, 308:5,
314:4
   **DAMAGES** [12] -
302:18, 306:14,
307:2, 307:9, 307:10,
307:11, 308:13,
310:1, 315:5, 315:15,
315:20
   **DATA** [2] - 386:23,
387:9
   **DATE** [5] - 301:10,
349:6, 364:17, 374:18
   **DATED** [1] - 396:15
   **DATES** [1] - 347:14
   **DAUGHTERS** [1] -
372:10
   **DAVID** [1] - 318:21
   **DAY** [2] - 293:16,
396:15
   **DAY-TO-DAY** [1] -
324:4
   **DE** [1] - 382:14
   **DE-APPOINTED** [1] -
382:14
   **DEAL** [2] - 359:1,
394:22
   **DEALT** [1] - 379:14
   **DEAR** [9] - 345:8,
365:24, 366:3,
380:16, 381:7,
381:17, 383:16,
384:23, 394:14
   **DEAR** [12] - 345:10,
345:14, 345:23,
346:3, 346:6, 346:21,
346:24, 347:2, 347:4,
347:15, 380:25, 382:9
   **DEBT** [24] - 307:22,
308:15, 311:22,

315:9, 315:20,
328:14, 332:25,
349:12, 349:20,
353:1, 353:4, 363:19,
364:7, 365:4, 368:10,
369:21, 370:3, 375:7,
376:13, 379:18,
379:22, 390:6,
390:10, 393:14
   **DECADE** [1] - 344:14
   **DECEMBER** [13] -
300:4, 301:9, 301:24,
301:25, 302:19,
302:25, 307:12,
312:15, 313:8,
313:10, 313:15,
314:12, 322:12
   **DECIDE** [1] - 329:25
   **DECIDED** [8] -
300:16, 340:14,
346:18, 356:7,
356:18, 365:4,
365:12, 370:7
   **DECIDING** [1] -
354:24
   **DECISION** [5] -
326:25, 354:10,
364:17, 365:11,
370:14
   **DECISIONS** [3] -
362:19, 369:11,
390:22
   **DECREASES** [1] -
343:7
   **DEEMED** [1] -
333:21, 335:6
   **DEFAULTING** [1] -
325:17
   **DEFENDANT** [2] -
317:21, 317:24
   **DEFENDANT'S** [1] -
322:2
   **DEFENDANT'S** [1] -
295:13
   **DEFENDANTS** [2] -
293:11, 294:13
   **DEFENDANTS** [2] -
358:13, 360:20
   **DEFENSE** [1] - 321:8
   **DEFINED** [1] -
316:20
   **DELAWARE** [1] -
293:5
   **DELETING** [1] -
364:10
   **DEMONSTRATIVE**
[4] - 304:9, 304:16,
309:21, 313:2
   **DEPICT** [1] - 304:2
   **DEPOSITION** [10] -

305:24, 306:4, 375:9,
375:13, 375:18,
376:25, 377:9,
389:16, 389:22,
392:11
   **DESCRIBE** [2] -
306:7, 308:4
   **DESCRIBED** [1] -
327:14
   **DESIGNATED** [1] -
329:17
   **DESK** [1] - 321:13
   **DETAILS** [1] - 331:23
   **DETERMINATION**
[2] - 314:19, 314:20
   **DETERMINE** [6] -
318:2, 328:19, 329:4,
329:21, 329:23, 367:8
   **DETERMINED** [1] -
393:7
   **DETERMINING** [1] -
393:18
   **DEVELOPMENTS**
[1] - 384:17
   **DIED** [1] - 372:9
   **DIFFERENCE** [2] -
371:7, 374:20
   **DIFFERENT** [10] -
310:4, 310:7, 310:13,
314:5, 314:6, 314:7,
326:1, 330:17,
330:18, 350:22
   **DIFFERENTIAL** [3] -
337:1, 337:22, 374:21
   **DIFFERENTLY** [1] -
353:11
   **DIFFICULT** [1] -
325:18
   **DIFFICULTY** [1] -
324:25
   **DIGIT** [1] - 372:5
   **DIMITRI** [1] - 294:5
   **DIP** [2] - 305:3, 305:4
   **DIRECT** [14] -
299:14, 309:22,
310:2, 313:3, 323:14,
357:24, 362:24,
364:23, 369:9,
370:16, 371:14,
373:21, 385:25,
394:12
   **DIRECT** [2] - 295:9,
295:15
   **DIRECT** [2] - 299:18,
322:3
   **DIRECTLY** [1] -
330:12
   **DIRECTORS** [2] -
381:9, 382:9
   **DIS** [1] - 378:22

**DISCLOSING** [1] - 360:3

**DISCLOSURE** [1] - 360:16

**DISCOUNTED** [1] - 312:14

**DISCRETIONARY** [1] - 363:6

**DISCUSS** [9] - 297:21, 302:10, 338:5, 358:1, 358:5, 373:11, 377:22, 385:19, 394:25

**DISCUSSED** [3] - 361:17, 361:21, 392:4

**DISCUSSES** [1] - 352:14

**DISCUSSION** [4] - 297:9, 331:13, 373:22, 373:25

**DISPARITY** [1] - 374:15

**DISPUTE** [1] - 394:2

**DISTRICT** [5] - 293:1, 293:2, 293:3, 396:6, 396:7

**DIVERSE** [2] - 300:7, 300:9

**DIVIDED** [1] - 306:20

**DIVISION** [1] - 293:2

**DO** [1] - 396:7

**DOCUMENT** [18] - 301:20, 302:1, 302:12, 302:13, 323:25, 324:6, 326:12, 329:18, 333:13, 343:2, 348:17, 350:17, 352:15, 355:4, 356:16, 359:15, 368:6, 385:18

**DOCUMENTS** [2] - 323:13, 343:2

**DOES** [1] - 293:10

**DOLLAR** [1] - 387:15

**DOLLARS** [1] - 344:8

**DONE** [7] - 298:3, 299:4, 326:18, 337:2, 354:20, 372:20, 389:14

**DOOR** [1] - 346:10

**DORADO** [1] - 316:15

**DOT** [1] - 305:4

**DOT-COM** [1] - 305:4

**DOUBLE** [2] - 306:5, 329:19

**DOWN** [15] - 298:25, 305:12, 309:19,

313:24, 314:2, 316:2, 317:2, 333:10, 337:12, 338:2, 338:5, 363:24, 367:6, 384:20, 387:16

**DOWNLOADED** [1] - 302:2

**DOZEN** [3] - 347:9, 372:22, 379:13

**DR** [8] - 338:6, 339:6, 340:13, 351:18, 352:16, 354:5, 355:25, 378:16

**DRAMATIC** [2] - 313:16, 313:17

**DRAMATICALLY** [1] - 314:1

**DRAW** [1] - 386:4

**DRAWING** [1] - 391:24

**DRAWN** [1] - 330:17

**DRIVES** [1] - 305:11

**DRY** [1] - 339:1

**DUE** [4] - 315:15, 324:23, 363:7, 363:19

**DURING** [27] - 301:12, 309:22, 310:1, 313:3, 330:3, 330:10, 332:19, 340:12, 345:13, 345:23, 346:2, 346:6, 346:15, 347:16, 347:22, 358:2, 361:12, 361:21, 364:23, 369:9, 371:14, 380:2, 380:4, 380:8, 380:13, 390:3

**DUTIES** [1] - 322:13

## E

**EARLY** [4] - 297:19, 318:15, 369:11, 394:22

**EARN** [2] - 324:20, 377:18

**ECONOMIC** [1] - 302:18

**EFFECT** [2] - 353:7, 392:1

**EFFECTIVELY** [1] - 387:16

**EITHER** [7] - 305:24, 325:8, 330:11, 335:8, 346:9, 348:9, 360:20

**EL** [1] - 316:15

**ELABORATE** [1] - 327:17

**ELECTED** [2] - 380:1, 380:6

**ELECTIONS** [1] - 344:22

**ELECTRIC** [1] - 319:7

**ELLIS** [6] - 303:7, 303:15, 304:10, 304:23, 305:14, 306:8

**ELLIS'** [2] - 305:10, 305:20

**ELLIS'S** [1] - 303:23

**EMPLOY** [1] - 370:12

**EMPLOYED** [3] - 348:1, 370:15, 390:3

**EMPLOYEE** [3] - 322:10, 344:20, 345:7

**ENACTED** [1] - 319:18

**END** [3] - 297:18, 313:15, 384:2

**ENDED** [2] - 338:6, 340:15

**ENGAGED** [1] - 382:3

**ENGINEERING** [1] - 335:16

**ENJOY** [1] - 388:5

**ENTIRE** [4] - 297:12, 314:21, 326:4, 385:18

**ENTIRETY** [1] - 368:3

**ENTITLED** [1] - 396:11

**ENTITLED** [4] - 312:3, 315:19, 320:8, 384:22

**EQUAL** [1] - 370:21

**EQUALLY** [1] - 306:19

**EQUATION** [1] - 328:15

**EQUITY** [1] - 319:5

**ERROR** [1] - 386:23

**ESSENTIALLY** [1] - 313:8

**ESTABLISHED** [2] - 323:17, 337:2

**ESTATE** [6] - 305:6, 309:10, 318:13, 338:13, 338:15, 391:13

**ESTATES** [3] - 316:19, 371:19, 376:19

**ESTIMATE** [3] - 313:6, 315:4, 392:2

**ESTIMATED** [2] - 388:21, 389:23

**EVALUATE** [1] - 366:12

**EVALUATING** [1] -

383:3

**EVD** [1] - 296:5

**EVICTED** [1] - 325:16

**EVIDENCE** [11] - 298:3, 303:18, 321:4, 358:1, 358:13, 359:7, 359:13, 359:19, 361:1, 367:24, 385:24

**EXACTLY** [2] - 339:24, 390:24

**EXAMINATION** [19] - 295:9, 295:10, 295:10, 295:11, 295:15, 295:16, 295:16, 295:17, 299:14, 308:18, 309:6, 357:25, 361:6, 361:22, 364:23, 369:9, 370:16, 371:14, 394:12

**EXAMINATION** [4] - 299:18, 308:19, 322:3, 361:7

**EXAMINING** [2] - 361:17, 368:24

**EXCESSIVE** [2] - 324:19, 325:17

**EXCHANGED** [1] - 302:8

**EXCUSE** [6] - 337:19, 351:20, 352:21, 360:3, 376:15, 392:12

**EXERCISE** [2] - 317:14, 317:18

**EXHIBIT** [92] - 296:5, 296:6, 296:7, 296:8, 296:9, 296:10, 296:11, 296:12, 296:13, 296:14, 296:15, 296:16, 296:17, 296:18, 296:19, 296:20, 296:21, 296:22, 296:23, 298:25, 301:15, 301:17, 301:22, 301:23, 302:5, 310:5, 323:19, 323:22, 324:5, 324:13, 326:10, 326:14, 331:25, 332:11, 333:5, 334:7, 334:9, 334:14, 339:17, 339:18, 340:3, 340:21, 341:14, 341:20, 342:18, 342:23, 343:5, 343:9, 343:11, 343:23, 348:12,

348:13, 349:25, 350:13, 350:16, 350:17, 351:6, 351:9, 351:14, 351:16, 351:20, 351:22, 353:16, 353:19, 353:20, 353:22, 353:23, 353:25, 354:1, 354:5, 354:8, 355:16, 355:18, 355:23, 355:24, 356:3, 356:6, 359:7, 359:13, 359:19, 361:1, 362:1, 362:25, 363:14, 364:17, 365:12, 365:16, 366:1, 368:2, 384:22, 385:8, 385:12

**EXHIBIT** [10] - 309:20, 323:14, 334:10, 342:25, 352:16, 358:24, 360:2, 360:5, 360:7, 386:5

**EXHIBITS** [1] - 358:14

**EXHIBITS** [1] - 296:1

**EXHIBITS** [8] - 309:22, 313:3, 339:8, 342:17, 358:1, 359:16, 360:3, 384:21

**EXPECT** [1] - 313:20

**EXPECTED** [2] - 340:12, 340:14

**EXPENSE** [9] - 307:20, 333:16, 333:24, 334:5, 340:12, 341:6, 379:22, 390:7, 390:12

**EXPENSES** [24] - 328:17, 329:21, 329:23, 334:15, 334:17, 334:21, 334:24, 335:6, 335:12, 335:14, 335:24, 341:8, 342:10, 342:13, 343:3, 343:7, 363:8, 368:10, 372:2, 375:7, 376:6, 376:11, 376:12

