1              UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION

3          HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5    COLONY COVE PROPERTIES, LLC, a      )
     Delaware limited liability company, )
6                                        )
                   PLAINTIFF,            )    CASE NO.
7                                        )
            vs.                          )    CV 14—03242—PSG
8                                        )
     CITY OF CARSON, a municipal         )
9    corporation; CITY OF CARSON         )
     MOBILEHOME PARK RENTAL REVIEW BOARD,)    PAGES (505 to 612)
10   a public administrative body; and   )
     DOES 1 to 10, inclusive,            )    VOLUME 6
11                                       )
                   DEFENDANTS.           )
12   _____ ____ )

13

14

15

16                REPORTER'S TRANSCRIPT OF
                       TRIAL DAY 3
17                 TUESDAY, MAY 3, 2016
                       1:30 P.M.
18               LOS ANGELES, CALIFORNIA

19

20

21

22

23   _____

24            MIRANDA ALGORRI, CSR 12743, CRR
             FEDERAL OFFICIAL COURT REPORTER
25          312 NORTH SPRING STREET, ROOM 435
              LOS ANGELES, CALIFORNIA 90012
                 MIRANDAALGORRI@GMAIL.COM

1          **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4

5       O'MELVENY & MYERS, LLP
        BY:  DIMITRI D. PORTNOI
        BY:  MATTHEW W. CLOSE
6       400 South Hope Street
        18th Floor
7       Los Angeles, California 90071

8

9       GILCHRIST & RUTTER, APC
        BY:  THOMAS W. CASPARIAN
        Wilshire Palisades Building
10      1299 Ocean Avenue
        Suite 900
11      Santa Monica, California 90401

12

13  **FOR THE DEFENDANTS:**

14

15      ALESHIRE & WYNDER, LLP
        BY:  JEFFREY MICHAEL MALAWY
        BY:  JUNE SUSAN AILIN
16      BY:  STEPHEN R. ONSTOT
        18881 Von Karman Avenue
17      Suite 1700
        Irvine, California 92612

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**I N D E X**

**TUESDAY, MAY 3, 2016; VOLUME 6**

**Chronological Index of Witnesses**

Witnesses:_____     Page

BAAR, Kenneth

    Redirect examination by Mr. Onstot          510
    Re-cross examination by Mr. Casparian       514


ELLIS, John

    Direct examination by Ms. Ailin             518
    Cross-examination by Mr. Portnoi            537
    Redirect examination by Ms. Ailin           552
    Re-cross examination by Mr. Portnoi         554


HANSEN, Mark

    Direct examination by Mr. Onstot            555
    Cross-examination by Mr. Casparian          571
    Redirect examination by Mr. Onstot          574

GOLDSTEIN, James

    Direct examination by Mr. Close             575
    Cross-examination by Ms. Ailin              581



<u>**EXHIBITS**</u>

**TUESDAY, MAY 3, 2016; VOLUME 6**

|                | For | In  |
|----------------|-----|-----|
| **Exhibit**    | **ID** | **EVD** |

(None)

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, MAY 3, 2016

 2                            1:30 P.M.

 3                               ---

 4         (The following proceedings were held in

 5         open court out of the presence of the jury:)

 6              THE COURT:  I believe the parties asked about

 7    scheduling.

 8              MR. CLOSE:  Yes, Your Honor.  May I?

 9              THE COURT:  Sure.

10              MR. CLOSE:  I think probably no way, shape, or

11    how are more than three hours of testimony left in this case.

12    So I think, if the Court were inclined to do the charge

13    conference at some point this afternoon -- I don't know the

14    Court's schedule -- the case could certainly be argued tomorrow

15    afternoon.  I think from my perspective --

16              THE COURT:  I need about an hour with it.  So

17    let's see what time we finish today.  Maybe we just come in

18    early tomorrow.  Let's see where we're at.  I think, if that's

19    the case, I can pick up the pace.  There's not that much to --

20              MR. CLOSE:  Right.

21              THE COURT:  I think, in my mind, know what I want

22    to do.  So I just want to double check a couple things.

23              MR. CLOSE:  I guess to the extent it works into

24    everything else, I prefer to know the instructions more than

25    the morning of the closing.
```

UNITED STATES DISTRICT COURT

```
 1                    THE COURT:  I understand.

 2                    MR. CLOSE:  Okay.

 3                    THE COURT:  Anything else?

 4                    MR. CLOSE:  No.

 5                    THE COURT:  All right.  Let's go ahead and bring

 6    the jurors in.

 7              (The following proceedings were held in

 8          open court in the presence of the jury:)

 9                    MR. ONSTOT:  May I proceed, Your Honor?

10                    THE COURT:  You may.

11                         KENNETH BAAR,

12               DEFENDANTS' WITNESS, SWORN:

13                    REDIRECT EXAMINATION

14    BY MR. ONSTOT:

15         Q    Dr. Baar, I'm not going to ask you any questions

16    about Carson Gardens, but by my calculations, Mr. Casparian

17    spent about 14 minutes talking about transcription mistakes.

18              Do you recall that testimony earlier?

19         A    Yes, I do.

20         Q    Now, we all make mistakes, don't we?

21         A    Unfortunately, yes.

22         Q    You've made some in the past; correct?

23         A    Yes.

24         Q    What do you do when you find a mistake?

25         A    Fix it.
```

1      Q      You fix it.

2             And did you do that in this circumstance?

3      A      Well, I acknowledged that I made a mistake and

4   that the correct language should be used.

5      Q      Now, the key here is did those transcription

6   errors in any way, shape, or form change either your analysis

7   or your conclusion with regards to the recommended rate

8   increase?

9      A      No.

10     Q      Okay.  Now, one of those mistakes that was

11   pointed out, you put "In light of existing rents," and I think

12   it should have been "In light of the rents allowed."

13            Do you recall that?

14     A      Yes.

15     Q      Allowed is past tense.  Would you agree with me

16   on that?

17     A      Yes.  I think that's the intent and purpose.

18     Q      Okay.

19     A      Yes.  Allowed is past tense.

20     Q      So previous rents.  Agreed?

21     A      Yes.

22     Q      Now, if you could turn to Exhibit 57 in your

23   black binder up there.

24     A      Okay.

25     Q      Mr. Casparian asked you some questions on the

 1   resolution dealing with the Carson Harbor Village applications

 2   for rent increase.

 3              Do you recall that?

 4        A    Yes.

 5        Q    If you can look at section 1.

 6        A    Okay.  That's page 57-1.

 7        Q    Correct.  It indicates in section 1 that

 8   Mr. Goldstein was asking for a rent increase ranging from

 9   $163.42 to $178.07.

10              Do you see where I'm referring to?

11        A    Yes.

12        Q    Okay.  Now, Mr. Casparian asked you a number of

13   questions about consideration of debt service with regards to

14   calculating the rent increase that Carson Gardens ultimately

15   received.

16              Do you recall that?

17        A    Yes.

18        Q    Okay.

19        A    We read some passages from the decision.

20        Q    Correct.  Now, if you can turn to the last page

21   of Exhibit 57, page 57-6.  The top line, can you read what the

22   rent increase that the board actually allowed was?

23        A    Yes.  It's $58.70.

24        Q    And is that consistent with your prior testimony

25   with regards to the board requiring to protect residents from

excessive rent increases?

    A    Yes.  $58.70 rent increase -- well, let me say it's not huge.  It's not like a $200 rent increase.  You know, it's moderate.

    Q    And $58.70 is certainly less than $618.

         Is that true?

    A    Yes.

    Q    Okay.  Now, if you can turn to page 60, this is another resolution Mr. Casparian talked to you about that allowed for passthrough of some of the debt service.

         And in section 1, what was the rent increase Mr. Goldstein was asking for in that case?

    A    It looks like it was -- it says "Requesting rental increases ranging from $222 to $240 per space."

    Q    Okay.  Now, turn to the last page of the resolution itself which is 60- -- actually, it's 60-5 the next to the last page.

         And what was the increase allowed by the board in this case?

    A    In section 4 it indicates an increase of $14.29 was permitted.

    Q    So $14.29 increase taking into account some of the debt service.  Is that consistent with your prior testimony that the board is required to consider many factors, sometimes debt service, and one of the purposes is to protect the

1 residents from excessive rents?

2      A     Well, certainly $14.29 rent increase is not an

3 excessive or large rent increase.

4      Q     And $14.29 is certainly much less than $618.

5      Would you agree?

6      A     Yes.

7      MR. ONSTOT:  Thank you.  Nothing further.

8      THE COURT:  Recross.

9                **RECROSS-EXAMINATION**

10 BY MR. CASPARIAN:

11      Q     Just a few questions, Dr. Baar.

12      A $58 rent increase is a moderate rent increase;

13 is that correct?  That's what you just stated?

14      A     Yeah.  Well, let me say this.

15      In some senses, you know, it's certainly -- I'll

16 qualify it as it's a lot less than 200.  In some instances you

17 could say it's a high rent increase because it would be higher

18 than the CPI.  It's moderate compared to 200.  It's not a huge

19 increase, but it's not a small rent increase.

20      Q     The board relied on your report where you

21 misquoted the language of the guidelines in awarding

22 Colony Cove a rent increase, didn't it?

23      MR. ONSTOT:  Objection.  Calls for speculation.

24      THE COURT:  Overruled.

25      THE WITNESS:  I don't know what -- the board made

1    a decision, and I prepared a report.  I don't know what

2    specifically they relied on in making their decision.

3         Q      BY MR. CASPARIAN:  And you were aware of your

4    misquotation of the guidelines at least as early as when you

5    had your deposition taken in January of this year.

6              Isn't that correct?

7         A      Yes.  But I was made aware of it at the

8    deposition.

9         Q      And did you make any effort to fix your report

10   before trial so the jury could have a copy with the correct

11   language from the guidelines?

12        A      No.

13             MR. ONSTOT:  Objection.  Relevance.

14             THE COURT:  Overruled.

15             THE WITNESS:  I didn't hear what you said.

16             THE COURT:  Overruled.

17             You may answer.

18             THE WITNESS:  No.  I didn't correct the report.

19   I acknowledged the error.  I didn't change the report.

20        Q      BY MR. CASPARIAN:  You acknowledged the error in

21   an amendment to your report?

22        A      No.  In the deposition.

23        Q      In preparing your report, you relied entirely on

24   information that the City's staff provided to you regarding

25   prior rent decisions of the Rent Board, didn't you?

1       A       You're talking about what -- the chart in the

2   report you're talking about.

3       Q       Yes.

4       A       Yeah.  I relied on the information that the staff

5   had given me.

6       Q       Okay.  They created a chart, and you relied on it

7   without confirming the accuracy of any of the underlying

8   information.

9               Isn't that true?

10      A       That's correct.  I assumed it was correct.

11      Q       And the City provided you with a copy of the 1983

12  Carson Harbor Village decision.  Didn't the City?

13      A       At that time you're talking about or when?

14      Q       At any point.

15      A       Yes.  I was -- I was provided with that decision.

16      Q       Did the City at any point ever provide you with a

17  copy of the 1997 Carson Harbor Village decision before I raised

18  it today in cross-examination?

19      A       Not that I'm aware of.

20      Q       Did the City provide you at any point with a copy

21  of the 1989 decision of the Carson Harbor Village before I

22  asked you about it today in cross-examination?

23      A       Not that I'm aware of.

24      Q       Did the City ever provide you with a copy of the

25  2003 Carson Harbor Village decision?

```
 1                    I'm sorry.  I may have misspoken.  With the 2003.
 2     Is that what I said?
 3          A       Yes.
 4          Q       Okay.  Did they?
 5          A       That I don't remember.
 6                  MR. CASPARIAN:  I have no further questions.
 7                  Thank you, Your Honor.
 8                  THE COURT:  You may step down.  Thank you.
 9                  MS. AILIN:  Your Honor, our next witness will be
10     John Ellis.  Someone is going out into the hall to bring him
11     in.
12                  THE CLERK:  Please raise your right hand.
13                  Do you solemnly state that the testimony you may
14     give in the cause now pending before this court shall be the
15     truth, the whole truth, and nothing but the truth, so help you
16     God?
17                  THE WITNESS:  I do.
18                  THE CLERK:  Thank you.  Please take a seat.
19                  THE WITNESS:  Thank you.
20                  THE CLERK:  For the record, can you please state
21     your full name and spell your last name.
22                  THE WITNESS:  Yes.  It's John Gregory Ellis.  My
23     last name is spelled E-l-l-i-s.
24                  THE COURT:  You may.
25     ///
```

**UNITED STATES DISTRICT COURT**

1                          **JOHN ELLIS,**

2                  **DEFENDANTS' WITNESS, SWORN:**

3                      **DIRECT EXAMINATION**

4    BY MS. AILIN:

5          Q      Good afternoon, Mr. Ellis.

6          A      Hello, Ms. Ailin.

7          Q      What is your occupation?

8          A      I'm a real estate appraiser.

9          Q      What education do you have for being a real

10   estate appraiser?

11         A      I have a degree in business economics from UCLA.

12   Following my graduation from UCLA, I attended courses offered

13   by the Appraisal Institute, total of over ten courses with 400

14   classroom hours dealing with various valuation and income

15   analysis topics.

16               That also led to the completion of a

17   comprehensive examination and the submittal of a

18   demonstrational appraisal report followed by a peer-review

19   process evaluating my work for the purpose of -- my obtaining

20   the MAI designation.

21         Q      Do you have any licenses or certifications other

22   than the MAI designation?

23         A      I do.  I'm a state certified real estate

24   appraiser.  I also hold the professional designation as a

25   counselor of real estate of the CRE designation.  And I'm a

1    fellow of the Royal Institution of Chartered Surveyors.

2         Q     And do you have any teaching experience?

3         A     Yes.  I've taught for the Appraisal Institute in

4    the course of income theory, capitalization, and techniques.

5    I've also taught for UCLA through their extension program, and

6    I've served as a guest lecturer for both UCLA and

7    Cal State Northridge.

8         Q     Do any of the courses that you teach deal with

9    damages in a real estate context?

10        A     Yes.  The Appraisal Institute, of course, income

11   capitalization theory and techniques deals with measuring cash

12   flows in different scenarios.  And included in that course is a

13   comparative analysis where two different financial models can

14   be compared for the purpose of damages analysis.  Similar

15   segment of the UCLA course on income property valuation deals

16   with damage analysis as well.

17        Q     And have you prepared a report on the work you

18   did for this case?

19        A     Yes.

20        Q     There are some binders back there behind the

21   witness stand, and one of those binders -- one of the white

22   binders contains Exhibit 2008.  Would you please locate that.

23        A     Yes.  Okay.  I have that.

24        Q     Is Exhibit 2008 a copy of the report that you

25   prepared?

**UNITED STATES DISTRICT COURT**

```
 1        A       Yes, it is.

 2               MS. AILIN:  Your Honor, I believe this was on the

 3   list of stipulated exhibits, but I move it into evidence now if

 4   it is not.

 5               THE COURT:  It's already been admitted.  You may

 6   publish.

 7               MS. AILIN:  Thank you, Your Honor.

 8        Q       Mr. Ellis, looking at pages 17 and 18 of your

 9   report, do those two pages include your resume?

10        A       Yes, they do.

11        Q       And pages 19 through 22, is that a list of cases

12   where you have done work as an expert witness in the last five

13   years?

14        A       Yes, it is.

15        Q       Have you testified as an expert in court before

16   today?

17        A       Yes.

18        Q       Approximately how many times?

19        A       On the order of 30.

20        Q       And in what courts have you testified?

21        A       Superior courts primarily in

22   Southern California -- Los Angeles, orange, Riverside,

23   San Bernardino, and Ventura counties.  I've testified in

24   federal court in the Central District in California.  Also

25   bankruptcy court in the Northern, Central, and
```

**UNITED STATES DISTRICT COURT**

1    Southern Districts of California and in the Third Judicial

2    District of Alaska.

3         Q        And have you been retained by Mr. Casparian's law

4    firm Gilchrist & Rutter?

5         A        I have, yes.

6         Q        To do what kind of work?

7         A        There were three studies I can think of.  One

8    dealt with a damages analysis on a single-family residence in

9    Brentwood.  One was an imminent domain matter in the mid cities

10   area in Los Angeles County.  And the other was a tax appeal

11   matter for a small office property in Ventura County.

12        Q        Have you done any work for the City of Carson

13   prior to this case?

14        A        Yes.

15        Q        How long ago did you do that work for Carson?

16        A        I think it's on the order of ten years, maybe

17   longer ago.

18        Q        And how much are you charging the City and the

19   Rent Review Board for your work on this case?

20        A        My hourly rate for court appearance is $450 per

21   hour.  For consulting work it's 375.

22        Q        And what is the total amount you have billed the

23   City and the Rent Review Board for your work in this case so

24   far?

25        A        It's on the order of $17,000.

1      Q      And have you been paid the entire amount that

2   you've billed?

3      A      Yes.

4      Q      So what were you retained to do in this case?

5      A      I was asked to complete a review of the financial

6   analysis that had been conducted by Mr. Salomon and to form

7   opinions concerning his methodology and the resulting

8   conclusions that he drew from that work.

9      Q      Have you formed an opinion about whether the City

10  and the Rent Review Board have taken any property from

11  Colony Cove Properties, the mobile home park owner?

12     A      No, I did not do that.

13     Q      Have you formed an opinion about whether

14  Colony Cove Properties has been damaged by the way the

15  Rent Control Ordinance has been applied to the mobile home

16  park?

17     A      No.  That was not part of my study.

18     Q      Do you have an opinion about how much the damages

19  would be if Colony Cove Properties were damaged?

20     A      Well, under the adopting the hypothetical

21  assumption that the figures utilized by Mr. Salomon are

22  correct, then, yes, I have formed an opinion in that regard.

23     Q      But that's -- that opinion is wholly based on

24  Mr. Salomon's assumptions; correct?

25     A      Yes.  It's a hypothetical assumption.

1    Q      Your assignment in this case was essentially to

2  critique Mr. Salomon's work.

3    A      That's correct, yes.

4    Q      And we have already introduced into evidence

5  Exhibit 94 which is in one of the black binders up there in

6  front of you.

7         Do you recognize Mr. Salomon's report -- I'll

8  wait until you find it.

9    A    I don't -- I'm sorry.  Here it is.  Okay.  I have

10  it now.  Thank you.

11    Q      And do you recognize Exhibit 94 as Mr. Salomon's

12  report that you reviewed?

13    A      Yes, I do.  It's the same, a copy of it, yes.

14    Q      And in reviewing Mr. Salomon's report, did you

15  conclude that there were things he should have done differently

16  in his analysis?

17    A      Yes.

18    Q      Please tell us briefly what those things were,

19  and then we'll go back and go into a little more detail on each

20  one.

21    A      It really falls into two categories.  One is that

22  Mr. Salomon performed what I refer to as a two-step process

23  that involved discounting the monthly projected rent

24  differential back to a 2008 date and then bringing it forward.

25  So a two-step process.  And it's my opinion that that

```
 1   methodology is inappropriate.  The valuation should be done in

 2   a direct single-step process.

 3            And then somewhat related to that are the

 4   specific rates that he used, the discount rate that he uses on

 5   the first step of his two-step process and then the second rate

 6   which is his rate for the calculation of prejudgment interest.

 7   So I think those rates are incorrect.

 8       Q    Okay.  Let's start with the subject of this

 9   two-step discounting process.

10            Why is it inappropriate to discount the stream of

11   income that Colony Cove claims it lost?

12       A    Because, if Colony Cove were to receive that

13   monthly amount, $65,213 per month, if they were to receive

14   that, they would get that money on a monthly basis going

15   forward from December of 2008 up to under Mr. Salomon's

16   analysis, January of 2017.  So that money would come in.

17            For example, the payment due in May of 2016 would

18   come in in May of 2016, and you'd measure it from that point.

19   Mr. Salomon took the May, 2016, payment and discounted it to a

20   value as if someone had received it in December of 2008 and

21   then took it forward to January of 2017.  Whereas, if you were

22   really going to receive that money, you'd receive it in May of

23   2016, and then there would be some interest on it up to the end

24   of the period, the January, 2017.

25       Q    Is there something, in particular, in
```

1    Mr. Salomon's report that highlights the impact of this

2    two-step process?

3         A       Yes.

4         Q       And what is that?

5         A       If you take the -- if you take the period of

6    January, 2017, which is the last month of Mr. Salomon's study

7    period, because --

8         Q       I'm sorry, Mr. Ellis.  Sorry to interrupt you,

9    but I'm going to put up, so the jury can see what you're

10   talking about, page 17 from Exhibit 94, Mr. Salomon's report.

11        A       That will be helpful.  Thank you.  And maybe if

12   you can get the column headings at the top, that would be

13   helpful as well.  That's great.  Thank you.

14               So in January of 2017, that's the end of the

15   study period.  That's when, if things worked well on an

16   application for rental increase, the rents could move up.  So

17   that would be the end of the study period.

18               So if that $65,000 is due and payable in January

19   of 2017, then when you're sitting there in January of 2017, you

20   don't get any interest on that money because it's received on

21   that date.  You're getting it in January of 2017, and basically

22   $65,000 is equal to $65,000.

23               What Mr. Salomon did, as you look through his

24   analysis -- we're in month No. 98, January of 2017.  It shows a

25   nominal value of lost rent.  That's the $65,213.  But then what

1    he does is he applies the same rate of interest as if -- as if

2    the certainty of this income stream was the same as a

3    United States Treasury bill, and he discounts it back to show

4    what would the value of the $65,000 have been in December of

5    2008.  So this is present value of lost rent as of

6    December 1, 2008, and that he shows as $52,355.

7                    Then he takes an assumed interest rate as if you

8    had received that money in December -- if you -- as if you had

9    received the January, 2017, payment at a discounted amount in

10   December of 2008, and he puts interest on that for the entire

11   98-month period.  So basically he's giving eight years of

12   interest at a rate that's over 7 percent, and that's the

13   prejudgment interest of $38,592.  And he adds -- he adds the

14   present value figure of the 52,000 to the prejudgment interest

15   of $38,000, and he shows the rent loss plus prejudgment

16   interest of $90,947.

17                   And the problem with that is, if you're sitting

18   there in January of 2017 and you're going to receive $65,000,

19   Mr. Salomon is now saying that $65,000 is really worth $90,000,

20   and that's the problem with the analysis.  And there's a

21   variation of that analysis that occurs in every month of the

22   study.  I think it's just easiest to see if you look at the

23   last month because there wouldn't be any interest payable in

24   that January, 2017, period.

25        Q        Now, Mr. Salomon testified that his approach of

```
 1    discounting the stream of payments back to when the damage

 2    allegedly occurred and then adding interest is the accepted

 3    method of doing a damages calculation.

 4              Do you agree that it's the accepted method?

 5        A    No, it's not.  The Appraisal Institute requires

 6    that the modeling of cash flow be done in a way that best

 7    reflects the actual receipt and disbursement of funds.

 8        Q    So what you're saying is that a damages analysis

 9    that has to do with the stream of income should look at that

10    stream of income in the way it actually would have been

11    received if it had been available?

12        A    Yes.  That's right.

13        Q    Now, if the income stream -- if the income stream

14    that Colony Cove had received had been $65,213 higher every

15    month, would Colony Cove have been able to retain that

16    additional money and invest it in something?

17        A    To a certain degree.  It depends on the financial

18    position of the owner.  But the first obligation that has to be

19    satisfied with any property is to pay the mortgage because the

20    lender has a secured position in the property.  And so any

21    mortgage obligations have to be satisfied before the owner

22    would keep that money.

23        Q    So, in effect, the money would have been invested

24    in the mobile home park by paying the mortgage.

25        A    Well, the mortgage would have to be paid, yes.
```

**UNITED STATES DISTRICT COURT**

```
1        Q       Now, you also mentioned that you disagreed with

2   Mr. Salomon's discount rate that he used in discounting the

3   stream of payments.

4        A       Right.

5        Q       What was your issue with Mr. Salomon's choice of

6   a discount rate?

7        A       So the discount rate is applied to reflect the

8   risk versus return relationship, and the greater the risk, the

9   higher the return.  This is an added level of income that would

10  be received from the operation of a mobile home park is what

11  that $65,000 amounts to.  And Mr. Salomon used a rate of

12  2.72 percent which is the same rate that would be paid by the

13  United States Government for anyone who held a ten-year

14  treasury security investment vehicle.

15              So essentially Mr. Salomon is saying the risk of

16  holding a treasury bond is the same as expecting to receive

17  monthly rental payments on mobile home park, and that's just

18  not the case.  There are additional elements of risk involved

19  in the operation of real estate that don't exist relative to a

20  ten-year treasury bond.  And so using the same rate for those

21  two significantly understates the appropriate discount rate to

22  be used for that discounting process.

23       Q       And if you were going to discount the stream of

24  payments, what discount rate would you use?

25       A       My conclusion is that a 7 percent discount rate
```

**UNITED STATES DISTRICT COURT**

1   would be appropriate.  And part of the reasoning for that is

2   that the mortgage rate was structured with a minimum rate of

3   return of 6.74 percent.

4           The holder of the mortgage or the lender is in a

5   secured position because, if the lender doesn't get repaid, the

6   lender can step in and foreclose on the property.  So the

7   lender has to get repaid and has less risk in the lender's

8   investment in the property than does the owner, the holder of

9   the equity position.  So the return on the cash flow that goes

10  to the owner has to be at a higher rate of risk than what the

11  lender receives.

12          And the second way of measuring that is to look

13  at what's known as the overall capitalization rate and the

14  anticipated growth of income.  So the cap rate -- and I'll

15  abbreviate capitalization rate, call it cap rate -- is the

16  relationship of net operating income divided by the sale price.

17          Colony Cove was purchased with negotiations that

18  focused on 5 percent overall capitalization rate, and the

19  overall return on the investment is a combination of that

20  starting cap rate plus the anticipated growth in income.  And

21  that's approximately 2 percent.  So by taking the 5 percent

22  cap rate, 2 percent growth and income gets you to a 7 percent

23  yield requirement that a property owner would expect at a

24  minimum.

25      Q       Now, Mr. Ellis, if you were going to use

**UNITED STATES DISTRICT COURT**

```
 1    Mr. Salomon's method, what prejudgment interest rate do you
 2    think would be appropriate?
 3         A       4.5 percent annually.
 4         Q       And how did you come to that conclusion?
 5         A       I looked at the same type of portfolio analysis
 6    that Mr. Salomon considered where you would take one third of
 7    available investment funds and invest them in treasury bills
 8    and take one third and invest them in corporate bonds and one
 9    third and invest it in the stock market.
10         Q       And, Mr. Ellis, do you show that generally on
11    page 10 of your report?
12         A       Yes.
13              And so the investments in the treasury bills, I
14    don't take any issue with that.  It's a very secured
15    investment.  The ability of the United States Government to
16    make those payments is secure and well established.  And for
17    corporate AAA rated bonds, I view those in the same way that
18    that 5.35 percent rate of return is a reasonable expectation.
19         Q       So where do you differ from Mr. Salomon in
20    deriving a prejudgment interest rate?
21         A       It's on the component of the S&P 500 Index fund.
22    So this is a way of measuring stock market performance.  And
23    Mr. Salomon concluded at an annual rate of approximately
24    15 percent that you would expect to receive from an investment
25    in the stock market.  And he got that by taking the
```

1    December, 2008, start date and taking that forward up through

2    2015.

3                    And that really distorts the long-term

4    performance of the stock market because, in December of 2008,

5    the world was in a financial catastrophe.  It was the onset of

6    a horrible recession.  The stock market had suffered more than

7    a 40 percent loss from September of 2007 to December of 2008.

8    It was in the midst of its steepest decline since the great

9    recession.

10                   And the premise of Mr. Salomon's analysis is

11   that, in the midst of this significant market downturn, you're

12   going to take one third of all of your available investment

13   funds and put it in the stock market, and that's just not a

14   reasonable premise.  So -- in terms of what you would expect to

15   receive.

16                   If you're following a year where the stock market

17   has gone down 40 percent, you wouldn't expect an annual return

18   of 15 percent on a going-forward basis.  So what I did, I

19   looked at ten different investment cycles in the stock

20   market --

21        Q      And, Mr. Ellis, do you show that on page 13 of

22   your report?

23        A      Yes.  It's Exhibit 1.

24                   So I looked at nine different seven-year holding

25   periods in the stock market plus a 14-year holding period

**UNITED STATES DISTRICT COURT**

1    that's shown at the very bottom.  What this shows is that,

2    depending on the holding period that you have, the rate of

3    return on an annualized basis ranges from a negative

4    1.3 percent for the period from 2001 to 2008 up to a high of

5    14.35 percent which is the period of Mr. Salomon's analysis.

6              So out of all these ten holding periods, the only

7    one that is above 7 percent per year is the one that

8    Mr. Salomon selected for his analysis.  And he got that number

9    because he started with a depressed period in terms of the

10   position of the stock market and then rode that up through a

11   period where the value did, in fact, go up.  It just somewhat

12   surprised many investors.

13             What I did was I took these ten investment

14   cycles, and I averaged them to form a more realistic

15   expectation for what an investor would expect to receive by

16   investing in the stock market and came to an average of

17   5.26 percent in terms of average expected return in stock

18   market over the holding period from 2008 to 2017.  And I put

19   that in the hypothetical portfolio.  So that became the

20   one-third component that goes into the stock market.

21             And as a result of that stabilized stock market

22   return, I came to the conclusion that the annualized rate of

23   return for prejudgment interest should be 4.5 percent.  And

24   that, again, is back on page 10 of Exhibit 2008.

25        Q     So you took the three interest rates that you

1    found by looking at treasury bills, corporate bonds, and a

2    stabilized S&P 500 Index and averaged them to arrive at the

3    prejudgment interest rate of 4.5 percent?

4         A    Yes.

5         Q    Did you also do a calculation based on your

6    corrected approach to the damages analysis?

7         A    Yes.

8         Q    And does that appear in your report on page 14?

9         A    Yes.

10        Q    And I apologize for how small this is.  Could you

11   give us an explanation of what page 14 of your report shows?

12        A    Yes.  And I'm sorry.  I know it's very difficult

13   to read.  But what these column headings say in going across

14   the top is the month and then -- my screen is black at this

15   point.

16        Q    Sorry.  We'll have it back up.  I hit the wrong

17   button.

18        A    Okay.  Great.

19             So going from left to right -- and this is much

20   easier to read.  Month and then month number.  So that's just

21   the 1 through 98 in terms of the 98-month period.  The nominal

22   value of the rent loss is the $65,213 per month.  Then I've

23   removed the step of the present value calculation.  So there's

24   nothing in that column.  The monthly interest on nominal value

25   of lost rent at 4.5 percent.  So that means for each month

534

1    there's $244.55 that's paid in prejudgment interest for each

2    month on each monthly payment.

3                Then the next one is the number of months of

4    prejudgment interest.  So in a 98-month cycle, the first month

5    gets 97 months of interest paid on top of that.  And then the

6    prejudgment interest column is taking the 97 months times the

7    $244 per month.

8                So what it's showing is the amount -- the

9    right-hand column is showing the amount of prejudgment interest

10   that's payable on each month's $65,000 rent differential.  And

11   I've done that 98 times.  And if you look down, the prejudgment

12   interest amount is declining.  So it starts out -- we go

13   somewhere in the middle of this sheet.  All right.  Okay.

14               So this figure on the right in the upper right

15   now is about $10,500 per month.  That's the one that started

16   out as 23,000, and it declines as we get closer to

17   January, 2017.  And here on the bottom, June of 2015, the

18   interest amount -- the prejudgment interest amount on that

19   month's $65,000 is 4,646.  And then you get all the way down to

20   the bottom.  You can see in the last month in January of 2017

21   there's no prejudgment interest.  And in the month before that

22   there's the $244.55.

23               So as there are fewer months of receiving the

24   interest, the total interest payable on each month's $65,000 is

25   less.  And when you add those 98 months of prejudgment interest

```
 1    payments, it comes out to 1,162,340 is the prejudgment interest

 2    amount.  And then $65,213 per month for 98 months amounts to

 3    $6,390,874.  So under this -- again, it's all under a

 4    hypothetical premise.  But under this premise, the total

 5    damages would be $7,553,214.

 6         Q     And is that final calculation also reflected on

 7    page 11 of your report?

 8         A     Yes.

 9              MS. AILIN:  Thank you, Mr. Ellis.

10              I have nothing further at this time, Your Honor.

11              THE COURT:  Cross-examination.

12              MS. AILIN:  Actually, I'm sorry.  Just one more

13    thing.

14         Q     Mr. Ellis, did you prepare something that

15    summarizes the differences between your approach and

16    Mr. Salomon's approach?

17         A     Yes, I did.

18              MS. AILIN:  Your Honor, I have this here as a

19    demonstrative exhibit which refers back to both Mr. Salomon's

20    and Mr. Ellis' reports.  May I publish?

21              THE COURT:  You may.

22         Q     BY MS. AILIN:  Mr. Ellis, is this the summary

23    that you prepared?

