1               UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5  COLONY COVE PROPERTIES, LLC, a      )
   Delaware limited liability company,   )

6                         )

                 PLAINTIFF,        )   CASE NO.

7                         )

        vs.               )   CV 14-03242-PSG

8                         )

   CITY OF CARSON, a municipal       )

9   corporation; CITY OF CARSON      )

   MOBILEHOME PARK RENTAL REVIEW BOARD,  )  PAGES (191 to 292)

10  a public administrative body; and    )

   DOES 1 to 10, inclusive,       )   VOLUME 3

11                         )

               DEFENDANTS.      )

12  _____)

13

14

15                  REPORTER'S TRANSCRIPT OF

16                     TRIAL DAY 2

              FRIDAY, APRIL 29, 2016

17                    9:07 A.M.

             LOS ANGELES, CALIFORNIA

18

19

20

21

22

23         MAREA WOOLRICH, CSR 12698, CCRR

        FEDERAL OFFICIAL COURT REPORTER

24      255 EAST TEMPLE STREET, ROOM 181-K

        LOS ANGELES, CALIFORNIA 90012

25         MAREAWOOLRICH@AOL.COM

1                 **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4
     O'MELVENY & MYERS, LLP
5        BY:  DIMITRI D. PORTNOI
     BY:  MATTHEW W. CLOSE
6        400 South Hope Street
     18th Floor
7        Los Angeles, California 90071

8
     GILCHRIST & RUTTER, APC
9        BY:  THOMAS W. CASPARIAN
     Wilshire Palisades Building
10       1299 Ocean Avenue, Suite 900
     Santa Monica, California 90401
11

12
  **FOR THE DEFENDANTS:**
13

14       ALESHIRE & WYNDER, LLP
     BY:  JEFFREY MICHAEL MALAWY
15       BY:  JUNE SUSAN AILIN
     BY:  STEPHEN R. ONSTOT
16       18881 Von Karman Avenue, Suite 1700
     Irvine, California 92612

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                          I N D E X

 2                  FRIDAY, APRIL 29, 2016

 3    VOLUME 3 - A.M. SESSION

 4    ---------------------------------------------------------

 5              CHRONOLOGICAL INDEX OF WITNESSES

 6

 7    WITNESSES                                          PAGE

 8    JAMES GOLDSTEIN
              CROSS-EXAMINATION (RESUMED) BY MS. AILIN    195
 9            REDIRECT EXAMINATION BY MR. CLOSE           200
              RECROSS-EXAMINATION BY MS. AILIN            211
10
      NOELLE STEPHENS
11            DIRECT EXAMINATION BY MR. CASPARIAN         214
              CROSS-EXAMINATION BY MR. ONSTOT             228
12            REDIRECT EXAMINATION BY MR. CASPARIAN       240

13    ROB DETLING
              DIRECT EXAMINATION BY MR. PORTNOI           244
14            CROSS-EXAMINATION BY MS. AILIN              262
              REDIRECT EXAMINATION BY MR. PORTNOI         271
15            RECROSS-EXAMINATION BY MS. AILIN            273

16    PETER SALOMON
              DIRECT EXAMINATION BY MR. CLOSE             275
17

18
      ---------------------------------------------------------
19
                      INDEX OF EXHIBITS
20

21                  RECEIVED INTO EVIDENCE

22
      EXHIBIT NO. 55  2006/2007 OPERATING EXPENSE         228
23    ADJUSTMENTS

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 29, 2016

 2                            9:04 A.M.
                                ---
 3

 4              (Outside the presence of the jury.)

 5              THE COURT:  Plaintiff's counsel requested the time.

 6   61 minutes for plaintiff, 46 for defense.

 7          There was another defense request?

 8              MR. ONSTOT:  Yes, Your Honor.  Stephen Onstot for

 9   the defendants.  I have contracted a cold over the course of

10   the evening and wondered if it would be okay if I sucked on

11   some cough drops as we go throughout here so I don't completely

12   lose my voice.

13              THE COURT:  That's fine.

14              MR. ONSTOT:  The second thing is, in the interest of

15   time, I conferred with plaintiff's counsel, and we agreed that

16   the defense will not call Mr. Goldstein or Noelle Stephens as

17   part of its case in chief and they will not object in terms of

18   going beyond the scope of direct.

19              THE COURT:  All right.

20          And where is Mr. Goldstein?

21              MR. CLOSE:  Your Honor, Matthew Close.  I'm told

22   he's clearing security downstairs in the lobby right now.  My

23   apologies to the Court and to --

24              THE COURT:  No apologies.  Plaintiff as of

25   9:00 o'clock is on the clock.  Thank you.
```

```
 1                    (A brief recess was taken.)

 2                    (In the presence of the jury.)

 3                    THE CLERK:  Sir, you are reminded that you are still

 4    under oath.

 5                    THE WITNESS:  Sorry?

 6                    THE CLERK:  You are reminded that you are still

 7    under oath.

 8                    THE WITNESS:  Yes.

 9                    THE CLERK:  Thank you.

10                    THE COURT:  You may resume cross-examination.

11                    MS. AILIN:  Thank you, Your Honor.

12                              JAMES GOLDSTEIN,

13    called as a witness by the plaintiff, was previously sworn and

14    testified as follows:

15                        CROSS-EXAMINATION (RESUMED)

16    BY MS. AILIN:

17    Q    Good morning, Mr. Goldstein.

18    A    Good morning.  Could you hold on one minute while I adjust

19    this?  All right.

20    Q    Good morning, Mr. Goldstein.  During your testimony

21    yesterday, you testified that you like to do things that make

22    your residents happy; right?

23    A    Correct.

24    Q    And you testified that seniors prefer to live in a senior

25    park; correct?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     I did not testify to that.  But I'm sure that --

 2   Q     You are sure of it?

 3   A     That many seniors would prefer that.  Not necessarily

 4   100 percent.  I don't know.

 5   Q     Well, yesterday on the first day of this trial, your

 6   management company gave notice to the residents in Colony Cove

 7   that the park is being converted to a family park; right?

 8                MR. CLOSE:  Objection.  Relevance.

 9                THE COURT:  Sustained.

10                THE WITNESS:  I'm not aware of that, if that

11   happened.

12   BY MS. AILIN:

13   Q     Do you remember testifying yesterday that you liked to

14   keep your options open?

15   A     Yes.

16   Q     And one of the options that you talked about was

17   subdividing the mobile home park and selling the individual

18   spaces; right?

19   A     Yes.

20   Q     And doing that involves kind of a two-step process,

21   doesn't it?

22   A     I'm not sure what you are referring to.

23   Q     Well, first you go through a process with the city to get

24   the city's permission to do that; right?

25   A     Correct.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     And then you have to go through another process with the
 2   Bureau of Real Estate before you sell the units; correct?
 3   A     Correct.
 4   Q     And on all of the parks that you own, you've gone through
 5   that first step in the process with the city; correct?
 6   A     Correct.
 7   Q     And the only park where you've gone through the second
 8   step in the process is the El Dorado park in Palm Springs;
 9   correct?
10   A     Correct.
11   Q     But you do have that option open to you; right?
12   A     Of going through the second step?
13   Q     Yes.
14   A     Yes.
15   Q     And the fact that you've already gone through the first
16   step, that increases the value of your park, doesn't it?
17   A     That remains to be seen.  I don't really know.  It's
18   possible.  But it hasn't been proven to me.
19   Q     Now, when you go through this process, if you take the
20   second step with the Bureau of Real Estate as you did on the
21   El Dorado mobile home park, I believe you testified yesterday
22   that once you sell one unit, rent control goes away for the
23   park?
24   A     I did not testify to that.
25   Q     Okay.  Isn't that the case, though, that the City's rent
```

1    control ordinance, the Palm Springs rent control ordinance, no

2    longer applies to the El Dorado mobile home park?

3    A    It becomes replaced by the state rent control ordinance.

4    Q    And the state rent control law only applies to low income

5    residents; correct?

6    A    I don't know what you mean to that.  It -- there are

7    restrictions that apply to everybody.  So that's a pretty broad

8    statement.

9    Q    Another option you have at Colony Cove is to add

10   additional mobile home spaces; correct?

11   A    Correct.

12   Q    There's enough extra land at the property for you to add

13   16 spaces; correct?

14   A    Correct.

15   Q    And you have the necessary permits for adding those

16   spaces; correct?

17   A    Not correct.

18   Q    Not correct?  Wasn't --

19   A    There have been some serious problems in developing those

20   extra spaces relating to previous oil wells that existed on the

21   property.

22   Q    And you are required to reabandon one of those oil wells;

23   correct?

24   A    Correct.

25   Q    That doesn't get in the way of your building out the other

1    15 areas for mobile homes, does it?

2    A     It's my understanding that it has delayed the entire

3    process.

4    Q     But you still have the permits to proceed with that

5    process; correct?

6    A     As far as I know.

7    Q     Now, when you made your first rent increase application

8    after acquiring Colony Cove, you did get a rent increase;

9    right?  It wasn't what you wanted, but you got a rent increase;

10   right?

11   A     Right.

12   Q     And that increase in rent increased the value of the park;

13   right?

14   A     You can say that.

15   Q     And then in the second year, you didn't get the rent

16   increase you wanted, but you got a rent increase; right?

17   A     Correct.

18   Q     So that also increased the value of the park, didn't it?

19   A     Yes.

20   Q     And even if you didn't get a rent increase, the park would

21   still have value, wouldn't it?

22   A     Yes, it would have some value.

23               MS. AILIN:  I have nothing further, Your Honor.

24               THE COURT:  Redirect?

25   ///

```
 1                        REDIRECT EXAMINATION
 2   BY MR. CLOSE:
 3   Q     Good morning, Mr. Goldstein.
 4   A     Good morning.
 5   Q     Counsel was just asking you a couple questions about the
 6   rent increases you've received.  Were the magnitude of those
 7   rent increases sufficient to overcome the loss in value you
 8   suffered when the city changed the rent control guidelines?
 9              MS. AILIN:  Objection.  Assumes facts not in
10   evidence.
11              THE COURT:  Overruled.
12              THE WITNESS:  No, they were not.  And opposing
13   counsel did not ask me about increasing the -- sorry -- the
14   increased operating expenses of the park, which more than
15   offset the increase in rent.
16   BY MR. CLOSE:
17   Q     Are you referring to your testimony yesterday -- are you
18   referring to your testimony yesterday, Mr. Goldstein, that
19   after purchasing the park, you put money in to improve the
20   quality of the park for the residents?
21   A     I don't recall really discussing that yesterday.  But it's
22   true that I greatly magnified the level of operating expenses,
23   particularly in the area of maintenance, because the park had
24   some maintenance issues when I bought it.  It was not being
25   maintained at the same quality level as when I took it over.
```

1    Q    And do you recall that the city's rent control staff

2    commended you for improving the quality of the park?

3    A    Yes, I did.

4    Q    I'd like to turn our attention to some things that were

5    discussed yesterday when defense counsel was examining you.

6         Do you recall yesterday that Ms. Ailin asked some

7    questions of you about a letter drafted by your attorney in

8    Exhibit 18 that talked about the lengths the city will go to

9    minimize or eliminate debt service?

10              MS. AILIN:  Objection.  Misstates the prior

11   questioning and testimony.

12              THE COURT:  Overruled.

13              THE WITNESS:  I'm sorry.  But I don't understand the

14   question.

15   BY MR. CLOSE:

16   Q    Do you recall yesterday when defense counsel was

17   questioning you that she asked you a series of questions about

18   the Gilchrist and Rudder letter that went to the seller

19   regarding rent control issues?

20   A    Yes.

21   Q    Okay.  Do you recall that Ms. Ailin showed you a selected

22   portion of Exhibit 18?

23   A    Yes.

24   Q    And do you recall that you testified that you instructed

25   your attorney to prepare the letter in Exhibit 18 so that you

1    could then show it to the seller as part of the price

2    negotiations?

3    A    Yes.

4    Q    And do you recall that Ms. Ailin asked you questions that

5    suggested your testimony about the purpose of that letter may

6    not have been accurate?

7    A    I'm -- I felt the questions were somewhat slanted, yes.

8    Q    Mr. Goldstein, at this time I would like to direct your

9    attention to the first page of Exhibit 18.

10              MR. CLOSE:  With permission to publish, Your Honor?

11              THE COURT:  You may.

12              MR. CLOSE:  I'd like to ask Mr. Newcomb to zoom in

13   on the top portion of this letter, the first page of

14   Exhibit 18.

15   Q    Mr. Goldstein, is this your handwriting?

16   A    Yes.

17   Q    And can you read who this letter was addressed to?

18   A    Matt Crow from Grossman Properties.

19   Q    And that was the seller?

20   A    Yes.

21              MR. CLOSE:  Okay.  And scrolling down just a little

22   bit to the first paragraph, Mr. Newcomb.

23   Q    Take a look at that, Mr. Goldstein.  And can you read that

24   into the record, please.

25   A    "Dear Matt, I am enclosing my proposal for the purchase of

1    Colony Cove Mobile Estates as we have discussed."

2    Q    Now I'd like to focus your attention to the bottom two

3    paragraphs of this page, the first page of Exhibit 18, and I'd

4    like to ask you to read them into the record, and they do

5    continue on to the next page.

6    A    "I am also" -- sorry.  "I am also enclosing comments from

7    my attorney, Richard Close, regarding the difficulties and

8    risks in the City of Carson for a park owner who attempts to

9    increase income.  Further, I am enclosing a letter from my loan

10   broker, Mark Hansen, relating to the financing of the

11   purchase."

12   Q    Let's continue on to the balance of the letter, please.

13   A    "As we have discussed, no other buyer is as qualified

14   position as I am to evaluate the potential pitfalls of a

15   purchase of a mobile home park in the City of Carson.  It makes

16   no sense to get tied up with someone else who then later

17   discovers that the city's tough practices require a downward

18   renegotiation of the price.  I look forward to hearing from you

19   after you have reviewed this with your partners."

20   Q    And are those your initials at the bottom there,

21   Mr. Goldstein?

22   A    Yes.

23   Q    Did Ms. Ailin show you this part of Exhibit 18 yesterday?

24   A    No.

25   Q    Does this portion of Exhibit 18 confirm your testimony

```
 1   yesterday regarding the purpose of the letter prepared by your
 2   attorney?
 3   A     Yes, it does.
 4   Q     Does it confirm your testimony that you had the letter
 5   prepared, not for your own education, but, rather, for the
 6   seller to read as part of the price negotiations?
 7               MS. AILIN:  Objection.  Leading.
 8               THE COURT:  Overruled.
 9               THE WITNESS:  It was part of my negotiation process
10   to try to drive the price down.
11   BY MR. CLOSE:
12   Q     Now, I'd like to take another look at that letter itself
13   further on in Exhibit 18.  I'd like to direct your attention to
14   page 14 of Exhibit 18 and the first full paragraph there,
15   please.
16         Let me call that out, Mr. Newcomb.  The last two
17   sentences, please.
18   A     Starting with, "That particular case"?
19   Q     Yes.
20   A     Okay.  "That particular case is very instructive to any
21   potential buyer of a mobile home park in Carson regarding the
22   lengths the city will go to to minimize or eliminate rent
23   increases, including violating an order from the Court."
24   Q     Do you recall yesterday that the city's lawyer read you a
25   portion of that exact sentence but she didn't read the entire
```

1    sentence?

2    A     Yes.

3    Q     And what part of that sentence did she fail to read you?

4    A     Sorry.  I don't recall.

5    Q     Did she read the last part of the sentence describing the

6    city's willingness to go so far as to violate an order of a

7    court?

8    A     Definitely she did not.

9    Q     And you actually tried to point that out in response to

10   her question yesterday, didn't you?

11   A     I believe so.

12   Q     Mr. Goldstein, do you recall defense counsel yesterday

13   asking you if the warnings in this letter turned out to be

14   accurate?

15   A     Yes.

16   Q     Mr. Goldstein, do you own two mobile home parks in Carson

17   that provide below-market housing to hundreds of Carson

18   residents?

19   A     Yes.

20   Q     Mr. Goldstein, do you think it's acceptable for the City

21   of Carson to violate on order from a court?

22           MS. AILIN:  Objection.  Assumes facts not in

23   evidence.

24           THE COURT:  Sustained.  Rephrase.

25   BY MR. CLOSE:

1   Q   Mr. Goldstein, would you find it acceptable if the City of

2   Carson violated an order from a court?

3          MS. AILIN:  Objection.  Relevance, no foundation.

4          THE COURT:  Sustained.  Relevance.

5   BY MR. CLOSE:

6   Q   Mr. Goldstein, this letter from 2006 talks about the

7   lengths the city will go to minimize or eliminate rent

8   increases.  Sitting here today, Mr. Goldstein, what information

9   do you now have about the lengths the city will go to minimize

10   or eliminate rent increases?

11          MS. AILIN:  Objection.  Calls for hearsay,

12   speculation, relevance.

13          THE COURT:  Overruled.

14   BY MR. CLOSE:

15   Q   You can answer.

16   A   I don't know what to add to what I just read.  The city

17   will really -- has no boundaries in their mind.  It's only

18   about appealing to the residents so they will get their votes.

19          MS. AILIN:  Objection.  No foundation, speculation.

20          THE COURT:  Overruled.

21   BY MR. CLOSE:

22   Q   Mr. Goldstein, do you recall yesterday that Ms. Ailin

23   asked you whether you did not follow the rent applications from

24   smaller park owners because you thought the rules were

25   different for smaller parks?

1  A    No, I didn't mean to imply that the rules were different.

2  I meant to explain that the park owners of very small parks had

3  a different set of circumstances because they sometimes didn't

4  go through the annual process, which is a very costly process.

5  And sometimes they waited several years before applying for a

6  rent increase.  So they were more focused on the CPI than any

7  other factor.

8  Q    Mr. Goldstein, in your 30 years of experience in owning

9  mobile home parks in Carson, is it your experience that the

10  smaller park owners are more vulnerable and potentially

11  intimidated by the lengths the city will go to minimize or

12  eliminate rent increases?

13          MS. AILIN:  Objection.  Speculation.

14          THE COURT:  Overruled.

15          THE WITNESS:  I think that, first of all, an owner

16  of a 35-space park is intimidated by the process itself.  It's

17  a very costly, time-consuming process to even get a 1 percent

18  increase.

19  BY MR. CLOSE:

20  Q    Thank you, Mr. Goldstein.

21      I would like now to move to Exhibit 1001, the rent control

22  guidelines that were discussed yesterday, page 6 of those,

23  please, on the board, paragraph F, that first sentence, please.

24  Let's bring that up?

25      And I'll have a question for you or two about it,

1    Mr. Goldstein.

2        And do you recall in this first sentence about debt

3    service that yesterday Ms. Ailin asked you some questions about

4    the word "may" in the second sentence and implied or indicated

5    by her questions that this meant that the consideration of

6    mortgage expenses was completely at the city's option?  Do you

7    recall that?

8    A    Yes.

9    Q    And do you recall her even asking you whether you were

10   familiar with what the word "may" means?

11   A    Yes.

12   Q    Mr. Goldstein, in 2006, what was your understanding --

13   excuse me.  Let me start again.  I apologize.

14       Mr. Goldstein, in 2006, was your understanding of what

15   this language meant informed by your experiences as a park

16   owner in Carson for the prior 20 years?

17   A    Absolutely.

18   Q    Please explain how those experiences shaped your

19   understanding.

20   A    My experience with my other park in Carson, Carson Harbor

21   Village, was that every year when I went in for a rent

22   increase, interest expenses were considered.  And as I

23   explained yesterday, sometimes it was considered to my

24   detriment because interest rates had decreased, and as a

25   result, I got a smaller rent increase than I would have gotten

```
 1   had interest been ignored.
 2   Q    All right.  I'd like to now take a look again at how the
 3   California courts had interpreted and analyzed this language
 4   and the city's historical practices at the time you made the
 5   decision to purchase Colony Cove.
 6        Exhibit 1005, we looked at it yesterday, is the
 7   Carson Gardens case from January 2006.  Specifically I'd like
 8   to return to page 5 of that exhibit, we talked about it a
 9   little bit yesterday, in the bottom left-hand column, please.
10        Can you cull that out, Mr. Newcomb?
11        Now, Mr. Goldstein, I'm going to read this just for the
12   benefit of everybody.  "The trial court stated the Court issued
13   the April 16th, 2003 writ based on the conclusion that 'The
14   board had historically acted to account for and was required by
15   its own process to utilize a methodology for reviewing
16   discretionary rent increase applications which gives due
17   consideration to the park's actual reasonable operating
18   expenses, including any financing costs associated with
19   ownership and acquisition of a park.'"
20        Did I read that correctly, Mr. Goldstein?
21   A    Yes.
22   Q    And was your understanding of the -- was this your
23   understanding of the Carson Gardens case at the time you
24   purchased Colony Cove?
25   A    Yes.
```

1    Q    I'd like to now move ahead one more page to page 6 of this

2    exhibit where the court of appeal again, for a second time,

3    describes what happened.

4         And we'll cull out the bottom of that paragraph on the

5    right.  Down there, please.  Yes.  No.  One above, please.

6    Actually, I'm going to go one more above and at the bottom of

7    that paragraph.  Thank you.

8         The last sentence, "Moreover, because the board failed to

9    appeal the trial court's judgment, which was based on the

10   conclusion that the ordinance required use of a methodology

11   that considered debt service costs, the board's claim that its

12   selection of MNOI methodology was proper under the ordinance is

13   not before us."

14        Did I read that correctly, Mr. Goldstein?

15   A    Yes.

16   Q    Do you see the word "required" in that sentence?

17   A    Yes.

18   Q    Do you know what the word "required" means, Mr. Goldstein?

19   A    It's self-evident that it means they should have used the

20   methodology that included interest expense.

21   Q    Mr. Goldstein, when you purchased Colony Cove in 2006, did

22   you have the same understanding of the Carson rent control

23   rules as the trial court judge did in the Carson Gardens case?

24   A    Definitely.

25             MR. CLOSE:  No further questions, Your Honor.

```
 1              THE COURT:  Recross?

 2                     RECROSS-EXAMINATION

 3   BY MS. AILIN:

 4   Q    Mr. Goldstein, since we are talking about the Carson

 5   Gardens opinion, let's look at a couple of other parts of it.

 6        And on page 1005-6, I've put another part of the opinion

 7   up on the screen that says, "If we were writing on the

 8   proverbial clean state, our analysis of the propriety of the

 9   trial court's order would first require an assessment of a

10   fundamental controlling issue:  The meaning of the Carson

11   ordinance, including whether Carson Gardens was entitled to

12   rely on the board's use of gross profits maintenance

13   methodology in determining a fair return."

14        Do you see that, Mr. Goldstein?

15   A    Yes.

16   Q    And then later on the same page, the Court says, "We are

17   not, however, writing on a clean slate."

18        Do you see that, Mr. Goldstein?

19   A    Yes.

20   Q    And then on page 1005-7, we have another part of the

21   opinion that says, "While the board cannot take new evidence on

22   remand, nothing in the city's ordinance requires the board to

23   apply any particular formula or methodology without deviation."

24        Do you see that, Mr. Goldstein?

25   A    Yes.
```

```
 1  Q    And then it goes on to say, "Indeed, the city's guidelines
 2  specifically state that the gross profits maintenance analysis
 3  is an aid to assist the board in applying the factors in the
 4  ordinance and is to be considered together with the factors in
 5  the ordinance other relevant evidence presented and the
 6  purposes of the ordinance and is not intended to create any
 7  entitlement to any particular rent increase."
 8       Do you see that, Mr. Goldstein?
 9  A    Yes.
10  Q    Mr. Goldstein, you testified a few minutes ago that small
11  park owners didn't tend to go in every year for a rent
12  increase.  Colony Cove is a large park, isn't it?
13  A    Yes.
14  Q    And isn't it true that the previous owner, the owner you
15  bought the park from, did not go in for annual rent increases?
16  A    Did not what?
17  Q    Did not make an application every year for an annual rent
18  increase?
19  A    Correct.
20            MS. AILIN:  Nothing further, Your Honor.
21            THE COURT:  You may step down.  Thank you.
22            MR. CLOSE:  Can I quickly -- one --
23            THE COURT:  No.
24       You may step down.  Thank you.  You may step down.
25       Plaintiff's next witness?
```

1          MR. CLOSE:  Can we reset the binders up there before

2    the next witness takes the stand?

3          THE COURT:  You may.

4          MR. CASPARIAN:  Good morning, Your Honor.  I'm

5    Tom Casparian on behalf of Colony Cove Mobile Estates.  May I

6    step out into the hall and get the next witness?

7          THE COURT:  You may.

8          MR. CASPARIAN:  Your Honor, Colony Cove calls to the

9    stand Noelle Stephens.

10          THE CLERK:  Do you solemnly swear that the testimony

11    you shall give in the cause now before this Court shall be the

12    truth, the whole truth, and nothing but the truth, so help you

13    God?

14          THE WITNESS:  I do.

15          THE CLERK:  Thank you.  Please take a seat.

16          MR. CASPARIAN:  Good morning, Ms. Stephens.

17          THE CLERK:  For the record, can you please state

18    your full name and spell your last name.

19          THE WITNESS:  My name is Noelle Elaine Stephens.  My

20    last name is spelled S-t-e-p-h-e-n-s.

21                      NOELLE STEPHENS,

22    called as a witness by the plaintiff, was sworn and testified

23    as follows:

24    ///

25    ///

```
 1                      DIRECT EXAMINATION

 2    BY MR. CASPARIAN:

 3    Q     Good morning again.  Could you please tell the jury,

 4    Ms. Stephens, where you live.

 5    A     I live in Cathedral City, California.

 6    Q     And where are you employed?

 7    A     I am employed by James & Associates.

 8    Q     What is James & Associates?

 9    A     James & Associates is a property management company.  We

10    manage mobile home parks in the state of California.

11    Q     How many mobile home parks does James & Associates manage?

12    A     We manage five mobile home parks and 147 lots at another

13    mobile home park.

14    Q     And does James & Associates manage Colony Cove Mobile

15    Estates, the mobile home park at issue in this case?

16    A     Yes, we do.

17    Q     Let's back up a little bit and get a little bit of

18    background on you.  Could you please just briefly tell the jury

19    about your education post high school.

20    A     I received my bachelor's in business with an emphasis in

21    finance from the State University of New York at Brockport in

22    1983.  And I received my master's degree in business

23    administration in -- while attending night school in 1986.

24    Q     Thank you.

25          Could you give us a brief summary of your employment
```

UNITED STATES DISTRICT COURT

1    history.

2    A    Outside of high school, I was in the Air Force for

3    five years.  After that, I worked a couple of part-time jobs

4    while I was going to college.  I worked after college for a

5    business company, a bookkeeping service for about a year.  Then

6    I went to work at Seven Lakes Country Club as their accounting

7    manager in Palm Springs for about three years.

8         After that I worked for Sunrise Company, which is a real

9    estate developer in the Coachella Valley, until I went to work

10   at James & Associates in 1995, and I've been there ever since.

11   Q    And did you get your MBA while you were working at these

12   companies?

13   A    Yes.  I worked at Seven Lakes Country Club full time, and

14   I was going to night school, and I received my MBA during that

15   time.

16   Q    Okay.  And you said you've been with James & Associates

17   since 1995?

18   A    Yes.

19   Q    Does James & Associates manage any other mobile home parks

20   in the City of Carson?

21   A    We also manage Carson Harbor Village which is located

22   across the street from Colony Cove.

23   Q    What do you do at James & Associates?

24   A    I'm the accounting manager.  I'm responsible for entry

25   into the computers of rents, payment of bills, preparation of

1  financial statements, bank reconciliations, filling out reports

2  that go to government agencies, state, federal, county, city.

3  I also prepare the rent applications.

4  Q    What are rent applications?

5  A    In the City of Carson, in order for a property owner to

6  receive a rent increase, they need to file with the city at

7  least annually as many -- the -- and record all the expenses

8  they have paid for the year.  Expenses are documented by

9  invoices and copies of checks and -- also with the income that

10  was received.

11  Q    So you have to submit all invoices, bills, checks to prove

12  they were paid?

13  A    Yes.

14  Q    And what's the purpose of you submitting the application?

15  A    In order for the owner of the park to receive a profit, he

16  needs to submit to the city to show why he needs an increase in

17  order to achieve the profit that he is expecting.

18  Q    You basically need to show the income and the expenses to

19  demonstrate that?

20  A    Yes.

21  Q    I see.  And so you said you need to submit a full year.

22  Is it true that you cannot apply for rent increase until you've

23  owned the park for essentially 12 full months?

24  A    Yes, that's correct.

25  Q    Typically how long does it take to get a rent increase in

1   Carson?

2   A     It takes about -- well over a year, maybe 15 months after

3   the end of the fiscal year to start your rent increase.

4   Q     And what's involved -- after you've prepared the

5   application and submitted it, then what happens?

6   A     Well, you submit the application within six months of the

7   end of the fiscal year.  After that, the expenses are reviewed

8   by the city staff.  And when they have determined the

9   application to be complete, they have -- after having reviewed

10  all the expenses and verifying and making sure everything is as

11  they want it, then they will -- a hearing date will be set.

12        After the hearing date -- this can usually take three to

13  six months to get to a hearing, and often it's postponed.  Once

14  the hearing has been held and the board makes a decision, the

15  residents need to be notified at least 90 days in advance of

16  the rent increase.  And that's a state requirement.

17  Q     Thank you.

18        Let's talk about the first rent increase application after

19  Mr. Goldstein purchased Colony Cove.  Did you review the park's

20  financial information after Mr. Goldstein's first year of

21  ownership?

22  A     Yes.

23  Q     And what did it show?

24  A     It showed a loss of over a million dollars.

25  Q     What do you mean "a loss of over a million dollars"?

```
 1   A    We paid bills in excess of income over a million dollars

 2   in expenses in excess of income.

 3   Q    Are these actual bills paid?

 4   A    Yes.

 5   Q    Does this include any so-called bookkeeping expenses like

 6   depreciation and write-offs?

 7   A    No.

 8   Q    Did it include any expenses from the other park or any

 9   other park?

10   A    No.

11   Q    If you could please find the binder marked Plaintiff's

12   No. 1.  I'm going to ask you to look for Tab 46, what's

13   previously been marked Exhibit 46.  Let me know when you've got

14   that.

15   A    Okay.  I'm there.

16   Q    Do you recognize?

17   A    This is the application for the mobile home space rent

18   increase that was filed in the first year.

19           MR. CASPARIAN:  Your Honor, may we publish to the

20   jury?

21           THE COURT:  You may.

22   BY MR. CASPARIAN:

23   Q    Did you prepare the financial information within this

24   application?

