1               UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5  COLONY COVE PROPERTIES, LLC, a     )
    Delaware limited liability company,  )
6                            )
             PLAINTIFF,       )   CASE NO.
7                         )
        vs.             )   CV 14-03242-PSG
8                         )
    CITY OF CARSON, a municipal      )
9    corporation; CITY OF CARSON      )
    MOBILEHOME PARK RENTAL REVIEW BOARD,  )   PAGES (397 to 504)
10  a public administrative body; and   )
    DOES 1 to 10, inclusive,      )   VOLUME 5
11                         )
            DEFENDANTS.      )
12  _____)

13

14

15

16                REPORTER'S TRANSCRIPT OF
                    TRIAL DAY 3
               TUESDAY, MAY 3, 2016
17                  9:01 A.M.
             LOS ANGELES, CALIFORNIA
18

19

20

21

22  _____

23           MAREA WOOLRICH, CSR 12698, CCRR
          FEDERAL OFFICIAL COURT REPORTER
24       255 EAST TEMPLE STREET, ROOM 181-K
         LOS ANGELES, CALIFORNIA 90012
25          MAREAWOOLRICH@AOL.COM

1          APPEARANCES OF COUNSEL:

2

3  **FOR THE PLAINTIFF:**

4

       O'MELVENY & MYERS, LLP
5      BY:  DIMITRI D. PORTNOI
       BY:  MATTHEW W. CLOSE
6      400 South Hope Street
       18th Floor
7      Los Angeles, California 90071

8

       GILCHRIST & RUTTER, APC
9      BY:  THOMAS W. CASPARIAN
       Wilshire Palisades Building
10     1299 Ocean Avenue, Suite 900
       Santa Monica, California 90401

11

12  **FOR THE DEFENDANTS:**

13

14     ALESHIRE & WYNDER, LLP
       BY:  JEFFREY MICHAEL MALAWY
15     BY:  JUNE SUSAN AILIN
       BY:  STEPHEN R. ONSTOT
16     18881 Von Karman Avenue, Suite 1700
       Irvine, California 92612

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                    I N D E X

 2              TUESDAY, MAY 3, 2016

 3   VOLUME 5 - A.M. SESSION

 4   ----------------------------------------------------------

 5            CHRONOLOGICAL INDEX OF WITNESSES

 6

 7   WITNESSES                                          PAGE

 8   DOUGLAS DANNY
           DIRECT EXAMINATION BY MR. ONSTOT            402
 9         CROSS-EXAMINATION BY MR. CLOSE              411

10   KENNETH FRESCHAUF
           REDIRECT EXAMINATION BY MS. AILIN           416
11         RECROSS-EXAMINATION BY MR. CLOSE            430

12   KENNETH BAAR
           DIRECT EXAMINATION BY MR. ONSTOT            442
13         CROSS-EXAMINATION BY MR. CASPARIAN          472

14

15   ----------------------------------------------------------

16                 INDEX OF EXHIBITS

17

18               RECEIVED INTO EVIDENCE

19

     EXHIBIT NO. 57  RESOLUTION 97-185                 488
20   EXHIBIT NO. 60  RESOLUTION 2001-212               489
     EXHIBIT NO. 74  KENNETH BAAR ANALYSIS 2008        456
21   EXHIBIT NO. 75  KENNETH BAAR                      466
                     SUPPLEMENTAL ANALYSIS
22   EXHIBIT NO. 76  KENNETH BAAR ANALYSIS 2009        468

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, MAY 3, 2016

 2                            9:01 A.M.
                                ---
 3

 4

 5              (In the presence of the jury.)

 6              THE CLERK:  Calling Item No. 1 on the Court's

 7    calendar, CV 14-3242, Colony Cove Properties, LLC, versus

 8    City of Carson, et al., Day 3, jury trial.

 9         Counsel, please state your appearances for the record.

10              MR. CLOSE:  Good morning, Your Honor.

11    Matthew Close, Dimitri Portnoi of O'Melveny & Meyers, LLP,

12    along with Tom Casparian from Gilchrist & Rutter for plaintiff.

13              THE COURT:  Thank you.

14              MR. ONSTOT:  Good morning, Your Honor.

15    Stephen Onstot of Aleshire & Wynder on behalf of Defendant

16    City of Carson and the City of Carson Rent Control Board.  With

17    me is June Ailin and Jeff Malawy at counsel table.  And behind

18    us is Attorney Margaret Rose, Carson City Attorney

19    Sunny Soltani, and Carson Housing Authority Manager

20    Amelia Soto.

21              THE COURT:  Thank you.  Good morning.  We are doing

22    a witness out of order?

23              MR. ONSTOT:  Yes, Your Honor.

24              THE COURT:  All right.  Mr. Onstot, you may.

25              MR. ONSTOT:  Your Honor, the defense would like to
```

 1   call Doug Danny.

 2             THE CLERK:  Please stand behind the court reporter

 3   to be sworn.  Please raise your right hand.

 4       Do you solemnly swear that the testimony you shall give in

 5   the cause now before this Court shall be the truth, the whole

 6   truth, and nothing but the truth, so help you God?

 7             THE WITNESS:  I do.

 8             THE CLERK:  Please go around and be seated.

 9             THE WITNESS:  Can I get my notes?  Is that

10   permissible?  My file?

11             THE CLERK:  His notes, Your Honor?

12             Please go around and be seated.  Please speak into

13   the mic.  State your full name and spell your last name for the

14   record, please.

15             THE WITNESS:  My full name is Douglas,

16   D-o-u-g-l-a-s, Alan, A-l-a-n, Danny D-a-n-n-y.

17             MR. ONSTOT:  Thank you.

18       Ladies and gentlemen, we are taking Mr. Danny as a witness

19   now out of order to accommodate some other business commitments

20   and travel arrangements that he has.  After we complete the

21   examination of Mr. Danny, Mr. Freschauf will come back on the

22   stand.  So this is an accommodation for Mr. Danny.

23                           DOUGLAS DANNY,

24   called as a witness by the defense, was sworn and testified as

25   follows:

```
 1                          DIRECT EXAMINATION

 2   BY MR. ONSTOT:

 3   Q    Who is your employer?

 4   A    I'm employed by Marcus & Millichap.  That's M-a-r-c-u-s,

 5   "&" sign, Millichap, M-i-l-l-i-c-h-a-p.

 6   Q    What type of business is Marcus & Millichap?

 7   A    Marcus & Millichap, we are commercial real estate brokers.

 8   Q    And how long have you worked for Marcus & Millichap?

 9   A    I started there in 1992.

10   Q    And can you give us an idea of what your job duties are

11   with Marcus & Millichap?

12   A    I specialize in multi-family, which would be apartments,

13   and then ultimately since 1988 manufactured home communities,

14   mobile home parks, and trailer parks.

15   Q    Approximately how many mobile home parks have you worked

16   with from the broker's side in your career?

17   A    To date I've sold 129 communities totaling 16-, 17,000 --

18   17,000 sites, probably $615-, $620 million worth of inventory

19   sold.

20   Q    Now, are you familiar with the sale of a mobile home park

21   called Colony Cove in 2006?

22   A    Yes, I am.  I was one of the three listing brokers.

23   Q    And who retained you to represent the seller for

24   Colony Cove?

25   A    I believe it was the Grossman family that owned the
```

1    community.

2    Q    Can you give us your college background, please.

3    A    I have a bachelor's degree from California State --

4    Cal State Long Beach with a major in Spanish and a minor in

5    Latin American studies.  I had a California teaching

6    credential, which I believe was another 30 units.  And that was

7    the extent of my educational background.

8    Q    In 2006, at the time Colony Cove was sold, did you have

9    any professional licenses?

10   A    I had at that time a -- I had a California corporate

11   broker's license.

12   Q    Now, you mentioned you had experience in selling mobile

13   home parks.  Were any of those in rent control jurisdictions?

14   A    Yes.

15   Q    Is it your understanding that Colony Cove is in the city

16   of Carson which is a rent control jurisdiction?

17   A    Yes.

18   Q    Mr. Danny, to your right on the floor are a number of

19   binders.  The black ones are plaintiff exhibits and the white

20   ones are defense exhibits.  If you can pull out the black

21   binder that has Exhibit 1000.  That's 1000.

22   A    I have it.

23   Q    Okay.  That purports to be a document called "Offering

24   Memorandum" for Colony Cove Mobile Estates in Carson from

25   Marcus & Millichap?

```
 1  A     That's correct.

 2  Q     Did you have a role in preparing this?

 3  A     Yes, I did.

 4  Q     And what is an offering memorandum?

 5  A     An offering memorandum is the summary of the facts,

 6  financial facts, physical characteristics, maybe some

 7  motivational reasons to buy a property.  It's the tool that we

 8  use to market a mobile home park in this case to the buying

 9  public.

10  Q     And did you prepare this offering memorandum in the spring

11  of 2006?

12  A     Yes, I did.

13            MR. ONSTOT:  Your Honor, Exhibit 1000 has been

14  admitted.  Permission to publish?

15            THE COURT:  You may.

16  BY MR. ONSTOT:

17  Q     If you can turn to the section in Exhibit 1000 called

18  "Potential Development."

19  A     I have it.

20  Q     Why is this section in the offering memorandum?

21  A     At the time of sale, there were some -- I believe they

22  were abandoned wells, and the previous owner had -- the current

23  owner at the time we were marketing it had investigated the

24  possibility of using this land to add mobile home sites to the

25  park to expand the number of sites.
```

1  Q    On page 1000-5, there's listed investment highlights.  Do

2  you see what I'm referring to?

3  A    Correct, investment highlights.

4  Q    One of them is 100 percent occupancy for the past

5  29 years.  Do you see what I'm referring to?

6  A    I see it.

7  Q    And why is that a highlight?

8  A    In -- stability of occupancy in manufactured home

9  communities is one of the key factors that draws investors into

10  that product type.

11  Q    Now, if you turn to page 1000-8, the section on rent

12  control ordinance, do you see where I'm referring to?

13  A    Yes.

14  Q    And why is that section in the offering memorandum?

15  A    To acquaint any potential buyer with an overview of the

16  rent control ordinance in the city in which they are purchasing

17  the property.

18  Q    And if you can turn to the section that's entitled

19  "Potential Rent Increases."

20  A    Which page is it?  1000 -- oh, I found it.  It's 1000-16.

21  Q    Why is potential rent increases a section of the offering

22  memorandum?

23  A    The potential rent increases allow the investor to grow

24  the revenue stream and add cash flow and value through

25  increasing the net amount of income that that investor

1    receives -- if you look at -- on an annual basis.

2    Q    Now, at the top under "Potential Rent Increases," you

3    mentioned that the past two increases -- this is before Colony

4    Cove was sold -- was $14.50 per space in one year and $4.46 per

5    space the second year.  Do you see where I'm referring to?

6    A    Yes.

7    Q    Why is that important?

8    A    It shows the history of the rent increases granted to the

9    park on a bi -- I think every two-year -- every two-year

10   process.  And it's important for an investor to have that

11   historical perspective when they -- you know, when they are

12   looking at buying a park.

13   Q    Now, if you continue down the page, the next to the last

14   paragraph states that a new owner would be able to propose

15   further rent increases based upon the additional costs they

16   would incur through purchase of the property at a higher tax

17   base value.  Do you see where I'm referring to?

18   A    Yes.

19   Q    Did you represent anywhere in the offering memorandum that

20   a purchaser was guaranteed a rent increase that would include

21   its debt service or mortgage payments?

22   A    I don't believe that we guarantee any aspect of a future

23   rent increase in that it's decided through a -- through a board

24   action.  What we did is we took the -- I believe we took the

25   ordinance and pointed out the areas in which a rent increase is

1    allowable under the ordinance.

2    Q    You did say in the offering memorandum that any rent

3    increase would be unpredictable; is that correct?

4    A    That's correct.

5    Q    What did you mean by that?

6    A    It's subject to the interpretation of the governing

7    entities based on the information being provided as to the

8    amount of the rent increase.  And it's decided in a way in

9    which there's -- there's not a certain formula that is applied.

10   There's some subjective considerations in granting a rent

11   increase in that jurisdiction.

12   Q    Now, in your deposition, you used the term that

13   Colony Cove was comparable to comparables.  Do you recall that?

14   A    Yes.

15   Q    What does that mean?

16   A    That there were other comparable mobile home parks,

17   manufactured home communities that had sold within a

18   reasonable -- historically within a reasonable time frame or

19   were being offered on the market that were comparable as far as

20   quality, pricing, the different metrics, the financial metrics,

21   that an investor would use to determine the value of the park

22   being offered in the -- in the -- to the marketplace.

23   Q    Now, did Carson's rent control ordinance have a negative

24   impact on your ability to market and sell the property?

25   A    No.  My opinion, no.

1    Q     Is the fact that Colony Cove was a senior park, senior

2    only park, was that an attribute, a selling point, in your

3    marketing and selling of the property?

4    A     That's a positive characteristic of the park.

5    Q     Are you familiar with the term "defensive investment"?

6    A     Yes, I am.

7    Q     What does that mean?

8                MR. CLOSE:  Objection.  701, 702.

9                THE COURT:  Sidebar.

10               (The following was held at sidebar

11               outside the presence of the jury.)

12               MR. CLOSE:  Matthew Close.  We were told the witness

13   would testify about selling the property, there wouldn't be any

14   purported expert testimony or market testimony.  I'm very

15   concerned that further down the line we are going to hear about

16   investment theory and market -- the witness's opinion on market

17   developments.

18               MR. ONSTOT:  Stephen Onstot for the defendants.  I'm

19   relating all my questions to the offering memorandum, what was

20   offered in connection with the sale.

21               THE COURT:  What's in the offering memorandum as it

22   relates to defensive investment?

23               MR. ONSTOT:  Because one of the selling points that

24   he's going to testify is that a mobile home park is a defensive

25   investment which protects the owner in recessionary times by

```
 1   providing income.
 2              THE COURT:  Is that in the offering memorandum?
 3              MR. ONSTOT:  It's not in there, but that's a
 4   consideration we have.
 5              THE COURT:  Sustained.
 6              (The following was held in open court.)
 7   BY MR. ONSTOT:
 8   Q    Mr. Danny, how many offers were made for Colony Cove?
 9   A    In my file, I believe we had three, maybe four offers on
10   the community.
11   Q    If you can pull out another black binder there for
12   Exhibits 39 and 40.
13   A    I have it.
14   Q    Exhibit 39 is -- strike that.
15        Is it your understanding that Exhibit 39 is an offer from
16   Cal-Am Properties to acquire Colony Cove?
17   A    That's correct.
18   Q    And Exhibit 40, if you turn to that one.
19   A    I have it.
20   Q    And what is Exhibit 40?
21   A    It's a letter of intent from David Welswasser.
22              MR. ONSTOT:  Your Honor, 40 is in evidence.  May I
23   publish?
24              THE COURT:  You may.
25   BY MR. ONSTOT:
```

1   Q    Now, did you have any discussions with Grossman Properties

2   regarding the Welswasser offer?

3   A    I don't recall.

4   Q    Did you have any discussions with Grossman regarding the

5   Cal Am offer at all?

6   A    I don't recall.

7   Q    Did you discuss the Colony Cove offer with Grossman?

8   A    I don't -- directly with the principal?  No.

9   Q    So is it fair to say that you don't know why Colony Cove's

10  offer was accepted and the other two were rejected?

11  A    I am not certain in that once the offer was presented

12  through legal counsel, most of the negotiation, if not all of

13  it, was conducted between the legal counsel representing the

14  seller and the legal counsel representing the buyer.  And I

15  don't -- I can't say with any certainty -- I can only speculate

16  why they would have taken --

17  Q    We don't want you to speculate.

18  A    Okay.

19  Q    So the answer is you don't know?

20  A    I don't know.

21  Q    Okay.  Is there anything in the offering memorandum that

22  in your view, as you put it together, would lead a prospective

23  purchaser to believe that any debt service used to purchase

24  Colony Cove would be passed on to the residents?

25            MR. CLOSE:  Objection.  Speculation.

```
 1              THE COURT:  Overruled.
 2   BY MR. ONSTOT:
 3   Q    You can answer.
 4   A    I believe that the information that we put into the
 5   marketing package was the information from the ordinance which
 6   does -- my recollection is it does allow for a passthrough in
 7   the increase in the debt service from the previous owner to the
 8   new owner, and, consequently, I believe that it is an allowable
 9   passthrough that the city rent control group will consider in
10   the application from the new owner.
11   Q    Is there anything in the offering memorandum, as you put
12   it together, that would lead a prospective purchaser to believe
13   that a passthrough of the debt service is guaranteed?
14   A    I believe that we were very careful in the offering
15   memorandum to point out that this -- there's no guarantee.
16   It's a process that leads to an event.  And what we tried to do
17   was articulate the provisions of the ordinance so then the
18   buyer could do his own due diligence and determine the
19   probability of success in those -- with those components.
20              MR. ONSTOT:  Thank you.  Nothing further.
21              THE COURT:  Cross-examination?
22                      CROSS-EXAMINATION
23   BY MR. CLOSE:
24   Q    Good morning, Mr. Danny.  Thank you for making the trip
25   up.
```

```
 1        At the time when you were listing the property in Carson,

 2   Colony Cove, were you aware of a case called the *Carson Gardens*

 3   litigation?

 4   A    *Carson Gardens*?  I don't recall.

 5   Q    At the time you were marketing the Colony Cove property in

 6   2006, did you have any information that the City of Carson

 7   would change its rent control rules later that year?

 8   A    No.

 9   Q    When you were marketing the Colony Cove park in 2006, you

10   had never heard of a term called "MNOI," had you?

11   A    I understand what the -- I believe I understand what the

12   term refers to, but I'm not familiar -- probably in 2006, I

13   don't recall if I was familiar with that.

14   Q    Mr. Danny, were you involved in setting the $28 million

15   listing price for the property?

16   A    Yes.

17   Q    And your firm, Marcus Millichap, believed that $28 million

18   was a reasonable price to list the property for; correct?

19   A    I believe that because of the component of the owner

20   financing at the 4 percent interest rate, we felt it was a

21   reasonable price that we would go to market and generate

22   offers.

23   Q    I want to ask it again.  Marcus Millichap believed that it

24   was a reasonable price to ask for that size and quality of

25   park; isn't that true?
```

```
 1   A     Yes.

 2   Q     Thank you.

 3         There is nothing in your files or Marcus Millichap's files

 4   that suggests Mr. Goldstein paid above market value for the

 5   property, is there?

 6   A     No.

 7   Q     And there's nothing in Marcus Millichap's files that

 8   suggests that the seller, Grossman, made a windfall from the

 9   sale of the property -- the park; correct?

10   A     No, that's correct.

11   Q     And you would also agree that the sale of Colony Cove for

12   $23 million represented a fair market transaction at a market

13   rate; isn't that right?

14   A     That's correct.

15   Q     And the value of this park is related to its potential to

16   produce rental income for its owner; isn't that correct?

17   A     That's correct.

18   Q     We talked a little bit about the oil wells on the property

19   during your -- when the City's attorney was examining you.

20   Neither the seller, nor Marcus Millichap, made any

21   representations whatsoever regarding permits for those

22   developments or the safety of the land; isn't that true?

23   A     That's correct.

24   Q     And do you recall that there was an issue with whether the

25   city sewer system actually had the capacity to support
```

1    additional homes on those sites?

2    A    I don't recall.

3    Q    Are you aware of any leaks that were discovered in the

4    oil wells after my client purchased the property?

5    A    No.

6    Q    Counsel for the City showed you briefly the two offers

7    from Cal-Am and Mr. Welswasser.  There's nothing in your files

8    or Marcus Millichap's files that would suggest those offers

9    were not legitimate; correct?

10   A    That's correct.

11   Q    Thank you again for joining us this morning.

12              MR. CLOSE:  I have no further questions, Your Honor.

13              THE COURT:  Redirect?

14              MR. ONSTOT:  None, Your Honor.

15              THE COURT:  You may step down.  Thank you.

16              THE WITNESS:  Thank you.

17              MS. AILIN:  Your Honor, if I may step out and locate

18   our next witness?

19              THE COURT:  You may.

20              (Pause in proceedings.)

21              MS. AILIN:  Your Honor, Mr. Freschauf is just coming

22   through security.  Apparently there's quite a line this

23   morning.  So he will be here momentarily.

24              THE COURT:  All right.  Let's go ahead and take a

25   break.

```
 1        Ladies and gentlemen, we are going to adjourn for a few

 2   minutes.

 3        Remember not to discuss the case among yourselves or with

 4   anyone else.  Don't form or express any opinion about the case

 5   until it's finally submitted to you.  We'll see you in a few

 6   minutes.

 7             THE CLERK:  All rise.

 8             (Outside the presence of the jury.)

 9             THE COURT:  When was Mr. Freschauf told to be here?

10             MS. AILIN:  I believe he was told to be here at

11   9:00.

12             THE COURT:  I want you to discover why he's barely

13   going through security at 9:30, because based on the

14   explanation, you are on the clock.

15             MS. AILIN:  I understand.

16             (A brief recess was taken.)

17             (In the presence of the jury.)

18             THE COURT:  You are reminded that you are under

19   oath.

20        Are we still on cross though?

21             MS. AILIN:  I'm sorry, Your Honor?

22             THE COURT:  Are we still on cross?

23             MS. AILIN:  Over the weekend, Mr. Close informed me

24   that he had completed his cross.

25             THE COURT:  Okay.  All right.
```

```
 1              MS. AILIN:  So we are beginning with redirect.
 2                        KENNETH FRESCHAUF,
 3    called as a witness by the defense, was previously sworn and
 4    testified as follows:
 5                        REDIRECT EXAMINATION
 6    BY MS. AILIN:
 7    Q    Good morning, Mr. Freschauf.
 8    A    Good morning.
 9    Q    Welcome back.
10    A    Thank you.
11    Q    Mr. Freschauf, let's start by taking another look at some
12    of the testimony you gave on cross-examination about the
13    guidelines.
14         Mr. Close brought up Exhibit 2005, the resolution amending
15    the guidelines, and he pointed out that that resolution was
16    signed by Mayor Dear.  Is there any significance to the fact
17    that it was Mayor Dear who signed that resolution?
18    A    No.  Whoever is mayor at the time that a resolution is
19    passed, unless for some reason they are out of town, the mayor
20    will sign that document.
21    Q    And so Mr. Dear signed the resolution just because he was
22    the mayor, not because he had any particular interest in or
23    promotion of that resolution?
24    A    No, he --
25              MR. CLOSE:  Objection.  Leading.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Sustained.  Rephrase.
 2    BY MS. AILIN:
 3    Q    Is it the case that Mr. Dear signed that resolution just
 4    because he was the mayor?
 5    A    Yes, there was no -- would be no other reason.  He was not
 6    involved in the discussions on that -- the changes in the
 7    guidelines at all.
 8    Q    And are the guidelines the law?
 9    A    No.  The guidelines are not the law.  The ordinance
10    itself, the rent control ordinance is the law.  The guidelines
11    are just -- they're just that.  They are guidelines for the
12    board and for staff to process an application, to help guide
13    the board in its deliberations, to help a park owner have some
14    sense of what would be expected.  It's just kind of a roadmap
15    of how things will probably be done.
16    Q    Does the ordinance specify any particular analysis to be
17    applied in deciding how large a rent increase to grant?
18    A    No, there's no one factor in the ordinance that overrides
19    all others.  There are 11 factors.  They are each considered at
20    any particular hearing, although usually not all of them will
21    apply.  But they are considered as separate items.  So would
22    any analysis or different analysis that we do such as gross
23    profit maintenance, three-year averaging, MNOI.  They'd all be
24    considered, and they all have the same weight as far as going
25    into the hearing.
```

1  Q    And do the guidelines lay out the same factors that are

2  laid out in the ordinance?

3  A    They discuss it and probably give it a little more

4  amplification, yes.

5  Q    And do the guidelines, like the ordinance, say that no

6  particular factor is controlling?

7  A    Right.  It's very clear on that that no one item or no one

8  formula entitles anyone to any rent in any specific rent

9  increase.

10  Q    Does a particular methodology or analysis have to be

11  mentioned in the ordinance or the guidelines for the board to

12  use it?

13  A    No.  Case in point is the MNOI.  We had used it prior to

14  finally putting it in the guidelines.

15  Q    So does the board have the discretion to use any

16  methodology it thinks is fair?

17  A    Yes.  They can use anything.  I believe we used gross

18  profit before it was actually put in the guidelines also.

19  Q    Now, on cross-examination, Mr. Close asked you whether

20  before Mr. Goldstein purchased Colony Cove there was anything

21  in the guidelines that referred to a Dr. Kenneth Baar, and you

22  said that there was not.  Do you recall giving that testimony?

23  A    No, there's -- well, I remember the testimony, yes.

24  There's no names mentioned in the guidelines or the ordinance

25  at all.

```
 1   Q     Is there anything in the guidelines that prohibits the
 2   board from hiring an expert to assist it with analyzing rent
 3   increase applications?
 4   A     No.  If the board feels and/or staff feels that we need an
 5   expert on a particular hearing for some reason, then we hire
 6   one.
 7   Q     And has the board actually hired an expert on several
 8   occasions?
 9   A     Yes.
10   Q     And were some of those occasions before Mr. Goldstein
11   purchased Colony Cove?
12   A     Yes, at least three that I can think of.
13   Q     And has the board hired an expert to assist it with rent
14   increase applications for mobile home parks owned by people
15   other than Mr. Goldstein?
16   A     Yes.
17   Q     Every time you've hired an expert, has the expert
18   recommended using the MNOI analysis?
19   A     Yes, they have.
20   Q     Has Dr. Barr always been the expert hired by the board?
21   A     Yes, he has.
22   Q     And why is it that the board has always hired Dr. Barr?
23   A     Well, one, he's probably one of the most well-known people
24   in rent control in handling it.  He's been through numerous
25   court cases.  He's been upheld as an expert witness.  He's
```

```
 1   written a number of books on the subject.  He's probably been

 2   in 20 -- and I could be even short on this -- at least 20-some

 3   court cases, both at superior and federal court, as an expert

 4   witness and/or testifying on behalf of a city.  So he's just a

 5   recognized expert.

 6        And for the sake of consistency, we want to have the same

 7   pair of eyes looking at these reports so that the board gets

 8   the same type of a report and the same look each time.

 9   Q    You were asked on cross-examination if the gross profits

10   maintenance analysis was performed on virtually all rent

11   applications.  Do you recall that?

12   A    Yes.

13   Q    And your response on cross-examination what that it was

14   not always performed.  Do you recall that?

15   A    Yes.

16   Q    And why do you say it was not always performed?

17   A    Okay.  I'm sorry.  This was the gross --

18   Q    Gross profits maintenance?

19   A    Right.  We didn't start using it consistently until just

20   about the time I first started rent control in 1990, '91 time

21   period.  I think it had been used once or twice prior.

22        But I sat down with some other staff and actually a couple

23   of residents and other people just to play devil's advocate

24   about how these things would work, how we would set it up, and

25   what should be in the formula, how it should be used.  And then
```

```
 1   from then on, I think it's been used, I think, almost in every
 2   hearing since.
 3   Q    Now, when you said you sat down with some residents, did
 4   you mean residents of mobile home parks?
 5   A    Yeah.  There was one resident in particular, actually was
 6   in Carson Harbor Village Mobile Home Park, Richard Seacrest.
 7   He was just a very sharp person and was somebody that came in
 8   consistently.  We probably talked about it once a week over a
 9   couple-month period and kind of worked out a formula.
10        And I passed it around to a couple other staff members,
11   and we all kind of bought off on it that it looked like it was
12   a reasonable way of handling income and expenses and how to
13   measure whether profit had been increased or decreased since
14   the last hearing.
15   Q    So you started using gross profits maintenance
16   consistently around 1990, '91?
17   A    Yes.
18   Q    And so that would have been about seven years after
19   Mr. Goldstein bought Carson Harbor Village?
20   A    Correct.  It wasn't used in the staff report when he
21   originally bought the Carson Harbor Village Mobile Home Park,
22   his first park.
23   Q    So when you used the gross profits maintenance analysis,
24   does that analysis control what the rent will be?
25   A    No.  It -- again, it's just like one of the factors in the
```

ordinance.  It's a tool that the board uses.  We line up all these different factors and all the different formulas that we use and come to a consensus -- or at least the board comes to a consensus on what they think is a reasonable rent increase and then on which level of CPI increase potentially that they are comfortable with.

Q    So even if the board applied the gross profits maintenance analysis in granting rent increases for Carson Harbor Village, and even if it did that every year, does that mean every park can expect a rent increase based on that formula?

A    No.  It could be that some parks may have that same formula used year after year for a decade and then the board may decide to use a different formula or a different factor in the ordinance.  But to my recollection, Carson Harbor Village didn't get gross profit analysis increases every year or -- yeah, Carson Harbor didn't get it every year prior to Colony Cove being purchased by Mr. Goldstein.  I think they did most of the time but not all.

Q    So does the board look at each application on its own merits?

A    Right, each application and each park.  And if you come in every year, they are looking at each year's application also, whereas some applications could be 10, 12 years of expenses, some are just one year.

Q    And on Carson Harbor Village and the rent applications

```
 1   that Carson Harbor Village put in, was Mr. Goldstein always

 2   happy with the result of those rent increase applications?

 3   A    No, he wasn't.  I'd say probably over that time period he

 4   sued us probably three-quarters of the time.  So three out of

 5   every four years that went --

 6            THE COURT:  This is the subject of a motion in

 7   limine.  You have violated the Court's order.  That is struck.

 8   That testimony is struck.

 9            MS. AILIN:  Your Honor, the motion --

10            THE COURT:  I've warned you once already outside the

11   presence of the jury.  Now I'm admonishing you now.  We are not

12   going into this area.  I told you not to do it in front -- when

13   the jurors weren't present.  Now I'm telling you in front of

14   the jurors.  Don't violate the Court's order again.

15            MS. AILIN:  I am asking --

16            THE COURT:  Don't argue with me.  Next question.

17   BY MS. AILIN:

18   Q    Mr. Freschauf, on cross-examination, Mr. Close asked you

19   whether you ever felt pressure from elected officials during

20   the 20-year period when you were working on rent control for

21   the city.  You said, "yes."  Do you recall that testimony?

22   A    Yes.

23   Q    Were any of those instances between 2006 and 2009?

24   A    No.

25   Q    And in later years when you felt that pressure, did you
```

1   give into it?

2   A     No.

3   Q     Between 2006 and 2009, did any of the rent review board

4   members try to influence your recommendations?

5   A     No.

6   Q     Mr. Close also asked you if Mr. Dear controlled some

7   members of the rent review board and you said yes.  Was that

8   the case during the period from 2006 to 2009?

9   A     No.

10  Q     On cross-examination, Mr. Close asked you whether at some

11  point in your 20-plus years of working on rent control for the

12  City you knew of instances where board members were removed

13  from the board if they tried to be fair and impartial.  Do you

14  recall giving that testimony?

15  A     Yes.

16  Q     Were any of those instances between 2006 and 2009?

17  A     No.

18  Q     The city's laws allow the mayor to remove board members

19  for any reason or no reason; true?

20  A     Correct.

21  Q     Now, Mr. Close also asked you whether you told the

22  investigator who was investigating Mr. Dear's conduct that no

23  trigger was pulled at city hall unless it was approved by

24  Mayor Dear.  Was that the case during the period from 2006 to

25  2009?

