**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COLONY COVE PROPERTIES, LLC, a Delaware limited liability company, *Plaintiff-Appellee*, v. CITY OF CARSON, a municipal corporation; CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW BOARD, a public administrative body, *Defendants-Appellants.* | No. 16-56255  D.C. No. 2:14-cv-03242-PSG-PJW  OPINION |

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted February 9, 2018
Pasadena, California

Filed April 23, 2018

Before: Susan P. Graber and Andrew D. Hurwitz, Circuit
Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge Hurwitz

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

2      COLONY COVE PROPERTIES V. CITY OF CARSON

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's judgment and remanded with instructions to enter judgment in favor of defendant in an action brought by the owner of a mobile home park who alleged that defendant, the City of Carson, engaged in an unconstitutional taking in violation of the Fifth Amendment when it approved a lower rent increase than plaintiff had requested.

Applying the factors set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978) the panel first held that plaintiff did not present sufficient evidence to create a triable question of fact as to the economic impact caused by the City's denial of larger rent increases. The panel then held that plaintiff failed to present sufficient evidence supporting its investment-backed expectations claim. Finally, the panel held that the character of the City's action could not be characterized as a physical invasion by the government. The panel concluded that based on the evidence, no reasonable finder of fact could conclude that the denials of plaintiff's requested rent increases were the functional equivalent of a direct appropriation of the property. Accordingly, the panel held that the district court should have granted the City's motion for judgment as a matter of law.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Matthew Dwight Zinn (argued) and Andrew W. Schwartz, Shute Mihaly & Weinberger LLP, San Francisco, California; Jeff M. Malawy, Stephen R. Onstot, June S. Ailin, William W. Wynder, and Sunny K. Soltani, Aleshire & Synder LLP, Irvine, California; for Defendants-Appellants.

Anton Matlitsky (argued), O'Melveny & Myers LLP, New York, New York; Adam P. Wiley, Thomas W. Casparian, and Richard H. Close, Gilchrist & Ruiter PC, Santa Monica, California; Daniel J. Tully, Dimitri Portnoi, and Matthew W. Close, O'Melveny & Myers LLP, Los Angeles, California; for Plaintiff-Appellee.

Christine Van Aken, Chief of Appellate Litigation; Dennis J. Herrera, City Attorney; City Attorney's Office, San Francisco, California; for Amici Curiae League of California Cities and California Chapter of the American Planning Association.

Navneet Grewal and Sue Himmelrich, Western Center on Law and Poverty, Los Angeles, California; Shirley Gibson, Legal Aid Society of San Mateo County, Redwood City, California; for Amici Curiae California Rural Legal Assistance Inc., California Coalition for Rural Housing, Community Legal Services of East Palo Alto, The Golden State Manufactured-Home Owners League Inc., Housing California, Legal Aid Foundation of Los Angeles, Legal Aid Society of San Mateo County, National Housing Law Project, Public Advocates, Public Counsel Law Center, The Public Interest Law Project, Tenants Together, Western Center on Law and Poverty, and Theresa L. Forsythe.

## OPINION

HURWITZ, Circuit Judge:

The Takings Clause of the Fifth Amendment, made applicable to the States by the Due Process Clause of the Fourteenth Amendment, provides that "private property" may not "be taken for public use, without just compensation." The issue in this case is whether a California city engaged in an unconstitutional taking when it approved a lower rent increase for a mobile home park than the park had requested.

After a jury trial, the district court entered a judgment finding an unconstitutional taking and awarding the park more than $3 million in damages. We reverse and instruct that the district court enter judgment in favor of the City.

## I. Background

### A. The Rent Control Ordinance

In 1979, the City of Carson adopted a "Mobile Home Space Rent Control Ordinance," establishing a seven-member Rent Review Board to "hear and determine applications of property owners for rent adjustments." The ordinance directs the Board to grant property owners a "fair, just and reasonable" rent increase, one that both "protects Homeowners from excessive rent increases and allows a fair return on investment to the Park Owner."