**EXPERIENCE** [5] - 322:23, 366:25, 374:24, 382:13, 382:22

**EXPERT** [5] - 303:7, 309:15, 314:16, 335:15, 360:6

**EXPERTS** [2] - 335:17, 340:13

**EXPLAIN** [2] -

342:23, 360:15
**EXPLAINING** [1] - 333:17
**EXPLAINS** [1] - 325:22
**EXPRESS** [2] - 358:6, 395:1
**EXTENDED** [2] - 344:12, 355:11
**EXTENSIVE** [1] - 339:8

# F

**F-R-E-S-C-H-A-U-F** [1] - 321:23
**FACT** [27] - 314:10, 316:14, 317:21, 318:5, 318:11, 318:15, 318:18, 318:21, 318:24, 319:1, 319:4, 319:7, 319:12, 319:15, 319:18, 319:24, 320:2, 320:6, 320:15, 320:22, 320:25, 364:6, 382:13, 383:8, 383:9, 387:5, 390:15
**FACTOR** [4] - 310:15, 362:19, 387:6, 393:14
**FACTORS** [3] - 326:24, 327:2, 327:4
**FACTS** [8] - 298:17, 299:6, 303:17, 316:6, 316:7, 316:8, 316:10, 367:24
**FAIR** [16] - 324:20, 336:1, 336:22, 337:10, 337:18, 340:14, 363:20, 366:15, 370:17, 370:20, 371:3, 372:14, 377:18, 382:15, 382:23, 383:4
**FAIRLY** [1] - 313:17
**FAMILIAR** [3] - 336:3, 362:2, 362:13
**FAMILIES** [1] - 379:12
**FAR** [1] - 370:9
**FAVORABLE** [2] - 381:9, 382:10
**FEASIBLE** [1] - 325:15
**FEDERAL** [3] - 293:24, 396:5, 396:19
**FEDERAL** [1] - 334:5
**FEES** [4] - 334:21, 335:14, 335:15,

335:16
**FEW** [5] - 372:20, 379:12, 385:6, 391:8, 395:9
**FIGURE** [1] - 372:15
**FIGURES** [1] - 388:5
**FILE** [2] - 341:11, 370:7
**FILED** [4] - 332:7, 341:17, 348:8, 369:17
**FILL** [1] - 329:12
**FINAL** [1] - 340:1
**FINALLY** [3] - 340:1, 359:15, 395:2
**FINANCE** [1] - 302:2
**FINANCIAL** [2] - 309:1, 309:3
**FINANCING** [2] - 319:8, 363:8
**FINE** [4] - 297:20, 297:22, 361:10, 367:9
**FINGERPRINTS** [1] - 329:18
**FIRST** [21] - 297:10, 302:13, 305:3, 307:14, 320:22, 321:8, 339:11, 339:12, 348:21, 349:4, 355:9, 358:16, 359:1, 359:25, 360:4, 362:12, 363:14, 364:1, 365:20, 366:5, 379:16
**FIT** [1] - 310:9
**FIVE** [5] - 317:20, 333:9, 334:23, 345:2, 389:13
**FIVE-YEAR** [1] - 334:23
**FIXED** [1] - 325:2
**FLAG** [1] - 333:15
**FLOOR** [1] - 294:6
**FOCAL** [1] - 387:4
**FOCUS** [2] - 366:6, 368:4
**FOCUSED** [1] - 380:10
**FOLLOW** [2] - 362:15, 362:21
**FOLLOWING** [8] - 297:5, 299:6, 299:12, 317:11, 322:24, 358:10, 361:4, 395:5
**FOLLOWS** [1] - 367:8
**FOR** [4] - 294:3, 294:13, 396:6
**FORECLOSED** [2] - 310:23, 311:1
**FOREGOING** [1] -

367:9
**FOREGOING** [1] - 396:9
**FOREVER** [1] - 341:7
**FORM** [3] - 329:12, 358:6, 395:1
**FORMAT** [1] - 396:11
**FORMER** [4] - 345:11, 345:12, 381:17
**FORMULA** [16] - 320:3, 326:17, 327:15, 327:18, 328:2, 328:10, 328:11, 328:19, 328:20, 328:25, 329:4, 354:17, 356:22, 378:21, 389:2, 389:12
**FORMULAS** [4] - 327:5, 327:9, 327:11, 350:22
**FORTH** [4] - 318:20, 318:23, 319:10, 326:20
**FORWARD** [5] - 308:7, 308:13, 321:12, 340:8, 341:7
**FOUNDATION** [9] - 304:18, 312:6, 366:21, 367:23, 380:18, 381:12, 382:18, 393:2, 393:22
**FOUR** [3] - 317:19, 335:1, 355:2
**FRAME** [1] - 394:18
**FREE** [1] - 323:13
**FREQUENTLY** [2] - 371:8, 384:16
**FRESCHAUF** [46] - 297:11, 321:22, 322:5, 323:11, 327:8, 331:3, 331:25, 332:3, 349:24, 350:3, 357:25, 361:9, 362:3, 363:11, 364:12, 364:19, 366:17, 367:11, 369:1, 369:14, 371:5, 372:7, 373:18, 374:2, 375:3, 375:9, 376:16, 377:3, 377:16, 377:20, 379:3, 379:24, 381:16, 381:25, 382:13, 382:21, 383:19, 384:4, 384:20, 385:23, 386:6, 387:1, 387:18, 387:20, 390:20,

390:25
**FRESCHAUF** [1] - 322:1
**FRESCHAUF'S** [1] - 375:18
**FRIDAY** [4] - 293:16, 295:3, 296:3, 297:1
**FRIDAY** [1] - 381:25
**FRONT** [4] - 333:6, 339:17, 368:20, 378:10
**FULL** [2] - 321:20, 368:5
**FULLY** [1] - 364:2
**FUNCTION** [1] - 362:20
**FUND** [1] - 300:9
**FUNGIBLE** [1] - 311:22
**FUTURE** [1] - 302:22

# G

**G.E** [1] - 319:8
**GARDENS** [5] - 361:22, 362:1, 362:2, 367:17, 378:7
**GEARS** [1] - 344:19
**GENERAL** [1] - 319:7
**GENERAL** [7] - 316:15, 316:24, 324:17, 326:22, 335:22, 346:14, 371:9
**GENERALLY** [5] - 325:14, 338:17, 346:11, 377:14, 386:15
**GENERATE** [1] - 301:3
**GENTLEMAN** [1] - 322:19
**GENTLEMEN** [2] - 316:5, 358:4
**GILCHRIST** [1] - 294:8
**GIVEN** [6] - 309:8, 313:19, 314:11, 357:8, 360:1, 391:3
**GOD** [1] - 321:17
**GOLDSTEIN** [55] - 310:24, 312:1, 312:9, 312:14, 312:18, 312:24, 315:15, 315:19, 316:14, 316:15, 316:23, 316:24, 317:6, 317:8, 320:13, 331:4, 331:6, 331:8, 331:15, 335:25, 336:6,

336:18, 336:21, 337:3, 337:15, 346:21, 348:3, 348:11, 348:22, 349:1, 357:4, 357:10, 357:11, 357:14, 369:25, 370:6, 373:1, 374:3, 374:17, 374:21, 374:24, 376:18, 377:4, 377:12, 377:21, 377:25, 378:7, 378:14, 378:19, 378:23, 379:17, 383:11, 383:19, 383:21, 384:7
**GOLDSTEIN** [1] - 331:11
**GOLDSTEIN'S** [5] - 349:12, 369:24, 379:16, 379:21, 390:5
**GOODS** [1] - 387:2
**GOVERN** [1] - 366:10
**GOVERNMENT** [2] - 299:25, 306:18
**GOVERNMENT** [1] - 311:8
**GRANADA** [5] - 355:20, 356:1, 356:4, 356:11, 357:4
**GRANT** [1] - 343:17
**GRANTED** [9] - 307:24, 314:25, 327:24, 340:11, 341:2, 341:7, 343:20, 353:3, 371:13
**GRANTING** [5] - 315:10, 340:19, 344:1, 344:9, 351:24
**GREAT** [2] - 305:5, 393:16
**GROSS** [8] - 327:13, 327:21, 328:1, 332:20, 363:18, 368:11, 388:21, 389:23
**GROSSMAN** [2] - 318:8
**GROUP** [1] - 323:3
**GROUP** [1] - 324:23
**GUARANTEED** [1] - 313:23
**GUESS** [7] - 297:25, 315:22, 334:1, 347:8, 376:14, 380:23, 394:1
**GUIDE** [1] - 319:25
**GUIDELINE** [1] - 387:25
**GUIDELINES** [58] -

319:22, 319:23, 319:24, 320:2, 320:7, 320:9, 320:11, 320:16, 320:20, 320:21, 324:4, 324:8, 324:10, 326:3, 326:4, 326:7, 326:15, 326:16, 326:20, 326:22, 327:3, 327:5, 327:9, 327:14, 327:17, 328:10, 328:18, 328:21, 328:24, 329:3, 329:6, 329:24, 331:18, 350:22, 351:3, 353:10, 356:21, 364:4, 365:5, 365:13, 365:18, 366:3, 366:10, 367:14, 367:21, 368:24, 369:6, 373:17, 378:2, 378:9, 378:15, 378:20, 378:24, 387:5, 388:11, 390:21

**GUTIERREZ** [1] - 293:3

# H

**HALF** [3] - 347:8, 372:22, 379:13

**HALL** [3] - 297:11, 321:10, 339:24

**HAND** [2] - 321:13, 363:1

**HANDFUL** [1] - 361:17

**HANDLE** [3] - 298:17, 298:18, 395:7

**HANDLED** [1] - 318:9

**HANDLING** [4] - 369:13, 379:25, 380:5, 390:4

**HANDS** [2] - 299:1, 338:18

**HANG** [3] - 349:17, 356:14, 385:7

**HARBOR** [35] - 316:25, 317:3, 317:4, 317:7, 317:8, 320:14, 336:3, 336:7, 336:8, 336:16, 336:17, 336:18, 336:23, 337:5, 337:9, 337:20, 347:2, 348:3, 348:8, 348:18, 348:22, 349:1, 349:15, 350:7, 350:10, 350:18, 369:10, 370:17,

370:23, 371:4, 373:24, 390:5, 390:10, 390:16, 390:23

**HEAR** [7] - 318:1, 347:4, 347:7, 347:15, 347:17, 362:17, 388:18

**HEARD** [4] - 336:1, 337:7, 347:19, 358:12

**HEARING** [26] - 311:25, 326:18, 327:20, 328:7, 328:8, 330:3, 330:6, 332:19, 333:19, 333:22, 334:11, 339:2, 339:4, 339:11, 339:13, 339:22, 340:1, 340:7, 340:12, 340:16, 342:9, 369:18, 369:23, 372:4, 373:4, 373:8

**HEARINGS** [3] - 339:25, 349:8, 364:14

**HEARSAY** [2] - 306:1, 385:16

**HELD** [6] - 297:5, 299:12, 337:12, 358:10, 361:4, 395:5

**HELD** [1] - 396:10

**HELP** [5] - 321:16, 338:6, 343:7, 366:14, 378:10

**HEREBY** [2] - 366:9, 367:8

**HEREBY** [1] - 396:7

**HIGH** [1] - 324:24

**HIGHER** [2] - 388:11, 388:12

**HIGHLIGHTED** [1] - 363:25

**HIRED** [1] - 318:12

**HISTORIC** [1] - 313:11

**HISTORICAL** [4] - 304:14, 304:21, 313:4, 371:6

**HISTORICALLY** [3] - 340:11, 363:4, 379:11

**HISTORY** [4] - 305:2, 305:9, 306:10, 306:12

**HIT** [2] - 313:25, 314:3

**HOLD** [2] - 314:17, 358:18

**HOLDING** [1] - 335:11

**HOME** [9] - 318:1, 319:22, 320:10, 320:20, 323:15,

323:22, 324:11, 325:22, 366:11

**HOME** [38] - 309:16, 311:5, 311:18, 311:19, 312:23, 316:19, 317:4, 319:16, 319:19, 322:15, 322:17, 324:19, 324:25, 325:8, 325:10, 325:14, 325:16, 325:17, 325:18, 325:19, 325:20, 325:25, 329:9, 329:10, 334:6, 345:1, 345:4, 348:3, 353:7, 353:11, 353:12, 357:12, 366:14, 379:4, 379:11, 391:18, 392:15

**HOMEOWNER** [2] - 325:15, 325:19

**HOMEOWNERS** [5] - 324:18, 324:22, 325:1, 325:4

**HOMES** [4] - 324:24, 325:7, 325:12, 325:13

**HONOR** [31] - 297:8, 297:23, 299:9, 299:15, 302:4, 302:7, 303:17, 309:24, 312:5, 316:1, 316:4, 316:11, 321:3, 321:6, 321:9, 357:24, 359:4, 359:11, 359:18, 359:25, 360:14, 360:17, 365:6, 365:9, 375:18, 376:24, 385:12, 385:14, 385:16, 389:16, 392:6