24         A     It is, yes.

25         Q     And could you just briefly go over what we have
```

1    there?

2         A       All right.  So this is just intended to summarize

3    the differences between Mr. Salomon's approach and my approach

4    to this.  Mr. Salomon discounted the stream of rent payments.

5    I did not.  The discount rate used by Mr. Salomon is

6    2.72 percent.  The number is zero for me because I did not

7    apply a discounting process although, if I were to adopt a

8    discount rate in Mr. Salomon's analysis, it would have been

9    7 percent.

10             Prejudgment interest is applied to the discounted

11   amount in Mr. Salomon's analysis, and it's applied to the

12   actual $65,213 amount when received.

13        Q       And down at the bottom -- sorry.

14             Then down at the bottom we have this interest

15   rate on G.E. Capital loan.  Why is that there?

16        A       It's a reference to the discount rate analysis.

17   So this is the rate that was payable to the mortgage holder,

18   the lender on the property.  And that's a very relevant

19   benchmark in terms of what the return requirement would be for

20   the property owner in evaluating the discount rate.

21             MS. AILIN:  Thank you, Mr. Ellis.

22             Thank you, Your Honor.

23             THE COURT:  Cross-examination.

24   ///

25   ///

**UNITED STATES DISTRICT COURT**

**CROSS-EXAMINATION**

1

BY MR. PORTNOI:

2

3      Q      Good afternoon, Mr. Ellis.

4      A      Hello, Mr. Portnoi.

5      Q      You're not a certified public accountant;

6   correct?

7      A      That's correct.

8      Q      You were retained to -- by the City's counsel to

9   prepare a rebuttal report to Mr. Salomon's expert report; is

10   that right?

11      A      I was -- I was retained to review his report and

12   subsequently to prepare a rebuttal report.

13      Q      You were retained to critique Mr. Salomon's

14   report; correct?

15      A      I was retained to review it and, upon reaching

16   opinions about it, form a critique.

17      Q      Let me ask that again.

18             Were you retained to critique Mr. Salomon's

19   report?

20      A      Yes.

21      Q      You did not develop an opinion regarding

22   Colony Cove's value; correct?

23      A      That's correct.

24      Q      Would you agree, however, that Mr. Salomon

25   reached a conclusion regarding Colony Cove's value?

 1        A        Mr. Salomon reached opinions concerning

 2   components of value for that property.

 3        Q        And is it your opinion that Mr. Salomon developed

 4   an opinion that relates to a relationship of value for

 5   Colony Cove?

 6        A        Yes.

 7        Q        Mr. Salomon concludes that the monthly rental

 8   value for the park should be $65,213 greater than the prior

 9   rental value; is that correct?

10        A        Yes.

11        Q        And your report does not disagree with that

12   number; correct?

13        A        I did not do an analysis nor form an opinion on

14   that -- regarding that number.

15        Q        Mr. Salomon's report expresses an opinion of a

16   rental value at a given time; correct?

17        A        Yes.

18        Q        In other words, Mr. Salomon's estimate of damages

19   reflects the loss of the park's ability to produce income

20   through rents beginning when the City's rent decision became

21   effective on December 1st, 2008, and ending with some point

22   after trial; correct?

23        A        Yes.

24        Q        And you've reviewed Mr. Salomon's expert report;

25   correct?

```
 1          A       I have.

 2          Q       Your report is based on the same assumption

 3   contained in Mr. Salomon's report; is that right?

 4          A       In terms of the hypothetical monthly rent loss,

 5   yes, that's correct.

 6          Q       Let me ask Mr. -- actually, Your Honor, may I

 7   please publish Exhibit 2008, Mr. Ellis' report?

 8                  THE COURT:  You may.

 9          Q       BY MR. PORTNOI:  If we can put up Exhibit 2008

10   which is your report and go to page 4 of that report.  I will

11   ask Mr. Newcomb to highlight the hypothetical conditions.

12                  So that states that your report is "Based on the

13   assumption that Colony Cove Properties, LLC, which is the

14   plaintiff in this action, is entitled to receive payment for

15   damages resulting from rulings made by the City of Carson, the

16   City of Carson Mobilehome Park Rental Review Board which are

17   the defendants in this action."

18                  Did I read that correct?

19          A       Yes.

20          Q       And you incorporated that assumption; correct?

21          A       I did, yes.

22          Q       You applied that assumption and reached a

23   different conclusion as to the amount of damages; correct?

24          A       Yes.

25          Q       At your conclusion, based on those assumptions,
```

```
 1   created the total measure of damages before interest at over

 2   $6 million; correct?

 3        A      Yes.  Yes.  Right.  Based on the $65,213 per

 4   month times the 98 months.

 5        Q      Right.  The $65,213 monthly amount that you don't

 6   dispute; correct?

 7        A      I've adopted it as an assumption.

 8               MR. PORTNOI:  Okay.  Mr. Newcomb, if we can go to

 9   page 10 of this report.  Go to page 11, please, actually, is

10   what I meant.  If you can call out that list of numbers in the

11   middle.

12        Q      So that's what I'm referring to as the value of

13   lost rent increases which you have at $6,390,874; is that

14   correct?

15        A      Yes.

16        Q      And, in fact, that number -- that value of lost

17   rent increases, that's larger than Mr. Salomon's figure, isn't

18   it?

19        A      It's larger than his discounted figure.

20               MR. PORTNOI:  Sure.  So, Mr. Newcomb, if you

21   could possibly keep that up but bring up Exhibit 94 as well.

22               Your Honor, do I have permission to publish

23   Exhibit 94 which has been admitted?

24               THE COURT:  You may.

25               MR. PORTNOI:  Thank you.
```

1              If you could call out the numbers in Exhibit 2008

2  and the numbers in Exhibit 94.

3       Q      So the one on top there, that's your numbers.  On

4  the bottom, that's Mr. Salomon's numbers; correct?

5       A      That's his -- that's the discount.  The 5,738,050

6  is the discounted.

7       Q      So the discount causes that number to go down;

8  correct?

9       A      Yes.

10      Q      It discounts the amount of money that would be

11  paid by the City to Mr. Goldstein; correct?  Or to Colony Cove;

12  correct?

13      A      It discounts it to a -- to a time that precedes

14  when the obligation would have been due.

15      Q      And so let's keep this up for just a moment.

16             But let me -- the way that you differ, however,

17  with Mr. Salomon, what makes your number -- your final number a

18  little smaller is how you calculate prejudgment interest; is

19  that right?

20      A      The prejudgment interest calculation is

21  important.

22      Q      Yeah.  And you reached a conclusion as to the

23  calculation of prejudgment interest; correct?

24      A      I did.

25      Q      And your, as you call it, corrected analysis

1    shows the prejudgment interest amount of $1,162,340; correct?

2         A    Yes.

3         Q    When you calculated that interest rate, you used

4    the same mix of investments; correct?

5         A    Yes.

6         Q    And you averaged those three same investments to

7    arrive at your final prejudgment interest rate; correct?

8         A    Yes.

9         Q    So you gave all three investments the same

10   one-third weight that Mr. Salomon did; right?

11        A    I did.

12        Q    And, again, you agree with Mr. Salomon's use of

13   U.S. Treasury bills, AAA rate of bonds, and the S&P Index as a

14   reasonable rate of interest; correct?

15        A    Yes.

16        Q    So am I correct in my understanding that your

17   prejudgment interest rate differs from Mr. Salomon's

18   prejudgment interest rate because of calculations related to

19   this S&P 500?

20             Is that right?

21        A    Yes.

22             MR. PORTNOI:  Mr. Newcomb, can you bring up

23   page 13 of Exhibit 2008.  If you could call out the whole

24   table.

25        Q    I think you already said this is an exhibit

```
 1   attached to your report; correct?

 2        A      Yes.

 3        Q      I just wanted to point out one thing.

 4               In the column -- the third column from the right,

 5   it says "Annual compound change over seven years."

 6               Is that right?

 7        A      Yes.

 8        Q      That's because you're using a compound interest

 9   rate?

10        A      Right.

11        Q      I'll come back to that.

12               During your testimony, you explained that you

13   used a 14-year holding period for your calculation for the

14   S&P 500 whereas Mr. Salomon calculated his index beginning on

15   December 1st, 2008; correct?

16        A      May I hear the first part of the question again,

17   please?

18        Q      Sure.  During your testimony, you explained you

19   used a 14-year holding period for your calculation for the

20   S&P 500 whereas Mr. Salomon calculated his index beginning

21   December 1st, 2008; is that right?

22        A      No.  I used a series of ten different seven-year

23   holding periods in addition to a 14-year holding period in

24   completing my analysis based on ten different holding period

25   assumptions.
```

1    Q        Isn't in your understanding that Mr. Salomon used

2    December 1st, 2008, as the start date for investments because

3    that is the date that Colony Cove claims it would have been

4    receiving the rent increases denied by the defendants?

5            Is that correct?

6    A        He used that starting date because it coincides

7    with the date on which the first $65,000 payment out of the 5.8

8    or $6.3 million would have been received.

9    Q        But your calculations began on

10   December 1st, 2000; correct?

11   A        Yes.

12   Q        Do you believe or have you been told that

13   Colony Cove claims that it should have received increased rents

14   in the year 2000, six years before it purchased the park?

15   A        No.  I don't think that's part of the claim in

16   this case.

17   Q        Okay.  Turning to your numbers on this page,

18   Mr. Salomon testified that he had someone with 15 years of

19   experience as a forensic economist check his numbers and

20   calculations.  You, however, didn't have anyone assist you in

21   preparing your report beyond someone in a clerical capacity; is

22   that correct?

23   A        I did not have someone in a clerical capacity

24   reviewing my work.  I had someone in a clerical capacity

25   assisting me in the preparation of the document.

1          Q        And nobody else assisted you in the preparation

2     of the document?

3          A        That's correct.

4                   MR. PORTNOI:  Your Honor, I'd like permission to

5     also publish 1008 which has previously been admitted into

6     evidence.  It's entitled "The historical prices of the

7     S&P 500."

8          Q        Mr. Ellis, it's going to be up there in the black

9     binder, but we're also going to call the stuff out in the

10    screen.  So you can reference it either way.

11                  Mr. Ellis, this document is a listing of the

12    S&P Index for the period referenced in your report,

13    December 1st, 2000, through December 1st, 2014.  Mr. Ellis, in

14    your report -- and Mr. Newcomb if we can put both of those

15    side-by-side again.

16                  Mr. Ellis, in your report you list the index

17    value of the S&P on December 1st, 2008, as $90.24; is that

18    correct?

19         A        Yes.

20         Q        Okay.  But the actual closing index value was

21    $82.11 on December 1st, 2008, wasn't it?

22                  And, Mr. Newcomb, if you can highlight those for

23    us or call them out.

24         A        Do you want me to look at your Yahoo exhibit in

25    answering that question?

1    Q       It's an exhibit that -- yes.  It is the exhibit

2    that is the historical prices of the S&P, but we'll get it up

3    on the screen in just a moment.

4            If you want, you can look at the screen.

5    A       Okay.  So yes.  It looks like on

6    December 1st, 2008, according to your exhibit, the market

7    opened at 87.51 and ended up closing at 82.11.  So it lost

8    about 5 percent that day.

9    Q       Yeah.  So -- and you said it was $90.24; correct?

10   A       I did.  I'm not using the same exhibit that

11   you've introduced.  I'd be happy to bring out my work papers if

12   you'd like to see them.

13   Q       This has been stipulated as to authenticity; so

14   we'll use that.

15           MS. AILIN:  Objection.  Misrepresents what the

16   stipulation was.  Move to strike.

17           THE COURT:  Overruled.

18   Q       BY MR. PORTNOI:  So as I said, it's been

19   stipulated as to authenticity.  So we'll use this, and it's an

20   exhibit in evidence as well.

21           So the index value you relied on was off by

22   almost ten percent; is that right?

23   A       I wouldn't say it's off.  I would say it's

24   different from the figures you pulled from Yahoo.

25   Q       Mr. Ellis, how about we compare another number.

1    Would you like to pick a different year?

2          A     Sure.  Why don't we look at December 1st of 2014.

3          Q     Let's look at December 1st, 2014.

4                Mr. Newcomb, if you can pull up this -- a

5    comparison look for December 1st, 2014.

6                What is your number for December 1st, 2014?

7          A     205.54.

8          Q     And here we show 205.76 or you may have been --

9    you probably weren't using the high or the low; correct?

10         A     I was using the figures that I received from the

11   S&P website.

12         Q     Okay.  But you can't point me to an exhibit where

13   that exists, can you?

14         A     Mr. Portnoi, I gave you my entire file when you

15   deposed me, and I'd be happy to refer to that if you'd like me

16   to.

17         Q     That's okay.

18               Would it surprise you to learn that, when we

19   compare your figures to the S&P 500, all 14 numbers are wrong?

20               MS. AILIN:  Objection.  Argumentative.

21               THE COURT:  Overruled.

22               THE WITNESS:  It wouldn't surprise me to find

23   that they are different from what you pulled from Yahoo.

24         Q     BY MR. PORTNOI:  And assuming that all 14 of your

25   figures are wrong -- and here, Mr. Newcomb, can we pull page 13

**UNITED STATES DISTRICT COURT**

1    up again.

2              Assuming it's true that all 14 of your figures

3    are wrong, that means that that next column over is wrong too,

4    doesn't it?  The total percentage change?

5         A     Not necessarily.

6         Q     And that might be -- but it might be; correct?

7    If all 14 figures are wrong?

8         A     It's within the realm of possibility.

9         Q     And that would also mean that your ultimate

10   conclusion of 5.26 percent would be wrong; correct?

11        A     Again, within the realm of possibility given the

12   description of your scenario.

13        Q     All right.  And we can move on.

14             Let's turn to the next page of your report,

15   page 14.  This is another exhibit that we've seen.  So just a

16   couple things here.

17             On this page, the 4.5 percent interest rate

18   referenced in the fifth column from the left, that's based on

19   your average of the U.S. Treasury bills, the AAA rated bonds,

20   and the S&P 500 Index; correct?

21        A     Yes.

22        Q     When it comes to the S&P 500 Index, again, that

23   component would be wrong if all 14 of the numbers you pulled

24   were wrong; correct?

25        A     It's within the realm of possibility.

1    Q    And in that column where you say 4.5 percent, if
2  we could scroll down just a little bit so we can see some of
3  those first sets of numbers.
4        I think you said what you do is you have your
5  65,213.  You multiply that by 4.5 percent.  You get that
6  $244.55.
7        Is that right?
8    A    Yes.
9    Q    And you multiply it by the number of months to
10 get the last number all the way on the right; correct?
11   A    Yes.
12   Q    You would agree that's a standard interest
13 calculation; correct?
14   A    It is, yes.
15   Q    It's not a compound interest calculation;
16 correct?
17   A    That's correct.
18   Q    But you used a compound interest calculation in
19 reaching this 4.5 percent; correct?
20   A    As it relates to the S&P Index, yes.
21   Q    Specifically you used a compound rate of return
22 because the funds typically reinvest their proceeds
23 year-after-year; correct?
24   A    It's a combination of fund reinvestment and
25 dividend distributions would be typical.

```
 1        Q       And you would agree that interest compounded

 2   annually over eight years would result in more interest earned

 3   than if it was not compounded over that period; correct?

 4        A       Yes.

 5        Q       Excuse me?

 6        A       Yes.

 7        Q       So because you used a standard interest rate

 8   rather than a compound interest rate, your calculation of the

 9   prejudgment interest owed to Colony Cove are actually

10   incorrect; is that right?

11        A       No.  They're not incorrect.  They're based on

12   based standard or simple interest calculation which means they

13   are not being paid interest on the interest.

14        Q       I know we discussed this, but let me be clear on

15   a few things, and I'm just wrapping up.

16                First, your mathematical calculation of the

17   estimated lost rental income set forth in Mr. Salomon's report

18   that, if there's a finding of liability, that Colony Cove's

19   rental value had been damaged to the tune of $6,390,874.

20                That's your preinterest figure, the $6,390,874;

21   is that correct?

22        A       Under that assumption, yes.

23        Q       Which, again, is larger than what Mr. Salomon

24   estimated; correct?

25        A       It's larger than Mr. Salomon's discounted figure,
```

1    right.

2          Q      Second, with respect to prejudgment interest, you

3    only disagreed with Mr. Salomon as to the S&P Index rate;

4    correct?

5          A      Yes.

6          Q      And that was based on numbers that don't match

7    the S&P 500 exhibit that you've been shown today; correct?

8          A      My numbers did not exactly align with Yahoo's

9    figures.

10         Q      And you also didn't compound the interest;

11   correct?

12         A      That's correct.

13         Q      And, finally, am I correct in stating that, in

14   your opinion, if a jury agrees with Mr. Salomon's assumption

15   meaning they find that Colony Cove is entitled to that $65,213

16   a month number which you don't dispute, so with that assumption

17   of that $65,213 number, that, if the jury finds in

18   Colony Cove's favor, the jury should return a verdict in

19   Colony Cove's favor totaling $7,553,214?

20                MS. AILIN:  Objection.  Argumentative.

21                THE COURT:  Sustained.  Rephrase.

22                MS. AILIN:  Outside this witness' expertise.

23                THE COURT:  Sustained.  Rephrase.

24         Q      BY MR. PORTNOI:  Well, your total damages you

25   list here, your words, is $7,553,214.  Excuse me.  $7,553,214.

UNITED STATES DISTRICT COURT

1          Is that correct?

2     A     Yes.  Under the assumptions as I've stated them.

3          MR. PORTNOI:  No further questions.

4          THE COURT:  Redirect.

5                    **REDIRECT EXAMINATION**

6     BY MS. AILIN:

7     Q     Mr. Ellis, you've reviewed Mr. Salomon's

8     deposition transcript, haven't you?

9     A     Yes.

10    Q     And in his deposition, Mr. Salomon identified a

11    specific index fund as the source of his information on the

12    S&P; correct?

13    A     Yes.

14    Q     And you used the actual S&P figures.

15    A     I did.

16    Q     And would that account for the difference between

17    the two?

18    A     I don't know that -- I don't know where these

19    specific figures came from that are shown on this Yahoo chart.

20    So it's possible that that would account for the difference.

21    Q     And you obtained your information about the

22    changes in the S&P Index by going to the index website?

23    A     Yes.

24    Q     Now, in talking about your qualifications, you

25    teach courses on damages; right?

```
 1        A      I do.

 2        Q      You teach people how to assess and estimate

 3   damages in a real estate context; correct?

 4        A      Yes.

 5        Q      In your review of Mr. Salomon's report and his

 6   deposition, did you see any indication that Mr. Salomon ever

 7   looked at the income stream potentially available over the

 8   entire useful life of the Colony Cove Mobilehome Park?

 9        A      No.  I don't recall seeing that analysis.

10        Q      Would doing that sort of analysis be important in

11   determining whether something that the Rent Review Board did

12   actually impacted the value of the Colony Cove Mobilehome Park?

13        A      You know, I haven't thought of it in that

14   context, and at this point I don't have an opinion on that.

15        Q      Mr. Portnoi pointed out a hypothetical assumption

16   that you made in your analysis.  What do you mean by

17   "hypothetical assumption"?

18        A      A "hypothetical assumption" is a circumstance

19   that is assumed to be true without knowing that it is and, in

20   fact, a situation that may actually be false but is assumed to

21   be true so a study or analysis can be completed.

22        Q      And so if the ultimate conclusion is that it is

23   not true that the Rent Review Board's rent increase decisions

24   were improper, then the amount of damages would be zero;

25   correct?
```

```
 1        A       Yes.  That's right.

 2                MS. AILIN:  Nothing further, Your Honor.

 3                THE COURT:  Recross.

 4                    RECROSS-EXAMINATION

 5   BY MR. PORTNOI:

 6        Q       I just wanted to ask one thing to reiterate.

 7                Again, it's a hypothetical assumption, the

 8   $65,213 per month rate.  But to clarify, therefore, nothing in

 9   your report disputes the $65,213 per month damage number;

10   correct?

11        A       That's correct.

12        Q       And you have -- no further questions.

13                THE COURT:  All right.  You may step down.  Thank

14   you.

15                THE WITNESS:  Thank you, Your Honor.

16                THE COURT:  Defense next witness.

17                MR. ONSTOT:  The defense calls Mark Hansen.

18                THE CLERK:  Sir, if you could please step

19   forward.  Raise your right hand.

20                Do you solemnly state that the testimony you may

21   give in the cause now pending before this court shall be the

22   truth, the whole truth, and nothing but the truth, so help you

23   God?

24                THE WITNESS:  I do.

25                THE CLERK:  Thank you.  Please take a seat.
```

```
 1                    For the record, can you please state your full
 2      name and spell your last name.
 3                    THE WITNESS:  Mark L. Hansen, H-a-n-s-e-n.
 4                    MR. ONSTOT:  May I inquire, Your Honor?
 5                    THE COURT:  You may.
 6                         MARK HANSEN,
 7                 DEFENDANTS' WITNESS, SWORN:
 8                      DIRECT EXAMINATION
 9      BY MR. ONSTOT:
10          Q     Good afternoon, Mr. Hansen.  Thank you for
11      driving out from Indio.  You're the defense's last witness.
12          A     Okay.
13          Q     We're going to talk today about the loan
14      Mr. Goldstein took out to purchase Colony Cove.  If you'll move
15      the microphone up a little closer to your mouth.  There you go.
16      Thank you.
17                    Can you tell us what you do for a living, please?
18          A     I'm sorry?
19          Q     Can you do -- maybe I should do it.
20                    Can you tell us what you do for a living?
21          A     Yes.  I place financing on commercial real
22      estate, primarily mobile home parks.
23          Q     And how long have you been doing that?
24          A     30 years.
25          Q     You're also a certified public accountant;
```

**UNITED STATES DISTRICT COURT**

1    correct?

2         A      Correct.

3         Q      Approximately how many financings have you placed

4    for mobile home parks in your career?

5         A      Hundred.

6         Q      And in the vernacular, you're called a loan

7    broker; correct?

8         A      Yes.

9         Q      And your job is to go out and find financing for

10   the mobile home park owners or potential mobile home park

11   owners to hire you to find that financing that they can use to

12   purchase parks.

13              Is that fair?

14        A      Correct.

15        Q      Pardon me?

16        A      Correct.

17        Q      Now, have you been hired by Mr. Goldstein before

18   to either finance or refinance any mobile home parks?

19        A      Yes.

20        Q      On how many occasions?

21        A      Numerous.

22        Q      Well, let's break them down.

23              Did he hire you to provide refinancing for

24   Carson Harbor Village?

25        A      Yes.

1      Q      Did he hire you to find financing for

2  Colony Cove?

3      A      Yes.

4      Q      Did he hire you to find financing for El Dorado?

5      A      Yes.

6      Q      Did he hire you to find refinancing for

7  Indian Springs?

8      A      Yes.

9      Q      And Rancho Verde?

10     A      Yes.

11     Q      And you are represented by Mr. Tom Casparian; is

12  that correct?

13     A      Yes.

14            MR. ONSTOT:  Your Honor, we move, pursuant to

15  Federal Rule of Evidence 611, for permission to lead, adverse

16  witness.

17            THE COURT:  Any objection?

18            MR. CASPARIAN:  No objection, Your Honor.

19            THE COURT:  You may.

20     Q      BY MR. ONSTOT:  Mr. Hansen, when were you

21  retained to find financing for Mr. Goldstein for the purchase

22  of Colony Cove?

23     A      Sometime in 2006.  Prior to the purchase.

24     Q      And at that time, was the ability to finance

25  mobile home parks affected at all by the recession of 2005 to

```
 1    2010?

 2         A       2010 but, no, not for 2005.

 3         Q       I'm sorry?

 4         A       This was in 2006 that I was looking for the loan.

 5         Q       Okay.  In 2006, was the ability to finance a

 6    mobile home park in any way affected by the recession?

 7         A       No.

 8         Q       And that's because mobile home parks provide

 9    primary housing; correct?

10         A       Well, not only primary housing but affordable

11    housing.

12         Q       Okay.  Now, you also attempted to refinance

13    Colony Cove for Mr. Goldstein; is that correct?

14         A       Yes.

15                 MR. PORTNOI:  Objection, Your Honor.

16                 MR. ONSTOT:  I'll withdraw the question.

17                 MR. CLOSE:  Motion in limine.

18         Q       BY MR. ONSTOT:  Now, Mr. Goldstein expressed to

19    you the goals that he had for you and for him with regards to

20    financing Colony Cove; is that correct?

21         A       Correct.

22         Q       And one of those goals included to procure the

23    largest loan amount available; correct?

24         A       The largest supportable loan amount available.

25         Q       Okay.  And by "supportable," you mean supportable
```

1   by the rents that would be charged at the mobile home park to

2   pay the mortgage; right?

3       A    The rents collected at the mobile home park at

4   the time of the mortgage.

5       Q    Which is 2006?

6       A    Yes.

7       Q    Okay.  Are you aware at the time when he

8   purchased it in 2006 that the net operating income was

9   1.1 million but the loan that was received had mortgage

10   payments of 1.2 million?

11       A    The net operating income of the property was

12   sufficient to cover the mortgage payments called for under the

13   loans.  I don't know where you're getting your 1.1 million.

14       Q    Okay.  Other than that, was one of

15   Mr. Goldstein's goals flexibility to add spaces?

16       A    Yes.

17       Q    And was another goal that he wanted the lender to

18   finance the cost of those spaces should he decide to expand --

19       A    No.  No.  No.  I'm sorry.  I'm confused.  In 2006

20   that was not an issue.  In fact, in 2006 I don't even think

21   anybody knew how many spaces could be expanded.

22       Q    In 2006 was another one of Mr. Goldstein's goals

23   that he wanted lenders to allow him to release spaces to sell

24   to residents?

25       A    It was requested but denied.

1      Q        What is a fractured condominium?

2               MR. PORTNOI:  Objection.  Relevance, Your Honor.

3               THE COURT:  Sustained.

4      Q        BY MR. ONSTOT:  Did Mr. Goldstein ever tell you

5  at the time of financing that he wanted you -- that he wanted

6  the lender to convert -- for permission from the lender to

7  convert to subdivisions?

8      A        That has to do with release prices, and the

9  lender would not agree to release prices.

10     Q        So the answer --

11     A        So the answer is that the loan would be due and

12  payable upon the sale of the first lot.

13     Q        Sale of the first --

14     A        Lot.  Space.

15     Q        Okay.  And did Mr. Goldstein tell you that the

16  reason he wanted the lender's permission was for the long-term

17  solution to avoid rent control and to provide affordable

18  housing?

19     A        Again, timing is at issue.  That is his position.

20  At 2006 he had successfully sold affordable housing to

21  residents previously.

22     Q        Now, the company that was ultimately selected to

23  provide financing was G.E. Capital.

24               Is that true?

25     A        Correct.

**UNITED STATES DISTRICT COURT**

```
 1          Q       Now, the G.E. Capital proposal did not meet all

 2     of Mr. Goldstein's goals, did it?

 3          A       Correct.

 4          Q       And one of those goals that it didn't meet was

 5     that the interest rates were not the lowest compared to

 6     competing proposals; is that correct?

 7          A       No.  The interest rates were very, very close to

 8     one another, and the interest rates was not a deciding factor

 9     in the decision to select the loan.

10                  MR. ONSTOT:  Move to strike as nonresponsive.

11                  THE COURT:  Denied.

12          Q       BY MR. ONSTOT:  Was the interest rate proposed by

13     G.E. Capital higher than the other competing proposals from

14     Bank of America and Wells Fargo?

15          A       One was identical, and one was slightly lower.

16          Q       Mr. Hansen, there is a black binder up there.  It

17     says 1 of 4.

18          A       Okay.

19          Q       If you could turn to Exhibit 10, please.

20          A       I'm sorry.  I don't see 1 of 4.

21          Q       Black binder on the spine it says "Plaintiff's

22     exhibit volume 1 of 4."

23          A       Right.

24          Q       Inside, if you turn the page, you go to

25     Exhibit 10.
```

562

```
 1      A       Okay.  I don't see that.  I'm sorry.

 2              MR. ONSTOT:  Your Honor, may I approach?

 3              THE WITNESS:  It starts at Exhibit 87 or

 4  something.

 5              THE COURT:  You may approach.

 6      Q       BY MR. ONSTOT:  Do you have it now, Mr. Hansen,

 7  Exhibit 10?

 8      A       Yes.

 9      Q       Turn to page 10-2 in the lower right-hand corner.

10  You'll see it in the bottom.

11      A       Yes.

12      Q       This is a summary of the loan from G.E. Capital;

13  correct?

14      A       Yes.  It's a loan application.

15      Q       Okay.  And there's some interlineations with the

16  initials J.G. throughout the document; is that correct?

17      A       Correct.

18      Q       It's your understanding that the initials are

19  Mr. Goldstein's?

20      A       Correct.

21      Q       Okay.  Now, if you can turn to section 13 which

22  is on page 10-7.

23              Are you there?

24      A       Yes.

25      Q       Okay.  Under section 13(b), as in boy, a few
```

1    minutes ago I asked you some questions about condominium

2    approvals.

3         A     Yes.

4         Q     Okay.  And under section 13(b), it says "Subject

5    to G.E. Capital review and approval, the loan documentation

6    will include provisions allowing the borrower to complete the

7    necessary requirements for future condominium conversion of the

8    property."

9              Do you see where I'm referring to?

10        A     I do.

11        Q     Mr. Goldstein did not cross that out, did he?

12        A     No, he didn't.

13        Q     Did you have any discussions with Mr. Goldstein

14   at the time of financing before the purchase of Colony Cove of

15   his intent to ultimately convert the Colony Cove Park to

16   condominiums?

17        A     Well, based on this, obviously we did.  And based

18   on the fact that he just sold one, we did.  But you're looking

19   at the wrong document.  You need to look at the loan

20   commitment.  As I told you before, there's a loan application,

21   and the loan application becomes a loan commitment once G.E.

22   approves what they're going to.  So the loan application had a

23   request for releases.  The loan commitment did not.

24        Q     Okay.

25        A     I have a copy of the loan commitment if you would

```
 1    like to have it for your files.

 2         Q      No.  I just asked you about the application.

 3         A      Okay.

 4         Q      Okay?

 5         A      Yes.

 6         Q      Fair enough.  Thanks.

 7                Now, if you can go to page 10-6, isn't it true

 8    that G.E. Capital required, as a condition of the loan, that

 9    Mr. Goldstein put up a $600,000 letter of credit from his own

10    personal finances to -- as a reserve for the debt service in

11    case the Carson Rent Review Board did not pass on debt service

12    to the residents at Colony Cove?

13         A      Well, there's one -- yes, they required him to

14    post a $600,000 letter of credit as collateral for the loan.

15    That amount was to be used should the property not generate the

16    income anticipated.

17         Q      Okay.

18         A      There was nothing said about a Rent Review Board

19    agreeing to rent increases.

20         Q      Okay.

21         A      It had to do with the property as a whole.

22         Q      Okay.  Now, if you look at, again, on page 10-6

23    under 8(d), as in dog, the first paragraph, the last line

24    refers to that letter of credit as debt service reserve.  Not

25    collateral.
```

```
 1                    Is that true, Mr. Hansen?

 2        A       Yeah.  It's the same thing.

 3        Q       Did you have any --

 4        A       It says, as additional collateral for the loan,

 5   it has too 600,000 to be used as a debt service reserve.

 6        Q       And that's an unusual provision; is that correct?

 7        A       Not for this loan.

 8        Q       No.  I'm talking in general for financing mobile

 9   home parks, that's an unusual provision; correct?

10        A       It is -- well, I don't know what "unusual

11   provision" means.

12        Q       It's not in all of the applications that -- the

13   hundred or so that you financed, is it?

14        A       I've financed lots of mobile home parks, and I've

15   had all types of collateral, earn outs, et cetera.  So I don't

16   know what "unusual" means.

17        Q       Not common.

18        A       You may find it unusual.  G.E. found it what they

19   needed to make this loan.

20        Q       In your experience in financing mobile home

21   parks, is it uncommon for the lender to require any type of

22   letter of credit as a reserve in case the income doesn't meet

23   the mortgage payments?

24        A       Yes.

25        Q       It is uncommon?
```

**UNITED STATES DISTRICT COURT**

```
 1        A       Yes.

 2        Q       Okay.  Now, did you have any discussions prior to

 3   Mr. Goldstein's purchase of Colony Cove regarding

 4   G.E. Capital's concern over whether Mr. Goldstein could make

 5   his mortgage payments?

 6        A       Did I have -- I'm sorry.  Could you repeat the

 7   question?

 8        Q       At any time prior to Mr. Goldstein purchasing

 9   Colony Cove, did you have any discussions with him regarding

10   G.E. Capital's concern over his ability to make the mortgage

11   payments with the rents that were currently being charged at

12   Colony Cove?

13        A       I don't recall.

14        Q       So there could have been, but you just don't

15   remember.

16        A       I don't remember.  All I do remember is that G.E.

17   required the letter of credit as collateral to make the loan.

18        Q       Now, Mr. Hansen, if you can -- do you recall the

19   length of the loan, the purchase finance?

20        A       Five years.

21        Q       Pardon me?

22        A       Five years.

23        Q       Okay.  And the interest rate or the payments,

24   were those interest only for a period of time?

25        A       One of them was interest only for five years.
```

1   I'm sorry.  For three years.  Then a fixed amount for the last

2   two years.

3           Q       Okay.  So in the first two years of

4   Mr. Goldstein's ownership --

5           A       Three.

6           Q       All of the debt service was all interest and no

7   paying down to the principal; correct?

8           A       That's correct.

9           Q       Okay.  Now, if you can turn to page 10-4 under

10  item 5, interest rate.

11          A       Yes.

12          Q       There were actually two loans that Mr. Goldstein

13  took out; correct?

14          A       No.  There were two tranches.

15          Q       What's a "tranche"?  T-r-a-u-n-c-h-e {sic}.

16  What's a tranche?

17          A       It's a legal term.  I don't know what it is, but

18  it's one loan with two tranches.

19          Q       Okay.  Two different parts.  How is that?

20          A       Okay.

21          Q       All right.  One part had a minimum interest rate

22  of 6.25 percent; correct?

23          A       That's correct.

24          Q       And the second one had a minimum interest rate of

25  8.25 percent.

**UNITED STATES DISTRICT COURT**

```
 1                  Is that your understanding?
 2        A      Yes.
 3                  THE COURT:  We're going to take the afternoon
 4   break.  Ladies and gentlemen, we're going to break for
 5   15 minutes.
 6                  Remember not to discuss the case among yourselves
 7   or with anyone else.  Do not form or express any opinions.
 8   We'll see you in 15 minutes.
 9           (A recess was taken at 3:05 p.m.)
10                  THE COURT:  You may.
11                  MR. ONSTOT:  Thank you, Your Honor.
12        Q      Mr. Hansen, are you back there?  Okay.  All
13   right.
14                  Do you still have the black binder in front of
15   you?
16        A      I'm sorry?
17        Q      Do you still have the black binder in front of
18   you?
19        A      I do.
20        Q      Okay.  Keep it there, but I want you to get a
21   white binder that says 1 of 3 on the spine.
22        A      Okay.
23        Q      Now, if you can turn in that white binder to
24   Exhibit 21.
25        A      Okay.
```

**UNITED STATES DISTRICT COURT**

1     Q      Okay.  Now, earlier just a few minutes ago, like

2   about 23 minutes ago, you said that the loan that Mr. Goldstein

3   got was supportable by the anticipated rents.

4            Do you recall that?

5     A      Yes.

6     Q      Okay.  Now, Exhibit 21, which is in evidence, is

7   Colony Cove's projected 2006 income and expense that we already

8   talked to Noelle Stephens about.

9            Do you know Noelle Stephens?

10    A      Yes.

11    Q      All right.  If you look at the first column under

12  21-1 near the bottom it says "NOI."

13           Do you see it?

14    A      Yes.

15    Q      Okay.  Net operating income, right?

16    A      Yes.

17    Q      And the first -- the second column is the buyer's

18  numbers or the buyer's projection.

19           Do you see where I'm referring to?

20    A      Yes.

21    Q      So the buyer's projected net operating income

22  prior to the purchase of Colony Cove -- that would be

23  Mr. Goldstein's projection -- is what number?

24    A      It says 1,025.

25    Q      Okay.  1,025,000.  Okay.  Now you can put the

**UNITED STATES DISTRICT COURT**

```
 1   white binder away.  You can put the white binder away.