25   A    Yes.
```

```
 1              MR. CASPARIAN:  Could we see the whole first page,
 2   please.  And if we could highlight the figure at the bottom.
 3   BY MR. CASPARIAN:
 4   Q    What did you determine regarding the park's finances
 5   exactly?
 6   A    There was a loss in that year of $1,082,191.
 7   Q    Now, does this amount include the mortgage interest
 8   payments --
 9   A    Yes.
10   Q    -- that were made to GE on the loan?
11   A    Yes, it does.
12   Q    Thank you.  Now, is that just the interest on the loan, or
13   does that include paying down some of the principal?
14   A    No.  It doesn't include payments of principal.
15   Q    If we could see page 11 of that same document, please.
16   How much were the mortgage interest payments during that first
17   year?
18   A    The interest payments were 1,224,681, and the loan fees
19   were $147,306.
20   Q    Now, if you know, what did the city staff do with this
21   expense information?
22   A    They disregarded this in their calculation of the rent
23   increase that the board approved.
24              MR. ONSTOT:  Objection.  Move to strike,
25   speculation.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Overruled.
 2   BY MR. CASPARIAN:
 3   Q    Did they disregard any other expenses other than the
 4   interest expenses?
 5              MR. ONSTOT:  Speculation.
 6              THE COURT:  Overruled.
 7   BY MR. CASPARIAN:
 8   Q    If you know.
 9   A    I know that they disallowed some expenses, and they
10   recategorized some expenses as capitals.
11   Q    All right.  In your binder could you turn, that same
12   binder, to Exhibit 55.  Tell me if you recognize that document.
13   A    This is a page -- a section of the staff report prepared
14   by the City of Carson staff.
15              MR. CASPARIAN:  Your Honor, may I publish?
16              THE COURT:  You may.
17   BY MR. CASPARIAN:
18   Q    And if we could see page 4 of that, please.
19        How much of the expenses did the city review -- I'm
20   sorry -- did the city remove?
21   A    They removed $889,438.
22   Q    And does that include the interest expense or is that in
23   addition to the interest expense?
24   A    That's in addition.
25   Q    Now, did the city dispute that these expenses, all of
```

```
 1   these expenses had actually been incurred and paid?
 2   A     No.
 3   Q     In fact, you submitted copies of the bills and the checks
 4   proving payment; correct?
 5   A     Yes, we did.
 6   Q     If you could please refer to what's previously been marked
 7   as Exhibit 48 in the binder.  Do you recognize that document?
 8   A     Yes.  This is the staff report for -- to the -- for the
 9   City of Carson.
10              MR. CASPARIAN:  Your Honor, may I publish?
11              THE COURT:  I'm sorry.  The exhibit number?
12              MR. CASPARIAN:  Is --
13              MR. CLOSE:  48.
14              MR. CASPARIAN:  Thank you.
15              THE COURT:  You may.
16   BY MR. CASPARIAN:
17   Q     Now, did you attend the rent board hearing on this
18   application?
19   A     Yes, I did.
20   Q     And what did the rent board do?
21   A     The rent board approved an increase of $36.74.
22   Q     And could you turn, please, to Exhibit 50.  Let me know if
23   you recognize that document.
24   A     This is the resolution for that hearing formalizing the
25   decision of the rent control board.
```

```
 1   Q    That's basically their financial official decision on the

 2   rent application; correct?

 3   A    Yes, it is.

 4            MR. CASPARIAN:  Your Honor, may I publish?

 5            THE COURT:  You may.

 6   BY MR. CASPARIAN:

 7   Q    And if we could see page 11 of that document, please.

 8   Could we see more detail of the board's financial decision and

 9   the highlight.  Thank you.

10        Is that the figure you just told us, $36.74?

11   A    Yes.

12   Q    How much additional income did that mean for the park,

13   that $36.74 increase?

14   A    In -- on the next page in paragraph C, it shows that that

15   was $177,675.

16   Q    177,675.  Did that rent increase give Colony Cove enough

17   rent to pay its bills?

18   A    No, it did not.

19   Q    In fact, you said the park had lost over a million dollars

20   that year?

21   A    That's correct.

22   Q    When were you able to start collecting the increased rent?

23   A    I think it was December 1st of 2008.

24   Q    And the park was purchased in?

25   A    2006.
```

1  Q    And why did it take so long after Mr. Goldstein purchased

2  the park?

3  A    He had to own it for a year.  So we could not file it

4  until at least the end of March 2007.  We, in fact, finished

5  our filing in September of 2007.  And by the time we went to

6  hearing and a decision was made, it was August of 2008.

7  Q    And then you had to give the 90 days' notice?

8  A    Yes.

9  Q    And today, if the park applied for new rent increase, in

10 your experience, how long does it typically take from the time

11 the application is filed to the time you can actually start

12 collecting any rent increase?

13          MR. ONSTOT:  Objection.  Relevance.

14          THE COURT:  Overruled.

15 BY MR. CASPARIAN:

16 Q    You may answer.

17 A    It's usually eight to ten months.

18 Q    Thank you.  Let's talk about the second year of ownership.

19      Did you review the park's financial information after the

20 second year of ownership?

21 A    Yes.

22 Q    What did it show?

23 A    It showed a loss of over 800,000.

24 Q    And, again, you mean that the expenses exceeded the income

25 by that much?

```
 1   A     That's correct.

 2   Q     Could you turn, please, to Exhibit 47 in the binder.  And

 3   let us know if you recognize that document.

 4   A     Yes.  This is the application we filed for the second

 5   year.

 6   Q     Did you prepare that application?

 7   A     Yes, I did.

 8              MR. CASPARIAN:  Your Honor, may I publish?

 9              THE COURT:  You may.

10              MR. CASPARIAN:  Could we have the portion at the

11   bottom highlighted?

12   BY MR. CASPARIAN:

13   Q     What, Ms. Stephens, did you determine regarding the park's

14   finances for the second year of ownership?

15   A     Colony Cove lost $812,177.

16   Q     And does this amount include the mortgage interest payment

17   made on the GE loan?

18   A     Yes, it does.

19   Q     Could we see page 10 from that same document.

20         If you could turn, Ms. Stephens, to page 10, please.  How

21   much were the mortgage interest payments in the second year of

22   ownership?

23   A     The mortgage interest payments were $1,323,700.

24   Q     And there were additional loan fees as well; right?

25   A     What happens when -- in the first year, they determined
```

**UNITED STATES DISTRICT COURT**

```
 1   that the loan fees needed to be amortized over the life of the
 2   loan.  So these are actually not paid in this year, but they
 3   were brought forward from the prior year.
 4   Q    So in your experience, loan fees are allowable as interest
 5   expenses, but they get amortized over the term of the loan --
 6   A    Yes.
 7   Q    -- spread over the term of the loan?  Thank you.
 8        Could you turn, please, to Exhibit 49 in the binder.  And
 9   when you have that, let me know if you recognize that.
10   A    Yes.  This is the staff report for the City of Carson to
11   the Mobile Home Rent Review Board.
12             MR. CASPARIAN:  May we publish, Your Honor?
13             THE COURT:  You may.
14             MR. CASPARIAN:  And could we see page 3 of that
15   document with the highlight.
16   BY MR. CASPARIAN:
17   Q    Ms. Stephens, what did the city do with the expense
18   information you submitted?
19   A    They -- they -- I'm sorry.  I'm --
20   Q    Do you want me to re-ask the question?  Sure.
21        Looking at the staff report, what did the staff -- leaving
22   aside the interest expense, what did the city do with all the
23   other expense information that you had submitted?  Did they
24   exclude some portion of it?
25   A    I'm sorry.  Okay.  I see it now.  Yes.  They disallowed
```

1   355,822 in expenses.

2   Q    And that was in addition to the interest expenses?

3   A    Yes.

4   Q    Did you attend the rent board hearing on this application?

5   A    Yes, I did.

6   Q    What did the rent board do?

7   A    The rent board determined an increase of $25.02 cents was

8   approved.

9   Q    Could you turn, please, to Exhibit 51 in the binder.  Tell

10  the jury if you recognize that document.

11  A    This is the resolution by the rent review board granting

12  the general increase for that year.

13         MR. CASPARIAN:  Your Honor, may I publish?

14         THE COURT:  You may.

15         MR. CASPARIAN:  And if we could see page 10, please.

16  The relevant section is highlighted.

17  BY MR. CASPARIAN:

18  Q    Ms. Stephens, how much additional income did that $25.02

19  rent increase mean for the park?

20  A    It was $120,966.72.

21  Q    You are reading the board's own determination of that

22  calculation; correct?

23  A    Yes, I am.

24  Q    And did that increase give Colony Cove enough rent to pay

25  its bills?

```
 1    A     No, it did not.

 2    Q     As you said, the park had lost --

 3    A     812,000 that year.

 4    Q     Thank you.  You said you'd been with James & Associates

 5    since 1959?

 6    A     Yes.

 7    Q     Okay.  And have you been preparing the rent increase

 8    applications for the other park that Mr. Goldstein owns in

 9    Carson, Carson Harbor?

10    A     Yes.

11    Q     Since 1995?

12    A     Yes.

13    Q     And in your experience, prior to Mr. Goldstein purchasing

14    Colony Cove, did the board ever refuse to include mortgage

15    payments in its calculation of Carson Harbor's expenses?

16    A     No.

17    Q     I have just a few more questions.  At any time before he

18    purchased the park, did Mr. Goldstein mention to you anything

19    about converting the park to resident ownership?

20    A     No.

21    Q     Do you have any experience with what Mr. Goldstein has

22    done in the past if a resident finds a large rent increase is a

23    real hardship?

24    A     Yes.

25    Q     And what has he done?
```

```
 1   A     At El Dorado, he worked with the residents to defer or
 2   give a concession for a portion of their rent.
 3   Q     And one final question.  In Colony Cove, did Mr. Goldstein
 4   cut or reduce the services and maintenance at the park when he
 5   was losing all that money those years?
 6   A     No, he did not.  In fact, in the staff report, during his
 7   inspections, staff noted that the level of service to the
 8   residents had increased.
 9              MR. CASPARIAN:  Your Honor, I'd like to move into
10   evidence Exhibits 46 through 51 and 55.
11              THE COURT:   46 through 51 have previously been
12   admitted.  And then you said 55?
13              MR. CASPARIAN:  Yes, Your Honor.
14              THE COURT:  55 is admitted.
15         (Exhibit No. 55 received into evidence.)
16              MR. CASPARIAN:  Thank you, Your Honor.  I have no
17   further questions of Ms. Stephens.  Thank you very much.
18              THE COURT:  Cross-examination?
19                        CROSS-EXAMINATION
20   BY MR. ONSTOT:
21   Q     Good morning, Ms. Stephens.  Are you a CPA?
22   A     No.
23   Q     If you can turn -- there should be a white binder up on
24   the witness stand.  If you can take Volume 1 of 3 and turn to
25   Tab 21.
```

UNITED STATES DISTRICT COURT

```
 1          Your Honor, 21 has been admitted.  Permission to publish?
 2               THE COURT:  You may.
 3  BY MR. ONSTOT:
 4  Q     Have you seen Exhibit 21 before?
 5  A     Yes, I have.
 6  Q     And did you prepare it?
 7  A     Yes.
 8  Q     Is this a projected budget for Colony Cove prior to
 9  Mr. Goldstein's purchase of the park?
10  A     Yes.
11  Q     Now, almost near the end of the first column is a NOI.
12  What is NOI?
13  A     It's net operating income.
14  Q     And the projected net operating income is $1,025,000
15  approximately; correct?
16  A     Yes.
17  Q     And that is what you used as a budget projection for the
18  income for the first year if Mr. Goldstein were to purchase
19  Colony Cove; is that correct?
20  A     Yes.
21  Q     Now, I believe that you mentioned earlier in response to
22  one of plaintiff's counsel's questions that the debt or the
23  mortgage payment for the first year of Colony Cove were
24  $1,224,000 approximately; is that correct?
25  A     I believe so.
```

1  Q    So the loan, the $18 million loan, was taken out in
2  advance of the purchase of Colony Cove; is that correct?
3  A    I was not involved in the loan.
4  Q    Well, you know that the loan was financed to purchase
5  Colony Cove; is that correct?
6  A    Yes.
7  Q    So you have a projected income of a little over $1 million
8  and a mortgage payment that is $1.2 million.  So is it fair to
9  say that at the time Mr. Goldstein purchased Colony Cove, he
10 was already underwater with regards to having his mortgage
11 payments exceeding his net operating income?
12 A    I can't answer that.
13 Q    Why not?
14 A    I was not involved in the loan or in the decisions that
15 had to do with the loan.
16 Q    No, but you are the accountant, and you calculated the
17 projected NOI, and you just told and testified as to what the
18 mortgage payments are going to be.
19      So am I correct in my subtraction that 1.2 million from
20 1 point -- let's call it $1 million is 100,000 basically
21 underwater?
22 A    Yes.
23 Q    Pardon me?
24 A    Yes.
25 Q    Okay.  So Mr. Goldstein -- did you advise Mr. Goldstein

1    that he would be purchasing Colony Cove knowing that his

2    mortgage payments would exceed the budgeted or projected

3    income?

4    A     No.

5    Q     Did he ask you?

6    A     No.

7    Q     Did you advise Mr. Goldstein at any time prior to the

8    purchase of Colony Cove that it was risky to have a mortgage

9    payment that exceeded operating income?

10   A     No.

11   Q     Are you aware that the Carson rent control ordinance, one

12   of the factors or one of the purposes is to protect park

13   residents from excessive rent increases?

14   A     Yes.

15   Q     Did you ever advise Mr. Goldstein that he would have to

16   seek a massive rent increase in order to cover his mortgage

17   payments as well as other expenses?

18           MR. CASPARIAN:  Objection.  Foundation.

19           THE COURT:  Overruled.  You may answer.

20           THE WITNESS:  I did -- I'm sorry.  Would you repeat

21   that question?

22   BY MR. ONSTOT:

23   Q     Did you ever advise Mr. Goldstein --

24   A     No, I did not.

25   Q     Mr. Casparian asked you about the rent applications.  So

1    if you can turn to the black binder, Exhibit 46, which is what

2    you had before -- do you have it there?

3    A    Yes.

4    Q    Now, you testified that at the time you prepared this rent

5    application, Colony Cove had lost over a million dollars;

6    correct?

7    A    Yes.

8    Q    Now, to your knowledge, prior to the purchase of

9    Colony Cove, was the City of Carson involved at all with the

10   negotiations between Mr. Goldstein and Grossman Properties?

11   A    I don't know.

12   Q    To your knowledge, was the city involved in approving or

13   reviewing the proposed financing agreement between GE Capital

14   and Mr. Goldstein?

15   A    I would have no idea.

16   Q    To your knowledge, what was the first involvement that the

17   City of Carson had with regards to issues dealing with rent

18   increases for Colony Cove?

19   A    I suppose when we buy it, we file the application.

20   Q    Okay.  And that was how many months after Mr. Goldstein

21   purchased the park?

22   A    18.

23   Q    Okay.  So from the time Mr. Goldstein purchased the park

24   until about 18 months later, that is when that million dollar

25   of losses occurred; correct?

1    A     Yes.

2    Q     And the City of Carson had nothing to do -- no

3    involvement, nothing to do with the incurrence of any of those

4    losses all the way up until what you just said would be their

5    action on the first application for rent increase; right?

6    A     I -- I -- I am not aware of any involvement of the city at

7    that point.

8    Q     Are you aware then of anything that the City of Carson did

9    prior to approving the first rent application to cause that

10   million dollars in debt?

11   A     No, I am not aware.

12   Q     Thank you.  Now, sticking with this first page, do you

13   recall the amount of rent increase that you asked for -- strike

14   that.

15        You asked for a rent increase of about $618 on average per

16   space per month; is that correct?

17   A     That's what was requested in the application.

18   Q     And did you -- before you filled out this application, did

19   you discuss that $618 number with Mr. Goldstein?

20   A     No.

21   Q     Where did the $618 come from?

22   A     That was prepared for as a separate -- by a separate

23   entity.  We did not prepare that particular part of the

24   application.

25   Q     Okay.  Did you discuss the requested $618 a month increase

1    with anybody at Colony Cove, anybody at James & Associates,

2    except for lawyers, or anybody associated with Mr. Goldstein

3    regarding that $618 proposed increase?

4    A     No.

5    Q     Knowing that the rent control ordinance was at least in

6    part designed to protect residents from excessive rent

7    increases, did anybody talk to you, send you anything, give you

8    any type of knowledge as to what the rent control board may do

9    in light of a requested $618 or a 159 percent rent increase

10   that would be effective basically immediately all in one fell

11   swoop?

12   A     That was not discussed with me.

13   Q     Did you discuss with anybody the possibility of instead of

14   asking for $618 all at once, that to bring the rents up perhaps

15   comparable to Carson Harbor Village, that you can ask for rent

16   increases in incremental steps, say over two, three, or four or

17   more years so that it wouldn't be a massive rent increase at

18   the end of Year 1?

19   A     No.

20   Q     To your knowledge, did anybody discuss that opportunity?

21   A     I have no knowledge of that.

22   Q     If you could turn the page to Exhibit 46-2, summary of

23   rent increase factors.  Factor No. 1, consumer price index.

24   What is a consumer price index?

25   A     It's the change in the cost of living based on certain

```
 1   government indices.

 2   Q    And basically it's a measure of inflation; correct?

 3   A    Yes.

 4   Q    Now, in Factor No. 1 here, you said that the consumer

 5   price index for the Los Angeles area was 6.67 percent.  Do you

 6   see where I'm referring to --

 7   A    Yes.

 8   Q    -- as of September of 2006?

 9   A    Yes, I do.

10   Q    Now, the rent increase that Carson gave to Mr. Goldstein

11   was 8.8 percent; correct?

12   A    Yes.

13   Q    So the rent increase that was allowed by the rent board

14   exceeded inflation; is that true?

15   A    Yes.

16   Q    Now if you could turn to Exhibit 47 which is the next one.

17   This is the application for Year 2.  At the end of Year 2, how

18   much of a rent increase did you ask for?

19   A    $342.46.

20   Q    I think it says after Footnote No. 1 there's, that's an

21   82.69 percent increase; is that correct?

22   A    Yes.

23   Q    And you were not granted that; is that true?

24   A    That's true.

25   Q    Did you have any discussions with Mr. Goldstein or anybody
```

```
 1    else at Colony Cove, especially after the decision on the first

 2    year's rent application, what the likely result or award from

 3    the Carson rent board would be if you submitted a $300 plus

 4    request for a rent increase in Year 2?

 5    A     No.

 6               MR. CASPARIAN:  Objection.  Relevance.

 7               THE COURT:  Overruled.

 8               THE WITNESS:  No.

 9    BY MR. ONSTOT:

10    Q     Did you prepare the request for a $382 rent increase or

11    was that some other firm as well?

12    A     That was another firm.

13    Q     If you could turn the page in Exhibit 46 again.  Again,

14    Factor No. 1 refers to the consumer price index.  This time for

15    this year it's 4.79 percent.  Do you see where I'm referring

16    to, Factor No. 1?

17    A     Yes, I do.

18    Q     And so that was the inflation at the time you applied for

19    the application.  And it's your understanding that the rent

20    control board awarded a rent increase of 5.5 percent; correct?

21    A     I know -- I believe that was the percentage.  I know it

22    was $25.00.

23    Q     So the rent increase granted by the board exceeded

24    inflation as to application for Year 2; correct?

25    A     Yes.
```

1   Q     Do you recall the interest rate that Mr. Goldstein was

2   paying on the loan from GE Capital?

3   A     No, I don't.

4   Q     Going back to the white binder, if you can turn to Exhibit

5   28.

6   A     Did you say 28?

7   Q     Let's see.  Actually let's go back to that one, I'm sorry,

8   in the black binder.  I think I said white.  If you would turn

9   to page 28-9.

10       Your Honor, 28 has been admitted.  May I publish?

11             THE COURT:  You may.

12   BY MR. ONSTOT:

13   Q     Do you see where I'm referring to with regards to section

14   2.2, No. 1 and No. 2?

15   A     Yes.

16   Q     Those talk about the interest rates on the loan that GE

17   Capital had with regards to the loan of Mr. Goldstein, the $18

18   million loan.  Here it refers to in paragraph 1 that one of

19   those loans has a floor of 6.25 percent interest rate.  Do you

20   see where I'm referring to?

21   A     Yes.

22   Q     And the second one, one paragraph down, shows that it

23   would be -- the second loan would have a minimum of

24   8.25 percent.  Do you see where I'm referring to?

25   A     Yes.

```
 1   Q     At any time were you involved in any discussions with

 2   anybody from Colony Cove regarding that level of interest rate,

 3   6.25 or higher for one and 8.25 higher for the other?

 4   A     No.

 5   Q     At any time did anybody discuss with you that competing

 6   offers for the property, at least one of them had a finance

 7   rate of 4 percent?

 8              MR. CASPARIAN:  Objection.  Foundation, misstates

 9   the evidence.

10              THE COURT:  Sustained.  Foundation.

11   BY MR. ONSTOT:

12   Q     Did you have any discussion with anybody regarding

13   competing offers for Colony Cove?

14   A     No.

15   Q     Did you attend any meetings of the Carson rent control

16   board other than when Carson Harbor Village or Colony Cove rent

17   applications were heard?

18   A     No.

19   Q     So you would have no knowledge as to how the board dealt

20   with determining rent increases for any other parks; is that

21   correct?

22   A     No.

23   Q     Pardon me?

24   A     No.

25   Q     No, that's not correct?
```

```
 1    A     No, I have no knowledge of that.
 2    Q     You have no knowledge of rent increases or how they were
 3   determined at any other park except Carson Harbor Village and
 4   Colony Cove; fair?
 5    A     That's correct.
 6    Q     To your knowledge, in the course of the last ten years or
 7   so when Mr. Goldstein owned Colony Cove, did the City of Carson
 8   physically take possession of any portion of the mobile home
 9   park?
10    A     No.
11    Q     To your knowledge, did the City of Carson impose any
12   limitation on uses of the park other than as a rent control
13   mobile home park for seniors?
14    A     No.
15    Q     To your knowledge, did the City of Carson take back any
16   rents or reduce any rents that were previously allowed by
17   Colony Cove to collect?
18    A     There were two instances where we were granted annual
19   increases that were only for a term of one year and rolled back
20   at the end of that year.
21    Q     Fair enough.  Other than those two?
22    A     No.
23    Q     Now, would you -- in both Year 1 and Year 2, I think you
24   testified earlier the rent control board granted rent increases
25   for Colony Cove; correct?
```

UNITED STATES DISTRICT COURT

```
 1   A      Yes.

 2   Q      So the -- and I think you mentioned a couple figures, but

 3   the income to the park was greater after the Year 1 application

 4   was approved than before the Year 1 application was approved;

 5   true?

 6   A      True.

 7   Q      And the income to the park was greater after the Year 2

 8   application was approved than before the Year 2 application was

 9   approved; correct?

10   A      Yes.

11          MR. ONSTOT:  Thank you.  Nothing further,

12   Ms. Stephens.

13          THE COURT:  Redirect?

14                      REDIRECT EXAMINATION

15   BY MR. CASPARIAN:

16   Q      Thank you, Ms. Stephens.  Just a few questions.

17          Mr. Onstot was referring you to an Exhibit 21 in the first

18   page, this income and expense estimation.  Do you have that in

19   front of you?

20   A      Yes.

21   Q      Do you see -- he was directing you towards the bottom of

22   that page.  Do you see where it says "income"?

23   A      Yes.

24   Q      And the amount under the buyer's figures and the seller's

25   figures is the very same amount; is that correct?
```

1   A      Yes, it is.

2   Q      Was there any attempt at all to include in this

3   calculation the expected increased rents pursuant to the city's

4   longstanding rules?

5   A      No.

6   Q      Mr. Onstot asked you if you were aware of anything that

7   the city did between Mr. Goldstein's purchase of the park and

8   when a rent increase was finally granted that affected the

9   income of the park.  Isn't it true that the city amended its

10  rent control rules in between the period of time that

11  Mr. Goldstein purchased the park and when we got to hearing on

12  the rent increase?

13  A      Yes.

14  Q      And those amended guidelines were applied to that

15  application, weren't they?

16  A      Yes.

17  Q      Mr. Onstot directed you to what's previously been marked

18  as Exhibit 47.  Actually, let's go to Exhibit 46 first.  I

19  think he took you there first.

20         And if we could see the second page of Exhibit 46.

21  A      Okay.

22  Q      Mr. Onstot directed you to only one of the factors, which

23  was the change in the CPI; correct?

24  A      Yes.

25  Q      And could you tell the jury, please, what's the second

1    factor that must be considered by the board in determining the

2    amount of a rent increase?

3    A    Comparison to other parks in the area.

4    Q    That would be the rent lawfully charged for other parks in

5    the area, other comparable parks; correct?

6    A    Comparable parks, yes.

7    Q    And in your experience attending the rent board hearings,

8    reading staff reports, do you know which parks in Carson are

9    considered comparable to Colony Cove?

10   A    The most comparable would be Carson Harbor Village.

11   Q    Thank you.

12        And could I direct your attention to Factor No. 8 that

13   must be considered by the board in determining the amount of a

14   rent increase?

15   A    Yes.

16   Q    And what is that factor?  Could you tell the jury, please.

17   A    "Changes in reasonable operating and maintenance

18   expenses."

19   Q    Thank you.

20        And if you could turn the page, please, and read for the

21   jury Factor No. 12 that must be considered by the rent board in

22   setting the new rents.

23   A    "Maintenance of gross profits prior to rent control taking

24   into consideration subsequent inflation."

25             MR. CASPARIAN:  Thank you.  I have no further

```
 1   questions.
 2              THE COURT:  Recross?
 3              MR. ONSTOT:  Nothing further, Your Honor.
 4              THE COURT:  You may step down.  Thank you.
 5        Plaintiff's next witness?
 6              MR. PORTNOI:  Your Honor, may I go into the hall to
 7   call Mr. Detling who is our next witness?
 8              THE COURT:  You may.
 9              MR. PORTNOI:  Your Honor, plaintiff calls
10   Rob Detling.
11              THE CLERK:  If you can please raise your right hand.
12        Do you solemnly swear that the testimony you shall give in
13   the cause now before this Court shall be the truth, the whole
14   truth, and nothing but the truth, so help you God?
15              THE WITNESS:  Yes.
16              THE CLERK:  Thank you.  Please take the stand.  For
17   the record, can you please state your full name and spell your
18   last name.
19              THE WITNESS:  Robin Andrew Detling, D, as in David,
20   e-t-l-i-n-g.
21                          ROB DETLING,
22   called as a witness by the plaintiff, was sworn and testified
23   as follows:
24   ///
25   ///
```

UNITED STATES DISTRICT COURT

```
 1                    DIRECT EXAMINATION
 2  BY MR. PORTNOI:
 3  Q    Good morning, Mr. Detling.  Before getting into your
 4  testimony, I'd like to ask you some questions about your
 5  educational and professional background.
 6        Where did you attend college, and what did you specialize
 7  in?
 8  A    I attended Brigham Young University in Provo, Utah, and I
 9  studied business management at the Marriott School.
10  Q    And what is the Marriott School?
11  A    It's the school of business there at the university.
12  Q    And what is your current occupation?
13  A    I'm a commercial real estate appraiser with Colliers
14  International Valuation and Advisory Services.  I'm the
15  managing director of the San Diego office.
16  Q    What do you do as the managing director?
17  A    I oversee production of numerous appraisals on all
18  income-producing property types, and I train other appraisers.
19  Q    How long have you been a real estate appraiser with
20  Colliers?
21  A    Well, I started in 2003 with PGP Valuation, Inc., which
22  was later acquired by Colliers.  So about 13 years.
23  Q    Do you have any professional licenses or affiliations?
24  A    I do.  I'm a certified general real estate appraiser in
25  the state of California.  It's the highest appraisal license
```

```
 1   the state grants.  I'm also -- I also have the MAI designation

 2   given by the appraisal institute.

 3   Q     What does MAI stand for?

 4   A     It doesn't stand for anything in particular.  It's just

 5   the title of designation.

 6   Q     What is the MAI designation?

 7   A     It's given to individuals who have demonstrated through

 8   education and experience and testing expertise in valuing

 9   commercial real estate.

10   Q     And how long have you been a real estate appraiser?

11   A     I was first licensed by the State of California in 2006, I

12   believe.  So about ten years.

13   Q     And how long have you had that MAI designation you

14   mentioned?

15   A     I was designated in 2010.  So another -- about six years

16   ago.

17   Q     Over your time as an appraiser, have you specialized in

18   appraising any specific types of real estate?

19   A     Yes.  Predominantly mobile home parks.

20   Q     Approximately how many mobile home parks have you

21   appraised over the course of your career?

22   A     Over 300.

23   Q     And about how much of your appraisal work is in the

24   mobile home park area?

25   A     Anywhere from 50 to 70 percent depending on the month.
```

```
 1  Q    And approximately how many of the mobile home parks you've
 2  appraised are subject to some form of rent control?
 3  A    About a third.
 4  Q    How many times have you been designated, if you can
 5  recall, as an expert witness?
 6  A    I think there have been eight different cases, but I think
 7  a couple were consolidated.  So I think six, six to eight.
 8  Q    And if you can recall, on those occasions, what topics
 9  were you designated as an expert?
10  A    Just to provide market value opinions for commercial
11  real estate.
12  Q    And tell me, have you authored any articles regarding
13  real estate appraisals?
14  A    I've written for some internal company documents,
15  publications, but those are just internal documents.
16  Q    Any of those documents or articles, were they about
17  mobile home park appraisals?
18  A    Yeah, a few of them.
19            MR. PORTNOI:  Your Honor, at this time pursuant to
20  Rule 702 of the Federal Rules of Evidence, I move that
21  Mr. Detling be deemed a qualified expert witness in the field
22  of commercial real estate appraisals and specifically
23  mobile home park appraisals.
24            THE COURT:  He may.
25  BY MR. PORTNOI:
```

```
 1   Q     Have you appraised Colony Cove mobile home park in Carson,

 2   California?

 3   A     Yes, I have.

 4   Q     When did you appraise the park?

 5   A     In early 2007.

 6   Q     Why did you appraise the park?

 7   A     The property owner's attorneys contacted our company and

 8   requested a market value appraisal in conjunction with a

 9   rent control application.

10   Q     Were you informed of why the park owner wanted to know the

11   market value?

12   A     No.  Just that it was needed for the rent control

13   application.

14   Q     Did you prepare a written appraisal?

15   A     I did.

16   Q     Could you look in plaintiff's binder 1 -- it maybe the one

17   in front of you, it might not be -- for Tab 36.  It will be a

18   black binder.