```
 1  A     No.
 2  Q     During the period from 2006 to 2009, did Mr. Dear ever
 3  instruct you to reach any particular recommendations on a rent
 4  control application?
 5  A     No.
 6  Q     Did he ever ask you to revise any of your recommendations
 7  on a rent control application between 2006 and 2009?
 8  A     No.
 9  Q     Did other counsel members either instruct you or ask you
10  to revise your recommendations on rent control applications
11  between 2006 and 2009?
12  A     No.
13  Q     And isn't it true that over 90 percent of the time, the
14  board followed your recommendations because these applications
15  are pretty complicated?
16  A     That's correct.  It's kind of unusual when they don't
17  follow what the staff recommendation is.  But it happens.
18  Q     You stated that, in your opinion, some board members were
19  not fair and neutral.  Do you recall that testimony?
20  A     Yes.
21  Q     During your 20-plus years with the City, how many board
22  members did you have that experience with that they were not
23  fair and neutral?
24  A     There's two that come to mind definitely.
25  Q     Were either of them on the rent review board during the
```

1   period from 2006 to 2009?

2   A    No.

3   Q    Are those the same board members that you earlier

4   indicated you thought Mr. Dear controlled?

5   A    Yes.

6   Q    Were there any other board members that Mr. Dear

7   controlled during that period from 2006 to 2009?

8   A    No.

9   Q    And are those two people that you believe were not fair

10   and neutral still on the rent review board?

11   A    No, they are not.

12   Q    Mr. Close asked you, now that you are working on rent

13   control as a consultant rather than a full-time city employee,

14   how often you hear from mobile home park residents, and you

15   said you hear from them weekly.  Do you recall that testimony?

16   A    Yes.

17   Q    When you were working for the City full time on rent

18   control, how often did you hear from mobile home park

19   residents?

20   A    Usually daily.

21   Q    And what kinds of things were they calling you about?

22            MR. CLOSE:  Objection.  Relevance, Your Honor.

23            THE COURT:  Overruled.

24            THE WITNESS:  Anything to do with mobile home

25   living, arguments with neighbors, arguments with a manager,

```
 1    arguments with a management company, utility usage in a mobile
 2    home park, and almost everything was fair game.  I got probably
 3    almost as many questions from mobile home residents asking me
 4    who in the city would take care of a certain issue.  I kind of
 5    became the clearinghouse for anyone that lived in a mobile
 6    home, they'd end up calling my office to find out who to
 7    contact about other items too.
 8    Q    We heard testimony from Noelle Stephens that Mr. Goldstein
 9    has made allowances for residents in his mobile home park out
10    in Palm Springs when the residents have not been able to pay
11    the rent.  Do you know of any resident in Carson Harbor Village
12    who got a break on the rent when they could not afford it?
13    A    No.
14    Q    Do you know of any residents in Colony Cove who got a
15    break on the rent when they could not afford it?
16    A    No.
17    Q    And, in fact, are you aware of some situations where
18    residents were evicted from Carson Harbor Village or
19    Colony Cove?
20    A    Yes.
21    Q    It came up on Mr. Close's cross-examination that you
22    believe Mr. Goldstein is going to convert Colony Cove to an
23    ownership park.  Do you recall that testimony?
24    A    Yes.
25    Q    And you explained you had received a call from a resident
```

```
 1  about a notice the resident received and they were pretty shook
 2  up about that.  Do you remember that testimony?
 3  A    Yes.
 4  Q    Have you obtained a copy of the notice --
 5  A    Yes, I did.
 6  Q    -- from the resident?
 7  A    I have got one here.
 8  Q    And what is the notice about?
 9  A    It appears to -- well, I'm trying to not make this very
10  confusing for everyone in the jury.  It -- this currently is a
11  senior mobile home park.  This letter would change it to a
12  family park, which I would think would be the precursor of
13  converting the park to resident use -- resident ownership,
14  because I believe Mr. Goldstein in his testimony had already
15  stated -- or his staff did that they prefer to have mobile home
16  parks that are senior parks, and that makes sense.  They are
17  easier to run.  But changing the park over to a family park
18  would make units easier to sell.  So I would guess if he's
19  doing that, then that's probably the precursor to going ahead
20  to convert the park.  At least that's what most of the
21  residents think too so --
22           MR. CLOSE:  Move to strike.  Irrelevant,
23  speculation.
24           THE COURT:  Motion to strike granted.
25  BY MS. AILIN:
```

```
1   Q    Yesterday you were shown a portion of your deposition

2   where it appears you testified that it would be reasonable for

3   a park owner in 2006 to believe that the rent setting process

4   would allow the park owner to charge rent sufficient to cover

5   the park owner's operating expenses including debt service.

6   And you tried to say something when you were being questioned

7   about that, but Mr. Close cut you off and stated that no

8   question was pending.  Do you recall that testimony?

9   A    Yes.

10  Q    What were you trying to say?

11  A    Well, just that it would be reasonable except in the case

12  where there's a large debt service increase.  That's the time

13  when it would not be reasonable.  As a matter of fact, I

14  believe later on in my testimony I got into the issue where I

15  explained it more clearly.  I think I actually answered that

16  one question incorrectly in the original deposition.

17  Q    So when you referred -- when you were talking about other

18  things you said in your testimony, you were referring to your

19  deposition?

20  A    Yes.

21            MS. AILIN:  I have nothing further, Your Honor.

22            THE COURT:  Redirect -- recross, rather.

23            MS. AILIN:  Your Honor, if I could come back and ask

24  one last question?

25            THE COURT:  You may.
```

1           MS. AILIN:  Thank you, Your Honor.

2    BY MS. AILIN:

3    Q    Mr. Freschauf, does Carson Harbor Village have the highest

4    rents of any of the 21 mobile home parks in Carson?

5    A    Yes.  At the time period that this case is -- let's see,

6    2006, it was probably around $600 a month give or take.

7           MS. AILIN:  Thank you, Your Honor.

8           THE WITNESS:  And Colony --

9    BY MS. AILIN:

10   Q    And I'm sorry.  How did Colony Cove compare to that?

11   A    Colony Cove was the number two park in town at that point.

12   The rents were in the 500 range.  It was about a

13   hundred dollars less than Carson Harbor Village.

14          MS. AILIN:  Thank you, Your Honor.

15          THE COURT:  Recross.

16                    RECROSS-EXAMINATION

17   BY MR. CLOSE:

18   Q    Good morning again, Mr. Freschauf.

19   A    Good morning.

20   Q    We -- just then we had a little bit of discussion about

21   your deposition testimony; correct?

22   A    Yes.

23   Q    You recall that after that deposition, the court -- that

24   you had a chance to review your deposition, make any

25   corrections, and you signed it under oath; isn't that true,

1    Mr. Freschauf?

2    A     All 300 pages, yes.

3    Q     And you made no corrections to any of your testimony

4    before you signed it under oath; isn't that correct?

5    A     That's correct.

6    Q     And you had 30 days to review it, at least; correct?

7    A     Well, I don't think I held it 30 days, but yes, I did have

8    up to 30 if I needed it.

9    Q     And made no corrections to your testimony?

10   A     Correct.

11   Q     Signed it under oath?

12   A     Yes.

13   Q     Thank you.

14         I'd like to -- Exhibit 1003 is the October resolution

15   amending the guidelines.  Do you recall there was some

16   testimony about that when the City's attorney was examining

17   you?

18   A     Okay.  Uh-huh.

19              MR. CLOSE:  Permission to publish page 1,

20   Your Honor?

21              THE COURT:  You may.

22   BY MR. CLOSE:

23   Q     I'd like to focus on the second whereas clause and ask --

24   it says there highlighted, "Whereas the city council hereby

25   finds that it's appropriate to amend the current guidelines

1    that govern the administration of the city's mobile home space

2    rent control ordinance."

3         Do you see that, Mr. Freschauf?

4    A    Yes.

5    Q    Isn't it true that the guidelines govern the

6    administration of the rent control ordinance?

7    A    I guess it would depend on your definition of "govern."

8    Q    What -- using your definition, Mr. Freschauf, isn't it

9    true that the guidelines govern the administration of the

10   city's mobile home space control ordinance?

11   A    No.  Using -- using my word, that -- I didn't write this,

12   number one.  And number two, they don't govern.  They are a

13   guideline.

14             MR. CLOSE:  Could I ask Mr. Newcomb to highlight

15   numeral one a little bit lower on the page.

16   BY MR. CLOSE:

17   Q    Do you see where it says, "The foregoing recitals are true

18   and correct"?  Do you see that?

19   A    Yes.

20   Q    You disagree that that -- that those foregoing recitals

21   are true and correct; isn't that true, Mr. Freschauf?

22   A    Well, looking back at it, I think I might have picked a

23   different word there, yes.

24   Q    All right.

25   A    But it wasn't for me to pick it.

```
 1   Q    I'd like to go to page 3, please.  We focused on the
 2   signature there of Mayor Jim Dear.  He was the mayor; right?
 3   A    Yes.  Apparently, yes.
 4   Q    And in addition, on the left, there's two other signatures
 5   on this document, formal document, correct, an official
 6   resolution; is that right?
 7   A    Yes.
 8   Q    It's also signed by what other signatures do you see?
 9   A    Helen S. Kawagoe, who was the city clerk at that time.
10   Q    And what's the other signature that you see?
11   A    William Wynder.
12   Q    And who was he?
13   A    City attorney.
14   Q    They all signed this document; correct?
15   A    Yes.
16   Q    We had some testimony about Mr. Baar and his MNOI
17   methodology on redirect; correct?
18   A    Yes.
19   Q    You and the City went and hired Mr. Baar in the
20   Carson Gardens case; isn't that true?
21   A    Yes.
22   Q    And the Court in that case rejected his MNOI analysis and
23   found that the City had to consider debt service when setting
24   the rents for that owner; isn't that true?
25   A    Yes, because we failed to appeal that case, and the
```

 1   appellate court stated, I believe, that, if they were ruling on

 2   a clean slate, they would not necessarily have ruled the way

 3   they did in that case.  So we were -- inadvertently we managed

 4   to hem ourselves into a corner on that particular rent

 5   increase.

 6   Q    Was there anything that stops the City of Carson, you and

 7   your colleagues, from making every single argument you wanted

 8   in that case to support the use of Dr. Barr and his MNOI,

 9   anything that stopped you?

10              MS. AILIN:  Objection.  Argumentative.

11              THE COURT:  Sustained.  Rephrase.

12   BY MR. CLOSE:

13   Q    Is there anything that stopped the City from presenting

14   every argument it wanted to the *Carson Gardens* Court in support

15   of Dr. Barr and his MNOI?

16              MS. AILIN:  Objection.  Argumentative, calls for a

17   legal conclusion.

18              THE COURT:  Overruled.

19              THE WITNESS:  I guess at what phase?  You mean

20   just -- I'm kind of lost on that question.  I'm sorry.

21   BY MR. CLOSE:

22   Q    I'll move on.

23              MR. CLOSE:  I'd like to put before -- up on the

24   board Exhibit 105, Your Honor, publish the *Carson Gardens*

25   decision.

```
 1                 THE COURT:  You may.
 2                 MR. CLOSE:  On the side, page 6, please.  Column on
 3      the right with the full paragraph in the middle actually.
 4      BY MR. CLOSE:
 5      Q    "The board contends" -- I'm going to read from it -- "that
 6      it fully complied with the original writ and that its selection
 7      of MNOI was authorized by the City's ordinance and guidelines
 8      as well as Court of Appeal precedents.  It is plain, however,
 9      that the board did not, in fact, comply with the writ because
10      it did not use a methodology that considered debt service
11      costs."
12           Do you see that, Mr. Freschauf?
13      A    Yes.
14      Q    That was what the court of appeal wrote in January 2006;
15      isn't that true?
16      A    Yes.
17      Q    Prior to Mr. Goldstein's purchase of the park, the Colony
18      Cove park, most of the time debt service was compensated in
19      rent setting in Carson; isn't that true?
20      A    I'm sorry.  I thought you were still doing something here.
21      Say it again.
22      Q    I'm sorry.  Good point.  I apologize.
23           Please take it down.  Sorry.  I'm going to move on.
24           But prior to my client's purchase of the Colony Cove park,
25      most of the time debt service was compensated in rent setting
```

```
 1    in Carson; isn't that true?

 2    A    Compensated at some level, not necessarily 100 percent.

 3    Q    But at some level it --

 4    A    Yes.

 5    Q    -- was compensated?  Okay.

 6    A    Yes.  And, I mean, Jim would -- Mr. Goldstein would know

 7    about that.  I mean, ever since he had Carson Harbor Village,

 8    he had been getting, I think, less than 100 percent of his

 9    rents, as he refinanced each year and went along, the actual

10    allowable amount of rent would go down slightly.

11    Q    Because the amount of allowable debt service was tied to

12    the debt he used to acquire Carson Harbor Village; correct?

13    A    Yes.

14    Q    So the amount of allowable debt was tied to the debt used

15    to acquire the Carson Harbor Village park; correct?

16    A    Yes.  Yes.

17    Q    Thank you.  Sorry.  I'm not so good.

18         Who is Sheri Repp-Loadsman?

19    A    She was my supervisor through most of the time that I was

20    handling rent control.

21    Q    She handled rent control matters too; correct?

22    A    Not really.  That was pretty much left up to me, although

23    I did have to sit with her occasionally when I got stumped on

24    something.

25    Q    But you and Ms. Repp-Loadsman were the two people that
```

```
 1   really understood rent control in the City of Carson; correct?
 2   A     Yes.  As far as staff, yes.
 3   Q     And it would be fair to say that the city council and the
 4   mayor ran Ms. Repp-Loadsman out of the city; correct?
 5             MS. AILIN:  Objection.  Argumentative.
 6             THE COURT:  Overruled.
 7             MS. AILIN:  Calls for speculation.
 8             THE COURT:  Overruled.
 9             THE WITNESS:  Yes, that's a fair statement.
10   BY MR. CLOSE:
11   Q     The mayor and city council ran her out of the city;
12   correct?
13   A     Yes.  She had a family, and she couldn't afford to be laid
14   off.  She and myself and a number of other people were all
15   potentially going to be fired or terminated probably without
16   cause.  And she chose -- I was at the retirement age at that
17   point.  So I opted to leave that way.  She opted to take a job
18   with another city and actually got a promotion.
19   Q     She feared for her job under Mayor Dear; correct?
20   A     Yes.  That was also right at the -- not during this time
21   period of 2006, 2009.  We are at the 2015 phase or '14.
22   Q     And it's your testimony that all these -- none of these
23   things happened back in '06, '07, '08; correct?
24   A     That's correct.
25   Q     Okay.
```

1  A     There was no -- no one bothered me doing what I did.  They

2  may ask questions, but nobody was trying to tell me how to do

3  it.

4  Q     Now, you recall that I took your deposition earlier this

5  year, isn't that correct, and we talked about that on Friday;

6  right?

7  A     About --

8  Q     The deposition --

9  A     Yes.  Deposition was in March, I believe.

10  Q     It was actually January.

11  A     January, okay.

12  Q     Time flies.  And at that deposition you understood that I

13  was asking questions trying to represent my client, wanted to

14  learn what information you had, and just trying to prepare my

15  client's case?  You understood that; correct?

16  A     Yes.

17  Q     And on Friday and today in response to the City's

18  attorney's questions, do you remember you gave testimony about

19  that you don't recall any specific interference by

20  Mayor Jim Dear in the rent applications that are at issue in

21  the litigation?  Do you recall that?

22  A     Yes.

23  Q     And do you recall testifying on Friday when your -- when

24  the City's lawyer was asking you questions that the City

25  amended the guidelines in October 2006 so there would be a

```
 1  paper trail and to just sort of formalize things?
 2  A     Yes.
 3  Q     Mr. Freschauf, do you remember that at your deposition I
 4  asked you these exact same questions about conversations with
 5  Mr. Dear in connection with the rent applications and why the
 6  City amended the guidelines when it did, and your lawyer at the
 7  deposition, the City's lawyer, instructed you not to answer my
 8  questions --
 9              MS. AILIN:  Objection.
10  BY MR. CLOSE:
11  Q     -- and that you followed those instructions and did not
12  answer them at the deposition?  Do you remember that?
13              MS. AILIN:  Objection.  Assertion of a privilege.
14              THE COURT:  Overruled.
15              THE WITNESS:  Okay.  Could you --
16  BY MR. CLOSE:
17  Q     Do you remember that happening at the deposition 30 times?
18  A     That she would --
19  Q     Instruct you not to answer these questions and you would
20  follow that instruction?
21  A     Well, there was six hours of questions, and if there was
22  30 on that, yeah, I -- there was a lot of questions on it, yes.
23  Q     But you remember that you were instructed not to answer
24  and followed the instruction not to answer my questions about
25  Jim Dear's role in connection with the rent application?  You
```

**UNITED STATES DISTRICT COURT**

```
 1   remember that; correct?
 2   A    I don't remember --
 3              MS. AILIN:  Objection.  Assertion of privilege.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  I don't remember exactly which topics,
 6   but there was some on Mayor Dear, yes.
 7   BY MR. CLOSE:
 8   Q    Okay.  This MNOI formula that we've been talking about,
 9   the MNOI formula ignores the reality of actual debt expense
10   that is being paid; correct?
11   A    No, it doesn't ignore it.  It -- I guess you are hoping
12   that the park owner is realizing that the actual rents being
13   charged on the park need to somehow correlate with how much you
14   are going to pay for the park.
15              MR. CLOSE:  Your Honor, deposition 200, line 6 to 8.
16              THE COURT:  Page?
17              MR. CLOSE:  200, line 6 to 8.
18              THE COURT:  You may.
19              MR. CLOSE:  May I publish, Your Honor?
20              THE COURT:  You may.
21              MR. CLOSE:  Can you zoom in?
22   BY MR. CLOSE:
23   Q    This is from your deposition where you were sworn under
24   oath, Mr. Freschauf.
25              "QUESTION:  But the MNOI ignores the reality of actual
```

```
 1    debt expense that is being paid; correct?

 2         "ANSWER:  Yes."

 3         Did I read that correctly?

 4    A    Yes.

 5    Q    Did I read the deposition correctly, Mr. Freschauf?

 6    A    Yes.  I was just reading what was above it to see what we

 7    were talking about.

 8              MR. CLOSE:  Well, I have no further questions.

 9    Thank you very much, Mr. Freschauf.

10              THE COURT:  You may step down.  Thank you.

11              THE WITNESS:  Thank you.

12              THE COURT:  Defense's next witness.

13              MR. ONSTOT:  Defense calls Dr. Kenneth Baar.

14              THE CLERK:  If you can please raise your right hand.

15         Do you solemnly swear that the testimony you shall give in

16    the cause now before this Court shall be the truth, the whole

17    truth, and nothing but the truth, so help you God?

18              THE WITNESS:  Yes, I do.

19              THE CLERK:  Thank you.  Please take a seat.  For the

20    record can you please state your full name and spell your last

21    name.

22              THE WITNESS:  Okay.  My full name is Kenneth Calvin

23    Baar, and the last name is spelled B-a-a-r.

24    ///

25    ///
```

```
 1                        KENNETH BAAR,

 2  called as a witness by the defendant, was sworn and testified

 3  as follows:

 4                      DIRECT EXAMINATION

 5  BY MR. ONSTOT:

 6  Q     Good morning, Dr. Barr.

 7  A     Good morning.

 8  Q     To your right on the floor, there should be a series of

 9  binders.  They are black binders that are labeled plaintiff's

10  exhibits and white binders that are labeled defense exhibits,

11  and we may use those as we go through your direct testimony

12  today.  So I wanted to let you know where they are.

13  A     Okay.  Thank you.

14  Q     What is your occupation?

15  A     I'm an attorney and urban planner, and my principal work

16  for the last -- since 1980 has been advising local governments

17  about issues related to rent regulations and preparing housing

18  and economic studies related to the rental housing market for

19  mobile homes and for apartments.  And I've also been an expert

20  witness for 15 different cities in California and fair return

21  cases under mobile home rent regulations.  Overall, I've

22  consulted to 35 different cities in California.

23  Q     Can you briefly describe your post high school education,

24  please.

25  A     Yes.  I've got a bachelor's degree from Westland
```

```
 1  University in Middletown, Connecticut.  I received a law degree

 2  from Hastings College of Law.  That's at University of

 3  California in San Francisco.  And then I received a master's

 4  and a doctorate degree in urban planning from UCLA.

 5  Q    Have you held any teaching positions?

 6  A    Yes, I have, a few.  A few times I got government you

 7  could say grants, they were called Fulbright scholarships, to

 8  teach in East Europe.  So a few years I was teaching in Hungary

 9  and for a few years I was teaching in Albania.  And I also was

10  a visiting professor for one year at Columbia University in

11  New York.

12  Q    Now, as a consultant, I think you mentioned to California

13  cities, have you participated in the drafting of rent control

14  ordinances or regulations?

15  A    Yes, I have.

16  Q    On approximately how many occasions?

17  A    Well, I'd say roughly -- I haven't counted them.  I'd say

18  roughly ten, but I haven't counted them.

19  Q    And have you conducted studies of the operation of mobile

20  home ownership and mobile home park space rental markets?

21  A    Yes, I have.  I've conducted those type of studies for

22  about seven cities, including the City of Los Angeles and the

23  city of El Monte.

24  Q    And you have served a consultant -- as a consultant both

25  to cities, counties, residents of mobile home parks, and mobile
```

```
 1   home park owners; is that correct?
 2   A     That's correct.
 3   Q     But mostly cities; is that fair?
 4   A     Yes.
 5   Q     Have you served as an expert witness before?
 6   A     Yes, I have.
 7   Q     On approximately how many occasions?
 8   A     In court cases, I would say about six cases.
 9   Q     Did you publish an article in a law review called "The
10   Fair Return Under Mobile Home Park Space Rent Controls"?
11   A     Yes, I did.  Yes, that --
12   Q     And what is that about?
13   A     Well, it's about -- it's about different fair return
14   standards under rent regulations.  And it was published by the
15   California continuing education of the bar journal -- that's
16   their journal.
17   Q     Did you also publish an article called "Laws Protecting
18   Mobile Home Park Residents"?
19   A     Yes.
20   Q     And one -- what was that about?
21   A     I have to go -- I published a number of articles.  Which
22   one was that published in?
23   Q     "Land Use and Zoning Digest."
24   A     Yes.  Okay.  That was an article I wrote quite a while ago
25   relating to different issues relating to mobile home park rent
```

1   regulations and the condition -- situation of mobile home park

2   owners.

3   Q      And in the "Real Property Law Reporter," did you publish

4   an article called "California Rent Controls, Rent Increase

5   Standards, and Fair Return"?

6   A      Yes, I did.

7   Q      What is that about?

8   A      That's about issues related to fair return under rent

9   regulations.

10  Q      And, lastly, in the "Rutgers Law Review," did you publish

11  an article called "Guidelines for Drafting Rent Control Laws,

12  Lessons of a Decade"?

13  A      Yes, I published that article too.  I wrote that article

14  too.

15  Q      What is that about?

16  A      That's a very lengthy article, over 100 pages, where it

17  discussed a great variety of issues related to rent regulations

18  and includes a chapter in that article about fair return

19  standards and discusses rent increase standards and eviction

20  standards and a lot of issues related to rent regulations.

21  Q      Have courts cited to your work in appellate court opinions

22  before?

23  A      Yes.  Frequently in -- first in California Court of Appeal

24  opinions --

25  Q      Excuse me, Dr. Baar.  Let me stop you there.  On

1   approximately how many occasions?

2   A     At least ten.

3   Q     And have you been qualified as an expert witness before on

4   the subject of rent control methodologies and fair return?

5   A     Yes, I have.

6   Q     On approximately how many occasions?

7   A     I'd say about five occasions.

8   Q     Now, is the City of Carson one of your clients?

9   A     Yes, they have been.  Yes.

10  Q     When did you start working for Carson?

11  A     In 19 -- in 2003.

12  Q     In your work, is it important for you to know the statutes

13  and case laws and ordinances that govern rent control in the

14  jurisdictions you represent?

15  A     Yes, it is.

16  Q     And do you keep up with those things?

17  A     Well, I follow -- there are a hundred different cities

18  that have rent regulations.  I keep up with them to the extent

19  possible, yes.

20  Q     Are you familiar with the types of methodologies that

21  courts have approved for determining fair rent increases?

22  A     Yes.

23  Q     And is part of your work advising clients as to what a

24  fair return -- or what a rent increase would yield in terms of

25  fair returns?

```
 1   A     Yes, it is.  And when I prepare fair return reports, they

 2   provide analysis of what rent increase would meet legal

 3   standards -- fair return standards.

 4   Q     Okay.  Dr. Baar, if you can turn in the white binder,

 5   Exhibit 74.

 6               MR. CASPARIAN:  Objection, Your Honor.

 7               THE COURT:  Hold on.

 8               THE WITNESS:  Which volume is that?

 9   BY MR. ONSTOT:

10   Q     It's a white binder.  It should be 1 of 3.

11   A     Yes.  I found it.

12   Q     Okay.  Exhibit 74 is titled "Analysis of the Colony Cove

13   Mobile Estates Rent Increase Application, Carson, California."

14   Did you prepare this?

15   A     Yes, I did.

16   Q     Did you prepare it on or about February 2008?

17   A     Yes, I did.

18   Q     If you can take a look, Dr. Barr, for a moment, the

19   question is is that a complete and accurate representation of

20   the report that you prepared?

21   A     I believe it is.

22               MR. ONSTOT:  Your Honor, 74 is not yet admitted.  We

23   move to admit.

24               MR. CASPARIAN:  Object, Your Honor.

25               THE COURT:  Let's discuss it over the break.
```

**UNITED STATES DISTRICT COURT**

```
 1   BY MR. ONSTOT:

 2   Q    Dr. Baar, do you recall -- strike that.

 3        Did you do an analysis of Colony Cove's year one or first

 4   application for a rent increase?

 5   A    Yes, I did.

 6   Q    That was in 2007, 2008 time frame?

 7   A    Yes.

 8   Q    At the time do you recall what the average space rental

 9   was for a space, not including the dwelling, just the space of

10   Colony Cove at the time Colony Cove acquired it?

11   A    Well, my memory was that it was about $425.

12   Q    400 and something; fair?

13   A    Yes.

14   Q    And do you recall in the first application that Colony

15   Cove asked for a $618 rent increase?

16   A    Yes, I do.

17   Q    Now, if you can turn in Exhibit 74 to page 74-8.

18   A    Okay.

19   Q    Listed there are three different types of analyses for

20   determining rent increases; correct?

21   A    That's correct.  They are in the middle of the page.

22   Q    Does that refresh your recollection as to the three that

23   you used in analyzing Colony Cove's year one rent application?

24   A    Yes.

25   Q    The first one is listed as gross profits maintenance;
```

```
 1  correct?

 2  A     Yes.

 3  Q     What is gross profits maintenance?

 4  A     Okay.  That's a formula under which the rent is set by

 5  adding the -- looking at the return the property owner had

 6  after operating expenses and after debt service.  So it

 7  includes both of those, and that's an important distinction.

 8  And basically that type of formula, one has a right to maintain

 9  whatever level of return -- net return after both of those

10  expenses that they had as of the prior -- as of the prior

11  decision providing a fair return.

12  Q     Did you perform a gross profit maintenance analysis for

13  Colony Cove's year one application?

14  A     Well, that was included in the report.  And I don't know

15  if Ken Freschauf actually prepared it or I did.  But it was

16  included in my report.

17  Q     The second one is maintenance of net operating income or

18  MNOI; correct?

19  A     Yes.

20  Q     Did you prepare an MNOI analysis for Colony Cove's year

21  one rent application?

22  A     Yes, I did.

23  Q     Can you explain what MNOI is.

24  A     Okay.  And this is a little complicated.  MNOI standard is

25  a standard where you preserve the return after operating
```

```
 1   expenses are considered.  So it's rent minus operating

 2   expenses.  But debt service is not considered an operating

 3   expense under that standard.

 4        And an owner has a right to keep whatever -- and the

 5   remainder is called net operating income, what the owner has

 6   after paying the operating expenses of the park.  And when I

 7   say "operating expenses," property taxes, insurance,

 8   maintenance, management, the kind of things you would need to

 9   operate a mobile home park.  So an owner is entitled to keep

10   the same level of net operating income that they had in past

11   years with some kind of inflation adjustment.

12   Q    Going back to gross profit maintenance analysis, did you

13   recommend to the Carson rent control board that they grant a

14   rent increase based on gross profit maintenance?

15   A    No, I did not.

16   Q    Why not?

17   A    Well, there are a few reasons.  One is, I mean, basically

18   if you allowed more -- the gross profit maintenance methodology

19   allows mortgage expenses as an expense.  And if you do that,

20   the purposes of rent regulation can be defeated because an

21   owner can get a very large mortgage, which is a cost of

22   purchasing the property, and pass that through to the

23   residents.  And if you allow that as an expense, in a way

24   there's no ceiling on how much the rents can be raised because

25   they can be raised to cover whatever mortgage the owner elects
```

```
 1   to get.
 2        So if you have rent regulation, it's sort of you have a
 3   flip situation where really, when somebody purchases a
 4   property, they should look at what rents are allowed rather
 5   than getting a mortgage and then saying the rent should be
 6   allowed based on this mortgage I elected to get.  And --
 7   Q    Are there any other reasons?
 8   A    Yes.  Well, another reason is it just wouldn't lead to
 9   sensible results.
10   Q    How so?
11        MR. CASPARIAN:  Objection, Your Honor.  The
12   defendants have not laid the foundation for admissibility under
13   Daubert and its progeny --
14        THE COURT:  Overruled.
15        MR. CASPARIAN:  -- in the testimony.
16        THE COURT:  Overruled.  You may.
17   BY MR. ONSTOT:
18   Q    You can answer.
19   A    Okay.  Well, it wouldn't make sense in the sense let's say
20   you had, you know, two mobile home parks that were virtually
21   identical in terms of, you know, quality, et cetera, in terms
22   of operating expenses, and if you allowed mortgage expenses as
23   an expense, let's say one owner has owned the park for a long
24   time and they have a small mortgage or no mortgage because they
25   bought the park for a much lower price, and then another park,
```

```
 1    the park owner purchased the park recently and they have a big

 2    mortgage, you'd have a system where the allowable rent would

 3    depend on, you know, when the park was purchased and the

 4    financing arrangements of the park.

 5         So you'd have parks that otherwise are, you know,

 6    comparable in terms of amenities and operating expenses but

 7    would have much different allowable rents if you allowed the

 8    mortgage payments as part of the cost that could be passed

 9    through to the residents and incorporated into the rent.

10    Q    So the park owner with the mortgage debt would be allowed

11    a larger rent increase under GPM than the park owner that had

12    little or no mortgage debt?

13    A    Yes.  Yes.  I mean, under the GPM formula, that formula

14    looks at the increase in the mortgage over what it was in the

15    prior rent increase case.

16    Q    Any other reasons why you did not recommend to the board

17    that they use gross profit maintenance?

18    A    Well, there are two others.  Another possibility is that,

19    if you allow mortgage expenses as an expense, this could be

20    manipulated.  And when I say that, what I mean is an owner can

21    get a big mortgage when they purchase a park, it could be a

22    certain interest rate, and then a few years later, they could

23    go back and they'd get a rent increase based on that mortgage

24    and that interest rate.  And then a few years later they could

25    pay off the mortgage or get a mortgage with a lower interest
```

**UNITED STATES DISTRICT COURT**

1  rate, and the rent wouldn't be reduced.

2      So basically you could, you know, make one mortgage

3  arrangement so that it favored you under the rent regulation if

4  you allowed mortgages and expense, and then you could go back

5  and get another mortgage later.  So the standard could be

6  manipulated in that way.  And --

7  Q   I think you said there was one more reason?

8  A   Yes.  Okay.  In two court cases, the courts have

9  indicated, California court of appeal opinions --

10             MR. CASPARIAN:  Objection, Your Honor, relevance of

11  the state court fair return cases.

12             THE COURT:  Let's take a break.  Ladies and

13  gentlemen, we are going to break for the morning break.  We'll

14  resume in 15 minutes.

15      Remember not to discuss the case among yourselves or with

16  anyone else.  Don't form or express any opinions about the case

17  until it's submitted to you.  Thank you.

18             THE CLERK:  All rise.

19             (Outside the presence of the jury.)

20             THE COURT:  First, with regard to Exhibit 4 -- so

21  that my understanding is correct, 74 was prepared by the

22  witness in -- you may step down.  Thank you.

23             THE WITNESS:  I should step down?

24             THE COURT:  Yes.  Step down, please.

25      So this is the analysis that was prepared by Mr. Baar and

```
 1    presented to the board for its consideration in reviewing the

 2    application; is that right?

 3              MR. ONSTOT:  For year one, correct.

 4              THE COURT:  For year one.  Okay.

 5         And there are multiple objections on the exhibit list.

 6    State your objection, please.

 7              MR. CASPARIAN:  Should I go to the lectern?

 8              THE COURT:  You can go from there as long as I can

 9    hear you.

10              MR. CASPARIAN:  Your Honor, this exhibit contains a

11    chart within it that has not been sourced.  Dr. Barr has

12    testified at his deposition that he did not create this chart.

13              THE COURT:  Can I have a page number of the chart?

14              MR. CASPARIAN:  Yes.  74-21.  It purports to be a

15    survey of prior decisions by the rent board.  Dr. Barr

16    testified that he did not create the chart.  So it's not

17    properly sourced.  In addition, it attempts to essentially

18    introduce hearsay for the truth of the matter of what the

19    result was in these cases underlying.

20              THE COURT:  But isn't it -- I mean, but isn't it, in

21    fact, what the board, at least in part, relied on in making its

22    decision on the application; is that correct?

23              MR. CASPARIAN:  That probably is correct.  My

24    concern is that this chart or some other version of it -- it

25    exists in several other exhibits, also Exhibit 81 is
```

1    essentially a standalone version of this chart -- is going to

2    be presented to the jury as a survey of decisions of the

3    prior -- of the rent board in several earlier cases.

4        It's also improper expert -- our main objection with

5    Dr. Barr, of course, is they are attempting to present him as

6    an expert on the issue with Baar, investment-backed

7    expectations.  He's only been qualified at best as an issue of

8    fair return.  And the likelihood of confusion with the jury as

9    to these two issues -- essentially, the fair return testimony

10   invades exactly what motion in limine 6 attempts to exclude,

11   which is these prior trial Court opinions.

12              THE COURT:  Okay.  So then moving on to the next

13   phase, the objection right before the break about the cases

14   that he was about to discuss, fill me in as to what's coming

15   next.

16              MR. ONSTOT:  Well, Your Honor, in his report he

17   mentions two cases.  He knows he's not going to talk about the

18   California cases related to Colony Cove.  And the two cases he

19   cites in his reports are the *Palomar* case and *Carson Gardens*

20   which everybody has seen ad nauseam here.  And he relied upon

21   them, and he said he has to consider the law in rendering his

22   opinions.

23              THE COURT:  What is the other case that he was going

24   to talk about?

25              MR. ONSTOT:  *Palomar*?

1          THE COURT:  Okay.  All right.

2          MR. CASPARIAN:  Your Honor, *Palomar* is a fair return

3   case.  It has nothing to do with the City of Carson.  It was

4   20 years before today prior to Carson's enactment of the

5   ordinances.  It purports to examine fair return under a

6   completely different rent control scheme and is irrelevant to

7   the issue of Carson.

8          MR. ONSTOT:  Your Honor, counsel's arguments don't

9   go to admissibility.  He can address it all he wants on

10  cross-examination.

11         THE COURT:  I understand.  74 is admitted, and you

12  may inquire.  Thank you.

13         (Exhibit No. 74 received into evidence.)

14         (A brief recess was taken.)

15         (In the presence of the jury.)

16         THE COURT:  You may resume.

17         MR. ONSTOT:  Thank you, Your Honor.

18  BY MR. ONSTOT:

19  Q    Before the break, Dr. Baar, you were, I think, going to

20  discuss the fourth reason why gross profit maintenance was not

21  used on your recommendation to the board, and you mentioned two

22  court cases.  Do you recall that?

23  A    Yes.

24  Q    Is one of those cases *Palomar Mobile Home Association vs.*

25  *The Rent Review Commission of San Marcos*?