To balance these competing concerns, the ordinance lists several factors to be considered when evaluating a proposed rent increase, including changes in the Consumer Price Index ("CPI"), rent at comparable parks, capital improvements conducted since the last increase, and changes

in operating and maintenance expenses. The listed factors, however, are neither exclusive nor dispositive.

To assist the Board, the City Council adopted Implementation Guidelines in 1998. The original Guidelines permitted, but did not require, the Board to conduct a "Gross Profits Maintenance Analysis" ("GPM Analysis") in evaluating a rent increase application. A GPM Analysis "compares the gross profit level expected from the last rent increase granted to the park prior to the current application . . . to the gross profit shown by the current application." The Analysis "provide[s] an estimate of whether a park is earning the profit estimated to provide a fair return, as established by the immediately prior rent increase, with some adjustment to reflect any increase in the CPI." Acquisition debt service can be a relevant expense under the GPM Analysis "if the purchase price paid was reasonable in light of the rents allowed under the Ordinance and involved prudent and customary financing practices." But the Guidelines expressly state that a GPM Analysis "is not intended to create any entitlement to any particular rent increase."

In October 2006, the City amended the Implementation Guidelines to permit the Board also to conduct a "Maintenance of Net Operating Income Analysis" ("MNOI Analysis") when considering applications for rent increases. The MNOI Analysis "compares the net operating income (NOI) level expected from the last rent increase granted to a park owner and prior to any pending rent increase application . . . to the NOI demonstrated in any pending rent increase application." "[C]hanges in debt service expenses are not to be considered in the" MNOI Analysis.

6   COLONY COVE PROPERTIES V. CITY OF CARSON

## B. Colony's Purchase of the Mobile Home Park and Requested Rent Increases

On April 4, 2006, Colony Cove Properties, LLC ("Colony") purchased Colony Cove Mobile Estates ("the Property"), a mobile home park in Carson, for $23,050,000; $18,000,000 of the purchase price was obtained through a loan. The annual debt service on that loan—$1,224,681—far exceeded the prior owner's annual profit of $718,240.

At the time of purchase, the Implementation Guidelines provided only for the GPM Analysis. Colony first filed an application for a rent increase in 2007, after the Guidelines were revised to also allow an MNOI Analysis. That application sought a rent increase of $618.05 per space; it was later amended to seek only $200 per space. The Board's GPM Analysis suggested a rent increase of $200.93 per space, driven largely by the post-acquisition debt service. The Board's MNOI Analysis, which did not account for the debt service, suggested a rent increase of only $36.74. The Board adopted the MNOI Analysis and approved the $36.74 increase. In 2008, Colony requested a $342.46 rent increase. The Board again conducted both a GPM and an MNOI Analysis, adopted the latter, and granted an increase of $25.02.

## C. Colony's Previous Litigation

In 2008, Colony sued the City, asserting facial and as-applied takings and due process claims with respect to the Board's 2007 decision. *See Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 953–54 (9th Cir. 2011). The district court dismissed the facial attack as time-barred and the as-applied takings claim as unripe; we affirmed. *Id.* at 956–57, 959.

COLONY COVE PROPERTIES V. CITY OF CARSON    7

The same day it appealed the first district court order, Colony also "filed a petition for writ of administrative mandate seeking review of the Board's 2008 determination of its September 2007 rent increase applications" in state court; Colony later filed a similar second petition concerning the 2008 application. *See Colony Cove Props., LLC v. City of Carson*, 163 Cal. Rptr. 3d 499, 515 (Ct. App. 2013). The state trial court denied Colony's petitions, and the California Court of Appeal affirmed, holding that state law allowed use of MNOI Analysis and that the Board's failure to take debt service into account did not deprive Colony of a fair rate of return. *Id.* at 521–24, 530. The California Supreme Court denied review.[1]

## D. The Current Litigation

Having exhausted its state-law claims,[2] Colony returned to federal court, alleging that the 2007 and 2008 Board decisions were an unconstitutional taking and violated Colony's substantive due process rights. The district court dismissed all of Colony's claims except for an as-applied

---

[1] The state trial court struck Colony's *England* reservation of its federal takings claims, but the Court of Appeal reinstated the reservation. *Colony Cove Props.*, 163 Cal. Rptr. 3d at 529–30; *see England v. La. State Bd. Of Exam'rs*, 375 U.S. 411, 421 (1964).