**HONORABLE** [1] - 293:3

**HOPE** [1] - 294:6

**HOPE** [1] - 382:24

**HOUSEKEEPING** [1] - 361:13

**HUGE** [2] - 305:3, 305:4

**HUNDRED** [2] - 330:9, 389:14

**HUSBAND** [1] - 372:9

# I

**IA** [1] - 324:14

**ID** [1] - 296:5

**IDEA** [6] - 331:16, 357:17, 391:16, 392:13, 392:21,

392:23

**IDENTIFICATION** [13] - 301:17, 342:18, 348:13, 350:16, 351:9, 351:16, 351:22, 353:19, 353:22, 353:25, 355:18, 355:24, 356:6

**IDENTIFIED** [5] - 300:7, 300:9, 310:5, 327:2, 359:17

**IDENTIFY** [1] - 350:22

**IMPACT** [1] - 305:8

**IMPLEMENTATION** [3] - 319:22, 320:10, 320:20

**IMPLEMENTING** [1] - 319:25

**IMPORTANT** [4] - 324:3, 362:19, 368:25, 369:6

**IMPROPER** [3] - 319:16, 367:17, 367:19

**IMPROVED** [1] - 374:3

**IMPROVEMENT** [2] - 335:23, 390:19

**IMPROVEMENTS** [4] - 311:24, 335:19, 374:6, 374:9

**IN** [3] - 396:6, 396:10, 396:11

**INAPPROPRIATE** [1] - 303:4

**INARGUABLY** [1] - 336:19

**INC** [2] - 316:24, 318:18

**INCH** [1] - 333:9

**INCLUDE** [2] - 328:14, 349:22

**INCLUDED** [1] - 343:6

**INCLUDING** [4] - 305:8, 363:8, 375:7, 376:13

**INCLUSION** [1] - 308:15

**INCLUSIVE** [1] - 293:10

**INCOME** [15] - 314:21, 326:17, 327:12, 328:6, 328:12, 328:13, 334:5, 343:7, 350:24, 352:11, 370:3, 387:24, 388:1, 388:12

**INCOMES** [3] -

325:2, 325:3, 387:21

**INCONSISTENT** [2] - 377:1, 378:12

**INCREASE** [115] - 307:19, 307:21, 307:24, 308:2, 309:7, 310:19, 311:18, 312:3, 312:22, 314:13, 314:25, 315:1, 315:10, 320:3, 320:5, 320:13, 320:23, 321:1, 325:5, 326:25, 327:23, 327:24, 328:19, 329:4, 329:10, 329:25, 331:19, 332:6, 332:13, 332:14, 332:16, 332:23, 332:25, 334:12, 335:22, 335:24, 338:8, 338:11, 338:16, 338:24, 340:4, 340:11, 340:15, 340:19, 341:1, 341:12, 341:16, 342:2, 342:7, 342:10, 343:17, 343:20, 344:3, 344:8, 344:14, 344:16, 345:24, 346:4, 346:7, 346:13, 346:17, 347:25, 348:2, 348:6, 348:7, 348:18, 348:22, 348:25, 349:3, 349:11, 349:12, 349:15, 350:7, 350:10, 350:19, 350:23, 351:11, 351:24, 352:11, 352:24, 352:25, 353:3, 354:2, 354:6, 354:10, 354:25, 355:12, 355:20, 356:1, 356:4, 356:8, 356:11, 357:2, 357:11, 357:18, 361:17, 362:5, 363:6, 366:13, 369:19, 370:1, 370:19, 371:13, 371:21, 371:22, 372:2, 372:6, 372:15, 373:1, 373:12, 373:15, 379:16, 390:22

**INCREASED** [3] - 328:16, 386:12, 386:13

**INCREASES** [6] - 320:1, 328:16, 343:7, 371:9, 372:19, 390:16

INCURRED [1] - 390:18
INDEED [1] - 364:8
INDEX [13] - 295:5, 300:3, 300:6, 300:11, 300:14, 300:16, 300:19, 300:23, 303:8, 303:12, 304:14, 313:4
INDEX [5] - 300:14, 300:17, 327:19, 386:11, 387:2
INDEX'S [1] - 301:6
INDICATE [1] - 305:22
INDICES [1] - 301:24
INDIVIDUAL [2] - 330:14, 334:11
INDOOR [1] - 317:15
INFERIOR [1] - 336:8
INFLATION [3] - 327:20, 327:23, 387:15
INFORMATION [8] - 333:18, 333:20, 344:25, 357:2, 386:6, 386:9, 386:14, 386:25
INFORMATIONAL [1] - 346:14
INHERENT [1] - 382:25
INITIAL [1] - 319:5
INSTALLED [1] - 337:14
INSTEAD [4] - 302:25, 315:12, 320:4, 328:5
INSTRUCT [3] - 298:6, 298:11, 387:5
INSTRUCTION [1] - 360:19
INSTRUCTIONS [2] - 298:12, 360:24
INSUFFICIENT [1] - 325:19
INTENDED [2] - 360:1, 360:5
INTEREST [15] - 299:25, 300:20, 300:25, 301:3, 303:8, 303:13, 303:16, 306:17, 306:24, 307:3, 307:20, 313:6, 314:7, 314:8, 390:17
INTERESTED [1] - 335:9
INTERRUPT [2] - 327:6, 339:14
INTERRUPTED [1] - 339:21

INTERVIEW [1] - 385:10
INTRODUCE [1] - 299:2
INVESTED [7] - 311:4, 311:8, 311:11, 311:14, 311:19, 312:22, 313:7
INVESTIGATING [1] - 381:20
INVESTIGATION [4] - 381:17, 382:3, 384:22, 385:4
INVESTIGATOR [8] - 381:19, 382:2, 382:6, 382:8, 383:14, 383:15, 385:5, 385:9
INVESTMENT [8] - 304:8, 313:18, 319:6, 324:21, 324:23, 325:6, 325:20, 377:18
INVESTMENTS [2] - 314:16, 366:16
INVESTOR [3] - 313:18, 313:22, 314:18
INVITE [1] - 299:7
INVOICES [3] - 329:13, 333:13, 334:2
INVOLVED [4] - 324:25, 355:13, 362:5, 376:22
INVOLVEMENT [1] - 367:1
IRVINE [1] - 294:17
IS [2] - 396:9, 396:11
ISSUE [5] - 309:3, 315:17, 340:8, 393:25, 394:4
ISSUED [1] - 363:3
ISSUES [1] - 338:5
ITEM [3] - 300:2, 311:22, 368:2
ITEMS [6] - 299:24, 334:4, 334:12, 334:20, 335:21, 395:10
ITSELF [6] - 311:5, 327:16, 334:22, 336:10, 338:9, 348:1

**J**

JACUZZI [1] - 317:14
JAMES [2] - 316:14, 374:3
JANUARY [5] - 302:20, 302:21, 304:21, 304:22, 364:18

JAPANESE [1] - 379:12
JEFFREY [1] - 294:15
JIM [8] - 345:8, 365:24, 366:3, 380:16, 381:7, 381:17, 384:23, 394:14
JOB [2] - 329:25, 362:15
JUDGE [1] - 293:3
JUDGMENT [4] - 301:2, 377:3, 377:11, 382:22
JUDICIAL [1] - 396:12
JUDICIAL [3] - 302:6, 360:19, 360:21
JUMPING [1] - 298:25
JUNE [3] - 354:11, 354:14, 354:25
JUNE [1] - 294:15
JURISDICTION [2] - 376:21, 392:18
JURORS [2] - 299:5, 299:10
JURY [12] - 297:6, 297:18, 298:1, 298:18, 299:2, 299:13, 316:6, 358:11, 360:19, 360:24, 361:5, 395:6
JUSTIFY [1] - 372:2

**K**

KARMAN [1] - 294:16
KEEP [1] - 297:17
KEN [2] - 297:11, 338:6
KENNETH [4] - 321:22, 351:18, 355:25, 378:16
KENNETH [1] - 322:1
KEPT [1] - 336:17
KIND [3] - 327:16, 371:2, 384:12
KINDS [1] - 335:14
KITCHEN [1] - 317:13
KNOWN [1] - 319:19

**L**

L.A [1] - 387:3
LACK [1] - 334:1

LADIES [2] - 316:5, 358:4
LAND [1] - 379:11
LARGE [6] - 317:12, 332:13, 344:16, 349:15, 350:9, 353:12
LARGER [2] - 336:9, 372:25
LARGEST [4] - 305:1, 305:8, 318:13, 344:8
LAST [12] - 297:10, 298:16, 321:21, 327:20, 327:23, 328:7, 334:19, 358:25, 363:15, 365:20, 391:8, 391:9
LASTLY [1] - 359:21
LATE [4] - 302:8, 318:15, 381:24, 393:15
LATENESS [1] - 360:15
LAUNDRY [1] - 317:15
LAW [1] - 318:4
LAWSUIT [2] - 315:23, 370:7
LAWSUITS [2] - 370:9, 370:13
LAWYER [3] - 381:19, 382:2, 394:13
LEARN [1] - 322:17
LEARNED [1] - 360:4
LEAST [5] - 318:16, 324:3, 330:19, 331:13, 364:14
LEAVE [2] - 395:9, 395:11
LECTERN [1] - 299:7
LEFT [2] - 328:14, 363:1
LEFT-HAND [1] - 363:1
LEGITIMATE [1] - 318:25
LENGTH [3] - 319:9, 319:14, 371:25
LESS [2] - 305:12, 372:22
LETTER [1] - 333:17
LEVEL [6] - 325:5, 337:5, 337:6, 372:12, 373:23, 387:21
LEVELS [4] - 304:14, 304:21, 313:4, 393:18
LIABILITY [2] - 293:5, 315:17
LIBRARY [1] - 317:14

LIFE [1] - 314:21
LIKELY [1] - 298:13
LIMITED [2] - 316:16, 316:25
LIMITED [2] - 293:5, 316:25
LINE [5] - 375:19, 375:21, 375:25, 376:25, 377:10
LINES [4] - 375:22, 389:17, 389:21, 392:11
LIST [5] - 298:21, 300:3, 326:24, 330:15, 358:16
LISTED [3] - 318:16, 327:5, 329:22
LISTING [1] - 301:23
LITIGATION [8] - 331:15, 362:1, 362:3, 362:9, 362:13, 362:16, 367:17, 375:10
LIVE [1] - 388:5
LLC [2] - 293:5, 316:17
LLP [2] - 294:4, 294:14
LOAN [8] - 319:10, 334:22, 334:23, 334:24, 351:16, 390:7, 390:11, 390:17
LOANS [1] - 390:17
LOCAL [1] - 387:3
LOCATE [1] - 342:19
LOCATED [3] - 316:19, 317:4, 317:22
LOGGED [1] - 362:23
LOOK [29] - 301:16, 313:2, 313:12, 314:14, 323:14, 323:19, 324:5, 326:10, 331:25, 334:7, 335:7, 340:21, 341:14, 343:23, 348:7, 348:12, 349:24, 350:13, 351:6, 353:15, 355:16, 355:23, 365:15, 367:6, 368:1, 368:3, 386:19, 386:21, 392:1
LOOKED [3] - 300:13, 304:23, 333:15
LOOKING [11] - 312:17, 313:18, 314:5, 327:22, 338:8, 341:9, 343:21,

UNITED STATES DISTRICT COURT

352:25, 355:1, 377:15, 391:23

**LOOKS** [4] - 343:12, 352:22, 355:12, 367:15

**LOS** [3] - 294:7, 317:23, 386:11

**LOS** [3] - 293:17, 293:25, 297:1

**LOSE** [1] - 325:6

**LOST** [7] - 306:14, 307:10, 307:11, 307:12, 307:15, 310:1, 310:10

**LOW** [3] - 313:11, 325:2, 388:1

**LOWER** [5] - 300:15, 301:2, 301:3, 337:13, 388:1

**LOWEST** [1] - 308:12

**LUCKY** [1] - 329:17

**LUMP** [1] - 344:17

**LUNCH** [2] - 299:22, 300:2

**M**

**MAINTAINING** [2] - 324:24, 325:7

**MAINTENANCE** [13] - 326:16, 327:12, 327:14, 328:2, 328:12, 332:20, 350:24, 352:10, 363:18, 368:11, 388:22, 389:24, 390:19