 2        A      Okay.

 3        Q      We're not going to use it anymore.

 4               Now open the black binder to Exhibit 46.  Are you

 5   there?

 6        A      Yes.

 7        Q      Now turn to page 46-11.  Exhibit 46 is

 8   Mr. Goldstein's Year 1 Application for a rent increase.  Okay?

 9   You got page 11 there?

10        A      I do.

11        Q      All right.  Now, the right-hand column, it says

12   "Debt service."

13               Do you see where I'm referring to?

14        A      Yes.

15        Q      Okay.  What's the number for debt service in the

16   Year 1 Application?

17        A      1,224.

18        Q      Okay.  Now 1,224 is greater than 1,025,000;

19   correct?

20        A      Correct.

21        Q      Okay.  My question is, Mr. Hansen, have you, in

22   the course of your career, ever advised any of your clients to

23   take out a loan where the mortgage payments exceed the net

24   operating income?

25        A      Well, I must have because I suggested him to take
```

UNITED STATES DISTRICT COURT

```
 1   this loan.

 2        Q      Okay.  Other than this one?

 3        A      I don't know.  I would have to look back at my

 4   notes to see what mitigating circumstances to make us feel

 5   comfortable.  And when I say "us," I mean General Electric

 6   Corporation that there was sufficient income in place and

 7   collateral in place that they don't have to worry about him

 8   meeting his mortgage payment.

 9             MR. ONSTOT:  Objection.  Move to strike as

10   nonresponsive everything after "this one."

11             THE COURT:  Denied.

12        Q      BY MR. ONSTOT:  I think you said -- did you

13   advise Mr. Goldstein to take this loan?

14        A      Yes.

15             MR. ONSTOT:  Thank you.  No further questions.

16                      CROSS-EXAMINATION

17   BY MR. CASPARIAN:

18        Q      Good afternoon, Mr. Hansen.

19             How many lenders did you solicit offers from for

20   Mr. Goldstein's purchase loan for Colony Cove?

21        A      I discussed it with about 15 to 20.

22        Q      And did you present all those offers to

23   Mr. Goldstein?

24        A      No.

25        Q      How many did you --
```

**UNITED STATES DISTRICT COURT**

1     A      I took the best proposals that we received from

2     lenders, and there were three.  And those three were discussed

3     with Mr. Goldstein.

4     Q      And of those three, was the G.E. loan the lowest

5     fixed rate loan that was offered?

6     A      Yes.

7     Q      And was fix rate interest -- I'm sorry.

8            Was a fixed interest rate typical?

9     A      Yes.

10    Q      Was the amount of the G.E. loan commercially

11    reasonable?

12    A      Yes.

13    Q      What was the loan-to-value ratio on the G.E. loan

14    if you recall?

15    A      78 percent.

16    Q      And that's with the full 18 million with both of

17    the parts or tranches that were referred to before; correct?

18    A      Correct.  The property was purchased for

19    $23 million.  G.E. reviewed the income it placed and determined

20    that that met their underwriting as to value.  And therefore,

21    they divide the $18 million by the 23 million, and it's

22    78 percent.

23    Q      And was that commercially reasonable loan to

24    value at that time?

25    A      Yes.

573

```
 1        Q       Was G.E. Capital a reputable lender?

 2        A       Absolutely.

 3        Q       In fact, they're one of the most significant

 4   lenders to mobile home parks at that period of time, weren't

 5   they?

 6        A       That's correct.

 7        Q       Just a couple more questions.

 8                Mr. Onstot showed you Exhibit 10.  You said that

 9   was just an application; right?

10        A       Yes.  That is correct.

11        Q       That wasn't the actual final loan agreement, was

12   it?

13        A       No.

14        Q       Did the terms of the actual loan agreement allow

15   for what you call release provisions?  Did it allow for

16   Mr. Goldstein to convert the park without having to pay off the

17   entire loan?

18        A       Yes, it did.

19        Q       So if he had converted the park during the

20   five-year term of the loan, he would have had to pay off the

21   entire G.E. loan?

22        A       Correct.

23                MR. CASPARIAN:  No further questions, Your Honor.

24                THE COURT:  Redirect?

25   ///
```

**UNITED STATES DISTRICT COURT**

1                        **REDIRECT EXAMINATION**

2    BY MR. ONSTOT:

3         Q       Exhibit 10, the loan application, that would

4    indicate Mr. Goldstein's intent; right?  His application to

5    G.E. Capital?

6         A       Correct.

7                 MR. ONSTOT:  Thank you.  Nothing further.

8                 THE COURT:  Anything further?  Defense?

9    Plaintiff?

10                MR. CASPARIAN:  Nothing further.  Thank you,

11   Your Honor.

12                THE COURT:  You may step down.  Thank you.  You

13   may step down.  Thank you.

14                Any additional witnesses for the defense?

15                MR. ONSTOT:  No, Your Honor.  The defense rests

16   subject to rebuttal.

17                THE COURT:  Any rebuttal?

18                MR. CLOSE:  Yes, Your Honor.

19                THE COURT:  Sidebar for scheduling purposes.

20           (The following proceedings were held at sidebar:)

21                THE COURT:  What do you have for rebuttal?

22                MR. CLOSE:  Mr. Goldstein.

23                THE COURT:  How long do you think?

24                MR. CLOSE:  Not too long.  15 at most.

25                THE COURT:  Okay.  All right.  Do you want to do

```
 1   it today?

 2                   MR. CLOSE:  Yeah.

 3           (The following proceedings were held in

 4           open court in the presence of the jury:)

 5                   THE COURT:  You may.

 6                   MR. CLOSE:  Plaintiff calls Mr. James Goldstein

 7   back to the stand.

 8                   THE COURT:  Mr. Goldstein, Mr. Goldstein.  You're

 9   reminded you're still under oath.  Thank you.  You're under

10   oath.  You understand.

11                   THE WITNESS:  Okay.

12                   THE COURT:  Thanks.

13                       JAMES GOLDSTEIN,

14           PLAINTIFF'S WITNESS, PREVIOUSLY SWORN:

15                     DIRECT EXAMINATION

16   BY MR. CLOSE:

17       Q     Mr. Goldstein, good afternoon.  Can you hear me

18   okay?

19       A     Yes.

20       Q     Mr. Goldstein, last week and again today you

21   heard Mr. Freschauf refer to some calls he's been receiving

22   from residents.  Are you changing the park rules to allow

23   families to live in Colony Cove Park?

24       A     No.  I have not changed the rules.  I have not

25   allowed the park to be converted to a family park in the ten
```

UNITED STATES DISTRICT COURT

1   years that I've owned it even though I had the right to do so,

2   and nothing has changed.

3        Q      All right.  You have the right under state law to

4   convert the park to permit families to live there?

5        A      I do have that right, but I have not exercised

6   it.

7        Q      Mr. Goldstein, you heard Mr. Freschauf

8   acknowledge that the hearing on the first rent application,

9   your representatives told the board that you would accept a

10  $200 rent increase, the amount necessary to cover the mortgage

11  payments.  Can you tell the jury why you were willing to accept

12  an increase of $200 at the hearing?

13       A      The $200 would have put me in a position of not

14  losing money.  I was hopeful of covering my negative cash flow

15  along with providing me money to make improvements to the park

16  which I had done anyway ultimately because I wanted it to be a

17  top quality park.  I wanted the residents to enjoy the park the

18  way they should be able to enjoy the park.

19              But at any rate, I was willing to accept a

20  $200 rent increase.  And I would have even been open to

21  considering a phased-in rent increase.  I was quite surprised

22  when Ken Freschauf testified that in the past there have been

23  other parks that were phased-in rent increases.  In my many

24  years in Carson, I had never heard of any rent increases that

25  were granted in that manner.  The City never came to me and

 1    said to me that that would be a possibility.

 2              I'm not in favor of giving the residents such a

 3    sudden jolt in their rent, but the Rent Control Ordinance in

 4    Carson forces a property owner to be in that position of either

 5    giving one big increase at one time without the option of just

 6    gradual rent increases over the years.  There have been some

 7    years where no rent increases are allowed by the City.

 8              In review, I have a very strong consideration of

 9    the residents.  I have a conscience and do not want to have the

10    residents forced into some impossible financial condition if I

11    can help it.  I testified earlier that I have worked with

12    residents in the past, and I used the example of El Dorado

13    Mobilehome Park, another park that I own.

14              Ken Freschauf testified that he never heard of me

15    doing that at Colony Cove or Carson Harbor.  I can only say to

16    that that Ken Freschauf is not managing the park.  He's not in

17    a position to know whether or not I did that.  And I would have

18    no reason to be considerate of the residents in one of my parks

19    and not the others.  It doesn't make any sense.

20              My management people were fully aware that I

21    would be able to -- that I would be willing to work with

22    financially-distressed residents.

23         Q    Mr. Goldstein, I just want to be clear on one

24    thing about the phased rent increases.  Was sitting here in

25    court on Friday the first time you had ever heard about the

1    case where the City of Carson gave those owners who had

2    inherited their park a triple digit rent increase phased in

3    over multiple years?  Was that the first time you had ever

4    heard of that when Mr. Freschauf shared that on the witness

5    stand?

6          A       Yes, it was.

7          Q       If you were losing -- while you were losing all

8    this money in those first years at Colony Cove, why did you

9    continue to put more money in to improve the quality and

10   condition of the park?

11         A       I have pride ownership.  I did not want to own a

12   property that has deferred maintenance, that's not high

13   quality, that's not in the condition that I feel the residents

14   are entitled to enjoy.

15               Some owners might take the position, well, if you

16   don't give me the rent increase, I'm not fixing up the

17   property.  That's not the way I operate.  I felt it was my

18   responsibility to maintain the property in the upmost high

19   quality position.

20         Q       Mr. Goldstein, we heard some testimony during

21   this trial about some surplus land at Colony Cove.  Why haven't

22   you yet put in those additional spaces that would potentially

23   allow you to generate more income at the park now that we're

24   ten years since you purchased it?

25         A       I have made every effort to move forward on the

1    construction of 16 additional spaces.  Plans were drawn up.

2    But as I mentioned earlier in this testimony, there have been

3    problems.  Oil wells existed on most of the surplus land.

4    These oil wells had to be kept and had to be deemed safe so

5    that somebody could live on a site that used to contain an oil

6    well.

7            The City found problems with two of the oil wells

8    that were kept and claimed that they were leaking, and these

9    had to be kept a certain time, one of them at a very

10   considerable expense on my part.  The City recently has imposed

11   some conditions to developing the new sites.  I'm working on

12   these now.

13           So I have never given up the plan to add

14   additional spaces, and hopefully one of these days I'll be able

15   to start construction.

16       Q    We heard some references by the City's attorneys

17   here that -- did you know, when you purchased Colony Cove, you

18   would have some losses in that first year before you could make

19   a rent application?

20       A    I've been through the long tedious process of

21   applying for rent increases because of my ownership at

22   Carson Harbor.  So I knew, number one, that I had to show a

23   history of 12 months of income and operating expenses.  So I

24   knew that it would be at least the one year just for that plus

25   the time required to submit the application and get a rent

**UNITED STATES DISTRICT COURT**

1    increase decision.

2          So I was prepared to go through some temporary

3    time period at the beginning of suffering losses.  I wasn't

4    buying the park for a quick fast profit.  That's not my style.

5    I don't flip properties.  I wanted to be able to sustain and

6    keep a high quality mobile home park that would provide me with

7    a fair return and keep the residents happy at the same time

8    with rents that were below market but not 50 percent below

9    market.

10         Q    Mr. Goldstein, why have you had your company, the

11   plaintiff in this case, bring this lawsuit against the

12   City of Carson and the City of Carson Rent Control Board?

13              MS. AILIN:  Objection.  Irrelevant.  Outside the

14   scope.  Improper hypothetical.

15              THE COURT:  The question isn't completed.  I

16   don't know what the question is.

17         Q    BY MR. CLOSE:  Why have you brought this lawsuit

18   against the defendant?

19              MS. AILIN:  Improper rebuttal.  Irrelevant.

20              THE COURT:  Sustained.

21         Q    BY MR. CLOSE:  When you purchased the park in

22   April, 2006, did you expect to receive a rent increase

23   sufficient to pay the bills?

24         A    Absolutely.

25              MS. AILIN:  Objection.  Vague and ambiguous.

```
 1    Irrelevant.
 2                   THE COURT:  Overruled.
 3                   MR. CLOSE:  No further questions, Your Honor.
 4                   THE COURT:  Cross?
 5                   MS. AILIN:  Yes, Your Honor.  If I can have a
 6    moment.
 7                   THE COURT:  Sure.
 8                   MS. AILIN:  I need to show something to
 9    plaintiff's counsel, Your Honor.
10                   THE COURT:  Sure.
11                         CROSS-EXAMINATION
12    BY MS. AILIN:
13         Q     Mr. Goldstein, you never asked the
14    Rent Review Board to phase in a rent increase for Colony Cove,
15    did you?
16         A     I'm sorry?
17         Q     You never asked the Rent Review Board to phase in
18    a rent increase for Colony Cove, did you?
19         A     I didn't think it was allowable under their
20    system.
21         Q     Have you ever given a resident in Colony Cove a
22    break on the rent?
23         A     Yes.
24         Q     How many times?
25         A     I don't know.
```

582

1      Q      And I'm assuming you also can't identify the

2  resident?

3      A      I also what?

4      Q      You can't identify the resident, can you?

5      A      No.  I do not handle the day-to-day management of

6  the park.

7      Q      You testified a few minutes ago that you did not

8  buy the park as a quick profit.  You bought it as a long-term

9  investment, didn't you?

10     A      Yes.

11            MS. AILIN:  Nothing further.

12            THE COURT:  Anything further?

13            MR. CLOSE:  No, Your Honor.

14            THE COURT:  You may step down.  Any additional

15  rebuttal?

16            MR. CLOSE:  No, Your Honor.

17            THE COURT:  Any surrebuttal?

18            MR. ONSTOT:  No, Your Honor.

19            THE COURT:  Ladies and gentlemen, we're just

20  going to take a short break.  I'm going to discuss a couple

21  scheduling matters with the attorneys, and I'll let you know

22  how we're going to proceed the rest of the way.  Thank you.

23            (The following proceedings were held in

24            open court out of the presence of the jury:)

25            THE COURT:  I think there's three issues I want

**UNITED STATES DISTRICT COURT**

1   to address.  One is I'm prepared to settle the jury

2   instructions after a short break.  So what I would propose is

3   this.  I'll make my rulings on the disputed instructions along

4   with some comments about -- I think we need a couple of

5   instructions that were omitted and then questions about whether

6   a few of the joint are necessary.

7           Then what I'd like to do to be more efficient,

8   because of my staffing situation, is that someone will be

9   charged with the task of revising the jury instructions

10  consistent with my rulings.  Then we'll -- and special verdict

11  forms.  And I'll give you some instructions about that.

12          And then I would propose that we -- so you'll

13  know what the instructions are going to be when you leave

14  tonight.  And then propose that we review the final version at

15  9:00 o'clock tomorrow.  It gives us time to make any changes if

16  there's a dispute about whether or not the final version is

17  consistent with my rulings.  And then have the jurors come back

18  at 10:00 o'clock and then have instructions -- preinstruct,

19  instructions and then have closing arguments.

20          Any issues with that proposal?

21          MR. CLOSE:  None from plaintiff.

22          MR. ONSTOT:  None from defense.

23          THE COURT:  Okay.  Then, also, too, just so that

24  you know in terms of scheduling, I don't want to break up

25  arguments.  Tomorrow I have some bit of lack of flexibility.

584

```
 1    I've got to cut out at 11:55 for an Executive Committee
 2    meeting.  So we have to schedule it in a way that nobody is cut
 3    off at 11:55.  I want you in the morning to think about how
 4    long you project in your closing argument so we can break
 5    appropriately without interrupting anyone.
 6              Then I want to hear counsels' thoughts.  Juror, I
 7    believe in seat No. 2, Mr. Laughlen, I had made the comment
 8    that I observed him sleeping during both opening statements.  I
 9    watched him fairly closely during the course of the trial, and
10    he's been engaged, and I haven't noticed him fall asleep again,
11    and he seems to be engaged in the trial.  Do the parties have a
12    proposal as to what to do with Mr. Laughlen?
13              MR. CLOSE:  Plaintiff -- I actually observed him
14    on Friday in response to the Court's comments, and he did seem
15    quite engaged.  I didn't notice any issues today.  So I think
16    he should -- I have no issue with him remaining on the jury.
17              THE COURT:  Okay.  Defense?
18              MR. ONSTOT:  We don't have an issue either.
19              THE COURT:  So no one is requesting that he be
20    relieved; is that correct?
21              MR. CLOSE:  That is correct, Your Honor.
22              THE COURT:  Then I just need to make a ruling --
23    there was left over -- remind me.  What's the exhibit number
24    with regard to the investigation?
25              MR. CLOSE:  62, Your Honor.
```

1          THE COURT:  62.  So let's talk about 62 when I

2     come back from break.

3          Let's go ahead and bring the jurors out and tell

4     them the schedule and let them know where we're at.

5          (The following proceedings were held in

6          open court in the presence of the jury:)

7          THE COURT:  Before you left today, I wanted to

8     give you an update as to where we're at so you can have a

9     complete understanding of what's left in the case.

10          So as to this point in time, you've heard all of

11     the evidence.  Tomorrow morning I'm going to have you come in

12     at 10:00 o'clock.  Not 9:00 o'clock.  The reason for the delay

13     is we're working on the correct instructions on the law.  So

14     I'm assuming we'll be ready at 9:00 o'clock, but I'm not sure.

15     So I don't want to have you wait back there for an hour as we

16     look for typos or any problems we have in the instructions.

17     We'll bring you back at 10:00.  We should be ready to go.

18          Then what will happen next is I will give you the

19     instructions on the law, and then the lawyers will have the

20     opportunity to make their closing arguments.  So I suspect that

21     you will begin your deliberations sometime tomorrow afternoon

22     which probably puts us about a day ahead of schedule.  Half a

23     day to a day ahead of schedule.  So that's the good news as

24     well.

25          But until that moment tomorrow afternoon, you're

 1    not to discuss the case among yourselves or with anyone else.

 2    Don't form or express any opinions about the case, and we'll

 3    see you tomorrow at 10:00 o'clock.

 4            (The following proceedings were held in

 5            open court out of the presence of the jury:)

 6                THE COURT:  We'll resume in 15 minutes.

 7        (A recess was taken at 3:56 p.m.)

 8                THE COURT:  Okay.  Exhibit 62, I'm not -- last

 9    opportunity for the plaintiff.  I'm not quite seeing how it

10    comes in.  It's multiple levels of hearsay.

11                MR. CLOSE:  Thank you, Your Honor.

12    Matthew Close.

13            Well, clearly we cleared the hearsay under the

14    fact of public record, adoptive admission, admission by an

15    agent.  Those are either not hearsay or hearsay exceptions.  I

16    mean, this is a --

17                THE COURT:  You said the individual people that

18    were interviewed?

19                MR. CLOSE:  Well, so I think for -- first of all,

20    the public records exception allows admission for the findings

21    and the contents of the public record.  So I think the public

22    record exception does clear all the hearsay requirements.

23    That's -- by definition, the public record would be -- would

24    contain investigations and findings.  That's the basis for the

25    exception.

1          In addition, I think the other --

2          THE COURT:  But that wouldn't apply to the

3    entire -- even if it deemed it applies, it wouldn't apply to

4    the entire document, would it?

5          MR. CLOSE:  We think it would.  I mean, the

6    entire document is the public record on the City's website.

7    They adopted it in its entirety, taken official action on the

8    basis thereof.  I do believe the public record exception would

9    clear all hearsay objections to the document in toto.  That's

10   the basis for the public record exception.

11         With respect to the adoptive admission and

12   admission of party exceptions to the hearsay rule, we would

13   submit that the document is -- and the report is relevant to

14   show that the actions the City have taken and, based on the

15   statements made by these people, whether or not they are --

16   whether or not the truth of the matter is asserted in the

17   report are true, the fact of the report, the fact that the

18   statements were made, the fact that the city council endorsed

19   adopted, ratified, and took official government action based on

20   those statements is relevant to the credibility of witnesses

21   who get on the stand and say, yeah, just all sort of suddenly

22   happened.

23         THE COURT:  Isn't that though -- assume for the

24   moment that you're correct and then the analysis turns over to

25   403 and you were given the opportunity to examine Freschauf.

1                MR. CLOSE:  I believe it's Mr. Freschauf.

2                THE COURT:  You were able to use the report to

3    make the points -- exact points that you're raising today.  Are

4    they really relevant to anyone else other than to him, and his

5    perception is -- about the mayor and then the defense's

6    explanation, well, it didn't relate to that period.

7                But weren't you allowed to use that -- use a

8    portion of the report to accomplish what you just mentioned,

9    and then to let in the whole report, doesn't that implicate

10   403?

11               MR. CLOSE:  Well, I agree with your premise to a

12   degree, but I think that actually proves my point that it does

13   have relevance to the case.  The jury has heard about it.  Then

14   the question really becomes at this point is its relevance

15   substantially outweighed by unfair prejudice?

16               In my mind, Your Honor, the question isn't

17   whether or not I need it.  Question is really it is relevant.

18   I mean, it was the City's attorney that asked the first

19   questions about the issues discussed in the report.  She did

20   not raise the report, but they asked questions designed to sort

21   of get ahead of it.  So I think there's no question of its

22   relevance.  And the jury has heard about it.

23               The real question under 403 becomes what's the

24   unfair prejudice that substantially outweighs that relevance?

25   The fact that I already have some relevant evidence in I don't

1    think really alters that balance.

2              THE COURT:  Is there a portion of the report that

3    discusses the time frame that's being investigated?  Because

4    it's a 2015 report, and I can't glean --

5              MR. CLOSE:  So there are portions of the report

6    that describe the tenure of -- let me get it another way.  It's

7    not crystal clear.  The report does relay incidents going as

8    far back as '07.  But the report doesn't sort of give -- my way

9    of reading it, doesn't say our scope is limited or we're only

10   investigating this time period.

11             And, in fact, the fact that the report does, with

12   respect to certain personnel, talk about time periods that do

13   overlap with exactly the relevant period in this case seems to

14   cut against any suggestion that the report itself focuses only

15   on a narrow period of time that post dates the period at issue

16   in this litigation.

17             THE COURT:  62 is not admitted.  At the very

18   least, it's pursuant to 403.

19             Let's walk through the jury instructions.

20   Starting, if you have handy, the joint jury instructions.

21   There's one that needs to be added now, and that would be

22   Model 1.1(c) which begins "You have heard all the" -- "Members

23   of the jury, now that you've heard all the evidence, it is my

24   duty to instruct you on the law."  So that preliminary one.

25             Then it should be amended or edited to reflect

1     that I preinstruct.  So the bracketed portion with regard to --

2     and the arguments of the attorneys needs to be deleted.

3            I'll leave it -- some trials I -- most trials I

4     do, not all trials do I, repeat most of the preliminary

5     instructions.  I'll leave it to the parties, whatever the

6     parties want to do.  It's not controversial.  However, we need

7     to leave in, I think -- well, anyway, I'll leave it to the

8     parties to sort that out tonight.

9            Then I have some questions as to whether other

10    instructions are applicable.

11           So starting with Instruction No. 13, stipulations

12    of fact, that is applicable.

13           14 is not applicable; so it shouldn't be given.

14    That's depositions.

15           Now, there was some reading of deposition

16    testimony as it relates to impeachment, but I'm not sure it's

17    appropriate to give Instruction No. 15.

18           Any thoughts?

19           MR. ONSTOT:  Defense agrees.

20           THE COURT:  Pardon me?

21           MR. ONSTOT:  Defense agrees.

22           THE COURT:  There were inconsistent statements,

23    but I wouldn't go so far as to saying lying under oath.  That's

24    a bit far.  And they're also given the credibility -- assuming

25    that you'll select to regive the credibility of witnesses, that

1   would solve -- that would take care of it.  But you have to

2   make sure you give that instruction.

3               MR. PORTNOI:  Agreed, Your Honor.

4               THE COURT:  Okay.  16 is applicable.

5               17, were there charts and summaries not received

6   in evidence?  Someone has to refresh my recollection.  Were

7   there charts and summaries not received?

8               MR. CLOSE:  I think so from both experts.

9               THE COURT:  If that's your memory, if that's

10  everybody's memory, let's just give it.  Were there charts and

11  summaries not received in evidence?

12              MS. AILIN:  I think they actually were all.

13              THE COURT:  That's my recollection all charts and

14  summaries were received in evidence.  I could be -- I could be

15  wrong, but I got the impression everything came -- everything

16  is in.

17              MR. ONSTOT:  It is.

18              MR. PORTNOI:  To clarify, it's your position that

19  all the demonstratives we used are admitted into evidence?

20              THE COURT:  That's my recollection.  There wasn't

21  anything presented for summary purposes.  Or, for example, the

22  HP, the different scenarios, I thought those were admitted into

23  evidence.  That I'm fuzzy on.  That's the reason I'm balking.

24              MR. ONSTOT:  Well, Your Honor, there are

25  demonstratives that will be used in closing that were not used

1    in opening and not admitted.

2              THE COURT:  When we're talking about charts and

3    summaries not received in evidence, I think that's different.

4    That's during the course of the taking of testimony as opposed

5    to argument that's going to be used at closing or at opening.

6    These are summary charts, things like that.

7              MS. AILIN:  If it's not clear, Your Honor, we

8    could just stipulate that all of the ones that were used during

9    witness testimony are admitted.

10             MR. PORTNOI:  We would stipulate to that.

11             MR. CLOSE:  Yes.

12             THE COURT:  So if there's a problem though --

13   here's the problem.  So it's going to be after instruction and

14   argument that you're going to meet with Ms. Hernandez, and

15   there had better not be disagreement about this because then

16   everything is done.  I don't expect there to be but -- so as

17   long as you're sure you're going to agree to this.  I don't see

18   a problem with it.  So let's not give it.  That's an

19   anticipated problem that probably doesn't exist.

20             And the rest of the joints are applicable.

21             MR. ONSTOT:  Your Honor, No. 4 would be

22   inapplicable, evidence for a limited purpose.

23             THE COURT:  That's true.  Those were preliminary.

24   So I definitely would not -- why don't I just make the

25   decision.  So I would include in the instructions 2, 3, 5, 6,

```
 1    7, 8, 10.  Those will be the preliminaries I would say include.

 2              Does anyone want another one that I didn't add?

 3              MR. ONSTOT:  Not from the defense.

 4              MR. PORTNOI:  How will the Court handle it if the

 5    jury requests to hear the transcript?

 6              THE COURT:  That's not going to happen.  I can't

 7    give you a straight answer because it could be like -- it could

 8    be no.  It could be everything.  I mean, the other part of the

 9    answer is I don't know.  I know in the criminal case I have to

10    give all of the testimony.  I'm not so sure about the civil

11    case.  I would want to think about that.

12              They may say, hypothetical, did Joe say the light

13    was red or green?  So typically in state court I would just go

14    find the part where Joe said the light was red or green and

15    read that portion back.  In a civil case, I don't know if I can

16    do that.  I know I can't do it in a criminal case.  So it just

17    depends on the nature of the read back and counsels' input.

18              If we get a request for read back, I'll meet with

19    everybody, and we'll make a decision what to do with it.  The

20    short answer is I don't have a definitive answer.

21              MR. PORTNOI:  Instruction 9 I think we agree does

22    not need to be given.

23              THE COURT:  Okay.  So basically what the homework

24    is going to be is you're going to start with 1.1(c), and then

25    you're going to go to 2, 3, 5, 6, 7, 8, 10, 13, 16, 18.  And
```

1    then we're going to go into the disputeds.

2              Disputed -- let's start with the plaintiff's

3    disputed.  I've already ruled on 2 and 3.  However, I edited 2

4    when I read it.  So I will give that edit to whoever is doing

5    the homework to change.

6              I've given 3 already.

7              MR. PORTNOI:  To clarify, that's to change it to

8    conform with the trial transcript?

9              THE COURT:  I'll give you my edit.  So it's what

10   I read.  Let me walk through the plaintiff's.  We'll go through

11   them one-by-one.

12             I'm not -- especially in light of the testimony

13   with Mr. Ellis, I'm not going to give 14, judicial notice.  Any

14   last word on that?

15             MR. PORTNOI:  Your Honor, I would argue that it

16   is more necessary in light of Mr. Ellis' testimony.  This has

17   been present in the jury instructions at the beginning.

18   There's been no dispute that those are the correct numbers.

19   Those are the ones included on the page.  Chambers had the

20   opportunity to double check them as did defendants.

21             THE COURT:  I think, though, what you can say is

22   they've been admitted into evidence.  So I don't -- I don't

23   feel in a position, especially now that I've heard the

24   testimony, to say that judicial notice would be appropriate

25   given that I now know when I go to Yahoo, when I go to the

1    index that was used by Mr. Ellis -- you have the Yahoo in

2    evidence.  That's what the jurors have.  They don't have the

3    other version.  But I don't feel comfortable putting my

4    handprint in terms of judicial notice.  So that won't be given.

5           20, I don't think inference is appropriate.  What

6    are your thoughts?

7           MR. PORTNOI:  May I go to the lectern?

8           THE COURT:  Sure.

9           MR. PORTNOI:  Your Honor, plaintiff agrees that

10   the adverse inference is necessary in this case.  We attempted,

11   as diligently as possible, to depose Mr. Dear and at all times

12   were represented that Aleshire & Wynder, defendants' law firm,

13   were, in fact, representing him.

14          We were at one point informed that the deposition

15   was going to be put off because Mr. Dear would only appear for

16   a deposition if represented by Mr. Wynder who at that time was

17   on a Mormon mission.  We accommodated that request.  We

18   accommodated request for extension after extension until

19   defendants ran out the clock and the city council certified a

20   recall and terminated him.

21          We do think that we've been denied the

22   opportunity to take evidence.  Given what the testimony has

23   been thus far, I think the inference is entirely reasonable

24   that what testimony we would have received in deposition would

25   have been adverse.  I think the case law that is cited with the

1    instruction is also quite clear that adverse inferences apply

2    to depositions and may apply as well in situations such as this

3    when somebody is their employee.

4           Mr. Dear was on their witness list until the day

5    he was -- his certification was recalled.  This was not -- this

6    all came as an immense surprise very late in the process.

7           THE COURT:  All right.  I will deny the request

8    for adverse inference.

9           All right.  So as to -- I would give 21 and 22.

10          23 I would edit.  My proposed edit would be to

11   simply track more closely *Penn Central*.  So, for example, in --

12   this is what I would propose.  So at page 29 of -- so now we're

13   talking about Jury Instruction 23, the disputed.  I would say

14   at line -- page 29, line 23, I would delete "and severity" so

15   it would just read "The extent of the interference with

16   plaintiff's reasonable investment back expectations."  And then

17   moving over to page 30, I would place a period at line 1 after

18   the word "action."  And then I would delete everything from

19   line 1 through line 12 so you would simply have the three

20   factors from *Penn Central*.  That would be my tentative.

21          Then you can see now the -- any thoughts first

22   from the plaintiff?

23          MR. PORTNOI:  I'm not clear.  Are you keeping in

24   lines 14 through 23?

25          THE COURT:  Yes.

1          MR. PORTNOI:  Your Honor, I don't think we object

2     to your edit on 29 or your edits on lines 1 through 3.  I do

3     believe that the case law says that this *Penn Central* case is

4     not limited to only the three factors.

5          THE COURT:  I understand that.  So, for example,

6     you see the character for the government action.

7          MR. PORTNOI:  Yes.

8          THE COURT:  Really I think encompassed in that is

9     portions of 4, 5, and 6, the easiest being 6, the character of

10    the action.  It could be argued in that ambit is the political

11    motivation.  All of a sudden you see -- judges tell you

12    consider character of the action.  Well, that includes the

13    politics of the City that you heard -- you know, whatever

14    evidence you could point to you could put under that category.

15         So I think the categories are broad enough that

16    4, 5, and 6 you can fashion an argument under 1, 2, and 3.

17         MR. PORTNOI:  To be clear, so as to all 4, 5, and

18    6, if Mr. Close is arguing at closing the language that is in

19    there without saying it's in the instruction and says these are

20    factors, you know, that you should consider when thinking about

21    the character of the government action, he's entitled to do

22    that without an objection that this instruction has been

23    rejected, Your Honor?  That's --

24         THE COURT:  I think if you can offer the -- you

25    tell me that there's a way that you can't argue it.  So the

example that I gave you is that the Court has told you that you

can consider the character of the government action.  So I

just -- at least as to that example, okay, you heard evidence

about whatever the politics of the situation was.  So,

therefore, you can consider that in balancing these factors.

Now, is there anything about 4 and 5 that you

don't think you could pigeonhole into 1, 2, and 3?

MR. PORTNOI:  I think, based on your prior -- on

the way you described how argument should go, I believe that we

could pigeonhole.

THE COURT:  Yeah.  So the judges -- the Court has

told you about factor No. 2 which is "X."  Here's the evidence

that talks about the allocation of burden as it relates to --

here's the evidence.

I feel it's just cleaner to just use

*Penn Central*.  I understand it doesn't say that other factors

can't be considered, but I think 1, 2, and 3 gives you the

ability to argue things you want to argue.

Anything else?

Defense on this point?  I think it's more

consistent.  That's what I read the defense to be saying in

some respects.

MR. MALAWY:  Yes, Your Honor.  We do agree with

you on that, that the second portion of that factor No. 3

should not be in the instruction.

1              THE COURT:  That's what I said.  I said there's a

2    period after "action."

3              MR. MALAWY:  Yes.  We agree -- defense agrees

4    with that, Your Honor.

5              THE COURT:  Yeah.

6              MR. MALAWY:  The one issue that we have with

7    Your Honor's proposed tentative instruction is page 29,

8    lines 13.5 to 15.5 there where it says justice in -- "Plaintiff

9    must establish by a preponderance of the evidence that justice

10   and fairness require that the economic injuries caused by

11   defendants be compensated by the government rather than remain

12   concentrated on the plaintiff."

13             We're not going to object to preponderance of the

14   evidence right now, but this sentence makes it seem like the

15   entire analysis is whether the jury believes that it's just and

16   fair that the injury is caused by the defendants should be

17   compensated.

18             But just and fair are not part of the

19   *Penn Central* analysis.  The analysis that the jury should

20   perform is to go directly to the factors.  The factors are not

21   determining whether the City's action is just and fair.

22             THE COURT:  So are you saying so -- do I

23   understand you correctly that then what you would say is, to

24   prove defendants affected a taking without just compensation in

25   violation of the 5th Amendment, plaintiff must establish by a

1    preponderance of the evidence, colon -- well, see, then I don't

2    know how to transition it.  But then you transition to line 17

3    in determining.

4              MR. MALAWY:  You could say plaintiff must

5    establish by a preponderance of the evidence that defendants'

6    actions constituted a taking -- a regulatory taking or taking

7    under the Constitution, and then go on, "In determining," the

8    next paragraph whether it affected a taking.

9              THE COURT:  Okay.  Anything else on this

10   instruction?

11             MR. MALAWY:  No, Your Honor.

12             THE COURT:  Okay.  So let me hear from the

13   plaintiff.  That has a nice simplicity to it because then we go

14   right into -- you had the prove by a preponderance of the

15   evidence of the taking, and then the next sentence you say and

16   this is how you figure out whether it's a taking.

17             MR. PORTNOI:  I have a few comments, Your Honor.

18             First off, this is an instruction to finding what

19   a regulatory taking is.  And we've made the instructions

20   circular by essentially saying regulatory taking occurs when

21   the jury finds by a preponderance of the evidence that this is

22   a regulatory taking.  I think that we have to have that

23   sentence there.  I think you just said then we transition.  I

24   think we're going to wind up back needing to transition using

25   justice and fairness language.

1          To be clear, Mr. Malawy said this is not language

2    that's in *Penn Central*.  At *Penn Central* 438 U.S. 123, that

3    'The Court has been unable to develop any set formula for

4    determining when --"

5          THE COURT:  Slow down.  Especially when you read

6    you have to slow down.

7          MR. PORTNOI:  "When justice and fairness require

8    that economic injuries caused by public action be compensated

9    by the government rather than remain disproportionately

10   concentrated on a few persons."  And this language is designed

11   to quote that as closely as possible, if not slight

12   paraphrasing, to make it into a jury instruction.

13         You know, I also have at the lectern defendants'

14   Instruction 23, and this is where we've been from the

15   beginning, that there hasn't been from the very beginning a

16   proposal on what the -- you know, you have to balance factors.

17         Thinking about an excessive force case, you may

18   have a whole bunch of factors underneath, but up top you need

19   to have some statement of this is what the jury is trying to

20   find.  Was the force too much?  And in this case what the jury

21   is trying to find is whether injustice and fairness, this the

22   kind of economic injury that should be borne by the public and

23   not an individual.

24         THE COURT:  All right.  I'll leave that paragraph

25   in tact.

**UNITED STATES DISTRICT COURT**

1          Before I get to the special verdict, what I would

2    say as to the defendants' disputed, I would not give any of the

3    disputed proposed by the defense.

4          Any that counsel wants to be heard on?  I think

5    all the things that you have in there are great for argument

6    when you point to the guidelines or the ordinance but not to be

7    instructed on the law.  Certainly those are the things of your

8    case, but I'm not sure it's appropriate for instruction.

9          Any last word?

10         MR. MALAWY:  Thank you, Your Honor.

11         The only thing I would note is they are things

12   that can be argued but they are things that have been decided

13   before.  I guess it's similar to our motion in limine arguments

14   that Colony Cove is collaterally estopped from denying as a

15   matter of law that Carson changed the rules because Carson

16   always -- any rent method has always been allowed to be applied

17   under Carson's ordinance.  And the 9th Circuit has already held

18   that in the prior litigation in this case.

19         And it's the same for all of the other jury

20   instructions 34 through 38 that, similar to the argument that

21   we made in our motions in limine, these are things that do not

22   need to be argued again because they've already been decided,

23   and Colony Cove is collaterally estopped from arguing

24   otherwise.

25         THE COURT:  The defendants' disputed will not be