19   A     Yes.

20   Q     And is that your written appraisal?

21   A     Yes.

22             MR. PORTNOI:  Your Honor, this has been admitted

23   into evidence.  Do I have permission to publish it during the

24   course of Mr. Detling --

25             THE COURT:  You may.
```

1           MR. PORTNOI:   Thank you.

2    Q    Does that report accurately reflect your calculations and

3    conclusions with respect to the park's market value as of

4    March 30th, 2006?

5    A    Yes.

6    Q    You just stated that you appraised the park in March 2007.

7    For the benefit of the jury, what does that mean, you appraised

8    the park?

9    A    It means I developed an opinion of value at that time

10   looking back to a date of value that was given, which was

11   March 30, 2006.

12          THE COURT:   Mr. Portnoi, could you just slow down a

13   little bit.

14          MR. PORTNOI:   Absolutely, Your Honor.

15   Q    And what was that value?

16   A    $23 million.

17   Q    In your experience, is it unusual to appraise a property

18   as of some date in the recent past?

19   A    No.  It's fairly typical.

20   Q    Is it a technique that appraisers -- that other appraisers

21   use?

22   A    Yes.

23   Q    And is it relevant that your appraisal was about a year

24   afterwards, if not longer?

25   A    Yeah, it is relevant.

1    Q    What kinds of information did you gather about

2    Colony Cove?

3    A    Well, I gathered information about the income-generating

4    ability of the property, like the rents it was generating, how

5    much it cost to run the property, what the rents were in the

6    other area -- the areas around it at other properties.

7         I looked at like zoning information for the property that

8    regulates the use of the land.  I looked at sales information

9    for other mobile home parks that have sold, that type of

10   information.

11   Q    You mentioned you got sales information from other parks,

12   you got income information from other parks.  Did you get any

13   other information about other parks?

14   A    Yes.  We -- I looked at the vacancy levels at other

15   properties and at the subject property.  I looked at the

16   operating expenses at the property that I was appraising as

17   well as the operating expenses at other comparable expense

18   properties.

19   Q    Did you investigate whether there were any other offers

20   for Colony Cove?

21   A    Yes, I did.

22   Q    And what did you learn?

23   A    I talked to one of the listing brokers.  Prior to the

24   property owner purchasing the property, the property was listed

25   for sale by Marcus & Millichap, which is a large commercial

real estate brokerage company.  The broker I talked to there

that was involved in that marketing, he indicated that there

were several other offers from strong buyers that were -- I

think he mentioned one was higher than what Mr. Goldstein

purchased the property for, and then there were other offers in

that area as well.

Q     Did you take these other offers into account in your

appraisal?

A     Well, not in calculating the value.  But after I did my

valuation, I kind of compared and contrasted my value opinion

with the other offers.

Q     Why did you do that?

A     Well, knowing about other offers helps to understand what

the marketability of the property is.  You know, if there's

multiple offers for a property that are all within a range of

value, that kind of gives you an indication of what the

market's perception of the property is, if there's a lot of

buyer interest for the property, and it helps to verify whether

my opinion and my calculations are reasonable.

Q     And in this particular case, how did that -- how did the

other offers compare and contrast to your evaluation?

A     Well, they bracketed my valuation.  I didn't know the

exact amounts of the other offers or anything, but the broker

indicated there was one higher offer and there were other

offers in -- near what Mr. Goldstein paid.  I kind of inferred

1    that those might be a little bit lower.  So I had some offers

2    that were lower and one offer that was higher.  So that

3    bracketed my value opinion.

4    Q    And so what information did you gather about the parcel of

5    land, its zoning or its development potential?

6    A    Well, the property's zoned, and the zoning will allow for

7    up to 420 mobile home sites.  There's only 404 sites at the

8    property that are developed.

9         And within the property, there are several areas of

10   undeveloped land, what appraisers call surplus land.  But most

11   of these areas are like old oil wells that were once in

12   operation but have now -- the oil rigs have been removed and

13   the wells have been capped.

14        And so they are just kind of small areas that could be

15   built with mobile homes -- mobile home spaces but would cost a

16   lot to develop.  And I didn't really have any costs about the

17   development of those sites.  But that was an interesting

18   feature of the property.

19   Q    A few times in that answer you mentioned there are 404

20   spaces or there is vacant land.  Are you meaning to refer to

21   the condition of the park today or the condition of the park as

22   of an earlier date?

23   A    No, as of March 30, 2006.

24   Q    How did you apply that information concerning that surplus

25   land to your appraisal?

 1   A    Well, I considered it, that it was there.  But it's a

 2   small number of potential additional spaces, you know, 16

 3   versus 404 that are already existing.  I didn't have any costs

 4   for developing those sites.  I didn't know anything about how,

 5   you know, marketable those sites might be if they were built.

 6        I don't know.  It seems like some people might not want to

 7   live on a piece of land that had an oil well on it.  So I

 8   considered it, but I really didn't give it much significance.

 9             MR. PORTNOI:  I'd ask Mr. Newcomb to put up page 38

10   of this report.

11   Q    You are welcome to turn to it as well.

12        Mr. Newcomb, if you could highlight that very bottom

13   paragraph, "It should be noted."

14        So here it says, "It should be noted that due to lack of

15   information regarding construction and permit costs,

16   construction timeline, the expansion potential of the subject

17   is addressed qualitatively within the valuation methodologies."

18        What did you mean "lack of information regarding

19   construction and permit costs"?

20   A    Well, I didn't have any costs from engineers or

21   contractors that would tell me how much it would cost to make

22   those surplus areas completely developable.  I didn't have any

23   information about the costs it would entail to actually extend

24   utilities on to those sites and get them ready to have

25   mobile homes set up.

1        I didn't know -- I didn't have information about how much

2   the city or county might charge in the way of permits or fees.

3   So with all of those unknown factors, I couldn't really do a

4   quantitative analysis, but I had to consider them

5   qualitatively.

6   Q    You mentioned that you gathered information about the rent

7   control rules in Carson.  Why did you do that?

8   A    Well, the rent control in Carson is a pertinent factor for

9   the valuation of the property.

10  Q    Was this the first park in Carson that you appraised?

11  A    No.

12  Q    What other parks in Carson have you appraised?

13  A    I appraised Carson Harbor Village, which is a park across

14  the street from Colony Cove, a few months before.

15  Q    What did you learn about the rent control rules in Carson?

16  A    Well, basically that any rent increases are determined by

17  the city's review board process and that, you know, if -- the

18  rent increases can -- the process the board goes through

19  considers whether operating expenses and mortgage interest and

20  real estate taxes, those types of things, have increased.  So

21  if there's an increase in expenses, the board would consider

22  some increase in rent.

23  Q    And how did that impact your report, if at all?

24  A    Well, it resulted in me using the rents that were in place

25  at the property at the time rather than market rents.

1    Q    Did you conduct an inspection in connection with your

2    appraisal?

3    A    I did not personally.

4    Q    Was the park inspected?

5    A    Yes.

6    Q    Who inspected the park?

7    A    Ryan Fletcher.

8    Q    I'm going to ask Mr. Newcomb to put up page 72 of your

9    report and highlight those bottom two bullets and the language

10   underneath.

11        Who is Ryan Fletcher?

12   A    He's another appraiser at Colliers that was working with

13   us at the time.

14   Q    In your experience, is it unusual for an appraiser to not

15   personally inspect the property being appraised?

16   A    No.

17   Q    Before we move on, you were paid for this appraisal;

18   correct?

19   A    Yes.

20   Q    Do you recall approximately how much?

21   A    For the appraisal, I think the fee was $5,500.

22   Q    And you've been paid for your preparation and testimony

23   today?

24   A    Yes.

25   Q    And the approximate value of the time in preparation and

1    your testimony?

2    A    Probably something like just under 5,000.

3    Q    You haven't completed all your billing?

4    A    No.

5    Q    You stated earlier that the park's market value was

6    $23 million on March 30, 2006.  When you calculated that value,

7    did you use one method or multiple methods?

8    A    Multiple methods.

9    Q    What's the first method you used?

10   A    The first method, the primary method I used, was the

11   income approach.

12   Q    Can you describe to the jury what you do when you appraise

13   a property using the income approach.

14   A    Sure.  You look at the rent and vacancy and expenses of a

15   property.  You compare it to market.  And you determine a net

16   operating income that the property generates.  Then you

17   translate that net operating income just like an investor does

18   using a capitalization rate, and that results in a value

19   indication.

20   Q    Do you look at the income and expenses of any other parks?

21   A    Yes.

22   Q    How do you use that information?

23   A    Well, the market tells you what the property's potential

24   is and what the property should be operating at.  So when you

25   compare expenses, for example, a particular property might have

```
 1   an owner that operates -- elects to have really high insurance
 2   coverage, for example.  But the market may operate at a lower
 3   level.  So you'd want to use the market expense when
 4   calculating market value.
 5   Q    Is there a particular property you found to be most
 6   comparable to Colony Cove?
 7   A    Yes.
 8   Q    What property is that?
 9   A    Carson Harbor Village across the street.
10   Q    Why do you find -- why did you find Carson Harbor Village
11   to be the most comparable?
12   A    Well, it's right across the street.  It's another large
13   mobile home park.  It has large common area amenities.  It has
14   no vacancy like Colony Cove.  And geographically, like I said,
15   it's right across the street.
16   Q    When you say "no vacancy," are you -- do you mean that
17   historically, or do you mean that just at one point in time?
18   A    Well, at the time that I was doing the appraisal and in
19   the past relatively close to that.
20   Q    Based on the income approach, what market value did you
21   find that Colony Cove had on March 30, 2006?
22   A    My primary method gave a value of $23,370,000.
23              MR. PORTNOI:  Mr. Newcomb, can you please put
24   page 56 up.  If you could highlight --
25   Q    Is it at the bottom, Mr. Detling, where --
```

```
 1   A     Yes, towards the bottom right.
 2              MR. PORTNOI:  If you could blow up those two black
 3   bars.
 4   Q     Does that reflect your calculations there?
 5   A     Yes.
 6   Q     How did you get to that number?
 7   A     Well, I used the rent in place at the time, which was $408
 8   per mobile home site, and there was 404 mobile home sites.
 9   That rent is way below market.  The market at other properties
10   in the area that aren't rent controlled is closer to $800.  But
11   because of the rent control ordinance, I used the actual in
12   place rents, the 408, and then I deducted applicable vacancy.
13         Even though Colony Cove doesn't have any vacancy, I feel
14   like most investors would deduct a little bit of vacancy
15   allowance to allow for some vacancy in the future.  And then I
16   deducted the operating expenses to get to the net operating
17   income, and I capitalized that net operating income to arrive
18   at that value estimate.
19   Q     We'll talk about some of those terms you used in a moment.
20         First, how did you select the comparable properties that
21   you used in your analysis?
22   A     Based on -- mostly on geography and physical
23   characteristics, physical similarities.
24   Q     And what did you do after you selected the comparable
25   properties?  What -- how did you use the comparable properties
```

1    after you selected them?

2    A     Well, I compared them to what the subject property's

3    operations were to make sure that my expense estimates were

4    reasonable compared to other properties that were similar.  I

5    looked at the rents at Colony Cove, like I said, compared to

6    other properties in the area.

7         Carson Harbor Village, for example, has rents that were

8    over $500 a month.  So that, to me, indicated -- that would

9    indicate that the market would perceive Colony Cove's rents as

10   comparatively low.  And then I -- once I had verified my

11   information -- verified my conclusions with the market, I

12   capitalized the income.

13   Q     Can you explain for the jury -- you mentioned that you

14   capitalized the rate.  What does that mean?

15   A     So capitalization is just basically dividing the net

16   operating income by a rate.  In this case, the market -- other

17   sales in the marketplace, when you compare their prices, the

18   prices at which they sold, to their net operating incomes, that

19   ratio gives you a rate.  And the rate translates net operating

20   income into value.

21        So from the market, just like investors do, I pulled

22   capitalization rates and compared them to Colony Cove and

23   divided the income into value -- to arrive at the value

24   opinion.

25             THE COURT:  Let's go ahead and take our morning

```
 1   break.  We are going to break for about 15 minutes.
 2       Remember not to discuss the case among yourselves or with
 3   anyone else.  Don't form or express any opinions about the
 4   case.  We'll see you in 15 minutes.
 5              (A brief recess was taken.)
 6              (In the presence of the jury.)
 7              THE COURT:  You may resume.
 8   BY MR. PORTNOI:
 9   Q    Mr. Detling, we were talking about your income approach.
10   Did you do anything else to confirm your conclusion on the
11   income approach?
12   A    Yes.  I did another cross-check secondary method.
13   Q    What was that?
14   A    Well, I used a hypothetical scenario where the rents at
15   the property were increased closer to the rents at
16   Carson Harbor Village across the street.  I used a pretty --
17   just a rough, conservative figure of $500 a month instead of
18   $404 per month.  And so I used that in my secondary cross-check
19   method.
20       And because that was an uncertain scenario, I raised the
21   capitalization rate to reflect the increased uncertainty, and
22   then that gave a value indication.  But then I deducted lost
23   rents that wouldn't be achieved for a few years because there's
24   a process that the property would have to go through to obtain
25   higher rents than what was currently in place at the time.
```

1  Q    So in this cross check, what estimated value did you come

2  to?

3  A    My cross-check hypothetical method was $23 million.

4  Q    Let's talk about -- what's the next method that you used

5  to evaluate the value of the park?

6  A    I used what's called the sales comparison approach.

7  Q    Could you explain for the jury what that is.

8  A    Sure.  So in appraiser talk, like, the sales comparison

9  approach, it just looks at the sales prices of other

10 mobile home parks and looks at how much those properties sold

11 for per space.  So if there's 100 spaces at a property and it

12 sold for $100,000, it would have sold for $1,000 per space.

13      So I used sales prices of other sales for mobile home

14 parks in Southern California and compared it to Colony Cove and

15 multiplied my price per space conclusion by 404 spaces at

16 Colony Cove.

17 Q    What was the market price per space you found?

18 A    My conclusion was 58,000 per space.

19          MR. PORTNOI:  Mr. Newcomb, if you could put up

20 page 70 for the jury.  This is still exhibit 36.  You could --

21 exactly.

22 Q    Does this -- what's on the screen reflect that conclusion?

23 A    Yes.

24 Q    How did you get to that 58,000 number?

25 A    Well, I looked at how the sales price indicators -- these

```
 1   numbers right here (indicating), these are what the comparable
 2   properties sold for.  This property at the low end, this
 3   $54,000 number, that's a property in Compton that is a smaller,
 4   older property that's not nearly as physically appealing as
 5   Colony Cove.  It's more like a trailer park.  And so my
 6   judgment was that Colony Cove should be higher than this
 7   indicator.
 8        Then I also looked at these other sales here, several of
 9   which were very much higher.  And then there's this other sale
10   here, Sale 6, that's a property located up in Hayward,
11   California near San Francisco across the Bay, and that's under
12   rent control.  But it generates more income per space than
13   Colony Cove.
14        So I determined in my opinion Colony Cove should be worth
15   less than that sale.  So my value opinion falls between those
16   two sales indicators at the bottom of the table.
17   Q    Why didn't you compare only to other parks in Carson?
18   A    Well, there's only a few.  There's only a few mobile home
19   parks in Carson, and there wouldn't have been any sales in
20   Carson in the time frame that I was valuing the property.  I
21   would have had to go back several years in the past to find a
22   sale in Carson, and it would have been in different market
23   conditions.  So rather than use older sales, I used more
24   current sales data.
25   Q    So the $58,000 per space, how does that compare to all the
```

1    sales comparables overall?

2    A     It's lower than all but one, and it's much lower than the

3    top three.  It's significantly lower than the top three.

4    Q     Just one more time for the jury.  With the sales

5    comparison approach, what was the total value of Colony Cove

6    that you came to?

7    A     $23,430,000 for the sales comparison.

8    Q     I know you mentioned it earlier, but can you tell the jury

9    one more time what was the conclusion of the market value from

10   your appraisal?

11   A     My market value opinion was $23 million.

12   Q     On what date?

13   A     As of March 30, 2006.

14   Q     Is that still your opinion?

15   A     Yes.

16              MR. PORTNOI:  Thank you.  No further questions.

17              THE COURT:  Cross-examination?

18                        CROSS-EXAMINATION

19   BY MS. AILIN:

20   Q     Good morning, Mr. Detling.

21   A     Good morning.

22   Q     You found out early on in your work on this appraisal what

23   the price was that Mr. Goldstein actually paid for Colony Cove,

24   didn't you?

25   A     When I researched the property, I pulled up the county

```
 1   records and found the recorded price for the property.

 2   Q    And you knew that you were being asked to do this

 3   appraisal in order to support a rent increase application;

 4   correct?

 5   A    Yes, I was told that it was in connection with the rent

 6   increase application.

 7   Q    So before you had reached your conclusion, before you had

 8   formed an opinion of value, you knew what your client wanted

 9   your opinion to be, right, because you knew how much

10   Mr. Goldstein had paid for the park?

11   A    Not really.  I guess I could have inferred that.  But

12   appraisers are -- we have to be third parties and have to be

13   objective, and we have to develop our own opinions.

14   Q    Now, you've appraised other mobile home parks for

15   Mr. Goldstein, haven't you?

16   A    Yes.

17   Q    You've appraised Carson Harbor Village at least once?

18   A    Yes.

19   Q    You've appraised the Indian Springs Mobile Home Park in

20   Palm Desert, and you think you did that more than twice; right?

21   A    Yes.

22   Q    And there's also a mobile home park in Rohnert Park that

23   Mr. Goldstein owns that you have appraised and you think you

24   appraised it twice; right?

25   A    I think so.
```

```
1    Q    Someone else in your appraisal firm appraised the
2    El Dorado Park in Palm Springs; correct?
3    A    Yes.
4    Q    You have appraised other mobile home parks for clients of
5    Mr. Casparian, haven't you?
6    A    I think so, yes.
7    Q    And you've appraised about five mobile home parks for
8    other clients of Mr. Casparian's firm; right?
9    A    I think that's about right, yes.
10   Q    Now, in your comparable sales approach, you relied on six
11   comparable sales; correct?
12   A    Yes.
13   Q    And four of those six sales were sales that you knew about
14   because your appraisal firm had appraised them for the bank the
15   last time they had sold; right?
16   A    I believe so, yes.
17   Q    Now, in looking for comparable sales, you didn't limit
18   yourself to mobile home parks that were subject to a city's
19   rent control ordinance, did you?
20   A    I did not.
21   Q    And in looking at the prices of those parks and comparing
22   them to Colony Cove, you didn't make any sort of adjustment to
23   reflect the fact that one of the comparable sales or some of
24   the comparable sales were not subject to rent control but
25   Colony Cove was; right?
```

1   A      I considered those differences.

2   Q      But you didn't make a specific adjustment for it, did you?

3   A      Do you mean a dollar adjustment?

4   Q      A dollar adjustment, a percentage adjustment, a

5   qualitative adjustment?

6   A      I did consider it qualitatively.  I did not make a

7   quantitative adjustment.

8   Q      Now, one of the things that you do when you appraise a

9   mobile home park that's subject to rent control is you research

10  the market's perception of the rent control ordinance; correct?

11  A      Correct.

12  Q      And you normally do that by doing several things.  You

13  talk to brokers; right?

14  A      I do.

15  Q      You talk to property owners and mobile home park owners;

16  right?

17  A      I do.

18  Q      You look at other sales comps that occurred in rent

19  controlled environments; correct?

20  A      Yes.

21  Q      You look at how mobile home park owners function under the

22  rent control ordinance; right?

23  A      Yes.

24  Q      And sometimes you look for articles in the newspaper about

25  the rent control ordinance; right?

1    A    Yes.

2    Q    And you read the rent control ordinance; right?

3    A    Yes.

4    Q    But in doing this particular appraisal, the only thing you

5    remembered doing to investigate the market perception of the

6    rent control ordinance was read the ordinance; right?

7    A    In connection with this particular appraisal, yes, I

8    believe so.

9    Q    So you didn't go through your normal investigation of the

10   market perception of the rent control ordinance for purposes of

11   this appraisal; right?

12   A    Well, to completely answer your question, during the

13   time frame of my appraisal, I did not repeat some of those

14   steps because I had recently undertaken them in a prior

15   appraisal when I completed an appraisal of Carson Harbor

16   Village a couple months before.

17   Q    The answer you just gave me you did not give me in your

18   deposition, did you?

19   A    I don't recall.

20   Q    In your direct capitalization of income approach, one of

21   the factors you looked at were the expenses associated with

22   operating a property; right?

23   A    Yes.

24            THE COURT:  I'm sorry.  Exhibit number and page?

25            MS. AILIN:  This is Exhibit 36, page 51.

```
 1              THE COURT:  Thank you.
 2   BY MS. AILIN:
 3   Q    In looking at the list of expenses you take into account,
 4   there's nothing on there about debt service, is there, on that
 5   list of expenses?
 6   A    No.
 7   Q    And the reason you don't take debt service into account in
 8   your capitalization of income approach is that that's an
 9   investment expense; right?
10   A    Correct.
11   Q    It's not an expense of operating and maintaining the
12   property; right?
13   A    Correct, it's not an operating expense.
14   Q    So when you formed your opinion of the value of the park,
15   you were essentially saying, we don't have to concern ourselves
16   with whether the income covers the debt service; right?
17   A    No.
18   Q    No, you don't have to concern yourself, or no, that wasn't
19   what you were saying?
20   A    Well, I do have to concern myself with that.
21   Q    But you don't factor it into your appraisal in any way, do
22   you?
23   A    Well, the appraisal -- the standard appraisal methodology
24   considers just real estate operating expenses and
25   capitalization rate derived from sales of properties and their
```

**UNITED STATES DISTRICT COURT**

```
 1   net incomes without debt service.
 2        There's alternate methodologies that could be employed.
 3   They are not considered traditional appraisal methodologies.
 4   So in this standard methodology that we used, that's routinely
 5   used, I did not consider debt service as an operating expense.
 6        But for an investor, anyone buying an investment property,
 7   they have to pay their debt service.  If they don't, their
 8   lender will foreclose on the property, and the property could,
 9   you know, go back to that lender, and then the lender has to
10   take care of the property.
11            MS. AILIN:  Move to strike as nonresponsive.
12            THE COURT:  Motion to strike denied.
13            THE WITNESS:  And the property could then fall into
14   disrepair, and all types of situations could --
15            MS. AILIN:  Move to strike as nonresponsive.  No
16   question pending.
17            THE COURT:  Motion to strike denied.
18            THE WITNESS:  So --
19            THE COURT:  Okay.  Next question.
20   BY MS. AILIN:
21   Q    In your capitalization of income approach, you said you
22   used the actual average rent per space, $408 per space per
23   month; right?
24   A    I believe that's right.  I can't remember if it's 404 or
25   408.  Hold on one second.  $408, yes.
```

```
1   Q    And you used a 4.75 percent capitalization rate; right?

2   A    In my primary method, yes.

3   Q    A capitalization rate and a rate of return are basically

4   the same thing; right?

5   A    No.

6   Q    No?  How are they different?

7   A    Well, the Appraisal Institute dictionary does not define

8   them in the same way.  The capitalization rate is merely a

9   ratio that expresses the relationship between a property's net

10  operating income and the price of the property.

11       A rate of return in a financial sense comprises several

12  components that are different than a capitalization rate.

13  Q    Did you ever calculate a rate of return for the

14  Colony Cove park?

15  A    No.

16  Q    Now, in your appraisal report, you said that you used a

17  low cap rate to reflect the upside potential of the property;

18  right?

19  A    In my primary method, yes.

20  Q    And then in your other income approach, the one that you

21  referred to as a cross check, you reflected that upside

22  potential by assuming the average rent per space would increase

23  $92.00 a month from $408 to $550; right?

24  A    Correct.

25  Q    So in doing this appraisal to try to persuade the Rent
```

```
 1   Review Board to give Colony Cove a $200 rent increase per space

 2   per month --

 3              MR. PORTNOI:  Objection.  Misstates the testimony.

 4              THE COURT:  Hold on.

 5        Finish your question.

 6   BY MS. AILIN:

 7   Q    In doing this appraisal which was used to try to persuade

 8   the Rent Review Board to give Colony Cove a $200 a month rent

 9   increase, you assumed that there would be a $92.00 rent

10   increase per space per month; correct?

11              MR. PORTNOI:  Objection.  Misstates the evidence,

12   assumes facts not in evidence.

13              THE COURT:  Sustained.

14   BY MS. AILIN:

15   Q    Mr. Detling, do you know whether your appraisal was

16   included as part of the first rent increase application that

17   Colony Cove did after acquiring the park?

18   A    I don't know.

19   Q    You testified at the hearing about that rent increase

20   application, didn't you?

21   A    I testified at a hearing, but I don't know if that was the

22   first one or second one.  I'm not sure.  I know I testified at

23   a hearing, at a rent increase hearing.

24              MS. AILIN:  I have nothing further, Your Honor.

25              THE COURT:  Redirect.
```

```
 1                    REDIRECT EXAMINATION

 2   BY MR. PORTNOI:

 3   Q     Mr. Detling, just a few questions.

 4         Ms. Ailin, I believe, solicited testimony that you had

 5   appraised about five other mobile home parks that are owned by

 6   Mr. Goldstein.  Do you remember that?

 7   A     Yes.

 8   Q     Can you remind the jury about how many mobile home parks

 9   you've appraised?

10   A     Over 300.

11   Q     About how many appraisals does Colliers do in a year?

12   A     My office or our whole firm?

13   Q     Let's start with your office.

14   A     I think last year we did over 200.

15   Q     You are the managing director of that office?

16   A     Yes.

17   Q     And Ms. Ailin also asked you whether you made adjustments

18   to -- in light of the different rents.  How did you take into

19   account that some of your sales comparables were not rent

20   control?

21   A     Well, I mean, some of it's just based on professional

22   judgment and experience.  For example, one of my sales is

23   located in Pacific Palisades.  It's subject to Los Angeles rent

24   control, which is a little more lenient than Carson.

25         Los Angeles rent control does have kind of an automatic
```

```
 1    increase every year.  So it's more flexible.  And so just

 2    knowing that about the property and knowing that it has ocean

 3    views and it's, you know, on the PCH overlooking the beach, I

 4    intuitively know that the value of Colony Cove should be much,

 5    much lower than that comparable.

 6         So qualitatively I can say in my analysis as I'm coming to

 7    my conclusion that my price should be significantly lower than

 8    this comparable, for example.

 9    Q    Just because you used something as a sales comparable,

10    that doesn't mean that you are assuming that Colony Cove will

11    have the same per space income; is that correct?

12    A    Correct.

13    Q    And Ms. Ailin asked you a question about what you

14    remembered doing when you conducted this appraisal.  How long

15    ago did you do this appraisal?

16    A    Early 2007.  So about nine years ago.

17    Q    Is that before you were contacted -- before you

18    participated in this litigation?

19    A    Yes.

20    Q    One last point.  You were asked about whether paying your

21    mortgage interest is an operating expense.  What is the

22    distinction between operating expense and expense in general?

23              MS. AILIN:  Objection.  Vague and ambiguous.

24              THE COURT:  Overruled.

25              THE WITNESS:  In the appraisal world, operating
```

UNITED STATES DISTRICT COURT

1   expenses are those expenses that are necessary to operate the

2   property.  Other expenses might include debt service or

3   partnership fees, things like that that are necessary to

4   maintain the ownership structure of the property that are not

5   directly related to maintaining an everyday operation of the

6   property.

7   BY MR. PORTNOI:

8   Q    Again, just to reiterate, what happens if you don't pay

9   your mortgage interest?

10  A    Well, in most cases, the source of your financing, whether

11  it's equity or debt, will pursue a remedy.  And if it's debt,

12  they'll typically foreclose and take over the property, hand it

13  over to a special servicer that may or may not know much about

14  operating that type of property.

15       And the special servicer will then try to operate the

16  property until it's deemed appropriate to dispose of the

17  property by selling it or redeveloping it or some other method.

18             MS. AILIN:  Move to strike.  Outside the scope of

19  the witness's expertise.

20             THE COURT:  Overruled.

21             MR. PORTNOI:  No further questions, Your Honor.

22             THE COURT:  Recross?

23                     RECROSS-EXAMINATION

24  BY MS. AILIN:

25  Q    Mr. Detling, in looking at the expenses of the park, you

 1    didn't do any sort of projection as to what the expense would

 2    be in the future, did you?  You just looked at what they were

 3    at the time; correct?

 4    A     Well, the appraisal methodology is to calculate the

 5    current operating income and expenses of the property.  So

 6    basically the first year of operations.  So it is a projection

 7    in that sense that it's the first year of operations in my

 8    primary analysis.

 9    Q     You also looked at the first year of operations in terms

10    of income; correct?

11    A     In my primary method, correct.

12    Q     And even though you assumed in your cross-check method

13    there would be a $92 per space per month rent increase, you

14    didn't project any future rent increases, did you?

15              MR. PORTNOI:  Objection.  Misstates the testimony.

16              THE COURT:  Overruled.

17              THE WITNESS:  Future rent increases?

18    BY MS. AILIN:

19    Q     Future rent increases that Colony Cove could obtain by

20    applying to the Rent Review Board.  You didn't factor that

21    potential into your appraisal in any way, did you?

22    A     In the secondary method?

23    Q     In any method.

24    A     Future increases, like what they would be like five to

25    ten years out or more, no, I did not project those.