```
 1   A     Yes.

 2   Q     And how did that case factor into your analysis not to use

 3   GPM?

 4   A     Well, in that case, the court of appeal in a published

 5   opinion concluded that it was not rational to consider debt

 6   service in determining what the allowable rent should be.

 7   Q     The other case which we all know about is Carson Gardens;

 8   correct?

 9   A     Yes.

10   Q     And how did that factor in your determination not to

11   recommend use of a gross profit maintenance determination for

12   the rent increase in year one?

13   A     Okay.  The case -- the situation regarding that case is

14   somewhat complicated.  I'll try to explain it.

15         In that case, a park owner had applied for a rent increase

16   and had a substantial increase in debt service, and the city

17   made a ruling, the city rent board, that the increase in debt

18   service could not be passed through.  The owner went to court

19   and said no, I have a right to have that debt service passed

20   through.

21         What happened was the trial Court said yes, the owner had

22   a right to pass the debt service through.  And so the rent

23   board -- and the decision -- the rent board, as I understand,

24   wasn't completely clear what the trial Court was ordering.  The

25   rent board didn't pass through the debt service.
```

 1      And then the owner went back in the second hearing -- the

 2  owner went back to court, went to the trial Court, and the

 3  Court said yes, the owner has a right to pass through the debt

 4  service.

 5      Then it went up to the court of appeal.  And this is

 6  what's complicated.  The court of appeal said in this case, the

 7  owner had a right to pass through debt service because the City

 8  never appealed the first trial Court opinion.  So the court of

 9  appeal could not undo that decision.

10      But then the court of appeal went out of its way to say we

11  are not making --

12          MR. CASPARIAN:  Objection, Your Honor.  Improper

13  legal opinion.

14          THE COURT:  Sustained.

15  BY MR. ONSTOT:

16  Q    Without reciting the case, how did that case factor into

17  your GPM analysis?

18  A    Okay.  The way it factored in was that the Court had

19  not -- the Court had held that it was -- that it was not ruling

20  on whether a city, in general, had to have a passthrough debt

21  service.

22  Q    Okay.  Now, if you would turn to page 74-13.  No. 5 says

23  net operating income or NOI may not be frozen.  Do you see that

24  paragraph there?

25  A    Yes.

```
1   Q    The first sentence reads that, "While the Courts have held

2   that no specific formula is constitutionally required, they

3   have set forth a critical parameter for fair return.  They've

4   consistently held that some growth in net operating income must

5   be permitted."

6        Do you see where I'm referring to?

7   A    Yes.

8   Q    What does that mean?

9   A    Well, that means the net operating income is the income

10  after the operating expenses but before the debt service.  And

11  what the courts have held is you have to allow that net

12  operating income to grow.  And, therefore, an owner would have

13  additional funds -- you know, additional return on investment

14  or additional income to cover debt service in the future.

15  Q    How do you maintain net operating income?

16  A    The way you maintain it is -- it's the opposite of

17  freezing.  You don't say the net operating income that somebody

18  got in the year 2000 is a fair net operating income today

19  because there's been inflation.  So you adjust that net

20  operating income by some inflation factor, which could be 100

21  percent of the inflation rate or a lower percentage, 75 or

22  50 percent of the inflation rate.  It provides for some growth

23  in the income after expenses.

24  Q    Now turning to page 74-22.

25  A    Okay.
```

1    Q    In your report, you addressed Colony Cove's claim to a

2    vested right to pass through its increases in debt services; is

3    that true?

4    A    That's correct.

5    Q    And you mentioned the *Palacio de Anza* case; correct?

6    A    Yes, I did.

7    Q    And without telling us the details of that case, how did

8    that case factor into your analysis regarding Colony Cove's

9    claim to a vested right -- of a vested right to pass through

10   debt service?

11   A    I concluded that case was not applicable in this case.

12   Q    Why?

13   A    Well, the ordinance in Palm Springs was different than the

14   ordinance in Carson.  The Carson ordinance held that an owner

15   didn't have a right to an entitlement under any particular

16   formula.  The Palm Springs ordinance held that an owner

17   could -- the Palm Springs ordinance held that an owner had a

18   right -- was allowed to pass through increases in debt service.

19        So here's one ordinance said you are allowed to pass

20   through increases in debt service, but you have the Carson

21   ordinance which says some analysis considering debt service

22   should be performed but you had no right to an entitlement to

23   an increase pursuant to any particular formula.

24   Q    Let's move on now to MNOI.  The same page, Roman Numeral

25   VI on page 74-22, the rationale for the MNOI standard.

**UNITED STATES DISTRICT COURT**

```
 1   A     Okay.  I don't know -- I don't know if it's easy to read

 2   this on the screen.  It has to be bigger.

 3   Q     It's not.

 4   A     Okay.  Sorry.  Okay.

 5   Q     So tell us what the rationale is for why you recommended

 6   that the board use the MNOI standard.

 7   A     Well, the maintenance of a net operating income standard,

 8   which is a standard that measures return after operating

 9   expenses, rent minus operating expenses, it's been widely used

10   among California jurisdictions.  It's been widely approved by

11   the courts.  And it's a rational standard.  It ties the rent

12   increases to increases in operating cost and the inflation

13   rate.

14        So if an owner, if the property taxes go up, their

15   maintenance, their insurance or whatever, utility costs, those

16   have gone up a lot in some cases, the owner is guaranteed a

17   right to get rent increases that can cover those cost

18   increases, and they are guaranteed to some growth in their

19   net -- their income that's left after those cost increases,

20   after covering those cost increases.

21        And it's -- as I say, it's a very widely used standard.

22   The City of Los Angeles uses it, and I think most rent

23   jurisdictions apply this type of standard.

24   Q     Now, we've heard testimony, Dr. Baar, that many

25   jurisdictions would do a GPM analysis but not necessarily apply
```

1    it in awarding a rent increase.  To your knowledge, does

2    anybody -- any of the jurisdictions you've worked with use GPM

3    and apply GPM for determining rent increases?

4    A    The time I've been working on these issues, I can't recall

5    another city using this type of analysis.  I'm not aware of

6    everything that 90 different cities do.  But I'm not aware of

7    other cities using this type of analysis or I don't recall

8    other cities using this type of analysis.

9    Q    Calling your attention to page 74-24, there's reference at

10   the bottom to an *Oceanside Mobile Home Park Owners Association*

11   *vs. City of Oceanside* case?

12   A    Yes.

13   Q    Where the Court's approved use of MNOI?

14   A    That's correct.

15   Q    How did that -- without telling us what the case details

16   are, how did that factor into your analysis in using --

17   preferring to use MNOI?

18   A    Well, the Court approved that as a legal -- a valid fair

19   return standard.

20   Q    Do you know of any -- strike that.

21        Can you briefly describe in simple terms how you calculate

22   a proposed rent increase using MNOI.

23   A    Okay.  I'll try.  Basically an apartment or a park owner

24   makes an application.  And in the application there will be

25   information about what income and expenses they had in the base

```
 1   year and what net operating income they had in the base year.
 2   They'll present this data.
 3       Then they will present data on what income they have,
 4   rental income in the current year, what operating expenses, and
 5   then what's left over, what net operating income they have left
 6   over.
 7       And so the analysis will be to compare the net operating
 8   income in the base year, which is a prior year, and -- with a
 9   net operating income in the current year.  If the net operating
10   income is lower, you know, obviously it has -- in the current
11   year, it has to be increased to be brought up to the net
12   operating income of the base year.  And then beyond that, it
13   has to be brought up to another level because there needs to be
14   some inflation adjustment of the net operating income.  So
15   basically it's preserving the prior level of net operating
16   income for the park.
17   Q    Page 74-27.  This was prepared specifically for Carson's
18   consideration of Colony Cove's rent application for year one;
19   correct?
20   A    That's correct.
21   Q    And does it walk through the process for determining the
22   proposed rent increase?
23   A    Yes.
24   Q    Can you please explain the chart.
25   A    Okay.  What I determined that case is the park owner --
```

1  the prior owner of the park had applied for a rent increase a

2  few years earlier.  And the determination was made that the

3  operating cost had increased by $7,400 since the prior case.

4  And so that was an adjustment that needed to be made to the

5  rent.

6      It was also determined that in the prior case, after the

7  rent increase that was awarded in the prior case, the owner had

8  a net operating income of $1.1 million approximately, and an

9  inflation adjustment was made to that $1 million -- $1.1

10  million net operating income.  And depending on whether you

11  adjusted it by 50 or 100 percent of the CPI, it was necessary

12  to -- it was a small increase because it was just a few years

13  later and inflation hadn't been very -- wasn't very high in

14  those years.  It was about a few percent a year, 3 percent a

15  year.

16      And so in order to adjust the net operating income, that

17  had to be adjusted by a range between 3 and 6 percent.  And

18  those were increases of $34,000 up to $68,000 for the park

19  depending on what percentage of the CPI, the Consumer Price

20  Index, you adjusted the net operating income.  So in the

21  report, it indicates that a rent increase, just to cover the --

22  provide growth in net operating income, a rent increase of 7 to

23  $14 would be required.

24      So you have two types of increases, one to cover the

25  operating cost and one to have the -- provide the growth and

```
 1   income.  And in the end, the allowable increase would be --
 2   overall would be between $8.00 and $15.00.  I mean, I'm
 3   rounding numbers.
 4        But so basically I took this particular methodology and
 5   applied it to this particular case, how much the operating
 6   costs have gone up and how much inflation there is and making
 7   an inflation adjustment to the net operating income.
 8   Q    And that was your initial recommendation for a rent
 9   increase; correct?
10   A    Yes.
11   Q    After you prepared your report, what happened?
12   A    Well, a few things.  One is that the owner, you know,
13   prepared -- made a new set of submissions with, you know,
14   different, you know, arguments or claims.  And then also
15   what -- I think as in this case what happened was there was an
16   issue of whether an owner should get an additional amount for
17   property tax increase.
18        And in this case, the owner hadn't paid the property tax
19   increase.  And normally you wouldn't allow it if it hasn't been
20   paid.  But in this case, it turned out -- the evidence that was
21   presented turned out -- indicated that it was a certainty that
22   the owner would have to pay it.  So, therefore, it was
23   allowed -- it was added on to the operating cost increase
24   because it was a certainty.
25   Q    So in response to Colony Cove's requests and arguments,
```

```
 1    did you go back and prepare a supplement to your original

 2    report?

 3    A     Yes.  Not on the property tax issue, but that -- the

 4    staff, I think, made some supplemental recommendations which I

 5    agreed with.

 6    Q     Okay.  And you went back and did a supplemental report to

 7    address other concerns; correct?

 8    A     Yes.

 9    Q     Can you turn to Exhibit 75, please.

10    A     Okay.

11    Q     Exhibit 75 purports to be a supplemental analysis of

12    Colony Cove's submission.  That would be for the year one

13    application; correct?

14    A     Correct.

15    Q     And did you prepare this?

16    A     Yes.

17    Q     Did you prepare it on or about June 2008?

18    A     Yes.

19    Q     In response to Colony Cove's comments and their year one

20    rent application?

21    A     Yes.

22            MR. ONSTOT:  Your Honor, we move 75 into evidence.

23            THE COURT:  Admitted.

24            (Exhibit No. 75 received into evidence.)

25    BY MR. ONSTOT:
```

1    Q     I'm not going to walk you through the report.  But I want

2    you to tell me what this supplemental report added to the

3    original.

4    A     Well, there are two things addressed.  The park owner --

5    if I remember correctly, the park owner made a vested rights

6    claim.  So it discussed that.  And it also discussed -- the

7    owner said that I have a right to have my net operating income

8    increased by 100 percent of the inflation rate, and I addressed

9    the issues related to that claim.

10   Q     Anything else you can recall?

11   A     Well, let -- okay.  Then there was a discussion of fair

12   rate of return on investment by the park owner where the park

13   owner, if I recall it, claimed that they were entitled to about

14   a 9 percent rate of return.  And I addressed the issues -- I

15   had some discussion related to those issues, and they pointed

16   to prior reports I had prepared.

17   Q     And is it your understanding that your supplemental report

18   went to the rent board?

19   A     Yes.

20   Q     And do you recall that the rent increase granted to Colony

21   Cove for its year one rent increase application was $36.74

22   pursuant to the MNOI formula?

23   A     Well, that -- yeah, that's my recollection.  I knew it was

24   about that.

25   Q     Okay.  On to year 2.  If you turn to Exhibit 76, "Analysis

 1    of Colony Cove Mobile Estates' Rent Increase Application for

 2    Year 2."  Did you prepare this report in or about June of 2009?

 3    A    Yes.

 4    Q    Does it accurately reflect the report that you provided to

 5    the board?

 6    A    I believe it does.

 7              MR. ONSTOT:  Your Honor, we move entry of 76.

 8              THE COURT:  Admitted.

 9              (Exhibit No. 76 received into evidence.)

10    BY MR. ONSTOT:

11    Q    Dr. Barr, I'm not going to walk you through this report

12    either.  But did you perform basically the same analysis for

13    year 2 that you did for year 1?

14    A    Yes.

15    Q    Do you recall any differences other than the actual

16    numbers?

17    A    I don't recall the analysis being different in substance.

18    As you say, the numbers were different.  It dealt with

19    different operating expenses, increases.

20    Q    Do you recall if the report for year 2 was submitted to

21    the board?

22    A    I'm sure it was -- yes.  Yes, it was.

23    Q    Okay.  And do you recall that the board granted a rent

24    increase of $25.02 for the year 2 application?

25    A    Okay.  I didn't recall that.

1    Q    Okay.  That's fair.  Now, Dr. Barr, you were asked to

2    provide an expert opinion regarding reasonable expectations of

3    Colony Cove at the time it purchased it -- the Colony Cove

4    mobile park; is that correct?

5    A    That's correct.

6    Q    And is that -- did you prepare a report expressing the

7    opinion and the basis therefor?

8    A    Yes, I did.

9              MR. CASPARIAN:  Objection, Your Honor.  Outside the

10   field of expertise.

11             THE COURT:  Overruled.

12   BY MR. ONSTOT:

13   Q    Can you look at Exhibit 77, please.  Is this a report that

14   you prepared?

15   A    Yes.

16   Q    Is it your opinion that Mr. Goldstein did not have a

17   reasonable investment backed expectation that a rent increase

18   would be obtained to cover its rent service for Colony Cove?

19   A    Yes, that's my opinion.

20   Q    Can you please explain the basis for that opinion.

21   A    Well, the ordinance made a few reasons.  One is the

22   ordinance made it clear that an owner was not entitled to a

23   rent increase pursuant to any particular formula.  So there

24   wasn't -- the board would do a GPM analysis, but at the end of

25   the, you know, guidelines regarding that analysis, this

1   analysis does not create any right.

2       A purpose of the ordinance was to prevent excessive rent

3   increases.  And so here the -- just to cover the increase in

4   debt service, it would have required a rent increase of about

5   $200.  And as we indicate, the rents were somewhere in the 400s

6   range.  So this would have been a very large rent increase

7   relative to the rents.

8       And looking -- looking back, there were a few things.

9   One, well, the GPM analysis had been used in past cases.  Those

10  were mostly cases where there was no increase in debt service.

11  And the board had not given any substantial rent increases

12  based on increases in debt service.  This was the practice.

13  And a few years before the application, another owner had come

14  in, applied to the city, had an increase in debt service, and

15  the board ruled it couldn't be passed through.

16      And, you know, then we mention -- we discussed the

17  *Carson Gardens* case where the City had taken the position that

18  an owner shouldn't get an increase for increase in debt

19  service, and the Court had ruled, look, they can in this case

20  but we are not deciding what would -- what the rule will be in

21  other cases.

22      So we had -- you could say there were all these yellow

23  lights.  The ordinance said there was no entitlement to any

24  increase pursuant to any formula.  It also said, which I

25  haven't mentioned, it said that the board could consider any

 1     other relevant factors.  There was a purpose to prevent against

 2     excessive rent increases.

 3         So you put all these things together, and somebody

 4     couldn't rely on being able to get a rent increase for the debt

 5     service.  You know, they could wish for it.  They could hope

 6     for it.  But they certainly couldn't rely on it.  There were

 7     all these, you know, warnings, the past practice of the board,

 8     et cetera.

 9         Then there was another old warning, it was back in the

10     '80s, where the park -- under the same ordinance the park owner

11     had an interest in another park, applied for a rent increase

12     based on their increase in debt service, and it was denied.

13         So when you -- and plus, as I mentioned, you had these two

14     court cases that said it wasn't rational to base the allowable

15     rents on the debt service.  So you had all this whole

16     collection of factors which, you know, certainly, you know, at

17     a minimum created extreme -- you know, a great uncertainty that

18     an owner could get an increase based on debt service.

19         And, you know, I mean, somebody could argue that they

20     should get it, but here the history was and the law was that,

21     you know, it didn't create a right.  It was very open-ended.

22     It gave the board discretion.  And the purpose of the ordinance

23     was to prevent excessive rent increases.

24             MR. ONSTOT:  Thank you, Dr. Barr.

25         Nothing further, Your Honor.

```
 1              THE COURT:  Cross-examination?

 2                        CROSS-EXAMINATION

 3   BY MR. CASPARIAN:

 4   Q     Good morning, Dr. Barr.

 5   A     Good morning.

 6   Q     You are not an economist, are you, Dr. Baar?

 7   A     No, I'm not an economist.

 8   Q     And you've never been hired to advise a real estate

 9   investor regarding investment expectations or projections, have

10   you?

11   A     That's correct.

12   Q     You've never been hired to advise investors in commercial

13   properties, have you?

14   A     That's correct.

15   Q     And you yourself are not an investor in commercial

16   properties; correct?

17   A     Yes.

18   Q     Yes, it's correct?

19   A     Yeah, if you don't -- if you don't count apartments.

20   Q     Have you ever been qualified by a court to testify

21   regarding the reasonableness of investment backed expectations?

22   A     No.  I don't think it's come up before.

23   Q     The jury has heard that the parties have stipulated that

24   the sale of the park in 2006 was an arm's length market

25   transaction.  And if it is an arm's length market transaction,
```

1    the purchase price is the market value; correct?

2    A    Yes, okay, it was the market value.

3    Q    And you don't contend that the loan with GE Capital was

4    not pursuant to customary financing practices, do you?

5    A    Well, let me say this.  I don't know what customary

6    financing practice is.  But one thing I noted was that the

7    mortgage payments exceeded the net operating income.

8    Q    After the purchase --

9    A    Right.

10   Q    -- of the park regarding the actual expenses that really

11   were incurred?

12   A    I'm not sure what you mean.  The net -- the debt service

13   was greater than the income from the park, the net operating

14   income.

15   Q    Now, you didn't contend that when you worked on Colony

16   Cove's rent increase applications in 2007 and 2008 that the GE

17   Capital loan was not pursuant to customary financing practices,

18   did you?

19   A    No.

20   Q    So regarding your reasons why the gross profit maintenance

21   analysis can be manipulated, those factors are not present

22   here; correct?

23   A    Well, I didn't look into those factors.

24   Q    Okay.  Now, under the guidelines, only debt that is

25   related to the original purchase mortgage is allowable as an

1    expense; correct?

2    A    Well, it says it "may" be allowed.

3    Q    Only the amount of the debt service that's related to the

4    original purchase mortgage; correct?  Not the amount on

5    refinances if somebody gets a larger loan after they purchased;

6    correct?

7    A    (Inaudible response.)

8    Q    Do you not know?

9    A    Well, let me -- okay.  Because let's say someone does

10   capital improvements, that kind of debt service would be

11   allowed.

12   Q    I'm addressing your statement regarding your criticism and

13   your disagreement with the gross profit maintenance analysis

14   and how you feel it could be misused with subsequent

15   refinancings.

16        So in that context, under the guidelines any additional

17   money borrowed that doesn't relate to the original purchase

18   loan wouldn't be allowable, would it?

19   A    Okay.  I think not.  I mean, I don't think that was an

20   issue in this case.

21   Q    I understand.  It was an issue that you raised in your

22   criticism of the gross profit maintenance analysis; correct?

23   A    No.  No.  My criticism was the other way around.  Somebody

24   could get an original purchase mortgage with one interest rate,

25   get a rent increase to cover that, and then after they get the

```
 1   rent increase, they could go in and get an interest -- mortgage
 2   with a lower interest rate.
 3   Q    And under the gross profit maintenance analysis, that
 4   would actually militate against any future rent increases,
 5   wouldn't it?  Isn't that how it's been applied in Carson?
 6   A    Okay.  I don't know.  But let me say this.  If they didn't
 7   apply for a rent increase, it wouldn't be considered that there
 8   was a big reduction in the debt service.  So if someone gets a
 9   rent increase based on the debt service, until they come back
10   to the board again, if you use this formula, it wouldn't -- the
11   lower interest rate and the fact that the owner got a lower
12   interest rate would just not be present in the rent setting
13   process.
14   Q    Actually, it would reduce the overall expenses, wouldn't
15   it, and thereby result in a lower rent increase?
16   A    Well, it wouldn't until the owner applied for a rent
17   increase again.
18   Q    Are you aware that Mr. Goldstein's experience with Carson
19   Harbor Village, when he obtained lower interest rates, that
20   actually resulted in lower rent increases that the board
21   granted him?  Are you aware of that?
22   A    You are talking about in Colony Cove?
23   Q    No, I'm talking about Mr. Goldstein's prior experiences
24   with the Carson rent board with Carson Harbor Village.
25   A    Okay.  I'm not aware of that.
```

1   Q    Mr. Baar, your report purports to analyze the text of the

2   guidelines; correct?

3   A    Yes.

4   Q    Carson rent control guidelines?

5   A    Yes.

6   Q    And you quote the guidelines, specifically the part of the

7   section concerning debt service; correct?

8   A    That's correct.

9            MR. CASPARIAN:  Could we see, Mr. Newcomb,

10  Exhibit 77, page 3.

11  BY MR. CASPARIAN:

12  Q    Your report cites the relevant guidelines section as

13  section II.A.2.F; correct?

14  A    What page are we on again?  I'm sorry, sir.  Yes.

15  Q    Page 4 of your report --

16  A    Yes.  Right.

17  Q    -- for this case.  You purport to block quote and rely on

18  that you cite as guidelines section II.A.2.F; correct?

19  A    In my report, yes, and subsequently it came out that

20  the -- you know, I had not transcribed this section correctly.

21  And I -- you know, I acknowledged that.  The wording is

22  somewhat different.  It doesn't change my conclusions.

23  Q    This is one place in your report that examines what the

24  guidelines provided regarding mortgage interest as an allowable

25  expense; correct?

1  A    That's correct.

2  Q    Now, let's look at that section II.A.2.F of the guidelines

3  themselves.

4      Could we bring that up right next to it for comparison.

5  That would be 1001, page 6.

6  A    Do you want to wait a minute so I can bring it up?  Just a

7  moment.

8  Q    In the white binder, Exhibit 1001, page 6.  Sorry.  I'm

9  being told it's the black binder.

10  A    It's the black binder?  Okay.  I'm sorry.  I have got

11  thousands of pages up here.  Okay.  What page?

12  Q    1001-6.

13  A    Yes.  What number?

14  Q    1001, page 6.

15  A    Okay.  Thank you.

16  Q    This is the actual section of the guidelines regarding

17  allowability of debt service; correct?

18  A    Yes, that's correct.

19        MR. CASPARIAN:  Okay.  Now, Mr. Newcomb, could you

20  please highlight Mr. Baar's report, the block quoted language.

21  BY MR. CASPARIAN:

22  Q    "Shall be an allowable operating expense to the extent

23  that it is reasonable in light of the existing rents and

24  prudent financing procedures."

25      Dr. Baar, you have got the actual guidelines in front of

1    you.  This language that you block quoted does not appear in

2    the guidelines text, does it?

3    A    That's correct.

4    Q    You have misread and misquoted the guidelines in your

5    report?

6    A    That's correct.

7    Q    All right.  The actual language in the guidelines is "may

8    be an allowable operating expense if the purchase price was

9    reasonable in light of the rents allowed under the ordinance

10   and involved prudent customary financing procedures"; isn't

11   that correct?

12   A    That's correct.

13   Q    And that's not limited to whether or not it was reasonable

14   in light of the existing rents; correct?

15   A    Well, I think there are other sections that refer to that.

16   Q    But in this section that you purport to cite, II.A.2.F, it

17   is not limited the way your report represents?

18   A    That's correct.  Now, as I indicate in the deposition, I

19   misquoted that section.

20   Q    It's rents that would be allowed under the ordinance;

21   isn't that correct?

22   A    Well, it says the rents allowed under the ordinance.  I

23   wouldn't read that to mean would be -- if you took into

24   account -- would theoretically be allowed.  Rents allowed under

25   the ordinance I believe means the rents that are currently

1    allowed.

2    Q    Do you recall that your deposition was taken in this

3    litigation?

4    A    Yes.

5    Q    And you took the oath to tell the truth at that

6    deposition?

7    A    Yes.

8    Q    And you did so to the best of your ability?

9    A    Yes.

10            MR. CASPARIAN:  Your Honor, may I provide a copy of

11   the deposition?

12            THE COURT:  You may.

13            MR. CASPARIAN:  Does Your Honor have it?

14            THE COURT:  I do not have it.

15            MR. CASPARIAN:  May I approach?

16            THE COURT:  You may.

17            MR. CASPARIAN:  Page 102, lines 18 through 20.

18            THE COURT:  I think you need to quote it somewhere

19   else.  It's not clear from 18 through 20 what's being

20   discussed.  It just says "it's."

21            MR. CASPARIAN:  The earlier text is referring to the

22   guidelines section II.A.2.F.

23            THE COURT:  Where is that?

24            MR. CASPARIAN:  It would be right above that.

25            THE COURT:  I'm still not sure what's being

 1    discussed.

 2              MR. CASPARIAN:  Looking where the conversation

 3    begins in the deposition, I believe it actually begins around

 4    page 97.

 5              THE COURT:  You may.

 6              MR. CASPARIAN:  May I publish and read?

 7              THE COURT:  Yes, you may.

 8              MR. CASPARIAN:  102, 18 through 20.

 9         "It's rents that would be allowed under the ordinance.

10         "Right."

11    BY MR. CASPARIAN:

12    Q    Dr. Baar, but your report relies on whether or not the

13    existing debt service was reasonable in light of existing

14    rents, doesn't it?

15    A    That's correct.

16    Q    There's another place in your report where you quote this

17    language; correct?

18    A    You'll have to refresh my memory of it.

19              MR. CASPARIAN:  Could we see page 5 of Exhibit 77,

20    please.  If you could leave the guidelines up.

21    BY MR. CASPARIAN:

22    Q    Your report states, "As indicated, the guidelines provide

23    the debt service shall be an allowable factor in determining

24    the permissible rents to the extent the debt service was

25    'reasonable in light of the existing rents.'"

```
1          Did I read that correctly?

2     A    Yes.

3     Q    And you underlined that because you believed that text was

4     important; correct?

5     A    Yes.

6     Q    But here too you misquote the guidelines again.  You see

7     "reasonable in light of the existing rents" where you misquote

8     it and you put it in bold, italicized, and underlines?

9     A    Right, that's correct.

10    Q    And then in the last sentence of that same area, you say

11    the guidelines direct your consideration of whether the debt

12    service was reasonable in light of the existing rents.  And,

13    again, you underline that incorrect text.

14    A    That's correct.

15    Q    I think you testified earlier this error might have

16    occurred because you copied and pasted portions of your report

17    from elsewhere; isn't that correct?

18    A    That's correct.

19          MR. CASPARIAN:  Mr. Newcomb, if you could please

20    leave up 1001-6.  On the other side, put up Exhibit 74 at

21    page 16.

22    BY MR. CASPARIAN:

23    Q    This is the report you wrote on Mr. Goldstein's first rent

24    application; correct?  Exhibit 74 --

25    A    That's correct.
```

```
 1   Q     -- that's the one I was asking you about.

 2   A     Yes.

 3   Q     And at the top, does it contain the same misquotation of

 4   the guidelines?

 5   A     Which page are you on again?

 6   Q     74, Exhibit -- page 16.

 7   A     Yes.

 8   Q     You wrote this document for the 2008 rent hearing;

 9   correct?

10   A     That's correct.

11   Q     And the board relied on that report, didn't it?

12   A     That's correct.

13   Q     Is it possible that you copied the text from your 2016

14   report from this report?

15   A     That's possible.

16   Q     You didn't even review the guidelines when you wrote the

17   report that you wished to present to the jury today, did you?

18   A     Well, I reviewed them.  I didn't go -- I won't say I went

19   through them, you know, slowly line by line, but I did review

20   them.  And I made -- I did make this mistake.  I lifted this

21   from the prior report.

22   Q     And the report you wrote for the first rent hearing in

23   2008 also relied on the same nonexistent language in the

24   guidelines, didn't it?

25   A     That's correct.
```

1    Q     Since 2008 going to the present, has anyone from the City

2    pointed out to you that you've been misquoting the guidelines

3    and relying on the wrong text in your work?

4    A     No.  And the park owner never did.  The City never did.

5    Nobody did.

6    Q     The park owner certainly disagreed with the conclusions in

7    your report at the hearing, didn't he?

8    A     Right.  But nobody pointed out this mistake.  I would have

9    fixed it in a minute.

10   Q     Did Mr. Freschauf ever point it out to you?

11   A     No.

12   Q     May I ask you how much you have been paid by the City

13   since 2008?

14   A     I don't know.  I've worked on a few fair return

15   applications since then.  I don't know how much.

16   Q     Is it in excess of $10,000?

17   A     Yes.

18   Q     Is it in excess of $20,000?

19   A     I think so, yes.

20   Q     Is it in excess of $30,000?

21   A     I don't know.  I mean, I think so.  I'd have to --

22   Q     Looking at the actual provision of the guidelines --

23         If we could go back to II.A.2.F, please.

24         You personally disagree with that provision, don't you?

25   A     Well, yeah, as I indicated -- I mean, I don't think that

484

```
 1   this methodology of taking into account debt service makes
 2   sense.
 3   Q    But that is, in fact, what the guidelines provide, this
 4   language here; isn't that correct?
 5   A    Right.  They provide it, but they say that that
 6   methodology -- there's no entitlement to that methodology.
 7   Q    But despite the fact it's specifically provided for, you
 8   don't think it ever should be; isn't that correct?
 9   A    Yeah, I don't think it's, you know, a rational way to do
10   it.
11   Q    You don't contend that the mortgage Mr. Goldstein took out
12   to purchase the park was not pursuant to customary and prudent
13   financing practices; isn't that correct?
14   A    Well, I guess -- let me say this.  This wasn't the, you
15   know, focus of my analysis.  The -- my point was, you know,
16   basically that it wasn't -- that the debt service was not
17   covered by the rents, the allow -- the rents that were in place
18   at that time, that were allowed at that time when the park was
19   purchased.
20   Q    It would require a rent increase in order to service the
21   debt; correct?
22   A    That's correct.
23   Q    You had no objection to the loan-to-value ratio, correct,
24   at the GE loan at issue here?
25   A    Well, when you say "no objection," what I considered was
```

1    the fact that it exceeded -- that the loan cost, carrying the

2    debt service, exceeded what was possible under the rents in

3    place.

4    Q    The in-place rents?

5    A    Yes.

6    Q    My question, though, you didn't have an objection to the

7    loan-to-value ratio that GE lent on; isn't that correct?

8    A    Right.  Well, it wasn't -- it wasn't part of my -- you

9    know, that's not what I was focusing on or wasn't the issue.

10   The issue was it exceeded -- in order to cover the debt

11   service, it was necessary to increase the rents.

12   They weren't -- the debt service was not covered out of the

13   existing rents.

14   Q    That's correct.  You didn't have any issue regarding the

15   interest rate on the GE loan, did you?

16   A    When you say I had no issue, I -- not like I approved it

17   or disapproved it.  It wasn't -- that wasn't the issue.

18   Q    You didn't feel that there was anything that was outside

19   customary financing practices at the time regarding the

20   interest rate; correct?

21   A    Yeah, I didn't have an opinion about the interest rate.

22   Q    Going back to the guidelines, the same section --

23        If we could highlight the word "when" about halfway down

24   in the following sentence.

25        I'll read.  "When it is determined that some increase was

486

```
 1   reasonably necessary to acquire the park but that amount
 2   incurred was not reasonable in light of the ordinance and
 3   customary and prudent financing practices, then only the
 4   appropriate portion of the debt service incurred may be allowed
 5   as an operating expense."
 6        Do you see that?
 7   A    Yes.
 8   Q    And yet here no portion of the debt service was allowed as
 9   an expense, was it?
10   A    That's correct.
11   Q    In your report, you state that an increase of $342.46 may
12   have been more than is consistent with the goal of preventing
13   excessive rent increases.  But your report does not analyze
14   whether a $200 rent increase is excessive; correct?
15   A    Okay.  I don't remember.  I'll believe that.
16   Q    In Carson there is no income qualification for residents
17   to obtain the protections of the rent control, is there?
18   A    That's correct.  But you could also note, I mean,
19   typically people who own mobile homes in mobile home parks are
20   not high income people.
21   Q    Well, you don't interpret the reference to the excessive
22   rents in the guidelines to mean the spaces need to be
23   affordable to any particular group of people, do you?
24   A    No, I don't.
25   Q    And someone who is making six figures can move into
```

```
 1   Colony Cove and get the benefit of controlled rents; correct?