[2] A "writ of administrative mandate" is a judicial avenue for relief from rent control decisions created by the California Supreme Court. *See Kavanau v. Santa Monica Rent Control Bd.*, 941 P.2d 851 (Cal. 1997). If the writ is granted, the property owner may seek a future rent adjustment "that takes into consideration past confiscatory rents." *Id.* at 866. "[T]he *Kavanau* adjustment process" satisfies the exhaustion requirements of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985). *See Equity Lifestyle Props., Inc. v. Cty. of San Luis Obispo*, 548 F.3d 1184, 1192 (9th Cir. 2008).

regulatory takings claim premised on *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).

Over the City's objection, the district court allowed a jury trial. At trial, Colony presented expert testimony that the Board's use of the MNOI Analysis and the consequent failure to take debt service into account in setting the 2007 and 2008 rents would cause Colony to lose rental income of approximately $5.7 million. Colony's owner, James Goldstein, also testified that, when he bought the Property, he expected the Board to consider debt service in future rent increase determinations, and he would not have paid $23 million for the park absent that expectation.

The City moved for judgment as a matter of law after both the close of Colony's case and the close of evidence. After the district court denied the motions, the jury found that the Board's 2007 and 2008 decisions were regulatory takings and awarded Colony $3,336,056 in damages. The City then filed a renewed Federal Rule of Civil Procedure 50(b) motion for judgment. The court denied the motion and awarded Colony prejudgment interest, attorneys' fees, and costs, entering a final judgment of $7,464,718.41.[3]

The City timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we review de novo the district court's denial of a motion for judgment as a matter of law. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1268 (9th Cir. 1996). In doing so, "[w]e must view the evidence in the light

---

[3] In the final judgment, the district court noted its agreement with the jury's verdict: "Having independently weighed and considered the evidence, the Court agrees with the jury's finding that a taking occurred, as well as the amount of damages that the jury awarded . . . ."

most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Ostad v. Or. Health Scis. Univ.*, 327 F.3d 876, 881 (9th Cir. 2003). "Judgment as a matter of law is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Id*.

## II. Discussion

"The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'" *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017). Although the paradigm of an unconstitutional taking is the direct appropriation of property, the Supreme Court has long acknowledged that "if regulation goes too far it will be recognized as a taking." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

"[T]he Court for the most part has refrained from elaborating . . . definitive rules" about when regulation goes so far as to become a taking. *Murr*, 137 S. Ct. at 1942. Judicial decisions considering regulatory takings claims are typically "characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (internal quotation marks and citations omitted). The goal is to determine whether regulatory actions "are functionally equivalent to the classic taking in which government directly appropriates private property." *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 sF.3d 1118, 1127 (9th Cir. 2013) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005)).

The *Penn Central* factors ground our regulatory takings analysis. *Penn Central* instructs us to consider "[1] the

10     COLONY COVE PROPERTIES V. CITY OF CARSON

regulation's economic impact on the claimant, [2] the extent to which the regulation interferes with distinct investment-backed expectations, and [3] the character of the government action." *MHC Fin.*, 714 F.3d at 1127. The question is whether Colony presented sufficient evidence on these factors to allow a reasonable finder of fact to conclude that the Board's denials of Colony's requested rate increases were the functional equivalent of the direct appropriation of the Property. We address each factor in turn.

**A. Economic Impact**

In considering the economic impact of an alleged taking, we "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). *Penn Central* stresses that, "[i]n deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole." 438 U.S. at 130–31. If "an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard*, 444 U.S. 51, 65–66 (1979).