**MAJOR** [1] - 371:25

**MALAWY** [1] - 350:3

**MALAWY** [1] - 294:15

**MAN** [1] - 334:3

**MANAGER** [3] - 316:16, 322:20, 338:3

**MANAGERS** [1] - 357:11

**MANAGING** [1] - 357:12

**MARCUS** [2] - 318:12, 318:13

**MARKED** [13] - 301:17, 342:18, 348:13, 350:16, 351:9, 351:16, 351:22, 353:19, 353:22, 353:25, 355:18, 355:24, 356:6

**MARKET** [25] - 305:2, 305:6, 305:8,

305:9, 306:10, 306:12, 311:14, 313:7, 313:11, 313:14, 313:19, 313:23, 314:6, 314:11, 314:13, 318:12, 319:14, 337:13, 337:17, 376:20, 376:22, 377:4, 377:12, 388:6

**MARKET-RATE** [2] - 376:20, 377:12

**MARSH** [2] - 336:10, 336:13

**MATCH** [1] - 304:3

**MATTER** [4] - 340:1, 353:13, 370:8, 394:22

**MATTER** [1] - 396:11

**MATTERS** [5] - 369:14, 379:25, 380:5, 380:16, 390:4

**MATTHEW** [1] - 294:5

**MAYOR** [10] - 330:12, 345:11, 345:14, 345:20, 345:22, 346:16, 347:10, 366:3, 380:16, 381:7

**MAYOR** [4] - 365:24, 381:17, 383:16, 394:14

**MEAN** [8] - 313:22, 333:24, 336:11, 341:5, 346:14, 362:17, 393:13, 393:24

**MEANS** [1] - 316:7

**MEASURE** [1] - 387:2

**MEDIUM** [1] - 353:14

**MEDIUM-SIZED** [1] - 353:14

**MEETING** [1] - 347:16

**MEMBER** [9] - 330:14, 330:23, 330:25, 345:11, 345:17, 346:9, 346:16, 347:9, 347:16

**MEMBERS** [7] - 330:8, 330:16, 330:20, 380:17, 380:25, 382:14, 382:23

**MENTION** [1] - 386:20

**MENTIONED** [5] - 328:1, 351:2, 358:1, 378:18, 383:24

**METHOD** [4] - 329:3, 351:4, 354:24, 356:10

**METHODOLOGY** [9] - 363:5, 363:19, 364:3, 364:7, 364:9, 365:3, 368:9, 368:16, 368:19

**MICHAEL** [1] - 294:15

**MICROPHONE** [1] - 309:13

**MID** [1] - 317:9

**MIDDLE** [6] - 365:22, 366:7, 368:4, 368:9, 371:2, 388:1

**MIGHT** [4] - 300:24, 313:12, 350:3, 377:22

**MILLICHAP** [2] - 318:12, 318:13

**MILLION** [9] - 318:19, 318:22, 319:2, 319:8, 357:16, 376:18, 393:9, 393:19, 394:5

**MIND** [3] - 297:25, 298:5, 342:8

**MINDS** [1] - 330:5

**MINUTE** [1] - 356:17

**MINUTES** [4] - 358:5, 358:8, 361:2, 395:10

**MIRANDA** [4] - 293:23, 396:5, 396:18, 396:19

**MIRANDAALGORRI@GMAIL.COM** [1] - 293:25

**MISCONDUCT** [2] - 381:17, 381:20

**MISSTATES** [4] - 303:22, 303:23, 365:6, 369:2

**MISTAKEN** [1] - 386:17

**MISTAKES** [1] - 386:16

**MNOI** [20] - 326:17, 328:10, 328:11, 329:2, 329:5, 338:6, 350:23, 352:22, 354:17, 354:24, 356:10, 356:22, 361:18, 364:3, 364:9, 367:14, 367:16, 368:8, 378:21, 378:25

**MNOI'S** [1] - 393:14

**MOBILE** [11] - 316:19, 318:1, 319:22, 320:10, 320:20, 323:15, 323:22, 324:11,

325:22, 366:11, 376:19

**MOBILE** [31] - 309:15, 311:5, 311:18, 311:19, 312:23, 316:19, 317:4, 319:16, 319:19, 322:15, 322:17, 324:19, 324:22, 325:12, 325:14, 325:25, 329:9, 329:10, 334:6, 345:1, 345:4, 348:2, 353:7, 353:11, 353:12, 357:12, 366:14, 379:4, 379:11, 391:17, 392:15

**MOBILEHOME** [1] - 293:9

**MOBILEHOME** [5] - 317:24, 338:20, 346:24, 354:3, 355:20

**MODERATE** [1] - 325:2

**MOM** [3] - 379:4, 379:13, 379:14

**MOMENT** [5] - 344:19, 361:14, 375:23, 385:14, 386:7

**MOMENTS** [1] - 385:6

**MONEY** [12] - 311:3, 311:7, 311:17, 311:21, 312:10, 312:22, 312:25, 313:7, 319:5, 319:16, 372:11, 374:5

**MONICA** [1] - 294:11

**MONITORING** [1] - 362:9

**MONTH** [5] - 315:12, 328:8, 331:10, 346:9, 350:11

**MONTHS** [1] - 391:9

**MORNING** [4] - 298:1, 298:6, 298:12, 307:5

**MORTGAGE** [19] - 307:19, 310:20, 310:21, 310:22, 311:1, 311:3, 311:8, 311:20, 312:2, 312:11, 312:12, 312:18, 312:20, 312:23, 312:24, 313:1, 319:10, 325:17, 373:2

**MOST** [10] - 306:9, 313:15, 328:7,

331:10, 335:7, 339:9, 370:24, 375:2, 380:22, 391:25

**MOVE** [10] - 302:4, 303:22, 309:13, 324:25, 325:5, 325:8, 325:10, 358:13, 359:22, 385:12

**MOVING** [4] - 302:15, 322:20, 325:14, 358:1

**MR** [74] - 297:24, 298:7, 298:14, 298:22, 298:24, 299:8, 299:15, 299:19, 301:19, 302:4, 302:11, 303:25, 304:13, 304:16, 305:7, 305:19, 306:7, 308:16, 312:5, 316:1, 316:4, 316:11, 316:12, 316:13, 317:3, 321:6, 356:7, 357:20, 359:4, 359:11, 360:17, 360:23, 361:8, 365:8, 365:11, 366:25, 368:1, 369:5, 375:17, 375:21, 375:24, 376:2, 376:5, 376:15, 376:24, 377:2, 377:7, 377:9, 380:13, 380:24, 381:5, 381:15, 382:21, 385:2, 385:4, 385:12, 385:20, 385:22, 386:4, 386:6, 388:10, 388:18, 388:21, 389:16, 389:19, 389:21, 390:15, 392:6, 392:8, 392:10, 393:4, 393:15, 394:2, 395:11

**MS** [60] - 297:8, 297:21, 297:23, 298:3, 299:9, 302:7, 303:17, 303:22, 304:18, 305:17, 306:1, 308:20, 309:15, 309:21, 309:24, 312:9, 315:24, 321:9, 322:4, 327:8, 342:19, 348:15, 350:17, 351:10, 351:17, 351:23, 353:20, 353:23, 354:1, 355:19, 355:25, 357:24, 358:13, 358:17, 358:19,

358:21, 358:24, 359:18, 359:25, 360:8, 360:11, 360:14, 365:6, 366:21, 367:23, 369:2, 380:9, 380:18, 381:2, 381:11, 382:17, 385:14, 385:16, 388:8, 388:16, 390:13, 391:20, 393:1, 393:11, 393:21
**MULTIPLE** [1] - 370:9
**MUNICIPAL** [2] - 293:8, 317:22
**MUST** [5] - 325:7, 325:16, 328:18, 328:25, 329:4
**MYERS** [1] - 294:4

## N

**NAME** [3] - 321:21, 371:12
**NAMED** [1] - 345:8
**NASDAQ** [7] - 300:12, 300:13, 300:16, 300:19, 300:23, 308:10
**NECESSARILY** [3] - 352:20, 375:8, 377:1
**NECESSARY** [1] - 370:2
**NEED** [8] - 307:4, 312:9, 323:13, 329:10, 338:9, 394:21, 395:7, 395:8
**NEEDED** [2] - 333:18, 335:21
**NEEDS** [1] - 387:6
**NEGOTIATIONS** [1] - 348:10
**NET** [7] - 314:21, 326:17, 327:12, 328:12, 328:13, 350:24, 352:11
**NEUTRAL** [4] - 330:20, 382:15, 382:23, 383:4
**NEVER** [7] - 340:11, 372:25, 383:24, 391:3, 391:5, 391:9, 391:13
**NEW** [6] - 325:12, 340:10, 352:25, 353:3, 357:16, 357:23
**NEWCOMB** [1] - 361:25, 376:2
**NEXT** [7] - 297:13,

321:12, 335:1, 338:24, 363:13, 363:24, 374:6
**NICE** [4] - 336:10, 336:13, 394:24
**NIGHT** [2] - 339:3, 339:12
**NINE** [1] - 308:24
**NO** [2] - 293:6, 396:19
**NOBODY** [1] - 357:22
**NOMINATIONS** [1] - 330:12
**NON** [1] - 337:19
**NON-RENT** [1] - 337:19
**NONE** [1] - 299:1
**NONRECURRING** [1] - 334:21
**NORMAL** [1] - 339:6
**NORMALLY** [5] - 326:17, 328:7, 330:23, 339:8, 386:15
**NORTH** [1] - 293:24
**NOS** [2] - 359:8, 359:20
**NOT-OBJECTIVE** [1] - 306:11
**NOT-REPRESENTATIVE** [1] - 306:11
**NOTE** [1] - 319:11
**NOTHING** [9] - 313:23, 315:25, 321:16, 337:3, 337:4, 378:15, 378:20, 378:21, 378:24
**NOTICE** [8] - 302:6, 360:1, 360:19, 360:22, 378:1, 378:5, 378:6, 384:12
**NOTICED** [2] - 304:25, 383:25
**NOWHERE** [1] - 328:21
**NUMBER** [11] - 311:24, 316:12, 320:17, 323:11, 334:4, 335:20, 336:1, 340:16, 370:24, 389:1, 389:12
**NUMBERED** [1] - 368:2
**NUMBERS** [6] - 302:22, 303:5, 308:13, 352:21, 358:15, 360:7
**NUMERAL** [1] - 324:14

**NUMEROUS** [1] - 320:13
**NUTS** [1] - 325:24

## O

**O'CLOCK** [2] - 394:23, 395:3
**O'MELVENY** [1] - 294:4
**OATH** [4] - 375:12, 377:10, 389:22, 392:11
**OBJECTION** [30] - 302:7, 303:17, 303:22, 304:18, 305:17, 306:1, 312:5, 357:20, 359:3, 359:10, 359:24, 360:12, 365:6, 366:21, 367:23, 369:2, 380:9, 380:18, 381:2, 381:11, 382:17, 385:13, 388:8, 388:16, 390:13, 391:20, 393:1, 393:11, 393:21
**OBJECTIVE** [1] - 306:11
**OBTAIN** [1] - 320:5
**OBTAINED** [1] - 344:24
**OCCASIONS** [2] - 329:6, 372:20
**OCCUR** [1] - 370:11
**OCCURRED** [2] - 337:4, 347:8
**OCEAN** [1] - 294:10
**OCTOBER** [7] - 320:17, 326:7, 328:9, 328:25, 329:2, 356:23, 366:2
**OF** [11] - 293:2, 293:8, 293:9, 293:15, 294:1, 396:1, 396:7, 396:9, 396:12, 396:15
**OFFER** [4] - 318:19, 318:20, 318:22, 318:23
**OFFERING** [2] - 392:22, 392:24
**OFFERS** [3] - 318:16, 318:25
**OFFHAND** [2] - 394:6, 394:8
**OFFICE** [1] - 346:10
**OFFICIAL** [4] - 293:24, 396:1, 396:5, 396:19
**OFFICIALS** [2] -