```
 1    given.

 2              Now let's talk about the special verdict.  When I

 3    first read the plaintiff's proposed special verdict, I said to

 4    myself why isn't year one broken off from year two?  Then as I

 5    try to figure out how to do it breaking year one to year two

 6    because of the way the case has been presented on both sides,

 7    I'm not sure how to do it because the -- the damages become

 8    difficult.  It becomes confusing.  But I mean, at my first

 9    brush, I was -- how do you -- you should separate one and two.

10              Let me hear from the defense about this, whether

11    or not the causation point solves the problem.

12              Go ahead.  Special verdict.

13              MR. ONSTOT:  Your Honor, they should be, for lack

14    of a better term, bifurcated because the situation for year

15    one, remember, was based upon the loan and the rents that

16    accrued before the City took any action.  The City then took

17    action on application No. 1 and went forward to No. 2.

18              So the causation element with regards to those

19    two separate years is different because they're saying they

20    should be compensated for year one for things that the City had

21    no role in allegedly creating.  And the situation is different

22    from number two because there's a time period between the

23    City's action on year one and the City's action on year two.

24              THE COURT:  So are you comfortable with -- let's

25    say, so paragraph one using the language proposed by the
```

```
 1    plaintiff, isolate year one, yes or no.  Go to question 2.

 2    Year two, yes or no.  Then if you answer questions one or two

 3    yes, either one, go to question which would be 3.

 4               MR. ONSTOT:  Yes.

 5               THE COURT:  That seems workable.  So is that --

 6    that's not exactly what you proposed in your special verdict,

 7    but that does satisfy what you're arguing in terms of breaking

 8    one and two out and being able to argue them separately.

 9               MR. ONSTOT:  Correct.

10               THE COURT:  I guess what you're saying is, if

11    there's a fallback position -- at the end of the day, the jury

12    has to analyze each year separately.

13               MR. ONSTOT:  True.

14               THE COURT:  Let me hear from the plaintiffs.

15               What's wrong with 1, year one; 2, year two.  Then

16    the instructions says, if you answer question 1 or 2 yes, then

17    answer question which now becomes 3.  And then you can make the

18    arguments and put in whatever number you feel comfortable with.

19               MR. CLOSE:  I suppose the main problem is that it

20    misstates plaintiff's case.  Plaintiff brought one claim for

21    relief that was based on year one and year two, and the

22    gravamen, in general, of our Complaint and the way the cases

23    come in has been about amendment to the guidelines, a series of

24    actions that began when we purchased the park and continued.

25               THE COURT:  I'm agreeing with some respects.  I
```

```
 1    mean, if the plaintiff wins, I would be stunned to see a "yes"
 2    and a "no."  But still, despite how the claim is couched, each
 3    year is -- each year there's a different set of circumstances
 4    for each year.  Although it wouldn't be consistent with my
 5    thinking, but a juror could say, well, year one, no.  Year two,
 6    yes.  Or year one, yes, or year one, no.  As opposed to an
 7    all-or-nothing proposal.
 8                 I'm not sure what the arguments look like.  I
 9    mean, I'm not clever enough to see how I would -- also, it's a
10    hard argument to make for me to decide.  I get that.  It may
11    not even be made.  I don't know.  If both sides started
12    arguing, would we take an all-or-nothing position as opposed --
13    for example, I don't see the fallback position of the defense
14    to say, well, you should say no but, if you're inclined, say
15    yes to two.
16                 That's inconsistent with the way the case has
17    been presented.  You're right.  You're absolutely right.  But
18    it just seems to me that the preponderance of the evidence has
19    to support both years.  They're separate years, different
20    actions.
21                 Last word?
22                 MR. CLOSE:  It's either year; right?
23                 MR. PORTNOI:  Again, either year --
24                 THE COURT:  Either year.  If you've answered 1 or
25    2 yes, then you go down to 3.
```

**UNITED STATES DISTRICT COURT**

1           MR. PORTNOI:  Subject to the argument I made,

2    that's it.

3           THE COURT:  I'll accept plaintiff's verdict with

4    the amendment.

5           So you're going to break out 1 and 2, and then

6    you're going to change the instructions.  So if you answer

7    questions 1 or 2 yes, then you're going to go to question 3.

8    Questions 2 and 3.  Or now it's 3 and 4.  Okay.

9           I think I've covered everything.  Let's review.

10          MR. ONSTOT:  One more, Your Honor.

11          On the joint, I don't know if Your Honor

12   commented on 18 to 24.  Those are charts and evidence --

13          THE COURT:  Yes.  I think those should be given.

14          MR. PORTNOI:  Your Honor, looking at the verdict

15   form, the prejudgment interest statement, it occurs to me -- I

16   don't believe I ever heard you rule on our proposed No. 25

17   which is an instruction on prejudgment interest.

18          THE COURT:  I would give it.

19          Let me summarize.  What I'll do is plaintiff

20   prepare the final instructions consistent with my instructions.

21   So the final instructions should be a clean set.  Should be

22   Instruction No. 1, for example, with no description.  So you

23   wouldn't put burden of proof, preponderance.  You would just

24   have Instruction No. whatever.

25          So what I would propose you would do is you would

1   start with 1.1(c) indicating that the Court preinstructs.  2,

2   3, 5, 6, 7, 8, 10, 13, 16, 18.  Then you would go into claims

3   and defenses, preponderance of the evidence.  You would go into

4   2 and 3, and then you would go into the plaintiff's disputed

5   that I have ruled upon.

6               Does that make sense?  Is that clear?  Okay.  I'm

7   looking at the scriptner.  You're the one doing the work.

8               MR. TULLY:  Yes, Your Honor.

9               MR. CLOSE:  I think we're okay.

10              THE COURT:  So you can approach and just take my

11  edits on plaintiff's and defenses'.

12              So we'll meet at 9:00 o'clock.  Also, I want the

13  clear sets, one for each other, one for the Court.  And then

14  give me the disc just in case there's a dispute and we need to

15  make a last-minute edit so I can make those edits, and we'll

16  make multiple copies for everybody.

17              MS. AILIN:  If you're still on jury instructions,

18  I'm going to be changing the subject.

19              MR. CLOSE:  I was going to go to sort of

20  housekeeping stuff.  So you go first.

21              THE COURT:  Let me clean this up first before I

22  get confused.  Hold on a second.  Okay.

23              MS. AILIN:  Your Honor, this morning during

24  Mr. Freschauf's testimony, I was asking him questions about

25  litigation involving Mr. Goldstein's other mobile home park