```
1   Q     And the appraisal that you have talked about here today is
2   the only appraisal you have done of Colony Cove of the value at
3   the time it was purchased by Colony Cove Properties; correct?
4   A     This is the only appraisal I've done as of March 30, 2006.
5               MS. AILIN:  Thank you.  Nothing further.
6               THE COURT:  You may step down.  Thank you.
7         Plaintiff's next witness.
8               MR. CLOSE:  Your Honor, plaintiffs call
9   Peter Salomon.
10              THE CLERK:  Sir, if you can please step forward.
11  Stand next to the court reporter's desk and raise your right
12  hand.
13        Do you solemnly swear that the testimony you shall give in
14  the cause now before this Court shall be the truth, the whole
15  truth, and nothing but the truth, so help you God?
16              THE WITNESS:  I do.
17              THE CLERK:  Thank you.  Please take a seat.  Can you
18  please state your full name and spell your last name.
19              THE WITNESS:  Peter Salomon, S-a-l-o-m-o-n.
20                          PETER SALOMON,
21  called as a witness by the plaintiff, was sworn and testified
22  as follows:
23                        DIRECT EXAMINATION
24  BY MR. CLOSE:
25  Q     Good morning, Mr. Salomon.  Would you share with the jury
```

1    your educational background, for example, where you went to

2    college.

3    A    I went to Bentley University in Massachusetts, and I

4    graduated with a bachelor of science degree in accounting with

5    the highest honors.

6    Q    I'd like to get some information about your background and

7    qualifications to calculate economic damages.

8         What is your current occupation?

9    A    I'm a certified public accountant, and I specialize in

10   forensic accounting.

11   Q    And what is -- can you give a little more detail about

12   your experience in accounting and forensic accounting, please.

13   A    I have 35 years of professional accounting experience.

14   The first ten years was spent with two of the big four

15   accounting firms doing auditing.  And for the past 25 years,

16   I've specialized in forensic accounting.

17   Q    Are you involved in any professional societies for

18   accountants?

19   A    I'm a member of the California Society of CPAs.

20   Q    And do you have any leadership roles in the California

21   Society of Certified Public Accountants?

22   A    Yes.  I'm the past chair of the forensic services section

23   for the California Society of Certified Public Accountants,

24   which is an organization of 40,000 CPAs.

25        That organization that I was chair of governs the economic

1  damages section, the fraud section, the business valuation

2  section, and the family law section.

3  Q     You mentioned some work for the big four accounting firms.

4  Can you share with the jury your current employment and some of

5  the more recent employment experiences you have.

6  A     Right now I'm the managing partner of Salomon Forensics.

7  It's a firm that I formed last August.  Prior to that I worked

8  for five years for Hemming Morse, which is a CPA firm that

9  specializes in forensic accounting.

10        Prior to that, I worked for seven or eight years for

11  Navigant Consulting.  That's a public company.  I was managing

12  director there and the office managing partner in Los Angeles.

13  Prior to that, for three years I worked for FTI Consulting.

14  That's also a public company that specializes in forensic

15  accounting.

16        Prior to that, I was a partner -- one of four in a firm

17  for ten years.  It was a CPA firm that specialized in forensic

18  accounting.  And for two years prior to that I worked in

19  PricewaterhouseCoopers' litigation department.

20  Q     Mr. Salomon, have you provided expert testimony before?

21  A     I have.

22  Q     In federal courts?

23  A     Federal courts, state courts, and arbitrations.

24  Q     And what percentage of those matters in which you provided

25  expert witness testimony have involved the calculation of

1    economic damages?

2    A      More than 50 percent.

3    Q      And have you ever been retained by a court to serve as a

4    court-appointed expert to calculate damages?

5    A      Yes.  On five occasions the California Superior Court has

6    retained me to be a neutral expert for the Court to help

7    determine damages.

8    Q      Now, in this case, who retained you?

9    A      Your firm.

10   Q      And what was the assignment in this case, Mr. Salomon?

11   A      I was asked to calculate Colony Cove's lost rent damages

12   due to the City of Carson's failure to include interest expense

13   in its -- in Colony Cove's application for a rent increase.  I

14   was also asked to calculate a prejudgment interest rate and

15   then calculate prejudgment interest damages on these lost rent

16   damages.

17   Q      I want to talk a little bit more about that.  But before,

18   are you being compensated for the time you have spent working

19   on this engagement?

20   A      My firm has been compensated, yes.

21   Q      And just -- I wanted to know approximately how much

22   compensation have you received for the time you've spent

23   working on this assignment?

24   A      We've received a little bit less than $33,000.

25   Q      Did the compensation you received for your time in any way

1    affect your objectivity during this assignment?

2    A    Certainly not.

3    Q    Now, did you prepare an expert report summarizing your

4    expert opinion, and was that report given to the defense much

5    earlier in the case?

6    A    It was.

7              MR. CLOSE:  Exhibit 94, Your Honor, I'd like

8    permission to publish.  I believe -- it's Mr. Salomon's report.

9    I believe its admissibility has been stipulated to.

10              THE COURT:  You may.

11              MR. CLOSE:  It's also in the binder up there.

12   Q    Mr. Salomon, why did you prepare the expert report in this

13   case?

14   A    I wanted to document in writing all of my opinions and all

15   the bases and reasons for those opinions.  And that way, the

16   jury could look at that report later when they were

17   deliberating.

18   Q    Now, what documents did you review to prepare your expert

19   report on the damages owed to Colony Cove and the prejudgment

20   interest rate?

21   A    I reviewed Colony Cove's applications for rent increases.

22   I reviewed the City of Carson's staff reports that analyze

23   those applications for rent increases.  I analyzed the work

24   done by Dr. Kenneth Baar who is an expert retained by the City

25   of Carson who he analyzed the applications for the rent

```
 1   increases.
 2        I reviewed an independent appraisal of the Colony Cove
 3   mobile home park value.  I reviewed pleadings for both the City
 4   of Carson and Colony Cove.  I reviewed court rulings in this
 5   case.  I also reviewed court rulings in other cases about how
 6   to determine prejudgment interest.
 7   Q    And are the opinions in your expert report, Exhibit 94,
 8   objective?
 9   A    They are.
10   Q    And are the opinions in your expert report intellectually
11   honest and unbiased?
12   A    They are.
13   Q    And does your role as a certified public accountant impact
14   the opinions you render as a damages expert?
15   A    It does.
16   Q    How so?
17   A    The code of professional conduct for CPAs who serve as
18   expert witnesses and the code of professional conduct that's
19   issued by the American Institute of Certified Public
20   Accountants, that requires me and all CPAs doing work to be
21   objective, impartial, and intellectually honest.
22   Q    Did anyone check the numbers in your report for accuracy?
23   A    Yes.  Someone who works for me who has 15 years as a
24   forensic economist checked all my numbers and all my work.
25   Q    And sitting here today in front of this jury, do you stand
```

1    by the numbers and conclusion in your expert report?

2    A     I do.

3    Q     Did you prepare some demonstratives to use in connection

4    with your testimony today, Mr. Salomon?

5    A     I did prepare some demonstratives, yes.

6              MR. CLOSE:  Your Honor, permission to approach?

7    These have been shared previously with defense counsel.

8              THE COURT:  You may.

9              MR. CLOSE:  Thank you, Your Honor.

10        I would like permission to publish and ask Mr. Newcomb to

11   put up on the screen the first demonstrative there of lost rent

12   damage calculations, which I'll refer to as slide D4.

13             THE COURT:  You may.

14   BY MR. CLOSE:

15   Q     Mr. Salomon, did you prepare this slide?

16   A     I did.

17   Q     And what does it show?

18   A     It shows my calculations of how I determined the lost rent

19   damages.

20   Q     And can you explain, please, how you calculated those lost

21   rent damages in this case.

22   A     Yes.  If you look at the first number under the

23   100 percent of CPI, which is the Consumer Price Index, the

24   $200.93, that's the amount of the rent increase required to

25   include the interest or debt service of Colony Cove as

1  calculated by the City of Carson staff.

2      I then -- in reviewing the work of the City of Carson

3  staff, I saw that they recommended that in granting an actual

4  rent increase, that they should use -- instead of 100 percent

5  of the Consumer Price Index, they should use 75 percent of the

6  Consumer Price Index.

7      In the city of staff work report, that $200.93 gets

8  reduced to $198.56 using the 75 percent of the Consumer Price

9  Index.  Given that amount, I subtracted from it the actual

10  monthly rent increase awarded by the City of Carson of $36.74.

11  So the difference between those two numbers would be the

12  damages of lost rent on a per month, per space basis.

13      I then took the $161.82, multiplied that by the 403

14  rentable spaces in the park to determine the lost rent damages

15  per month of $65,213.46.  I then multiplied that number by

16  12 months in a year to come up with lost rent damages per year

17  of $782,561.52.

18  Q    Thank you.

19      Have you -- excuse me.  Have you reviewed the report of

20  the city's appraisal expert, Mr. Ellis, who -- which has been

21  admitted into evidence as Exhibit 2008?  Have you reviewed his

22  report and his calculation of the damages to Colony Cove in

23  this case?

24  A    I have.

25  Q    And in that report, what did the city's appraisal expert

1  use for Colony Cove's monthly and annual lost rent damages?

2  A    He adopted my numbers, the $65,213 per month and the

3  $782,000 of lost rent damages per year.

4  Q    Okay.  Did you prepare another demonstrative slide to show

5  how you calculated and summarized the total amount of

6  Colony Cove's lost damages -- lost rent damages?

7  A    I did.

8           MR. CLOSE:  With the Court's permission, the second

9  slide there, I'd like permission to publish as D5.

10          THE COURT:  You may.

11 BY MR. CLOSE:

12 Q    Is this slide up on the screen, Mr. Salomon, something

13 that you prepared to show the jury how you calculated and

14 summarized the total amount of Colony Cove's lost rent damages?

15 A    Yes.  I personally prepared this.

16 Q    And can you now please explain how you calculated and

17 summarized the total Colony Cove lost rent damages in this

18 case.

19 A    Okay.  If you go to the first column where it says "month"

20 and "year" and you go down to the bottom, you could see that --

21 it starts December 1st, 2008.  It goes through January 1st,

22 2017.  And that's the period of damages.  And I'll explain

23 later why I picked the starting and end dates.

24      But for each month -- and on this chart I show each month

25 for the year 2009 and each month for the last year, 2016.  And

```
 1   I show the total amounts for the years 2010, '11, '12, '13,

 2   '14, and '15, only so I can fit everything on one chart because

 3   there's over 90 months.  So I just kind of showed the middle

 4   years and the first -- first and last full years.

 5       So you can see on like the first line, December 2008, we

 6   have lost rent damages of $65,213, which came from the previous

 7   slide or the previous demonstrative exhibit.

 8   Q    Okay.

 9   A    It's a little bit hard for me to explain it with that

10   thing there.

11           MR. CLOSE:  Can you take down the blow-out, please.

12           THE WITNESS:  Thank you.

13       So we have 65,213 of lost rent damages per month.  You can

14   see that all for 2009.  Then starting in 2010, you have a full

15   year's worth, which was the 782,000 I testified about

16   previously.

17       And so if you go to the bottom of the second column of

18   lost rent damages, which you can highlight that now, you get

19   6 million -- so you get total lost rent damages for the damages

20   period of $6,390,919.

21   BY MR. CLOSE:

22   Q    Okay.  Now, so that's the total amount of the lost rent

23   over the period of time in which you calculated it.

24       Did you use a present value factor or discount rate in

25   calculating the total lost rent damages?
```

1    A      I did.

2    Q      And can you explain for the jury what that is and its

3    purpose.

4    A      Well, a discount rate or present value factor, basically

5    the concept of that is that money you have today is worth more

6    than money you would receive in the future.  It's sort of like,

7    if you win the lottery and you win $100 million, you don't get

8    that right away.  You get $5 million for 20 years.  That's

9    $100 million.

10          But you can elect to get a lump sum payment up front which

11   might be 70 percent.  You might get $70 million up front versus

12   $100 million over 20 years.  So the present value factor is to

13   take into account the fact that you don't get all that money up

14   front, it comes in over time.

15          And as an example on this chart, you can see in the third

16   column is the present value factor.  So the first month the

17   factor is one.  That's the beginning of the damages period.

18   But each successive month the present value factor becomes a

19   lower and lower number.  The farther you go out into the

20   future, those $65,213 amounts become worth less and less.

21          So what you do is you multiply the present value factor

22   times the monthly lost rent to get the present value of the

23   lost rent as of December 1st, 2008.

24   Q      Mr. Salomon, do experts typically use discount rates to

25   calculate economic damages when there's a future stream of cash

1    flow?

2    A     That's the accepted methodology experts use to discount

3    future payments to a measurement date.

4    Q     And in this assignment, how did you choose the appropriate

5    discount rate for the monthly lost rent damages after

6    December 1, 2008?

7    A     I used a -- what is known as a risk-free rate.  And in

8    this case, that risk-free rate is 2.72 percent representing the

9    interest rate paid on United States treasury bills.  Those are

10   considered to be the safest investment in the world.

11        So as a damages expert, what we do is discount when it's a

12   risk-free rate situation using a U.S. treasury bill.  It's

13   considered the safest investment in the world.

14   Q     Why is there no risk that these below market rents at the

15   park will not be collected?

16   A     Because based on a history at the park, everyone has paid

17   their rent, and there's been no delinquencies in rent or unpaid

18   rents.  There's a zero vacancy rate at the park because of the

19   fact the rents are under market.  And if someone thought that

20   the rents were too high and decided to move out, there are many

21   people who would want to move in and take their place and pay

22   this below market rent.  So there's really zero risk of not

23   getting paid these rents.

24   Q     You previously mentioned that you used a damage period of

25   December 1, 2008, to January 1, 2017.  Why did you start the

1   damages period at December 1, 2008?

2   A    December 1st, 2008, is the time period when the actual

3   rent increase was granted for Colony Cove's initial

4   application.  They initially got 36.74.  And so that's when it

5   went into place.  So had the additional interest been included,

6   it would have went into effect on December 1st, 2008.

7   Q    And why did you continue the damages period to January 1,

8   2017?

9   A    Because as of February 1st, 2017, that would be the first

10  opportunity that would be possible to have Colony Cove get an

11  additional rent increase for the interest.  So they would have

12  to file another application.  It would have to go through

13  regulatory processes and approvals.  And until February 1st, it

14  wouldn't be possible to get an increase.

15       And so the damages period would go through January 1st,

16  2017, because they didn't -- those damages will exist until

17  such time it's possible to get an increase.

18  Q    So we are sitting here at the end of April 2016; correct?

19  A    Yes.

20  Q    I'd like to talk a little bit about prejudgment interest

21  rate.  You have a column up here that has a prejudgment

22  interest rate of 7.8 percent.  Can you please explain to the

23  jury what is the purpose of prejudgment interest as it relates

24  to damages calculations.

25  A    A prejudgment interest, the concept behind that is to make