 2   A     It's possible.

 3   Q     Do you know what homes are selling for in Colony Cove

 4   these days?

 5   A     You are talking about right now?

 6   Q     Yes.

 7   A     No.  I -- let me say I've done -- looked at trends in

 8   mobile home prices in the Los Angeles area, and they are $50-,

 9   $100,000, $50- and $100,000, I mean, substantial amounts of

10   money that people pay for their mobile homes.

11   Q     So when you say "excessive rents," that has nothing to do

12   with a person's income; correct?

13   A     Well, the rent formula doesn't use the tenant's income as

14   a factor.

15   Q     Your report mentions a 1983 decision of the board

16   concerning Carson Harbor.

17   A     That's correct.

18   Q     Now, you are aware that Mr. Freschauf testified earlier

19   that that was eight years before the board started using the

20   gross profit maintenance formula consistently.  Are you aware

21   of that?

22   A     No.

23   Q     Now, your report doesn't refer to any other decisions

24   since 1983 concerning Carson Harbor, does it?

25   A     No, it doesn't.
```

```
 1   Q    And 1983 is many years before the guidelines at issue were
 2   enacted, isn't it?
 3   A    That's correct.
 4   Q    Do you recall that Carson Harbor had other rent increase
 5   applications after 1983?
 6   A    I believe it.
 7   Q    I'd like to show you Exhibit 57.
 8        Your Honor, may I publish?
 9            THE COURT:  One moment.  57 I don't believe has been
10   admitted.
11        Any objection to admission?
12            MR. ONSTOT:  None, Your Honor.
13            THE COURT:  Admitted.  You may publish.
14        (Exhibit No. 57 received into evidence.)
15            MR. CASPARIAN:  Can we highlight the top portion,
16   please.
17   BY MR. CASPARIAN:
18   Q    You see this is a resolution concerning Carson Harbor?
19   A    Yes.
20   Q    And if we look at page -- 57, page 6, you'll see this is a
21   resolution from 1997, and it's by the Carson Mobile Home Park
22   Rental Review Board.
23   A    Okay.  Yes, I see this.
24   Q    Now, let's go back a couple of pages to page 4.  It says
25   that the board has determined, quote, "that 81.8 percent of the
```

```
 1    increased debt service was an allowable operating expense and

 2    that 81.8 percent of the debt service previously allowed as an

 3    operating expense was based on the debt service attributable to

 4    the park's prior acquisition loan."

 5         Do you see that?

 6    A    Okay.  I see it now, yes.

 7    Q    So in 1997 the board allowed Mr. Goldstein to recover the

 8    mortgage interest expense that related to the loan he used to

 9    purchase Carson Harbor; isn't that correct?

10    A    Right.  No, I mean, I -- I believe that reading this, yes.

11    Q    And it's referring to a prior instance in 1989 when the

12    board also allowed debt services in operating expense?

13    A    That's correct.

14              MR. CASPARIAN:  Your Honor, I move to admit

15    Exhibit 57.

16              THE COURT:  It's admitted.

17    BY MR. CASPARIAN:

18    Q    Let me show you Exhibit 60.

19         Your Honor, may I publish?

20              THE COURT:  60 has not been admitted.

21         Any objection to admitting?

22              MR. ONSTOT:  None.

23              THE COURT:  Admitted.  You may publish.

24         (Exhibit No. 60 received into evidence.)

25    BY MR. CASPARIAN:
```

1  Q    Once again, you can look at the first page, and you can

2  see this is a resolution concerning Carson Harbor.  Looking at

3  page 60-6, you see this is from 2001 and it's a resolution of

4  the Mobile Home Park Rental Review Board in Carson.

5       Now, let's look at page 4 of that document, and let's pull

6  up a sentence towards the middle.  And it says, "The interest

7  portion of those payments, which is an interest expense

8  actually paid in 1999, was allowed as an operating expense.

9  Under the guidelines, principle payments are now allowed as an

10 operating expense."

11      Do you see that?

12 A    Yes.

13 Q    So the board is saying that interest payments in 1999 were

14 allowed as an operating expense; correct?

15 A    Yes.  In this resolution, yes.

16           MR. CASPARIAN:  Your Honor, we move to admit

17 Exhibit 60.

18           THE COURT:  It's admitted.

19 BY MR. CASPARIAN:

20 Q    And do you recall that in connection with the 2003

21 application, the board stated that all the interest actually

22 paid in 2001 on the portion of the debt to purchase the park

23 was allowed?

24 A    Just a minute.  I haven't seen that resolution.

25 Q    You are not familiar with that resolution?

```
1          In the section of your report about Carson Harbor, you
2     ignore the 1997 Carson Harbor decision and the 2001 Carson
3     Harbor decision and, in fact, any decision regarding Carson
4     Harbor since 1983; isn't that correct?
5     A    Well, what I did in my analysis is I looked at what rent
6     increases -- I was supplied information by the City which
7     indicated what rent increases had been allowed based on debt
8     service, I think it was from 1996 to 2003.
9     Q    Referring to Carson Harbor specifically?
10    A    Well, they gave me an overall list of all the cases and
11    indicated to me that owners -- you know, that -- what rent
12    increases had been allowed based on debt service.
13    Q    So you had that list, but you made no reference in your
14    report to these other decisions regarding Carson Harbor
15    Village; isn't that correct?
16    A    Well, I'd have to go back.  I made -- I referred to the
17    decisions that were -- you know, the information that was
18    supplied to me.
19    Q    You agree that, if an investor has personal experience
20    with the implementation of the ordinance and the guidelines,
21    that is a very important factor for the investor to rely on,
22    don't you?
23    A    It's one factor.
24    Q    The guidelines specify that a gross profit maintenance
25    analysis must be done; correct?
```

1   A     That's correct.

2   Q     We had seen earlier in your Exhibit 74 you cited three

3   methodologies.  One of those is gross profit maintenance;

4   correct?

5   A     That's correct.

6   Q     And the guidelines specifically provide for that; correct?

7   A     Right.  But as I indicated, they don't provide an

8   entitlement.  The guidelines also say that.

9   Q     And another methodology that's provided is what's called

10  the overall rate of return.  That is specifically provided for

11  in the Carson guidelines, isn't it?

12  A     That's correct.

13  Q     But they don't even mention MNOI prior to April 2006, do

14  they?

15  A     That's correct.  But this standard was -- had come -- been

16  more and more widely used, it had been approved by the courts,

17  and the board had the authority to take into account any other

18  relevant factors.

19  Q     When you say "approved by the courts," you mean in other

20  cities; correct?

21  A     Yes.  But the principles -- when they are talking about a

22  particular type of standard, you know, in a broad sense, a

23  generic type of standard, and they approve another city's,

24  that's certainly significant, I think, in every city.

25  Q     Those cities did not include guidelines that read the way

1    Carson's guidelines do, did they?

2    A    No.  That's correct.

3    Q    Now, in your opinion, can a park owner who just purchased

4    a park at market value be receiving a fair return if he's

5    losing over a million dollars a year?

6    A    Well, if he's losing it because he got a debt -- a

7    mortgage that wasn't covered by the rents, yes, he still could

8    be getting a fair return.  And, you know, the debt service

9    doesn't create -- what you need to cover the debt service is

10   not what you need to get a fair return.  I'd say it works the

11   other way around.

12       You look at what you can get -- what rents you are allowed

13   under the fair return standard and then look at what debt

14   service that will cover.  You don't -- you are -- I feel like

15   you are flipping the whole thing.  We have a regulation.  You

16   look at the law and then see what you are allowed rather than

17   the debt service driving what's allowed.

18   Q    So you are arguing for a system where purchase price is

19   only reasonable in light of the existing rents?  That's what

20   you feel?

21   A    Well, no.  What I'm saying is that, when somebody incurs

22   debt service, they need to look at what rents are allowed under

23   the regulation.  I mean, you know, it's like, if you buy a

24   piece of land and you want to build an apartment building and

25   under the law all you can build is a house on that piece of

```
 1   land, you can't go to the city and say, well, I got a huge

 2   mortgage, let me build an apartment building.  You have to look

 3   at what's allowed.

 4   Q    And when you say rents allowed in terms of the Carson

 5   ordinance, you mean the existing rents?  That's what you think?

 6   A    I think that's the intent of the provision.

 7   Q    But you've agreed today that the provision provides

 8   differently than that, don't you?

 9   A    Well --

10   Q    It's rents allowed under the ordinance?

11   A    Right.  I said I think that means the exist -- you know,

12   the rents in place unless somebody stored up rent increases and

13   hasn't implemented them, and they -- because, you know, the

14   purpose of the ordinance, when it says rents allowed under the

15   ordinance, it doesn't -- you know, it would defeat the

16   ordinance if you said rents allowed under the ordinance means

17   what rents I could get if you, you know, guarantee me something

18   that I don't have a guarantee under the ordinance.

19   Q    Only -- you think "allowed" means "guaranteed"?

20   A    Well, or -- yeah, quite certain, quite certain.

21   Q    You discussed two cases today, Palomar and Oceanside.  Do

22   you remember that testimony?

23   A    Yes.

24   Q    And in either case, did the city in those cases have an

25   ordinance or guidelines that mandated that a gross profit
```

```
 1   maintenance formula be performed?

 2   A    No, they didn't.

 3   Q    And did the city in either case have a history of using

 4   the gross profit maintenance formula almost invariably in

 5   setting rents?

 6   A    Not that I know of.

 7   Q    And did the city in either case have an ordinance or

 8   guidelines that specifically stated that debt service used to

 9   purchase a park was an allowable expense?

10   A    No.  But this ordinance says you have no right to

11   entitlement pursuant to any formula, the Carson ordinance.  So,

12   you know, there are a lot of conditions.  It says you may allow

13   it, but you have no right to it.  You know, it's not an

14   entitlement.  It may or may not be permitted.

15   Q    Did the park owner in either of those cases lose money

16   after paying their mortgage?

17   A    That I don't know.

18   Q    So those courts didn't examine that question, did they?

19   A    No.  They took the proposition this it wasn't rational to

20   set rents based on what the debt service was.

21   Q    In cities that did not have the language of the guidelines

22   that we have in Carson; correct?

23   A    Right.  But these were -- these were general propositions

24   regardless of the law.

25   Q    Understood.  None of those decisions involved the City of
```

```
 1   Carson or the guidelines that are in evidence today?
 2   A    That's correct.
 3   Q    Now, the Carson case did deal with the Carson ordinance
 4   and the guidelines that were on the books in early 2006, didn't
 5   it?
 6   A    Okay.  When you say the "Carson case" --
 7   Q    Carson Gardens.
 8   A    Okay.
 9   Q    I misspoke.  I'm sorry.  The Carson Gardens case did deal
10   with it?
11   A    Yes.
12   Q    And they were enacted after those two cases were decided?
13   Those guidelines were enacted after Palomar and Oceanside;
14   isn't that correct?
15   A    That's correct.
16   Q    And you agree that an investor in a mobile home park
17   should read the guidelines; correct?
18   A    Yes, they should read them.
19   Q    All right.
20   A    Absolutely.
21   Q    One more question about Palomar and Oceanside.
22        Neither of those cases involved situations where the rules
23   were changed right after the park owner bought the park, were
24   they?
25   A    Well, let me say this.  Not that I'm aware of.  I mean,
```

```
 1   you know, my point was that those courts said, as a general
 2   proposition, it was not reasonable to set rents based on debt
 3   service.
 4   Q    You were involved in the Carson Gardens case, weren't you?
 5   A    Yes, I was.
 6   Q    Originally the board didn't give the park owner in
 7   Carson Gardens a rent increase based on debt service; correct?
 8   A    That's correct.
 9   Q    And you understand that the park owner in Carson Gardens
10   went to court after the board decided not to give a rent
11   increase based on the mortgage payments; correct?
12   A    That's correct.
13   Q    And the trial Court agreed with the park owner that the
14   City was obligated to apply the gross profit maintenance or
15   some other methodology that gave due consideration to the
16   park's mortgage payments; isn't that correct?
17   A    Well, I don't know if, you know, that's the exact words.
18   And, you know, I say that's important.  The Court -- the Court
19   said there had to be some kind of consideration of operating
20   expenses and look at debt service.
21   Q    And the Carson Gardens case, nothing stopped or prevented
22   the City from arguing that the Courts applying the debt service
23   would be irrational; right?
24   A    That's right.  Nothing stopped them.
25   Q    The City could have told the Courts and may, in fact, have
```

1    about *Palomar*; correct?

2    A    Well, let me say I don't know what they told the Court.

3    Q    And if it wanted to, the City could have argued, as you do

4    today, that the guidelines themselves were irrational; correct?

5    A    Yeah, it could have argued that.

6    Q    You are not aware of anything that stopped or prevented

7    the City from making every argument at its disposal to persuade

8    the Court that mortgage payments could be ignored when setting

9    rents, are you?

10   A    No, I'm not.

11   Q    The court of appeal later issued a decision regarding

12   *Carson Gardens*; isn't that correct?

13   A    That's correct.

14            MR. CASPARIAN:  Can we see 1005, please.

15   BY MR. CASPARIAN:

16   Q    On page 2 it says, "The trial Court's judgment and writ

17   rejecting the board's initial decision required the board to

18   apply an analysis or methodology that 'gives due consideration

19   to debt service costs, mortgage interest, in calculating a fair

20   return on the owner's investment.'"

21            Do you see that?

22   A    Yes.

23   Q    And also here on page 5 of that same decision, it states,

24   "The Court issued the April 16th, 2003, writ based on its

25   conclusion that 'the board has historically acted to account

1  for and was required by its own process to utilize a

2  methodology for reviewing discretionary rent increase

3  applications which gives due consideration to the park's actual

4  reasonable operating expenses, including any financing costs

5  associated with ownership and acquisition of the park.'"

6      Did I read that correctly?

7  A    Well, I believe you did, yes.

8  Q    Later, next bullet point, "The board's resolution was not

9  in compliance with the April 16th, 2003, judgment or writ in

10  that it fails to consider all of the park's actual reasonable

11  operating expenses and, in particular, adopted for the first

12  time a maintenance of net operating income methodology because

13  that methodology would allow the board to exclude financing

14  costs as an operating expense."

15      Did I read that correctly?

16  A    Yes.

17  Q    Then on the next page, page 6, the court of appeal states,

18  "The board was thus bound to comply with the trial Court's writ

19  which required it to use gross profit maintenance analysis or

20  some other methodology giving due consideration to debt service

21  costs in calculating a fair return."

22      Did I read that correctly?

23  A    I don't think you have that highlighted.

24  Q    Page 6.

25  A    Okay.  Yes.

```
 1    Q     Just a few more questions.
 2          You referenced earlier a chart of 33 cases; correct?
 3    A     Yes.
 4    Q     And in your report, you say that city staff created the
 5    chart; correct?
 6    A     Yes.
 7    Q     But you've testified under oath that you created the
 8    chart?
 9    A     Yeah.  I -- what I said was I said that to the best of my
10    recollection.  You are asking me about a chart that was created
11    in 2003.  And then I see I went back in the report, and it says
12    no, the City gave me that chart.  So it's correct.  The City
13    created that chart.
14    Q     And that chart was created for the Carson Gardens case?
15    A     That's correct.
16    Q     And in that case, the Court rejected the City's argument
17    that it could disregard debt service cost; isn't that correct?
18    A     Yes, the trial Court.
19    Q     And in this chart, of the 33 cases you analyzed, 32 used
20    the gross profit maintenance formula; isn't that correct?
21    A     Right.  And none of them got a big increase based on debt
22    service using that formula.
23    Q     And in 32 out of 33 cases, the board used an analysis that
24    would take into account debt service; isn't that correct?
25    A     Right.  Let's go -- what page is that in my report?
```

```
 1   Q     I'm not sure.  Of the 33 cases, they all predate the court
 2   of appeals decision in Carson Gardens; isn't that correct?
 3   A     Yes.
 4   Q     And you didn't review any of the underlying applications
 5   in creating that chart?
 6   A     No.
 7   Q     I'm sorry.  You didn't create the chart?
 8   A     The point of the chart was I didn't look at the individual
 9   decisions.  What I looked at was whether a rent increase had
10   been granted based on increases in debt service.  And most of
11   the cases they used that GPM analysis but there wasn't any
12   increase in debt service.
13         So in a sense you could say yes, they used that type of
14   analysis, but debt service wasn't a factor.  And in none of
15   them, according to the information the City gave me, had the
16   City given a significant rent increase based on debt service.
17   Q     And so you may have misspoke.  Did you say debt service
18   wasn't a factor in those decisions?  It was actually a factor
19   used in the methodology in 32 out of 33, wasn't it?
20   A     Okay.  My understanding was they used the methodology.
21   What I said -- what I meant to say was the owners didn't get a
22   big -- an increase based on an increase in debt service.
23   Q     Now, you aren't aware of any other decision by the Carson
24   rent board, other than for Mr. Goldstein, that resulted in the
25   park owner losing money annually, are you?
```