The jury concluded that Colony would have received approximately $3.3 million in additional income over an 8-year period if the Board had adopted the alternative GPM Analysis and factored debt service into the 2007 and 2008 rent increases. But the mere loss of some income because of regulation does not itself establish a taking. Rather, economic impact is determined by comparing the total value of the affected property before and after the government action. *See MHC Fin.*, 714 F.3d at 1127. Projected income streams can contribute to a method for determining the post-

deprivation value of property, but the severity of the loss can be determined only by comparing the post-deprivation value to pre-deprivation value. *Id.*

Not every diminution in property value caused by a government regulation rises to the level of an unconstitutional taking. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Penn. Coal Co.*, 260 U.S. at 413. Although no litmus test determines whether a taking occurred, we start from the premise that the *Penn Central* factors seek "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *See Lingle*, 544 U.S. at 539. Thus, we have observed that diminution in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking. *MHC Fin.*, 714 F.3d at 1127–28. The Federal Circuit has noted that it is "aware of no case in which a court has found a taking where diminution in value was less than 50 percent." *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011). Nor are we.

There was no evidence before the district court allowing a comparison of the pre-deprivation and post-deprivation values of the Property. Colony purchased the Property for approximately $23 million, and we assume that this number establishes the pre-deprivation value. But Colony presented no evidence, expert or otherwise, about the Property's post-deprivation value. Rather, the only evidence concerned the amount of rent claimed to be lost over an 8-year period because of the Board's refusals to approve higher increases. Even assuming that the lost rental income asserted by Colony—$5.7 million—equates to diminution in property

12     COLONY COVE PROPERTIES V. CITY OF CARSON

value, that reduction would only be 24.8% of the assumed $23 million pre-deprivation value of the Property, far too small to establish a regulatory taking.[4]

Colony argues that post-deprivation "sale value is *not* the only permissible basis to consider economic loss." We agree—for example, the discounted future cash flows produced by an income-producing property can provide an appropriate valuation methodology. *See, e.g.*, *Cienega Gardens v. United States*, 503 F.3d 1266, 1282 (Fed. Cir. 2007) (determining economic impact by "compar[ing] the lost net income due to the restriction (discounted to present value at the date the restriction was imposed) with the total net income without the restriction over the entire useful life of the property (again discounted to present value)"). But Colony presented no evidence, by virtue of analyzing diminished income streams or otherwise, of the post-deprivation value of the Property.

Colony also asserts that the Board took its property because it suffered annual operating losses in 2007 and 2008. But those losses resulted directly from Colony's decision to incur a large debt when purchasing the property and cannot alone establish a taking. Even if Colony's decision to borrow was commercially reasonable, it serves only to establish that the purchase price of $23 million is the pre-deprivation value. The post-deprivation value of the Property cannot be dictated by debt service; otherwise, two identical mobile home properties would have different values, depending on how their owners chose to finance the acquisitions. *See Colony Cove Props.*, 163 Cal. Rptr. 3d at

---

[4] The jury, whose award Colony does not challenge on appeal, found that the lost rental income was only $3.3 million, which would equate to a 14.3% reduction in the Property's value.

COLONY COVE PROPERTIES V. CITY OF CARSON    13

521 (praising the MNOI Analysis "for its fairness and ease of administration" in contrast to the GPM Analysis, which can be "problematic to administer, because an owner's equity can be greatly affected by individual differences in methods and costs of financing" (internal quotation marks omitted)).

Thus, on the first *Penn Central* prong, Colony did not present sufficient evidence to create a triable question of fact as to the economic impact caused by the City's denial of larger rent increases. We therefore turn to the second prong.

**B. Distinct Investment-Backed Expectations**

Colony argues that, when it acquired the Property, it had a distinct investment-backed expectation that the Board would use the GPM Analysis and account for debt service in determining future rent increases. It is this expectation, Colony argues, with which the City interfered, and the jury therefore properly awarded Colony the rent increases it expected. Even accepting Colony's argument that we should focus only on the lost rental income, rather than the post-deprivation value of the Property as a whole,[5] the argument fails.

To form the basis for a taking claim, a purported distinct investment-backed expectation must be objectively reasonable. *See CCA Assocs.*, 667 F.3d at 1247; *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1035 (1992) (Kennedy, J., concurring in the judgment) (noting that investment-backed "expectations protected by the

---

[5] *Cf. Penn Cent.*, 438 U.S. at 130 n.27 (stating that in determining whether a regulatory taking occurred, the government's action is measured against "the parcel as a whole").