380:1, 380:7
**OFTEN** [2] - 325:11, 325:18
**ONCE** [3] - 338:17, 346:9, 372:17
**ONE** [59] - 298:23, 298:25, 309:18, 309:21, 310:9, 310:14, 310:15, 313:3, 313:15, 314:12, 314:24, 317:12, 318:13, 323:20, 327:7, 327:13, 328:6, 328:13, 328:19, 328:25, 329:22, 330:11, 332:1, 332:2, 332:4, 333:11, 335:7, 339:1, 339:9, 339:10, 339:14, 341:4, 341:6, 341:7, 341:9, 342:16, 343:9, 344:10, 344:17, 347:10, 352:5, 355:15, 358:14, 358:25, 361:21, 370:24, 371:2, 371:24, 375:23, 377:16, 377:21, 384:21, 385:14, 386:7, 389:7, 390:2
**ONE-YEAR** [1] - 341:4
**ONES** [1] - 342:13
**ONSTOT** [2] - 294:16, 316:12
**OPEN** [6] - 297:6, 297:25, 299:13, 358:11, 361:5, 395:6
**OPERATING** [13] - 326:17, 327:12, 328:12, 328:13, 334:5, 335:5, 350:24, 352:11, 363:8, 375:6, 376:6, 376:11, 376:12
**OPERATION** [2] - 324:4, 390:19
**OPERATIONS** [1] - 309:16
**OPINION** [4] - 309:3, 315:18, 365:7, 395:2
**OPINIONS** [1] - 358:7
**OPPORTUNITY** [1] - 368:3
**ORANGE** [2] - 386:11, 387:4
**ORANGES** [1] - 337:11
**ORDER** [2] - 301:3,

325:6
**ORDINANCE** [9] - 318:1, 319:23, 320:10, 320:21, 323:16, 323:23, 324:11, 325:23, 366:11
**ORDINANCE** [30] - 319:19, 319:20, 319:21, 319:25, 320:2, 323:18, 323:25, 324:2, 324:15, 324:18, 327:1, 327:4, 327:16, 328:22, 329:24, 330:16, 337:2, 353:10, 364:4, 368:25, 369:7, 373:17, 377:17, 378:16, 378:21, 378:24, 387:24, 388:11, 388:25
**ORIGINAL** [3] - 320:11, 320:16, 364:3
**ORIGINALLY** [1] - 360:17
**OUTLAID** [1] - 304:20
**OUTLINES** [1] - 334:11
**OUTLINING** [1] - 326:18
**OVERRULED** [21] - 303:19, 303:24, 304:19, 306:2, 312:7, 357:21, 366:23, 369:3, 380:11, 380:20, 381:3, 381:13, 382:19, 388:9, 388:17, 388:19, 390:14, 391:21, 393:3, 393:12, 393:23
**OWN** [3] - 319:5, 330:21, 363:5
**OWNED** [7] - 317:8, 318:5, 336:18, 355:13, 374:17, 379:10, 379:13
**OWNER** [29] - 316:18, 316:23, 317:3, 317:7, 320:4, 329:9, 329:10, 330:4, 330:21, 330:25, 331:22, 333:17, 333:25, 335:22, 344:13, 344:16, 349:5, 353:1, 371:8, 371:21, 372:1, 372:6, 372:9, 375:4, 375:5,

376:7, 376:10, 382:25, 383:8

**OWNER'S** [3] - 353:4, 375:6, 376:11

**OWNERS** [11] - 318:2, 324:20, 330:22, 338:15, 366:14, 372:14, 377:17, 379:4, 379:5, 379:7, 379:9

**OWNERSHIP** [4] - 335:10, 335:13, 337:3, 363:9

**OWNS** [1] - 348:3

## P

**P.M** [2] - 293:17, 297:2

**P.M** [2] - 361:3, 395:13

**PACK** [1] - 325:4

**PAGE** [30] - 302:13, 310:9, 324:13, 333:12, 333:14, 334:19, 349:17, 351:20, 359:16, 362:25, 363:13, 364:16, 365:21, 365:22, 366:1, 366:5, 366:7, 368:1, 375:19, 375:21, 375:24, 376:24, 377:10, 385:8, 385:25, 389:16, 389:21

**PAGE** [1] - 396:11

**PAGE** [1] - 295:7

**PAGES** [1] - 293:9

**PAGES** [3] - 310:9, 333:7, 355:2

**PAID** [6] - 312:18, 312:24, 313:1, 376:19, 377:4, 377:12

**PALISADES** [1] - 294:9

**PALM** [1] - 316:16

**PAPER** [1] - 357:1

**PAPERWORK** [1] - 339:10

**PARADISE** [7] - 351:11, 351:18, 351:24, 352:1, 352:25, 353:7, 357:3

**PARAGRAPH** [6] - 324:14, 325:21, 326:3, 363:15, 363:24

**PARK** [26] - 317:10, 317:24, 338:20, 346:24, 351:12, 351:18, 351:24,

352:1, 352:25, 353:7, 354:2, 354:3, 354:25, 355:9, 355:20, 355:21, 356:1, 356:4, 356:11, 357:3, 357:4, 378:15, 378:20, 386:13, 390:5

**PARK** [1] - 293:9

**PARK** [125] - 307:20, 309:16, 310:23, 311:5, 311:18, 311:19, 312:23, 316:19, 316:21, 317:4, 317:10, 318:6, 318:10, 318:12, 318:16, 318:19, 318:22, 319:2, 319:4, 319:9, 319:12, 319:16, 320:4, 320:7, 320:13, 320:16, 322:15, 322:17, 324:20, 325:8, 325:13, 325:25, 327:20, 327:21, 328:14, 328:17, 329:9, 329:10, 330:4, 330:21, 330:22, 330:25, 331:1, 331:22, 332:25, 333:17, 333:25, 334:6, 334:21, 334:22, 335:8, 335:9, 335:10, 335:11, 335:13, 335:19, 335:20, 335:22, 336:2, 336:8, 336:9, 336:11, 336:14, 337:15, 338:12, 338:15, 338:17, 340:9, 344:13, 344:16, 345:1, 348:3, 349:13, 353:1, 353:8, 353:11, 353:12, 353:14, 355:6, 355:10, 355:13, 357:11, 357:16, 363:9, 366:14, 370:24, 371:12, 371:16, 371:22, 372:10, 372:11, 374:4, 374:16, 374:20, 374:22, 375:4, 375:5, 375:6, 376:7, 376:9, 376:11, 377:4, 377:13, 377:17, 377:23, 377:25, 378:8, 378:23, 379:4, 382:25, 383:1, 384:3, 384:8, 390:18, 390:19, 391:18,

392:15, 392:22, 392:24

**PARK'S** [3] - 363:7, 390:6, 390:11

**PARKS** [9] - 324:19, 325:11, 336:4, 345:4, 357:12, 373:23, 379:11, 379:13, 384:18

**PART** [10] - 326:4, 326:6, 328:15, 338:11, 338:20, 343:1, 362:15, 372:4, 375:2, 380:22

**PARTICULAR** [8] - 302:16, 311:25, 328:18, 334:25, 335:4, 335:17, 367:19, 380:2

**PARTIES** [3] - 299:6, 316:22, 317:6

**PARTNER** [2] - 316:15, 316:24

**PARTNERSHIP** [1] - 317:1

**PAUL** [1] - 321:22

**PAUL** [1] - 322:1

**PAY** [17] - 310:20, 310:21, 310:22, 311:3, 311:7, 311:22, 311:23, 312:1, 312:11, 312:12, 312:19, 344:21, 370:3, 373:1, 379:18, 388:12

**PAYING** [3] - 311:19, 312:23, 323:6

**PENDING** [5] - 302:5, 321:15, 366:12, 370:9, 376:16

**PENSION** [1] - 323:8

**PEOPLE** [4] - 330:17, 379:10, 387:21, 388:1

**PER** [5] - 349:19, 350:11, 391:17, 392:14

**PERCENT** [19] - 300:8, 300:23, 300:24, 301:1, 301:13, 305:12, 313:20, 314:12, 330:9, 332:21, 332:24, 334:24, 335:1, 345:2, 349:23, 387:10, 387:11

**PERCENTAGE** [2] - 315:4, 344:25

**PERFECTLY** [1] - 371:3

**PERFORM** [1] - 309:9

**PERFORMANCE** [6] - 304:6, 304:10, 304:23, 304:25, 305:1, 305:3

**PERFORMED** [1] - 362:20

**PERHAPS** [1] - 332:4

**PERIOD** [65] - 300:22, 301:10, 301:12, 302:16, 302:17, 302:19, 303:21, 304:2, 304:4, 304:6, 304:7, 304:8, 304:10, 304:22, 304:23, 304:25, 305:1, 305:3, 305:5, 305:10, 305:14, 305:16, 305:23, 306:4, 306:5, 306:6, 306:8, 306:10, 313:5, 313:7, 313:8, 313:25, 314:3, 314:4, 314:6, 314:11, 314:14, 330:7, 330:10, 341:4, 344:11, 344:12, 345:13, 345:15, 345:23, 346:2, 346:6, 346:15, 347:23, 355:11, 360:18, 361:18, 374:16, 380:2, 380:5, 380:10, 380:14, 386:10, 386:13, 387:1, 387:10, 387:12, 387:16, 394:16

**PERIODS** [3] - 313:23, 313:24, 360:23

**PERMISSION** [2] - 375:20, 386:1

**PERMIT** [1] - 320:3

**PERSON** [5] - 324:1, 329:17, 334:3, 338:4, 362:11

**PERSONAL** [2] - 325:4, 382:22

**PERSONALLY** [1] - 302:2

**PERSPECTIVE** [1] - 312:17

**PET** [1] - 317:18

**PETER** [1] - 299:16

**PHASE** [1] - 372:18

**PHASED** [3] - 372:16, 373:12, 373:15

**PHASED-IN** [1] - 373:12

**PHASING** [1] - 372:25

**PHILIP** [1] - 293:3

**PHONE** [1] - 346:9

**PHRASE** [1] - 333:23

**PICKED** [1] - 304:2

**PICTURE** [1] - 302:12

**PLACE** [3] - 320:7, 325:8, 342:4

**PLACED** [1] - 335:1

**PLAIN** [1] - 364:5

**PLAINTIFF** [2] - 293:6, 294:3

**PLAINTIFF** [5] - 316:3, 316:18, 321:5, 321:6, 360:1

**PLAINTIFF** [1] - 318:6

**PLAINTIFF'S** [1] - 299:17

**PLAINTIFF'S** [4] - 297:10, 301:15, 301:16, 384:21

**PLAINTIFFS** [2] - 359:22, 360:4

**PLAN** [1] - 384:1

**PLANNED** [1] - 383:22

**PLANNING** [1] - 338:3

**PLENTY** [1] - 388:12

**POINT** [18] - 313:11, 313:19, 315:11, 315:12, 328:6, 335:16, 336:12, 336:17, 336:20, 337:3, 338:3, 345:22, 352:19, 356:25, 364:15, 372:10, 381:23, 387:4

**POOL** [1] - 317:13

**POP** [3] - 379:4, 379:14

**PORTFOLIO** [1] - 300:8

**PORTION** [3] - 367:13, 390:6, 390:10

**PORTNOI** [1] - 294:5

**POSTPONED** [1] - 339:13

**POTENTIAL** [4] - 348:10, 378:1, 392:22, 392:23

**POTENTIALLY** [2] - 298:10, 379:25

**POWER** [3] - 373:16, 381:8, 382:9

**PRECEDENCE** [1] - 364:5

PRECEDING [1] - 320:12
PREDICTED [1] - 314:12
PREDOMINANTLY [1] - 322:15
PREJUDGMENT [12] - 299:24, 300:19, 300:25, 301:3, 303:8, 303:12, 303:16, 306:17, 306:23, 307:3, 313:6, 314:8
PREMISED [2] - 374:16, 383:8
PREPARE [2] - 320:4, 334:10
PREPARED [7] - 304:9, 304:17, 339:4, 339:7, 339:19, 343:12, 351:18
PREPARING [2] - 333:22, 352:19
PRESENCE [5] - 297:6, 299:13, 358:11, 361:5, 395:6
PRESENT [1] - 307:12
PRESENT [3] - 299:3, 300:4, 310:15
PRESENTED [2] - 307:15, 343:14
PRESENTING [1] - 360:18
PRESIDENT [1] - 316:14
PRESSURE [3] - 380:1, 380:6, 380:12
PRETTY [4] - 314:17, 339:1, 341:23, 384:5
PREVIOUS [4] - 342:9, 349:5, 349:7, 349:8
PREVIOUSLY [1] - 359:14
PRICE [14] - 325:19, 327:19, 376:20, 377:4, 377:13, 383:22, 386:11, 387:2, 391:17, 392:3, 392:14, 393:9, 393:20, 394:5
PRIMARY [2] - 332:22, 342:6
PRINCIPAL [1] - 300:10
PRINCIPLES [1] - 324:17
PRINT [1] - 302:1
PRINTED [1] - 302:3
PRO [2] - 381:9,