```
 1   Carson Harbor Village.  Your Honor stopped me based on a motion
 2   in limine that Your Honor had ruled on and instructed the jury
 3   that I had violated your order on that.
 4              What I'd like to point out is that the motion in
 5   limine did not deal at all with litigation involving
 6   Carson Harbor Village.
 7              THE COURT:  I agree.  But I think my recollection
 8   was that your question was not limited to Carson Harbor.  Your
 9   questions were limited into lawsuits against the City.  And the
10   problem that I had with that is that within that -- I would be
11   mistaken if you just asked about Carson Harbor.  But I think
12   the question was broader than that, and it included a subset
13   that I at that point didn't have any understanding, much like
14   the day before, if it included the state court litigation
15   relating to Colony Cove.  That's why I did what I did.
16              MS. AILIN:  I believe that my questions were
17   specific to Carson Harbor Village, and I will check the
18   transcript tonight.
19              THE COURT:  If you're correct, I will -- if
20   you're correct and I was incorrect, then I would -- you can
21   propose some curative instruction that I was incorrect when I
22   admonished you.
23              MS. AILIN:  Thank you, Your Honor.  We will bring
24   it up in the morning after I've had a chance to look at the
25   transcript.
```

1          THE COURT:  My recollection is that the question

2  was broad as to lawsuits.  If you were asking solely about

3  Carson Harbor, I think you're right.  But my reading was

4  broader -- I thought it was more consistent than the time

5  before when we were talking about lawsuits and then I confirmed

6  with those lawsuits was a subset of a subject of the motion in

7  limine.

8          Bring it to my attention, and I'll give a

9  curative instruction.

10          MS. AILIN:  Thank you, Your Honor.  I'll look at

11  the transcript tonight.

12          THE COURT:  Okay.

13          MR. CLOSE:  Your Honor, just a couple questions

14  about closing argument procedure with the Court.  I assume

15  plaintiff can have rebuttal in closing.

16          THE COURT:  Yes.

17          MR. CLOSE:  Okay.

18          THE COURT:  It should be rebuttal.  It's not

19  sandbag.

20          MR. CLOSE:  I understand.  No problem publishing

21  trial testimony?  What's the Court's preference practice on

22  closing demonstratives, the exchange of them?

23          THE COURT:  Same as opening.  Make sure I know of

24  any objection before it happens.

25          MR. CLOSE:  So better to exchange them and

 1   determine what's --

 2                THE COURT:  Right.  Unless you want to -- so you

 3   don't really want to be interrupted with a sidebar and take

 4   down your demonstrative.

 5                MR. ONSTOT:  We've already exchanged them.  It's

 6   a matter of discussing them.

 7                MR. CLOSE:  There will be new ones for closing

 8   now that the evidence is in.

 9                Anything else we have questions on?  I don't

10   believe so.

11                THE COURT:  Do you have any guess as to what your

12   opening closing is going to look like timing?

13                MR. CLOSE:  Well, let's see.  We're getting them

14   at 10:00 a.m. tomorrow.  Under an hour for sure.  Whether it's

15   closer to 30 or closer to 60.

16                THE COURT:  Okay.  So it might be -- I suspect

17   that -- let's say we start on time.  So here's my question.  So

18   I suspect instruction will take about 20 minutes.  An hour.  So

19   that puts us at 11:30, and that puts me at 20 minutes before.

20   So do you just want -- I guess to think about breaking and then

21   starting at 1:15, 1:30.

22                MR. ONSTOT:  That's fine.

23                THE COURT:  Go with their closing rebuttal, and

24   the case is submitted.  Does that work?

25                MR. ONSTOT:  That's fine with us.

1           THE COURT:  From the defense, any guesstimate

2    about what your closing will be?

3           MR. ONSTOT:  30 to 45.

4           THE COURT:  Anything else?

5           MR. PORTNOI:  Does the jury take a copy of the

6    jury instructions into --

7           THE COURT:  Yes.  They'll take a copy back.  Yes.

8           Okay.  We'll see you tomorrow at 9:00 o'clock.

9           MR. CLOSE:  Thank you, Your Honor.

10          (Proceedings concluded at 4:52 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

 5   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 6   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 7   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 8   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

 9   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

10   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

11   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

12   THE UNITED STATES.

13

14                            DATED THIS  3RD  DAY OF MAY, 2016.

15

16

17                            /S/ MIRANDA ALGORRI

18                            MIRANDA ALGORRI, CSR NO. 12743, CRR
                              FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

## $

**$1,162,340** [1] - 542:1
**$10,500** [1] - 534:15
**$14.29** [4] - 513:20, 513:22, 514:2, 514:4
**$163.42** [1] - 512:9
**$17,000** [1] - 521:25
**$178.07** [1] - 512:9
**$18** [1] - 572:21
**$200** [5] - 513:3, 576:10, 576:12, 576:13, 576:20
**$222** [1] - 513:14
**$23** [1] - 572:19
**$240** [1] - 513:14
**$244** [1] - 534:7
**$244.55** [3] - 534:1, 534:22, 549:6
**$38,000** [1] - 526:15
**$38,592** [1] - 526:13
**$450** [1] - 521:20
**$52,355** [1] - 526:6
**$58** [1] - 514:12
**$58.70** [3] - 512:23, 513:2, 513:5
**$6,390,874** [4] - 535:3, 540:13, 550:19, 550:20
**$600,000** [2] - 564:9, 564:14
**$618** [2] - 513:5, 514:4
**$65,000** [11] - 525:18, 525:22, 526:4, 526:18, 526:19, 528:11, 534:10, 534:19, 534:24, 544:7
**$65,213** [13] - 524:13, 525:25, 527:14, 533:22, 535:2, 536:12, 538:8, 540:3, 540:5, 551:15, 551:17, 554:8, 554:9
**$7,553,214** [4] - 535:5, 551:19, 551:25
**$82.11** [1] - 545:21
**$90,000** [1] - 526:19
**$90,947** [1] - 526:16
**$90.24** [2] - 545:17, 546:9

## '

**'07** [1] - 589:8
**'THE** [1] - 601:3

## /

**/S** [1] - 612:17

## 1

**1** [26] - 505:10, 512:5, 512:7, 513:11, 526:6, 531:23, 533:21, 561:17,

561:20, 561:22, 568:21, 570:8, 570:16, 596:17, 596:19, 597:2, 597:16, 598:7, 598:17, 603:17, 604:15, 604:16, 605:24, 606:5, 606:7, 606:22
**1,025** [1] - 569:24
**1,025,000** [2] - 569:25, 570:18
**1,162,340** [1] - 535:1
**1,224** [2] - 570:17, 570:18
**1.1** [2] - 559:9, 559:13
**1.1(C** [3] - 589:22, 593:24, 607:1
**1.2** [1] - 559:10
**1.3** [1] - 532:4
**10** [12] - 505:10, 530:11, 532:24, 540:9, 561:19, 561:25, 562:7, 573:8, 574:3, 593:1, 593:25, 607:2
**10-2** [1] - 562:9
**10-4** [1] - 567:9
**10-6** [2] - 564:7, 564:22
**10-7** [1] - 562:22
**1008** [1] - 545:5
**10:00** [5] - 583:18, 585:12, 585:17, 586:3, 610:14
**11** [3] - 535:7, 540:9, 570:9
**11:30** [1] - 610:19
**11:55** [2] - 584:1, 584:3
**12** [2] - 579:23, 596:19
**123** [1] - 601:2
**12743** [2] - 505:23, 612:18
**1299** [1] - 506:10
**13** [7] - 531:21, 542:23, 547:25, 562:21, 590:11, 593:25, 607:2
**13(B** [2] - 562:25, 563:4
**13.5** [1] - 599:8
**14** [12] - 510:17, 533:8, 533:11, 547:19, 547:24, 548:2, 548:7, 548:15, 548:23, 590:13, 594:13, 596:24
**14-03242-PSG** [1] - 505:7
**14-YEAR** [4] - 531:25, 543:13, 543:19, 543:23
**14.35** [1] - 532:5
**15** [9] - 530:24, 531:18, 544:18, 568:5, 568:8, 571:21, 574:24, 586:6, 590:17
**15.5** [1] - 599:8
**16** [4] - 579:1, 591:4, 593:25, 607:2
**17** [4] - 520:8, 525:10, 591:5, 600:2
**1700** [1] - 506:17
**18** [5] - 520:8, 572:16, 593:25, 606:12, 607:2

**18881** [1] - 506:16
**18TH** [1] - 506:6
**19** [1] - 520:11
**1983** [1] - 516:11
**1989** [1] - 516:21
**1997** [1] - 516:17
**1:15** [1] - 610:21
**1:30** [3] - 505:17, 509:2, 610:21
**1ST** [14] - 538:21, 543:15, 543:21, 544:2, 544:10, 545:13, 545:17, 545:21, 546:6, 547:2, 547:3, 547:5, 547:6

## 2

**2** [21] - 529:21, 529:22, 584:7, 592:25, 593:25, 594:3, 597:16, 598:7, 598:12, 598:17, 603:17, 604:1, 604:15, 604:16, 605:25, 606:5, 606:7, 606:8, 607:1, 607:4
**2.72** [2] - 528:12, 536:6
**20** [4] - 571:21, 595:5, 610:18, 610:19
**200** [2] - 514:16, 514:18
**2000** [3] - 544:10, 544:14, 545:13
**2001** [1] - 532:4
**2003** [2] - 516:25, 517:1
**2005** [2] - 557:25, 558:2
**2006** [11] - 557:23, 558:4, 558:5, 559:5, 559:8, 559:19, 559:20, 559:22, 560:20, 569:7, 580:22
**2007** [1] - 531:7
**2008** [25] - 519:22, 519:24, 523:24, 524:15, 524:20, 526:5, 526:6, 526:10, 531:1, 531:4, 531:7, 532:4, 532:18, 532:24, 538:21, 539:7, 539:9, 541:1, 542:23, 543:15, 543:21, 544:2, 545:17, 545:21, 546:6
**2010** [2] - 558:1, 558:2
**2014** [5] - 545:13, 547:2, 547:3, 547:5, 547:6
**2015** [3] - 531:2, 534:17, 589:4
**2016** [9] - 505:16, 507:3, 508:3, 509:1, 524:17, 524:18, 524:19, 524:23, 612:14
**2017** [15] - 524:16, 524:21, 524:24, 525:6, 525:14, 525:19, 525:21, 525:24, 526:9, 526:18, 526:24, 532:18, 534:17, 534:20

**205.54** [1] - 547:7
**205.76** [1] - 547:8
**21** [3] - 568:24, 569:6, 596:9
**21-1** [1] - 569:12
**22** [2] - 520:11, 596:9
**23** [7] - 569:2, 572:21, 596:10, 596:13, 596:14, 596:24, 601:14
**23,000** [1] - 534:16
**24** [1] - 606:12
**25** [1] - 606:16
**28** [1] - 612:7
**29** [4] - 596:12, 596:14, 597:2, 599:7

## 3

**3** [23] - 505:16, 505:16, 507:3, 508:3, 509:1, 568:21, 592:25, 593:25, 594:3, 594:6, 597:2, 597:16, 598:7, 598:17, 598:24, 604:3, 604:17, 605:25, 606:7, 606:8, 607:2, 607:4
**30** [5] - 520:19, 555:24, 596:17, 610:15, 611:3
**312** [1] - 505:24
**34** [1] - 602:20
**375** [1] - 521:21
**38** [1] - 602:20
**3:05** [1] - 568:9
**3:56** [1] - 586:7
**3RD** [1] - 612:14

## 4

**4** [14] - 513:20, 539:10, 561:17, 561:20, 561:22, 592:21, 597:9, 597:16, 597:17, 598:6, 606:8
**4,646** [1] - 534:19
**4.5** [8] - 530:3, 532:23, 533:3, 533:25, 548:17, 549:1, 549:5, 549:19
**40** [2] - 531:7, 531:17
**400** [2] - 506:6, 518:13
**403** [4] - 587:25, 588:10, 588:23, 589:18
**435** [1] - 505:24
**438** [1] - 601:2
**45** [1] - 611:3
**46** [2] - 570:4, 570:7
**46-11** [1] - 570:7
**4:52** [1] - 611:10

## 5

**5** [11] - 529:18, 529:21, 546:8, 567:10, 592:25,

593:25, 597:9, 597:16, 597:17, 598:6, 607:2
**5,738,050** [1] - 541:5
**5.26** [2] - 532:17, 548:10
**5.35** [1] - 530:18
**5.8** [1] - 544:7
**50** [1] - 580:8
**500** [10] - 530:21, 533:2, 542:19, 543:14, 543:20, 545:7, 547:19, 548:20, 548:22, 551:7
**505** [1] - 505:9
**510** [1] - 507:9
**514** [1] - 507:10
**518** [1] - 507:12
**52,000** [1] - 526:14
**537** [1] - 507:13
**552** [1] - 507:13
**554** [1] - 507:14
**555** [1] - 507:16
**57** [2] - 511:22, 512:21
**57-1** [1] - 512:6
**57-6** [1] - 512:21
**571** [1] - 507:17
**574** [1] - 507:17
**575** [1] - 507:20
**581** [1] - 507:20
**5TH** [1] - 599:25

## 6

**6** [11] - 505:10, 507:3, 508:3, 540:2, 592:25, 593:25, 597:9, 597:16, 597:18, 607:2
**6.25** [1] - 567:22
**6.3** [1] - 544:8
**6.74** [1] - 529:3
**60** [3] - 513:8, 513:16, 610:15
**60-5** [1] - 513:16
**600,000** [1] - 565:5
**611** [1] - 557:15
**612** [1] - 505:9
**62** [5] - 584:25, 585:1, 586:8, 589:17
**65,213** [1] - 549:5

## 7

**7** [8] - 526:12, 528:25, 529:22, 532:7, 536:9, 593:1, 593:25, 607:2
**753** [1] - 612:7
**78** [2] - 572:15, 572:22

## 8

**8** [3] - 593:1, 593:25, 607:2
**8(D** [1] - 564:23

**8.25** [1] - 567:25
**82.11** [1] - 546:7
**87** [1] - 562:3
**87.51** [1] - 546:7

## 9

**9** [1] - 593:21
**900** [1] - 506:10
**90012** [1] - 505:25
**90071** [1] - 506:7
**90401** [1] - 506:11
**92612** [1] - 506:17
**94** [6] - 523:5, 523:11, 525:10, 540:21, 540:23, 541:2
**97** [2] - 534:5, 534:6
**98** [6] - 525:24, 533:21, 534:11, 534:25, 535:2, 540:4
**98-MONTH** [3] - 526:11, 533:21, 534:4
**9:00** [5] - 583:15, 585:12, 585:14, 607:12, 611:8
**9TH** [1] - 602:17

## A

**A.M** [1] - 610:14
**AAA** [3] - 530:17, 542:13, 548:19
**ABBREVIATE** [1] - 529:15
**ABILITY** [6] - 530:15, 538:19, 557:24, 558:5, 566:10, 598:18
**ABLE** [7] - 527:15, 576:18, 577:21, 579:14, 580:5, 588:2, 604:8
**ABOVE** [1] - 612:10
**ABOVE-ENTITLED** [1] - 612:10
**ABSOLUTELY** [3] - 573:2, 580:24, 605:17
**ACCEPT** [4] - 576:9, 576:11, 576:19, 606:3
**ACCEPTED** [2] - 527:2, 527:4
**ACCOMMODATED** [2] - 595:17, 595:18
**ACCOMPLISH** [1] - 588:8
**ACCORDING** [1] - 546:6
**ACCOUNT** [2] - 513:22, 552:16, 552:20
**ACCOUNTANT** [2] - 537:5, 555:25
**ACCRUED** [1] - 603:16
**ACCURACY** [1] - 516:7
**ACKNOWLEDGE** [1] - 576:8
**ACKNOWLEDGED** [3] - 511:3, 515:19, 515:20

**ACTION** [17] - 539:14, 539:17, 587:7, 587:19, 596:18, 597:6, 597:10, 597:12, 597:21, 598:2, 599:2, 599:21, 601:8, 603:16, 603:17, 603:23
**ACTIONS** [4] - 587:14, 600:6, 604:24, 605:20
**ACTUAL** [6] - 527:7, 536:12, 545:20, 552:14, 573:11, 573:14
**ADD** [4] - 534:25, 559:15, 579:13, 593:2
**ADDED** [2] - 528:9, 589:21
**ADDING** [1] - 527:2
**ADDITION** [2] - 543:23, 587:1
**ADDITIONAL** [8] - 527:16, 528:18, 565:4, 574:14, 578:22, 579:1, 579:14, 582:14
**ADDRESS** [1] - 583:1
**ADDS** [2] - 526:13
**ADMINISTRATIVE** [1] - 505:10
**ADMISSION** [5] - 586:14, 586:20, 587:11, 587:12
**ADMITTED** [9] - 520:5, 540:23, 545:5, 589:17, 591:19, 591:22, 592:1, 592:9, 594:22
**ADMONISHED** [1] - 608:22
**ADOPT** [1] - 536:7
**ADOPTED** [3] - 540:7, 587:7, 587:19
**ADOPTING** [1] - 522:20
**ADOPTIVE** [2] - 586:14, 587:11
**ADVERSE** [5] - 557:15, 595:10, 595:25, 596:1, 596:8
**ADVISE** [1] - 571:13
**ADVISED** [1] - 570:22
**AFFECTED** [4] - 557:25, 558:6, 599:24, 600:8
**AFFORDABLE** [3] - 558:10, 560:17, 560:20
**AFTERNOON** [10] - 509:13, 509:15, 518:5, 537:3, 555:10, 568:3, 571:18, 575:17, 585:21, 585:25
**AGENT** [1] - 586:15
**AGO** [6] - 521:15, 521:17, 563:1, 569:1, 569:2, 582:7
**AGREE** [14] - 511:15, 514:5, 527:4, 537:24, 542:12, 549:12, 550:1, 560:9, 588:11, 592:17, 593:21, 598:23, 599:3, 608:7
**AGREED** [2] - 511:20, 591:3

**AGREEING** [2] - 564:19, 604:25
**AGREEMENT** [2] - 573:11, 573:14
**AGREES** [5] - 551:14, 590:19, 590:21, 595:9, 599:3
**AHEAD** [6] - 510:5, 585:3, 585:22, 585:23, 588:21, 603:12
**AILIN** [30] - 506:15, 517:9, 518:4, 520:2, 520:7, 535:9, 535:12, 535:18, 535:22, 536:21, 546:15, 547:20, 551:20, 551:22, 552:6, 554:2, 580:13, 580:19, 580:25, 581:5, 581:8, 581:12, 582:11, 591:12, 592:7, 607:17, 607:23, 608:16, 608:23, 609:10
**AILIN** [4] - 507:12, 507:13, 507:20, 518:6
**ALASKA** [1] - 521:2
**ALESHIRE** [1] - 595:12
**ALESHIRE** [1] - 506:14
**ALGORRI** [4] - 505:23, 612:4, 612:17, 612:18
**ALIGN** [1] - 551:8
**ALL-OR-NOTHING** [2] - 605:7, 605:12
**ALLEGEDLY** [2] - 527:2, 603:21
**ALLOCATION** [1] - 598:13
**ALLOW** [5] - 559:23, 573:14, 573:15, 575:22, 578:23
**ALLOWABLE** [1] - 581:19
**ALLOWED** [10] - 511:12, 511:15, 511:19, 512:22, 513:10, 513:18, 575:25, 577:7, 588:7, 602:16
**ALLOWING** [1] - 563:6
**ALLOWS** [1] - 586:20
**ALMOST** [1] - 546:22
**ALTERS** [1] - 589:1
**AMBIGUOUS** [1] - 580:25
**AMBIT** [1] - 597:10
**AMENDED** [1] - 589:25
**AMENDMENT** [3] - 515:21, 604:23, 606:4
**AMENDMENT** [1] - 599:25
**AMERICA** [1] - 561:14
**AMOUNT** [23] - 521:22, 522:1, 524:13, 526:9, 534:8, 534:9, 534:12, 534:18, 535:2, 536:11, 536:12, 539:23, 540:5, 541:10, 542:1, 553:24, 558:23, 558:24, 564:15, 567:1, 572:10, 576:10
**AMOUNTS** [2] - 528:11,

535:2

**ANALYSIS** [32] - 511:6, 518:15, 519:13, 519:14, 519:16, 521:8, 522:6, 523:16, 524:16, 525:24, 526:20, 526:21, 527:8, 530:5, 531:10, 532:5, 532:8, 533:6, 536:8, 536:11, 536:16, 538:13, 541:25, 543:24, 553:9, 553:10, 553:16, 553:21, 587:24, 599:15, 599:19

**ANALYZE** [1] - 604:12

**AND** [3] - 612:5, 612:8, 612:10

**ANGELES** [3] - 506:7, 520:22, 521:10

**ANGELES** [3] - 505:17, 505:25, 509:1

**ANNUAL** [1] - 543:5

**ANNUAL** [2] - 530:23, 531:17

**ANNUALIZED** [2] - 532:3, 532:22

**ANNUALLY** [2] - 530:3, 550:2

**ANSWER** [11] - 515:17, 560:10, 560:11, 593:7, 593:9, 593:20, 604:2, 604:16, 604:17, 606:6

**ANSWERED** [1] - 605:24

**ANSWERING** [1] - 545:25

**ANTICIPATED** [5] - 529:14, 529:20, 564:16, 569:3, 592:19

**ANYWAY** [2] - 576:16, 590:7

**APC** [1] - 506:8

**APOLOGIZE** [1] - 533:10

**APPEAL** [1] - 521:10

**APPEAR** [2] - 533:8, 595:15

**APPEARANCE** [1] - 521:20

**APPEARANCES** [1] - 506:1

**APPLICABLE** [5] - 590:10, 590:12, 590:13, 591:4, 592:20

**APPLICATION** [2] - 570:8, 570:16

**APPLICATION** [13] - 525:16, 562:14, 563:20, 563:21, 563:22, 564:2, 573:9, 574:3, 574:4, 576:8, 579:19, 579:25, 603:17

**APPLICATIONS** [2] - 512:1, 565:12

**APPLIED** [6] - 522:15, 528:7, 536:10, 536:11, 539:22, 602:16

**APPLIES** [2] - 526:1, 587:3

**APPLY** [5] - 536:7, 587:2,

587:3, 596:1, 596:2

**APPLYING** [1] - 579:21

**APPRAISAL** [4] - 518:13, 519:3, 519:10, 527:5

**APPRAISAL** [1] - 518:18

**APPRAISER** [3] - 518:8, 518:10, 518:24

**APPROACH** [9] - 526:25, 533:6, 535:15, 535:16, 536:3, 562:2, 562:5, 607:10

**APPROPRIATE** [7] - 528:21, 529:1, 530:2, 590:17, 594:24, 595:5, 602:8

**APPROPRIATELY** [1] - 584:5

**APPROVAL** [1] - 563:5

**APPROVALS** [1] - 563:2

**APPROVES** [1] - 563:22

**APRIL** [1] - 580:22

**AREA** [1] - 521:10

**ARGUE** [5] - 594:15, 597:25, 598:18, 604:8

**ARGUED** [4] - 509:14, 597:10, 602:12, 602:22

**ARGUING** [4] - 597:18, 602:23, 604:7, 605:12

**ARGUMENT** [10] - 584:4, 592:5, 592:14, 597:16, 598:9, 602:5, 602:20, 605:10, 606:1, 609:14

**ARGUMENTATIVE** [2] - 547:20, 551:20

**ARGUMENTS** [7] - 583:19, 583:25, 585:20, 590:2, 602:13, 604:18, 605:8

**ARRIVE** [2] - 533:2, 542:7

**ASLEEP** [1] - 584:10

**ASSERTED** [1] - 587:16

**ASSESS** [1] - 553:2

**ASSIGNMENT** [1] - 523:1

**ASSIST** [1] - 544:20

**ASSISTED** [1] - 545:1

**ASSISTING** [1] - 544:25

**ASSUME** [2] - 587:23, 609:14

**ASSUMED** [4] - 516:10, 526:7, 553:19, 553:20

**ASSUMING** [5] - 547:24, 548:2, 582:1, 585:14, 590:24

**ASSUMPTION** [14] - 522:21, 522:25, 539:2, 539:13, 539:20, 539:22, 540:7, 550:22, 551:14, 551:16, 553:15, 553:17, 553:18, 554:7

**ASSUMPTIONS** [4] - 522:24, 539:25, 543:25, 552:2

**ATTACHED** [1] - 543:1

**ATTEMPTED** [2] - 558:12,

595:10

**ATTENDED** [1] - 518:12

**ATTENTION** [1] - 609:8

**ATTORNEY** [1] - 588:18

**ATTORNEYS** [3] - 579:16, 582:21, 590:2

**AUTHENTICITY** [2] - 546:13, 546:19

**AVAILABLE** [6] - 527:11, 530:7, 531:12, 553:7, 558:23, 558:24

**AVENUE** [2] - 506:10, 506:16

**AVERAGE** [3] - 532:16, 532:17, 548:19

**AVERAGED** [3] - 532:14, 533:2, 542:6

**AVOID** [1] - 560:17

**AWARDING** [1] - 514:21

**AWARE** [6] - 515:3, 515:7, 516:19, 516:23, 559:7, 577:20

## B

**BAAR** [2] - 507:8, 510:11

**BAAR** [2] - 510:15, 514:11

**BALANCE** [2] - 589:1, 601:16

**BALANCING** [1] - 598:5

**BALKING** [1] - 591:23

**BANK** [1] - 561:14

**BANKRUPTCY** [1] - 520:25

**BASED** [2] - 539:12

**BASED** [18] - 522:23, 533:5, 539:2, 539:25, 540:3, 543:24, 548:18, 550:11, 550:12, 551:6, 563:17, 587:14, 587:19, 598:8, 603:15, 604:21, 608:1

**BASIS** [4] - 524:14, 531:18, 532:3, 586:24, 587:8, 587:10

**BECAME** [2] - 532:19, 538:20

**BECOME** [1] - 603:7

**BECOMES** [5] - 563:21, 588:14, 588:23, 603:8, 604:17

**BEGAN** [2] - 544:9, 604:24

**BEGIN** [1] - 585:21

**BEGINNING** [7] - 538:20, 543:14, 543:20, 580:3, 594:17, 601:15

**BEGINS** [1] - 589:22

**BEHIND** [1] - 519:20

**BELIEVES** [1] - 599:15

**BELOW** [2] - 580:8

**BENCHMARK** [1] - 536:19

**BERNARDINO** [2] - 520:23

**BEST** [2] - 527:6, 572:1

**BETTER** [3] - 592:15, 603:14, 609:25

**BETWEEN** [4] - 535:15, 536:3, 552:16, 603:22

**BEYOND** [1] - 544:21

**BIFURCATED** [1] - 603:14

**BIG** [1] - 577:5

**BILL** [1] - 526:3

**BILLED** [2] - 521:22, 522:2

**BILLS** [6] - 530:7, 530:13, 533:1, 542:13, 548:19, 580:23

**BINDER** [11] - 511:23, 545:9, 561:16, 561:21, 568:14, 568:17, 568:21, 568:23, 570:1, 570:4

**BINDERS** [4] - 519:20, 519:21, 519:22, 523:5

**BIT** [3] - 549:2, 583:25, 590:24

**BLACK** [9] - 511:23, 523:5, 533:14, 545:8, 561:16, 561:21, 568:14, 568:17, 570:4

**BOARD** [11] - 515:25, 521:19, 521:23, 522:10, 539:16, 553:11, 564:11, 564:18, 580:12, 581:14, 581:17

**BOARD** [1] - 505:9

**BOARD** [7] - 512:22, 512:25, 513:18, 513:24, 514:20, 514:25, 576:9

**BOARD'S** [1] - 553:23

**BODY** [1] - 505:10

**BOND** [2] - 528:16, 528:20

**BONDS** [5] - 530:8, 530:17, 533:1, 542:13, 548:19

**BORNE** [1] - 601:22

**BORROWER** [1] - 563:6

**BOTTOM** [8] - 532:1, 534:17, 534:20, 536:13, 536:14, 541:4, 562:10, 569:12

**BOUGHT** [1] - 582:8

**BOY** [1] - 562:25

**BRACKETED** [1] - 590:1

**BREAK** [10] - 556:22, 568:4, 581:22, 582:20, 583:2, 583:24, 584:4, 585:2, 606:5

**BREAKING** [3] - 603:5, 604:7, 610:20

**BRENTWOOD** [1] - 521:9

**BRIEFLY** [2] - 523:18, 535:25

**BRING** [10] - 510:5, 517:10, 540:21, 542:22, 546:11, 580:11, 585:3, 585:17, 608:23, 609:8

**BRINGING** [1] - 523:24
**BROAD** [2] - 597:15, 609:2
**BROADER** [2] - 608:12, 609:4
**BROKEN** [1] - 603:4
**BROKER** [1] - 556:7
**BROUGHT** [2] - 580:17, 604:20
**BRUSH** [1] - 603:9
**BUILDING** [1] - 506:9
**BUNCH** [1] - 601:18
**BURDEN** [2] - 598:13, 606:23
**BUSINESS** [1] - 518:11
**BUTTON** [1] - 533:17
**BUY** [1] - 582:8
**BUYER'S** [3] - 569:17, 569:18, 569:21
**BUYING** [1] - 580:4
**BY** [32] - 506:5, 506:5, 506:9, 506:15, 506:15, 506:16, 510:14, 514:10, 515:3, 515:20, 518:4, 535:22, 537:2, 539:9, 546:18, 547:24, 551:24, 552:6, 554:5, 555:9, 557:20, 558:18, 560:4, 561:12, 562:6, 571:12, 571:17, 574:2, 575:16, 580:17, 580:21, 581:12

**C**

**CAL** [1] - 519:7
**CALCULATE** [1] - 541:18
**CALCULATED** [3] - 542:3, 543:14, 543:20
**CALCULATING** [1] - 512:14
**CALCULATION** [15] - 524:6, 527:3, 533:5, 533:23, 535:6, 541:20, 541:23, 543:13, 543:19, 549:13, 549:15, 549:18, 550:8, 550:12, 550:16
**CALCULATIONS** [4] - 510:16, 542:18, 544:9, 544:20
**CALIFORNIA** [6] - 506:7, 506:11, 506:17, 520:22, 520:24, 521:1
**CALIFORNIA** [5] - 505:2, 505:17, 505:25, 509:1, 612:6
**CAP** [4] - 529:14, 529:15, 529:20, 529:22
**CAPACITY** [1] - 544:21, 544:23, 544:24
**CAPITAL** [9] - 536:15, 560:23, 561:1, 561:13, 562:12, 563:5, 564:8, 573:1, 574:5

**CAPITAL'S** [2] - 566:4, 566:10
**CAPITALIZATION** [5] - 519:4, 519:11, 529:13, 529:15, 529:18
**CARE** [1] - 591:1
**CAREER** [2] - 556:4, 570:22
**CARSON** [28] - 510:16, 512:1, 512:14, 516:12, 516:17, 516:21, 516:25, 521:12, 521:15, 539:15, 539:16, 556:24, 564:11, 576:24, 577:4, 577:15, 578:1, 579:22, 580:12, 602:15, 608:1, 608:6, 608:8, 608:11, 608:17, 609:3
**CARSON** [2] - 505:8, 505:9
**CARSON'S** [1] - 602:17
**CASE** [40] - 509:11, 509:14, 509:19, 513:12, 513:19, 519:18, 521:13, 521:19, 521:23, 522:4, 523:1, 528:18, 544:16, 564:11, 565:22, 568:6, 578:1, 580:11, 585:9, 586:1, 586:2, 588:13, 589:13, 593:9, 593:11, 593:15, 593:16, 595:10, 595:25, 597:3, 601:17, 601:20, 602:8, 602:18, 603:6, 604:20, 605:16, 607:14, 610:24
**CASE** [1] - 505:6
**CASES** [2] - 520:11, 604:22
**CASH** [4] - 519:11, 527:6, 529:9, 576:14
**CASPARIAN** [9] - 506:9, 514:10, 515:3, 515:20, 517:6, 557:18, 571:17, 573:23, 574:10
**CASPARIAN** [7] - 507:10, 507:17, 510:16, 511:25, 512:12, 513:9, 557:11
**CASPARIAN'S** [1] - 521:3
**CATASTROPHE** [1] - 531:5
**CATEGORIES** [2] - 523:21, 597:15
**CATEGORY** [1] - 597:14
**CAUSATION** [2] - 603:11, 603:18
**CAUSED** [3] - 599:10, 599:16, 601:8
**CAUSES** [1] - 541:7
**CENTRAL** [2] - 505:2, 612:6
**CENTRAL** [9] - 520:24, 520:25, 596:11, 596:20, 597:3, 598:16, 599:19, 601:2
**CERTAIN** [3] - 527:17, 579:9, 589:12

**CERTAINLY** [6] - 509:14, 513:5, 514:2, 514:4, 514:15, 602:7
**CERTAINTY** [1] - 526:2
**CERTIFICATE** [1] - 612:1
**CERTIFICATION** [1] - 596:5
**CERTIFICATIONS** [1] - 518:21
**CERTIFIED** [4] - 518:23, 537:5, 555:25, 595:19
**CERTIFY** [1] - 612:6
**CETERA** [1] - 565:15
**CHAMBERS** [1] - 594:19
**CHANCE** [1] - 608:24
**CHANGE** [7] - 511:6, 515:19, 543:5, 548:4, 594:5, 594:7, 606:6
**CHANGED** [3] - 575:24, 576:2, 602:15
**CHANGES** [2] - 552:22, 583:15
**CHANGING** [2] - 575:22, 607:18
**CHARACTER** [5] - 597:6, 597:9, 597:12, 597:21, 598:2
**CHARGE** [1] - 509:12
**CHARGED** [3] - 559:1, 566:11, 583:9
**CHARGING** [1] - 521:18
**CHART** [3] - 516:1, 516:6, 552:19
**CHARTERED** [1] - 519:1
**CHARTS** [7] - 591:5, 591:7, 591:10, 591:13, 592:2, 592:6, 606:12
**CHECK** [4] - 509:22, 544:19, 594:20, 608:17
**CHOICE** [1] - 528:5
**CHRONOLOGICAL** [1] - 507:5
**CIRCUIT** [1] - 602:17
**CIRCULAR** [1] - 600:20
**CIRCUMSTANCE** [2] - 511:2, 553:18
**CIRCUMSTANCES** [2] - 571:4, 605:3
**CITED** [1] - 595:25
**CITIES** [1] - 521:9
**CITY** [2] - 587:18, 595:19
**CITY** [25] - 516:11, 516:12, 516:16, 516:20, 516:24, 521:12, 521:18, 521:23, 522:9, 539:15, 539:16, 541:11, 576:25, 577:7, 578:1, 579:7, 579:10, 580:12, 587:14, 597:13, 603:16, 603:20, 608:9
**CITY** [2] - 505:8, 505:9
**CITY'S** [9] - 515:24, 537:8, 538:20, 579:16, 587:6,

588:18, 599:21, 603:23
**CIVIL** [2] - 593:10, 593:15
**CLAIM** [3] - 544:15, 604:20, 605:2
**CLAIMED** [1] - 579:8
**CLAIMS** [4] - 524:11, 544:3, 544:13, 607:2
**CLARIFY** [3] - 554:8, 591:18, 594:7
**CLASSROOM** [1] - 518:14
**CLEAN** [2] - 606:21, 607:21
**CLEANER** [1] - 598:15
**CLEAR** [12] - 550:14, 577:23, 586:22, 587:9, 589:7, 592:7, 596:1, 596:23, 597:17, 601:1, 607:6, 607:13
**CLEARED** [1] - 586:13
**CLEARLY** [1] - 586:13
**CLERICAL** [3] - 544:21, 544:23, 544:24
**CLERK** [5] - 517:12, 517:18, 517:20, 554:18, 554:25
**CLEVER** [1] - 605:9
**CLIENTS** [1] - 570:22
**CLOCK** [1] - 595:19
**CLOSE** [42] - 506:5, 509:8, 509:10, 509:20, 509:23, 510:2, 510:4, 558:17, 574:18, 574:22, 574:24, 575:2, 575:6, 575:16, 580:17, 580:21, 581:3, 582:13, 582:16, 583:21, 584:13, 584:21, 584:25, 586:11, 586:19, 587:5, 588:1, 588:11, 589:5, 591:8, 592:11, 604:19, 605:22, 607:9, 607:19, 609:13, 609:17, 609:20, 609:25, 610:7, 610:13, 611:9
**CLOSE** [3] - 507:20, 586:12, 597:18
**CLOSE** [1] - 561:7
**CLOSELY** [3] - 584:9, 596:11, 601:11
**CLOSER** [4] - 534:16, 555:15, 610:15
**CLOSING** [16] - 509:25, 545:20, 546:7, 583:19, 584:4, 585:20, 591:25, 592:5, 597:18, 609:14, 609:15, 609:22, 610:7, 610:12, 610:23, 611:2
**CODE** [1] - 612:7
**COINCIDES** [1] - 544:6
**COLLATERAL** [6] - 564:14, 564:25, 565:4, 565:15, 566:17, 571:7
**COLLATERALLY** [2] - 602:14, 602:23

COLLECTED [1] - 559:3