```
 1   the person who is damaged whole, because the damages of -- the
 2   present value of the lost rent damages of the $5,738,000, those
 3   are as of December 1st, 2008.  Therefore, that person or that
 4   entity has not had the use of the money for almost eight years.
 5       So those damages I calculated for the present value
 6   damages don't take into account the fact they haven't had use
 7   of the money.  So prejudgment interest, in effect, gives the
 8   harmed party the investment earnings they would have earned
 9   otherwise had they had the money eight years ago.
10   Q    Did you prepare a demonstrative that shows how you
11   calculated the 7.8 percent prejudgment interest rate in this
12   case?
13   A    I have.
14           MR. CLOSE:  I'd like to publish the next slide, the
15   calculation of prejudgment interest rate.
16           THE COURT:  You may.
17   BY MR. CLOSE:
18   Q    And you prepared this, Mr. Salomon?
19   A    I did.
20   Q    And what is your basis for your calculation of a
21   prejudgment interest rate in a case of this type?
22   A    You and your other lawyers furnished me with legal rulings
23   that show what is the precedent to calculate prejudgment
24   interest in cases like this.
25   Q    And what do you recall those cases instructing with
```

1   respect to preparing a prejudgment interest rate?

2   A     They require to calculate a prejudgment interest rate,

3   that would be something that a reasonable prudent investor

4   would do based upon a diverse group of securities that would

5   have safety of principal and generate a reasonable rate of

6   return.  And those rate of securities, according to the law,

7   also has to include U.S. treasury bills, which is probably the

8   safest investment you can make.

9   Q     Using -- so based on that case law, how did you calculate

10  7.8 percent as the prejudgment interest rate in this case?

11  A     I chose three different securities and took the average of

12  those securities.  And the average of those three securities I

13  chose came out to 7.8 percent for the period.

14  Q     So let's talk a little bit about those three securities.

15  Was one of them -- I think you mentioned the U.S. treasury

16  bill.

17  A     Right.  That's required under the legal statutes.

18  Q     And I have a question.  Did the defendant's appraisal

19  expert, Mr. Ellis, also use the same ten-year U.S. treasury

20  bill that you used to calculate prejudgment interest?

21  A     He used the same bill and the same rate, yes.

22  Q     No difference?

23  A     No difference.

24  Q     And what was -- I see the second line on the left you used

25  AAA corporate bond rate as of December 1, 2008.  Why did you

1   choose that?

2   A    Well, a AAA corporate bond rate represents the safest bond

3   rate you can have based upon professional credit rating

4   agencies.  Those are bonds issued by the most financially sound

5   companies.  And I also chose that rate because the rate of

6   return on that is very conservative.  It's the lowest rate.  I

7   could have chosen a AA bond or a A bond with a much higher

8   rate.  So I tried to be as conservative as possible by taking

9   the AAA rate which is the safest bond.

10  Q    And what was that rate?

11  A    5.35 percent.

12  Q    And I see here that it says that you took that as of

13  December 1, 2008.  Why did you choose that as the point in

14  time?

15  A    I chose that as the point in time, the AAA bond rate as

16  well as the treasury note rate of 2.72 percent, because that is

17  the commencement or start date for the damage period.  If the

18  person who is damaged had the money as of that date, they could

19  have invested in those securities.

20  Q    Now, did Mr. Ellis also use an AAA-rated corporate bond

21  rate to calculate prejudgment interest in his report?

22  A    Yes, he adopted the bond rate that I used of 5.35 percent.

23  Q    Okay.

24          THE COURT:  Mr. Close, I'd like to break for lunch.

25          MR. CLOSE:  Sure.

1           THE COURT:  Ladies and gentlemen, we are going to

2    break for lunch until 1:30.

3        Again, remember not to discuss the case among yourselves

4    or with anyone else.  Don't form or express any opinions about

5    the case.  We'll see you at 1:30.

6           THE CLERK:  All rise.

7           (Jury out at 11:56 A.M.)

8           THE COURT:  You may step down.

9           (At 11:56 A.M. the lunch recess was taken.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5           I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15           DATED THIS  29TH  DAY OF APRIL, 2016.

16

17

18        /S/ MAREA WOOLRICH

19        MAREA WOOLRICH, CSR NO. 12698, CRR
          FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

## $

**$1,000** [1] - 260:13
**$1,025,000** [1] - 229:14
**$1,082,191** [1] - 219:6
**$1,224,000** [1] - 229:24
**$1,323,700** [1] - 224:23
**$100** [3] - 285:10, 285:12, 285:15
**$100,000** [1] - 260:13
**$120,966.72** [1] - 226:20
**$147,306** [1] - 219:19
**$161.82** [1] - 282:16
**$177,675** [1] - 222:15
**$18** [2] - 230:1, 237:17
**$198.56** [1] - 282:11
**$200** [2] - 270:2, 270:9
**$200.93** [1] - 282:2, 282:10
**$23** [4] - 248:16, 255:6, 260:4, 262:12
**$23,370,000** [1] - 256:22
**$23,430,000** [1] - 262:8
**$25.00** [1] - 236:22
**$25.02** [2] - 226:7, 226:18
**$300** [1] - 236:3
**$33,000** [1] - 279:2
**$342.46** [1] - 235:19
**$36.74** [4] - 221:21, 222:10, 222:13, 282:13
**$382** [1] - 236:10
**$404** [1] - 259:18
**$408** [4] - 257:7, 268:23, 269:1, 269:24
**$5,500** [1] - 254:21
**$5,738,000** [1] - 288:5
**$500** [2] - 258:8, 259:17
**$54,000** [1] - 261:4
**$550** [1] - 269:24
**$58,000** [1] - 262:1
**$6,390,919** [1] - 284:23
**$618** [7] - 233:15, 233:19, 233:21, 233:25, 234:3, 234:9, 234:14
**$65,213** [3] - 283:5, 284:9, 285:23
**$65,213.46** [1] - 282:18
**$70** [1] - 285:14
**$782,000** [1] - 283:6
**$782,561.52** [1] - 282:20
**$800** [1] - 257:10
**$812,177** [1] - 224:15
**$889,438** [1] - 220:21
**$92** [1] - 274:16
**$92.00** [2] - 269:24, 270:10

## '

**'11** [1] - 284:4
**'12** [1] - 284:4

**'13** [1] - 284:4
**'14** [1] - 284:5
**'15** [1] - 284:5
**'THE** [1] - 209:13

## 1

**1** [25] - 207:17, 218:12, 228:24, 230:7, 230:20, 234:18, 234:23, 235:4, 235:20, 236:14, 236:16, 237:14, 237:18, 239:23, 240:3, 240:4, 247:16, 286:9, 287:3, 287:4, 287:10, 290:3, 290:16
**1,224,681** [1] - 219:18
**1.2** [1] - 230:8, 230:19
**10** [3] - 224:19, 224:20, 226:15
**100** [4] - 196:4, 260:12, 282:1, 282:7
**100,000** [1] - 230:20
**1001** [1] - 207:21
**1005** [1] - 209:6
**1005-6** [1] - 211:6
**1005-7** [1] - 211:20
**11** [2] - 219:15, 222:7
**11:55** [1] - 291:10
**11:56** [1] - 291:12
**12** [3] - 216:23, 242:21, 282:19
**13** [1] - 244:22
**14** [1] - 204:14
**147** [1] - 214:12
**15** [5] - 199:1, 217:2, 259:1, 259:4, 281:1
**159** [1] - 234:9
**16** [2] - 198:13, 252:2
**16TH** [1] - 209:13
**177,675** [1] - 222:16
**18** [12] - 201:8, 201:22, 201:25, 202:9, 202:14, 203:3, 203:23, 203:25, 204:13, 204:14, 232:22, 232:24
**1959** [1] - 227:5
**1983** [1] - 214:22
**1986** [1] - 214:23
**1995** [3] - 215:10, 215:17, 227:11
**1:30** [2] - 291:5, 291:8
**1ST** [10] - 222:23, 283:24, 286:1, 287:5, 287:9, 287:12, 287:16, 287:18, 288:6

## 2

**2** [8] - 235:17, 236:4, 236:24, 237:14, 239:23, 240:7,

**240:8**
**2.2** [1] - 237:14
**2.72** [2] - 286:11, 290:19
**20** [3] - 208:16, 285:11, 285:15
**200** [1] - 271:15
**2003** [2] - 209:13, 244:21
**2006** [15] - 206:6, 208:12, 208:14, 209:7, 210:21, 222:25, 235:8, 245:11, 248:4, 248:11, 251:23, 255:6, 256:21, 262:14, 275:7
**2007** [5] - 223:4, 223:5, 247:5, 248:6, 272:17
**2008** [14] - 222:23, 223:6, 282:24, 283:24, 284:8, 286:1, 286:9, 287:3, 287:4, 287:5, 287:9, 288:6, 290:3, 290:16
**2009** [2] - 284:3, 284:17
**2010** [3] - 245:15, 284:4, 284:17
**2016** [3] - 194:1, 284:3, 287:21
**2017** [5] - 283:25, 287:3, 287:11, 287:12, 287:19
**21** [4] - 228:25, 229:1, 229:4, 240:17
**25** [1] - 276:18
**28** [3] - 237:5, 237:6, 237:10
**28-9** [1] - 237:9
**29** [1] - 194:1

## 3

**3** [2] - 225:14, 228:24
**30** [7] - 207:8, 248:11, 251:23, 255:6, 256:21, 262:14, 275:7
**300** [2] - 245:22, 271:11
**30TH** [1] - 248:4
**35** [1] - 276:16
**35-SPACE** [1] - 207:16
**355,822** [1] - 226:1
**36** [3] - 247:17, 260:21, 267:1
**36.74** [1] - 287:7
**38** [1] - 252:9

## 4

**4** [2] - 220:18, 238:7
**4.75** [1] - 266:2
**4.79** [1] - 236:15
**40,000** [1] - 277:2
**403** [1] - 282:16
**404** [6] - 251:7, 251:19, 252:3, 257:8, 260:16, 268:25
**408** [2] - 257:12, 269:1

## 420

**420** [1] - 251:7
**46** [9] - 194:6, 218:12, 218:13, 228:10, 228:11, 232:1, 236:13, 241:18, 241:20
**46-2** [1] - 234:22
**47** [3] - 224:2, 235:16, 241:18
**48** [2] - 221:7, 221:13
**49** [1] - 225:8

## 5

**5** [2] - 209:8, 285:11
**5,000** [1] - 255:2
**5.35** [2] - 290:14, 290:25
**5.5** [1] - 236:20
**50** [3] - 221:22, 245:25, 278:5
**51** [4] - 226:9, 228:10, 228:11, 267:1
**55** [5] - 220:12, 228:10, 228:12, 228:14, 228:15
**56** [1] - 256:24
**58,000** [2] - 260:19, 260:25

## 6

**6** [4] - 207:22, 210:1, 261:11, 284:22
**6.25** [2] - 237:19, 238:3
**6.67** [1] - 235:5
**61** [1] - 194:6
**65,213** [1] - 284:16

## 7

**7.8** [4] - 287:25, 288:14, 289:13, 289:16
**70** [3] - 245:25, 260:21, 285:14
**702** [1] - 246:20
**72** [1] - 254:8
**75** [2] - 282:8, 282:11
**782,000** [1] - 284:18

## 8

**8** [1] - 242:12
**8.25** [2] - 237:24, 238:3
**8.8** [1] - 235:11
**800,000** [1] - 223:23
**812,000** [1] - 227:3
**82.69** [1] - 235:21

## 9

**90** [3] - 217:15, 223:7, 284:6
**94** [2] - 279:10, 280:10
**9:00** [1] - 194:25
**9:04** [1] - 194:2

# A

**A.M** [3] - 194:2, 291:10, 291:12
**AA** [1] - 290:10
**AAA** [5] - 290:3, 290:5, 290:12, 290:18, 290:23
**AAA-RATED** [1] - 290:23
**ABILITY** [1] - 249:4
**ABLE** [1] - 222:22
**ABSOLUTELY** [2] - 208:17, 248:14
**ACCEPTABLE** [2] - 205:20, 206:1
**ACCEPTED** [1] - 286:5
**ACCORDING** [1] - 289:9
**ACCOUNT** [7] - 209:14, 250:7, 267:4, 267:8, 271:20, 285:16, 288:9
**ACCOUNTANT** [3] - 230:16, 276:12, 280:16
**ACCOUNTANTS** [4] - 276:21, 276:24, 277:1, 280:23
**ACCOUNTING** [13] - 215:6, 215:24, 276:7, 276:13, 276:15, 276:16, 276:18, 276:19, 277:6, 277:12, 277:18, 277:21
**ACCURACY** [1] - 280:25
**ACCURATE** [2] - 202:6, 205:14
**ACCURATELY** [1] - 248:2
**ACHIEVE** [1] - 216:17
**ACHIEVED** [1] - 259:23
**ACQUIRED** [1] - 244:22
**ACQUIRING** [2] - 199:8, 270:18
**ACQUISITION** [1] - 209:19
**ACTED** [1] - 209:14
**ACTION** [1] - 233:5
**ACTUAL** [7] - 209:17, 218:3, 257:11, 268:23, 282:6, 282:12, 287:5
**ADD** [3] - 198:9, 198:12, 206:16
**ADDING** [1] - 198:15
**ADDITION** [3] - 220:23, 220:24, 226:2
**ADDITIONAL** [7] - 198:10, 222:12, 224:24, 226:18, 252:2, 287:8, 287:14
**ADDRESSED** [2] - 202:17, 252:17
**ADJUST** [1] - 195:18
**ADJUSTMENT** [7] - 264:23, 265:3, 265:4, 265:5, 265:6, 265:8
**ADJUSTMENTS** [1] - 271:18
**ADMINISTRATION** [1] -

214:23
**ADMISSIBILITY** [1] - 279:12
**ADMITTED** [6] - 228:12, 228:14, 229:1, 237:10, 247:22, 282:24
**ADOPTED** [2] - 283:5, 290:25
**ADVANCE** [2] - 217:15, 230:2
**ADVISE** [4] - 230:25, 231:7, 231:15, 231:23
**ADVISORY** [1] - 244:14
**AFFECT** [1] - 279:4
**AFFECTED** [1] - 241:8
**AFFILIATIONS** [1] - 244:23
**AFTERWARDS** [1] - 248:24
**AGENCIES** [2] - 216:2, 290:7
**AGO** [5] - 212:10, 245:16, 272:16, 272:17, 288:12
**AGREED** [1] - 194:15
**AGREEMENT** [1] - 232:13
**AHEAD** [2] - 210:1, 258:25
**AID** [1] - 212:3
**AILIN** [9] - 201:6, 201:21, 202:4, 203:23, 206:22, 208:3, 271:5, 271:18, 272:14
**AILIN** [28] - 195:11, 195:16, 196:12, 199:23, 200:9, 201:10, 204:7, 205:22, 206:3, 206:11, 206:19, 207:13, 211:3, 212:20, 262:20, 267:1, 267:3, 268:12, 268:16, 268:21, 270:7, 270:15, 270:25, 272:24, 273:19, 274:2, 274:21, 275:8
**AIR** [1] - 215:2
**ALLOW** [2] - 251:6, 257:15
**ALLOWABLE** [1] - 225:4
**ALLOWANCE** [1] - 257:15
**ALLOWED** [2] - 235:13, 239:16
**ALMOST** [2] - 229:11, 288:7
**ALTERNATE** [1] - 268:3
**AMBIGUOUS** [1] - 272:24
**AMENDED** [2] - 241:9, 241:14
**AMENITIES** [1] - 256:13
**AMERICAN** [1] - 280:22
**AMORTIZED** [2] - 225:1, 225:5
**AMOUNT** [12] - 219:7, 224:16, 233:13, 240:24, 240:25, 242:2, 242:13, 282:2, 282:12, 283:8, 283:17, 284:25
**AMOUNTS** [2] - 250:23, 284:4, 285:23
**ANALYSIS** [6] - 211:8, 212:2,

253:4, 257:21, 272:7, 274:11
**ANALYZE** [1] - 279:25
**ANALYZED** [2] - 209:3, 280:1, 280:3
**ANDREW** [1] - 243:19
**ANGELES** [4] - 235:5, 271:24, 272:1, 277:15
**ANGELES** [1] - 194:1
**ANNUAL** [5] - 207:4, 212:15, 212:17, 239:18, 283:4
**ANNUALLY** [1] - 216:7
**ANSWER** [7] - 206:15, 223:16, 230:12, 231:19, 251:19, 266:13, 266:18
**APOLOGIES** [2] - 194:23, 194:24
**APOLOGIZE** [1] - 208:13
**APPEAL** [2] - 210:2, 210:9
**APPEALING** [2] - 206:18, 261:5
**APPLICABLE** [1] - 257:12
**APPLICATION** [40] - 199:7, 212:17, 216:14, 217:5, 217:6, 217:9, 217:18, 218:17, 218:24, 221:18, 222:2, 223:11, 224:4, 224:6, 226:4, 232:5, 232:19, 233:5, 233:9, 233:17, 233:18, 233:24, 235:17, 236:2, 236:19, 236:24, 240:3, 240:4, 240:8, 241:15, 247:9, 247:13, 263:4, 263:7, 270:17, 270:21, 278:16, 287:7, 287:15
**APPLICATIONS** [10] - 206:23, 209:16, 216:3, 216:4, 227:8, 231:25, 238:17, 279:24, 280:1, 280:3
**APPLIED** [3] - 223:9, 236:18, 241:14
**APPLIES** [2] - 198:2, 198:4
**APPLY** [4] - 198:7, 211:23, 216:22, 251:24
**APPLYING** [3] - 207:5, 212:3, 274:23
**APPOINTED** [1] - 278:7
**APPRAISAL** [1] - 269:8
**APPRAISAL** [44] - 244:25, 245:2, 245:23, 247:8, 247:14, 247:20, 248:23, 250:8, 251:25, 254:2, 254:17, 254:21, 256:18, 262:11, 262:23, 263:4, 264:2, 264:15, 266:5, 266:8, 266:12, 266:14, 266:16, 267:22, 267:24, 268:4, 269:17, 270:1,

270:8, 270:16, 272:15, 272:16, 273:1, 274:7, 274:24, 275:4, 275:5, 275:7, 280:5, 282:23, 283:3, 289:21
**APPRAISALS** [6] - 244:17, 246:13, 246:17, 246:22, 246:23, 271:12
**APPRAISE** [5] - 247:4, 247:6, 248:17, 255:12, 265:9
**APPRAISED** [20] - 245:21, 246:2, 247:1, 248:6, 248:7, 253:10, 253:12, 253:13, 254:15, 263:15, 263:18, 263:20, 263:24, 263:25, 264:2, 264:5, 264:8, 264:15, 271:6, 271:10
**APPRAISER** [8] - 244:13, 244:19, 244:24, 245:10, 245:17, 254:12, 254:14, 260:9
**APPRAISERS** [5] - 244:18, 248:20, 251:10, 263:13
**APPRAISING** [2] - 245:18, 249:16
**APPROACH** [14] - 255:11, 255:13, 256:20, 259:9, 259:11, 260:7, 260:10, 262:6, 264:11, 266:21, 267:9, 268:22, 269:21, 281:9
**APPROPRIATE** [2] - 273:17, 286:7
**APPROVALS** [1] - 287:16
**APPROVED** [7] - 219:23, 221:21, 226:8, 240:4, 240:8, 240:9
**APPROVING** [2] - 232:12, 233:9
**APPROXIMATE** [1] - 254:25
**APRIL** [2] - 209:13, 287:21
**APRIL** [1] - 194:1
**ARBITRATIONS** [1] - 278:1
**AREA** [10] - 200:23, 235:5, 242:3, 242:5, 245:24, 249:6, 250:6, 256:13, 257:10, 258:6
**AREAS** [6] - 199:1, 249:6, 251:9, 251:11, 251:14, 252:22
**ARRIVE** [2] - 257:17, 258:23
**ARTICLES** [3] - 246:12, 246:16, 265:25
**ASIDE** [1] - 225:22
**ASSESSMENT** [1] - 211:9
**ASSIGNMENT** [4] - 278:13, 279:1, 279:4, 286:7
**ASSIST** [1] - 212:3
**ASSOCIATED** [3] - 209:18, 234:2, 266:22

**ASSOCIATES** [6] - 214:7, 214:8, 214:9, 214:14, 215:10, 215:16
**ASSOCIATES** [5] - 214:11, 215:19, 215:23, 227:4, 234:1
**ASSUMED** [2] - 270:10, 274:15
**ASSUMES** [3] - 200:9, 205:22, 270:13
**ASSUMING** [2] - 269:23, 272:11
**ATTEMPT** [1] - 241:2
**ATTEMPTS** [1] - 203:8
**ATTEND** [4] - 221:17, 226:4, 238:15, 244:6
**ATTENDED** [1] - 244:8
**ATTENDING** [2] - 214:23, 242:7
**ATTENTION** [5] - 201:4, 202:9, 203:2, 204:13, 242:12
**ATTORNEY** [4] - 201:7, 201:25, 203:7, 204:2
**ATTORNEYS** [1] - 247:7
**AUDITING** [1] - 276:18
**AUGUST** [2] - 223:6, 277:10
**AUTHORED** [1] - 246:12
**AUTOMATIC** [1] - 272:1
**AVERAGE** [5] - 233:15, 268:23, 269:23, 289:14, 289:15
**AWARD** [1] - 236:2
**AWARDED** [2] - 236:20, 282:13
**AWARE** [6] - 196:10, 231:11, 233:6, 233:8, 233:11, 241:6

## B

**BAAR** [1] - 280:2
**BACHELOR** [1] - 276:7
**BACHELOR'S** [1] - 214:20
**BACKGROUND** [4] - 214:18, 244:5, 276:4, 276:9
**BALANCE** [1] - 203:12
**BANK** [2] - 216:1, 264:15
**BARS** [1] - 257:3
**BASED** [10] - 209:13, 210:9, 234:25, 256:20, 257:22, 271:22, 286:19, 289:7, 289:12, 290:6
**BASES** [1] - 279:18
**BASIS** [2] - 282:15, 288:23
**BAY** [1] - 261:12
**BEACH** [1] - 272:4
**BECOME** [1] - 285:23
**BECOMES** [2] - 198:3, 285:21

**BEGINNING** [1] - 285:20
**BEHALF** [1] - 213:5
**BEHIND** [1] - 288:3
**BELOW** [4] - 205:17, 257:9, 286:17, 286:25
**BELOW-MARKET** [1] - 205:17
**BENEFIT** [2] - 209:12, 248:7
**BENTLEY** [1] - 276:6
**BETWEEN** [8] - 232:10, 232:13, 241:7, 241:10, 261:16, 269:10, 272:23, 282:14
**BEYOND** [1] - 194:18
**BIG** [2] - 276:17, 277:6
**BILL** [4] - 286:15, 289:19, 289:23, 289:24
**BILLING** [1] - 255:3
**BILLS** [9] - 215:25, 216:11, 218:1, 218:3, 221:3, 222:17, 226:25, 286:12, 289:10
**BINDER** [4] - 218:11, 220:11, 220:12, 221:7, 224:2, 225:8, 226:9, 228:23, 232:1, 237:4, 237:8, 247:16, 247:18, 279:14
**BINDERS** [1] - 213:1
**BIT** [12] - 202:22, 209:9, 214:17, 248:13, 251:1, 257:14, 278:20, 279:2, 284:12, 287:23, 289:17
**BLACK** [4] - 232:1, 237:8, 247:18, 257:2
**BLOW** [2] - 257:2, 284:14
**BLOW-OUT** [1] - 284:14
**BOARD** [33] - 207:23, 209:14, 210:8, 211:21, 211:22, 212:3, 217:14, 219:23, 221:17, 221:20, 221:21, 221:25, 225:11, 226:4, 226:6, 226:7, 226:11, 227:14, 234:8, 235:13, 236:3, 236:20, 236:23, 238:16, 238:19, 239:24, 242:1, 242:7, 242:13, 242:21, 253:17, 253:18, 253:21
**BOARD** [3] - 270:2, 270:9, 274:23
**BOARD'S** [4] - 210:11, 211:12, 222:8, 226:21
**BOND** [9] - 290:3, 290:5, 290:10, 290:12, 290:18, 290:23, 290:25
**BONDS** [1] - 290:7
**BOOKKEEPING** [2] - 215:5, 218:5
**BOTTOM** [15] - 203:2,

203:20, 209:9, 210:4, 210:6, 219:2, 224:11, 240:21, 252:12, 254:9, 256:25, 257:1, 261:17, 283:23, 284:20
**BOUGHT** [2] - 200:24, 212:15
**BOUNDARIES** [1] - 206:17
**BRACKETED** [2] - 250:22, 251:3
**BREAK** [4] - 259:1, 291:2, 291:5
**BRIEF** [3] - 195:1, 214:25, 259:5
**BRIEFLY** [1] - 214:18
**BRIGHAM** [1] - 244:8
**BRING** [2] - 207:24, 234:14
**BROAD** [1] - 198:7
**BROCKPORT** [1] - 214:21
**BROKER** [3] - 203:10, 250:1, 250:23
**BROKERAGE** [1] - 250:1
**BROKERS** [2] - 249:23, 265:14
**BROUGHT** [1] - 225:3
**BUDGET** [2] - 229:8, 229:17
**BUDGETED** [1] - 231:2
**BUILDING** [1] - 198:25
**BUILT** [2] - 251:15, 252:5
**BULLETS** [1] - 254:9
**BUREAU** [1] - 197:2, 197:20
**BUSINESS** [6] - 214:20, 214:22, 215:5, 244:9, 244:11, 277:4
**BUY** [1] - 232:19
**BUYER** [3] - 203:13, 204:21, 250:18
**BUYER'S** [1] - 240:24
**BUYERS** [1] - 250:3
**BUYING** [1] - 268:7
**BY** [48] - 195:16, 196:12, 200:2, 200:16, 201:15, 204:11, 205:25, 206:5, 206:14, 206:21, 207:19, 211:3, 214:2, 218:22, 219:3, 220:2, 220:7, 220:17, 221:16, 222:6, 223:15, 224:12, 225:16, 226:17, 228:20, 229:3, 231:22, 236:9, 237:12, 238:11, 240:15, 244:2, 246:25, 259:8, 262:20, 267:3, 268:21, 270:7, 270:15, 271:3, 273:8, 274:2, 274:21, 276:2, 281:17, 283:14, 284:24, 288:20

## C

**CALCULATE** [13] - 269:14, 274:7, 276:10, 278:7, 278:14, 278:17, 278:18, 286:3, 289:1, 289:5, 289:12, 289:23, 290:24
**CALCULATED** [10] - 230:16, 255:6, 281:23, 282:4, 283:8, 283:16, 283:19, 285:1, 288:8, 288:14
**CALCULATING** [3] - 250:9, 256:4, 285:3
**CALCULATION** [8] - 219:22, 226:22, 227:15, 241:3, 278:3, 282:25, 288:18, 288:23
**CALCULATIONS** [6] - 248:2, 250:19, 257:4, 281:15, 281:21, 288:2
**CALIFORNIA** [1] - 194:1
**CALIFORNIA** [12] - 209:3, 214:5, 214:10, 244:25, 245:11, 247:2, 260:15, 261:12, 276:22, 276:23, 277:1, 278:8
**CANNOT** [2] - 211:21, 216:22
**CAP** [1] - 269:18
**CAPITAL** [2] - 237:2, 237:17
**CAPITAL** [1] - 232:13
**CAPITALIZATION** [12] - 255:18, 258:15, 258:22, 259:21, 266:21, 267:9, 268:1, 268:22, 269:2, 269:4, 269:9, 269:13
**CAPITALIZED** [3] - 257:17, 258:12, 258:14
**CAPITALS** [1] - 220:10
**CAPPED** [1] - 251:13
**CARE** [1] - 268:11
**CAREER** [1] - 245:21
**CARSON** [67] - 203:8, 203:15, 204:21, 205:16, 205:17, 205:21, 206:2, 207:9, 208:16, 208:20, 209:7, 209:23, 210:22, 210:23, 211:4, 211:10, 211:11, 215:20, 215:21, 216:5, 217:1, 220:14, 221:9, 225:10, 227:9, 227:15, 231:11, 232:9, 232:17, 233:2, 233:8, 234:15, 235:10, 236:3, 238:15, 238:16, 239:3, 239:7, 239:11, 239:15, 242:8, 242:10, 247:1, 253:7, 253:8, 253:10, 253:12, 253:13, 253:15, 256:9, 256:10, 258:7,

259:16, 261:18, 261:20, 261:21, 261:23, 263:18, 266:16, 271:25, 280:3, 280:7, 282:4, 282:5, 282:13

**CARSON'S** [2] - 278:15, 279:25

**CASE** [27] - 194:17, 197:25, 204:18, 204:20, 209:7, 209:23, 210:23, 214:15, 250:20, 258:16, 259:2, 259:4, 278:11, 278:13, 279:8, 279:16, 280:8, 281:24, 283:1, 283:21, 286:11, 288:15, 288:24, 289:12, 289:13, 291:6, 291:8

**CASES** [5] - 246:6, 273:11, 280:8, 289:2, 289:3

**CASH** [1] - 286:3

**CASPARIAN** [36] - 213:4, 213:8, 213:16, 214:2, 218:19, 218:22, 219:1, 219:3, 220:2, 220:7, 220:15, 220:17, 221:10, 221:12, 221:14, 221:16, 222:4, 222:6, 223:15, 224:8, 224:10, 224:12, 225:12, 225:14, 225:16, 226:13, 226:15, 226:17, 228:9, 228:13, 228:16, 231:18, 236:6, 238:8, 240:15, 242:25

**CASPARIAN** [3] - 213:5, 231:25, 264:6

**CASPARIAN'S** [1] - 264:9

**CATHEDRAL** [1] - 214:5

**CENTS** [1] - 226:7

**CERTAIN** [1] - 234:25

**CERTAINLY** [1] - 279:5

**CERTIFIED** [6] - 244:24, 276:12, 276:24, 277:1, 280:16, 280:22

**CHAIR** [2] - 276:25, 277:3

**CHANGE** [2] - 234:25, 241:23

**CHANGED** [1] - 200:8

**CHANGES** [1] - 242:17

**CHARACTERISTICS** [1] - 257:23

**CHARGE** [1] - 253:2

**CHARGED** [1] - 242:4

**CHART** [3] - 284:2, 284:5, 285:18

**CHECK** [7] - 259:12, 259:18, 260:2, 260:4, 269:22, 274:15, 280:25

**CHECKED** [1] - 281:2

**CHECKS** [3] - 216:9, 216:11, 221:3

**CHIEF** [1] - 194:17

**CHOOSE** [3] - 286:7, 290:4, 290:16

**CHOSE** [4] - 289:14, 289:16, 290:8, 290:18

**CHOSEN** [1] - 290:10

**CIRCUMSTANCES** [1] - 207:3

**CITY** [26] - 196:23, 197:5, 200:8, 201:8, 204:22, 206:7, 206:9, 206:16, 207:11, 214:5, 216:2, 216:6, 216:16, 217:8, 219:20, 220:19, 220:20, 220:25, 225:17, 225:22, 232:12, 233:6, 241:7, 241:9, 253:2, 282:10

**CITY** [23] - 203:8, 203:15, 205:20, 206:1, 215:20, 216:5, 220:14, 221:9, 225:10, 232:9, 232:17, 233:2, 233:8, 239:7, 239:11, 239:15, 278:15, 279:25, 280:2, 280:6, 282:4, 282:5, 282:13

**CITY'S** [14] - 196:24, 201:1, 203:17, 204:24, 205:6, 208:6, 209:4, 211:22, 212:1, 241:3, 253:17, 264:19, 282:23, 283:3

**CITY'S** [1] - 197:25

**CLAIM** [1] - 210:11

**CLEAN** [2] - 211:8, 211:17

**CLEARING** [1] - 194:22

**CLERK** [11] - 195:3, 195:6, 195:9, 213:10, 213:15, 213:17, 243:11, 243:16, 275:13, 275:20, 291:9

**CLIENT** [1] - 263:9

**CLIENTS** [2] - 264:5, 264:9

**CLOCK** [1] - 194:25

**CLOSE** [32] - 194:21, 196:8, 200:2, 200:16, 201:15, 202:10, 202:12, 202:21, 204:11, 205:25, 206:5, 206:14, 206:21, 207:19, 210:25, 212:22, 213:1, 221:13, 275:11, 276:2, 279:10, 279:14, 281:9, 281:12, 281:17, 283:11, 283:14, 284:14, 284:24, 288:17, 288:20, 291:3

**CLOSE** [3] - 203:7, 256:19, 291:2

**CLOSE** [1] - 194:21

**CLOSER** [1] - 257:10, 259:15

**CLUB** [2] - 215:6, 215:13

**COACHELLA** [1] - 215:9

**CODE** [2] - 280:20, 280:21

**COLD** [1] - 194:9

**COLLECT** [1] - 239:17

**COLLECTED** [1] - 286:18

**COLLECTING** [2] - 222:22, 223:12

**COLLEGE** [4] - 215:4, 244:6, 276:5

**COLLIERS** [5] - 244:13, 244:20, 244:22, 254:12, 271:12

**COLONY** [83] - 196:6, 198:9, 199:8, 203:1, 209:5, 209:24, 210:21, 212:12, 213:5, 213:8, 214:14, 215:22, 217:19, 222:16, 224:15, 226:24, 227:14, 228:3, 229:8, 229:19, 229:23, 230:2, 230:5, 230:9, 231:1, 231:8, 232:5, 232:9, 232:18, 234:1, 236:1, 238:2, 238:13, 238:16, 239:4, 239:7, 239:17, 239:25, 242:9, 247:1, 249:2, 249:20, 253:14, 256:6, 256:14, 256:21, 257:13, 258:5, 258:9, 258:22, 260:15, 260:17, 261:6, 261:7, 261:14, 261:15, 262:6, 262:24, 264:23, 265:1, 269:15, 270:2, 270:9, 270:18, 272:5, 272:11, 274:22, 275:5, 275:6, 278:14, 278:16, 279:22, 279:24, 280:5, 280:7, 282:3, 282:25, 283:4, 283:9, 283:17, 283:20, 287:6, 287:13

**COLUMN** [6] - 209:9, 229:11, 283:22, 284:20, 285:19, 287:24

**COMING** [1] - 272:7

**COMMENCEMENT** [1] - 290:20

**COMMENDED** [1] - 201:2

**COMMENTS** [1] - 203:6

**COMMERCIAL** [5] - 244:13, 245:9, 246:10, 246:22, 249:25

**COMMON** [1] - 256:13

**COMPANIES** [2] - 215:12, 290:8

**COMPANY** [9] - 196:6, 214:9, 215:5, 215:8, 246:14, 247:7, 250:1, 277:14, 277:17

**COMPARABLE** [20] - 234:15, 242:5, 242:6, 242:9, 242:10, 249:17, 256:6, 256:11, 257:20, 257:24, 257:25, 261:2, 264:11,

**COLLECT** [1] - 239:17
264:12, 264:18, 264:24, 264:25, 272:6, 272:9, 272:10