```
1    A     Well, when you say I'm not aware, that's not what I've
2    looked into.
3    Q     That doesn't concern you?
4    A     No.  What concerns me is having a reasonable standard.
5    Q     Final questions.
6          You attended the rent board hearing in 2008 and 2009;
7    correct?
8    A     That's correct.
9    Q     And did you know that Mayor Jim Dear at times controlled
10   members of the rent control board?
11   A     I didn't know that.
12   Q     Did you know that Mayor Dear used his power to appoint and
13   remove rent control members based on their favorable
14   pro-residence stance?
15                MR. ONSTOT:  Objection.  Beyond the scope, vague as
16   to time.
17                THE COURT:  Overruled.
18                THE WITNESS:  I wasn't aware of any of that.
19   BY MR. CASPARIAN:
20   Q     Did you know that some rent control board members were
21   deappointed or removed from the board if they attempted to be
22   fair and neutral?
23   A     No.  I presented my analysis, and I wasn't aware of any
24   politics or anything going on in the city.
25                MR. CASPARIAN:  Thank you.  No further questions.
```

1          THE COURT:  Ladies and gentlemen, we are going to

2   break for the lunch break.  Remember not to discuss the case

3   among yourselves or with anyone else.  Don't form or express

4   any opinions about the case.  And we'll see you at 1:30.

5   Thank you.

6          (At 11:59 A.M. the lunch recess was taken.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  3RD  DAY OF MAY, 2016.


/S/ MAREA WOOLRICH
_____
MAREA WOOLRICH, CSR NO. 12698, CRR
FEDERAL OFFICIAL COURT REPORTER

## $

**$10,000** [1] - 483:16
**$100,000** [2] - 487:9
**$14** [1] - 464:23
**$14.50** [1] - 406:4
**$15.00** [1] - 465:2
**$20,000** [1] - 483:18
**$200** [2] - 470:5, 486:14
**$23** [1] - 413:12
**$25.02** [1] - 468:24
**$28** [2] - 412:14, 412:17
**$30,000** [1] - 483:20
**$34,000** [1] - 464:18
**$342.46** [1] - 486:11
**$36.74** [1] - 467:21
**$4.46** [1] - 406:4
**$425** [1] - 448:11
**$50** [2] - 487:8, 487:9
**$600** [1] - 430:6
**$615** [1] - 402:18
**$618** [1] - 448:15
**$620** [1] - 402:18
**$68,000** [1] - 464:18
**$7,400** [1] - 464:3
**$8.00** [1] - 465:2

## '

**'06** [1] - 437:23
**'07** [1] - 437:23
**'08** [1] - 437:23
**'14** [1] - 437:21
**'80S** [1] - 471:10
**'91** [2] - 420:20, 421:16
**'GIVES** [1] - 498:18
**'REASONABLE** [1] - 480:25
**'THE** [1] - 498:25

## 1

**1** [5] - 400:6, 431:19, 447:10, 464:9, 468:13
**1.1** [2] - 464:8, 464:9
**10** [1] - 422:23
**100** [7] - 405:4, 436:2, 436:8, 445:16, 459:20, 464:11, 467:8
**1000** [5] - 403:21, 404:13, 404:17, 405:20
**1000-16** [1] - 405:20
**1000-5** [1] - 405:1
**1000-8** [1] - 405:11
**1001** [3] - 477:5, 477:8, 477:14
**1001-6** [2] - 477:12, 481:20
**1003** [1] - 431:14
**1005** [1] - 498:14
**102** [2] - 479:17, 480:8

**105** [1] - 434:24
**11** [1] - 417:19
**11:59** [1] - 503:6
**12** [1] - 422:23
**129** [1] - 402:17
**14-3242** [1] - 400:7
**15** [2] - 442:20, 453:14
**16** [3] - 402:17, 481:21, 482:6
**16TH** [2] - 498:24, 499:9
**17,000** [2] - 402:17, 402:18
**18** [3] - 479:17, 479:19, 480:8
**19** [1] - 446:11
**1980** [1] - 442:16
**1983** [5] - 487:15, 487:24, 488:1, 488:5, 491:4
**1988** [1] - 402:13
**1989** [1] - 489:11
**1990** [2] - 420:20, 421:16
**1992** [1] - 402:9
**1996** [1] - 491:8
**1997** [3] - 488:21, 489:7, 491:2
**1999** [2] - 490:8, 490:13
**1:30** [1] - 503:4

## 2

**2** [6] - 467:25, 468:2, 468:13, 468:20, 468:24, 498:16
**20** [5] - 420:2, 456:4, 479:17, 479:19, 480:8
**20-PLUS** [2] - 424:11, 425:21
**20-SOME** [1] - 420:2
**20-YEAR** [1] - 423:20
**200** [2] - 440:15, 440:17
**2000** [1] - 459:18
**2001** [3] - 490:3, 490:22, 491:2
**2003** [6] - 446:11, 490:20, 491:8, 498:24, 499:9, 500:11
**2005** [1] - 416:14
**2006** [24] - 402:21, 403:8, 404:11, 412:6, 412:9, 412:12, 423:23, 424:3, 424:8, 424:16, 424:24, 425:2, 425:7, 425:11, 426:1, 426:7, 429:3, 430:6, 435:14, 437:21, 438:25, 472:24, 492:13, 496:4
**2007** [2] - 448:6, 473:16
**2008** [9] - 447:16, 448:6, 466:17, 473:16, 482:8, 482:23, 483:1, 483:13, 502:6
**2009** [13] - 423:23, 424:3, 424:8, 424:16, 424:25, 425:2, 425:7, 425:11, 426:1, 426:7, 437:21, 468:2, 502:6

**2015** [1] - 437:21
**2016** [2] - 400:1, 482:13
**21** [1] - 430:4
**29** [1] - 405:5

## 3

**3** [7] - 400:1, 400:8, 433:1, 447:10, 464:14, 464:17, 476:10
**30** [6] - 403:6, 431:6, 431:7, 431:8, 439:17, 439:22
**300** [1] - 431:2
**32** [3] - 500:19, 500:23, 501:19
**33** [5] - 500:2, 500:19, 500:23, 501:1, 501:19
**35** [1] - 442:22
**39** [3] - 409:12, 409:14, 409:15

## 4

**4** [5] - 412:20, 453:20, 476:15, 488:24, 490:5
**40** [4] - 409:12, 409:18, 409:20, 409:22
**400** [1] - 448:12
**400S** [1] - 470:5

## 5

**5** [3] - 458:22, 480:19, 498:23
**50** [2] - 459:22, 464:11
**500** [1] - 430:12
**57** [3] - 488:7, 488:9, 488:14, 488:20, 489:15

## 6

**6** [11] - 435:2, 440:15, 440:17, 455:10, 464:17, 477:5, 477:8, 477:14, 488:20, 499:17, 499:24
**60** [4] - 489:18, 489:20, 489:24, 490:17
**60-6** [1] - 490:3

## 7

**7** [1] - 464:22
**701** [1] - 408:8
**702** [1] - 408:8
**74** [11] - 447:5, 447:12, 447:22, 448:17, 453:21, 456:11, 456:13, 481:20, 481:24, 482:6, 492:2
**74-13** [1] - 458:22
**74-21** [1] - 454:14
**74-22** [2] - 459:24, 460:25

**74-24** [1] - 462:9
**74-27** [1] - 463:17
**74-8** [1] - 448:17
**75** [5] - 459:21, 466:9, 466:11, 466:22, 466:24
**76** [3] - 467:25, 468:7, 468:9
**77** [3] - 469:13, 476:10, 480:19

## 8

**8** [2] - 440:15, 440:17
**81** [1] - 454:25
**81.8** [2] - 488:25, 489:2

## 9

**9** [1] - 467:14
**90** [2] - 425:13, 462:6
**97** [1] - 480:4
**9:00** [1] - 415:11
**9:01** [1] - 400:2
**9:30** [1] - 415:13

## A

**A.M** [2] - 400:2, 503:6
**ABANDONED** [1] - 404:22
**ABILITY** [2] - 407:24, 479:8
**ABLE** [3] - 406:14, 427:10, 471:4
**ABSOLUTELY** [1] - 496:20
**ACCEPTED** [1] - 410:10
**ACCOMMODATE** [1] - 401:19
**ACCOMMODATION** [1] - 401:22
**ACCORDING** [1] - 501:15
**ACCOUNT** [5] - 478:24, 484:1, 492:17, 498:25, 500:24
**ACCURATE** [1] - 447:19
**ACCURATELY** [1] - 468:4
**ACKNOWLEDGED** [1] - 476:21
**ACQUAINT** [1] - 405:15
**ACQUIRE** [4] - 409:16, 436:12, 436:15, 486:1
**ACQUIRED** [1] - 448:10
**ACQUISITION** [2] - 489:4, 499:5
**ACTED** [1] - 498:25
**ACTION** [1] - 406:24
**ACTUAL** [12] - 436:9, 440:9, 440:12, 440:25, 468:15, 473:10, 477:16, 477:25, 478:7, 483:22, 499:3, 499:10
**AD** [1] - 455:20
**ADD** [2] - 404:24, 405:24

ADDED [2] - 465:23, 467:2
ADDING [1] - 449:5
ADDITION [2] - 433:4, 454:17
ADDITIONAL [7] - 406:15, 414:1, 459:13, 459:14, 465:16, 474:16
ADDRESS [2] - 456:9, 466:7
ADDRESSED [4] - 460:1, 467:4, 467:8, 467:14
ADDRESSING [1] - 474:12
ADJOURN [1] - 415:1
ADJUST [2] - 459:19, 464:16
ADJUSTED [3] - 464:11, 464:17, 464:20
ADJUSTMENT [5] - 450:11, 463:14, 464:4, 464:9, 465:7
ADMINISTRATION [3] - 432:1, 432:6, 432:9
ADMISSIBILITY [2] - 451:12, 456:9
ADMISSION [1] - 488:11
ADMIT [3] - 447:23, 489:14, 490:16
ADMITTED [11] - 404:14, 447:22, 456:11, 466:23, 468:8, 488:10, 488:13, 489:16, 489:20, 489:23, 490:18
ADMITTING [1] - 489:21
ADMONISHING [1] - 423:11
ADOPTED [1] - 499:11
ADVISE [2] - 472:8, 472:12
ADVISING [2] - 442:16, 446:23
ADVOCATE [1] - 420:23
AFFORD [3] - 427:12, 427:15, 437:13
AFFORDABLE [1] - 486:23
AGE [1] - 437:16
AGO [1] - 444:24
AGREE [3] - 413:11, 491:19, 496:16
AGREED [3] - 466:5, 494:7, 497:13
AHEAD [2] - 414:24, 428:19
AILIN [1] - 400:17
AILIN [27] - 414:17, 414:21, 415:10, 415:15, 415:21, 415:23, 416:1, 416:6, 417:2, 423:9, 423:15, 423:17, 428:25, 429:21, 429:23, 430:1, 430:2, 430:7, 430:9, 430:14, 434:10, 434:16, 437:5, 437:7, 439:9, 439:13, 440:3
AL [1] - 400:8
ALAN [1] - 401:16

ALAN [1] - 401:16
ALBANIA [1] - 443:9
ALESHIRE [1] - 400:15
ALLOW [11] - 405:23, 411:6, 424:18, 429:4, 450:23, 452:19, 459:11, 465:19, 484:17, 495:12, 499:13
ALLOWABILITY [1] - 477:17
ALLOWABLE [18] - 407:1, 411:8, 436:10, 436:11, 436:14, 452:2, 452:7, 457:6, 465:1, 471:14, 473:25, 474:18, 476:24, 477:22, 478:8, 480:23, 489:1, 495:9
ALLOWANCES [1] - 427:9
ALLOWED [41] - 450:18, 451:4, 451:6, 451:22, 452:7, 452:10, 453:4, 460:18, 460:19, 465:23, 474:2, 474:11, 478:9, 478:20, 478:22, 478:24, 479:1, 480:9, 484:18, 486:4, 486:8, 489:2, 489:7, 489:12, 490:8, 490:9, 490:14, 490:23, 491:7, 491:12, 493:12, 493:16, 493:17, 493:22, 494:3, 494:4, 494:10, 494:14, 494:16, 494:19
ALLOWS [1] - 450:19
ALMOST [4] - 421:1, 427:2, 427:3, 495:4
AMELIA [1] - 400:20
AMEND [1] - 431:25
AMENDED [2] - 438:25, 439:6
AMENDING [2] - 416:14, 431:15
AMENITIES [1] - 452:6
AMERICAN [1] - 403:5
AMOUNT [9] - 405:25, 407:8, 436:10, 436:11, 436:14, 465:16, 474:3, 474:4, 486:1
AMOUNTS [1] - 487:9
AMPLIFICATION [1] - 418:4
ANALYSES [1] - 448:19
ANALYSIS [49] - 417:16, 417:22, 418:10, 419:18, 420:10, 421:23, 421:24, 422:8, 422:15, 433:22, 447:2, 447:12, 448:3, 449:12, 449:20, 450:12, 453:25, 457:2, 458:17, 460:8, 460:21, 461:25, 462:5, 462:7, 462:8, 462:16, 463:7, 466:11, 467:25, 468:12, 468:17, 469:24, 469:25, 470:1,

470:9, 473:21, 474:13, 474:22, 475:3, 484:15, 491:5, 491:25, 498:18, 499:19, 500:23, 501:11, 501:14, 502:23
ANALYZE [2] - 476:1, 486:13
ANALYZED [1] - 500:19
ANALYZING [2] - 419:2, 448:23
ANGELES [3] - 443:22, 461:22, 487:8
ANGELES [1] - 400:1
ANNUAL [1] - 406:1
ANNUALLY [1] - 501:25
ANSWER [8] - 410:19, 411:3, 439:7, 439:12, 439:19, 439:23, 439:24, 451:18
ANSWER [1] - 441:2
ANSWERED [1] - 429:15
ANZA [1] - 460:5
APARTMENT [2] - 462:23, 493:24, 494:2
APARTMENTS [3] - 402:12, 442:19, 472:19
APOLOGIZE [1] - 435:22
APPEAL [10] - 433:25, 435:14, 453:9, 457:4, 458:5, 458:6, 458:9, 458:10, 498:11, 499:17
APPEAL [2] - 435:8, 445:23
APPEALED [1] - 458:8
APPEALS [1] - 501:2
APPEAR [1] - 478:1
APPEARANCES [1] - 400:9
APPELLATE [2] - 434:1, 445:21
APPLICABLE [1] - 460:11
APPLICATION [27] - 411:10, 417:12, 422:19, 422:21, 422:22, 425:4, 425:7, 439:25, 447:13, 448:4, 448:14, 448:23, 449:13, 449:21, 454:2, 454:22, 462:24, 463:18, 466:13, 466:20, 467:21, 468:1, 468:24, 470:13, 481:24, 490:21
APPLICATIONS [15] - 419:3, 419:14, 420:11, 422:23, 422:25, 423:2, 425:10, 425:14, 438:20, 439:5, 473:16, 483:15, 488:5, 499:3, 501:4
APPLIED [10] - 407:9, 417:17, 422:7, 457:15, 464:1, 465:5, 470:14, 471:11, 475:5, 475:16
APPLY [7] - 417:21, 461:23, 461:25, 462:3, 475:7, 497:14, 498:18

APPLYING [1] - 497:22
APPOINT [1] - 502:12
APPROACH [1] - 479:15
APPROPRIATE [2] - 431:25, 486:4
APPROVE [1] - 492:23
APPROVED [8] - 424:23, 446:21, 461:10, 462:13, 462:18, 485:16, 492:16, 492:19
APRIL [3] - 492:13, 498:24, 499:9
AREA [3] - 423:12, 481:10, 487:8
AREAS [1] - 406:25
ARGUE [2] - 423:16, 471:19
ARGUED [2] - 498:3, 498:5
ARGUING [3] - 493:18, 497:22
ARGUMENT [4] - 434:7, 434:14, 498:7, 500:16
ARGUMENTATIVE [3] - 434:10, 434:16, 437:5
ARGUMENTS [6] - 426:25, 427:1, 456:8, 465:14, 465:25
ARM'S [2] - 472:24, 472:25
ARRANGEMENT [1] - 453:3
ARRANGEMENTS [2] - 401:20, 452:4
ARTICLE [9] - 444:9, 444:17, 444:24, 445:4, 445:11, 445:13, 445:16, 445:18
ARTICLES [1] - 444:21
ARTICULATE [1] - 411:17
ASPECT [1] - 406:22
ASSERTION [2] - 439:13, 440:3
ASSIST [2] - 419:2, 419:13
ASSOCIATED [1] - 499:5
ASSOCIATION [2] - 456:24, 462:10
ATTEMPTED [1] - 502:21
ATTEMPTING [1] - 455:5
ATTEMPTS [2] - 454:17, 455:10
ATTENDED [1] - 502:6
ATTENTION [5] - 462:9
ATTORNEY [5] - 400:18, 413:19, 431:16, 433:13, 442:15
ATTORNEY [1] - 400:18
ATTORNEY'S [1] - 438:18
ATTRIBUTABLE [1] - 489:3
ATTRIBUTE [1] - 408:2
AUTHORITY [1] - 400:19
AUTHORITY [1] - 492:17
AUTHORIZED [1] - 435:7
AVERAGE [1] - 448:8

**AVERAGING** [1] - 417:23
**AWARDED** [1] - 464:7
**AWARDING** [1] - 462:1
**AWARE** [16] - 412:2, 414:3, 427:17, 462:5, 462:6, 475:18, 475:21, 475:25, 487:18, 487:20, 496:25, 498:6, 501:23, 502:1, 502:18, 502:23

# B

**B-A-A-R** [1] - 441:23
**BAAR** [16] - 418:21, 433:16, 433:19, 441:13, 441:23, 445:25, 447:4, 448:2, 453:25, 455:6, 456:19, 461:24, 472:6, 476:1, 477:25, 480:12
**BAAR** [1] - 442:1
**BAAR'S** [1] - 477:20
**BACHELOR'S** [2] - 403:3, 442:25
**BACKED** [3] - 455:6, 469:17, 472:21
**BACKGROUND** [2] - 403:2, 403:7
**BAR** [1] - 444:15
**BARELY** [1] - 415:12
**BARR** [13] - 419:20, 419:22, 434:8, 434:15, 442:6, 447:18, 454:11, 454:15, 455:5, 468:11, 469:1, 471:24, 472:4
**BASE** [6] - 406:17, 462:25, 463:1, 463:8, 463:12, 471:14
**BASED** [24] - 406:15, 407:7, 415:13, 422:10, 450:14, 451:6, 452:23, 470:12, 471:12, 471:18, 475:9, 489:3, 491:7, 491:12, 495:20, 497:2, 497:7, 497:11, 498:24, 500:21, 501:10, 501:16, 501:22, 502:13
**BASIS** [3] - 406:1, 469:7, 469:20
**BEACH** [1] - 403:4
**BECAME** [1] - 427:5
**BEGINNING** [1] - 416:1
**BEGINS** [2] - 480:3
**BEHALF** [2] - 400:15, 420:4
**BEHIND** [2] - 400:17, 401:2
**BENEFIT** [1] - 487:1
**BEST** [3] - 455:7, 479:8, 500:9
**BETWEEN** [8] - 410:13, 423:23, 424:3, 424:16, 425:7, 425:11, 464:17,

465:2
**BEYOND** [2] - 463:12, 502:15
**BI** [1] - 406:9
**BIG** [5] - 452:1, 452:21, 475:8, 500:21, 501:22
**BIGGER** [1] - 461:2
**BINDER** [7] - 403:21, 409:11, 447:4, 447:10, 477:8, 477:9, 477:10
**BINDERS** [4] - 403:19, 442:9, 442:10
**BIT** [3] - 413:18, 430:20, 432:15
**BLACK** [6] - 403:19, 403:20, 409:11, 442:9, 477:9, 477:10
**BLOCK** [3] - 476:17, 477:20, 478:1
**BOARD** [3] - 400:16, 488:22, 490:4
**BOARD** [78] - 406:23, 417:12, 417:13, 418:11, 418:15, 419:2, 419:4, 419:7, 419:13, 419:20, 419:22, 420:7, 422:1, 422:3, 422:7, 422:12, 422:19, 424:3, 424:7, 424:12, 424:13, 424:18, 425:14, 425:18, 425:21, 425:25, 426:3, 426:6, 426:10, 434:24, 435:5, 435:9, 450:13, 452:16, 454:1, 454:15, 454:21, 455:3, 456:21, 457:17, 457:23, 457:25, 461:6, 467:18, 468:5, 468:21, 468:23, 469:24, 470:11, 470:15, 470:25, 471:7, 471:22, 475:10, 475:20, 475:24, 482:11, 487:15, 487:19, 488:25, 489:7, 489:12, 490:13, 490:21, 492:17, 497:6, 497:10, 498:17, 498:25, 499:13, 499:18, 500:23, 501:24, 502:6, 502:10, 502:20, 502:21
**BOARD'S** [2] - 498:17, 499:8
**BOLD** [1] - 481:8
**BOOKS** [2] - 420:1, 496:4
**BORROWED** [1] - 474:17
**BOTHERED** [1] - 438:1
**BOTTOM** [1] - 462:10
**BOUGHT** [5] - 421:11, 421:19, 421:21, 451:25, 496:23
**BOUND** [1] - 499:18
**BREAK** [11] - 414:25, 427:12, 427:15, 447:25,

453:12, 453:13, 455:13, 456:19, 503:2
**BRIEF** [2] - 415:16, 456:14
**BRIEFLY** [3] - 414:6, 442:23, 462:21
**BRING** [2] - 477:4, 477:6
**BROAD** [1] - 492:22
**BROKER'S** [2] - 402:16, 403:11
**BROKERS** [2] - 402:7, 402:22
**BROUGHT** [3] - 416:14, 463:11, 463:13
**BUILD** [3] - 493:24, 493:25, 494:2
**BUILDING** [2] - 493:24, 494:2
**BULLET** [1] - 499:8
**BUSINESS** [2] - 401:19, 402:6
**BUY** [2] - 404:7, 493:23
**BUYER** [3] - 405:15, 410:14, 411:18
**BUYING** [2] - 404:8, 406:12
**BY** [44] - 402:2, 404:16, 409:7, 409:25, 411:2, 411:23, 416:6, 417:2, 423:17, 428:25, 430:2, 430:9, 430:17, 431:22, 432:16, 434:12, 434:21, 435:4, 437:10, 439:10, 439:16, 440:7, 440:22, 442:5, 447:9, 448:1, 451:17, 456:18, 458:15, 466:25, 468:10, 469:12, 472:3, 476:11, 477:21, 480:11, 480:21, 481:22, 488:17, 489:17, 489:25, 490:19, 498:15, 502:19

# C

**CAL** [4] - 403:4, 409:16, 410:5, 414:7
**CAL-AM** [2] - 409:16, 414:7
**CALCULATE** [1] - 462:21
**CALCULATING** [2] - 498:19, 499:21
**CALENDAR** [1] - 400:7
**CALIFORNIA** [14] - 403:3, 403:5, 403:10, 442:20, 442:22, 443:3, 443:12, 444:15, 445:4, 445:23, 447:13, 453:9, 455:18, 461:10
**CALIFORNIA** [1] - 400:1
**CALVIN** [1] - 441:22
**CAPACITY** [1] - 413:25
**CAPITAL** [2] - 473:3, 473:17
**CAPITAL** [1] - 474:10

**CARE** [1] - 427:4
**CAREER** [1] - 402:16
**CAREFUL** [1] - 411:14
**CARRYING** [1] - 485:1
**CARSON** [84] - 400:8, 400:16, 400:18, 400:19, 403:16, 403:24, 412:1, 412:2, 412:4, 412:6, 421:6, 421:19, 421:21, 422:8, 422:14, 422:16, 422:25, 423:1, 427:11, 427:18, 430:3, 430:4, 430:13, 433:20, 434:6, 434:14, 434:24, 435:19, 436:1, 436:7, 436:12, 436:15, 437:1, 446:8, 446:10, 447:13, 450:13, 455:19, 456:3, 456:7, 457:7, 460:14, 460:20, 470:17, 475:5, 475:18, 475:24, 476:4, 486:16, 487:16, 487:24, 488:4, 488:18, 488:21, 489:9, 490:2, 490:4, 491:1, 491:2, 491:3, 491:9, 491:14, 492:11, 494:4, 495:11, 495:22, 496:1, 496:3, 496:6, 496:7, 496:9, 497:4, 497:7, 497:9, 497:21, 498:12, 500:14, 501:2, 501:23
**CARSON'S** [4] - 407:23, 456:4, 463:17, 493:1
**CASE** [63] - 404:8, 412:2, 415:3, 415:4, 417:3, 418:13, 424:8, 424:24, 429:11, 430:5, 433:20, 433:22, 433:25, 434:3, 434:8, 438:15, 446:13, 452:15, 453:15, 453:16, 455:19, 455:23, 456:3, 457:2, 457:4, 457:7, 457:13, 457:15, 458:6, 458:16, 460:5, 460:7, 460:8, 460:11, 462:11, 462:15, 463:25, 464:3, 464:6, 464:7, 465:5, 465:15, 465:18, 465:20, 470:17, 470:19, 474:20, 476:17, 494:24, 495:3, 495:7, 496:3, 496:6, 496:9, 497:4, 497:21, 500:14, 500:16, 503:2, 503:4
**CASES** [31] - 419:25, 420:3, 442:21, 448:8, 453:8, 453:11, 454:19, 455:3, 455:13, 455:17, 455:18, 456:22, 456:24, 461:16, 470:9, 470:10, 470:21, 471:14, 491:10, 494:21, 494:24, 495:15, 496:12,

496:22, 500:2, 500:19, 500:23, 501:1, 501:11
**CASH** [1] - 405:24
**CASPARIAN** [1] - 400:12
**CASPARIAN** [42] - 447:6, 447:24, 451:11, 451:15, 453:10, 454:7, 454:10, 454:14, 454:23, 456:2, 458:12, 469:9, 472:3, 476:9, 476:11, 477:19, 477:21, 479:10, 479:13, 479:15, 479:17, 479:21, 479:24, 480:2, 480:6, 480:8, 480:11, 480:19, 480:21, 481:19, 481:22, 488:15, 488:17, 489:14, 489:17, 489:25, 490:16, 490:19, 498:14, 498:15, 502:19, 502:25
**CEILING** [1] - 450:24
**CERTAIN** [6] - 407:9, 410:11, 427:4, 452:22, 494:20
**CERTAINLY** [4] - 471:6, 471:16, 483:6, 492:24
**CERTAINTY** [3] - 410:15, 465:21, 465:24
**CETERA** [2] - 451:21, 471:8
**CHANCE** [1] - 430:24
**CHANGE** [3] - 412:7, 428:11, 476:22
**CHANGED** [1] - 496:23
**CHANGES** [1] - 417:6
**CHANGING** [1] - 428:17
**CHAPTER** [1] - 445:18
**CHARACTERISTIC** [1] - 408:4
**CHARACTERISTICS** [1] - 404:6
**CHARGE** [1] - 429:4
**CHARGED** [1] - 440:13
**CHART** [18] - 454:11, 454:12, 454:13, 454:16, 454:24, 455:1, 463:24, 500:2, 500:5, 500:8, 500:10, 500:12, 500:13, 500:14, 500:19, 501:5, 501:7, 501:8
**CHOSE** [1] - 437:16
**CITE** [2] - 476:18, 478:16
**CITED** [2] - 445:21, 492:2
**CITES** [2] - 455:19, 476:12
**CITIES** [13] - 442:20, 442:22, 443:13, 443:22, 443:25, 444:3, 446:17, 462:6, 462:7, 462:8, 492:20, 492:25, 495:21
**CITY** [30] - 403:15, 405:16, 411:9, 413:25, 420:4, 423:21, 424:23, 426:13, 427:4, 431:24, 433:9,

437:3, 437:4, 437:11, 437:18, 443:23, 457:16, 457:17, 458:20, 462:5, 462:11, 470:14, 492:24, 494:1, 494:24, 495:3, 495:7, 500:4, 502:24
**CITY** [37] - 400:8, 400:16, 400:18, 412:6, 414:6, 424:12, 425:21, 426:17, 433:13, 433:19, 433:23, 434:6, 434:13, 437:1, 438:24, 439:6, 443:22, 446:8, 456:3, 458:7, 461:22, 470:17, 483:1, 483:4, 483:12, 491:6, 495:25, 497:14, 497:22, 497:25, 498:3, 498:7, 500:12, 501:15, 501:16
**CITY'S** [7] - 413:19, 431:16, 435:7, 438:17, 438:24, 439:7, 500:16
**CITY'S** [4] - 424:18, 432:1, 432:10, 492:23
**CLAIM** [4] - 460:1, 460:9, 467:6, 467:9
**CLAIMED** [1] - 467:13
**CLAIMS** [1] - 465:14
**CLAUSE** [1] - 431:23
**CLEAN** [1] - 434:2
**CLEAR** [4] - 418:7, 457:24, 469:22, 479:19
**CLEARINGHOUSE** [1] - 427:5
**CLEARLY** [1] - 429:15
**CLERK** [8] - 400:6, 401:2, 401:8, 401:11, 415:7, 441:14, 441:19, 453:18
**CLERK** [1] - 433:9
**CLIENT** [2] - 414:4, 438:13
**CLIENT'S** [2] - 435:24, 438:15
**CLIENTS** [2] - 446:8, 446:23
**CLOCK** [1] - 415:14
**CLOSE** [29] - 400:10, 408:8, 408:12, 410:25, 411:23, 414:12, 416:25, 426:22, 428:22, 430:17, 431:19, 431:22, 432:14, 432:16, 434:12, 434:21, 434:23, 435:2, 435:4, 437:10, 439:10, 439:16, 440:7, 440:15, 440:17, 440:19, 440:21, 440:22, 441:8
**CLOSE** [9] - 415:23, 416:14, 418:19, 423:18, 424:6, 424:10, 424:21, 426:12, 429:7
**CLOSE** [2] - 400:11, 408:12
**CLOSE'S** [1] - 427:21
**COLLEAGUES** [1] - 434:7

**COLLECTION** [1] - 471:16
**COLLEGE** [2] - 403:2, 443:2
**COLONY** [1] - 430:8
**COLONY** [52] - 400:7, 402:21, 402:24, 403:8, 403:15, 403:24, 406:3, 407:13, 408:1, 409:8, 409:16, 410:7, 410:9, 410:24, 412:2, 412:5, 412:9, 413:11, 418:20, 419:11, 422:17, 427:14, 427:19, 427:22, 430:10, 430:11, 435:17, 435:24, 447:12, 448:3, 448:10, 448:14, 448:23, 449:13, 449:20, 455:18, 460:1, 460:8, 463:18, 465:25, 466:12, 466:19, 467:20, 468:1, 469:3, 469:18, 473:15, 475:22, 487:1, 487:3
**COLUMBIA** [1] - 443:10
**COLUMN** [1] - 435:2
**COMFORTABLE** [1] - 422:6
**COMING** [2] - 414:21, 455:14
**COMMENTS** [1] - 466:19
**COMMERCIAL** [3] - 402:7, 472:12, 472:15
**COMMISSION** [1] - 456:25
**COMMITMENTS** [1] - 401:19
**COMMUNITIES** [4] - 402:13, 402:17, 405:9, 407:17
**COMMUNITY** [2] - 403:1, 409:10
**COMPANY** [1] - 427:1
**COMPARABLE** [4] - 407:13, 407:16, 407:19, 452:6
**COMPARABLES** [1] - 407:13
**COMPARE** [2] - 430:10, 463:7
**COMPARISON** [1] - 477:4
**COMPENSATED** [4] - 435:18, 435:25, 436:2, 436:5
**COMPLETE** [2] - 401:20, 447:19
**COMPLETED** [1] - 415:24
**COMPLETELY** [2] - 456:6, 457:24
**COMPLIANCE** [1] - 499:9
**COMPLICATED** [4] - 425:15, 449:24, 457:14, 458:6
**COMPLIED** [1] - 435:6
**COMPLY** [2] - 435:9, 499:18
**COMPONENT** [1] - 412:19
**COMPONENTS** [1] - 411:19
**CONCERN** [2] - 454:24, 502:3
**CONCERNED** [1] - 408:15
**CONCERNING** [5] - 476:7,

487:16, 487:24, 488:18, 490:2
**CONCERNS** [2] - 466:7, 502:4
**CONCLUDED** [2] - 457:5, 460:11
**CONCLUSION** [2] - 434:17, 498:25
**CONCLUSIONS** [2] - 476:22, 483:6
**CONDITION** [1] - 445:1
**CONDITIONS** [1] - 495:12
**CONDUCT** [1] - 424:22
**CONDUCTED** [3] - 410:13, 443:19, 443:21
**CONFUSING** [1] - 428:10
**CONFUSION** [1] - 455:8
**CONNECTICUT** [1] - 443:1
**CONNECTION** [4] - 408:20, 439:5, 439:25, 490:20
**CONSENSUS** [2] - 422:3, 422:4
**CONSEQUENTLY** [1] - 411:8
**CONSIDER** [6] - 411:9, 433:23, 455:21, 457:5, 470:25, 499:10
**CONSIDERATION** [9] - 409:4, 454:1, 463:18, 481:11, 497:15, 497:19, 498:18, 499:3, 499:20
**CONSIDERATIONS** [1] - 407:10
**CONSIDERED** [8] - 417:19, 417:21, 417:24, 435:10, 450:1, 450:2, 475:7, 484:25
**CONSIDERING** [1] - 460:21
**CONSISTENCY** [1] - 420:6
**CONSISTENT** [1] - 486:12
**CONSISTENTLY** [5] - 420:19, 421:8, 421:16, 459:4, 487:20
**CONSTITUTIONALLY** [1] - 459:2
**CONSULTANT** [4] - 426:13, 443:12, 443:24
**CONSULTED** [1] - 442:22
**CONSUMER** [1] - 464:19
**CONTACT** [1] - 427:7
**CONTAIN** [1] - 482:3
**CONTAINS** [1] - 454:10
**CONTEND** [3] - 473:3, 473:15, 484:11
**CONTENDS** [1] - 435:5
**CONTEXT** [1] - 474:16
**CONTINUE** [1] - 406:13
**CONTINUING** [1] - 444:15
**CONTROL** [1] - 400:16
**CONTROL** [35] - 403:13, 403:16, 405:12, 405:16,

407:23, 411:9, 412:7,
417:10, 419:24, 420:20,
421:24, 423:20, 424:11,
425:4, 425:7, 425:10,
426:13, 426:18, 432:2,
432:6, 432:10, 436:20,
436:21, 437:1, 443:13,
445:11, 446:4, 446:13,
450:13, 456:6, 476:4,
486:17, 502:10, 502:13,
502:20
**CONTROLLED** [5] - 424:6,
426:4, 426:7, 487:1, 502:9
**CONTROLLING** [1] - 418:6
**CONTROLS** [2] - 444:10,
445:4
**CONVERSATION** [1] - 480:2
**CONVERSATIONS** [1] -
439:4
**CONVERT** [2] - 427:22,
428:20
**CONVERTING** [1] - 428:13
**COPIED** [2] - 481:16, 482:13
**COPY** [2] - 428:4, 479:10
**CORNER** [1] - 434:4
**CORPORATE** [1] - 403:10
**CORRECT** [156] - 404:1,
405:3, 407:3, 407:4,
409:17, 412:18, 413:9,
413:10, 413:14, 413:16,
413:17, 413:23, 414:9,
414:10, 421:20, 424:20,
425:16, 430:21, 431:4,
431:5, 431:6, 431:10,
432:18, 432:21, 433:5,
433:14, 433:17, 436:12,
436:15, 436:21, 437:1,
437:4, 437:12, 437:19,
437:23, 437:24, 438:5,
438:15, 440:1, 440:10,
441:1, 444:1, 444:2,
448:20, 448:21, 449:1,
449:18, 453:21, 454:3,
454:22, 454:23, 457:8,
460:4, 460:5, 462:14,
463:19, 463:20, 465:9,
466:7, 466:13, 466:14,
469:4, 469:5, 472:11,
472:14, 472:16, 472:18,
473:1, 473:22, 474:1,
474:4, 474:6, 474:22,
476:2, 476:7, 476:8,
476:13, 476:18, 476:25,
477:1, 477:17, 477:18,
478:3, 478:6, 478:11,
478:12, 478:14, 478:18,
478:21, 480:15, 480:17,
481:4, 481:9, 481:14,
481:17, 481:18, 481:24,