Constitution are based on objective rules and customs that can be understood as reasonable by all parties involved"); *Chancellor Manor v. United States*, 331 F.3d 891, 907 (Fed. Cir. 2003) (holding that courts must use "an objective analysis to determine the reasonable investment-backed expectations of the Owners"). Colony claims that, when it purchased the Property, it reasonably expected that debt service would be recognized in future rent increases because (1) the existing Implementation Guidelines then provided only for a GPM Analysis; (2) the Board had always recognized debt service as a factor when granting rent increases on another mobile home park owned by Goldstein; and (3) two California Court of Appeal opinions—*Palacio de Anza v. Palm Springs Rent Review Commission*, 257 Cal. Rptr. 121 (Ct. App. 1989), and *Carson Gardens, L.L.C. v. City of Carson Mobilehome Park Rental Review Board*, 37 Cal. Rptr. 3d 768 (Ct. App. 2006)—required consideration of debt service. We address each argument in turn.

    1. The Implementation Guidelines—even before the 2006 Amendment allowing MNOI Analysis—clearly could not have formed the basis for an objectively reasonable expectation that the Board would always account for debt service in considering future rent increases. The Guidelines plainly stated that "[n]o one factor in the Ordinance is determinative and the facts must be considered together and balanced in light of the purposes of the Ordinance and all the relevant evidence." More importantly, the Guidelines stressed that the GPM Analysis "is not intended to create any entitlement to any particular rent increase." Indeed, Colony concedes that "Carson does not permit an automatic rent increase based on a set formula."

COLONY COVE PROPERTIES V. CITY OF CARSON   15

2. Goldstein's experience as an owner of another mobile home park in Carson in the two decades before his purchase of the Property did not establish a reasonable expectation that the Board would consider debt service in all rent increase applications. As a general matter, an investor must account for "the burden of rent control" in its expectations about future increased rental income. *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120–21 (9th Cir. 2010) (en banc). And, the Implementation Guidelines, adopted in 1998—long before the purchase of the Property—made plain that use of a GPM Analysis created no expectation to a particular rent increase. Moreover, the Board did *not* consider acquisition interest expenses in Goldstein's first application for a rent increase at his other park. Goldstein initially applied for a $57.85 rent increase for that park, $41.38 of which related to increased debt service. The Board, however, granted only a $12 rent increase, which did not account for the debt service. Thus, an objectively reasonable person could not have expected that all future rent increase applications seeking increases because of debt service would be granted. [6]

3. Colony's contention that the two California Court of Appeal decisions require "the City to take debt service into account in considering rent-increase applications, and . . . preclude[d] the City from . . . using MNOI," misreads both opinions. Neither mandates that a rent control board account for debt service in determining rent increases. Rather, both merely hold that a Board must conduct the analyses it

---

[6] Colony's purported expectation of a $200 increase in 2007 would have resulted in a 49.5% per-space rent increase for Colony Gardens. Such an increase would have been twice as large as the largest increase ever previously granted by the Board and significantly larger than the largest increase Goldstein's other properties ever received—$58.70.

represented it would conduct, without requiring the adoption of a particular method of analysis.

*Palacio de Anza* simply required a rent control board to apply its guidelines when considering a rent increase application. 257 Cal. Rptr. at 124. There is no contest that the Board did so here. And, in *Carson Gardens*, the Court of Appeal expressly held:

> [N]othing in the [City of Carson's] ordinance requires the Board to apply any particular formula or methodology without deviation. Indeed, the city's Guidelines specifically state that the [GPM] analysis 'is an aid to assist the Board in applying the factors in the Ordinance and is to be considered together with the factors in [the ordinance], other relevant evidence presented and the purposes of the Ordinance,' and is not intended to create any entitlement to any particular rent increase.