382:10
PRO-RESIDENTS [2] - 381:9, 382:10
PROCEEDINGS [6] - 297:5, 299:12, 358:10, 361:4, 395:5, 395:13
PROCEEDINGS [1] - 396:10
PROCESS [17] - 326:21, 326:23, 329:16, 331:21, 333:4, 338:12, 340:7, 341:23, 347:25, 348:2, 361:18, 362:6, 363:5, 364:10, 367:1, 375:5, 376:9
PROCESSED [3] - 331:19, 341:24, 352:5
PROCESSING [3] - 332:17, 342:12, 369:8
PROFESSION [1] - 391:14
PROFIT [6] - 327:13, 328:15, 332:20, 388:22, 389:24
PROFITS [3] - 328:1, 363:18, 368:11
PROJECT [2] - 301:7, 335:18
PROJECTED [2] - 302:24, 303:4
PROMISSORY [1] - 319:11
PROPERLY [1] - 315:9
PROPERTIES [1] - 293:5
PROPERTIES [1] - 316:24
PROPERTIES [7] - 310:18, 316:15, 316:17, 318:8, 318:9, 318:18, 338:19
PROPERTY [6] - 318:2, 330:22, 340:9, 349:21, 391:10, 392:2
PROPOSED [1] - 372:25
PRORATED [2] - 334:20, 334:22
PROTECT [1] - 324:18
PROVIDE [6] - 329:13, 330:16, 338:19, 366:12, 370:2, 373:1
PROVIDED [2] - 319:8, 336:13
PROVIDES [1] -

317:10
PROVISION [3] - 363:11, 363:24, 388:10
PUBLIC [6] - 293:10, 317:25, 330:3, 378:1, 378:4, 378:6
PUBLISH [6] - 302:9, 376:2, 377:7, 386:2, 389:19, 392:8
PUBLISHED [1] - 319:24
PULLED [2] - 383:16, 386:10
PURCHASE [17] - 318:19, 318:22, 319:16, 320:12, 334:21, 336:20, 340:10, 349:13, 355:10, 357:23, 383:25, 392:3, 392:22, 392:24, 393:9, 393:19, 394:5
PURCHASED [23] - 318:7, 319:2, 319:4, 320:7, 320:15, 335:20, 335:25, 336:6, 336:21, 349:1, 349:14, 357:15, 374:3, 374:22, 377:22, 377:25, 378:8, 378:14, 378:19, 378:23, 383:21, 391:9, 391:13
PURCHASING [3] - 324:24, 325:7, 348:22
PURPOSE [6] - 324:10, 324:15, 324:17, 324:18, 364:10, 377:16
PURPOSES [3] - 316:22, 317:6, 370:22
PURSUANT [1] - 396:8
PUT [8] - 299:21, 304:13, 304:24, 329:6, 337:15, 361:25, 362:24, 394:18
PUTS [1] - 380:21

Q

QUALIFIED [1] - 390:25
QUALITY [2] - 374:4, 374:20
QUESTIONS [9] - 306:25, 307:1, 308:17, 316:1,

346:11, 346:14, 373:7, 393:16, 394:13
QUICKER [1] - 354:20
QUICKLY [1] - 325:16
QUITE [7] - 371:16, 372:11, 373:23, 379:8, 379:12, 389:1, 392:5

R

RAIL [1] - 332:3
RAISE [3] - 321:13, 373:11, 379:17
RARELY [1] - 338:14
RATE [34] - 299:25, 300:3, 300:15, 300:25, 301:3, 301:6, 301:7, 301:8, 301:11, 302:15, 302:24, 302:25, 303:4, 303:9, 303:11, 303:13, 303:15, 303:16, 305:9, 305:12, 305:13, 306:11, 306:16, 306:17, 307:3, 308:12, 313:6, 314:7, 337:13, 337:17, 376:20, 376:22, 377:4, 377:12
RATED [1] - 300:1
RATES [1] - 306:19
RATHER [3] - 314:1, 335:10, 339:8
RE [2] - 295:11, 295:17
RE-CROSS [2] - 295:11, 295:17
READ [13] - 299:7, 306:4, 316:6, 316:9, 324:15, 325:21, 326:4, 358:15, 366:8, 368:5, 375:20, 377:6, 389:18
READING [1] - 298:17
REAL [8] - 305:6, 309:10, 318:13, 331:16, 338:13, 338:15, 387:15, 391:13
REALITY [1] - 312:21
REALLY [3] - 313:20, 338:5, 362:17
REALTIME [1] - 396:5
REASON [10] - 314:13, 325:22,

330:24, 332:23, 334:13, 337:12, 339:2, 342:7, 371:20, 386:17
REASONABLE [9] - 324:20, 329:23, 363:7, 372:12, 375:4, 376:7, 377:18, 391:17, 392:14
REASONS [2] - 371:25, 372:13
REASSESSED [1] - 340:10
REBUTTAL [1] - 321:7
RECEIVE [1] - 366:15
RECEIVED [1] - 359:7
RECEIVED [4] - 318:17, 359:13, 359:19, 361:1
RECENT [2] - 328:7, 347:20
RECENTLY [1] - 337:14
RECESS [1] - 361:3
RECISION [1] - 305:5
RECITALS [1] - 367:9
RECOGNIZE [6] - 341:15, 341:16, 348:17, 351:10, 365:17, 365:23
RECOLLECTION [4] - 330:10, 332:18, 347:12, 366:2
RECOMMENDATIO N [5] - 330:2, 331:23, 340:2, 340:5, 340:6
RECOMMENDATIO NS [1] - 330:13
RECOMMENDED [3] - 340:4, 372:25, 373:20
RECORD [5] - 316:7, 316:9, 321:20, 364:8, 366:8
RECORDS [2] - 339:24, 395:8
RECOVERY [1] - 325:20
RECREATIONAL [1] - 317:16
REDEVELOPMENT [1] - 392:5
REDIRECT [2] - 295:10, 295:16
REDUCTIONS [1] -

335:5
**REFER** [7] - 303:25, 316:22, 317:6, 332:9, 341:19, 356:22, 376:24
**REFERENCE** [2] - 360:7, 360:8
**REFERRED** [12] - 304:5, 304:7, 319:20, 319:23, 320:11, 320:21, 359:23, 360:7, 378:16, 378:21, 378:24, 379:3
**REFERRING** [5] - 302:19, 306:24, 323:12, 332:10, 390:21
**REFERS** [1] - 379:7
**REFLECTS** [1] - 343:2
**REFRESH** [1] - 366:2
**REGARD** [1] - 359:21
**REGARDING** [4] - 351:11, 351:17, 354:2, 394:13
**REGARDS** [1] - 340:9
**REGULARLY** [1] - 384:13
**REGULATIONS** [1] - 396:12
**REIMBURSED** [1] - 374:13
**RELATED** [9] - 305:5, 307:22, 318:9, 323:4, 335:13, 349:12, 352:16, 390:6, 390:11
**RELATES** [1] - 304:3
**RELATIONSHIP** [1] - 323:1
**RELEVANCE** [2] - 385:17, 393:1
**RELEVANT** [4] - 318:3, 324:1, 380:10
**RELIED** [2] - 360:10, 360:11
**RELOCATED** [1] - 325:13
**REMEMBER** [7] - 339:24, 344:9, 346:16, 358:5, 371:16, 373:25, 394:25
**REMEMBERING** [1] - 372:8
**REMOVE** [3] - 347:10, 381:8, 382:9
**REMOVED** [7] -

331:12, 335:19, 347:4, 347:9, 370:6, 382:14, 383:12
**RENT** [177] - 306:14, 307:10, 307:11, 307:12, 307:15, 307:19, 307:24, 308:2, 309:7, 310:1, 310:11, 310:19, 312:3, 312:10, 312:14, 312:15, 312:21, 314:24, 315:1, 315:10, 318:2, 319:18, 319:19, 320:1, 320:3, 320:4, 320:5, 320:13, 320:23, 321:1, 322:15, 322:17, 323:4, 324:18, 325:9, 325:16, 326:21, 326:23, 326:25, 327:21, 328:5, 328:19, 329:4, 329:10, 329:25, 331:19, 332:6, 332:13, 332:14, 332:23, 334:12, 335:22, 335:23, 336:22, 336:23, 337:1, 337:8, 337:9, 337:11, 337:16, 337:19, 337:20, 337:21, 338:5, 338:11, 338:16, 338:24, 340:4, 340:11, 341:1, 341:11, 341:16, 342:1, 342:7, 343:17, 343:20, 344:3, 344:7, 344:14, 344:16, 345:24, 346:3, 346:7, 346:17, 347:25, 348:2, 348:6, 348:7, 348:17, 348:21, 348:25, 349:3, 349:11, 349:15, 350:6, 350:9, 350:18, 350:23, 351:11, 351:24, 352:2, 352:11, 352:24, 352:25, 353:3, 354:2, 354:5, 354:10, 354:25, 355:12, 355:14, 355:20, 356:1, 356:4, 356:7, 356:11, 357:2, 357:11, 357:18, 361:17, 362:5, 362:6, 363:6, 364:22, 366:13, 367:1, 369:10, 369:11,

369:14, 369:19, 369:24, 370:1, 370:8, 370:18, 370:19, 371:9, 371:13, 371:21, 371:22, 372:2, 372:5, 372:15, 372:18, 372:25, 373:5, 373:12, 373:15, 374:25, 375:5, 376:8, 376:21, 376:22, 377:17, 378:16, 379:16, 379:25, 380:5, 380:15, 388:23, 390:4, 390:12, 390:16, 390:22, 391:17, 392:2, 392:17, 392:19, 392:20, 393:8, 393:18, 394:15
**RENT** [32] - 315:9, 315:14, 317:25, 318:1, 319:22, 320:10, 320:20, 323:15, 323:22, 324:11, 325:22, 330:3, 330:8, 337:23, 340:24, 347:5, 347:16, 366:11, 370:7, 373:4, 373:11, 379:15, 379:20, 380:17, 381:1, 381:8, 382:10, 382:14, 382:22, 383:3, 383:7, 390:22
**RENT-CONTROL** [1] - 369:14
**RENT-CONTROLLED** [5] - 337:19, 337:20, 376:21, 391:17, 392:17
**RENT-SETTING** [2] - 375:5, 376:8
**RENTAL** [1] - 293:9
**RENTAL** [3] - 325:12, 330:21, 335:11
**RENTED** [1] - 317:17
**RENTERS** [1] - 372:14
**RENTS** [18] - 324:19, 325:5, 325:18, 337:17, 370:17, 371:4, 375:6, 376:10, 379:17, 379:22, 386:12, 387:10, 387:16, 388:6, 388:11, 388:13, 391:23

**REPAIR** [1] - 335:21
**REPEAT** [2] - 369:4, 390:9
**REPHRASE** [5] - 305:18, 365:8, 367:25, 378:22, 383:20
**REPORT** [40] - 301:10, 302:22, 303:23, 304:6, 304:11, 304:22, 304:24, 305:20, 305:22, 305:24, 306:3, 306:5, 310:5, 310:8, 310:14, 310:16, 333:22, 339:5, 339:6, 339:7, 339:19, 340:3, 343:1, 343:12, 350:18, 351:11, 351:17, 352:20, 352:21, 354:1, 354:5, 355:19, 355:25, 360:6, 370:23, 373:6, 374:19, 384:22, 386:19, 386:22
**REPORTED** [1] - 396:10
**REPORTER** [4] - 293:24, 396:1, 396:6, 396:19
**REPORTER'S** [1] - 321:13
**REPORTER'S** [1] - 293:15
**REPORTING** [2] - 309:1, 309:6
**REPORTS** [2] - 372:23, 392:20
**REPP** [1] - 338:3
**REPRESENTATIVE** [1] - 306:11
**REPRESENTATIVES** [6] - 330:4, 369:18, 369:25, 377:21, 383:8, 383:9
**REPRESENTS** [1] - 315:5
**REPS** [2] - 382:25, 383:1
**REQUEST** [3] - 302:5, 360:19, 360:21
**REQUESTED** [4] - 314:25, 332:16, 338:8, 342:2
**REQUIRE** [2] - 320:4, 325:18
**REQUIRED** [3] - 363:5, 363:17, 365:3
**REQUIREMENT** [1] -