COLON [1] - 600:1
COLONY [48] - 514:22, 522:11, 522:14, 522:19, 524:11, 524:12, 527:14, 527:15, 529:17, 537:22, 537:25, 538:5, 539:13, 541:11, 544:3, 544:13, 550:9, 550:18, 551:15, 551:18, 551:19, 553:8, 553:12, 555:14, 557:2, 557:22, 558:13, 558:20, 563:14, 563:15, 564:12, 566:3, 566:9, 566:12, 569:7, 569:22, 571:20, 575:23, 577:15, 578:8, 578:21, 579:17, 581:14, 581:18, 581:21, 602:14, 602:23, 608:15
COLONY [1] - 505:5
COLUMN [13] - 525:12, 533:13, 533:24, 534:6, 534:9, 543:4, 548:3, 548:18, 549:1, 569:11, 569:17, 570:11
COMBINATION [2] - 529:19, 549:24
COMFORTABLE [4] - 571:5, 595:3, 603:24, 604:18
COMMENT [1] - 584:7
COMMENTED [1] - 606:12
COMMENTS [3] - 583:4, 584:14, 600:17
COMMERCIAL [1] - 555:21
COMMERCIALLY [2] - 572:10, 572:23
COMMITMENT [4] - 563:20, 563:21, 563:23, 563:25
COMMITTEE [1] - 584:1
COMMON [1] - 565:17
COMPANY [3] - 505:5, 560:22, 580:10
COMPARATIVE [1] - 519:13
COMPARE [2] - 546:25, 547:19
COMPARED [3] - 514:18, 519:14, 561:5
COMPARISON [1] - 547:5
COMPENSATED [4] - 599:11, 599:17, 601:8, 603:20
COMPENSATION [1] - 599:24
COMPETING [2] - 561:6, 561:13
COMPLAINT [1] - 604:22
COMPLETE [3] - 522:5, 563:6, 585:9
COMPLETED [2] - 553:21,

580:15
COMPLETING [1] - 543:24
COMPLETION [1] - 518:16
COMPONENT [3] - 530:21, 532:20, 548:23
COMPONENTS [1] - 538:2
COMPOUND [7] - 543:5, 543:8, 549:15, 549:18, 549:21, 550:8, 551:10
COMPOUNDED [2] - 550:1, 550:3
COMPREHENSIVE [1] - 518:17
CONCENTRATED [2] - 599:12, 601:10
CONCERN [2] - 566:4, 566:10
CONCERNING [2] - 522:7, 538:1
CONCLUDE [1] - 523:15
CONCLUDED [2] - 530:23, 611:10
CONCLUDES [1] - 537:5
CONCLUSION [10] - 511:7, 528:25, 530:4, 532:22, 537:25, 539:23, 539:25, 541:22, 548:10, 553:22
CONCLUSIONS [1] - 519:7
CONDITION [4] - 564:8, 577:10, 578:10, 578:13
CONDITIONS [2] - 539:11, 579:11
CONDOMINIUM [3] - 560:1, 563:1, 563:7
CONDOMINIUMS [1] - 563:16
CONDUCTED [1] - 522:6
CONFERENCE [1] - 509:13
CONFERENCE [1] - 612:11
CONFIRMED [1] - 609:5
CONFIRMING [1] - 516:7
CONFORM [1] - 594:8
CONFORMANCE [1] - 612:11
CONFUSED [2] - 559:19, 607:22
CONFUSING [1] - 603:8
CONSCIENCE [1] - 577:9
CONSIDER [5] - 513:24, 597:12, 597:20, 598:2, 598:5
CONSIDERABLE [1] - 579:10
CONSIDERATE [1] - 577:18
CONSIDERATION [2] - 512:13, 577:8
CONSIDERED [2] - 530:6, 598:17
CONSIDERING [1] - 576:21
CONSISTENT [8] - 512:24,

513:23, 583:10, 583:17, 598:21, 605:4, 606:20, 609:4
CONSTITUTED [1] - 600:6
CONSTITUTION [1] - 600:7
CONSTRUCTION [2] - 579:1, 579:15
CONSULTING [1] - 521:21
CONTAIN [2] - 579:5, 586:24
CONTAINED [1] - 539:3
CONTAINS [1] - 519:22
CONTENTS [1] - 586:21
CONTEXT [3] - 519:9, 553:3, 553:14
CONTINUE [1] - 578:9
CONTINUED [1] - 604:24
CONTROL [1] - 560:17
CONTROL [3] - 522:15, 577:3, 580:12
CONTROVERSIAL [1] - 590:6
CONVERSION [1] - 563:7
CONVERT [5] - 560:6, 560:7, 563:15, 573:16, 576:4
CONVERTED [2] - 573:19, 575:25
COPIES [1] - 607:16
COPY [15] - 515:10, 516:11, 516:17, 516:20, 516:24, 519:24, 523:13, 563:25, 611:5, 611:7
CORNER [1] - 562:9
CORPORATE [3] - 530:8, 530:17, 533:1
CORPORATION [1] - 505:9
CORPORATION [1] - 571:6
CORRECT [114] - 510:22, 511:4, 512:7, 512:20, 514:13, 515:6, 515:10, 515:18, 516:10, 522:22, 522:24, 523:3, 537:6, 537:7, 537:14, 537:22, 537:23, 538:9, 538:12, 538:16, 538:22, 538:25, 539:5, 539:18, 539:20, 539:23, 540:2, 540:6, 540:14, 541:4, 541:8, 541:11, 541:12, 541:23, 542:1, 542:4, 542:7, 542:14, 542:16, 543:1, 543:15, 544:5, 544:10, 544:22, 545:3, 545:18, 546:9, 547:9, 548:6, 548:10, 548:20, 548:24, 549:10, 549:13, 549:16, 549:17, 549:19, 549:23, 550:3, 550:21, 550:24, 551:4, 551:7, 551:11, 551:12, 551:22, 552:1, 552:12, 553:3, 553:25, 554:10, 554:11, 556:1, 556:2, 556:7,

556:14, 556:16, 557:12, 558:9, 558:13, 558:20, 558:21, 558:23, 560:25, 561:3, 561:6, 562:13, 562:16, 562:17, 562:20, 565:6, 565:9, 567:7, 567:8, 567:13, 567:22, 567:23, 570:19, 570:20, 572:17, 572:18, 573:6, 573:10, 573:22, 574:6, 584:20, 584:21, 585:13, 587:24, 594:18, 604:9, 608:19, 608:20
CORRECT [1] - 612:8
CORRECTED [2] - 533:6, 541:25
CORRECTLY [1] - 599:23
COST [1] - 559:18
COUCHED [1] - 605:2
COUNCIL [2] - 587:18, 595:19
COUNSEL [3] - 537:8, 581:9, 602:4
COUNSEL [1] - 506:1
COUNSELOR [1] - 518:25
COUNSELS' [2] - 584:6, 593:17
COUNTIES [1] - 520:23
COUNTY [2] - 521:10, 521:11
COUPLE [6] - 509:22, 548:16, 573:7, 582:20, 583:4, 609:13
COURSE [7] - 519:4, 519:10, 519:12, 519:15, 570:22, 584:9, 592:4
COURSES [4] - 518:12, 518:13, 519:8, 552:25
COURT [131] - 505:1, 505:24, 509:6, 509:9, 509:16, 509:21, 510:1, 510:3, 510:5, 510:10, 514:8, 514:24, 515:14, 515:16, 517:8, 517:24, 520:5, 535:11, 535:21, 536:23, 539:8, 540:24, 546:17, 547:21, 551:21, 551:23, 552:4, 554:3, 554:13, 554:16, 555:5, 557:17, 557:19, 560:3, 561:11, 562:5, 568:3, 568:10, 571:11, 573:24, 574:8, 574:12, 574:17, 574:19, 574:21, 574:23, 574:25, 575:5, 575:8, 575:12, 580:15, 580:20, 581:2, 581:4, 581:7, 581:10, 582:12, 582:14, 582:17, 582:19, 582:25, 583:23, 584:17, 584:19, 584:22,

585:1, 585:7, 586:6, 586:8, 586:17, 587:2, 587:23, 588:2, 589:2, 589:17, 590:20, 590:22, 591:4, 591:9, 591:13, 591:20, 592:2, 592:12, 592:23, 593:6, 593:23, 594:9, 594:21, 595:8, 596:7, 596:25, 597:5, 597:8, 597:24, 598:11, 599:1, 599:5, 599:22, 600:9, 600:12, 601:5, 601:24, 602:25, 603:24, 604:5, 604:10, 604:14, 604:25, 605:24, 606:3, 606:13, 606:18, 607:10, 607:21, 608:7, 608:19, 609:1, 609:12, 609:16, 609:18, 609:23, 610:2, 610:11, 610:16, 610:23, 611:1, 611:4, 611:7, 612:5, 612:18
**COURT** [15] - 509:5, 510:8, 517:14, 520:15, 520:24, 520:25, 521:20, 554:21, 575:4, 577:25, 582:24, 585:6, 586:5, 593:13, 608:14
**COURT** [8] - 509:12, 593:4, 598:1, 598:11, 601:3, 607:1, 607:13, 609:14
**COURT'S** [3] - 509:14, 584:14, 609:21
**COURTS** [2] - 520:20, 520:21
**COVE** [42] - 514:22, 522:11, 522:14, 522:19, 524:11, 524:12, 527:14, 527:15, 529:17, 538:5, 539:13, 541:11, 544:3, 544:13, 550:9, 551:15, 553:8, 553:12, 555:14, 557:2, 557:22, 558:13, 558:20, 563:14, 563:15, 564:12, 566:3, 566:9, 566:12, 569:22, 571:20, 575:23, 577:15, 578:8, 578:21, 579:17, 581:14, 581:18, 581:21, 602:14, 602:23, 608:15
**COVE** [1] - 505:5
**COVE'S** [6] - 537:22, 537:25, 550:18, 551:18, 551:19, 569:7
**COVER** [2] - 559:12, 576:10
**COVERED** [1] - 606:9
**COVERING** [1] - 576:14
**CPI** [1] - 514:18
**CRE** [1] - 518:25
**CREATED** [2] - 516:6, 540:1
**CREATING** [1] - 603:21

**CREDIBILITY** [3] - 587:20, 590:24, 590:25
**CREDIT** [5] - 564:9, 564:14, 564:24, 565:22, 566:17
**CRIMINAL** [2] - 593:9, 593:16
**CRITIQUE** [4] - 523:2, 537:13, 537:16, 537:18
**CROSS** [3] - 537:1, 571:16, 581:11
**CROSS** [8] - 507:10, 507:14, 516:18, 516:22, 535:11, 536:23, 563:11, 581:4
**CROSS** [3] - 507:13, 507:17, 507:20
**CROSS-EXAMINATION** [4] - 516:18, 516:22, 535:11, 536:23
**CROSS-EXAMINATION** [3] - 537:1, 571:16, 581:11
**CROSS-EXAMINATION** [3] - 507:13, 507:17, 507:20
**CRR** [2] - 505:23, 612:18
**CRYSTAL** [1] - 589:7
**CSR** [2] - 505:23, 612:18
**CURATIVE** [2] - 608:21, 609:9
**CUT** [3] - 584:1, 584:2, 589:14
**CV** [1] - 505:7
**CYCLE** [1] - 534:4
**CYCLES** [2] - 531:19, 532:14

# D

**DAMAGE** [3] - 519:16, 527:1, 554:9
**DAMAGED** [3] - 522:14, 522:19, 550:19
**DAMAGES** [17] - 519:9, 519:14, 521:8, 522:18, 527:3, 527:8, 533:6, 535:5, 538:18, 539:15, 539:23, 540:1, 551:24, 552:25, 553:3, 553:24, 603:7
**DATE** [7] - 523:24, 525:21, 531:1, 544:2, 544:3, 544:6, 544:7
**DATED** [1] - 612:14
**DATES** [1] - 589:15
**DAY** [2] - 505:16, 612:14
**DAY-TO-DAY** [1] - 582:5
**DAYS** [1] - 579:14
**DEAL** [2] - 519:8, 608:5
**DEALING** [2] - 512:1, 518:14
**DEALS** [2] - 519:11, 519:15
**DEALT** [1] - 521:8

**DEAR** [3] - 595:11, 595:15, 596:4
**DEBT** [1] - 570:12
**DEBT** [10] - 512:13, 513:10, 513:23, 513:25, 564:10, 564:11, 564:24, 565:5, 567:6, 570:15
**DECEMBER** [23] - 524:15, 524:20, 526:4, 526:6, 526:8, 526:10, 531:1, 531:4, 531:7, 538:21, 543:15, 543:21, 544:2, 544:10, 545:13, 545:17, 545:21, 546:6, 547:2, 547:3, 547:5, 547:6
**DECIDE** [2] - 559:18, 605:10
**DECIDED** [2] - 602:12, 602:22
**DECIDING** [1] - 561:8
**DECISION** [13] - 512:19, 515:1, 515:12, 516:12, 516:15, 516:17, 516:21, 516:25, 538:20, 561:9, 580:1, 592:25, 593:19
**DECISIONS** [2] - 515:25, 553:23
**DECLINE** [1] - 531:8
**DECLINES** [1] - 534:16
**DECLINING** [1] - 534:12
**DEEMED** [2] - 579:4, 587:3
**DEFENDANT** [1] - 580:18
**DEFENDANTS** [7] - 539:17, 544:4, 594:20, 595:19, 599:11, 599:16, 599:24
**DEFENDANTS** [2] - 505:11, 506:13
**DEFENDANTS'** [5] - 595:12, 600:5, 601:13, 602:2, 602:25
**DEFENDANTS'** [3] - 510:12, 518:2, 555:7
**DEFENSE** [17] - 554:16, 554:17, 574:8, 574:14, 574:15, 583:22, 584:17, 590:19, 590:21, 593:3, 598:20, 598:21, 599:3, 602:3, 603:10, 605:13, 611:1
**DEFENSE'S** [2] - 555:11, 588:5
**DEFENSES** [1] - 607:3
**DEFENSES'** [1] - 607:11
**DEFERRED** [1] - 578:12
**DEFINITELY** [1] - 592:24
**DEFINITION** [1] - 586:23
**DEFINITIVE** [1] - 593:20
**DEGREE** [3] - 511:4, 527:17, 588:12
**DELAWARE** [1] - 505:5
**DELAY** [1] - 585:12
**DELETE** [2] - 596:14,

596:18
**DELETED** [1] - 590:2
**DELIBERATIONS** [1] - 585:21
**DEMONSTRATIONAL** [1] - 518:18
**DEMONSTRATIVE** [2] - 535:19, 610:4
**DEMONSTRATIVES** [3] - 591:19, 591:25, 609:22
**DENIED** [5] - 544:4, 559:25, 561:11, 571:11, 595:21
**DENY** [1] - 596:7
**DENYING** [1] - 602:14
**DEPOSE** [1] - 595:11
**DEPOSED** [1] - 547:15
**DEPOSITION** [10] - 515:5, 515:8, 515:22, 552:8, 552:10, 553:6, 590:15, 595:14, 595:16, 595:24
**DEPOSITIONS** [2] - 590:14, 596:2
**DEPRESSED** [1] - 532:9
**DERIVING** [1] - 530:20
**DESCRIBE** [1] - 589:6
**DESCRIBED** [1] - 598:9
**DESCRIPTION** [2] - 548:12, 606:22
**DESIGNATION** [4] - 518:20, 518:22, 518:24, 518:25
**DESIGNED** [2] - 588:20, 601:10
**DESPITE** [1] - 605:2
**DETAIL** [1] - 523:19
**DETERMINE** [1] - 610:1
**DETERMINED** [1] - 572:19
**DETERMINING** [5] - 553:11, 599:21, 600:3, 600:7, 601:4
**DEVELOP** [2] - 537:21, 601:3
**DEVELOPED** [1] - 538:3
**DEVELOPING** [1] - 579:11
**DIFFER** [2] - 530:19, 541:16
**DIFFERENCE** [2] - 552:16, 552:20
**DIFFERENCES** [2] - 535:15, 536:3
**DIFFERENT** [17] - 519:12, 519:13, 531:19, 531:24, 539:23, 543:22, 543:24, 546:24, 547:1, 547:23, 567:19, 591:22, 592:3, 603:19, 603:21, 605:3, 605:19
**DIFFERENTIAL** [2] - 523:24, 534:10
**DIFFERENTLY** [1] - 523:15

DIFFERS [1] - 542:17
DIFFICULT [2] - 533:12, 603:8
DIGIT [1] - 578:2
DILIGENTLY [1] - 595:11
DIMITRI [1] - 506:5
DIRECT [3] - 518:3, 555:8, 575:15
DIRECT [3] - 507:12, 507:16, 507:20
DIRECT [1] - 524:2
DIRECTLY [1] - 599:20
DISAGREE [1] - 538:11
DISAGREED [2] - 528:1, 551:3
DISAGREEMENT [1] - 592:15
DISBURSEMENT [1] - 527:7
DISC [1] - 607:14
DISCOUNT [15] - 524:4, 524:10, 528:2, 528:6, 528:7, 528:21, 528:23, 528:24, 528:25, 536:5, 536:8, 536:16, 536:20, 541:5, 541:7
DISCOUNTED [7] - 524:19, 526:9, 536:4, 536:10, 540:19, 541:6, 550:25
DISCOUNTING [6] - 523:23, 524:9, 527:1, 528:2, 528:22, 536:7
DISCOUNTS [3] - 526:3, 541:10, 541:13
DISCUSS [3] - 568:6, 582:20, 586:1
DISCUSSED [4] - 550:14, 571:21, 572:2, 588:19
DISCUSSES [1] - 589:3
DISCUSSING [1] - 610:6
DISCUSSIONS [3] - 563:13, 566:2, 566:9
DISPROPORTIONATELY [1] - 601:9
DISPUTE [5] - 540:6, 551:16, 583:16, 594:18, 607:14
DISPUTED [8] - 583:3, 594:2, 594:3, 596:13, 602:2, 602:3, 602:25, 607:4
DISPUTEDS [1] - 594:1
DISPUTES [1] - 554:9
DISTORTS [1] - 531:3
DISTRESSED [1] - 577:22
DISTRIBUTIONS [1] - 549:25
DISTRICT [5] - 505:1, 505:2, 505:3, 612:5, 612:6
DISTRICT [2] - 520:24, 521:2
DISTRICTS [1] - 521:1

DIVIDE [1] - 572:21
DIVIDED [1] - 529:16
DIVIDEND [1] - 549:25
DIVISION [1] - 505:2
DO [1] - 612:6
DOCUMENT [2] - 544:25, 545:2, 545:11, 562:16, 563:19, 587:4, 587:6, 587:9, 587:13
DOCUMENTATION [1] - 563:5
DOES [1] - 505:10
DOG [1] - 564:23
DOMAIN [1] - 521:9
DONE [8] - 520:12, 521:12, 523:15, 524:1, 527:6, 534:11, 576:16, 592:16
DORADO [2] - 557:4, 577:12
DOUBLE [2] - 509:22, 594:20
DOWN [10] - 517:8, 531:17, 534:11, 534:19, 536:13, 536:14, 541:7, 549:2, 554:13, 556:22, 567:7, 574:12, 574:13, 582:14, 601:5, 601:6, 605:25, 610:4
DOWNTURN [1] - 531:11
DR [2] - 510:15, 514:11
DRAWN [1] - 579:1
DREW [1] - 522:8
DRIVING [1] - 555:11
DUE [4] - 524:17, 525:18, 541:14, 560:11
DURING [9] - 543:12, 543:18, 573:19, 578:20, 584:8, 584:9, 592:4, 592:8, 607:23
DUTY [1] - 589:24

## E

E-L-L-I-S [1] - 517:23
EARLY [2] - 509:18, 515:4
EARN [1] - 565:15
EARNED [1] - 550:2
EASIER [1] - 533:20
EASIEST [2] - 526:22, 597:9
ECONOMIC [3] - 599:10, 601:8, 601:22
ECONOMICS [1] - 518:11
ECONOMIST [1] - 544:19
EDIT [6] - 594:4, 594:9, 596:10, 597:2, 607:15
EDITED [2] - 589:25, 594:3
EDITS [3] - 597:2, 607:11, 607:15
EDUCATION [1] - 518:9
EFFECT [1] - 527:23

EFFECTIVE [1] - 538:21
EFFICIENT [1] - 583:7
EFFORT [2] - 515:9, 578:25
EIGHT [2] - 526:11, 550:2
EITHER [10] - 511:6, 545:10, 556:18, 577:4, 584:18, 586:15, 604:3, 605:22, 605:23, 605:24
EL [2] - 557:4, 577:12
ELECTRIC [1] - 571:5
ELEMENT [1] - 603:18
ELEMENTS [1] - 528:18
ELLIS [21] - 517:10, 517:22, 518:5, 520:18, 525:9, 529:25, 530:10, 531:21, 535:9, 535:14, 535:22, 536:21, 537:3, 545:8, 545:11, 545:13, 545:16, 546:25, 552:7, 594:13, 595:1
ELLIS [2] - 507:11, 518:1
ELLIS' [3] - 535:20, 539:7, 594:16
EMPLOYEE [1] - 596:3
ENCOMPASSED [1] - 597:8
END [4] - 524:23, 525:14, 525:17, 604:11
ENDED [1] - 546:7
ENDING [1] - 538:21
ENDORSED [1] - 587:18
ENGAGED [3] - 584:10, 584:11, 584:15
ENJOY [3] - 576:17, 576:18, 578:14
ENTIRE [10] - 522:1, 526:10, 547:14, 553:8, 573:17, 573:21, 587:3, 587:4, 587:6, 599:15
ENTIRELY [2] - 515:23, 595:23
ENTIRETY [1] - 587:7
ENTITLED [1] - 612:10
ENTITLED [5] - 539:14, 545:6, 551:15, 578:14, 597:21
EQUAL [1] - 525:22
EQUITY [1] - 529:9
ERROR [2] - 515:19, 515:20
ERRORS [1] - 511:6
ESPECIALLY [3] - 594:12, 594:23, 601:5
ESSENTIALLY [3] - 523:1, 528:15, 600:20
ESTABLISH [3] - 599:9, 599:25, 600:5
ESTABLISHED [1] - 530:16
ESTATE [8] - 518:8, 518:10, 518:23, 518:25, 519:9, 528:19, 553:3, 555:22

ESTIMATE [2] - 538:18, 553:2
ESTIMATED [2] - 550:17, 550:24
ESTOPPED [2] - 602:14, 602:23
ET [1] - 565:15
EVALUATING [2] - 518:19, 536:20
EVD [1] - 508:5
EVIDENCE [1] - 557:15
EVIDENCE [32] - 520:3, 523:4, 545:6, 546:20, 569:6, 585:11, 588:25, 589:23, 591:6, 591:11, 591:14, 591:19, 591:23, 592:3, 592:22, 594:22, 595:2, 595:22, 597:14, 598:3, 598:12, 598:14, 599:9, 599:14, 600:1, 600:5, 600:15, 600:21, 605:18, 606:12, 607:3, 610:8
EXACT [1] - 588:3
EXACTLY [3] - 551:8, 589:13, 604:6
EXAMINATION [11] - 510:13, 514:9, 518:3, 537:1, 552:5, 554:4, 555:8, 571:16, 574:1, 575:15, 581:11
EXAMINATION [16] - 507:9, 507:10, 507:12, 507:13, 507:13, 507:14, 507:16, 507:17, 507:17, 507:20, 507:20, 516:18, 516:22, 518:17, 535:11, 536:23
EXAMINE [1] - 587:25
EXAMPLE [9] - 524:17, 577:12, 591:21, 596:11, 597:5, 598:1, 598:3, 605:13, 606:22
EXCEED [1] - 570:23
EXCEPTION [5] - 586:20, 586:22, 586:25, 587:8, 587:10
EXCEPTIONS [2] - 586:15, 587:12
EXCESSIVE [4] - 513:1, 514:1, 514:3, 601:17
EXCHANGE [2] - 609:22, 609:25
EXCHANGED [1] - 610:5
EXCUSE [2] - 550:5, 551:25
EXECUTIVE [1] - 584:1
EXERCISED [1] - 576:5
EXHIBIT [28] - 508:5, 511:22, 512:21, 519:22, 519:24, 523:5, 523:11, 525:10, 531:23, 532:24, 539:7, 539:9, 540:21, 540:23, 541:1, 541:2,

542:23, 561:19, 561:25, 562:3, 562:7, 568:24, 569:6, 570:4, 570:7, 573:8, 574:3, 586:8

**EXHIBIT** [13] - 535:19, 542:25, 545:24, 546:1, 546:6, 546:10, 546:20, 547:12, 548:15, 551:7, 561:22, 584:23

**EXHIBITS** [1] - 520:3

**EXHIBITS** [1] - 508:1

**EXIST** [2] - 528:19, 592:19

**EXISTED** [1] - 579:3

**EXISTING** [1] - 511:11

**EXISTS** [1] - 547:13

**EXPAND** [1] - 559:18

**EXPANDED** [1] - 559:21

**EXPECT** [7] - 529:23, 530:24, 531:14, 531:17, 532:15, 580:22, 592:16

**EXPECTATION** [2] - 530:18, 532:15

**EXPECTATIONS** [1] - 596:16

**EXPECTED** [1] - 532:17

**EXPECTING** [1] - 528:16

**EXPENSE** [2] - 569:7, 579:10

**EXPENSES** [1] - 579:23

**EXPERIENCE** [3] - 519:2, 544:19, 565:20

**EXPERT** [4] - 520:12, 520:15, 537:9, 538:24

**EXPERTISE** [1] - 551:22

**EXPERTS** [1] - 591:8

**EXPLAINED** [1] - 543:12, 543:18

**EXPLANATION** [2] - 533:11, 588:6

**EXPRESS** [2] - 568:7, 586:2

**EXPRESSED** [1] - 558:18

**EXPRESSES** [1] - 538:15

**EXTENSION** [3] - 519:5, 595:18

**EXTENT** [2] - 509:23, 596:15

---

**F**

---

**FACT** [15] - 532:11, 540:16, 553:20, 559:20, 563:18, 573:3, 586:14, 587:17, 587:18, 588:25, 589:11, 590:12, 595:13

**FACTOR** [3] - 561:8, 598:12, 598:24

**FACTORS** [10] - 513:24, 596:20, 597:4, 597:20, 598:5, 598:16, 599:20,

601:16, 601:18

**FAIR** [6] - 556:13, 564:6, 580:7, 599:16, 599:18, 599:21

**FAIRLY** [1] - 584:9

**FAIRNESS** [4] - 599:10, 600:25, 601:7, 601:21

**FALL** [1] - 584:10

**FALLBACK** [2] - 604:11, 605:13

**FALLS** [1] - 523:21

**FALSE** [1] - 553:20

**FAMILIES** [2] - 575:23, 576:4

**FAMILY** [2] - 521:8, 575:25

**FAR** [5] - 521:24, 589:8, 590:23, 590:24, 595:23

**FARGO** [1] - 561:14

**FASHION** [1] - 597:16

**FAST** [1] - 580:4

**FAVOR** [3] - 551:18, 551:19, 577:2

**FEDERAL** [1] - 557:15

**FEDERAL** [3] - 505:24, 612:4, 612:18

**FEDERAL** [1] - 520:24

**FELLOW** [1] - 519:1

**FELT** [1] - 578:17

**FEW** [8] - 514:11, 550:15, 562:25, 569:1, 582:7, 583:6, 600:17, 601:10

**FEWER** [1] - 534:23

**FIFTH** [1] - 548:18

**FIGURE** [8] - 526:14, 534:14, 540:17, 540:19, 550:20, 550:25, 600:16, 603:5

**FIGURES** [12] - 521:21, 546:24, 547:10, 547:19, 547:25, 548:2, 548:7, 551:9, 552:14, 552:19

**FILE** [1] - 547:14

**FILES** [1] - 564:1

**FINAL** [8] - 535:6, 541:17, 542:7, 573:11, 583:14, 583:16, 606:20, 606:21

**FINALLY** [1] - 551:13

**FINANCE** [5] - 556:18, 557:24, 558:5, 559:18, 566:19

**FINANCED** [2] - 565:13, 565:14

**FINANCES** [1] - 564:10

**FINANCIAL** [5] - 519:13, 522:5, 527:17, 531:5, 577:10

**FINANCIALLY** [1] - 577:22

**FINANCIALLY-DISTRESSED** [1] - 577:22

**FINANCING** [12] - 555:21, 556:9, 556:11, 557:1, 557:4,

557:21, 558:20, 560:5, 560:23, 563:14, 565:8, 565:20

**FINANCINGS** [1] - 556:3

**FINDINGS** [2] - 586:20, 586:24

**FINE** [2] - 610:22, 610:25

**FINISH** [1] - 509:17

**FIRM** [2] - 521:4, 595:12

**FIRST** [26] - 524:5, 527:18, 534:4, 543:16, 544:7, 549:3, 550:16, 560:12, 560:13, 564:23, 567:3, 569:11, 569:17, 576:8, 577:25, 578:3, 578:8, 579:18, 586:19, 588:18, 596:21, 600:18, 603:3, 603:8, 607:20, 607:21

**FIVE** [5] - 520:12, 566:20, 566:22, 566:25, 573:20

**FIVE-YEAR** [1] - 573:20

**FIX** [4] - 510:25, 511:1, 515:9, 572:7

**FIXED** [3] - 567:1, 572:5, 572:8

**FIXING** [1] - 578:16

**FLEXIBILITY** [2] - 559:15, 583:25

**FLIP** [1] - 580:5

**FLOOR** [1] - 506:6

**FLOW** [3] - 527:6, 529:9, 576:14

**FLOWS** [1] - 519:12

**FOCUSED** [1] - 529:18

**FOCUSES** [1] - 589:14

**FOLLOWED** [1] - 518:18

**FOLLOWING** [9] - 509:4, 510:7, 518:12, 531:16, 574:20, 575:3, 582:23, 585:5, 586:4

**FOR** [6] - 506:3, 506:13, 612:5

**FORCE** [2] - 601:17, 601:20

**FORCED** [1] - 577:10

**FORCES** [1] - 577:4

**FORECLOSE** [1] - 529:6

**FOREGOING** [1] - 612:8

**FORENSIC** [1] - 544:19

**FORM** [8] - 511:6, 522:6, 532:14, 537:16, 538:13, 568:7, 586:2, 606:15

**FORMAT** [1] - 612:10

**FORMED** [2] - 522:9, 522:13, 522:22

**FORMS** [1] - 583:11

**FORMULA** [1] - 601:3

**FORTH** [1] - 550:17

**FORWARD** [8] - 523:24, 524:15, 524:21, 531:1, 531:18, 554:19, 578:25,

603:17

**FRACTURED** [1] - 560:1

**FRAME** [1] - 589:3

**FRESCHAUF** [8] - 575:21, 576:7, 576:22, 577:14, 577:16, 578:4, 587:25, 588:1

**FRESCHAUF'S** [1] - 607:24

**FRIDAY** [2] - 577:25, 584:14

**FRONT** [3] - 523:6, 568:14, 568:17

**FULL** [3] - 517:21, 555:1, 572:16

**FULLY** [1] - 577:20

**FUND** [3] - 530:21, 549:24, 552:11

**FUNDS** [4] - 527:7, 530:7, 531:13, 549:22

**FUTURE** [1] - 563:7

**FUZZY** [1] - 591:23

---

**G**

---

**G.E** [19] - 536:15, 560:23, 561:1, 561:13, 562:12, 563:5, 563:21, 564:8, 565:18, 566:4, 566:10, 566:16, 572:4, 572:10, 572:13, 572:19, 573:1, 573:21, 574:5

**GARDENS** [2] - 510:16, 512:14

**GENERAL** [1] - 571:5

**GENERAL** [2] - 565:8, 604:22

**GENERALLY** [1] - 530:10

**GENERATE** [2] - 564:15, 578:23

**GENTLEMEN** [2] - 568:4, 582:19

**GILCHRIST** [1] - 506:8

**GILCHRIST** [1] - 521:4

**GIVEN** [1] - 516:5, 538:16, 548:11, 579:13, 581:21, 587:25, 590:13, 590:24, 593:22, 594:6, 594:25, 595:4, 595:22, 603:1, 606:13

**GLEAN** [1] - 589:4

**GOAL** [1] - 559:17

**GOALS** [1] - 558:19, 558:22, 559:15, 559:22, 561:2, 561:4

**GOD** [2] - 517:16, 554:23

**GOING-FORWARD** [1] - 531:18

**GOLDSTEIN** [32] - 512:8, 513:12, 541:11, 555:14, 556:17, 557:21, 558:13, 558:18, 560:4, 560:15, 563:11, 563:13, 564:9,

566:4, 566:8, 567:12, 569:2, 571:13, 571:23, 572:3, 573:16, 574:22, 575:6, 575:8, 575:17, 575:20, 576:7, 577:23, 578:20, 580:10, 581:13
**GOLDSTEIN** [2] - 507:19, 575:13
**GOLDSTEIN'S** [11] - 559:15, 559:22, 561:2, 562:19, 566:3, 567:4, 569:23, 570:8, 571:20, 574:4, 607:25
**GOVERNMENT** [6] - 587:19, 597:6, 597:21, 598:2, 599:11, 601:9
**GOVERNMENT** [2] - 528:13, 530:15
**GRADUAL** [1] - 577:6
**GRADUATION** [1] - 518:12
**GRANTED** [1] - 576:25
**GRAVAMEN** [1] - 604:22
**GREAT** [4] - 525:13, 531:8, 533:18, 602:5
**GREATER** [3] - 528:8, 538:8, 570:18
**GREEN** [2] - 593:13, 593:14
**GREGORY** [1] - 517:22
**GROWTH** [3] - 529:14, 529:20, 529:22
**GUESS** [5] - 509:23, 602:13, 604:10, 610:11, 610:20
**GUESSTIMATE** [1] - 611:1
**GUEST** [1] - 519:6
**GUIDELINES** [5] - 514:21, 515:4, 515:11, 602:6, 604:23
**GUTIERREZ** [1] - 505:3

## H

**H-A-N-S-E-N** [1] - 555:3
**HALF** [1] - 585:22
**HALL** [1] - 517:10
**HAND** [5] - 517:12, 534:9, 554:19, 562:9, 570:11
**HANDLE** [2] - 582:5, 593:4
**HANDPRINT** [1] - 595:4
**HANDY** [1] - 589:20
**HANSEN** [11] - 554:17, 555:3, 555:10, 557:20, 561:16, 562:6, 565:1, 566:18, 568:12, 570:21, 571:18
**HANSEN** [2] - 507:15, 555:6
**HAPPY** [3] - 546:11, 547:15, 580:7
**HARBOR** [14] - 512:1, 516:12, 516:17, 516:21,

516:25, 556:24, 577:15, 579:22, 608:1, 608:6, 608:8, 608:11, 608:17, 609:3
**HARD** [1] - 605:10
**HEADINGS** [2] - 525:12, 533:13
**HEAR** [8] - 515:15, 543:16, 575:17, 584:6, 593:5, 600:12, 603:10, 604:14
**HEARD** [18] - 575:21, 576:7, 576:24, 577:14, 577:25, 578:4, 578:20, 579:16, 585:10, 588:13, 588:22, 589:22, 589:23, 594:23, 597:13, 598:3, 602:4, 606:16
**HEARING** [2] - 576:8, 576:12
**HEARSAY** [7] - 586:10, 586:13, 586:15, 586:22, 587:9, 587:12
**HELD** [9] - 509:4, 510:7, 528:13, 574:20, 575:3, 582:23, 585:5, 586:4, 602:17
**HELD** [1] - 612:9
**HELLO** [2] - 518:6, 537:4
**HELP** [3] - 517:15, 554:22, 577:11
**HELPFUL** [2] - 525:11, 525:13
**HEREBY** [1] - 612:6
**HERNANDEZ** [1] - 592:14
**HIGH** [6] - 514:17, 532:4, 547:9, 578:12, 578:18, 580:6
**HIGHER** [5] - 514:17, 527:14, 528:9, 529:10, 561:13
**HIGHLIGHT** [2] - 539:11, 545:22
**HIGHLIGHTS** [1] - 525:1
**HIRE** [5] - 556:11, 556:23, 557:1, 557:4, 557:6
**HIRED** [1] - 556:17
**HISTORICAL** [2] - 545:6, 546:2
**HISTORY** [1] - 579:23
**HIT** [1] - 533:16
**HOLD** [2] - 518:24, 607:22
**HOLDER** [3] - 529:4, 529:8, 536:17
**HOLDING** [11] - 528:16, 531:24, 531:25, 532:2, 532:6, 532:18, 543:13, 543:19, 543:23, 543:24
**HOME** [21] - 522:11, 522:15, 527:24, 528:10, 528:17, 555:22, 556:4, 556:10, 556:18, 557:25, 558:6, 558:8, 559:1, 559:3, 565:9, 565:14, 565:20,

573:4, 580:6, 607:25
**HOMEWORK** [2] - 593:23, 594:5
**HONOR** [60] - 509:8, 510:9, 517:7, 517:9, 520:2, 520:7, 535:10, 535:18, 536:22, 539:6, 540:22, 545:4, 554:2, 554:15, 555:4, 557:14, 557:18, 558:15, 560:2, 562:2, 568:11, 573:23, 574:11, 574:15, 574:18, 581:3, 581:5, 581:9, 582:13, 582:16, 582:18, 584:21, 584:25, 586:11, 588:16, 591:3, 591:24, 592:7, 592:21, 594:15, 595:9, 597:1, 597:23, 598:23, 599:4, 600:11, 600:17, 602:10, 603:13, 606:10, 606:11, 606:14, 607:8, 607:23, 608:1, 608:2, 608:23, 609:10, 609:13, 611:9
**HONOR'S** [1] - 599:7
**HONORABLE** [1] - 505:3
**HOPE** [1] - 506:6
**HOPEFUL** [1] - 576:14
**HOPEFULLY** [1] - 576:14
**HORRIBLE** [1] - 531:6
**HOUR** [5] - 509:16, 521:21, 585:15, 610:14, 610:18
**HOURLY** [1] - 521:20
**HOURS** [2] - 509:11, 518:14
**HOUSEKEEPING** [1] - 607:20
**HOUSING** [5] - 558:9, 558:10, 558:11, 560:18, 560:20
**HP** [1] - 591:22
**HUGE** [2] - 513:3, 514:18
**HUNDRED** [2] - 556:5, 565:13
**HYPOTHETICAL** [12] - 522:20, 522:25, 532:19, 535:4, 539:4, 539:11, 553:15, 553:17, 553:18, 554:7, 580:14, 593:12

## I

**ID** [1] - 508:5
**IDENTICAL** [1] - 561:15
**IDENTIFIED** [1] - 552:10
**IDENTIFY** [2] - 582:1, 582:4
**IMMENSE** [1] - 596:6
**IMMINENT** [1] - 521:9
**IMPACT** [1] - 525:1
**IMPACTED** [1] - 553:12
**IMPEACHMENT** [1] -

590:16
**IMPLICATE** [1] - 588:9
**IMPORTANT** [2] - 541:21, 553:10
**IMPOSED** [1] - 579:10
**IMPOSSIBLE** [1] - 577:10
**IMPRESSION** [1] - 591:15
**IMPROPER** [3] - 553:24, 580:14, 580:19
**IMPROVE** [1] - 578:9
**IMPROVEMENTS** [1] - 576:15
**IN** [3] - 612:5, 612:9, 612:10
**INAPPLICABLE** [1] - 592:22
**INAPPROPRIATE** [2] - 524:1, 524:10
**INCIDENTS** [1] - 589:7
**INCLINED** [2] - 509:12, 605:14
**INCLUDE** [4] - 520:9, 563:6, 592:25, 593:1
**INCLUDED** [5] - 519:12, 558:22, 594:19, 608:12, 608:14
**INCLUDES** [1] - 597:12
**INCLUSIVE** [1] - 505:10
**INCOME** [30] - 518:14, 519:4, 519:10, 519:15, 524:11, 526:2, 527:9, 527:10, 527:13, 528:9, 529:14, 529:16, 529:20, 529:22, 538:19, 550:17, 553:7, 559:8, 559:11, 564:16, 565:22, 569:7, 569:15, 569:21, 570:24, 571:6, 572:19, 578:23, 579:23
**INCONSISTENT** [2] - 590:22, 605:16
**INCORPORATED** [1] - 539:20
**INCORRECT** [5] - 524:7, 550:10, 550:11, 608:20, 608:21
**INCREASE** [33] - 511:8, 512:2, 512:8, 512:14, 512:22, 513:2, 513:3, 513:11, 513:18, 513:20, 513:22, 514:2, 514:3, 514:12, 514:17, 514:19, 514:22, 525:16, 553:23, 570:8, 576:10, 576:12, 576:20, 576:21, 577:5, 578:2, 578:16, 580:1, 580:22, 581:14, 581:18
**INCREASED** [1] - 544:13
**INCREASES** [5] - 513:1, 513:14, 540:13, 540:17, 544:4, 564:19, 576:23,

576:24, 577:6, 577:7, 577:24, 579:21