**COMPARABLES** [2] - 262:2, 271:20

**COMPARATIVELY** [1] - 258:10

**COMPARE** [6] - 250:21, 255:15, 255:25, 258:17, 261:18, 262:1

**COMPARED** [6] - 250:10, 258:2, 258:4, 258:5, 258:22, 260:15

**COMPARING** [1] - 264:22

**COMPARISON** [5] - 242:3, 260:7, 260:9, 262:6, 262:8

**COMPENSATED** [2] - 278:21, 278:23

**COMPENSATION** [2] - 278:25, 279:3

**COMPETING** [2] - 238:5, 238:13

**COMPLETE** [1] - 217:9

**COMPLETED** [2] - 255:3, 266:16

**COMPLETELY** [4] - 194:11, 208:6, 252:22, 266:13

**COMPONENTS** [1] - 269:13

**COMPRISES** [1] - 269:12

**COMPS** [1] - 265:19

**COMPTON** [1] - 261:4

**COMPUTERS** [1] - 215:25

**CONCEPT** [2] - 285:8, 288:3

**CONCERN** [3] - 267:16, 267:19, 267:21

**CONCERNING** [1] - 251:24

**CONCESSION** [1] - 228:2

**CONCLUSION** [10] - 209:13, 210:10, 259:10, 260:16, 260:19, 260:23, 262:10, 263:8, 272:8, 281:4

**CONCLUSIONS** [2] - 248:3, 258:11

**CONDITION** [2] - 251:21

**CONDITIONS** [1] - 261:24

**CONDUCT** [3] - 254:1, 280:20, 280:21

**CONDUCTED** [1] - 272:15

**CONFERRED** [1] - 194:15

**CONFIRM** [3] - 203:25, 204:4, 259:10

**CONJUNCTION** [1] - 247:8

**CONNECTION** [4] - 254:1, 263:6, 266:8, 281:6

**CONSERVATIVE** [3] - 259:17, 290:9, 290:11

**CONSIDER** [4] - 253:4, 253:21, 265:7, 268:6

**CONSIDERATION** [3] - 208:5, 209:17, 242:24

**CONSIDERED** [14] - 208:22, 208:23, 210:11, 212:4, 242:1, 242:9, 242:13, 242:21, 252:1, 252:8, 265:2, 268:4, 286:13, 286:16
**CONSIDERS** [2] - 253:19, 267:25
**CONSOLIDATED** [1] - 246:7
**CONSTRUCTION** [3] - 252:15, 252:16, 252:19
**CONSULTING** [2] - 277:14, 277:16
**CONSUMER** [3] - 282:1, 282:9, 282:11
**CONSUMER** [5] - 234:23, 234:24, 235:4, 236:14, 282:8
**CONSUMING** [1] - 207:17
**CONTACTED** [2] - 247:7, 272:18
**CONTINUE** [3] - 203:5, 203:12, 287:10
**CONTRACTED** [1] - 194:9
**CONTRACTORS** [1] - 252:21
**CONTRAST** [1] - 250:21
**CONTRASTED** [1] - 250:10
**CONTROL** [40] - 197:22, 198:1, 198:3, 198:4, 200:8, 201:1, 201:19, 207:21, 210:22, 221:25, 231:11, 234:5, 234:8, 236:20, 238:15, 239:12, 239:24, 241:10, 242:23, 246:2, 247:9, 247:12, 253:7, 253:8, 253:15, 257:11, 261:13, 264:20, 264:25, 265:10, 265:11, 265:23, 266:1, 266:3, 266:7, 266:11, 271:21, 271:25, 272:1
**CONTROLLED** [2] - 257:10, 265:20
**CONTROLLING** [1] - 211:10
**CONVERTED** [1] - 196:7
**CONVERTING** [1] - 227:19
**COPIES** [2] - 216:9, 221:3
**CORPORATE** [3] - 290:3, 290:5, 290:23
**CORRECT** [68] - 195:23, 195:25, 196:25, 197:2, 197:3, 197:5, 197:6, 197:9, 197:10, 198:5, 198:10, 198:11, 198:13, 198:14, 198:16, 198:17, 198:18, 198:23, 198:24, 199:5, 199:17, 212:19, 216:24, 221:4, 222:2, 222:21, 224:1, 226:22, 229:15, 229:19, 229:24, 230:2,

230:5, 230:19, 232:6, 232:25, 233:16, 235:2, 235:11, 235:21, 236:20, 236:24, 238:21, 238:25, 239:5, 239:25, 240:9, 240:25, 241:23, 242:5, 254:18, 263:5, 264:3, 264:12, 265:11, 265:12, 265:20, 267:11, 267:14, 269:25, 270:11, 272:12, 272:13, 274:6, 274:13, 274:14, 275:6, 287:21
**CORRECTLY** [2] - 209:20, 210:14
**COST** [4] - 234:25, 249:5, 251:15, 252:21
**COSTLY** [2] - 207:4, 207:17
**COSTS** [8] - 209:18, 210:11, 251:16, 252:3, 252:15, 252:19, 252:20, 252:23
**COUGH** [1] - 194:11
**COUNSEL** [8] - 194:5, 194:15, 200:5, 200:13, 201:5, 201:16, 205:12, 281:10
**COUNSEL'S** [1] - 229:22
**COUNTRY** [2] - 215:6, 215:13
**COUNTY** [3] - 216:2, 253:2, 263:1
**COUPLE** [6] - 200:5, 211:5, 215:3, 240:2, 246:7, 266:17
**COURSE** [4] - 194:9, 239:6, 245:21, 247:24
**COURT** [11] - 205:7, 205:21, 206:2, 209:12, 210:2, 210:23, 275:14, 278:6, 278:7, 280:7, 280:8
**COURT** [71] - 194:5, 194:13, 194:19, 194:24, 195:10, 196:9, 199:24, 200:11, 201:12, 202:11, 204:8, 205:24, 206:4, 206:13, 206:20, 207:14, 211:1, 212:21, 212:23, 213:3, 213:7, 218:21, 220:1, 220:6, 220:16, 221:11, 221:15, 222:5, 223:14, 224:9, 225:13, 226:14, 228:11, 228:14, 228:18, 229:2, 231:19, 236:7, 237:11, 238:10, 240:13, 243:2, 243:4, 243:8, 246:24, 247:25, 248:12, 258:25, 259:7, 262:18, 266:25, 267:2, 268:13, 268:18, 268:20, 270:5, 270:14, 271:1, 272:25, 273:21, 273:23, 274:19,

275:9, 279:13, 281:11, 281:16, 283:13, 288:19, 291:2, 291:4, 291:11
**COURT** [9] - 194:23, 204:23, 209:12, 211:16, 213:11, 243:13, 275:17, 278:8, 278:9
**COURT'S** [1] - 283:11
**COURT'S** [2] - 210:9, 211:9
**COURT-APPOINTED** [1] - 278:7
**COURTS** [4] - 209:3, 277:25, 278:1
**COVE** [75] - 196:6, 198:9, 199:8, 203:1, 209:5, 209:24, 210:21, 212:12, 213:5, 213:8, 214:14, 215:22, 217:19, 222:16, 224:15, 226:24, 227:14, 228:3, 229:8, 229:19, 229:23, 230:2, 230:5, 230:9, 231:1, 231:8, 232:5, 232:9, 232:18, 234:1, 236:1, 238:2, 238:13, 238:16, 239:4, 239:7, 239:17, 239:25, 242:9, 247:1, 249:2, 249:20, 253:14, 256:6, 256:14, 256:21, 257:13, 258:5, 258:22, 260:15, 260:17, 261:6, 261:7, 261:14, 261:15, 262:6, 262:24, 264:23, 265:1, 269:15, 270:2, 270:9, 270:18, 272:5, 272:11, 274:22, 275:5, 275:6, 279:22, 280:5, 280:7, 282:3, 282:25, 283:20, 287:13
**COVE'S** [8] - 258:9, 278:14, 278:16, 279:24, 283:4, 283:9, 283:17, 287:6
**COVER** [1] - 231:16
**COVERAGE** [1] - 256:2
**COVERS** [1] - 267:17
**CPA** [3] - 228:21, 277:11, 277:20
**CPAS** [4] - 276:22, 277:2, 280:20, 280:23
**CPI** [3] - 207:6, 241:23, 282:1
**CREATE** [1] - 212:6
**CREDIT** [1] - 290:6
**CROSS** [9] - 195:10, 228:18, 259:12, 259:18, 260:2, 260:4, 262:18, 269:22, 274:15
**CROSS** [3] - 195:15, 228:19, 262:19
**CROSS-CHECK** [4] - 259:12, 259:18, 260:4, 274:15
**CROSS-EXAMINATION** [3] -

195:10, 228:18, 262:18
**CROSS-EXAMINATION** [3] - 195:15, 228:19, 262:19
**CROW** [1] - 202:18
**CULL** [2] - 209:10, 210:4
**CURRENT** [5] - 244:12, 261:25, 274:8, 276:11, 277:7
**CUT** [1] - 228:4

# D

**D4** [1] - 281:15
**D5** [1] - 283:12
**DAMAGE** [3] - 281:15, 287:2, 290:20
**DAMAGED** [2] - 288:4, 290:21
**DAMAGES** [42] - 276:10, 277:4, 278:4, 278:7, 278:10, 278:14, 278:18, 278:19, 279:22, 280:17, 281:22, 281:24, 282:15, 282:17, 282:19, 282:25, 283:4, 283:6, 283:9, 283:17, 283:20, 283:25, 284:9, 284:16, 284:21, 284:22, 285:3, 285:20, 286:3, 286:8, 286:14, 287:4, 287:10, 287:18, 287:19, 288:2, 288:4, 288:5, 288:8, 288:9
**DATA** [1] - 261:25
**DATE** [9] - 217:11, 217:12, 248:10, 248:18, 251:22, 262:13, 286:6, 290:20, 290:21
**DATES** [1] - 284:1
**DAVID** [1] - 243:19
**DAYS** [1] - 217:15
**DAYS'** [1] - 223:7
**DEALING** [1] - 232:17
**DEALT** [1] - 238:19
**DEAR** [1] - 202:25
**DEBT** [15] - 201:9, 208:2, 210:11, 229:22, 233:10, 267:5, 267:8, 267:17, 268:2, 268:6, 268:8, 273:3, 273:12, 282:3
**DECEMBER** [12] - 222:23, 283:24, 284:8, 286:1, 286:9, 287:3, 287:4, 287:5, 287:9, 288:6, 290:3, 290:16
**DECIDED** [1] - 286:23
**DECISION** [7] - 209:5, 217:14, 221:25, 222:1, 222:8, 223:6, 236:1
**DECISIONS** [1] - 230:14
**DECREASED** [1] - 208:24

**DEDUCT** [1] - 257:14
**DEDUCTED** [3] - 257:12, 257:16, 259:22
**DEEMED** [2] - 246:21, 273:17
**DEFENDANT'S** [1] - 289:21
**DEFENDANTS** [1] - 194:9
**DEFENSE** [8] - 194:6, 194:7, 194:16, 201:5, 201:16, 205:12, 279:7, 281:10
**DEFER** [1] - 228:1
**DEFINE** [1] - 269:8
**DEFINITELY** [2] - 205:8, 210:24
**DEGREE** [2] - 214:22, 276:7
**DELAYED** [1] - 199:2
**DELIBERATING** [1] - 279:20
**DELINQUENCIES** [1] - 286:20
**DEMONSTRATE** [1] - 216:19
**DEMONSTRATED** [1] - 245:7
**DEMONSTRATIVE** [4] - 281:14, 283:7, 284:10, 288:13
**DEMONSTRATIVES** [2] - 281:6, 281:8
**DENIED** [2] - 268:13, 268:18
**DEPARTMENT** [1] - 277:22
**DEPOSITION** [1] - 266:19
**DEPRECIATION** [1] - 218:6
**DERIVED** [1] - 268:1
**DESCRIBE** [1] - 255:12
**DESCRIBES** [1] - 210:3
**DESCRIBING** [1] - 205:5
**DESERT** [1] - 263:21
**DESIGNATED** [3] - 245:15, 246:4, 246:9
**DESIGNATION** [4] - 245:1, 245:5, 245:6, 245:13
**DESIGNED** [1] - 234:6
**DESK** [1] - 275:14
**DETAIL** [2] - 222:8, 276:14
**DETERMINATION** [1] - 226:21
**DETERMINE** [6] - 219:4, 224:13, 255:15, 278:10, 280:9, 282:17
**DETERMINED** [7] - 217:8, 224:25, 226:7, 239:3, 253:16, 261:15, 281:21
**DETERMINING** [4] - 211:13, 238:20, 242:1, 242:13
**DETLING** [12] - 243:7, 243:10, 243:19, 244:3, 246:21, 247:24, 256:25, 259:9, 262:21, 270:16, 271:4, 274:3
**DETLING** [1] - 243:21
**DETRIMENT** [1] - 208:24

**DEVELOP** [2] - 251:16, 263:14
**DEVELOPABLE** [1] - 252:22
**DEVELOPED** [2] - 248:9, 251:8
**DEVELOPER** [1] - 215:9
**DEVELOPING** [2] - 198:19, 252:4
**DEVELOPMENT** [2] - 251:5, 251:17
**DEVIATION** [1] - 211:23
**DICTIONARY** [1] - 269:8
**DIEGO** [1] - 244:15
**DIFFERENCE** [3] - 282:14, 289:25, 290:1
**DIFFERENCES** [1] - 265:2
**DIFFERENT** [9] - 206:25, 207:1, 207:3, 246:6, 261:23, 269:7, 269:13, 271:19, 289:14
**DIFFICULTIES** [1] - 203:7
**DIRECT** [5] - 194:18, 202:8, 204:13, 242:12, 266:21
**DIRECT** [2] - 214:1, 244:1, 276:1
**DIRECTED** [2] - 241:17, 241:22
**DIRECTING** [1] - 240:21
**DIRECTLY** [1] - 273:6
**DIRECTOR** [4] - 244:15, 244:16, 271:16, 277:15
**DISALLOWED** [2] - 220:9, 225:25
**DISCOUNT** [6] - 285:2, 285:7, 286:2, 286:5, 286:8, 286:14
**DISCOVERS** [1] - 203:17
**DISCRETIONARY** [1] - 209:16
**DISCUSS** [7] - 233:19, 233:25, 234:13, 234:20, 238:5, 259:2, 291:6
**DISCUSSED** [5] - 201:5, 203:1, 203:13, 207:22, 234:12
**DISCUSSING** [1] - 200:21
**DISCUSSION** [1] - 238:12
**DISCUSSIONS** [2] - 235:25, 238:1
**DISPOSE** [1] - 273:17
**DISPUTE** [1] - 220:25
**DISREGARD** [1] - 220:3
**DISREGARDED** [1] - 219:22
**DISREPAIR** [1] - 268:15
**DISTINCTION** [1] - 272:23
**DIVERSE** [1] - 289:7
**DIVIDED** [1] - 258:23
**DIVIDING** [1] - 258:15
**DOCUMENT** [10] - 219:15, 220:12, 221:7, 221:23,

222:7, 224:3, 224:19, 225:15, 226:10, 279:17
**DOCUMENTED** [1] - 216:8
**DOCUMENTS** [4] - 246:14, 246:15, 246:16, 279:21
**DOLLAR** [3] - 232:24, 265:4, 265:5
**DOLLARS** [6] - 217:24, 217:25, 218:1, 222:19, 232:5, 233:10
**DONE** [5] - 227:22, 227:25, 275:5, 275:7, 280:2
**DORADO** [5] - 197:8, 197:21, 198:2, 228:1, 264:3
**DOWN** [14] - 202:21, 204:10, 210:5, 212:21, 212:24, 219:13, 237:22, 243:4, 248:12, 275:9, 283:23, 284:14, 291:11
**DOWNSTAIRS** [1] - 194:22
**DOWNWARD** [1] - 203:17
**DR** [1] - 280:2
**DRAFTED** [1] - 201:7
**DRIVE** [1] - 204:10
**DROPS** [1] - 194:11
**DUE** [3] - 209:16, 252:14, 278:15
**DURING** [7] - 195:20, 215:14, 219:16, 228:6, 247:23, 266:13, 279:4

---

**E**

**E-T-L-I-N-G** [1] - 243:20
**EARLY** [3] - 247:5, 262:23, 272:17
**EARNED** [1] - 288:11
**EARNINGS** [1] - 288:11
**ECONOMIC** [4] - 276:10, 277:3, 278:4, 286:3
**ECONOMIST** [1] - 281:2
**EDUCATION** [3] - 204:5, 214:19, 245:8
**EDUCATIONAL** [2] - 244:5, 276:4
**EFFECT** [2] - 287:9, 288:10
**EFFECTIVE** [1] - 234:10
**EIGHT** [6] - 223:17, 246:6, 246:7, 277:13, 288:7, 288:12
**EL** [5] - 197:8, 197:21, 198:2, 228:1, 264:3
**ELAINE** [1] - 213:19
**ELECT** [1] - 285:13
**ELECTS** [1] - 256:1
**ELIMINATE** [5] - 201:9, 204:22, 206:7, 206:10, 207:12
**ELLIS** [3] - 282:23, 289:22, 290:23

**EMPHASIS** [1] - 214:20
**EMPLOYED** [3] - 214:6, 214:7, 268:3
**EMPLOYMENT** [3] - 214:25, 277:7, 277:8
**ENCLOSING** [3] - 202:25, 203:6, 203:9
**END** [10] - 217:3, 217:7, 223:4, 229:11, 234:18, 235:17, 239:20, 261:3, 284:1, 287:21
**ENGAGEMENT** [1] - 278:22
**ENGINEERS** [1] - 252:20
**ENTAIL** [1] - 252:23
**ENTIRE** [2] - 199:2, 204:25
**ENTITLED** [1] - 211:11
**ENTITLEMENT** [1] - 212:7
**ENTITY** [2] - 233:23, 288:7
**ENTRY** [1] - 215:24
**ENVIRONMENTS** [1] - 265:20
**EQUITY** [1] - 273:12
**ESPECIALLY** [1] - 236:1
**ESSENTIALLY** [2] - 216:23, 267:16
**ESTATE** [2] - 197:2, 197:20
**ESTATE** [13] - 215:9, 244:13, 244:19, 244:24, 245:9, 245:10, 245:18, 246:11, 246:13, 246:22, 250:1, 253:20, 267:25
**ESTATES** [3] - 203:1, 213:5, 214:15
**ESTIMATE** [1] - 257:18
**ESTIMATED** [1] - 260:2
**ESTIMATES** [1] - 258:3
**ESTIMATION** [1] - 240:18
**EVALUATE** [2] - 203:14, 260:6
**EVALUATION** [1] - 250:21
**EVENING** [1] - 194:10
**EVERYDAY** [1] - 273:6
**EVIDENCE** [1] - 246:20
**EVIDENCE** [11] - 200:10, 205:23, 211:21, 212:5, 228:10, 228:15, 238:9, 247:23, 270:12, 270:13, 282:24
**EVIDENT** [1] - 210:19
**EXACT** [2] - 204:25, 250:23
**EXACTLY** [2] - 219:5, 260:22
**EXAMINATION** [3] - 195:10, 228:18, 262:18
**EXAMINATION** [11] - 195:15, 200:1, 211:2, 214:1, 228:19, 240:14, 244:1, 262:19, 271:2, 274:1, 276:1
**EXAMINING** [1] - 201:5
**EXAMPLE** [7] - 255:25,

256:2, 258:7, 271:23, 272:9, 276:4, 285:18
**EXCEED** [1] – 231:2
**EXCEEDED** [4] – 223:24, 231:9, 235:14, 236:23
**EXCEEDING** [1] – 230:11
**EXCEPT** [2] – 234:2, 239:3
**EXCESS** [2] – 218:1, 218:2
**EXCESSIVE** [2] – 231:13, 234:6
**EXCLUDE** [1] – 225:24
**EXCUSE** [2] – 208:13, 282:22
**EXHIBIT** [12] – 201:8, 209:8, 210:2, 221:11, 224:2, 225:8, 235:16, 237:4, 241:18, 260:21, 267:1, 284:10
**EXHIBIT** [28] – 201:22, 201:25, 202:9, 202:14, 203:3, 203:23, 203:25, 204:13, 204:14, 207:21, 209:6, 218:13, 220:12, 221:7, 221:22, 226:9, 228:15, 229:4, 232:1, 234:22, 236:13, 240:17, 241:18, 241:20, 266:25, 279:10, 280:10, 282:24
**EXHIBITS** [1] – 228:10
**EXIST** [1] – 287:19
**EXISTED** [1] – 198:20
**EXISTING** [1] – 252:3
**EXPANSION** [1] – 252:16
**EXPECTED** [1] – 241:3
**EXPECTING** [1] – 216:17
**EXPENSE** [20] – 210:20, 219:21, 220:22, 220:23, 225:17, 225:22, 225:23, 240:18, 249:17, 256:3, 258:3, 267:10, 267:12, 267:14, 268:6, 272:22, 272:23, 274:4, 278:15
**EXPENSES** [44] – 200:14, 200:22, 208:6, 208:22, 209:18, 216:7, 216:8, 216:18, 217:7, 217:10, 218:2, 218:5, 218:8, 220:3, 220:4, 220:9, 220:10, 220:19, 220:25, 221:1, 223:24, 225:5, 226:1, 226:2, 227:15, 231:17, 242:18, 249:16, 249:17, 253:19, 253:21, 255:14, 255:20, 255:25, 257:16, 266:22, 267:4, 267:6, 267:25, 273:2, 273:3, 274:3, 274:8
**EXPERIENCE** [14] – 207:8, 207:9, 208:20, 223:10, 225:4, 227:13, 227:21, 242:7, 245:8, 248:17,

254:14, 271:23, 276:15, 276:16
**EXPERIENCES** [3] – 208:15, 208:18, 277:8
**EXPERT** [21] – 246:5, 246:9, 246:21, 277:23, 278:3, 278:7, 278:9, 279:6, 279:7, 279:15, 279:21, 280:2, 280:10, 280:13, 280:17, 280:21, 281:4, 282:23, 283:3, 286:14, 289:22
**EXPERTISE** [2] – 245:8, 273:20
**EXPERTS** [2] – 286:2, 286:5
**EXPLAIN** [10] – 207:2, 208:18, 258:13, 260:8, 281:23, 283:19, 283:25, 284:12, 285:5, 287:25
**EXPLAINED** [1] – 208:23
**EXPRESS** [2] – 259:3, 291:7
**EXPRESSES** [1] – 269:10
**EXTEND** [1] – 252:23
**EXTRA** [2] – 198:12, 198:20

# F

**FACT** [9] – 197:15, 221:3, 222:19, 223:4, 228:6, 264:24, 285:16, 286:22, 288:9
**FACTOR** [6] – 234:23, 235:4, 236:14, 236:16, 242:12, 242:21
**FACTOR** [13] – 207:7, 242:1, 242:16, 253:8, 267:22, 274:23, 285:2, 285:7, 285:15, 285:19, 285:20, 285:21, 285:24
**FACTORS** [7] – 212:3, 212:4, 231:12, 234:23, 241:22, 253:3, 266:22
**FACTS** [3] – 200:9, 205:22, 270:13
**FAIL** [1] – 205:3
**FAILED** [1] – 210:8
**FAILURE** [1] – 278:15
**FAIR** [4] – 211:13, 230:8, 239:4, 239:21
**FAIRLY** [1] – 248:19
**FALL** [1] – 268:14
**FALLS** [1] – 261:16
**FAMILIAR** [1] – 208:10
**FAMILY** [2] – 196:7, 277:5
**FAR** [2] – 199:6, 205:6
**FEATURE** [1] – 251:18
**FEBRUARY** [2] – 287:12, 287:16
**FEDERAL** [3] – 216:2, 277:25, 278:1
**FEDERAL** [1] – 246:20

**FEE** [1] – 254:21
**FEES** [6] – 219:18, 224:24, 225:1, 225:4, 253:2, 273:4
**FELL** [1] – 234:10
**FELT** [1] – 202:7
**FEW** [10] – 212:10, 227:17, 240:16, 246:18, 251:19, 253:14, 259:23, 261:19, 271:4
**FIELD** [1] – 246:21
**FIGURE** [3] – 219:2, 222:10, 259:17
**FIGURES** [3] – 240:2, 240:24, 240:25
**FILE** [4] – 216:6, 223:3, 232:19, 287:15
**FILED** [3] – 218:18, 223:11, 224:4
**FILING** [1] – 223:5
**FILLED** [1] – 233:18
**FILLING** [1] – 216:1
**FINAL** [1] – 228:3
**FINALLY** [1] – 241:8
**FINANCE** [2] – 214:21, 238:6
**FINANCED** [1] – 230:4
**FINANCES** [2] – 219:4, 224:14
**FINANCIAL** [7] – 216:1, 217:20, 218:23, 222:1, 222:8, 223:19, 269:12
**FINANCIALLY** [1] – 290:7
**FINANCING** [4] – 203:10, 209:18, 232:13, 273:11
**FINE** [1] – 194:13
**FINISH** [1] – 270:6
**FINISHED** [1] – 223:4
**FIRM** [12] – 236:11, 236:12, 264:2, 264:9, 264:15, 271:13, 277:10, 277:11, 277:19, 277:20, 278:12, 278:23
**FIRMS** [2] – 276:18, 277:6
**FIRST** [50] – 196:5, 196:23, 197:5, 197:15, 199:7, 202:9, 202:13, 202:22, 203:3, 204:14, 207:15, 207:23, 208:2, 211:9, 217:18, 217:20, 218:18, 219:1, 219:16, 224:25, 229:11, 229:18, 229:23, 232:16, 233:5, 233:9, 233:12, 236:1, 240:17, 241:18, 241:19, 245:11, 253:10, 255:9, 255:10, 257:20, 270:17, 270:23, 274:9, 274:10, 274:12, 276:17, 281:14, 281:25, 283:22, 284:7, 284:8, 285:19, 287:12
**FISCAL** [2] – 217:3, 217:7

**FIT** [1] – 284:5
**FIVE** [7] – 214:12, 215:3, 264:8, 271:6, 275:2, 277:11, 278:8
**FLETCHER** [2] – 254:7, 254:11
**FLEXIBLE** [1] – 272:2
**FLOOR** [1] – 237:19
**FLOW** [1] – 286:4
**FOCUS** [1] – 203:2
**FOCUSED** [1] – 207:6
**FOLLOW** [1] – 206:23
**FOLLOWS** [4] – 195:14, 213:23, 243:23, 275:25
**FOOTNOTE** [1] – 235:20
**FORCE** [1] – 215:2
**FORECLOSE** [2] – 268:9, 273:13
**FORENSIC** [8] – 276:13, 276:15, 276:19, 276:25, 277:12, 277:17, 277:20, 281:2
**FORENSICS** [1] – 277:9
**FORM** [3] – 246:2, 259:3, 291:7
**FORMALIZING** [1] – 221:24
**FORMED** [2] – 263:9, 267:15, 277:10
**FORMULA** [1] – 211:23
**FORWARD** [3] – 203:18, 225:3, 275:13
**FOUNDATION** [5] – 206:3, 206:19, 231:18, 238:8, 238:10
**FOUR** [5] – 234:16, 264:14, 276:17, 277:6, 277:19
**FRAME** [2] – 261:21, 266:14
**FRANCISCO** [1] – 261:12
**FRAUD** [1] – 277:4
**FREE** [3] – 286:10, 286:11, 286:15
**FRIDAY** [1] – 194:1
**FRONT** [6] – 240:19, 247:17, 281:3, 285:13, 285:14, 285:17
**FTI** [1] – 277:16
**FULL** [9] – 204:14, 213:18, 215:13, 216:21, 216:23, 243:17, 275:21, 284:7, 284:17
**FUNCTION** [1] – 265:22
**FUNDAMENTAL** [1] – 211:10
**FURNISHED** [1] – 288:25
**FUTURE** [10] – 257:15, 274:5, 274:17, 274:20, 274:22, 275:2, 285:9, 285:23, 286:3, 286:6

## G

**GARDENS** [5] - 209:7, 209:23, 210:23, 211:5, 211:11
**GATHER** [2] - 249:1, 251:4
**GATHERED** [2] - 249:3, 253:6
**GE** [5] - 219:10, 224:17, 232:13, 237:2, 237:16
**GENERAL** [3] - 226:12, 244:24, 272:23
**GENERATE** [1] - 289:8
**GENERATES** [2] - 255:16, 261:13
**GENERATING** [2] - 249:3, 249:4
**GENTLEMEN** [1] - 291:4
**GEOGRAPHICALLY** [1] - 256:14
**GEOGRAPHY** [1] - 257:22
**GILCHRIST** [1] - 201:18
**GIVEN** [5] - 245:2, 245:7, 248:10, 279:7, 282:12
**GOD** [3] - 213:13, 243:14, 275:18
**GOLDSTEIN** [1] - 195:12
**GOLDSTEIN** [66] - 194:16, 194:20, 195:17, 195:20, 200:3, 200:18, 202:8, 202:15, 202:23, 203:21, 205:12, 205:16, 205:20, 206:1, 206:6, 206:8, 206:22, 207:8, 207:20, 208:1, 208:12, 208:14, 209:11, 209:20, 210:14, 210:18, 210:21, 211:4, 211:14, 211:18, 211:24, 212:8, 212:10, 217:19, 223:1, 227:8, 227:13, 227:18, 227:21, 228:3, 229:18, 230:9, 230:25, 231:7, 231:15, 231:23, 232:10, 232:14, 232:20, 232:23, 233:19, 234:2, 235:10, 235:25, 237:1, 237:17, 239:7, 241:11, 250:4, 250:25, 262:24, 263:11, 263:16, 263:24, 271:7
**GOLDSTEIN'S** [3] - 217:20, 229:9, 241:7
**GOVERNMENT** [2] - 216:2, 235:1
**GOVERNS** [1] - 277:3
**GRADUATED** [1] - 276:7
**GRANTED** [6] - 235:23, 236:23, 239:18, 239:24, 241:8, 287:6
**GRANTING** [2] - 226:11,

282:6
**GRANTS** [1] - 245:1
**GREATER** [2] - 240:3, 240:7
**GREATLY** [1] - 200:22
**GROSS** [3] - 211:12, 212:2, 242:23
**GROSSMAN** [2] - 202:18, 232:10
**GROUP** [1] - 289:7
**GUESS** [1] - 263:12
**GUIDELINES** [4] - 200:8, 207:22, 212:1, 241:14

## H

**HALL** [2] - 213:6, 243:6
**HAND** [4] - 209:9, 243:11, 273:13, 275:15
**HANDWRITING** [1] - 202:15
**HANSEN** [1] - 203:10
**HAPPY** [1] - 195:22
**HARBOR** [14] - 208:20, 215:21, 227:9, 234:15, 238:16, 239:3, 242:10, 253:13, 256:9, 256:10, 258:7, 259:16, 263:18, 266:16
**HARBOR'S** [1] - 227:15
**HARD** [1] - 284:12
**HARDSHIP** [1] - 227:23
**HARMED** [1] - 288:11
**HAYWARD** [1] - 261:11
**HEARD** [1] - 238:17
**HEARING** [14] - 203:18, 217:11, 217:12, 217:13, 217:14, 221:17, 221:24, 223:6, 226:4, 241:11, 270:20, 270:22, 270:24
**HEARINGS** [1] - 242:7
**HEARSAY** [1] - 206:11
**HELD** [1] - 217:14
**HELP** [4] - 213:12, 243:14, 275:18, 278:9
**HELPS** [2] - 250:13, 250:18
**HEMMING** [1] - 277:11
**HIGH** [4] - 214:19, 215:2, 256:1, 286:23
**HIGHER** [9] - 238:3, 250:4, 250:24, 251:2, 259:25, 261:7, 261:10, 290:10
**HIGHEST** [2] - 244:25, 276:8
**HIGHLIGHT** [7] - 219:2, 222:9, 225:15, 252:12, 254:9, 256:24, 284:21
**HIGHLIGHTED** [2] - 224:11, 226:16
**HISTORICAL** [1] - 209:4
**HISTORICALLY** [2] - 209:14, 256:17
**HISTORY** [2] - 215:1, 286:19

**HOLD** [3] - 195:18, 269:1, 270:5
**HOME** [1] - 263:20
**HOME** [45] - 196:17, 197:21, 198:2, 198:10, 203:15, 204:21, 205:16, 207:9, 214:10, 214:11, 214:12, 214:13, 214:15, 215:19, 218:17, 225:11, 239:8, 239:13, 245:19, 245:20, 245:24, 246:1, 246:17, 246:23, 247:1, 249:9, 251:7, 251:15, 256:13, 257:8, 260:11, 260:14, 261:19, 263:15, 263:23, 264:5, 264:8, 264:19, 265:10, 265:16, 265:22, 271:6, 271:9, 280:6
**HOMES** [3] - 199:1, 251:15, 252:25
**HONEST** [2] - 280:14, 280:24
**HONOR** [33] - 194:8, 194:21, 195:11, 199:23, 202:10, 210:25, 212:20, 213:4, 213:8, 218:19, 220:15, 221:10, 222:4, 224:8, 225:12, 226:13, 228:9, 228:13, 228:16, 229:1, 237:10, 243:3, 243:6, 243:9, 246:19, 247:22, 248:14, 270:25, 273:22, 275:11, 279:10, 281:9, 281:12
**HONORS** [1] - 276:8
**HOUSING** [1] - 205:17
**HUNDREDS** [1] - 205:17
**HYPOTHETICAL** [2] - 259:14, 260:4

## I

**IDEA** [1] - 232:15
**IGNORED** [1] - 209:1
**IMMEDIATELY** [1] - 234:10
**IMPACT** [2] - 253:23, 280:16
**IMPARTIAL** [1] - 280:24
**IMPLIED** [1] - 208:4
**IMPLY** [1] - 207:1
**IMPOSE** [1] - 239:11
**IMPROVE** [1] - 200:19
**IMPROVING** [1] - 201:2
**INC** [1] - 244:21
**INCLUDE** [13] - 218:5, 218:8, 219:7, 219:13, 219:14, 220:22, 224:16, 227:14, 241:2, 273:3, 278:15, 282:3, 289:10
**INCLUDED** [3] - 210:20, 270:17, 287:8
**INCLUDING** [3] - 204:23,

209:18, 211:11