481:25, 482:9, 482:10,

482:12, 482:25, 484:4,
484:8, 484:13, 484:21,
484:22, 484:23, 485:7,
485:14, 485:20, 486:10,
486:14, 486:18, 487:1,
487:12, 487:17, 488:3,
489:9, 489:13, 490:14,
491:4, 491:15, 491:25,
492:1, 492:4, 492:5, 492:6,
492:12, 492:15, 492:20,
493:2, 495:22, 496:2,
496:14, 496:15, 496:17,
497:7, 497:8, 497:11,
497:12, 497:16, 498:1,
498:4, 498:12, 498:13,
500:2, 500:5, 500:12,
500:15, 500:17, 500:20,
500:24, 501:2, 502:7,
502:8
**CORRECTIONS** [3] - 430:25,
431:3, 431:9
**CORRECTLY** [8] - 441:3,
441:5, 467:5, 476:20,
481:1, 499:6, 499:15,
499:22
**CORRELATE** [1] - 440:13
**COST** [11] - 450:21, 452:8,
461:12, 461:17, 461:19,
461:20, 464:3, 464:25,
465:23, 485:1, 500:17
**COSTS** [8] - 406:15, 435:11,
461:15, 465:6, 498:19,
499:4, 499:14, 499:21
**COUNCIL** [3] - 431:24,
437:3, 437:11
**COUNSEL** [7] - 400:9,
400:17, 410:12, 410:13,
410:14, 414:6, 425:9
**COUNSEL'S** [1] - 456:8
**COUNT** [1] - 472:19
**COUNTED** [2] - 443:17,
443:18
**COUNTIES** [1] - 443:25
**COUPLE** [4] - 420:22, 421:9,
421:10, 488:24
**COUPLE-MONTH** [1] - 421:9
**COURSE** [1] - 455:5
**COURT** [79] - 400:13,
400:21, 400:24, 404:15,
408:9, 408:21, 409:2,
409:5, 409:24, 411:1,
411:21, 414:13, 414:15,
414:19, 414:24, 415:9,
415:12, 415:18, 415:22,
415:25, 417:1, 423:6,
423:10, 423:16, 426:23,
428:24, 429:22, 429:25,
430:15, 431:21, 434:11,
434:18, 435:1, 437:6,
437:8, 439:14, 440:4,

440:16, 440:18, 440:20,
441:10, 441:12, 447:7,
447:25, 451:14, 451:16,
453:12, 453:20, 453:24,
454:4, 454:8, 454:13,
454:20, 455:12, 455:23,
456:1, 456:11, 456:16,
458:14, 466:23, 468:8,
469:11, 472:1, 479:12,
479:14, 479:16, 479:18,
479:23, 479:25, 480:5,
480:7, 488:9, 488:13,
489:16, 489:20, 489:23,
490:18, 502:17, 503:1
**COURT** [27] - 401:2, 409:6,
419:25, 420:3, 430:23,
434:1, 435:14, 444:8,
445:21, 453:8, 453:9,
453:11, 456:22, 457:4,
457:18, 458:2, 458:5,
458:6, 458:8, 458:10,
471:14, 472:20, 497:10,
498:11, 499:17, 501:1
**COURT** [24] - 401:5, 433:22,
434:14, 435:8, 441:16,
445:23, 455:11, 457:21,
457:24, 458:2, 458:3,
458:8, 458:18, 458:19,
462:18, 470:19, 497:13,
497:18, 498:2, 498:8,
498:24, 500:16, 500:18
**COURT'S** [5] - 423:7,
423:14, 462:13, 498:16,
499:18
**COURT'S** [1] - 400:6
**COURTS** [3] - 459:1, 497:22,
497:25
**COURTS** [9] - 445:21,
446:21, 453:8, 459:11,
461:11, 492:16, 492:19,
495:18, 497:1
**COVE** [40] - 400:7, 402:21,
402:24, 403:8, 403:15,
403:24, 406:4, 407:13,
408:1, 409:8, 409:16,
410:7, 410:24, 412:2,
412:5, 412:9, 413:11,
418:20, 419:11, 422:17,
427:14, 427:19, 427:22,
430:10, 430:11, 435:18,
435:24, 447:12, 448:10,
448:15, 455:18, 467:21,
468:1, 469:3, 469:18,
475:22, 487:1, 487:3
**COVE'S** [12] - 410:9, 448:3,
448:23, 449:13, 449:20,
460:1, 460:8, 463:18,
465:25, 466:12, 466:19,
473:16
**COVER** [12] - 429:4, 450:25,

459:14, 461:17, 464:21,
464:24, 469:18, 470:3,
474:25, 485:10, 493:9,
493:14
**COVERED** [3] - 484:17,
485:12, 493:7
**COVERING** [1] - 461:20
**CPI** [3] - 422:5, 464:11,
464:19
**CREATE** [6] - 454:12,
454:16, 470:1, 471:21,
493:9, 501:7
**CREATED** [6] - 471:17,
500:4, 500:7, 500:10,
500:13, 500:14
**CREATING** [1] - 501:5
**CREDENTIAL** [1] - 403:6
**CRITICAL** [1] - 459:3
**CRITICISM** [3] - 474:12,
474:22, 474:23
**CROSS** [13] - 411:21,
415:20, 415:22, 415:24,
416:12, 418:19, 420:9,
420:13, 423:18, 424:10,
427:21, 456:10, 472:1
**CROSS** [2] - 411:22, 472:2
**CROSS-EXAMINATION** [10]
- 411:21, 416:12, 418:19,
420:9, 420:13, 423:18,
424:10, 427:21, 456:10,
472:1
**CROSS-EXAMINATION** [2] -
411:22, 472:2
**CURRENT** [5] - 404:22,
431:25, 463:4, 463:9,
463:10
**CUSTOMARY** [7] - 473:4,
473:5, 473:17, 478:10,
484:12, 485:19, 486:3
**CUT** [1] - 429:7
**CV** [1] - 400:7

## D

**D-A-N-N-Y** [1] - 401:16
**DAILY** [1] - 426:20
**DANNY** [9] - 401:1, 401:16,
401:18, 401:21, 401:22,
403:18, 409:8, 411:24,
412:14
**DANNY** [1] - 401:23
**DATA** [2] - 463:2, 463:3
**DATE** [1] - 402:17
**DAUBERT** [1] - 451:13
**DAVID** [1] - 409:21
**DAYS** [3] - 431:6, 431:7,
487:4
**DE** [1] - 460:5
**DEAL** [2] - 496:3, 496:9
**DEALT** [1] - 468:18

DEAPPOINTED [1] - 502:21
DEAR [15] - 416:16, 416:17, 416:21, 417:3, 424:6, 424:24, 425:2, 426:4, 426:6, 433:2, 437:19, 438:20, 440:6, 502:9, 502:12
DEAR [1] - 439:5
DEAR'S [2] - 424:22, 439:25
DEBT [95] - 406:21, 410:23, 411:7, 411:13, 429:5, 429:12, 433:23, 435:10, 435:18, 435:25, 436:11, 436:12, 436:14, 440:9, 441:1, 449:6, 450:2, 452:10, 452:12, 457:5, 457:16, 457:17, 457:19, 457:22, 457:25, 458:3, 458:7, 458:20, 459:10, 459:14, 460:2, 460:10, 460:18, 460:20, 460:21, 470:4, 470:10, 470:12, 470:14, 470:18, 471:4, 471:12, 471:15, 471:18, 473:12, 473:24, 474:3, 474:10, 475:8, 475:9, 476:7, 477:17, 480:13, 480:23, 480:24, 481:11, 484:1, 484:16, 484:21, 485:2, 485:10, 485:12, 486:4, 486:8, 489:1, 489:2, 489:3, 489:12, 490:22, 491:7, 491:12, 493:6, 493:8, 493:9, 493:13, 493:17, 493:22, 495:8, 495:20, 497:2, 497:7, 497:20, 497:22, 498:19, 499:20, 500:17, 500:21, 500:24, 501:10, 501:12, 501:14, 501:16, 501:17, 501:22
DECADE [2] - 422:12, 445:12
DECIDE [1] - 422:13
DECIDED [4] - 406:23, 407:8, 496:12, 497:10
DECIDING [2] - 417:17, 470:20
DECISION [14] - 434:25, 449:11, 454:22, 457:23, 458:9, 487:15, 491:2, 491:3, 498:11, 498:17, 498:23, 501:2, 501:23
DECISIONS [8] - 454:15, 455:2, 487:23, 491:14, 491:17, 495:25, 501:9, 501:18
DECREASED [1] - 421:13
DEFEAT [1] - 494:15
DEFEATED [1] - 450:20

DEFENDANT [1] - 400:15
DEFENDANT [1] - 442:2
DEFENDANTS [2] - 408:18, 451:12
DEFENSE [6] - 400:25, 401:24, 403:20, 416:3, 441:13, 442:10
DEFENSE'S [1] - 441:12
DEFENSIVE [3] - 408:5, 408:22, 408:24
DEFINITELY [1] - 425:24
DEFINITION [2] - 432:7, 432:8
DEGREE [4] - 403:3, 442:25, 443:1, 443:4
DELIBERATIONS [1] - 417:13
DENIED [1] - 471:12
DEPOSITION [24] - 407:12, 429:1, 429:16, 429:19, 430:21, 430:23, 430:24, 438:4, 438:8, 438:9, 438:12, 439:3, 439:7, 439:12, 439:17, 440:15, 440:23, 441:5, 454:12, 478:18, 479:2, 479:6, 479:11, 480:3
DESCRIBE [2] - 442:23, 462:21
DESPITE [1] - 484:7
DETAILS [2] - 460:7, 462:15
DETERMINATION [3] - 457:10, 457:11, 464:2
DETERMINE [2] - 407:21, 411:18
DETERMINED [4] - 463:25, 464:6, 485:25, 488:25
DETERMINING [6] - 446:21, 448:20, 457:6, 462:3, 463:21, 480:23
DEVELOPMENT [1] - 404:18
DEVELOPMENTS [2] - 408:17, 413:22
DEVIL'S [1] - 420:23
DIFFERENCES [1] - 468:15
DIFFERENT [22] - 407:20, 417:22, 422:2, 422:13, 432:23, 442:20, 442:22, 444:13, 444:25, 446:17, 448:19, 452:7, 456:6, 460:13, 462:6, 465:14, 468:17, 468:18, 468:19, 476:22
DIFFERENTLY [1] - 494:8
DIGEST [1] - 444:23
DILIGENCE [1] - 411:18
DIMITRI [1] - 400:11
DIRECT [2] - 402:1, 442:4
DIRECT [2] - 442:11, 481:11
DIRECTLY [1] - 410:8

DISAGREE [2] - 432:20, 483:24
DISAGREED [1] - 483:6
DISAGREEMENT [1] - 474:13
DISAPPROVED [1] - 485:17
DISCOVER [1] - 415:12
DISCOVERED [1] - 414:3
DISCRETION [2] - 418:15, 471:22
DISCRETIONARY [1] - 499:2
DISCUSS [8] - 410:7, 415:3, 418:3, 447:25, 453:15, 455:14, 456:20, 503:2
DISCUSSED [7] - 445:17, 467:6, 470:16, 479:20, 480:1, 494:21
DISCUSSES [1] - 445:19
DISCUSSION [3] - 430:20, 467:11, 467:15
DISCUSSIONS [3] - 410:1, 410:4, 417:6
DISPOSAL [1] - 498:7
DISREGARD [1] - 500:17
DISTINCTION [1] - 449:7
DOCTORATE [1] - 443:4
DOCUMENT [7] - 403:23, 416:20, 433:5, 433:14, 482:8, 490:5
DOLLARS [2] - 430:13, 493:5
DONE [3] - 417:15, 487:7, 491:25
DOUG [1] - 401:1
DOUGLAS [1] - 401:15
DOUGLAS [2] - 401:16, 401:23
DOWN [12] - 406:13, 408:15, 414:15, 420:22, 421:3, 435:23, 436:10, 441:10, 453:22, 453:23, 453:24, 485:23
DR [23] - 418:21, 419:20, 419:22, 434:8, 434:15, 441:13, 442:6, 445:25, 447:4, 447:18, 448:2, 454:11, 454:15, 455:5, 456:19, 461:24, 468:11, 469:1, 471:24, 472:4, 472:6, 477:25, 480:12
DRAFTING [2] - 443:13, 445:11
DRAWS [1] - 405:9
DRIVING [1] - 493:17
DUE [5] - 411:18, 497:15, 498:18, 499:3, 499:20
DURING [9] - 413:19, 423:19, 424:8, 424:24, 425:2, 425:21, 425:25, 426:7, 437:20

DUTIES [1] - 402:10
DWELLING [1] - 448:9

**E**

EARLY [1] - 496:4
EASIER [2] - 428:17, 428:18
EAST [1] - 443:8
EASY [1] - 461:1
ECONOMIC [1] - 442:18
ECONOMIST [2] - 472:6, 472:7
EDUCATION [2] - 442:23, 444:15
EDUCATIONAL [1] - 403:7
EIGHT [1] - 487:19
EITHER [7] - 425:9, 425:25, 468:12, 494:24, 495:3, 495:7, 495:15
EL [1] - 443:23
ELECTED [2] - 423:19, 451:6
ELECTS [1] - 450:25
ELSEWHERE [1] - 481:17
EMPLOYED [1] - 402:4
EMPLOYEE [1] - 426:13
EMPLOYER [1] - 402:3
ENACTED [3] - 488:2, 496:12, 496:13
ENACTMENT [1] - 456:4
END [3] - 427:6, 465:1, 469:24
ENDED [1] - 471:21
ENTITIES [1] - 407:7
ENTITLED [4] - 405:18, 450:9, 467:13, 469:22
ENTITLEMENT [7] - 460:15, 460:22, 470:23, 484:6, 492:8, 495:11, 495:14
ENTITLES [1] - 418:8
ENTRY [1] - 468:7
ERROR [1] - 481:15
ESSENTIALLY [3] - 454:17, 455:1, 455:9
ESTATE [2] - 402:7, 472:8
ESTATES [1] - 447:13
ESTATES [1] - 403:24
ESTATES' [1] - 468:1
ET [3] - 400:8, 451:21, 471:8
EUROPE [1] - 443:8
EVENT [1] - 411:16
EVICTED [1] - 427:18
EVICTION [1] - 445:19
EVIDENCE [9] - 409:22, 456:13, 465:20, 466:22, 466:24, 468:9, 488:14, 489:24, 496:1
EXACT [2] - 439:4, 497:17
EXACTLY [2] - 440:5, 455:10
EXAMINATION [11] - 401:21, 411:21, 416:12, 418:19,

420:9, 420:13, 423:18, 424:10, 427:21, 456:10, 472:1
**EXAMINATION** [6] - 402:1, 411:22, 416:5, 430:16, 442:4, 472:2
**EXAMINE** [2] - 456:5, 495:18
**EXAMINES** [1] - 476:23
**EXAMINING** [2] - 413:19, 431:16
**EXCEEDED** [4] - 473:7, 485:1, 485:2, 485:10
**EXCEPT** [1] - 429:11
**EXCESS** [3] - 483:16, 483:18, 483:20
**EXCESSIVE** [7] - 470:2, 471:2, 471:23, 486:13, 486:14, 486:21, 487:11
**EXCLUDE** [2] - 455:10, 499:13
**EXCUSE** [1] - 445:25
**EXHIBIT** [10] - 409:14, 409:15, 409:18, 409:20, 454:5, 454:10, 482:6, 488:7, 489:15, 490:17
**EXHIBIT** [27] - 403:21, 404:13, 404:17, 416:14, 431:14, 434:24, 447:5, 447:12, 448:17, 453:20, 454:25, 456:13, 466:9, 466:11, 466:24, 467:25, 468:9, 469:13, 476:10, 477:8, 480:19, 481:20, 481:24, 488:14, 489:18, 489:24, 492:2
**EXHIBITS** [6] - 403:19, 403:20, 409:12, 442:10, 454:25
**EXIST** [1] - 494:11
**EXISTING** [10] - 477:23, 478:14, 480:13, 480:25, 481:7, 481:12, 485:13, 493:19, 494:5
**EXISTS** [1] - 454:25
**EXPAND** [1] - 404:25
**EXPECT** [1] - 422:10
**EXPECTATION** [1] - 469:17
**EXPECTATIONS** [4] - 455:7, 469:2, 472:9, 472:21
**EXPECTED** [1] - 417:14
**EXPENSE** [24] - 440:9, 441:1, 450:3, 450:19, 450:23, 451:23, 452:19, 453:4, 474:1, 476:25, 477:22, 478:8, 486:5, 486:9, 489:1, 489:3, 489:8, 489:12, 490:7, 490:8, 490:10, 490:14, 495:9, 499:14
**EXPENSES** [26] - 421:12,

422:23, 429:5, 449:6, 449:10, 450:1, 450:2, 450:6, 450:7, 450:19, 451:22, 452:6, 452:19, 459:10, 459:23, 461:9, 462:25, 463:4, 468:19, 473:10, 475:14, 497:20, 499:4, 499:11
**EXPERIENCE** [4] - 403:12, 425:22, 475:18, 491:19
**EXPERIENCES** [1] - 475:23
**EXPERT** [17] - 408:14, 419:2, 419:5, 419:7, 419:13, 419:17, 419:20, 419:25, 420:3, 420:5, 442:19, 444:5, 446:3, 455:4, 455:6, 469:2
**EXPERTISE** [1] - 469:10
**EXPLAIN** [4] - 449:23, 457:14, 463:24, 469:20
**EXPLAINED** [2] - 427:25, 429:15
**EXPLANATION** [1] - 415:14
**EXPRESS** [3] - 415:4, 453:16, 503:3
**EXPRESSING** [1] - 469:6
**EXTENT** [4] - 403:7, 446:18, 477:22, 480:24
**EXTREME** [1] - 471:17
**EYES** [1] - 420:7

---

## F

**FACT** [12] - 408:1, 416:16, 427:17, 429:13, 435:9, 454:21, 475:11, 484:3, 484:7, 485:1, 491:3, 497:25
**FACTOR** [16] - 417:18, 418:6, 422:13, 457:2, 457:10, 458:16, 459:20, 460:8, 462:16, 480:23, 487:14, 491:21, 491:23, 501:14, 501:18
**FACTORED** [1] - 458:18
**FACTORS** [10] - 405:9, 417:19, 418:1, 421:25, 422:2, 471:1, 471:16, 473:21, 473:23, 492:18
**FACTS** [2] - 404:5, 404:6
**FAILED** [1] - 433:25
**FAILS** [1] - 499:10
**FAIR** [4] - 410:9, 413:12, 418:16, 424:13, 425:19, 425:23, 426:9, 427:2, 437:3, 437:9, 442:20, 444:3, 444:10, 444:13, 445:5, 445:8, 445:18, 446:4, 446:21, 446:24, 446:25, 447:1, 447:3,

448:12, 449:11, 453:11, 455:8, 455:9, 456:2, 456:5, 459:3, 459:18, 462:18, 467:11, 469:1, 483:14, 493:4, 493:8, 493:10, 493:13, 498:19, 499:21, 502:22
**FAMILIAR** [6] - 402:20, 408:5, 412:12, 412:13, 446:20, 490:25
**FAMILY** [5] - 402:12, 402:25, 428:12, 428:17, 437:13
**FAR** [3] - 407:19, 417:24, 437:2
**FAVORABLE** [1] - 502:13
**FAVORED** [1] - 453:3
**FEARED** [1] - 437:19
**FEBRUARY** [1] - 447:16
**FEDERAL** [1] - 420:3
**FELT** [3] - 412:20, 423:19, 423:25
**FEW** [18] - 415:1, 415:5, 443:6, 443:8, 443:9, 450:17, 452:22, 452:24, 464:2, 464:12, 464:14, 465:12, 469:21, 470:8, 470:13, 483:14, 500:1
**FIELD** [1] - 469:10
**FIGURES** [1] - 486:25
**FILE** [2] - 401:10, 409:9
**FILES** [3] - 413:3, 413:7, 414:7, 414:8
**FILL** [1] - 455:14
**FINAL** [1] - 502:5
**FINALLY** [2] - 415:5, 418:14
**FINANCIAL** [2] - 404:6, 407:20
**FINANCING** [12] - 412:20, 452:4, 473:4, 473:6, 473:17, 477:24, 478:10, 484:13, 485:19, 486:3, 499:4, 499:13
**FIRED** [1] - 437:15
**FIRM** [1] - 412:17
**FIRST** [13] - 420:20, 421:22, 445:23, 448:3, 448:14, 448:25, 453:20, 458:8, 459:1, 481:23, 482:22, 490:1, 499:11
**FIVE** [1] - 446:7
**FIXED** [1] - 483:9
**FLIES** [1] - 438:12
**FLIP** [1] - 451:3
**FLIPPING** [1] - 493:15
**FLOOR** [2] - 403:18, 442:8
**FLOW** [1] - 405:24
**FOCUS** [2] - 431:23, 484:15
**FOCUSED** [1] - 433:1
**FOCUSING** [1] - 485:9
**FOLLOW** [3] - 425:17,

439:20, 446:17
**FOLLOWED** [3] - 425:14, 439:11, 439:24
**FOLLOWING** [3] - 408:10, 409:6, 485:24
**FOLLOWS** [3] - 401:25, 416:4, 442:3
**FOREGOING** [2] - 432:17, 432:20
**FORM** [3] - 415:4, 453:16, 503:3
**FORMAL** [1] - 433:5
**FORMALIZE** [1] - 439:1
**FORMULA** [27] - 407:9, 418:8, 420:25, 421:9, 422:10, 422:12, 422:13, 440:8, 440:9, 449:4, 449:8, 452:13, 459:2, 460:16, 460:23, 467:22, 469:23, 470:24, 475:10, 487:13, 487:20, 495:1, 495:4, 495:11, 500:20, 500:22
**FORMULAS** [1] - 422:2
**FORTH** [1] - 459:3
**FOUNDATION** [1] - 451:12
**FOUR** [2] - 409:9, 423:5
**FOURTH** [1] - 456:20
**FRAME** [2] - 407:18, 448:6
**FRANCISCO** [1] - 443:3
**FREEZING** [1] - 459:17
**FREQUENTLY** [1] - 445:23
**FRESCHAUF** [1] - 416:2
**FRESCHAUF** [20] - 401:21, 414:21, 415:9, 416:7, 416:11, 423:18, 430:3, 430:18, 431:1, 432:3, 432:8, 432:21, 435:12, 439:3, 440:24, 441:5, 441:9, 449:15, 483:10, 487:18
**FRIDAY** [3] - 438:5, 438:17, 438:23
**FRONT** [3] - 423:12, 423:13, 477:25
**FROZEN** [1] - 458:23
**FULBRIGHT** [1] - 443:7
**FULL** [7] - 401:13, 401:15, 426:13, 426:17, 435:3, 441:20, 441:22
**FULL-TIME** [1] - 426:13
**FULLY** [1] - 435:6
**FUNDS** [1] - 459:13
**FUTURE** [3] - 406:22, 459:14, 475:4

---

## G

**GAME** [1] - 427:2
**GARDENS** [17] - 412:2, 412:4, 433:20, 434:14,

434:24, 455:19, 457:7, 470:17, 496:7, 496:9, 497:4, 497:7, 497:9, 497:21, 498:12, 500:14, 501:2

**GE** [5] - 473:3, 473:16, 484:24, 485:7, 485:15

**GENERAL** [3] - 458:20, 495:23, 497:1

**GENERATE** [1] - 412:21

**GENERIC** [1] - 492:23

**GENTLEMEN** [4] - 401:18, 415:1, 453:13, 503:1

**GILCHRIST** [1] - 400:12

**GIVEN** [2] - 470:11, 501:16

**GOAL** [1] - 486:12

**GOD** [2] - 401:6, 441:17

**GOLDSTEIN** [15] - 413:4, 418:20, 419:10, 419:15, 421:19, 422:17, 423:1, 427:8, 427:22, 428:14, 436:6, 469:16, 484:11, 489:7, 501:24

**GOLDSTEIN'S** [4] - 435:17, 475:18, 475:23, 481:23

**GOVERN** [6] - 432:1, 432:5, 432:7, 432:9, 432:12, 446:13

**GOVERNING** [1] - 407:6

**GOVERNMENT** [1] - 443:6

**GOVERNMENTS** [1] - 442:16

**GPM** [10] - 452:11, 452:13, 457:3, 458:17, 461:25, 462:2, 462:3, 469:24, 470:9, 501:11

**GRANT** [2] - 417:17, 450:13

**GRANTED** [6] - 406:8, 428:24, 467:20, 468:23, 475:21, 501:10

**GRANTING** [2] - 407:10, 422:8

**GRANTS** [1] - 443:7

**GREAT** [2] - 445:17, 471:17

**GREATER** [1] - 473:13

**GROSS** [30] - 417:22, 418:17, 420:9, 420:17, 420:18, 421:15, 421:23, 422:7, 422:15, 448:25, 449:3, 449:12, 450:12, 450:14, 450:18, 452:17, 456:20, 457:11, 473:20, 474:13, 474:22, 475:3, 487:20, 491:24, 492:3, 494:25, 495:4, 497:14, 499:19, 500:20

**GROSSMAN** [5] - 402:25, 410:1, 410:4, 410:7, 413:8

**GROUP** [2] - 411:9, 486:23

**GROW** [2] - 405:23, 459:12

**GROWTH** [5] - 459:4, 459:22, 461:18, 464:22, 464:25

**GUARANTEE** [4] - 406:22, 411:15, 494:17, 494:18

**GUARANTEED** [5] - 406:20, 411:13, 461:16, 461:18, 494:19

**GUESS** [5] - 428:18, 432:7, 434:19, 440:11, 484:14

**GUIDE** [1] - 417:12

**GUIDELINE** [1] - 432:13

**GUIDELINES** [6] - 416:13, 416:15, 417:7, 417:8, 417:9, 417:10, 417:11, 418:1, 418:5, 418:11, 418:14, 418:18, 418:21, 418:24, 419:1, 431:15, 431:25, 432:5, 432:9, 435:7, 438:25, 439:6, 445:11, 469:25, 473:24, 474:16, 476:2, 476:4, 476:6, 476:12, 476:18, 476:24, 477:2, 477:16, 477:25, 478:2, 478:4, 478:7, 479:22, 480:20, 480:22, 481:6, 481:11, 482:4, 482:16, 482:24, 483:2, 483:22, 484:3, 485:22, 486:22, 488:1, 490:9, 491:20, 491:24, 492:6, 492:8, 492:11, 492:25, 493:1, 494:25, 495:8, 495:21, 496:1, 496:4, 496:13, 496:17, 498:4

## H

**HALFWAY** [1] - 485:23

**HALL** [1] - 424:23

**HAND** [2] - 401:3, 441:14

**HANDLED** [1] - 436:21

**HANDLING** [3] - 419:24, 421:12, 436:20

**HAPPY** [1] - 423:2

**HARBOR** [29] - 421:6, 421:19, 421:21, 422:8, 422:14, 422:16, 422:25, 423:1, 427:11, 427:18, 430:3, 430:13, 436:7, 436:12, 436:15, 475:19, 475:24, 487:16, 487:24, 488:4, 488:18, 489:9, 490:2, 491:1, 491:2, 491:3, 491:4, 491:9, 491:14

**HASTINGS** [1] - 443:2

**HEAR** [5] - 408:15, 426:14, 426:15, 426:18, 454:9

**HEARD** [4] - 412:10, 427:8,

461:24, 472:23

**HEARING** [10] - 417:20, 417:25, 419:5, 421:2, 421:14, 458:1, 482:8, 482:22, 483:7, 502:6

**HEARSAY** [1] - 454:18

**HELD** [11] - 408:10, 409:6, 431:7, 443:5, 458:19, 459:1, 459:4, 459:11, 460:14, 460:16, 460:17

**HELEN** [1] - 433:9

**HELP** [4] - 401:6, 417:12, 417:13, 441:17

**HEM** [1] - 434:4

**HEREBY** [1] - 431:24

**HIGH** [3] - 442:23, 464:13, 486:20

**HIGHER** [1] - 406:16

**HIGHEST** [1] - 430:3

**HIGHLIGHT** [5] - 405:7, 432:14, 477:20, 485:23, 488:15

**HIGHLIGHTED** [2] - 431:24, 499:23

**HIGHLIGHTS** [2] - 405:1, 405:3

**HIRE** [1] - 419:5

**HIRED** [6] - 419:7, 419:13, 419:17, 419:20, 419:22, 433:19, 472:8, 472:12

**HIRING** [1] - 419:2

**HISTORICAL** [1] - 406:11

**HISTORICALLY** [2] - 407:18, 498:25

**HISTORY** [3] - 406:8, 471:20, 495:3

**HOLD** [1] - 447:7

**HOME** [2] - 421:6, 421:21

**HOME** [43] - 402:13, 402:14, 402:15, 402:20, 403:13, 404:8, 404:24, 405:8, 407:16, 407:17, 408:24, 419:14, 421:4, 426:14, 426:18, 426:24, 427:2, 427:3, 427:6, 427:9, 428:11, 428:15, 430:4, 432:1, 432:10, 442:21, 443:20, 443:25, 444:1, 444:10, 444:18, 444:25, 445:1, 450:9, 451:20, 456:24, 462:10, 486:19, 487:8, 488:21, 490:4, 496:16

**HOMES** [5] - 414:1, 442:19, 486:19, 487:3, 487:10

**HONOR** [45] - 400:10, 400:14, 400:23, 400:25, 401:11, 404:13, 409:22, 414:12, 414:14, 414:17, 414:21, 415:21, 423:9,

426:22, 429:21, 429:23, 430:1, 430:7, 430:14, 431:20, 434:24, 440:15, 440:19, 447:6, 447:22, 447:24, 451:11, 453:10, 454:10, 455:16, 456:2, 456:8, 456:17, 458:12, 466:22, 468:7, 469:9, 471:25, 479:10, 479:13, 488:8, 488:12, 489:14, 489:19, 490:16

**HOPE** [1] - 471:5

**HOPING** [1] - 440:11

**HOURS** [1] - 439:21

**HOUSE** [1] - 493:25

**HOUSING** [1] - 400:19

**HOUSING** [2] - 442:17, 442:18

**HUGE** [1] - 494:1

**HUNDRED** [2] - 430:13, 446:17

**HUNGARY** [1] - 443:8

## I

**IDEA** [1] - 402:10

**IDENTICAL** [1] - 451:21

**IGNORE** [2] - 440:11, 491:2

**IGNORED** [1] - 498:8

**IGNORES** [2] - 440:9, 440:25

**II.A.2.F** [6] - 476:13, 476:18, 477:2, 478:16, 479:22, 483:23

**IMPACT** [1] - 407:24

**IMPARTIAL** [1] - 424:13

**IMPLEMENTATION** [1] - 491:20

**IMPLEMENTED** [1] - 494:13

**IMPORTANT** [7] - 406:7, 406:10, 446:12, 449:7, 481:4, 491:21, 497:18

**IMPROPER** [2] - 455:4, 458:12

**IMPROVEMENTS** [1] - 474:10

**IN-PLACE** [1] - 485:4

**INADVERTENTLY** [1] - 434:3

**INAUDIBLE** [1] - 474:7

**INCLUDE** [2] - 406:20, 492:25

**INCLUDED** [2] - 449:14, 449:16

**INCLUDES** [2] - 445:18, 449:7

**INCLUDING** [4] - 429:5, 443:22, 448:9, 499:4

**INCOME** [47] - 405:25, 409:1, 413:16, 421:12, 449:17, 450:5, 450:10, 458:23, 459:4, 459:9, 459:12,

459:14, 459:15, 459:17, 459:18, 459:20, 459:23, 461:7, 461:19, 462:25, 463:1, 463:3, 463:4, 463:5, 463:8, 463:9, 463:10, 463:12, 463:14, 463:16, 464:8, 464:10, 464:16, 464:20, 464:22, 465:1, 465:7, 467:7, 473:7, 473:13, 473:14, 486:16, 486:20, 487:12, 487:13, 499:12

**INCORPORATED** [1] - 452:9
**INCORRECT** [1] - 481:13
**INCORRECTLY** [1] - 429:16
**INCREASE** [87] - 406:20, 406:23, 406:25, 407:3, 407:8, 407:11, 411:7, 417:17, 418:9, 419:3, 419:14, 422:4, 422:5, 422:10, 423:2, 429:12, 434:5, 445:4, 445:19, 446:24, 447:2, 447:13, 448:4, 448:15, 450:14, 452:11, 452:14, 452:15, 452:23, 457:12, 457:15, 457:16, 457:17, 460:23, 462:1, 462:22, 463:22, 464:1, 464:7, 464:12, 464:21, 464:22, 465:1, 465:9, 465:17, 465:19, 465:23, 467:20, 467:21, 468:1, 468:24, 469:17, 469:23, 470:3, 470:4, 470:6, 470:10, 470:14, 470:18, 470:24, 471:4, 471:11, 471:12, 471:18, 473:16, 474:25, 475:1, 475:7, 475:9, 475:15, 475:17, 484:20, 485:11, 485:25, 486:11, 486:14, 488:4, 497:7, 497:11, 499:2, 500:21, 501:9, 501:12, 501:16, 501:22
**INCREASED** [5] - 421:13, 463:11, 464:3, 467:8, 489:1
**INCREASES** [2] - 405:19, 406:2
**INCREASES** [35] - 405:21, 405:23, 406:3, 406:8, 406:15, 422:8, 422:15, 446:21, 448:20, 460:2, 460:18, 460:20, 461:12, 461:17, 461:18, 461:19, 461:20, 462:3, 464:18, 464:24, 468:19, 470:3, 470:11, 470:12, 471:2, 471:23, 475:4, 475:20, 486:13, 491:6, 491:7,

491:12, 494:12, 501:10
**INCREASING** [1] - 405:25
**INCUR** [1] - 406:16
**INCURRED** [3] - 473:11, 486:2, 486:4
**INCURS** [1] - 493:21
**INDEX** [1] - 464:20
**INDICATE** [2] - 470:5, 478:18
**INDICATED** [8] - 426:4, 453:9, 465:21, 480:22, 483:25, 491:7, 491:11, 492:7
**INDICATES** [1] - 464:21
**INDIVIDUAL** [1] - 501:8
**INFLATION** [12] - 450:11, 459:19, 459:20, 459:21, 459:22, 461:12, 463:14, 464:9, 464:13, 465:6, 465:7, 467:8
**INFLUENCE** [1] - 424:4
**INFORMATION** [9] - 407:7, 411:4, 411:5, 412:6, 438:14, 462:25, 491:6, 491:17, 501:15
**INFORMED** [1] - 415:23
**INITIAL** [2] - 465:8, 498:17
**INQUIRE** [1] - 456:12
**INSTANCE** [1] - 489:11
**INSTANCES** [3] - 423:23, 424:12, 424:16
**INSTRUCT** [3] - 425:3, 425:9, 439:19
**INSTRUCTED** [2] - 439:7, 439:23
**INSTRUCTION** [2] - 439:20, 439:24
**INSTRUCTIONS** [1] - 439:11
**INSURANCE** [2] - 450:7, 461:15
**INTENT** [2] - 409:21, 494:6
**INTEREST** [22] - 412:20, 416:22, 452:22, 452:24, 452:25, 471:11, 474:24, 475:1, 475:2, 475:11, 475:12, 475:19, 476:24, 485:15, 485:20, 485:21, 489:8, 490:6, 490:7, 490:13, 490:21, 498:19
**INTERFERENCE** [1] - 438:19
**INTERPRET** [1] - 486:21
**INTERPRETATION** [1] - 407:6
**INTRODUCE** [1] - 454:18
**INVADES** [1] - 455:10
**INVARIABLY** [1] - 495:4
**INVENTORY** [1] - 402:18
**INVESTIGATED** [1] - 404:23
**INVESTIGATING** [1] - 424:22
**INVESTIGATOR** [1] - 424:22
**INVESTMENT** [13] - 405:1,

405:3, 408:5, 408:16, 408:22, 408:25, 455:6, 459:13, 467:12, 469:17, 472:9, 472:21, 498:20
**INVESTMENT-BACKED** [1] - 455:6
**INVESTOR** [9] - 405:23, 405:25, 406:10, 407:21, 472:9, 472:15, 491:19, 491:21, 496:16
**INVESTORS** [2] - 405:9, 472:12
**INVOLVED** [6] - 412:14, 417:6, 478:10, 495:25, 496:22, 497:4
**IRRATIONAL** [2] - 497:23, 498:4
**IRRELEVANT** [2] - 428:22, 456:6
**ISSUE** [18] - 413:24, 427:4, 429:14, 438:20, 455:6, 455:7, 456:7, 465:16, 466:3, 474:20, 474:21, 484:24, 485:9, 485:10, 485:14, 485:16, 485:17, 488:1
**ISSUED** [2] - 498:11, 498:24
**ISSUES** [10] - 442:17, 444:25, 445:8, 445:17, 445:20, 455:9, 462:4, 467:9, 467:14, 467:15
**ITALICIZED** [1] - 481:8
**ITEM** [2] - 400:6, 418:7
**ITEMS** [2] - 417:21, 427:7
**ITSELF** [1] - 417:10

**J**

**JANUARY** [3] - 435:14, 438:10, 438:11
**JEFF** [1] - 400:17
**JIM** [5] - 433:2, 436:6, 438:20, 439:25, 502:9
**JOB** [3] - 402:10, 437:17, 437:19
**JOINING** [1] - 414:11
**JOURNAL** [2] - 444:15, 444:16
**JUDGMENT** [2] - 498:16, 499:9
**JUNE** [3] - 400:17, 466:17, 468:2
**JURISDICTION** [2] - 403:16, 407:11
**JURISDICTIONS** [6] - 403:13, 446:14, 461:10, 461:23, 461:25, 462:2
**JURORS** [2] - 423:13, 423:14
**JURY** [13] - 400:5, 400:8,

408:11, 415:8, 415:17, 423:11, 428:10, 453:19, 455:2, 455:8, 456:15, 472:23, 482:17