37 Cal. Rptr. 3d at 777 (fourth alteration in original). At most, *Carson Gardens* compels the Board only to *consider* a GPM Analysis, *see id.* at 776–77, and in affirming the trial court's dismissal of Colony's petition, the Court of Appeal here expressly acknowledged that the Board did precisely that in evaluating both the 2007 and 2008 Colony applications, *see Colony Cove Props.*, 163 Cal. Rptr. 3d at 504–11.[7]

---

[7] The Court of Appeal also noted that "the MNOI approach has been upheld by every court to have considered it." *Colony Cove Props.*, 163 Cal. Rptr. 3d at 522.

In *Carson Gardens* the plaintiff sued the Board, claiming in part that the Board did not conduct a GPM Analysis. 37 Cal. Rptr. 3d at 770–76. A trial court ordered the Board to conduct the analysis and remanded the case, but the Board failed to conduct the GPM Analysis on remand. *Id.* at 772–73. On the second challenge, the trial court granted the plaintiff's proposed rent increase based on its GPM Analysis, but the Court of Appeal reversed. *Id.* at 774–75, 777. Although the initial trial court's order required consideration of debt service costs, the Court of Appeal remanded the case "so that the Board c[ould] exercise its discretion on the question of whether passing through the entire amount of debt service costs was necessary to provide a fair return." *Id.* at 776.

No objectively reasonable person confronted with this evidence in 2006 could have expected that the Board would always account for debt service when determining rent increases.[8] Colony failed to present sufficient evidence supporting its investment-backed expectations claim under *Penn Central*'s second prong.

## C. Character of the Government Action

*Penn Central* instructs that "[a] 'taking' may more readily be found when the interference with property can be

---

[8] Colony also claims that its expectations were reasonable because a former City employee testified that the Implementation Guidelines were "more important, at least for day-to-day operation[s]" than the ordinance. But the Guidelines, even before their amendment, made clear that a property owner had no right to a rent increase based on the GPM Analysis. And Colony does not contend that it relied on this statement, which was made in a deposition in this litigation, in determining whether to purchase the Property.

18  COLONY COVE PROPERTIES V. CITY OF CARSON

characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124 (citation omitted).[9] The City's rent control ordinance is precisely such a program, striving to "protect[ ] Homeowners from excessive rent increases and allow[ ] a fair return on investment to the Park Owner." This central purpose of rent control programs "counsels against finding a *Penn Central* taking." *MHC Fin.*, 714 F.3d at 1128.

Citing *Lingle*, 544 U.S. at 539, and *David Hill Development, LLC v. City of Forest Grove*, No. 3:08-CV-266-AC, 2012 WL 5381555 (D. Or. Oct. 30, 2012), Colony argues that the 2006 amendment to the Guidelines should be characterized as a taking because it targeted Colony's acquisition of the Property and the consequent large debt service. But these cases are inapposite. *Lingle* simply held that a plaintiff could not claim that a regulation constituted a taking merely because it did not substantially advance a legitimate state interest. 544 U.S. at 547–48. And *David Hill* dealt with an express exaction. 2012 WL 5381555, at *9–12. More importantly, government action is legitimately prompted by changes in regulated areas. Even assuming that the 2006 Amendment to the Guidelines was prompted by the large amount of debt service involved in Colony's acquisition and the City's realization that a more sophisticated analysis than the GPM might be needed to

---

[9] The Supreme Court also stressed that the first two *Penn Central* factors are the most important. *See Lingle*, 544 U.S. at 538–39 ("Primary among those factors are the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." (internal quotation marks and brackets omitted)).

address requests for rent increases, the character of the government regulation remains the same.  The third *Penn Central* prong therefore is not satisfied.

### III.  Conclusion

On the evidence in this case, no reasonable finder of fact could conclude that the Board's denials of Colony's requested rent increases were the functional equivalent of a direct appropriation of the Property.  Accordingly, the district court should have granted the City's motion for judgment as a matter of law.  We therefore **REVERSE** the judgment of the district court and **REMAND** with instructions to enter judgment in favor of the City.[10]

---

[10] We therefore need not consider the City's alternative argument that a district court, not a jury, is the appropriate finder of fact in regulatory takings cases.