387:24
**RESERVED** [1] - 387:21
**RESIDENT** [5] - 330:21, 331:1, 335:10, 383:1, 383:8
**RESIDENTS** [11] - 317:11, 317:17, 330:23, 336:11, 345:1, 381:9, 382:10, 383:24, 384:11, 384:17, 388:12
**RESO** [2] - 343:21, 352:4
**RESOLUTION** [24] - 320:8, 320:17, 320:18, 320:19, 326:15, 340:2, 340:18, 340:23, 343:24, 350:6, 350:9, 351:23, 354:8, 354:13, 354:16, 356:3, 365:17, 366:20, 367:14, 368:2, 368:15, 368:19, 394:4
**RESOLUTIONS** [1] - 390:15
**RESOLVE** [1] - 367:8
**RESOURCES** [1] - 379:8
**RESPONSE** [2] - 340:19, 367:21
**RESPONSIBLE** [1] - 324:1
**RESTRICT** [2] - 325:12, 387:25
**RESTS** [1] - 321:6
**RESULT** [2] - 300:20, 300:24
**RESULTS** [3] - 344:21, 344:22, 362:22
**RESUME** [1] - 299:14
**RESUMED** [1] - 299:18
**RETIRE** [1] - 322:11
**RETIRED** [1] - 381:22
**RETRIEVE** [1] - 395:10
**RETURN** [29] - 300:3, 300:15, 300:19, 301:2, 301:7, 301:8, 301:11, 302:16, 302:24, 303:1, 303:5, 303:11, 303:15, 303:21, 305:9, 305:11,

305:12, 306:11, 306:13, 306:17, 306:20, 311:17, 313:20, 324:21, 363:20, 366:5, 366:15, 377:18
**RETURNS** [1] - 304:8
**REVENUE** [3] - 310:24, 370:3, 373:1
**REVIEW** [3] - 309:8, 333:1, 337:2
**REVIEW** [10] - 315:9, 315:14, 317:25, 330:3, 330:8, 340:24, 347:5, 347:16, 373:11, 381:1
**REVIEW** [1] - 293:9
**REVIEWED** [2] - 305:20, 372:24
**REVIEWING** [8] - 301:20, 324:6, 333:4, 352:15, 355:4, 356:16, 363:6, 368:6
**REVISED** [3] - 320:9, 320:19, 320:21
**RISE** [3] - 313:14, 358:9, 395:4
**RIVERSIDE** [2] - 386:11, 387:4
**ROLE** [1] - 329:15
**ROMAN** [1] - 324:14
**ROOM** [1] - 293:24
**ROOM** [5] - 317:13, 317:14, 317:15
**ROSE** [2] - 387:10, 387:11
**ROSENOW** [1] - 323:3
**ROUGHLY** [1] - 345:2
**RSG** [1] - 323:3
**RUN** [2] - 317:18, 334:6
**RUTTER** [1] - 294:8

**S**

**S&P** [22] - 300:3, 300:6, 300:7, 300:11, 300:13, 300:14, 300:22, 301:6, 301:8, 301:12, 301:23, 302:15, 303:8, 303:12, 303:15, 303:21, 304:14, 304:21, 306:19, 308:10, 313:4, 359:22
**SAFETY** [1] - 300:10
**SALARIES** [1] -

311:23
**SALE** [2] - 318:10, 319:12
**SALOMON** [18] - 297:9, 298:15, 299:5, 299:20, 300:5, 301:14, 302:16, 304:1, 304:17, 306:15, 308:16, 308:21, 309:12, 309:25, 312:2, 314:16, 315:8, 315:24
**SALOMON** [1] - 299:16
**SALOMON'S** [2] - 309:22, 359:23
**SANTA** [1] - 294:11
**SAT** [2] - 338:2, 339:11
**SAW** [1] - 386:20
**SCENARIO** [1] - 298:10
**SCHEDULE** [1] - 297:17
**SCHEDULING** [2] - 297:9, 297:14
**SCREEN** [1] - 299:21
**SEAL** [1] - 395:8
**SEAT** [1] - 321:19
**SECOND** [10] - 305:4, 307:4, 321:1, 327:7, 342:3, 349:17, 352:21, 356:15, 363:25, 385:7
**SECTION** [2] - 391:25, 392:1
**SECTION** [1] - 396:8
**SECURITIES** [3] - 299:23, 306:15, 306:18
**SECURITY** [1] - 317:19
**SEE** [11] - 313:20, 349:6, 352:13, 352:14, 358:8, 361:2, 366:17, 367:11, 386:19, 394:23, 395:3
**SEEING** [1] - 366:1
**SELECT** [1] - 301:2
**SELECTED** [3] - 306:8, 306:16, 383:12
**SELECTION** [1] - 364:3
**SELL** [4] - 325:8, 325:16, 325:18, 325:19
**SELLER** [1] - 319:3
**SEMINARS** [1] - 392:4
**SEND** [3] - 321:10,

333:16, 362:22
**SENIORS** [1] - 325:2
**SENT** [2] - 339:7, 349:8
**SENTENCE** [2] - 363:15, 363:25
**SENTENCES** [1] - 364:1
**SEPARATE** [2] - 339:25, 352:20
**SEPARATELY** [1] - 372:3
**SEPTEMBER** [6] - 320:24, 321:2, 332:7, 341:12, 341:17, 356:8
**SEQUENTIALLY** [1] - 358:22
**SERVE** [1] - 383:12
**SERVES** [1] - 316:16
**SERVICE** [24] - 307:22, 308:15, 311:22, 315:10, 315:20, 328:14, 332:25, 349:12, 349:20, 353:1, 353:4, 363:19, 364:7, 365:4, 368:10, 369:21, 370:3, 375:7, 376:13, 379:18, 379:22, 390:6, 390:11, 393:14
**SERVICES** [2] - 317:19, 387:3
**SERVING** [1] - 383:2
**SET** [7] - 318:20, 318:23, 319:10, 320:3, 320:23, 321:1, 326:20
**SETTING** [3] - 375:5, 376:8, 390:12
**SETTLED** [1] - 340:17
**SETTLEMENT** [1] - 348:10
**SEVEN** [3] - 306:5, 306:6, 330:23
**SEVEN-MEMBER** [1] - 330:23
**SEVEN-YEAR** [2] - 306:5, 306:6
**SEVERAL** [5] - 304:20, 327:5, 329:6, 338:7, 374:6
**SEWER** [1] - 317:20
**SHALL** [1] - 321:15
**SHAPE** [1] - 336:19
**SHARE** [1] - 384:17
**SHARING** [1] - 360:24
**SHEET** [1] - 342:24
**SHEETS** [1] - 329:20

**SHERRY** [1] - 338:3
**SHIFT** [2] - 343:8, 344:19
**SHIFTING** [1] - 347:25
**SHOOK** [1] - 384:12
**SHORT** [1] - 331:7
**SHOW** [3] - 304:17, 307:21, 343:7
**SHOWING** [1] - 309:25
**SHOWS** [6] - 304:20, 306:10, 310:14, 386:14, 386:25, 387:9
**SIDE** [2] - 328:15, 340:14
**SIDES** [1] - 316:7
**SIGNATURE** [2] - 365:22, 365:23
**SIGNED** [1] - 352:4
**SIGNIFICANT** [3] - 335:21, 342:11, 374:19
**SIMILAR** [2] - 333:10, 342:13
**SIMPLIFIED** [1] - 310:8
**SINGLE** [1] - 344:8
**SIT** [1] - 338:5
**SIX** [2] - 333:9, 388:5
**SIZED** [1] - 353:14
**SLIDE** [10] - 299:21, 304:13, 306:13, 306:22, 306:24, 307:1, 307:4, 307:6, 307:14, 307:16
**SLIGHTLY** [1] - 336:15
**SLOT** [1] - 322:21
**SLOW** [1] - 317:2
**SMALL** [3] - 305:11, 353:7, 353:11
**SMELL** [1] - 336:12
**SOLEMNLY** [1] - 321:14
**SOMEONE** [4] - 321:10, 345:8, 347:5, 347:11
**SOMETIMES** [2] - 338:15, 380:1
**SOMEWHERE** [1] - 347:21
**SOON** [1] - 374:3
**SOPHISTICATED** [2] - 379:8, 379:9
**SORRY** [26] - 309:12, 309:19, 317:2, 327:6, 332:2, 338:25, 339:14, 339:21, 341:6, 343:8, 345:15,

354:12, 354:22, 355:1, 368:18, 369:4, 369:22, 372:8, 381:24, 386:7, 390:9, 390:21, 390:24, 393:4, 394:7, 394:21
**SORT** [2] - 334:17, 357:1
**SOUGHT** [2] - 327:24, 371:9
**SOUTH** [3] - 294:6, 316:20, 317:5
**SPA** [1] - 317:15
**SPACE** [8] - 319:19, 336:23, 337:14, 349:19, 350:11, 391:17, 392:14
**SPACE** [2] - 318:1, 319:22, 320:10, 320:20, 366:11
**SPACES** [11] - 317:16, 324:19, 325:10, 325:11, 335:8, 337:8, 337:12, 337:15, 337:19, 353:8, 353:9
**SPEAKING** [1] - 377:14
**SPECIFIC** [2] - 345:25, 347:14
**SPECIFICALLY** [4] - 328:22, 329:7, 334:14, 356:21
**SPECIFIED** [1] - 329:3
**SPECULATING** [1] - 384:10
**SPECULATION** [8] - 305:17, 357:20, 366:22, 380:19, 381:2, 381:11, 382:17, 388:8
**SPELL** [1] - 321:21
**SPEND** [1] - 372:11
**SPENT** [2] - 308:23, 374:5
**SPEVACEK** [1] - 323:3
**SPOKEN** [1] - 297:16
**SPREADSHEET** [1] - 343:6
**SPRING** [1] - 293:24
**SPRINGS** [1] - 316:16
**STABILIZED** [7] - 304:6, 304:8, 304:10, 304:23, 304:25, 305:1, 306:6
**STAFF** [34] - 308:14, 324:1, 326:22,

329:14, 333:22, 334:10, 338:4, 339:4, 339:6, 339:19, 340:3, 340:5, 342:24, 343:1, 343:12, 350:18, 351:11, 352:21, 354:1, 355:19, 362:11, 369:20, 370:1, 370:23, 372:23, 372:25, 373:6, 373:10, 373:19, 374:19, 386:19, 386:22, 387:6, 392:20
**STAGGERED** [1] - 373:15
**STANCE** [2] - 381:9, 382:11
**STAND** [2] - 321:12, 323:12
**START** [6] - 314:4, 333:22, 353:16, 354:21, 361:15, 380:4
**STARTED** [2] - 388:25, 389:13
**STARTING** [4] - 301:9, 301:24, 315:11, 315:12
**STATE** [4] - 317:22, 318:4, 321:14, 321:20
**STATEMENT** [4] - 366:19, 367:2, 378:11, 383:18
**STATEMENTS** [2] - 309:1, 309:4
**STATES** [1] - 328:22
**STATES** [4] - 293:1, 396:6, 396:8, 396:13
**STENOGRAPHICALLY** [1] - 396:10
**STEP** [1] - 316:2
**STEPHEN** [1] - 294:16
**STICK** [1] - 349:9
**STILL** [7] - 297:17, 323:4, 330:13, 331:1, 331:21, 345:17
**STIPULATED** [2] - 299:6, 316:7
**STOCK** [12] - 305:2, 305:6, 305:8, 305:9, 306:10, 306:12, 311:14, 313:7, 313:19, 313:23, 314:11, 314:13
**STOCKS** [4] - 300:8, 300:12, 302:25
**STORAGE** [1] - 317:16
**STRAIGHT** [2] -

308:7, 308:12
**STRAIGHT-FORWARD** [1] - 308:7
**STREET** [1] - 336:3
**STREET** [1] - 293:24
**STREET** [1] - 294:6
**STRETCHED** [1] - 305:15
**STRIKE** [5] - 303:23, 314:19, 365:1, 380:14, 383:20
**STRUCTURE** [1] - 383:7
**STYLE** [1] - 317:12
**SUBJECT** [5] - 302:5, 318:20, 318:22, 321:7, 337:9
**SUBMIT** [1] - 320:4, 329:14, 331:22
**SUBMITS** [1] - 333:25
**SUBMITTED** [10] - 318:19, 318:21, 320:13, 320:22, 320:25, 329:19, 329:20, 342:25, 348:19, 395:2
**SUBTRACTED** [1] - 307:23
**SUFFICIENT** [5] - 370:3, 375:6, 376:10, 379:17, 379:22
**SUGGEST** [1] - 373:11
**SUITE** [2] - 294:10, 294:17
**SUM** [1] - 344:17
**SUMMARIZES** [2] - 385:9, 385:10
**SUMMARY** [5] - 307:17, 308:4, 329:20, 333:14, 334:20
**SUNDAY** [1] - 360:2
**SUPERVISOR** [1] - 338:2
**SUPPLEMENTAL** [2] - 333:8, 384:22
**SUPPORT** [1] - 338:16
**SUPPORTS** [1] - 364:8
**SUPPOSE** [1] - 382:25
**SUPPOSED** [3] - 382:23, 383:4, 383:5
**SURROUNDING** [1] - 325:11
**SUSAN** [1] - 294:15
**SUSPECT** [1] - 298:4