**INDEX** [10] - 507:5, 530:21, 533:2, 542:13, 545:12, 548:20, 548:22, 549:20, 551:3, 552:22
**INDEX** [8] - 543:14, 543:20, 545:16, 545:20, 546:21, 552:11, 552:22, 595:1
**INDIAN** [1] - 557:7
**INDICATE** [1] - 574:4
**INDICATES** [2] - 512:7, 513:20
**INDICATING** [1] - 607:1
**INDICATION** [1] - 553:6
**INDIO** [1] - 555:11
**INDIVIDUAL** [2] - 586:17, 601:23
**INFERENCE** [4] - 595:5, 595:10, 595:23, 596:8
**INFERENCES** [1] - 596:1
**INFORMATION** [5] - 515:24, 516:4, 516:8, 552:11, 552:21
**INFORMED** [1] - 595:14
**INHERITED** [1] - 578:2
**INITIALS** [2] - 562:16, 562:18
**INJURIES** [1] - 599:10, 601:8
**INJURY** [2] - 599:16, 601:22
**INJUSTICE** [1] - 601:21
**INPUT** [1] - 593:17
**INQUIRE** [1] - 555:4
**INSIDE** [1] - 561:24
**INSTANCES** [1] - 514:16
**INSTITUTE** [4] - 518:13, 519:3, 519:10, 527:5
**INSTITUTION** [1] - 519:1
**INSTRUCT** [1] - 589:24
**INSTRUCTED** [2] - 602:7, 608:2
**INSTRUCTION** [16] - 591:2, 592:13, 593:21, 596:1, 597:19, 597:22, 598:25, 599:7, 600:10, 600:18, 601:12, 602:8, 606:17, 608:21, 609:9, 610:18
**INSTRUCTION** [6] - 590:11, 590:17, 596:13, 601:14, 606:22, 606:24
**INSTRUCTIONS** [27] - 509:24, 583:2, 583:3, 583:5, 583:9, 583:11, 583:13, 583:18, 583:19, 585:13, 585:16, 585:19, 589:19, 589:20, 590:5, 590:10, 592:25, 594:17, 600:19, 602:20, 604:16, 606:6,

606:20, 606:21, 607:17, 611:6
**INTENDED** [1] - 536:2
**INTENT** [3] - 511:17, 563:15, 574:4
**INTEREST** [73] - 524:6, 524:23, 525:20, 526:1, 526:7, 526:10, 526:12, 526:13, 526:14, 526:16, 526:23, 527:2, 530:1, 530:20, 532:23, 532:25, 533:3, 533:24, 534:1, 534:4, 534:5, 534:6, 534:9, 534:12, 534:18, 534:21, 534:24, 534:25, 535:1, 536:10, 536:14, 540:1, 541:18, 541:20, 541:23, 542:1, 542:3, 542:7, 542:14, 542:17, 542:18, 543:8, 548:17, 549:12, 549:15, 549:18, 550:1, 550:2, 550:7, 550:8, 550:9, 550:12, 550:13, 551:2, 551:10, 561:5, 561:7, 561:8, 561:12, 566:23, 566:24, 566:25, 567:6, 567:10, 567:21, 567:24, 572:7, 572:8, 606:15, 606:17
**INTERFERENCE** [1] - 596:15
**INTERLINEATIONS** [1] - 562:15
**INTERRUPT** [1] - 525:8
**INTERRUPTED** [1] - 610:3
**INTERRUPTING** [1] - 584:5
**INTERVIEWED** [1] - 586:18
**INTRODUCED** [2] - 523:4, 546:11
**INVEST** [4] - 527:16, 530:7, 530:8, 530:9
**INVESTED** [1] - 527:23
**INVESTIGATED** [1] - 589:3
**INVESTIGATING** [1] - 589:10
**INVESTIGATION** [1] - 584:24
**INVESTIGATIONS** [1] - 586:24
**INVESTING** [1] - 532:16
**INVESTMENT** [11] - 528:14, 529:8, 529:19, 530:7, 530:15, 530:24, 531:12, 531:19, 532:13, 582:9, 596:16
**INVESTMENTS** [5] - 530:13, 542:4, 542:6, 542:9, 544:2
**INVESTOR** [1] - 532:15
**INVESTORS** [1] - 532:12
**INVOLVED** [2] - 523:23,

528:18
**INVOLVING** [2] - 607:25, 608:5
**IRRELEVANT** [3] - 580:13, 580:19, 581:1
**IRVINE** [1] - 506:17
**IS** [2] - 612:8, 612:10
**ISOLATE** [1] - 604:1
**ISSUE** [8] - 528:5, 530:14, 559:20, 560:19, 584:16, 584:18, 589:15, 599:6
**ISSUES** [4] - 582:25, 583:20, 584:15, 588:19
**ITEM** [1] - 567:10
**ITSELF** [2] - 513:16, 589:14

**J**

**J.G** [1] - 562:16
**JAMES** [1] - 575:13
**JAMES** [2] - 507:19, 575:6
**JANUARY** [15] - 515:5, 524:16, 524:21, 524:24, 525:6, 525:14, 525:18, 525:19, 525:21, 525:24, 526:9, 526:18, 526:24, 534:17, 534:20
**JEFFREY** [1] - 506:15
**JOB** [1] - 556:9
**JOE** [2] - 593:12, 593:14
**JOHN** [1] - 518:1
**JOHN** [3] - 507:11, 517:10, 517:22
**JOINT** [3] - 583:6, 589:20, 606:11
**JOINTS** [1] - 592:20
**JOLT** [1] - 577:3
**JUDGE** [1] - 505:3
**JUDGES** [2] - 597:11, 598:11
**JUDICIAL** [1] - 612:11
**JUDICIAL** [1] - 521:1
**JUDICIAL** [3] - 594:13, 594:24, 595:4
**JUNE** [1] - 506:15
**JUNE** [1] - 534:17
**JUROR** [2] - 584:6, 605:5
**JURORS** [4] - 510:6, 583:17, 585:3, 595:2
**JURY** [1] - 596:13
**JURY** [34] - 509:5, 510:8, 515:10, 525:9, 551:14, 551:17, 551:18, 575:4, 576:11, 582:24, 583:1, 583:9, 584:16, 585:6, 586:5, 588:13, 588:22, 589:19, 589:20, 589:23, 593:5, 594:17, 599:15, 599:19, 600:21, 601:12, 601:19, 601:20, 602:19, 604:11,

607:17, 608:2, 611:5, 611:6
**JUSTICE** [4] - 599:8, 599:9, 600:25, 601:7

**K**

**KARMAN** [1] - 506:16
**KEEP** [6] - 527:22, 540:21, 541:15, 568:20, 580:6, 580:7
**KEEPING** [1] - 596:23
**KEN** [3] - 576:22, 577:14, 577:16
**KENNETH** [1] - 510:11
**KENNETH** [1] - 507:8
**KEPT** [3] - 579:4, 579:8, 579:9
**KEY** [1] - 511:5
**KIND** [2] - 521:6, 601:22
**KNOWING** [1] - 553:19
**KNOWN** [1] - 529:13

**L**

**LACK** [2] - 583:25, 603:13
**LADIES** [2] - 568:4, 582:19
**LAND** [2] - 578:21, 579:3
**LANGUAGE** [8] - 511:4, 514:21, 515:11, 597:18, 600:25, 601:1, 601:10, 603:25
**LARGE** [1] - 514:3
**LARGER** [4] - 540:17, 540:19, 550:23, 550:25
**LARGEST** [2] - 558:23, 558:24
**LAST** [20] - 512:20, 513:15, 513:17, 517:21, 517:23, 520:12, 525:6, 526:23, 534:20, 549:10, 555:2, 555:11, 564:23, 567:1, 575:20, 586:8, 594:14, 602:9, 605:21, 607:15
**LAST-MINUTE** [1] - 607:15
**LATE** [1] - 596:6
**LAUGHLEN** [2] - 584:7, 584:12
**LAW** [10] - 521:3, 576:3, 585:13, 585:19, 589:24, 595:12, 595:25, 597:3, 602:7, 602:15
**LAWSUIT** [2] - 580:11, 580:17
**LAWSUITS** [4] - 608:9, 609:2, 609:5, 609:6
**LAWYERS** [1] - 585:19
**LEAD** [1] - 557:15
**LEAKING** [1] - 579:8
**LEARN** [1] - 547:18
**LEAST** [4] - 515:4, 579:24, 589:18, 598:3

**LEAVE** [6] - 583:13, 590:3, 590:5, 590:7, 601:24
**LECTERN** [2] - 595:7, 601:13
**LECTURER** [1] - 519:6
**LED** [1] - 518:16
**LEFT** [6] - 509:11, 533:19, 548:18, 584:23, 585:7, 585:9
**LEGAL** [1] - 567:17
**LENDER** [13] - 527:20, 529:4, 529:5, 529:6, 529:7, 529:11, 536:18, 559:17, 560:6, 560:9, 565:21, 573:1
**LENDER'S** [2] - 529:7, 560:16
**LENDERS** [4] - 559:23, 571:19, 572:2, 573:4
**LENGTH** [1] - 566:19
**LESS** [5] - 513:5, 514:4, 514:16, 529:7, 534:25
**LETTER** [5] - 564:9, 564:14, 564:24, 565:22, 566:17
**LEVEL** [1] - 528:9
**LEVELS** [1] - 586:10
**LIABILITY** [2] - 505:5, 550:18
**LICENSES** [1] - 518:21
**LIFE** [1] - 553:8
**LIGHT** [6] - 511:11, 511:12, 593:12, 593:14, 594:12, 594:16
**LIMINE** [6] - 558:17, 602:13, 602:21, 608:2, 608:5, 609:7
**LIMITED** [6] - 505:5, 589:9, 592:22, 597:4, 608:8, 608:9
**LINE** [8] - 512:21, 564:23, 596:14, 596:17, 596:19, 600:2
**LINES** [3] - 596:24, 597:2, 599:8
**LIST** [6] - 520:3, 520:11, 540:10, 545:16, 551:25, 596:4
**LISTING** [1] - 545:11
**LITIGATION** [5] - 589:16, 602:18, 607:25, 608:5, 608:14
**LIVE** [3] - 575:23, 576:4, 579:5
**LIVING** [2] - 555:17, 555:20
**LLC** [2] - 505:5, 539:13
**LLP** [2] - 506:4, 506:14
**LOAN** [45] - 536:15, 555:13, 556:6, 558:4, 558:23, 558:24, 559:9, 560:11, 561:9, 562:12, 562:14, 563:5, 563:19, 563:20, 563:21, 563:22, 563:23,

563:25, 564:8, 564:14, 565:4, 565:7, 565:19, 566:17, 566:19, 567:18, 569:2, 570:23, 571:1, 571:13, 571:20, 572:4, 572:5, 572:10, 572:13, 572:23, 573:11, 573:14, 573:17, 573:20, 573:21, 574:3, 603:15
**LOAN-TO-VALUE** [1] - 572:13
**LOANS** [2] - 559:13, 567:12
**LOCATE** [1] - 519:22
**LONG-TERM** [3] - 531:3, 560:16, 582:8
**LOOK** [20] - 512:5, 525:23, 526:22, 527:9, 529:12, 534:11, 545:24, 546:4, 547:2, 547:3, 547:5, 563:19, 564:22, 569:11, 571:3, 585:16, 605:8, 608:24, 609:10, 610:12
**LOOKED** [1] - 530:5, 531:19, 531:24, 553:7
**LOOKING** [6] - 520:8, 533:1, 558:4, 563:18, 606:14, 607:7
**LOOKS** [2] - 513:13, 546:5
**LOS** [3] - 506:7, 520:22, 521:10
**LOS** [3] - 505:17, 505:25, 505:1
**LOSING** [3] - 576:14, 578:7
**LOSS** [5] - 526:15, 531:7, 533:22, 538:19, 539:4
**LOSSES** [2] - 579:18, 580:3
**LOST** [8] - 524:11, 525:25, 526:5, 533:25, 540:13, 540:16, 546:7, 550:17
**LOW** [1] - 547:9
**LOWER** [2] - 561:15, 562:9
**LOWEST** [2] - 561:5, 572:4
**LYING** [1] - 590:23

## M

**MAI** [2] - 518:20, 518:22
**MAIN** [1] - 604:19
**MAINTAIN** [1] - 578:18
**MAINTENANCE** [1] - 578:12
**MALAWY** [1] - 601:1
**MALAWY** [7] - 506:15, 598:23, 599:3, 599:6, 600:4, 600:11, 602:10
**MANAGEMENT** [2] - 577:20, 582:5
**MANAGING** [1] - 577:16
**MANNER** [1] - 576:25
**MARK** [2] - 507:15, 554:17

**MARK** [1] - 555:3
**MARK** [1] - 555:6
**MARKET** [18] - 530:9, 530:22, 530:25, 531:4, 531:6, 531:11, 531:13, 531:16, 531:20, 531:25, 532:10, 532:16, 532:18, 532:20, 532:21, 546:6, 580:8, 580:9
**MATCH** [1] - 551:6
**MATHEMATICAL** [1] - 550:16
**MATTER** [5] - 521:9, 521:11, 587:16, 602:15, 610:6
**MATTER** [1] - 612:10
**MATTERS** [1] - 582:21
**MATTHEW** [1] - 586:12
**MATTHEW** [1] - 506:5
**MAY** [5] - 505:16, 507:3, 508:3, 509:1, 612:14
**MAYOR** [1] - 588:5
**MEAN** [11] - 549:8, 553:16, 558:25, 571:5, 586:16, 587:5, 588:18, 593:8, 603:8, 605:1, 605:9
**MEANING** [1] - 551:15
**MEANS** [5] - 533:25, 548:3, 550:12, 565:11, 565:16
**MEANT** [1] - 540:10
**MEASURE** [2] - 524:18, 540:1
**MEASURING** [3] - 519:11, 529:12, 530:22
**MEET** [6] - 561:1, 561:4, 565:22, 592:14, 593:18, 607:12
**MEETING** [2] - 571:8, 584:2
**MEMBERS** [1] - 589:22
**MEMORY** [2] - 591:9, 591:10
**MENTIONED** [3] - 528:1, 579:2, 588:8
**MET** [1] - 572:20
**METHOD** [4] - 527:3, 527:4, 530:1, 602:16
**METHODOLOGY** [2] - 522:7, 524:1
**MICHAEL** [1] - 506:15
**MICROPHONE** [1] - 555:15
**MID** [1] - 521:9
**MIDDLE** [2] - 534:13, 540:11
**MIDST** [2] - 531:8, 531:11
**MIGHT** [4] - 548:6, 578:15, 610:16
**MILLION** [9] - 540:2, 544:8, 559:9, 559:10, 559:13, 572:16, 572:19, 572:21
**MIND** [2] - 509:21, 588:16

**MINIMUM** [4] - 529:2, 529:24, 567:21, 567:24
**MINUTE** [1] - 607:15
**MINUTES** [10] - 510:17, 563:1, 568:5, 568:8, 569:1, 569:2, 582:7, 586:6, 610:18, 610:19
**MIRANDA** [4] - 505:23, 612:4, 612:17, 612:18
**MIRANDAALGORRI@ GMAIL.COM** [1] - 505:25
**MISQUOTATION** [1] - 515:4
**MISQUOTED** [1] - 514:21
**MISREPRESENTS** [1] - 546:15
**MISSION** [1] - 595:17
**MISSPOKEN** [1] - 517:1
**MISSTATES** [1] - 604:20
**MISTAKE** [2] - 510:24, 511:3
**MISTAKEN** [1] - 608:11
**MISTAKES** [3] - 510:17, 510:20, 511:10
**MITIGATING** [1] - 571:4
**MIX** [1] - 542:4
**MOBILE** [21] - 522:11, 522:15, 527:24, 528:10, 528:17, 555:22, 556:4, 556:10, 556:18, 557:25, 558:6, 558:8, 559:1, 559:3, 565:8, 565:14, 565:20, 573:4, 580:6, 607:25
**MOBILEHOME** [1] - 505:9
**MOBILEHOME** [4] - 539:16, 553:8, 553:12, 577:13
**MODEL** [1] - 589:22
**MODELING** [1] - 527:6
**MODELS** [1] - 519:13
**MODERATE** [3] - 513:4, 514:12, 514:18
**MOMENT** [5] - 541:15, 546:3, 581:6, 585:25, 587:24
**MONEY** [13] - 524:14, 524:16, 524:22, 525:20, 526:8, 527:16, 527:22, 527:23, 541:10, 576:14, 576:15, 578:8, 578:9
**MONICA** [1] - 506:11
**MONTH** [22] - 524:13, 525:6, 525:24, 526:21, 526:23, 527:15, 533:14, 533:20, 533:22, 533:25, 534:2, 534:4, 534:7, 534:15, 534:20, 534:21, 535:2, 540:4, 551:16, 554:8, 554:9
**MONTH'S** [3] - 534:10, 534:19, 534:24
**MONTHLY** [9] - 523:23, 524:13, 524:14, 528:17, 533:24, 534:2, 538:7, 539:4,

540:5
**MONTHS** [9] - 534:3, 534:5, 534:6, 534:23, 534:25, 535:2, 540:4, 549:9, 579:23
**MORMON** [1] - 595:17
**MORNING** [5] - 509:25, 584:3, 585:11, 607:23, 608:24
**MORTGAGE** [17] - 527:19, 527:21, 527:24, 527:25, 529:2, 529:4, 536:17, 559:2, 559:4, 559:9, 559:12, 565:23, 566:5, 566:10, 570:23, 571:8, 576:10
**MOST** [5] - 573:3, 574:24, 579:3, 590:3, 590:4
**MOTION** [5] - 558:17, 602:13, 608:1, 608:4, 609:6
**MOTIONS** [1] - 602:21
**MOTIVATION** [1] - 597:11
**MOUTH** [1] - 555:15
**MOVE** [9] - 520:3, 525:16, 546:16, 548:13, 555:14, 557:14, 561:10, 571:9, 578:25
**MOVING** [1] - 596:17
**MR** [132] - 509:8, 509:10, 509:20, 509:23, 510:2, 510:4, 510:9, 510:14, 514:7, 514:10, 514:23, 515:3, 515:13, 515:20, 517:6, 537:2, 539:9, 540:8, 540:20, 540:25, 542:22, 545:4, 546:18, 547:24, 551:24, 552:3, 554:5, 554:17, 555:4, 555:9, 557:14, 557:18, 557:20, 558:15, 558:16, 558:17, 558:18, 560:2, 560:4, 561:10, 561:12, 562:2, 562:6, 568:11, 571:9, 571:12, 571:15, 571:17, 573:23, 574:2, 574:7, 574:10, 574:15, 574:18, 574:22, 574:24, 575:2, 575:6, 575:16, 580:17, 580:21, 581:3, 582:13, 582:16, 582:18, 583:21, 583:22, 584:13, 584:18, 584:21, 584:25, 586:11, 586:19, 587:5, 588:1, 588:11, 589:5, 590:19, 590:21, 591:3, 591:8, 591:17, 591:18, 591:24, 592:10, 592:11, 592:21, 593:3, 593:4, 593:21, 594:7, 594:15, 595:7, 595:9, 596:23, 597:1, 597:7, 597:17, 598:8, 598:23, 599:3, 599:6, 600:4, 600:11, 600:17, 601:7, 602:10,

603:13, 604:4, 604:9, 604:13, 604:19, 605:22, 605:23, 606:1, 606:10, 606:14, 607:8, 607:9, 607:19, 609:13, 609:17, 609:20, 609:25, 610:5, 610:7, 610:13, 610:22, 610:25, 611:3, 611:5, 611:9
**MS** [29] - 517:9, 518:4, 520:2, 520:7, 535:9, 535:12, 535:18, 535:22, 536:21, 546:15, 547:20, 551:20, 551:22, 552:6, 554:2, 580:13, 580:19, 580:25, 581:5, 581:8, 581:12, 582:11, 591:12, 592:7, 607:17, 607:23, 608:16, 608:23, 609:10
**MULTIPLE** [3] - 578:3, 586:10, 607:16
**MULTIPLY** [2] - 549:5, 549:9
**MUNICIPAL** [1] - 505:8
**MUST** [4] - 570:25, 599:9, 599:25, 600:4
**MYERS** [1] - 506:4

## N

**NAME** [5] - 517:21, 517:23, 555:2
**NARROW** [1] - 589:15
**NATURE** [1] - 593:17
**NEAR** [1] - 569:12
**NECESSARILY** [1] - 548:5
**NECESSARY** [5] - 563:7, 576:10, 583:6, 594:16, 595:10
**NEED** [11] - 509:16, 563:19, 581:8, 583:4, 584:22, 588:17, 590:6, 593:22, 601:18, 602:22, 607:14
**NEEDED** [1] - 565:19
**NEEDING** [1] - 600:24
**NEEDS** [2] - 589:21, 590:2
**NEGATIVE** [2] - 532:3, 576:14
**NEGOTIATIONS** [1] - 529:17
**NET** [6] - 529:16, 559:8, 559:11, 569:15, 569:21, 570:23
**NEVER** [6] - 576:24, 576:25, 577:14, 579:13, 581:13, 581:17
**NEW** [2] - 579:11, 610:7
**NEWCOMB** [8] - 539:11, 540:8, 540:20, 542:22, 545:14, 545:22, 547:4, 547:25

**NEWS** [1] - 585:23
**NEXT** [9] - 513:16, 517:9, 534:3, 548:3, 548:14, 554:16, 585:18, 600:8, 600:15
**NICE** [1] - 600:13
**NINE** [1] - 531:24
**NO** [2] - 505:6, 612:18
**NOBODY** [2] - 545:1, 584:2
**NOELLE** [2] - 569:8, 569:9
**NOI** [1] - 569:12
**NOMINAL** [3] - 525:25, 533:21, 533:24
**NONE** [2] - 583:21, 583:22
**NONE** [1] - 508:8
**NONRESPONSIVE** [2] - 561:10, 571:10
**NORTH** [1] - 505:24
**NORTHERN** [1] - 520:25
**NORTHRIDGE** [1] - 519:7
**NOTE** [1] - 602:11
**NOTES** [1] - 571:4
**NOTHING** [14] - 514:7, 517:15, 533:24, 535:10, 554:2, 554:8, 554:22, 564:18, 574:7, 574:10, 576:2, 582:11, 605:7, 605:12
**NOTICE** [4] - 584:15, 594:13, 594:24, 595:4
**NOTICED** [1] - 584:10
**NUMBER** [24] - 512:12, 532:8, 533:20, 534:3, 536:6, 538:12, 538:14, 540:16, 541:7, 541:17, 546:25, 547:6, 549:9, 549:10, 551:16, 551:17, 554:9, 569:23, 570:15, 579:22, 584:23, 603:22, 604:18
**NUMBERS** [14] - 540:10, 541:1, 541:2, 541:3, 541:4, 544:17, 544:19, 547:19, 548:23, 549:3, 551:6, 551:8, 569:18, 594:18
**NUMEROUS** [1] - 556:21

## O

**O'CLOCK** [8] - 583:15, 583:18, 585:12, 585:14, 586:3, 607:12, 611:8
**O'MELVENY** [1] - 506:4
**OATH** [3] - 575:9, 575:10, 590:23
**OBJECT** [2] - 597:1, 599:13
**OBJECTION** [14] - 514:23, 515:13, 546:15, 547:20, 551:20, 557:17, 557:18, 558:15, 560:2, 571:9, 580:13, 580:25, 597:22, 609:24

**OBJECTIONS** [1] - 587:9
**OBLIGATION** [2] - 527:18, 541:14
**OBLIGATIONS** [1] - 527:21
**OBSERVED** [2] - 584:8, 584:13
**OBTAINED** [1] - 552:21
**OBTAINING** [1] - 518:19
**OBVIOUSLY** [1] - 563:17
**OCCASIONS** [1] - 556:20
**OCCUPATION** [1] - 518:7
**OCCURRED** [1] - 527:2
**OCCURS** [3] - 526:21, 600:20, 606:15
**OCEAN** [1] - 506:10
**OF** [11] - 505:2, 505:8, 505:9, 505:15, 506:1, 612:1, 612:6, 612:8, 612:11, 612:14
**OFFER** [1] - 597:24
**OFFERED** [2] - 518:12, 572:5
**OFFERS** [2] - 571:19, 571:22
**OFFICE** [1] - 521:11
**OFFICIAL** [2] - 587:7, 587:19
**OFFICIAL** [4] - 505:24, 612:1, 612:4, 612:18
**OIL** [4] - 579:3, 579:4, 579:5, 579:7
**OMITTED** [1] - 583:5
**ONCE** [1] - 563:21
**ONE** [77] - 511:10, 513:25, 519:21, 521:7, 521:9, 523:5, 523:20, 523:21, 530:6, 530:8, 531:12, 532:7, 532:20, 534:3, 534:15, 535:12, 541:3, 542:10, 543:3, 554:6, 558:22, 559:14, 559:22, 561:4, 561:8, 561:15, 563:18, 564:13, 566:25, 567:18, 567:21, 567:24, 571:2, 571:10, 573:3, 577:5, 577:18, 577:23, 579:9, 579:14, 579:22, 579:24, 583:1, 584:19, 589:21, 589:24, 593:2, 594:11, 595:14, 599:6, 603:4, 603:5, 603:9, 603:15, 603:20, 603:23, 603:25, 604:1, 604:2, 604:3, 604:8, 604:15, 604:20, 604:21, 605:5, 605:6, 606:10, 607:7, 607:13
**ONE-BY-ONE** [1] - 594:11
**ONE-THIRD** [2] - 532:20, 542:10
**ONES** [2] - 592:8, 594:19, 610:7
**ONSET** [1] - 531:5

**ONSTOT** [43] - 506:16, 510:9, 510:14, 514:7, 514:23, 515:13, 554:17, 555:4, 555:9, 557:14, 557:20, 558:16, 558:18, 560:4, 561:10, 561:12, 562:2, 562:6, 568:11, 571:9, 571:12, 571:15, 574:2, 574:7, 574:15, 582:18, 583:22, 584:18, 590:19, 590:21, 591:17, 591:24, 592:21, 593:3, 603:13, 604:4, 604:9, 604:13, 606:10, 610:5, 610:22, 610:25, 611:3

**ONSTOT** [4] - 507:9, 507:16, 507:17, 573:8

**OPEN** [8] - 509:5, 510:8, 570:4, 575:4, 576:20, 582:24, 585:6, 586:5

**OPENED** [1] - 546:7

**OPENING** [5] - 584:8, 592:1, 592:5, 609:23, 610:12

**OPERATE** [1] - 578:17

**OPERATING** [7] - 529:16, 559:8, 559:11, 569:15, 569:21, 570:24, 579:23

**OPERATION** [2] - 528:10, 528:19

**OPINION** [13] - 522:9, 522:13, 522:18, 522:22, 522:23, 523:25, 537:21, 538:3, 538:4, 538:13, 538:15, 551:14, 553:14

**OPINIONS** [5] - 522:7, 537:16, 538:1, 568:7, 586:2

**OPPORTUNITY** [5] - 585:20, 586:9, 587:25, 594:20, 595:22

**OPPOSED** [3] - 592:4, 605:6, 605:12

**OPTION** [1] - 577:5

**ORANGE** [1] - 520:22

**ORDER** [4] - 520:19, 521:16, 521:25, 608:3

**ORDINANCE** [2] - 602:6, 602:17

**ORDINANCE** [2] - 522:15, 577:3

**OTHERWISE** [1] - 602:24

**OUTS** [1] - 565:15

**OUTSIDE** [2] - 551:22, 580:13

**OUTWEIGHED** [1] - 588:15

**OUTWEIGHS** [1] - 588:24

**OVERALL** [3] - 529:13, 529:18, 529:19

**OVERLAP** [1] - 589:13

**OVERRULED** [6] - 514:24, 515:14, 515:16, 546:17,

547:21, 581:2

**OWED** [1] - 550:9

**OWN** [3] - 564:9, 577:13, 578:11

**OWNED** [1] - 576:1

**OWNER** [8] - 522:11, 527:18, 527:21, 529:8, 529:10, 529:23, 536:20, 577:4

**OWNERS** [4] - 556:10, 556:11, 578:1, 578:15

**OWNERSHIP** [3] - 567:4, 578:11, 579:21

---

## P

**P.M** [2] - 505:17, 509:2
**P.M** [3] - 568:9, 586:7, 611:10

**PACE** [1] - 509:19

**PAGE** [1] - 612:10

**PAGE** [35] - 512:6, 512:20, 512:21, 513:8, 513:15, 513:17, 525:10, 530:11, 531:21, 532:24, 533:8, 533:11, 535:7, 539:10, 540:9, 542:23, 544:17, 547:25, 548:14, 548:15, 548:17, 561:24, 562:9, 562:22, 564:7, 564:22, 567:9, 570:7, 570:9, 594:19, 596:12, 596:14, 596:17, 599:7

**PAGE** [1] - 507:7

**PAGES** [3] - 520:8, 520:9, 520:11

**PAGES** [1] - 505:9

**PAID** [7] - 522:1, 527:25, 528:12, 534:1, 534:5, 541:11, 550:13

**PALISADES** [1] - 506:9

**PAPERS** [1] - 546:11

**PARAGRAPH** [4] - 564:23, 600:8, 601:24, 603:25

**PARAPHRASING** [1] - 601:12

**PARDON** [3] - 556:15, 566:21, 590:20

**PARK** [6] - 539:16, 553:8, 553:12, 563:15, 575:23, 577:13

**PARK** [34] - 522:11, 522:16, 527:24, 528:10, 528:17, 538:8, 544:14, 556:10, 558:6, 559:1, 559:3, 573:16, 573:19, 575:22, 575:25, 576:4, 576:15, 576:17, 576:18, 577:13, 577:16, 578:2, 578:10, 578:23, 580:4, 580:6, 580:21, 582:6,

582:8, 604:24, 607:25

**PARK** [1] - 505:9

**PARK'S** [1] - 538:19

**PARKS** [12] - 555:22, 556:4, 556:12, 556:18, 557:25, 558:8, 565:9, 565:14, 565:21, 573:4, 576:23, 577:18

**PART** [9] - 522:17, 529:1, 543:16, 544:15, 567:21, 579:10, 593:8, 593:14, 599:18

**PARTICULAR** [1] - 524:25

**PARTIES** [5] - 509:6, 584:11, 590:5, 590:6, 590:8

**PARTS** [2] - 567:19, 572:17

**PARTY** [1] - 587:12

**PASS** [1] - 564:11

**PASSAGES** [1] - 512:19

**PASSTHROUGH** [1] - 513:10

**PAST** [5] - 510:22, 511:15, 511:19, 576:22, 577:12

**PAY** [5] - 527:19, 559:2, 573:16, 573:20, 580:23

**PAYABLE** [6] - 525:18, 526:23, 534:10, 534:24, 536:17, 560:12

**PAYING** [2] - 527:24, 567:7

**PAYMENT** [7] - 524:17, 524:19, 526:9, 534:2, 539:14, 544:7, 571:8

**PAYMENTS** [15] - 527:1, 528:3, 528:17, 528:24, 530:16, 535:1, 536:4, 559:10, 559:12, 565:23, 566:5, 566:11, 566:23, 570:23, 576:11

**PEER** [1] - 518:18

**PEER-REVIEW** [1] - 518:18

**PENDING** [2] - 517:14, 554:21

**PENN** [7] - 596:11, 596:20, 597:3, 598:16, 599:19, 601:2

**PEOPLE** [4] - 553:2, 577:20, 586:17, 587:15

**PER** [11] - 513:14, 521:20, 524:13, 532:7, 533:22, 534:7, 534:15, 535:2, 540:3, 554:8, 554:9

**PERCENT** [36] - 526:12, 528:12, 528:25, 529:3, 529:18, 529:21, 529:22, 530:3, 530:18, 530:24, 531:7, 531:17, 531:18, 532:4, 532:5, 532:7, 532:17, 532:23, 533:3, 533:25, 536:6, 536:9, 546:8, 546:22, 548:10, 548:17, 549:1, 549:5, 549:19, 567:22,

567:25, 572:15, 572:22, 580:8

**PERCENTAGE** [1] - 548:4

**PERCEPTION** [1] - 588:5

**PERFORM** [1] - 599:20

**PERFORMANCE** [2] - 530:22, 531:4

**PERFORMED** [1] - 523:22

**PERIOD** [32] - 524:24, 525:5, 525:7, 525:15, 525:17, 526:11, 526:24, 531:25, 532:2, 532:4, 532:5, 532:9, 532:11, 532:18, 533:21, 543:13, 543:19, 543:23, 543:24, 545:12, 550:3, 566:24, 573:4, 580:3, 588:6, 589:10, 589:13, 589:15, 596:17, 599:2, 603:22

**PERIODS** [4] - 531:25, 532:6, 543:23, 589:12

**PERMISSION** [5] - 540:22, 545:4, 557:15, 560:6, 560:16

**PERMIT** [1] - 576:4

**PERMITTED** [1] - 513:21

**PERSONAL** [1] - 564:10

**PERSONNEL** [1] - 589:12

**PERSONS** [1] - 601:10

**PERSPECTIVE** [1] - 509:15

**PHASE** [2] - 581:14, 581:17

**PHASED** [4] - 576:21, 576:23, 577:24, 578:2

**PHASED-IN** [2] - 576:21, 576:23

**PHILIP** [1] - 505:3

**PICK** [2] - 509:19, 547:1

**PIGEONHOLE** [2] - 598:7, 598:10

**PLACE** [4] - 555:21, 571:6, 571:7, 596:17

**PLACED** [2] - 556:3, 572:19

**PLAINTIFF** [2] - 505:6, 506:3

**PLAINTIFF** [18] - 539:14, 574:9, 575:6, 580:11, 583:21, 584:13, 586:9, 595:9, 596:22, 599:12, 599:25, 600:4, 600:13, 604:1, 604:20, 605:1, 606:19, 609:15

**PLAINTIFF** [1] - 599:8

**PLAINTIFF'S** [1] - 561:21

**PLAINTIFF'S** [1] - 575:14

**PLAINTIFF'S** [9] - 581:9, 594:2, 594:10, 596:16, 603:3, 604:20, 606:3, 607:4, 607:11

**PLAINTIFFS** [1] - 604:14

**PLAN** [1] - 579:13

**PLANS** [1] - 579:1

**PLUS** [4] - 526:15, 529:20, 531:25, 579:24
**POINT** [20] - 509:13, 516:14, 516:16, 516:20, 524:18, 533:15, 538:21, 543:3, 547:12, 553:14, 585:10, 588:12, 588:14, 595:14, 597:14, 598:20, 602:6, 603:11, 608:4, 608:13
**POINTED** [2] - 511:11, 553:15
**POINTS** [2] - 588:3
**POLITICAL** [1] - 597:10
**POLITICS** [2] - 597:13, 598:4
**PORTFOLIO** [2] - 530:5, 532:19
**PORTION** [5] - 588:8, 589:2, 590:1, 593:15, 598:24
**PORTIONS** [2] - 589:5, 597:9
**PORTNOI** [5] - 507:13, 507:14, 537:4, 547:14, 553:15
**PORTNOI** [35] - 506:5, 537:2, 539:9, 540:8, 540:20, 540:25, 542:22, 545:4, 546:18, 547:24, 551:24, 552:3, 554:5, 558:15, 560:2, 591:3, 591:18, 592:10, 593:4, 593:21, 594:7, 594:15, 595:7, 595:9, 596:23, 597:1, 597:7, 597:17, 598:8, 600:17, 601:7, 605:23, 606:1, 606:14, 611:5
**POSITION** [16] - 527:18, 527:20, 529:5, 529:9, 532:10, 560:19, 576:13, 577:4, 577:17, 578:15, 578:19, 591:18, 594:23, 604:11, 605:12, 605:13
**POSSIBILITY** [4] - 548:8, 548:11, 548:25, 577:1
**POSSIBLE** [3] - 552:20, 595:11, 601:11
**POSSIBLY** [1] - 540:21
**POST** [2] - 564:14, 589:15
**POTENTIAL** [1] - 556:10
**POTENTIALLY** [2] - 553:7, 578:22
**PRACTICE** [1] - 609:21
**PRECEDES** [1] - 541:13
**PREFER** [1] - 509:24
**PREFERENCE** [1] - 609:21
**PREINSTRUCT** [2] - 583:18, 590:1
**PREINSTRUCTS** [1] - 607:1
**PREINTEREST** [1] - 550:20
**PREJUDGMENT** [29] -

524:6, 526:13, 526:14, 526:15, 530:1, 530:20, 532:23, 533:3, 534:1, 534:4, 534:6, 534:9, 534:11, 534:18, 534:21, 534:25, 535:1, 536:10, 541:18, 541:20, 541:23, 542:1, 542:7, 542:17, 542:18, 550:9, 551:2, 606:15, 606:17
**PREJUDICE** [2] - 588:15, 588:24
**PRELIMINARIES** [1] - 593:1
**PRELIMINARY** [3] - 589:24, 590:4, 592:23
**PREMISE** [5] - 531:10, 531:14, 535:4, 588:11
**PREPARATION** [2] - 544:25, 545:1
**PREPARE** [4] - 535:14, 537:9, 537:12, 606:20
**PREPARED** [6] - 515:1, 519:17, 519:25, 535:23, 580:2, 583:1
**PREPARING** [2] - 515:23, 544:21
**PREPONDERANCE** [9] - 599:9, 599:13, 600:1, 600:5, 600:14, 600:21, 605:18, 606:23, 607:3
**PRESENCE** [6] - 509:5, 510:8, 575:4, 582:24, 585:6, 586:5
**PRESENT** [5] - 526:5, 526:14, 533:23, 571:22, 594:17
**PRESENTED** [3] - 591:21, 603:6, 605:17
**PREVIOUS** [1] - 511:20
**PREVIOUSLY** [2] - 545:5, 560:21
**PREVIOUSLY** [1] - 575:14
**PRICE** [1] - 529:16
**PRICES** [4] - 545:6, 546:2, 560:8, 560:9
**PRIDE** [1] - 578:11
**PRIMARILY** [2] - 520:21, 555:22
**PRIMARY** [2] - 558:9, 558:10
**PRINCIPAL** [1] - 567:7
**PROBLEM** [10] - 526:17, 526:20, 592:12, 592:13, 592:18, 592:19, 603:11, 604:19, 608:10, 609:20
**PROBLEMS** [2] - 579:3, 579:7, 585:16
**PROCEDURE** [1] - 609:14
**PROCEED** [2] - 510:9, 582:22

**PROCEEDINGS** [8] - 509:4, 510:7, 574:20, 575:3, 582:23, 585:5, 586:4, 611:10
**PROCEEDINGS** [1] - 612:9
**PROCEEDS** [1] - 549:22
**PROCESS** [11] - 518:19, 523:22, 523:25, 524:2, 524:5, 524:9, 525:2, 528:22, 536:7, 579:20, 596:6
**PROCURE** [1] - 558:22
**PRODUCE** [1] - 538:19
**PROFESSIONAL** [1] - 518:24
**PROFIT** [2] - 580:4, 582:8
**PROGRAM** [1] - 519:5
**PROJECT** [1] - 584:4
**PROJECTED** [3] - 523:23, 569:7, 569:21
**PROJECTION** [2] - 569:18, 569:23
**PROOF** [1] - 606:23
**PROPERTIES** [1] - 580:5
**PROPERTIES** [1] - 505:5
**PROPERTIES** [4] - 522:11, 522:14, 522:19, 539:13
**PROPERTY** [20] - 519:15, 521:11, 522:10, 527:19, 527:20, 529:6, 529:8, 529:23, 536:18, 536:20, 538:2, 559:11, 563:8, 564:15, 564:21, 572:18, 577:4, 578:12, 578:17, 578:18
**PROPOSAL** [5] - 561:1, 583:20, 584:12, 601:16, 605:7
**PROPOSALS** [3] - 561:6, 561:13, 572:1
**PROPOSE** [6] - 583:2, 583:12, 583:14, 596:12, 606:25, 608:21
**PROPOSED** [8] - 561:12, 596:10, 599:7, 602:3, 603:3, 603:25, 604:6, 606:16
**PROTECT** [2] - 512:25, 513:25
**PROVE** [2] - 599:24, 600:14
**PROVES** [1] - 588:12
**PROVIDE** [8] - 516:16, 516:20, 516:24, 556:23, 558:8, 560:17, 560:23, 580:6
**PROVIDED** [3] - 515:24, 516:11, 516:15
**PROVIDING** [1] - 576:15
**PROVISION** [3] - 565:6, 565:9, 565:11
**PROVISIONS** [2] - 563:6, 573:15
**PUBLIC** [13] - 505:10, 537:5, 555:25, 586:14,

586:20, 586:21, 586:23, 587:6, 587:8, 587:10, 601:8, 601:22