**INCOME** [48] - 198:4, 203:9, 216:9, 216:18, 218:1, 218:2, 222:12, 223:24, 226:18, 229:13, 229:14, 229:18, 230:7, 230:11, 231:3, 231:9, 240:3, 240:7, 240:18, 240:22, 241:9, 244:18, 249:3, 249:12, 255:11, 255:13, 255:16, 255:17, 255:20, 256:20, 257:17, 258:12, 258:16, 258:20, 258:23, 259:9, 259:11, 261:13, 266:21, 267:9, 267:17, 268:22, 269:11, 269:21, 272:12, 274:8, 274:13
**INCOME-GENERATING** [1] - 249:3
**INCOME-PRODUCING** [1] - 244:18
**INCOMES** [2] - 258:18, 268:2
**INCREASE** [79] - 197:7, 199:8, 199:9, 199:12, 199:16, 199:20, 200:15, 203:9, 207:6, 207:18, 208:22, 208:25, 209:16, 212:7, 212:12, 212:18, 216:6, 216:16, 216:22, 216:25, 217:3, 217:16, 217:18, 218:18, 219:23, 221:21, 222:13, 222:16, 223:9, 223:12, 226:7, 226:12, 226:19, 226:24, 227:7, 227:22, 231:16, 233:5, 233:13, 233:15, 233:25, 234:3, 234:9, 234:17, 234:23, 235:10, 235:13, 235:18, 235:21, 236:4, 236:10, 236:20, 236:23, 241:8, 241:12, 242:2, 242:14, 253:21, 253:22, 263:4, 263:7, 269:23, 270:2, 270:10, 270:11, 270:17, 270:20, 270:24, 272:2, 274:16, 278:16, 282:2, 282:7, 282:13, 287:6, 287:14, 287:17, 287:20
**INCREASED** [9] - 199:12, 199:18, 200:14, 222:22, 228:8, 241:3, 253:20, 259:15, 259:21
**INCREASES** [25] - 197:16, 200:6, 200:7, 204:23, 206:8, 206:10, 207:12, 212:15, 231:13, 232:18, 234:7, 234:16, 238:20, 239:2, 239:19, 239:24, 253:16, 253:18, 274:17,

274:20, 274:22, 275:2, 279:24, 280:1, 280:4

**INCREASING** [1] - 200:13

**INCREMENTAL** [1] - 234:16

**INCURRED** [1] - 221:1

**INCURRENCE** [1] - 233:3

**INDEED** [1] - 212:1

**INDEPENDENT** [1] - 280:5

**INDEX** [3] - 282:1, 282:9, 282:12

**INDEX** [5] - 234:23, 234:24, 235:5, 236:14, 282:8

**INDIAN** [1] - 263:20

**INDICATE** [1] - 258:9

**INDICATED** [4] - 208:4, 250:2, 250:24, 258:8

**INDICATING** [1] - 261:2

**INDICATION** [3] - 250:16, 255:19, 259:22

**INDICATOR** [1] - 261:8

**INDICATORS** [2] - 261:1, 261:17

**INDICES** [1] - 235:1

**INDIVIDUAL** [1] - 196:17

**INDIVIDUALS** [1] - 245:7

**INFERRED** [2] - 250:25, 263:12

**INFLATION** [5] - 235:2, 235:14, 236:18, 236:24, 242:24

**INFORMATION** [25] - 206:8, 217:20, 218:23, 219:21, 223:19, 225:18, 225:23, 249:1, 249:3, 249:7, 249:8, 249:10, 249:11, 249:12, 249:13, 251:4, 251:24, 252:15, 252:18, 252:23, 253:1, 253:6, 255:22, 258:11, 276:9

**INFORMED** [2] - 208:15, 247:10

**INITIAL** [1] - 287:6

**INITIALS** [1] - 203:20

**INSPECT** [1] - 254:15

**INSPECTED** [2] - 254:4, 254:6

**INSPECTION** [1] - 254:1

**INSPECTIONS** [1] - 228:7

**INSTANCES** [1] - 239:18

**INSTEAD** [3] - 234:13, 259:17, 282:7

**INSTITUTE** [1] - 245:2

**INSTITUTE** [1] - 269:8, 280:22

**INSTRUCTED** [1] - 201:24

**INSTRUCTING** [1] - 289:3

**INSTRUCTIVE** [1] - 204:20

**INSURANCE** [1] - 256:1

**INTELLECTUALLY** [2] - 280:13, 280:24

**INTENDED** [1] - 212:6

**INTEREST** [49] - 194:14, 208:22, 208:24, 209:1, 210:20, 219:7, 219:12, 219:16, 219:18, 220:4, 220:22, 220:23, 224:16, 224:21, 224:23, 225:4, 225:22, 226:2, 237:1, 237:16, 237:19, 238:2, 250:18, 253:19, 272:22, 273:10, 278:15, 278:17, 278:18, 279:23, 280:9, 282:3, 286:12, 287:8, 287:14, 287:23, 287:25, 288:1, 288:3, 288:10, 288:14, 288:18, 288:24, 289:2, 289:4, 289:5, 289:13, 289:23, 290:24

**INTERESTING** [1] - 251:17

**INTERNAL** [2] - 246:14, 246:15

**INTERNATIONAL** [1] - 244:14

**INTERPRETED** [1] - 209:3

**INTIMIDATED** [2] - 207:11, 207:16

**INTUITIVELY** [1] - 272:5

**INVESTED** [1] - 290:22

**INVESTIGATE** [2] - 249:19, 266:6

**INVESTIGATION** [1] - 266:10

**INVESTMENT** [6] - 267:10, 268:7, 286:13, 286:16, 288:11, 289:11

**INVESTOR** [3] - 255:17, 268:7, 289:6

**INVESTORS** [2] - 257:14, 258:21

**INVOICES** [2] - 216:9, 216:11

**INVOLVED** [9] - 217:4, 230:3, 230:14, 232:9, 232:12, 238:1, 250:2, 276:20, 278:3

**INVOLVEMENT** [3] - 232:16, 233:3, 233:6

**INVOLVES** [1] - 196:20

**ISSUE** [2] - 211:10, 214:15

**ISSUED** [2] - 209:12, 280:22, 290:7

**ISSUES** [3] - 200:24, 201:19, 232:17

**ITSELF** [2] - 204:12, 207:16

**J**

**JAMES** [1] - 195:12

**JAMES** [11] - 214:7, 214:8, 214:9, 214:11, 214:14, 215:10, 215:16, 215:19,

215:23, 227:4, 234:1

**JANUARY** [5] - 209:7, 283:24, 287:3, 287:10, 287:18

**JOBS** [1] - 215:3

**JUDGE** [1] - 210:23

**JUDGMENT** [3] - 210:9, 261:7, 271:23

**JURY** [26] - 194:4, 195:2, 214:3, 214:18, 218:20, 226:10, 241:25, 242:16, 242:21, 248:7, 255:12, 258:13, 259:6, 260:8, 260:21, 262:5, 262:9, 271:9, 276:3, 277:7, 279:19, 281:3, 283:16, 285:5, 288:1, 291:10

**K**

**KEEP** [1] - 196:14

**KENNETH** [1] - 280:2

**KIND** [7] - 196:20, 250:10, 250:16, 250:25, 251:14, 272:1, 284:6

**KINDS** [1] - 249:1

**KNOWING** [5] - 231:1, 234:5, 250:13, 272:3

**KNOWLEDGE** [12] - 232:8, 232:12, 232:16, 234:8, 234:20, 234:21, 238:19, 239:1, 239:2, 239:6, 239:11, 239:15

**KNOWN** [1] - 286:10

**L**

**LACK** [2] - 252:14, 252:18

**LADIES** [1] - 291:4

**LAKES** [2] - 215:6, 215:13

**LAND** [8] - 198:12, 249:8, 251:5, 251:10, 251:20, 251:25, 252:7

**LANGUAGE** [3] - 208:15, 209:3, 254:9

**LARGE** [5] - 212:12, 227:22, 249:25, 256:12, 256:13

**LAST** [14] - 204:16, 205:5, 210:8, 213:18, 213:20, 239:6, 243:18, 264:16, 271:15, 272:21, 275:21, 277:10, 284:3, 284:7

**LAW** [4] - 198:4, 277:5, 289:9, 289:12

**LAWFULLY** [1] - 242:4

**LAWYER** [1] - 204:24

**LAWYERS** [2] - 234:2, 288:25

**LEADERSHIP** [1] - 276:23

**LEADING** [1] - 204:7

**LEARN** [2] - 249:22, 253:15

**LEAST** [6] - 216:7, 217:15, 223:4, 234:5, 238:6, 263:18

**LEAVING** [1] - 225:21

**LEFT** [2] - 209:9, 290:2

**LEFT-HAND** [1] - 209:9

**LEGAL** [2] - 288:25, 289:20

**LENDER** [3] - 268:9, 268:10

**LENGTHS** [5] - 201:8, 204:22, 206:7, 206:9, 207:11

**LENIENT** [1] - 271:25

**LESS** [4] - 261:16, 279:2, 285:23

**LETTER** [13] - 201:7, 201:18, 201:25, 202:5, 202:13, 202:17, 203:9, 203:12, 204:1, 204:4, 204:12, 205:13, 206:6

**LEVEL** [5] - 200:22, 200:25, 228:7, 238:2, 256:3

**LEVELS** [1] - 249:14

**LICENSE** [1] - 244:25

**LICENSED** [1] - 245:11

**LICENSES** [1] - 244:23

**LIFE** [1] - 225:1

**LIGHT** [2] - 234:9, 271:19

**LIKELY** [1] - 236:2

**LIMIT** [1] - 264:18

**LIMITATION** [1] - 239:12

**LINE** [2] - 284:8, 290:2

**LIST** [2] - 267:4, 267:6

**LISTED** [1] - 249:24

**LISTING** [1] - 249:23

**LITIGATION** [2] - 272:19, 277:22

**LIVE** [4] - 195:24, 214:4, 214:5, 252:7

**LIVING** [1] - 234:25

**LOAN** [22] - 203:9, 219:10, 219:12, 219:18, 224:17, 224:24, 225:1, 225:2, 225:4, 225:5, 225:7, 230:1, 230:3, 230:4, 230:14, 230:15, 237:2, 237:16, 237:17, 237:18, 237:23

**LOANS** [1] - 237:19

**LOBBY** [1] - 194:22

**LOCATED** [3] - 215:21, 261:11, 271:24

**LONGSTANDING** [1] - 241:4

**LOOK** [14] - 202:23, 203:18, 204:12, 209:2, 211:5, 218:12, 247:16, 255:14, 255:20, 265:19, 265:22, 265:25, 279:19, 281:25

**LOOKED** [1] - 209:6, 249:7, 249:8, 249:14, 249:15, 258:5, 261:1, 261:9,

266:22, 274:5, 274:12
**LOOKING** [6] - 225:21, 248:10, 264:18, 264:22, 267:4, 274:3
**LOOKS** [2] - 260:10, 260:11
**LOS** [1] - 194:1
**LOS** [4] - 235:5, 271:24, 272:1, 277:15
**LOSE** [1] - 194:12
**LOSING** [1] - 228:5
**LOSS** [5] - 200:7, 217:24, 217:25, 219:6, 223:23
**LOSSES** [2] - 232:25, 233:4
**LOST** [29] - 222:19, 224:15, 227:2, 232:5, 259:23, 278:14, 278:18, 281:14, 281:21, 281:23, 282:15, 282:17, 282:19, 283:4, 283:6, 283:9, 283:17, 283:20, 284:9, 284:16, 284:21, 284:22, 284:25, 285:3, 285:25, 286:1, 286:8, 288:5
**LOTTERY** [1] - 285:10
**LOW** [4] - 198:4, 258:10, 261:3, 269:18
**LOWER** [10] - 251:1, 251:2, 256:2, 262:3, 262:4, 272:6, 272:8, 285:22
**LOWEST** [1] - 290:9
**LUMP** [1] - 285:13
**LUNCH** [3] - 291:2, 291:5, 291:12

## M

**MAGNIFIED** [1] - 200:22
**MAGNITUDE** [1] - 200:6
**MAI** [4] - 245:1, 245:3, 245:6, 245:13
**MAINTAIN** [1] - 273:5
**MAINTAINED** [1] - 200:25
**MAINTAINING** [2] - 267:12, 273:6
**MAINTENANCE** [7] - 200:23, 200:24, 211:12, 212:2, 228:4, 242:17, 242:23
**MANAGE** [6] - 214:10, 214:11, 214:12, 214:14, 215:19, 215:21
**MANAGEMENT** [3] - 196:6, 214:9, 244:9
**MANAGER** [2] - 215:7, 215:24
**MANAGING** [4] - 244:15, 244:16, 271:16, 277:9, 277:14, 277:15
**MARCH** [9] - 223:4, 248:4, 248:6, 248:11, 251:23, 255:6, 256:21, 262:14,

275:7
**MARCUS** [1] - 249:25
**MARK** [1] - 203:10
**MARKED** [4] - 218:11, 218:13, 221:6, 241:17
**MARKET** [28] - 205:17, 246:10, 247:8, 247:11, 248:3, 253:25, 255:5, 255:15, 255:23, 256:2, 256:3, 256:4, 256:20, 257:9, 258:9, 258:11, 258:16, 258:21, 260:18, 261:23, 262:10, 262:12, 266:6, 266:11, 286:17, 286:22, 286:25
**MARKET'S** [2] - 250:17, 265:11
**MARKETABILITY** [1] - 250:14
**MARKETABLE** [1] - 252:5
**MARKETING** [1] - 250:2
**MARKETPLACE** [1] - 258:17
**MARRIOTT** [2] - 244:9, 244:10
**MASSACHUSETTS** [1] - 276:6
**MASSIVE** [2] - 231:16, 234:17
**MASTER'S** [1] - 214:22
**MATT** [2] - 202:18, 202:25
**MATTERS** [1] - 278:2
**MATTHEW** [1] - 194:21
**MBA** [2] - 215:11, 215:14
**MEAN** [14] - 198:6, 207:1, 217:25, 222:12, 223:24, 226:19, 248:7, 252:18, 256:16, 256:17, 258:14, 265:4, 271:22, 272:11
**MEANING** [2] - 211:10, 251:20
**MEANS** [4] - 208:10, 210:18, 210:19, 248:9
**MEANT** [3] - 207:2, 208:5, 208:15
**MEASURE** [1] - 235:2
**MEASUREMENT** [1] - 286:6
**MEETINGS** [1] - 238:15
**MEMBER** [1] - 276:22
**MENTION** [1] - 227:18
**MENTIONED** [12] - 229:21, 240:2, 245:14, 249:11, 250:4, 251:19, 253:6, 258:13, 262:9, 277:6, 287:2, 289:18
**MERELY** [1] - 269:9
**METHOD** [16] - 255:7, 255:9, 255:10, 256:22, 259:12, 259:19, 260:4, 260:5, 269:3, 269:20, 273:18, 274:14, 274:15, 274:25,

275:1
**METHODOLOGIES** [3] - 252:17, 268:3, 268:4
**METHODOLOGY** [10] - 209:15, 210:10, 210:12, 210:20, 211:13, 211:23, 267:24, 268:5, 274:7, 286:5
**METHODS** [2] - 255:7, 255:8
**MIDDLE** [1] - 284:6
**MIGHT** [9] - 247:17, 251:1, 252:5, 252:6, 253:2, 255:25, 273:3, 285:14
**MILLICHAP** [1] - 249:25
**MILLION** [23] - 217:24, 217:25, 218:1, 222:19, 230:1, 230:7, 230:8, 230:19, 230:20, 232:5, 232:24, 233:10, 237:18, 248:16, 255:6, 260:4, 262:12, 284:22, 285:10, 285:11, 285:12, 285:14, 285:15
**MIND** [1] - 206:17
**MINIMIZE** [5] - 201:9, 204:22, 206:7, 206:9, 207:11
**MINIMUM** [1] - 237:23
**MINUTE** [1] - 195:18
**MINUTES** [4] - 194:6, 212:10, 259:1, 259:4
**MISSTATES** [5] - 201:10, 238:8, 270:4, 270:12, 274:18
**MNOI** [1] - 210:12
**MOBILE** [4] - 203:1, 213:5, 214:14, 263:20
**MOBILE** [48] - 196:17, 197:21, 198:2, 198:10, 199:1, 203:15, 204:21, 205:16, 207:9, 214:10, 214:11, 214:12, 214:13, 214:15, 215:19, 218:17, 225:11, 239:8, 239:13, 245:19, 245:20, 245:24, 246:1, 246:17, 246:23, 247:1, 249:9, 251:7, 251:15, 252:25, 256:13, 257:8, 260:11, 260:14, 261:19, 263:15, 263:23, 264:5, 264:8, 264:19, 265:10, 265:16, 265:22, 271:6, 271:9, 280:6
**MOMENT** [1] - 257:19
**MONEY** [9] - 200:19, 228:5, 285:8, 285:9, 285:16, 288:7, 288:10, 288:12, 290:21
**MONTH** [22] - 233:16, 233:25, 245:25, 258:8,

259:17, 259:18, 268:24, 269:24, 270:3, 270:9, 270:11, 274:16, 282:15, 282:18, 283:5, 283:22, 284:2, 284:3, 284:16, 285:19, 285:21
**MONTHLY** [4] - 282:13, 283:4, 285:25, 286:8
**MONTHS** [11] - 216:23, 217:2, 217:6, 217:13, 223:17, 232:20, 232:24, 253:14, 266:17, 282:19, 284:6
**MOREOVER** [1] - 210:8
**MORNING** [14] - 195:17, 195:18, 195:20, 200:3, 200:4, 213:4, 213:16, 214:3, 228:21, 244:3, 258:25, 262:21, 262:22, 276:3
**MORSE** [1] - 277:11
**MORTGAGE** [17] - 208:6, 219:7, 219:16, 224:16, 224:21, 224:23, 227:14, 229:23, 230:8, 230:10, 230:18, 231:2, 231:8, 231:16, 253:19, 272:22, 273:10
**MOST** [7] - 242:10, 251:10, 256:5, 256:11, 257:14, 273:11, 290:7
**MOSTLY** [1] - 257:22
**MOTION** [2] - 268:13, 268:18
**MOVE** [11] - 207:21, 210:1, 219:24, 228:9, 246:20, 254:17, 268:12, 268:16, 273:19, 286:23, 286:24
**MR** [101] - 194:8, 194:14, 194:21, 196:8, 200:2, 200:16, 201:15, 202:10, 202:12, 202:21, 204:11, 205:25, 206:5, 206:14, 206:21, 207:19, 210:25, 212:22, 213:1, 213:4, 213:8, 213:16, 214:2, 218:19, 218:22, 219:1, 219:3, 219:24, 220:2, 220:5, 220:7, 220:15, 220:17, 221:10, 221:12, 221:13, 221:14, 221:16, 222:4, 222:6, 223:13, 223:15, 224:8, 224:10, 224:12, 225:12, 225:14, 225:16, 226:13, 226:15, 226:17, 228:9, 228:13, 228:16, 228:20, 229:3, 231:18, 231:22, 236:6, 236:9, 237:12, 238:8, 238:11, 240:11, 240:15, 242:25, 243:3, 243:6,

243:9, 244:2, 246:19, 246:25, 247:22, 248:1, 248:14, 252:9, 256:23, 257:2, 259:8, 260:20, 262:17, 270:4, 270:12, 271:3, 273:8, 273:22, 274:18, 275:11, 276:2, 279:10, 279:14, 281:9, 281:12, 281:17, 283:11, 283:14, 284:14, 284:24, 288:17, 288:20, 291:3
**MS** [28] - 195:11, 195:16, 196:12, 199:23, 200:9, 201:10, 204:7, 205:22, 206:3, 206:11, 206:19, 207:13, 211:3, 212:20, 262:20, 267:1, 267:3, 268:12, 268:16, 268:21, 270:7, 270:15, 270:25, 272:24, 273:19, 274:2, 274:21, 275:8
**MULTIPLE** [3] - 250:15, 255:7, 255:8
**MULTIPLIED** [3] - 260:16, 282:16, 282:18
**MULTIPLY** [1] - 285:24
**MUST** [3] - 242:1, 242:13, 242:21

**N**

**NAME** [8] - 213:18, 213:19, 213:20, 243:17, 243:18, 275:21
**NAVIGANT** [1] - 277:14
**NEAR** [3] - 229:11, 250:25, 261:12
**NEARLY** [1] - 261:5
**NECESSARILY** [1] - 196:3
**NECESSARY** [3] - 198:15, 273:2, 273:4
**NEED** [4] - 216:6, 216:18, 216:21, 217:15
**NEEDED** [2] - 225:1, 247:12
**NEEDS** [2] - 216:16
**NEGOTIATION** [1] - 204:9
**NEGOTIATIONS** [3] - 202:2, 204:6, 232:10
**NET** [12] - 229:13, 229:14, 230:11, 255:15, 255:17, 257:16, 257:17, 258:15, 258:18, 258:19, 268:2, 269:10
**NEUTRAL** [1] - 278:9
**NEW** [3] - 211:21, 223:9, 242:22
**NEW** [1] - 214:21
**NEWCOMB** [10] - 202:12, 202:22, 204:16, 209:10, 252:9, 252:12, 254:8,

256:23, 260:20, 281:13
**NEWSPAPER** [1] - 265:25
**NEXT** [13] - 203:5, 212:25, 213:2, 213:6, 222:14, 235:16, 243:5, 243:7, 260:5, 268:20, 275:10, 275:14, 288:17
**NIGHT** [2] - 214:23, 215:14
**NINE** [1] - 272:17
**NOELLE** [3] - 194:16, 213:9, 213:19
**NOELLE** [1] - 213:21
**NOI** [3] - 229:11, 229:12, 230:17
**NONRESPONSIVE** [2] - 268:12, 268:16
**NORMAL** [1] - 266:10
**NORMALLY** [1] - 265:13
**NOTE** [1] - 290:19
**NOTED** [3] - 228:7, 252:13, 252:14
**NOTHING** [13] - 199:23, 211:22, 212:20, 213:12, 233:2, 233:3, 240:11, 243:3, 243:14, 267:5, 270:25, 275:8, 275:18
**NOTICE** [2] - 196:6, 223:7
**NOTIFIED** [1] - 217:15
**NUMBER** [10] - 221:11, 233:19, 252:2, 257:6, 260:25, 261:4, 266:25, 281:25, 282:18, 285:22
**NUMBERS** [6] - 261:2, 280:25, 281:2, 281:4, 282:14, 283:5
**NUMEROUS** [1] - 244:17

**O**

**O'CLOCK** [1] - 194:25
**OATH** [2] - 195:4, 195:7
**OBJECT** [1] - 194:17
**OBJECTION** [18] - 196:8, 200:9, 201:10, 204:7, 205:22, 206:3, 206:11, 206:19, 207:13, 219:24, 223:13, 231:18, 236:6, 238:8, 270:4, 270:12, 272:24, 274:18
**OBJECTIVE** [3] - 263:14, 280:11, 280:24
**OBJECTIVITY** [1] - 279:4
**OBTAIN** [2] - 259:25, 274:22
**OCCASIONS** [2] - 246:8, 278:8
**OCCUPATION** [2] - 244:12, 276:11
**OCCURRED** [2] - 232:25, 265:19
**OCEAN** [1] - 272:3

**OFFER** [2] - 250:24, 251:2
**OFFERS** [13] - 238:6, 238:13, 249:19, 250:3, 250:5, 250:7, 250:11, 250:13, 250:15, 250:21, 250:23, 250:25, 251:1
**OFFICE** [5] - 244:15, 271:13, 271:14, 271:16, 277:15
**OFFICIAL** [1] - 222:1
**OFFS** [1] - 218:6
**OFFSET** [1] - 200:15
**OFTEN** [1] - 217:13
**OIL** [5] - 198:20, 198:22, 251:11, 251:12, 252:7
**OLD** [1] - 251:11
**OLDER** [2] - 261:5, 261:24
**ONCE** [6] - 197:22, 217:13, 234:14, 251:11, 258:10, 263:18
**ONE** [45] - 195:18, 196:16, 197:22, 198:22, 210:1, 210:5, 210:6, 212:22, 228:3, 229:22, 231:11, 231:12, 234:10, 235:16, 237:7, 237:18, 237:22, 238:3, 238:6, 239:19, 241:22, 247:16, 249:23, 250:4, 250:24, 251:2, 255:7, 256:17, 262:3, 262:5, 262:10, 264:24, 265:9, 266:21, 269:1, 269:21, 270:23, 271:23, 272:21, 277:19, 284:5, 285:20, 289:18
**ONSTOT** [1] - 241:22
**ONSTOT** [13] - 194:8, 194:14, 219:24, 220:5, 223:13, 228:20, 229:3, 231:22, 236:9, 237:12, 238:11, 240:11, 243:3
**ONSTOT** [4] - 194:8, 240:17, 241:6, 241:17
**OPEN** [2] - 196:14, 197:11
**OPERATE** [3] - 256:2, 273:2, 273:16
**OPERATES** [1] - 256:1
**OPERATING** [31] - 200:14, 200:22, 209:17, 229:13, 229:14, 230:11, 231:9, 242:17, 249:16, 249:17, 253:19, 255:16, 255:17, 255:24, 257:16, 257:17, 258:16, 258:18, 258:19, 266:23, 267:12, 267:14, 267:25, 268:6, 269:11, 272:22, 272:23, 273:1, 273:15, 274:8
**OPERATION** [2] - 251:12, 273:6
**OPERATIONS** [4] - 258:3,

274:9, 274:10, 274:12
**OPINION** [16] - 211:5, 211:6, 211:21, 248:9, 250:10, 250:19, 251:3, 258:24, 261:15, 261:16, 262:12, 262:15, 263:9, 263:10, 267:15, 279:7
**OPINIONS** [9] - 246:10, 259:3, 263:14, 279:17, 279:18, 280:10, 280:13, 280:17, 291:7
**OPPORTUNITY** [2] - 234:20, 287:13
**OPPOSING** [1] - 200:12
**OPTION** [3] - 197:11, 198:9, 208:6
**OPTIONS** [2] - 196:14, 196:16
**ORDER** [10] - 204:23, 205:6, 205:21, 206:2, 211:9, 216:5, 216:15, 216:17, 231:16, 263:4
**ORDINANCE** [21] - 198:1, 198:3, 210:10, 210:12, 211:11, 211:22, 212:4, 212:5, 212:6, 231:11, 234:5, 257:11, 264:20, 265:11, 265:23, 266:1, 266:3, 266:7, 266:11
**ORGANIZATION** [2] - 277:2, 277:3
**OTHERWISE** [1] - 288:12
**OURSELVES** [1] - 267:16
**OUTSIDE** [3] - 194:4, 215:2, 273:19
**OVERALL** [1] - 262:2
**OVERCOME** [1] - 200:7
**OVERLOOKING** [1] - 272:4
**OVERRULED** [14] - 200:11, 201:12, 204:8, 206:13, 206:20, 207:14, 220:1, 220:6, 223:14, 231:19, 236:7, 272:25, 273:21, 274:19
**OVERSEE** [1] - 244:17
**OWED** [1] - 279:22
**OWN** [7] - 197:4, 204:5, 205:16, 209:15, 223:3, 226:21, 263:14
**OWNED** [3] - 216:23, 239:7, 271:6
**OWNER** [10] - 203:8, 207:15, 208:16, 212:14, 216:5, 216:15, 247:10, 249:24, 256:1
**OWNER'S** [1] - 247:7
**OWNERS** [7] - 206:24, 207:2, 207:10, 212:11, 265:16, 265:22
**OWNERSHIP** [8] - 209:19,

217:21, 223:18, 223:20, 224:14, 224:22, 227:19, 273:5
**OWNING** [1] - 207:8
**OWNS** [2] - 227:8, 263:24

# P

**PACIFIC** [1] - 271:24
**PAGE** [37] - 202:9, 202:13, 203:3, 203:5, 204:14, 207:22, 209:8, 210:1, 211:6, 211:16, 211:20, 219:1, 219:15, 220:13, 220:18, 222:7, 222:14, 224:19, 224:20, 225:14, 226:15, 233:12, 234:22, 236:13, 237:9, 240:18, 240:22, 241:20, 242:20, 252:9, 254:8, 256:24, 260:21, 266:25, 267:1
**PAID** [14] - 216:8, 216:12, 218:1, 218:3, 221:1, 225:2, 250:25, 254:17, 254:22, 262:24, 263:11, 286:12, 286:19, 287:1
**PALISADES** [1] - 271:24
**PALM** [5] - 197:8, 198:1, 215:7, 263:21, 264:3
**PARAGRAPH** [9] - 202:22, 204:14, 207:23, 210:4, 210:7, 222:14, 237:18, 237:22, 252:13
**PARAGRAPHS** [1] - 203:3
**PARCEL** [1] - 251:4
**PARDON** [2] - 230:23, 238:23
**PARK** [93] - 195:25, 196:7, 196:17, 197:7, 197:8, 197:16, 197:21, 197:23, 198:2, 199:12, 199:18, 199:20, 200:14, 200:19, 200:20, 200:23, 201:2, 203:8, 203:15, 204:21, 206:24, 207:2, 207:10, 207:16, 208:15, 208:20, 209:19, 212:11, 212:12, 212:15, 214:13, 214:15, 216:15, 216:23, 218:8, 218:9, 222:12, 222:19, 222:24, 223:2, 223:9, 226:19, 227:2, 227:8, 227:18, 227:19, 228:4, 229:9, 231:12, 232:21, 232:23, 239:3, 239:9, 239:12, 239:13, 240:3, 240:7, 241:7, 241:9, 241:11, 245:24, 246:17, 246:23, 247:1, 247:4, 247:6, 247:10, 248:6,

248:8, 251:21, 253:10, 253:13, 254:4, 254:6, 256:13, 260:6, 261:6, 263:11, 263:23, 265:10, 265:16, 265:22, 267:15, 269:15, 270:18, 274:3, 280:6, 282:17, 286:18, 286:19, 286:21
**PARK** [3] - 263:20, 263:23, 264:3
**PARK'S** [7] - 209:17, 217:19, 219:4, 223:19, 224:13, 248:3, 255:5
**PARKS** [35] - 197:4, 205:16, 206:25, 207:2, 207:9, 214:10, 214:11, 214:12, 215:19, 238:20, 242:3, 242:4, 242:5, 242:6, 242:8, 245:19, 245:20, 246:1, 249:9, 249:11, 249:12, 249:13, 253:12, 255:20, 260:11, 260:15, 261:18, 261:20, 263:15, 264:5, 264:8, 264:19, 264:22, 271:6, 271:9
**PART** [13] - 194:17, 202:1, 203:23, 204:6, 204:9, 205:3, 205:5, 211:6, 211:20, 215:3, 233:23, 234:6, 270:17
**PART-TIME** [1] - 215:3
**PARTICIPATED** [1] - 272:19
**PARTICULAR** [11] - 204:18, 204:20, 211:23, 212:7, 233:23, 245:4, 250:20, 255:25, 256:5, 266:5, 266:8
**PARTICULARLY** [1] - 200:23
**PARTIES** [1] - 263:13
**PARTNER** [3] - 277:9, 277:15, 277:19
**PARTNERS** [1] - 203:19
**PARTNERSHIP** [1] - 273:4
**PARTS** [1] - 211:5
**PARTY** [1] - 288:11
**PAST** [6] - 227:22, 248:18, 256:19, 261:22, 276:18, 276:25
**PAY** [5] - 222:17, 226:24, 268:8, 273:9, 286:24
**PAYING** [3] - 219:13, 237:2, 272:21
**PAYMENT** [7] - 215:25, 221:4, 224:16, 229:23, 230:8, 231:9, 285:13
**PAYMENTS** [12] - 219:8, 219:14, 219:16, 219:18, 224:21, 224:23, 227:15, 230:11, 230:18, 231:2, 231:17, 286:6

**PCH** [1] - 272:4
**PENDING** [1] - 268:17
**PEOPLE** [2] - 252:6, 286:24
**PER** [29] - 233:15, 233:16, 257:8, 259:18, 260:12, 260:13, 260:16, 260:18, 260:19, 261:13, 262:1, 268:23, 269:23, 270:2, 270:3, 270:11, 272:12, 274:16, 282:15, 282:18, 282:19, 283:5, 283:6, 284:16
**PERCEIVE** [1] - 258:9
**PERCENT** [27] - 196:4, 207:17, 234:9, 235:5, 235:11, 235:21, 236:15, 236:20, 237:19, 237:24, 238:7, 245:25, 269:2, 278:5, 282:1, 282:7, 282:8, 282:11, 285:14, 286:11, 287:25, 288:14, 289:13, 289:16, 290:14, 290:19, 290:25
**PERCENTAGE** [3] - 236:21, 265:5, 278:2
**PERCEPTION** [4] - 250:17, 265:11, 266:6, 266:11
**PERHAPS** [1] - 234:14
**PERIOD** [12] - 241:10, 283:25, 284:23, 285:1, 285:20, 287:2, 287:4, 287:5, 287:10, 287:18, 289:16, 290:20
**PERMISSION** [9] - 196:24, 202:10, 229:1, 247:23, 279:11, 281:9, 281:13, 283:11, 283:12
**PERMIT** [2] - 252:15, 252:19
**PERMITS** [3] - 198:15, 199:4, 253:2
**PERSON** [3] - 288:4, 288:6, 290:21
**PERSONALLY** [3] - 254:3, 254:15, 283:18
**PERSUADE** [2] - 270:1, 270:8
**PERTINENT** [1] - 253:8
**PETER** [2] - 275:12, 275:22
**PETER** [1] - 275:23
**PGP** [1] - 244:21
**PHYSICAL** [2] - 257:22, 257:23
**PHYSICALLY** [2] - 239:8, 261:5
**PICKED** [1] - 284:1
**PIECE** [1] - 252:7
**PITFALLS** [1] - 203:14
**PLACE** [6] - 253:24, 257:7, 257:12, 259:25, 286:24, 287:8

**PLAINTIFF** [7] - 194:6, 194:24, 195:13, 213:22, 243:9, 243:22, 275:24
**PLAINTIFF'S** [8] - 194:5, 194:15, 212:25, 218:11, 229:22, 243:5, 247:16, 275:10
**PLAINTIFFS** [1] - 275:11
**PLEADINGS** [1] - 280:6
**PLUS** [1] - 236:3
**POINT** [7] - 205:9, 230:20, 233:7, 256:17, 272:21, 290:16, 290:18
**PORTION** [8] - 201:22, 202:13, 203:25, 204:25, 224:10, 225:24, 228:2, 239:8
**PORTNOI** [1] - 248:12
**PORTNOI** [20] - 243:6, 243:9, 244:2, 246:19, 246:25, 247:22, 248:1, 248:14, 252:9, 256:23, 257:2, 259:8, 260:20, 262:17, 270:4, 270:12, 271:3, 273:8, 273:22, 274:18
**POSITION** [1] - 203:14
**POSSESSION** [1] - 239:8
**POSSIBILITY** [1] - 234:13
**POSSIBLE** [5] - 197:18, 287:13, 287:17, 287:20, 290:11
**POST** [1] - 214:19
**POSTPONED** [1] - 217:13
**POTENTIAL** [9] - 203:14, 204:21, 251:5, 252:2, 252:16, 255:23, 269:18, 269:23, 274:24
**POTENTIALLY** [1] - 207:10
**PRACTICES** [2] - 203:17, 209:4
**PRECEDENT** [1] - 289:1
**PREDOMINANTLY** [1] - 245:19
**PREFER** [2] - 195:24, 196:3
**PREJUDGMENT** [18] - 278:17, 278:18, 279:22, 280:9, 287:23, 287:24, 288:1, 288:3, 288:10, 288:14, 288:18, 288:24, 289:1, 289:4, 289:5, 289:13, 289:23, 290:24
**PREPARATION** [3] - 215:25, 254:22, 254:25
**PREPARE** [16] - 201:25, 216:3, 218:23, 224:6, 229:6, 233:23, 236:10, 247:14, 279:6, 279:15, 279:21, 281:6, 281:8, 281:18, 283:7, 288:13
**PREPARED** [9] - 204:1,

204:5, 217:4, 220:13, 232:4, 233:22, 283:16, 283:18, 288:21