**K**

**KAWAGOE** [1] - 433:9
**KEEP** [4] - 446:16, 446:18, 450:4, 450:9
**KEN** [1] - 449:15
**KENNETH** [2] - 416:2, 442:1
**KENNETH** [3] - 418:21, 441:13, 441:22
**KEY** [1] - 405:9
**KIND** [10] - 417:14, 421:9, 421:11, 425:16, 427:4, 434:20, 450:8, 450:11, 474:10, 497:19
**KINDS** [1] - 426:21
**KNOWLEDGE** [1] - 462:1
**KNOWN** [1] - 419:23
**KNOWS** [1] - 455:17

**L**

**LABELED** [2] - 442:9, 442:10
**LADIES** [4] - 401:18, 415:1, 453:12, 503:1
**LAID** [3] - 418:2, 437:13, 451:12
**LAND** [5] - 404:24, 413:22, 444:23, 493:24, 494:1
**LANGUAGE** [7] - 477:20, 478:1, 478:7, 480:17, 482:23, 484:4, 495:21
**LARGE** [4] - 417:17, 429:12, 450:21, 470:6
**LARGER** [2] - 452:11, 474:5
**LAST** [8] - 401:13, 406:13, 421:14, 429:24, 441:20, 441:23, 442:16, 481:10
**LASTLY** [1] - 445:10
**LATIN** [1] - 403:5
**LAW** [13] - 417:8, 417:9, 417:10, 443:1, 443:2, 444:9, 445:3, 445:10, 455:21, 471:20, 493:16, 493:25, 495:24
**LAWS** [4] - 424:18, 444:17, 445:11, 446:13
**LAWYER** [3] - 438:24, 439:6, 439:7
**LAY** [1] - 418:1
**LEAD** [3] - 410:22, 411:12, 451:8
**LEADING** [1] - 416:25
**LEADS** [1] - 411:16
**LEAKS** [1] - 414:3
**LEARN** [1] - 438:14

**LEAST** [7] - 419:12, 420:2, 422:3, 428:20, 431:6, 446:2, 454:21
**LEAVE** [3] - 437:17, 480:20, 481:20
**LECTERN** [1] - 454:7
**LEFT** [5] - 433:4, 436:22, 461:19, 463:5
**LEGAL** [7] - 410:12, 410:13, 410:14, 434:17, 447:2, 458:13, 462:18
**LEGITIMATE** [1] - 414:9
**LENGTH** [2] - 472:24, 472:25
**LENGTHY** [1] - 445:16
**LENT** [1] - 485:7
**LESS** [2] - 430:13, 436:8
**LESSONS** [1] - 445:12
**LETTER** [2] - 409:21, 428:11
**LEVEL** [7] - 422:5, 436:2, 436:3, 449:9, 450:10, 463:13, 463:15
**LICENSE** [1] - 403:11
**LICENSES** [1] - 403:9
**LIFTED** [1] - 482:20
**LIGHT** [9] - 477:23, 478:9, 478:14, 480:13, 480:25, 481:7, 481:12, 486:2, 493:19
**LIGHTS** [1] - 470:23
**LIKELIHOOD** [1] - 455:8
**LIMINE** [2] - 423:7, 455:10
**LIMITED** [2] - 478:13, 478:17
**LINE** [7] - 408:15, 414:22, 422:1, 440:15, 440:17, 482:19
**LINES** [1] - 479:17
**LIST** [4] - 412:18, 454:5, 491:10, 491:13
**LISTED** [3] - 405:1, 448:19, 448:25
**LISTING** [3] - 402:22, 412:1, 412:15
**LITIGATION** [2] - 412:3, 438:21, 479:3
**LIVED** [1] - 427:5
**LIVING** [1] - 426:25
**LLC** [1] - 400:7
**LLP** [1] - 400:11
**LOADSMAN** [3] - 436:18, 436:25, 437:4
**LOAN** [11] - 473:3, 473:17, 474:5, 474:18, 484:23, 484:24, 485:1, 485:7, 485:15, 489:4, 489:8
**LOAN-TO-VALUE** [2] - 484:23, 485:7
**LOCAL** [1] - 442:16
**LOCATE** [1] - 414:17
**LOOK** [20] - 406:1, 416:11, 420:8, 422:19, 447:18,

451:4, 469:13, 470:19, 473:23, 477:2, 488:20, 490:1, 490:5, 493:12, 493:13, 493:16, 493:22, 494:2, 497:20, 501:8
**LOOKED** [5] - 421:11, 487:7, 491:5, 501:9, 502:2
**LOOKING** [10] - 406:12, 420:7, 422:22, 432:22, 449:5, 470:8, 480:2, 483:22, 490:2
**LOOKS** [1] - 452:14
**LOS** [1] - 400:1
**LOS** [3] - 443:22, 461:22, 487:8
**LOSE** [1] - 495:15
**LOSING** [3] - 493:5, 493:6, 501:25
**LOST** [1] - 434:20
**LOWER** [11] - 432:15, 451:25, 452:25, 459:21, 463:10, 475:2, 475:11, 475:15, 475:19, 475:20
**LUNCH** [2] - 503:2, 503:6

---

# M

**M-I-L-L-I-C-H-A-P** [1] - 402:5
**MAIN** [1] - 455:4
**MAINTAIN** [3] - 449:8, 459:15, 459:16
**MAINTENANCE** [32] - 417:23, 420:10, 420:18, 421:15, 421:23, 422:7, 448:25, 449:3, 449:12, 449:17, 450:8, 450:12, 450:14, 450:18, 452:17, 456:20, 457:11, 461:7, 461:15, 473:20, 474:13, 474:22, 475:3, 487:20, 491:24, 492:3, 495:1, 495:4, 497:14, 499:12, 499:19, 500:20
**MAJOR** [1] - 403:4
**MALAWY** [1] - 400:17
**MANAGED** [1] - 434:3
**MANAGEMENT** [2] - 427:1, 450:8
**MANAGER** [1] - 400:19
**MANAGER** [1] - 426:25
**MANDATED** [1] - 494:25
**MANIPULATED** [3] - 452:20, 453:6, 473:21
**MANUFACTURED** [3] - 402:13, 405:8, 407:17
**MARCH** [1] - 438:9
**MARCOS** [1] - 456:25
**MARCUS** [12] - 402:4, 402:6, 402:7, 402:8, 402:11, 403:25, 412:17, 412:23,

413:3, 413:7, 413:20, 414:8
**MARCUS** [1] - 402:4
**MARGARET** [1] - 400:18
**MARKET** [16] - 404:8, 407:19, 407:24, 408:14, 408:16, 412:21, 413:4, 413:12, 442:18, 472:24, 472:25, 473:1, 473:2, 493:4
**MARKETING** [5] - 404:23, 408:3, 411:5, 412:5, 412:9
**MARKETPLACE** [1] - 407:22
**MARKETS** [1] - 443:20
**MASTER'S** [1] - 443:3
**MATTER** [2] - 429:13, 454:18
**MATTERS** [1] - 436:21
**MATTHEW** [2] - 400:11, 408:12
**MAY** [1] - 400:1
**MAYOR** [2] - 424:24, 438:20
**MAYOR** [15] - 416:16, 416:17, 416:18, 416:19, 416:22, 417:4, 424:18, 433:2, 437:4, 437:11, 437:19, 440:6, 502:9, 502:12
**MEAN** [26] - 407:5, 407:15, 408:7, 421:4, 422:9, 434:19, 436:6, 436:7, 450:17, 452:13, 452:20, 454:20, 459:8, 465:2, 471:19, 473:12, 474:19, 478:23, 483:21, 483:25, 486:18, 486:22, 487:9, 489:10, 492:19, 493:23, 494:5, 496:25
**MEANS** [5] - 459:9, 478:25, 494:11, 494:16, 494:19
**MEANT** [1] - 501:21
**MEASURE** [1] - 421:13
**MEASURES** [1] - 461:8
**MEET** [1] - 447:2
**MEMBERS** [13] - 421:10, 424:4, 424:7, 424:12, 424:18, 425:9, 425:18, 425:22, 426:3, 426:6, 502:10, 502:13, 502:20
**MEMORANDUM** [1] - 403:24
**MEMORANDUM** [14] - 404:4, 404:5, 404:10, 404:20, 405:14, 405:22, 406:19, 407:2, 408:19, 408:21, 409:2, 410:21, 411:11, 411:15
**MEMORY** [2] - 448:11, 480:18
**MENTION** [2] - 470:16, 492:13
**MENTIONED** [9] - 403:12,

413:3, 413:7, 413:20, 414:8
**MARCUS** [1] - 402:4
**MARGARET** [1] - 400:18
**MARKET** [16] - 404:8, 407:19, 407:24, 408:14, 408:16, 412:21, 413:4, 413:12, 442:18, 472:24, 472:25, 473:1, 473:2, 493:4
**MARKETING** [5] - 404:23, 408:3, 411:5, 412:5, 412:9
**MARKETPLACE** [1] - 407:22
**MARKETS** [1] - 443:20
**MASTER'S** [1] - 443:3
**MATTER** [2] - 429:13, 454:18
**MATTERS** [1] - 436:21
**MATTHEW** [2] - 400:11, 408:12
**MAY** [1] - 400:1
**MAYOR** [2] - 424:24, 438:20
**MAYOR** [15] - 416:16, 416:17, 416:18, 416:19, 416:22, 417:4, 424:18, 433:2, 437:4, 437:11, 437:19, 440:6, 502:9, 502:12
**MEAN** [26] - 407:5, 407:15, 408:7, 421:4, 422:9, 434:19, 436:6, 436:7, 450:17, 452:13, 452:20, 454:20, 459:8, 465:2, 471:19, 473:12, 474:19, 478:23, 483:21, 483:25, 486:18, 486:22, 487:9, 489:10, 492:19, 493:23, 494:5, 496:25
**MEANS** [5] - 459:9, 478:25, 494:11, 494:16, 494:19
**MEANT** [1] - 501:21
**MEASURE** [1] - 421:13
**MEASURES** [1] - 461:8
**MEET** [1] - 447:2
**MEMBERS** [13] - 421:10, 424:4, 424:7, 424:12, 424:18, 425:9, 425:18, 425:22, 426:3, 426:6, 502:10, 502:13, 502:20
**MEMORANDUM** [1] - 403:24
**MEMORANDUM** [14] - 404:4, 404:5, 404:10, 404:20, 405:14, 405:22, 406:19, 407:2, 408:19, 408:21, 409:2, 410:21, 411:11, 411:15
**MEMORY** [2] - 448:11, 480:18
**MENTION** [2] - 470:16, 492:13
**MENTIONED** [9] - 403:12,

406:3, 418:11, 418:24, 443:12, 456:21, 460:5, 470:25, 471:13
**MENTIONS** [2] - 455:17, 487:15
**MERITS** [1] - 422:20
**METHODOLOGIES** [3] - 446:4, 446:20, 492:3
**METHODOLOGY** [18] - 418:10, 418:16, 433:17, 435:10, 450:18, 465:4, 484:1, 484:6, 492:9, 497:15, 498:18, 499:2, 499:12, 499:13, 499:20, 501:19, 501:20
**METRICS** [2] - 407:20
**MEYERS** [1] - 400:11
**MIC** [1] - 401:13
**MIDDLE** [3] - 435:3, 448:21, 490:6
**MIDDLETOWN** [1] - 443:1
**MIGHT** [2] - 432:22, 481:15
**MILITATE** [1] - 475:4
**MILLICHAP** [10] - 402:4, 402:5, 402:6, 402:7, 402:8, 402:11, 403:25, 412:17, 412:23, 413:20
**MILLICHAP'S** [3] - 413:3, 413:7, 414:8
**MILLION** [8] - 402:18, 412:14, 412:17, 413:12, 464:8, 464:9, 464:10, 493:5
**MIND** [1] - 425:24
**MINIMUM** [1] - 471:17
**MINOR** [1] - 403:4
**MINUS** [2] - 450:1, 461:9
**MINUTE** [3] - 477:6, 483:9, 490:24
**MINUTES** [3] - 415:2, 415:6, 453:14
**MISQUOTATION** [1] - 482:3
**MISQUOTE** [2] - 481:6, 481:7
**MISQUOTED** [2] - 478:4, 478:19
**MISQUOTING** [1] - 483:2
**MISREAD** [1] - 478:4
**MISSPOKE** [2] - 496:9, 501:17
**MISTAKE** [2] - 482:20, 483:8
**MISUSED** [1] - 474:14
**MNOI** [24] - 412:10, 417:23, 418:13, 419:18, 433:16, 433:22, 434:8, 434:15, 435:7, 440:8, 440:9, 440:25, 449:18, 449:20, 449:23, 449:24, 460:24, 460:25, 461:6, 462:13, 462:17, 462:22, 467:22,

492:13
**MOBILE** [44] - 402:14, 402:15, 402:20, 403:12, 404:8, 404:24, 407:16, 408:24, 419:14, 421:4, 426:14, 426:18, 426:24, 427:1, 427:3, 427:5, 427:9, 428:11, 428:15, 430:4, 432:1, 432:10, 442:19, 442:21, 443:19, 443:20, 443:25, 444:10, 444:18, 444:25, 445:1, 447:13, 450:9, 451:20, 456:24, 462:10, 468:1, 469:4, 486:19, 487:8, 487:10, 496:16
**MOBILE** [5] - 403:24, 421:6, 421:21, 488:21, 490:4
**MOMENT** [3] - 447:18, 477:7, 488:9
**MOMENTARILY** [1] - 414:23
**MONEY** [4] - 474:17, 487:10, 495:15, 501:25
**MONTE** [1] - 443:23
**MONTH** [2] - 421:9, 430:6
**MORNING** [15] - 400:10, 400:14, 400:21, 411:24, 414:11, 414:23, 416:7, 416:8, 430:18, 430:19, 442:6, 442:7, 453:13, 472:4, 472:5
**MORTGAGE** [36] - 406:21, 450:19, 450:21, 450:25, 451:5, 451:6, 451:22, 451:24, 452:2, 452:8, 452:10, 452:12, 452:14, 452:19, 452:21, 452:23, 452:25, 453:2, 453:5, 473:7, 473:25, 474:4, 474:24, 475:1, 476:24, 484:11, 489:8, 493:7, 494:2, 495:16, 497:11, 497:16, 498:8, 498:19
**MORTGAGES** [1] - 453:4
**MOST** [9] - 410:12, 419:23, 422:18, 428:20, 435:18, 435:25, 436:19, 461:22, 501:10
**MOSTLY** [2] - 444:3, 470:10
**MOTION** [4] - 423:6, 423:9, 428:24, 455:10
**MOTIVATIONAL** [1] - 404:7
**MOVE** [10] - 428:22, 434:22, 435:23, 447:23, 460:24, 466:22, 468:7, 486:25, 489:14, 490:16
**MOVING** [1] - 455:12
**MR** [109] - 400:10, 400:14, 400:23, 400:25, 401:17, 402:2, 404:13, 404:16,

408:8, 408:12, 408:18, 408:23, 409:3, 409:7, 409:22, 409:25, 410:25, 411:2, 411:20, 411:23, 414:12, 414:14, 416:25, 426:22, 428:22, 430:17, 431:19, 431:22, 432:14, 432:16, 434:12, 434:21, 434:23, 435:2, 435:4, 437:10, 439:10, 439:16, 440:7, 440:15, 440:17, 440:19, 440:21, 440:22, 441:8, 441:13, 442:5, 447:6, 447:9, 447:22, 447:24, 448:1, 451:11, 451:15, 451:17, 453:10, 454:3, 454:7, 454:10, 454:14, 454:23, 455:16, 455:25, 456:2, 456:8, 456:17, 456:18, 458:12, 458:15, 466:22, 466:25, 468:7, 468:10, 469:9, 469:12, 471:24, 472:3, 476:9, 476:11, 477:19, 477:21, 479:10, 479:13, 479:15, 479:17, 479:21, 479:24, 480:2, 480:6, 480:8, 480:11, 480:19, 480:21, 481:19, 481:22, 488:12, 488:15, 488:17, 489:14, 489:17, 489:22, 489:25, 490:16, 490:19, 498:14, 498:15, 502:15, 502:19, 502:25
**MS** [27] - 414:17, 414:21, 415:10, 415:15, 415:21, 415:23, 416:1, 416:6, 417:2, 423:9, 423:15, 423:17, 428:25, 429:21, 429:23, 430:1, 430:2, 430:7, 430:9, 430:14, 434:10, 434:16, 437:5, 437:7, 439:9, 439:13, 440:3
**MULTI** [1] - 402:12
**MULTI-FAMILY** [1] - 402:12
**MULTIPLE** [1] - 454:5
**MUST** [2] - 459:4, 491:25

**N**

**NAME** [7] - 401:13, 401:15, 441:20, 441:21, 441:22, 441:23
**NAMES** [1] - 418:24
**NAUSEAM** [1] - 455:20
**NECESSARILY** [3] - 434:2, 436:2, 461:25
**NECESSARY** [3] - 464:11, 485:11, 486:1

**NEED** [8] - 419:4, 440:13, 450:8, 479:18, 486:22, 493:9, 493:10, 493:22
**NEEDED** [2] - 431:8, 464:4
**NEEDS** [1] - 463:13
**NEGATIVE** [1] - 407:23
**NEGOTIATION** [1] - 410:12
**NEIGHBORS** [1] - 426:25
**NET** [34] - 405:25, 449:9, 449:17, 450:5, 450:10, 458:23, 459:4, 459:9, 459:11, 459:15, 459:17, 459:18, 459:19, 461:7, 461:19, 463:1, 463:5, 463:7, 463:9, 463:11, 463:14, 463:15, 464:8, 464:10, 464:16, 464:20, 464:22, 465:7, 467:7, 473:7, 473:12, 473:13, 499:12
**NEUTRAL** [4] - 425:19, 425:23, 426:10, 502:22
**NEVER** [6] - 412:10, 458:8, 472:8, 472:12, 483:4
**NEW** [4] - 406:14, 411:8, 411:10, 465:13
**NEW** [1] - 443:11
**NEWCOMB** [3] - 432:14, 477:19, 481:19
**NEWCOMB** [1] - 476:9
**NEXT** [9] - 406:13, 414:18, 423:16, 441:12, 455:12, 455:15, 477:4, 499:8, 499:17
**NOBODY** [3] - 438:2, 483:5, 483:8
**NOELLE** [1] - 427:8
**NOI** [1] - 458:23
**NONE** [7] - 414:14, 437:22, 488:12, 489:22, 495:25, 500:21, 501:14
**NONEXISTENT** [1] - 482:23
**NORMALLY** [1] - 465:19
**NOTE** [1] - 486:18
**NOTED** [1] - 473:6
**NOTES** [2] - 401:9, 401:11
**NOTHING** [12] - 401:6, 411:20, 413:3, 413:7, 414:7, 429:21, 441:17, 456:3, 471:25, 487:11, 497:21, 497:24
**NOTICE** [3] - 428:1, 428:4, 428:8
**NUMBER** [10] - 403:18, 404:25, 420:1, 430:11, 432:12, 437:14, 444:21, 454:13, 477:13
**NUMBERS** [3] - 465:3, 468:16, 468:18
**NUMERAL** [2] - 432:15,

460:24
**NUMEROUS** [1] - 419:24

**O**

**O'MELVENY** [1] - 400:11
**OATH** [7] - 415:19, 430:25, 431:4, 431:11, 440:24, 479:5, 500:7
**OBJECT** [1] - 447:24
**OBJECTION** [24] - 408:8, 410:25, 416:25, 426:22, 434:10, 434:16, 437:5, 439:9, 439:13, 440:3, 447:6, 451:11, 453:10, 454:6, 455:4, 455:13, 458:12, 469:9, 484:23, 484:25, 485:6, 488:11, 489:21, 502:15
**OBJECTIONS** [1] - 454:5
**OBLIGATED** [1] - 497:14
**OBTAIN** [1] - 486:17
**OBTAINED** [3] - 428:4, 469:18, 475:19
**OBVIOUSLY** [1] - 463:10
**OCCASIONALLY** [1] - 436:23
**OCCASIONS** [7] - 419:8, 419:10, 443:16, 444:7, 446:1, 446:6, 446:7
**OCCUPANCY** [2] - 405:4, 405:8
**OCCUPATION** [1] - 442:14
**OCCURRED** [1] - 481:16
**OCEANSIDE** [5] - 462:10, 462:11, 494:21, 496:13, 496:21
**OCTOBER** [2] - 431:14, 438:25
**OFFER** [6] - 409:15, 410:2, 410:5, 410:7, 410:10, 410:11
**OFFERED** [3] - 407:19, 407:22, 408:20
**OFFERING** [1] - 403:23
**OFFERING** [14] - 404:4, 404:5, 404:10, 404:20, 405:14, 405:21, 406:19, 407:2, 408:19, 408:21, 409:2, 410:21, 411:11, 411:14
**OFFERS** [5] - 409:8, 409:9, 412:22, 414:6, 414:8
**OFFICE** [1] - 427:6
**OFFICIAL** [1] - 433:5
**OFFICIALS** [1] - 423:19
**OFTEN** [2] - 426:14, 426:18
**OIL** [2] - 413:18, 414:4
**OLD** [1] - 471:9
**ONCE** [5] - 410:11, 420:21,

421:8, 423:10, 490:1
ONE [58] - 402:22, 405:4, 405:9, 406:4, 408:23, 409:18, 417:18, 418:7, 419:6, 419:23, 421:5, 421:25, 422:24, 428:7, 429:16, 429:24, 432:12, 432:15, 438:1, 443:10, 444:20, 444:22, 446:8, 448:3, 448:23, 448:25, 449:8, 449:13, 449:17, 449:21, 450:17, 451:23, 453:2, 453:7, 454:3, 454:4, 456:24, 457:12, 460:19, 463:18, 464:24, 464:25, 465:12, 466:12, 466:19, 467:21, 469:21, 470:9, 473:6, 474:24, 476:23, 482:1, 488:9, 491:23, 492:3, 496:21
ONES [2] - 403:19, 403:20
ONSTOT [38] - 400:14, 400:23, 400:25, 401:17, 402:2, 404:13, 404:16, 408:18, 408:23, 409:3, 409:7, 409:22, 409:25, 411:2, 411:20, 414:14, 441:13, 442:5, 447:9, 447:22, 448:1, 451:17, 454:3, 455:16, 455:25, 456:8, 456:17, 456:18, 458:15, 466:22, 466:25, 468:7, 468:10, 469:12, 471:24, 488:12, 489:22, 502:15
ONSTOT [3] - 400:15, 400:24, 408:18
OPEN [2] - 409:6, 471:21
OPEN-ENDED [1] - 471:21
OPERATE [1] - 450:9
OPERATING [62] - 429:5, 449:6, 449:17, 449:25, 450:1, 450:2, 450:5, 450:6, 450:7, 450:10, 451:22, 452:6, 458:23, 459:4, 459:9, 459:10, 459:12, 459:15, 459:17, 459:18, 459:20, 461:7, 461:8, 461:9, 461:12, 463:1, 463:4, 463:5, 463:7, 463:9, 463:12, 463:14, 463:15, 464:3, 464:8, 464:10, 464:16, 464:20, 464:22, 464:25, 465:5, 465:7, 465:23, 467:7, 468:19, 473:7, 473:13, 477:22, 478:8, 486:5, 489:1, 489:3, 489:12, 490:8, 490:10, 490:14, 497:19, 499:4, 499:11, 499:12, 499:14

OPERATION [1] - 443:19
OPINION [14] - 407:25, 408:16, 415:4, 425:18, 457:5, 458:8, 458:13, 469:2, 469:7, 469:16, 469:19, 469:20, 485:21, 493:3
OPINIONS [7] - 445:21, 445:24, 453:9, 453:16, 455:11, 455:22, 503:4
OPPOSITE [1] - 459:16
OPTED [2] - 437:17
ORDER [7] - 400:22, 401:19, 423:7, 423:14, 464:16, 484:20, 485:10
ORDERING [1] - 457:24
ORDINANCE [53] - 405:12, 405:16, 406:25, 407:1, 407:23, 411:5, 411:17, 417:9, 417:10, 417:16, 417:18, 418:2, 418:5, 418:11, 418:24, 422:1, 422:14, 432:2, 432:6, 432:10, 435:7, 460:13, 460:14, 460:16, 460:17, 460:19, 460:21, 469:21, 469:22, 470:2, 470:23, 471:10, 471:22, 478:9, 478:20, 478:22, 478:25, 480:9, 486:2, 491:20, 494:5, 494:10, 494:14, 494:15, 494:16, 494:18, 494:25, 495:7, 495:10, 495:11, 496:3
ORDINANCES [3] - 443:14, 446:13, 456:5
ORIGINAL [8] - 429:16, 435:6, 466:1, 467:3, 473:25, 474:4, 474:17, 474:24
ORIGINALLY [2] - 421:21, 497:6
OTHERWISE [1] - 452:5
OURSELVES [1] - 434:4
OUTSIDE [1] - 415:8
OUTSIDE [5] - 408:11, 423:10, 453:19, 469:9, 485:18
OVERALL [5] - 442:21, 465:2, 475:14, 491:10, 492:10
OVERRIDES [1] - 417:18
OVERRULED [11] - 411:1, 426:23, 434:18, 437:6, 437:8, 439:14, 440:4, 451:14, 451:16, 469:11, 502:17
OVERVIEW [1] - 405:15
OWN [4] - 411:18, 422:19, 486:19, 499:1

OWNED [3] - 402:25, 419:14, 451:23
OWNER [67] - 404:22, 404:23, 406:14, 408:25, 411:7, 411:8, 411:10, 412:19, 413:16, 417:13, 429:3, 429:4, 433:24, 440:12, 449:5, 450:4, 450:5, 450:9, 450:21, 450:25, 451:23, 452:1, 452:10, 452:12, 452:20, 457:15, 457:18, 457:21, 458:1, 458:2, 458:3, 458:7, 459:12, 460:14, 460:16, 460:17, 461:14, 461:16, 462:23, 463:25, 464:1, 464:7, 465:12, 465:16, 465:18, 465:22, 467:4, 467:5, 467:7, 467:12, 467:13, 469:22, 470:13, 470:18, 471:10, 471:18, 475:11, 475:16, 483:4, 483:6, 493:3, 495:15, 496:23, 497:6, 497:9, 497:13, 501:25
OWNER'S [2] - 429:5, 498:20
OWNERS [5] - 444:1, 445:2, 462:10, 491:11, 501:21
OWNERSHIP [4] - 427:23, 428:13, 443:20, 499:5

P

PACKAGE [1] - 411:5
PAGE [43] - 405:1, 405:11, 405:20, 406:13, 431:19, 432:15, 433:1, 435:2, 440:16, 448:17, 448:21, 454:13, 458:22, 459:24, 460:24, 460:25, 462:9, 463:17, 476:10, 476:14, 476:15, 477:5, 477:8, 477:11, 477:14, 479:17, 480:4, 480:19, 481:21, 482:5, 482:6, 488:20, 488:24, 490:1, 490:3, 490:5, 498:16, 498:23, 499:17, 499:24, 500:25
PAGES [4] - 431:2, 445:16, 477:11, 488:24
PAID [8] - 413:4, 440:10, 441:1, 465:18, 465:20, 483:12, 490:8, 490:22
PAIR [1] - 420:7
PALACIO [1] - 460:5
PALM [3] - 427:10, 460:13, 460:17
PALM [1] - 460:16
PALOMAR [8] - 455:19,

455:25, 456:2, 456:24, 494:21, 496:13, 496:21, 498:1
PAPER [1] - 439:1
PARAGRAPH [3] - 406:14, 435:3, 458:24
PARAMETER [1] - 459:3
PARK [4] - 421:6, 421:21, 488:21, 490:4
PARK [94] - 402:20, 404:8, 404:25, 406:9, 406:12, 407:21, 408:1, 408:2, 408:4, 408:24, 412:9, 412:25, 413:9, 413:15, 417:13, 421:22, 422:9, 422:21, 426:14, 426:18, 427:2, 427:9, 427:23, 428:11, 428:12, 428:13, 428:17, 428:20, 429:3, 429:4, 429:5, 430:11, 435:17, 435:18, 435:24, 436:15, 440:12, 440:13, 440:14, 443:20, 444:1, 444:10, 444:18, 444:25, 445:1, 450:6, 450:9, 451:23, 451:25, 452:1, 452:3, 452:4, 452:10, 452:11, 452:21, 457:15, 462:10, 462:23, 463:16, 463:25, 464:1, 464:18, 467:4, 467:5, 467:12, 469:4, 471:10, 471:11, 472:24, 473:10, 473:13, 483:4, 483:6, 484:12, 484:18, 486:1, 490:22, 493:3, 493:4, 495:9, 495:15, 496:16, 496:23, 497:6, 497:9, 497:13, 499:5, 501:25
PARK'S [4] - 489:4, 497:16, 499:3, 499:10
PARKS [15] - 402:14, 402:15, 403:13, 407:16, 419:14, 421:4, 422:11, 428:16, 430:4, 443:25, 451:20, 452:5, 486:19
PART [5] - 446:23, 452:8, 454:21, 476:6, 485:8
PARTICIPATED [1] - 443:13
PARTICULAR [17] - 416:22, 417:16, 417:20, 418:6, 418:10, 419:5, 421:5, 425:3, 434:4, 460:15, 460:23, 465:4, 465:5, 469:23, 486:23, 492:22, 499:11
PARTIES [1] - 472:23
PASS [9] - 450:22, 457:22, 457:25, 458:3, 458:7, 460:2, 460:9, 460:18,

460:19
**PASSED** [7] - 410:24,
416:19, 421:10, 452:8,
457:18, 457:19, 470:15
**PASSTHROUGH** [4] - 411:6,
411:9, 411:13, 458:20
**PAST** [5] - 405:4, 406:3,
450:10, 470:9, 471:7
**PASTED** [1] - 481:16
**PAUSE** [1] - 414:20
**PAY** [5] - 427:10, 440:14,
452:25, 465:22, 487:10
**PAYING** [2] - 450:6, 495:16
**PAYMENTS** [9] - 406:21,
452:8, 473:7, 490:7, 490:9,
490:13, 497:11, 497:16,
498:8
**PENDING** [1] - 429:8
**PEOPLE** [10] - 419:14,
419:23, 420:23, 426:9,
436:25, 437:14, 486:19,
486:20, 486:23, 487:10
**PER** [2] - 406:4
**PERCENT** [15] - 405:4,
412:20, 425:13, 436:2,
436:8, 459:21, 459:22,
464:11, 464:14, 464:17,
467:8, 467:14, 488:25,
489:2
**PERCENTAGE** [2] - 459:21,
464:19
**PERFORM** [2] - 449:12,
468:12
**PERFORMED** [5] - 420:10,
420:14, 420:16, 460:22,
495:1
**PERIOD** [11] - 420:21, 421:9,
423:3, 423:20, 424:8,
424:24, 425:2, 426:1,
426:7, 430:5, 437:21
**PERMISSIBLE** [2] - 401:10,
480:24
**PERMISSION** [2] - 404:14,
431:19
**PERMITS** [1] - 413:21
**PERMITTED** [2] - 459:5,
495:14
**PERSON** [1] - 421:7
**PERSON'S** [1] - 487:12
**PERSONAL** [1] - 491:19
**PERSONALLY** [1] - 483:24
**PERSPECTIVE** [1] - 406:11
**PERSUADE** [1] - 498:7
**PHASE** [3] - 434:19, 437:21,
455:13
**PHYSICAL** [1] - 404:6
**PICK** [1] - 432:25
**PICKED** [1] - 432:22
**PIECE** [1] - 493:24, 493:25
**PLACE** [6] - 476:23, 480:16,

484:17, 485:3, 485:4,
494:12
**PLAIN** [1] - 435:8
**PLAINTIFF** [2] - 400:12,
403:19
**PLAINTIFF'S** [1] - 442:9
**PLANNER** [1] - 442:15
**PLANNING** [1] - 443:4
**PLAY** [1] - 420:23
**PLUS** [1] - 471:13
**POINT** [12] - 408:2, 411:15,
418:13, 424:11, 430:11,
435:22, 437:17, 483:10,
484:15, 497:1, 499:8,
501:8
**POINTED** [5] - 406:25,
416:15, 467:15, 483:2,
483:8
**POINTS** [1] - 408:23
**POLITICS** [1] - 502:24
**PORTION** [6] - 429:1, 486:4,
486:8, 488:15, 490:7,
490:22
**PORTIONS** [1] - 481:16
**PORTNOI** [1] - 400:11
**POSITION** [1] - 470:17
**POSITIONS** [1] - 443:5
**POSITIVE** [1] - 408:4
**POSSIBILITY** [2] - 404:24,
452:18
**POSSIBLE** [5] - 446:19,
482:13, 482:15, 485:2,
487:2
**POST** [1] - 442:23
**POTENTIAL** [3] - 404:18,
405:19, 406:2
**POTENTIAL** [1] - 405:15,
405:21, 405:23, 413:15
**POTENTIALLY** [2] - 422:5,
437:15
**POWER** [1] - 502:12
**PRACTICE** [3] - 470:12,
471:7, 473:6
**PRACTICES** [5] - 473:4,
473:17, 484:13, 485:19,
486:3
**PRECEDENTS** [1] - 435:8
**PRECURSOR** [2] - 428:12,
428:19
**PREDATE** [1] - 501:1
**PREFER** [1] - 428:15
**PREFERRING** [1] - 462:17
**PREPARE** [1] - 404:10,
438:14, 447:1, 447:14,
447:16, 449:20, 466:1,
466:15, 466:17, 468:2,
469:6
**PREPARED** [1] - 447:20,
449:15, 453:21, 453:25,
463:17, 465:11, 465:13,

467:16, 469:14
**PREPARING** [2] - 404:2,
442:17
**PRESENCE** [7] - 400:5,
408:11, 415:8, 415:17,
423:11, 453:19, 456:15
**PRESENT** [8] - 423:13,
455:5, 463:2, 463:3,
473:21, 475:12, 482:17,
483:1
**PRESENTED** [5] - 410:11,
454:1, 455:2, 465:21,
502:23
**PRESENTING** [1] - 434:13
**PRESERVE** [1] - 449:25
**PRESERVING** [1] - 463:15
**PRESSURE** [2] - 423:19,
423:25
**PRETTY** [3] - 425:15, 428:1,
436:22
**PREVENT** [3] - 470:2, 471:1,
471:23
**PREVENTED** [1] - 497:21,
498:6
**PREVENTING** [1] - 486:12
**PREVIOUS** [2] - 404:22,
411:7
**PREVIOUSLY** [2] - 416:3,
489:2
**PRICE** [9] - 412:15, 412:18,
412:21, 412:24, 451:25,
464:19, 473:1, 478:8,
493:18
**PRICES** [1] - 487:8
**PRICING** [1] - 407:20
**PRINCIPAL** [2] - 410:8,
442:15
**PRINCIPLE** [1] - 490:9
**PRINCIPLES** [1] - 492:21
**PRIVILEGE** [2] - 439:13,
440:3
**PRO** [1] - 502:14
**PRO-RESIDENCE** [1] -
502:14
**PROBABILITY** [1] - 411:19
**PROCEDURES** [2] - 477:24,
478:10
**PROCEEDINGS** [1] - 414:20
**PROCESS** [7] - 406:10,
411:16, 417:12, 429:3,
463:21, 475:13, 499:1
**PRODUCE** [1] - 413:16
**PRODUCT** [1] - 405:10
**PROFESSIONAL** [1] - 403:9
**PROFESSOR** [1] - 443:10
**PROFIT** [23] - 417:23,
418:18, 421:13, 422:15,
449:12, 450:12, 450:14,
450:18, 452:17, 456:20,
457:11, 473:20, 474:13,

474:22, 475:3, 487:20,
491:24, 492:3, 494:25,
495:4, 497:14, 499:19,
500:20
**PROFITS** [7] - 420:9, 420:18,
421:15, 421:23, 422:7,
448:25, 449:3
**PROGENY** [1] - 451:13
**PROHIBITS** [1] - 419:1
**PROJECTIONS** [1] - 472:9
**PROMOTION** [2] - 416:23,
437:18
**PROPERLY** [1] - 454:17
**PROPERTIES** [2] - 400:7,
410:1
**PROPERTIES** [3] - 409:16,
472:13, 472:16
**PROPERTY** [23] - 404:7,
405:17, 406:16, 407:24,
408:3, 408:13, 412:1,
412:5, 412:15, 412:18,
413:5, 413:9, 413:18,
414:4, 445:3, 449:5, 450:7,
450:22, 451:4, 461:14,
465:17, 465:18, 466:3
**PROPOSE** [1] - 406:14
**PROPOSED** [2] - 462:22,
463:22
**PROPOSITION** [2] - 495:19,
497:2
**PROPOSITIONS** [1] - 495:23
**PROSPECTIVE** [2] - 410:22,
411:12
**PROTECTING** [1] - 444:17
**PROTECTIONS** [1] - 486:17
**PROTECTS** [1] - 408:25
**PROVIDE** [10] - 447:2,
464:22, 464:25, 469:2,
479:10, 480:22, 484:3,
484:5, 492:6, 492:7
**PROVIDED** [6] - 407:7,
468:4, 476:24, 484:7,
492:9, 492:10
**PROVIDES** [2] - 459:22,
494:7
**PROVIDING** [2] - 409:1,
449:11