**SUSTAINED** [3] - 305:18, 367:25, 385:18
**SWIMMING** [1] - 317:13
**SWITCHED** [1] - 379:11
**SWORN** [2] - 299:17, 322:2
**SWORN** [2] - 377:10, 392:11

## T

**TAB** [1] - 385:23
**TABLE** [2] - 309:25, 395:11
**TALKS** [1] - 348:10
**TASKED** [1] - 322:21
**TAX** [3] - 334:3, 334:5
**TAXES** [2] - 340:9, 349:21
**TELEVISION** [1] - 317:14
**TEN** [4] - 330:19, 361:2, 371:22, 389:13
**TENANT** [2] - 325:25, 326:1
**TENANTS** [4] - 310:24, 324:23, 325:3, 384:17
**TERM** [3] - 334:1, 334:23, 391:24
**TERMS** [4] - 318:20, 318:22, 319:10, 344:8
**TESTIFIED** [6] - 304:23, 368:23, 369:16, 371:14, 373:5, 381:5
**TESTIFY** [2] - 330:4, 369:5
**TESTIMONY** [17] - 309:22, 310:2, 313:3, 321:14, 323:6, 323:9, 336:2, 337:7, 353:6, 358:2, 359:23, 369:2, 369:10, 373:21, 374:15, 377:20, 394:17
**TEXT** [1] - 368:4
**TEXTED** [1] - 347:15
**THAT** [3] - 396:7, 396:8, 396:11
**THE** [124] - 294:3, 294:13, 297:7, 297:20, 297:22, 298:2, 298:4, 298:10, 298:20, 298:23, 299:4, 299:10,

299:14, 301:18, 302:9, 303:19, 303:20, 303:24, 304:15, 304:19, 304:20, 305:18, 306:2, 306:3, 308:18, 309:12, 309:19, 309:23, 312:7, 312:8, 316:2, 316:5, 317:2, 321:4, 321:8, 321:11, 321:12, 321:18, 321:19, 321:22, 327:6, 348:14, 357:21, 357:22, 358:3, 358:9, 358:12, 358:16, 358:18, 358:20, 358:22, 359:1, 359:5, 359:9, 359:12, 359:14, 359:21, 360:6, 360:10, 360:12, 360:15, 360:21, 360:25, 361:2, 361:6, 365:10, 366:23, 366:24, 367:25, 369:3, 369:4, 375:19, 375:23, 376:1, 376:4, 376:14, 377:1, 377:6, 377:8, 380:11, 380:12, 380:20, 380:21, 381:3, 381:4, 381:13, 381:14, 382:19, 382:20, 385:3, 385:13, 385:18, 385:21, 386:3, 386:7, 388:9, 388:17, 388:19, 388:20, 389:18, 389:20, 390:14, 391:21, 391:22, 392:7, 392:9, 393:3, 393:12, 393:13, 393:23, 393:24, 394:21, 395:4, 395:7, 395:12, 396:6, 396:7, 396:8, 396:9, 396:10, 396:11, 396:12, 396:13
**THEMSELVES** [1] - 308:14
**THEREFORE** [2] - 367:7, 388:4
**THINKING** [7] - 297:25, 330:12, 339:3, 344:10, 345:17, 357:15, 374:18
**THIRD** [4] - 300:2, 340:16, 366:7, 386:5
**THIS** [1] - 396:15

**THOMAS** [1] - 294:9
**THREE** [16] - 299:23, 299:24, 306:15, 306:20, 310:8, 317:18, 318:16, 330:18, 330:20, 333:9, 339:25, 355:2, 356:18, 364:21, 371:2, 371:11
**THREE-INCH** [1] - 333:9
**THROW** [1] - 370:14
**THURSDAY** [3] - 298:1, 298:6, 298:12
**TIMELINE** [1] - 378:10
**TITLE** [1] - 396:8
**TITLED** [1] - 320:18
**TO** [1] - 396:8
**TODAY** [6] - 297:19, 298:9, 307:15, 323:6, 331:4, 394:22
**TOGETHER** [1] - 354:21
**TOOK** [4] - 306:19, 335:12, 365:3, 375:12
**TOOLS** [2] - 366:12, 366:13
**TOP** [2] - 313:1, 364:17
**TOTAL** [9] - 307:2, 307:9, 314:20, 327:21, 328:5, 328:6, 334:13, 392:2, 392:3
**TOUCHED** [1] - 299:25
**TOWN** [1] - 297:13
**TRAIL** [1] - 357:1
**TRAILER** [7] - 351:11, 351:18, 351:24, 352:1, 352:25, 353:7, 357:3
**TRAINED** [1] - 391:5
**TRANSACTION** [2] - 312:13, 319:14
**TRANSACTIONS** [2] - 309:1, 309:6
**TRANSCRIPT** [3] - 293:15, 396:9, 396:11
**TRASH** [1] - 317:20
**TREASURY** [1] - 311:9
**TREASURY** [1] - 300:1
**TREATED** [1] - 390:12
**TREATING** [1] - 312:13
**TRIAL** [5] - 316:22, 317:6, 363:3, 363:17,

364:8
**TRIAL** [1] - 293:16
**TRIED** [1] - 308:6
**TRIGGER** [1] - 383:15
**TRIPLE** [2] - 372:5, 372:15
**TROUBLE** [1] - 343:22
**TRUE** [35] - 299:6, 310:17, 313:10, 313:14, 315:22, 316:8, 366:19, 366:24, 367:2, 367:9, 369:23, 370:6, 370:25, 371:5, 374:2, 375:1, 378:3, 378:6, 379:1, 379:2, 379:24, 381:21, 382:16, 383:11, 383:17, 387:18, 387:19, 388:2, 388:4, 388:14, 388:24, 390:5, 390:20, 391:11, 393:7
**TRUE** [1] - 396:9
**TRUTH** [4] - 321:16, 375:12
**TRUTHFULLY** [1] - 382:8
**TRY** [4] - 301:7, 381:25, 383:20, 393:17
**TRYING** [4] - 342:9, 370:21, 371:15, 391:23
**TUESDAY** [2] - 394:23, 395:3
**TURN** [2] - 365:20, 385:23
**TWO** [18] - 297:16, 305:1, 305:8, 317:16, 322:21, 330:11, 330:22, 337:1, 342:17, 364:1, 364:14, 371:11, 372:23, 382:25, 383:1, 383:25
**TWO-WEEK** [1] - 322:21
**TYPE** [2] - 338:8, 379:4

## U

**U.S** [2] - 293:3, 311:8
**ULTIMATELY** [1] - 340:18
**UNBELIEVABLE** [1] - 339:10
**UNCERTAIN** [1] -

297:14
**UNDER** [8] - 318:4, 337:3, 337:16, 373:16, 377:10, 389:22, 392:11
**UNDERSTOOD** [1] - 298:16
**UNIQUELY** [1] - 324:22, 324:23
**UNITED** [4] - 293:1, 396:6, 396:8, 396:13
**UNLESS** [2] - 383:16, 391:8
**UNLIKE** [1] - 325:3, 368:11
**UNLIKELY** [1] - 297:12
**UNREASONABLE** [1] - 319:15
**UNSTABILIZED** [1] - 306:9
**UNUSUAL** [1] - 346:8
**UP** [28] - 298:25, 300:16, 301:15, 304:13, 313:24, 314:1, 323:20, 325:4, 326:19, 328:8, 330:5, 332:1, 332:3, 333:15, 336:17, 337:4, 338:6, 339:9, 340:12, 340:15, 342:9, 342:16, 361:12, 372:11, 373:23, 384:12, 385:22, 389:13
**UPKEEP** [1] - 374:20
**UPWARDS** [1] - 336:25
**USEFUL** [1] - 314:21
**USES** [1] - 326:22
**UTILITIES** [1] - 372:3
**UTILIZE** [1] - 363:5

## V

**VACANT** [2] - 325:10, 325:11
**VAGUE** [4] - 380:9, 390:13, 393:11, 393:21
**VALUE** [4] - 307:12, 310:15, 311:18, 315:5
**VALUED** [1] - 306:18
**VARIETY** [1] - 326:24
**VARIOUS** [1] - 348:9
**VEHICLE** [1] - 317:16
**VERBALLY** [1] -

332:19
**VERIFY** [2] - 308:25, 355:2
**VERSUS** [3] - 308:10, 336:16, 337:20
**VIA** [1] - 320:8
**VIEWED** [1] - 370:23
**VIEWS** [1] - 394:14
**VILLA** [4] - 354:2, 354:25, 355:9, 357:3
**VILLAGE** [33] - 316:25, 317:3, 317:4, 317:7, 317:8, 320:14, 336:3, 336:7, 336:9, 336:16, 336:18, 336:23, 337:5, 337:9, 347:2, 348:4, 348:8, 348:18, 348:23, 349:1, 349:16, 350:7, 350:10, 350:18, 369:10, 370:17, 370:23, 371:4, 373:24, 390:5, 390:10, 390:23
**VIRTUALLY** [6] - 388:23, 389:4, 389:8, 389:10, 389:11, 389:25
**VISTA** [1] - 336:13
**VOLUME** [1] - 384:21
**VOLUME** [3] - 293:10, 295:3, 296:3
**VON** [1] - 294:16
**VOTERS** [1] - 344:25
**VS** [1] - 293:7
**VULNERABLE** [1] - 324:23

## W

**WAIT** [2] - 356:17, 385:2
**WALKING** [1] - 336:14
**WANTS** [1] - 329:9
**WATER** [1] - 317:20
**WAVING** [1] - 299:1
**WAYS** [2] - 330:11, 350:22
**WEDNESDAY** [3] - 297:18, 298:5, 298:11
**WEEK** [1] - 322:21
**WEEKEND** [1] - 394:24
**WEEKLY** [1] - 384:19
**WEEKS** [2] - 331:10, 383:25

**WEISSWASSER** [1] - 318:21
**WEISSWASSER'S** [1] - 318:24
**WELCOME** [1] - 299:20
**WESTERN** [1] - 293:2
**WHEREAS** [3] - 366:6, 366:7, 366:9
**WHITE** [7] - 342:16, 348:14, 348:15, 350:4, 350:13, 351:7, 353:17
**WHOLE** [2] - 321:16, 325:22
**WIDE** [1] - 300:7
**WIFE** [1] - 372:9
**WILDLIFE** [1] - 336:10
**WILLING** [1] - 369:19
**WILSHIRE** [1] - 294:9
**WISH** [1] - 354:20
**WITH** [1] - 396:12
**WITHDRAW** [1] - 365:8
**WITNESS** [23] - 299:17, 301:18, 303:20, 304:20, 306:3, 312:8, 321:18, 321:22, 322:2, 348:14, 357:22, 366:24, 369:4, 376:14, 380:12, 380:21, 381:4, 381:14, 382:20, 388:20, 391:22, 393:13, 393:24
**WITNESS** [13] - 297:10, 297:11, 298:16, 301:20, 321:8, 323:12, 324:6, 335:15, 335:16, 352:15, 355:4, 356:16, 368:6
**WITNESS1** [2] - 295:8, 295:14
**WITNESSES** [2] - 295:5, 295:7
**WITNESSES** [3] - 297:13, 316:3, 336:1
**WRIT** [4] - 363:3, 363:17, 364:3, 364:6
**WRITTEN** [2] - 318:20, 318:23
**WROTE** [1] - 304:24
**WYNDER** [1] - 294:14

## X

**XX** [1] - 293:9

## Y

**Y-A-K-U-R-A** [1] - 355:14
**YAHOO** [1] - 302:2
**YAKURAS** [1] - 355:13
**YEAR** [12] - 306:5, 306:6, 310:15, 313:20, 334:23, 334:25, 341:4, 341:6, 341:7, 341:9, 388:5
**YEAR** [35] - 332:9, 332:23, 333:2, 334:15, 334:18, 337:23, 337:25, 338:1, 338:21, 338:24, 340:19, 340:24, 341:2, 341:19, 341:23, 341:24, 342:1, 342:12, 342:14, 342:25, 343:3, 343:12, 343:14, 343:18, 344:1, 345:24, 346:3, 369:17, 369:24, 379:21, 385:24, 392:20, 393:8, 393:19
**YEARS** [20] - 308:23, 310:11, 320:12, 322:10, 322:16, 322:23, 330:20, 335:1, 337:13, 344:7, 344:11, 356:22, 371:11, 371:22, 374:6, 374:25, 389:1, 389:12, 389:13, 391:9
**YESTERDAY** [1] - 298:15
**YOURSELF** [1] - 302:1
**YOURSELVES** [2] - 358:6, 395:1

## Z

**ZERO** [3] - 315:13, 315:20