**PUBLISH** [5] - 520:6, 535:20, 539:7, 540:22, 545:5
**PUBLISHING** [1] - 609:20
**PULL** [2] - 547:4, 547:25
**PULLED** [3] - 546:24, 547:23, 548:23
**PURCHASE** [9] - 555:14, 556:12, 557:21, 557:23, 563:14, 566:3, 566:19, 569:22, 571:20
**PURCHASED** [8] - 529:17, 544:14, 559:8, 572:18, 578:24, 579:17, 580:21, 604:24
**PURCHASING** [1] - 566:8
**PURPOSE** [4] - 511:17, 518:19, 519:14, 592:22
**PURPOSES** [3] - 513:25, 574:19, 591:21
**PURSUANT** [1] - 612:7
**PURSUANT** [2] - 557:14, 589:18
**PUT** [16] - 511:11, 525:9, 531:13, 532:18, 539:9, 545:14, 564:9, 569:25, 570:1, 576:13, 578:9, 578:22, 595:15, 597:14, 604:18, 606:23
**PUTS** [4] - 526:10, 585:22, 610:19
**PUTTING** [1] - 595:3

**Q**

**QUALIFICATIONS** [1] - 552:24
**QUALIFY** [1] - 514:16
**QUALITY** [5] - 576:17, 578:9, 578:13, 578:19, 580:6
**QUESTIONS** [24] - 510:15, 511:25, 512:13, 514:11, 517:6, 552:3, 554:12, 563:1, 571:15, 573:7, 573:23, 581:3, 583:5, 588:19, 588:20, 590:9, 604:2, 606:7, 606:8, 607:24, 608:9, 608:16, 609:13, 610:9
**QUICK** [2] - 580:4, 582:8
**QUITE** [4] - 576:21, 584:15, 586:9, 596:1
**QUOTE** [1] - 601:11

**R**

**RAISE** [3] - 517:12, 554:19, 588:20
**RAISED** [1] - 516:17

**RAISING** [1] - 588:3
**RAN** [1] - 595:19
**RANCHO** [1] - 557:9
**RANGES** [1] - 532:3
**RANGING** [2] - 512:8, 513:14
**RATE** [62] - 511:7, 521:20, 524:4, 524:5, 524:6, 526:1, 526:7, 526:12, 528:2, 528:6, 528:7, 528:11, 528:12, 528:20, 528:21, 528:24, 528:25, 529:2, 529:10, 529:13, 529:14, 529:15, 529:18, 529:20, 529:22, 530:1, 530:18, 530:20, 530:23, 532:2, 532:22, 533:3, 536:5, 536:8, 536:15, 536:16, 536:17, 536:20, 542:3, 542:7, 542:13, 542:14, 542:17, 542:18, 543:9, 548:17, 549:21, 550:7, 550:8, 551:3, 554:8, 561:12, 566:23, 567:10, 567:21, 567:24, 572:5, 572:7, 572:8, 576:19
**RATED** [2] - 530:17, 548:19
**RATES** [6] - 524:4, 524:7, 532:25, 561:5, 561:7, 561:8
**RATHER** [3] - 550:8, 599:11, 601:9
**RATIFIED** [1] - 587:19
**RATIO** [1] - 572:13
**RE** [2] - 507:10, 507:14
**RE-CROSS** [2] - 507:10, 507:14
**REACHED** [4] - 537:25, 538:1, 539:22, 541:22
**REACHING** [2] - 537:15, 549:19
**READ** [14] - 512:19, 512:21, 533:13, 533:20, 539:18, 593:15, 593:17, 593:18, 594:4, 594:10, 596:15, 598:21, 601:5, 603:3
**READING** [3] - 589:9, 590:15, 609:3
**READY** [2] - 585:14, 585:17
**REAL** [9] - 518:8, 518:9, 518:23, 518:25, 519:9, 528:19, 553:3, 555:21, 588:23
**REALISTIC** [1] - 532:14
**REALLY** [10] - 523:21, 524:22, 526:19, 531:3, 588:4, 588:14, 588:17, 589:1, 597:8, 610:3
**REALM** [3] - 548:8, 548:11, 548:25
**REALTIME** [1] - 612:4
**REASON** [4] - 560:16,

577:18, 585:12, 591:23
**REASONABLE** [7] - 530:18, 531:14, 542:14, 572:11, 572:23, 595:23, 596:16
**REASONING** [1] - 529:1
**REBUTTAL** [10] - 537:9, 537:12, 574:16, 574:17, 574:21, 580:19, 582:15, 609:15, 609:18, 610:23
**RECALLED** [1] - 596:5
**RECEIPT** [1] - 527:7
**RECEIVE** [11] - 524:12, 524:13, 524:22, 526:18, 528:16, 530:24, 531:15, 532:15, 539:14, 580:22
**RECEIVED** [20] - 512:15, 524:20, 525:20, 526:8, 526:9, 527:11, 527:14, 528:10, 536:12, 544:8, 544:13, 547:10, 559:9, 572:1, 591:5, 591:7, 591:11, 591:14, 592:3, 595:24
**RECEIVES** [1] - 529:11
**RECEIVING** [3] - 534:23, 544:4, 575:21
**RECENTLY** [1] - 579:10
**RECESS** [2] - 568:9, 586:7
**RECESSION** [4] - 531:6, 531:9, 557:25, 558:6
**RECOGNIZE** [2] - 523:7, 523:11
**RECOLLECTION** [5] - 591:6, 591:13, 591:20, 608:7, 609:1
**RECOMMENDED** [1] - 511:7
**RECORD** [9] - 517:20, 555:1, 586:14, 586:21, 586:22, 586:23, 587:6, 587:8, 587:10
**RECORDS** [1] - 586:20
**RECROSS** [2] - 514:8, 554:3
**RECROSS** [2] - 514:9, 554:4
**RECROSS-EXAMINATION** [2] - 514:9, 554:4
**RED** [2] - 593:13, 593:14
**REDIRECT** [3] - 507:9, 507:13, 507:17
**REDIRECT** [5] - 510:13, 552:4, 552:5, 573:24, 574:1
**REFER** [3] - 523:22, 547:15, 575:21
**REFERENCE** [2] - 536:16, 545:10
**REFERENCED** [2] - 545:12, 548:18

**REFERENCES** [1] - 579:16
**REFERRED** [1] - 572:17
**REFERRING** [5] - 512:10, 540:12, 563:9, 569:19, 570:13
**REFERS** [2] - 535:19, 564:24
**REFINANCE** [2] - 556:18, 558:12
**REFINANCING** [2] - 556:23, 557:6
**REFLECT** [2] - 528:7, 589:25
**REFLECTED** [1] - 535:6
**REFLECTS** [2] - 527:7, 538:19
**REFRESH** [1] - 591:6
**REGARD** [3] - 522:22, 584:24, 590:1
**REGARDING** [6] - 515:24, 537:21, 537:25, 538:14, 566:3, 566:9
**REGARDS** [5] - 511:7, 512:13, 512:25, 558:19, 603:18
**REGIVE** [1] - 590:25
**REGULATIONS** [1] - 612:11
**REGULATORY** [4] - 600:6, 600:19, 600:20, 600:22
**REINVEST** [1] - 549:22
**REINVESTMENT** [1] - 549:24
**REITERATE** [1] - 554:6
**REJECTED** [1] - 597:23
**RELATE** [1] - 588:6
**RELATED** [2] - 524:3, 542:18
**RELATES** [4] - 538:4, 549:20, 590:16, 598:13
**RELATING** [1] - 608:15
**RELATIONSHIP** [3] - 528:8, 529:16, 538:4
**RELATIVE** [1] - 528:19
**RELAY** [1] - 589:7
**RELEASE** [4] - 559:23, 560:8, 560:9, 573:15
**RELEASES** [1] - 563:23
**RELEVANCE** [6] - 515:13, 560:2, 588:13, 588:14, 588:22, 588:24
**RELEVANT** [7] - 536:18, 587:13, 587:20, 588:4, 588:17, 588:25, 589:13
**RELIED** [6] - 514:20, 515:2, 515:23, 516:4, 516:6, 546:21
**RELIEF** [1] - 604:21
**RELIEVED** [1] - 584:20
**REMAIN** [2] - 599:11, 601:9
**REMAINING** [1] - 584:16

**REMEMBER** [6] - 517:5, 566:15, 566:16, 568:6, 603:15
**REMIND** [1] - 584:23
**REMINDED** [1] - 575:9
**REMOVED** [1] - 533:23
**RENT** [53] - 512:2, 512:8, 512:14, 512:22, 513:1, 513:2, 513:3, 513:11, 514:2, 514:3, 514:12, 514:17, 514:19, 514:22, 515:25, 523:23, 525:25, 526:5, 526:15, 533:22, 533:25, 534:10, 536:4, 538:20, 539:4, 540:13, 540:17, 544:4, 553:23, 560:17, 564:19, 570:8, 576:8, 576:10, 576:20, 576:21, 576:23, 576:24, 577:3, 577:6, 577:7, 577:24, 578:2, 578:16, 579:19, 579:21, 579:25, 580:22, 581:14, 581:18, 581:22, 602:16
**RENT** [13] - 515:25, 521:19, 521:23, 522:10, 522:15, 553:11, 553:23, 564:11, 564:18, 577:3, 580:12, 581:14, 581:17
**RENTAL** [8] - 513:14, 525:16, 528:17, 538:7, 538:9, 538:16, 550:17, 550:19
**RENTAL** [1] - 539:16
**RENTAL** [1] - 505:9
**RENTS** [13] - 511:11, 511:12, 511:20, 514:1, 525:16, 538:20, 544:13, 559:1, 559:3, 566:11, 569:3, 580:8, 603:15
**REPAID** [2] - 529:5, 529:7
**REPEAT** [2] - 566:6, 590:4
**REPHRASE** [2] - 551:21, 551:23
**REPORT** [62] - 514:20, 515:1, 515:9, 515:18, 515:19, 515:21, 515:23, 516:2, 518:18, 519:17, 519:24, 520:9, 523:7, 523:12, 523:14, 525:1, 525:10, 530:11, 531:22, 533:8, 533:11, 535:7, 537:9, 537:11, 537:12, 537:14, 537:19, 538:11, 538:15, 538:24, 539:2, 539:3, 539:7, 539:10, 539:12, 540:9, 543:1, 544:21, 545:12, 545:14, 545:16, 548:14, 550:17, 553:5, 554:9, 587:13, 587:17, 588:2, 588:8, 588:9, 588:19,

588:20, 589:2, 589:4, 589:5, 589:7, 589:8, 589:11, 589:14
**REPORTED** [1] - 612:9
**REPORTER** [4] - 505:24, 612:1, 612:5, 612:18
**REPORTER'S** [1] - 505:15
**REPORTS** [1] - 535:20
**REPRESENTATIVES** [1] - 576:9
**REPRESENTED** [3] - 557:11, 595:12, 595:16
**REPRESENTING** [1] - 595:13
**REPUTABLE** [1] - 573:1
**REQUEST** [5] - 563:23, 593:18, 595:17, 595:18, 596:7
**REQUESTED** [1] - 559:25
**REQUESTING** [1] - 584:19
**REQUESTING** [1] - 513:13
**REQUESTS** [1] - 593:5
**REQUIRE** [3] - 565:21, 599:10, 601:7
**REQUIRED** [5] - 513:24, 564:8, 564:13, 566:17, 579:25
**REQUIREMENT** [2] - 529:23, 536:19
**REQUIREMENTS** [2] - 563:7, 586:22
**REQUIRES** [1] - 527:5
**REQUIRING** [1] - 512:25
**RESERVE** [4] - 564:10, 564:24, 565:5, 565:22
**RESIDENCE** [1] - 521:8
**RESIDENT** [3] - 581:21, 582:2, 582:4
**RESIDENTS** [15] - 512:25, 514:1, 559:24, 560:21, 564:12, 575:22, 576:17, 577:2, 577:9, 577:10, 577:12, 577:18, 577:22, 578:13, 580:7
**RESOLUTION** [3] - 512:1, 513:9, 513:16
**RESPECT** [3] - 551:2, 587:11, 589:12
**RESPECTS** [2] - 598:22, 604:25
**RESPONSE** [1] - 584:14
**RESPONSIBILITY** [1] - 578:18
**REST** [2] - 582:22, 592:20
**RESTS** [1] - 574:15
**RESULT** [2] - 532:21, 550:2
**RESULTING** [2] - 522:7, 539:15
**RESUME** [2] - 520:9, 586:6
**RETAIN** [1] - 527:15
**RETAINED** [8] - 521:3,

522:4, 537:8, 537:11, 537:13, 537:15, 537:18, 557:21
**RETURN** [15] - 528:8, 528:9, 529:3, 529:9, 529:19, 530:18, 531:17, 532:3, 532:17, 532:22, 532:23, 536:19, 549:21, 551:18, 580:7
**REVIEW** [1] - 505:9
**REVIEW** [9] - 518:18, 522:5, 537:11, 537:15, 553:5, 563:5, 577:8, 583:14, 606:9
**REVIEW** [10] - 521:19, 521:23, 522:10, 539:16, 553:11, 553:23, 564:11, 564:18, 581:14, 581:17
**REVIEWED** [4] - 532:12, 538:24, 552:7, 572:19
**REVIEWING** [2] - 523:14, 544:24
**REVISING** [1] - 583:9
**RIGHT-HAND** [3] - 534:9, 562:9, 570:11
**RISK** [6] - 528:8, 528:15, 528:18, 529:7, 529:10
**RIVERSIDE** [1] - 520:22
**RODE** [1] - 532:10
**ROLE** [1] - 603:21
**ROOM** [1] - 505:24
**ROYAL** [1] - 519:1
**RULE** [1] - 557:15
**RULE** [2] - 587:12, 606:16
**RULED** [3] - 594:3, 607:5, 608:2
**RULES** [1] - 575:22, 575:24, 602:15
**RULING** [1] - 584:22
**RULINGS** [4] - 539:15, 583:3, 583:10, 583:17
**RUTTER** [1] - 521:4
**RUTTER** [1] - 506:8

# S

**S&P** [20] - 530:21, 533:2, 542:13, 542:19, 543:14, 543:20, 545:7, 545:12, 545:17, 546:2, 547:11, 547:19, 548:20, 548:22, 549:20, 551:3, 551:7, 552:12, 552:14, 552:22
**SAFE** [1] - 579:4
**SALE** [3] - 529:16, 560:12, 560:13
**SALOMON** [29] - 522:6, 522:21, 523:22, 524:19, 525:23, 526:19, 526:25, 528:11, 528:15, 530:6,

530:19, 530:23, 532:8, 536:4, 536:5, 537:24, 538:1, 538:3, 538:7, 541:17, 542:10, 543:14, 543:20, 544:1, 544:18, 550:23, 551:3, 552:10, 553:6
**SALOMON'S** [35] - 522:24, 523:2, 523:7, 523:11, 523:14, 524:15, 525:1, 525:6, 525:10, 528:2, 528:5, 530:1, 531:10, 532:5, 535:16, 535:19, 536:3, 536:8, 536:11, 537:9, 537:13, 537:18, 538:15, 538:18, 538:24, 539:3, 540:17, 541:4, 542:12, 542:17, 550:17, 550:25, 551:14, 552:7, 553:5
**SAN** [1] - 520:23
**SANDBAG** [1] - 609:19
**SANTA** [1] - 506:11
**SATISFIED** [2] - 527:19, 527:21
**SATISFY** [1] - 604:7
**SCENARIO** [1] - 548:12
**SCENARIOS** [2] - 519:12, 591:22
**SCHEDULE** [5] - 509:14, 584:2, 585:4, 585:22, 585:23
**SCHEDULING** [4] - 509:7, 574:19, 582:21, 583:24
**SCOPE** [2] - 580:14, 589:9
**SCREEN** [4] - 533:14, 545:10, 546:3, 546:4
**SCRIPTNER** [1] - 607:7
**SCROLL** [1] - 549:2
**SEAT** [3] - 517:18, 554:25, 584:7
**SECOND** [7] - 524:5, 529:12, 551:2, 567:24, 569:17, 598:24, 607:22
**SECTION** [7] - 512:5, 512:7, 513:11, 513:20, 562:21, 562:25, 563:4
**SECTION** [1] - 612:7
**SECURE** [1] - 530:16
**SECURED** [3] - 527:20, 529:5, 530:14
**SECURITY** [1] - 528:14
**SEE** [29] - 509:17, 509:18, 512:10, 525:9, 526:22, 534:20, 546:12, 549:2, 553:6, 561:20, 562:1, 562:10, 563:9, 568:8, 569:13, 569:19, 570:13, 571:4, 586:3, 592:17, 596:21, 597:6, 597:11, 600:1, 605:1, 605:9, 605:13, 610:13, 611:8
**SEEING** [2] - 553:9, 586:9

**SEEM** [2] - 584:14, 599:14
**SEGMENT** [1] - 519:15
**SELECT** [2] - 561:9, 590:25
**SELECTED** [2] - 532:8, 560:22
**SELL** [1] - 559:23
**SENSE** [2] - 577:19, 607:6
**SENSES** [1] - 514:15
**SENTENCE** [3] - 599:14, 600:15, 600:23
**SEPARATE** [3] - 603:9, 603:19, 605:19
**SEPARATELY** [2] - 604:8, 604:12
**SEPTEMBER** [1] - 531:7
**SERIES** [2] - 543:22, 604:23
**SERVED** [1] - 519:6
**SERVICE** [11] - 512:13, 513:10, 513:23, 513:25, 564:10, 564:11, 564:24, 565:5, 567:6, 570:12, 570:15
**SET** [4] - 550:17, 601:3, 605:3, 606:21
**SETS** [2] - 549:3, 607:13
**SETTLE** [1] - 583:1
**SEVEN** [3] - 531:24, 543:5, 543:22
**SEVEN-YEAR** [2] - 531:24, 543:22
**SEVERITY** [1] - 596:14
**SHALL** [2] - 517:14, 554:21
**SHAPE** [2] - 509:10, 511:6
**SHARED** [1] - 578:4
**SHEET** [1] - 534:13
**SHORT** [3] - 582:20, 583:2, 593:20
**SHOW** [7] - 526:3, 530:10, 531:21, 547:8, 579:22, 581:8, 587:14
**SHOWED** [1] - 573:8
**SHOWING** [2] - 534:8, 534:9
**SHOWN** [3] - 532:1, 551:7, 552:19
**SHOWS** [6] - 525:24, 526:6, 526:15, 532:1, 533:11, 542:1
**SIC)** [1] - 567:15
**SIDE** [2] - 545:15
**SIDE-BY-SIDE** [1] - 545:15
**SIDEBAR** [3] - 574:19, 574:20, 610:3
**SIDES** [2] - 603:6, 605:11
**SIGNIFICANT** [2] - 531:11, 573:3
**SIGNIFICANTLY** [1] - 528:21
**SIMILAR** [3] - 519:14, 602:13, 602:20
**SIMPLE** [1] - 550:12

**SIMPLICITY** [1] - 600:13
**SIMPLY** [2] - 596:11, 596:19
**SINGLE** [2] - 521:8, 524:2
**SINGLE-FAMILY** [1] - 521:8
**SINGLE-STEP** [1] - 524:2
**SITE** [1] - 579:5
**SITES** [1] - 579:11
**SITTING** [3] - 525:19, 526:17, 577:24
**SITUATION** [5] - 553:20, 583:8, 598:4, 603:14, 603:21
**SITUATIONS** [1] - 596:2
**SIX** [1] - 544:14
**SLEEPING** [1] - 584:8
**SLIGHT** [1] - 601:11
**SLIGHTLY** [1] - 561:15
**SLOW** [2] - 601:5, 601:6
**SMALL** [3] - 514:19, 521:11, 533:10
**SMALLER** [1] - 541:18
**SOLD** [2] - 560:20, 563:18
**SOLELY** [1] - 609:2
**SOLEMNLY** [2] - 517:13, 554:20
**SOLICIT** [1] - 571:19
**SOLUTION** [1] - 560:17
**SOLVE** [1] - 591:1
**SOLVES** [1] - 603:11
**SOMEONE** [8] - 517:10, 524:20, 544:18, 544:21, 544:23, 544:24, 583:8, 591:6
**SOMETIME** [2] - 557:23, 585:21
**SOMETIMES** [1] - 513:24
**SOMEWHAT** [2] - 524:3, 532:11
**SOMEWHERE** [1] - 534:13
**SORRY** [18] - 517:1, 523:9, 525:8, 533:12, 533:16, 535:12, 536:13, 555:18, 558:3, 559:19, 561:20, 562:1, 566:6, 567:1, 568:16, 572:7, 581:16
**SORT** [6] - 553:10, 587:21, 588:20, 589:8, 590:8, 607:19
**SOURCE** [1] - 552:11
**SOUTH** [1] - 506:6
**SOUTHERN** [2] - 520:22, 521:1
**SPACE** [2] - 513:14, 560:14
**SPACES** [7] - 559:15, 559:18, 559:21, 559:23, 578:22, 579:1, 579:14
**SPECIAL** [6] - 583:10, 602:1, 603:2, 603:3, 603:12, 604:6
**SPECIFIC** [4] - 524:4, 552:11, 552:19, 608:17

**SPECIFICALLY** [2] - 515:2, 549:21
**SPECULATION** [1] - 514:23
**SPELL** [2] - 517:21, 555:2
**SPELLED** [1] - 517:23
**SPENT** [1] - 510:17
**SPINE** [2] - 561:21, 568:21
**SPRING** [1] - 505:24
**SPRINGS** [1] - 557:7
**STABILIZED** [2] - 532:21, 533:2
**STAFF** [2] - 515:24, 516:4
**STAFFING** [1] - 583:8
**STAND** [4] - 519:21, 575:7, 578:5, 587:21
**STANDARD** [3] - 549:12, 550:7, 550:12
**START** [8] - 524:8, 531:1, 544:2, 579:15, 593:24, 594:2, 607:1, 610:17
**STARTED** [3] - 532:9, 534:15, 605:11
**STARTING** [5] - 529:20, 544:6, 589:20, 590:11, 610:21
**STARTS** [2] - 534:12, 562:3
**STATE** [1] - 519:7
**STATE** [8] - 517:13, 517:20, 518:23, 554:20, 555:1, 576:3, 593:13, 608:14
**STATEMENT** [2] - 601:19, 606:15
**STATEMENTS** [5] - 584:8, 587:15, 587:18, 587:20, 590:22
**STATES** [1] - 539:12
**STATES** [4] - 505:1, 612:5, 612:7, 612:12
**STATES** [3] - 526:3, 528:13, 530:15
**STATING** [1] - 551:13
**STEEPEST** [1] - 531:8
**STENOGRAPHICALLY** [1] - 612:9
**STEP** [15] - 517:8, 523:22, 523:25, 524:2, 524:5, 524:9, 525:2, 529:6, 533:23, 554:13, 554:18, 574:12, 574:13, 582:14
**STEPHEN** [1] - 506:16
**STEPHENS** [2] - 569:8, 569:9
**STILL** [3] - 568:14, 568:17, 575:9, 605:2, 607:17
**STIPULATE** [2] - 592:8, 592:10
**STIPULATED** [3] - 520:3, 546:13, 546:19
**STIPULATION** [1] - 546:16
**STIPULATIONS** [1] -

590:11
**STOCK** [14] - 530:9, 530:22, 530:25, 531:4, 531:6, 531:13, 531:16, 531:19, 531:25, 532:10, 532:16, 532:17, 532:20, 532:21
**STOPPED** [1] - 608:1
**STRAIGHT** [1] - 593:7
**STREAM** [11] - 524:10, 526:2, 527:1, 527:9, 527:10, 527:13, 528:3, 528:23, 536:4, 553:7
**STREET** [1] - 505:24
**STREET** [1] - 506:6
**STRIKE** [3] - 546:16, 561:10, 571:9
**STRONG** [1] - 577:8
**STRUCTURED** [1] - 529:2
**STUDIES** [1] - 521:7
**STUDY** [6] - 522:17, 525:6, 525:15, 525:17, 526:22, 553:21
**STUFF** [2] - 545:9, 607:20
**STUNNED** [1] - 605:1
**STYLE** [1] - 580:4
**SUBDIVISIONS** [1] - 560:7
**SUBJECT** [1] - 563:4
**SUBJECT** [5] - 524:8, 574:16, 606:1, 607:18, 609:6
**SUBMIT** [2] - 579:25, 587:13
**SUBMITTAL** [1] - 518:17
**SUBMITTED** [1] - 610:24
**SUBSEQUENTLY** [1] - 537:12
**SUBSET** [2] - 608:12, 609:6
**SUBSTANTIALLY** [2] - 588:15, 588:24
**SUCCESSFULLY** [1] - 560:20
**SUDDEN** [2] - 577:3, 597:11
**SUDDENLY** [1] - 587:21
**SUFFERED** [1] - 531:6
**SUFFERING** [1] - 531:3
**SUFFICIENT** [3] - 559:12, 571:6, 580:23
**SUGGESTED** [1] - 570:25
**SUGGESTION** [1] - 589:14
**SUITE** [2] - 506:10, 506:17
**SUMMARIES** [5] - 591:5, 591:7, 591:11, 591:14, 592:3
**SUMMARIZE** [2] - 536:2, 606:19
**SUMMARIZES** [1] - 535:15
**SUMMARY** [4] - 535:22, 562:12, 591:21, 592:6
**SUPERIOR** [1] - 520:21
**SUPPORT** [1] - 605:19

**SUPPORTABLE** [4] - 558:24, 558:25, 569:3
**SUPPOSE** [1] - 604:19
**SURPLUS** [2] - 578:21, 579:3
**SURPRISE** [3] - 547:18, 547:22, 596:6
**SURPRISED** [2] - 532:12, 576:21
**SURREBUTTAL** [1] - 582:17
**SURVEYORS** [1] - 519:1
**SUSAN** [1] - 506:15
**SUSPECT** [3] - 585:20, 610:16, 610:18
**SUSTAIN** [1] - 580:5
**SUSTAINED** [4] - 551:21, 551:23, 560:3, 580:20
**SWORN** [4] - 510:12, 518:2, 555:7, 575:14
**SYSTEM** [1] - 581:20

**T**

**TABLE** [1] - 542:24
**TACT** [1] - 601:25
**TALKS** [1] - 598:13
**TASK** [1] - 583:9
**TAUGHT** [2] - 519:3, 519:5
**TAX** [1] - 521:10
**TEACH** [3] - 519:8, 552:25, 553:2
**TEACHING** [1] - 519:2
**TECHNIQUES** [2] - 519:4, 519:11
**TEDIOUS** [1] - 579:20
**TEMPORARY** [1] - 580:2
**TEN** [12] - 518:13, 521:16, 528:13, 528:20, 531:19, 532:6, 532:13, 543:22, 543:24, 546:22, 575:25, 578:24
**TEN-YEAR** [2] - 528:13, 528:20
**TENSE** [2] - 511:15, 511:19
**TENTATIVE** [2] - 596:20, 599:7
**TENURE** [1] - 589:6
**TERM** [6] - 531:3, 560:16, 567:17, 573:20, 582:8, 603:14
**TERMINATED** [1] - 595:20
**TERMS** [10] - 531:14, 532:9, 532:17, 533:21, 536:19, 539:4, 573:14, 583:24, 595:4, 604:7
**TESTIFIED** [9] - 520:15, 520:20, 520:23, 526:25, 544:18, 576:22, 577:11, 577:14, 582:7

**TESTIMONY** [21] - 509:11, 510:18, 512:24, 513:23, 517:13, 543:12, 543:18, 554:20, 578:20, 579:2, 590:16, 592:4, 592:9, 593:10, 594:12, 594:16, 594:24, 595:22, 595:24, 607:24, 609:21

**THAT** [3] - 612:6, 612:7, 612:10

**THE** [154] - 506:3, 506:13, 509:6, 509:9, 509:16, 509:21, 510:1, 510:3, 510:5, 510:10, 514:8, 514:24, 514:25, 515:14, 515:15, 515:16, 515:18, 517:8, 517:12, 517:17, 517:18, 517:19, 517:20, 517:22, 517:24, 520:5, 535:11, 535:21, 536:23, 539:8, 540:24, 546:17, 547:21, 547:22, 551:21, 551:23, 552:4, 554:3, 554:13, 554:15, 554:16, 554:18, 554:24, 554:25, 555:3, 555:5, 557:17, 557:19, 560:3, 561:11, 562:3, 562:5, 568:3, 568:10, 571:11, 573:24, 574:8, 574:12, 574:17, 574:19, 574:21, 574:23, 574:25, 575:5, 575:8, 575:11, 575:12, 580:15, 580:20, 581:2, 581:4, 581:7, 581:10, 582:12, 582:14, 582:17, 582:19, 582:25, 583:23, 584:17, 584:19, 584:22, 585:1, 585:7, 586:6, 586:8, 586:17, 587:2, 587:23, 588:2, 589:2, 589:17, 590:20, 590:22, 591:4, 591:9, 591:13, 591:20, 592:2, 592:12, 592:23, 593:6, 593:23, 594:9, 594:21, 595:8, 596:7, 596:25, 597:5, 597:8, 597:24, 598:11, 599:1, 599:5, 599:22, 600:9, 600:12, 601:5, 601:24, 602:25, 603:24, 604:5, 604:10, 604:14, 604:25, 605:24, 606:3, 606:13, 606:18, 607:10, 607:21, 608:7, 608:19, 609:1, 609:12, 609:16, 609:18, 609:23, 610:2, 610:11, 610:16, 610:23, 611:1, 611:4, 611:7, 612:5, 612:6, 612:7, 612:8, 612:9, 612:10, 612:11, 612:12

**THEORY** [2] - 519:4,

519:11

**THEREFORE** [3] - 554:8, 572:20, 598:5

**THEREOF** [1] - 587:8

**THEY'VE** [2] - 594:22, 602:22

**THINKING** [3] - 597:20, 601:17, 605:5

**THIRD** [7] - 530:6, 530:8, 530:9, 531:12, 532:20, 542:10, 543:4

**THIRD** [1] - 521:1

**THIS** [1] - 612:14

**THOMAS** [1] - 506:9

**THOUGHTS** [4] - 584:6, 590:18, 595:6, 596:21

**THREE** [13] - 509:11, 521:7, 532:25, 542:6, 542:9, 567:1, 567:5, 572:2, 572:4, 582:25, 596:19, 597:4

**THROUGHOUT** [1] - 562:16

**TIMING** [1] - 560:19, 610:12

**TITLE** [1] - 612:7

**TO** [1] - 612:7

**TODAY** [11] - 509:17, 516:18, 516:22, 520:16, 551:7, 555:13, 575:1, 575:20, 584:15, 585:7, 588:3

**TOM** [1] - 557:11

**TOMORROW** [10] - 509:14, 509:18, 583:15, 583:25, 585:11, 585:21, 585:25, 586:3, 610:14, 611:8

**TONIGHT** [4] - 583:14, 590:8, 608:18, 609:11

**TOOK** [10] - 524:19, 524:21, 532:13, 532:25, 555:14, 567:13, 572:1, 587:19, 603:16

**TOP** [7] - 512:21, 525:12, 533:14, 534:5, 541:3, 576:17, 601:18

**TOPICS** [1] - 518:15

**TOTAL** [7] - 518:13, 521:22, 534:24, 535:4, 540:1, 548:4, 551:24

**TOTALING** [1] - 551:19

**TOTO** [1] - 587:9

**TRACK** [1] - 596:11

**TRANCHE** [2] - 567:15, 567:16

**TRANCHES** [3] - 567:14, 567:18, 572:17

**TRANSCRIPT** [6] - 552:8, 593:5, 594:8, 608:18, 608:25, 609:11

**TRANSCRIPT** [3] - 505:15, 612:8, 612:10

**TRANSCRIPTION** [2] - 510:17, 511:5

**TRANSITION** [4] - 600:2, 600:23, 600:24

**TRAUNCHE** [1] - 567:15

**TREASURY** [3] - 526:3, 542:13, 548:19

**TREASURY** [6] - 528:14, 528:16, 528:20, 530:7, 530:13, 533:1

**TRIAL** [7] - 515:10, 538:22, 578:21, 584:9, 584:11, 594:8, 609:21

**TRIAL** [1] - 505:16

**TRIALS** [3] - 590:3, 590:4

**TRIPLE** [1] - 578:2

**TRUE** [1] - 612:8

**TRUE** [12] - 513:6, 516:9, 548:2, 553:19, 553:21, 553:23, 560:24, 564:7, 565:1, 587:17, 592:23, 604:13

**TRUTH** [7] - 517:15, 554:22, 587:16

**TRY** [1] - 603:5

**TRYING** [2] - 601:19, 601:21

**TUESDAY** [4] - 505:16, 507:3, 508:3, 509:1

**TULLY** [1] - 607:8

**TUNE** [1] - 550:19

**TURN** [12] - 511:22, 512:20, 513:8, 513:15, 548:14, 561:19, 561:24, 562:9, 562:21, 567:9, 568:23, 570:7

**TURNING** [1] - 544:17

**TURNS** [1] - 587:24

**TWO** [30] - 519:13, 520:9, 523:21, 523:22, 523:25, 524:5, 524:9, 525:2, 528:21, 552:17, 567:2, 567:3, 567:12, 567:14, 567:18, 567:19, 579:7, 603:4, 603:5, 603:9, 603:19, 603:22, 603:23, 604:2, 604:8, 604:15, 604:21, 605:5, 605:15

**TWO-STEP** [5] - 523:22, 523:25, 524:5, 524:9, 525:2

**TYPE** [2] - 530:5, 565:21

**TYPES** [1] - 565:15

**TYPICAL** [2] - 549:25, 572:8

**TYPICALLY** [2] - 549:22, 593:13

**TYPOS** [1] - 585:16

---

# U

**U.S** [4] - 505:3, 542:13, 548:19, 601:2

**UCLA** [5] - 518:11, 518:12,

519:5, 519:6, 519:15

**ULTIMATE** [2] - 548:9, 553:22

**ULTIMATELY** [4] - 512:14, 560:22, 563:15, 576:16

**UNABLE** [1] - 601:3

**UNCOMMON** [2] - 565:21, 565:25

**UNDER** [25] - 522:20, 524:15, 535:3, 535:4, 550:22, 552:2, 559:12, 562:25, 563:4, 564:23, 567:9, 569:11, 575:9, 576:3, 581:19, 586:13, 588:23, 590:23, 597:14, 597:16, 600:7, 602:17, 610:14

**UNDERLYING** [1] - 516:7

**UNDERNEATH** [1] - 601:18

**UNDERSTATES** [1] - 528:21

**UNDERWRITING** [1] - 572:20

**UNFAIR** [2] - 588:15, 588:24

**UNFORTUNATELY** [1] - 510:21

**UNITED** [3] - 526:3, 528:13, 530:15

**UNITED** [4] - 505:1, 612:5, 612:7, 612:12

**UNLESS** [1] - 610:2

**UNUSUAL** [5] - 565:6, 565:9, 565:10, 565:16, 565:18

**UP** [34] - 509:19, 511:23, 523:5, 524:15, 524:23, 525:9, 525:16, 531:1, 532:4, 532:10, 532:11, 533:16, 539:9, 540:21, 541:15, 542:22, 545:8, 546:2, 546:7, 547:4, 548:1, 550:15, 555:15, 561:16, 564:9, 578:16, 579:1, 579:13, 583:24, 600:24, 601:18, 607:21, 608:24

**UPDATE** [1] - 585:8

**UPMOST** [1] - 578:18

**UPPER** [1] - 534:14

**USEFUL** [1] - 553:8

**USES** [1] - 524:4

**UTILIZED** [1] - 522:21

---

# V

**VAGUE** [1] - 580:25

**VALUATION** [3] - 518:14, 519:15, 524:1

**VALUE** [26] - 524:20, 525:25, 526:4, 526:5, 526:14, 532:11, 533:22,

533:23, 533:24, 537:22, 537:25, 538:2, 538:4, 538:8, 538:9, 538:16, 540:12, 540:16, 545:17, 545:20, 546:21, 550:19, 553:12, 572:13, 572:20, 572:24

**VARIATION** [1] - 526:21

**VARIOUS** [1] - 518:14

**VEHICLE** [1] - 528:14

**VENTURA** [2] - 520:23, 521:11

**VERDE** [1] - 557:9

**VERDICT** [9] - 551:18, 583:10, 602:1, 603:2, 603:3, 603:12, 604:6, 606:3, 606:14

**VERNACULAR** [1] - 556:6

**VERSION** [3] - 583:14, 583:16, 595:3

**VERSUS** [1] - 528:8

**VIEW** [1] - 530:17

**VILLAGE** [9] - 512:1, 516:12, 516:17, 516:21, 516:25, 556:24, 608:1, 608:6, 608:17

**VIOLATED** [1] - 608:3

**VIOLATION** [1] - 599:25

**VOLUME** [1] - 561:22

**VOLUME** [3] - 505:10, 507:3, 508:3

**VON** [1] - 506:16

**VS** [1] - 505:7

**W**

**WAIT** [2] - 523:8, 585:15

**WALK** [2] - 589:19, 594:10

**WANTS** [1] - 602:4

**WATCHED** [1] - 584:9

**WEBSITE** [3] - 547:11, 552:22, 587:6

**WEEK** [1] - 575:20

**WEIGHT** [1] - 542:10

**WELLS** [3] - 579:3, 579:4, 579:7

**WELLS** [1] - 561:14

**WESTERN** [1] - 505:2

**WHEREAS** [3] - 524:21, 543:14, 543:20

**WHITE** [5] - 519:21, 568:21, 568:23, 570:1

**WHOLE** [6] - 517:15, 542:23, 554:22, 564:21, 588:9, 601:18

**WHOLLY** [1] - 522:23

**WILLING** [3] - 576:11, 576:19, 577:21

**WILSHIRE** [1] - 506:9

**WIND** [1] - 600:24

**WINS** [1] - 605:1

**WITH** [1] - 612:11

**WITHDRAW** [1] - 558:16

**WITNESS** [16] - 510:12, 514:25, 515:15, 515:18, 517:17, 517:19, 517:22, 518:2, 547:22, 554:15, 554:24, 555:3, 555:7, 562:3, 575:11, 575:14

**WITNESS** [9] - 517:9, 519:21, 520:12, 554:16, 555:11, 557:16, 578:4, 592:9, 596:4

**WITNESS'** [1] - 551:22

**WITNESSES** [2] - 507:5, 507:7

**WITNESSES** [3] - 574:14, 587:20, 590:25

**WORD** [4] - 594:14, 596:18, 602:9, 605:21

**WORDS** [2] - 538:18, 551:25

**WORKABLE** [1] - 604:5

**WORKS** [1] - 509:23

**WORLD** [1] - 531:5

**WORRY** [1] - 571:7

**WORTH** [1] - 526:19

**WRAPPING** [1] - 550:15

**WYNDER** [1] - 506:14

**WYNDER** [2] - 595:12, 595:16

**Y**

**YAHOO** [6] - 545:24, 546:24, 547:23, 552:19, 594:25, 595:1

**YAHOO'S** [1] - 551:8

**YEAR** [2] - 570:8, 570:16

**YEAR** [39] - 515:5, 528:13, 528:20, 531:16, 531:24, 532:7, 543:22, 544:14, 547:1, 549:23, 573:20, 579:18, 579:24, 603:4, 603:5, 603:14, 603:20, 603:23, 604:1, 604:2, 604:12, 604:15, 604:21, 605:3, 605:4, 605:5, 605:6, 605:22, 605:23, 605:24

**YEAR-AFTER-YEAR** [1] - 549:23

**YEARS** [24] - 520:13, 521:16, 526:11, 543:5, 544:14, 544:18, 550:2, 555:24, 566:20, 566:22, 566:25, 567:1, 567:2, 567:3, 576:1, 576:24, 577:6, 577:7, 578:3, 578:8, 578:24, 603:19, 605:19

**YIELD** [1] - 529:23

**YOURSELVES** [2] - 568:6, 586:1

**Z**

**ZERO** [2] - 536:6, 553:24

UNITED  STATES  DISTRICT  COURT