**PREPARING** [2] - 227:7, 289:4
**PRESENCE** [3] - 194:4, 195:2, 259:6
**PRESENT** [9] - 285:2, 285:7, 285:15, 285:19, 285:21, 285:24, 285:25, 288:5, 288:8
**PRESENTED** [1] - 212:5
**PRETTY** [2] - 198:7, 259:16
**PREVIOUS** [4] - 198:20, 212:14, 284:9, 284:10
**PREVIOUSLY** [9] - 195:13, 218:13, 221:6, 228:11, 239:16, 241:17, 281:10, 284:19, 287:2
**PRICE** [16] - 202:1, 203:18, 204:6, 204:10, 234:23, 234:24, 235:5, 236:14, 260:16, 260:18, 261:1, 262:24, 263:2, 269:11, 272:8, 282:8
**PRICE** [3] - 282:1, 282:9, 282:11
**PRICES** [5] - 258:17, 258:18, 260:10, 260:14, 264:22
**PRICEWATERHOUSECOO PERS'** [1] - 277:22
**PRIMARY** [6] - 255:10, 256:22, 269:3, 269:20, 274:11, 274:14
**PRINCIPAL** [3] - 219:13, 219:14, 289:8
**PROBLEMS** [1] - 198:19
**PROCEED** [1] - 199:4
**PROCESS** [17] - 196:20, 196:23, 197:1, 197:5, 197:8, 197:19, 199:3, 199:5, 204:9, 207:4, 207:16, 207:17, 209:15, 253:17, 253:18, 259:24
**PROCESSES** [1] - 287:16
**PRODUCING** [1] - 244:18
**PRODUCTION** [1] - 244:17
**PROFESSIONAL** [8] - 244:5, 244:23, 271:22, 276:16, 276:20, 280:20, 280:21, 290:6
**PROFIT** [2] - 216:15, 216:17
**PROFITS** [3] - 211:12, 212:2, 242:23
**PROJECT** [2] - 274:17, 275:3
**PROJECTED** [5] - 229:8, 229:14, 230:7, 230:17, 231:2
**PROJECTION** [3] - 229:17, 274:4, 274:9

**PROPER** [1] - 210:12
**PROPERTIES** [3] - 202:18, 232:10, 275:6
**PROPERTIES** [12] - 249:6, 249:15, 249:18, 257:9, 257:20, 257:25, 258:4, 258:6, 260:11, 261:3, 268:1
**PROPERTY** [63] - 198:12, 198:21, 214:9, 216:5, 238:6, 244:18, 247:7, 248:17, 249:4, 249:5, 249:7, 249:15, 249:16, 249:24, 250:5, 250:14, 250:15, 250:17, 250:18, 251:8, 251:9, 251:18, 253:9, 253:25, 254:15, 255:13, 255:15, 255:16, 255:24, 255:25, 256:5, 256:8, 259:15, 259:24, 260:12, 261:3, 261:4, 261:5, 261:11, 261:21, 263:1, 263:2, 265:16, 266:23, 267:13, 268:7, 268:9, 268:11, 268:14, 269:11, 269:18, 272:3, 273:3, 273:5, 273:7, 273:13, 273:15, 273:17, 273:18, 274:8
**PROPERTY'S** [4] - 251:6, 255:23, 258:2, 269:10
**PROPOSAL** [1] - 202:25
**PROPOSED** [2] - 232:13, 234:3
**PROPRIETY** [1] - 211:8
**PROTECT** [2] - 231:12, 234:6
**PROVE** [1] - 216:11
**PROVEN** [1] - 197:18
**PROVERBIAL** [1] - 211:8
**PROVIDE** [2] - 205:17, 246:10
**PROVIDED** [2] - 277:23, 278:2
**PROVING** [1] - 221:4
**PROVO** [1] - 244:8
**PRUDENT** [1] - 289:6
**PUBLIC** [7] - 276:12, 276:24, 277:1, 277:14, 277:17, 280:16, 280:22
**PUBLICATIONS** [1] - 246:15
**PUBLISH** [15] - 202:10, 218:19, 220:15, 221:10, 222:4, 224:8, 225:12, 226:13, 229:1, 237:10, 247:23, 279:11, 281:13, 283:12, 288:17
**PULLED** [2] - 258:21, 263:1
**PURCHASE** [11] - 202:25, 203:11, 203:15, 209:5,

229:9, 229:18, 230:2, 230:4, 231:8, 232:8, 241:7
**PURCHASED** [12] - 209:24, 210:21, 217:19, 222:24, 223:1, 227:18, 230:9, 232:21, 232:23, 241:11, 250:5, 275:6
**PURCHASING** [4] - 200:19, 227:13, 231:1, 249:24
**PURPOSE** [5] - 202:5, 204:1, 216:14, 285:6, 288:1
**PURPOSES** [3] - 212:6, 231:12, 266:11
**PURSUANT** [2] - 241:3, 246:19
**PURSUE** [1] - 273:12
**PUT** [7] - 200:19, 211:6, 252:9, 254:8, 256:23, 260:20, 281:14

## Q

**QUALIFICATIONS** [1] - 276:10
**QUALIFIED** [2] - 203:13, 246:21
**QUALITATIVE** [1] - 265:6
**QUALITATIVELY** [4] - 252:17, 253:5, 265:7, 272:7
**QUALITY** [3] - 200:20, 200:25, 201:2
**QUANTITATIVE** [2] - 253:4, 265:8
**QUESTIONING** [2] - 201:11, 201:17
**QUESTIONS** [17] - 200:5, 201:7, 201:17, 202:4, 202:7, 208:3, 208:5, 210:25, 227:17, 228:17, 229:22, 240:16, 243:1, 244:4, 262:17, 271:4, 273:22
**QUICKLY** [1] - 212:22

## R

**RAISE** [2] - 243:11, 275:14
**RAISED** [1] - 259:20
**RANGE** [1] - 250:15
**RATE** [53] - 237:1, 237:19, 238:2, 238:7, 255:18, 258:14, 258:16, 258:19, 259:21, 268:1, 269:2, 269:4, 269:9, 269:12, 269:13, 269:14, 269:18, 278:17, 279:23, 285:2, 285:7, 286:8, 286:10, 286:11, 286:12, 286:15, 286:21, 287:24, 287:25,

288:14, 288:18, 288:24, 289:4, 289:5, 289:8, 289:9, 289:13, 289:24, 290:3, 290:5, 290:6, 290:8, 290:9, 290:11, 290:12, 290:13, 290:18, 290:19, 290:24, 290:25
**RATED** [1] - 290:23
**RATES** [4] - 208:24, 237:16, 258:22, 286:2
**RATHER** [3] - 204:5, 253:25, 261:24
**RATING** [1] - 290:6
**RATIO** [2] - 258:19, 269:10
**RE** [1] - 225:20
**RE-ASK** [1] - 225:20
**REABANDON** [1] - 198:22
**REACHED** [1] - 263:8
**READ** [15] - 202:17, 202:23, 203:4, 204:6, 204:24, 204:25, 205:3, 205:5, 206:16, 209:11, 209:20, 210:14, 242:20, 266:3, 266:7
**READING** [2] - 226:21, 242:8
**READY** [1] - 252:24
**REAL** [14] - 215:8, 227:23, 244:13, 244:19, 244:24, 245:9, 245:10, 245:18, 246:11, 246:13, 246:22, 250:1, 253:20, 267:25
**REAL** [2] - 197:2, 197:20
**REALLY** [9] - 197:17, 200:21, 206:17, 251:16, 252:8, 253:3, 256:1, 263:12, 286:25
**REASON** [1] - 267:8
**REASONABLE** [6] - 209:17, 242:17, 250:19, 258:4, 289:6, 289:8
**REASONS** [1] - 279:18
**RECATEGORIZED** [1] - 220:10
**RECEIVE** [3] - 216:6, 216:15, 285:9
**RECEIVED** [9] - 200:6, 214:20, 214:22, 215:14, 216:10, 228:15, 278:25, 279:2, 279:3
**RECENT** [2] - 248:18, 277:8
**RECENTLY** [1] - 266:15
**RECESS** [3] - 195:1, 259:5, 291:12
**RECOGNIZE** [7] - 218:16, 220:12, 221:7, 221:23, 224:3, 225:9, 226:10
**RECOMMENDED** [1] - 282:6
**RECONCILIATIONS** [1] - 216:1
**RECORD** [5] - 202:24, 203:4,

213:17, 216:7, 243:17
**RECORDED** [1] - 263:2
**RECORDS** [1] - 263:2
**RECROSS** [3] - 211:1, 243:2, 273:23
**RECROSS** [2] - 211:2, 274:1
**RECROSS-EXAMINATION** [2] - 211:2, 274:1
**REDEVELOPING** [1] - 273:18
**REDIRECT** [3] - 199:24, 240:13, 271:1
**REDIRECT** [2] - 200:1, 240:14, 271:2
**REDUCE** [2] - 228:4, 239:16
**REDUCED** [1] - 282:11
**REFER** [3] - 221:6, 251:20, 281:15
**REFERRED** [1] - 269:22
**REFERRING** [9] - 196:22, 200:17, 200:18, 235:6, 236:15, 237:13, 237:20, 237:24, 240:17
**REFERS** [2] - 236:14, 237:18
**REFLECT** [6] - 248:2, 257:4, 259:21, 260:23, 264:24, 269:18
**REFLECTED** [1] - 269:22
**REFUSE** [1] - 227:14
**REGARDING** [12] - 201:19, 203:7, 204:1, 204:21, 219:4, 224:13, 234:3, 238:2, 238:12, 246:12, 252:15, 252:18
**REGARDS** [4] - 230:10, 232:17, 237:13, 237:17
**REGULATES** [1] - 249:8
**REGULATORY** [1] - 287:16
**REITERATE** [1] - 273:9
**RELATED** [1] - 273:6
**RELATES** [1] - 288:1
**RELATING** [2] - 198:20, 203:10
**RELATIONSHIP** [1] - 269:10
**RELATIVELY** [1] - 256:19
**RELEVANCE** [6] - 196:8, 206:3, 206:4, 206:12, 223:13, 236:6
**RELEVANT** [4] - 212:5, 226:16, 248:23, 248:25
**RELIED** [1] - 264:11
**RELY** [1] - 211:12
**REMAINS** [1] - 197:17
**REMAND** [1] - 211:22
**REMEDY** [1] - 273:12
**REMEMBER** [5] - 196:13, 259:2, 268:25, 271:7, 291:6
**REMEMBERED** [2] - 266:6, 272:15

**REMIND** [1] - 271:9
**REMINDED** [2] - 195:3, 195:6
**REMOVE** [1] - 220:20
**REMOVED** [2] - 220:21, 251:12
**RENDER** [1] - 280:17
**RENEGOTIATION** [1] - 203:18
**RENT** [184] - 197:22, 197:25, 198:1, 198:3, 198:4, 199:7, 199:8, 199:9, 199:12, 199:15, 199:16, 199:20, 200:6, 200:7, 200:8, 200:15, 201:1, 201:19, 204:22, 206:7, 206:10, 206:23, 207:6, 207:12, 207:21, 208:21, 208:25, 209:16, 210:22, 212:7, 212:11, 212:15, 212:17, 216:3, 216:4, 216:6, 216:22, 216:25, 217:3, 217:16, 217:18, 218:17, 219:22, 221:17, 221:20, 221:21, 221:25, 222:2, 222:16, 222:17, 222:22, 223:9, 223:12, 225:11, 226:4, 226:6, 226:7, 226:11, 226:19, 226:24, 227:7, 227:22, 228:2, 231:11, 231:13, 231:16, 231:25, 232:4, 232:17, 233:5, 233:9, 233:13, 233:15, 234:5, 234:6, 234:8, 234:9, 234:15, 234:17, 234:23, 235:10, 235:13, 235:18, 236:2, 236:3, 236:4, 236:10, 236:19, 236:20, 236:23, 238:15, 238:16, 238:20, 239:2, 239:12, 239:24, 241:8, 241:10, 241:12, 242:2, 242:4, 242:7, 242:14, 242:21, 242:23, 246:2, 247:9, 247:12, 253:6, 253:8, 253:15, 253:16, 253:18, 253:22, 255:14, 257:7, 257:9, 257:10, 257:11, 261:13, 263:4, 263:6, 264:20, 264:25, 265:10, 265:11, 265:19, 265:23, 266:1, 266:3, 266:7, 266:11, 268:23, 269:23, 270:2, 270:9, 270:10, 270:17, 270:20, 270:24, 271:20, 271:24, 272:1, 274:16, 274:17, 274:20, 274:22, 278:14, 278:16, 278:18, 279:24, 280:1, 280:3,

281:14, 281:21, 281:24, 282:2, 282:7, 282:13, 282:15, 282:17, 282:19, 283:4, 283:6, 283:9, 283:17, 283:20, 284:9, 284:16, 284:21, 284:22, 284:25, 285:3, 285:25, 286:1, 286:8, 286:20, 286:25, 287:6, 287:14, 288:5
**RENT** [3] - 270:1, 270:9, 274:23
**RENTABLE** [1] - 282:17
**RENTS** [24] - 215:25, 234:14, 239:16, 241:3, 242:22, 249:4, 249:5, 253:24, 253:25, 257:12, 258:5, 258:7, 258:9, 259:14, 259:15, 259:23, 259:25, 271:19, 286:17, 286:21, 286:22, 286:23, 287:1
**REPEAT** [2] - 231:20, 266:14
**REPHRASE** [1] - 205:24
**REPLACED** [1] - 198:3
**REPORT** [25] - 220:13, 221:8, 225:10, 225:21, 228:6, 248:2, 252:10, 253:23, 254:9, 269:17, 279:6, 279:7, 279:11, 279:15, 279:19, 279:22, 280:10, 280:13, 280:25, 281:4, 282:10, 282:22, 282:25, 283:3, 290:24
**REPORTER'S** [1] - 275:14
**REPORTS** [3] - 216:1, 242:8, 279:25
**REPRESENTING** [1] - 286:11
**REPRESENTS** [1] - 290:5
**REQUEST** [3] - 194:7, 236:4, 236:10
**REQUESTED** [5] - 194:5, 233:17, 233:25, 234:9, 247:8
**REQUIRE** [3] - 203:17, 211:9, 289:5
**REQUIRED** [7] - 198:22, 209:14, 210:10, 210:16, 210:18, 282:2, 289:20
**REQUIREMENT** [1] - 217:16
**REQUIRES** [2] - 211:22, 280:23
**RESEARCH** [1] - 265:10
**RESEARCHED** [1] - 263:1
**RESET** [1] - 213:1
**RESIDENT** [2] - 227:19, 227:22
**RESIDENTS** [11] - 195:22, 196:6, 198:5, 200:20, 205:18, 206:18, 217:15,

228:1, 228:8, 231:13, 234:6
**RESOLUTION** [2] - 221:24, 226:11
**RESPECT** [2] - 248:3, 289:4
**RESPONSE** [2] - 205:9, 229:21
**RESPONSIBLE** [1] - 215:24
**RESTRICTIONS** [1] - 198:7
**RESULT** [2] - 208:25, 236:2
**RESULTED** [1] - 253:24
**RESULTS** [1] - 255:18
**RESUME** [2] - 195:10, 259:7
**RESUMED** [1] - 195:15
**RETAINED** [4] - 278:6, 278:9, 278:11, 280:2
**RETURN** [7] - 209:8, 211:13, 269:4, 269:12, 269:14, 289:9, 290:9
**REVIEW** [3] - 270:2, 270:9, 274:23
**REVIEW** [7] - 217:19, 220:19, 223:19, 225:11, 226:11, 253:17, 279:21
**REVIEWED** [11] - 203:19, 217:7, 217:9, 279:24, 279:25, 280:5, 280:6, 280:7, 280:8, 282:22, 282:24
**REVIEWING** [3] - 209:15, 232:13, 282:5
**RICHARD** [1] - 203:7
**RIGS** [1] - 251:12
**RISE** [1] - 291:9
**RISK** [5] - 286:10, 286:11, 286:15, 286:17, 286:25
**RISK-FREE** [3] - 286:10, 286:11, 286:15
**RISKS** [1] - 203:8
**RISKY** [1] - 231:8
**ROB** [1] - 243:10
**ROB** [1] - 243:21
**ROBIN** [1] - 243:19
**ROHNERT** [1] - 263:23
**ROLE** [1] - 280:16
**ROLES** [1] - 276:23
**ROLLED** [1] - 239:19
**ROUGH** [1] - 259:17
**ROUTINELY** [1] - 268:5
**RUDDER** [1] - 201:18
**RULE** [1] - 246:20
**RULES** [7] - 206:24, 207:1, 210:23, 241:4, 241:10, 253:7, 253:15
**RULES** [1] - 246:20
**RULINGS** [3] - 280:7, 280:8, 288:25
**RUN** [1] - 249:5
**RYAN** [2] - 254:7, 254:11

# S

**S-A-L-O-M-O-N** [1] - 275:22
**S-T-E-P-H-E-N-S** [1] - 213:20
**SAFEST** [5] - 286:13, 286:16, 289:11, 290:5, 290:12
**SAFETY** [1] - 289:8
**SALE** [1] - 261:11
**SALE** [4] - 249:25, 261:10, 261:16, 261:23
**SALES** [29] - 249:8, 249:11, 258:17, 260:7, 260:9, 260:10, 260:14, 261:1, 261:9, 261:17, 261:20, 261:24, 261:25, 262:2, 262:5, 262:8, 264:11, 264:12, 264:14, 264:18, 264:24, 264:25, 265:19, 268:1, 271:20, 271:23, 272:10
**SALOMON** [12] - 275:12, 275:22, 276:3, 277:9, 277:23, 278:13, 279:15, 281:7, 281:18, 283:15, 286:2, 288:21
**SALOMON** [1] - 275:23
**SALOMON'S** [1] - 279:11
**SAN** [2] - 244:15, 261:12
**SAW** [1] - 282:6
**SCENARIO** [2] - 259:14, 259:20
**SCHOOL** [1] - 244:10
**SCHOOL** [6] - 214:19, 214:23, 215:2, 215:14, 244:9, 244:11
**SCIENCE** [1] - 276:7
**SCOPE** [2] - 194:13, 273:19
**SCREEN** [4] - 211:7, 260:23, 281:14, 283:15
**SCROLLING** [1] - 202:21
**SEAT** [2] - 213:15, 275:20
**SECOND** [21] - 194:14, 197:7, 197:12, 197:20, 199:15, 208:4, 210:2, 223:18, 223:20, 224:4, 224:14, 224:21, 237:22, 237:23, 241:20, 241:25, 269:1, 270:23, 283:11, 284:20, 290:2
**SECONDARY** [3] - 259:12, 259:18, 274:25
**SECTION** [8] - 220:13, 226:16, 237:13, 276:25, 277:4, 277:5
**SECURITIES** [7] - 289:7, 289:9, 289:14, 289:15, 289:17, 290:22
**SECURITY** [1] - 194:22
**SEE** [32] - 210:16, 211:14, 211:18, 211:24, 212:8,

216:21, 219:1, 219:15, 220:18, 222:7, 222:8, 224:19, 225:14, 225:25, 226:15, 235:6, 236:15, 237:7, 237:13, 237:20, 237:24, 240:21, 240:22, 241:20, 259:4, 283:23, 284:8, 284:17, 285:18, 290:2, 290:15, 291:8
**SEEK** [1] - 231:16
**SELECT** [1] - 257:20
**SELECTED** [3] - 201:21, 257:24, 258:1
**SELECTION** [1] - 210:12
**SELF** [1] - 210:19
**SELF-EVIDENT** [1] - 210:19
**SELL** [2] - 197:2, 197:22
**SELLER** [4] - 201:18, 202:1, 202:19, 204:6
**SELLER'S** [1] - 240:24
**SELLING** [2] - 196:17, 273:18
**SEND** [1] - 234:7
**SENIOR** [1] - 195:24
**SENIORS** [3] - 195:24, 196:3, 239:13
**SENSE** [3] - 203:16, 269:12, 274:10
**SENTENCE** [9] - 204:25, 205:1, 205:3, 205:5, 207:23, 208:2, 208:4, 210:8, 210:16
**SENTENCES** [1] - 204:17
**SEPARATE** [1] - 233:22
**SEPTEMBER** [2] - 223:5, 235:8
**SERIES** [1] - 201:17
**SERIOUS** [1] - 198:19
**SERVE** [2] - 278:6, 280:20
**SERVICE** [13] - 201:9, 208:3, 210:11, 215:5, 228:7, 267:5, 267:8, 267:17, 268:2, 268:6, 268:8, 273:3, 282:3
**SERVICER** [2] - 273:14, 273:16
**SERVICES** [3] - 228:4, 244:14, 276:25
**SET** [3] - 207:3, 217:11, 252:25
**SETTING** [1] - 242:22
**SEVEN** [3] - 215:6, 215:13, 277:13
**SEVERAL** [7] - 207:5, 250:3, 251:9, 261:9, 261:22, 265:13, 269:12
**SHALL** [6] - 213:11, 243:12, 243:13, 275:16, 275:17
**SHAPED** [1] - 208:18
**SHARE** [2] - 276:3, 277:7

**SHARED** [1] - 281:10
**SHOW** [12] - 202:1, 203:23, 216:16, 216:18, 217:23, 223:22, 281:20, 283:7, 283:16, 284:2, 284:4, 289:1
**SHOWED** [4] - 201:21, 217:24, 223:23, 284:6
**SHOWS** [4] - 222:14, 237:22, 281:21, 288:13
**SIGNIFICANCE** [1] - 252:8
**SIGNIFICANTLY** [2] - 262:4, 272:8
**SIMILAR** [1] - 258:4
**SIMILARITIES** [1] - 257:23
**SITE** [1] - 257:8
**SITES** [7] - 251:7, 251:17, 252:4, 252:5, 252:24, 257:8
**SITTING** [3] - 206:8, 281:3, 287:21
**SITUATION** [1] - 286:15
**SITUATIONS** [1] - 268:15
**SIX** [7] - 217:6, 217:13, 245:15, 246:7, 264:11, 264:14
**SLANTED** [1] - 202:7
**SLATE** [1] - 211:17
**SLIDE** [7] - 281:15, 281:18, 283:7, 283:12, 283:15, 284:10, 288:17
**SLOW** [1] - 248:12
**SMALL** [4] - 207:2, 212:10, 251:14, 252:2
**SMALLER** [5] - 206:24, 206:25, 207:10, 208:25, 261:4
**SO-CALLED** [1] - 218:5
**SOCIETIES** [1] - 276:20
**SOCIETY** [3] - 276:22, 276:24, 277:1
**SOLD** [7] - 249:9, 258:18, 260:11, 260:13, 261:3, 264:16
**SOLEMNLY** [3] - 213:10, 243:12, 275:16
**SOLICITED** [1] - 271:5
**SOMEONE** [4] - 203:16, 264:2, 281:1, 286:22
**SOMETIMES** [4] - 207:3, 207:5, 208:23, 265:25
**SOMEWHAT** [1] - 202:7
**SORRY** [12] - 195:5, 200:13, 201:13, 203:6, 205:4, 220:20, 221:11, 225:19, 225:25, 231:20, 237:7, 266:25
**SORT** [3] - 264:23, 274:4, 285:9
**SOUND** [1] - 290:7

**SOURCE** [1] - 273:11
**SOUTHERN** [1] - 260:15
**SPACE** [17] - 218:17, 233:16, 260:12, 260:13, 260:16, 260:18, 260:19, 261:13, 262:1, 268:23, 269:23, 270:2, 270:11, 272:12, 274:16, 282:15
**SPACES** [11] - 196:18, 198:10, 198:13, 198:16, 198:20, 251:15, 251:20, 252:2, 260:12, 260:16, 282:17
**SPECIAL** [2] - 273:14, 273:16
**SPECIALIZE** [2] - 244:6, 276:12
**SPECIALIZED** [3] - 245:17, 276:19, 277:20
**SPECIALIZES** [2] - 277:12, 277:17
**SPECIFIC** [2] - 245:18, 265:3
**SPECIFICALLY** [3] - 209:7, 212:2, 246:22
**SPECULATION** [5] - 206:12, 206:19, 207:13, 219:25, 220:5
**SPELL** [3] - 213:18, 243:17, 275:21
**SPELLED** [1] - 213:20
**SPENT** [3] - 276:17, 278:21, 278:25
**SPREAD** [1] - 225:7
**SPRINGS** [5] - 197:8, 198:1, 215:7, 263:20, 264:3
**STAFF** [16] - 201:1, 217:8, 219:20, 220:13, 220:14, 221:8, 225:10, 225:21, 228:6, 228:7, 242:8, 279:25, 282:4, 282:6, 282:10
**STAND** [8] - 213:2, 213:9, 228:24, 243:16, 245:3, 245:4, 275:14, 281:3
**STANDARD** [2] - 267:24, 268:15
**START** [7] - 208:13, 217:3, 222:22, 223:11, 271:14, 287:3, 290:20
**STARTED** [1] - 244:21
**STARTING** [3] - 204:18, 284:1, 284:17
**STARTS** [1] - 283:24
**STATE** [13] - 198:3, 198:4, 211:8, 212:2, 213:17, 214:10, 216:2, 217:16, 243:17, 244:25, 245:1, 275:21, 278:1
**STATE** [2] - 214:21, 245:11
**STATEMENT** [1] - 198:8

STATEMENTS [1] - 216:1
STATES [1] - 286:12
STATUTES [1] - 289:20
STEP [14] - 196:20, 197:5, 197:8, 197:12, 197:16, 197:20, 212:21, 212:24, 213:6, 243:4, 275:9, 275:13, 291:11
STEPHEN [1] - 194:8
STEPHENS [1] - 213:21
STEPHENS [13] - 194:16, 213:9, 213:16, 213:19, 214:4, 224:13, 224:20, 225:17, 226:18, 228:17, 228:21, 240:12, 240:16
STEPS [2] - 234:16, 266:15
STICKING [1] - 233:12
STILL [6] - 195:3, 195:6, 199:4, 199:21, 260:21, 262:15
STIPULATED [1] - 279:12
STREAM [1] - 286:3
STREET [6] - 215:22, 253:14, 256:9, 256:12, 256:15, 259:16
STRIKE [7] - 219:24, 233:13, 268:12, 268:13, 268:16, 268:18, 273:19
STRONG [1] - 250:3
STRUCTURE [1] - 273:5
STUDIED [1] - 244:9
SUBDIVIDING [1] - 196:17
SUBJECT [8] - 246:2, 249:15, 252:16, 258:2, 264:19, 264:25, 265:10, 271:24
SUBMIT [4] - 216:11, 216:16, 216:21, 217:6
SUBMITTED [5] - 217:5, 221:3, 225:18, 225:23, 236:3
SUBMITTING [1] - 216:14
SUBSEQUENT [1] - 242:24
SUBTRACTED [1] - 282:12
SUBTRACTION [1] - 230:19
SUCCESSIVE [1] - 285:21
SUCKED [1] - 194:10
SUFFERED [1] - 200:8
SUFFICIENT [1] - 200:7
SUGGESTED [1] - 202:5
SUM [1] - 285:13
SUMMARIZED [3] - 283:8, 283:17, 283:20
SUMMARIZING [1] - 279:6
SUMMARY [2] - 214:25, 234:22
SUNRISE [1] - 215:8
SUPERIOR [1] - 278:8
SUPPORT [1] - 263:4
SUPPOSE [1] - 232:19

SURPLUS [3] - 251:10, 251:24, 252:22
SUSTAINED [5] - 196:9, 205:24, 206:4, 238:10, 270:14
SWEAR [3] - 213:10, 243:12, 275:16
SWOOP [1] - 234:11
SWORN [4] - 195:13, 213:22, 243:22, 275:24

## T

TAB [3] - 218:12, 228:25, 247:17
TABLE [1] - 261:17
TALKS [1] - 206:6
TAXES [1] - 253:20
TECHNIQUE [1] - 248:20
TEN [7] - 223:17, 239:6, 245:12, 275:3, 276:17, 277:20, 289:22
TEN-YEAR [1] - 289:22
TEND [1] - 212:11
TERM [3] - 225:5, 225:7, 239:19
TERMS [3] - 194:17, 257:19, 274:12
TESTIFIED [16] - 195:14, 195:21, 195:24, 197:21, 201:24, 212:10, 213:22, 230:17, 232:4, 239:24, 243:22, 270:20, 270:22, 270:23, 275:24, 284:18
TESTIFY [2] - 196:1, 197:24
TESTIFYING [1] - 196:13
TESTIMONY [19] - 195:20, 200:17, 200:18, 201:11, 202:5, 203:25, 204:4, 213:10, 243:12, 244:4, 254:22, 255:1, 270:4, 271:5, 274:18, 275:16, 277:23, 278:3, 281:7
TESTING [1] - 245:8
THE [102] - 194:5, 194:13, 194:19, 194:24, 195:3, 195:5, 195:6, 195:8, 195:9, 195:10, 196:9, 196:10, 199:24, 200:11, 200:12, 201:12, 201:13, 202:11, 204:8, 204:9, 205:24, 206:4, 206:13, 206:20, 207:14, 207:15, 211:1, 212:21, 212:23, 213:3, 213:7, 213:10, 213:14, 213:15, 213:17, 213:19, 218:21, 220:1, 220:6, 220:16, 221:11, 221:15, 222:5, 223:14, 224:9, 225:13, 226:14, 228:11,

228:14, 228:18, 229:2, 231:19, 231:20, 236:7, 236:8, 237:11, 238:10, 240:13, 243:2, 243:4, 243:8, 243:11, 243:15, 243:16, 243:19, 246:24, 247:25, 248:12, 258:25, 259:7, 262:18, 266:25, 267:2, 268:13, 268:14, 268:18, 268:19, 268:20, 270:5, 270:14, 271:1, 272:25, 273:1, 273:21, 273:23, 274:19, 274:20, 275:9, 275:13, 275:19, 275:20, 275:22, 279:13, 281:11, 281:16, 283:13, 284:15, 288:19, 291:2, 291:4, 291:9, 291:11
THEREFORE [1] - 288:6
THIRD [3] - 246:3, 263:13, 285:18
THREE [9] - 215:7, 217:12, 234:16, 262:4, 277:16, 289:14, 289:15, 289:17
THROUGHOUT [1] - 194:11
TIED [1] - 203:16
TIME-CONSUMING [1] - 207:17
TIMELINE [1] - 252:16
TITLE [1] - 245:5
TODAY [8] - 206:8, 223:9, 251:21, 254:23, 275:4, 281:3, 281:7, 285:8
TOGETHER [1] - 212:4
TOM [1] - 213:5
TOOK [5] - 200:25, 241:19, 282:16, 289:14, 290:15
TOP [3] - 202:13, 262:4
TOPICS [1] - 246:8
TOTAL [6] - 262:6, 283:8, 283:17, 283:20, 284:4, 284:22, 284:25, 285:3
TOUGH [1] - 203:17
TOWARDS [2] - 240:21, 257:1
TRADITIONAL [1] - 268:4
TRAILER [1] - 261:6
TRAIN [1] - 244:18
TRANSLATE [1] - 255:17
TRANSLATES [1] - 258:19
TREASURY [6] - 286:12, 286:15, 289:10, 289:18, 289:22, 290:19
TRIAL [6] - 196:5, 209:12, 210:9, 210:23, 211:9
TRIED [2] - 205:9, 290:11
TRUE [9] - 200:22, 212:14, 216:22, 235:14, 235:23, 235:24, 240:5, 240:6, 241:9

TRUTH [9] - 213:12, 243:13, 243:14, 275:17, 275:18
TRY [4] - 204:10, 270:1, 270:8, 273:16
TURN [17] - 201:4, 220:11, 221:22, 224:2, 224:20, 225:8, 226:9, 228:23, 228:24, 232:1, 234:22, 235:16, 236:13, 237:4, 237:8, 242:20, 252:11
TURNED [1] - 205:13
TWICE [2] - 263:21, 263:25
TWO [14] - 196:20, 203:2, 204:16, 205:16, 207:25, 234:16, 239:18, 239:21, 254:9, 257:2, 261:17, 276:17, 277:21, 282:14
TWO-STEP [1] - 196:20
TYPE [4] - 234:8, 249:9, 273:15, 288:24
TYPES [4] - 244:18, 245:18, 253:20, 268:15
TYPICAL [1] - 248:19
TYPICALLY [4] - 216:25, 223:10, 273:13, 286:2

## U

U.S [2] - 286:15, 289:10, 289:18, 289:22
UNBIASED [1] - 280:14
UNCERTAIN [1] - 259:20
UNCERTAINTY [1] - 259:21
UNDER [10] - 195:4, 195:7, 210:12, 240:24, 255:2, 261:12, 265:22, 281:25, 286:22, 289:20
UNDERNEATH [1] - 254:10
UNDERTAKEN [1] - 266:15
UNDERWATER [2] - 230:10, 230:21
UNDEVELOPED [1] - 251:10
UNIT [1] - 197:22
UNITED [1] - 286:12
UNITS [1] - 197:2
UNIVERSITY [3] - 244:8, 244:11, 276:6
UNIVERSITY [1] - 214:21
UNKNOWN [1] - 253:3
UNPAID [1] - 286:20
UNUSUAL [2] - 248:17, 254:14
UP [25] - 203:16, 207:24, 211:7, 213:1, 214:17, 228:23, 233:4, 234:14, 251:7, 252:9, 252:25, 254:8, 256:24, 257:2, 260:20, 261:11, 263:1, 279:14, 281:14, 282:19, 283:15, 285:13, 285:14,

285:16, 287:24
**UPSIDE** [2] - 269:18, 269:22
**USES** [1] - 239:12
**UTAH** [1] - 244:8
**UTILITIES** [1] - 252:24
**UTILIZE** [1] - 209:15

## V

**VACANCY** [9] - 249:14, 255:14, 256:14, 256:16, 257:12, 257:13, 257:14, 257:15, 286:21
**VACANT** [1] - 251:20
**VAGUE** [1] - 272:24
**VALLEY** [1] - 215:9
**VALUATION** [7] - 244:14, 244:21, 250:10, 250:22, 252:17, 253:9, 277:4
**VALUE** [49] - 197:16, 199:12, 199:18, 199:21, 199:22, 200:7, 246:10, 247:8, 247:11, 248:3, 248:9, 248:10, 248:15, 250:9, 250:10, 250:16, 251:3, 254:25, 255:5, 255:6, 255:18, 256:4, 256:20, 256:22, 257:18, 258:20, 258:23, 259:22, 260:2, 260:6, 261:16, 262:6, 262:10, 262:12, 263:9, 267:15, 272:5, 275:5, 280:6, 285:2, 285:7, 285:15, 285:19, 285:21, 285:24, 285:25, 288:5, 288:8
**VALUING** [2] - 245:8, 261:21
**VERIFIED** [2] - 258:10, 258:11
**VERIFY** [1] - 250:18
**VERIFYING** [1] - 217:10
**VERSUS** [2] - 252:3, 285:14
**VIEWS** [1] - 272:4
**VILLAGE** [13] - 208:21, 215:21, 234:15, 238:16, 239:3, 242:10, 253:13, 256:9, 256:10, 258:7, 259:16, 263:18, 266:17
**VIOLATE** [2] - 205:6, 205:21
**VIOLATED** [1] - 206:2
**VIOLATING** [1] - 204:23
**VOICE** [1] - 194:12
**VOLUME** [1] - 228:24
**VOTES** [1] - 206:18
**VULNERABLE** [1] - 207:10

## W

**WAITED** [1] - 207:5
**WARNINGS** [1] - 205:13

**WELCOME** [1] - 252:11
**WELLS** [4] - 198:20, 198:22, 251:11, 251:13
**WHITE** [3] - 228:23, 237:4, 237:8
**WHOLE** [6] - 213:12, 219:1, 243:13, 271:13, 275:17, 288:4
**WILLINGNESS** [1] - 205:6
**WIN** [2] - 285:10
**WITNESS** [20] - 195:5, 195:8, 196:10, 200:12, 201:13, 204:9, 207:15, 213:14, 213:19, 231:20, 236:8, 243:15, 243:19, 268:14, 268:19, 273:1, 274:20, 275:19, 275:22, 284:15
**WITNESS** [14] - 195:13, 212:25, 213:2, 213:6, 213:22, 228:24, 243:5, 243:7, 243:22, 246:5, 246:21, 275:10, 275:24, 278:3
**WITNESS'S** [1] - 273:20
**WITNESSES** [1] - 280:21
**WONDERED** [1] - 194:10
**WORD** [4] - 208:4, 208:10, 210:16, 210:18
**WORKS** [1] - 281:1
**WORLD** [3] - 273:1, 286:13, 286:16
**WORTH** [4] - 261:15, 284:18, 285:8, 285:23
**WRIT** [1] - 209:13
**WRITE** [1] - 218:6
**WRITE-OFFS** [1] - 218:6
**WRITING** [3] - 211:7, 211:17, 279:17
**WRITTEN** [3] - 246:14, 247:14, 247:20

## Y

**YEAR** [45] - 199:15, 208:21, 212:11, 212:17, 215:5, 216:8, 216:21, 217:2, 217:3, 217:7, 217:20, 218:18, 219:6, 219:17, 222:20, 223:3, 223:18, 223:20, 224:5, 224:14, 224:21, 224:25, 225:2, 225:3, 226:12, 227:3, 229:18, 229:23, 236:15, 239:19, 239:20, 248:23, 271:12, 271:15, 272:2, 274:9, 274:10, 274:12, 282:19, 283:6, 283:23, 284:3, 289:22
**YEAR** [11] - 234:18, 235:17, 236:4, 236:24, 239:23,

240:3, 240:4, 240:7, 240:8
**YEAR'S** [2] - 236:2, 284:18
**YEARS** [31] - 207:5, 207:8, 208:16, 215:3, 215:7, 228:5, 234:17, 239:6, 244:22, 245:12, 245:15, 259:23, 261:22, 272:17, 275:3, 276:16, 276:17, 276:18, 277:11, 277:13, 277:16, 277:20, 277:21, 281:1, 284:4, 284:7, 285:11, 285:15, 288:7, 288:12
**YESTERDAY** [21] - 195:21, 196:5, 196:13, 197:21, 200:17, 200:18, 200:21, 201:5, 201:6, 201:16, 203:23, 204:1, 204:24, 205:10, 205:12, 206:22, 207:22, 208:3, 208:23, 209:6, 209:9
**YORK** [1] - 214:21
**YOUNG** [1] - 244:8
**YOURSELF** [2] - 264:19, 267:19
**YOURSELVES** [2] - 259:2, 291:6

## Z

**ZERO** [2] - 286:21, 286:25
**ZONED** [1] - 251:6
**ZONING** [3] - 249:7, 251:5, 251:6
**ZOOM** [1] - 202:12

**UNITED STATES DISTRICT COURT**