**PROVISION** [4] - 483:22,
483:24, 494:6, 494:7
**PROVISIONS** [1] - 411:17
**PRUDENT** [4] - 477:24,
478:10, 484:12, 486:3
**PUBLIC** [1] - 404:9
**PUBLISH** [14] - 404:14,
409:23, 431:19, 434:24,
440:19, 444:9, 444:17,
445:3, 445:10, 480:6,
488:8, 488:13, 489:19,
489:23
**PUBLISHED** [5] - 444:14,

444:21, 444:22, 445:13, 457:4
**PULL** [3] - 403:20, 409:11, 490:5
**PULLED** [1] - 424:23
**PURCHASE** [17] - 406:16, 410:23, 435:17, 435:24, 452:21, 473:1, 473:8, 473:25, 474:4, 474:17, 474:24, 478:8, 484:12, 489:9, 490:22, 493:18, 495:9
**PURCHASED** [10] - 414:4, 418:20, 419:11, 422:17, 452:1, 452:3, 469:3, 474:5, 484:19, 493:3
**PURCHASER** [3] - 406:20, 410:23, 411:12
**PURCHASES** [1] - 451:3
**PURCHASING** [2] - 405:16, 450:22
**PURPORT** [2] - 476:17, 478:16
**PURPORTED** [1] - 408:14
**PURPORTS** [5] - 403:23, 454:14, 456:5, 466:11, 476:1
**PURPOSE** [4] - 470:2, 471:1, 471:22, 494:14
**PURPOSES** [1] - 450:20
**PURSUANT** [8] - 460:23, 467:22, 469:23, 470:24, 473:4, 473:17, 484:12, 495:11
**PUT** [9] - 410:22, 411:4, 411:11, 418:18, 423:1, 434:23, 471:3, 481:8, 481:20
**PUTTING** [1] - 418:14

## Q

**QUALIFICATION** [1] - 486:16
**QUALIFIED** [3] - 446:3, 455:7, 472:20
**QUALITY** [3] - 407:20, 412:24, 451:21
**QUARTERS** [1] - 423:4
**QUESTION** [1] - 440:25
**QUESTIONED** [1] - 429:6
**QUESTIONS** [17] - 408:19, 414:12, 427:3, 438:2, 438:13, 438:18, 438:24, 439:4, 439:8, 439:19, 439:21, 439:22, 439:24, 441:8, 500:1, 502:5, 502:25
**QUITE** [4] - 414:22, 444:24, 494:20
**QUOTE** [5] - 476:6, 476:17,

479:18, 480:16, 488:25
**QUOTED** [2] - 477:20, 478:1

## R

**RAISE** [2] - 401:3, 441:14
**RAISED** [3] - 450:24, 450:25, 474:21
**RAN** [2] - 437:4, 437:11
**RANGE** [3] - 430:12, 464:17, 470:6
**RATE** [19] - 412:20, 413:13, 452:22, 452:24, 453:1, 459:21, 459:22, 461:13, 467:8, 467:12, 467:14, 474:24, 475:2, 475:11, 475:12, 485:15, 485:20, 485:21, 492:10
**RATES** [1] - 475:19
**RATHER** [4] - 426:13, 429:22, 451:4, 493:16
**RATIO** [2] - 484:23, 485:7
**RATIONAL** [5] - 457:5, 461:11, 471:14, 484:9, 495:19
**RATIONALE** [2] - 460:25, 461:5
**REACH** [1] - 425:3
**READ** [14] - 435:5, 441:3, 441:5, 461:1, 478:23, 480:6, 481:1, 485:25, 492:25, 496:17, 496:18, 499:6, 499:15, 499:22
**READING** [2] - 441:6, 489:10
**READS** [1] - 459:1
**REAL** [3] - 402:7, 445:3, 472:8
**REALITY** [2] - 440:9, 440:25
**REALIZING** [1] - 440:12
**REALLY** [4] - 436:22, 437:1, 451:3, 473:10
**REASON** [8] - 416:19, 417:5, 419:5, 424:19, 451:8, 453:7, 456:20
**REASONABLE** [24] - 407:18, 412:18, 412:21, 412:24, 421:12, 422:4, 429:2, 429:11, 429:13, 469:2, 469:17, 477:23, 478:9, 478:13, 480:13, 481:7, 481:12, 486:2, 493:19, 497:2, 499:4, 499:10, 502:4
**REASONABLENESS** [1] - 472:21
**REASONABLY** [1] - 486:1
**REASONS** [6] - 404:7, 450:17, 451:7, 452:16, 469:21, 473:20
**RECEIVED** [9] - 427:25,

428:1, 443:1, 443:3, 456:13, 466:24, 468:9, 488:14, 489:24
**RECEIVES** [1] - 406:1
**RECEIVING** [1] - 493:4
**RECENTLY** [1] - 452:1
**RECESS** [3] - 415:16, 456:14, 503:6
**RECESSIONARY** [1] - 408:25
**RECITALS** [2] - 432:17, 432:20
**RECITING** [1] - 458:16
**RECOGNIZED** [1] - 420:5
**RECOLLECTION** [5] - 411:6, 422:14, 448:22, 467:23, 500:10
**RECOMMEND** [3] - 450:13, 452:16, 457:11
**RECOMMENDATION** [3] - 425:17, 456:21, 465:8
**RECOMMENDATIONS** [6] - 424:4, 425:3, 425:6, 425:10, 425:14, 466:4
**RECOMMENDED** [2] - 419:18, 461:5
**RECORD** [3] - 400:9, 401:14, 441:20
**RECOVER** [1] - 489:7
**RECROSS** [2] - 429:22, 430:15
**RECROSS** - 430:16
**RECROSS-EXAMINATION** [1] - 430:16
**REDIRECT** [4] - 414:13, 416:1, 429:22, 433:17
**REDIRECT** [1] - 416:5
**REDUCE** [1] - 475:14
**REDUCED** [1] - 453:1
**REDUCTION** [1] - 475:8
**REFER** [2] - 478:15, 487:23
**REFERENCE** [3] - 462:9, 486:21, 491:13
**REFERENCED** [1] - 500:2
**REFERRED** [3] - 418:21, 429:17, 491:16
**REFERRING** [10] - 405:2, 405:5, 405:12, 406:5, 406:17, 429:18, 459:6, 479:21, 489:11, 491:9
**REFERS** [1] - 412:12
**REFINANCED** [1] - 436:9
**REFINANCES** [1] - 474:5
**REFINANCINGS** [1] - 474:15
**REFLECT** [1] - 468:4
**REFRESH** [2] - 448:22, 480:18
**REGARD** [1] - 453:20
**REGARDING** [19] - 410:2, 410:4, 413:21, 457:13,

460:8, 469:2, 469:25, 472:9, 472:21, 473:10, 473:20, 474:12, 476:24, 477:16, 485:14, 485:19, 491:3, 491:14, 498:11
**REGARDLESS** [1] - 495:24
**REGULATION** [5] - 450:20, 451:2, 453:3, 493:15, 493:23
**REGULATIONS** [9] - 442:17, 442:21, 443:14, 444:14, 445:1, 445:9, 445:17, 445:20, 446:18
**REJECTED** [3] - 410:10, 433:22, 500:16
**REJECTING** [1] - 498:17
**RELATE** [1] - 474:17
**RELATED** [12] - 413:15, 442:17, 442:18, 445:8, 445:17, 445:20, 455:18, 467:9, 467:15, 473:25, 474:3, 489:8
**RELATES** [1] - 408:22
**RELATING** [3] - 408:19, 444:25
**RELATIVE** [1] - 470:7
**RELEVANCE** [2] - 426:22, 453:10
**RELEVANT** [3] - 471:1, 476:12, 492:18
**RELIED** [4] - 454:21, 455:20, 482:11, 482:23
**RELIES** [1] - 480:12
**RELY** [4] - 471:4, 471:6, 476:17, 491:21
**RELYING** [1] - 483:3
**REMAINDER** [1] - 450:5
**REMEMBER** [16] - 415:3, 418:23, 428:2, 438:18, 439:3, 439:12, 439:17, 439:23, 440:1, 440:2, 440:5, 453:15, 467:5, 486:15, 494:22, 503:2
**REMINDED** [1] - 415:18
**REMOVE** [2] - 424:18, 502:13
**REMOVED** [2] - 424:12, 502:21
**RENDERING** [1] - 455:21
**RENT** [177] - 403:13, 403:16, 405:11, 405:16, 405:21, 405:23, 406:8, 406:15, 406:20, 406:23, 406:25, 407:2, 407:8, 407:10, 407:23, 411:9, 412:7, 417:10, 417:17, 418:8, 419:2, 419:13, 419:24, 420:10, 420:20, 421:24, 422:4, 422:8, 422:10, 422:25, 423:2, 423:20,

424:3, 424:7, 424:11, 425:3, 425:7, 425:10, 425:25, 426:10, 426:12, 426:17, 427:11, 427:12, 427:15, 429:3, 429:4, 432:2, 432:6, 434:4, 435:19, 435:25, 436:10, 436:20, 436:21, 437:1, 438:20, 439:5, 439:25, 442:17, 442:21, 443:13, 444:10, 444:14, 444:25, 445:4, 445:8, 445:11, 445:17, 445:19, 445:20, 446:4, 446:13, 446:18, 446:21, 446:24, 447:2, 447:13, 448:4, 448:15, 448:20, 448:23, 449:4, 449:21, 450:1, 450:13, 450:14, 450:20, 451:2, 451:5, 452:2, 452:9, 452:11, 452:15, 452:23, 453:1, 453:3, 454:15, 455:3, 456:6, 456:25, 457:6, 457:12, 457:15, 457:17, 457:22, 457:23, 457:25, 461:9, 461:11, 461:17, 461:22, 462:1, 462:3, 462:22, 463:18, 463:22, 464:1, 464:5, 464:7, 464:21, 464:22, 465:8, 466:20, 467:18, 467:20, 467:21, 468:1, 468:23, 469:17, 469:18, 469:23, 470:2, 470:4, 470:6, 470:11, 471:2, 471:4, 471:11, 471:23, 473:16, 474:25, 475:1, 475:4, 475:7, 475:9, 475:12, 475:15, 475:16, 475:20, 475:24, 476:4, 481:23, 482:8, 482:22, 484:20, 486:13, 486:14, 486:17, 487:13, 488:4, 491:5, 491:7, 491:11, 494:12, 497:7, 497:10, 499:2, 501:9, 501:16, 501:24, 502:6, 502:10, 502:13, 502:20

**RENT** [3] - 400:16, 405:19, 406:2

**RENTAL** [5] - 413:16, 442:18, 443:20, 448:8, 463:4

**RENTAL** [2] - 488:22, 490:4

**RENTS** [48] - 430:4, 430:12, 433:24, 436:9, 440:12, 450:24, 451:4, 452:7, 470:5, 470:7, 471:15, 477:23, 478:9, 478:14, 478:20, 478:22, 478:24, 478:25, 480:9, 480:14,

480:24, 480:25, 481:7, 481:12, 484:17, 485:2, 485:4, 485:11, 485:13, 486:22, 487:1, 487:11, 493:7, 493:12, 493:19, 493:22, 494:4, 494:5, 494:10, 494:12, 494:14, 494:16, 494:17, 495:5, 495:20, 497:2, 498:9

**REPHRASE** [2] - 417:1, 434:11

**REPORT** [49] - 420:8, 421:20, 447:20, 449:14, 449:16, 455:16, 460:1, 464:21, 465:11, 466:2, 466:6, 467:1, 467:2, 467:17, 468:2, 468:4, 468:11, 468:20, 469:6, 469:13, 476:1, 476:12, 476:15, 476:19, 476:23, 477:20, 478:5, 478:17, 480:12, 480:16, 480:22, 481:16, 481:23, 482:11, 482:14, 482:17, 482:21, 482:22, 483:7, 486:11, 486:13, 487:15, 487:23, 491:1, 491:14, 500:4, 500:11, 500:25

**REPORTER** [2] - 401:2, 445:3

**REPORTS** [4] - 420:7, 447:1, 455:19, 467:16

**REPP** [3] - 436:18, 436:25, 437:4

**REPP-LOADSMAN** [3] - 436:18, 436:25, 437:4

**REPRESENT** [4] - 402:23, 406:19, 438:13, 446:14

**REPRESENTATION** [1] - 447:19

**REPRESENTATIONS** [1] - 413:21

**REPRESENTED** [1] - 413:12

**REPRESENTING** [2] - 410:13, 410:14

**REPRESENTS** [1] - 478:17

**REQUESTS** [1] - 465:25

**REQUIRE** [1] - 484:20

**REQUIRED** [6] - 459:2, 464:23, 470:4, 498:17, 499:1, 499:19

**RESIDENCE** [1] - 502:14

**RESIDENT** [7] - 421:5, 427:11, 427:25, 428:1, 428:6, 428:13

**RESIDENTS** [17] - 410:24, 420:23, 421:3, 421:4, 426:14, 426:19, 427:3, 427:9, 427:10, 427:14, 427:18, 428:21, 443:25,

444:18, 450:23, 452:9, 486:16

**RESOLUTION** [17] - 416:14, 416:15, 416:17, 416:18, 416:21, 416:23, 417:3, 431:14, 433:6, 488:18, 488:21, 490:2, 490:3, 490:15, 490:24, 490:25, 499:8

**RESPONSE** [5] - 420:13, 438:17, 465:25, 466:19, 474:7

**RESULT** [3] - 423:2, 454:19, 475:15

**RESULTED** [2] - 475:20, 501:24

**RESULTS** [1] - 451:9

**RESUME** [2] - 453:14, 456:16

**RETAINED** [1] - 402:23

**RETIREMENT** [1] - 437:16

**RETURN** [34] - 442:20, 444:10, 444:13, 445:5, 445:8, 445:18, 446:4, 446:24, 447:1, 447:3, 449:5, 449:9, 449:11, 449:25, 453:11, 455:8, 455:9, 456:2, 456:5, 459:3, 459:13, 461:8, 462:19, 467:12, 467:14, 483:14, 492:10, 493:4, 493:8, 493:10, 493:13, 498:20, 499:21

**RETURNS** [1] - 446:25

**REVENUE** [1] - 405:24

**REVIEW** [11] - 424:3, 424:7, 425:25, 426:10, 430:24, 431:6, 444:9, 445:10, 482:16, 482:19, 501:4

**REVIEW** [3] - 456:25, 488:22, 490:4

**REVIEWED** [1] - 482:18

**REVIEWING** [2] - 454:1, 499:2

**REVISE** [2] - 425:6, 425:10

**RICHARD** [1] - 421:6

**RIGHTS** [1] - 467:5

**RISE** [2] - 415:7, 453:18

**ROADMAP** [1] - 417:14

**ROLE** [2] - 404:2, 439:25

**ROMAN** [1] - 460:24

**ROSE** [1] - 400:18

**ROUGHLY** [2] - 443:17, 443:18

**ROUNDING** [1] - 465:3

**RULE** [1] - 470:20

**RULED** [3] - 434:2, 470:15, 470:19

**RULES** [2] - 412:7, 496:22

**RULING** [3] - 434:1, 457:17,

458:19

**RUN** [1] - 428:17

**RUTGERS** [1] - 445:10

**RUTTER** [1] - 400:12

## S

**SAFETY** [1] - 413:22

**SAKE** [1] - 420:6

**SALE** [6] - 402:20, 404:21, 408:20, 413:9, 413:11, 472:24

**SAN** [2] - 443:3, 456:25

**SAT** [2] - 420:22, 421:3

**SCHEME** [1] - 456:6

**SCHOLARSHIPS** [1] - 443:7

**SCHOOL** [1] - 442:23

**SCOPE** [1] - 502:15

**SCREEN** [1] - 461:2

**SEACREST** [1] - 421:6

**SEAT** [1] - 441:19

**SEATED** [2] - 401:8, 401:12

**SECOND** [4] - 406:5, 431:23, 449:17, 458:1

**SECTION** [18] - 404:17, 404:20, 405:11, 405:14, 405:18, 405:21, 476:7, 476:12, 476:13, 476:18, 476:20, 477:2, 477:16, 478:16, 478:19, 479:22, 485:22, 491:1

**SECTIONS** [1] - 478:15

**SECURITY** [2] - 414:22, 415:13

**SEE** [34] - 405:2, 405:5, 405:6, 405:12, 406:5, 406:17, 415:5, 430:5, 432:3, 432:17, 432:18, 433:8, 433:10, 435:12, 441:6, 458:23, 459:6, 476:9, 480:19, 481:6, 486:6, 488:18, 488:20, 488:23, 489:5, 489:6, 490:2, 490:3, 490:11, 493:16, 498:14, 498:21, 500:11, 503:4

**SELECTION** [1] - 435:6

**SELL** [2] - 407:24, 428:18

**SELLER** [4] - 402:23, 410:14, 413:8, 413:20

**SELLING** [6] - 403:12, 408:2, 408:3, 408:13, 408:23, 487:3

**SENIOR** [4] - 408:1, 428:11, 428:16

**SENSE** [7] - 417:14, 428:16, 451:19, 484:2, 492:22, 501:13

**SENSIBLE** [1] - 451:9

**SENTENCE** [4] - 459:1,

481:10, 485:24, 490:6

**SEPARATE** [1] - 417:21

**SERIES** [1] - 442:8

**SERVED** [2] - 443:24, 444:5

**SERVICE** [84] - 406:21, 410:23, 411:7, 411:13, 429:5, 429:12, 433:23, 435:10, 435:18, 435:25, 436:11, 449:6, 450:2, 457:6, 457:16, 457:18, 457:19, 457:22, 457:25, 458:4, 458:7, 458:21, 459:10, 459:14, 460:10, 460:18, 460:20, 460:21, 469:18, 470:4, 470:10, 470:12, 470:14, 470:19, 471:5, 471:12, 471:15, 471:18, 473:12, 474:3, 474:10, 475:8, 475:9, 476:7, 477:17, 480:13, 480:23, 480:24, 481:12, 484:1, 484:16, 484:20, 485:2, 485:11, 485:12, 486:4, 486:8, 489:1, 489:2, 489:3, 491:8, 491:12, 493:8, 493:9, 493:14, 493:17, 493:22, 495:8, 495:20, 497:3, 497:7, 497:20, 497:22, 498:19, 499:20, 500:17, 500:22, 500:24, 501:10, 501:12, 501:14, 501:16, 501:17, 501:22

**SERVICES** [2] - 460:2, 489:12

**SET** [6] - 420:24, 449:4, 459:3, 465:13, 495:20, 497:2

**SETTING** [8] - 412:14, 429:3, 433:23, 435:19, 435:25, 475:12, 495:5, 498:8

**SEVEN** [2] - 421:18, 443:22

**SEVERAL** [3] - 419:7, 454:25, 455:3

**SEWER** [1] - 413:25

**SHALL** [6] - 401:4, 401:5, 441:15, 441:16, 477:22, 480:23

**SHARP** [1] - 421:7

**SHERI** [1] - 436:18

**SHOOK** [1] - 428:1

**SHORT** [1] - 420:2

**SHOW** [2] - 488:7, 489:18

**SHOWED** [1] - 414:6

**SHOWN** [1] - 429:1

**SHOWS** [1] - 406:8

**SIDE** [3] - 402:16, 435:2, 481:20

**SIDEBAR** [2] - 408:9, 408:10

**SIGN** [2] - 402:5, 416:20

**SIGNATURE** [2] - 433:2, 433:10

**SIGNATURES** [2] - 433:4, 433:8

**SIGNED** [9] - 416:16, 416:17, 416:21, 417:3, 430:25, 431:4, 431:11, 433:8, 433:14

**SIGNIFICANCE** [1] - 416:16

**SIGNIFICANT** [2] - 492:24, 501:16

**SIMPLE** [1] - 462:21

**SINGLE** [1] - 434:7

**SIT** [1] - 436:23

**SITES** [4] - 402:18, 404:24, 404:25, 414:1

**SITUATION** [3] - 445:1, 451:3, 457:13

**SITUATIONS** [2] - 427:17, 496:22

**SIX** [3] - 439:21, 444:8, 486:25

**SIZE** [1] - 412:24

**SLATE** [1] - 434:2

**SLIGHTLY** [1] - 436:10

**SLOWLY** [1] - 482:19

**SMALL** [2] - 451:24, 464:12

**SOLD** [5] - 402:17, 402:19, 403:8, 406:4, 407:17

**SOLEMNLY** [2] - 401:4, 441:15

**SOLTANI** [1] - 400:19

**SOMEONE** [2] - 474:9, 475:8, 486:25

**SOMEWHAT** [2] - 457:14, 476:22

**SOMEWHERE** [2] - 470:5, 479:18

**SORRY** [14] - 415:21, 420:17, 430:10, 434:20, 435:20, 435:22, 435:23, 436:17, 461:4, 476:14, 477:8, 477:10, 496:9, 501:7

**SORT** [2] - 439:1, 451:2

**SOTO** [1] - 400:20

**SOURCED** [2] - 454:11, 454:17

**SPACE** [9] - 406:4, 406:5, 432:1, 432:10, 443:20, 444:10, 448:8, 448:9

**SPACES** [1] - 486:22

**SPANISH** [1] - 403:4

**SPECIALIZE** [1] - 402:12

**SPECIFIC** [3] - 418:8, 438:19, 459:2

**SPECIFICALLY** [7] - 463:17, 476:6, 484:7, 491:9, 492:6, 492:10, 495:8

**SPECIFY** [2] - 417:16,

491:24

**SPECULATE** [2] - 410:15, 410:17

**SPECULATION** [3] - 410:25, 428:23, 437:7

**SPELL** [2] - 401:13, 441:20

**SPELLED** [1] - 441:23

**SPRING** [1] - 404:10

**SPRINGS** [4] - 427:10, 460:13, 460:16, 460:17

**STABILITY** [1] - 405:8

**STAFF** [10] - 417:12, 419:4, 420:22, 421:10, 421:20, 425:17, 428:15, 437:2, 466:4, 500:4

**STANCE** [1] - 502:14

**STAND** [2] - 401:2, 401:22

**STANDALONE** [1] - 455:1

**STANDARD** [17] - 449:24, 449:25, 450:3, 453:5, 460:25, 461:6, 461:7, 461:8, 461:11, 461:21, 461:23, 462:19, 492:15, 492:22, 492:23, 493:13, 502:4

**STANDARDS** [7] - 444:14, 445:5, 445:19, 445:20, 447:3

**START** [3] - 416:11, 420:19, 446:10

**STARTED** [4] - 402:9, 420:20, 421:15, 487:19

**STATE** [2] - 403:3, 403:4

**STATE** [4] - 400:9, 401:13, 441:20, 453:11, 454:6, 486:11

**STATEMENT** [2] - 437:9, 474:12

**STATES** [4] - 406:14, 480:22, 498:23, 499:17

**STATUTES** [1] - 446:12

**STEP** [6] - 414:15, 414:17, 441:10, 453:22, 453:23, 453:24

**STEPHEN** [2] - 400:15, 408:18

**STEPHENS** [1] - 427:8

**STILL** [6] - 415:20, 415:22, 426:10, 435:20, 479:25, 493:7

**STIPULATED** [1] - 472:23

**STOP** [1] - 445:25

**STOPPED** [5] - 434:9, 434:13, 497:21, 497:24, 498:6

**STOPS** [1] - 434:6

**STORED** [1] - 494:12

**STREAM** [1] - 405:24

**STRIKE** [5] - 409:14, 428:22, 428:24, 448:2, 462:20

**STRUCK** [2] - 423:7, 423:8

**STUDIES** [4] - 403:5, 442:18, 443:19, 443:21

**STUMPED** [1] - 436:23

**SUBJECT** [4] - 407:6, 420:1, 423:6, 446:4

**SUBJECTIVE** [1] - 407:10

**SUBMISSION** [1] - 466:12

**SUBMISSIONS** [1] - 465:13

**SUBMITTED** [3] - 415:5, 453:17, 468:20

**SUBSEQUENT** [1] - 474:14

**SUBSEQUENTLY** [1] - 476:19

**SUBSTANCE** [1] - 468:17

**SUBSTANTIAL** [3] - 457:16, 470:11, 487:9

**SUCCESS** [1] - 411:19

**SUED** [1] - 423:4

**SUFFICIENT** [1] - 429:4

**SUGGEST** [1] - 414:8

**SUGGESTS** [2] - 413:4, 413:8

**SUMMARY** [1] - 404:5

**SUNNY** [1] - 400:19

**SUPERIOR** [1] - 420:3

**SUPERVISOR** [1] - 436:19

**SUPPLEMENT** [1] - 466:1

**SUPPLEMENTAL** [5] - 466:4, 466:6, 466:11, 467:2, 467:17

**SUPPLIED** [2] - 491:6, 491:18

**SUPPORT** [3] - 413:25, 434:8, 434:14

**SURVEY** [2] - 454:15, 455:2

**SUSTAINED** [4] - 409:5, 417:1, 434:11, 458:14

**SWEAR** [2] - 401:4, 441:15

**SWORN** [5] - 401:3, 401:24, 416:3, 440:23, 442:2

**SYSTEM** [2] - 413:25, 452:2, 493:18

### T

**TABLE** [1] - 400:17

**TAX** [4] - 406:16, 465:17, 465:18, 466:3

**TAXES** [2] - 450:7, 461:14

**TEACH** [1] - 443:8

**TEACHING** [4] - 403:5, 443:5, 443:8, 443:9

**TEN** [2] - 443:18, 446:2

**TENANT'S** [1] - 487:13

**TERM** [4] - 407:12, 408:5, 412:10, 412:12

**TERMINATED** [1] - 437:15

**TERMS** [6] - 446:24, 451:21, 452:6, 462:21, 494:4

**UNITED STATES DISTRICT COURT**

**TESTIFIED** [9] - 401:24, 416:4, 429:2, 442:2, 454:12, 454:16, 481:15, 487:18, 500:7
**TESTIFY** [3] - 408:13, 408:24, 472:20
**TESTIFYING** [2] - 420:4, 438:23
**TESTIMONY** [31] - 401:4, 408:14, 416:12, 418:22, 418:23, 423:8, 423:21, 424:14, 425:19, 426:15, 427:8, 427:23, 428:2, 428:14, 429:8, 429:14, 429:18, 430:21, 431:3, 431:9, 431:16, 433:16, 437:22, 438:18, 441:15, 442:11, 451:15, 455:9, 461:24, 494:22
**TEXT** [7] - 476:1, 478:2, 479:21, 481:3, 481:13, 482:13, 483:3
**THE** [103] - 400:6, 400:13, 400:21, 400:24, 401:2, 401:7, 401:8, 401:9, 401:11, 401:15, 404:15, 408:9, 408:21, 409:2, 409:5, 409:24, 411:1, 411:21, 414:13, 414:15, 414:16, 414:19, 414:24, 415:7, 415:9, 415:12, 415:18, 415:22, 415:25, 417:1, 423:6, 423:10, 423:16, 426:23, 426:24, 428:24, 429:22, 429:25, 430:8, 430:15, 431:21, 434:11, 434:18, 434:19, 435:1, 437:6, 437:8, 437:9, 439:14, 439:15, 440:4, 440:5, 440:16, 440:18, 440:20, 441:10, 441:11, 441:12, 441:14, 441:18, 441:19, 441:22, 447:7, 447:8, 447:25, 451:14, 451:16, 453:12, 453:18, 453:20, 453:23, 453:24, 454:4, 454:8, 454:13, 454:20, 455:12, 455:23, 456:1, 456:11, 456:16, 458:14, 466:23, 468:8, 469:11, 472:1, 479:12, 479:14, 479:16, 479:18, 479:23, 479:25, 480:5, 480:7, 488:9, 488:13, 489:16, 489:20, 489:23, 490:18, 502:17, 502:18, 503:1
**THEMSELVES** [2] - 477:3, 498:4
**THEORETICALLY** [1] -

478:24
**THEORY** [1] - 408:16
**THEREBY** [1] - 475:15
**THEREFOR** [1] - 469:7
**THEREFORE** [2] - 459:12, 465:22
**THEY'VE** [1] - 459:3
**THINKS** [1] - 418:16
**THOUSANDS** [1] - 477:11
**THREE** [9] - 402:22, 409:9, 417:23, 419:12, 423:4, 448:19, 448:22, 492:2
**THREE-QUARTERS** [1] - 423:4
**THREE-YEAR** [1] - 417:23
**TIED** [2] - 436:11, 436:14
**TIES** [1] - 461:11
**TITLED** [1] - 447:12
**TODAY** [9] - 438:17, 442:12, 456:4, 459:18, 482:17, 494:7, 494:21, 496:1, 498:4
**TOGETHER** [3] - 410:22, 411:12, 471:3
**TOM** [1] - 400:12
**TOOK** [8] - 406:24, 438:4, 465:4, 478:23, 479:5, 484:11, 495:19
**TOOL** [2] - 404:7, 422:1
**TOP** [3] - 406:2, 482:3, 488:15
**TOPICS** [1] - 440:5
**TOTALING** [1] - 402:17
**TOWARDS** [1] - 490:6
**TOWN** [2] - 416:19, 430:11
**TRAIL** [1] - 439:1
**TRAILER** [1] - 402:14
**TRANSACTION** [3] - 413:12, 472:25
**TRANSCRIBED** [1] - 476:20
**TRAVEL** [1] - 401:20
**TRENDS** [1] - 487:7
**TRIAL** [10] - 400:8, 455:11, 457:21, 457:24, 458:2, 458:8, 497:13, 498:16, 499:18, 500:18
**TRIED** [3] - 411:16, 424:13, 429:6
**TRIGGER** [1] - 424:23
**TRIP** [1] - 411:24
**TRUE** [16] - 412:25, 413:22, 424:19, 425:13, 430:25, 432:5, 432:9, 432:17, 432:21, 433:20, 433:24, 435:15, 435:19, 436:1, 460:3
**TRUTH** [8] - 401:5, 401:6, 441:16, 441:17, 454:18, 479:5
**TRY** [3] - 424:4, 457:14,

462:23
**TRYING** [5] - 428:9, 429:10, 438:2, 438:13, 438:14
**TUESDAY** [1] - 400:1
**TURN** [9] - 404:17, 405:11, 405:18, 409:18, 447:4, 448:17, 458:22, 466:9, 467:25
**TURNED** [2] - 465:20, 465:21
**TURNING** [1] - 459:24
**TWICE** [1] - 420:21
**TWO** [23] - 406:3, 406:9, 410:10, 414:6, 425:24, 426:9, 430:11, 432:12, 433:4, 436:25, 451:20, 452:18, 453:8, 455:9, 455:17, 455:18, 456:21, 464:24, 467:4, 471:13, 494:21, 496:12
**TWO-YEAR** [2] - 406:9
**TYPE** [12] - 402:6, 405:10, 420:8, 443:21, 449:8, 461:23, 462:5, 462:7, 462:8, 492:22, 492:23, 501:13
**TYPES** [3] - 446:20, 448:19, 464:24
**TYPICALLY** [1] - 486:19

**U**

**UCLA** [1] - 443:4
**ULTIMATELY** [1] - 402:13
**UNCERTAINTY** [1] - 471:17
**UNDER** [39] - 406:2, 407:1, 415:18, 430:25, 431:4, 431:11, 437:19, 440:23, 442:21, 444:10, 444:14, 445:8, 449:4, 450:3, 451:12, 452:11, 452:13, 453:3, 456:5, 460:15, 471:10, 473:24, 474:16, 475:3, 478:9, 478:20, 478:22, 478:24, 480:9, 485:2, 490:9, 493:13, 493:22, 493:25, 494:10, 494:14, 494:16, 494:18, 500:7
**UNDERLINE** [1] - 481:13
**UNDERLINED** [1] - 481:3
**UNDERLINES** [1] - 481:8
**UNDERLYING** [2] - 454:19, 501:4
**UNDERSTOOD** [4] - 437:1, 438:12, 438:15, 495:25
**UNDO** [1] - 458:9
**UNITS** [2] - 403:6, 428:18
**UNIVERSITY** [2] - 443:1, 443:10
**UNIVERSITY** [1] - 443:2

**UNLESS** [3] - 416:19, 424:23, 494:12
**UNPREDICTABLE** [1] - 407:3
**UNUSUAL** [1] - 425:16
**UP** [28] - 411:25, 416:14, 420:24, 422:1, 427:6, 427:21, 428:2, 431:8, 434:23, 436:22, 446:16, 446:18, 458:5, 461:14, 461:16, 463:11, 463:13, 464:18, 465:6, 472:22, 477:4, 477:6, 477:11, 480:20, 481:20, 490:6, 494:12
**UPHELD** [1] - 419:25
**URBAN** [2] - 442:15, 443:4
**USAGE** [1] - 427:1
**USES** [2] - 422:1, 461:22
**UTILITY** [2] - 427:1, 461:15
**UTILIZE** [1] - 499:1

**V**

**VAGUE** [1] - 502:15
**VALID** [1] - 462:18
**VALUE** [10] - 405:24, 406:17, 407:21, 413:4, 413:15, 473:1, 473:2, 484:23, 485:7, 493:4
**VARIETY** [1] - 445:17
**VERSION** [2] - 454:24, 455:1
**VERSUS** [1] - 400:7
**VESTED** [4] - 460:2, 460:9, 467:5
**VI** [1] - 460:25
**VIEW** [1] - 410:22
**VILLAGE** [17] - 421:6, 421:19, 421:21, 422:8, 422:14, 422:25, 423:1, 427:11, 427:18, 430:3, 430:13, 436:7, 436:12, 436:15, 475:19, 475:24, 491:15
**VIOLATE** [1] - 423:14
**VIOLATED** [1] - 423:7
**VIRTUALLY** [2] - 420:10, 451:20
**VISITING** [1] - 443:10
**VOLUME** [1] - 447:8
**VS** [2] - 456:24, 462:11

**W**

**WAIT** [1] - 477:6
**WALK** [3] - 463:21, 467:1, 468:11
**WANTS** [1] - 456:9
**WARNED** [1] - 423:10
**WARNING** [1] - 471:9

**UNITED STATES DISTRICT COURT**

**WARNINGS** [1] - 471:7
**WEEK** [1] - 421:8
**WEEKEND** [1] - 415:23
**WEEKLY** [1] - 426:15
**WEIGHT** [1] - 417:24
**WELCOME** [1] - 416:9
**WELL-KNOWN** [1] - 419:23
**WELLS** [3] - 404:22, 413:18, 414:4
**WELSWASSER** [3] - 409:21, 410:2, 414:7
**WESTLAND** [1] - 442:25
**WHATSOEVER** [1] - 413:21
**WHEREAS** [1] - 431:24
**WHEREAS** [2] - 422:23, 431:23
**WHITE** [5] - 403:19, 442:10, 447:4, 447:10, 477:8
**WHOLE** [4] - 401:5, 441:16, 471:15, 493:15
**WIDELY** [4] - 461:9, 461:10, 461:21, 492:16
**WILLIAM** [1] - 433:11
**WINDFALL** [1] - 413:8
**WISH** [1] - 471:5
**WISHED** [1] - 482:17
**WITNESS** [14] - 400:22, 401:18, 401:24, 408:12, 414:18, 416:3, 419:25, 420:4, 441:12, 442:2, 442:20, 444:5, 446:3, 453:22
**WITNESS** [16] - 401:7, 401:9, 401:15, 414:16, 426:24, 430:8, 434:19, 437:9, 439:15, 440:5, 441:11, 441:18, 441:22, 447:8, 453:23, 502:18
**WITNESS'S** [1] - 408:16
**WORD** [3] - 432:11, 432:23, 485:23
**WORDING** [1] - 476:21
**WORDS** [1] - 497:17
**WORKS** [1] - 493:10
**WORTH** [1] - 402:18
**WRIT** [6] - 435:6, 435:9, 498:16, 498:24, 499:9, 499:18
**WRITE** [1] - 432:11
**WRITTEN** [1] - 420:1
**WROTE** [7] - 435:14, 444:24, 445:13, 481:23, 482:8, 482:16, 482:22
**WYNDER** [2] - 400:15, 433:11

## Y

**YEAR** [45] - 406:4, 406:5, 406:9, 412:7, 417:23,

422:9, 422:12, 422:15, 422:16, 422:22, 422:24, 436:9, 438:5, 443:10, 448:3, 448:23, 449:13, 449:20, 454:3, 454:4, 457:12, 459:18, 463:1, 463:4, 463:8, 463:9, 463:11, 463:12, 463:18, 464:14, 464:15, 466:12, 466:19, 467:21, 467:25, 468:2, 468:13, 468:20, 468:24, 493:5
**YEAR'S** [1] - 422:22
**YEARS** [19] - 405:5, 421:18, 422:23, 423:5, 423:25, 424:11, 425:21, 443:8, 443:9, 450:11, 452:22, 452:24, 456:4, 464:2, 464:12, 464:14, 470:13, 487:19, 488:1
**YELLOW** [1] - 470:22
**YESTERDAY** [1] - 429:1
**YIELD** [1] - 446:24
**YORK** [1] - 443:11
**YOURSELF** [1] - 472:15
**YOURSELVES** [3] - 415:3, 453:15, 503:3

## Z

**ZONING** [1] - 444:23
**ZOOM** [1] - 440:21

**UNITED STATES DISTRICT COURT**